ORIGINAL

United States Courts
Southern District of Texas
FILED

MAY 1 4 2003

Michael N. Milby, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re ENRON CORPORATION SECURITIES LITIGATION | § § | Civil Action No. H-01-3624 **(Consolidated)** |
| This Document Relates To: | § | |
| | § | CLASS ACTION |
| MARK NEWBY, et al., Individually and On Behalf of All Others Similarly Situated, | § § | |
| | § | |
| | § | FIRST AMENDED CONSOLIDATED |
| Plaintiffs, | § | COMPLAINT FOR VIOLATION OF THE |
| | § | SECURITIES LAWS |
| vs. | § | |
| | § | |
| ENRON CORP., et al., | § | |
| | § | |
| Defendants. | § | |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al., Individually and On Behalf of All Others Similarly Situated, | § § § | |
| | § | |
| Plaintiffs, | § § | |
| | § | |
| vs. | § | |
| | § | |
| KENNETH L. LAY, JEFFREY K. SKILLING, ANDREW S. FASTOW, RICHARD A. CAUSEY, MARK A. FREVERT, STANLEY C. HORTON, KENNETH D. RICE, RICHARD B. BUY, LOU L. PAI, JOSEPH M. HIRKO, | § § § § § § | |

[Caption continued on following page.]

This writing/publication is a creative work fully protected by all applicable copyright laws, as well as by misappropriation, trade secret, unfair competition and other applicable laws. The authors of this work have added value to the underlying factual materials herein through one or more of the following: unique and original selection, coordination, expression, arrangement, and classification of the information.

No copyright is claimed in the text of statutes, regulations, and any excerpts from analysts' reports quoted within this work.

Copyright © 2002 by William S. Lerach and Milberg Weiss Bershad Hynes & Lerach LLP. William S. Lerach and Milberg Weiss Bershad Hynes & Lerach LLP will vigorously defend all of their rights to this writing/publication.

All rights reserved – including the right to reproduce in whole or in part in any form. Any reproduction in any form by anyone of the material contained herein without the permission of William S. Lerach and Milberg Weiss Bershad Hynes & Lerach LLP is prohibited.

1388

KEN L. HARRISON, STEVEN J. KEAN, §
REBECCA P. MARK-JUSBASCHE, JEFFREY §
MCMAHON, CINDY K. OLSON, JOSEPH W. §
SUTTON, MARK E. KOENIG, KEVIN P. §
HANNON, LAWRENCE GREG WHALLEY, §
ROBERT A. BELFER, NORMAN P. BLAKE, §
JR., RONNIE C. CHAN, JOHN H. DUNCAN, §
WENDY L. GRAMM, ROBERT K. JAEDICKE, §
CHARLES A. LEMAISTRE, JOE H. FOY, §
JOHN MENDELSOHN, PAULO V. FERRAZ §
PEREIRA, JEROME J. MEYER, JOHN A. §
URQUHART, JOHN WAKEHAM, CHARLS E. §
WALKER, HERBERT S. WINOKUR, JR., §
FRANK SAVAGE, ALLIANCE CAPITAL §
MANAGEMENT L.P., JOSEPH F. §
BERARDINO, THOMAS H. BAUER, DAVID B. §
DUNCAN, DEBRA A. CASH, DAVID §
STEPHEN GODDARD, JR., GARY B. §
GOOLSBY, MICHAEL M. LOWTHER, §
MICHAEL C. ODOM, JOHN E. STEWART, §
MICHAEL L. BENNETT, BENJAMIN S. §
NEUHAUSEN, RICHARD R. PETERSEN, §
WILLIAM E. SWANSON, MICHAEL D. §
JONES, ARTHUR ANDERSEN LLP, §
ANDERSEN WORLDWIDE, S.C., ANDERSEN §
CO. (INDIA), ARTHUR ANDERSEN-PUERTO §
RICO, ANDERSEN LLP (CAYMAN ISLANDS), §
ARTHUR ANDERSEN-BRAZIL, ARTHUR §
ANDERSEN (UNITED KINGDOM), VINSON & §
ELKINS, L.L.P., J.P. MORGAN CHASE & CO., §
JP MORGAN CHASE BANK, JP MORGAN §
SECURITIES INC., CITIGROUP, INC., §
CITIBANK, N.A., SALOMON SMITH §
BARNEY, INC., SALOMON BROTHERS §
INTERNATIONAL LIMITED, CREDIT SUISSE §
FIRST BOSTON (USA), INC., PERSHING LLC, §
CREDIT SUISSE FIRST BOSTON CORP., §
CANADIAN IMPERIAL BANK OF §
COMMERCE, CIBC WORLD MARKETS §
CORP., CIBC WORLD MARKETS PLC, CIBC §

[Caption continued on following page.]

OPPENHEIMER CORP., BANK OF §
AMERICA CORP., BANC OF AMERICA §
SECURITIES LLC, MERRILL LYNCH & §
CO., INC., MERRILL LYNCH, PIERCE, §
FENNER & SMITH, INC., BARCLAYS PLC, §
BARCLAYS BANK PLC, BARCLAYS §
CAPITAL, INC., DEUTSCHE BANK AG, §
DEUTSCHE BANK SECURITIES INC., DB §
ALEX. BROWN LLC, DEUTSCHE BANK §
TRUST COMPANY AMERICAS, LEHMAN §
BROTHERS HOLDING, INC. and LEHMAN §
BROTHERS INC., §
§
Defendants. § DEMAND FOR JURY TRIAL

# TABLE OF CONTENTS

**Page**

PREAMBLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

OVERVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SUMMARY OF COMPLAINT . . . . . . . . . . . . . . . . . . . . . . . . . 7

JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . 61

PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

BACKGROUND TO THE CLASS PERIOD . . . . . . . . . . . . . . . . . . . 130

CLASS PERIOD EVENTS AND FALSE STATEMENTS . . . . . . . . . . . . . 135

DEFENDANTS' SCHEME AND FRAUDULENT
COURSE OF BUSINESS . . . . . . . . . . . . . . . . . . . . . . . . . . . 308

ENRON DEFENDANTS' SCIENTER ALLEGATIONS . . . . . . . . . . . . . . 309

ENRON'S FALSE FINANCIAL STATEMENTS . . . . . . . . . . . . . . . . . 320

ENRON'S FALSE AND MISLEADING STATEMENTS
IN ITS 10-Ks AND REGISTRATION STATEMENTS . . . . . . . . . . . . . . 394

THE FOREIGN DEBT SECURITIES . . . . . . . . . . . . . . . . . . . . . . 409

INVOLVEMENT OF THE BANKS . . . . . . . . . . . . . . . . . . . . . . . 440

INVOLVEMENT OF VINSON & ELKINS . . . . . . . . . . . . . . . . . . . 542

INVOLVEMENT OF ARTHUR ANDERSEN . . . . . . . . . . . . . . . . . . 578

FRAUD-ON-THE-MARKET . . . . . . . . . . . . . . . . . . . . . . . . . . 623

STATUTORY SAFE HARBOR . . . . . . . . . . . . . . . . . . . . . . . . . 624

CLASS ACTION ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . 625

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . 645

JURY DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 646

### PREAMBLE

## The Enron Disaster

## Lies.  Arrogance.  Betrayal.

Start with arrogance.  Add greed, deceit, and financial chicanery.  What do you get?  A company that wasn't what it was cracked up to be.

*Fortune*, 12/24/01.

## Internal Report Cites Extensive Abuse at Enron

Panel puts the blame for the firm's collapse squarely on corporate management, accounting firm, lawyers and the board itself for inadequate oversight.

*Los Angeles Times*, 2/3/02.

## Employee Letter to Enron Chairman/CEO Lay

*I am incredibly nervous that we will implode in a wave of accounting scandals....  [T]he business world will consider the past successes as nothing but an elaborate accounting hoax*.

\*   \*   \*

I have heard one manager level employee ... say "I know it would be devastating to all of us, but I wish we would get caught. **We're such a crooked company**."

## Employee Letter to Enron Board

[T]he removal of [Skilling] was ... to correct the wrongdoings of the various management teams at Enron ... (*i.e.*, **EES's management's**

- 1 -

*... hiding losses/SEC violations*).... EES ... was losing money on almost all the deals they had booked....  [I]t will add up to over $500MM that EES is losing .... [I]t is closer to $1 Billion.... ***EES has knowingly misrepresented EES['s] earnings.  This is common knowledge among all the EES employees ....***"

## OVERVIEW

1.      This is a securities class action on behalf of purchasers of Enron Corporation's ("Enron" or the "Company") publicly traded equity and debt securities between 10/19/98 and 11/27/01 (the "Class Period")[1] against:

(a)      Enron's top executives and directors (the "Enron Defendants"):

| | |
|---|---|
| Robert A. Belfer | Charles A. LeMaistre |
| Norman P. Blake, Jr. | Rebecca P. Mark-Jusbasche |
| Richard B. Buy | Jeffrey McMahon |
| Richard A. Causey | John Mendelsohn |
| Ronnie C. Chan | Jerome J. Meyer |
| John H. Duncan | Cindy K. Olson |
| Andrew S. Fastow | Lou L. Pai |
| Joe H. Foy | Paulo V. Ferraz Pereira |
| Mark A. Frevert | Kenneth D. Rice |
| Wendy L. Gramm | Frank Savage (Alliance) |
| Kevin P. Hannon | Jeffrey K. Skilling |
| Ken L. Harrison | Joseph W. Sutton |
| Joseph M. Hirko | John A. Urquhart |
| Stanley C. Horton | John Wakeham |
| Robert K. Jaedicke | Charls E. Walker |
| Steven J. Kean | Lawrence Greg Whalley |
| Mark E. Koenig | Herbert S. Winokur, Jr. |
| Kenneth L. Lay | |

(b)      Enron's accountants and affiliated entities and partners and officers therein (collectively, "Andersen"):

| | |
|---|---|
| Andersen Worldwide, S.C. | Joseph F. Berardino |
| Andersen-U.S. | Thomas H. Bauer |
| Andersen-India | Michael L. Bennett |
| Andersen-Puerto Rico | David B. Duncan |
| Andersen-Cayman Islands | Debra A. Cash |
| Andersen-Brazil | David Stephen Goddard, Jr. |
| Andersen-United Kingdom | Gary B. Goolsby |
| | Michael M. Lowther |
| | Benjamin S. Neuhausen |

---

[1]      Enron's publicly-traded securities include the publicly-traded securities of entities related to Enron, the repayment of which was dependent upon Enron's credit, financial condition and ability to pay.

Michael C. Odom
Richard R. Petersen
John E. Stewart
William E. Swanson
Michael D. Jones

(c)     Law firm that represented Enron and its related entities:

Vinson & Elkins

(d)     Enron's banks:

| | |
|---|---|
| JP Morgan | Merrill Lynch |
| CitiGroup | Bank of America |
| CS First Boston | Barclays |
| Canadian Imperial Bank of | Deutsche Bank |
| Commerce | Lehman Brothers |

2.       Each of the defendants sued for fraud engaged or participated in the implementation of manipulative devices to inflate Enron's reported profits and financial condition, made or participated in the making of false and misleading statements *and* participated in a scheme to defraud *or* a course of business that operated as a fraud or a deceit on purchasers of Enron's publicly traded securities between 10/19/98 and 11/27/01.[2] Enron extolled the current success and future prospects and earning power of its Wholesale Energy trading business ("WEOS"), its retail Energy Services business ("EES") and its Broadband Content Delivery and Access Trading, *i.e.*, intermediation, business ("EBS"). Both prior to and during the Class Period, Enron reported very strong profits and profit growth and a strong balance sheet which enabled it to maintain an investment grade credit rating. As a result of defendants' wrongful conduct and scheme, Enron's common stock was artificially inflated to as high as $90-3/4 (giving Enron a market capitalization of over $70 billion in 8/00), while Enron's preferred and debt securities also traded at artificially inflated prices.

_____

[2]       Certain defendants named herein, including Mendelsohn, Meyer, Ferraz Pereira, Urquhart, Wakeham, Walker, Winokur, Savage and Alliance Capital Management are not sued for fraud, but rather, only under non-fraud provisions of the 1933 and 1934 Acts. No allegations of fraud are made against or directed at these defendants.

- 4 -

Defendants' scheme and fraudulent course of business was also designed to and did enable Enron to issue billions of dollars of new equity and debt securities to investors during the Class Period.

3.      This fraudulent scheme and course of business enabled defendants to pocket **_billions of dollars_** of legal, accounting, auditing and consulting fees, underwriting commissions, interest and credit facility payments, cash bonuses based on Enron's reported earnings and its stock performance and illegal insider trading proceeds, such that each defendant was significantly enriched.  In 10/01, Enron suddenly reported $1 billion (after-tax) in write-offs and a billion dollar shareholder equity writedown.  It then restated its previously reported financial results to eliminate hundreds of millions of dollars of previously reported profits and billions more in shareholders' equity.  Enron's stock collapsed, its credit rating was downgraded to "junk" and it went bankrupt, as investors realized that the huge profits Enron had reported over the past several years had been grossly inflated and falsified, that Enron had hidden billions of dollars of debt that should have been reported on Enron's balance sheet and that Enron had misrepresented the current success and future prospects of its WEOS, EES and EBS businesses.

4.      This fraud was accomplished, in part, through clandestinely controlled partnerships and so-called special purpose entities ("SPEs") that the defendants created, structured, financed and used to do transactions with Enron to inflate its profits and hide its debt and thus perpetuate the fraud by violating Generally Accepted Accounting Principles ("GAAP") and the principles of "fair presentation" of financial results.  Virtually all of Enron's top insiders have been kicked out of the Company.  The Securities and Exchange Commission ("SEC") and the Department of Justice ("DOJ") are conducting wide-ranging investigations of the Enron fiasco.  Enron and Andersen have admitted destroying incriminating evidence and Andersen has been indicted for obstruction of justice.  Enron executives and Andersen officials have "**_taken the 5th_**" and refused to testify because

to do so would incriminate them.  While the defendants all personally profited from this scheme, public investors – from Enron employees who purchased Enron stock for their 401(k) retirement accounts and lost their life savings, to public and Taft-Hartley pension plans which invested in Enron securities and lost hundreds of millions of dollars – collectively suffered billions of dollars of damages.  The chart below shows the rise and collapse of Enron's stock.



- 6 -

## SUMMARY OF COMPLAINT
### *"Quis Custodiet Custodies?"*
### *"But Who Will Guard the Guards Themselves?"*

**A.    The Beginning of Enron**

5.    Enron was formed in 85 when Kenneth Lay ("Lay") arranged the merger of two pipeline companies and Lay became the Chairman/CEO of the surviving entity.  Over the next five years, Enron operated as a stodgy regulated natural gas company, which was burdened by excessive debt and was in danger of being taken over.  Between 85-90, Enron's stock performed poorly, trading at between $5-$7 per share and Enron's top executives received very modest annual bonuses and engaged in little if any sales of Enron stock.[3]

6.    In 90, Lay decided to attempt to transform Enron into a higher growth, higher profit enterprise and recruited Jeffrey Skilling ("Skilling") and Andrew Fastow ("Fastow") to become executives and help him transform Enron into a growth company which engaged in providing and trading wholesale energy resources and services, operating power plants and water supply facilities (WEOS), providing retail energy and management services to companies all over the world (EES) and later building a large broadband fiber optic communication network and also trading in broadband communication access, *i.e.*, "broadband intermediation" (EBS).  During 90-96, Enron began to show accelerating growth in revenue and profits and its stock price rose to $23-3/4 in late 96.

7.    However, even early on, Lay, Skilling and Fastow began to inflate Enron's results by doing transactions with entities it controlled.  In 95, one James Alexander warned Lay that Enron was on a perilous path in this regard.  He told Lay he perceived conflicts of interest between Enron and a company Alexander worked for, Enron Global Power and Pipelines, which had been formed

---

[3]    All share and per share amounts are adjusted to reflect Enron's 2-for-1 stock split in 8/99.

by Enron to keep high-debt assets like power plants off Enron's balance sheet. Alexander told Lay that assertions of accounting irregularity were swirling within Enron and that there were stories of deal-makers enriching themselves to the Company's detriment. When confronted, Lay simply said he would have Enron's president look into the matter, ended the discussion and did nothing. Other former Global Power executives agreed that this was an early example of Enron's aggressive financial techniques and a precursor to the later deal-making with controlled entities that led to Enron's collapse:

> "We were the dead canary in the coal mine," Mr. Alexander said.
>
> Accounting principles generally prohibit a company from basing its profits on sales to a subsidiary. But Mr. Alexander's team worked closely with Enron's accounting firm, Arthur Andersen, and its main law firm, Vinson & Elkins, to create a corporate structure that allowed Enron to own 52 percent of the stock of Enron Global Power and Pipelines while maintaining that the unit was independent enough to characterize the sales as profit-making transactions ... Mr. Alexander said. "***How do you have a major interest without having control?***"

*New York Times*, 2/20/02.

8.      However, during mid-97, Enron encountered problems due to a huge ($400+ million) loss on a British natural gas transaction and a $100 million charge due to MTBE transactions, which called into question its trading skills and risk management capabilities and which resulted in analysts downgrading Enron's stock and lowering their forecasts of Enron's future earnings per share ("EPS") growth. Enron's stock price lost one-third of its value by the Fall of 97 and Enron's executives' performance-based bonuses were slashed. These events were very disturbing to Enron's top executives and Board members who were determined to halt Enron's stock price decline and get the stock to advance back to much higher levels. They knew this could only be accomplished by having Enron report stronger-than-expected financial results going forward, thus enabling it to credibly

forecast stronger future revenue and earnings growth.   Unfortunately, Enron's actual business operations were not capable of generating such results.

**B.      Year-End 97 Crisis**

9.      To make matters worse, in late 97, Enron learned that an entity it had established with an outside investor a few years earlier, Joint Energy Development Incorporated ("JEDI") – and had done transactions with to generate large amounts of the profits Enron had been able to report during 97 – had to be restructured, as the outside investor was going to withdraw from JEDI.  This situation created a crisis for Enron's top insiders.  Because of the involvement of the outside investor in JEDI, JEDI had been treated as independent of Enron and had *not* been consolidated into Enron's financial statements and results.   Thus, Enron had been able to engage in transactions with JEDI as an independent third party, recognize revenue and profits from those transactions and not carry JEDI's debt on Enron's books.  However, in late 97, unless JEDI could be quickly restructured by having a new, independent investor come forward, *Enron would have to wipe out all of the profitable transactions it had done with JEDI in 97 – 40% of that year's profits – put JEDI's debt on Enron's balance sheet – some $700 million in debt – and lose the ability to generate profits from similar such deals with JEDI or its successor going forward.*

10.      However, Enron *could not find a legitimate buyer for the outside investor's interest* in JEDI.  So Lay, Skilling and Fastow, with Barclays, Andersen (Enron's accountants) and Vinson & Elkins (Enron's lawyers) quickly formed a new entity called Chewco, which Enron and an Enron executive (Michael J. Kopper ("Kopper")) controlled, to buy the outside investor's interest in JEDI. Chewco *did not have an outside equity investor willing to commit a 3% stake – the minimum required to enable Chewco and JEDI to be treated as an independent third party.  Barclays loaned some $240 million to Chewco, requiring a guarantee from Enron, so that Chewco would invest*

*in JEDI, making it possible for transactions between JEDI and Enron to artificially boost Enron's reported results. Barclays also loaned the money to two straw parties (Little River and Big River to provide the $11.4 million in funds for the 3% "equity" investment in Chewco. But because Barclays knew that the purported equity investors in Chewco were, in fact, "strawmen" for Enron, Barclays required Chewco to support the purported "equity loans" Barclays made to the two "strawmen" via a $6.6 million reserve paid to Barclays*! Because there was no legitimate independent outside investor in Chewco, Chewco was required to have been consolidated with Enron and *all of Enron's 97 profits generated by transactions with JEDI would have been eliminated*!

11.     By forming Chewco at year-end 97, Enron's top insiders avoided a disaster by keeping Enron's previously recorded profits from transactions with JEDI in place, thus inflating Enron's 97 reported profits by $45 million. They also kept as much as $700 million worth of debt off Enron's books, making Enron look much more creditworthy and liquid than it actually was. Chewco was now also positioned to serve as a controlled entity which Enron could use going forward to do non-arm's-length transactions with, creating phony profits for Enron (at least $350 million) and allowing Enron to conceal the true state of its indebtedness by improperly moving debt off its balance sheet and onto the books of Chewco. Between 98 and 01, Enron, its accountants, lawyers and bankers would create numerous other secretly controlled partnerships and entities and use them to generate billions of dollars of additional phony profits for Enron and to conceal billions of dollars of Enron debt by moving it off Enron's balance sheet.

## C.     The 97-00 Successes – Enron's Stock Soars

12.     As Enron reported its *better-than-expected year-end 97 financial performance*, Enron stock began to move higher, more than recovering all of the ground it had lost in 97. Then, during 98 through mid-01, Enron appeared to evolve into an enormously profitable high-growth

enterprise, reaching annual revenues of $100 billion by 00, with net income in excess of $1.2 billion, presenting a very strong balance sheet that entitled it to an investment grade credit rating. As Enron consistently reported *higher-than-forecasted earnings each quarter*, it forecasted *continued strong growth going forward*. Enron's financial results from 97 through 6/30/01 are set forth below:

ENRON CORPORATION
Quarterly & Annual Results
(in millions, except EPS)

### 1997

|  | 03/31 | 06/30 | 09/30 | 12/31 | Year |
|---|---|---|---|---|---|
| Revenues | $ 5,344 | $ 3,240 | $ 5,800 | $ 5,889 | $20,273 |
| Net income | $222 | ($420) | $134 | $169 | $105 |
| EPS | $.44 | ($.86) | $.22 | $.27 | $.16 |

### 1998

|  | 03/31 | 06/30 | 09/30 | 12/31 | Year |
|---|---|---|---|---|---|
| Revenues | $ 5,682 | $ 6,557 | $11,320 | $ 7,667 | $31,226 |
| Net income | $214 | $145 | $168 | $176 | $703 |
| EPS | $.33 | $.21 | $.24 | $.24 | $1.00 |

### 1999

|  | 03/31 | 06/30 | 09/30 | 12/31 | Year |
|---|---|---|---|---|---|
| Revenues | $ 7,632 | $ 9,672 | $11,835 | $11,049 | $40,188 |
| Net income | $122 | $222 | $290 | $259 | $893 |
| EPS | $.34 | $.27 | $.35 | $.31 | $1.18 |

### 2000

|  | 03/31 | 06/30 | 09/30 | 12/31 | Year |
|---|---|---|---|---|---|
| Revenues | $13,145 | $16,886 | $30,007 | $40,751 | $100,789 |
| Net income | $338 | $289 | $292 | $347 | $1,266 |
| EPS | $.40 | $.34 | $.34 | $.41 | $1.47 |

### 2001

|  | 03/31 | 06/30 |
|---|---|---|
| Revenues | $50,129 | $50,060 |
| Net income | $425 | $404 |
| EPS | $.49 | $.45 |

13.     By 01, Enron was accounting for 25% of all U.S. energy trades and had become the 7th largest corporation in the United States. As a result of its apparent success, Enron's stock price

- 11 -

continued to accelerate, ultimately climbing to as high as $90-3/4 per share in late 8/00, giving Enron a market capitalization of over $70 billion – one of the largest in the world. The Company was repeatedly cited in financial and academic circles as one of the world's most innovative companies and success stories of modern capitalism, with Enron's top executives being praised for their skill, creativity and entrepreneurial and financial ability

      14.    Enron and its bankers consistently stressed the success of Enron's wholesale and retail energy operations, its international prospects and operations, its broadband content delivery and intermediation businesses, its strong financial condition and earnings, and its prospects for continued strong earnings growth:

      (a)    Throughout 98 and 99, as Andersen certified Enron's record annual profits and very strong financial position, Enron, it lawyers and Enron's banks stated:

- Enron's strong results were due to the success of all of its business lines.

- Enron had a leading position in each of its businesses. Enron had an extremely strong franchise position.

- Wessex Water would be accretive to Enron's business now and a $20 billion business in five years. Azurix Corp. was becoming a major global water company.

- International projects would drive major earnings growth for Enron. The Dabhol, India power project would contribute to earnings in 99 and beyond.

- WEOS's business remained strong.

- EES was exceeding expectations for contracts and profitability. EES was adding billions in new contracts and would be profitable by 4thQ 00.

- Enron was optimistic about its broadband business. EBS was firing on track.

- Enron's tremendous competitive advantages enabled it to achieve strong EPS growth.

- Enron was very well managed and knew how to manage and mitigate risk. Enron had effectively used off-balance sheet non-recourse financing. Enron had a strong balance sheet. Enron was a master of risk management.

- No other company offered such impressive sustainable growth.

- Enron was hitting on all eight cylinders.  Enron's outlook was excellent.  Enron was very optimistic.

- Enron was a global powerhouse, with EPS growth to exceed 17%.  Enron would maintain strong earnings growth for years.

    (b)    During 00, as Andersen certified Enron's record annual profits and financial position, Enron, with the participation of its lawyers and its banks stated:

- Enron's strong financial results were due to strong results in all operations.

- Enron had very strong momentum.  Its new trends were sustainable and would accelerate.

- Enron's business was booming.  All its operations were gaining momentum.

- Investors were about to see breakout performance of EES and rapid growth and development of EBS.

- EES's new contracts and profitability were accelerating.  EES had the potential to double Enron's size in a few years.

- EBS broadband trading was accelerating.  The market was larger than expected, and would reach $100 billion in a few years with 3%-4% margins.

- Enron/Blockbuster video-on-demand ("VOD") deal a "Killer Opp."  Unparalleled quality of service.  Contract worth over $1 billion.  VOD to rollout nationally in 01. All components in place.  VOD had solid technology and platform.

- Enron's WEOS merchant investments were protected through hedging.

- Enron had monumental earnings potential over the next five years.  Enron was well managed and a pioneer in global energy.  Enron was never in better shape.  Enron was very optimistic about the continued strong outlook for the Company.

- Growth and strong earnings were why investors should buy Enron stock.

    15.    As a result of Enron's strong EPS, the positive statements about its business, and the forecasts of continuing strong earnings growth, Enron's common stock was a very strong performer, while its debt and preferred securities also traded at high prices, reflecting Enron's apparent strong

- 13 -

financial condition and investment grade credit rating. Enron stock soared to its all-time high of $90-3/4 on 8/23/00. The stock continued to trade at these high levels for months – at $90-3/8 in mid-9/00, $89-15/16 in late 9/00, $88-11/16 in 10/00 and $83-13/16 in 11/00, as shown below:



16.     This apparent success drove Enron's stock price to its all-time high and kept its preferred and debt securities trading at high prices. It also enabled Enron to credibly forecast strong revenue and profit growth for the next several years. In combination, these favorable factors gave Enron ready access to the capital markets by which defendants, working together, raised billions of dollars of short-term financing for Enron via the commercial paper market and billions of new long-term capital to fund Enron's rapidly expanding businesses by selling newly issued Enron securities to public investors.

17.     However, the apparent success of Enron was a grand illusion – a false picture created by manipulative devices and contrivances – a scheme to defraud and a wrongful course of business by defendants that operated as a fraud and deceit on the purchasers of Enron's publicly traded securities. Defendants' scheme was accomplished by Enron, Enron's insiders, Enron's accounting

- 14 -

firm, Andersen, Enron's general counsel, Vinson & Elkins and several banks, including J.P. Morgan

Chase & Co. ("JP Morgan"), CitiGroup, Inc. ("CitiGroup"), Credit Suisse First Boston ("CS First

Boston"), Merrill Lynch & Co. Inc. ("Merrill Lynch"), Canadian Imperial Bank of Commerce

("CIBC"), Deutsche Bank AG ("Deutsche Bank"), Bank of America Corp. ("Bank America"),

Barclays PLC ("Barclays") and Lehman Brothers Holding, Inc. ("Lehman Brothers"), who

collectively pocketed hundreds of millions of dollars a year from Enron – which by 97-98 had

become the *golden goose of Wall Street – while Enron's insiders pocketed over 2 billion dollars*

*from sales of their Enron stock and bonuses due to Enron's reported record earnings and its*

*strong stock performance*.

18.     By 97-98, Enron was a hall of mirrors inside a house of cards – reporting hundreds

of millions of dollars of phony profits each year, while concealing billions of dollars of debt that

should have been on its balance sheet, thus inflating its shareholder equity by billions of dollars.

Enron had turned into an enormous Ponzi scheme – the largest in history – constantly raising money

from public offerings of its securities or those of related entities to sustain itself, while appearing to

achieve successful growth and profits.  But, because most of Enron's reported profits were being

generated by phony, non-arm's-length transactions and improper accounting tricks – including the

misuse and abuse of "mark-to-market" accounting techniques to accelerate the recognition of

hundreds of millions of dollars of profits to *current periods* from transactions in which Enron was

only entitled to receive *cash over many future years* (if ever) – Enron was cash starved.  Yet to

continue to report *growing* profits, Enron was forced to not only continue to engage in such phony

transactions and improper accounting tricks, *but to accelerate the number and size of such*

*transactions it engaged in*, which created a vicious cycle only further exacerbating Enron's need to

obtain cash financing from these transactions.  To make matters worse, Enron had capitalized entities

- 15 -

it controlled, and was doing phony deals with, with shares of Enron common stock and Enron *had*
*agreed to issue millions of shares of its stock to these entities if Enron's stock price declined below*
*certain so-called "trigger prices*." Because of the triggers and the way Enron capitalized the SPEs,
it was absolutely vital that Enron's stock continue to trade at high levels and that Enron maintain its
"investment grade" credit rating, otherwise defendants' scheme would unravel.

19.     Enron's investment grade credit rating was indispensable to enabling it to get
counterparties to do huge trading transactions with it – transactions others would not do unless
assured of Enron's creditworthiness.  Since Enron's trading of energy resources was the core of its
WEOS business, any downgrade of its credit rating would have disastrous consequences for its core
business operation.  This investment grade credit rating gave Enron access to the commercial paper
market – a market reserved for America's largest and most creditworthy corporations – so that it
could borrow billions of dollars to maintain its liquidity and finance its capital-intensive business.
Enron's access to the commercial paper market also meant that Enron's $3 billion commercial paper
back-up credit line, arranged by the lead banks (JP Morgan and CitiGroup) with participating banks,
would not be drawn down upon, thus limiting those banks' financial exposure to Enron.  It also
meant that Enron and its banks could easily sell debt securities to public investors to raise long-term
capital, using the proceeds to reduce its short-term commercial paper and other bank debt.  Finally,
Enron's investment grade credit rating was critical to the scheme, as only Enron's insiders and its
banks knew, because under the terms of the partnerships/SPE deals, *if Enron's debt was*
*downgraded to below investment grade, the debt of those entities that they had told the securities*
*markets was non-recourse as to Enron would become recourse to Enron, which could cause the*
*house of cards to topple*.  As Enron's CFO stated in a 10/01 conference call, "*We understand that*
*our credit rating is critical to both the capital markets as well as our counterparties*."  Earlier,

- 16 -

Fastow stated to *CFO Magazine*, "***My credit rating is strategically critical***." ***In 10/99, Skilling said "Retaining a high investment-grade rating is critical to the success of our energy franchises .... If we were downgraded, we could lose critical market share in North America***."

20.    By 97-98, ***Enron had become completely dependent on maintaining its investment grade credit rating and a high stock price so that Enron could continue to have access to the capital markets to borrow billions in commercial paper and to enable it to periodically raise hundreds of millions of dollars of new longer term capital it needed to repay its commercial paper debt and the short-term loans it was receiving from its banks to sustain its business operations, and so the stock issuance "triggers" would not be hit which would force Enron into a death spiral***. To secure financing for the entities Enron controlled and was using to structure manipulative devices to improperly boost its reported profits, Enron had agreed to issue massive amounts of its common stock or otherwise make payments to those entities if Enron's common stock fell below certain so-called "trigger" levels – $83, $81, $79, $68, $60, $57, $52, $48, $34 and $19 per share – ***and to become liable for the debt of those entities if Enron lost its investment grade credit rating***. Some of the "trigger" prices are listed below:

## TRIGGER PRICES

| SPE | TRIGGER PRICE |
|---|---|
| Azurix (a) | $19 |
| Azurix (b) | $19 |
| LJM2 | $48-$52 |
| Osprey Trust | $60 |
| Osprey I | |
| Talon | $81 |
| Raptor I | $57.50 |
| Timberwolf | $79 |
| Raptor-II | |

| | |
|---|---|
| Bobcat | $83 |
| Raptor-IV | $68 |
| | |
| Marlin Trust I | $34 |
| Marlin Capital II | |

**D.     The Partnerships and SPEs**

21.     To manipulate and thus falsify Enron's financial condition and inflate its reported results, Enron, Andersen, Vinson & Elkins, and several of Enron's banks engaged in a series of purported "partnership" and "related party" transactions, including those described below. Many of the entities Enron used to falsify its financial results were known as SPEs. A public company that conducts business with an SPE may treat that SPE as if it were an independent entity *only* if it does not control the SPE. At a bare minimum, two conditions must be met: (i) an owner independent of the company must make an equity investment of *at least 3% of the SPE's assets, and that 3% must remain at risk throughout the transaction*; and (ii) *the independent owner must exercise control of the SPE*.

22.     Prior to 97, Enron was a partner in JEDI. Because the 3% outside equity and independent control conditions were met in JEDI, Enron was not required to consolidate JEDI into its financial statements, and Enron thus recorded its share of profits from JEDI on its income statement but did *not* show JEDI's debt on its balance sheet. However, in late 97, Enron had to quickly find a buyer for its partner's interest in JEDI, as the partner wanted to sell its interest. Otherwise, Enron would have to consolidate JEDI into its financial statements, *which would wipe out much of its 97 reported profits and put millions of dollars of debt back on its balance sheet*. Unfortunately, Enron could not find a party willing to pay for its former partner's 50% interest in JEDI by year-end. So Enron and Vinson & Elkins quickly formed a new partnership managed by an Enron executive – called "Chewco" – to purchase the third party's interest. Because Enron was

- 18 -

unable to locate an independent outside investor to quickly buy the 50% interest in JEDI, Barclays financed *Chewco's purchase of the JEDI interest with debt, not equity.  Thus, Chewco/JEDI was not a valid SPE meeting the requirements for non-consolidation.  Notwithstanding, Enron did not consolidate Chewco/JEDI into Enron's financial statements during 97-01 and used Chewco/JEDI to generate false profits from 97 through 01*.

23.     In 99, Enron, Vinson & Elkins, Andersen and certain of Enron's bankers, created and then entered into numerous business transactions with two *LJM partnerships which Enron and Enron's CFO Fastow controlled.  Over the next few years, defendants engaged in a series of transactions – which were, in fact, manipulative devices – between Enron and the LJM partnerships and LJM SPEs which resulted in Enron inflating its reported financial results by more than a billion dollars – at the same time enriching Fastow and his friends and several of Enron's bankers who were allowed to invest in the LJM2 partnership – by tens of millions of dollars.  The reason for establishing these partnerships was that they would permit Enron to accomplish transactions it could not otherwise accomplish with an independent entity, by providing Enron with a buyer of assets that Enron wanted to sell*.  The LJM1 and LJM2 transactions were structured, reviewed and approved by Andersen, Vinson & Elkins, the Enron Defendants and certain of Enron's bankers, which also helped create and finance the LJM partnerships and these transactions.

24.     One of the primary manipulative devices used to falsify Enron's financial results during the Class Period was LJM2, which was formed in 10/99 and secretly controlled by Enron and used to help create numerous SPEs (including the "Raptors") which defendants used to engage in transactions to artificially inflate Enron's profits while concealing billions of dollars in debt that should have been included on Enron's balance sheet. Defendants knew that because LJM2 was going

- 19 -

to be utilized to engage in transactions with Enron where Enron insiders would be on both sides of the transactions, the LJM2 partnership would be extremely lucrative – *a deal that was virtually guaranteed to provide huge returns to LJM2's early investors as the Enron Ponzi scheme went forward*. In fact, Fastow's dual role by which he could self-deal on behalf of the LJM2 partnership with Enron's assets was so important *that investors in LJM2 were assured that they did not have to make any additional capital contributions if Fastow's dual role ended*.

      25.     Because the LJM2 partnership was potentially so lucrative to investors in that private entity, Enron's top insiders and Merrill Lynch decided that in funding LJM2, they would *allow certain favored investment banks and high-level officers of those investment banks and other favored Merrill Lynch clients to invest in LJM2 because they knew the investment was virtually guaranteed to produce exceptional returns as the Enron Ponzi scheme continued*. In fact, the offering memorandum for the LJM2 partnership by which Enron and Merrill Lynch brought investors into the partnership – *which was not a public document* – contained an invitation to benefit from the insider self-dealing transactions that LJM2 would engage in. It stressed the "*unusually attractive investment opportunity*" resulting from LJM2's connection to Enron. It emphasized Fastow's position as Enron's CFO, and that LJM2's day-to-day activities would be managed by Enron insiders Fastow, Kopper, and Ben Glisan, Enron's Treasurer. It explained that "*[t]he Partnership expects that Enron will be the Partnership's primary source of investment opportunities*" and that it "*expects to benefit from having the opportunity to invest in Enron-generated investment opportunities that would not be available otherwise to outside investors.*" It specifically noted that Fastow's "*access to Enron's information pertaining to potential investments will contribute to superior returns.*" In addition, investors were told that investors in a similar Fastow controlled partnership (JEDI) that had done deals with Enron like the ones

- 20 -

*LJM2 would do had tripled their investment in just two years and that overall returns of 2,500% to LJM2 investors were actually anticipated*. In short, the non-public offering memorandum was an invitation to join in the benefits of self-dealing transactions with Enron. Enron's bankers and the top executives of those banks were permitted to invest in LJM2, *as a reward to them for their ongoing participation in the scheme – a sure thing for them*.

26.     It was indispensable to defendants' scheme that LJM2 be formed before year-end 99 because of the need to use it as a vehicle to consummate some transactions with Enron before year-end 99 to create huge profits for Enron in the 4thQ 99 so that Enron could meet and exceed its forecasted 99 earnings. However, as had been the case with Chewco at year-end 97, there was tremendous time pressure and Merrill Lynch could not raise the money from outside investors in LJM2 in time to fund LJM2 by year-end 99 with sufficient capital to enable it to do the desperately needed transactions with Enron. So, in an extraordinary step, in 12/99, Enron, Fastow, Kopper, Andersen, Vinson & Elkins and Enron's banks and bankers (JP Morgan, CIBC, Deutsche Bank, CS First Boston, Lehman Brothers and Merrill Lynch), knowing that LJM2 was going to be an extraordinarily lucrative investment anyway, created documentation that enabled the banks to advance virtually 100% of the monies needed to initially fund LJM2, *i.e.*, many times more than their allocated shares in 12/99. Then, after LJM2 was fully funded in 00 and other investors' money flowed into LJM2, those banks' initial "over-funding" in 12/99 was adjusted for in subsequent capital contributions to LJM2.

27.     To ensure that LJM2 could be an effective instrumentality of defendants' scheme to manipulate Enron's reported profits and financial condition and enable Enron to conceal the true extent of its debt, LJM2 needed bank financing. So JP Morgan initially provided a $65 million line of credit to LJM2 – later, increased to $120 million with CS First Boston doing the lending – to

facilitate and finance LJM2's illicit deals and manipulative devices with Enron. *In addition, JP Morgan and CitiGroup administered all the financial affairs of LJM2, i.e., profit distributions and capital calls, and were completely knowledgeable about the details of LJM2's deals, finances and distributions.*

28.     The reason the banks put up virtually all the money to pre-fund LJM2 in 12/99 was that they knew Enron doing the 99 year-end deals with the LJM2 and its SPEs was indispensable to Enron avoiding reporting a very bad 4thQ 99 – which would have caused its stock to plunge.  These vital year-end 99 deals included:

(a)     *Collateralized Loan Obligations ("CLOs").  On 12/22/99*, Enron pooled purchaser CLO rights and sold the lowest-rated tranche to Whitewing LLP (an Enron affiliate) and LJM2.  Whitewing loaned LJM2 the money to purchase its interest in the CLOs.  Enron secretly guaranteed Whitewing's investment and loan to LJM2.  This transaction allowed Enron to record the sale of millions of dollars in the 4thQ 99 to an entity that should have been consolidated.

(b)     *Nowa Sarzyna (Poland Power Plant).  On 12/21/99*, Enron sold LJM2 a 75% interest in the Nowa Sarzyna power plant.  Enron had tried to sell this interest by year-end to an independent buyer but could not find an independent buyer in time, so it used LJM2, which paid $30 million.  This transaction moved millions of dollars of debt off Enron's balance sheet.  This was a sham transaction.  The debt financing required Enron to maintain ownership of at least 47.5% of the equity until the project was completed.  However, the lender *granted a waiver* of this until 3/31/00, at which time Enron and Whitewing reacquired LJM2's equity interest and repaid that loan.

(c)     *MEGS, LLC.  On 12/29/99*, Enron sold LJM2 a 90% equity interest in MEGS, a natural gas system in the Gulf of Mexico.  This allowed Enron to avoid consolidating the

asset at year-end 99, avoiding millions of dollars of debt on Enron's balance sheet. Enron repurchased LJM2's interest in MEGS in early 00.

(d)    *Yosemite*. *On 12/29/99*, Enron purportedly sold certificates in Yosemite to LJM2, however, in fact, this transaction did not occur until 2/28/00. The transaction was made to appear to occur at year-end 99 to reduce Enron's interest in Yosemite from 50% to 10% so Enron would not have to disclose its ownership of these certificates in Enron's 99 financial statements and that, in effect, Enron owned some of its own debt. On 12/29/99, Condor (an affiliate of Whitewing), which was controlled by Enron, loaned the $35 million to LJM2 to buy the certificates. On 12/30/99, LJM2 transferred the certificates to Condor, satisfying the one-day loan.

29.    After LJM2 was formed and JP Morgan, CitiGroup, CS First Boston, CIBC, Merrill Lynch, Lehman Brothers, Bank America, Deutsche Bank and/or their top executives had secretly been permitted to invest in LJM2 to the tune of some $150 million, each of these banks continued to issue very positive analyst reports on Enron. Each of these reports contained "boilerplate" disclosures like:

> We may from time to time have long or short positions in any buy and sell securities referred to herein. The firm may from time to time perform investment banking or other services for, or solicit investment banking or other business from, any company mentioned in this report.

*These boilerplate disclosures did not change after these banks and/or their top executives became huge investors in LJM2*. The failure to disclose the LJM2 investments of these banks and/or their top executives made their "boilerplate" disclosure false and misleading and concealed from the market the very significant and serious conflict of interests which Enron and the banks knew would have cast serious doubts on the objectivity and honesty of those banks' analyst reports and disclosed that the banks or their executives had compromising ties to and serious conflicts of interest regarding Enron.

- 23 -

30.     This blatant self-dealing by Enron's banks during the Class Period has not gone unnoticed:

> Many institutional investors declined to buy into LJM2 because of Fastow's conflict of interest. But some of the world's biggest institutions took a piece. Among them *were Citigroup, Credit Suisse Group, Deutsche Bank, J.P. Morgan Chase, and Lehman Brothers.*
>
> *What were they thinking?  Much of the world's financial community turned out to be willing enablers of Enron.  No wonder "Wall Street credibility" is fast becoming an oxymoron.  Investors are angry....*
>
> *             *             *
>
> *It is increasingly clear that Wall Street has known for years that many corporations had wildly exaggerated earnings, but it didn't tell the investing public. Some on the Street may be guilty of worse.  Take the case of Enron Corp. and Merrill Lynch & Co.  Merrill executives helped create the LJM2 Enron partnership and attracted institutional investors. As many as 100 of Merrill's own top executives put their personal money into the deal.  Why?  Because Enron's chief financial officer, Andrew S. Fastow, would run it, and he promised enormous returns....  Fastow's glaring conflict of interest, which should have stopped the Merrill executives, actually acted as an incentive to them:  "A. Fastow's dual role creates advantages for the fund and Enron," said the Merrill Lynch prospectus sent to a select group of potential investors.*

*Business Week*, 2/11/02.  As reported by *Bloomberg* on 2/5/02:

> "In this case, the Enron banker at each of the firms probably went back and said, '*This is a sweetheart deal and we can make a lot of money, Enron is a huge player in this business and they have access to some juicy trades*,'" [a professor of finance at New York University and a former partner at Goldman, Sachs & Co.] said. "*The bankers wanted to suck up some of the juice*."

According to *The Washington Post* on 3/22/02:

### Vast LJM2 Returns Lured Partners

> The ... confidential LJM2 promotion *promised returns of 30 percent or more a year, and promoters suggested the actual returns could be even higher*.  Fastow, for example, estimated in confidential reports to the LJM2 partners obtained by The *Washington Post* that rates of return on investments *with Enron reached as high as 2,500 percent*.

Enron's closeness to LJM2 was reinforced not just by Fastow's role, but by an appearance by Enron then-President Jeffrey Skilling at an LJM2 partnership meeting in the fall of 2000.

In a Feb. 6, 2001, letter to investors, Fastow recounted a successful year with "deal flow higher than originally expected" and the projected returns "*far in excess of the targeted 30%.*"

The partnership still had nearly $400 million in assets in early January ....

31.     Not only did these favored investors in LJM2 get a promise of superior returns when LJM2 was formed, they actually *witnessed* a series of extraordinary pay outs from the Raptor SPEs which LJM2 controlled over the next two years – securing hundreds of millions of dollars in distributions from the Raptors to LJM2 and *then to themselves* – cash generated by the illicit and improper transactions Enron was engaging in – *i.e.*, the manipulative devices – with the Raptors to falsify Enron's financial results. Thus, the banks and bankers who were partners in LJM2 *were not only knowing participants in the Enron scheme to defraud, they were economic beneficiaries of it. Had the Enron Ponzi scheme continued to operate for the full life of the LJM2 partnership, Enron's banks would have achieved the stupendous returns they were promised – measured in thousands of percent. And these actual and potential payments from LJM2 were on top of the huge advisory fees, underwriter fees, interest and loan commitment fees these banks were already getting from Enron and would continue to get if the Enron scheme continued.*

32.     From 6/99 through 6/01, Enron entered into numerous transactions with the LJM partnerships. Enron sold assets to LJM that it wanted to get off its books on terms that no independent third party would ever have agreed to. *The transactions between the LJM partnerships and Enron or its affiliates  occurred close to the end of financial reporting periods to artificially boost reported results to meet forecasts Enron and other participants in the scheme had been making.* For instance, near the end of the 3rd and 4thQ 99, Enron sold interests in seven assets to

LJM1 and LJM2 in transactions structured, reviewed and approved by Andersen, Vinson & Elkins and certain of Enron's banks. The transactions permitted Enron to conceal its true debt levels by removing the assets from Enron's *balance sheet and, at the same time, record large gains. However, (i) as it had agreed in advance it would do, Enron bought back five of the seven assets after the close of the financial reporting period; (ii) the LJM partnerships made large profits on every transaction, even when the asset they had purchased actually declined in market value; and (iii) those transactions generated "earnings" for Enron of $229 million in the second half of 99 out of total earnings for that period of $549 million. In three of these transactions where Enron ultimately bought back LJM's interest, Enron had agreed in advance to protect the LJM partnerships against any loss. Thus, the LJM partnerships functioned only as vehicles to accommodate defendants in the manipulation, falsification and artificial inflation of Enron's reported financial results, while enriching the LJM investors.*

33. One "hedging" transaction with LJM1 in 6/99 involved Rhythms NetConnections ("Rhythms") stock owned by Enron, *to "hedge" Enron's huge gains in Rhythms stock and enable Enron to create a huge profit. Enron transferred its own stock to the SPE in exchange for a note. But if the SPE were required to pay Enron on the "hedge," the Enron stock would be the source of payment. Other "hedging" transactions occurred in 00 and 01 and involved SPEs known as the "Raptor" vehicles. These were also structures, funded principally with Enron's own stock, that were intended to "hedge" against declines in the value of certain of Enron's merchant investments. These transactions were not economic hedges. They actually were manipulative devices devised to circumvent accounting rules. The economic reality was that Enron never escaped the risk of loss, because it had provided the bulk of the capital with which the SPEs would pay Enron.* The Enron Defendants, Andersen, Vinson & Elkins and Enron's banks used these contrivances and manipulative devices to inflate Enron's reported financial results. In 99, Enron

recognized income of over $100 million from the Rhythms' "hedging" transaction. *In the last two quarters of 00, Enron recognized pre-tax earnings of $530 million on several transactions with the Raptor entities* out of reported pre-tax earnings of $650 million. These *"earnings" from the Raptors' manipulative contrivances accounted for more than 80% of the total*!

34.     Hedging Enron's investments with the value of Enron's stock created an enormous and unusual motive for the participants in the Enron scheme to keep Enron stock trading at inflated levels. This was because if the value of the investments fell at the same time as the value of Enron stock fell, the SPEs would be unable to meet their obligations and the "hedges" would fail. This happened in late 00 and early 01 when the Raptor SPEs lacked sufficient credit capacity to pay Enron on the "hedges." By 11/00, Enron had entered into derivative transactions with the Raptors with a notional value of over $1.5 billion. Enron's accounting department prepared a daily tracking report on the performance of the Raptors. In 12/00, Enron calculated its net gain (and the Raptors' corresponding net loss) on these transactions to be slightly over $500 million. Enron could recognize these gains – offsetting corresponding losses on the investments in its merchant portfolio – only if the Raptors had the capacity to make good on their debt to Enron. If they did not, Enron would be required to record a "credit reserve." Such a loss would defeat the very purpose of the Raptors, which was to shield Enron's financial statements from reflecting the change in value of its merchant investments.

35.     As year-end 00 approached, two of Enron's Raptor SPEs were in danger of coming unwound as they lacked sufficient credit capacity to support their obligations, let alone continue to engage in similar transactions with Enron. If something were not done to prevent the unwinding of these SPEs, Enron would have to take a multi-million dollar charge against earnings which would expose the prior falsification of Enron's financial results and result in Enron's stock plunging, more

and more of the stock issuance "triggers" would begin to be hit, and a vicious fatal down-cycle would kick in. Therefore, with the participation of Andersen, Vinson & Elkins and certain of Enron's banks, Enron restructured and capitalized the Raptor SPEs at year-end 00 via artificial transactions which transferred rights *to even more shares* of Enron stock to these entities in exchange for notes, creating ever-increasing pressure on Enron and the other participants in the scheme to support Enron's stock price. This artifice enabled Enron to avoid recording a huge credit reserve for the year ending 12/31/00.

E.      **Abuse of Mark-to-Market Accounting**

36.      In addition to falsifying its financial results by engaging in transactions with SPEs that it secretly controlled, Enron engaged in several other accounting tricks and manipulations to falsify its financial results during the Class Period. Chief among these was the misuse and abuse of "*mark-to-market accounting*" (also known as "fair value accounting") whereby Enron would compute the purported economic value or profit it would ultimately obtain on a multi-year contract, discount that to present value and recognize the entire "mark-to-market" profit in the current period. Unless Enron's expected profit on the transaction was truly hedged, Enron was required in each following quarter to recompute or readjust the profit computation to adjust for changing economic values. "Mark-to-market" accounting was appropriate only where Enron had a long-term track record which gave it the ability to accurately estimate and forecast future values (as was true with certain aspects of Enron's wholesale energy business). However, Enron misused and abused mark-to-market accounting *throughout its entire business to grossly inflate its reported revenues and profits during the Class Period*, a tactic furthered by the fact that Enron managers willing to engage in such falsifications were able to obtain larger bonuses based on the inflated values. In Enron's wholesale energy business this was done by assigning unrealistic values to wholesale energy

- 28 -

transactions which inflated current period income.  In Enron's new retail energy services operations where Enron had no long-term track record to justify the use of mark-to-market accounting, Enron nevertheless consistently utilized mark-to-market accounting to record huge current period profits on long-term, highly speculative retail energy risk-management contracts which, in fact, Enron had no basis to project a profit on and in fact knew would likely result in losses.  Finally, in Enron's broadband business – also a new business where Enron had absolutely no track record which would justify the use of mark-to-market accounting – Enron utilized mark-to-market accounting to generate hundreds of millions of dollars of phony current period profits in several transactions – the most notable of which was the Blockbuster/Enron Video-On-Demand ("VOD") joint venture.  Enron not only misused and abused mark-to-market accounting to initially value multi-year transactions to generate inflated current period profits, it also, when reviewing those computations on a quarterly basis as it was required to do, consistently *increased* the estimated value of the transaction even though subsequent data revealed *a reduction of the estimated value of the transaction, a practice known within the Company as "moving the curve*."

**F.     Enron Energy Services ("EES")**

37.     The falsification of Enron's financial statements was not limited to the illicit partnership and SPE transactions. While Enron's wholesale energy business was the largest single contributor to its profits on an ongoing basis, consistently reporting strong profit growth due to defendants' accounting tricks and manipulations, defendants were also telling investors that an area of tremendous growth for Enron was its retail energy services business – EES – whereby Enron purportedly undertook to manage the energy needs of corporate consumers for multi-year periods in return for fees to be paid over a number of years.  Enron presented this business as achieving tremendous success during the Class Period by constantly signing new multi-million or even billion

dollar contracts which allowed it to exceed Enron's internal forecasts and, later, that this division had turned profitable in the 4thQ 99 and was achieving substantial gains in its profitability thereafter.

38.     However, in fact, EES was actually losing hundreds of millions of dollars. This was because in order to induce large enterprises to sign long-term energy management contracts and "jumpstart" this business so it could appear to obtain the huge contract volumes Enron was promising, Enron was entering into energy management contracts which it knew would likely result in huge losses. Worse yet, many of these contracts required Enron to make large up-front expenditures for more efficient energy equipment, etc., which only served to exacerbate Enron's ever-increasing cash shortfalls. However, by the misuse and abuse of mark-to-market accounting, Enron grossly overvalued the ultimate value of these contracts and created greatly inflated current period profits from transactions which generated little, if any, current period cash, and which Enron, its accountants and lawyers knew would likely actually result in long-term losses. In order to conceal the true nature of the large, multi-million dollar losses being suffered by EES, Enron moved those losses over into its much larger wholesale energy operation and covered up the losses there by the abuse of mark-to-market accounting and phony hedging transactions with SPEs. As a letter written in 8/01 to Enron's Board by an EES manager stated:

> One can only surmise that the removal of Jeff Skilling was an action taken by the board to correct the wrongdoings of the various management teams at Enron .... (*i.e.*, ***EES's management's ... hiding losses/SEC violations***).

*   *   *

> ... [I]t became obvious that EES had been doing deals for 2 years and was losing money on almost all the deals they had booked.

*   *   *

> ... [I]t will add up to over $500MM that EES is losing and trying to hide in Wholesale. Rumor on the 7th floor is that it is closer to $1 Billion.... [T]hey decided ... to hide the $500MM in losses that EES was experiencing.... ***EES has knowingly***

- 30 -

*misrepresented EES['s] earnings. This is common knowledge among all the EES employees, and is actually joked about. But it should be taken seriously.*

**G.    Enron Broadband ("EBS")**

39.    Another purported growth area of Enron's business was its broadband services business, which consisted of building out an 18,000-mile fiber optic network which Enron was constructing and engaging in trading access to Enron's and others' fiber optic cable capability, *i.e.*, "***Broadband Intermediation***." Enron presented ***both parts*** of its broadband business as poised to achieve and later as actually achieving huge success, reporting that its fiber optic network was being and had been successfully constructed, was state of the art and provided unparalleled quality of service, and that its broadband trading business was succeeding and achieving much higher trading volume and revenues than expected – *i.e.*, "***exponential growth***."

40.    Another example of the purported success of Enron's broadband content business was its joint venture with Blockbuster Entertainment, announced with great fanfare in 7/00. Enron presented this 20-year agreement as having a billion dollar value, that it was a first-of-its-kind agreement whereby consumers would obtain video-on-demand content to be provided by Blockbuster in their home as if they were watching the movie on their own VCR, and that this incredible advance in technology was made possible due to the ***high quality of Enron's fiber optic network***. Abusing mark-to-market accounting, with the help of CIBC, which purportedly invested in the deal ***while secretly getting a no-loss guarantee from Enron***, Enron recognized an astonishing $110+ million profit on this deal in the 4thQ 99 and 1stQ 00, even though the project was nothing more than a failed pilot project – failing in its test markets because Enron did not have the technology to deliver the product as represented – which was unable to go forward because Blockbuster had not yet obtained and could not obtain the legal right to deliver movies from movie studios in a digital format, the only format which could be utilized for VOD.

- 31 -

41.    Just eight months after announcing this contract with great fanfare and just weeks after representing that testing of the system in four cities had *succeeded* and that the service was being launched nationwide, Enron was forced to abandon the venture due to the failure of Enron's technology and the inability of Blockbuster to obtain the ability to provide content in digital format. But Enron did not reverse the huge profits it had secretly recorded and improperly reported on this transaction earlier, for to do so would have not only exposed its ongoing abuse and misuse of mark-to-market accounting, but also would have crushed Enron's stock at a time when Enron and the other participants in the scheme were desperately attempting to support Enron's then falling stock price so that it would not fall below certain trigger prices in the SPE agreements which would obligate Enron to pay off investors in the SPEs. CIBC did not force Enron to honor its secret guarantee against losses, as it knew to do so would undermine Enron's fragile financial condition, but rather, carried it as part of its overall exposure to Enron. After CIBC became an investor in the Blockbuster VOD joint venture with Enron and received its secret guarantee, CIBC refused to disclose its economic relationship with Enron or its affiliates, continuing to use the same "boilerplate" disclosures in its analyst reports on Enron, concealing its investment and resulting conflicts of interest.

## H.    New Power

42.    Another example of how Enron, Vinson & Elkins, Andersen and CIBC falsified Enron's reported results is the New Power transaction, including the New Power IPO, by which Enron improperly recognized $370 million in profits in the 4thQ 00. In 00, Enron owned millions of shares of New Power stock – then a private company – and controlled New Power. If Enron could take New Power public and create a trading market in its stock, then Enron could recognize a profit on the gain in value on its shares by "hedging" that gain via yet another non-arm's length transaction

with the LJM2 entity. In the 4thQ 00, Enron desperately needed to create profits to perpetuate the Ponzi scheme. Enron and its bankers, CS First Boston, CitiGroup and CIBC, did the huge New Power IPO – 27.6 million shares at $21 per share in 10/00. After the IPO, Enron continued to hold 13.6 million shares of New Power common stock and warrants to purchase 42 million more shares. With the participation of Vinson & Elkins, Andersen and CIBC, in a deal secretly structured before the IPO, Enron quickly moved to create a huge phony profit using LJM2. Immediately after the New Power IPO, Enron, Vinson & Elkins, Andersen and CIBC created an SPE called Hawaii 125-0. CIBC (and several other of Enron's banks) made a "loan" of $125 million to Hawaii 125-0, but received a "total return swap" guarantee that was supposed to protect CIBC and the other banks against *any loss* from Enron. Enron transferred millions of its New Power warrants to Hawaii 125-0 to "secure" the banks' loan and thus created a huge $370 million "profit" on the purported gain on the New Power warrants made possible by the New Power IPO. Hawaii 125-0 simultaneously supposedly "hedged" the warrants with another entity created and controlled by Enron called "Porcupine." To supposedly capitalize Porcupine, LJM2 put $30 million into Porcupine to facilitate the so-called hedge of the New Power warrants, but, one week later, Porcupine paid the $30 million back to LJM2 plus a $9.5 million profit – leaving Porcupine with no assets. During 01, New Power stock fell sharply, as the chart below shows:



This collapse in New Power's stock converted Enron's huge gain on its New Power equity holdings into a huge loss early in 01 – a loss of about $250 million – which Enron, Vinson & Elkins and Andersen agreed to conceal and did conceal until 10/01 – when Enron shocked the markets by revealing a $1 billion write-off and $1 billion reduction in shareholders' equity

**I.    Dark Fiber Swaps**

43.    In late 9/01, as Enron stock was falling sharply, frequently piercing equity issuance "trigger" prices, and Enron knew it was going to have to take large asset writedowns in connection with its 3rdQ 01 results, Enron was desperate to find a way to limit the size of these writeoffs and generate apparently healthy "operating" earnings. So, on Sunday, 9/30/01, Enron and Qwest (another Andersen client), with the help of Andersen and Vinson & Elkins, arranged a "swap" of fiber optic assets.  This Qwest-Enron deal, one of the largest ever recorded, allowed Enron to avoid recording

- 34 -

a huge loss by selling an asset whose value had plummeted on the open market. "*Qwest said we will overpay for the assets, and you will overpay me on the contract*," one former Enron executive said. A financial analyst looking at the deal's details stated: "*This is clearly a swap for accounting purposes.*" Executives at Enron and Qwest held discussions into the final days of the 3rdQ, discussing how to account for the deal so that each would gain accounting benefits and improve their quarterly earnings results. On 9/30/01, *a Sunday and the final day of the 3rdQ*, Qwest signed a deal to buy from Enron "dark fiber" along a route from Salt Lake City to New Orleans. Enron agreed to buy "lit wavelength," or active fiber optic cable services, from Qwest over a 25-year period, and each company exchanged checks for about $112 million around the close of the deal. The deal enabled Enron to book a sale and avoid recording a loss on the dark fiber assets, whose value in the open market had dropped far below the price on Enron's books. Enron had recorded a high value on its dark fiber assets after selling some dark fiber to LJM2.

**J.     Hidden/Disguised Loans**

44.     Another tactic utilized by Enron to falsify its financial condition and hide the true extent of its debt and liquidity involved transactions with certain of its banks – JP Morgan, CitiGroup and CS First Boston. In the case of JP Morgan, these manipulations used an entity controlled by JP Morgan, known as "Mahonia," which was located in the Channel Islands off England. JP Morgan and Enron utilized a scheme which JP Morgan had originally utilized before with a commodities trader from Sumitomo, by which large bank loans are disguised to be commodity trades. In fact, offsetting trades were arranged with the ultimate cost differential being in favor of the bank, representing the interest rate on the disguised loan. Enron, Mahonia and JP Morgan got Vinson & Elkins to give a false legal opinion that these transactions were in fact legitimate commodities trades. Thus, by utilizing this manipulative device, JP Morgan and Enron falsified

- 35 -

Enron's financial condition to make it appear much stronger than it really was, concealing some $3.9 billion in debt, which, had it been known and disclosed, would likely have resulted in Enron losing its investment grade credit rating with all the negative consequences that would flow from that. JP Morgan attempted to insure against default on those disguised loans by buying performance bonds from several insurance companies. However, the insurers refused to pay, alleging that in fact the commodity trades were fraudulent and a subterfuge to conceal the real nature of the transactions, *i.e.*, done for the purpose of disguising loans. ***A federal district court judge has ruled that there is significant evidence to support the insurers' claims of fraud and deception and that these transactions were, in fact, disguised loans***.

45.    CitiGroup and CS First Boston also engaged in subterfuges to disguise large loans to Enron to help Enron present a misleading picture of its liquidity, financial condition and balance sheet. CitiGroup lent Enron $2.4 billion in a series of "pre-paid" swaps via what were called "Delta" transactions because they were conducted through CitiGroup's Cayman Island subsidiary named "Delta." In a true swap, neither party receives all the agreed payments up front. However, in these transactions, CitiGroup paid an estimate of the fair value of its portion of the swaps – hundreds of millions of dollars each time – immediately, and Enron was obliged to repay the cash over five years. The transactions perfectly replicated loans and were, in fact, loans – but Enron never disclosed them as such on its balance sheet. CS First Boston also engaged in making disguised loans/trades in derivatives to Enron so that Enron's true credit situation, liquidity and debt levels were being disguised. In 00, CS First Boston gave Enron $150 million to be repaid over two years, with Enron's payments to vary with the price of oil. The transaction was made to appear to be a "swap." But because CS First Boston paid Enron up front, the transaction was, in fact, a loan – a reality noted by the bank: "***It was like a floating-rate loan***," said Pen Pendleton, a CS First Boston spokesman. "***We***

*booked the transaction as a loan*." However, Enron kept the loans off its balance sheet by accounting for the loans from CS First Boston and CitiGroup as "*assets from price risk management*" and as "*accounts receivable*."

46.     The secret offshore JP Morgan "Mahonia" and CitiGroup "Delta" transactions substantially increased in monetary amount at the end of 00 and then during 01 as Enron's stock price began to decline sharply and pierced certain of the higher priced equity issuance triggers, and the structure of the Raptor SPEs threatened to collapse for lack of credit capacity. JP Morgan and CitiGroup knew that this created the threat of a death spiral for Enron. Also, by this time Enron's accumulated financial chicanery had created a liquidity crunch inside Enron, which made Enron increasingly desperate for additional cash to try to stave off its growing liquidity problems. Enron, JP Morgan and CitiGroup substantially increased the amount of money flowing to Enron in the disguised loan transactions they were engaging in, *i.e.,* the phony commodity oil and gas trades and swaps. By so doing, JP Morgan and CitiGroup were able to *secretly* prop up Enron's deteriorating finances without any disclosure that in fact Enron *had just borrowed between $4-$6 billion from those two banks*. Had these phony commodity and swap transactions in fact been treated as the bank loans that they really were, the internal procedures at JP Morgan and CitiGroup would have required a syndication of those loans to other lending institutions – but that would have greatly increased the scope of knowledge of the liquidity problems Enron was then encountering. Also, any attempt to even put together loans of this size, either by JP Morgan or CitiGroup (individually or collectively), would have quickly become public knowledge in the financial community and been reported in specialized journals which follow bank lending syndication activity. And because of the high profile of Enron and the controversy over its finances, attempted borrowings of this size would have been reported on by the financial press. This would not only have called into question the health of

Enron's finances, but very likely would have resulted in a substantial downgrade of Enron's credit rating because of the huge amount of debt it was undertaking. That, in turn, would have endangered, if not ended, Enron's ability to borrow in the commercial paper market, triggering a further decline in its stock, causing it to pierce more stock issuance price triggers – a death spiral for Enron – which Enron, JP Morgan and CitiGroup were desperate to avoid. Also astonishing about the Mahonia and Delta transactions is the way JP Morgan and CitiGroup were ***paid off*** to engage in this manipulative subterfuge. Based on Enron's purported investment-grade credit rating, Enron could have borrowed money from banks at 3.75%-4.25%. However, in the phony Mahonia and Delta transactions, ***Enron paid JP Morgan and CitiGroup between 6.5%-7.0% for the disguised loans – a huge difference from the cost of a legitimate bank loan – which made these disguised loans hugely profitable for JP Morgan and CitiGroup***!

47.     In addition to charging extortionate interest rates for engaging and participating in the Mahonia and Delta contrivances, both JP Morgan and CitiGroup took unusual steps to protect themselves financially against loss and what they knew were not only dubious but highly dangerous transactions. In the case of JP Morgan, it purchased security bond insurance (deceiving the insurance companies into thinking they were insuring commodity trades and not loans) and obtained other letters of credit from other financial institutions (deceiving them as well), while CitiGroup undertook to lay off substantial portions of its economic risk by selling Enron-linked securities as notes, including the concealed Delta loans in that package of linked securities.

**K.     Enron's Access to the Capital Markets**

48.     Because of the nature of and the rapid expansion of Enron's business, Enron needed constant access to huge amounts of capital. For Enron to continue to appear to succeed it had to keep its investment grade credit rating and keep its stock price high. Enron's investment grade credit

rating and high stock price could *only* be maintained by (i) limiting the amount of debt shown on Enron's balance sheet; (ii) reporting strong current period earnings; *and* (iii) forecasting strong future revenue and earnings growth. Yet Enron was able to achieve these ends only through pursuing an increasing number of phony transactions, many of which were accomplished by increasing the number and size of transaction entities which were supposedly independent of Enron but which, in fact, Enron controlled through a series of secret understandings and illicit financing arrangements, including the LJM1 and LJM2 partnerships. The creation of these SPEs and the billions of dollars of complex transactions Enron engaged in with them were accomplished with the knowing and active participation of Enron's bankers, lawyers and accountants. Enron's illicit financial transactions with the SPEs identified above allowed Enron to conceal hundreds of millions of dollars of losses and generate hundreds of millions of dollars of phony profits, while concealing billions of dollars of debt that belonged on its balance sheet and inflating its reported stockholders' equity by billions of dollars. As a result of reporting strong earnings, the apparent success of its business and its future earnings growth forecasts, Enron had unlimited access to the capital markets, borrowing billions of dollars in the commercial paper markets and selling Enron securities to the public. Enron and its commercial/investment bankers, working with Enron's lawyers and accountants, raised at least $6 billion in new debt and equity capital from public investors through numerous securities offerings between late 96 and mid-01, thus raising the capital necessary to allow Enron to repay or pay down its short-term debt and continue to operate while associated entities, like Azurix, New Power, Osprey, Yosemite, Enron Credit Linked Notes Trust and Marlin, raised some $4 billion more, which directly and/or indirectly benefitted Enron. These Enron offerings are shown below:

| ENRON SECURITIES UNDERWRITINGS | | |
|---|---|---|
| **Banks Named As Defendants** | **Date of Offering** | **Security Sold** |
| Merrill Lynch<br>CitiGroup | 11/96 | 8 million shares Enron Capital Trust I 8.3% Trust Originated Preferred Securities at $25 per share |
| JP Morgan | 7/97 | $100,000,000 6-5/8% Enron Notes |
| Lehman Brothers<br>CitiGroup | 8/97 | $150,000,000<br>6.5% Notes due 8/1/2002 |
| Merrill Lynch | 11/97 | $200,000,000<br>Remarketed Reset Notes due 11/15/2037 |
| Merrill Lynch<br>CitiGroup | 1/97 | 6 million shares Enron Capital Trust II 8-1/8% Trust Originated Preferred Securities at $25 per share |
| Bank America | 11/97 | $250,000,000<br>6.625% Notes due 11/15/2005 |
| CitiGroup | 11/97 | $300,000,000<br>6.45% Notes due 2001 |
| CS First Boston<br>Lehman Brothers<br>Merrill Lynch<br>CIBC<br>JP Morgan<br>Bank America | 5/98 | 35 million shares of common stock at $25 per share |
| JP Morgan<br>Lehman Brothers | 7/98 | $250,000,000<br>6.40% Notes due 7/15/2006<br>$250,000,000<br>6.95% Notes due 7/15/2028 |
| Merrill Lynch<br>CitiGroup | 9/98 | $250,000,000<br>Floating-rate Notes due 3/30/2000 |
| CS First Boston | 11/98 | $250,000,000<br>6.95% Notes due 7/15/2028 |
| CS First Boston<br>Lehman Brothers<br>Merrill Lynch<br>CitiGroup | 2/99 | 27.6 million shares of common stock at $31.34 |

| Banks Named As Defendants | Date of Offering | Security Sold |
|---|---|---|
| Lehman Brothers<br>Bank America<br>CIBC | 5/19/99 | $500,000,000<br>7.375% Notes due 5/15/2019 |
| Bank America<br>CitiGroup | 8/10/99 | $222,500,000<br>7% Exchangeable Notes due 7/31/2002 |
| Bank America<br>Lehman Brothers | 5/00 | $500,000,000<br>Notes due 5/23/2005 and 6/15/2003 |
| Deutsche Bank<br>JP Morgan<br>Bank America<br>Barclays<br>CitiGroup | 2/01 (private placement)<br>7/01 (resales) | $1,907,698,000<br>Zero Coupon Convertible Senior Notes due 2021, original issue date 2/7/2001 |

49.     Some of the offerings of the associated entities are shown below:

| ENRON-RELATED SECURITIES UNDERWRITINGS | | |
|---|---|---|
| **Banks Named As Defendants** | **Date of Offering** | **Security Sold** |
| Merrill Lynch<br>CS First Boston<br>Deutsche Bank<br>Bank America | 6/9/99 | 36.6 million shares Azurix stock at $19 per share |
| Bank America | 7/99 | 27 million shares of Enron Oil & Gas at $22.25 per share |
| Deutsche Bank<br>CS First Boston | 9/23/99 | $1,400,000,000 8.31% Osprey Trust, Osprey I, Inc. Senior Secured Notes due 03 |
| CitiGroup | 11/15/99 | $750,000,000 8.25% Yosemite Securities Trust I Series 1999-A Linked Enron Obligations (LEOs) due 11/15/04 |
| CS First Boston<br>Merrill Lynch<br>JP Morgan | 2/11/00 | $440 million and £100 million Azurix 10.375% and 10.75% Senior Notes |

| Banks Named As Defendants | Date of Offering | Security Sold |
|---|---|---|
| CitiGroup<br>Barclays | 2/15/00 | £200,000,000 8.75% Yosemite Securities Co. Ltd. Series 2000-A Linked Enron Obligations due 07 |
| CitiGroup<br>Lehman Brothers<br>Deutsche Bank | 8/17/00 | $500,000,000 8% Enron Credit Linked Notes Trust Notes due 05 |
| CS First Boston<br>Deutsche Bank<br>Lehman Brothers | 9/28/00 | $750,000,000 7.797% Osprey Trust, Osprey I, Inc. Senior Secured Notes due 2003; and €315,000,000 6.375% Senior Secured Notes due 2003 |
| CS First Boston<br>CitiGroup<br>CIBC | 10/00 | 27.6 million shares New Power at $21 per share |
| CitiGroup | 5/17/01 | $500,000,000 7.375% Enron Credit Linked Notes Trust II Notes due 06 |
| CitiGroup | 5/17/01 | €200,000,000 6.5% Enron Euro Credit Linked Notes Trust Notes due 06 |
| CitiGroup | 5/17/01 | £125,000,000 7.25% Enron Sterling Credit Linked Notes Trust Notes due 06 |
| CS First Boston<br>Deutsche Bank<br>Bank America<br>CIBC<br>JP Morgan | 7/12/01 | $475,000,000 6.31% Marlin Water Trust II, Marlin Water Capital Corp. II Senior Secured Notes due 03; and €515,000,000 6.19% Senior Secured Notes due 03 |

## L.   Enron's Corporate Culture

50.     Inside Enron there was a fixation on the price of Enron stock and doing whatever was

necessary to generate the financial results necessary to push the stock ever higher.  For instance,

throughout Enron's corporate headquarters in Houston were TV monitors that constantly displayed

the price of Enron stock.  Inside Enron there was a saying that managers were to always be

"*ABC*ing," meaning to "*a*lways *b*e *c*losing" deals to generate revenues and profits, even if the

economics of the deal were suspect – a practice facilitated by a compensation system inside Enron

- 42 -

for corporate managers and executives that directly rewarded them financially for **closing** transactions and placing a high (*i.e.*, inflated) value on them, regardless of the true economic substance of the deal, so long as the deal generated an apparent profit when "marked to market."

51.     Inside Enron, the pressures applied to corporate managers by the top executives to do anything necessary to enable Enron to make its numbers was widespread, as was the knowledge that Enron's revenues and earnings were being falsified at the direction of top executives who rewarded the lower level managers who engaged in such conduct with bonuses in larger amounts to those who were willing to facilitate what had become a Company-wide fraudulent pattern of behavior. Former insiders have been quoted as saying "*[y]ou don't object to anything*" and "*[t]he whole culture at the vice-president level and above just became a yes-man culture*."

> But that culture had a negative side beyond the inbred arrogance. **Greed was evident, even in the early days. "More than anywhere else, they talked about how much money we would make," says someone who worked for Skilling. Compensation plans often seemed oriented toward enriching executives rather than generating profits for shareholders. For instance, in Enron's** energy services division, which managed the energy needs of large companies like Eli Lilly, executives were compensated based on a market valuation formula that relied **on internal estimates. As a result, says one former executive, there was pressure to, in effect, inflate the value of the contracts – even though it had no impact on the actual cash that was generated.**

*Fortune*, 12/24/01.

> **"If your boss was [fudging], and you have never worked anywhere else, you just assume that everybody fudges earnings," says one young Enron control person. "Once you get there and you realized how it was, do you stand up and lose your job? It was scary. It was easy to get into 'Well, everybody else is doing it, so maybe it isn't so bad.'"**

>                    *   *   *

> **The flaw only grew more pronounced as Enron struggled to meet the wildly optimistic expectations for growth it had set for itself. "You've got someone at the top saying the stock price is the most important thing, which is driven by earnings," says one insider. "Whoever could provide earnings quickly would be promoted."**

> *The employee adds that anyone who questioned suspect deals quickly learned to accept assurances of outside lawyers and accountants. She says there was little scrutiny of whether the earnings were real or how they were booked. The more people pushed the envelope with aggressive accounting, she says, the harder they would have to push the next year. "It's like being a heroin junkie," she said. "How do you go cold turkey?"*

*Business Week*, 2/25/02. In fact, in mid-8/01, an Enron executive (who was a former Andersen accountant) wrote Lay, telling him the Company was "***nothing but an elaborate accounting hoax***," and, in referring to the SPE transactions, that nothing "***will protect Enron if these transactions are ever disclosed in the bright light of day***" – warning that many employees believed "*[W]e're such a crooked company*."

**M.    Late 00/Early 01 Prop-Up**

52.    In late 00/early 01, Enron's financial results began to come under scrutiny from a few accounting sleuths and short-sellers, who began to question the quality of Enron's reported financial results. While Enron, its top insiders and its bankers assured investors of the correctness of Enron's accounting and the high quality of Enron's reported earnings, the success and strength of its business and its solid prospects for continued strong profit growth, in part because of this increasing controversy, Enron stock began to decline. As this price decline accelerated, it put pressure on Enron's top executives to do something – anything – to halt the decline in the price of the stock as they knew that if that price decline continued and the stock fell to lower levels, more and more of the Enron stock "triggers" contained in agreements for deals with entities controlled by Chewco, LJM1 and LJM2 would be triggered, ***which would require Enron to issue over 100 million shares of its common stock to those partnerships, causing a huge reduction in Enron's shareholders' equity***.

53.    ***In late 3/01, inside Enron it appeared that Enron would be required to take a pre-tax charge against earnings of more than $500 million*** to reflect a shortfall in credit capacity of

- 44 -

the Raptor SPEs, which would have been catastrophic and exposed the scheme. Rather than take

that loss and face these consequences, Enron, Andersen, Vinson & Elkins and certain of Enron's

banks "restructured" the Raptor vehicles by transferring *more than $800 million of contracts to*

*receive Enron's own stock to them just before quarter-end. This was a transfer of huge value for*

*no consideration and was accounted for as increases to equity and to assets in violation of GAAP.*

*It also permitted the participants in the scheme to continue the concealment of the substantial*

*losses in Enron's merchant investments, keep billions of dollars of debt off Enron's balance sheet*

*and allowed the Enron Ponzi scheme to continue.*

   54.  During early 01, Enron continued to report record results (certified by Andersen) and

with its lawyers and bankers made very positive statements:

- Enron's strong results reflected breakout performance in all business units. Enron was a strong unified business.

- WEOS had strong growth and a tremendous market franchise with significant sustainable competitive advantages.

- EBS intermediation was great. Broadband glut and lowered prices *would help Enron*.

- VOD was successfully tested and launched. Proven technology created enormous opportunities.

- All of Enron's businesses were generating high levels of earnings. Fundamentals were improving. Enron was very optimistic. Enron was confident growth was sustainable for years to come.

**N.**  **The Impending Collapse**

   55.  By the Summer of 01, Enron's top insiders realized that Enron would not be able to

continue to sustain the illusion of strong profitable growth much longer and that it would have to

take large write-offs in the second half of 01 that, in turn, could result in a downgrade of Enron's

critical investment-grade credit rating – an event that they knew would mean that debt on the books

of the SPEs Enron did business with (and partnerships controlled by them), which debt Enron had

assured investors was "*non-recourse*" to Enron would, in fact, become Enron's obligation.

56.      *In a 6/01 meeting between an Enron manager and two CS First Boston managing directors, the CS First Boston people made statements showing they had knowledge about the nature and extent of Enron's off-balance sheet exposure*.  During discussions about structuring an off-balance-sheet partnership, the CS First Boston people commented to the Enron manager, "How can you guys keep doing this?" – referring to Enron's repeated statements to the market that its stock was undervalued.  The CS First Boston people said that even at $40 per share, *Enron's stock was still overvalued in their view and added, "Do employees actually believe it's worth what management is saying*?"  At the time, Enron's stock was trading at around $48.50.  *The CS First Boston people said "you guys are at a critical price point right now" and referenced the Raptor deal and said that if Enron's stock continued to fall, that would cause Raptor to unwind and the debt balance to come due.  The CS First Boston people asked the Enron manager, "Do you know how much off-balance sheet debt you [Enron] have*?"  When the Enron executive said he thought it was around one to two billion dollars, the CS First Boston people said, "*Try eight to 12 billion*."  *They added that if Enron's stock hits $20 a share, things were going to come falling down and "you guys are gonna be fucked*."  This knowledge did not stop CS First Boston, however, from issuing a report on 8/14/01 rating Enron a "*Strong Buy*" with a price target of $84!

57.      Faced with this impending catastrophe on 7/13/01, Skilling told Lay that he was going to quit because he knew that the Enron house of cards was crumbling.  To conceal the horrible problems at Enron that were the true reason Skilling quit, in the ensuing weeks, Lay, Skilling and other top Enron insiders concocted a story that Skilling's resignation would be presented as being for "*personal reasons*," so as to try to conceal the true reasons and limit the damage to Enron's stock

from what they knew would be an incendiary revelation.  On 8/14/01, when Enron announced that Skilling – who had become Enron's CEO just months earlier – was resigning, they said it was for "***personal reasons***."  While this resignation fanned the controversy over the true nature of Enron's finances and the condition of Enron's business, Lay, Fastow, Skilling, Enron's other top executives and its bankers lied to investors, telling them that Skilling's resignation was only for personal reasons and did not raise "***any accounting or business issues of any kind***" and that Enron's financial condition "***had never been stronger***" and its "***future had never been brighter***."  They said there was "***nothing to disclose***," Enron's "***numbers look good***," there were "***no problems***" or "***accounting issues***."  According to them, the Enron "***machine was in top shape and continues to roll on – Enron's the best of the best***."

58.     As the value of Enron's stock and its merchant investments continued to fall in 01, ***the credit problems in the Raptor SPE entities became insoluble***.  As the end of Enron's 3rdQ 01 (9/30/01) was looming, Enron's top insiders realized that despite continuing to falsify Enron's reported results with phony transactions like the Enron/Qwest fiber optic swap, they could not avoid recognizing a multi-hundred million dollar loss in the 3rdQ 01 due to the write-off of hundreds of millions of dollars of impaired assets on Enron's balance sheet, would have to eliminate one billion dollars of shareholders' equity and that Enron would have to restate and eliminate hundreds of millions of dollars of profits it had reported over the prior several years.  Shortly after the close of Enron's 3rdQ 01 (9/30/01), as these events crystalized, Enron's top executives and its accounting firm, Andersen, realized that there was a very substantial likelihood that these negative revelations and accounting restatements would result in the collapse of Enron and in governmental investigations as well as shareholder lawsuits against them. ***Thus, Enron and Andersen both began to destroy evidence of their prior illegal conduct, complicity and fraudulent course of conduct,***

- 47 -

*destroying millions of pages of documents and vast amounts of electronically stored data over the*

*ensuing weeks.*

## O.    The Attempted Coverup

59.    By 8/01, inside Enron management employees were complaining to Enron's Board

that the fraud at Enron was so widespread it was out of control.  In 8/01, two employees complained

to the Board:

(a)    One employee wrote:

Skilling's abrupt departure will raise suspicions of accounting improprieties and
valuation issues.  Enron has been very aggressive in its accounting – most notably the
Raptor transactions and the Condor vehicle.  We do have valuation issues with our
international assets and possibly some of our EES MTM positions.

\*   \*   \*

We have recognized over $550 million of fair value gains on stock via our swaps
with Raptor, much of that stock has declined significantly – Avici by 98%, from
$178 mm to $5 mm.  The New Power Co. by 70%, from $20/share to $6/share.  The
value in the swaps won't be there for Raptor, so once again Enron will issue stock to
offset these losses.  Raptor is an LJM entity.  It sure looks to the layman on the street
that we are hiding losses in a related company and will compensate that company
with Enron stock in the future.

*I am incredibly nervous that we will implode in a wave of accounting scandals....*
*[T]he business world will consider the past successes as nothing but an elaborate*
*accounting hoax....*

*[W]e booked the Condor and Raptor deals in 1999 and 2000, we enjoyed a*
*wonderfully high stock price, many executives sold stock, we then try and reverse*
*or fix the deals in 2001 and it's a bit like robbing the bank in one year and trying*
*to pay it back 2 years later.  Nice try, but investors were hurt, they bought at $70*
*and $80/share looking for $120/share and now they're at $38 or worse.*  We are
under too much scrutiny and there are probably one or two disgruntled "redeployed"
employees who know enough about the "funny" accounting to get us in trouble.

\*   \*   \*

I realize that we have had a lot of smart people looking at this ....  *None of that will*
*protect Enron if these transactions are ever disclosed in the bright light of day*.....

- 48 -

*   *   *

I firmly believe that the probability of discovery significantly increased with Skilling's shocking departure. Too many people are looking for a smoking gun.

*   *   *

3.   ***There is a veil of secrecy around LJM and Raptor.  Employees question our accounting propriety consistently and constantly*** ....

      a.   Jeff McMahon was highly vexed over the inherent conflicts of LJM. ***He complained mightily to Jeff Skilling*** .... 3 days later, Skilling offered him the CEO spot at Enron Industrial Markets ....

      b.   ***Cliff Baxter complained mightily to Skilling and all who would listen about the inappropriateness of our transactions with LJM.***

      c.   I have heard one manager level employee ... say "***I know it would be devastating to all of us, but I wish we would get caught. We're such a crooked company.***"... ***Many similar comments are made when you ask about these deals*** ....

    (b)   A second employee wrote:

One can only surmise that the removal of Jeff Skilling was an action taken by the board to correct the wrong doings of the various management teams at Enron. However ... I'm sure the board has only scratched the surface of the impending problems that plague Enron at the moment. (*i.e.*, EES's ... hiding losses/SEC violations ... lack of product, etc.).

*   *   *

[I]t became obvious that EES had been doing deals for 2 years and was losing money on almost all the deals they had booked. (JC Penney being a $60MM loss alone, then Safeway, Albertson's, GAP, etc.). Some customers threatened to sue if EES didn't close the deal with a loss (Simon Properties – $8MM loss day one).... Overnight the product offerings evaporated.... Starwood is also mad since EES has not invested the $45MM in equipment under the agreement.... Now you will loose [sic] at least $45MM on the deal.... You should also check on the Safeway contract, Albertson's, IBM and the California contracts that are being negotiated.... It will add up to over $500MM that EES is losing and trying to hide in Wholesale. Rumor on the 7th floor is that it is closer to $1 Billion....

This is when they decided to merge the EES risk group with Wholesale to hide the $500MM in losses that EES was experiencing. But somehow EES, to everyone's amazement, reported earnings for the 2nd quarter. According to FAS 131

- 49 -

– Statement of Financial Accounting Standards (SFAS) #131, "Disclosures about Segments of an Enterprise and related information," EES has knowingly misrepresented EES' earnings. This is common knowledge among all the EES employees, and is actually joked about....

There are numerous operational problems with all the accounts.

\*   \*   \*

... Some would say the house of cards are falling....

You are potentially facing Shareholder lawsuits, Employee lawsuits ... Heat from the Analysts and newspapers.  The market has lost all confidence, and its obvious why.

You, the board have a big task at hand.  You have to decide the moral, or ethical things to do, to right the wrongs of your various management teams.

\*   \*   \*

... But all of the problems I have mentioned, they are very much common knowledge to hundreds of EES employees, past and present.

60.     Despite receiving these detailed accounts of fraud throughout Enron, Enron's directors did not take any positive action to investigate or to disclose these issues.  Instead, Vinson & Elkins – which had participated in many of the fraudulent transactions – was brought in to cover up the wrongdoing so the scheme could continue, which Vinson & Elkins did by writing a whitewash report dismissing these detailed accounts of fraud, even though Vinson & Elkins knew them to be true.

**P.     The End of Enron**

61.     ***On 10/16/01, Enron shocked the markets with revelations of $1.0 billion in charges and a reduction of shareholders' equity by $1.2 billion***.  Within days, *The Wall Street Journal* began an exposé of the JEDI, Chewco and the LJM SPEs, the SEC announced an investigation of Enron, and Fastow, Enron's Chief Financial Officer, resigned.  In 11/01 Enron was ***forced to admit that Chewco had never satisfied the SPE accounting rules and – because JEDI's non-consolidation depended on Chewco's status – neither did JEDI, and Enron consolidated Chewco***

- 50 -

*and JEDI retroactive to 97.  Enron also admitted it had failed to correct $51 million in errors found by Andersen for 97.  This retroactive consolidation resulted in a massive reduction in Enron's reported net income and massive increase in its reported debt*.  Enron revealed that it was restating its 97, 98, 99 and 00 financial results to eliminate $600 million in previously reported profits and approximately $1.2 billion in shareholders' equity as detailed below:

| ENRON ACCOUNTING RESTATEMENTS | | | | |
|---|---|---|---|---|
| | 1997 | 1998 | 1999 | 2000 |
| **Recurring Net Income** Amount of Overstatement | $ 96,000,000 | $113,000,000 | $250,000,000 | $ 132,000,000 |
| **Debt** Amount of Understatement | $711,000,000 | $561,000,000 | $685,000,000 | $ 628,000,000 |
| **Shareholders' Equity** Amount of Overstatement | $313,000,000 | $448,000,000 | $833,000,000 | $1,208,000,000 |

62.     These partnerships – Chewco, LJM1 and LJM2 – *were used by Enron management to enter into transactions that Enron could not, or would not, do with unrelated commercial entities*.  Many of the most significant transactions were designed to *accomplish favorable financial results, i.e., not to achieve bona fide economic objectives or to transfer risk*.  Other transactions were implemented improperly *to offset losses*.  These transactions allowed Enron to conceal from the market *very large losses resulting from Enron's merchant investments by creating an appearance that those investments were hedged – that is, that a third party was obligated to pay Enron the amount of those losses, when in fact that third party was simply an entity in which only Enron had a substantial economic stake.  The Raptors transactions alone resulted in Enron*

*reporting earnings from the 3rdQ 00 through the 3rdQ 01 that were almost $1 billion higher than should have been reported*!

63.     As huge as the 11/01 restatements of Enron's 97-00 financial statements were, they just scratched the surface of the true extent of the prior falsification of Enron's financial statements, failing to eliminate additional hundreds of millions of dollars of phony profits as Enron, Andersen, Vinson & Elkins and the banks were still trying to keep Enron afloat and trying to conceal how extensive the fraud had really been.

64.     Notwithstanding the write-offs and restated revelations of 10/01-11/01, the Enron insiders, JP Morgan and CitiGroup believed that they could limit their legal exposure for participation in the scheme if they could effectuate a sale of Enron to another company. So, in 10/01 to 11/01, as the Enron scheme began to unravel and Enron reported a huge 3rdQ 01 loss and restated its 97-01 financial results, JP Morgan and CitiGroup worked hand-in-hand with Enron to desperately try to save Enron in the hope that by arranging a salvation merger with Dynegy (for which JP Morgan and CitiGroup would each be paid approximately $45 million in fees) they could prevent the insolvency of Enron and the inevitable investigations and revelations that would follow such insolvency.

65.     In late 11/01, JP Morgan and CitiGroup were desperately trying to arrange the sale of Enron to Dynegy so they could split a $90 million fee and so Enron would not go bankrupt, which they knew would lead to suits over, and investigations into, their prior deals with Enron – which they knew would be highly embarrassing and could expose them to liability to third parties and subordination of their creditor claims against Enron. A key part of achieving a sale of Enron and thereby avoiding public exposure of defendants' participation in the Enron Ponzi scheme required Enron to keep its investment grade credit rating, as failing to do so meant that Enron's debt would

be accelerated and the Enron scheme would immediately collapse. So, in late 11/01, Robert Rubin, the Vice Chairman of CitiGroup, and William Harrison, the Chairman of JP Morgan, called Moody's – a key rating agency – and pressured Moody's to keep Enron's investment grade credit rating in place until they had completed the sale of Enron to Dynegy.

66.    Rubin's and Harrison's effort to strong-arm Moody's failed. Despite the efforts of Enron, JP Morgan and CitiGroup to conceal Enron's true financial condition from Dynegy and get Dynegy to agree to acquire Enron, the due diligence efforts of Dynegy and its investment bankers uncovered that the true financial condition of Enron was far worse than had ever been disclosed publicly to date and that Enron had been engaged in a wide-ranging falsification of its financial statements over the several prior years. Thus, Dynegy refused to acquire Enron and Enron went bankrupt. By 11/28/01, the charade could be continued no longer and Enron's publicly traded debt had been downgraded to "junk" status by the rating agencies, and on 12/2/01, Enron filed for bankruptcy – *the largest bankruptcy in history*. Enron's common and preferred stock have become virtually worthless and its publicly traded debt securities have suffered massive price declines, inflicting billions of dollars of losses on purchasers of those securities.

67.    While Enron's publicly filed reports disclosed the existence of the LJM partnerships, *these disclosures did not reveal the essence of the transactions completely or clearly, and failed to convey the substance of what was going on between Enron and the partnerships. The disclosures also did not fully disclose the nature or extent of Fastow's financial interest in the LJM partnerships. This was the result of an effort to avoid disclosing Fastow's financial interest and to downplay the significance of the related-party transactions and to disguise their substance and import. The disclosures also represented that the related-party transactions were reasonable compared to transactions with third parties when, in fact, they were not. These misleading*

- 53 -

*disclosures were crafted and approved by Enron's outside auditors and its outside counsel in meetings between Enron's top insiders and Enron's counsel at Vinson & Elkins and Enron's auditors at Andersen.* Enron's manipulative devices, contrivances and related-party transactions were extraordinarily lucrative for Fastow and others. In exchange for their passive and largely risk-free roles in these transactions, the LJM partnerships and their investors were richly rewarded. Fastow and other Enron employees received tens of millions of dollars at Enron's expense. Enron employees involved in the partnerships were enriched, in the aggregate, *by tens of millions of dollars they should never have received – Fastow by at least $30 million, Kopper by at least $10 million, two other Enron employees by $1 million each and still two more by hundreds of thousands of dollars.*

68.     As outrage over what is likely the worst financial scandal involving a public company in the history of the United States erupted, Congress launched the most massive investigation it has ever undertaken of a public company's financial fraud, summoning before it some of the Enron executives and Andersen partners who were intimately involved in these matters. Nancy Temple, a senior Andersen lawyer who directed the destruction *of documents* and defendants Lay, Fastow, Buy and Causey of Enron and David Duncan, the Andersen partner in charge of the Enron account, *have all refused to testify, asserting that their testimony would incriminate them.*

69.     As *Newsweek* has written:

In the late 1990s, by my count, Enron lost about $2 billion on telecom capacity, $2 billion in water investments, $2 billion in a Brazilian utility and $1 billion on a controversial electricity plant in India. Enron's debt was soaring. If these harsh truths became obvious to outsiders, Enron's stock price would get clobbered – and a rising stock price was the company's be-all and end-all. Worse, what few people knew was that Enron had engaged in billions of dollars of off-balance-sheet deals that would come back to haunt the company if its stock price fell.

*Newsweek*, 1/21/02.

- 54 -

The key to the Enron mess is that the company was allowed to give misleading financial information to the world for years. Those fictional figures, showing nicely rising profits, enable Enron to become the nation's seventh largest company, with $100 billion of annual revenues. Once accurate numbers started coming out in October, thanks to pressure from stockholders, lenders and the previously quiescent SEC, Enron was bankrupt in six weeks. The bottom line: we have to change the rules to make companies deathly afraid of producing dishonest numbers, and we have to make accountants mortally afraid of certifying them. Anything else is window dressing.

*Newsweek*, 1/28/02.

70.    As detailed herein, the scheme to defraud Enron investors was extraordinary in its scope, duration and size. Billions of dollars in phony profits were reported. Billions of dollars of debt was hidden. Enron's shareholders' equity was overstated by billions of dollars. This was accomplished over a multi-year period through numerous manipulative devices and contrivances and misrepresentations to investors in Enron releases and SEC filings, including Registration Statements utilized to raise billions of dollars of new capital which was indispensable to keep Enron afloat. This fraudulent scheme could not have been and was not perpetrated only by Enron and its insiders. It was designed and/or perpetrated only via the active and knowing involvement of Enron's general counsel, Vinson & Elkins, the law firm for the LJM2 entity and its SPEs, Enron's accounting firm, Andersen, and Enron's banks, including JP Morgan, CitiGroup, CS First Boston, Merrill Lynch, Deutsche Bank, Barclays, Lehman Brothers and Bank America. Each of these actors directly violated the securities laws and played an important role in the fraudulent scheme and wrongful course of business complained of:

(a)    Andersen, Enron's purportedly independent public accounting firm, was never independent of Enron but, in fact, economically dependent on what was the second largest client of Andersen, providing Andersen with annual fees approximating $50 million, which Andersen estimated internally could increase to $100 million per year. Andersen not only permitted Enron to

falsify its financial results and then falsely certify them, but actually actively engaged and participated in structuring transactions to help falsify Enron's financial results, including the illicit partnerships and SPEs, misuse of mark-to-market accounting and arranging dark fiber swaps with other of Andersen's clients in the telecom business (like Qwest and Global Crossing) and, when the Enron scheme began to unwind in earnest in the Fall of 01, Andersen (along with Enron) moved quickly to destroy evidence of the fraudulent accounting and scheme.

      (b)    Vinson & Elkins participated and engaged in several aspects of the fraudulent scheme, including issuing opinions it knew were false or had no basis in fact. Vinson & Elkins participated in writing, reviewing and approving Enron's SEC filings, as well as its shareholder reports and financial press releases. Vinson & Elkins also participated in setting up Chewco, JEDI, LJM1 and LJM2 and virtually *all* of the related SPE transactions. Vinson & Elkins also participated in structuring and opined on the bogus commodity trades used by JP Morgan and Enron to hide billions of dollars of Enron debt – manipulative devices – engaged in by them to falsify Enron's financial condition and results. Also, when the Enron scheme was unraveling in 8/01 and Skilling quit, Vinson & Elkins participated in the cover up of the fraudulent scheme by writing a report to Enron's insiders which dismissed (whitewashed) detailed allegations of fraud at Enron that had been presented by a management level employee – allegations Vinson & Elkins knew were true because of its own involvement in many of the bogus transactions that the employee detailed.

      (c)    Enron's banks sued for fraud structured and/or financed the secretly controlled partnerships and SPEs, and in fact, at key times advanced funds to them to allow them to complete bogus transactions just before year- or quarter-end and helped create huge profits via transactions between Enron and those entities. The banks also provided loans that enabled Enron to preserve its liquidity and continue to operate while helping Enron sell billions of dollars of securities to public

- 56 -

investors to utilize to pay down Enron's short-term commercial paper and bank debt, again to keep the Enron Ponzi scheme in operation, and the banks also played an indispensable role in helping to inflate and support Enron's stock price by issuing research reports which contained false and misleading information about Enron's business, finances and future prospects. Secret or disguised transactions by JP Morgan, CitiGroup and CS First Boston also concealed billions of dollars of loans to Enron. The banks and/or their top executives were rewarded by allowing the banks or certain top executives of the banks to invest in the LJM2 partnership, which they knew would be very lucrative as it was going to engage in self-dealing with Enron.

71.     On 2/19/02, *The New York Times* reported:

Citigroup ... structured some of the deals to remove poorly performing assets from Enron's balance sheet.... Dozens of Wall Street firms were involved in financing Enron's rapid rise, selling its stock and bonds, arranging acquisitions, and, later, putting together the off-the-book deals that masked Enron's true financial condition. In doing so, these firms earned tens of millions of dollars in fees and put billions of dollars of Enron securities into the market.

They helped Enron on the way up and on the way down. As Enron's downward spiral began, Wall Street firms – among them CS First Boston, Citigroup and Deutsche Banc Alex. Brown – helped finance Enron's side partnerships that removed lagging assets from the company's balance sheet. In these deals, the banks arranged partnerships that allowed Enron to appear more profitable than it actually was and then sold several billions of dollars in bonds backed by Enron stock.

In other cases, dozens of banks and brokerage firms were approached about investing in Enron side partnerships and were shown confidential documents disclosing the extent of Enron's off-balance-sheet deals. Yet this information was considered confidential and not shared with Enron shareholders or clients of these Wall Street firms.

*One of these firms was Merrill Lynch, the nation's largest retail broker, which was the underwriter of a partnership called LJM2,* Other LJM2 investors – all of whom had more information about Enron's finances than Enron shareholders – *were Citigroup; Travelers Insurance, a Citigroup unit; an investment group affiliated with Morgan Stanley Dean Witter; and a group of Merrill Lynch executives.*

72.     On 2/26/02, *Dow Jones News Service* ran a story headlined "*Next Stop on the Enron Express: Wall Street*." It noted the "*long gravy train of stock and bond offerings that Enron sent the Street's way over the past decade*," and stated:

> This review of Wall Street's ties to Enron makes sense given the parade of major financial institutions that were investors in the now-infamous LJM2 partnership set up by Enron's former chief financial officer, Andrew Fastow. It's been well-documented now – both by SmartMoney.com and other publications – that high-powered finance firms such as *CS First Boston, Merrill Lynch, JP Morgan and Citigroup, were lured into the LJM2 partnership by the promise of potentially rich returns and the chance to get an inside peek into Enron's mysterious deals*....
>
> ... Wall Street – which got rich touting Enron – is still acting as if it has nothing to answer for in the Enron mess.
>
> So far, most Wall Street institutions have said little about the Enron debacle, issuing either blanket "no comments," or denying any responsibility for the company's collapse. CS First Boston, which underwrote more than $4.5 billion in Enron stock and bond offerings – roughly 20% of Enron's total underwriting work since 1990, according to Thomson Financial Securities Data – has refused to say anything whatsoever. Merrill Lynch, which lined up investors for Fastow's LJM2 partnership and underwrote more than $4 billion in stock and bond offerings for Enron, has been a bit more talkative – but only to say it's utterly blameless.
>
> \*   \*   \*
>
> Between them, Citigroup and J.P. Morgan served as lead manager on more than $20 billion in syndicated bank loans to Enron over the past decade, with Citigroup also underwriting more than $4 billion in stock and bond offerings for the company ....
>
> ... Wall Street has plenty of explaining to do. Jonathan Kord Lagemann, a securities lawyer and former general counsel for a brokerage firm, says the Enron affair exposes the "*enormous conflict of interest" inherent in these firms' efforts to be three things at one time: underwriter, corporate analyst and stock seller*.

73.     This frenzy of fraud created enormous financial benefits for the participants. In addition to the billions of dollars of capital Enron was able to raise during the Class Period to sustain Enron's operations, hundreds of millions of dollars of interest, underwriting, consulting and advisory fees were generated for Enron's bankers, Andersen received hundreds of millions of dollars of

consulting and auditing fees, Vinson & Elkins received over $100 million in legal fees, and Enron's top insiders pocketed almost $1.1 billion of illegal insider trading proceeds, together with over a billion dollars in cash bonuses which were based on the phony financial results they generated and because they artificially inflated Enron's stock to meet certain stock price targets.  The favored investors in LJM2 were placed to obtain huge returns from the self-dealing and unfair transactions LJM2 and entities it controlled engaged in with Enron.

74.     At end of the day, the Enron fiasco represents a massive wealth transfer from public investors, including individual and institutional investors, including pension funds and thousands of Enron employees who purchased Enron stock for their retirement, to corporate insiders, Wall Street bankers and the accounting and legal professionals who perpetrated the fraud.  The graphic that follows outlines these sordid events:



# on Timeline
## /98 - 3/7/02

**⊚ Enron Stock Issuance Price Trigger**

**400**

**300**

**200**

**100**

**0**

**10/19/98 = 100**

...arkable. New contracts over $2 ...ouble size of Co  Turned corner on ...llection of large contracts  Well ...ut on schedule. Full VOD roll out ...EB, Deutsche and ...ell $750 million and ...on Osprey notes

**10/00** Strong 3Q 00 income.  Merchant investments hedged  EES at breakout pace VOD deal value $1 billion - going fine.  All components in place. EBS designed to take advantage of broadband glut

**1/01** Strong 4Q 00 results  Breakout performance. $16 billion in EES contracts.  Outstanding year.  Increasing profitability. WEOS has significant sustainable competitive advantage.  Successfully launched VOD.  Proven technology  Will increase profitability Increases forecasted EPS growth  Stock worth $126.

**2/01** Enron sells $1 9 billion 0% convertible notes

**3/01** Business in good shape  WEOS, EBS intermediation great  Very optimistic for VOD.  Everything fine.  EBS business predicated on surplus of supply - declining prices good for Enron  Balance sheet great Financing vehicles have de minimus share issuance requirements.

**3/01** Strong, unique business.  Tremendous growth.  Will continue strong Erns performance.  EES had breakout year - proven concept with profitable dealflow.  $30 billion in contracts in 01  EBS model working.  Intermediation growing exponentially  VOD sucessful Enron in top tier of world's corporations.

**3/01** VOD deal terminated - Blockbuster failed to provide movies  Technology sound  Rapid growth intact.  Stock selloff overdone  All businesses doing very well.  Will hit Erns targets.

**10/00** Strong 3Q 00 income. Very optimistic about the strong outlook

**4/01** Great 1Q 01 results  WEOS outstanding, EES + EBS rapidly accelerating - each generating high levels of Erns  Very optimistic. Increase 01 EPS to $1.75-$1.80. 15% growth in 02  Growth sustainable for years

**5/01** Fundamentals improving.  Enron's fortunes have not peaked Erns power continues to grow
**5/01** Citi sells € 200million Enron CLN
**5/01** Citi sells $500 million Enron CLN
**5/01** Citi sells $125 million Enron CLN
**8/01** Performance never stronger, business model never more robust; growth never more certain.

**11/00** Rumors of shortfall untrue Businesses performing very well.  Comfortable with $1.65 EPS for 01

/00 Strong 2Q 00 income. ...usiness booming - gaining ...omentum  EBS profits ...scalating.  Ahead of expectations ...OD contract over $1 billion  New ...ES contracts - $3.8 billion  Never ...n better shape  Very excited about ...uture.

**2/01** Fortune criticizes accounting Enron says sour grapes by analysts who failed to get investment banking business  Enron no black box.

**12/00** Strong growth to continue Growth and strong Erns are reason to buy Enron.  VOD launched Unparalleled quality of service Solid technical foundations

**6/01** Fundamentals improving. Long term Erns growth will reach 25%

**7/01** Enron will hit or beat EPS estimates  Re possible losses in Broadband and India - "All of these [questions] are bunk!"

**9/01** Lay: "incredibly cheap stock."

...ckbuster ...r App." ...uality of

...Citi, Lehman and ...sche sell $500 million ...CLN

**7/01** CSFB, Deutsche, B of A, CIBC and JPMorgan sell $475 million and €515 million Marlin notes

**7/01** Strong 2Q 01 income - strong growth and strong profits.  EES  to double profits in 01. Fundamentals excellent  No loss on Dabhol.  Will have 01/02 EPS of $1 80-$2 15 Stock will recover

**10/01** $1 billion writeoff, $1.2 billion shareholder equity reduction Core fundamentals strong. Excellent prospects Strong EPS outlook; liquidity fine

...ncome  Great year  Continued strong ...reakout performance from EES and rapid ...EBS  EBS will drive growth - expected to ...profitable. Momentum building ...ings potential

**8/01** Skilling resigns  Co  never in better shape. Strongest ever  No changes in outlook Performance accelerating  Nothing to disclose Numbers look good. No problems  No accounting issues. Enron machine in top shape The best of the best  Expect stock to recover

**12/01** Enron bankrupt

...owth ...ron right - ...opportunity ...irst ...entially ...5-20%.

## JURISDICTION AND VENUE

75.      The claims asserted herein arise under and pursuant to §§10(b), 20(a) and 20A of the Securities Exchange Act of 1934 ("1934 Act") [15 U.S.C. §§78j(b), 78t(a) and 78t-1] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5], §§11, 12(a)(2) and 15 of the Securities Act of 1933 ("1993 Act") [15 U.S.C. §§77k, 77l(a)(2) and 77o] and Texas Rev. Civ. Stat., art. 581-33.

76.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1367; §27 of the 1934 Act [15 U.S.C. §78aa] and §22 of the 1933 Act [15 U.S.C. §77v].

77.      Venue is proper in this District pursuant to §27 of the 1934 Act and §22 of the 1933 Act, and 28 U.S.C. §1391(b).  Enron maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

78.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

The Remainder of this

Document Can be Viewed

at the Clerk's Office

Parties     pgs 62 -129

Background     pgs 130 - 134

Class Period Events     pgs 135 -307

Fraudulent Scheme     pg 308

Enron Defs Scienter     pgs 309 -319

False Fin Stmts     pgs 320 - 408

Foreign Debt Securities     pgs 409 - 439

The Banks     pgs 440 - 541

Vinson & Elkins     pgs 542 - 577

Andersen     pgs 578 - 624

Class Allegations     pgs 625 - 644

Prayer     pgs 645 - 649