United States Courts
Southern District of Texas
FILED
OCT 2 3 2003
Michael N. Milby, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE ENRON CORPORATION SECURITIES AND DERIVATIVE & "ERISA" LITIGATION | § § | MDL 1446 |
| MARK NEWBY, et al., | § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. H-01-3624 |
| v. | § | AND CONSOLIDATED CASES |
| ENRON CORPORATION, et al., | § § | |
| Defendants. | § § | |

**CERTAIN DEFENDANTS' BRIEF IN OPPOSITION TO CLASS
CERTIFICATION OF PLAINTIFFS' SECTION 10(b) AND RULE 10b-5 CLAIMS**

TO THE HONORABLE MELINDA HARMON:

Lead Plaintiff's Amended Motion for Class Certification of their Section 10(b) and Rule 10b-5 claims should be denied because Plaintiffs have failed to meet their burden to demonstrate that the putative class -- as defined by Plaintiffs -- meets the requirements for Rule 23 class certification. In support of their opposition to class certification, the Moving Defendants[1] respectfully show the Court as follows:

A. **Standards For Class Certification Under Rule 23:**

"The party seeking certification bears the burden of demonstrating the Rule 23 requirements have been met." *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002); *see also Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 & n.4 (5th Cir. 2001). To do that, Plaintiffs must establish that all of the prerequisites of 23(a)[2] are satisfied and that the class

---

[1] This Brief in Opposition is filed on behalf of and joined by Kenneth L. Lay, Jeffrey Skilling, Lou L. Pai, Joseph W. Sutton, Richard B. Buy, Mark A. Frevert, Richard A. Causey, Steven J. Kean, Mark E. Koenig, Jeffrey McMahon, Kenneth D. Rice, and Cindy K. Olson.

[2] As set forth in Plaintiffs' Motion, under Rule 23(a), Plaintiffs must show that (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or



satisfies at least one category of Rule 23(b). *Castano v. American Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996). Plaintiffs seek certification under Rule 23(b)(3), which states that an action may be maintained as a class action if "the court finds that the questions of law or fact common to members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED. R. CIV. P. 23(b)(3).

Plaintiffs have failed to meet their burden in this case because they have neglected to analyze the predominance and superiority requirements of Rule 23(b)(3). The predominance and superiority requirements are "far more demanding" than is Rule 23(a)(2)'s commonality requirement. *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003) (quoting *Amchem Prods. v. Windsor*, 521 U.S. 591, 624 (1997)).

Rule 23 requires the Court to determine whether it would be both fair to the various parties and judicially appropriate to consolidate the claims of many different plaintiffs for adjudication in a single trial. To answer this question in the affirmative, the facts that determine the success or failure of the putative class representatives' claims must be essentially the same for every class member. *Castano*, 84 F.3d at 745 (to satisfy predominance, central elements of plaintiffs' claims must be provable on an aggregate basis). This concept is embodied in the class-wide proof requirement: The named plaintiffs' individual claims cannot be certified unless they are shown to be susceptible of proof equally applicable to all class members. *See, e.g., Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1005 (D.D.C. 1986) (affirming the denial of class certification and adopting "class wide proof requirement"); *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 327 (5th Cir. 1978) (same).

---

defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. FED. R. CIV. P. 23(a).

A district court must conduct a "rigorous analysis" of the Rule 23 prerequisites before certifying a class. *Castano,* 84 F.3d at 740; *Young v. Nationwide Life Insurance Co.,* 183 F.R.D. 502, 506 (S.D. Tex. 1998) (J. Kent). It is the Plaintiffs' burden to demonstrate to the Court that a class should be certified; it is not Defendants' burden to show why it should not be. *Castano,* 84 F.3d at 740; *Berger,* 257 F.3d at 481 (holding district court improperly shifted the burden of proof to defendants). Plaintiffs' Motion utterly fails to meet that burden.

B. **Plaintiffs Have Failed To Analyze the Predominance and Superiority Requirements of Rule 23(b)(3).**

In Section II. E. of their Motion, Plaintiffs conclude without any real analysis that this action satisfies Rule 23(b)(3) because common issues of law and fact predominate over individual issues. Plaintiffs completely fail, however, to provide the Court with any kind of roadmap of how Plaintiffs' 10(b) and 10b-5 claims would be tried, given the enormous variations in circumstances among the various putative class members. The Fifth Circuit has held that certifying a class without consideration of how the trial on the merits will be conducted constitutes reversible error. *Castano,* 84 F.3d at 741. That is because, without a thorough analysis of how the individual issues will be tried, it is impossible for the Court to know whether the common issues or the individual issues truly will predominate. *Id.* at 745; *Countrywide Home Loans,* 319 F.3d at 738 (noting that "[d]etermining whether legal issues common to the class predominate over individual issues requires that the court inquire how the case will be tried"). This analysis should entail identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class. *Countrywide Home Loans,* 319 F.3d at 738.

"Absent considered judgment on the manageability of the class, a comparison to millions of individual trials is meaningless." *Castano,* 84 F.3d at 744. Accordingly, the Plaintiffs must

3

provide the Court with a workable plan to deal with manageability issues. *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 420 n. 15 (5th Cir. 1998). Generalized assertions about the Court's ability to manage the case are unavailing absent specific methods for handling the various issues that inevitably will arise. *Id.*

### C. **The Class As Defined By Plaintiffs Is Not Suitable For Class Certification.**

Plaintiffs ask this Court to certify a massive class consisting of:

> (i) all persons who purchased the publicly traded equity and debt securities of Enron Corporation ("Enron" or the "Company") between October 19, 1998 and November 27, 2001 (the "Class Period"), including the publicly traded securities issued by Enron-related entities during the Class Period, the value or repayment of which was dependent upon the credit, financial condition, or ability to pay of Enron, and (ii) all states or political subdivisions thereof or state pension plans that purchased from defendants Enron's 6.40% Notes due 7/15/06 or 6.95% Notes due 7/15/28, and that authorize the prosecution of their claim pursuant to the Texas Securities Act (collectively, the "Class").

As defined, this wide-ranging and diverse class simply cannot be certified for the purpose of trying Plaintiffs' claims brought under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 because the class contains too many disparate groups, whose numerous individualized questions necessarily will predominate over common issues.

### 1. **The Purported Class Relied on Non-Uniform Representations Made By Different Sub-Sets of Defendants.**

First, the class cannot be certified as defined because there is a material variation in the representations allegedly made and in the degrees of reliance by the individual plaintiffs. Plaintiffs' claims against the Moving Defendants are based on more than 85 allegedly fraudulent statements. (Amended Complaint, pp. 130-307) More than 40 of these were oral statements, including conference calls with analysts and various investors, "follow-up conversations" with analysts, interviews with the press and analysts, and statements made at analyst meetings and conferences (see ¶¶ 119, 120, 145, 157, 160, 168, 173, 175, 178, 179, 191, 197, 202, 209, 212,

4

213, 224, 227, 231, 241, 247, 258, 263, 264, 274, 275, 282, 283, 309, 311, 317, 318, 329, 330, 331, 332, 337, 356, 368, 369, 377). These allegedly fraudulent statements were made over the course of three-and-a-half years, from March 1998 through November 14, 2001. Plaintiffs' descriptions of these alleged misrepresentations demonstrate that they cover a myriad of subjects, were not uniform, and were made by various Defendants. (Amended Complaint, pp. 130-307) For example, the alleged misrepresentations regarding Enron's broadband business were made at different times and by different Defendants than the alleged misrepresentations about EES or the alleged misrepresentations regarding the New Power IPO.

These are exactly the type of claims that the Fifth Circuit has held are unsuitable for broad single-class certification because of the enormous variations in the alleged misrepresentations. In *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880 (5th Cir. 1973), the plaintiff brought suit against Merrill Lynch individually and as representative of a putative class, alleging common law fraud and securities laws violations stemming from Merrill Lynch's alleged misrepresentations and omissions of material facts in its written and oral statements, advertisements, and acts. The Fifth Circuit held that the trial court was correct in denying certification of this class, holding that "[i]f there is any material variation in the representations made *or* in the degrees of reliance thereupon, a fraud case may be unsuited for treatment as a class action." *Id.* at 882 (citing Rule 23, Advisory Committee's Official Note, 39 F.R.D. 98, 107 (1966)) (emphasis added).

The Fifth Circuit agreed with several courts that had previously held that an action based substantially on oral rather than written misrepresentations cannot be maintained as a class action. *Id.* It went on to hold that, even where the misrepresentations are written, if the "writings contain material variations, emanate from several sources, or do not actually reach the

5

subject investors, they are no more valid a basis for a class action than dissimilar oral representations." *Id.* Twenty-three years later in *Castano*, the Fifth Circuit reiterated the principles announced in *Simon* and reversed the trial court's class certification of plaintiffs' fraud-based claims. *Castano*, 84 F.3d at 745.

Plaintiffs do not dispute the fact that this material variation in the alleged misrepresentations defeats class certification under the controlling Fifth Circuit precedent. Instead, Plaintiffs try to focus the Court's attention only on the second prong of the *Simon* test, involving reliance. But even if the material variation in the alleged misrepresentations alone did not preclude class certification (which it does), Plaintiffs' argument regarding reliance is unavailing.

2. **The Fraud On The Market Theory Does Not Save the Putative Class.**

Plaintiffs claim that no issues of individual reliance destroy predominance, asserting that because they rely on the fraud on the market theory, individual reliance is not important. The fraud on the market theory merely provides that in certain circumstances, where materiality is shown, there may be a rebuttable presumption of reliance. *Young,* 183 F.R.D. 502. But the Court cannot merely assume that the fraud on the market theory will supply the necessary element of reliance. The Court must make a thorough inquiry as to whether a plaintiff can in fact establish the fraud on the market presumption before certifying a class on fraud issues. *Id.,* citing *Castano,* 84 F.3d 734. It is by no means clear that the fraud on the market theory will be applied in this case to any or all of Plaintiffs' claims. As just one example, Plaintiffs have not provided any evidence to establish that Enron's debt securities, which are traded over-the-counter, are traded in an efficient market. Therefore, the fraud on the market theory may very

well not apply to any claims based on debt securities, yet the purchasers of those securities are included in the purported class.

Even if the Plaintiffs could establish fraud on the market in this case, their Complaint makes clear that they allege not just one fraud on the market, but several. Plaintiffs' Complaint spells out many separate allegedly fraudulent schemes, each of which they contend inflated the market price for Enron stock. As just an example of some of the divergent and wide-ranging schemes Plaintiffs allege Defendants engaged in, Plaintiffs contend:

- Defendants engaged in a series of transactions, characterized by Plaintiffs as manipulative devices, between Enron and various partnerships and SPEs, which resulted in Enron inflating its reported financial results by more than a billion dollars. (Amended Complaint, ¶¶ 21-35);
- Defendants engaged in misuse and abuse of "mark-to-market" accounting in order to falsify Enron's financial results. (Amended Complaint, ¶ 36);
- In an effort to demonstrate "tremendous success" in Enron's retail energy services business -- EES -- Defendants entered into a series of energy management contracts that they knew would likely result in huge losses. (Amended Complaint, ¶¶ 37-38);
- Defendants misrepresented the potential for success of Enron's new broadband business -- EBS. (Amended Complaint, ¶¶ 39-41);
- Enron improperly recognized $370 million in profits in connection with the New Power IPO. (Amended Complaint, ¶ 42);
- Enron conspired with Qwest to "swap" fiber optic assets to allow Enron to avoid recording a huge loss by selling an asset whose value had plummeted. (Amended Complaint, ¶ 43); and
- Enron engaged in a series of transactions with certain of its banks in order to obtain "disguised loans" that would help Enron present a misleading picture of its liquidity, financial condition, and balance sheet. (Amended Complaint, ¶¶ 44-47).

Plaintiffs allege that these various schemes were carried out at different times during the class period and involved different sub-sets of Defendants. Plaintiffs' Complaint separates the alleged fraudulent activity into at least seven distinct time periods: July 14, 1998 through October 14, 1998 (¶ 121); October 21, 1998 through July 6, 1999 (¶ 155); July 13, 1999 through February 28, 2000 (¶ 214); March 31, 2000 through March 1, 2001 (¶300); March 12, 2001

7

through July 26, 2001 (¶339); the period "surrounding" Jeff Skilling's resignation on August 14, 2001 (¶ 359) and October 16, 2001 through November 14, 2001 (¶ 390). Thus, even if reliance could be presumed based on an efficient market theory, the various class members all purchased and sold their stock at different times during the three-year class period and, therefore, presumptively relied on different alleged misrepresentations, which would potentially subject different groups of Defendants to liability. As the court in *King v. Sharp* noted, the claim of any particular class representative will be against only those Defendants who are proven to have made material misrepresentations during a particular time period. 63 F.R.D. 60, 66 (N.D. Tex. 1974). Such proof will do nothing to prove alleged misrepresentations made at other times to other purchasers by other Defendants. *Id.* These highly individualized issues simply are not subject to class-wide proof.

The court recognized a similar flaw in the plaintiffs' theory in *Richland v. Cheatham*, 272 F.Supp. 148 (S.D.N.Y. 1967) (cited by *King*, 63 F.R.D. at 65 n.3). In that case, the plaintiffs alleged that they were required to pay higher prices for Georgia-Pacific common stock as a result of four different fraudulent schemes allegedly carried out by the defendants during the class period. The court held that class certification was inappropriate because individual issues predominated over common questions. *Id.* at 154. The court noted that, in proving that any particular plaintiff paid a manipulated price for stock, plaintiffs do "not prove that purchasers at other periods of time paid a manipulated price, [thus] there is no predominant question of law or fact common to all purchasers throughout the four periods." *Id.* For the same reasons, there is no predominant question of law or fact that extends throughout the entire class period in this case.

3. **Individual Issues Regarding Damages Preclude Class Certification.**

In addition or in the alternative, certification of the class proposed by Plaintiffs is inappropriate because of the individualized nature of the damages calculations. "Where the plaintiffs' damage claims focus almost entirely on facts and issues specific to individuals rather than the class as a whole, the potential . . . that the class action may degenerate in practice into multiple lawsuits separately tried renders class treatment inappropriate." *Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003) (quoting *Countrywide Home Loans*, 319 F.3d at 744) (internal quotations omitted).

Here, the massive class defined by Plaintiffs includes investors who were not damaged at all by the alleged fraud. Even a superficial examination of Plaintiffs' allegations reveals this flaw in the proposed class definition. For example, some of the first alleged fraudulent acts identified by Plaintiffs within the class period involved allegedly undisclosed transactions between Enron and LJM2 in the fourth quarter of 1999. Plaintiffs contend that this alleged scheme was not disclosed to the market until two years later, in October 2001. Therefore, under Plaintiffs' theory, any putative class members who bought and sold during the first two years of the class period received the benefit of the allegedly inflated stock price and likely *made* money. Obviously, those persons who bought high but sold higher are not appropriate members of the class.

Some of the purported class representatives are perfect examples of this fact. For example, the Hawaii Laborers Pension Plan purchased 49,000 shares of Enron stock during the class period at prices between $27.05 and $39.09 per share and then sold those shares at prices of $37.17 to $84.82, making a profit of over $1.1 million dollars. (Appendix to Amended Complaint) Similarly, Employer-Teamsters Local Nos. 175 & 505 Pension Trust Fund

9

purchased shares for $26.17 to $64.01 per share and then sold for between $31.25 and $89.50, also making a handsome profit during the class period. (*Id.*) These and similarly-situated investors simply cannot be included in the same class as purchasers who bought stock at an allegedly-inflated price and then sold at a loss after the alleged fraud was revealed.

At the other end of the class period are persons who bought their Enron stock after Plaintiffs contend the alleged fraud was disclosed to the market. In October and November 2001, Enron reported charge-offs and restated its earnings, while the press simultaneously reported on many of the allegedly previously undisclosed transactions with entities such as Chewco, LJM1, and LJM2. (Amended Complaint, pp. 293-304) Yet, the class period proposed by Plaintiffs does not end until November 27, 2001 -- just prior to Enron filing for bankruptcy. Obviously, those persons who purchased Enron stock after one or more of the purported fraudulent schemes were allegedly revealed should not be included in the same class as those persons who purchased stock earlier in the class period.

Moreover, individualized damage issues will predominate even among those investors who arguably lost money as a result of Defendants' alleged misrepresentations. Unlike the alleged damages arising from Plaintiffs' Section 11 claims, which would be susceptible to a mathematical or formulaic calculation,[3] the calculation of damages for any particular 10(b) or 10b-5 plaintiff would depend -- at a minimum -- on the date(s) of trading, the profit or loss incurred, and the extent to which the price paid and received reflected the "true" value of the stock versus the alleged inflated value. Because any reasonable approximation of the damages actually suffered by the various class members would, therefore, require an inquiry into each trading transaction, individual issues concerning damages predominate over questions common

---

[3] See discussion in the Memorandum Concerning Certification of Class Claims Under Section 11, which was filed by the Outside Directors and joined by the Moving Defendants.

10

to the proposed class. *Bell Atlantic*, 339 F.3d at 306; *see also, Allison*, 151 F.3d at 419 (holding the predominance of individual-specific issues relating to the plaintiffs' claims for compensatory . . . damages in turn detracts from the superiority of the class action device in resolving these claims).

4. **Current and Former Enron Employees Should Not Be Included In the Class.**

The current and former employees of Enron also are included within Plaintiffs' extremely broad class definition, but should not be. According to the allegations in the consolidated *Tittle* cases, with which the Court is very familiar, the Enron employees allege that they based their decisions to purchase and sell Enron stock on a variety of alleged misrepresentations that were made to them as employees of Enron. Which representation(s), if any, each employee heard and relied on will be a very individualized determination. And, because there is no allegation that these communications to employees influenced the public market price for Enron stock, these Plaintiffs will not be able to rely on the fraud on the market theory to escape proving individual reliance.

In addition, there will be highly individualized questions regarding whether particular employees could possibly have been deceived by a particular purported misrepresentation based on the information to which they were exposed in the course of their duties at Enron. To the extent any employee-Plaintiffs were involved in the very transactions at issue and/or had knowledge of allegedly undisclosed information, they will not be able to demonstrate that they relied on the publicly disseminated statements allegedly relied on by the rest of the class. Because of these very individualized inquiries, the current and former employees of Enron should not be included in the class.

D.  **The Court Must Hold Plaintiffs To Their Burden of Defining a Manageable Class or Classes and Demonstrating How Common Proof Will Prevail Within Such Class(es).**

In light of the very strict standards for class certification set forth in *Simon* and its progeny, it is not surprising that, after a diligent search, Defendants' counsel were unable to find a single post-*Simon* case in which the Fifth Circuit has affirmed certification in a fraud-based class action over challenge by an objecting party. In fact, in every such case in which the issue has been raised, the Fifth Circuit has reversed class certification. *Castano*, 84 F.3d 734 (reversing class certification in fraud case citing *Simon*); *Patterson v. Mobil Oil Corp.*, 241 F.3d 417, 418 (5th Cir. 2001) (reversing class certification of RICO claim on grounds that "[c]laims for money damages in which individual reliance is an element are poor candidates for class treatment, at best"); *Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 978 and n.47 (5th Cir. 2000) (reversing class certification of RICO claim under Rule 23(b)(2), but noting that the reliance issue would preclude certification under 23(b)(3) as well); *see also, Shivangi v. Dean Witter Reynolds, Inc*, 825 F.2d 885 (5th Cir. 1987) (affirming denial of class certification in case alleging violations of Rule 10b-5 citing *Simon*).

Should this Court decide to take on the very daunting task of certifying a class that the Fifth Circuit might uphold, it should require Plaintiffs to fulfill their burden of defining a manageable class or a group of sub-classes that will withstand a "rigorous analysis" under Rule 23. The individualized issues among the class as currently defined simply cannot be addressed without a multitude of "mini-trials" on the various individual issues, thus rendering certification inappropriate. *Castano*, 84 F.3d at 745 n. 19. Unless and until Plaintiffs provide the Court with a thorough analysis of how the individual issues will be tried and how manageability issues will affect the definition of the putative class or sub-classes, the Court may not certify the class under prevailing Fifth Circuit authority, and Plaintiffs' Motion for Class Certification should be denied.

For all of the foregoing reasons, the Moving Defendants respectfully request that the Court deny Plaintiffs' Amended Motion for Class Certification on the grounds that, as the class is currently defined, individualized issues among the putative class members predominate over any common issues of law or fact.

Respectfully submitted,

*James Coleman* w/permission BTR

James E. Coleman, Jr.
State Bar No. 0457400
Southern District ID No. 04574000
CARRINGTON, COLEMAN, SLOMAN
& BLUMENTHAL, L.L.P.
200 Crescent Court, Suite 1500
Dallas, Texas 75201
(214) 855-3000 (telephone)
(214) 855-1333 (telecopy)

ATTORNEY IN CHARGE FOR
DEFENDANT KENNETH L. LAY

*Bruce Hiler* w/permission BTR

Bruce A. Hiler
Jeffrey W. Kilduff
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
(202) 383-5300

ATTORNEYS IN CHARGE FOR
DEFENDANT JEFFREY SKILLING

*Roger Zuckerman* w/permission BTR
Roger E. Zuckerman
Deborah J. Jeffrey
Thomas B. Mason
Karen Eisenberg
ZUCKERMAN-SPAEDER LLP
1201 Connecticut Avenue, N.W.
Washington, D.C. 20036-2638
(202) 778-1800 Telephone
(202) 822-8106 Facsimile

*Murray Fogler* w/permission BTR
Murray Fogler
McDADE FOGLER MAINES LLP
Attorney in Charge
State Bar No.: 07207300
S.D. ID No.: 2300
Two Houston Center
909 Fannin, Suite 1200
Houston, Texas 77010-1006
(713) 654-4300 Telephone
(713) 654-4343 Facsimile

ATTORNEYS FOR DEFENDANT
LOU L. PAI

*Jack O'Neill* w/permission BTR
Jack O'Neill
CLEMENTS, O'NEILL, PIERCE,
WILSON & FULKERSON, L.L.P.
State Bar No. 15288500
Jason C. Norwood
State Bar No. 24027579
Federal ID No. 28825
Federal ID No. 3696
Wells Fargo Plaza
1000 Louisiana Street, Suite 1800
Houston, Texas 77002-5009
Telephone: (713) 654-7607
Telecopier: (713) 654-7690

ATTORNEYS FOR DEFENDANT
JOSEPH W. SUTTON

14

*Jacks C. Nickens w/permission BTR*
Jacks C. Nickens
NICKENS, KEETON, LAWLESS,
FARRELL & FLACK, L.L.P.
State Bar No. 15013800
600 Travis, Suite 7500
Houston, Texas 77002
(713) 353-6660
(713) 571-9652 (Fax)

ATTORNEYS FOR DEFENDANTS
RICHARD B. BUY, MARK A. FREVERT,
RICHARD A. CAUSEY, STEVEN J.
KEAN, MARK E. KOENIG, JEFFREY
MCMAHON, KENNETH D. RICE, AND
CINDY K. OLSON

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing pleading was served on all counsel of record on the Service List on October 23, 2003 via posting to www.esl3624.com in compliance with the Court's Order Regarding Service of Papers and Notice of Hearing Via Independent Website.

*Kelli Hinson w/permission BTR*

15