IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE ENRON CORPORATION SECURITIES LITIGATION | § § | MDL NO. 1446 |
| | § | |
| This Document Relates To: | § § | |
| MARK NEWBY, et al., | § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. H-01-3624 AND CONSOLIDATED CASES |
| ENRON CORP., et al., | § § | |
| Defendants. | § § § | |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | |
| KENNETH L. LAY, et al., | § § § | |
| Defendants. | § § | |

UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED

OCT 23 2003

Michael N. Milby, Clerk of Court

**OPPOSITION OF DEFENDANT ALLIANCE CAPITAL MANAGEMENT L.P. TO
THE APPOINTMENT OF STARO ASSET MANAGEMENT, LLC AS CLASS
REPRESENTATIVE AND MEMORANDUM OF LAW IN SUPPORT OF OPPOSITION**

1781

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

OPPOSITION ............................................................................................................... 1

MEMORANDUM OF LAW ......................................................................................... 2

STATEMENT OF FACTS ............................................................................................ 2

I. The Unusual Nature of Staro's Business ........................................................... 2

II. Staro's Lead Plaintiff Application .................................................................... 4

III. The Purported Enron Securities Purchases ....................................................... 5

IV. Staro's Continued Trading After the Enron Financial Disclosures ................... 8

V. Staro's Role in Managing This Litigation ......................................................... 8

ARGUMENT AND AUTHORITIES .......................................................................... 10

I. The Applicable Standards ............................................................................... 10

II. Staro's Attempt to Mislead This Court in Its Lead Plaintiff Application Should Disqualify It as a Class Representative ............................................................. 11

III. Staro is Not an Adequate Class Representative Because It is Subject to Unique Defenses .......................................................................................................... 13

    A. Lack of Standing ...................................................................................... 13

    B. Hedgers/Arbitrageurs Like Staro Have Fundamentally Different Interests From Ordinary Investors ......................................................................... 15

        1. Staro, as a Short Seller of Enron Stock, Cannot Adequately Represent Most Equity Investors ................................................... 17

        2. Staro's Trading Following Enron's November 2001 Disclosures ........... 18

IV. Staro's Inadequacy is Further Demonstrated By Its Management's Ignorance of This Litigation and Its Abdication of Control to Its Lawyers .......................... 19

CONCLUSION .......................................................................................................... 21

CERTIFICATE OF SERVICE ................................................................................... 22

# TABLE OF AUTHORITIES

**Page**

## CASES

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)......................................................................................................11, 13

*Berger v. Compaq Computer Corp.*,
257 F.3d 475 (5th Cir. 2001), reh'g en banc denied, 279 F.3d 313 (5th Cir. 2002)...............11, 19

*Bertulli v. Independent Ass'n of Cont'l Pilots*,
242 F.3d 290 (5th Cir. 2001) ...............................................................................................13

*Byes v. Telecheck Recovery Servs., Inc.*,
173 F.R.D. 421 (E.D. La. 1997)...........................................................................................11

*Camden Asset Mgmt., L.P.  v. Sunbeam Corp.*,
No. 99-8275, 2001 U.S. Dist. LEXIS 11022 (S.D. Fla. July 3, 2001)...................................16, 17

*East Texas Motor Freight Sys. Inc., v. Rodriquez*,
431 U.S. 395 (1977)...........................................................................................................13

*In re Enron Corp. Sec. Litig.*,
206 F.R.D. 427 (S.D. Tex. 2002).................................................................................11, 15, 19

*Epstein v. American Reserve Corp.*,
No. 79 C 4767, 1988 WL 40500 (N.D. Ill. Apr. 21, 1988)............................................................19

*In re Firstplus Fin. Group, Inc. Sec. Litig.*,
No. Civ.A.3:98-CV-2551-M, 2002 WL 31415951 (N.D. Tex. Oct. 28, 2002) .....................15, 19

*In re Ford Motor Co. Bronco II Prod. Liab. Litig.*,
177 F.R.D. 360 (E.D. La. 1997).............................................................................................14

*Griffin v. GK Intelligent Sys., Inc.*,
196 F.R.D. 298 (S.D. Tex. 2000) ...................................................................................... 19-20

*Horton v. Goose Creek Indep. Sch. Dist.*,
690 F.2d 470 (5th Cir. 1982), cert. denied, 463 U.S. 1207 (1983)...............................................11

*James v. City of Dallas*,
254 F.3d 551 (5th Cir. 2001), cert. denied, 534 U.S. 1113 (2002).................................................14

*Kline v. Wolf*,
702 F.2d 400 (2d Cir. 1983)...................................................................................................13

## TABLE OF AUTHORITIES

**Page**

### CASES

*Koenig v. Benson,*
   117 F.R.D. 330 (E.D.N.Y. 1987) .................................................................................17, 19

*Kovaleff v. Piano,*
   142 F.R.D. 406 (S.D.N.Y. 1992) .........................................................................................19

*In re LTV Sec. Litig.,*
   88 F.R.D. 134 (N.D. Tex. 1980) ..........................................................................................14

*Landry v. Price Waterhouse Chartered Accountants,*
   123 F.R.D. 474 (S.D.N.Y. 1989) .........................................................................................15

*Payne v. Travenol Labs., Inc.,*
   565 F.2d 895 (5th Cir.), cert. denied, 439 U.S. 835 (1978) ...........................................13

*In re Party City Sec. Litig.*
   189 F.R.D. 91 (D.N.J. 1999) .................................................................................................19

*Phillips Petroleum Co. v. Shutts,*
   472 U.S. 797 (1985) ................................................................................................................11

*Prado-Steinman ex rel. v. Bush,*
   221 F.3d 1266 (11th Cir. 2000) ...........................................................................................14

*In re Quarterdeck Office Sys., Inc., Sec. Litig.,*
   No. CV 92-3970-DWW, 1993 WL 623310 (C.D. Cal. Sept. 30, 1993)......................15

*Rivera v. Wyeth-Ayerst Labs.,*
   283 F.3d 315 (5th Cir. 2002) ...............................................................................................13

*Rosenzweig v. Azurix Corp.,*
   332 F.3d 854 (5th Cir. 2003) ...............................................................................................14

*Savino v. Computer Credit Inc.,*
   164 F.3d 81 (2d Cir. 1998)....................................................................................................11

*Schlesinger v. Reservists Comm. to Stop the War,*
   418 U.S. 208 (1974) ................................................................................................................13

*Smyth v. Carter,*
   168 F.R.D. 28 (W.D. Va. 1996) ...........................................................................................11

# TABLE OF AUTHORITIES

**Page**

## CASES

*Sosna v. Iowa,*
    419 U.S. 393 (1975)................................................................................................14

*Stirman v. Exxon Corp.,*
    280 F.3d 554 (5th Cir. 2002) .............................................................................10, 11

*In re U.S. Liquids Sec. Litig.,*
    No. H-99-2785, 2002 U.S. Dist. LEXIS 26713 (S.D. Tex. June 12, 2002)..................14

*In re U.S. Liquids Sec. Litig.,*
    No. H-99-2785, 2002 U.S. Dist. LEXIS 26714 (S.D. Tex. Apr. 29, 2002)...................14

*Zandman v. Joseph,*
    102 F.R.D. 924 (N.D. Ind. 1984) .........................................................................13

## STATUTES

Securities Act of 1933,
    15 U.S.C. § 77k *et seq.*.........................................................................................5

    15 U.S.C. § 77k(a) .............................................................................................14

## RULES

Fed. R. Civ. P. 23 .................................................................................................1

Fed. R. Civ. P. 23(a)(4)....................................................................................10, 20

## TREATISES

Louis Loss & Joel Seligman, <u>Fundamentals of Securities Regulation</u> (4th ed. 2001).........................14

Defendant Alliance Capital Management L.P. ("Alliance Capital") respectfully submits, pursuant to Federal Rule of Civil Procedure 23, its Opposition to the Appointment of Staro Asset Management, LLC ("Staro") as Class Representative and its memorandum of law in support of its Opposition. For the reasons stated below, Alliance Capital seeks an Order denying Staro appointment as class representative.

## OPPOSITION

Staro seeks appointment as a class representative for all purchasers of Enron debt securities (and apparently, although this is less clear, for purchasers of Enron equity as well, see infra, p. 17.) This application should be denied because Staro entirely fails to meet the adequacy standards set by the Fifth Circuit under Federal Rule of Civil Procedure 23. Staro has demonstrated a lack of candor in its dealings with the Court; it is subject to unique defenses, including lack of standing; its interests are not typical of, and indeed are actually in direct conflict with, the interests of a majority of the class it seeks to represent; and Staro's management has demonstrated a fundamental ignorance of the litigation, completely abdicating responsibility for its control to Staro's lawyers. Among other things:

- Staro previously sought appointment in this action as Lead Plaintiff for a class of debt investors, based on the representations that it was a pure debt investor – unlike other candidates that had invested in both debt and equity – and that its losses amounted to $40 million. On deposition, however, Staro's designated management representative admitted that: (a) Staro's note and bond purchases were in fact only "one leg" of a "unified" debt/equity investment strategy; and (b) Staro's actual loss was approximately half the amount stated in its Lead Plaintiff application, a fact Staro knew at the time it submitted that application;

- Based on the documents Staro produced and the deposition testimony of its representative, there is no evidence that Staro or any of its affiliates actually purchased the Enron Zero Coupon Convertible Senior Notes Due 2021 (the "Zero Coupon Notes" or the "Notes") on which Staro bases its claim;

- Indeed, the only even attenuated connection to the Notes Staro can claim is that its limited partners – not Staro itself – owned derivative "economic interests" keyed to

the value of the Notes, which is not the same thing as purchasing the Notes themselves;

- Further, Staro now has admitted that it never notified the actual purchasers about the present litigation, nor has it obtained their consent to its filing;

- Because of its unusual convertible arbitrage strategy (i.e., purchasing Enron convertible debt while selling Enron stock short), which sought to profit by arbitraging market imperfections – in other words, regardless of whether Enron securities rose or fell – Staro's economic interests were fundamentally different from those of most investors in Enron, both equity and debt;

- To the extent that Staro continued to trade in Enron securities after the company's negative disclosures in November 2001, and even after the December 2, 2001 bankruptcy filing, Staro's interests also differ sharply from those of most investors that it seeks to represent, even apart from the fact that Staro apparently made a profit on such post-disclosure trading;

- Although it now seeks to represent equity as well as debt investors, Staro was primarily a short seller of Enron stock, such that – as its representative admitted on deposition – its interests were directly opposite to those of most equity investors;

- Staro's designated management witness professed ignorance about fundamental developments in the present litigation; e.g., he had never seen the papers on Staro's Lead Plaintiff application, had never authorized their filing, and disagreed with some of the main contentions in those papers after he reviewed them for the first time at his deposition.

Each of these points is more fully developed in the memorandum of law below.

## MEMORANDUM OF LAW

## STATEMENT OF FACTS

### I.   The Unusual Nature of Staro's Business

The business of Staro and its related entities[1] focuses on hedging and arbitrage. Unlike

an ordinary investor who buys a security hoping that it will increase in value, Staro seeks profits

––––––––––––––––––––––

[1]   Staro is the general partner of a group of limited partnerships, majority owned and managed by Brian J. Stark and Michael A. Roth, which apply similar arbitrage-based investment strategies. These partnerships include Stark Investments, LP ("Stark Investments"), Shepherd Trading ("Shepherd"), and Reliant Trading (continued...)

independent of the direction of market movement. Staro's organizational literature states that its investing objective is to provide "uncorrelated returns" through the use of various arbitrage vehicles. (Cook Decl. Ex. 8, p. I-1.) One author notes that Staro's "philosophy, strategy, and goals have remained unchanged since inception" and quotes Brian J. Stark, one of Staro's founding partners, as saying: "'Our goal is to make money independent of the direction of the market. We are risk-averse. We want to protect our principal but earn 20 percent-plus. We always do this through arbitrage.'" (Cook Decl., Ex. 11, p. 230 (emphasis added).)

Beginning in March, 2001, Staro invested in Enron securities through a unified "convertible arbitrage" strategy, which involved concurrently purchasing Enron's convertible bonds and making short sales of its common stock.[2] (Cook Decl. Ex. 1, pp. 72-73.) Convertible arbitrage attempts to "capture what [one] believe[s] to be the relative mispricing between the two securities." (Cook Decl. Ex. 13, p. 8.) By focusing on the "mispricing" between the two types of securities, convertible arbitrageurs profit when a company's stock price or convertible bond price rises or falls. (Id.) At the deposition of Donald T. Bobbs, Staro's designated management witness, Mr. Bobbs described convertible arbitrage as "the combination of investments involving convertible bonds and equities ... [where] [y]ou're typically buying [the bonds] and selling [the equity short] ... trying to arbitrage the pricing inefficiencies that exist." (Cook Decl. Ex. 1, p. 72.)

---

(continued...)
   ("Reliant"). (See Cook Decl. Ex. 8, p. I-1; Cook Decl. Ex. 9, p. STARO-00001956.) As further set forth below (see infra, pp. 5-7), Staro itself actually purchased none of the Enron securities.

[2]   On some occasions Staro also took long positions in Enron stock (see Cook Decl. Ex. 1, pp. 69-70), but its trading in Enron equity consisted primarily of short sales and puts. (See id., p. 172.)

## II.   Staro's Lead Plaintiff Application

Staro based its prior unsuccessful application for Lead Plaintiff status on the representations that (1) it was a pure debt security investor, unlike competing applicants that traded in equities as well, and (2) it had sustained losses of over $40 million.[3]  Thus, Staro stated in the opening of its Reply Brief on the Lead Plaintiff motion:

> In this action, debt investors need separate, unconflicted representation. Staro [] is by far the largest <u>unconflicted debt investor</u> seeking appointment as Lead Plaintiff....  It has filed a class action complaint, <u>exclusively for purchasers of debt securities, and its losses now exceed $40 million</u>.

(Cook Decl. Ex. 6, p. 1 (emphasis added).)  However, the deposition testimony of Staro's designated management witness disclosed that both representations are untrue.  Mr. Bobbs repeatedly stressed the "unified" nature of Staro's debt/equity investment strategy, of which the note and bond purchases were only "one leg":

> Q:   [Did] your investment in Enron involve[] both debt and equity?
> A:   Securities, uh-huh.
> ******
> Q:   And they were an integral part of an overall strategy, woven together, in other words?
> A:   Yeah.  They were part of an overall strategy, yes.
> ******
> Q:   [T]he investment in Enron had, can we say, two legs to it?  It had a bond leg and an equity leg?
> A:   That might be a fair characterization.

(Cook Decl. Ex. 1, p. 130.)

He further testified that the loss was only about half of the figure claimed in Staro's Lead Plaintiff application.  Mr. Bobbs explained that the Certification attached to said application

---

[3]   Staro's briefs contain a table showing a $40 million claim for debt losses and an equity claim of $0.  (Cook Decl. Ex. 5, p. 10; Cook Decl. Ex. 6, p. 4.)

(Cook Decl. Ex. 4) did not reflect profits from Staro's investments in Enron equity securities. (See Cook Decl. Ex. 1, pp. 159-60.) He also testified that Staro "[was] luckily able to offset [the $40 million loss] by about half through our investments in the equity … [by] [s]hort selling [and] buying puts." (Id., p. 172.) Mr. Bobbs could not explain, though, why this $20 million offset was not disclosed anywhere in Staro's Lead Plaintiff application:

> Q:  Do you see there your debt securities claim in the reply brief that your lawyers filed with the court is listed at $40 million?
> A:  Uh-huh…. Yes.
> Q:  And you don't say anything in this reply brief to let Judge Harmon know that you have sold short Enron equity or made money through the purchase and exercise of puts on Enron equity; is that right?
> A:  It doesn't say that in the complaint.  I'm not sure whether we've made her aware of that or not.
> Q:  [A]re you aware of any pleading that has advised Judge Harmon that you have, as you indicated earlier, roughly $20 million worth of profit from short selling and the exercise of puts?
> A:  Not to my knowledge.  I'm not aware of anything.
> Q:  Why didn't you tell the judge that when you were asking to be appointed lead plaintiff?
> A:  It's a legal issue between and among our attorneys.

(Id., pp. 183-84 (emphasis added).)

## III.    The Purported Enron Securities Purchases

Staro bases its sole claim in this action, under Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k et seq. (the "1933 Act"), on its purported purchase, pursuant to an allegedly misleading Registration Statement, of Enron's Zero Coupon Notes (Cook Decl. Ex. 2).  (See 1st Am. Compl. ¶¶ 81(e), 1006-08, 1008.1(g); Am. Mot. for Class Cert., p. 23.)  The record on discovery reveals, however, that:

> (1) there is no evidence that the purchases in question ever involved any actual ownership interest in the Notes, as opposed to derivatives trades in "economic interests" keyed to the value of the Notes; and

> (2) even those derivative interests were purchased <u>not</u> by Staro, but by its limited partners, who apparently <u>were not informed of the present action and have not consented to its filing</u>.

None of the documents produced – which, according to Staro's counsel, include all of its trading records (<u>see</u> Cook Decl. Ex. 10) – show any ownership interest in the actual Enron Notes that are the subject of Staro's claim.  In this connection, Staro's representative, Mr. Bobbs, testified:

> Q:    [O]ne can buy an economic interest in a derivative without buying the security itself, right?
> A:    Uh-huh.
> Q:    Yes?
> A:    Yes.
> Q:    Okay.   In this transaction, do you know whether Stark [Investments] bought the security or just bought the economic interest?
> A:    I do not know.
> Q:    Is it possible that you did not buy the security and only bought the economic interest?
> A:    I don't know.  It's more an issue of – it's getting – it's a – it's a legal thing, and I don't – I'm not familiar with it.
> Q:    Okay.   But it's at least possible, in your mind, given your understanding of the market, that you didn't actually buy the bond itself?
> A:    It is possible that we didn't physically buy the bond.  It's possible, yes.

(Cook Decl. Ex. 1, pp. 135-36.)  Mr. Bobbs further testified:

> Q:    [D]id Staro or any of the firms in which it was the general partner, ever acquire an ownership interest in the global notes deposited with the trustee as custodian for DTC [the Depository Trust Company][4]?
> A:    To the best of my knowledge, no.

(<u>Id</u>., p. 207.)

---

[4]    The Zero Coupon Notes's Prospectus states, in relevant part:  all "[n]otes sold by the selling security holders pursuant to the registration statement of which this prospectus forms a part are represented by one or more permanent global notes on definitive, fully-registered form without interest coupons.  Each global note has been deposited with the trustee as custodian for DTC and registered in the name of a nominee of DTC in New York, [NY] for the accounts of participants in DTC."  (Cook Decl. Ex. 2, p. 32.)

Even as to the derivative interest, Mr. Bobbs testified that the actual purchaser was not the plaintiff, but several of Staro's limited partners:

> Q:   [showing the Certification] Is Staro [] the purchaser of the securities here, or is it the funds you manage?
> A:   I believe it's the funds that we manage.
> ******
> Q:   As far as you know, Staro [] did not purchase for its own account a single zero coupon convertible bond?
> A:   To the best of my knowledge, I believe that's correct.
> Q:   Did not purchase either a single share of Enron equity or sell it short?
> A:   I believe that's true.
> Q:   Same for the [6.75%] notes?
> A:   Correct.

(Id., pp. 85-86.)  Further, it appears that the limited partners were never informed of the present litigation and never consented to its filing.

> Q:   Do you know whether Staro [] solicited consent from its partners before it filed this lawsuit?
> A:   I don't believe that they did, no.
> Q:   Has Staro [] informed its limited partners that it has filed this lawsuit?
> A:.   I do not know the answer to that.
> ******
> Q:   Do you know if your limited partners are willing to allow Staro to assume a fiduciary duty to a class of purchasers of zero coupon convertible bonds?
> A:   I believe they are in favor of that, yes.
> Q:   How do you know that?
> A:   I've not solicited their responses or anything, but my general opinion is that ... [Staro] act[s] in the best interest of the limited partners.  And just like they rely on us to make good investment decisions on their behalf, I'm assuming the same thing applies when it comes to issues such as this.
> Q:   You assume they would consent if they knew?
> A:   Uh-huh [yes].
> Q:   But you don't know if they've been asked?
> A:   That's correct.
> Q:   And you certainly don't remember, as a limited partner, receiving a solicitation to consent?
> A:   I do not.

> Q:    And you don't know what the reaction of any or all of the limited partners would be if they were asked?  You're speculating?
> A:    Correct.

(Id., pp. 89-91 (emphasis added).)  Mr. Bobbs also stated that "we didn't go out of our way to let any of our limited partners know how much we made or lost in Enron." (Id., p. 185.)

## IV.   Staro's Continued Trading After the Enron Financial Disclosures

Staro's related entities continued to purchase Enron securities after the company released its November 8, 2001 8-K (Cook Decl. Ex. 3) (see Cook Decl. Ex. 1, pp. 148-49), wherein Enron stated, among other things, that its financial statements for 1997 through 2000 should not be relied upon.  (Cook Decl. Ex. 3, p. 2; see also Cook Decl. Ex. 1, pp. 101-02.)  Mr. Bobbs said that by doing so, these entities "may have actually generated proceeds from investments after this 8-K was produced ... [and] may have sold so much more stock than we bought bonds that we didn't spend any money investing in Enron Corp." (See Cook Decl. Ex. 1, p. 119.)

## V.   Staro's Role in Managing This Litigation

Staro's designated management witness repeatedly testified to ignorance of the proceedings in this action:

> Q:    Have [Staro's in-house attorneys] ever attended any hearings in this case, to your knowledge?
> A:    I do not know the answer to that.
> Q:    Do you know how frequently they speak to your attorneys?
> A:    No, I do not.
> Q:    Do you know how frequently they speak with ... Milberg, Weiss?
> A:    No, I do not.
> Q:    Do you know how frequently they speak with [Lead Plaintiff] about the overall progress of the litigation?
> A:    I do not know the answer.
> Q:    Do you know if there's ever been a meeting among the clients that are seeking to be appointed class representatives here to coordinate overall strategy for the pursuit of the case?
> A:    I do not know.
> ******

Q:     Are you aware that a mediation was ordered by Judge Harmon?
A:     I was not aware of that, no.
Q:     Did any representatives of Staro attend the mediation?
A:     I do not know.
******
Q:     Would it surprise you to learn that mediation presentations have –
       at least written papers have already been presented?
A:     I don't know what to say to that.  I don't know if I would be
       surprised or not.  I guess not.  I don't know.
Q:     [D]o you know what, if any, input Staro gave to Bill Lerach and
       Milberg, Weiss about the position that ought to be taken on behalf
       of the zero coupon note holders with regard to a settlement?
A:     No, I do not know.

(Cook Decl. Ex. 1, pp. 187-89.)

Mr. Bobbs stated that he left the litigation decision-making to his attorneys; for example,

he admitted that he had not read the papers on Staro's application for Lead Plaintiff status.  After

reviewing portions of these documents, which he saw for the first time at his deposition (see id.,

p. 143), Mr. Bobbs actually expressed disagreement with some of their key points:

Q:     Have you told [Judge Harmon] in any filing that you think the
       interests of bondholders cannot be represented by people that hold
       equity because there is a conflict of interest between the two?
A:     I'm not exactly sure of all the legal documents that we've filed
       with Judge Harmon.
Q:     Do you think that's true … that the interests of debt and equity
       holders are in conflict in this case?
A:     I don't believe that's true.
******
Q:     And [you] certainly wouldn't have thought it appropriate for your
       lawyers to say anything like that on your behalf?
A:     I can't answer that, but I don't think it's true that equity and debt
       holders have conflicts as it relates to this case.  We were all
       defrauded.
Q:     [H]ad you known your lawyers were going to take that position
       [that equity and debt holders had conflicting interests], what would
       your reaction have been?
A:     Don't know.
Q:     Did you authorize your lawyers to take the position that the
       interests of debt holders and equity holders were in conflict in this
       case?
A:     I don't believe I authorized our lawyers to do anything.

> Q:    Did someone at Staro authorize them to take that position?
> A:    I don't know.
> Q:    Did someone at Staro authorize the lawyers to take that position in
>       order to argue for a separate debt-only class?
> A:    I do not know.

(Id., pp. 139-41 (emphasis added).)

Mr. Bobbs also testified that, prior to his deposition, he had never seen Professor Feinstein's Declaration in support of Staro's Lead Plaintiff application (Cook Decl. Ex. 7). (See Cook Decl. Ex. 1, p. 202.) He stated that he could only "assume" someone at Staro had read it prior to filing, but did not know. (Id., p. 203.) When specifically asked about Prof. Feinstein's statement that "[c]ertain factors, events, and misrepresentations that may cause bonds to lose value actually cause stocks to rise in value" (Cook Decl. Ex. 7, p. 2, ¶ 2(c)), Mr. Bobbs testified:

> I can think of no example off the top of my head – and, again, I haven't thought – I've thought about it since you've just pointed it out – where there would be certain factors and events and misrepresentations that would cause bonds to lose value and simultaneously cause stocks to rise in value as it relates to a specific company.  If that's what he's saying here, I disagree with this.

(Cook Decl. Ex. 1, p. 204 (emphasis added).)

## ARGUMENT AND AUTHORITIES

### I.    The Applicable Standards

Rule 23(a)(4) requires that a proposed class representative must be able to "fairly and adequately protect the interests of the class."[5]  FED. R. CIV. P. 23(a)(4).  The Fifth Circuit has stressed that the class representative has the burden of establishing compliance with Rule 23(a)(4)'s elements, including adequacy, see Stirman v. Exxon Corp., 280 F.3d 554, 563

---

[5]    This memorandum does not address the adequacy of proposed class representatives other than Staro or the other requirements of Rule 23.

(5th Cir. 2002); Berger v. Compaq Computer Corp., 257 F.3d 475, 479 n.4 (5th Cir. 2001), reh'g

en banc denied, 279 F.3d 313 (5th Cir. 2002); see also In re Enron Corp. Sec. Litig., 206 F.R.D.

427, 441 (S.D. Tex. 2002) (Harmon, J.), and that the district court is to carry out a "sufficiently

'rigorous' analysis" of a plaintiff's purported adequacy under Rule 23(a)(4).  Stirman, 280 F.3d

at 563.  The class representative must be able and willing to participate actively and control the

litigation.  Id. at n.7 (citing Horton v. Goose Creek Indep. Sch. Dist., 690 F.2d 470, 484 (5th Cir.

1982), cert. denied, 463 U.S. 1207 (1983)).

Further, these standards reflect "the constitutional dimensions of the adequacy

requirement, which implicates the due process rights of all members who will be bound by the

judgment," Berger, 257 F.3d at 481, since "the Due Process Clause of course requires that the

named plaintiff at all times adequately represent the interests of the absent class members."

Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 812 (1985).  Additionally, "the adequacy inquiry

also 'serves to uncover conflicts of interest between the named plaintiffs and the class they seek

to represent.'"  Id. at 479-80 (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625

(1997)).  By these standards, Staro clearly is not an adequate class representative.

## II.    Staro's Attempt to Mislead This Court in Its Lead Plaintiff
##        Application Should Disqualify It as a Class Representative

It is clear that "[t]o judge the adequacy of representation, courts may consider the honesty

and trustworthiness of the named plaintiff."  Savino v. Computer Credit Inc., 164 F.3d 81, 87

(2d Cir. 1998).  Parties seeking to become class representatives must adhere to a high standard of

candor and integrity.  See Byes v. Telecheck Recovery Servs., Inc., 173 F.R.D. 421, 428-29

(E.D. La. 1997); Smyth v. Carter, 168 F.R.D. 28, 33-34 (W.D. Va. 1996).

In its prior application to be appointed Lead Plaintiff, Staro made representations that

were admittedly false.  Staro asserted that it invested only in Enron debt securities, which

resulted in a $40 million loss.  (Cook Decl. Ex. 6, p. 1.)  Staro claimed $0 for equity losses and argued that its "Section 11 claims on behalf of debt securities investors cannot be represented by common stock purchasers" (id., p. 7 (emphasis in original)), notwithstanding its unrevealed purchase of Enron stock.  Staro also failed to disclose that it employed a convertible arbitrage strategy, fundamental to which were short sales of Enron common stock.

But at his deposition, Staro's designated management witness detailed how Staro purchased substantial interests in Enron's equity securities.   He explained that Staro simultaneously purchased both common stock and the Zero Coupon Notes to "reduc[e] the risk of purchasing [the Zero Coupon Notes] by selling [short ... Enron] stock" (Cook Decl. Ex. 1, p. 105), and how Staro "[was] luckily able to offset that [$40 million loss] by about half through our investments in the equity." (Id., p. 172.)  However, he could not explain why this $20 million "offset" had not been disclosed to the Court, stating only that "[i]t [was] a legal issue between and among our attorneys." (Id., p. 184.)  Thus, by depicting itself in the Lead Plaintiff application merely as a debt investor and patently misrepresenting its losses to this Court, Staro disguised the true nature of both its Enron investments and the amount of its claims against Enron directors and officers.  This lack of candor should disqualify Staro from becoming a class representative.

Further concern about Staro's candor is raised by:  1) its failure to disclose to the Court that it was not the actual purchaser of any Enron securities; and 2) its failure to inform the actual purchasers – i.e., its own limited partners, to which Staro is a fiduciary – of the extent of its Enron losses and its decision to file this lawsuit.  (See id., pp. 89-90.)  Mr. Bobbs conceded that he "[didn't] believe" Staro obtained its limited partners' consent before filing suit and admitted

that "we didn't go out of our way to let any of [them] know how much we made or lost in Enron." (Id., p. 185.)

Even if Staro may seek to explain away or mitigate its apparent lack of candor, it still should be deemed an inadequate class representative. The Court need not finally resolve the challenges to Staro's credibility at this stage; the mere fact that Staro faces these issues renders it an inadequate class representative. "The district court cannot be expected to resolve the credibility issue but rather need only determine that evidence on the record shows that plaintiff's credibility is vulnerable to attack." Zandman v. Joseph, 102 F.R.D. 924, 933 (N.D. Ind. 1984) (citing Kline v. Wolf, 702 F.2d 400 (2d Cir. 1983)).

The patent omissions and misleading representations in Staro's Lead Plaintiff application and the contradictory testimony of its designated management witness raise serious questions about Staro's honesty, trustworthiness, and credibility. The Court therefore should not appoint Staro as class representative.

## III.     Staro is Not an Adequate Class Representative Because It is Subject to Unique Defenses

### A.     Lack of Standing

Inquiring into Staro's standing at this stage of the litigation is proper. "'Standing is an inherent prerequisite to the class certification inquiry.'" Rivera v. Wyeth-Ayerst Labs., 283 F.3d 315, 319 (5th Cir. 2002) (quoting Bertulli v. Independent Ass'n of Cont'l Pilots, 242 F.3d 290, 294 (5th Cir. 2001)). At a minimum, "a class representative must be part of the class." Amchem Prods., 521 U.S. at 625; East Texas Motor Freight Sys. v. Rodriquez, 431 U.S. 395, 403 (1977); Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 216 (1974); Payne v. Travenol Labs., Inc., 565 F.2d 895, 898-99 (5th Cir.), cert. denied, 439 U.S. 835 (1978). "'A litigant must be a member of the class which he or she seeks to represent at the time the class action is

certified by the district court.'" <u>James</u> v. <u>City of Dallas</u>, 254 F.3d 551, 562 (5th Cir. 2001), <u>cert.</u>

<u>denied</u>, 534 U.S. 1113 (2002) (quoting <u>Sosna</u> v. <u>Iowa</u>, 419 U.S. 393, 403 (1975)).  Because Staro

has produced no evidence that it or any of its affiliates actually purchased any Enron securities,

Staro lacks standing.  For this reason also, the Court should find Staro inadequate as a class

representative.  "'It should be obvious that there cannot be adequate typicality between a class

and a named representative unless the named representative has individual standing to raise the

legal claims of the class.'"   <u>In re U.S. Liquids Sec. Litig.</u>, No. H-99-2785, 2002 U.S. Dist.

LEXIS 26714, at *16 (S.D. Tex. Apr. 29, 2002) (Harmon, J.) (quoting <u>Prado-Steinman ex rel.</u>

<u>Prado</u> v. <u>Bush,</u> 221 F.3d 1266, 1279 (11th Cir. 2000)).[6]

Here, in order to be part of the Section 11 class with respect to the Zero Coupon Notes,

Staro must show that it is a "person acquiring <u>such security</u>."   15 U.S.C. § 77k(a) (emphasis

added); <u>Rosenzweig</u> v. <u>Azurix Corp.</u>, 332 F.3d 854, 872 (5th Cir. 2003) (Section 11 action must

be brought by a person "who has acquired a security registered under the 1933 Act" (quoting

Louis Loss & Joel Seligman, <u>Fundamentals of Securities Regulation</u> 1150 (4th ed. 2001)).

Despite confirming that it produced all the Enron-related trading records in its possession (<u>see</u>

Cook Decl. Ex. 10), Staro produced no documents whatsoever showing that it ever owned any of

the Zero Coupon Notes.[7]   Staro itself did not even own a derivative interest keyed to the value of

_____

[6]     Two proposed class representatives in <u>U.S. Liquids</u> ultimately were accepted, <u>see</u> No. H-99-2785, 2002
U.S. Dist. LEXIS 26713, at *6-7 (S.D. Tex. June 12, 2002), upon submitting proof that they actually had
purchased the securities in question – which is precisely what Staro has failed to do here.

[7]     Assuming <u>arguendo</u> that Staro produces such documents in the future, this will not cure its inadequacy.
Fifth Circuit courts have held that "[f]ailure to cooperate in discovery may support a finding that class
representatives are inadequate."  <u>In re Ford Motor Co. Bronco II Prod. Liab. Litig.</u>, 177 F.R.D. 360, 367-68
(E.D. La. 1997) (finding named plaintiffs inadequate where over one-third failed to cooperate in discovery
and provided contradictory discovery responses undermining their reliability) (citation omitted); <u>see also</u> <u>In</u>
<u>re LTV Sec. Litig.</u>, 88 F.R.D. 134, 151-52 (N.D. Tex. 1980).  Thus, Staro's failure to produce key
documents bearing upon its standing could in itself render Staro an inadequate class representative.

the Notes – only its limited partners did.  (See Cook Decl. Ex. 1, pp. 85-86, 135-36.)  Thus, Staro's class standing remains at best in doubt, which renders it inadequate to represent the class. See In re Quarterdeck Office Sys., Inc. Sec. Litig., No. CV 92-3970-DWW, 1993 WL 623310, at *2-3 (C.D. Cal. Sept. 30, 1993) (declining to certify plaintiff as class representative where it offered only statistical probability that it had purchased registered shares).

On the present motion, the Court need not determine whether any unique defenses against Staro ultimately will succeed on the merits.  "[W]hether these defenses will be successful is of no matter.  The fact that plaintiff[] will be subject to such defenses renders [its] claims atypical of other class members." Landry v. Price Waterhouse Chartered Accountants, 123 F.R.D. 474, 476 (S.D.N.Y. 1989).  Instead, "the critical inquiry is whether [Staro's] energies will be spent defending against unique or atypical issues arising from" its Enron investments.  In re Firstplus Fin. Group, Inc. Sec. Litig., No. Civ.A.3:98-CV-2551-M, 2002 WL 31415951, at *5 (N.D. Tex. Oct. 28, 2002) (citing In re Enron Corp., 206 F.R.D. at 456; Landry, 123 F.R.D. at 476).  Thus, since the "'side issues' arising from" Staro's possible lack of standing "will be a significant distraction from [its] work for the class," id., which potentially "would prejudice absent class members," Landry, 123 F.R.D. at 476, Staro cannot adequately represent the class.

## B.    Hedgers/Arbitrageurs Like Staro Have Fundamentally Different Interests From Ordinary Investors

Staro's investment history and economic interests differ sharply from those of other investors which Staro seeks to represent in this litigation.  As noted above, Staro is a "multi-strategy [firm]" devoted to hedging and arbitrage. (Cook Decl. Ex. 1, p. 13.)  According to Brian Stark, "Our goal is to make money independent of the direction of the market" (Cook Decl., Ex. 11, p. 230 (emphasis added)), and "[we] are attempting to exploit temporary mispricings

between one security and another." (Id., p. 234.)  Stark himself has written about Staro's investment strategy:

> The power of the warrant hedge is already beginning to reveal itself.  In this example, the underlying common could rise to infinity or drop 40 percent in price, and the investor would not lose.  Anywhere between those *break-even points* the hedger would profit.  (emphasis in original) Quite a change from the usual "heads you win, tails you lose" aspect of normal stock investing.
> ******
> Success does not hinge upon the direction the stock moves, only upon *how far* it moves.

(Cook Decl., Ex. 12, pp. 54, 75 (emphasis added).)  These writings clearly show that Staro does not consider itself an "ordinary" investor – unlike the vast majority of class members whom Staro seeks to represent.

The peculiar interests and motivations of convertible arbitrageurs were discussed in Camden Asset Mgmt., L.P. v. Sunbeam Corp., No. 99-8275, 2001 U.S. Dist. LEXIS 11022 (S.D. Fla. July 3, 2001).  In Camden, a class of arbitrageurs – including Stark Investments, one of Staro's affiliated companies – sued Sunbeam and others for material misrepresentations contained in a zero-coupon note Offering Memorandum ("O.M.").  The court refused to certify the class, stating:

> It appears that a significant number of class members, extrapolating from discovery of the named representatives as well as several other class members, bought the debentures for particularized reasons (be it convertible arbitrage, hedging or flipping strategies) separate and apart from the O.M. representations about Sunbeam's 1996 and 1997 financial performance.

Id., at *55.  Due to the O.M.'s forward-looking statements and the unusual nature of the convertible bond market, the court ruled that "individualized treatment is necessary in terms of assessing why investors bought and sold these debentures and whether these investors lost money on their global Sunbeam investments (e.g., if they shorted Sunbeam common stock and

went long on the debentures)." <u>Id.</u>; <u>see also</u> <u>Koenig</u> v. <u>Benson</u>, 117 F.R.D. 330, 336 (E.D.N.Y. 1987) (finding that speculators who invest without regard to market information are inadequate and atypical class representatives).

Although <u>Camden</u> was not a Section 11 action, the court's analysis in that case is also applicable to the issue of materiality under Section 11. Particular information and events that clearly are material to traditional long side-only investors may not be material at all to hedgers and arbitrageurs. For example, to the ordinary investor in a security, the crucial concern is whether the value of that security goes up or down, whereas to the hedger/arbitrageur, as one of Staro's principals has noted, "[s]uccess does not hinge upon the direction the stock moves, only upon <u>how far</u> it moves." (Cook Decl. Ex. 12, p. 75 (emphasis in original).) Investors whose success or failure depends entirely on the direction of the market cannot adequately be represented by a plaintiff whose entire strategy is designed "to make money independent of the direction of the market." (Cook Decl. Ex. 11, p. 230.) Therefore, because Staro's position as a hedger and arbitrageur renders its claims atypical, it cannot adequately represent the ordinary investors.

> **1. Staro, as a Short Seller of Enron Stock, Cannot Adequately Represent Most Equity Investors**

Contrary to its earlier position in its prior Lead Plaintiff application, Staro now apparently seeks to represent equity as well as debt investors, asserting that its purchases of Enron equity as well as debt were an integral part of "an overall strategy." (Cook Decl. Ex. 1, p. 130.)[8] But, since Staro was primarily a short seller with respect to Enron's equity (<u>see</u> <u>id.</u>, p. 172), this latest

_____

[8]     Staro's designated management witness also testified that "we are in the – you know, the bigger claim," (Cook Decl. Ex. 1, p. 65), which he described as "the general claim that's representing all the security holders" (<u>id.</u>), and that "I think we have a claim on our entire investment in Enron." (<u>Id.</u>, p. 129.)

change in position involves a further conflict with most members of the class that Staro seeks to represent. Staro's designated management witness acknowledged that regarding a long and short investor, "the same market event [i]s going to have the direct opposite impact [on the two]." (Id., pp. 205-06.)

For example, the announcement of a major negative development concerning a company's business (e.g., a significant downward restatement of earnings) would normally cause a drop in the price of its stock. Ordinary long-side investors in the stock would be adversely affected, and could be expected to argue that they would not have purchased the stock (at least at that price) if the adverse information had been known. In contrast, an investor who had sold the stock short – in effect, gambling that the price would decline – actually would profit from the same development that injured the long investors. Thus, as Staro's witness acknowledged on deposition, Staro's unified convertible arbitrage strategy enabled it to "reduc[e] the risk of purchasing [the Zero Coupon Notes] by selling [short … Enron] stock." (Id., p. 105.) As a short seller of Enron stock, Staro actually profited to that extent when the share price dropped. (See id., p. 172.) Therefore, Staro logically had conflicting interests with ordinary Enron equity investors who purchased the stock hoping that it would rise. Given these competing interests, Staro cannot adequately represent the proposed class.

## 2. Staro's Trading Following Enron's November 2001 Disclosures

Staro modified its trading strategy in Enron securities following the public disclosures of November, 2001 (when Enron announced, among other things, that its financial statements for 1997 through 2000 could not be relied upon), combining its post-disclosure short sales with purchases at deeply discounted prices (see Cook Decl., Ex. 1, pp. 110-11), and apparently doing

so at a profit.  (See id., p. 124.)  While this type of event-driven arbitrage is somewhat different

from the convertible hedging strategy which Staro followed earlier,[9] it is equally atypical of the

class Staro seeks to represent.  The post-November 8 trades – on which Staro "more likely …

profited … than not" (id.) – clearly were not made pursuant to information in the Registration

Statement, upon which Staro bases its Section 11 claim, but which Enron had by then publicly

repudiated (see Cook Decl. Ex. 3, p. 2; Cook Decl. Ex. 1, p. 115).  See e.g., In re Enron Corp.,

206 F.R.D. at 455 (citing In re Party City Sec. Litig., 189 F.R.D. 91 (D.N.J. 1999)); Koenig, 117

F.R.D. at 335-336; Epstein v. American Reserve Corp., No. 79 C 4767, 1988 WL 40500, at *3-4

(N.D. Ill. Apr. 21, 1988); Kovaleff v. Piano, 142 F.R.D. 406, 407-408 (S.D.N.Y. 1992).  Thus,

Staro cannot adequately represent a class of investors whose claims are based on that

Registration Statement.

## IV.    Staro's Inadequacy is Further Demonstrated By Its Management's Ignorance of This Litigation and Its Abdication of Control to Its Lawyers

The Fifth Circuit has emphasized that the Rule 23(a)(4) standard of adequacy requires not

only zealous and competent counsel, but also a finding "that the proposed class representative is

willing and able to take an active role in controlling the litigation and protecting the absent class

members."  In re Firstplus Fin. Group, 2002 WL 31415951, at *6 (citing Berger, 257 F.3d at

479).  A class representative is inadequate if he has "so little knowledge of and involvement in

the class action that [he] would be unable or unwilling to protect the interests of the class against

the possibly competing interests of the attorneys."  Griffin v. GK Intelligent Sys., Inc., 196

F.R.D. 298, 301 (S.D. Tex. 2000) (holding proposed class representatives inadequate under

---

[9]    For a general description of the different varieties of arbitrage and hedging strategies followed by hedge funds, see Staff Report to the United States Securities and Exchange Commission, "Implications of the Growth of Hedge Funds" (September 2003) (Cook Decl. Ex. 14), pp. 33-43.

Rule 23(a)(4) where they failed to take supervisory role over lead counsel and neglected to participate in key litigation decisions or stay abreast of key litigation developments).   The witness representing Staro management professed ignorance about fundamental developments in the instant action and repeatedly indicated that his attorneys run the litigation.   For example, he admitted that: (1) he has "not specifically read the orders that [Judge Harmon has] issued.... That's something that I rely upon our in-house counsel, as well as our outside counsel ... to read" (Cook Decl. Ex. 1, p. 67); (2) he "[does not] remember who filed the amended complaint ... I don't recall looking at it.  It was something that our lawyers handled for the most part" (id., p. 95); and (3) he did not know why Staro did not apprise the Court of the $20 million offset, because again, "It [was] a legal issue between and among our attorneys." (Id., p. 184.)

Additionally, Mr. Bobbs claimed to know nothing about decisions concerning class certification issues – i.e., whether there even should be a debt-only class – stating that this was "more of an issue of discussion among the attorneys." (Id., p. 142.)  Moreover, he admitted that he never had seen Staro's Lead Plaintiff application papers nor authorized their filing.  (See id., pp. 141, 143, 202.)  In fact, after reviewing portions of these papers for the first time at his deposition, he disagreed with some of their main contentions.  (See supra, pp. 9-10.)  Mr. Bobbs also did not know whether Staro's in-house counsel ever attended court hearings (see Cook Decl. Ex. 1, pp. 187-89), and he did not know how often (if at all) in-house counsel consulted with outside counsel or with any other plaintiffs.  (Id.)  Such a complete abdication of responsibility is clearly incompatible with the requirements of Rule 23(a)(4).

## CONCLUSION

For the reasons stated above, Staro Asset Management, LLC's application to be appointed Class Representative should be denied.

Respectfully submitted,

By: _____

Ronald E. Cook
State Bar No. 04744800
S.D. ID No. 4143
1111 Bagby Street, Suite 2650
Houston, Texas 77002
Telephone: (713) 652-2031
Facsimile:  (713) 652-2029

ATTORNEY-IN-CHARGE FOR DEFENDANT,
ALLIANCE CAPITAL MANAGEMENT L.P.

OF COUNSEL:

COOK & ROACH, L.L.P.
1111 Bagby Street, Suite 2650
Houston, Texas 77002
Telephone:(713) 652-2800
Facsimile: (713) 652-2029

CLIFFORD CHANCE US L.L.P.
James N. Benedict
Mark A. Kirsch
James F. Moyle
Sean M. Murphy
Guy C. Quinlan
200 Park Avenue
New York, New York 10166-0153
Telephone:(212) 878-8000
Facsimile: (212) 878-8375

## CERTIFICATE OF SERVICE

This is to certify that on October 23, 2003, a true and correct copy of the Opposition of Defendant Alliance Capital Management L.P. to the Appointment of Staro Asset Management, LLC as Class Representative and Memorandum of Law in Support of Opposition was served on Staro's attorneys of record:  Sherrie R. Savett, Berger & Montague, P.C., 1622 Locust St., Philadelphia, Pennsylvania 19103; and lead counsel, G. Paul Howes, Milberg Weiss Bershad Hynes & Lerach LLP, 401 B St., Suite 1700, San Diego, California 92101; and all counsel of record, via posting to http://www.esl3624.com pursuant to the Court's August 7, 2002 Order Regarding Service of Papers and Notice of Hearings Via Independent Website.

Ronald E. Cook