

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MARK NEWBY, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| V. | § | Consolidated Lead No. H-01-3624 |
| | § | |
| ENRON CORP., ET AL., | § | |
| | § | |
| Defendants | | |

| | | |
|---|---|---|
| INVESTORS PARTNER LIFE INSURANCE | § | |
| COMPANY, JOHN HANCOCK LIFE INSURANCE | § | |
| COMPANY, and JOHN HANCOCK VARIABLE | § | |
| LIFE INSURANCE COMPANY, Individually and on | § | |
| Behalf of All Others Similarly Situated, | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| V. | § | Civil Action No. H-02-1364 |
| | § | |
| KENNETH L. LAY, et al. | § | |
| | § | |
| Defendants | | |

## AMENDED CLASS ACTION COMPLAINT FOR
## VIOLATIONS OF THE FEDERAL SECURITIES LAWS

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

COME NOW, Plaintiffs INVESTORS PARTNER LIFE INSURANCE COMPANY, JOHN

HANCOCK LIFE INSURANCE COMPANY (formerly John Hancock Mutual Life Insurance

Company), and JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY, individually and

on behalf of all others similarly situated, by its undersigned attorneys, for their complaint, allege as

follows:

### I.  NATURE OF THE ACTION

1.  This is an amended securities class action complaint filed on behalf of all persons who,

between October 19, 1998 and November 27, 2001, inclusive (the "Class Period"), purchased non-

publicly traded securities (collectively, the "Class Securities") that were (a) issued by Enron Corp.

28

("Enron") by Enron affiliates or by trusts or other issuers (collectively with Enron, "Enron Entities") and (b) that either (i) were secured or guaranteed, in whole or in part, directly or indirectly by Enron or by Enron's issuance of other Enron debt or preferred or equity securities, or which benefited from any such guarantee, including, without limitation, Enron performance guarantees or Enron payment guarantees that were issued in connection with securities or that were structured to be repaid, in whole or in part (including without limitation payments of dividends, yield or interest with respect to such Class Securities) from a stream of income generated by notes or by other securities or other payment obligations of Enron. The Class Securities do not include any securities which are included within the class definition in the Consolidated Action captioned *Amalgamated Bank, et al. v. Kenneth L. Lay, et al.*, Civil Action No. H-01-4198, filed in this court. Excluded from the Class are defendants, the officers and directors of Enron, members of their immediate families and their legal representatives, heirs, successors or assigns.

2.     Enron is engaged in the businesses of natural gas, electricity and communications on a wholesale and retail level. During the Class Period, defendants issued false financial statements and made false and misleading statements about Enron's financial results. A number of the Individual Defendants (as defined in paragraphs 11-12) also used various transactions for their own personal profit rather than for legitimate business purposes.

3.     The members of the Class purchased Class Securities during the Class Period in reliance on statements made by defendants concerning the financial health of Enron and in the belief that the underlying transactions were legitimate transactions that were entered into for legitimate purposes and that would be properly accounted for in Enron's financial statements.

4.     Beginning in late 2001, it was revealed that Enron would be restating its results for 1997, 1998, 1999 and 2000, and the first two quarters of 2001, to correct for errors which had inflated Enron's net income by $591 million in those years and which had understated the debt which should

have been reported on Enron's consolidated balance sheet. The impact of the restatement was enormous:

|  | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|
| Recurring Net Income<br>Amount of Overstatement | $96,000,000 | $113,000,000 | $250,000,000 | $134,000,000 |
| Debt<br>Amount of Understatement | $711,000,000 | $561,000,000 | $685,000,000 | $628,000,000 |
| Shareholders' Equity<br>Amount of Overstatement | $313,000,000 | $448,000,000 | $833,000,000 | $1,164,000,000 |

5.   Upon these disclosures, Enron's stock dropped to as low as $8.20 before closing at $8.41 on November 8, 2001, some 91% below the Class Period high of $90.75. Then, on November 28, 2001, it was revealed that the attempted acquisition of Enron by Dynegy Inc. would not close. Thereafter, Enron's debt was cut to junk bond status and its stock dropped to just $0.26 per share. The values of the Class Securities and of other Enron-related obligations dropped precipitously after the disclosures of these restatements and after subsequent disclosures regarding improper accounting and self-dealing by Enron officers.

## II.   JURISDICTION AND VENUE

6.   The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b), 78t(a) and 78t-1] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. §240.10b-5] and also under Texas state law.

7.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 and §27 of the Exchange Act.  15 U.S.C. §78aa.

8.  Venue is proper in this District pursuant to §27 of the Exchange Act, and 28 U.S.C. §1391(b). Enron maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

9.  In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

### III.  PARTIES

10. Plaintiff Investors Partner Life Insurance Company purchased, as a principal and/or agent with discretion, in excess of $3 million of Class Securities during the Class Period, at artificially inflated prices, as described in the certification filed with this Court, and has been damaged thereby. Plaintiff John Hancock Life Insurance Company purchased, as a principal and/or agent with discretion, in excess of $200 million of Class Securities during the Class Period, at artificially inflated prices, as described in the attached certification, and has been damaged thereby. Plaintiff John Hancock Variable Life Insurance Company purchased, as a principal and/or agent with discretion, in excess of $12 million of Class Securities during the Class Period, at artificially inflated prices, as described in the attached certification, and has been damaged thereby.

### A.   ENRON DEFENDANTS

11. Enron is not named as a defendant in this action as it is protected by the automatic stay pursuant to Chapter 11 of the U.S. Bankruptcy Code.

12. (a)  Defendant Kenneth L. Lay ("Lay") served at all times relevant hereto as a director of Enron and Chairman of the Board of Directors. Lay also served as Enron's Chief Executive Officer from 1986 until February 2001. During the Class Period, while defendants were causing Enron to make false statements and issue false financial results, Lay sold 1,810,793 shares of his Enron stock for insider trading proceeds of $101 million. Lay also received bonus payments of $14.1 million, in addition to his salary, for 1998, 1999 and 2000 based on Enron's false financial reports.

(b)     Defendant Jeffrey K. Skilling ("Skilling") served at all times relevant hereto as a director of Enron.  Skilling also served as Enron's President and Chief Operating Officer until February 2001, when he became Chief Executive Officer. Skilling resigned as President and Chief Executive Officer in August 2001. During the Class Period, while defendants were causing Enron to make false statements and issue false financial results, Skilling sold 1,119,958 shares of his Enron stock for insider trading proceeds of $66.9 million. Skilling also received bonus payments of $10.8 million, in addition to his salary, for 1998, 1999 and 2000 based on Enron's false financial reports.

(c)     Defendant Andrew S. Fastow ("Fastow") served as the Chief Financial Officer of Enron from 1998 until he was fired in October 2001. During the Class Period, while defendants were causing Enron to make false statements and issue false financial results, Fastow sold 561,423 shares of his Enron stock for insider trading proceeds of $30.4 million.

(d)     Defendant Richard A. Causey ("Causey") was, at all relevant times, Executive Vice President and Chief Accounting Officer of Enron.  Causey signed each Form 10-K and Form 10-Q issued during the Class Period. During the Class Period, while defendants were causing Enron to make false statements and issue false financial results, Causey sold 197,485 shares of his Enron stock for insider trading proceeds of $13.3 million.

(e)     Defendant James V. Derrick, Jr. ("Derrick") has been Executive Vice President and General Counsel of Enron since July 1999, and prior to that was Senior Vice President and General Counsel. During the Class Period, while defendants were causing Enron to make false statements and issue false financial results, Derrick sold 230,660 shares of his Enron stock for insider trading proceeds of $12.6 million.

(f)     Defendant Mark A. Frevert ("Frevert") has been Chairman and Chief Executive Officer of Enron Wholesale Services since June 2000, and Chairman and Chief Executive Officer of Enron Europe from March 1997 to June 2000. During the Class Period, while defendants

were causing Enron to make false statements and issue false financial results, Frevert sold 830,620 shares of his Enron stock for insider trading proceeds of $50.2 million. Frevert also received bonus payments of $4.3 million, in addition to his salary, for 1998, 1999 and 2000 based on Enron's false financial reports.

(g)     Defendant Stanley C. Horton ("Horton") was, at all relevant times, Chairman and Chief Executive Officer of Enron Transportation Services. During the Class Period, while defendants were causing Enron to make false statements and issue false financial results, Horton sold 734,444 shares of his Enron stock for insider trading proceeds of $45.4 million. Horton also received bonus payments of $2.9 million, in addition to his salary, for 1998, 1999 and 2000 based on Enron's false financial reports.

(h)     Defendant Kenneth D. Rice ("Rice") has been Chairman and Chief Executive Officer of Enron Broadband Services, Inc. since June 2000. Prior to that, Rice was Chairman and Chief Executive Officer of Enron Capital & Trade ("ECT")-North America from March 1997 until June 1999. During the Class Period, while defendants were causing Enron to make false statements and issue false financial results, Rice sold 1,138,370 shares of his Enron stock for insider trading proceeds of $72.7 million. Rice also received bonus payments of $3.9 million, in addition to his salary, for 1998, 1999 and 2000 based on Enron's false financial reports.

(i)     Defendant Richard B. Buy ("Buy") has been Executive Vice President and Chief Risk Officer of Enron since July 1999, Senior Vice President and Chief Risk Officer from March 1999 until July 1999, and Managing Director and Chief Risk Officer of ECT from January 1998 to March 1999. During the Class Period, while defendants were causing Enron to make false statements and issue false financial results, Buy sold 54,874 shares of his Enron stock for insider trading proceeds of $4.3 million.

(j)        Defendant Lou L. Pai ("Pai") was Chairman and CEO of Enron Accelerator, and prior to that Pai was a director of Enron Energy Services and was involved in structuring the transactions which were improperly accounted for at Enron.  During the Class Period, while defendants were causing Enron to make false statements and issue false financial results, Pai sold 5,031,105 shares of his Enron stock for insider trading proceeds of $353.7 million.

(k)        Defendant Robert A. Belfer ("Belfer") was, at all relevant times, a director of Enron.  During the Class Period, while defendants were causing Enron to make false statements and issue false financial results, Belfer sold 1,052,138 shares of his Enron stock for insider trading proceeds of $51 million.

(l)        Defendant Norman P. Blake, Jr. ("Blake") was, at all relevant times, a director of Enron.  During the Class Period, while defendants were causing Enron to make false statements and issue false financial results, Blake sold 21,200 shares of his Enron stock for insider trading proceeds of $1.7 million.

(m)        Defendant Ronnie C. Chan ("Chan") was, at all relevant times, a director of Enron.  During the Class Period, while defendants were causing Enron to make false statements and issue false financial results, Chan sold 8,000 shares of his Enron stock for insider trading proceeds of $337,200 million.

(n)        Defendant John H. Duncan ("Duncan") was, at all relevant times, a director of Enron.  During the Class Period, while defendants were causing Enron to make false statements and issue false financial results, Duncan sold 35,000 shares of his Enron stock for insider trading proceeds of $2.0 million.

(o)        Defendant Wendy L. Gramm ("Gramm") was, at all relevant times, a director of Enron.  During the Class Period, while defendants were causing Enron to make false statements and issue false financial results, Gramm sold 10,256 shares of her Enron stock for insider trading proceeds of $276,912.

(p)     Defendant Robert K. Jaedicke ("Jaedicke") was, at all relevant times, a director of Enron.  During the Class Period, while defendants were causing Enron to make false statements and issue false financial results, Jaedicke sold 13,360 shares of his Enron stock for insider trading proceeds of $841,438.

(q)     Defendant Charles A. LeMaistre ("LeMaistre") was, at all relevant times, a director of Enron.  During the Class Period, while defendants were causing Enron to make false statements and issue false financial results, LeMaistre sold 17,344 shares of his Enron stock for insider trading proceeds of $841,768.

(r)     Defendant Joe H. Foy ("Foy") was, at all relevant times, a director of Enron until June 2000. During the Class Period, while defendants were causing Enron to make false statements and issue false financial results, Foy sold 31,320 shares of his Enron stock for insider trading proceeds of $1.6 million.

(s)     Defendant Joseph M. Hirko ("Hirko") was, at all relevant times, Chief Executive Officer of Enron Broadband Services. During the Class Period, while defendants were causing Enron to make false statements and issue false financial results, Hirko sold 473,837 shares of his Enron stock for insider trading proceeds of $35.1 million.

(t)     Defendant Ken L. Harrison ("Harrison") was, at all relevant times, Chief Executive Officer of Portland General Electric (a subsidiary of Enron) until March 31, 2000, and was a director of Enron. During the Class Period, while defendants were causing Enron to make false statements and issue false financial results, Harrison sold 1,004,170 shares of his Enron stock for insider trading proceeds of $75.2 million.

(u)     Defendant Mark E. Koenig ("Koenig") was, at all relevant times, Executive Vice President, Investor Relations of Enron. During the Class Period, while defendants were causing Enron to make false statements and issue false financial results, Koenig sold 129,153 shares of his Enron stock for insider trading proceeds of $9.1 million.

(v)     Defendant Steven J. Kean ("Kean") has been Executive Vice President and Chief of Staff of Enron since 1999. During the Class Period, while defendants were causing Enron to make false statements and issue false financial results, Kean sold 64,932 shares of his Enron stock for insider trading proceeds of $5.1 million.

(w)     Defendant Rebecca P. Mark-Jusbasche ("Mark-Jusbasche") was a director of Enron until August 2000. During the Class Period, while defendants were causing Enron to make false statements and issue false financial results, Mark-Jusbasche sold 1,410,262 shares of her Enron stock for insider trading proceeds of $79.5 million.

(x)     Defendant Michael S. McConnell ("McConnell") was, at all relevant times, Executive Vice President, Technology of Enron.  During the Class Period, while defendants were causing Enron to make false statements and issue false financial results, McConnell sold 30,960 shares of his Enron stock for insider trading proceeds of $2.3 million.

(y)     Defendant J. Mark Metts ("Metts") was, at all relevant times, Executive Vice President Corporate, Development of Enron. During the Class Period, while defendants were causing Enron to make false statements and issue false financial results, Metts sold 17,711 shares of his Enron stock for insider trading proceeds of $1.4 million.

(z)     Defendant Cindy K. Olson ("Olson") was, at all relevant times, Executive Vice President, Human Resources of Enron.  During the Class Period, while defendants were causing Enron to make false statements and issue false financial results, Olson sold 83,183 shares of her Enron stock for insider trading proceeds of $6.5 million.

(aa)    Defendant Joseph W. Sutton ("Sutton") has been, at all relevant times, Vice Chairman of Enron until early 2001. During the Class Period, while defendants were causing Enron to make false statements and issue false financial results, Sutton sold 614,960 shares of his Enron stock for insider trading proceeds of $40 million.

13. The defendants referenced above in ¶¶11(a)-(aa) are referred to herein as the "Individual Defendants."

14. Lay, Skilling and Fastow are controlling persons of Enron due to their positions with Enron Notwithstanding the other Individual Defendants' positions with Enron pursuant to which they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects. Each of the Individual Defendants had material roles in the preparation or dissemination of the false statements and/or engaged in the unlawful practice of selling their Enron stock while in possession of undisclosed adverse information about Enron.

15. It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in Enron's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers and directors of Enron, by virtue of their current or former high-level positions with Enron, participated in the management of Enron, and was privy to confidential proprietary information concerning Enron and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.

16. The Individual Defendants, because of their positions of authority as officers and/or directors of Enron, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to Enron during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or to cause them to be corrected.

17. Certain of the Individual Defendants also caused Enron or Enron Entities to make these representations to purchasers of the Class Securities in connection with the issuance of Class Securities.

18. Each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

19. Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of the Class Securities by disseminating materially false and misleading statements and/or concealing material adverse facts.

20. During the Class Period, taking advantage of the inflation in Enron's stock caused by their misstatements, defendants sold the following amounts of their Enron stock:

| INSIDER | SHARES SOLD | PROCEEDS |
|---|---|---|
| Buy | 54,874 | $4,325,309 |
| Derrick | 230,660 | $12,656,238 |
| Fastow | 561,423 | $30,463,609 |
| Frevert | 830,620 | $50,269,504 |
| Horton | 734,444 | $45,472,278 |
| Lay | 1,810,793 | $101,346,951 |
| Rice | 1,138,370 | $72,786,034 |
| Skilling | 1,119,958 | $66,924,028 |
| Pai | 5,031,105 | $353,712,438 |
| Belfer | 1,052,138 | $51,080,967 |

| | | |
|---|---:|---:|
| Blake | 21,200 | $1,705,328 |
| Chan | 8,000 | $337,200 |
| Duncan | 35,000 | $2,009,700 |
| Gramm | 10,256 | $276,912 |
| Jaedicke | 13,360 | $841,438 |
| LeMaistre | 17,344 | $841,768 |
| Foy | 31,320 | $1,639,590 |
| Hirko | 473,837 | $35,168,721 |
| Harrison | 1,004,170 | $75,211,630 |
| Koenig | 129,153 | $9,110,466 |
| Kean | 64,932 | $5,166,414 |
| Mark-Jusbasche | 1,410,262 | $79,526,787 |
| McConnell | 30,960 | $2,353,431 |
| Olson | 83,183 | $6,505,870 |
| Metts | 17,711 | $1,448,937 |
| Sutton | 614,960 | $40,093,346 |
| **TOTAL:** | **$16,727,518** | **$1,064,604,637** |

**B.     ANDERSEN DEFENDANTS**

21. The various offices of Arthur Andersen LLP and Andersen Worldwide S.C.  described

below in ¶¶22(a)-(g) and the Andersen partners and employees described below in ¶¶208-209 are

collectively referred to as "Andersen."

22. The various offices of Arthur Andersen LLP and Andersen Worldwide S.C. described below in ¶¶22(a)-(g) and the Andersen partners and employees described below in ¶¶208-209 are collectively referred to as "Andersen."

23. (a) Defendant Andersen Worldwide S.C. ("Andersen-Worldwide" or "AWO") is comprised of Société Coopérative, Switzerland, a partnership organized under the Swiss Federal Code of Obligations ("AWSC"), the AWO member firms and the partners of AWSC. Andersen-Worldwide partners include more than 4,800 individuals from 390 offices in 84 countries. Various individuals who are partners of Andersen-Worldwide participated in the '97-'00 audits of Enron. Andersen-Worldwide and Arthur Andersen LLP dictate the policies and procedures to be used within Andersen throughout the world.

(b)     Defendant Andersen Co. ("Andersen-India") is part of Andersen-Worldwide. Andersen-India participated in the '97-'00 audits of Enron.

(c)     Defendant Arthur Andersen-Puerto Rico ("Andersen-Puerto Rico") is part of Andersen-Worldwide. Andersen-Puerto Rico participated in the '97-'00 audits of Enron.

(d)     Defendant Andersen LLP ("Andersen-Cayman Islands") is part of Andersen-Worldwide. Andersen-Cayman Islands participated in the '97-'00 audits of Enron.

(e)     Defendant Arthur Andersen-Brazil ("Andersen-Brazil") is part of Andersen-Worldwide. Andersen-Brazil participated in the '97-'00 audits of Enron.

(f)     Defendant Arthur Andersen ("Andersen-United Kingdom") is part of Andersen-Worldwide. Andersen-United Kingdom participated in the '97-'00 audits of Enron. Andersen-United Kingdom has been implicated in the document shredding indictment, indicating an awareness of possible wrongdoing in connection with work for Enron.

(g)     Defendant Arthur Andersen LLP ("Andersen-US") is part of Andersen-Worldwide. Andersen-US is a partnership formed under the laws of the State of Illinois.

The partners of Andersen-US are residents of numerous States.  Andersen-US participated in and coordinated the '97-'00 audits of Enron.  In addition, Andersen-US partners and employees provided consulting services to Enron.  Defendant Arthur Andersen, LLP ("Arthur Andersen") is an accounting an consulting firm and a member firm of Andersen Worldwide, S.C.  Arthur Andersen was engaged by Enron for many years to provide "independent" auditing, accounting and management consulting services, tax services, examination and review of filings with the SEC, audits and/or reviews of financial statements which were included in Enron's SEC filings, including audited and unaudited information, and annual reports. As a result of the myriad of services it rendered to Enron, Arthur Andersen personnel were present at Enron corporate offices and operations continuously during 1997-2001 and had continual access to and knowledge of Enron's private and confidential corporate information and business information. Arthur Andersen received over $100 million in audit and consulting fees during the Class Period, including $52 million in 2000 alone. Arthur Andersen's role in the fraud alleged herein is described herein.

24. John Does 1-100 are other member firms of Andersen Worldwide, S.C. who participated in the preparation of the Enron 1997-2001 audits.

## IV.   PLAINTIFFS' CLASS ACTION ALLEGATIONS

25. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who, between October 19, 1998 and November 27, 2001, inclusive (the "Class Period"), purchased non-publicly traded securities (collectively, the "Class Securities") that were (a) issued by Enron by Enron affiliates or by trusts or other issuers, and (b) that either (i) were secured or guaranteed, in whole or in part, directly or indirectly by Enron or by Enron's issuance of other Enron debt or preferred or equity securities, or (ii) which benefitted from any such guarantee, including, without limitation, Enron performance guarantees or Enron payment guarantees that were issued in connection with securities or that were

structured to be repaid, in whole or in part (including without limitation payments of dividends, yield or interest with respect to such Class Securities) from a stream of income generated by notes or by other securities or other payment obligations of Enron.  The Class Securities do not include any securities which are included within the class definition in the Consolidated Action captioned *Amalgamated Bank, et al. v. Kenneth L. Lay, et al.*, Civil Action No. H-01-4198, filed in this court. Excluded from the Class are defendants, the officers and directors of Enron, members of their immediate families and their legal representatives, heirs, successors or assigns.

26. The members of the Class are so numerous that joinder of all members is impracticable. The exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery.

27. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

28. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

29. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants during the Class Period misrepresented material facts about the business, operations and management of Enron; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

30. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. There will be no difficulty in the management of this action as a class action.

## V. BACKGROUND AND OVERVIEW

31. Enron is an Oregon corporation with its principal place of business at 1400 Smith Street, Houston, Texas. Enron is engaged in electricity, natural gas and communications businesses. Enron produces electricity and natural gas, develops, constructs and operates energy facilities worldwide and trades both physical commodities and financial derivatives.

32. Between 1993 and 1997, Enron principally engaged in the production and distribution of natural gas. The Company began a diversification program in 1997 which included making acquisitions and entering new businesses. As defendants promoted these opportunities and reported favorable financial results, Enron's publicly traded stock price began to increase, reaching $40 per share by mid-1999, and its financial results dramatically improved. The value of the Class Securities similarly rose. Throughout fiscal year 2000, the price of Enron stock publicly traded substantially increased – rising from $43.4375 per share on January 3, 2000 to $83.125 per share on December 29, 2000. During the Class Period, Enron maintained investment-grade credit ratings.

33. In early November 2001, Enron was forced to resolve its prior years' financial statements in respect of an improperly unconsolidated partnership known as Chewco. The restatement of Chewco as a fully consolidated entity for FY 1997-2000 had a material impact upon Enron's previously reported net income. It decreased Enron's reported net income by $28 million (out of $105 million) in 1997, by $133 million (out of $979 million) in 2000. It also increased Enron's actual debt by more than $500 million in each such year.

34. Enron's press release of October 16, 2001 further detailed the charge as follows: $287 million related to asset impairments recorded by Azurix Corp.; $180 million associated with the

restructuring of the Company's Broadband Services Division; $544 million related to losses associated with certain investments; and early termination during the third quarter of certain structured finance arrangements with a previously disclosed entity.

35. In response to the news that Enron would be eliminating more than $1 billion of shareholder equity and that it might impact the Company's credit rating, value of the Class Securities declined.

36. Then, on November 8, 2001, defendants announced that Enron would restate its results for 1997, 1998, 1999, 2000, and interim 2001, to include losses from other partnerships which should have been consolidated into Enron's results during those years pursuant to Generally Accepted Accounting Principles ("GAAP").

37. Subsequently, as the details about the magnitude of defendants' financial improprieties reached the market, defendants found it increasingly difficult to raise money for Enron. On November 20, 2001, Enron disclosed that it would have to pay some $9.15 billion in debt before it could complete its merger with Dynegy, money Enron didn't have.

38. Then, on November 28, 2001, Enron revealed that Dynegy had terminated the Enron acquisition. November 28, 2001 Standard & Poor's downgraded Enron's credit rating to B-, below investment grade. Enron has now filed for Chapter 11 bankruptcy and its stock is now trading at less than $0.50 per share. The value of the Class Securities has similarly diminished. Because of the inability of Enron to satisfy its financial guarantees and other support obligations with respect to the Class Securities, these securities have materially declined in value.

39. During the Class Period, defendants issued materially false and misleading statements concerning Enron's financial results and operations, while selling more than $1.1 billion worth of their own Enron shares at prices as high as $89 per share. During the Class Period, defendants materially misrepresented Enron's ability to perform pursuant to guarantees and other forms of credit

enhancement issued as part of the Class Securities, both through public statements and audited financial statements, and through disclosure documentation provided to purchasers of the Class Securities. Enron's financial condition was a material disclosure to each purchaser of Class Securities because each such purchaser directly relied upon Enron's audited financials in connection with its investment decision.

## VI.   THE ENRON DEFENDANTS' FRAUDULENT SCHEME AND WRONGFUL COURSE OF BUSINESS

40. On January 20, 1998, defendants caused Enron to announce its 1997 total year and fourth quarter results in a release which reported $105 million in net income.

41. In fact, these statements were false and misleading. Enron has now admitted its 1997 net income was actually $9 million, instead of the $105 million reported due to its failure to consolidate the results of two entities (Joint Energy Development Investments LP ("JEDI") and Chewco Investments, LP ("Chewco")) and due to the other accounting misstatements as described herein.

42. On March 31, 1998, Enron filed its 1997 Form 10-K with the SEC which was signed by defendants Lay, Skilling and Fastow. The Form 10-K included the financial results previously reported for 1997 and included a "Consolidated Balance Sheet" for "Enron Corp. and Subsidiaries." This Balance Sheet represented that Enron had debt of only $6.254 billion and shareholders' equity of $5.618 billion.

43. In fact, this Form 10-K was false and misleading and prepared in violation of GAAP and SEC rules, as described herein, due to Enron's failure to consolidate certain subsidiaries. Enron actually had debt of $6.965 billion, and its shareholders' equity was actually only $5.305 billion.

44. On January 19, 1999, defendants caused Enron to report its FY 1998 results in a press release which stated in part:

> Enron Corp. announced today a 16 percent increase in 1998 earnings per diluted share to $[1.01] from $[0.87] in 1997. Corresponding net

18

income increased 36 percent to $698 million from $515 million during the year....

"Across Enron, 1998 was an excellent year," said Kenneth L. Lay, Enron Corp. chairman and chief executive officer. "Our Wholesale Energy Operations and Services business led the company's growth during the year, achieving record levels both in volumes of energy marketed and in earnings.

"In addition to positive developments in our established businesses, Enron Energy Services has advanced to a fully developed business with broad new capabilities to provide energy outsourcing products to business customers across the nation," Lay said. "We have experienced a strong market reception and very successful contracting results, and we are very pleased about the prospects for this dynamic business.

"The operating success across Enron was reflected in an almost 40 percent shareholder return during the year, significantly above the very strong returns of the broader U.S. equity market," Lay said.

45. In fact, these 1998 results were materially false and misleading due to defendants' failure to cause Enron to include $107 million in losses incurred by partnerships which had improperly not been consolidated. Defendants have now caused (through a restatement) Enron to admit it was improper not to include these losses.

46. Subsequent to issuing its results, defendants, including Lay, Skilling and Fastow, caused Enron to host a conference for analysts and large investors at which it discussed Enron's 1998 results, its business and prospects. Prudential Securities later reported on the conference in a January 25, 1999 report by C. Coale:

At the conference, management stressed that 1999 would be a "momentum" year for the company, whereas 1998 was a "break out" year and 1997 a "transition" year. In its wholesale energy trading and financing subsidiary, Enron Capital & Trade (ECT), growth in the European markets is expected to continue to be exponential in gas and power marketing sales.

CIBC Oppenheimer also repeated defendants' statements in a January 25, 1999 report by William Hyler:

> Management appears to have the systems, personnel and, importantly, customer relationships, in place to maintain its leadership role in energy marketing, namely gas and power, for the foreseeable future.
>
> * * *
>
> Enron management sees greater profit opportunities in energy management outsourcing for commercial and industrial customers. To date management has indicated that strong market response is resulting in significant contract success. At year end 1998 total retail contracts stood at $3.8 billion. Management is targeting $8 billion by year-end 1999, a number which could prove conservative. Backlog of potential prospects now stands at $18 billion. Importantly, EES is expected to turn profitable by the fourth quarter.

47. On February 3, 1999, defendants caused Enron to file a form S-3/A Registration Statement offering of $1 billion in Debt Securities, Preferred Stock and Depositary Shares, and 27.6 million shares of its common stock. The Form S-3/A included Enron's recently reported results for fiscal year 1998.

48. On March 31, 1999, Enron filed its 1998 Form 10-K with the SEC which was signed by Lay, Skilling, Fastow and Causey. The Form 10-K included the financial results previously reported for 1998 and included a "Consolidated Balance Sheet" for "Enron Corp. and Subsidiaries." This balance sheet represented that Enron had debt of only $7.357 billion and shareholders' equity of $7.048 billion.

49. In fact, this Form 10-K was false and misleading and prepared in violation of GAAP and SEC rules, as described herein, due to Enron's failure to consolidate subsidiaries in which Enron had control. Enron actually had debt of $7.918 billion and its shareholders' equity was actually only $6.6 billion.

50. On April 13, 1999, defendants caused Enron to announce its first quarter 1999 results in a release which stated in part:

> Enron Corp. announced today that 1999 first quarter net income increased 18 percent to $253 million compared to $214 million in the

first quarter of 1998. Enron also reported earnings per diluted share of $[0.34] for the most recent quarter compared to $[0.33] a year ago....

"Our first quarter results reflect the continued strength of our worldwide energy businesses. Each region of our wholesale business continued to grow during the quarter in terms of both volumes of energy delivered and profitability. Also, during the quarter, Enron Energy Services added $1.7 billion of retail contracts, including several large, multi-location energy outsourcing agreements," said Kenneth L. Lay, Enron chairman and chief executive officer.

51. By this time Enron was becoming a favorite of the market. Its stock had increased from the $25 range at the beginning of the Class Period to above $35 per share. On May 7, 1999, Lehman Brothers issued a report on Enron raising its price target to $45. The report stated:

Multiple To Expand To High End Of Historical Range Based On Growing Evidence That 15% Growth Rate Is Sustainable, Returns Are Improving And Capital Intensity Is Dropping.

52. On June 9, 1999, J.P. Morgan initiated coverage of Enron with a report entitled "Initiating Coverage With A Buy: Size And Savvy Seize The Day." The report stated:

We see no other company in our universe that offers such impressive, sustainable, and controlled growth as Enron. Enron's core strengths include scale and scope, financial expertise, technological know-how, intellectual capital, and global presence and reach. In short, the company has the necessary skillset to compete and win in the global marketplace. Enron has become a builder of companies and markets.

53. On July 13, 1999, Enron announced its second quarter 1999 results in a release which stated in part:

Enron Corp. announced today a 29 percent increase in earnings for the second quarter of 1999 to $[0.27] per diluted share compared to second quarter 1998 results of $[0.21] per diluted share. Net income in the current quarter increased 53 percent to $222 million compared to $145 million in the prior year's quarter. Revenues were also up significantly in the second quarter of 1999 to $9.7 billion compared to $6.6 billion in the same period of 1998, a 47 percent increase.

* * *

"Enron's consistent earnings growth reflects the very strong market positions in all of our businesses. We have established unique

> networks in natural gas, electricity and, most recently,
> communications, that each have distinct advantages of scale and
> scope. Combining this strong market presence with our core skills
> and market knowledge, we are positioned to be the leading player in
> the largest and fastest growing markets in the world," said Kenneth L.
> Lay, Enron chairman and chief executive officer.

54. On July 23, 1999, defendants caused Enron to file a Form S-3 Registration Statement

pursuant to the offering of $225 million in exchangeable notes. The Form S-3 represented that Enron

had net income on common stock of $122 million in the first quarter 1999, $203 million in 1998 and

$105 million in 1997. Enron has now admitted these results were materially false and misleading as

described herein. The Form S-3 was signed by (or on behalf of) Causey, Lay, Fastow, Belfer, Blake,

Chan, Duncan, Foy, Gramm, Harrison, Jaedicke, LeMaistre, Mark-Jusbasche and Skilling.

55. On October 12, 1999, defendants caused Enron to announce its results for the third

quarter of 1999 in a press release which stated in part:

> Enron Corp. announced today a 33 percent increase in net income to
> $223 million for the third quarter of 1999, compared to $168 million
> in the third quarter of 1998. Enron also announced a 13 percent
> increase in earnings per diluted share to $0.27 for the most recent
> quarter, compared to $0.24 a year ago....
>
> "The scale and scope of Enron's wholesale businesses provide
> tremendous competitive advantages in the rapidly growing,
> deregulating energy markets, enabling Enron to consistently achieve
> strong earnings growth. Our new retail energy network has similar
> operating advantages and continues to exceed our own expectations
> both for signing long-term outsourcing contracts and for
> profitability," said Kenneth L. Lay, Enron chairman and chief
> executive officer.

56. On January 18, 2000, defendants caused Enron to issue a press release announcing its

financial results for the fourth quarter of 1999 and fiscal year 1999. The Company reported that for

fiscal 1999 it earned $957 million and had revenues of $40 billion. Defendant Lay commented on the

results, stating in pertinent part as follows:

> "Our strong results in both the fourth quarter and full year 1999
> reflect excellent performance in all of our operating businesses.... In

22

addition, Enron continues to develop innovative, high-growth new businesses that capitalize on our core skills, as demonstrated by the early success of our new broadband services business. Overall, a great year – one in which our shareholders received a total return of 58 percent."

57. In fact, defendants have now caused Enron to admit that its 1999 results were false and misleading since it failed to include $153 million in losses from its JEDI and Chewco Partnerships and $95 million in losses from a subsidiary (LJM Cayman LP ("LJM1")), which, pursuant to GAAP, should have been consolidated into Enron's financial statements, as described below.

58. On March 30, 2000, defendants caused Enron to file its 1999 Form 10-K with the SEC which was signed by Lay, Skilling, Fastow and Causey. The Form 10-K included the financial results previously reported for 1999 and included a "Consolidated Balance Sheet" for "Enron Corp. and Subsidiaries." This balance sheet represented that Enron had debt of only $8.152 billion and shareholders' equity of $9.57 billion.

59. In fact, this Form 10-K was false and misleading, and prepared in violation of GAAP and SEC rules, as described below, due to Enron's failure to consolidate certain subsidiaries. Enron actually had debt of $8.837 billion and its shareholders' equity was actually only $8.736 billion.

60. On April 4, 2000, defendants caused Enron to file a Form S-3 Registration Statement for the registration of $4.9 million shares of its stock for sale by a shareholder. The Form S-3 incorporated by reference Enron's 1999 Form 10-K which contained Enron's 1999 results. Defendants have now admitted these results were materially false and misleading as described below. The Form S-3 was signed by (or on behalf of) Causey, Lay, Fastow, Belfer, Blake, Chan, Duncan, Foy, Gramm, Harrison, Jaedicke, LeMaistre, Mark-Jusbasche and Skilling.

61. On April 12, 2000, defendants caused Enron to issue a press release announcing its financial results for the first quarter of 2000, the period ending March 31, 2000. Enron reported net

income of $338 million, or $0.40 per share, and revenues of $13.1 billion.  Defendants have now admitted these results were materially false and misleading as described below.

62. On July 19, 2000, defendants caused Enron to file a Form S-3 Registration Statement for the offering of $1 billion in Debt Securities, Preferred Stock and Depositary Shares. The Form S-3 incorporated by reference Enron's 1999 Form 10-K containing its 1999 results. Defendants have now admitted these results were materially false and misleading as described below.  The Form S-3 was signed by (or on behalf of) Causey, Lay, Fastow, Belfer, Blake, Chan, Duncan, Gramm, Harrison, Jaedicke, LeMaistre, Mark-Jusbasche and Skilling.

63. On July 24, 2000, defendants caused Enron to issue a press release announcing its financial results for the second quarter of 2000, the period ending June 30, 2000. Enron reported net income of $289 million, or $0.34 per share, and revenues of $16.9 billion for the second quarter. Defendant Lay described these results as "another excellent quarter" and highlighted that Enron broadband had recently executed "an exclusive, 20-year, first-of-its-kind contract with Blockbuster to stream on-demand movies." The press release further reported that Enron broadband had executed $19 million of new contracts.

64. On October 17, 2000, defendants caused Enron to issue a press release announcing its financial results for the third quarter of 2000, the period ending September 30, 2000. Enron reported net income of $292 million, or $0.34 per share, and revenues of $30 billion. Defendant Lay commented on the results stating in pertinent part as follows:

> "Enron delivered very strong earnings growth again this quarter, further demonstrating the leading market positions in each of our major businesses .... We operate in some of the largest and fastest growing markets in the world, and we are very optimistic about the continued strong outlook for our company."

65. On January 22, 2001, defendants caused Enron to issue a press release announcing its financial results for the fourth quarter of 2000 and fiscal year 2000, the period ending December 31,

2000. Enron reported earnings of $0.41 per share for the fourth quarter of 2000. Defendant Lay commented on the results stating in pertinent part as follows:

> "Our strong results reflect breakout performances in all of our operations .... Our wholesale services, retail energy and broadband businesses further expanded their leading market positions, as reflected in record levels of physical deliveries, contract originations and profitability. Our shareholders had another excellent year in 2000, as Enron's stock returned 89 percent, significantly in excess of any major investment index."

66. In fact, defendants have now admitted that Enron's 2000 financial results were materially misstated as it failed to record $91 million in losses from its JEDI and Chewco partnerships and $8 million in losses from its LJM1 subsidiary. Defendants have now also admitted that they failed to cause Enron to make some $33 million in proposed audit adjustments to correct its financial statements.

67. On January 30, 2001, defendants caused Enron to issue a press release announcing that it had priced a private offering of 20-year zero coupon convertible senior debt securities, raising $1.25 billion.

68. On April 2, 2001, defendants caused Enron to file its 2000 Form 10-K with the SEC which was signed by Lay, Skilling, Fastow and Causey.

69. In fact, this Form 10-K was false and misleading and prepared in violation of GAAP and SEC rules, as described below, due to Enron's failure to consolidate certain of its subsidiaries. Enron actually had debt of $10.857 billion and its shareholders' equity was actually only $10.306 billion. The Form 10-K also overstated Enron's assets by $172 million due to improper accounting, beginning in the second quarter 2000, from a transaction in which Enron issued common stock in exchange for a note receivable and increased assets by this amount. In fact, this should have been treated as a reduction in shareholders' equity pursuant to GAAP and SEC regulations.

70. On April 17, 2001, defendants caused Enron to issue a press release announcing its financial results for the first quarter of 2001, the period ending March 30, 2001. Enron reported earnings per share of $0.47. Defendant Skilling commented on the results, stating in pertinent part as follows:

> "Enron's wholesale business continues to generate outstanding results. Transaction and volume growth are translating into increased profitability .... In addition, our retail energy services and broadband intermediation activities are rapidly accelerating."

71. In May 2001, *The Wall Street Transcript* published an interview with defendant Frevert. During this interview, Frevert stated:

> As we move forward in time, we would expect to enhance that growth rate by virtue of some of these new industries and new businesses that we're trying to develop. Over the next year or two, these new businesses should begin to generate significant earnings. With this in mind, I'd look for continued growth rates in our underlying volumes in the 25%-30% range, and an earnings growth in the 20%-plus range.
>
> * * *
>
> We think, clearly, we're undervalued at today's price. We've fallen back fairly significantly in line with a lot of the other companies due to the recent market corrections, which we think were overdone. If you look at some of the analyst projections and target prices over the next 12-18 months, more companies have Enron targeted somewhere between $90 and $110 a share. So we think that at these prices it's a bargain.

72. On July 12, 2001, defendants caused Enron to issue a press release announcing its financial results for the second quarter of 2001, the period ending June 30, 2001. The Company reported diluted earnings of $0.45 per share.

73. On July 25, 2001, *Bloomberg Business News* reported that at a meeting with analysts, defendant Skilling stated that Enron would meet or beat its profit projections. The article stated in pertinent part:

"We will hit those numbers, and we will beat those numbers," Skilling told a meeting of analysts and investors in New York....

Analysts have also cited concern about unpaid power bills by Enron customers in California and India, and losses by Enron's broadband trading unit, which may hurt Enron's profits.

"All of these are bunk," Skilling said. "These are not issues for this stock."

74. On August 14, 2001, defendants caused Enron to issue a press release announcing that defendant Skilling had resigned his positions at the Company.  According to a report carried by *Bloomberg Business New*s, on August 17, 2001, after the announcement of defendant Skilling's resignation, defendant Lay met with investors and analysts "to calm fears that the Company may be hiding dire financial news." The article quoted an analyst from UBS Warburg as stating: "'Ken met with us to reassure us that there is nothing wrong with the company .... There is no other shoe to fall, and no charges to be taken.'"

75. The statements referenced above, were each materially false and misleading when made as they misrepresented and/or omitted the following adverse facts which then existed and disclosure of which was necessary to make the statements made not false and/or misleading, including that:

(a) Enron's operating results were materially overstated as a result of Enron failing to timely write down the value of its investments with LJM1 and LJM2 Co-Investment LP ("LJM2");

(b) Enron's operating results were misstated due to defendants' failure, in violation of GAAP, to consolidate certain partnerships and subsidiaries which had lost hundreds of millions of dollars and which losses should have been (but were not) recorded on Enron's financial statements as described above;

(c) Defendants had caused Enron to fail to write down impaired assets on a timely basis in accordance with GAAP as described above; and

(d)      Enron's assets were overstated in 2000 and 2001 by up to $1 billion due to the improper accounting for a note received in exchange for stock.

76. On October 16, 2001, Enron surprised the market by announcing that Enron was taking non-recurring charges of $1.01 billion after-tax, or ($1.11) loss per diluted share, in the third quarter of 2001, the period ending September 30, 2001. Defendant Lay commented on the substantial charge, stating:

> "After a thorough review of our businesses, we have decided to take these charges to clear away issues that have clouded our performance and earnings potential of our core energy businesses ...."

77. The press release further detailed the charge as follows: $287 million related to asset impairments recorded by Azurix Corp.; $180 million associated with the restructuring of Enron's Broadband Services Division; $544 million related to losses associated with certain investments; and early termination during the third quarter of certain structured finance arrangements with a previously disclosed entity.

78. On November 8, 2001, Enron filed a Form 8-K disclosing a massive restatement of its results for 1997 through 2001. The restatement resulted in additional losses of $396 million being recorded for unconsolidated partnerships JEDI and Chewco and $103 million in unconsolidated losses for the LJM1 subsidiary and $92 million in losses which should have been recorded in prior periods but were not. Enron also corrected its accounting for notes received in exchange for common stock to net the notes against shareholders' equity.

79. Upon these disclosures, Enron's publicly traded stock declined to as low as $8.20 before closing at $8.41 on November 8, 2001, some 91% below the Class Period high of $90.75. Similarly, the Class Securities decreased in value upon those disclosures. Thereafter, on November 9, 2001, Enron announced that it would be acquired for approximately $22 billion in stock and assumed debt by Dynegy. Within 11 days, however, investors were again stunned when it was disclosed that:

- Enron's fourth quarter 2001 results would be hurt by lost business; and

- Enron might run out of cash before it could complete the merger with Dynegy.

80. Then, on November 28, 2001, Dynegy issued a press release which stated: Dynegy Inc. today reported that it has terminated its previously announced merger agreement with Enron Corp. The company cited Enron's breaches of representations, warranties, covenants and agreements in the merger agreement, including the material adverse change provision.

81. On this news, it became clear that Enron was headed for bankruptcy. The value of the Class Securities similarly headed downward. On December 2, 2001, Enron – which had been trading at more than $90 per share just 14 months before, giving the Company a market capitalization of more than $70 billion – filed for bankruptcy.

## VII.   FALSE FINANCIAL STATEMENTS

82. In order to overstate its net income and earnings per share during the Class Period, the defendants caused the Company to violate GAAP and SEC rules by failing to consolidate entities which, pursuant to GAAP, were required to be consolidated into Enron's financial statements and which entities were incurring hundreds of millions of dollars in losses and should have reduced Enron's earnings. Enron also improperly accounted for common stock issued to a related-party entity which should have been treated as a reduction to shareholders' equity but was accounted for as a note receivable. Enron has also admitted to not recording an aggregate of $478 million from 1997 to 2000 in proposed audit adjustments and reclassifications to shareholders' equity which Enron chose not to make until the end of the Class Period. Enron also failed to record, on a timely basis, required write-downs for impairment in the value of Enron's content services business, and for the impairment in the value of Enron's interest in The New Power Company, and its broadband and technology investments.

83. Enron has now admitted that these results were false and improperly reported and has restated the results. The scope and size of the restatement is enormous:

|  | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|
| Recurring Net Income<br>Amount of Overstatement | $96,000,000 | $113,000,000 | $250,000,000 | $134,000,000 |
| Debt<br>Amount of Understatement | $711,000,000 | $561,000,000 | $685,000,000 | $628,000,000 |
| Shareholders' Equity<br>Amount of Overstatement | $313,000,000 | $448,000,000 | $833,000,000 | $1,164,000,000 |

84. Enron reported the following financial results prior to and during the Class Period:

|  | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|
| Recurring Net Income | $515 M | $698 M | $957M | $1.27 B |
| Total Assets | $22.5 B | $29.4 B | $33.4 B | $65.5 B |
| Debt | $6.25 B | $7.36 B | $8.15 B | $10.23 B |
| Shareholders' Equity | $5.62 B | $7.05 B | $9.57 B | $11.47 B |

|  | 3/31/01 | 6/30/01 | 9/30/01 |
|---|---|---|---|
| Recurring Net Income | $406 M | $404 M | $393 M |
| Total Assets | $67.3 B | $63.4 B |  |
| Shareholders' Equity | $11.73 B | $11.74 B |  |

85. Enron included these results in press releases and in SEC filings, including Form 10-Qs for the interim results and Form 10-Ks for the annual results. The SEC filings represented that the financial information was a fair statement of its financial results and that the results were prepared in accordance with GAAP. Those results were also used to market the Class Securities to members of the Class.

86. These representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information "a fair presentation" of Enron's operations due to Enron's improper accounting for its subsidiaries and its improper accounting for investments in broadband and content services business, causing the financial results to be presented in violation of GAAP and SEC rules.

87. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. §210.4-01(a)(1)), states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

88. Moreover, pursuant to §13(b)(2) of the Exchange Act, Enron was required to:

> (A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

> (B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

>> (i) transactions are executed in accordance with management's general or specific authorization;

>> (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles ....

## A.   ENRON'S FAILURE TO CONSOLIDATE SUBSIDIARIES AND SPECIAL PURPOSE ENTITIES

89. GAAP, as set forth in Accounting Research Bulletin ("ARB") No. 51 and as amended by FASB Statement of Financial Accounting Standards ("SFAS") No. 94, requires consolidation of all

majority-owned subsidiaries unless control is temporary or does not rest with the majority owner. ARB No. 51, ¶1, states in part:

> There is a presumption that consolidated statements are more meaningful than separate statements and that they are usually necessary for a fair presentation when one of the companies in the group directly or indirectly has a controlling financial interest in the other companies.

90. GAAP provides that certain qualifying Special Purpose Entities ("SPE") do not have to be consolidated. SFAS No. 125 sets forth criteria for a qualifying SPE that must be met, including that it is a legal entity whose activities are limited by legal documents establishing the SPE to: (i) hold title to transferred assets; (ii) issue beneficial interests; (iii) collect cash proceeds from the assets and reinvest or distribute to holders of interests; and (iv) distribute proceeds to holders. It also must have standing apart from the transferor. SFAS No. 125, ¶26. *See also* FASB Emerging Issues Task Force Abstracts ("EITF") Nos. 96-20 and 96-21.

91. Prior to and during the Class Period, Enron formed partnerships and other entities to buy Enron assets with borrowed funds. These entities were purportedly qualifying SPEs such that consolidation of their losses and debt on Enron's financial statements was not required.

92. One entity which should have been consolidated was Chewco. Chewco was formed in 1997 with about $400 million in financial backing to buy interests in unnamed Enron assets, and was run by Michael Kopper, a managing director of Enron's Global Equity Markets Group. Enron then formed a limited partnership named Joint Energy Development Investments ("JEDI") in which Chewco was an investor. As a result of this disqualifying relationship with Chewco, JEDI also failed to be a qualifying SPE. Nevertheless, in order to keep the losses from these entities and the debt attributed to these entities off Enron's financial statements, defendants caused Enron to not consolidate these entities.

93. As a result, Enron failed to record losses from these two entities and debt attributed to these two entities by the following amounts:

|  | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|
| Unrecorded Losses | $28M | $1337M | $153M | $91M |
| Unrecorded Debt | $711M | $561M | $685M | $628M |

94. During the Class Period, Enron used the LJM1, LJM2, Chewco and JEDI partnerships to engage in transactions in which Enron assets were purchased at inflated prices. Enron did not properly account for such transactions or for the liabilities associated with Enron's guarantees and for Enron's issuances of debt and equity interests in connection with such transactions.

95. Enron has now admitted that Chewco and JEDI did not meet the criteria to qualify as unconsolidated SPEs and has restated its results to consolidate these entities' losses and debt into its own financial statements.

96. LJM1 and LJM2 are investment limited partnerships formed in 1999. Fastow was the managing member of the general partners of both LJM1 and LJM2. From June 1999 through September 2001, Enron and Enron-related entities entered into 24 business relationships in which LJM1 or LJM2 participated. These relationships were of several general types, including: (a) sales of assets by Enron to LJM2 and by LJM2 to Enron; (b) purchases of debt or equity interests by LJM1 or LJM2 in Enron-sponsored SPEs; (c) purchases of debt or equity interests by LJM1 or LJM2 in Enron affiliates or other entities in which Enron was an investor; (d) purchases of equity investments by LJM1 or LJM2 in SPEs designed to mitigate market risk in Enron's investments; (e) the sale of a call option and a put option by LJM2 on physical assets; and (f) a subordinated loan to LJM2 from an Enron affiliate.

97. Despite the fact that the results of LJM1 should have been consolidated into Enron's financial statements (as Enron has now admitted should have been done), defendants caused Enron to not consolidate these results, eliminating losses of $95 million and $8 million in 1999 and 2000, respectively, from Enron's financial statements. The failure to consolidate also caused Enron to report $222 million in assets which it was not entitled to report in 1999. Enron has now restated its financial results to record the losses and to remove the assets from its balance sheet.

**B.   ENRON'S IMPROPER ACCOUNTING FOR COMMON STOCK ISSUED**

98. GAAP, as set forth in EITF 85-1, Classifying Notes Received for Capital Stock, requires that except in very rare circumstances, notes received in payment for stock should be recorded as a reduction in shareholders' equity:

> The SEC requires that public companies report notes received in payment for the enterprise's stock as a deduction from shareholders' equity. Task force members confirmed the predominant practice is to offset the notes and stock in the equity section. However, such notes may be recorded as an asset if collected in cash prior to issuance of the financial statements.

99. In the second quarter of 2000 and the first quarter of 2001, Enron issued $1.2 billion in common stock in exchange for a note receivable to capitalize four entities known as Raptor I-IV. Notwithstanding the basic requirement that such transactions should be accounted for as a reduction in shareholders' equity, Enron recorded the notes receivable as assets. Enron has admitted that its 2000 financial statements included overstated assets of $172 million for notes receivable that should have been recorded as an offset to equity and that, "as a result of these errors, shareholders' equity and notes receivable were overstated by a total of $1 billion in the unaudited financial statements of Enron at March 31 and June 30, 2001."

**C.      ENRON'S FAILURE TO MAKE PROPOSED**
**AUDIT ADJUSTMENTS AND RECLASSIFICATIONS**

100.    Enron has admitted to failing to make proposed audit adjustments and reclassifications it was informed about by Andersen in prior years because it had considered those adjustments "immaterial." In each year, the changes which Enron refused to make would have reduced Enron's net income. Enron has admitted that the proposed adjustment for 1997 was $51 million. This represented 48% of net income and 10% of recurring net income. Yet, Enron considered this amount to be "immaterial." However, Enron was required to consider the materiality of events in the aggregate. SEC Staff Accounting Bulletin No. 99 states:

> Even though a misstatement of an individual amount may not cause the financial statements taken as a whole to be materially misstated, it may nonetheless, when aggregated with other misstatements, render the financial statements taken as a whole to be materially misleading. Registrants and the auditors of their financial statements accordingly should consider the effect of the misstatement on subtotals or totals. The auditor should aggregate all misstatements that affect each subtotal or total and consider whether the misstatements in the aggregate affect the subtotal or total in a way that causes the registrant's financial statements taken as a whole to be materially misleading.

**D.      ENRON'S RESTATEMENT IS AN ADMISSION THE PRIOR**
**FINANCIAL STATEMENTS WERE MATERIALLY FALSE**

101.    The fact that Enron has restated its financial statements for 1997 through the second quarter of 2001 is an admission that the financial statements originally issued were false and that the overstatement of revenues and income was material. Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced by Enron was to correct for material errors in its previously issued financial statements. *See* APB No. 20, ¶¶7-13. The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when restatement occurs. *See* APB No. 20, ¶14. Thus, GAAP provides that financial statements

should only be restated in limited circumstances, *i.e.*, when there is a change in the reporting entity, there is a change in accounting principles used or to correct an error in previously issued financial statements. Enron's restatement was not due to a change in reporting entity or a change in accounting principles, but rather, was due to errors in previously issued financial statements. Thus, the restatement is an admission by Enron that its previously issued financial results and its public statements regarding those results were false and misleading.

**E.     ENRON'S IMPROPER ACCOUNTING FOR LONG-TERM ASSETS**

102.    GAAP, as set forth in SFAS No. 121, requires that companies review long lived assets to determine if the assets are impaired. SFAS No. 121, ¶¶5-6, state:

> 5. The following are examples of events or changes in circumstances that indicate that the recoverability of the carrying amount of an asset should be assessed:
>
> > a.    A significant decrease in the market value of an asset
> >
> > b.    A significant change in the extent or manner in which an asset is used or a significant physical change in an asset
> >
> > c.    A significant adverse change in legal factors or in the business climate that could affect the value of an asset or an adverse action or assessment by a regulator
> >
> > d.    An accumulation of costs significantly in excess of the amount originally expected to acquire or construct an asset
> >
> > e.    A current period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with an asset used for the purpose of producing revenue.
>
> 6. If the examples of events or changes in circumstances set forth in paragraph 5 are present or if other events or changes in circumstances indicate that the carrying amount of an asset that an entity expects to hold and use may not be recoverable, the entity shall estimate the future cash flows expected to result from the use of the

asset and its eventual disposition. Future cash flows are the future cash inflows expected to be generated by an asset less the future cash outflows expected to be necessary to obtain those inflows. If the sum of the expected future cash flows (undiscounted and without interest charges) is less than the carrying amount of the asset, the entity shall recognize an impairment loss in accordance with this Statement. Otherwise, an impairment loss shall not be recognized; however, a review of depreciation policies may be appropriate.

(Footnote omitted.)

103.    During 2001, contrary to GAAP, Enron failed to adequately reflect the deterioration in the value of the its broadband assets and content services business. In fact, the assets were not worth anywhere near what Enron reported in its financial statements. Instead Enron hid losses incurred in connection with this business sector through improperly recorded hedging transactions as described above.

104.    As a result of these factors, the assets would not provide the benefits estimated when they were acquired. However, defendants did not take the required write-downs in order to report strong earnings.

105.    On October 16, 2001, Enron belatedly announced that it was writing off $1 billion in assets, including belated asset write-downs.

**F.    ENRON'S FINANCIAL STATEMENTS VIOLATED GAAP**

106.    As stated in the recently completed report of Investigation by the Special Investigative Committee of the Board of Directors of Enron Corp. (the "Powers Report") "Enron's disclosures and the information we have about how they were drafted reflect a strong predisposition on the part of some in the company to minimize the disclosures about the related party transactions."

107.    Due to accounting improprieties, Enron presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(1)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(2)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(3)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(4)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(5)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are

commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(6)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(7)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(8)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

108.     Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be disclosed.

## VIII.   ANDERSEN'S PARTICIPATION IN THE FRAUD

109.     Andersen, a worldwide firm of certified public accountants, was engaged by Enron to provide independent auditing and accounting services throughout the Class Period.  Andersen was engaged to examine and opine on Enron's financial statements for 1997, 1998, 1999 and 2000, to

perform review services on Enron's interim 2001 results, and to provide significant consulting, tax and due diligence services throughout 1997 through 2001. As a result of the far-reaching scope of services provided by Andersen, it was intimately familiar with Enron's business, including its business relationships. Andersen received large fees for its services to Enron. These fees were particularly important to the partners in Andersen's Houston office as their incomes were dependent on the continued business from Enron. For 2000 alone, for example, Andersen received $25 million in fees related to the audit of Enron's financial statements and another $27 million for non-audit related work.

110.    Andersen, through Andersen Worldwide and all of its 4800+ worldwide partners, served Enron as an integrated part of a global enterprise. Andersen attracted clients like Enron, by holding itself out as one firm, as described in ¶¶182-194, and by heavily emphasizing a "one firm" worldwide brand recognition. Andersen's Houston and Chicago offices were routinely involved in the development, consulting and accounting for the fraudulent deals and transactions at issue herein. Other offices in the U.S. including the Portland, Oregon office, were also involved in the Enron engagements. Andersen's worldwide offices were also an integral part of the Enron audit. Andersen-Brazil rendered professional services for the Cuiaba, Brazil Power Plant. Andersen-India provided services related to the power plant in Dabhol. Andersen-United Kingdom provided services to Enron relating to commodities trading and the Wessex water plant.

111.    Andersen falsely represented that Enron's financial statements for 1997, 1998, 1999 and 2000 were presented in accordance with GAAP and that Andersen's audits of Enron's financial statements had been performed in accordance with Generally Accepted Auditing Standards ("GAAS"). Andersen also consented to the incorporation of its false reports on Enron's financial statements in Enron's marketing documents for the Class Securities and in Form 10-Ks for those years.

112.    The SEC has stressed the importance of meaningful audits being performed by independent accountants:

> [T]he capital formation process depends in large part on the confidence of investors in financial reporting. An investor's willingness to commit his capital to an impersonal market is dependent on the availability of accurate, material and timely information regarding the corporations in which he has invested or proposes to invest. The quality of information disseminated in the securities markets and the continuing conviction of individual investors that such information is reliable are thus key to the formation and effective allocation of capital. ***Accordingly, the audit function must be meaningfully performed and the accountants' independence not compromised.*** *Relationship Between Registrants and Independent Accountant*s, SEC Accounting Series Release No. 2961, 1981 SEC LEXIS 858 (Aug. 20, 1981).

113.    GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA"), relate to the conduct of individual audit engagements. Statements on Auditing Standards (codified and referred to as AU §___) are recognized by the AICPA as the interpretation of GAAS.

## A.    ANDERSEN WAS NOT INDEPENDENT

114.    Enron was Andersen's crown jewel client. Enron was the firm's second largest single client and its relationship with Enron was extremely lucrative and was expected to become even more so in the near future.  In '00 alone, Andersen received $52 million in fees for services it provided to Enron, of which $25 million related to the audit fees and another $27 million related to its highly-profitable consulting work.  This was an incredible level of fees, even for one of the largest accounting firms in the world.  These fees were particularly important to Andersen's partners as their incomes were dependent on the continued business from Enron.  Andersen's Houston office alone had at least eight partners working on Enron engagements, five of which were assigned to Enron full time, as well as at least 100 additional professionals.  Numerous Houston Andersen auditors worked solely on Enron engagements.  Andersen's Gulf Coast Market partners had a

particular incentive and were under enormous pressure to not only retain Enron, but to increase the billings to the client which already accounted for a large portion of the Houston office total revenue. Andersen partners assigned to the Enron account held regular "Client Service Team" meetings during the Class Period to discuss ways to sell more services and bill more fees to Enron.

115.    Because Andersen partners could not increase the fees from Enron fast enough by performing traditional audit and accounting work, Andersen incentivized its partners to sell its much more lucrative consulting services. Andersen tied part of audit partners' compensation to the solicitation and marketing of non-audit consulting services, and creating other revenue-sharing arrangements between audit and consulting partners groups. Andersen put tremendous pressure on partners to generate more fees. A "depth chart" was developed for each audit client based upon the level of services provided to that client. Partners received extra units (worth about $200,000 per year) based on the additional services sold. Because Enron purchased so many services, the engagement was looked upon as a blueprint for how other partners should "mature a client." Hundreds of Andersen partners were each earning in excess of $1 million per year (Duncan was earning as much as $2 million per year), based primarily upon the level of fees that each individual partner "controlled" or sold to his or her assigned clients. These pressures directly led to a conflict of interest for the auditors on the Enron engagement, and were a significant factor that led to Andersen abandoning its independence, objectivity and integrity on the Enron financial statement audits and reviews.

116.    Professional Audit Standards promulgated by both the AICPA and the SEC require that auditors be independent, objective and free of conflicts of interest. See ET§54, 55,102.

117.    Andersen violated these professional standards and others as alleged at ¶¶175-178, and breached its duty to the public trust when its thirst for fees caused it to assist Enron in Enron's improper accounting as outlined below.

B.    ANDERSEN'S CONFLICTS OF INTEREST

118.    Andersen knew that the key to increasing its fees was to help Enron maintain its undeserved investment-grade credit rating as it grew.  Enron set up outside entities with joint investors that would hold assets and the debt Enron was incurring to finance them.  Andersen and the Enron Defendants knew however, that if Enron retained effective control over the joint entity, GAAP required consolidation of the investment in its entirety (the inclusion of all assets, liabilities and losses) into Enron's consolidated financial statements.  Determined to earn the enormous fees associated with this guidance, Andersen abandoned its professional duty to remain independent, objective and skeptical, and did not require revision of an accounting treatment it had approved, even when Enron and its lawyers and bankers structured more and more egregious transactions.  The effort put forth by Andersen included the consultation and involvement of partners at the highest level of Andersen, including top partners at Andersen's national office headquartered in Chicago.

119.    In this collaboration with Enron, its lawyers and bankers, Andersen violated the profession's fundamental principles of objectivity, skepticism, independence and integrity required by GAAS.  As an auditor, Andersen's job was not to find a way to justify spurious accounting treatment that a layman would intuitively recognize as a ruse.

120.    Keeping the Enron client happy at all costs however, was so important to Andersen partners that they found ways to either ignore or justify their own complicity in the most egregious examples of Enron's improper accounting as alleged herein.  As an example, during an Andersen meeting in 2/01 held to discuss Enron's serious accounting issues, it is very apparent that top level Andersen partners from both the Houston and Chicago offices concluded that the potential to almost double the Enron fee level to an unprecedented $100 million per year was worth retaining the client despite the fact that Andersen knew Enron's accounting presented serious engagement risks:

> Ultimately the conclusion was reached to retain Enron as a client
> citing that it appeared that we had the appropriate people and

processes in place to serve Enron and manage our engagement risks. We discussed whether there would be a perceived independence issue solely considering our level of fees. We discussed that the concerns should not be on the magnitude of fees but on the nature of fees. We arbitrarily discussed that it would not be unforeseeable that fees could reach a $100 million per year amount considering the multi-disciplinary services being provided. Such amount did not trouble the participants as long as the nature of the services was not an issue.

121. In another example, Andersen partners at the highest level removed partner Carl Bass from his oversight role on the Enron audits because he continued to oppose Enron's improper accounting practices and Andersen's complicity therein. Bass was a top accounting expert in Andersen's internal Professional Standards Group – a national team of experts whose job was to review and approve accounting and auditing questions facing local offices. As early as '99, Bass had strongly objected to Enron's accounting. Again in February, March and December '00 and March '01, e-mails, Bass continued to express his disagreement with Enron and other Andersen partners over Enron's improper accounting. This eventually upset Enron management. As a consequence, Richard Causey, with David Duncan's help, pressed top Andersen management in Chicago to have Bass removed from the account. Causey went so far as to bring this up in a personal meeting with Andersen CEO Berardino on 2/21/01. Three weeks later, top Andersen management removed Bass from his job of providing oversight and approval of accounting issues to Andersen's Enron audit team.

122. Andersen's close relationship with management was another significant contributing factor in impairing Andersen's independence and objectivity on its Enron audits during the Class Period. For example, at one time, former Andersen auditors and professionals occupied upwards of 300 accounting and finance positions at Enron, many in mid-level and senior management. In fact, Enron was the world's largest single employer of Andersen alumni. Enron defendants liked the relationship as they knew that current Andersen auditors were much less likely to challenge the

improper accounting done by their former Andersen co-workers and bosses that were now officers and managers at Enron.

123.    Andersen also performed certain consulting services in such a way as to impair its independence on its audits and reviews.  For example, during the early-to-mid 90's, as part of its relentless mission to sell more and more non-audit services to Enron, Andersen set its sights on stealing Enron's important internal audit oversight function away from Enron's own internal auditors, and selling the service itself to Enron on an outsourced, contract basis.  Andersen and other big accounting firms had successfully lobbied the AICPA to allow the practice on a limited basis, the dual role of internal and external auditor was extremely controversial, and many outside the "big six accounting firms" saw it as an outrageous conflict of interest.  In Enron's case, Andersen's internal audit consulting turned out to be just that.  For example, by stripping Enron's internal audit function of its power and assuming most of the responsibilities itself, Andersen effectively eliminated the potential that another independent oversight body would discover and report the fraud.  As a former Enron employee involved in the transition to Andersen performing internal audit characterized it, "Going forward, Skilling was left to run a casino for a business, with a day-care center for an auditor."

124.    Andersen's obsession with generating consulting fees from Enron caused a significant conflict of interest while performing Enron's audits and reviews during the Class Period, and was one of the factors that led to the impairment of the firm's integrity, objectivity and independence.  In fact, recent conclusions reached by the very committee Andersen established and funded to look into its own policies as a result of the Enron debacle are in effect, an acknowledgment that such conflicts do exist and did impair Andersen's independence on the Enron audits.  On 3/11/02, less than ten days after accepting the chairmanship of the blue-ribbon committee at Andersen's behest, Chairman Paul Volcker quickly came to the conclusion that, among other things, if Andersen was to resolve the

kinds of conflicts of interest and impairment of independence that caused the problems in its Enron audits, the firm needed to 1) split its audit from its consulting practice; 2) ban the current financial incentives tying auditors' compensation to selling consulting work; 3) refrain from performing internal audit work on audit clients; and 4) adopt a waiting period before Andersen partners could go to work for a client.

## C.    ANDERSEN'S FALSE STATEMENTS AS TO ENRON'S 1997-2000 FINANCIAL STATEMENTS

125.    With respect to Enron's financial statements for 2000, Andersen represented, in a report dated February 23, 2001, the following:

REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To the Shareholders and Board of Directors of Enron Corp.:

We have audited the accompanying consolidated balance sheet of Enron Corp. (an Oregon corporation) and subsidiaries as of December 31, 2000 and 1999, and the related consolidated statements of income, comprehensive income, cash flows and changes in shareholders' equity for each of the three years in the period ended December 31, 2000. These financial statements are the responsibility of Enron Corp.'s management. Our responsibility is to express an opinion on these financial statements based on our audits:

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Enron Corp. and subsidiaries as of December 31, 2000 and 1999, and the results of their operations, cash flows and changes in shareholders' equity for each of the three years in the period ended December 31, 2000, in conformity with accounting principles generally accepted in the United States.

126. Andersen issued nearly identical clean audit reports for 1997 (issued February 23, 1998), 1998 (issued March 5, 1999), and 1999 (issued March 13, 2000).

127. Andersen's reports were false and misleading due to its failure to comply with GAAS and because Enron's financial statements were not prepared in conformity with GAAP, as alleged in detail in ¶¶81-107, so that issuing the reports was in violation of GAAS and SEC rules. Andersen knew its reports would be relied upon by the Company as well as by present and potential investors in the Class Securities. Indeed, Andersen performed accounting services in connection with the structuring of certain of the entities which issued the Class Securities.

## D. ANDERSEN DISREGARDED "RED FLAG INDICATORS OF FINANCIAL STATEMENT FRAUD AT ENRON

### (1) Andersen Knew the Risk of Fraud Was Extremely High

128. Andersen had direct knowledge of Enron's improper accounting as alleged herein. Andersen also knew that the risk of fraudulent financial reporting at Enron was very high. In designing and carrying out audit procedures, professional standards specifically require that auditors assess the risk of material misstatement due to fraud. To that end, Andersen, pursuant to SAS No. 82 (AU §§316, 110), was required to assess the risk of fraudulent financial statements at Enron. Andersen had a "responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud," AU §110, and plan an audit to increase the likelihood that fraud will be discovered. AU §316 provides categories of fraud risk factors that should be considered in making that assessment. Andersen knew that Enron possessed many of the risk factors delineated in AU §316.16-.18, including:

***Risk factors relating to operating characteristics and financial stability.***

- Overly complex organizational structure involving numerous or unusual legal entities, managerial lines of authority, or contractual arrangements without apparent business purpose.

- Significant related-party transactions not in the ordinary course of business or with related entities not audited or audited by another firm.

- Significant, unusual, or highly complex transactions, especially those close to year end, that pose difficult "substance over form" questions.

- Significant bank accounts or subsidiary or branch operations in tax haven jurisdictions for which there appears to be no clear business justification.

129. Andersen knew that Enron had an extraordinarily complex structure. Andersen helped Enron structure hundreds of highly complex partnerships many of which had no apparent business purpose other than to conceal debt and losses. Moreover, Enron's related-party transactions were massive. The true "substance" of many of these related-party transactions was that Enron maintained control over entities but improperly did not consolidate them. Further, Andersen knew that Enron used at least 600 offshore tax haven entities to shift income, minimize taxation, circumvent laws in the U.S., and maintain secrecy. Andersen even knew that many of the Fastow controlled partnerships were formed in offshore havens. Andersen, including its tax and consulting departments, knew about the excessive use of such entities and knew that no clear business justification existed for many of them. Other risk factors included:

***Risk factors relating to management's characteristics and influence over the control environment.***

- Management failing to correct known reportable conditions on a timely basis.

- Management setting unduly aggressive financial targets and expectations for operating personnel.

–   A significant portion of management's compensation represented by bonuses, stock options, or other incentives, the value of which is contingent upon the entity achieving unduly aggressive targets for operating results, financial position, or cash flow.

–   An excessive interest by management in maintaining or increasing the entity's stock price or earnings trend through the use of unusually aggressive accounting practices.

–   A practice by management of committing to analysts, creditors, and other third parties to achieve what appear to be unduly aggressive or clearly unrealistic forecasts.  AU §316.17(a).

130.    Andersen knew that Enron management had not only an "excessive interest" but a highly unusual interest in maintaining the Company's stock price.  In fact, Enron was recognizing, with Andersen's knowledge, income from the inflation of its own stock price.  Enron's hedges were dependent on maintaining its stock price.  Insider trading proceeds were a huge part of management's income.  In addition, Enron executives received multi-millions of dollars in bonuses from hitting a series of stock-price targets based on a program known as the "Performance Unit Plan."  Highly "aggressive targets" were the definition of Enron's business and management practices.  Andersen knew that Enron had failed to make some $51 million in proposed audit adjustments in '97. Other risk factors included:

•   Unusually rapid growth or profitability, especially compared with that of other companies in the same industry.

•   Significant pressure to obtain additional capital necessary to stay competitive considering the financial position of the entity–including need for funds to finance major research and development or capital expenditures.  AU §316.17(c).

131.    As depicted in the following chart, Enron experienced dramatic growth between '96

and '00. Note the following:

| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|
| **Net Sales** | $9.2B | $13.3B | $20.3B | $31.3B | $40.1B | $100.8B |

132.    As a result of the extensive audit, review, tax, internal control and other consulting services it rendered to Enron (in '00 alone, these fees were $52 million – or approximately 260,000 hours using an average rate of $200 per hour), Andersen knew that these and nearly every other fraud risk factor identified by AU §316 above applied to Enron's situation during the Class Period. As a consequence, Andersen also knew that these risk factors present at Enron, taken collectively, meant that the risk of fraudulent financial reporting was extremely high.

133.    Ultimately, Andersen was forced to acknowledge this fact when Congressional hearings in early '02 revealed an Andersen email describing the same conclusion. On 10/9/01, an Andersen Chicago "risk management" auditor named Mark Zajac sent an email to Andersen partners on the Enron account, including David Duncan, alerting them that, as a result of considering these and other risk factors in a routine analysis designed to determine the risk of fraud in a client's financial statements, the test triggered a "red alert" indicating a heightened risk of fraud. Andersen however, knew these factors were present throughout the Class Period as well. Despite this knowledge and knowledge of actual misrepresentations as alleged herein, Andersen chose to turn a blind eye to the numerous red flags at Enron and continued to issue "clean" audit opinions to generate tens of millions of dollars in fees and thereby increase Andersen's partners' compensation.

### (2)    Andersen Documents Support Allegations That It Knew of Improper Accounting

134.    Not only did Andersen work with Enron's lawyers and bankers to participate in creating improper accounting practices, several Andersen documents that survived Andersen's destruction campaign also clearly illustrate that Andersen knew, and was concerned about, Enron's fraudulent accounting practices, but ignored them or covered them up.

135.   For example, on 12/18/99, Andersen PSG partner Carl Bass wrote an e-mail to defendants Stewart and Neuhausen expressing his opposition to Enron's accounting for a particular entity and that Andersen should not support the accounting.

136.   On 2/4/00, Bass wrote another e-mail to Stewart expressing his opinion that a particular SPE they had been discussing had no real substance, and that Bass was bothered by the fact that Enron would receive the appreciation on its own stock that was contributed to the SPE. Bauer, Cash and David Duncan also received the information in this e-mail.  In an e-mail to Stewart and Neuhausen three days earlier, Bass, when describing several transactions at a different partnership, wrote, "this whole deal looks like there is no substance."

137.   In another example, on 2/5/01, top Andersen executives from the national headquarters in Chicago met via teleconference with top Houston and Gulf Coast partners assigned to Enron to discuss whether or not to retain Enron as an ongoing client.  The participants in this meeting included Andersen's head of U.S. operations, defendants Swanson, Stewart, Jones, David Duncan, Bauer, Jones, Lowther, Odom, Goolsby, Goddard, Bennett and partner Kutsenda.  The minutes of the meeting reveal that significant discussion ensued regarding the propriety of the very accounting issues that ultimately caused the collapse of Enron, including:

- Significant related-party transactions with LJM, including the materiality of such amounts to Enron's income statement and the amount retained "off balance sheet";

- Fastow's conflicts of interest in his capacity as CFO and the LJM fund manager;

- The amount that Fastow received for his services and participation in LJM;

- The disclosures of transactions in the financial footnotes;

- Enron's mark-to-market earnings and the fact that it was "intelligent gambling";

- Enron's reliance on its current credit rating to maintain solvency; and

- Enron's aggressive transaction structuring.

138.   Despite Andersen's knowledge of these "red flags" regarding improper accounting, given the lucrative nature of the Enron engagement, Andersen decided to continue to keep Enron as a client, and, a few weeks later, issued a "clean" audit opinion on Enron's '00 financial statements.

139.   On 3/4/01, just prior to being removed by Andersen management as the PSG advisor to the Enron audit team, Bass sent yet another e-mail to Stewart venting his opposition to Enron's accounting for the Blockbuster and Raptor transactions, that together represented at least $150 million in improperly recognized income or avoided losses at year-end '00.

140.   On 8/20/01, former Andersen accountant and current Enron Vice President Sherron Watkins made a phone call to an Andersen audit partner, James A. Hecker, and warned him about a series of improper accounting practices that had been ongoing at Enron.  On 8/21, Hecker called an emergency meeting with other Andersen partners, including Duncan, Swanson, Cash and Odom, to discuss Watkins' questions and concerns about "the propriety of accounting for certain related party transactions" with LJM.  Indeed, Watkins' concerns were very similar to Andersen's concerns back in 2/01 – albeit ignored and dismissed by Andersen in light of the $100 million potential fee level, and the very issues that caused Enron's collapse.  For example:

- How Enron could, with its own capital stock, repeatedly add to the collateral underlying an obligation owed to Enron from a related party without recognizing it in the financial statements.

- Enron stock contributions/issuances to LJM did not appear to be recorded on Enron's books.

- Enron's financial statement disclosures related to the Fastow investment-company relationships and transactions were (putting it kindly) hard to understand or incomplete.

- The LJM equity had been distributed to its shareholders, including Fastow and CIBC, concurrently, or shortly after, its original formation.

141.    Watkins informed Hecker that "she was concerned enough about these issues that she was going to discuss them with Ken Lay, Enron's Chairman, on Wednesday, 8/22/01."

## E.    ANDERSEN SIGNED OFF ON ENRON'S PHONY BROADBAND REPORTING AND MARK-TO-MARKET ACCOUNTING

142.    Andersen was consulted on, and reviewed, many of Enron's manipulative transactions involving broadband. Andersen signed off on Enron's mark-to-market accounting that the Company also used (and abused) for its broadband transactions.

143.    The improper accounting for the Braveheart/Blockbuster transactions, for example, was agreed to by Andersen. This egregious transaction was responsible for most of the profits Enron reported for broadband. Andersen actually signed off on the phony recognition. As The New York Times noted on 1/30/02:

> Enron asserted that there was a market in broadband, and that its transaction amounted to one involving the transfer of financial assets.    That meant it could report the transaction on a mark-to-market basis, similar to the way it accounted for the energy trades.    It applied its undisclosed model to calculate how much revenue it could report from the transaction, and reported more than $110 million. Former executives say accountants at Arthur Andersen approved the accounting.
>
> "Nobody in the division could comprehend how they got Andersen to sign off on that," one former senior executive in the broadband division said. "It just didn't make any sense.  When we heard what they did, everybody's mouths just hung open.  We weren't doing business on any scale even close to those numbers."

144.    That Andersen was involved in the improper accounting for broadband swaps is shown by its destruction of documents related to broadband.  Andersen's document destruction included documents in Portland where much of the broadband work occurred. The Associated Press reported on 3/15/02:

Arthur Andersen obstructed justice by destroying tons of evidence relating to Enron, including shredding some documents in its Portland office, according to a criminal indictment.

\* \* \*

Last October or November, after Andersen learned that the U.S. Securities and Exchange Commission was investigating Enron, a team of auditors from Houston asked a Portland employee to "clean up the files," Wilborn told the newspaper. The files were for Enron Broadband, the now-defunct telecommunications arm that for a time was based in Portland, he said.

Enron Broadband is now a focus of investigators because it booked hundreds of dollars worth of revenue by posting sales to Enron's notorious partnerships and by swapping capacity on its fiberoptic network with struggling telecom companies, a technique that investors claim was fraudulent.

145.    Andersen was also aware of and did not require revision of Enron's abusive use of mark-to-market accounting. As the 2/01 email from Andersen partner Jones indicated: A significant discussion was also held regarding Enron's MTM earnings and the fact that it was "intelligent gambling." We discussed Enron's risk management activities including authority limits, valuation and position monitoring.

146.    Enron started using mark-to-market accounting more aggressively in the early 90s when Skilling wanted to book profits faster. As U.S. News & World Report noted:

Because it called for Enron to write long-term contracts, the company could start accounting for those contracts differently. Traditional accounting would book revenue from a long-term contract when it came in. But Skilling wanted Enron to book all anticipated revenue immediately. The practice is known as mark-to-market or, more colloquially, counting your chickens before they hatch. Whatever the term, it was the third time in five years that Enron had significantly changed its accounting.

Tallying all expected profits immediately would mean a huge earnings kick for a company obsessed with debt. But it would also put Enron on a treadmill: To keep growing, it would have to book bigger and bigger deals every quarter. The result, in hindsight, was predictable: a shift from developing economically sound partnerships to doing deals at all costs. "The focus wasn't on maintaining

relationships and serving customers," says a former Enron official. "The quality of the deals deteriorated." The turning point, some say, was a deal involving a British power facility that earned Enron brass big bonuses. Yet, says one executive, the deal was "a disaster" that forced Enron to cough up $400 million when gas prices moved the wrong way.

The new accounting made workers eligible for fatter payoffs. Enron employees once were urged to work together on deals. But the new arrangements created an incentive to cut out colleagues, because bringing them in meant carving more slices in the bonus pie. "It was a very intense and urgent form of accounting," says Dan Ryser, a former employee who worked with Skilling.

147.    Andersen, including PSG partners Stewart, Petersen and Neuhausen, continued to approve Enron's use of mark to market accounting as Enron became more egregious in revenue recognition.

### F.    ANDERSEN KNEW ENRON IMPROPERLY HID DEBT AND BOOSTED REPORTED INCOME THROUGH USE OF THE SPEs

148.    The Enron Defendants, with Andersen's and Enron's lawyers' and bankers' participation, embarked on a scheme of structuring and accounting that allowed Enron to keep debt off its books and, at the same time, record income from and maintain control over the entities involved in the deal.  Andersen and the Enron Defendants knew, however, that if Enron retained effective control over the joint entity, GAAP required consolidation of the investment in its entirety (the inclusion of all assets, liabilities and losses) into Enron's consolidated financial statements.

149.    As one of the largest audit firms in the world, Andersen was well aware of the strategies, methods and procedures required by GAAS to conduct a proper audit.  Additionally, Andersen knew of the audit risks inherent at Enron and in the industries in which Enron operated because of the comprehensive services it provided to Enron over the years and its experience with many other clients.  To fully comprehend the extent of Andersen's involvement in the structuring, accounting, and activities of Enron's SPEs, it is important to view the transactions in light of the fact that Andersen billed Enron $5.7 million for the advice it provided on the LJM and Chewco entities.

d)      Test for reasonableness the compilation of amounts to be disclosed, or considered for disclosure, in the financial statements.

e)      Arrange for the audits of intercompany account balances to be performed as of concurrent dates, even if the fiscal years differ, and for the examination of specified, important, and representative related party transactions by the auditors for each of the parties, with appropriate exchange of relevant information.

f)      Inspect or confirm and obtain satisfaction concerning the transferability and value of collateral.

1.      Andersen ignored this professional literature, which required that Andersen understand the transactions and the business purpose for the transactions, and failed to insist that Enron make adequate disclosure and proper accounting for the transactions. Andersen knew that:

- Employees and officers of Enron had interests in and control over certain of the SPEs.

- Enron had recorded a note receivable received in exchange for stock issued in '00 as an asset.

- The Barclays investment on the Chewco deal had a reserve of $6.6 million such that there was not 3% independent equity in the partnership and it was not a qualifying SPE.

- Andersen's extensive involvement with the JEDI and Chewco transactions is evidenced by the $5.7 million Andersen billed Enron for its work on those transactions.

**(1) Red Flags Start with JEDI/Chewco**

151.    The beginning of Enron's pervasive practice of not consolidating its joint investments can be traced back at least to '93, with the formation and capitalization of the JEDI joint venture.

Andersen provided audit and consulting services at the time, and was involved in the accounting for those transactions.

152.    Enron created the Chewco SPE with Barclays' help in late '97 for the purpose of buying out an institutional investor's 50% stake in JEDI so that JEDI could still ostensibly be considered independent. Significant red flags surrounded the creation of this SPE, raising significant questions regarding the substance or legitimate business purpose of the transaction. Andersen provided significant assistance in structuring and reviewing the transaction, and billed Enron $80,000 for its review of the Chewco deal. This amounted to approximately 400 hours of examination on Chewco (assuming an average hourly rate of $200 per hour) during a short period at the end of '97. During Andersen's examination, including its review of Enron's 11/97 and 12/97 board minutes, Andersen recognized or should have recognized that virtually every aspect of the deal carried a red flag that raised questions about Enron control, or the legitimacy of the business purpose and substance of the investment. For example, even on its face the details surrounding the formation of Chewco were red flags:

a)      Andersen knew that Chewco's general partners were senior financial employees at Enron;

b)      A 3% minimum of independent, at risk, controlling capital was not met, as Barclays required a reserve account deposit of $6.6 million to collateralize the loans. According to former Enron employees, Andersen was given documentation showing the reserve; and

c)      The Barclays funding to Chewco that purportedly made up the "equity part" of the investment actually was more like a loan.

153.    In sum, as a result of Andersen's involvement in the creation and review of the Chewco deal, Andersen knew that practically every feature of Chewco's creation, funding, structure

and wind-down raised red flags, yet Andersen ignored them. By ignoring these related-party connections and Enron's constructive control in the Chewco deal, Andersen helped Enron improperly keep the Chewco deal off the books. As a result, Andersen allowed Enron to improperly overstate profits by $405 million and understate debt by hundreds of millions of dollars.

### (2) Red Flags Generated by the LJM Transactions

154. Enron, with Andersen's approval, designed and entered into virtually all the LJM transactions for little purpose other than hiding debt and losses, and personally enriching certain Enron financial officers, including defendant Fastow. Details surrounding the LJM partnerships presented prominent warnings that Enron controlled the entities, but Andersen ignored them. In the course of performing tens of thousands of hours of work on the LJM partnerships, Andersen read the LJM2 PPM and noticed that the document's first few pages clearly described that: (1) Enron would retain significant economic or operating interests in the investments; (2) the General Partner was owned and controlled by Fastow, Kopper and Glisan; (3) some of the banks were initial investors in LJM2 who were guaranteed the return of their investment and large profits before LJM2 entities could enter into hedging transactions with Enron; (4) LJM2 would be managed on a day-today basis by senior level Enron finance executives; and (5) LJM2 would invest in the assets "sold" by Enron, yet Enron would require that it retain significant economic or operating interests. The document even touted how superior the investment returns would be because the general partners were senior Enron finance executives, and as such, had access to Enron's inside information and resources. Additionally, when describing Enron as a whole, the LJM2 PPM disclosed that $17 billion of Enron assets – an incredible 33% of its assets – were "financed off-balance sheet," and that even though Enron might sell a portion of such investments, "in many cases, [Enron] s[ought] to maintain an active or controlling role in the underlying investment."

155.    By its work on the LJM2 structuring, Andersen could clearly see the following evidence of improper accounting for LJM2 and other SPEs:

a)      Enron management controlled LJM2 and therefore, in accordance with accounting rules, the investment should have been consolidated (but was not);

b)      Enron had at least $17 billion in assets and associated liabilities carried off balance sheet and as such, Andersen should have thoroughly investigated the business purpose and substantive reasons for accounting for as much as 33% of Enron's total assets on an "off-balance sheet" basis;

c)      Enron made a practice of maintaining control in its off-balance-sheet investments despite the fact that accounting rules required consolidation if Enron maintained control;

d)      Enron finance executives and insiders received tens of millions of dollars in management fees and quick profits;

e)      Enron assets were purportedly sold to LJM, but then quickly repurchased within a very short period producing a gain, despite the fact that the value of the assets had declined; and

f)      Enron's use of its own shares as security for supposed hedges of other Enron investments.

156.    Duncan, Cash, Stewart and Neuhausen and others were heavily involved in the structuring of the entity, the decisions to allow Enron to improperly account for the LJM2 entity, and were aware of Bass's disagreement with the LJM2 accounting beginning in '00.

**(3)      Andersen's Knowledge of Improper Accounting for the Raptors**

157.    Andersen also permitted Enron to improperly account for notes received for stock issued, which manipulation is described in 99-100. Andersen billed Enron at least $335,000 (1,675

hours at $200 per hour) in '00 alone for its work on the Raptor deals (which ultimately resulted in a $1 billion reduction in shareholders' equity when Enron and Andersen's improper accounting was corrected).  According to the SEC's former Chief Accountant, Andersen ignored a basic accounting rule on this issue.  An 11/12/01 Bloomberg article stated:

> Lynn Turner, who was the SEC's chief accountant for three years until he resigned in August, said Enron and Andersen ignored a basic accounting rule when they overstated shareholder's equity.
>
> Explaining the equity reduction last week, Enron said it had given common stock to companies created by Enron's former chief financial officer in exchange for notes receivable, and then improperly increased shareholder equity on its balance sheet by the value of the notes.
>
> **"Basic Accounting"**
>
> "What we teach in college is that you don't record equity until you get cash for it, and a note is not cash," said Turner, who is now director of the Center for Quality Financial Reporting at Colorado State University. "It's a mystery how both the company would violate, and the auditors would miss, such a basic accounting rule, when the number is one billion dollars."

158.   Proper financial accounting does not permit this result.  To reach it, the accountants at Enron and Andersen – including the local engagement team and Andersen's national office experts in Chicago – circumvented numerous obstacles presented by pertinent accounting rules.  A careful review of the transactions show however, that the accounting violated several accounting rules and Andersen knew it:

   a)   Accounting principles forbid a company from recognizing an increase in the value of its capital stock in its income statement except under limited circumstances not present here.  The substance of the Raptors and other transactions effectively allowed Enron to report net income and gains on its income statement that were backed almost entirely by Enron stock, and contracts to receive Enron stock, held by the Raptors.  In essence, the transactions created net income from thin air.

b)      Andersen-Houston consulted the PSG in Chicago frequently regarding the Raptor transactions.  PSG initially required an analysis of whether there was a minimum 3% independent, at-risk equity investment not only at inception of a partnership, but also each time a derivative transaction was entered into.  Later Andersen improperly agreed that the analysis only needed to be performed at inception, such that subsequent deterioration of the interest was not important.

c)      Andersen also made the decision to allow Enron to improperly avoid recording individual impairment charges for Raptor investments that had significantly and permanently declined in value.  Andersen e-mails between Cash, David Duncan and Stewart throughout the Class Period reveal that David Duncan, Cash, Lowther, Odom, Stewart and others were deeply involved in this accounting decision, and were aware that Bass thought the Raptor accounting was improper.

159.    The accountants at Andersen, who should have brought a measure of objectivity and perspective to these transactions, did not do so.  Andersen accountants were in a position to understand all the critical features of the Raptors and offer advice on the appropriate accounting treatment.  Andersen's total bill for Raptor-related work came to approximately $1.3 million.  Andersen in fact offered Enron advice at every step, from inception through restructuring and ultimately terminating the Raptors.  Enron followed that advice.

160.    In the restatement of Enron's prior financial statements, Andersen improperly did not require revision of the $1 billion in prior earnings improperly derived from the Raptors.

## G.    $51 MILLION OF KNOWN ERRORS IGNORED IN THE '97 AUDIT

161.    During its audits of Enron's '97 financial statements, Andersen staff auditors compiled $51 million of adjustments where Enron's accounting was identified as improper.  Andersen knew that these adjustments, taken collectively, amounted to almost 50% of Enron's $105 million net

income for '97 and, as such, were clearly material to the financial statements and needed to be made in order for the financial statements to not be misleading. However, Enron told Andersen it did not want to make the adjustments, because the adjustments would dramatically reduce the $105 million in the net income figure Enron management was going to report to the public. As alleged above, because Enron was such a lucrative client, Andersen partners associated with the engagement acquiesced to Enron management and did not insist that the adjustments be made. In failing to do so, Andersen abandoned its role as the public watchdog and violated GAAS. However, due to the sheer size of the collective adjustments – almost 50% of Enron's net income, Andersen could not simply waive the adjustments in its workpapers without concocting some sort of justification. Andersen's obfuscation was as follows: In calculating whether $51 million in adjustments were material to the financial statements, it was obvious to Andersen that if it calculated the needed adjustment as a percentage of net income, as auditors universally do, the resulting answer of 50% of net income was clearly material. To divert attention from this reality, Andersen calculated the $51 million as a percentage of a contrived figure Andersen called "normalized earnings" instead of net income. By cooking up this supposed measure of materiality, Andersen improperly declared that because the $51 million adjustment was only 8% of "normalized earnings" (instead of a whopping 50% of net income) it was somehow immaterial and therefore no adjustment was necessary. By concocting a justification for waiving these necessary adjustments, Andersen demonstrated the depths it would sink to in order to please Enron management. In doing so, Andersen improperly allowed Enron to overstate income in '97 by $51 million.

162.     Enron has now restated its financial statements for '97 through '00 and Andersen has stated that the audit reports covering the year-end financial statements for '97 through '00 "should not be relied upon." Unfortunately for the thousands of investors who had already relied upon

Andersen's reports, this warning came years too late, after they had lost billions of dollars based on admittedly false financial statements.

## H.   ANDERSEN KNEW ENRON'S DISCLOSURES WERE FALSE

163.   In accordance with GAAS, Andersen was required to consider whether Enron's disclosures accompanying its financial statements were adequate.  SAS No. 32 as set forth in AU §431.02-.03 states:

> **.02** The presentation of financial statements in conformity with generally accepted accounting principles includes adequate disclosure of material matters.  These matters relate to the form, arrangement, and content of the financial statements and their appended notes, including, for example, the terminology used, the amount of detail given, the classification of items in the statements, and the bases of amounts set forth.  An independent auditor considers whether a particular matter should be disclosed in light of the circumstances and facts of which he is aware at the time.
>
> **.03** If management omits from the financial statements, including the accompanying notes, information that is required by generally accepted accounting principles, the auditor should express a qualified or an adverse opinion and should provide the information in his report, if practicable, unless its omission from the auditor's report is recognized as appropriate by a specific Statement on Auditing Standards.

164.   The required disclosures include those concerning related parties.  Auditors are required to gather sufficient evidence to ensure they understand the relationship between parties and the effects of the transactions on the financial statements.  The auditor should then satisfy himself that the transactions are adequately disclosed.  AU §334.11 States:

> For each material related party transaction (or aggregation of similar transactions) or common ownership or management control relationship for which FASB Statement No.  57 [AC section R36] requires disclosure, the auditor should consider whether he has obtained sufficient competent evidential matter to understand the relationship of the parties and, for related party transactions, the effects of the transaction on the financial statements. He should then evaluate all the information available to him concerning the related party transaction or control relationship and satisfy himself on the

basis of his professional judgment that it is adequately disclosed in
the financial statements.

165. As detailed herein, Enron's disclosures with respect to its accounting practices and
related parties were woefully inadequate. The Company failed to adequately disclose the
transactions involving Chewco, the management involvement in LJM, the manipulative transactions
involving the Raptors, the improper and abusive use of mark-to-market accounting, its improper use
of its own stock to generate income, and the manipulative practices involving broadband and many
other accounting manipulations. Andersen actually knew about many of these issues as it had helped
develop the accounting for them. Yet Andersen did not require notification of the disclosures and
did not issue a qualified or adverse opinion on Enron's financial statements in violation of GAAS.

166. As The Wall Street Journal noted on 11/5/01:

> Questions could well turn to whether Andersen fulfilled its obligation
> to protect investors' interests. And an important focus is likely to be
> whether Andersen should have required Enron to better explain its
> dealings with partnerships run by former Chief Financial Officer
> Andrew S. Fastow before agreeing to bless the company's financial
> statements.

> * * *

> For its part, Enron – which is hardly the only large energy company
> with complex partnership dealings – maintains its off-balance-sheet
> transactions were legal and properly disclosed. "They comply with
> reporting requirements," says Enron spokeswoman Karen Denne,
> adding that Andersen was aware of the transactions and reviewed
> them.

167. Contrary to GAAP, Enron's disclosures were inadequate and contrary to GAAS,
Andersen failed to require revision. As noted by The New York Times in 10/01, "Enron's
disclosures have been widely criticized for being impossible to understand." These were the same
disclosures with which Andersen had stated it was "very comfortable."

## I.   ANDERSEN'S DESTRUCTION
##      OF DOCUMENTS

168.    Beginning in 9/01 and continuing into 11/01, Andersen engaged in a worldwide campaign to destroy documents that could implicate them on the Enron fraud. Andersen destroyed, according to the Justice Department, "tons" of documents throughout its U.S. and London offices related to its Enron audits and consulting engagements. On 3/14/02, a federal grand jury indicted Andersen on charges of obstructing justice in the Justice Department's probe of Enron's collapse. The indictment charged that, during '01, Andersen in its Houston, Chicago, Portland and London offices, knowingly persuaded Andersen employees to withhold records from regulatory proceedings and alter, destroy and shred documents with the intent to impede an official investigation.

169.    When Andersen's document destruction first came to light, Andersen's executives scrambled to portray the destruction as an isolated incident in its Houston office or even a few Houston partners. Nothing could be further from the truth. Document destruction at Andersen is deeply ingrained in Andersen's professional culture. From the day a young college recruit begins work at Andersen as an auditor, and throughout his or her entire career, document destruction or, to use Andersen staffers' clever euphemism, "complying with the firm's retention policy," is a mantra that is formally taught and formally and informally enforced by policy and practice at every turn throughout an auditor's career at Andersen. Indeed while Andersen has a professional responsibility to retain and preserve documents and information to support and defend the conclusions and work performed during its audit and review services, Andersen's formal and informal document destruction practices are driven by an overwhelming mission to insulate itself from potential legal exposure and outside scrutiny when its audit work comes under fire. Often in practice, Andersen's duty to maintain and preserve documents under professional standards is directly at odds with its overwhelming desire to "not retain" evidence that could, in the event of litigation, reveal that it failed to perform a proper audit. In '98, Andersen's formal and informal document destruction

policies were taken to new heights as a result of costly and embarrassing revelations that Andersen was implicated in its client Waste Management's accounting scandal. As particularized at ¶173, that year, in connection with an SEC investigation into a massive accounting scandal at Waste Management, the commission found that Andersen's internal documents revealed that Andersen not only knew of the accounting fraud, but was deeply involved in its coverup.

170.   What happened with the Enron client documents is a classic example of Andersen's "scorched earth" document destruction directive in action. During the Summer and Fall of '01, a series of serious developments led Andersen to believe that civil litigation and government investigation was imminent against Enron and, as a consequence, Andersen's deep involvement would undoubtedly implicate it in any litigation or investigation. In 8/01, Enron Vice President Sherron Watkins detailed specific examples of Enron's long-running fraudulent financial reporting to Andersen. By mid-9/01, Andersen's top audit specialists in the Chicago office, including Stewart, began to review their old e-mail and Enron memos, and in doing so, concluded that many memoranda that Andersen partners had written approving certain Enron accounting decisions were obviously improper and terribly wrong. Just as in the Waste Management debacle, Andersen's own memoranda and e-mail from the Houston and Chicago offices documented that Andersen's Chicago office had approved the improper accounting at the client and once again evidenced the national office's complicity. Immediately, Chicago office partners, including audit partners and in-house lawyers and "risk-management experts," began debating in almost daily conference calls with Houston partners about how to alter the original memos or create new memos to mitigate the potential damage. They were joined by defendant Temple, an in-house lawyer at the firm, who reminded everyone about Andersen's policy on destroying "unnecessary" records. The e-mail sent by Temple reminding personnel to comply with firm policy on document retention was an occurrence used by Andersen almost exclusively when litigation was envisioned. Such "reminders"

about compliance were widely understood within Andersen to be a directive to destroy any incriminating documents at Andersen.

171.    Andersen's worldwide headquarter's swung into action.  After Temple "reminded" them about complying with Andersen's document retention policy, senior auditors in Chicago began deleting old e-mail related to Enron by the second week of 10/01.  When certain Andersen partners told Temple that they wanted to retain their e-mail to support their work on Enron, Temple insisted they delete it.  These deleted documents included e-mails relating to Carl Bass's disagreement with Enron's accounting during the Class Period.  According to The New York Times on 3/18/02, Andersen Houston began destroying documents related to its Enron work:

>    In Houston on Oct. 10, Michael C. Odom, Andersen's practice director there, stood in a conference room to remind his accountants about the importance of destroying documents.  According to an investigation by Andersen's lawyers, Mr.  Odom explained that in past lawsuits, Andersen had been forced to produce documents that should not have been retained.
>
>    "If documents are destroyed and litigation is filed the next day, that's great," Mr.  Odom told the crowd.  "We've followed our own policy, and whatever there was that might have been of interest to somebody is gone and irretrievable."
>
>    The message had its effect.  Andersen personnel headed back to their desks, and some employees began deleting an unusually large number of e-mail messages, computer records show.   The government said in its indictment that the document destruction that day had been the first attempt to obstruct justice.

172.    On 10/16/01, after a meeting with high level partners in Chicago, including Friedlieb and Dreyfuss, Andersen's lawyer, Temple, sent an e-mail message to the Enron team suggesting changes to memoranda that Temple, Stewart and other top Andersen officials were drafting to "add back" Carl Bass's previously omitted criticisms to earlier memos, in an attempt to give the impression that Andersen had been more critical of Enron's accounting that it really had been.  Temple even instructed partners to delete her name and any references to her from draft accounting

memoranda to conceal the fact that Andersen in-house lawyers were actually crafting what would be held out as work performed and conclusions reached by David Duncan and other accountants in their workpapers.  Temple also instructed them to delete Andersen's conclusion that Enron's imminent financial statement release was misleading.  Forty minutes later, she sent a second e-mail message to Odom, director for the Gulf Coast Market Circle, instructing the Enron engagement team to "comply" with Andersen's documentation and retention policy.  This was the code word to destroy documents.  Odom forwarded the e-mail message to David Duncan, head of the Enron team.  On 10/22, David Duncan and another auditor heard from Enron management that another subpeona from the SEC requesting documents was imminent.  On 10/23/01, David Duncan and Bauer, lead partners on the Enron engagements, ordered a meeting where they stressed the need to get the files in "compliance."  Notes taken during that meeting show the SEC inquiry was cited.  Willard, a partner on the Enron engagement, also held a meeting with his managers and staff to ensure "compliance" with Andersen's document retention policy.  Defendant Berardino, CEO and managing director of Andersen, was in regular contact with the senior partners at Andersen and was aware of the document destruction of Enron-related documents.  Between 10/23 and 11/9, massive amounts of Enron-related documents were shredded.  Bauer has stated in his deposition that he destroyed Enron-related documents during this time period.  Within 36 hours of ordering the destruction of documents, the shred room at Andersen became inundated with over 20 trunk loads of documents from the Enron engagement team at 3 Allen Center.  The volume of documents to be shredded was so voluminous, Andersen's outside shredding company, Shred-It, had to make a special visit to Andersen.  Shredding did not stop with Houston.  In other offices, the same cleanup was under way. On 10/23, Houston partners called the head of the London office.  Shortly afterward, instructions went out in London to destroy unnecessary documents.  The same message was sent by voice mail to an auditor in the Portland, Oregon office, which had also done work on Enron.  The next day, the

69

Portland auditor sent an email to the Houston partners to tell them that he had destroyed his Enron records.  The shredding continued until at least 11/9, when Andersen was served with the SEC subpoena it had been told to expect.

## J.    ANDERSEN HAS A HISTORY OF PARTICIPATING IN MAJOR ACCOUNTING FRAUDS

173.    Andersen's egregious conduct surrounding the Enron affair is hardly an isolated incident.  Andersen is a repeat offender with a history of failed audits, conflicts of interest and document destruction in some of the most egregious cases of accounting fraud in history.  Moreover, Andersen's conduct in these cases often shares the same underlying themes as its conduct in the Enron debacle.  Such cases include:

(a)    Waste Management.  In '98, Waste Management restated its '92-'96 financial statements which had been audited by Andersen's Houston office, revealing a massive fraud that included the overstatement of profits by as much as $1.7 billion.  At the time, this was the largest restatement of earnings in history.  In 6/01, as a result of its egregious behavior associated with its audits of its Waste Management client, the SEC hit Andersen with the first anti-fraud injunction in 20 years and the largest civil penalty ($7 million) in SEC history for an accounting firm.  The SEC also required Andersen to sign a consent decree promising to refrain from wrongdoing in the future.  Andersen partner Goolsby signed that agreement.  Andersen and defendant Goolsby, a Houston partner with certain oversight responsibility on the Enron engagements, knew its ongoing conduct with another client, Enron, violated the agreement when it was signed.  As with Enron, Andersen's willingness to keep quiet about fraudulent accounting to protect the huge fees it earned played a significant role in Waste Management's ability to perpetrate one of the largest accounting frauds in history.  Andersen recognized Waste Management's "aggressive" accounting as early as '88, according to SEC documents, and by '93, Andersen had documented that Waste Management was a "high-risk client" and that the client inflated profits by

70

more than $100 million.  However, during the same time frame, Andersen was relentlessly marketing its consulting services to the client, resulting in consulting fees more than double the size of the audit fees.  Even when Waste Management refused to fix the improper accounting practices recommended by Andersen in prior years, Andersen caved in and continued to sign off on the company's annual audits.  This went on for the next three years.  According to the SEC, those decisions were backed at the highest levels of Andersen's Chicago office, including Andersen's Practice Director, the firm's Managing Partner and the Audit Division Head for the firm's National office in Chicago.  In addition to the SEC penalty, according to media reports Waste Management and Andersen paid $220 million to settle class action lawsuits brought by shareholders.  Several parallels exist between Andersen's conduct on Waste Management and Enron.  For example: Enron and Waste Management were Andersen's two largest clients.  Andersen's Houston office audited both Waste Management and Enron.  Further, Andersen partners, including Swanson and Goolsby, had oversight responsibility over both the Waste Management and Enron engagements.

(b)     Sunbeam.  In 5/01, the SEC filed an injunctive action against Andersen partner Phillip E.  Harlow, the former engagement partner on the Sunbeam account, for authorizing the issuance of unqualified audit opinions on Sunbeam's '96 and '97 financial statements, even though he was aware of many of the company's accounting improprieties and disclosure failures.  In '01, Andersen paid $110 million to settle shareholder lawsuits in connection with Sunbeam's restatement of six quarters of financial results.  Indeed, the SEC stated that Sunbeam's purported turnaround was little more than accounting gimmicks, accomplished through the creation of inappropriate "cookiejar" reserves.  In this case, as in Enron, Andersen's document destruction was a common theme.  In fact, an Andersen partner testified that months after the restatements were announced and after shareholder lawsuits had been filed, the firm ordered its Fort Lauderdale

employees to dispose of any work papers or correspondence that did not agree with the final documentation of the Sunbeam restatement.

(c)      Baptist Foundation of Arizona.  In a suit filed by the Arizona Attorney General, Andersen had recently agreed to pay investors $217 million to settle a suit in connection with the '99 failure of The Baptist Foundation of Arizona ("Foundation"), where an ongoing Ponzi scheme wiped out $590 million of investors' savings, many of them retirees.  Three key individuals associated with the Foundation have pleaded guilty to felony charges, five others have been indicted, and Arizona authorities are in the process of revoking the licenses of three Andersen auditors.  Jay Steven Ozer, one of the senior partners on Andersen's audits of the Foundation, audited Charles Keating's Lincoln Savings & Loan, described below.  Ozer has recently agreed to give up his Arizona accounting license.  The Foundation used accounting artifices that were strikingly similar to Enron's.  For example, the Foundation used off-balance-sheet entities to hide significant losses in its real estate investments.  Unbeknownst to investors, the Foundation sold the real estate at artificially inflated prices to a company called ALO, in exchange for a mere IOU instead of cash.  In a theme common to many Enron SPEs, unknown to investors, ALO was a related-party entity created, financed and controlled by the Foundation.  Particularly egregious was the fact that outside CPAs and professionals continued to warn Andersen for two years that they highly suspected fraudulent accounting at the Foundation, yet Andersen completely ignored them. An accountant for the Foundation testified that more than two years before the bankruptcy she met with Andersen and openly explained the nature of the Foundation and ALO relationship. Subsequently, a Texas Baptist group became suspicious, called Andersen, spoke with partners, including Corgel and Dreyfuss, and told them about the suspected fraudulent accounting at the Foundation.  Additionally, Dee Griebel, a sole practitioner CPA figured the fraud out in an afternoon by conducting a simple search of ALO's public records, revealing that ALO had a negative net worth

of approximately $106 million and couldn't possibly make good on the debt to the Foundation. Griebel then called Andersen's Chicago headquarters and the Phoenix office twice, stating, "'You must withdraw your unqualified opinion immediately. The company's effectively broke. Call me.'" Neither the Chicago or Phoenix Andersen office ever called her back. From the first warning until the Foundation's failure, Andersen issued two more unqualified opinions, allowing the Foundation to take in another $200 million of investor savings.

(d)     Colonial Realty Company. In the mid '90s, the State of Connecticut revoked Andersen's license to practice after investigating Andersen's conduct in its audits surrounding the collapse of Colonial Realty Company, a national real estate syndication firm. Central to the Colonial Realty fraud was a Ponzi scheme that involved deliberate and grossly exaggerated valuation of Colonial Realty properties. Andersen furnished unqualified opinions supporting Colonial Realty's extravagant valuations and claims, and assisted in preparing private placement memoranda in connection with the public offerings that resulted in investors sustaining substantial losses. As with Enron, after conducting an extensive investigation, Connecticut's Attorney General concluded that Andersen employees destroyed incriminating documents under the auspices of complying with Andersen's document retention policy.

(e)     Lincoln Savings/ACC. Andersen was also associated with this infamous fraud perpetrated by Charles Keating. In '84 and '85, Andersen improperly issued "clean" or unqualified audit opinions on the ACC/Lincoln financial statements. Those opinions were included in ACC/Lincoln SEC filings and helped Keating promote an illusion of prosperity that was used to market notes to investors. Thus, Andersen participated in the Charles Keating fraud that bilked investors out of over $500 million. In '92, Andersen paid $30 million to settle the securities fraud action. Andersen of course, did not learn a lesson from this experience. In fact, Partner Jay

73

Ozer, a member of the Andersen audit team on Lincoln/ACC, went on to be a key Andersen auditor on the aforementioned Baptist Foundation of Arizona Scandal.

174.    These cases demonstrate that for years Andersen has demonstrated a callous, reckless disregard for its duty to investors and the public trust.  Andersen's conduct throughout this period displays an uncaring, calculated cost/benefit approach to ignoring fraud and improper accounting in its audit engagements.  As the facts above indicate, Andersen is unrepentant and would rather pay hundreds of millions of dollars to settle these cases than actually rectify its improper behavior.  In essence, Andersen considers compromising its integrity and getting caught allying itself with management's interests an ordinary and necessary cost of doing business.

## K.    ANDERSEN VIOLATED PROFESSIONAL STANDARDS

175.    In addition to Andersen's improper departures from professional standards as particularized above, Andersen also violated the following professional standards among others.

176.    The bylaws of AICPA require that members adhere to the Principles and Rules of the Code of Professional Conduct.  Andersen violated those rules, including the following:

ET §53 – Article II – **The Public Interest**

> ***Members should accept the obligation to act in a way that will serve the public interest, honor the public trust, and demonstrate commitment to professionalism.***

ET §102 – **Integrity and Objectivity**

> ***.02    Knowing misrepresentations in the preparation of financial statements or records.*** A member shall be considered to have knowingly misrepresented facts in violation of rule 102 [ET section 102.01] when he or she knowingly –
>
> > *a.*    Makes, or permits or directs another to make, materially false and misleading entries in an entity's financial statements or

records shall be considered to have knowingly misrepresented facts in violation of rule 102 [ET section 102.01]; or

ET §501 – *Acts Discreditable*

*.05 501.4 – Negligence in the preparation of financial statements or records*.   A member shall be considered to have committed an act discreditable to the profession in violation of rule 501 [ET section 501.01] when, by virtue of his or her negligence, such member –

a.   Makes, or permits or directs another to make, materially false and misleading entries in the financial statements or records of an entity; or

b.   Fails to correct an entity's financial statements that are materially false and misleading when the member has the authority to record an entry; or

c.   Signs, or permits or directs another to sign, a document containing materially false and misleading information.

Additionally, AU §220 – Independence, further states that:

**.01**   The second general standard is:

In all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors.

**.02**   This standard requires that the auditor be independent; aside from being in public practice (as distinct from being in private practice), he must be without bias with respect to the client since otherwise he would lack that impartiality necessary for the dependability of his findings, however excellent his technical proficiency may be.  However, independence does not imply the attitude of a prosecutor but rather a judicial impartiality that recognizes an obligation for fairness not only to management and owners of a business but also to creditors and those who may otherwise rely (in part, at least) upon the independent auditor's report, as in the case of prospective owners or creditors.

75

177.    One of Andersen's responsibilities as Enron's independent auditor, was to obtain "[s]ufficient competent evidential matter ... to afford a reasonable basis for an opinion regarding the financial statements under audit" as to "the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles." AU §§150, 110. In violation of GAAS, and contrary to the representations in its report on Enron's financial statements, Andersen did not obtain sufficient, competent, evidential matter to support Enron's assertions regarding its income, assets, debt and shareholders' equity for '97, '98, '99 and '00. Moreover, Andersen deliberately ignored information indicating that Enron's financial statements did not "present fairly" the Company's financial position.

178.    Due to Andersen's false statements, knowledge of the improper accounting, failure to identify and modify its reports to identify Enron's false financial reporting, and lack of independence, Andersen violated the following GAAS standards:

a)    The first general standard is that the audit should be performed by persons having adequate technical training and proficiency as auditors.

b)    The second general standard is that the auditors should maintain an independence in mental attitude in all matters relating to the engagement.

c)    The third general standard is that due professional care is to be exercised in the performance of the audit and preparation of the report.

d)    The first standard of field work is that the audit is to be adequately planned and that assistants should be properly supervised.

e)    The second standard of field work is that the auditor should obtain a sufficient understanding of internal controls so as to plan the audit and determine the nature, timing and extent of tests to be performed.

f) The third standard of field work is that sufficient, competent, evidential matter is to be obtained to afford a reasonable basis for an opinion on the financial statements under audit.

g) The first standard of reporting is that the report state whether the financial statements are presented in accordance with GAAP.

h) The second standard of reporting is that the report shall identify circumstances in which GAAP has not been consistently observed.

i) The third standard of reporting is that informative disclosures are regarded as reasonably adequate unless otherwise stated in the report.

j) The fourth standard of reporting is that the report shall contain an expression of opinion or the reasons why an opinion cannot be expressed.

## IX. THE LIABILITY OF ANDERSEN WORLDWIDE AND ITS MEMBER FIRMS

179. Andersen Worldwide and its member firms function as and are marketed as a single firm.

180. The senior partners of the member firms of Andersen Worldwide, including the U.K., Indian, and U.S. member firms were also senior officers of Andersen Worldwide. They were charged by Andersen Worldwide with overseeing the business and operations of the member firms. The knowledge, acts and scienter of these partners is, by law, attributable to Andersen Worldwide.

181. The Andersen member firms of India, Puerto Rico, the Cayman Islands, Brazil the U.K. and the U.S. each participated in the fraudulent acts described herein by preparing audits which misstated the financial condition of local Enron affiliates or transactions engaged in by Enron in such countries and then execrably permitted such audits to be included into the Enron GAAP audit. These acts, by law, are attributable to Andersen Worldwide.

## A. ANDERSEN IS "ONE FIRM"

182.     Andersen was formed in Illinois in 1913 as an accounting and consulting partnership under the name "Arthur Andersen & Co."  In 1977, as Andersen increased its global presence, it created a new structure; the Andersen Worldwide Organization ("AWO"), comprised of a Swiss cooperative entity, Arthur Andersen & Co.  Société Coopérative, ("AWSC"), which acts as an umbrella entity for the AWO member firms, the partners of AWSC, the individual partners of Andersen-Worldwide and Andersen-Worldwide's offices around the globe, which together, operates as a single global partnership or joint venture.  The model adopted by AWSC Partners was meant to preserve "The Heart of Partnership Culture," including income sharing among the member firms of the two business units and common governance model.  The AWO structure was and is designed to maintain the "one firm" concept, and was and is intended to foster the belief that Andersen operates as a single entity.  In its promotional literature, including its Web site, Andersen-Worldwide markets itself as "one firm."  "a single worldwide operating structure" that "think[s] and act[s] as one."

183.     In fact, the Federal Election Committee Advisory Opinion No.  2000-36 dated 12/18/00, concluded:

> Prior to the effective date of the arbitration order, AC [Andersen Consulting] and AA [Arthur Andersen] were signatories to MFIFA's [Member Firm Interfirm Agreements] entered into with the AWSC [Andersen Worldwide Societe Coooperative] and were thereby subject to coordination and limited governance by the same body.  ***Such an arrangement may have been, in some way, akin to the relationship of subsidiaries of the same parent entity***, although neither partnership was owned by the AWSC.

184.     Andersen-Worldwide is the instrumentality through which the "one firm" concept becomes reality.  Andersen's guiding principles were that the member firms' practices shall be correlated and coordinated on an international basis.  It achieves this in four distinct ways.

a)      **Partner Overlap**: Andersen-Worldwide is a partnership made up of more than 4,800 partners from 390 offices in 84 different countries worldwide.  Simultaneously, the partners of Andersen-Worldwide also are partners (or the equivalent) in the entities

that make up those offices.  Thus, all of those offices are managed by individuals who are both local partners (or the equivalent) and partners of Andersen-Worldwide.  Every member firm and its practice partners enter into a Member Firm Inter Firm Agreement ("MFIFA") with AWSC.

b)  **Sharing of Costs and Profits**: Andersen-Worldwide coordinates the sharing of costs and allocation of revenues and profits among its partners and its offices around the world.  As one of AWO's top clients, fees from Enron were distributed directly and indirectly around the world.  Profits were shared globally.  In fact, fees from U.S. fees have been funding offices in Europe, Asia and Australia for years.  Compensation for AWO partners was based on units granted to partners.  Global earnings are added together and then divided by the number of units outstanding, resulting in earnings per unit ("EPU").  Partners then are paid their share of profits by multiplying the EPU by the number of units they hold.

c)  **Global Setting of Professional Standards**: Andersen-Worldwide purports to establish the professional standards and principles under which its offices operate.  Andersen-Worldwide's international offices enter into a standard agreement with Andersen-Worldwide under which they agree to be bound by those professional standards and principles.  An office of Andersen-Worldwide that breaches the agreement is subject to removal from the organization.  The Assurance Professional Standards Group has firm-wide responsibility for providing guidance on the professional standards to be followed by Andersen-Worldwide's offices.

d)  **Infrastructure and Administration**: Andersen-Worldwide handles all borrowing on behalf of its international offices, and maintains the financial records, payroll and employee and health benefits of those international offices as well.  All of Andersen's

offices also share global computer operations, a worldwide tax structure and training facilities.  By establishing a legal, financial and administrative infrastructure, Andersen enables each of its offices around the world to function as, and to appear to clients as, an extension of a single, global entity.

185.   Andersen instituted its "one-firm" concept through partner overlays, global setting of standards, sharing of costs and profits and infrastructure and administration.  Moreover, Andersen's news releases confirmed they functioned and operated as a single worldwide operation:

- Andersen refers to the brand identity adopted by member firms of the Andersen *"global client service network."*

- "With world-class skills in assurance, tax, consulting and corporate finance, Arthur Andersen has more than 77,000 people in 84 countries *who are united by a single worldwide operating structure* that fosters inventiveness, knowledge sharing and a focus on client success."

- Andersen spokesman Dave Tabolt – *"We conduct more than 30,000 audits around the world every year . . . "*

- *"AA is already much more integrated globally than the rest of the Big Five*.  As Mr. Berardino points out, 'there is one name over the door.  We're not an alphabet soup.'  The cohesiveness of AA's culture has been a source of humor to outsiders, who have labeled its bean counters 'Androids.'  *While some rivals are still struggling with a complicated array of national partnerships, and thus different systems for sharing pay, AA partners enjoy a single, and possibly unique, system of remuneration: they receive a list of what each of them has earned in the past year."*

Andersen-Worldwide Web site (Andersen.com) confirms that it was one worldwide organization:

- *"Our 390 offices may be scattered amid 84 different countries, but our voice is the same.   No matter where you go, or who you talk to, we act with one vision. Without boundaries."*

- *"One world.  One organization."*

Andersen's '01 recruiting brochures confirms that it was one worldwide firm:

- "We will, in Arthur Andersen's own words, *'act as one firm and speak with one voice*.   It is a united family that *operates across hierarchies, geographical boundaries,* client groupings, service lines and competencies and feels the kinship of understanding and shared responsibility."

186.    Andersen-Worldwide manages, directs and controls its international offices in two overlapping groups: by practice areas (also known as "lines of service") and by geographic location.

187.    Each practice group is managed by a global practice director who oversees, directs and controls the operations of each practice group worldwide.  Regional practice directors report to the global practice director and manage, direct and control the practice group within their regions. The global practice director and managing partner for the audit practice group of Andersen-Worldwide is C.E.  Andrews, a United States-based partner.

188.    In addition, Andersen-Worldwide groups its offices into several geographic regions and assigns a managing partner to each region.

189.    Partners on the Enron audits, including David Duncan, Bauer, Dreyfuss, Goddard, Goolsby, Lowther, Neuhausen, Odom, Peterson, Stewart and Swanson are partners of both Andersen-US and Andersen-Worldwide.

190.    In addition to overlapping partners, Andersen-Worldwide and Andersen-US share officers in common as well.  For example, the former Chief Executive Officer and Managing Partner of Andersen-Worldwide (Berardino), was also the Chief Executive Officer and Managing Partner of

Andersen-US.

191.     Andersen-Worldwide and Andersen-US share more than partners and officers – they share the same address.   In its promotional literature, Andersen-Worldwide states that its headquarters are located at 33 West Monroe Street, Chicago, Illinois 60603.   That is the same address as the headquarters of Andersen-US.

192.     The components of the Andersen organization ignore corporate formalities in referring to themselves or to each other.  Andersen's worldwide personnel regularly exchanged correspondence and e-mails that were labeled "Andersenwo" – short for "world organization." Andersen continually relied on and touted its global abilities to provide resources to its clients and attract international and domestic business.  Documents by Andersen-US often bear the insignia and logos of Andersen-Worldwide, including "Andersen-Worldwide," "Andersen," and "Arthur Andersen" In its promotional literature, Andersen used the names "Andersen Worldwide," "Andersen," and "Arthur Andersen LLP" interchangeably.  In addition, Andersen sometimes uses only the name "Andersen" and does not differentiate between Andersen-Worldwide and its offices around the globe.

193.     Financially, Andersen operates as "one firm" global enterprise.  For fiscal '00, Andersen derived 44% of its revenues from North America, 33% of its revenues from Europe, Middle East, India and Africa, 13% from Asia/Pacific and 10% from Latin America.  Of the $9.3 billion in revenues in '01, Andersen's North American operations contributed about half, or $4.49 billion, and its Europe, Middle east, Africa, Asia/Pacific and Latin America operations contributed about half, or $4.85 billion.

194.     Each of the individuals listed below was a partner and/or employee of the Andersen member firms.  Although they are included under the term "Andersen" they are not

named as individual defendants in this complaint. They were involved in the audits and

consultations of Enron and had knowledge of the adverse facts as pleaded at ¶¶108-178.

## B. ANDERSEN PARTNERS AND AGENTS

195.    The following non-parties are partners of Andersen-Wordwide and its member

firms. Their knowledge, acts and scienter are attributable to Andersen-Worldwide and its

member firms:

(a)    Joseph F. Berardino ("Berardino") was the Chief Executive Officer and managing partner of Andersen-Worldwide until his resignation on 3/26/02. Berardino partricipated in setting worldwide policy with respect to Andersen audits. As such, he reviewed and approved Andersen's destruction policy that was the justification for the destruction of massive amounts of documents between 10/23/01 and 11/9/01. Berardino had regular contact with several senior level partners on the Enron engagement and had regular contact with David B. Duncan, through, among other things, his involvement on the Chairman's Advisory Counsel. Berardino met with Enron's Chief Accounting Officer, defendant Causey, who objected to Carl Bass's legitimate concerns about Enron's inappropriate accounting practices[2]. Berardino was instrumental in removing Bass from the Enron engagement at Enron's request. Andersen's headquarters in Chicago regularly reviewed and approved Enron's off balance sheet transactions that are the subject of this litigation. Berardino kept apprised of Enron – the firm's second largest client

---

[2]    Bass was a top partner in Andersen's Professional Standards Group ("PSG") and reviewed the accounting propriety of Enron's transactions.

– on a regular basis.  Berardino was a partner in both Andersen-Worldwide and Andersen-US.

(b)     Thomas H.  Bauer ("Bauer) was a partner of Andersen-US. on the Enron engagement.  Bauer was responsible for auditing the commodity trading activities at Enron, and worked solely on Enron.  Bauer was also in the Audit-Energy practice of the Houston office and was an integral part of the Enron auditing and consulting engagements.  Andersen placed Bauer on administrative leave on 1/15/02.  Bauer was also a senior officer and partner of Andersen-Worldwide.

(c)     David B.  Duncan ("David Duncan") was the lead Andersen partner since '97 on the Enron engagement – David Duncan's only client.  David Duncan's compensation was directly tied to the fees generated on the Enron engagement which was personally and professionally beneficial to David Duncan.  Because of his relationship with Enron, David Duncan became one of the highest paid partners at Andersen – earning up to $2 million in good years.  In '99 and '00, David Duncan was a member of the worldwide Strategy Advisory Counsel and defendant Berardino personally asked David Duncan to be on the Chairman's Advisory Counsel, an elite group of 21 worldwide partners.  David Duncan was a partner in both Andersen-Worldwide and Andersen-US.  Andersen fired David Duncan on or about 1/15/02.

(d)     Debra A. Cash ("Cash"), a partner of Andersen-U.S., is head of the lucrative energy unit in the Houston office and was an integral part of the Enron audit and consulting engagements.

(e)    Donald Dreyfuss ("Dreyfuss") is a partner at Andersen-Worldwide's headquarters in Chicago.  Dreyfuss was an integral part of the destruction of Andersen's documents relating to Enron.

(f)    James A.  Friedlieb ("Friedlieb") is a partner in Andersen-Worldwide's headquarters in Chicago.  Friedlieb was an integral part of the destruction of Andersen's documents relating to Enron.  Friedlieb is a partner in both Andersen-Worldwide and Andersen-US.

(g)    David Stephen Goddard, Jr.  ("Goddard") is the managing partner for the Houston office of the U.S. member firm since '97 and was in charge of Andersen's Audit & Business Advisory and Energy practice for the Houston office.  Goddard was an integral part of the Enron audit and consulting engagements.  Goddard is also the managing partner for the Gulf Coast Market Circle.  Goddard is a partner in both Andersen-Worldwide and Andersen-US.

(h)    Gary B.  Goolsby ("Goolsby") was Andersen's partner in charge of  Global Risk Management and Consulting Practice Director of the Houston office.  Goolsby was an integral part of the Enron audit and consulting engagements.  Goolsby was relieved of his management responsibilities on 1/15/02.  Goolsby was a partner in both Andersen Worldwide and Andersen-US.

(i)    Michael M. Lowther ("Lowther") was Andersen's concurring partner on the Enron audit since '97.  Lowther was an integral part of the Enron audit and consulting  engagements.    Lowther  was  a  partner  in  both Andersen-Worldwide and Andersen-US.  Lowther was relieved of his management responsibilities on 1/15/02.

(j)    Benjamin S. Neuhausen ("Neuhausen") is an Andersen partner in the Chicago Business Unit Management office. Neuhausen was an integral part of the Enron audit and consulting engagement. Neuhausen was a party to and involved in internal Andersen discussions regarding Enron's inappropriate accounting practices. Neuhausen was also involved in internal Andersen discussions and correspondence relating to Carl Bass's legitimate concerns regarding Enron's improper accounting practices. Neuhausen was a partner in both Andersen-US and Andersen Worldwide.

(k)    Michael C. Odom ("Odom") was Andersen's Audit Practice Director for the Gulf Coast Market Circle. Odom was an integral part of the Enron audit and consulting engagements and the destruction of Andersen's documents relating to Enron. Odom was instrumental in removing Carl Bass from his oversight responsibilities after Bass raised legitimate concerns about Enron's accounting. Odom was a partner in both Andersen-Worldwide and Andersen-US. Andersen relieved Odom of his management responsibilities on 1/15/02.

(l)    Richard R. Petersen ("Petersen") is partner in Andersen's Professional Service Group. Petersen was an integral part of the Enron audit and consulting engagement. Petersen was a party to and involved in internal Andersen communications regarding Enron's inappropriate accounting practices. Petersen was also involved in internal Andersen discussions and correspondence relating to Carl Bass's legitimate concerns regarding Enron's improper accounting procedures. Petersen is a partner in both Andersen-US and Andersen Worldwide.

(m)     John E.  Stewart ("Stewart") is a senior partner in Andersen-U.S and Andersen Worldwide. He is one of the firm's top audit specialists at Andersen's headquarters in Chicago.  Stewart was an integral part of the Enron audit and consulting engagements.

(n)     Michael L.  Bennett ("Bennett") is a partner in Andersen-US's the Houston office.  Bennett was an integral part of the Enron audit and consulting engagements.

(o)     William E.  Swanson ("Swanson") is the Audit Division Head ("ADH") for the Gulf Coast Market Circle.  Swanson was an integral part of the Enron audit and consulting engagements.  Swanson was a partner in both Andersen-Worldwide and Andersen-US.

(p)     Roger D.  Willard ("Willard") was an Andersen partner on the Enron engagement and was part of Andersen's Audit and Business Advisory practice in Houston.  Willard was an integral part of the Enron audit and consulting engagements.   Willard was relieved of his management responsibilities on 1/15/02.

(q)     Michael D.  Jones ("Jones") was an Andersen partner in the Houston office.  Jones transferred to the London office in mid-2001.  In 10/01, David Duncan and Bauer had a telephone conference with Jones giving instructions to destroy documents.  Jones caused Enron-related documents to be destroyed in Andersen's London office.

(r)     Gregory W.  Hale ("Hale") is a partner of Andersen based in the Houston office and was an integral part of the Enron audit and consulting engagements.

(s)     John E.  Sorrells ("Sorrells") is a partner of Andersen based in the Houston office and was an integral part of the Enron audit and consulting engagements.

(t)     Danny D.  Rudloff ("Rudloff") is a partner of Andersen based in the Houston office and was an integral part of the Enron audit and consulting engagements.

(u)     Philip A.  Randall ("Randall") was Andersen's Country Managing Partner for Andersen-United Kingdom throughout the Class Period until 1/10/01, when he became Managing Partner-Global Operations.  He is a senior officer of Andersen Worldwide.

(v)     Roman W.  McAlindon ("McAlindon") was Andersen's Regional Managing Partner for the Nordic Countries, Southern and Western Africa, Ireland, India and Israel until 3/15/01, when he was appointed to the CEEMEIA Region - ("Central and Eastern Europe, Middle East, India and Africa") on 3/01.

(w)     C.E.  Andrews ("Andrews"), is Andersen's Global Finance Director and Managing Partner.  Andrews is a partner of Andersen-US and Andersen Worldwide.

196.   Non-party Nancy Temple ("Temple") was a high ranking in-house lawyer for Andersen in Andersen-Worldwide's headquarters in Chicago. Temple was aware of the imminent litigation surrounding Andersen's work for Enron and Temple was aware of the improper accounting allegations Sherron Watkins had made in 8/01.  After a meeting with senior partners at Andersen's headquarters in 10/01, Temple authored an e-mail instructing Andersen partners and staff to "comply" with the firm's document destruction policy.  Temple instructed lead partner David Duncan to delete her name from memos because it might lead to her being called as a witness.

Temple also instructed that language explaining Andersen's conclusion that Enron's pending financial statement release was misleading be deleted from documents.

## X. THE INDIVIDUAL DEFENDANTS' SCIENTER

197.    As alleged herein, the Individual Defendants acted with scienter in that they knew that the documents and statements issued or disseminated in the name of Enron were materially false and misleading, that such statements or documents would be issued or disseminated to investors, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Enron, their control over, and/or receipt and/or modification of Enron's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Enron, participated in the fraudulent scheme alleged herein.

198.    Defendants' scienter is further evidenced by the large amount of insider selling. The Individual Defendants sold the amounts of stock listed in below.

| INSIDER | SHARES SOLD | PROCEEDS |
|---|---|---|
| Buy | 54,874 | $4,325,309 |
| Causey | 197,485 | $13,329,743 |
| Derrick | 230,660 | $12,656,238 |
| Fastow | 561,423 | $30,463,609 |
| Frevert | 830,620 | $50,269,504 |
| Horton | 734,444 | $45,472,278 |
| Lay | 1,810,793 | $101,346,951 |
| Rice | 1,138,370 | $72,786,034 |
| Skilling | 1,119,958 | $66,924,028 |

| Pai | 5,031,105 | $353,712,438 |
| Belfer | 1,052,138 | $51,080,967 |
| Blake | 21,200 | $1,705,328 |
| Chan | 8,000 | $337,200 |
| Duncan | 35,000 | $2,009,700 |
| Gramm | 10,256 | $276,912 |
| Jaedicke | 13,360 | $841,438 |
| LeMaistre | 17,344 | $841,768 |
| Foy | 31,320 | $1,639,590 |
| Hirko | 473,837 | $35,168,721 |
| Harrison | 1,004,170 | $75,211,630 |
| Koenig | 129,153 | $9,110,466 |
| Kean | 64,932 | $5,166,414 |
| Mark-Jusbasche | 1,410,262 | $79,526,787 |
| McConnell | 30,960 | $2,353,431 |
| Olson | 83,183 | $6,505,870 |
| Metts | 17,711 | $1,448,937 |
| Sutton | 614,960 | $40,093,346 |
| **TOTAL:** | **$16,727,518** | **$1,064,604,637** |

199.    Fastow's scienter is also established by their improperly hidden agreements whereby he received payments of $30,000,000 in connection with structuring and "administering" the improperly unconsolidated Enron entities.

200.    As a result of these materially false and misleading statements and failures to disclose, Plaintiffs and other members of the Class purchased or otherwise acquired Class Securities relying upon the integrity of Enron's publicly disclosed financial information, and the belief that

Enron was engaging in transactions that had legitimate purposes and that were being properly accounted for.

201.    During the Class Period, defendants engaged in unlawful insider trading by disposing of millions of dollars of their own Enron shares while in possession of the material adverse information concerning Enron's operations and/or materially misled investors, thereby inflating the price of Enron's publicly traded securities and the value of the Class Securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Enron, its business and operations, as alleged herein.

202.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiffs and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Enron's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Enron and its business, prospects and operations.

## FIRST CLAIM FOR RELIEF

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Individual Defendants, Arthur Andersen, LLP, Andersen Worldwide, S.C., Andersen Co. (India), Arthur Andersen-Puerto Rico, Andersen LLP (Cayman Islands), Arthur Andersen-Brazil, Arthur Andersen (United Kingdom), and John Does 1-100**

203.    Plaintiffs repeat and reallege all the allegations contained above as if fully set forth herein against all Individual Defendants, Arthur Andersen, LLP, Andersen Worldwide, S.C.,

91

Andersen Co. (India), Arthur Andersen-Puerto Rico, Andersen LLP (Cayman Islands), Arthur Andersen-Brazil, Arthur Andersen (United Kingdom), and John Does 1-100.

204.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:

(1)    deceive investors regarding Enron's business, operations, management, financial condition and liabilities, the value of Enron guarantees and the value of the Class Securities;

(2)    caused Enron to sell hundreds of millions of dollars of registered and unregistered securities;

(3)    enable Individual Defendants to sell more than $1.1 billion worth of their own Enron common stock; and

(4)    enable Class Securities to be sold to plaintiffs and other members of the Class in reliance on defendants' untrue and misleading statements.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

205.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Class Securities.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

206.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the business, operations, prospects, financial condition and liabilities of Enron as specified herein.

207.    These defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Enron's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Enron and its business operations, financial condition, liabilities and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Class Securities during the Class Period.

208.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and/or directors at Enron during the Class Period and members of Enron's management team or had control thereof; (b) each of these defendants, by virtue of his or her responsibilities and activities as a senior officer and/or director of Enron was privy to and participated in the creation, development and reporting of Enron's internal budgets, plans, projections and/or reports; (c) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of Enron's management team, internal reports and other data and information about the Enron's finances, operations, and sales at all relevant times; and/or (d) each of these defendants was aware of Enron's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

209.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Enron's operating condition and future business prospects from the investing public. As demonstrated by defendants' overstatements and misstatements of Enron's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

210.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, plaintiffs and the other members of the Class acquired the Class Securities during the Class Period relying directly or indirectly on the false and misleading statements made by defendants, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed by defendants during the Class Period.

211.    At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Enron was experiencing, which were not disclosed by defendants, plaintiffs and other members of the Class would not have purchased or otherwise acquired the Class Securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

212.    By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

213.     As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Class Securities during the Class Period.

## SECOND CLAIM FOR RELIEF

### Violation of Section 20(a) of the Exchange Act
### Against Defendants Lay, Skilling and Fastow

214.     Plaintiffs repeat and reallege against the three defendants named in this count each and every allegation contained above as if fully set forth herein.

215.     Defendants Lay, Skilling and Fastow acted as controlling persons of Enron within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of Enron's operations and/or intimate knowledge of the false financial statements filed by Enron with the SEC and disseminated to investors, defendants Lay, Skilling and Fastow had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Enron, including the content and dissemination of the various statements which plaintiffs contend are false and misleading and the creation and structure of JEDI and Chewco, which were designed by defendants Lay, Skilling and Fastow to falsify Enron's financial statements as detailed herein. Defendants Lay, Skilling and Fastow were provided with or had unlimited access to copies of Enron's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

216.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of Enron and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

217.    As set forth above, defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, defendants Lay, Skilling and Fastow are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Class Securities during the Class Period.

218.    Plaintiffs and all the other members of the Class who purchased shares of Class Securities contemporaneously with the sales of Enron stock by the Individual Defendants: have suffered substantial damages in that as a result of the violations of §10(b) and Rule 10b-5 herein described, they would not have purchased the Class Securities at the prices they paid, or at all, if they had been aware of false and misleading statements.

### THIRD CLAIM FOR RELIEF

**Negligence Against Arthur Andersen, LLP, Andersen Worldwide, S.C., Andersen Co. (India), Arthur Andersen-Puerto Rico, Andersen LLP (Cayman Islands), Arthur Andersen-Brazil, Arthur Andersen (United Kingdom) and John Does 1-100**

219.    Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as though fully set forth herein against Arthur Andersen, LLP, Andersen Worldwide, S.C., Andersen Co. (India), Arthur Andersen-Puerto Rico, Andersen LLP (Cayman Islands), Arthur Andersen-Brazil, Arthur Andersen (United Kingdom) and John Does 1-100.

220.    By accepting the position of independent auditor of Enron, each of the defendants named in this count undertook and owed to Plaintiffs and the Class a duty to exercise reasonable care and skill in the performance of its audits of the financial statements of Enron.

221.    By virtue of conduct, acts and omissions described above, the defendants named in this count  negligently breached such duty.

222.    Plaintiffs and the other members of the Class had a privity-like relationship with the defendants named in this count and in connection with their purchase of Class Securities reasonably relied upon the audited financial statements of Enron and upon the audit opinions of the defendants referenced herein and would not have invested in the Class Securities had they known that such financial statements and audit opinions upon which they relied were materially false as a result of the negligent conduct described above.

223.    The defendants named in this count knew through its work in structuring the transactions pursuant to which the Class Securities were issued that purchasers were relying upon the audits provided to purchasers in connection with such sales.

224.    As a direct and proximate result of Andersen's breach of its duties as set forth above, Plaintiffs and the Class suffered substantial damages, in amounts to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief and judgment, including preliminary and permanent injunctive relief, as follows:

A.    Determining that this action is a proper class action, designating plaintiffs as lead plaintiffs and certifying plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding preliminary and permanent injunctive relief in favor of plaintiffs and the Class against defendants and their agents and all persons acting under, in concert with, or for them, including the imposition of a constructive trust and/or an asset freeze on the individual defendants' insider trading proceeds;

C.    Requiring restitution of investors' monies of which they were defrauded;

D.      Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

E.      Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

F.      Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: April __, 2004.

**ELLIS, CARSTARPHEN, DOUGHERTY & GOLDENTHAL P.C.**

By:  _Edward M. Carty_____

Edward M. Carstarphen
State Bar No. 03906700
G. Joe Ellis
State Bar No. 06575050
Douglas B. Dougherty
State Bar No. 06031650
Lawrence E. Goldenthal
State Bar No. 08089508
720 North Post Oak, Suite 330
Houston, TX 77024-3834
Tel:  (713) 647-6800
Fax:  (713) 647-6884

**KIRBY McINERNEY & SQUIRE, LLP**
Roger W. Kirby, Esq.
Richard L. Stone, Esq.
Mark A. Strauss, Esq.
830 Third Avenue
New York, NY 10022
Tel: (212) 371-6600
Fax: (212) 751-2540

Counsel for Plaintiffs