IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re Enron Corporation Securities, Derivative & "ERISA Litigation | § § § § | MDL-1446 |
| MARK NEWBY, ET AL., | § § | |
| Plaintiffs | § § | |
| VS. | § § | CIVIL ACTION NO. H-01-3624 CONSOLIDATED CASES |
| ENRON CORPORATION, ET AL., | § § | |
| Defendants | § § | |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al., Individually and On Behalf of All Others Similarly Situated, | § § § § § § | |
| Plaintiffs, | § | |
| VS. | § § | |
| KENNETH L. LAY, et al., | § § | |
| Defendants. | § | |

**OPINION AND ORDER**

Pending before the Court in the above referenced cause is Lead Plaintiff's Federal Rule of Civil Procedure 54(b) motion for reconsideration (instrument #2101) of the Court's order of March 29, 2004, dismissing claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 against the Deutsche Bank Entity Defendants[1] (#2036) as time-barred by the three-year statute of repose.  Specifically the Court determined that Deutsche Bank's

---

[1] Parent Deutsche Bank AG, Deutsche Bank Securities, Inc. (formerly known as Deutsche Bank Alex. Brown LLC), and Deutsche Bank Trust Company Americas (collectively, "the Deutsche Bank Entities").

structured tax deals ("STDs"), allegedly intended to falsify Enron Corporation's reported financial results, were time-barred because they closed more than three years before Lead Plaintiff filed its First Consolidated Complaint on April 8, 2002.

Lead Plaintiff argues that in addition to involvement with the STDs, it has also alleged that Deutsche Bank Entities knowingly made numerous false and misleading statements in analyst reports and offering documents for Enron securities during the Class Period.[2]  It contends that the Deutsche Bank Entities' scienter (knowledge that these statements were false and misleading) for Lead Plaintiff's § 10(b) claims can be shown by Deutsche Bank Entities' pre-Class-Period and ongoing conduct in connection with these fraudulent STDs, which were intended to falsify Enron's financial result for years into the future.[3]  Lead Plaintiff also emphasizes that this Court previously ruled that

---

[2] Initially the Court found that the First Consolidated Complaint's general allegations failed to meet the heightened pleading requirements for § 10(b) claims.  #1194.  In the First Amended Consolidated Complaint Lead Plaintiff drew on reports from the Enron Bankruptcy Examiner Neal Batson to add the allegations regarding six pre-Class-Period STDs, which it described as being without any valid business purpose but merely designed to mislead investors by fraudulently inflating the company's financial results, and thus the value of its publicly traded securities, and to allow Enron to avoid paying federal income taxes from 1996-2001, as well as recognize present earnings from future speculative tax savings.  See third Interim Report of Neal Batson, Court-Appointed Examiner, Ex. 1 to #2698.  The Court decided that the detailed allegations about the STDs would have stated primary violations of § 10(b) and Rule 10b-5 were they not time-barred.

[3] Lead Plaintiff further alleges there was no disclosure in Enron's financial statements, nor in Deutsche Bank's offering documents that incorporated the financial statements by reference, of the fact that Enron was recognizing as pre-tax income amounts that were actually speculative future tax deductions from sham tax transactions.

even where a claim is time-barred, conduct prior to the Class Period giving rise to it may still be asserted to establish scienter or a pattern and practice amounting to a scheme for purposes of § 10(b). *In re Enron Corp. Sec. Litig.*, 235 F. Supp.2d 549, 689 (S.D. Tex. 2002). Lead Plaintiff maintains that this ruling is the "law of the case" and that the Court made a legal error in not applying it to the First Amended Consolidated Complaint's claims against the Deutsche Bank Entities.[4] In addition, Lead Plaintiff maintains that the Court previously recognized that once a defendant has joined the alleged Ponzi scheme, his later actions become "suspect as further complicity in, expansion of, and perpetuation of the alleged Ponzi scheme."

---

[4] Lead Plaintiff contends that its Rule 54(b) motion is proper because it identifies a legal error, i.e., demonstrates that the March 29th, 2004 order is inconsistent with the law of the case here since the Court previously held that pre-Class Period misconduct may be used to show scienter for activity or to establish a scheme or pattern for purposes of claims under § 10(b) arising during the Class Period.

Technically, the law of the case doctrine ordinarily applies after an issue of fact or law is decided on appeal to preclude the district court from reexamining that issue. *U.S. v. Phipps*, 368 F.3d 505, 510 (5th Cir. 2004), *cert. denied*, 124 S. Ct. 2891 (2004). Moreover, rather than "a limit on judicial power," the doctrine "is an exercise of judicial discretion which merely expresses the practice of courts generally to refuse to reopen what has been decided." *U.S. v. Lee*, 358 F.3d 315, 320 (5th Cir. 2002), *citing Messinger v. Anderson*, 225 U.S. 436, 444 (1912).

Nevertheless, it is well established that prior to final judgment, a district court may modify, rescind or vacate an interlocutory order. *Bon Air Hotel, Inc. v. Time*, 426 F.2d 858, 862 (5th Cir. 1970), *citing John Simmons Co. v. Grier Bros. Co.*, 258 U.S. 82, 88 (1922); *Zimzores v. Veterans Administration*, 778 F.2d 264, 266 (5th Cir. 1985). This Court has done so a number of times in the course of this litigation. Here the Court will review its order of dismissal of claims against Deutsche Bank Entities in light of its conclusion that pre-Class-Period acts may be pled to establish scienter and scheme. While the Court concluded that is acceptable, there are still issues of adequacy of such pleading that must be addressed.

Lead Plaintiff suggests, especially "because the focus of Deutsche Bank's Motion [to Dismiss] concerned whether the STDs closed within the period of repose," that the Court "understandably focused on plaintiffs' new allegations concerning the STDs alone, without considering whether other primary deceptive acts Deutsche Bank committed during the Class Period were performed with scienter demonstrated by significant pre-Class Period conduct." #2101 at 3, 1.  It insists that Deutsche Bank's involvement in the scheme "did not stop with its knowing participation in the fraudulent STDs," but continued in the offering documents that it issued while underwriting Enron securities during the Class Period and that incorporated by reference Enron's financial results that Deutsche Bank had falsified with its STDs.  In sum, "Deutsche Bank's pre-Class period role in creating, structuring and funding the STDs made it keenly aware that Enron's Class Period financial results were false--yet Deutsche Bank sold Enron securities anyway."  #2101 at 4.  Also during the Class Period Deutsche Bank issued analyst reports containing false and misleading financial results for Enron and concealing adverse information about the company, while rating Enron stock in a manner inconsistent with this inside information.  Viewed cumulatively, argues Lead Plaintiff, these facts establish violations of § 10(b) with the requisite scienter, insists Lead Plaintiff. *See* ¶¶ 127, 131, 146, 152, 159, 184, 210, 232, 237, 243, 253, and 257 of the First Amended Consolidated Complaint (#1338).

In response the Deutsche Bank Entities assert that Rule 54(b) is properly used for the narrow purpose of "allow[ing] a

- 4 -

party to correct manifest errors of law or fact or present newly discovered evidence," or where there has been an intervening change in controlling law, none of which applies here; Rule 54(b) in not the proper vehicle for a motion for reconsideration that advances legal theories, arguments or facts that could have been presented previously.  Conceding that the Court does have inherent power to reconsider its interlocutory orders *sua sponte*, the Deutsche Bank Entities insist the claims were properly dismissed. This Court's order, #2036 at 18, stated that the continuing wrong doctrine does not apply to seeking damages for fraudulent acts that are otherwise time-barred by the statute of repose, and that without these time-barred claims, Lead Plaintiff has failed to adequately plead, with the particularity required by Federal Rule of Civil Procedure 9(b) and the PSLRA, that during the Class Period any Deutsche Bank Entity engaged in any timely fraudulent act or scheme or was privy to information about Enron's true financial condition.  *Id.* at 15, 28.  Group pleading is not sufficient.

As an initial point, the Court disagrees with Lead Plaintiff's reading of the Fifth Circuit's recent opinion, *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 364 F.3d 353 (5th Cir. 2004), in which the Fifth Circuit held that the judicially created group pleading doctrine, never embodied within the securities statutes, did not survive passage of the PSLRA. The appellate court noted that a corporation "may be treated as making press releases and public statements made by its authorized officers to further the interests of the corporation."  365 F.3d

at 365.  Nevertheless to hold a corporation liable for untrue statements or omissions of material fact under § 10(b) and Rule 10b-5, the Fifth Circuit required that a plaintiff adequately plead scienter ("intent to deceive, manipulate, or defraud" or "severe recklessness") in "the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than [look] generally to the collective knowledge of the corporation's officers and employees acquired in the course of their business."  Id. at 366.  The Fifth Circuit made clear, "A defendant corporation is deemed to have the requisite scienter for fraud only if the individual officer making the statement has the requisite level of scienter, i.e., knows that the statement is false, or is at least deliberately reckless to its falsity, at the time he or she makes the statement."  Id.  Lead Plaintiff's First Amended Consolidated Complaint has not pointed to such an individual, named or not, for purposes of liability of the Deutsche Bank Entities, no less shown scienter on that official's part, making material misrepresentations and omissions during the Class Period, but only named individuals involved in the time-barred STDs, but not in the alleged Class Period misrepresentations and/or omissions (¶¶ 797.5, 797.8).

       The Court is also aware that at the time Lead Plaintiff filed its amended complaint, Southland[5] had not issued and Lead

---

[5] Indeed the Court submits that Southland is an intervening change in controlling law.  The Fifth Circuit is the first

Plaintiff could not know of the Fifth Circuit's recent requirement that an officer making the allegedly misleading statement or material omission with scienter was necessary to plead corporate liability. When challenged under *Southland*'s holding, it provided both an argument, appropriate allegations, and supporting evidence in the deposition of Deutsche Bank Director Paul Cambridge to provide the requisite factual threads to stitch together the pre-Class allegations regarding the STDs to the alleged false and misleading statements during the Class period and to demonstrate scienter in a Deutsche Bank official for the purpose of imposing liability on the Deutsche Bank Corporations. #2698 and Ex. 2. Specifically Lead Plaintiff asserts that Cambridge "made and/or authorized the issuance of false and misleading statements concerning Enron that were contained in the offering documents for the Osprey I Notes offering dated 9/23/99, the Osprey II Notes offering dated 9/28/00, the Marlin II Notes offering dated 7/12/01 and the Yosemite I notes offering dated 11/15/99," which incorporated by reference Enron's financial statements that "falsely and misleadingly contained material amounts of pre- and post-tax earnings resulting from the sham tax transactions." #2698 at 2. Lead Plaintiff also claims that Cambridge had the primary responsibility for performing due diligence on these

---

appellate court to declare that group pleading did not survive the PSLRA. Circuit courts remain split on the question. *Phillips v. Scientific-Altanta, Inc.*, 347 F.3d 1015, 1018-19 (4th Cir. 2004). Some continue to apply the doctrine. *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1061-63 (9th Cir. 2000); *Schwartz v. Celestial Seasonings, Inc.*, 125 F.3d 1246, 1254 (10th Cir. 1997). The First Circuit has not decided, but questions its continuing viability. *In re Cabletron Systems, Inc.*, 311 F.3d 11, 40 (1st Cir. 2002).

offering to ensure that the offering documents were accurate, and he approved the documents even though he knew about the fraudulent tax transactions and their effect on Enron's financial statements. *Id.* at 3.  Cambridge knew about the STDs because, as Deutsche Bank's (and its predecessor Bankers Trust's) Senior Relationship Manager for the Enron account, Cambridge reviewed all the tax transactions at least once a year, met with the tax team to discuss the objectives of each tax transaction before it was closed, and received many memoranda indicating that Enron was recognizing specific amounts of pre- and post-tax accounting income from tax transactions with no legitimate business purpose. *Id.* at 3-4.  Lead Plaintiff identifies specific memoranda received on specific dates from named individuals regarding specific STDs generating specified sums in after-tax accounting income.  *Id.* at 4-5.  Lead Plaintiff attaches an interim report of Enron's Court-Appointed Examiner Neal Batson (Ex. 1) finding no reasonable basis for characterizing such income as pre-tax income.  Also to demonstrate scienter, it has provided Deutsche Bank's manual for procedures for due diligence review to demonstrate Deutsche Bank's strict procedure, an industry norm, for maintaining a central repository of all information in its possession and providing it to those performing due diligence reviews, regardless of confidentiality agreements or internal walls. *Id.,* Ex. 4; #2376, Ex. 1.  The Court finds that under the circumstances and in the interests of justice Lead Plaintiff's allegations in #2698 should be deemed sufficient to reinstate the § 10(b) claims against Deutsche Bank Entities.

In a new request for dismissal of the remaining claims against them, Deutsche Bank Entities address the fact that the Court's March 29th, 2004 order left standing claims against the Deutsche Bank Entities under Section 12 of the Securities Act of 1933 based on four Foreign Debt Securities.[6] The Deutsche Bank Entities now assert that the Court lacks subject matter jurisdiction over any sales of these securities made by any Deutsche Bank Entity under Regulation S.[7] They argue that the 1933 Act is silent about its territorial reach and that the Supreme Court has noted that absent contrary intent in a statute, there is a presumption against extraterritorial jurisdiction for that statute. *EEOC v. Arabian American Oil Co.*, 499 U.S. 244 (1991), *superseded by statute on other grounds as stated in Gushi Bros. Co. v. Bank of Guam*, 28 F.3d 1535, 1543 n.9 (9th Cir. 1994). Regulation S excepts from the protections afforded by registration the sales of securities made outside of the United States to non-U.S. persons; therefore, before applying securities laws beyond United States boundaries, courts require that the pleadings establish a requisite connection to the United States by conduct or effect to support subject matter jurisdiction of the federal courts. *Robinson v. TCI/US West Communications, Inc.*, 117 F.3d

---

[6] Deutsche Bank Entities seek to make clear that Lead Plaintiff has not alleged that they violated Section 12(a) and 15 of the 1933 Act based on participation in any non-Foreign Debt Securities offerings.

[7] Subject matter jurisdiction, which cannot be waived, may be challenged at any phase of a proceeding or *sua sponte* by the Court. *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 575 (5th Cir. 2003); *Warren v. U.S.*, 874 F.2d 280, 281-82 (5th Cir. 1989).

900, 904-06 (5th Cir. 1997).  The Deutsche Bank Entities assert that sales of the Foreign Debt Securities under Regulation S were made entirely outside the United States to non-U.S. investors, and that Plaintiffs have not pled otherwise.

It is well established that the federal securities statutes are silent regarding the question of their extraterritorial jurisdiction.  *See, e.g., Alfadda v. Fenn*, 935 F.2d 475 (2d Cir.), *cert. denied*, 502 U.S. 1005 (1991); *Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 30 (D.C. Cir. 1987); *SEC v. Kasser*, 548 F.2d 109, 114 n.21 (3d Cir. 1977).  Although a presumption against subject matter jurisdiction normally arises where a statute is silent, most federal courts of appeals have adopted the conduct and effects tests to decide if United States courts have jurisdiction under the federal securities statutes over cases involving mainly foreign securities transactions with some connection to the United States.  *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994).  "When a court is confronted with transactions that on any view are predominantly foreign, it must seek to determine whether Congress would have wished the precious resources of the United States courts and law enforcement agencies to be devoted to them rather than leave the problem to foreign countries."  *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 985 (2d Cir. 1975).  Plaintiffs bear the burden of demonstrating subject matter jurisdiction.  *Boudreau v. United States*, 53 F.3d 81, 82 (5th Cir. 1995).

In trying to determine what Congress would have intended regarding the extraterritorial jurisdiction of the securities

statutes in fraud cases, the courts have developed two tests, the "effects test" and the "conduct test." *Robinson v. TCI/US W. Communications, Inc.*, 117 F.3d 900, 905-06 (5th Cir. 1997). Different circuits have applied different standards in determining whether an alleged nexus to the United States is sufficient to support jurisdiction. *See, e.g.,* discussion in *In re Royal Ahold N.V. Securities & ERISA Litig.*, 351 F. Supp.2d 334, 358 (D. Md. 2004)(and cases cited therein); *Robinson*, 117 F.3d at 905-06. Because this Court is within the Fifth Circuit, it applies its standard. *Robinson*, 117 F.3d at 905.

The effects test examines whether the conduct outside the United States had a substantial adverse impact on United States investors or the United States securities markets. *Id.* The conduct test inquires "whether the fraudulent conduct that forms the alleged violation occurred in the United States." *Id.* The Fifth Circuit has adopted the more demanding version of the conduct test set out by the Second Circuit in *Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041, 1045-46 (2d Cir. 1983), and by the District of Columbia Circuit in *Zoelsch*, 824 F.2d at 31-33: the domestic conduct must have been "of material importance" to or must have "directly caused" the complained-of fraud. *Id.* at 905 & n.10. (The Third, Eighth and Ninth Circuit require only that the domestic activity be significant to the fraud rather than a direct cause of it. *Id.* at 906.) Therefore the plaintiff must allege that substantial acts in furtherance of the fraud occurred in the United States; acts that are "merely preparatory" by themselves will not sustain subject matter jurisdiction. *Id.* at

905. Either the effects or the conduct test may, by itself, establish subject matter jurisdiction. *Id.* at 905. Nevertheless, "[t]he two tests need not be applied 'separately and distinctly,' and 'an admixture or combination of the two often gives a better picture of whether there is sufficient United States involvement to justify the exercise of jurisdiction by an American court.'" *Cromer Finance Ltd. v. Berger*, No. 00 Civ. 2284 DLC, 2003 WL 21436164, *2 (S.D.N.Y. July 23, 2003)(Cotes, J.)(quoting *Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 128 & n.13 (2d Cir. 1998)). *See also Robinson*, 117 F.3d at 905 (same); *Itoba Ltd. v. LEP Group PLC*, 54 F.3d 118, 122 (2d Cir. 1995)(same). The Second Circuit has found that there is "'jurisdiction over a predominantly foreign securities transaction under the conduct test when, in addition to communications with or meetings in the Untied States, there has also been a transaction in a U.S. exchange, economic activity in the U.S. harm to a U.S. party, or activity by a U.S. person or entity meriting redress.'" *SEC v. Berger*, 322 F.3d 187, 194 (2d Cir. 2003), *citing Banque Paribas*, 147 F.3d at 130 & n.16.

Lead Plaintiff disagrees that the Court lacks subject matter jurisdiction and quotes *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1017 (2d Cir. 1975): "Congress [did not] intend[] to allow the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners." Lead Plaintiff insists that it pled that the alleged Ponzi scheme included the Regulation S offerings and that "the Regulation S offering documents incorporated by reference Enron's

- 12 -

financial statements made false by defendants' course of conduct in the United States."  Because this fraudulent course of conduct involving the Foreign Debt Securities occurred within the United States and caused injury to foreign investors, this Court has subject matter jurisdiction over the claims.

At first, as examples of a causal nexus Lead Plaintiff only pointed to the memorandum for the 7.797% and 6.357% Notes due 2003, issued by Osprey Trust (a Delaware corporation with principal offices in Wilmington, Delaware) Osprey I, Inc., at ¶ 641.21, stating that the notes, although issued overseas, are "governed by, and construed in accordance with, the laws of the state of New York."  Lead Plaintiff further observed that all legal advisors for the offering had their offices in the United States, including Vinson & Elkins here in Houston, Texas.  In addition, the offering memorandum refers purchasers to SEC filings and other documents, incorporated by reference, which are made available to investors in the notes at locations around the United States.  The Court finds that these factual connections to the United States fail to constitute a sufficient causal nexus relating fraud within the United States to the sale of the Foreign Debt Securities outside this country; these factors did not directly cause the fraud alleged or the losses to the plaintiffs.

Nevertheless, as the briefing expanded, Lead Plaintiff identified other, more substantial connections and argued that they satisfy both the cause and effects tests. #2256.  The Court agrees.  Although the Deutsche Bank Entities claimed that the solicitation and sales of the Foreign Debt securities under SEC

Regulation S occurred outside of this country to foreigners, Lead Plaintiff pointed out that Deutsche Bank sold the same securities to United States entities classified as "qualified institutional investors" pursuant to Rule 144A and & C.F.R. § 230.144A, specifically identifying the Imperial County Employees Retirement System ("ICERS"), which the Court allowed to intervene.[8]  Thus both foreign and United States investors were damaged by the alleged Ponzi scheme conducted in unison by United States and foreign Defendants.  Lead Plaintiff has alleged that the sale of the Foreign Debt Securities was an essential part of that fraudulent scheme, and that much of that scheme was conducted in the United States.  The Second Circuit has stated, "In considering the conduct test, we have held that jurisdiction exists only when substantial acts in the furtherance of the fraud were committed within the United States, and that the test is met whenever (1) the defendant's activities in the United States were more than 'merely preparatory' to a securities fraud conducted elsewhere and (2) the activities or culpable failures to act within the United States directly caused the claimed losses."  *SEC v. Berger*, 322 F.3d at 193.  Clearly the domestic conduct of the alleged Ponzi scheme participants inside the United States as well as outside was of material importance to and directly caused the fraud and the purported injury to Plaintiffs, including at least one large United States investor.  Moreover, Lead Plaintiff contends that it

---

[8] ICERS purchased on July 12, 2001 $345,000 par value of Marlin Water Trust II Notes, for which Deutsche Bank acted as an underwriter.

also satisfied the effects test because the fraudulent conduct impacted stock registered and listed on an American securities exchange was detrimental to the interests of American investors. *Cromer*, 137 F. Supp. at 479.

Accordingly, for these reasons the Court

ORDERS that Lead Plaintiff's motion for reconsideration (#2101) is GRANTED and the § 10(b) and Rule 10b-5 claims against the Deutsche Bank Entities are REINSTATED.  Furthermore, the Court

ORDERS that Deutsche Bank Entities' request that Lead Plaintiff's remaining claims against the Deutsche Bank Entities under Section 12 of the Securities Act of 1933 based on four Foreign Debt Securities should be dismissed for lack of subject matter jurisdiction is DENIED

**SIGNED** at Houston, Texas, this 26th day of July, 2005.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE