IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re Enron Corporation Securities, Derivative & "ERISA" Litigation | § § § | MDL-1446 |
| | § | |
| MARK NEWBY, ET AL., | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-01-3624 |
| | § | CONSOLIDATED CASES |
| ENRON CORPORATION, ET AL., | § | |
| | § | |
| Defendants | § | |

**OPINION AND ORDER DENYING MOTIONS TO COMPEL ARBITRATION**

Pending before the Court in the above referenced cause, relating to four proposed partial settlements, are a number of motions to dismiss or stay interpleader and compel arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 2,[1] 3,[2] 4[3]

---

[1] Section 2 provides,

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such conduct or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

[2] Section 3 provides,

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit

and 206,[4] and under the terms of Excess D&O Liability Insurance
Policies purchased by Enron Corporation, filed by Third-Party
Counterclaim Defendants Shelby, Yeager, Howard and Krautz[5] ("EBS

---

> or proceeding is referable to arbitration
> under such an agreement, shall on application
> of one of the parties stay the trial of the
> action until such arbitration has been had in
> accordance with the terms of the agreement,
> providing the applicant for the stay is not in
> default in proceeding with such arbitration.

[3] Section 4 states,

> A party aggrieved by the alleged failure,
> neglect, or refusal of another to arbitrate
> under a written agreement for arbitration may
> petition any United States district court,
> which, save for such agreement, would have
> jurisdiction under Title 28, in a civil action
> or in admiralty of the subject matter of a
> suit arising out of the controversy between
> the parties, for an order directing that such
> arbitration proceed in the manner provided for
> in such agreement.

[4] Section 206 reads in relevant part,

> A court having jurisdiction under this chapter
> may direct that arbitration be held in
> accordance with the agreement at any place
> therein provided for, whether that place is
> within or without the United States. . . .

[5] Shelby, Yeager, Howard, and Krautz describe themselves as
"non-*Newby* EBS [Enron Broadband Services] Defendants" who are
insured under the D&O policies and claim that the carriers have
recognized their obligation to cover the non-Newby Defendants'
defense in a civil enforcement suit brought by the SEC and are
disputing whether coverage is due in the criminal case against
them, recently tried before the Honorable Vanessa Gilmore, but
resulting in a hung jury on some counts against every defendant.

Defendants") (instrument #2527),[6] Jeffrey K. Skilling (#2632),[7] Kevin Hannon (#2827), and Mark Koenig (#3063).[8]

## Insurance Policies

Enron purchased one primary directors and officers liability insurance policy: Policy No. D0079A1A98 § IV(Q)(3) issued by Associated Electric & Gas Insurance Services United ("Primary AEGIS Policy"), which provided a $35 million limit of liability.

In addition, Enron purchased ten excess liability policies, the first three of which, like the Primary AEGIS Policy, have been exhausted: (1) Policy No. 900630-00D0 issued by Energy Insurance Mutual ("EIM Policy"), providing a $65 million limit excess of the underlying primary coverage of $35 million; (2) Policy No. 8142-05-47C issued by Federal Insurance Company, providing a $25 million limit excess of the $100 million in

---

[6] Joined by Joseph Hirko (#2562), Jeffrey Skilling (#2586), Kathy Lynn (#2633), Kristina Mordaunt (#2627), Andrew Fastow (#2765), Kevin Hannon (#2778), and Mark Koenig (#3063). Kenneth L. Lay initially joined in the motion (#2533), but provisionally withdrew that joinder (#3511) after entering into an Agreement Regarding Insurance Proceeds and Interpleader Action (Ex. B to Stipulation of Settlement, #2949). Stanley C. Horton also initially joined in the motion (#2536), but as his counsel informed the Court by letter dated May 25, 2005 (duplicatively filed as #3519 and #3528), because he was voluntarily dismissed from the cases on December 9, 2004, he considers the joinder moot.

[7] Joined by Joseph Hirko (#2635) and Kevin Hannon (#2827).

[8] Also pending on the same issue and others are cross motions for summary judgment filed by Andrew Fastow (#3114), Kevin Hannon (#3118), the Excess Insurers (#3119), and the Former Outside Directors (#3121, joined by Ken Harrison, #3131). Because Mr. Hannon has indicated that he will appeal any determination that arbitration is not required, the Court does not reach these motions.

underlying coverage; (3) Policy No. NDA 0131301-98H issued by Twin City Fire Insurance Company ("Twin City Policy"), providing a $25 million limit excess of the $125 million in underlying coverage; (4) Policy No. ELU 82248-01 issued by Greenwich Insurance Company ("Greenwich Policy"), providing coverage from $150 million to $175 million; (5) Policy No. 901/LK9802531 issued by certain Underwriters at Lloyd's of London, providing coverage from $175 million to $200 million; (6) Policy No. 568CM0934 issued by St. Paul Mercury Insurance Company ("St. Paul Policy"), providing coverage from $200 million to $225 million; (7) Policy No. 8181-43-14 issued by Federal Insurance Company, providing coverage from $225 million to $250 million; (8) Policy No. PSF000633 issued by Royal Insurance Company of America, providing coverage from $250 million to $275 million; (9) Policy No. ENE-9459D issued by ACE Bermuda Insurance Ltd.("ACE Policy"), providing coverage from $275 million to $300 million; and (10) Policy No. 8179-41-03 SWH issued by Federal Insurance Company in a Quota Share Policy with five participating insurers (Federal Insurance Company (50%), Kemper Insurance Indemnity Co. (20%), EIM (15%), Greenwich (5%), and AEGIS (10%)), providing coverage from $300 million to $350 million.[9] Copies of the various policies, all of which are

---

[9] Thus the "Excess Insurers" are Associated Electric and Gas Services Limited, Energy Insurance Mutual, Limited, Federal Insurance Company, Greenwich Insurance Company, certain Underwriters at Lloyd's, London subscribing to insurance certificate no. 901/LK9802531, St. Paul Mercury Insurance Company, Royal Indemnity Company as successor in interest to Royal Insurance Company of America, ACE Bermuda Insurance Ltd., and Kemper Indemnity Insurance Company (collectively, the "Excess Insurers").

implicated in the $200 million demand by the settling parties, are
attached as exhibits to a number of the pleadings.[10]

        The policies are layered, with each triggered only when
the lower one is exhausted.   All the excess policies contain
language that at minimum follows form of the Primary AEGIS Policy,
to be discussed further *infra*.   The Primary AEGIS Policy and the
first three excess policies have been exhausted by payment of
defense costs and settlements of various insureds, leaving
approximately $200 million of proceeds remaining before the filing
of the Interpleader.

**Procedural Background**

        In October 2004 three different settlement demands from
different insureds were made upon the Excess Insurers for payment
from these remaining proceeds.  First, eighteen of Enron's former
Outside Directors sent a letter dated October 12, 2004 informing
the carriers that they had reached a settlement with *Newby* Lead
Plaintiff, an agreement which would require payment of the entire
$200 million, in addition to personal contributions from some of
the insureds.  Another letter dated October 14, 2004 informed the
Excess Insurers of a settlement in *Pirelli* between the Official
Creditors Committee and some insureds (the Outside Directors,
James Derrick, and Rick Buy) for payment of 17.2% of the remaining

---

        [10] For example, the Outside Directors' motion for summary
judgment (#3121) contains all of the relevant documents to the
issues here, except the ACE policy which was supposed to have been
ex. A.2.j, but which counsel reported was inadvertently left out
(#3316).   That policy can be found *inter alia* as exhibit 8 to
Fastow's brief in support of his motion to compel arbitration
(#3115).

insurance proceeds, which would reduce the amount to be paid to the *Newby* plaintiffs.[11]  Subsequently *Stowers*[12] demands were made on the Excess Insurers in connection with these settlements. Finally, in a letter dated October 20, 2004, Kenneth Lay made a demand that Greenwich pay $10.25 million to settle claims against him in two Enron-related suits:   *The Retirement Systems of Alabama, et al. v. Merrill Lynch & Co., et al.*, No. CV-03-F-69-N (M.D. Ala.), and *City of Montgomery, et al. v. Lay, et al.,* No. CV-03-F-1152-N (M.D.  Ala.).   The Outside Directors argue that Lay's settlement is subordinate to the *Newby* and *Pirelli* settlements.

Furthermore, legal proceedings were commenced by various parties.  On October 12, 2004 certain former Outside Directors of Enron filed in *Newby* a Third-Party Complaint for Contract Enforcement and Injunctive Relief regarding D&O Policy Proceeds against a number of excess insurance carriers (#2450).   They amended it on October 18, 2004 (#2462), announcing the settlement with *Newby* Plaintiffs and with the Official Committee of Unsecured Creditors of Enron in *Pirelli* and seeking a declaratory judgment acknowledging their right to use all of the remaining proceeds of the  excess  insurance  policies  to  fund  their  settlements,

---

[11] Thus the total amount that would be paid from the Excess Policies for the *Newby* and *Pirelli* settlements would be the $200 million, i.e., all the remaining proceeds in the Excess Policies.

[12] *G.A. Stowers Furniture Co. v. American Indemnity Co.*, 15 S.W.2d  544,  547-48  (Tex.  Comm'n  App.  1929,  holding approved)(holding that insurers may be liable for negligently failing to settle within policy limits claims against their insureds).

regardless of the defense needs of other insureds, as well as for a preliminary and permanent injunction to prohibit the Excess Insurers from paying out any more of the remaining proceeds to others.  After notice and a hearing on October 18, 2004, this Court entered a temporary restraining order enjoining Greenwich, the Excess Insurer responsible for providing the first layer of the remaining $200 million of coverage, from processing any claims from or disbursing any funds to insureds, and thus in essence all the layers above it.

On October 20, 2004 Ken Harrison sued the Excess Insurers in New York, seeking to compel them to binding arbitration regarding claims for his defense costs that they had rejected and all claims for allocation of the $200 million in policy proceeds.  *Harrison v. AEGIS, et al.*, Case No. 04-CV-08319 (S.D.N.Y.).  Alternatively Harrison sought to compel litigation to be filed exclusively in New York.

In response to the demands from the Outside Directors and complaints from other insureds, on October 21, 2004, the Enron Excess Insurers filed their First Amended Third-Party Counterclaim for Interpleader (Part 2 of #2483), pursuant to 28 U.S.C. §§ 1335, 1397 and 2361 and Rule 22 of the Federal Rules of Civil Procedure, to interplead the contested policy proceeds, as a compulsory counterclaim to the Outside Directors' Third-Party Complaint for Contract Enforcement and Injunctive Relief regarding D&O Policy Proceeds against them, before the Excess Insurers knew of Harrison's suit.  The Excess Insurers then amended that counterclaim the next day (#2488).  The interpleader names as

defendants all the known persons and entities who are actual or alleged insureds under the Excess Policies and against whom or which one or more claims have been made.

Meanwhile the EBS Defendants also filed a suit similar to Harrison's against the Excess Insurers in New York on October 22, 2004. *Krautz, et al. v. Greenwich Ins. Co., et al.*, Case No. 04 CV 8389 (S.D.N.Y.).

That same day this Court enjoined Harrison, and any other of the interpleader defendants, from prosecuting this suit or initiating any action or arbitration proceedings in New York and any other suit relating to D&O policies. #2478. It noted that Harrison had appeared by telephone through counsel at the October 18, 2004 injunction hearing, argued against the requested TRO, and was present when the Court granted the restraining order. The Court found that Harrison's filing of the suit in the Southern District of New York "directly contravened the relief already granted" in the temporary restraining order and interfered with this Court's jurisdiction over the interpleader action.   #2478.

On November 1, 2004 the Former Outside Directors of Enron answered the Excess Insurers' interpleader and filed a counterclaim for a declaratory judgment and injunctive relief (#2552).  On December 8, 2004 the Court entered a preliminary injunction enjoining anyone claiming an interest in the remaining excess insurance proceeds from pursuing action outside the interpleader and restraining any disbursement of those proceeds by the Excess Insurers without a court order. #2782. Then on December 22, 2004 (#2865), after the parties obtained Judge

Gonzalez's leave to lift the automatic stay in the bankruptcy
court, the Court authorized payment of all the remaining excess
insurance proceeds into the registry of the Court to fund the
interpleader.[13]

**Movants' Arguments**

Movants now further argue that an order compelling
arbitration and staying this action should issue under the
sections 3, 4, and 206 of the Federal Arbitration Act because this
Court lacks jurisdiction over this matter based on the mandatory
arbitration provisions, express or incorporated by reference, in
the excess insurance policies.  Furthermore they contend under

---

[13] No one disputes that the claims being settled are covered
under the policies.  The insuring clause of the Primary AEGIS
Policy provides,

> The INSURER shall pay on behalf of the
> DIRECTORS and OFFICERS any and all sums which
> they shall become obligated to pay as ULTIMATE
> NET LOSS for which the COMPANY has not
> provided reimbursement, by reason of any
> WRONGFUL ACT which takes place during the
> COVERAGE PERIOD and is actually or allegedly
> caused, committed or attempted by the
> DIRECTORS or OFFICERS while acting in their
> respective capacities as DIRECTORS or
> OFFICERS, provided such ULTIMATE NET LOSS
> arises from a CLAIM first made against the
> DIRECTORS or OFFICERS during the POLICY YEAR
> or during the DISCOVERY PERIOD, if purchased.

AEGIS Policy, Endorsement 22; Endorsement No. 1D(3).  The Outside
Directors and Harrison have become obligated to pay the settlements
to the *Newby* Plaintiffs and Official Committee of Unsecured
Creditors, sums which are included in the definition of "ULTIMATE
NET LOSS" because they constitute indemnity (§ II(O)), i.e., money
the directors "shall be legally obligated to pay as damages, either
by adjudication or compromise with the consent of the Insurer" (§
II(G)) for allegedly wrongful acts performed in their official
capacities at Enron.  Conditions precedent have been satisfied:
the claims against the settling Defendants were asserted during the
policy period, and Enron is bankrupt and unable to reimburse them.

other terms of the policies (specifically the EIM Policy and all other higher layers that follow form), all disputes "arising under or relating to" coverage under the policies and to allocation of insurance proceeds are governed by New York law, not Texas law, and, in accordance with the forum selection clause, any non-arbitrable issues must be tried in the Southern District of New York.

Seeking to compel arbitration, Movants, who are all to some degree undisputed insureds under the policies, have made demands upon the insurers, and after rejection of those claims, now seek arbitration, contend that the terms of the excess liability policies, in particular the two agreements to arbitrate found in Primary AEGIS Policy No. D0079A1A98 § IV(Q)(3) and in Policy No. 900630-00D0, § III(G)(2)(a) and (f) and § III(G)(3) and 4, and § III(F), issued by Energy Insurance Mutual ("EIM Policy"), require the submission to arbitration of any disputes "arising out of or relating to" the policies.

Section Q of the Primary AEGIS Policy states, "Any controversy or dispute arising out of or relating to this POLICY, or the breach, termination or validity thereof, shall be resolved in accordance with the procedures specified in this Section IV(Q), which shall be the sole and exclusive procedures for the resolution of any such controversy or dispute." Section IV(Q)(3)[14] of the Primary AEGIS Policy provides,

---

[14] As will be discussed, the Outside Directors and Excess Insurers contend that Endorsement 24 substantially modified this provision.

> Any controversy or dispute arising out of or relating to this POLICY, or the breach, termination or validity thereof, which has not been resolved by non-binding means [negotiation and mediation] as provided herein within ninety (90) days of the initiation of such procedure, shall be settled by binding arbitration in accordance with the CPR Institute Rules for Non-Administered Arbitration of Business Disputes (the "CPR Rules") by three (3) independent and impartial arbitrators. . . . . The terms of this POLICY are to be construed . . . in accordance with the jurisdiction in which the situation forming the basis for the controversy arose.[15]

Movants also rely upon the following provisions of the EMI Policy, the first layer of excess insurance that was exhausted before the Outside Directors made their settlement demand and before the interpleader was filed, and argue that "[a]ll of the non-exhausted Policies follow the form of this policy"[16] and incorporate the following EIM Policy provisions:

> In the event of any dispute between the Insured and the Company as to any matters arising out of or relating to any provision of this Policy, the parties shall resolve the dispute by use of a mini-trial. . . . [Section III(G)(2)(a)]

> If the parties are unable to agree on the ground rules of the mini-trial, either party may make a demand in writing for arbitration upon the other party. [Section III (G)(2)(f)]

> Any claim or controversy between the Insured and the Company not settled in accordance

---

[15] The Outside Directors and the Excess Insurers argue that under this provision the law applicable to these disputes "under the current circumstances appears to be Texas." Letter from Dan Bailey, dated October 21, 2004, on behalf of the Excess Insurers (Vol I, ex. A.3, to Appendix to #3121 at 2, n.2).

[16] Instrument #2527 at 14.

> with Section (2) above, shall be submitted to arbitration in New York City before three arbitrators at the request of either the Insured or the Company. . . . [Section III(G)(3)]
>
> To the extent that any claim or controversy between the Insured and the Company [EMI] hereunder is not subject to arbitration for any reason, whatsoever, the United States District Court for the Southern District of New York shall have exclusive jurisdiction thereof. . . . [Section III(G)(4)]
>
> In view of the diverse locations of the parties purchasing insurance from the Company and the desirability of unified regulation, the parties agree that the Policy shall be construed and enforced in accordance with and governed by the internal law of the State of New York, except in so far as such law may prohibit payment in respect of punitive damages hereunder. [Section III(F)]

The Outside Directors observe that outside of the Primary AEGIS Policy and the EIM Policy, only the ACE and Royal Policies have independent provisions with arbitration agreements.

Movants further argue that under New York law, in contrast to the *Stowers* doctrine under Texas law, the payment of the remaining insurance proceeds solely to the Settling Defendants under the circumstances here would violate the D&O carriers' contractual and fiduciary duties to the Movants and other non-settling insureds. *Smoral v. Hanover Ins. Co.*, 37 A.D. 2d 23, 322 N.Y.S.2d 12, 14 (N.Y. App. [1st Dept.] 1971). Their interpretation of *Smoral* will be addressed later.

Although the proceeds of the Primary AEGIS and the EIM Policies have been exhausted by payments to the insureds and thus are not part of the Interpleader Action, Movants argue that the

Excess Polices use "follow form" language[17] to incorporate provisions of underlying policies.  Specifically Movants argue that they incorporate the arbitration, choice-of-law, and forum selection provisions of the EIM Policy by reference.  *See, e.g.*, § I of Policy No. ELU 82248-01 issued by Greenwich Insurance Company ("Greenwich Policy").  This Greenwich Policy was the first unexhausted layer regarding which this Court entered an injunction to stay the distribution of its proceeds.  The policy states, "Coverage hereunder will apply in conformance with the terms, conditions, endorsements and warranties of the **Primary Policy** together with the terms, conditions, endorsements and warranties of any other **Underlying Insurance**."  Greenwich Policy § I, Ex. A.2.e to #3121.

Nevertheless, the policies are not consistent with respect to following form.  Expressly following form of **only the Primary AEGIS Policy**, the Lloyd's of London Policy specifies, "[T]his Policy is subject to the same insuring clauses, definitions, items, conditions, exclusions, and other provisions, as those set forth in the Primary Policy . . . . No changes to the Primary Policy as so described shall be binding upon Underwriters under this Policy unless specifically endorsed."  Ex. A.2.f to #3121 at 5.  The first of the two Federal Insurance Company's Policies similarly states, "Coverage hereunder then shall apply in conformance with the terms and conditions of the Primary Policy

---

[17] The Excess Policies "follow form," i.e, they have provisions adopting and following the same terms and conditions as the AEGIS Primary Policy and in some cases other underlying policies unless otherwise indicated in each excess policy's own provisions.

except as otherwise provided herein." Ex. A.2.h to #3121, in ¶ 4 of an Endorsement dated October 27, 1999. Thus EIM's arbitration, forum-selection, and choice-of-law provisions are irrelevant to these two policies.

The St. Paul's Policy, Ex. A.2.g at I, provides that "this policy incorporates by reference and affords coverage in accordance with and subject to the insuring clauses, warranties, definitions, terms, conditions, exclusions and other provisions contained in the **Primary Policy** and **to the extent that coverage is further limited or restricted thereby, in any other Underlying Insurance** . . . . [emphasis added by the Court]" Likewise the two Federal Insurance Company Policies and the Quota Share Policy, Exhibits A.2.c at ¶ 1, A.2.h at ¶ 1, and A.2.k at ¶ 1 to #3121, state, "Coverage hereunder shall then apply in conformance with the terms and conditions of the **Primary Policy as amended by any more restrictive terms and conditions of any other policy designated in Item 4(B) of the Declarations**, except as otherwise provided herein. [emphasis added by the Court]"

In addition, two of the excess policies contain their own independent arbitration provisions, one conditional and the other mandatory: (1) § V of Policy No. PSF 000633 issued by Royal Insurance Company of America ("Royal Policy")(following form as to AEGIS and any more restrictive provisions of any underlying insurance, § 1, and adding in § V(f), "Only if requested by the Insureds, the Insurer shall submit any dispute, controversy or claim arising out of or relating to this Policy or the breach, termination or invalidity thereof to final and binding arbitration

- 14 -

pursuant to such rules and procedures as the parties may agree."); and (2) § IV(H) of Policy No. ENE-9459D issued by ACE Bermuda Insurance Ltd. ("ACE Policy")("Any dispute controversy or claim arising out of or relating to this Policy or the breach, termination or invalidity thereof shall be finally and fully determined in London, England under the provisions of the Arbitration Acts of 1950, 1975, and 1979, and/or any statutory modifications thereto, for the time being in force, by a Board composed of three arbitrators.").   Exs. A.2.i and A.2.j to 3121. The Outside Directors point out that neither of these policies provides for the New York forum or application of New York law sought by Movants.[18]

---

[18] Outside Directors make a strained, unpersuasive, and unsupported argument that the Royal Policy's "only if requested by the Insureds" contemplates that the insurers must proceed to arbitration only if requested by *all* the insureds rather than one or some.   It is highly improbable that any dispute would involve all the insureds and that all insureds would then request arbitration.

In addition the Outside Directors argue that the ACE and Royal Policies' arbitration provisions do not apply because there is no coverage issue under them since the Objectors' claims are too small to "leapfrog" up the $100 million into these last two excess layers to trigger their coverage.

Furthermore they contend that the language of the policies indicates that the policies only covered costs that have been "incurred," not future costs.   As for claims previously made and rejected by the insurers, the Outside Directors, without citing any authority, insist that the amounts incurred arose out of the first four, exhausted policies (AEGIS, EIM, Federal, and Twin City) and must therefore be asserted against those four insurers, not against the subsequent excess layers.

This Court notes that under Texas law, in "claims-made" policies covering claims discovered and reported to the insurance company within the policy period like those here (as opposed to "occurrence" triggered policies for occurrences during the policy period regardless of the date of discovery), coverage often extends to future claims when the insured gives notice to the insurer during the policy period of specified wrongful acts of officers and directors, but not for merely generalized allegations of wrongdoing

Movants argue that provisions "restricting" coverage in the EIM Policy include the choice-of-New York-law provision and New York venue provision because under the circumstances here, New York law restricts coverage, specifically pursuant to *Smoral v. Hanover Ins. Co.*, 37 A.D. 2d 23, 322 N.Y.S.2d 12, 14 (N.Y. App. [1st Dept.] 1971)(Good faith duty of insurer requires it to adequately protect the interests of all insureds and not to prefer one over the other by tendering the full limits of the policy to one and leaving others exposed).  Under *Smoral*, Movants insist they are entitled as a matter of law to a portion of the remaining insurance proceeds and threaten to sue the Excess Insurers for breach of fiduciary duty and bad faith.

The Outside Directors respond that these choice-of-law and forum-selection clauses do not "restrict or limit" coverage, but merely specify a forum in which disputes can or must be resolved; thus the St. Paul, Federal Insurance, Royal and ACE Policies do not "follow form" as to the EIM arbitration provision because the provisions do not "restrict or limit" coverage.

This Court disagrees with the Movants' interpretation of *Smoral*.

The facts in *Smoral* limit the scope of its holding.  In *Smoral*, an insured driver of a company car sued the insurer for breach of contract, specifically of an insurer's duty of good

---

or adverse information.  *Nation Union Fire Ins. Co. of Pittsburgh, Pa. v. Willis*, 139 F. Supp.2d 827, 832 (S.D. Tex. 2001)(and cases cited therein), *aff'd*, 296 F.3d 336 (5th Cir. 2002).  Movants have not met this evidentiary burden here.

faith, because the insurer, which was actively defending the driver, without notice to or consent of the insured driver tendered the full limits of an automobile liability policy in return for a complete release of two coinsureds, the corporate policy holder and the president of the corporation, while leaving the driver fully exposed.  The trial judge found the insurer had an adverse interest to the driver and ordered the insurer's attorneys to withdraw from representation of the driver. 322 N.Y.S.2d at 13.   The New York Supreme Court, highlighting an insurer's duty of good faith, i.e., the "adequate protection of the interests of the assured," wrote, "It is absolutely no answer for the company to say that it paid the full amount of its policy if in so doing it fully protected one of its insureds and left the other completely exposed." 322 N.Y.S.2d at 14.  Thus the insurer, which had undertaken a duty to defend as well as to indemnify, went behind its insured's back in surreptitiously settling claims against the others for the limits of the policy, to the detriment of the truck driver.

Furthermore the Fifth Circuit has noted that not only has Texas rejected the *Smoral* rule, but that *Smoral* is followed only in New York and California. *Travelers Indemnity Co. v. Citgo Petroleum Corp.*, 166 F.3d 761, 766 (5th Cir. 1999); *In the Matter of Vitek*, 51 F.3d 530, 536 (5th Cir. 1995).

Moreover, *Smoral* does not stand for the rule that an insurer may never enter into a partial settlement that exhausts policy limits while leaving other insureds exposed.  The Fifth Circuit opined in *Vitek*, 51 F.3d at 537, "Nowhere in either *Smoral*

or *Soriano* do we find true support for a general principle of insurance law that forbids an insurer from settling with one of its coinsureds to the disadvantage of another one.  Rather, those cases  recognize nothing more than the aggrieved insured's right to seek damages from the insurance company for making such a settlement, by initiating a suit for breach of good faith." Moreover, other post-*Smoral* New York cases have held expressly or implicitly that "[a]n insurer may settle with less than all of the claimants under a particular policy even if such settlement exhausts the policy proceeds . . . ."  *See, e.g., STV Group, Inc. v. American Continental Properties, Inc.*, 234 A.D.2d 50, 51, 650 N.Y.S.2d 204, 205 (N.Y. App. [1st Dept.] 1996)(*citing Duprey v. Security Mut. Cas. Co.*, 22 A.D.2d 544, 256 (3d Dept. 1965)), *leave to appeal denied*, 90 N.Y.2d 806, 686 N.E.2d 223, 663 N.Y.S.2d 511 (N.Y. 1997)(Table).

In the *Newby* and *Pirelli* litigation, the Excess Insurers have not assumed the duty to defend the Criminal Defendants and thus far there have been no proceedings instigated charging any conflict of interest or bad faith by the Excess Insurers regarding the partial settlements.  Furthermore the Outside Directors have cited a number of New York cases that demonstrate that New York law allows insurers to pay claims on a chronological basis until policy proceeds are exhausted without breaching their duty of good faith.  *See, e.g., State Farm Ins. Co. v. Credle*, 228 A.D.2d 191, 643 N.Y.S.2d 97, 98 (N.Y. App. [1st Dept.] 1996); *Richter v. Vitale*, 59 Misc.2d 374, 376, 299 N.Y.S.2d 293, 296 (Sup. Ct.

1969)("Generally, insurance proceeds are distributed on a first-come-first-served basis according to priority of judgment.").

Unlike New York, Texas has rejected a common law cause of action for breach of duty of good faith against an insurer settling a third-party claim.  According to the Fifth Circuit, the Texas Supreme Court has held that "the *Stowers* duty is the only common law tort duty Texas currently recognizes in third party insurance claims."  *Ford v. Cimarron Ins. Co.*, 230 F.3d 828, 831-32 (5th Cir. 2000)(*quoting Ins. Exchange v. Garcia*, 876 S.W.2d 842, 849 (Tex. 1994)("In the context of a *Stowers* lawsuit, evidence concerning claims investigation, trial defense, and conduct during settlement negotiations is necessarily subsidiary to the ultimate issue of whether the claimant's demand was reasonable under the circumstances, such that an ordinarily prudent insurer would accept it.").[19]

---

[19] In *Maryland Ins. Co. v.. Head Industrial Coatings & Services, Inc.*, 938 S.W.2d 27, 28-29 (Tex. 1996)(per curiam), the Texas Supreme Court held that the insured's right to challenge its insurer for unfair settlement acts was limited to the rights under the *Stowers* doctrine.  Nevertheless, that action was filed before the Texas Legislature in 1995 amended Texas Insurance Code article 21.21 to add section 4(10), which provided a statutory private cause of action to an insured to sue its insurer for unfair settlement practices in settling third-party claims and defined as an unfair settlement practice "failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which the insurer's liability has become reasonably clear."  *See, e.g., Chickasha Cotton Oil Co. v. Houston Gen. Ins. Co.*, No. 05-00-01789-CV, 2002 WL 1792467, *7 (Tex. App.–Dallas 2002, no pet.); *Rocor Int'l, Inc. v. National Union Fire Ins. Co. of Pittsburgh, PA*, 77 S.W.3d 253, 255, 258-60 (Tex. 2002); *Gulf Ins. Co. v. Jones*, No. Civ. A. 300CV0330L, 2003 WL 22208551, *9 (N.D. Tex. Sept. 24, 2003).  The statute was recodified, eff. April 1, 2005 in Tex. Ins. Code Ann. § 541.060, Act of June 21, 2003, 78th Leg., R.S., 2003 Tex. Session Law Service ch. 1274 (Vernon's).  The parties here have not asserted that the insurers have a statutory

Regardless, under the Court's reading of *Smoral*, it concludes that Movants have not demonstrated that the choice of venue and choice of law provisions "restrict" or "limit" coverage. Thus the Court finds that the St. Paul, Federal Insurance, Royal and ACE Policies do not "follow form" as to the EIM arbitration provision based on such an argument.

Movants insist generally that the language of the policies clearly require mandatory, binding arbitration. They contend that under the broad language of Section 2 of the FAA, 9 U.S.C. § 2, a written agreement to arbitrate in "a contract evidencing a transaction involving commerce . . . shall be valid,

---

duty to reasonably attempt settlement of a third-party claim against an assured. Nevertheless, the common law does permit an exposed insured to file a first-party action to challenge its insurer based on the reasonableness of a settlement offer that "exhausts or diminishes the proceeds available to satisfy other claims" because such a rule "promotes settlement of lawsuits and encourages claimants to make their claims promptly." *Texas Farmers Ins. Co. v. Soriano*, 881 S.W.2d 312, 315 (Tex. 1994); *Citgo Petroleum*, 166 F.3d at 765 (under Texas law an insurer may be liable if "the settlement they reached was unreasonable 'considering solely the merits of the' settled 'claim and the potential liability of the insured on' that claim")(*quoting Soriano* at 316); *American Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 849 (Tex. 1994)("In the context of a *Stowers* lawsuit, . . . the ultimate issue [is] whether the claimant's demand was reasonable under the circumstances, such that an ordinarily prudent insurer would accept it."); *Gulf Ins. Co. v. Jones*, No. Civ. A. 300CV0330L, 2003 WL 22208551, *3 (N.D. Tex. Sept. 24, 2003)("The focus in a *Stowers* lawsuit is solely on the reasonableness of the settlement offer."), *citing Birmingham Fire Ins. Co. v. Pennsylvania v. Am. Nat'l Fire Ins. Co.*, 947 S.W.2d, 592, 597 (Tex. App.–Texarkana 1997, writ denied).

The Excess Insurers here have made clear their determination to avoid such liability. Though ordered by the Court to fulfill their implied duty under *Stowers* to make a determination of the "reasonableness" of the proposed settlements here after the claims made against the policies, they have chosen instead, as the law permits them to do, to file an interpleader and thus shield themselves from such a risk. #3678.

irrevocable, and enforceable, save upon grounds as exist at law or in equity for the revocation of any contract." This statutory language "is a congressional declaration of a liberal federal policy favoring arbitration." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). In light of this presumption in favor of arbitration, any doubts about arbitrability should be resolved in favor of arbitration, urge Movants. *Primerica Life Ins. Inc. v. Brown*, 304 F.3d 469, 471 (5th Cir. 2002).

Nevertheless, this Court notes that the Supreme Court has held that the federal policy favoring arbitration does not override the contractual choices of the parties and that no party can be required to submit to arbitration any dispute to which he has not agreed to submit. *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479, 476 (1989)("Arbitration under the [FAA] is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit"; federal policy under the FAA aims to "ensure the enforceability, according to their terms, of private agreements to arbitrate."), *quoted in Ford v. NYLCare Health Plans of the Gulf Coast, Inc.*, 141 F.3d 243, 247-48 (5th Cir. 1998).

In addition Movants maintain that the filing of the interpleader was improper and merely an attempt to circumvent the requirement that the claims be submitted to and resolved by arbitration. This Court disagrees. The interpleader does not

nullify the arbitration issue here, as will be discussed subsequently. The Court would stay or dismiss the interpleader and compel arbitration if it, or the Fifth Circuit on appeal, determines that the mandatory arbitration clauses govern this dispute.

Finally, Movants object that even if Texas law applies, the settlement with the Outside Directors and the Official Committee of Unsecured Creditors, whose *Stowers* demand exhausts the remaining $200 million in excess insurance policies' proceeds, is not reasonable in amount,[20] as well as unfair to the non-settling insured Defendants who would be left without any coverage for their ongoing defense costs. Movants further complain that claims for substantial defense costs already incurred have been presented for payment from the insurance proceeds, but either

---

[20] To show that a settlement demand was unreasonable under Texas law, a plaintiff must demonstrate that a reasonably prudent insurer would not have settled the claim in view of the merits of the claim and the potential liability of its insured on the claim. *Texas Farmers Ins. Co. v. Soriano*, 881 S.W.2d 312, 316 (Tex. 1994). *See also American Physicians Ins. Exchange v. Garcia*, 876 S.W.2d 842, 848 (Tex. 1994)(under Texas law Texas insurers have a *Stowers* duty to "exercise 'that degree of care and diligence which an ordinarily prudent person would exercise in the management of his own business' in responding to settlement demands within policy limits."). To trigger a *Stowers* duty, the insured must demonstrate that the claim against him was within the scope of coverage of the policy, that the demand was within the policy's limits, and that an ordinarily prudent insurer would accept such terms in view of the likelihood and degree of the insured's potential exposure to an excess judgment. *Id.* An insurer may be held liable if "the settlement [the parties] reached was unreasonable 'considering solely the merits' of the settled 'claim and the potential liability of the insured on' that claim." *Citgo*, 166 F.3d 765, *quoting Soriano*, 881 S.W.2d at 316.

disclaimed or still in the payment process, and they have priority
over the settling Defendants' claims to the proceeds.[21]

_____

[21] In May 2003 and October 2004, before the Outside Directors
made their *Stowers* demand based on the settlement, Kevin Hannon
maintains that he submitted claims reimbursement for defense costs
that he incurred in an SEC civil enforcement action against him and
other employees of Enron Broadband Services in a criminal action
against the same individuals, but that payment was refused by the
carriers.   Like Harrison (who has since joined in the settlement
and thus impliedly withdrawn his objection) and Fastow, Hannon
insists his claims for past, present, and future defense costs take
priority over the settlement demand.
        There have been some vague contentions that prior,
rejected claims against the policy from other insureds have
priority over the settlement demands of the settling parties.
Clearly their claims must be determined to be "covered" under the
policies before priority becomes an issue.
        The Court presumes these arguments may also refer in part
to the "first in time, first in right" common-law rule, applying
chronological priority, for determining distribution of insurance
proceeds among competing claimants, a rule which New York follows.
*David v. Bauman*, 24 Misc. 2d 67, 196 N.Y.S.2d 746, 748 (Sup. Ct.,
Nassau Co., 1960)(plaintiffs who diligently obtained summary
judgment for proceeds of a liability policy insurer has right to
settle some claims regardless whether other claimants may be
affected by these settlements where the insurance contract gave the
insurer the right to do so); *Gerdes v. Travelers Ins. Co.*, 109
Misc.2d 816, 819, 440 N.Y.S.2d 976, 978 (Sup. Ct., Suffolk Co.,
1981).   The Court's research indicates that in the context of
distribution of insurance policy proceeds the rule applies to
**judgments** and **settlements**.   *See, e.g.,* 12 Couch on Insurance §
172:67 ("In a majority of cases, the courts have held that
liability insurers may distribute proceeds of inadequate insurance
to judgment creditors on the basis of priority of judgments.")
(Thompson/West 2002); *id.* at § 170:28 (same, but adding that "in
interpleader actions by liability insurers against their insureds'
judgment creditors who had obtained judgments in separate actions,
to determine how inadequate insurance proceeds were to be
distributed, it has been held that the proceeds were to be
distributed on a pro rata basis and not on the basis of priority of
judgment"); *Boris v. Flaherty*, 242 A.D.2d 9, 13, 672 N.Y.S.2d 177,
180 (Sup. Ct. App. Div. 4th Dept. N.Y.)(the normal rule of "first
in time, first in right" does not take precedence over an
interpleader action and in such an action the court "may exercise
its equitable power to prorate insurance proceeds among
claimants"); *Liberty Mutual Ins. Co. v. Davis*, 412 F.2d 475, 478
(5th Cir. 1969)("New York follows the rule of 'first in time, first
in right,' which rule applies as well to amicable settlements as to
judgments."). A claim not reduced to judgment by an insured
against his insurer via arbitration or litigation is not the same

Also at issue here is whether defense costs in **criminal** actions are covered by the policies.  "Claim" is defined in § IV(I)(1) in the EIM policy, mirroring that in § II(A)(1) of the AEGIS Policy, as "any demand, suit or proceeding against any DIRECTORS and/or OFFICERS during the POLICY PERIOD or during the

---

thing as a settlement demand within the limits of the policy under *Stowers* and progeny in a suit filed by injured third-party defendants.  None of the Defendants contends that he made a settlement demand before the *Newby* and *Pirelli* settling Defendants. *Texas Farmers Ins. Co. v. Soriano*, 881 S.W.2d 312, 315 (Tex. 1994)(insurer had no duty to settle with claimants where there was no evidence of a settlement demand within policy limits by them prior to the reasonable settlement demand by other insureds that was accepted).  Moreover, the first in time rule has been harshly criticized, even in New York courts. *See, e.g., Belizaire v. Aetna Casualty & Surety Co.*, 171 Misc.2d 473, 477, 654 N.Y.S.2d 982, 985 (Sup. Ct., Kings Co., 1997)("The first in time rule seems to merely be an expedient rather than a reasoned response to a situation where an injustice will inevitably result to either the carrier or the claimant.").

Under *Soriano*, an insurer, faced with multiple claims and inadequate policy proceeds and a *Stowers* demand, may enter into a reasonable settlement with some of them even if the settlement exhausts the policy proceeds.  If a prior claimant/insured, whose claim was denied for lack of coverage, ultimately prevails against the insurer, he may have a first-party claim against the insurer for breach of duty of good faith and fair dealing for refusal to pay his claim if he can show the (1) the insurer had not reasonable basis for denying or delaying payment of the claim or (2) the insurer knew or should have known that there was no reasonable basis for denying or delaying payment of the claim.  *Arnold v. National County Mutual Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987); *Aranda v. Ins. Co. of North America*, 748 S.W.2d 210, 213 (Tex. 1988); *Lyons v. Millers Casualty Ins. Co.*, 866 S.W.2d 597, 601 (Tex. 1993).

As will be discussed, where a Defendant argues that he made a demand for arbitration of his claim before a settlement demand was made, the Court must first determine whether the claim was covered under the policy and whether it was within the scope of an arbitration provision.  Furthermore in Hannon's case, the Excess Insurers state that they have no record of Hannon's demanding **arbitration** of any issue before the Excess Insurers filed their interpleader action, despite requests to Hannon's counsel that he provide evidence of such a demand.  Moreover they represent that those insureds who had demanded arbitration of their claims are now not objecting to the propriety of the interpleader.  #3185 at 2-3 & n.1.

DISCOVERY PERIOD, if any, which seeks actual monetary damages or other relief and which may result in any Directors and/or officers becoming legally obligated to pay Ultimate Net Loss[22] by reason of any Wrongful Act actually or allegedly caused, committed or attempted . . . ."[23]

Movants who have been indicted, including the non-Newby EBS Defendants, Mark Koenig, and Fastow, have been denied coverage by the insurers for their defense costs in criminal actions against them on the grounds that the term "claim" under the policies does not cover **criminal** proceedings or investigations since criminal proceedings do not seek "monetary damages or other relief."[24]  The Outside Directors, too, maintain that the policy covering claims for defense costs is limited to civil actions by the phrase "actual monetary damages or other relief," which refers to compensatory awards or equitable remedies available to a plaintiff.  *See Foster v. Summit Medical Systems, Inc.*, 610 N.W. 2d 350, 354 (Minn. App. 2000)("[T]he ordinary understanding of the

---

[22] "Ultimate Net Loss" is "the total INDEMNITY and DEFENSE COST with respect to which this Policy applies . . . ."  AEGIS Policy Ex. A.2.A, § II(O), to #3121.

[23] In "claims-made" D&O liability policies, a "claim" "does not refer to the notice by the insured to the insurer, but to a demand by a third party against the insured seeking to hold the insured responsible for the consequences of some alleged wrongful act." John F. Olson, Josiah O. Hatch, Ty R. Sagalow & publisher's editorial staff, *Director & Officer Liability: Indemnification and Insurance*, Dir. & Off. Liab. § 12:7 (2004).

[24] The insurers emphasize that the language of the EIM policy obligates EIM to pay the "ultimate net loss," which the policy defines as including defense costs, of any insured because of a wrongful act that results in a "claim."  They too interpret "claim" as limited to civil actions for compensatory damages and equitable relief.

term 'relief' is assistance or something that lessens pain or discomfort. . . . In the legal context, the term 'relief' refers to redress or benefit, especially equitable redress such as an injunction or specific performance."); *Deluxe Black's Law Dictionary* at 1292 (6th ed. 1990)("relief" defined as "general designation of the assistance, redress, or benefit which a complainant seeks at the hands of a court in equity. . . . [including] such remedies as specific performance, injunction, or the reformation or rescission of a contract.").

The non-*Newby* EBS Defendants object that their defense costs in the criminal proceedings against them are covered under the "other relief" portion of the definition of "CLAIM", which term at the very minimum is ambiguous.  EBS Defendants maintain that a conviction in the criminal case may result in fines, mandatory restitution and statutory monetary special assessments, all of which would fall under "other relief."  *Polychron v. Crum & Foster Ins. Co.*, 916 F.2d 461 (8th Cir. 1990)(finding that in the absence of any definition in the D&O insurance policy, the ordinary meaning of "claim" included a grand jury indictment, that possible penalties in a criminal proceeding are monetary "other relief," and that any ambiguity should be resolved in favor of the insured).

Should the Court determine that there is no coverage under the insuring clause for defense costs in criminal actions, the EBS Criminal Defendants[25] alternatively argue that there is an

_____

[25] In addition to Hannon and Rice, the other "Criminal Defendants" raising objections here who have pled guilty and made

exclusion to coverage in the policies that nevertheless creates coverage for at least their criminal defense costs under the particular circumstances here. Section III(A)(1) of the Primary AEGIS Policy provides,

### III. Exclusions

The INSURER shall not be liable to make any payment for ULTIMATE NET LOSS arising from any CLAIM(S) made against any DIRECTOR or OFFICER:

(a)(1) for any fines or penalties imposed in a criminal suit, action or proceeding . . . .

They interpret this passage as establishing an exclusion from coverage of criminal fines or penalties if the Criminal Defendants are ultimately assessed (the fines or penalties are "imposed") in a criminal case, but they highlight the fact that it does not preclude coverage for defense costs for the ongoing proceedings leading up to conviction.[26] They argue that otherwise this narrow exclusion, a small portion of ULTIMATE NET LOSS embracing both indemnity and defense costs, would be unnecessary and that the carriers remain otherwise liable for costs of criminal proceedings

---

claims on insurance proceeds for defense costs are Andrew Fastow and Mark Koenig. At the preliminary approval hearing on February 4, 2005, Mr. Park informed the Court that Criminal Defendants Rice and Koenig had withdrawn their objections. TR at 13-4 (Appendix to #3121, Vol. I, Ex. 4. The Court addresses the arguments anyway since they are also made by Defendants Fastow and Hannon.

[26] The Court notes that none of the nonsettling insureds has made a claim for reimbursement of imposed fines or penalties, nor has anyone yet incurred such; moreover it finds that they are expressly excluded from coverage. Rather, here some Movants seek reimbursement of incurred defense attorney's fees prior to adjudication establishing dishonesty or fraud, if ever.

- 27 -

(e.g., investigating, settling, defending).[27]  They make the same
argument, under Section III(B)(3), that coverage exists for
defense costs incurred prior to the "final adjudication" of
dishonest acts, if ever, even though it excludes coverage for
specific claims that are

> brought about or contributed to by the
> dishonest, fraudulent, criminal or malicious
> act or omission of such DIRECTOR or OFFICER
> if a final adjudication establishes that acts
> of active and deliberate dishonesty were
> committed or attempted with actual dishonest
> purpose and intent and were material to the
> cause of action so adjudicated.

They also note that in the year following their claim, EIM added
an express exclusion for defense costs for criminal proceedings,
indicating there was no such exclusion earlier.  EBS Criminal
Defendants and Fastow contend that since there has been no "final
adjudication" of acts of dishonesty by them, the D&O carriers must
pay their criminal defense costs.  *National Union Fire Ins. Co.
of Pittsburgh, Pa. v. Brown*, 787 F. Supp. 1424, 1429 (S.D. Fla.
1991)(without final adjudication that insured engaged in fraud,
dishonesty or criminal acts, the policy exclusion for such conduct
did not apply), *aff'd*, 963 F.2d 385 (11th Cir. 1992);  *United
States v. Gottlieb*, 817 F.2d 475, 476 (8th Cir. 1987)(orders
regarding a guilty plea are not final decisions until after
sentencing); *Aguilera-Enrique v. INS*, 516 F.2d 565, 571 (6th Cir.

---

[27] Outside Directors disagree, insisting that the language and
structure of the exclusion contemplates two proceedings, a civil
and a criminal suit, and applies to allow coverage only when a
civil "claim" is brought against an insured to recover fines and
penalties imposed in a criminal proceeding, e.g., a shareholder
derivative suit against directors and officers after a corporation
like Enron is criminally fined.

1975)("Once sentencing [on guilty plea] is completed . . . the conviction is final for deportation purposes), *cert. denied*, 423 U.S. 1050 (1976); Fed. Rule of Crim. P. 11 (allowing a defendant to withdraw guilty plea; providing that a guilty plea is not final until "the court imposes sentence"). Some note that the Cooperation Agreements that they signed with the Enron Task Force permit the Task Force, in its sole and exclusive discretion, to withdraw the plea agreements and prosecute them on all counts of their indictments.

Finally the non-*Newby* EBS Defendants point out that the SEC has filed a civil enforcement lawsuit against them, for which EIM, after some dispute, has agreed to pay the defense costs. The defense overlaps with much of the criminal action and any fact finding in the criminal case will have a preclusive effect in the SEC suit. Thus, they argue, their defense costs in the criminal action should also be covered.

**COURT'S RULING**

This Court has reviewed carefully all of the pleadings filed not just relating to the motions to compel arbitration, to stay interpleader, and for summary judgment, but also arguments made regarding the preliminary injunction, in order to fully understand the arguments in the motions to compel arbitration. After reviewing the record and the applicable law, it reaches the following determinations regarding the issues raised above and others raised in the briefing but thus far not mentioned.

**I. Does the Court Have Subject Matter Jurisdiction Over The Interpleader Action?**

The Court has supplemental jurisdiction under 28 U.S.C. § 1391(b) over the First Amended Third-Party Complaint for Contract Enforcement and Injunctive Relief Regarding D&O Policy Proceeds (#2462). The Court has previously rejected arguments that it lacks federal subject matter jurisdiction over the interpleader and will not reiterate its conclusions. *In re Enron Corporation Securities, Derivative & "ERISA" Litigation*, No. MDL-1446, Civ. H-01-3624, 2004 WL 2889891 (S.D. Tex. Dec. 9, 2004)(concluding that the Court has jurisdiction under both 28 U.S.C. §§ 1335 for a statutory interpleader action and 1367(a) for supplemental jurisdiction for claims relating to indemnification relating to the underlying lawsuits).

In the Third-Party Counterclaim for Interpleader, the Third-Party Defendants/Third-Party Counterclaim Plaintffs initially state that the interpleader is both statutory and brought under Rule 22. #2483 at 22. When addressing jurisdiction, however, they state there is federal subject matter jurisdiction based on the statutes, i.e., 28 U.S.C. §§ 1367 and 1335.[28] Moreover, the Counterclaim in identifying the citizenship

---

[28] Section 1335(a) provides in relevant part,

> The district courts shall have original jurisdiction of any civil action of interpleader . . . if
> (1) Tow or more adverse claimants, of diverse citizenship as defined in section 1332 of this title, are claiming or may claim to be entitled to such money or property . . . and if (2) the plaintiff has deposited such money or property . . . into the registry of the court . . . .

of the numerous parties reflects that not all the parties on both sides are diverse.  Therefore the interpleader does not meet the requirement of complete diversity of citizenship under Rule 22. *Aetna Casualty and Surety Co. v. Ahrens*, 414 F. Supp.. 1235, 1253 (S.D. Tex. 1975, supplemented 1976)(Bue, J.)(Rule 22 interpleader actions require complete  diversity; statutory interpleader under 28 U.S.C. §1335 requires only minimum diversity of citizenship between two [or more] adverse claimants), *citing State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 530 (1976)(§ 1335 "has been uniformly construed to require only 'minimal diversity,' that is, diversity of citizenship between two or more claimants, without regard to the circumstance that other rival claimants may be co-citizens.").  Therefore this Court treats the interpleader as a statutory action.[29]

## II.  Does An Arbitration Provision Apply, and If So, Which?

While there is a strong federal policy favoring enforcement of arbitration agreements, arbitration is a matter of contract and the parties must have expressly agreed to arbitrate the disagreement before the court or the court will not compel arbitration.  *Texaco Exploration & Prod. Co. v. AmClyde Engineered Prods. Co.*, 243 F.3d 906, 909 (5th Cir.  2001).  To determine whether there is an express agreement to submit a dispute to arbitration, the court must decide (1) whether a valid agreement

---

[29] This distinction becomes important, as will be discussed later, because a Rule 22 interpleader, unlike a statutory interpleader under 28 U.S.C. § 1335, does not require a deposit  to establish jurisdiction.  *See, e.g., Murphy v. Travelers Ins. Co.*, 534 F.2d 1155, 1159 (1976); *Percival Construction Co. v. Miller & Miller Auctioneers, Inc.*, 532 F.2d 166, 170-71 (10th Cir. 1976).

to arbitrate exists between the parties, under ordinary state-law principles of contract interpretation[30]; if so, (2) whether the dispute or particular claims before the court falls within the scope of that agreement, with any doubts usually to be resolved in favor of arbitration; and (3) whether other external legal constraints preclude arbitration, such as a preempting federal statute. *Mitsubishi Motors Corp. v. Soler Chrysler Plymouth, Inc.*, 473 U.S. 614, 628 (1985); *Personal Security & Safety Systems, Inc. v. Motorola*, 297 F.3d 388, 392 (5th Cir. 2002); *OPE Intern. L.P. v. Chet Morrison Contractors*, 258 F.3d 443, 446 (5th Cir. 2001); *Woodmen of the World Life Ins. Co. v. Lewis*, 118 Fed. Appx. 826, 828 & nn. 6-7(5th Cir. 2004).

## A.    May a Non-Signatory to the Insurance Contract Compel Arbitration?

The meritless argument has been made that Movants as non-signatories to the agreement cannot invoke an arbitration clause in an insurance policy.

D&O insurance policies are third-party beneficiary contracts, with the insurer the promissor, the insured company (here Enron) the promisee, and the insured officers and directors the third-party beneficiaries.  17 Couch on Insurance § 242:28 (3d ed. updated June 2005), *citing Wedtech Corp. v. Fed. Ins. Co.*, 740

---

[30] The federal policy in favor of enforcing arbitration agreements "'does not apply to the determination of whether there is a valid agreement to arbitrate between the parties' or to 'the determination of who is bound' by the arbitration agreement.' *American Heritage Life Ins. Co. v. Lang*, 321 F.3d 533, 537-38 (5th Cir. 2003), *quoting Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1073-74 (5th Cir. 2002).   The Court makes these determinations.  *Id.*

F. Supp. 214, 219 (S.D.N.Y. 1990).  It is established law in the Fifth Circuit that non-signatories may enforce arbitration clauses if they were intended third-party beneficiaries of the agreement in question. *Bridas S.A.P.I.C. v. Turkmenistan*, 345 F.3d 347, 356 (5th Cir. 2003)("Six theories for binding a nonsignatory to an arbitration agreement have been recognized:  (a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing/alter ego; (e) estoppel; and (f) third-party beneficiary."), *cert. denied*, 541 U.S. 937 (2004); *Westmoreland v. Sadoux*, 299 F.3d 462 (5th Cir. 2002); *see also E.I. Dupont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 195-97 (3d Cir. 2001).  The Second Circuit also recognizes that because arbitration is contractual, under "ordinary principles of contract" a nonsignatory who is a third-party beneficiary of an agreement can compel arbitration under that agreement. *Spear, Leeds & Kellogg v. Central Life Assurance Co.*, 85 F.3d 21, 27-28 (2d Cir. 1996); *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776, 778-79 (2d Cir. 1995)(a signatory can also compel a nonsignatory to arbitrate a dispute under a theory of equitable estoppel if the nonsignatory has knowingly accepted benefits derived from the agreement), *cert. denied*, 519 U.S. 1040 (1996).

It is clear that the former Officers and Directors of Enron were the intended beneficiaries of the D&O Policies.

## B.  Insured v. Insured or Insurer v. Company (Enron)

Both the Outside Directors and the Insurers have argued that because the insurers conceded that the Settling parties' claims impaired the limits of the excess policies' liability and

because the insurers tendered the remaining insurance proceeds into the Court's registry, the dispute is no longer between insurers and Enron, but among the insureds themselves, and that the insureds have not agreed to arbitrate disputes among themselves. Therefore the dispute does not fall within the arbitration provision of any of the policies.

Specifically, insisting that the dispute is among the insureds, not between the insureds and the Excess Insurers, the Excess Insurers urge that the dispute resolution and forum selection clauses, as well as the arbitration clause, of the EIM Policy therefore do not apply. Section III(G)(3) of EIM Policy, the arbitration clause, requires a "claim or controversy between the Insured and the Company . . . ." Section III(G)(4), the forum selection clause, also applies only to a "claim or controversy between the Insured and the Company."

Fastow objects strenuously to this argument, insisting that he "does not have a right of coverage from any other *insured*; he has a right to coverage from the *Insurers*," which "have refused his demands for payment of his continuing defense costs." Instrument #3115 at 9. In his reply, he adds, "The fact that the reason for the dispute [between the Insurers and Fastow] is that other people are demanding the Insurers' money does not somehow eliminate the dispute." #3153 at 11. AEGIS' arbitration provision applies to "[a]ny controversy or dispute arising out of or relating to the POLICY," no matter who the party to the dispute is. *Id.* He further insists that the EIM Policy's dispute

- 34 -

resolution provision, Section III(G), "*expressly contemplates* that one of the potential subjects of dispute between the Insurers and an insured is the equitable allocation of available proceeds *among insureds."  Id.* (observing that according to Section III(G) the dispute resolution procedures are designed to have "'the Company serve as a financially stable and reliable entity, responsive to the coverage needs of its participants and providing coverage fairly and equitably as to each insured, *but taking equally into account fairness and equity to all insureds as a group.'"* [emphasis added]).

It is well established that under the federal interpleader statute, where two or more adverse claimants of diverse citizenship claim to be entitled to insurance proceeds valued at $500 or more, an insurer may opt to file an interpleader or an action for declaratory relief action to protect its own interests. *See State Farm Fire & Casualty Cp. v. Tashire*, 386 U.S. 523, 534 (1967)("[W]here a stakeholder, faced with rival claims to the [single] fund . . . acknowledges--or denies--his liability to one or the other of the claimants[,] . . . the fund itself is the target of the claimants[,] . . . [i]t marks the outer limits of the controversy[, and] . . . [i]t is, therefore, reasonable and sensible that interpleader, in the discharge of its office to protect the fund, should also protect the stakeholder from vexatious and multiple litigation.")(*citing* 28 U.S.C. § 1335(a), authorizing district court to hear actions with two or more claimants of diverse citizenship who "are claiming or may claim to be entitled" to money or property valued at $500 or more;

28 U.S.C. § 2361, authorizing district court to "hear and determine the case," determine the rights of competing claimants, "discharge plaintiff from further liability," and enjoin all parties from instituting proceedings in any court regarding the property at issue).

Furthermore, three Circuit Courts of Appeals, including the Second and the Fifth, have held that the district court normally determines the rights of the parties and the priority of claims in an interpleader action as they existed at the time the interpleader action was commenced. *Avant Petroleum, Inc. v. Banque Paribas,* 853 F.2d 140, 143-44 (2d Cir. 1988)(holding "that where an interpleader action is brought to have the court determine which of two parties has priority with respect to the interpleader fund, the court should normally determine priority as of the time the fund was created"); *White v. FDIC*, 19 F.3d 249, 252 (5th Cir. 1994)(holding that "activity subsequent to the initiation of an interpleader action is normally immaterial in determining which claimant has a superior right to the interpleader fund"); *Texaco, Inc. v. Ponsoldt*, 118 F.3d 1367, 1369-70, 1371 (9th Cir. 1997)("The priority of claims to the res in an interpleader action must normally be determined at the time the action is initiated, and cannot be altered by the events after the interpleader fund becomes viable."). As stated by the Ninth Circuit, "As the entire point of an interpleader action is to resolve then competing rights and claims, it makes perfect sense that the action itself cannot be used as a vehicle for further jockeying for claim position." *Ponsoldt*, 118 F.3d at 1370.

The date a statutory interpleader is "commenced," however, is the date when the interpleader fund is deposited with the Court.  *Avant Petroleum*, 853 F.2d at 143, 144; *Ponsoldt*, 118 F.3d at 1369; *Murphy v. Travelers Ins. Co.*, 534 F.2d 1155, 1159 (5th Cir. 1976)("[T]he deposit requirement is a jurisdictional prerequisite to a suit under the interpleader statute.  28 U.S.C. § 1335.").  The language of § 1335(a)(2) reflects this point: "The district court shall have original jurisdiction of any civil action of interpleader or in the nature of interpleader . . . if . . . the  plaintiff has deposited such money or property . . . into the registry of the  court . . . ."[31]

In the instant action, that interpleader action compulsory counterclaim was filed on October 21, 2004.  There is no evidence that any of the parties now seeking to compel arbitration did so properly before the Court's entry of the restraining order to preserve the insurance policy proceeds in response to the Outside Directors' settlement demand for the remaining proceeds and before the Excess Insurers filed their First Amended Third-Party Counterclaim for Interpleader as a compulsory counterclaim.

Nevertheless, in a statutory interpleader it is the deposit of the funds that determines when the interpleader has been commenced.  The Court issued the order authorizing deposit

---

[31] In contrast, under the language of Fed. R. of Civ. Proc. 22, a Rule 22 interpleader does not require a deposit and the court may determine the parties' rights as of the date the interpleader action was filed.  *Murphy v. Travelers*, 534 F.2d at 1159; *School Board of Broward Co. v. J.V. Construction Corp.*, No. 03-60005-CIV-MOR/GAR, 2004 WL 1304058, *9 (S.D. Fla. Apr. 23, 2004).

of the insurance proceeds (the interpleader fund) on December 22, 2004 (#2865), and the money was actually deposited in the registry by different insurers between January 4-11, 2005.  Meanwhile the motions to compel arbitration were filed before those deposits; thus the Movants had preserved their rights and the priority of their claims, and they were clearly adverse to the Insurers at the time the interpleader was "commenced."  *See generally* 7 Charles Alan Wright, et al., *Federal Practice & Procedure Civ. 3d* § 1714 ("Interpleader is a remedy involving two steps. . . . During the first the court determines the right of the party invoking the remedy to compel the claimants to litigate their claims to the stake in one proceeding.  It is at this point that the court determines whether the prerequisites to rule or statutory interpleader have been met by examining such things as the citizenship of the litigants, the merits of the asserted threat of multiple vexation, and, if interpleader is sought under the statute, the sufficiency of the stakeholder's deposit or bond. . . . The **second** stage of interpleader involves the determination of the respective rights of the claimants to the stake.  **At this juncture, each claimant occupies an adversary position to the others** and must proceed accordingly. [emphasis added by the Court]").

Given the timing of the depositing of the interpleader fund in the Court's registry, the Court concludes that the Interpleaders here cannot use commencement of their interpleader action to deny or nullify the Movants' prior demands and assertions of their right to seek arbitration if those demands are

- 38 -

within the scope of coverage of the policies and if they are governed by the disputed arbitration provisions. *Avant Petroleum*, 118 F.3d at 1369 ("the general purpose of an interpleader action is to decide the validity and priority of *existing claims* to a res"; "interpleader actions do not . . . remove priority from claims which existed when the interpleader commenced"). *See also In re Ambassador Group, Inc. Litigation*, 738 F. Supp. 57, 65 (E.D.N.Y. 1990)(" . . . Congress nowhere indicated that the interpleader statute was intended to alter state contract and insurance law.").[32]

If the arbitration provision in the EIM policy does not govern, and if Texas law applies[33] to the excess layers starting with the Greenwich layer, the settling Defendants have made the first *Stowers* demand for the policy limits.

**C.  Did the Criminal Defendants Waive Their Rights to Compel Arbitration?**

---

[32] Supported by an affidavit from attorney David L Schwarz and a Declaration from attorney Stephen Crimmins (Exs. 2 and 3 to Hannon's motion for summary judgment, #3118), Kevin Hannon asserts that he submitted defense cost claims amounting to $2,633,148 from May 2002 through October 2004 to the AEGIS, EIM, and Federal Insurance layers that were denied by those insurers. Key dates, to be discussed are August 31, 2004, he pled guilty to the criminal indictment in the EBS criminal proceeding, and October 18, 2004, when his attorney sent a letter to the insurance carriers demanding that his claims be submitted to arbitration.

[33] The Primary AEGIS Policy at 11, § IV(Q)(3), provides that the terms of the policy are to be construed in accordance with the laws "of the jurisdiction in which the situation forming the basis for the controversy arose," which in this instance for Enron's former directors and officers would be Texas.

As a "independent" reason for denying the motion to compel arbitration, the Outside Directors point to a Disclosure Agreement, dated August 29, 2003 and signed by the insured Defendants[34] with full knowledge of the provisions of all the insurance policies.  The Disclosure Agreement (¶4 of Ex. A.7 to #3121) sets out the procedure by which insureds under the D&O Policy give notice to one another by electronic mail or facsimile of potential settlements and discuss any objections to them.  If no agreement is reached, the Disclosure Agreement provides that the parties may file a declaratory relief action.  *Id.* at ¶ 6. Most important is that ¶ 8 specifies that the Southern District of Texas will be the exclusive forum for such a declaratory relief action.[35]   Paragraph 8 states,

> Any declaratory relief action arising out of Paragraph 6 of this Agreement shall be supplemental to the claims asserted in *In re Enron Corp. Securities, Derivative & "ERISA") Litigation*, MDL 1446 (S.D. Tex.).  As they are directly related to, and intertwined with, the claims at issue in that litigation. The Parties further agree that Southern District of Texas shall be the exclusive forum in which any such declaratory relief actions shall be commenced and fully litigated, and the Parties consent to jurisdiction in that court.

---

[34] Ken Harrison alone of the insured *Newby* Defendants did not sign the Disclosure Agreement, but since he is now part of the settling group, any challenge from him is moot.

[35] Paragraph 9 states, "All claims or disputes arising out of this Agreement shall be governed and enforceable by the laws of the State of Texas, without giving any effect to any choice or conflict of law provision or rule thereof."

The Outside Directors contend that the Disclosure Agreement demonstrates that the insureds have always understood that arbitration was not required for a dispute among themselves and, regardless of whether arbitration was required, this Court would be the exclusive forum for disputes about the use of insurance proceeds.  In other words, insist the Outside Directors, by this Disclosure Agreement Movants expressly waived their right to arbitration; the Outside Directors characterize it as "entirely inconsistent with an intent to assert a right to arbitrate--and it is an intentional relinquishment of that right, in exchange for something that would not have been required[,] namely, notice by settling parties (like the Outside Directors) to nonsettling parties of potential settlements before they were consummated." #3121 at 13-14, and citing *Frye v. Paine, Webber, Jackson & Curtis, Inc.*, 877 F.2d 396, 398 (5th Cir. 1989)("Despite the strong federal policy favoring arbitration, the right to arbitration may be waived."), *cert. denied*, 494 U.S. 1016 (1990).  The Outside Directors argue that they have met all requirements under the Disclosure Agreement (gave notice, waited specified time, and tried to resolve objections before they made a demand on the insurers).  They now claim that they would be prejudiced if the Criminal Defendants, who obtained and used the benefits of the Disclosure Agreement, are allowed to circumvent their promise to litigate disputes in the Southern District of Texas.  In sum, the Outside Directors maintain that there are no arbitration agreements that cover this dispute and any claimed right to arbitrate has been waived.

Fastow objects that the Disclosure Agreement, rather than constituting a waiver of the right to arbitrate under the excess policies, expressly preserves that right and all others. *See* Disclosure Agreement at ¶6 (a signatory "may" file a declaratory judgment action in the Southern District of Texas) and ¶19 ("Nothing in this Agreement . . . shall amend, modify or change in any way the rights, obligations or defenses by the Enron Insureds or the Enron D&O Insurers or with respect to the Enron D&O Policies."). This Court agrees with Fastow; the language preserving the parties substantive rights, which would include a right to seek arbitration if there is a valid agreement to do so, is clear and unambiguous.[36]

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960).

Nevertheless, in *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557-58 (1964), the United States Supreme Court distinguished questions of arbitrability, which are for the

---

[36]   Regarding his personal situation, Fastow further argues that even if the Disclosure Agreement did waive his right to arbitrate, the Outside Directors materially breached the Disclosure Agreement by "conduct[ing] clandestine negotiations to hijack the insurance policies" and by not noticing Fastow then or since with their demand for the remaining $200 million of proceeds, emphasizing that Fastow's counsel was not on the list of recipients of their e-mails, that they prematurely filed suit for declaratory relief before attempting to resolve objections from other insureds regarding the proposed settlement and less than seven days after notice issued, and that they therefore cannot enforce the Agreement. Because the Court would not construe the Disclosure Agreement as a Waiver, it does not address these factual issues.

district court to decide, from questions of procedure, which, belong to the arbitrator even if they "grow out of the dispute and bear upon its final disposition." Moreover in *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)("[W]hether the parties have submitted a particular dispute to arbitration, i.e., the 'question of arbitrability,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise."), the high court emphasized the breadth of the scope of procedural issues compared with the scope of arbitrability issues, noting that unless the parties clearly and unmistakably provide otherwise, the arbitrability applies to "the kind of narrow circumstance where contracting parties would likely have expected a court to have decided the gateway matter, where they are not likely to have thought that they agreed that an arbitrator would do so, and consequently, where reference of the gateway dispute to the courts avoids the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate." *Id.* at 591, 592.

Thus under the FAA the court, not the arbitrator, is to determine the "gateway matters," i.e., (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement covers the dispute before the court. *Green Tree Financial Corporation v. Bazzle*, 539 U.S. 444, 452 (2003); *Howsam*, 537 U.S. at 83; *International Association of Bridge, Structural, Ornamental, and Reinforcing Ironworkers, Shopman's Local 493 v. EFCO Corp. and Construction Products, Inc.*, 359 F.3d 954, 956 (8th Cir. 2004).

Waiver may be found "when the party seeking arbitration substantially invokes the judicial process to the detriment or prejudice of the other party." *Tristar Financial Ins. Agency v. Equicredit Corp. of America*, No. 03-40425, 2004 WL 838633, *2 (5th Cir. Apr. 20, 2004). Nevertheless, when a party asserts its right to arbitration during pretrial proceedings, the party opposing the motion to compel arbitration has a heavy burden to demonstrate waiver and any doubts "'should be resolved in favor of arbitration, whether the problem at hand is the construction of the language itself or any allegation of waiver, delay or a like defense to arbitrability.'" *Id.*, *quoting Moses H. Cone Mem'l Hosp.*, 460 U.S. at 25. Because waiver is typically defined as the knowing and voluntary relinquishment of a known right, "the invocation of the judicial process that effects a waiver requires the waiving party to demonstrate a *desire* to resolve the arbitrable dispute through litigation *rather* than arbitration." *Id.*

The Supreme Court pronounced in *Howsam*, "The presumption is that the arbitrator should decide 'allegation[s] of waiver, delay, or a like defense to arbitrability.'" *Howsam*, 537 U.S. at 84, *quoting Moses H. Cone Mem. Hosp. v. Mercury Construction Corp.*, 469 U.S. at 25; *John Wiley*, 376 U.S. at 557. *See also International Association of Bridge, Structural, Ornamental, and Reinforcing Ironworkers*, 359 F.3d at 955 (It is for the arbitrator to determine "procedural questions which grow out of the dispute,"

including charges of waiver, delay or similar defenses and whether a party has satisfied procedural prerequisites).[37]

Thus if the Court determines that the issues before it fall within coverage of the policies and are governed by the mandatory arbitration provisions, and therefore that the motions to compel arbitration should be granted, the arbitrator should determine whether the parties waived their right to compel arbitration by signing the Disclosure Agreement. If not, as indicated, this Court concludes that the clear and unambiguous language of the Disclosure Agreement contradicts the waiver assertion.

## D.  Is There Coverage for Criminal Defense Costs Under the Policies?

### 1.  Law Regarding Construction of Contracts

Because the rules of contract construction affect many of the following issues, the Court sets them out here.

The interpretation of a contract and the determination whether a contract is ambiguous are issues of law for the court.

---

[37] In the wake of *Howsam*, an exception has been established by the Fifth Circuit: "while waiver can be characterized as a procedural issue, and while we have recognized that the arbitrator 'generally decides whether the parties complied with the agreement's procedural rules,' . . . where the waiver "depends on the conduct of the parties before the district court, . . . the court, not the arbitrator, is in the best position to decide whether the conduct amounts to a waiver under applicable law." *Tristar Financial Ins. Agency v. Equicredit Corp. of America*, No. 03-40425, 2004 WL 838633, *1 (5th Cir. Apr. 20, 2004)("Contracting parties would expect the court to decide whether one party's conduct before the court waived the right to arbitrate."). The alleged waiver here, i.e., the Disclosure Agreement, did not occur before this Court, but long before the Interpleader Action was filed.

*Reliant Energy Services, Inc. v. Enron Canada Corp.*, 349 F.3d 816, 821 (5th Cir. 2003), *citing Stinnett v. Colorado Interstate Gas Co.*, 227 F.3d 247, 254 (5th Cir. 2000). *See also Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998)(same with New York law); *Ruttenberg v. Davidge Data Systems Corp.*, 215 A.D.2d 191, 192, 626 N.Y.S.2d 174, 175 (N.Y. App. [1st Dept.] 1995). A court "must enforce the unambiguous language in a contract as written, and the applicable standard is the objective intent evidenced by the language used, rather than the subjective intent of the parties." *Clardy Mfg. Co. v. Marine Midland Bus. Loans*, 88 F.3d 347, 352 (5th Cir. 1996)(*quoting Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981)), *cert. denied*, 519 U.S. 1078 (1997); *in accord Francis v. INA Life Ins. Co. of N.Y.*, 809 F.2d 183, 185 (2d Cir. 1987). The court may not consider the parties' interpretations unless it finds the contract is ambiguous. *H.E. Butt Grocery Co. v. Nat'l Union Fir Ins. Co.*, 150 F.3d 526, 529 (5th Cir. 1998).

Under Texas law, insurance policies are contracts and their construction is governed by ordinary state law contract principles. *Empire Fire and Marine Insurance Company v. Brantley Trucking, Inc.*, 220 F.3d 679, 681 (5th Cir. 2000). *New York law in accord, Bell v. Cedant Corp.*, 293 F.3d at 566 (2d Cir.)(Although the FAA "creates 'a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act,' . . . [b]ecause an agreement to arbitrate is a creature of contract, . . . the ultimate question of whether the parties agreed to arbitrate is determined by state

law."); *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1198 (2d Cir. 1996)("in interpreting an arbitration agreement we apply the principles of state law that govern the formation of ordinary contracts").

The AEGIS Primary Policy's provision addresses the question of applicable state law only in regard to Dispute Resolution, specifically Arbitration, and states that the terms of the policy are to be construed in accordance with the laws "of the jurisdiction in which the situation forming the basis for the controversy arose," which in this instance for Enron's former directors and officers would be Texas.   AEGIS Policy at 11, § IV(Q)(3).

The EIM Policy specified that arbitrable claims shall be resolved in New York under New York law, and that the exclusive forum for nonarbitrable claims is New York with New York law governing.   At the same time Section I of the EIM Policy states that generally its "coverage shall apply in conformance with the warranties, terms, conditions, definitions and exclusions (except as regards those matters expressly set forth herein) contained in the form of the Underlying Policy . . . ," creating a patent ambiguity.

In construing a contract and attempting to identify the intent of the parties in the agreement, the court examines the plain language of the contract, its commercial context, and its purposes.   *Reliant Energy*, 349 F.3d at 822.   When the contract is expressed in unambiguous language, its terms will be given their

plain meaning and will be enforced as written." *Id.  See also Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992).  A contract is ambiguous only if, after applying the rules of contract construction, its meaning is reasonably susceptible to multiple interpretations.  *Id.; Gomez v. Hartford Co. of the Midwest*, 803 S.W.2d 438, 441 (Tex. App-El Paso 1991, writ denied).  "The mere fact that the parties may disagree on the meaning of a contractual provision is not enough to constitute ambiguity." *Reliant Energy*, 349 F.3d at 821-22; *Kelly-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998).

Contract construction principles require the court to examine the entire instrument to discover the true intentions of the parties, in an attempt to harmonize and give effect to all of its provisions. *Gomez*, 803 S.W.2d at 442; *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1995).  The parties' intentions are considered only to the extent that they are evident within the document as a whole. *Balandran v. Safeco Ins. Co. of America*, 972 S.W.2d 738, 741 (Tex. 1998). Where the provisions of a contract arguably conflict, they should be harmonized to the extent possible by the court by application of the rules of contract construction. *Ogden v. Dickinson State Bank*, 662 S.W.2d 330, 332 (Tex. 1983).  A contract is not ambiguous if it can be given a certain or definite legal meaning or interpretation. *Lopez v. Munoz, Hockema & Reed*, L.L.P., 22 S.W.3d 857, 861 (Tex. 2000); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Industries, Inc.*, 907 S.W.2d 517, 520 (Tex. 1995).  Where the

contract is not ambiguous, the court can construe it as a matter of law. *Coker*, 650 S.W.2d at 393.

If the court determines that the insurance policy is ambiguous, i.e., subject to more than one reasonable interpretation, Texas law requires the court to construe the policy against the insurer. *Performance Autoplex II Ltd. v. Mid-Continent Casualty Co.*, 322 F.3d 847, 854 (5th Cir. 2003).

If the court finds that the contract is ambiguous in an exclusion provision, it construes the contract strictly against the insurer. *Balandran*, 972 S.W.2d at 741 *National Union Fire Ins. Co. of Pittsburgh v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991)("if a contract of insurance is susceptible of more than one reasonable interpretation, we must resolve the uncertainty by adopting the construction that most favors the insured"); *American States Ins. Co. v. Bailey*, 133 F.3d 363, 369 (5th Cir. 1998)(applying Texas law).  The insurer has the burden to show that coverage is precluded by an exclusionary provision. *Bailey*, 133 F.3d at 369.  Where the insured's construction of an exclusion is reasonable, the court must adopt it even if the insurer's construction is more reasonable. *Hudson Energy*, 811 S.W.2d at 555 ("The court must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent.").  "[A]n attempt to exclude coverage must be expressed in clear and unambiguous language." *Id.  See also TIG Specialty Ins, Co. v. Pinkmonkey.com, Inc.*, 375

F.3d 365, 373-74 (5th Cir. 2004)(Pickens, J., concurring and dissenting).

**2.  Coverage for Defense Costs in Criminal Actions under Policies Before the Court**

As noted, "CLAIM" is defined in both the AEGIS and EIM Policies, § II(A)(1) and § IV(I)(1) respectively, as "any demand, suit or proceeding against any DIRECTORS and/or OFFICERS during the POLICY PERIOD, . . . which seeks actual monetary damages or other relief and which may result in any Directors and/or OFFICERS becoming legally obligated to pay ULTIMATE NET LOSS by reason of any Wrongful Act actually or allegedly caused, committed or attempted . . . ."  "ULTIMATE NET LOSS" is the "total INDEMNITY and DEFENSE COST with respect to which this POLICY applies . . . ."  AEGIS Policy, Ex. A.2.a, § II(O) to #3121.  "WRONGFUL ACT" is "any actual or alleged breach of duty, neglect, error, misstatement, misleading statement or omission actually or allegedly caused, committed or attempted by any DIRECTOR or OFFICER while acting individually or collectively in their capacity as such, or claimed against them solely by reason of their being DIRECTORS or OFFICERS."  AEGIS Policy, § A.2.a, § II(Q).  Section I of the EIM Policy states that generally its "coverage shall apply in conformance with the warranties, terms, conditions, definitions and exclusions (except as regards those matters expressly set forth herein) contained in the form of the Underlying Policy . . . ."

These definitions need to be read along with the criminal and fraud/dishonesty and intentional criminality

exclusions.   Section III(A)(1) of the Primary AEGIS Policy provides,

### III. Exclusions

The INSURER shall not be liable to make any payment for ULTIMATE NET LOSS arising from any CLAIM(S) made against any DIRECTOR or OFFICER:

(A)(1) for any fines or penalties imposed in a criminal suit, action or proceeding . . . .

Section III(B)(3) excludes coverage for specific claims

brought about or contributed to by the dishonest, fraudulent, criminal or malicious act or omission of such DIRECTOR or OFFICER if a final adjudication establishes that acts of active and deliberate dishonesty were committed or attempted with actual dishonest purpose and intent and were material to the cause of action so adjudicated.

There are several issues here.  Do the policies cover reimbursement for defense costs incurred by the insureds in criminal actions?   Under the fraud/dishonesty exclusion, in criminal proceedings before final adjudication of charges of fraud and dishonesty, do the insurers have a duty to provide reimbursement for defense costs as those costs are incurred and demanded, i.e., contemporaneous or interim funding, or does that duty not arise until the final disposition ("final adjudication") of the cases and then only if the Defendant is found guilty?

The situation is complicated here by the fact that the alleged scheme to defraud investors and the public with the same actions by Defendants has given rise to the parallel civil, criminal, and even administrative (SEC enforcement) proceedings.

The Court's research has revealed that the in cases addressing liability insurance policies' coverage of defense costs, the language of the policies standardly and explicitly states whether coverage is for civil and/or criminal costs. Such is not the case here, where the words civil and criminal are not mentioned. Under Texas law, "an attempt to exclude coverage must be expressed in clear and unambiguous language." *Hudson Energy*, 811 S.W.2d at 555. *See also TIG Specialty Ins Co. v. Pinkmonkey.com, Inc.*, 373 F.3d at 373-74. Moreover, an examination of the policy as a whole does not clearly and unambiguously demonstrate that the policies cover defense costs of only civil litigation.

It is important to look at the particular wording and provisions of the AEGIS policy here.

> D&O insurance is not sold on a common form used by the insurance industry as a whole. Rather each insurance company has developed its own set of forms. Moreover, as circumstances have evolved in recent year, each insurance company has continued to modify its policy language.

Randy Paar, *Directors and Officers Insurance*, 865 PLI/Comm 9, at 21 (2004). Moreover, "although policyholders are not in a very strong bargaining position, . . . they can negotiate" for language favorable to them relating to coverage. *Id*.

Although "CLAIM" is very broadly defined as "any demand, suit or proceeding . . .," which could clearly embrace civil criminal, administrative and/or investigative proceedings, the insurers emphasize a later portion of the definition, "which seeks

**actual monetary damages or other relief**."   A computer search of the phrase "compensatory damages and other relief" reveals that in case law it is most frequently used to describe remedies for civil litigation.   Moreover this Court acknowledges that some courts have held that D&O liability policies do not cover costs for criminal actions, including attorney's fees, because criminal punishments do not seek damages that "compensate" a party for injuries suffered.   *See, e.g., Potomac Electric Power Co. v. California Union Ins. Co.*, 777 F. Supp. 980, 983-84 (D.D.C. 1991)("fees expended in defending [solely] against possible criminal charges are not recoverable under a liability policy" because "criminal punishments--fines and incarceration--are not 'damages' caused to the property of another" and because "allowing fees spent on criminal defense to be recovered under a liability policy would violate public policy."); *Stein v. International Ins. Co.*, 217 Cal. App.3d 609, 266 Cal. Rptr. 75, 75, *modified, reh'g denied*, 217 Cal. App.3d 1450 (1990)("It is well established that an insurer is not required to provide a criminal defense to an insured under a liability policy obligating the insurer to pay 'damages' for which the insured is found liable."); *Perzik v. St. Paul Fire & Marine Ins. Co.*, 228 Cal. App.3d 1273, 279 Cal. Rptr. 498 (Cal. App. 1 Dist. 1991)(quoting *Stein*); 1 G. Couch. *Cyclopedia of Insurance Law* 114-15 (2d ed. 1984); 6C J. Appleman, *Insurance Law and Practice* 404 (1979).   Other courts have distinguished between claims to recover fines and penalties, which are generally recognized as not covered because they are not compensatory and because requiring insurers to reimburse

wrongdoers for the damage they have done others would be contrary
to public policy, from claims for attorney's fees incurred for an
insured's defense.  *Polychron*, 916 F.2d 461.

The dictionary definitions of "compensatory damages" and
"relief" do not mandate that they are restricted to civil
proceedings.  "Compensatory damages are such as will compensate
the injured party for the injury sustained, and nothing more; such
as will simply make good or replace the loss caused by the wrong
or injury.  Damages awarded to a person as compensation,
indemnity, or restitution for harm sustained by him.  The
rationale behind compensatory damages is to restore the injured
party to the position he or she was in prior to the injury."
*Black's Law Dictionary* at 390 (West 6th ed. 1990)(Compensatory
damages are the "[e]quivalent of *actual damages*").  "Damages,"
i.e., "a compensation in money for a loss or damage," is defined
by *Black's Law Dictionary* as "[a] pecuniary compensation or
indemnity, which may be recovered in the courts by any person who
has suffered loss, detriment, or injury . . . ."  *Id.* at 389.
Incurred attorneys' fees for Fastow and Hannon's criminal
defenses, which factually overlap with their civil defenses, are
losses to them if not reimbursed.  "Relief is defined as
"[d]eliverance from oppression, wrong, or injustice.  In this
sense it is used as a general designation of the assistance,
redress or benefit which a complainant seeks at the hands of a
court, particularly in equity.  It may be thus used of such
remedies a specific performance, injunction, or the reformation

or rescission of a contract." *Id.* at 1292.   The language is permissive and expansive rather than restrictive.

The policies provide coverage for any "ULTIMATE NET LOSS," expressly including defense costs, that an officer or director becomes legally obligated to pay arising out of a "WRONGFUL ACT" committed in his capacity as a director or officer of Enron.   The definition of "WRONGFUL ACT" does not directly address the state of mind of the insured at the time he performed that act nor use the terms "civil" and "criminal."   The wrongful conduct specifically addressed (breach of duty, neglect, error, misstatement, misleading statement or omission), other than "neglect," can include intentional acts involving fraud, dishonesty or other criminal act.   Both criminal and civil acts can fall within the reach of the definition.   *See, e.g., Nat'l Union Fire Ins., Pa. v. Brown*, 787 F. Supp. 1424, 1429 (S.D. Fla. 1991)("The pending civil actions and criminal action essentially allege that the directors and officers engaged in a scheme to defraud numerous home buyers and investors.   The focus of the alleged wrongdoing in the civil and criminal actions may be inherently different, but the conduct addressed derives from the same alleged scheme.   The Court finds that the allegations in the criminal and civil actions fall within the definition of wrongful acts under the . . . D&O Policy."), *aff'd*, 963 F.2d 385 (11th Cir. 1992)(Table).

In the instant policies, "ULTIMATE NET LOSS" is the defined as the "total INDEMNITY and DEFENSE COST with respect to which this POLICY applies . . . ."   AEGIS Policy, Ex. A.2.a, §

II(O) to #3121.  "DEFENSE COST" means "all expense incurred by or on behalf of the DIRECTORS, OFFICERS . . . in the investigation, negotiation, settlement and defense of any CLAIM except salaries, wages and benefit expenses . . . ."  *Id.*, § II(D).  It is undisputed that these expenses include attorney's fees for defendant against a covered claim.  A "CLAIM" is "any demand, suit or proceeding . . . which seeks actual monetary damages or other relief and which may result in any DIRECTORS and/or OFFICERS becoming legally obligated to pay ULTIMATE NET LOSS by reason of any WRONGFUL ACT actually or allegedly caused, committed or attempted . . . ."   § II(A)(1). As with the definition of "WRONGFUL ACT," there is no civil/criminal distinction in the definition of "DEFENSE COST"; the language refers to "all expense incurred . . . in the . . . defense of any CLAIM."

The definitions of key terms like "CLAIM" and "ULTIMATE NET LOSS" must be read in the context of the policy as a whole, including the Exclusions, to determine whether defense costs in the criminal actions are covered.  There is an exclusion of coverage of "ULTIMATE NET LOSS" for "any **fines or penalties imposed** in a criminal suit, action or proceeding, [emphasis added by the Court]" without mention of attorney's fees.[38]  There is also

---

[38] The Court notes that the general rule is that criminal fines, regardless of whether they are monetary penalties or restitution, are not recoverable from an insurer because "[u]nlike civil damages, restitution is a criminal sanction.  The purpose of restitution is not only to compensate the victim, but also to serve the rehabilitative, deterrent and retributive goals of the criminal justice system." Michael J. Holland, *Footing the Bill: Paying the Legal Costs of Criminal Proceedings*, 60 Def. Couns. J. 27 at 32-33S

an exemption for claims "brought about or contributed to by the dishonest, fraudulent, criminal or malicious act or omission of such DIRECTOR or OFFICER **if a final adjudication** establishes that acts of active and deliberate dishonesty were committed or attempted with actual dishonest purpose and intent and were material to the cause of action so adjudicated."  The first exclusion and part of the second exclusion would not be necessary if the policy did not cover defense costs for criminal actions. Moreover, both exclusions are limited to litigation resulting in final judgment:  the penalties must have been "imposed" and there must be a "final adjudication" by a judge finding the insureds committed or attempted acts of dishonesty and fraud to preclude coverage.  *See, e.g., Nat'l Union Fire Ins. Co. v. Brown*, 787 F. Supp. 1424, 1429 (S.D. Fla. 19991), *aff'd*, 963 F.2d 385 (11th Cir. 1992)(table).  In addition, the "final adjudication" requirement of these exclusions implies that where the insured is not found guilty, there is coverage for his costs and expenses in defending himself in a criminal action where the loss arises out of a

---

(Jan. 2002), *quoting Spivey v. Florida*, 531 So.2d 965, 967 (Fla. 1988).  Courts have also held that permitting insurers to pay restitution under a criminal judgment is against public policy. *Id.* at 33, *citing as leading case Shew v. Southern Fire & Casualty Co.*, 298 S.E.2d 380, 384 (N.C. 1983)(forcing insurer to pay restitution to an insured's victim would be "tantamount to condoning insurance against the results and penalties of one's own criminal acts.  This is against public policy.").  *See also Jaffe v. Cranford Ins. Co.*, 168 Cal. App.3d 930, 934, 214 Cal. Rptr. 567, 570 (Cal. App. 4 Dist. 1985)("[N]either imprisonment nor a fine constitutes 'damages' for insurance purposes."); *Potomac Electric Power Co. v. California Union Ins. Co.*, 777 F. Supp. 980, 983-84 (D.D.C. 1991).

wrongful act committed in his capacity as an officer or director of Enron.

Movants have pointed to a frequently cited case, *Polychron v. Crum & Forster Ins. Cos.*, 916 F.2d 461 (8th Cir. 1990). Polychron sought reimbursement for defense costs in responding to a grand jury subpoena, which he characterized as a "claim" against him. The policy defined a covered "loss" as follows and includes elements of the Exclusion at issue before this Court:

> [A]ny amount which the Insureds are legally obligated to pay for a claim or claims made against them for Wrongful Acts, and shall include but not be limited to damages, judgments settlements and costs, cost of investigation . . . and defense of legal actions, claims or proceedings and appeals there from, . . . providing always, however, such subject of loss shall not include fines or penalties imposed by law, or matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

*Id.* at 462 n.4. Noting the broad definition of "claim" and rejecting application of a dictionary definition to construe the term, the appellate court first focused on whether a demand for reimbursement of legal fees relating to a grand jury subpoena and investigation, as opposed to a grand jury indictment, constituted a "claim" under Arkansas law and concluded that it did because Arkansas law required construing ambiguous provisions strongly against the insurance company. *Id.* at 463. The panel then examined the defendant insurer's contention that Polychron's legal fees for his defense for this criminal matter were not a covered "loss" under the policy because the policy excluded coverage of

"fines or penalties imposed by law."  The Eighth Circuit concluded that the policy's exclusion for "fines and penalties imposed by law" did not exclude coverage for attorney's fees in defense of a criminal matter, at least where the insured is acquitted . . . ."  *Id.* at 463-64.  *See also Nat'l Union Fire Ins. Co. v. Brown*, in which the court found that the scheme charged gave rise to parallel criminal and civil actions, both falling within the definition of "WRONGFUL ACT" in the D&O policy and required the insurer to pay defense costs in both when they were incurred by the insureds, i.e., when they were billed and the insureds became legally obligated to pay a specific loss.  787 F. Supp. at 1429.

The Court finds from the definitions of "CLAIM," "WRONGFUL ACT," and "ULTIMATE NET LOSS," from the Exclusions, and from the case law that there is sufficient ambiguity here to construe the policy against the insurer in favor of the insured, as providing coverage for attorneys' fees in defending against criminal proceedings through a final adjudication, but only where the insured is ultimately found not guilty of having committed or attempted to commit acts of dishonest, fraud, or criminality.

As a related issue, are the insurers required to advance legal fees until the criminal proceedings are concluded and a final adjudication made?  There is a split among the courts that have considered the question regarding whether insurers have a duty to reimburse defense costs as they are incurred where there is a dishonesty exclusion like the one here.  The majority of courts have concluded that the insurer must pay the defense costs as incurred.  *See, e.g., Fight Against Coercive Tactics Network,*

*Inc. v. Coregis Ins. Co.*, 926 F. Supp. 1426, 1432-33 (D. Colo. 1996); *Gon v. First State Ins. Co.,* 871 F.2d 863, 868 (9th Cir. 1989); *Little v. MGIC Indem. Corp.*, 836 F.2d 789, 793 (3d Cir. 1987); *Okada v. MGIC Indem. Corp.*, 823 F.2d 276, 280 (9th Cir. 1986); *McCuen v. American Casualty Co. of Reading, Pa.*, 946 F.2d 1401, 1407 (8th Cir. 1991); *FDIC v. Booth*, 824 F. Supp. 76, 80-81 (M.D. La. 1993), *aff'd on subsequent appeal on other grounds*, 82 F.3d 670, 673 (5th Cir. 1996)("[W]e do not address the issue of contemporaneous reimbursement of defense fees."; *Nat'l Union Fire Ins., Pa. v. Brown*, 787 F. Supp. 1424, 1430 (S.D. Fla. 1991), *aff'd*, 963 F.2d 385 (11th Cir. 1992)(Table); *FSLIC v. Burdette*, 718 F. Supp. 649, 661 (E.D. Tenn. 1989); *Mt. Hawley Ins. Co. v. FSLIC*, 695 F. Supp. 469, 476 (C.D. Cal. 1987); *American Casualty Co. v. Bank of Montana System*, 675 F. Supp. 538, 543 (D. Minn. 1987); *PepsiCo, Inc. v. Continental Cas. Co.*, 640 F. Supp. 656, 659 (S.D.N.Y. 1986); *Fight Against Coercive Tactics Network*, 926 F. Supp. at 1432 & nn. 1 & 2.  In many of these actions "loss" was defined as any amount the insureds became "legally obligated to pay."[39]  In *Little v. MGIC*, the Third Circuit opined, "[T]he only reasonable interpretation is that [the duty to pay] arises at the time the insured becomes 'legally obligated to  pay.'  To infer any other . . . time for the insurer's duty to pay would be

---

[39] Claim is § II(A)(1) of the AEGIS Policy is defined as "any demand, suit or proceeding against any DIRECTORS and/or OFFICERS during the POLICY PERIOD or during the DISCOVERY PERIOD, if any, which seeks actual monetary damages or other relief and which may result in any Directors and/or officers becoming legally obligated to pay Ultimate Net Loss by reason of any Wrongful Act actually or allegedly caused, committed or attempted . . . ."

arbitrary because nothing in the definition gives any guidance to when this latter time might be." 836 F.2d at 794; *in accord Brown*, 787 F. Supp. at 1431-32. Morever, as the district court in *Little v. MGIC* reasoned for public policy concerns,

> If the D&O policy allowed absolute discretion to the insurer to withhold payment whenever charges of intentional dishonesty are leveled against directors and officers, . . . then insurers would be able to withhold payment in virtually every case. That would be a most unsatisfactory result. It would leave directors and officers in an extremely vulnerable position. Any allegations of intentional dishonesty, no matter how groundless, could bring financial ruin upon a director or officer . . . . Directors and officers would be forced to advance their defense expenditures, which are likely to be staggering. Meanwhile the insurer defers all payment until the final disposition of suit, which may take years. This situation is unreasonably favorable to the insurers who may blithely disclaim responsibility for the insured's enormous financial burdens while the insured must fight on.

*Little v. MGIC Indem. Corp.*, 649 F. Supp. 1460, 1468 (W.D. Pa. 1986), *aff'd*, 836 F.2d 789 (3d Cir. 1987). The Court finds this reasoning persuasive, especially in light of the form of the policies before it.[40]

---

[40] Other courts have rejected the concept of contemporaneous payment of defense costs. *See, e.g., Kenai Corp. v. National Union Fire Ins. Co. (In re Kenai Corp.*, 136 B.R. 59, 63 (S.D.N.Y. 1992); *Zaborac v. American Cas. Co. of Reading, Pa.*), 663 F. Supp. 330, 333 (C.D. Ill. 1987); *American Cas. Co. v. FDIC*, 677 F. Supp. 600, 606 (N.D. Iowa 1987); *Luther v. Fidelity & Deposit Co.*, 679 F. Supp. 1092, 1093 (S.D. Fla. 1986).
   *Zaborac* and *Luther* are distinguishable because the policy in dispute in each had an option clause that expressly permitted the insurer to pay at its option. 663 F. Supp. at 334; 679 F. Supp. at 1093. There is no option clause in the policies before this Court.

After reviewing this cases the Court concludes that the majority view, requiring payment of defense expenses up to a final adjudication, is the better rule.  Should the guilt of the defendant for a wrongful act of fraud and dishonesty be established, he would be required to repay the insurer any reimbursements for defense costs made up to that point.

The next issue is whether a guilty plea accepted in open court by a judge, where the defendant waives all right to appeal or to mount a collateral attack, but where the defendant has not yet been sentenced, is a "final adjudication."  The Outside Directors insist that given the circumstances here, they are the same in all but name.  Outside Directors have produced transcripts of the plea hearings demonstrating that those insureds who have pled guilty to criminal charges involving fraud and dishonesty on the record in open court, knowingly and voluntarily with assistance of counsel, waived their right to appeal and to collaterally attack that guilty plea, and that their counsel stated in open court that the pleas would not be withdrawn.  Fastow objects that his counsel "simply stated that Fastow has not withdrawn his guilty plea and has no present intent to do so" and argues that "circumstances may arise that warrant or authorize withdrawal of a guilty plea."  #3277 at 4, citing Fed. R. Crim. P. 11(d)(2)(B).  Morever, if the government determines that the defendants have violated the plea agreement, contrary to Hannon and Fastow's argument that the pleas are not final because the government might withdraw, according to the terms of their plea agreements of Hannon and Fastow the government can pursue

additional charges, but the guilty pleas would remain in force.

Federal Rule of Criminal Procedure 32(d) states that a guilty plea does not become final and may be withdrawn for any fair or just reason before sentence is imposed by the court. The case law is clear that a criminal adjudication is not final until a sentence is imposed on the defendant. *See, e.g., Berman v. United States*, 302 U.S. 211, 212 (1937)("Final judgment in a criminal case means sentence. The sentence is the judgment."); *Teague v. Lane*, 489 U.S. 288, 314 n. 2 (1989)("a criminal judgment necessarily includes the sentence imposed upon the defendant"); *Flynt v. Ohio*, 451 U.S. 619, 620 (1981)("Applied in the context of a criminal prosecution, finality is normally defined by the imposition of the sentence."); *Parr v. United States*, 351 U.S. 513, 518 (1956)("Final judgment in a criminal case means sentence."). In the only case this Court has found dealing with a dishonesty exclusion in an insurance contract similar to that in dispute here, a defendant who was president and CEO of a bank pled guilty to conspiracy to commit bank fraud, bank fraud, making false statements on a bank document, and violations of the currency reporting regulations. *First National Bank Holding Co. v. Fidelity and Deposit Co. of Md.*, 885 F. Supp. 1533 (N.D. Fla. 1995). The imposition of a sentence on the defendant was necessary before the court concluded that the defendant's cconviction constituted "final adjudication" precluding coverage for third-party claims of loss caused or contributed to by that dishonesty. *Id.*

Nevertheless, Outside Directors argue that in the event the Court agrees, that there has not been a final adjudication of the Criminal Defendants' guilt to trigger the exclusion from coverage, those who pled guilty are judicially estopped from arguing to the contrary. "Judicial estoppel is a common law doctrine that prevents a party from assuming inconsistent positions in litigation." *In re Superior Crewboats, Inc.*, 374 F.3d 330, 334-35 (5th Cir. 2004). "The purpose of judicial estoppel is to protect the integrity of the judicial process by preventing the parties from playing fast and loose with the courts to suit the exigencies of self interest." *Id.* at 334. The three elements of judicial estoppel are (1) the party's position is clearly inconsistent with a previous one; (2) the court accepted the previous position; and (3) the previous position must not have been inadvertent. *Id.* at 335. Moreover, judicial estoppel "does not require a formal judgment; rather, it only requires that the first court has adopted the position urged by the party, either as a preliminary matter or as part of a final disposition." *Id.* at 335. Outside Directors maintain that all these requirements have been met in the adjudication of Fastow's guilty plea and that he should be precluded from "playing fast and loose with the courts to suit the exigencies of self interest." *In re Superior Crewboats, Inc.*, 374 F.3d at 334-36 (holding that "as a matter of law" a personal injury plaintiff was judicially estopped from suing on that claim after he did not disclose it to a bankruptcy court that had granted the plaintiff/debtor a "no asset" discharge). *See also, e.g., Ergo Science, Inc. v. Martin*, 73 F.3d

595, 598 (5ᵗʰ Cir. 1996); *Hall v. GE Plastic Pacific PTE Ltd.*, 327
F.3d 391, 396-97 (5ᵗʰ Cir. 2003).

This Court agrees and applies the doctrine of judicial
estoppel here as to Fastow.  The United States Supreme Court has
opined, "[W]here a party assumes a certain position in a legal
proceeding, and succeeds in maintaining that position, he may not
thereafter, simply because his interests have changed, assume a
contrary position . . . ." *New Hampshire v. Maine*, 532 U.S. 742,
749 (2001)(citations omitted)(holding that New Hampshire was
judicially estopped from arguing, contrary to its position in
litigation over the states' lobster fishing rights in the 1970's,
that the inland Piscataqua River boundary runs along Maine's
shoreline and thus the River and Portsmouth Harbor belong to New
Hampshire).  Noting that other courts have recognized its purpose
"'to protect the integrity of the judicial process'" and that it
"'is an equitable doctrine invoked by a court at its discretion,"
the Supreme Court rejected the use of "inflexible prerequisites
or an exhaustive formula for determining the applicability of
judicial estoppel." *Id.* at 749, 751.  Instead it identified the
three factors cited by the Outside Directors to apply to a
particular case in the determination whether judicial estoppel is
appropriately invoked and concluded that the doctrine was
applicable in the case before it.⁴¹ *Id.* at 750-51.  The Court

_____

⁴¹ Before *New Hampshire v. Maine* was issued, the Tenth and D.C.
Circuit Courts of Appeals had rejected the doctrine of judicial
estoppel, but may now reconsider. *Parkinson v. California, Co.*,
233 F.2d 432 (10ᵗʰ Cir. 1956); *Konstantinidis v. Chen*, 623 F.2d 933,
938 (D.C. Cir. 1980).

agrees that these three criteria are met here by those Criminal Defendants who entered guilty pleas. *See Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996)(applying judicial estoppel where Lowery's guilty plea was inconsistent with his position in a subsequent § 1983 suit that he did not maliciously attack the victim), *cert. denied sub nom. Lowery v. Redd*, 519 U.S. 1113 (1997).

Fastow argues that none of this precludes coverage for at least some of his defense costs in the Enron litigation because many of the allegations against him are based on acts of negligence and/or recklessness. Outside Directors respond that the dishonesty exclusion precludes coverage for all losses "contributed to" by the dishonest conduct to which he has pled guilty. Here the conduct to which Fastow pled guilty "contributed to" the same losses which Plaintiffs in *Newby* and *Pirelli,* as reflected in the relevant Complaints, seek to hold Fastow liable for in negligence and for recklessness. Fastow's superseding indictment also reflects the overlap between the criminal charges and the civil claims. *See First Nat'l Bank Holding Co. v. Fidelity & Deposit Co.*, 885 F. Supp. 1533, 1537-38 (N.D. Fla. 1995). This Court agrees and concludes that Fastow's claims therefore are not covered under the policies and are therefore not subject to any of their arbitration clauses.

**3. Does Any of the Four Arbitration Clauses in the Policies Control?**

**a. Is the AEGIS Policy's arbitration provision non-binding?**

Originally, before the addition of Endorsement 24, Section IV(Q) of the AEGIS Primary Policy provided for dispute resolution by a three-step process composed of negotiation, mediation, and arbitration:

> Any controversy or dispute arising out of this POLICY, or the breach, termination or validity thereof, shall be resolved in accordance with **the procedures specified in this Section IV(Q), which shall be the sole and exclusive procedures for the resolution of any controversy or dispute** [emphasis added by the Court].
>
> (1) Negotiation. The COMPANY and the INSURER shall attempt in good faith to resolve any controversy or dispute arising out of or relating to this POLICY promptly by negotiations between executives who have authority to settle the controversy . . . .
>
> (2) Mediation.  If this dispute has not been resolved by negotiation as provided herein, the parties shall endeavor to settle the dispute by mediation under the then current CPR Institute Model Procedure for Mediation of Business Disputes . . . .
>
> (3) Arbitration.  Any controversy or dispute arising out of or relating to the POLICY, or the breach, termination or validity thereof, which has not been resolved by non-binding means as provided herein within ninety (90) days of the initiation of such procedure shall be settled by binding arbitration in accordance with the CPR Institute Rules for Non-Administered Arbitration of Business Disputes (the "CPR Rules") by three (3) independent arbitrators . . . .[42]

Endorsement 24 amended Section IV(Q): "Any controversy or dispute arising out of or relating to this POLICY, or the breach,

---

[42] In contrast, Section III(G)(3) of the EIM Policy provides for a two-step dispute resolution process composed of a mini-trial and then binding arbitration in New York City, along with a forum selection clause, Section III(G)(4), for exclusive jurisdiction of any non-arbitrable claims in the Southern District of New York.

termination or validity thereof, shall be resolved in accordance with the procedures specified in this Section IV(Q), which shall be non-binding on either party."

Andrew Fastow retorts that this construction "leads to the nonsensical result that the policy entails a non-binding agreement to binding arbitration." Instead, along with the EBS Criminal Defendants (Kevin Hannon and Kenneth Rice), Fastow proposes reading the Endorsement "to render only the sequence of dispute resolution procedures contemplated by § IV(Q)--i.e., negotiation, then mediation, then arbitration--non-binding." He justifies this interpretation as the only construction that does not change the language of § IV(Q)(3), leaving it to continue to provide, "Any controversy or dispute . . . which has  not been resolved by non-binding means . . . shall be settled by binding arbitration . . . ." #3115 at 11. At the very least Fastow insists that Endorsement 24 "injects ambiguity in the policy that must be resolved against the Insurers under the doctrine of *contra proferentem*." *Id.*

The Outside Directors respond, and this Court agrees, that the doctrine of *contra proferentem* requiring construing an ambiguous contract against the drafter applies only where the contract is deemed ambiguous and then only as a last resort. *Clardy Mfg. Co. v. Marine Midland Bus. Loans, Inc.*, 88 F.3d 347, 355 (5th Cir. 1996), *cert. denied*, 519 U.S. 1078 (1997); *Uribe v. Merchants Bank*, 91 N.Y.2d 336, 341, 693 N.E.2d 740, 743 (N.Y. 1998)(applying New York law); *DaPuzzo v. Globalvest Mgmt. Co.*, 263 F. Supp.2d 714, 729 (S.D.N.Y. 2003)(same). Nor does it apply

where the contracts are between sophisticated parties of equal bargaining power, as in a corporation with counsel like Enron and its insurers. *McDermott Int'l v. Lloyds Underwriters of London*, 944 F.2d 1199, 1207 (5th Cir. 1991); *DaPuzzo*, 263 F. Supp. 2d at 729.

Furthermore this Court notes that § IV(Q)(3) of the AEGIS policy, dealing with Dispute Resolution and arbitration, states that the terms of the policy are "to be construed in an evenhanded fashion as between the COMPANY and the INSURER" and that any ambiguity is to be resolved "without regard to the authorship of the language and without any presumption or arbitrary interpretation or construction in favor of either the COMPANY or the INSURER."

The determination whether a contract is ambiguous and the interpretation of a contract are questions of law for the court. *Reliant Energy Services, Inc. v. Enron Canada Corp.*, 349 F.3d 816, 821 (5th Cir. 2003), *citing Stinnett v. Colorado Interstate Gas Co.*, 227 F.3d 247, 254 (5th Cir. 2000). This Court finds Fastow's interpretation strained and agrees with the Outside Directors that Endorsement 24 clearly and unambiguously refers to the whole paragraph and to all three procedures ("the procedures specified in this Section IV(Q)"), as now being non-binding and optional, compared with their having previously been the "sole and exclusive procedures" prior to addition of the Endorsement.

Alternatively, since the Court has concluded that the AEGIS Policy does not mandate binding arbitration, Fastow

maintains that at minimum it does require non-binding arbitration, which agreement is also enforceable under the FAA. *United States v. Bankers Ins. Co.*, 245 F.3d 315, 322 (4th Cir. 2001)("Although non-binding arbitration may turn out to be a futile exercise . . . this fact does not, as a legal matter, preclude a non-binding arbitration agreement from being enforced."), *citing Wolsey, Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205, 1209 (9th Cir. 1998)("In light of the strong presumption in favor of arbitrability . . . , we hold that arbitration need not be binding in order to fall within the scope of the Federal Arbitration Act.").

This question whether the FAA applies to non-binding arbitration agreements with dispute resolution alternatives is unsettled, and neither the Fifth Circuit nor Texas courts have addressed it. *Bankers*, 245 F.3d at 322 ("Whether an agreement to enter into non-binding arbitration is enforceable under the FAA is not a matter well settled in the federal courts . . . ."). Moreover, the Third Circuit disagrees with the Ninth Circuit's ruling in *Wolsey*. *Dluhos v. Strasberg*, 321 F.3d 365, 371 (3d Cir. 2003)(dispute resolution procedure did not constitute "arbitration" within the meaning of the FAA because the dispute would not necessarily be resolved by arbitration); *Harrison v. Nissan Motor Corp.*, 111 F.3d 343, 349-52 (3d Cir. 1997)(informal dispute resolution procedure provided by Nissan was not an "arbitration" contemplated by the FAA, which does not occur until the process is completed and the arbitrator makes a decision; moreover the Lemon Law permits party to file suit as an alternative to arbitration).

The AEGIS Policy does provide in steps alternative ways the suit could be resolved without a final decision by an arbitrator and the partial settlement before the Court was accomplished by negotiation.   In accord with Third Circuit law, the Court declines to enforce the non-binding arbitration step under the FAA.

**b.   Are the Greenwich and St. Paul Policies Ambiguous Regarding Arbitration and Should the Issue be Referred to the Arbitrator?**

Given (1) the "follow form" language of the Greenwich Policy ("Coverage hereunder will apply in conformance with the terms, conditions, endorsements and warranties of the **Primary Policy** together with the terms, conditions, endorsements and warranties of any other **Underlying Insurance**"),[43] (2) the inconsistency between the AEGIS Policy's non-binding arbitration clause and the EIM's binding arbitration clause, and (3) the contradiction between AEGIS' choice-of-law provision ("jurisdiction in which the situation forming the basis for the controversy arose," here Texas) and EIM's choice-of-New York-law provision, the threshold questions are (1) which clauses govern for claims under the Greenwich Policy and St. Paul Policies and (2) who decides which clauses govern.

"[W]hether an arbitrator has the power to arbitrate a dispute depends on whether the parties to a dispute agreed to submit the question to that arbitrator for decision."   *General Motors Corp. v. Pamela Equities Corp.*, 146 F.3d 242, 248 (5th Cir.

---

[43] Greenwich Policy § I, Ex. A.2.e to #3121.

1998).  In *Free Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)(establishing "presumption against the finding of an agreement to arbitrate arbitral authority or, in other words, . . . , the . . . requirement that such agreements be proved by clear and unmistakable evidence") and *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643 (1986), the Supreme Court recognized a presumption "against an arbitrator having the power to decide the scope of his own power," in other words there is a presumption that parties to a contract did not agree to submit any question regarding the scope of an arbitrator's authority to that same arbitrator; moreover it held that "any silence, ambiguity or doubts about this question [of arbitrability] should be resolved in favor of concluding that the parties did not agree to submit the issue to the arbitrator." *Id.* at 250, 249, 248.  Instead, unless the parties demonstrate by "clear and unmistakable evidence" that they intended that an arbitrator to determine whether an issue should arbitrated, the determination "'whether an agreement creates a duty for parties to arbitrate a particular grievance'" is for the court.  *Id.* at 248-49.  *See also Bell v. Cedant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002)(although "where the scope of an arbitration agreement is ambiguous, the Federal Arbitration Act's policy favoring arbitration requires that 'any doubts . . . be resolved in favor of arbitration,' . . where the ambiguity relates to *who* determines arbitrability--that is, the arbitrability of the question of arbitrability--the Act's presumption is reversed and a court ordinarily decides the question"; "the issue of arbitrability may

only be referred to the arbitrator if 'there is *clear and unmistakable' evidence* from the arbitration agreements, as construed by the relevant state law, that the parties intended that question of arbitrability shall be decided by the arbitrator.")(relying *inter alia* on *First Options*); *PaineWebber, Inc. v. Bybyk*, 81 F.3d 1193, 1198-99 (2d Cir. 1996)("under *First Options* and *AT&T Technologies*, the arbitrability of a given issue is a question for the court *unless* there is 'clear and unmistakable' evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator.").

The Second Circuit has held that the broad language in an arbitration provision calling for arbitration of "all disputes . . . concerning or rising out of" the agreement, in dispute of which the clause was a part, was sufficiently sweeping to constitute evidence of the parties' clear and unmistakable intent to submit questions of arbitrability to the arbitrators. *Shaw Group Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 2d Cir. 2003); *see also Bybyk*, 81 F.3d at 119 ("The words 'any and all' are elastic enough to encompass disputes over whether a claim . . . is within the scope of arbitration.").[44]  The EIM Policy also

---

[44]  The *Shaw* panel also noted that the contract's referral of "all" disputes about the construction of the contract to arbitrators supported its conclusion that the parties intended to submit questions of arbitrability to the arbitrators.

uses expansive language, "any dispute . . . as to any matters arising out of or relating to any provision of this Policy." .

Nevertheless, the initial issue here is not whether the disputes arise out of or relate to the EIM policy because the EIM policy was long ago exhausted, but instead whether the Greenwich Policy and the further excess insurance policies incorporate and are governed by the EIM Policy's arbitration, choice-of-law and choice-of-forum clauses, which are clearly inconsistent with the arbitration and choice of law provisions of the Primary AEGIS Policy.  On this issue silence and ambiguity, and the complete absence of contractual language directing the issue to the arbitrator, reign in favor of a judicial decision.  This Court concludes the objectors have not shown by clear and unmistakable evidence that the insurers and Enron agreed to submit to a New York arbitrator the issue of who should resolve the inconsistency between the two underlying policies for purposes of enforcing the Greenwich Policy, or among any of the subsequent excess layers incorporating it by reference.

The issue here is whether those later excess insurance policies that expressly state they include the provisions of the Primary AEGIS Policy and that "Coverage hereunder will apply in conformance with the terms, conditions, endorsements and warranties of any other Underlying Insurance," thus incorporate the inconsistent arbitration and choice-of-law terms of both the AEGIS and EIM Policies, and if so, which policy "trumps?"

As noted, all except the ACE and Royal Policies identify the Primary AEGIS Policy as the a source of their own terms, conditions, endorsements and warranties except to the extent that they conflict with that policy's express provisions. Only the Greenwich and the St. Paul's Policies incorporate the terms of "other underlying Insurance, and St. Paul's, only to the extent that it "limits or restricts" coverage. Not one excess layer identifies by name the EIM Policy nor specifies any particular terms or provisions; the policies merely refer to "any of the other underlying" policies without differentiation. The more reasonable interpretation here is the incorporation of the Primary Policy on which all the other excess policies rest.

Buttressing this conclusion, New York law, itself, does not recognize the enforceability of such vague language as is found in the subsequent policies to effect incorporation by reference:

> Under New York law and the law of [the Second] Circuit, two essential elements must be satisfied before a document will be deemed to have been incorporated by reference into another instrument or agreement. First, the agreement must specifically reference and sufficiently describe the document to be incorporated, such as the latter "may be *identified beyond all reasonable doubt.*" *Bybyk*, 81 F.3d at 1201 (quoting *Chiacchia v. Nat'l Westminster Bank USA*, 124 A.D.2d 626, 507 N.Y.S.2d 888, 889-90 (2d Dep't 1986)(emphasis supplied in *Bybyk*). Second, "it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms." *Bybyk* 81 F.3d at 1201 (quoting *Lamb v. Emhart Corp.*, 47 F.3d 551, 558 (2d Cir. 1995); *see generally Federated Mut. Ins. Co. v. Woodstock '99, LLC*, 140 F. Supp. 2d 225, 228 (N.D.N.Y. 2001)(before a document will be deemed

> incorporated by reference, "the document to be incorporated must be identified with sufficient specificity," and "there must be a clear manifestation of an intent to be bound by the terms of the incorporated instrument."

*Ryan, Beck & Co., L.L.C. v. Fakih*, 268 F. Supp.2d 210, 223 (E.D.N.Y. 2003).  *See also* Romualdo P. Eclavea, LLB, LLM, 23 Carmody-Wait 2d New York Practice with Forms § 141:15 ("Arbitration:  Incorporation by Reference") (2004)("[U]nless there is additional evidence showing an intent to adopt an arbitration clause contained in another contract, a general incorporation of such other contract by reference, without specific mention of the arbitration clause, is not sufficiently clear to obligate the parties to arbitrate."), *citing In re Wachusett Spinning Mills, Inc.*, 7 A.D.2d 382, 183 N.Y.S.2d 601 (N.Y.A.D. 1st Dep't 1959), *aff'd*, 6 N.Y.2d 938, 161 N.E.2d 601, 190 N.Y.S.2d 1011 (N.Y. 1959).  This exacting standard of New York law is not met here with respect to the EIM Policy provisions; such specificity is totally lacking in the reference to "other underlying Insurance" and the absence of any identification of the

specific provisions.[45]   The purported incorporation-by-reference to the Primary AEGIS Policy is adequate.

Furthermore, under New York law an agreement must expressly state that a forum selection clause is incorporated by reference for such a clause to be enforceable.  *Coopervision, Inc. v. Intek Integration Technologies, Inc.*, 2004 WL 366888, *3-4 (N.Y. Super. Feb. 2, 2005).  None of the later excess insurance policies has expressly incorporated by reference EIM's choice of a New York forum.

Not only is the incorporation by reference of the arbitration, choice of law, and choice of forum provisions of the EIM Policy too vague to satisfy New York's standards, but Movants have argued that the New York law provision satisfies the "restrict or limit" coverage requirement in the St. Paul's Policy. A provision in a contract needs to be clear and enforceable on its face.  Whether New York law might "restrict or limit" coverage depends on each particular issue in dispute and would require

---

[45] By contrast, Texas's doctrine of incorporation by reference is relaxed.  It applies general principles of contract law that separate agreements, even unsigned ones, may be incorporated by reference by a signed contract.  *Tribble & Stephens Co. v. RGM Constructors, L.P.*, 154 S.W.3d 639, 663 (Tex. App.–Houston [14th Dist.] 2004)(and cases cited therein).  Morever the language of the incorporating document  "is not important provided that the signed document "plainly refers" to the incorporated document."  *Id.*, citing *Owen v. Hendricks*, 433 S.W.2d 164, 167 (Tex. 1968); *see also Hunton v. Guardian Life Insurance Co. of America*, 243 F. Supp.2d 686, 708-09 (S.D. Tex. 2002), *aff'd*, No. 01-21294, 2003 WL 21418107 (5th Cir. June 10, 2003).  "An arbitration agreement is not invalid or unenforceable merely because it is contained in a document incorporated into the contract by reference."  *Teal Construction Co./Hillside Villas Ltd. v. Darren Casey Interests, Inc.*, 46 S.W.3d 417, 420 (Tex. App.--Austin 2001), citing *D. Wilson Constr. Co. v. McAllen Indep. Sch. Dist.*, 848 S.W.2d 226, 240 (Tex. App.--Corpus Christi 1992, writ dism'd w.o.j.).

researching New York law to determine the effect of its application.   Surely the parties to the St. Paul Policy did not intend that such individual investigations had to be done on each issue before they could determine if the choice-of-law provision applied.   Reason and practicality counsel against such an interpretation.   The reasonable interpretation of the provision is that it constitutes only a choice of forum and of applicable law and that it does not  "limit or restrict coverage" under the policies. *See, e.g., Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974)("An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of a suit, but also the procedure to be used in resolving the dispute."); *Haynsworth v. The Corporation*, 121 F.3d 956, 963 (5th Cir. 1997)("[F]oreign arbitration clauses are but a subset of foreign forum selection clauses in general.), *cert. denied sub nom. Haynsworth v. Lloyd's of London*, 523 U.S. 1072 (1998).

Finally, with respect to the principles of contract interpretation, under Texas law, which would apply under the AEGIS policy because Texas is the place where "the basis for the controversy arose," "[w]hen portions of a contract cannot be reconciled, a court may resolve the conflict by striking down one of the provisions." *Lavaca Bay Autoworld, L.L.C. v. Marshall Pontiac Buick Oldsmobile*, 103 S.W.3d 650, 659 (Tex. App.–Corpus Christi 2003), following settlement, judgment withdrawn, but op. remains in effect, 2003 WL 21356104 (Tex. App.–Corpus Christi

2003), *citing Ogden v. Dickinson State Bank*, 662 S.W.2d 330, 332
(Tex. 1983)(court may strike down a portion of a contract where
"there is irreconcilable conflict"); *Woods v. Sims*, 154 Tex. 59,
273 S.W.2d 617, 620-21 (1954)(court "will not strike down any
portion [of a contract] unless there is an irreconcilable conflict
wherein one part of the instrument destroys in effect another
part"); and *Henry v. Gonzalez*, 18 S.W.3d 684, 688 (Tex. App.–San
Antonio 2000, pet. dism'd by agreement)(striking down a provision
that was "in irreconcilable conflict with other relevant portion
of this contract").[46]

---

[46] As noted, AEGIS' choice-of-law provision applies the law of
the "jurisdiction in which the situation forming the basis for the
controversy arose." "A federal court must follow the choice-of-law
rules of the state in which it sits." *St. Paul Mercury Ins. Co. v.
Lexington Ins. Co.*, 78 F.3d 202, 205 (5th Cir. 1996). Under Texas
choice-of-law rules, "When the issues of a case require the
construction and application of insurance policies, . . . the
relevant inquiry is what contacts the state has with the insurance
dispute and not [what contacts the state has] with the underlying
lawsuit." *Id.*; *see also Schneider National Transport v. Ford Motor
Co.*, 280 F.3d 532, 536 (5th Cir. 2002)(under Texas rules "the law
of the state with the most significant relationship to the
particular substantive issue" controls). New York law requires
courts to apply the law of the jurisdiction with "the most
significant contacts with the matter in dispute." *Auten v. Auten*,
308 N.Y. 155, 160, 124 N.E.2d 99, 101-02 (1954). In insurance
contract cases, New York emphasizes as factors in making this
decision the "location of the insured risk, residence of the
parties, and where the contract was issued and negotiated."
*Avondale Indus., Inc. v. Travelers Indemnity Co.*, 774 F. Supp.
1416, 1422 (S.D.N.Y. 1991). In this litigation while many of the
suits were filed in sister state courts, nearly all of the
defendant insureds reside in Texas, where they did business with
Enron, which has its principal place of business in Houston, the
insurers issued the policies in Texas, Texas was the location of
the insured risk and the coverage dispute arises out of acts
largely done in Texas. Thus application of Texas law is
appropriate under the express provision of the parties and of both
New York and Texas' choice-of-law principles.

The last two Excess Policies, the ACE and Royal, follow form as to the Primary AEGIS Policy,[47] but contain independent dispute resolution clauses that therefore control claims brought under them rather than those in the AEGIS or EIM Policies.[48]   The ACE Policy also has a provision for application of New York law.

Nevertheless, these two policies are not triggered by the nonsettling Defendants' claims because these Defendants' claims for  past "incurred" claims that are not barred by the dishonesty exclusion and the judicial estoppel doctrine, by themselves, do not exhaust the $100 million for claims covered by the layers below these two and future costs are not covered by the policies.[49]   The Royal Policy provides $25 million in excess of the $250 million of the underlying insurance, and the Ace Policy, the final layer, provides coverage for claims in excess of $275

---

[47] Section I (the Insuring Clause) of the ACE Policy states that the "insurer agrees to provide insurance coverage to Insured Persons . . . in accordance with the terms, conditions, exclusions and limitations of the Followed [AEGIS] Policy.   Section 3 reiterates the same idea "except as provided herein."   Section I of the Royal Policy provides, "[C]overage shall be in accordance with and subject to the same warranties, terms, conditions, exclusions and limitations (. . . except as otherwise provided herein) as are contained in or as may be added to the Primary Policy and, to the extent coverage is further limited or restricted thereby, to any other Underlying Policy."

[48] The Royal Policy has a provision for optional AAA arbitration, while the ACE Policy has a provision for mandatory arbitration in London.

[49] Hannon represents that his claims for past defense costs, allegedly wrongfully denied by the insurers, amount to $2,633,148. #3257 at 2.   Fastow claims he incurred legal fees of $65,692.55, which the Insurers have denied, between September and October 2004, and since the Court enjoined further payment from the excess policies, additional fees of $65,692.55 through January 2005. #3114 at 4.

million to $300 million.  Royal Policy § II.A, ex. A.2.i to #3121
("Liability for any covered Loss on account of Claims made in each
Limit Period shall attach to the Insurer only after insurers of
the Underlying Policies shall have paid in legal currency the full
amount of the Underlying Limit for such Limit Period . . . .");
ACE Policy, § II.A, Ex. 8 to #3115 (same).  Because the policies
are not implicated, neither are their arbitration provisions nor
ACE's choice of law provision.[50]

        In addition the Court agrees with the Outside Directors
that  this  choice-of-law  provision  in  the  ACE  Policy  is
unenforceable based on conflict-of-law principles.  Because the
Court sits in Texas, it applies Texas conflict of law principles.[51]
Under *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex.
1990), in Texas the parties to a contract "cannot require that
their contract be governed by the law of a jurisdiction which has
no relation whatever to them or their agreement, [a]nd they cannot
by agreement thwart or offend the public policy of the state the

---

[50] Thus Hannon's request for discovery on a potential bad faith
against  ACE  for  the  denial  of  his  request  for  advancement  of
defense costs between May 2003 and October 2004 is moot.

[51] As noted earlier, this Court questions whether Texas law and
New York law, specifically *Smoral*, conflict.  *See* pp. 16-18 of this
Opinion and Order.  "If the laws of the state do not conflict,
then  no  choice-of-law  analysis  is  necessary."   *W.R. Grace and Co. v.
Continental Cas. Co.*, 896 F.2d 865, 874 (5th Cir. 1990); *National
Union Fire Ins. v. CNA Ins. Companies,* 28 F.3d 29, 32 n.3 (5th Cir.
1994),  *cert.  denied*,  513  U.S.  1190  (1995);  *Schneider  Nat'l
Transport*, 280 F.3d at 536; *Mumblow v. Monroe Broadcasting, Inc.*,
401 F.3d 616, 620-21 (5th Cir. 2005)("Because there is no apparent
conflict  of  law . . . we  need  not  engage  in  a  choice-of-law
analysis [but instead] we apply the law of the forum state.").  But
to address the arguments raised, assuming that the laws of New York
and Texas do conflict, the Court performs such analysis.

law of which ought otherwise to apply."[52]   The Texas Supreme Court adopted the test of § 187 of the Restatement 2d of Conflict of Laws to weigh the interests of the state whose law was chosen and of Texas:

> (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.
> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement direct to that issue, unless either
>> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no reasonable basis for the parties' choice, **or**
>> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater

----

[52] Under New York law also where the parties have agreed on a choice of law to govern their contract, under New York policy the court will enforce that choice of law "provided that (a) the law of the State selected has a 'reasonable relationship' to the agreement . . . and (b) the law chosen does not violate the fundamental public policy of New York. [citations omitted]" *Finucane v. Interior Construction Corp.*, 264 A.D. 618, 620, 695 N.Y.S.2d 322, 324-25 (N.Y.A.D. 1st Dept. 1999). With respect to the first prong the court looked to principal place of business as a significant factor even where New York had a greater interest in the litigation. *Id.* The public policy prong imposes a heavy burden on the party opposing the choice-of-law provision to demonstrate that the "foreign law is offensive to our public policy," i.e, not merely different but that the foreign law would "'violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal.'" *Id.* Nevertheless New York public policy is only imposed "when New York's nexus with the case is substantial enough that applying foreign law would threaten New York public policy." *Brinks Ltd. v. South African Airways*, 93 F.3d 1022, 1031 (2d Cir. 1996), *cert. denied*, 519 U.S. 1116 (1997).

> interest than the chosen state in
> the determination of the particular
> issue and which, under the rule of
> § 188, would be the state of the
> applicable law in the absence of an
> effective choice of law by the
> parties. [emphasis added by the
> Court]

*DeSantis*, 793 S.W.2d at 677-78, citing in relevant part § 187 of

the Restatement 2d of Conflict of Laws.

Given the ACE Policy's choice of New York law, the

Outside Directors point out that contracting parties in Texas

could not have resolved the issue by a provision in the contract

directing the issue of the insurers' duty.  Comment (c) to § 187

makes clear that this test applies when there is a conflict of

laws between Texas and the state whose law has been chosen by the

parties:

> In state X, A establishes a trust and
> provides that B, the trustee, shall be paid
> commissions at the highest rate permissible
> under the local law of state Y.  A and B are
> both domiciled in X, and the trust has no
> relation to any state but X.  In X, the
> highest permissible rate of commissions for
> trustees in [4 percent].  In Y, the highest
> permissible rate is [5 per cent].  Effect
> will not be given to the choice-of-law
> provision since under X local law, the
> parties lacked power to provide for a rate of
> commissions in excess of 4 per cent and Y,
> the state of the chose law, has no relation
> to the parties or the trust.

The Outside Directors contend that contractors in Texas could not

contract away the duty imposed on the insurers by Texas law when

presented with a reasonable settlement demand within policy

limits, i.e., the *Stowers* doctrine, which is not followed by New

York law but which constitutes fundamental public policy for the

state in promoting settlement and protecting the interests of Texas insureds.

Thus, proceeding to the second prong, the Outside Directors maintain, and the Court agrees, that New York has no substantial relationship or any other reasonable basis for the imposing New York law here.  Enron is an Oregon corporation with its principal place of business in Texas; ACE, Ltd. is a Bermuda company with its headquarters in Bermuda.  Despite several interpleader defendants and possibly one Outside Director being domiciled in New York and a settlement meeting taking place there,[53] New York has no significant relationship to the parties or the policy other than the choice of law provision in the exhausted EIM policy and in the ACE Policy.  Thus the ACE Policy's choice of law provision is unenforceable.

Since the  choice of law provision is not enforceable, the Court looks for guidance to what Texas would do without a choice of law provision.  Texas would apply the "most significant relationship" test of Restatement 2d Conflict of Laws § 188, involving consideration of various contacts:  place of contracting, place of negotiation, place of performance, location of contract's subject matter, and the domicile, residence, place of incorporation, and place of business of the parties.  *Compaq Computer Corp. v. Lapray*, 135 S.W.3d 657, 680 (Tex. 2004). Because the contract is an insurance policy, according to Comment

---

[53] Ex. A to #3226, Letter from Jeffrey W. Kilduff of O'Melveny & Myers LLP, counsel for Jeffrey Skilling.

e of § 188 the most important factor is the location of the contract's subject matter, or "the location of the risk," since, as is the case here, it "insures the honesty and fidelity of employees at a particular place of business," here favoring Texas Restatement 2d of Conflict of Laws at § 193, cmt. (b-c).[54] Domicile of most of the parties, including the third-party counterclaim defendants for the interpleader action, and place of business support application of Texas law.  Other significant factors such as location of the sources of proof, the MDL Panel's chosen forum, and the expertise of the undersigned judge who has presided over this complex litigation for more than three years.

For all the above reasons, this Court concludes that the EIM policy's arbitration clause does not control here and does not compel arbitration of this dispute.  Nor do the Royal and Ace Policies.

## 4.  Stay of Proceedings

As a final note, Kevin  Hannon filed a motion (#3420) to stay further proceedings in the interpleader action pending his petition for mandamus, which requested the Fifth Circuit to direct this Court to rule on his motion to compel arbitration, and if denied, pending appeal, or pending resolution of the arbitration proceedings.  When the petition for mandamus was dismissed, the Clerk terminated that motion.  Apparently from Hannon's reply he intends the motion to relate to any forthcoming appeal of a denial

---

[54] Had the Court found that the excess insurance policies followed form as to the EIM policy's choice of forum and choice of law provisions, the same arguments would then have applied to those provisions.

of the motion to compel and/or resolution of the arbitration proceedings.  In addition Andrew Fastow has urged the Court that if it denies his motion to compel arbitration, it should stay all further proceedings pending his appeal of that denial, pursuant to *Bradford-Scott Data Corp. v. Physician Computer Network, Inc.*, 128 F.3d 504, 507 (7th Cir. 1997)(holding that upon the filing of a non-frivolous notice of appeal[55] of a denial of a motion to compel arbitration, the district court should stay litigation during the pendency of that appeal), and *Blinco v. Green Tree Servicing LLC*, 366 F.3d 1249, 1251 (11th Cir. 2004)("Upon motion, proceedings in the district court . . . should be stayed pending resolution of a nonfrivolous appeal from the denial of a motion to compel arbitration.")(following *Bradford-Scott*).  In *Bradford-Scott*, the Seventh Circuit stated, "[I]t is fundamental to a hierarchical judiciary that "a federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously.  The filing of a notice of appeal is an event of jurisdictional significance--it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." 459 F.3d at 505, *quoting Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982).  The Eleventh Circuit reasoned, "By providing a party who seeks arbitration with swift access to appellate review, Congress acknowledged that one of the principal

---

[55] The Seventh Circuit ruled that "either the court of appeals or the district court may declare that the appeal is frivolous, and if it is, the district court may carry on with the case." *Bradford-Scott*, 128 F.3d at 506-07.

benefits of arbitration, avoiding the high costs and time involved in judicial dispute resolution, is lost if the case proceeds in both judicial and arbitral forums."); *Blinco*, 366 F.3d at 1251. *In accord Baron v. Best Buy, Inc.*, 79 F. Supp.2d 1350 (S.D. Fla. 1999)(interlocutory appeal from denial of motion to compel arbitration requires stay of all further district court proceedings); *Intergen N.V. v. Grina*, No. Civ. A. 01-11774-REK, 2003 WL 1562200 (D. Mass. Feb. 21, 2003).

An appeal from a denial of a motion to compel arbitration under § 16(a) of the FAA is an exception to the general rule that appeals are permissible only from final judgments of the district court. *Marie v. Allied Home Mortgage Corp.*, 402 F.3d 1, 6 (1st Cir. 2005), *citing Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 142-43 (1993). This Court notes that courts are split about whether a party is entitled to a stay of all proceedings in the district court until resolution of an appeal from denial of arbitration. Those Circuit Courts of Appeals disagreeing with *Bradford-Scott* include the Ninth Circuit in *Britton v. Co-op Banking Group*, 916 F.2d 1405 (9th Cir. 1990)(holding that an appeal of an order denying arbitration "does not deprive the district court of jurisdiction over other proceedings in the case"; the district court may, but does not have to, stay the proceedings upon determining if the appeal raises a substantial issue)[56]; and the

---

[56] In *Britton*, the Ninth Circuit cited *Moore's Federal Practice* ¶ 203.11 at 3-54, which states, "[W]here an appeal is taken from a judgment which does not finally determine the entire action, the appeal does not prevent the district court from proceeding with

Second Circuit in *Motorola Credit Corp. v. Uzan*, 388 F.3d 39 (2d Cir. 2004)(adopting Ninth Circuit's position "that further district court proceedings in a case are not 'involved in' the appeal of an order refusing arbitration, and that a district court therefore has jurisdiction to proceed with a case absent a stay" from the appellate court), *cert. denied*, 125 S. Ct. 2270 (2005), and *In re Salomon Inc. Shareholders' Derivative Litigation*, 68 F.3d 554 (2d Cir. 1995).  The Ninth Circuit was concerned that a per se rule staying a case pending appeal of a denial of arbitration "would allow a defendant to stall a trial simply by bringing a frivolous motion to compel arbitration." *Britton*, 916 F.2d at 1412.  *In accord, e.g., Hill v. PeopleSoft USA*, 341 F. Supp.2d 559 (D. Md. 2004)(stay of all proceedings during appeal of denial of motion to compel arbitration not appropriate); *See also Bailey v. Ameriquest Mortgage Co.*, No. CIV. 01-545, 2002 WL 1835642 (D. Minn. Aug. 5, 2002)(stay of discovery not warranted under *Britton* or *Bradford-Scott* because production of this limited discovery has no bearing on the actual merits of the case so there will be no risk of inconsistent rulings).

> The situation in this case can be distinguished from the holding in *Bradford-Scott* by its language limiting the scope of a stay to the "divest[ing] the district court of its control *over those aspects of the case involved in the appeal.*"

> In the instant case, the appeal relates to the interpleader action and the two proposed partial settlements with

---

matters not involved in the appeal." *Britton*, 916 F.2d at 1411.

only some of the former Enron Director and Officer Defendants who were insureds under the policies in *Newby* and objecting nonsettling co-insureds. The D&O insurance policies do not cover a number of the remaining parties and independent nonarbitral claims against them. The partial settlements, if ultimately approved, will not resolve the litigation. *See, e.g., In re Managed Care Litig.*, No. 1334, 00-1334-MD, 2001 WL 664391 (S.D. Fla. June 12, 2001).

Accordingly, the Court

ORDERS that the requests to stay proceedings are GRANTED as to the interpleader, the related motions for summary judgment, and motions for approval of the two partial settlements that would exhaust the interpled policy proceeds. The ongoing general discovery regarding claims in *Newby* and MDL 1446 shall continue.

In addition, for the reasons stated above, the Court

ORDERS that the motions to compel arbitration are DENIED.

**SIGNED** at Houston, Texas, this 1st day of August, 2005.

_____
          MELINDA HARMON
    UNITED STATES DISTRICT JUDGE