IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re Enron Corporation Securities Derivative & "ERISA" Litigation | § § | MDL-1446 |
| | § | |
| MARK NEWBY, ET AL. | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-01-3624 |
| | § | CONSOLIDATED CASES |
| ENRON CORPORATION, ET AL., | § | |
| | § | |
| Defendants | § | |
| | § | |
| THE REGENTS OF THE UNIVERSITY | § | |
| OF CALIFORNIA, et al. | § | |
| Individually and On Behalf of | § | |
| All Others Similarly Situated, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | |
| | § | |
| KENNETH L. LAY, et al., | § | |
| | § | |
| Defendants. | § | |

## OPINION AND ORDER RE CLASS CERTIFICATION

# ROAD MAP

I.    Lead Plaintiff's Objectives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.   Objections to Motion for Class Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.   Certain Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      B.   Alliance Capital Management, LLP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      C.   Outside Directors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      D.   Financial Institutions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      E.   Putative Class Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

      F.   Certain Individual Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      G.   Vinson & Elkins, LLP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      H.   Merrill Lynch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

III.  Prerequisites for Class Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

      A.   General Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

      B.   Rule 23(a)'s Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

           1.   Numerosity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

           2.   Commonality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

           3.   Typicality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

           4.   Adequacy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

      C.   Rule 23(b)'s Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

           1.   Predominance of Common Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

                a.   *Affiliate Ute* and/or Fraud-on-the-Market Presumptions for
                     Section 10(b)/Rule 10b-5 Claims . . . . . . . . . . . . . . . . . . . . . . . 42

                b.   Reliance and Section 11 Claims . . . . . . . . . . . . . . . . . . . . . . . 66

           2.   Superiority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

IV.   Rulings on Specific Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

      A.   Single Class . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

      B.   Scheme Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

i

C.     Limitations and Tolling Regarding Section 12(a)(2) Claims . . . . . . . . . . . . . . . 82

D.     Length of Class Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

E.     Scheme or Schemes/Individual Damages: Potential Conflicts of
Interest Among Class Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

F.     Damages and Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

      1.    Claims Under § 10(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

      2.    Claims Under §§ 11 and 12(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

      3.    PSLRA and Exchange Act "Inconsistency" . . . . . . . . . . . . . . . . . . . . . . 103

G.     Standing and Foreign Debt Securities Claims Under §§ 12(a)(2) and 10(b) . . . 105

H.     Adequacy of Challenged Class Representatives . . . . . . . . . . . . . . . . . . . . . . . . 107

I.      Presumptions of Reliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

      1.    *Affiliated Ute* Presumption Applies . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

      2.    Fraud-on-the-Market Presumption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

           a.    Analyst Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

           b.    *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657 . . . . . . . . . . . . . 134

           c.    Market Efficiency and Fraud on The  Market:  Enron Securities  . . . 137

J.      Claims Against Deutsche Bank Entities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

V.    Court's Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

## OPINION AND ORDER RE CLASS CERTIFICATION

The above referenced putative class action alleges violations of sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b), 78t(a), 78t-1(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and of sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a), and 77o,[1] during a proposed Class Period commencing on October 19, 1998 and ending November 27, 2001.[2]  Pending before the Court is

---

[1] For elements of the various statutory causes of action and a summary of the factual allegations, see #1194, which the Court hereby incorporates into this opinion.

Standing to sue under § 11 of the Securities Act of 1933, 15 U.S.C. § 77k, is limited to purchasers of shares issued and sold pursuant to an allegedly false registration statement and includes aftermarket purchasers who can trace their shares back to the statements at issue.  Section 12(a)(2) of the same Act expressly limits recovery to a purchaser of the security at issue in a primary, public offering for misrepresentations in a prospectus or other selling materials against the purchaser's seller (term that includes the person who passed title to the purchaser or the person who successfully solicited the purchase for the solicitor's financial interest or that of the owner of the securities).  15 U.S.C. § 77l(a)(2); *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 582 (1995)(holding that § 12(a)(2) does not relate to private sales or sales of securities in secondary market, i.e. shares that have been sold previously).  Private damages actions under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder are limited to purchasers or sellers of the securities at issue.  *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731 (1975); *Kaplan v. Utilicorp United, Inc.*, 9 F.3d 405, 407 (5th Cir. 1993).

[2] Specifically, the First Amended Consolidated Complaint (#1388), filed May 14, 2003, asserted six claims for relief.  Lead Plaintiff's settlements with Lehman Brothers, Bank of America, CIBC, Citigroup, Conseco Annuity, and J.P. Morgan have mooted the claims against them.

The first cause of action was for violation of §§ 10(b) and 20(a) of the 1934 Act against Defendants Buy, Causey, Fastow, Frevert, Hannon, Harrison, Hirko, Horton, Kean, Koenig, Lay, McMahon, Olson, Pai, Rice, Skilling, Sutton, Whalley, Arthur Andersen-U.S., Arthur Andersen-Worldwide, Berardino, Bauer, Bennett, David B. Duncan, Cash, Goddard, Goolsby, Lowther, Neuhausen, Odom, Petersen, Stewart, Swanson, Jones, Vinson & Elkins LLP, JP Morgan and related entities, CitiGroup and related entities, Credit Suisse First Boston and related entities, CIBC and related entities, Merrill Lynch, Barclays and related entities, Deutsche Bank entities, and Lehman Brothers entities.

The second claim for relief was for violations of § 20A under the 1934 Act for insider trading against all defendants listed in Ex. A of Lead Plaintiff's Appendix (#1389).  Of these, this Court earlier dismissed the § 20A claims against the Outside Directors.  *In re Enron Corp. Sec., Derivative, & ERISA Litig.*, 258 F. Supp.2d 576 (S.D. Tex. 2003).

The third claim was for violations of §§ 11 and 15 of the 1933 Act for false and misleading Registration Statements and Prospectuses against Lehman Brothers entities, Bank of America entities, CIBC entities, Citigroup entities, Andersen-U.S., and individual Defendants Lay, Causey, Fastow, Belfer, Blake, Chan, Duncan, Foy, Gramm, Harrison, Jaedicke, LeMaistre, Mark-Jusbasche, Mendelsohn, Meyer, Ferraz Pereira, Savage/Alliance, Skilling, Urquhart, Wakeham, Walker, and Winokur.  Lead Plaintiff has settled with the banks.  The preliminarily approved settlement between Lead Plaintiff and the Former Outside Directors and Ken Harrison, if and when finalized, will winnow the remaining group of Defendants.

The fourth claim was for violations of §§ 12(a)(2) and 15 of the 1933 Act for false and misleading Offering Memoranda and control person liability against the Deutsche Bank entities,

Lead Plaintiff The Regents of the University of California's amended motion for class certification (#1445), pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3).  A class certification hearing was held on March 7-8, 2006.

Because they are directly relevant to the motion for class certification, this Court also addresses the Deutsche Bank Entities' motion for partial reconsideration and dismissal, or motion to require a second amended complaint before a response by them (#3791) and Lead Plaintiff's motion for leave to file an amended complaint as to Deutsche Bank and motion for entry of an order requiring Deutsche Bank to answer Lead Plaintiff's amended complaint (#3903).

## I.  Lead Plaintiff's Objectives

Specifically Lead Plaintiff seeks certification of a single plaintiff class[3] defined as follows:

> [A]ll persons, excluding defendants and members of their immediate families, any officer, director or partner of any defendant, any entity in which a defendant has a controlling interest and the heirs of any such excluded party, who purchased the publicly traded equity and debt securities of Enron Corporation between October 19, 1998 and November 27, 2001, including the publicly traded securities issued by Enron-related entities during the Class Period, the value or repayment of which was dependent upon the credit, financial condition or ability to pay of Enron, and (2) all states or political subdivisions thereof or state pension plans that purchased from

---

Credit Suisse entities, Barclays entities, Bank of America entities, CIBC entities, J.P. Morgan entities, Lehman Brothers entities, and CitiGroup entities.  Lead Plaintiff has settled with all but the first three banks. Because Lead Plaintiff conceded at the Class Certification Hearing that no class representative with standing for claims under § 12(a)(2) (and derivatively, § 15) had come forward, the fourth claim must be dismissed. #4336 at 2.

The fifth claim was for violations of the Texas Securities Act, Article 581-33(A)(2), against JP Morgan and Lehman Brothers, both of which have settled with Lead Plaintiff, so this claim is moot.

The last claim was for violations of the Texas Securities Act, Article 581-33F(1), against individual Enron officers Buy, Causey, Fastow, Lay, and Skilling.

[3] The Enron securities at issue are composed of Enron common stock, call and put options on the common stock, six issues of preferred securities registered with the Securities and Exchange Commission ("SEC"), twenty-three United-States-issued Enron bonds registered with the SEC ("Registered Bonds"), and eleven Foreign Debt Securities, i.e. derivative securities issued by Enron-related entities, initially listed on the Luxembourg Stock Exchange (although Defendants maintain that none were actually traded on it), and traded in the over-the-counter market.  For a specific list see Dr. Blaine Nye's Declaration (#4390) at 3-4.

defendants Enron's 6.40% Notes due 7/15/06 or 6.95% Notes due 7/15/28, and that authorize the prosecution of their claim pursuant to the Texas Securities Act.[4]

---

[4] As authority for one class, Lead Plaintiff points to the single, plaintiff class of investors ("all persons who purchased any and all types of securities of American Continental Corporation," the parent company of Lincoln Savings and Loan Association), certified under Rule 23(a) and (b)(3) in *In re American Continental Corp./Lincoln Savings and Loan Securities Litig.,* 49 F.3d 541, 542 (9th Cir. 1995).

That class action targeted a "practice, or course of business which operates as a fraud . . . ," prohibited by Rule 10b-5(a) and (c), alleged that "a multifarious scheme to defraud was perpetrated by the directors and officers of ACC/Lincoln and assisted in numerous respects by accountants, lawyers, and others" "to inflate the apparent worth and prospects of ACC/Lincoln, while simultaneously concealing its latent but material weaknesses," and asserted various California state-law causes of action, in addition to federal law claims under § 10(b) and Rule 10b-5(a) and (c), § 11, § 12 and §§ 1962(c) and (d) of the Racketeer Influenced and Corrupt Organizations Act. *In re American Continental Corp./Lincoln Savings and Loan Securities Litig. ("Lincoln Savings"),* 140 F.R.D. 425, 427, 428 (D. Az. 1992). Those purchasers, varying from institutions to employees of the defendant corporation, were allegedly defrauded over a period of time by similar, but not identical, oral misrepresentations, in aggregate, which distorted the entire public image of the company's health and lawful character. *Id.* at 432.

Defendants filed a motion to decertify the class, *inter alia,* for failure to satisfy the reliance element under § 10(b). The district court found that "[t]he fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available *material information* regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations." *Id.* at 429, *quoting Basic, Inc. v. Levinson,* 485 US. 224, 249 (1988). The court, finding flexibility essential to realize the purposes of the securities statutes, concluded that the principles of *Basic, Inc.* applied beyond transactions on the open securities market to the limited market and to facts in the case before it because "the proof problems associated with a fraudulent scheme to register and sell subordinated debentures out of the offices of a savings and loan institution are comparable to those facing purchasers of open market securities." *Id.* at 429. In *Lincoln Savings* the court found that the bond purchasers listened to oral sales pitches that, while not identical, were sufficiently uniform to justify class treatment. *Id.* at 430. Since not the exact wording of the misrepresentations, but the underlying, pervasive scheme, was the gravamen of the alleged fraud, the court applied the fraud-on-the-market presumption of reliance because it found that each plaintiff was similarly situated with respect to that fraudulent scheme, which was not limited to specific misrepresentations made to the bond purchasers ("a whole roster of deception designed to contrive a false image of ACC/Lincoln," including misrepresentations in prospectuses, registration statements, brochures, and sham accounting). *Id.* at 431. The court found that "it would be folly to force each bond purchaser to prove the nucleus of alleged fraud again and again." *Id.*

For other courts certifying a single class for securities fraud violations based on a comprehensive scheme to defraud investors, see also *In re Initial Public Offering Securities Litig.,* 227 F.R.D. 65 (S.D.N.Y. 2004); *In re LTV Sec. Litig.,* 88 F.R.D. 134, 144 (N.D. Tex. 1980)(Higgenbotham, J.)(certifying a single class of purchasers and sellers of nine types of the corporation's publicly traded securities during the class period in a complex securities fraud action alleging a scheme in violation of §§ 10(b), 11, and 12); *In re WorldCom Sec. Litig,* 219 F.R.D. 267, 280 (S.D.N.Y. 2003)(certifying a single class of §§ 10(b), 11, and 12(a)(2) claimants involving a "pervasive accounting fraud and the correspondingly pervasive failure of those charged with monitoring and evaluating WorldCom to review diligently the company's financial records and representations, and of those who spoke of WorldCom's financial condition to do so honestly and accurately."), *appeal granted in part on other grounds sub nom. Havesi v. Citigroup,* 366 F.3d 70

#1445 at 1.  Plaintiffs have alleged a common scheme to defraud throughout the Class Period and argue that any of the multiple "separate schemes" raised in opposition by Defendants are part of this single scheme (including SPEs, off-the-book partnerships and transactions, swaps, etc.) to falsify Enron's financial results and defraud its investors.  The federal securities laws "reach complex fraudulent schemes as well as lesser misrepresentations or omissions."  *Shores v. Sklar*, 647 F.2d 462, 470 (5th Cir. 1981), *cert, denied*, 459 U.S. 1102 (1983).[5]  Lead Plaintiff insists that the investors relied upon the integrity of the market price and on Enron's reputation as a well run company in determining whether to buy Enron securities.  Had they known of the concealed actions of some of the currently objecting Defendants, such as the Financial Institutions, who or which purportedly contributed to the fraudulent scheme but claim Plaintiffs failed to demonstrate reliance, the putative class representatives have testified that they would not have been lured into investing in the company, thereby justifying a presumption of class-wide reliance based on the fraud-on-the-market theory.  More recently Lead Plaintiff has alternatively claimed that the class is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

Lead Plaintiff proposes that the following plaintiffs, a mixture of individuals and entities, be designated as class representatives: **(1) For purchasers of Enron Common Stock**, Lead Plaintiff; Robert V. Flint; Amalgamated Bank, as Trustee for the Long View Collective Investment Fund, Long View Core Bond Index Fund and Certain Other Trust Accounts; Hawaii Laborers Pension Plan; George M. Placke; Michael J. Bessire; Dr. Richard Kimmerling; Michael B. Henning; John Zegarski; Joseph C. Speck; Ben L. Schuette; San Francisco City and County Employees' Retirement System; John J. and Charlotte E. Cassidy, as Trustees for the John & Charlotte Cassidy Family Trust; Dr. Fitzhugh Mayo; and **(2) for purchasers of Enron Debt**, Washington State Investment Board; Employer-Teamsters Local Nos. 175 & 505 Pension Trust Fund; Archdiocese

---

(2d Cir. 2003).
        For a summary of the scheme alleged in *Newby*, see #1194.

    [5] At the time *Shores v. Sklar* and many subsequent Fifth Circuit cases issued, what is now Rule 10b-5(a)-(c)) was designated Rule 10b-5(1)-(3).  For clarity's sake, the Court employs the current designation throughout.

of Milwaukee Supporting Fund, Inc.; Nathaniel Pulsifer, trustee of the Shooters Hill Revocable Trust; Staro Asset Management, L.L.C.; and the Greenville Plumbers Pension Plan; **(3) for purchasers of Enron Preferred Stock**, Mervin Schwartz, Jr.; and Stephen M. Smith.[6]

Lead Plaintiff also seeks approval of Lerach Coughlin Stoia Geller Rudman & Robbins LLP as Lead Class Counsel.

## II. Objections to Motion for Class Certification

Because Lead Plaintiff has settled with Bank of America Corporation the Court does not address its individual brief in opposition, on behalf of itself and Banc of America Securities LLC (#1778) and supplemental memorandum (#2114).

Conseco Annuity Assurance Company, which initially opposed certification (#1770) here of a class that would include purchasers of credit-linked notes issued by trusts created by Citigroup ("Citigroup CLNs"), not by Enron, for claims brought under § 12(a)(2) of the Securities Act of 1933 and § 10(b) of the Securities Exchange Act of 1934, has since decided to join the *Newby* class and participated in the settlement between Citigroup and Lead Plaintiff, to which this Court recently gave final approval. Thus the Court also does not address its arguments.

## A. Certain Defendants' Opposition (#1780),[7] Joined by Stanley C.    Horton (#1796) and Ken L. Harrison (#1798)

Certain Defendants argue that Lead Plaintiff has not met its burden on the predominance and superiority requirements of Rule 23(b) and has failed to provide a roadmap of how the § 10(b) and Rule 10b-5 claims would be tried (identifying the substantive issues that will control the outcome,

---

[6] Lead Plaintiff contends that "'plaintiffs need not name a representative of the class for each subgroup of securities, where common issues predominate as to all securities.'" #1445 at 29, *quoting Lincoln Savings*, 794 F. Supp. at 1461. Here the class members, all investors, "were damaged by a massive fraudulent scheme, which allegedly violated state and federal securities laws and was perpetrated by a large group of diverse defendants that included accountants, bankers, and lawyers," as in *Lincoln Savings. Id.* Nevertheless, apparently erring on the side of caution, Lead Plaintiff "has designated Class representatives who purchased various types of securities covered by the Class, including common and preferred stock, and a wide selection of debt securities." *Id. See* #1388 (First Amended Consolidated Complaint) at ¶¶ 79-81; #1446 (Declaration of James J. Jaconnette and Exhibits 4-25); #1855 (Lead Plaintiff's Appendix in Support of Replies).

[7] Certain Defendants are Kenneth L. Lay, Jeffrey Skilling, Lou L. Pai, Joseph W. Sutton, Richard B. Buy, Mark A. Frevert, Richard A. Causey, Steve J. Kean, Mark E. Koenig, Jeffrey McMahon, Kenneth D. Rice, and Cindy K. Olson.

assessing which issues will predominate, and determining whether the issues are common to the class) in light of the variations in circumstances among putative class members, i.e. "manageability issues." *Castano v. American Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996)(reversible error if a class is certified without consideration of how the trial on the merits will be conducted); *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003)("Determining whether legal issues common to the class predominate over individual issues requires that the court inquire how the case will be tried").

Certain Defendants contend that the class, defined too broadly, relied on more than eighty-five nonuniform, allegedly material misrepresentations (more than forty of which were oral statements made in conference calls with analysts and investors, followup conversations with analysts, interviews with the press and analysts, and statements made at analyst meetings and conferences) on different subjects and transactions made by different subsets of Defendants, and which gave rise to disparate degrees of reliance by putative class members, over a three-and-a-half-year period.  Such claims are unsuitable for single-class certification.[8]  *See Simon v. Merrill Lynch, Pierce, Fenner & Smith*, 482 F.2d 880, 882 (5th Cir. 1973)("If there is any material variation in the representations made or in the degrees of reliance thereupon, a fraud case may be unsuitable for treatment as a class action"[9]; an action based substantially on oral rather than written misrepresentations cannot be maintained as a class action); *Castano*, 84 F.3d at 745.  "Similarly, if

---

[8] Lead Plaintiff relies on *Lincoln Savings*, 140 F.R.D. at 431, in which the court certified a class in which part of the alleged fraudulent scheme was effected through oral representations:

> The allegation is of a whole roster of deception designed to contrive a false image of ACC/Lincoln . . . . Sham accounting allegedly enabled Defendants to mask ACC/Lincoln's weaknesses, while substantially skewing its worth. . . . The exact wording of the oral representations, therefore, is not the predominant issue.  It is the underlying scheme which demands attention.  Each plaintiff is similarly situated with respect to it, and it would be folly to force each bond purchaser to prove the nucleus of alleged fraud again and again.

[9] This Court notes that *Simon* was issued years before the Supreme Court recognized a rebuttable presumption of reliance under the fraud-on-the-market theory in 1988 in *Basic Inc. v. Levinson*.
    That theory requires a showing of an efficient market.  Certain Defendants argue that Lead Plaintiff has not provided any evidence to establish that there was an efficient market for Enron debt securities during the Class Period.  Since they filed their response, Lead Plaintiff has submitted  Dr. Blaine Nye's Declaration and Rebuttal Declaration.  #4390 and #4527.

the writings contain material variations, emanate from several sources, or do not actually reach the subject investors, they are not more valid a basis for a class action than dissimilar oral representations." *Simon*, 482 F.2d at 882.  Certain Defendants argue that the complaint identifies many separate fraudulent schemes, in at least seven distinct time periods, involving different subsets of Defendants, with each scheme purportedly inflating the market price of the securities.  Thus they maintain that different class members purchased and sold Enron securities at different times and presumptively relied on different alleged misrepresentations; such highly individualized issues are not subject to class-wide proof, insist Defendants.  *See, e.g., Richland v. Cheatham*, 272 F. Supp. 148 (S.D.N.Y. 1967).  The class includes some investors who bought and sold during the first two years and were not damaged by the alleged fraud and indeed may even have made money.  Others bought their securities after the alleged fraud was disclosed to the market.  "Where the plaintiffs' damage claims focus almost entirely on facts and issues specific to individuals rather than the class as a whole, the potential . . . that the class action may degenerate in practice into multiple lawsuits separately tried renders class treatment inappropriate." *Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003)(antitrust case), *quoting Countrywide Home Loans*, 319 F.3d at 744.

Additionally, Certain Defendants contend that unlike § 11 claims, whose damages could be determined by a mathematical or formulaic calculation, damages for § 10(b) claims would depend on date(s) of trading, profit or loss incurred, the extent to which the price paid and received reflected the "true" value versus inflated value of the stock, i.e., individual issues that would predominate over questions common to the class.

Finally Certain Defendants insist that current and former Enron employees should not be included in the class because they claim that they based their decisions to buy and sell Enron stock on various misrepresentations made to them as employees that were not made to the public, and therefore did not impact the public market price for the Enron stock.  The employees, also, will have individual reliance issues and some may have had personal knowledge from working on the transactions involved.

**B.**     **Alliance Capital Management LLP's Objections (#1781, 1782)**

Alliance Capital Management LLP ("Alliance Capital") objects on the grounds of inadequacy to the appointment, as a class representative for all purchasers of Enron Debt Securities, of Staro Asset Management, LLC, which asserts only a § 11 claim based on a purportedly misleading Registration Statement for Enron Zero Coupon Notes.  Alliance Capital explains that Staro is a general partner of a group of limited partnerships that focus on hedging and arbitrage and seek profits independent of the direction of the market.  It is also an investment manager and advisor for client companies.

Alliance Capital charges generally, "Staro has demonstrated a lack of candor in its dealing with the Court; it is subject to unique defenses, including lack of standing because it never owned either the Zero Coupon Notes or a derivative interest keyed to the value of the Notes; its interests are not typical of, and indeed are in direct conflict with, the interests of a majority of the class it seeks to represent; and Staro's management has demonstrated a fundamental ignorance of the litigation, completely abdicating responsibility for its control to Staro's lawyers."  #1781 at 1. Alliance Capital emphasizes, with supporting documents, that when Staro earlier and unsuccessfully sought appointment as Lead Plaintiff for a class of debt investors in *Newby*, Staro claimed that it was a pure debt investor and that its losses amounted to $40 million.  On deposition, its designated representative, investment analyst Donald Trent Bobbs, revealed that Staro's note and bond purchases were only "one leg" of its "unified debt/equity investment strategy" and that its actual loss was half that it previously claimed because it offset its loss through the purchase and exercise of puts on Enron equity, which Staro had failed to disclose to the Court.  Thus its claims are not typical of the class members' either in its investment strategy nor its "loss."  Furthermore Alliance Capital asserts that based on the documents produced by Staro and the deposition testimony of its representative, there is no evidence that Staro or any of its limited partners purchased the Enron Zero Coupon Convertible Senior Notes Due 2021, on which Staro grounds its claim, but only that one of

its limited partners had purchased an economic interest in a derivative.[10]  In addition Bobbs testified that Staro had not notified the actual purchasers (its limited partners, to which Staro is a fiduciary) of the extent of its Enron losses and its decision to file this suit nor obtained their consent to filing it.  Alliance Capital argues that Staro's arbitrage strategy[11] (purchasing Enron convertible debt while it sold Enron stock short) differentiates its economic interests from those of investors in Enron, both equity and debt.   Moreover Staro continued to trade in Enron securities after Enron's negative disclosures in November 2001 and even after it filed for bankruptcy on December 2, 2001, and it made a profit from doing so; thus its interests differ sharply from those of most class members.

_____

[10] Whether Staro purchased the Enron Zero Coupon Convertible Notes is actually a standing issue.  Lead Plaintiff argues that Staro is an investment manager or general partner for several related affiliates for which it is authorized to make all investment decisions and purchase securities.  Even if Staro, alone, were shown to have a unique defense, Lead Plaintiff maintains that there are other class representatives that can typically represent the § 11 claimants and any unique defense of Staro's would not become the focus of the litigation.  Lead Plaintiff also contends that Plaintiffs' invocation of the presumption that they relied on the market price for Enron securities, which reflects all publicly available information about Enron, further makes any need to address unique defenses less likely.  *See infra*, discussion regarding predominance and reliance.

[11] *See Camden Asset Management, L.P. v. Sunbeam Corp.*, No. 99-8275, 2001 U.S. Dist. LEXIS 11022, *46-51 (S.D. Fla. July 3, 2001)(discussing interests, motivations, and investment strategies of hedgers/arbitrageurs, which are different from the concern of an ordinary investor's about whether the value of a stock goes up or down):

> Convertible arbitrage strategies typically involve "going long" on convertible securities while simultaneously "going short" on underlying equities of the same issuer that are determined to be overvalued.  This approach is considered a relatively conservative market neutral strategy because it "works the spread" between the two types of securities.  Investors may also use this approach as a way to hedge their convertible bond holdings by shorting enough of the common stock to match or offset the sensitivity of the convertible bond to common stock price changes. . . .  Such strategies, however, do not attempt to predict the "direction of the common stock," but only attempt to take advantage of misvaluations in the relative price differential between the stock and debenture prices, and to profit from volatility.  Alternatively, in classic hedge strategy, institutions purchase debentures with the expectation that they may actually earn more from the "short" side of the transaction--by selling short Sunbeam common stock--and undoubtedly, many members of the class presumably did not profit in this manner.  In such cases, purchasers of the debentures were actually anticipating that the value of Sunbeam stock would decline, and were simply purchasing the debentures as a hedge against the short-sale of common stock.

*Id.* at *46-47.

While it now seeks to represent both equity and debt investors, Staro primarily was a short seller of Enron stock, with interests directly opposite those of most Enron equity investors.

Finally they challenge, as an inadequate class representative, Staro's designated management witness, Donald Trent Bobbs.  Bobbs admitted ignorance about fundamental developments in this litigation, including that he did not know of the court-ordered mediation, he had never seen Staro's application to be Lead Plaintiff, but could only guess that someone at Staro had read it, he had not authorized the filing of the motion, and he disagreed with some of the main contentions in Professor Stephen P. Feinstein's supporting declaration, which he had not reviewed before it was filed (Dep. At 202-04).

The Outside Directors, the remainder of whose opposition will be discussed next, also argue that Staro has no standing to pursue claims on behalf of the Zero Coupon Convertible Notes because it did not purchase them; instead the three funds managed by Staro (Stark Investments, Shepherd and Reliant) purchased them and are the record holders of the securities in question.  #1785 at 13; Ex. 141 to Bobbs Dep. and Ex. B to # 1785.  Outside Directors state that they consider the three funds to be adequate class representatives and that the three funds should be substituted for Staro. *Id.* at 14 n.20.  The Outside Directors also argue that Amalgamated Bank is suing in a representative capacity on behalf of other entities that are the actual holders of record of the notes at issue and that the real parties should be substituted as class representatives.

**C.     Outside Directors' Opposition (#1785), Joined by Rebecca Mark-Jusbasche (#1792), and in part by Ken L Harrison[12] (#1798)**

The Outside Directors[13] oppose the motion for class certification for a single "behemoth" class as it relates to the claims under § 11 because (1) the class representatives lack standing; (2) the

---

[12] Outside Directors and Ken Harrison have announced settlement with Lead Plaintiff, but the settlement has not been finally approved.

[13] The Outside Directors are Robert A. Belfer, Norman P. Blake, Jr., Ronnie C. Chan, John H, Duncan, Paulo V. Ferraz Pereira, Joe H. Foy, Wendy L. Gramm, Robert K. Jaedicke, Charles A. LeMaistre, John Mendelsohn, Jerome Meyer, Frank Savage, John A. Urquhart, Charles E. Walker, John Wakeham, and Herbert Winokur, Jr.  Counsel for Richard A. Causey, Kenneth L. Lay, Rebecca Mark-Jusbasche, and Jeffrey K. Skilling have stated they adopt the arguments set forth by the Outside Directors.

class includes claims that have previously been dismissed by the Court; (3) the class is not limited to the time periods authorized by § 11 and prior order of the Court (i.e, the periods after the registration statement for the offer was filed and before a Form 10K was filed by Enron (#1269 at 130-32); and (4) unlike § 10(b), § 11 does not require proof of reliance.  They ask the Court to order Lead Plaintiff to amend and request "certification of tailored classes that conform to Fifth Circuit law and the Court's previous orders," specifically a "pure Section 11 class, with subclasses for each note offering."

Outside Directors challenge Lead Plaintiff's standing to bring Section 11 claims when it bought no debt because that provision limits suits to purchasers of "such security."  15 U.S.C. § 77k. *See Krim v. pcOrder*, 402 F.3d 489, 495, 498 (5th Cir. 2005)(Section 11's "standing provisions limit putative plaintiffs to the 'narrow class of persons' consisting of 'those who purchase securities that are the direct subject of the prospectus and registration statement'"; "Section 11 is available for anyone who purchased directly in the offering and any after market purchasers who can demonstrate that their shares are traceable to the registration statement in question").  A Section 11 class representative must have purchased the same security sold pursuant to the same registration statement and offering documents as the class it seeks to represent.[14]

Furthermore, Outside Directors insist the "mass class" motion does not provide a manageable trial plan for such a broad and amorphously described single class-–it covers different classes of securities (debt, equity, and preferred stock for both Enron-related securities and Enron securities) purchased at different times over a three-year period, under three different statutes of the two federal securities acts (§§ 10(b) and 20(a) of the 1934 Act and §§ 11, 12, and 15 of the 1933 Act), as well as state statutory claims, involving different elements and types of proof (some requiring reliance and scienter, others not), against different parties, and involving different defenses. Submitting jury instructions if there is a single class would be rife with problems.  Outside Directors suggest that a

---

[14] Outside Directors maintain that Lead Plaintiff's reliance on *Lincoln Savings* is misplaced because the Ninth Circuit does not follow the Fifth Circuit's rigorous requirement that standing be established at the class certification stage.  *In re Taxable Mun. Bonds Litig.*, 51 F.3d 518, 521-22 (5th Cir. 1995); *James v. City of Dallas, Texas*, 254 F.3d 551, 563 (5th Cir. 2001), *cert. denied*, 534 U.S. 1113 (2002).

separate § 11 class be certified with subclasses for each note offering with proposed class representative with standing to represent each subclass. They contend that proper subclassing would insure that common issues predominate, specifically the two issues in § 11 claims, i.e., that financial statements in registration statements were misleading and the defendants' due diligence defense (15 U.S.C. § 77k(b)(3)), which they claim is a common and predominant element of every § 11 trial. By certifying a section 11 class, judicial efficiency will be served because the defense need be tried only once, and if defendants prevail, no § 11 claim will survive. Individual reliance is not an issue under these claims because the Court dismissed all reliance-based claims. #1269 at 130-32. While calculation of damages under § 11 will require each purchaser's proof of purchase and sales prices, it is formulaic because it does not require calculation of the "true value" of Enron stock.

Moreover, for the Zero Coupon Convertible Notes, which originated as a Rule 144A private placement but were subsequently registered, the Court ruled (#1269 at 132) that the § 11 claims were limited to persons who purchased in the registered offering filed on July 18, 2001; therefore claimants who bought in the 144A private placement lack standing to sue and should not be included in that subclass. Since the Court also dismissed § 11 claims brought on behalf of persons who purchased after the filing of a Form 10K because Lead Plaintiff failed to plead reliance by any of these parties, the subclass for claims for each note offering should be limited to persons who purchased after the registration statement and before the filing of a cumulative Form 10-K. #1269 at 130; 15 U.S.C. § 77k(a)(requiring proof of reliance by persons who purchased after the issuer made available an earning statement covering a period of at least 12 months beginning after the effective date of the registration statement).[15]

---

[15] Under 15 U.S.C. § 77k(a)(5), if an investor "acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement, then the right of recovery under this subsection shall be conditioned on proof that such person acquired the securities relying on such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission but such reliance may be established without proof of the reading of the registration statement by such person."

D.  **Financial Institutions**[16] **(# 1788)(Joined by Deutsche Bank Entities #4128), Supplemental Submission (#1793), Supplemental Memorandum in Further Opposition (#2317), Supplemental Memorandum in Opposition (#4491), Notice of Supplemental Authority (#4596) and Reply (#4629) to Response, Credit Suisse and Pershing LLC's Supplemental Memorandum in Opposition (4490), Barclay's Supplemental Memorandum (#4492), and Deutsche Bank's Opposition (#4489)**

The Financial Institutions also object to the lumping together of so many distinct claims with different elements, against different defendants, arising at different times, into one undifferentiated class.

Because the § 10(b) claims against the Financial Institutions are not based on alleged material misrepresentations, but on their conduct in the alleged fraudulent scheme under Rule 10b-5(a) and (c)), and because Lead Plaintiff relies on the fraud-on-the-market presumption to satisfy the reliance element, the Financial Institutions argue that since their conduct was not conveyed to investors and the market, it could not have been relied upon by the investors and the market; therefore the presumption of reliance does not apply. *Basic, Inc.*, 485 U.S. at 247 (presumption of reliance applies to "any public material misrepresentations").[17] Thus each plaintiff must demonstrate that he relied on the specific conduct of each Financial Institution Defendant-–undermining class certification because the predominance requirement cannot be satisfied. *Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indemn. Ins. Co.*, 319 F.3d 205, 211 (5th Cir. 2003)("Fraud actions that require

_____

[16] The original Movant Financial Institutions are Defendants Bank of America Corporation, Banc of America Securities LLC, Barclays PLC, Barclays Bank PLC, Barclays Capital Inc., Canadian Imperial Bank of Commerce, CIBC World Markets Corp. (f/k/a CIBC Oppenheimer Corp.), CIBC World Markets plc, Citigroup, Inc., Citibank, N.A., Salomon Smith Barney, Inc. (now called Citigroup Global Markets, Inc.), Salomon Brothers International Limited, Credit Suisse First Boston LLC (f/k/a Credit Suisse First Boston Corporation), Credit Suisse First Boston (USA), Inc., Pershing LLC, J.P. Morgan Chase & Co., JPMorgan Chase Bank, JP Morgan Securities Inc., Lehman Brothers, Inc. Lehman Brothers Holdings, Inc., Merrill Lynch & Co., Inc., and Merrill Lynch, Pierce, Fenner & Smith Incorporated. The Bank of America and Lehman Brothers entities have settled, and their settlements received final approval from the Court. Preliminary approval of settlements between Lead Plaintiff and the J.P. Morgan, Citigroup, and CIBC entities has been granted. Because other Financial Institutions Movants (Barclays entities, Credit Suisse entities, and the Merrill Lynch entities, along with the Deutsche Bank entities following reconsideration of their dismissal) are still involved in this litigation, the Court addresses the group's objections.

[17] Lead Plaintiff replies that "[t]he Financial Institutions conveniently neglect that fact that analyst reports by the banks were, without question, 'public statements to the market.'" # 1854 at 34.

proof of individual reliance cannot be certified as Fed. R. Civ. P. 23(b)(3) class actions because individual, rather than common, issues will predominate."), *cert. denied*, 540 U.S. 819 (2003).

Similarly, the Financial Institutions argue, it is also improper to presume that Lead Plaintiff can satisfy the requirement that the fraud be "in connection with the purchase or sale of any security," i.e., that there be a nexus between the alleged fraud and a securities transaction, with respect to them. The transactions through which each of them allegedly participated in the alleged scheme took place at different times throughout the class period and affected different statements read by different plaintiffs in different ways; thus the Financial Defendants alleged transactions cannot be presumed to be "interdependent and coincidental" with all plaintiffs' purchases.

The Financial Institutions cite testimony from the proposed representatives' depositions that the Financial Institutions did not make any express representations to the representatives, but only "enabled," "assisted" or "helped to perpetuate" Enron's fraud, to demonstrate that it is inappropriate to presume that all putative class members relied upon the Financial Defendants' nonpublic conduct. At deposition most representatives stated that they had had no contact with the Financial Institutions and had not relied on anything the Financial Institution Defendants said or did in making their investment decisions. Each class member must individually establish that he relied on each Financial Defendant's conduct, they contend. In sum, they insist under Plaintiff's theory of liability, individual issues of reliance predominate over common questions.

Furthermore the Financial Institutions argue that Lead Plaintiff's class definition does not meet Rule 23(b)(3)'s superiority requirement because there are numerous different factual and legal issues relating to each defendant and because the huge putative class presents insurmountable manageability problems. If a class is certified for the § 10(b), § 11, and § 12(a)(2) claims, the Financial Institutions insist that the proposed class period for claims against the Financial Institution Defendants must be modified to begin on April 8, 1999 instead of October 19, 1998. They maintain that any claims made before April 8, 1999 against them are time-barred under the *Lampf* three-year

period of repose, as this Court has ruled,[18] and that the Class Period must end on October 16, 2001, when Lead Plaintiff has asserted that Enron "shocked the markets" by announcing it had overstated its financial condition by more that $1 billion, a disclosure that operated as a "correction" of earlier financial statements and other statements about Enron's financial condition.  *Basic, Inc.*, 485 U.S. at 248 (if the fraud-on-the-market presumption applied and if the information that Lead Plaintiff claims has been concealed or misrepresented "credibly entered the market and dissipated the effects of the misstatements," a plaintiff who "trades . . . after the corrective statements would have no direct or indirect connection with the fraud."); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 574 (S.D. Tex. 2002)(a misrepresentation is "immaterial if the information is already known to the market because the misrepresentation therefore cannot defraud the market"). Thus investors who purchased Enron securities after October 16, 2001 could not have relied on the alleged fraud and their claims cannot be saved by certifying them together with those of purchasers before October 16, 2001.

Moreover, argue the Financial Institutions, class members who purchased after that date cannot prevail as a matter of law because (1) for their § 10(b) claims relying on the fraud-on-the-market presumption, "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price [such as this corrective information], will be sufficient to rebut the presumption of reliance," *Basic, Inc.*, 485 U.S. at 248; (2) their §§ 11 and 12(a)(2) claims are subject to an absolute loss causation defense (because of Enron's statement that "shocked the markets" their losses could not have been caused by the alleged fraud); and (3) three of their § 11 claims (based on the May 19, 1999 offering of Enron Corp. 7.375% Notes due 5/15/2019, the August 10, 1999 offering of Enron Corp. 7% Exchangeable Notes due 7/31/2002, and a June 1, 2000 offering of Enron Corp. 7.875% Notes due 6/15/2003) require establishment of reliance because Enron filed a Form 10-K for the 12-month

---

[18] The first time Lead Plaintiff asserted claims against the Financial Institutions was when they filed the Consolidated Complaint (#441) on April 8, 2002.

period after the registration statements became effective before their purchases, and thus the purchasers could not have relied upon the alleged fraud. 15 U.S.C. § 77k(a).

Regardless, argue the Financial Institutions, the Class Period alternatively must end at the latest by November 8, 2001 when Enron publicly announced that it was restating its financial statements for 1997-2000 to eliminate $600 million in profits and approximately $1.2 billion in shareholder equity and expressly warned that its financial statements and audit reports for that period "should not be relied upon." Such an announcement precluded any reasonable reliance on Enron's financial statements.

Lead Plaintiff's § 11 claims against the Financial Institution Defendants are based on four public securities offerings, three[19] of which were underwritten by different subsets of these Defendants. Not only do the claims present manageability problems because the offerings were conducted at different times, incorporated different Enron financial statements, and were underwritten by different combinations of them, argue the Financial Institutions, but some class members must prove reliance because they purchased them after Enron filed its Form 10-Ks for 1999 and 2000; these factors work against certifying this action as a single class. At minimum, different subclasses would have to be created under Rule 23(c)(4) for each of the three offerings for purchasers who must prove reliance and those who do not need to prove reliance.

Financial Institution Defendants additionally assert that the claims under § 12(a)(2) fail because not a single proposed class representative bought the securities at issue and thus no one has standing to pursue claims based on any of the nine offerings, which were issued from September 1999 through July 2001. *See* this Court's orders, #1999[20] and 2043. The Financial Institutions'

---

[19] These three offerings are (1) a May 19, 1999 offering of Enron Corp. 7.375% Notes due 5/15/2019, underwritten by Lehman Brothers, Inc., Banc of America Securities LLC and CIBC World Markets Corp.; (2) an August 10, 1999 offering of Enron Corp. 7% Exchangeable Notes due 7/13/2002, underwritten by Banc of America Securities LLC and Salomon Smith Barney, Inc.; and (3) a June 1, 2000 offering of Enron Corp. 7.875% Notes due 6/15/2003, underwritten by Lehman Brothers, Inc. Because all these Defendants have entered into settlements with Lead Plaintiff, either preliminarily or finally approved, the Court does not address pp. 33-38 of #1788.

[20] *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, No. MDL 1446, Civ. A. H-01-3624, 2004 WL 405886 (S.D. Tex. Feb. 25, 2004).

Supplemental Submission points out that intervenor the Imperial County Employees Retirement System ("ICERS") has withdrawn.  Alternatively, if the Court does certify a class, a separate subclass should be established for each of the nine offerings.

Moreover, Financial Institution Defendants argue, since § 12(a)(2) claims must be brought within three years of the sale of the securities, the claims are barred by the applicable § 13's statute of limitations/repose, 15 U.S.C. § 77m.[21]  Since equitable tolling principles do not apply to the statute of repose (#1999 at 58 & n.44, 59), they maintain that any belated intervenor will not relate back to Lead Plaintiff's filing of the Amended Consolidated Complaint on May 15, 2003, which this Court has deemed filed as of January 14, 2003 (#2044 at 6-7).  That complaint asserted the § 12(a)(2) claims for the first time based on the Foreign Debt Securities, all the offerings of which occurred on or before July 12, 2001.  Thus the statute of repose for the § 12(a)(2) claims expired at the latest on July 12, 2004, since the last of the offerings occurred on July 12, 2001, and no class member with standing has come forward.  (ICERS settled its claims and withdrew.)

Financial Institutions further argue that the *American Pipe* rule tolling statutes of limitations and of repose when a class action is commenced does not apply when no named plaintiff has standing to assert the claims.  *In re Colonial Ltd. P'ship Litig.*, 854 F. Supp. 64, 82 (D. Conn. 1994).

In their most recent memorandum (#4491, the Financial Institutions contend that to be primarily liable under § 10(b) in the wake of *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994) and progeny a defendant must have made a material misstatement or omission on which the market could rely.  They insist Lead Plaintiff has not established any misrepresentation made by any Financial Institution Defendant with the requisite scienter of the individual corporate official making the statement to hold the Financial Institution liable under *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 366-67 (5th Cir. 204).  Lead Plaintiff has also failed to demonstrate that any Financial Institution made an actionable misstatement through an analyst that had a material and measurable impact on the price of Enron

---

[21] Section 13 requires a plaintiff to file suit within one year from the time that the violation of § 11 or § 12(a)(2) was or should have been discovered, but in no event more than three years after the offering to the public.

securities. *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 663-66 (5th Cir. 2004). They insist that Lead Plaintiff's allegation that claims against the Financial Institutions based on statements made by Enron, on which class members relied, about transactions funded or structured by the Financial Institution Defendants, are not actionable under *Central Bank* and *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 913, 916 (S.D. Tex. 2004)(holding that Citigroup, alleged to have "structured, funded and executed two major series of transactions to hide off Dynegy's balance sheet hundreds of millions of dollars in debt" and to have issued misleading analyst reports about Dynegy, was not liable for misstatements made by Dynegy in Dynegy's financial statements because such claims are barred by *"Central Bank*'s limitations on liability for a secondary actor's involvement in the preparation of false and misleading statements.").

Furthermore the Financial Institutions assert that Lead Plaintiff has failed to demonstrate an efficient market for the Foreign Debt Securities, Enron Registered Bonds, Enron Preferred Securities, and Stock Options.

The Foreign Debt Securities were issued pursuant to unregistered private placements under 17 C.F.R. §§ 230.901-230.905 in private offerings limited to Qualified Institutional Buyers ("QIBs," i.e., entities owning and investing in the aggregate at least $100 million in securities that are exempted from registration for private resales of securities, under 17 C.F.R. § 230.144A).[22] Regulation S, under which the foreign portions of the Foreign Debt Securities were issued, exempts such securities from registration requirements under § 5 of the Securities Act of 1933. The offering memoranda state they are confidential and prepared solely for the QIBs permitted to purchase them, are not offers to any other persons of the public generally, and that there is no existing market for the notes offered nor any assurance that there would be the development or liquidity of a market for them. They point out that Lead Plaintiff's expert, Dr. Blaine Nye, does not try to demonstrate that the primary offerings of the Foreign Debt Securities traded in efficient markets.

Moreover, argue the Financial Defendants, the market for the Foreign Debt Securities was inefficient. Dr. Nye's data reflect that the Foreign Debt Securities were thinly traded in the

---

[22] In contrast, the purchases and sales of the Enron Registered Bonds were not restricted to QIBs.

secondary market, while Dr. Suresh M. Sundaresan, Deutsche Bank's expert on market efficiency,

shows they had small weekly turnover rates and low trading frequencies.  Dr. Nye merely points out

that the number of days during the Class Period when these securities even traded varied from 6.1%

to 31.6%, with an average trading frequency of 20.6% and a median trading frequency of 21.0%;

there was no trading of these securities on the majority of trading days.  Dr. Nye provides data on

institutional holdings, but fails to explain how that data compare with data for securities in

inefficient markets.  Dr. Nye states that analysts at only seven institutions covered Osprey and

Marlin securities, at only five financial institutions covered Yosemite securities, and at only four

financial institutions covered Enron credit-linked notes, far fewer than the 29-31 analysts covering

Enron common stock.  Moreover some of those analysts were affiliated with the underwriters of the

Rule 144A offerings.   In addition these debt securities were traded over the counter by calling

around an informal net of investors and brokers rather than having a centralized trading platform

with publicly quoted bids, asks and transactions.  *See In re Livent, Inc. Sec. Litig.*, 211 F.R.D. 219,

222 (S.D.N.Y. 2002)(holding that notes not purchased on a public exchange but "bought and sold

through an informal net of contacts among institutional investors and brokers who would exchange

bids and negotiate prices privately" and where there "was no centralized source of price and trading

information" was "inconsistent with the central tenet of 'fraud on the market' theory, which

presupposes that 'an efficient securities market rapidly incorporates all publicly available

information about a company's business and financial situation.'"); *Camden Asset Management,

L.P. v. Sunbeam Corp.*, No. 99-CV-8275, 2001 WL 34556527, *10 (S.D. Fla. July 3,

2001)("debentures were not priced efficiently" where "the only way to obtain pricing information

. . . was by 'calling around,' rather than relying on a market where bids, asks, and transactions are

quoted publicly and accurate transaction data and information is [*sic*] available"); *Greenberg v.

Boettcher & Co.*, 755 F. Supp. 776, 782 (N.D. Ill. Jan 3, 1991)(an efficient market for bonds is "a

developed market--a secondary market with a relatively high level of trading activity and for which

trading information such as price and volume were readily available'").

In addition to joining in the Financial Institution Defendants' briefs, Barclays, in a separate memorandum (#4492), points out that Barclays did not make any misrepresentations upon which class member or the market could have relied.[23] It argues that the fraud-on-the-market doctrine is unavailable against Barclays because the doctrine applies only to Rule 10b-5(b) claims; thus there are no common questions, including questions of reliance, that will predominate in claims against Barclays. It is also unavailable because Lead Plaintiff failed to show that any statement by Barclays had any effect on Enron's stock price or was anything other than confirmatory under *Greenberg v. Crossroads Sys., Inc.,* 364 F.3d 657 (5th Cir. 2004).

Deutsche Bank entities filed additional Opposition (#4489) to the motion for class certification. They identify as the § 10(b) allegations against them that Deutsche Bank entities made misrepresentations in Osprey, Yosemite and/or Marlin offering memoranda[24] and in debt and equity analyst reports. With respect to the fraud-on-the-market presumption of reliance, pointing to Dr. Sundaresan's expert report, they argue that Lead Plaintiff cannot satisfy the touchstones for class certification established in recent Fifth Circuit cases[25] for application of the fraud-on-the-market presumption of classwide reliance because Lead Plaintiff cannot show that (1) the primary (new issue) or secondary markets for the Foreign Debt Securities, the Enron Registered Bonds, and the Preferred Securities were efficient, and (2) any of the alleged public misrepresentations is

---

[23] Barclays concedes that Lead Plaintiff alleged in its Amended Complaint that Barclays issued research analyst reports, but it maintains that it did not do so and that Plaintiffs have not established in discovery that it did so. Nor did Plaintiffs' expert Dr. Blaine Nye identify a single statement by Barclays.

[24] Deutsche Bank points out that the alleged misstatements in the offering memoranda of Osprey, Yosemite, and Marlin II were not made by the Deutsche Bank entities but by Enron and that the offering memoranda expressly state that Enron was responsible for the accuracy of its financial statements as the description of Enron in the Offering Memoranda, as this Court noted in dismissing a similar claim against Milbank Tweed. Deutsche Bank had no role in preparing Enron's SEC filings or press releases before their initial release and Lead Plaintiff has not presented any proof that Deutsche Bank "approved" Enron's financial statements incorporated into the Offering Memoranda.

[25] *Greenberg v. Crossroads Systems, Inc.*, 364 F.3d 657 (5th Cir. 2004); *Unger v. Amedisys, Inc.*, 401 F.3d 316 (5th Cir. 2005); and *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307 (5th Cir. 2005).

actionable, since the statements are either confirmatory[26] or they cannot be shown to have affected the price of the security (materiality).  Furthermore, since many of the alleged misrepresentations occurred long after the start of the proposed class period and thus after many class members' purchases, the proposed dates for the Class Period are not applicable against Deutsche Bank entities.

Nor, Deutsche Bank entities maintain, has Lead Plaintiff alleged that Deutsche Bank performed any timely fraudulent act that could independently constitute a primary violation upon which plaintiffs relied, since this Court previously ruled that structured tax transactions involving Enron and Deutsche Bank were time-barred.  *In re Enron Corp.*, 310 F. Supp. 2d 819, 859 (S.D. Tex. 2004).[27]

_____

[26] In dismissing the claims against Milbank Tweed, this Court noted that every alleged misrepresentation about Enron's financial condition in the Offering Memoranda came from previously released  public statements and SEC filings by Enron.

[27] Lead Plaintiff argues that Deutsche Bank's liability does not rest on misleading statements alone, but instead on its actions as a "robust participant in the scheme."  Not only was Deutsche Bank an underwriter/initial purchaser of Enron's Osprey I notes (9/99), Yosemite I notes (11/99), ECLN I notes (8/00), Osprey II notes (9/00), zero coupon convertible notes (2/01 with resale 7/01), and Marlin II notes (7/01), but Lead Plaintiff asserts that Deutsche Bank "knowingly structured the fraudulent Osprey and Marlin financings to hide Enron's true debt levels and to falsify Enron's earnings." First Amended Consolidated Complaint at ¶¶ 497-505. Lead Plaintiff alleges that Osprey and Marlin were "designed to transfer billions of dollars of debt off Enron's balance sheet," that their offering memoranda failed to "disclose billions of dollars more in Enron liabilities," and that Deutsche Bank "structured Osprey to fund Whitewing knowing Enron sold assets to Whitewing at inflated values to falsify Enron's earnings." #4528 at 5.  The sale of the Foreign Debt securities (including Marlin and Osprey) was alleged to be "an essential part of that fraudulent scheme." Id. at 6.  Yosemite I and Yosemite III (a/k/a ECLN 1) included a loan disguised as a prepaid commodity trade to hide Enron's debt and inflate its reported cash flow from operations.  Moreover, charges Lead Plaintiff, Deutsche Bank entered into concealed loans with Enron during the Class Period, including a $50 million loan to the fraudulent Hawaii 125-0 Trust (characterized by Deutsche Bank as "participation in routine group loan syndicates for deals designed and led by others") so Enron could sell underperforming assets to the Trust to recognize earnings without disclosing that the sale was guaranteed by a total return swap with Enron.  Lead Plaintiff further claims that in addition to hidden loans to Enron throughout the Class Period, Deutsche Bank was also on the LJM2 advisory committee where it had an obligation to police the transactions that LJM2 entered into to make sure they were negotiated at fair-market rates, review  transactions for potential conflicts of interest, including Fastow's self-dealing, and approve a number of LJM2's investments including the fraudulent Raptor transactions.  Thus its offering memoranda for the various notes failed to disclose the fraudulent manipulations of these various partnerships, trusts and SPEs or that Enron was dangerously over-leveraged and at great risk of a liquidity crisis. Lead Plaintiff further points to the deposition testimony of Deutsche Bank's Rule 30(b)(6) representative on due diligence (the purpose of which is to assure the buyer that the offering documents are accurate), who testified that Deutsche Bank's employees reviewed and approved inclusion of Enron's financial statements in the offering

Because the allegations against the Deutsche Bank entities are in the nature of misrepresentation and affirmative deceit, not of silence and omission, the Deutsche Bank entities insist the *Affiliated Ute* presumption of reliance is not applicable to the claims against them; it also does not apply because the proposed class had no special relationship with Deutsche Bank that could give rise to a duty to disclose.

Since there is not classwide presumption of reliance available to Lead Plaintiff according to Deutsche Bank, Lead Plaintiff must show reliance upon each Financial Institution's statements or actions to avoid imposing liability on an entity that did not commit a primary violation but merely aided others; thus individual proof of reliance is required and bars class certification.

Deutsche Bank entities further argue that the market for each security must be considered separately in determining market efficiency and that primary markets by definition are not efficient. Moreover, they maintain that Dr. Nye's Declaration ignores the primary market for the Enron debt securities and thus Lead Plaintiff has not met its burden of proof to trigger the fraud-on-the-market presumption.

### E.     Putative Class Members' Partial Objection (#1789)

Putative Class Members ("Objectors"), as QIBs, purchased notes issued by the Osprey Trust. These Osprey Notes were not registered under the 1933 Securities Act and, as stated in the Offering Memorandum, were offered and sold only to QIBs in reliance on Rule 144A and in offshore transactions in reliance on Regulation S. The Objectors purchased only the Rule 144A Notes, but note that Lead Plaintiff asserts that both kinds of Osprey Notes fall inside the *Newby* class definition. The Objectors are opposed to certification of a single class of purchasers of Enron Corp. securities **and** purchasers of Osprey Notes.

They explain that the original *Newby* class action complaint, filed in April 2002, reached only investor losses in Enron Corp. securities, not losses in securities that were not issued by Enron, which include Osprey Notes. Thus these Objectors filed a separate non-class action in October 2002

---

documents. Instead of objective reports, Deutsche Bank's analysts purportedly issued false, misleading, biased information about Enron for Deutsche Bank's own self interest in winning investment banking fees.

in the California Superior Court against the banks and affiliated controlled entities that sold them the Osprey Notes, based solely on their losses from those Notes.  Then on May 14, 2003 the *Newby* plaintiffs filed a first amended consolidated complaint that expanded the class to include losses for securities issued by Enron-related entities,[28] which includes Osprey Notes.  The two *Newby* claims based on the Osprey Notes are grounded in (1) § 10(b) and Rule 10b-5, and (2) § 12(a)(2).

The Objectors point out that none of the proposed class representatives purchased Osprey Notes, received any of the Osprey offering materials, discussed the offering with the selling syndicate member, nor read or relied on particularized, material, false and misleading statements in those offering materials.  Objectors argue that because no proposed class representative purchased the Osprey Notes, none has standing to bring claims on behalf of Osprey purchasers because none has a stake in the Osprey Notes nor interests aligned with those of the Osprey Note purchasers, and none can adequately prosecute claims.  They contend that for claims under § 10(b) and § 12(a)(2), a plaintiff only has standing if it purchased or sold the relevant securities.[29]  They further argue that even if a class representative had purchased Osprey Notes, the typicality and predominant elements for class certification cannot be satisfied.

---

[28] The amended complaint expanded the class to include purchasers of the Foreign Debt Securities issued by entities other than Enron, including Osprey Trust, Osprey I, Inc., Yosemite Securities Trust I, Yosemite Securities Co. Ltd., Enron Credit Linked Notes Trust, Enron Euro Credit Linked Notes Trust, Enron Credit Linked Notes Trust II, Enron Sterling Credit Linked Notes Trust, Marlin Water Trust II, and Marlin Water Capital Corp. I.  These Foreign Debt Securities have different issuers, different syndicate sellers, and different offering documents containing different misrepresentations and omissions.  (Objectors maintain that Lead Plaintiff's reliance on the single class certification in *Lincoln Savings* is misplaced because that case involved purchasers of various stocks and debentures from a single issuer.)  The Osprey Notes at issue here were jointly issued by Osprey Trust and Osprey I, Inc., two Enron-sponsored off-balance-sheet SPEs, in two Rule 144A exempt offerings, a $1.5 billion 1999 offering ("Osprey I") and a $1 billion 2000 offering ("Osprey II").  For a detailed discussion of the alleged facts regarding these Notes, see #1789.

[29] At the class certification hearing, Mr. Clary, on behalf of the four remaining Financial Institution Defendants pointed out the Court's December 20, 2005 ruling clarifying the standing issue for the Foreign Debt Securities claims under § 10(b), in contrast to the privity limitation under § 12(a)(2): "For claims brought pursuant to Section 10(b) of the Securities Exchange Act of 1934, Lead Plaintiff [or a class representative] may represent a class of various types of foreign debt securities, even if Lead Plaintiff [or the class representative] purchased only one type of foreign debt security."  Mr. Clary emphasized that Lead Plaintiff never purchased any of the foreign debt securities and thus lacks standing to sue on behalf of foreign debt securities purchasers under both statutes.

The Objectors point out that *Newby* Lead Plaintiff has failed to name key Osprey Note sellers as defendants, including Bear Stearns for Osprey I and UBS Warburg for Osprey II, has failed to assert key facts and legal theories relating to the Osprey claims, and has characterized and attacked the Osprey structure as an artifice for Enron shareholders. They also object that the *Newby* plaintiffs have failed to consider the relative strengths and weaknesses of the Enron securities claims and the Foreign Debt Securities claims, but instead have insisted that all recovery be distributed pro-rata among class members.

The Objectors argue that they have different elements of proof to satisfy and different remedies available under California state law, which they contend they should not be deprived of the opportunity of pursuing, and that the Osprey Notes were not "covered securities" under SLUSA.

While the Objectors could opt-out of *Newby*, they would risk their claims relating to their purchase of other Enron securities, which might be time-barred outside of *Newby* and which they did not include in their California lawsuit because they were being pursued in *Newby*. They ask the Court either to certify a class that excludes Osprey Notes purchasers from the *Newby* class or to allow them to opt out of the *Newby* class with respect to their Osprey Note purchases only, while still participating in the class with respect to any Enron-issued securities.

The Objectors emphasize the differences in situation, claims, and defenses of Osprey Noteholders from those of the Proposed Representative and other putative class members. The private offering to QIBs is different from public trading of securities on an United States securities exchange or in the NASDAQ system, which was the case with publicly traded Enron Corporation securities purchased by Lead Plaintiff and other proposed class representatives. The latter are not exempted from registration under Rule 144A. 17 C.F.R. § 230.144A(d)(3)(I). In contrast investment banks purchase the Rule 144A securities and resell them to QIBs by means of printed private offering memoranda and direct sales presentations, and the QIBs buy directly from these investment banks. For example, the Osprey I syndicate directly solicited PIMCO and gave it the Osprey I Memorandum and DLJ Summary Sheet. In contrast the *Newby* plaintiffs did not receive those offering materials and thus were not affected by the alleged misleading statements made by

the investment banks in those offering materials regarding the use of the offering proceeds, an absence of conflicts of interest, the Whitewing asset transactions and value of Whitewing assets, and the Osprey Noteholders' ability to force liquidation of those assets upon default. The Objectors characterize *Newby* as a fraud-on-the-market case charging an overarching scheme and artifice to defraud against all scheme participants who are allegedly responsible for materially inflating Enron's financial statements and caused the losses of investors who relied on the integrity of the market; they insist none of the six claims[30] in *Newby* adequately covers the Osprey Note purchasers.

**F.    Certain Individual Defendants' Opposition to Class Certification of § 20A claims[31] (#1795), Joined by Andrew Fastow (#1796), and in part by Ken L Harrison (#1798)**

To prevail in a § 20A claim, a plaintiff must show that a defendant (1) used material, nonpublic information, (2) knew or recklessly disregarded that the information was material and nonpublic, and (3) traded contemporaneously with the plaintiff in the same class of security. Insisting that the adequacy, typicality, commonality, predominance, superiority, and manageability requirements of Rule 23 cannot be met, and that classwide proof is not possible, Certain Individual Defendants[32] argue that trying the § 20A claims as a single class "ignores the practical realities of what will be required for claimants to establish liability with respect to nearly 450 separate transactions, completed on more than 200 days, by 16 defendants, over a 3-year period." Determining standing to sue requires a claimant-by-claimant inquiry as to when the individual plaintiff investor purchased and sold which stock, whether and to what extent the price of that stock

---

[30] Claim One under §§ 10(b) and 20(a) alleges claims under all three subsections of Rule 10b-5 and calls on the theory of fraud on the market to satisfy the reliance element; Claim Two under § 20A alleges insider trading against selected defendants who sold Enron stock, not Osprey Notes, to selected plaintiffs; Claim Three, under §§ 11 and 15 is on behalf of selected plaintiffs who purchased Enron securities (not Osprey securities), pursuant to prospectuses as part of registered public offerings; Claim Four on behalf of Foreign Debt securities offered in foreign exchanges; and Claims Five and Six, under the Texas Securities Act for governmental entities that purchased two series of Notes issued by Enron. They emphasize that even *Newby*'s fourth claim under §§ 12(a)(2) and 15 on behalf of plaintiffs who purchased Foreign Debt Securities is directed to securities offered on foreign exchanges under Regulation S, not on behalf of Rule 144A purchasers who purchased Osprey Notes domestically.

[31] Section 20A addresses liability to contemporaneous traders for insider trading.

[32] These are Lay, Skilling, Causey, Frevert, Horton, Rice, Buy, Pai, Kean, McMahon, Olson, Sutton, and Koenig, who are all subjects of the § 20A claim.

was inflated at the time of that purchase and sale as a result of particular undisclosed material information used by which defendant, and whether that plaintiff suffered a loss[33] and if so, how much. They insist that proof would vary with individual defendants, trading days, and transactions. The Court would have to examine the particular circumstances of each transaction (e.g., material nonpublic information allegedly available to the trading defendant at the time of the transaction) to determine standing, liability and damages for that transaction. They cite conflicts of interest among putative class members in competition with each other to demonstrate that Enron stock was the most inflated on the day each traded.

Certain Individual Defendants further object that Lead Plaintiff has provided no trial plan to show how these individualized determinations could proceed as a class proceeding; indeed the motion for class certification does not mention the § 20A claims. Not only do they assert that individual questions would make a trial unmanageable, but they question how the enormous number of issues could be submitted to a jury, how a jury could keep track of the different issues for different plaintiffs against different defendants over a three-year period, and how standing could be established on a classwide basis without bringing each class member before the Court. They insist there are too many transactions with individual issues to make subclassing of any help.

In the event that the Court does certify a § 20A class, Certain Individual Defendants ask that the Court limit membership in that class or in subclasses to those who purchased stock within one day after a defendant sold his stock to satisfy the contemporaneity requirement, in light of recent case law.[34]

---

[33] Certain Individual Defendants claim that the class definition encompasses persons with conflicting interests because it includes not only those who suffered losses as a result of defendants' actions, but also those who bought and sold at profitable times, benefitting from their stock investment. Furthermore, because the class representatives are intent on proving Defendants' conduct was wrongful, the interests of those who benefitted will not be properly represented by the named plaintiffs.

[34] This Court previously determined that "contemporaneous" for purposes of 20A should mean that the plaintiffs purchased their Enron stock within two to three days, certainly less than a week, of the Defendant's insider trading, while relevant, material, nonpublic information remained undisclosed. *In re Enron Corp. Securities, Derivative & "ERISA" Litig.*, 258 F. Supp. 2d 576, 599-600 (S.D. Tex. 2003). It will continue to apply that measure.

Certain Individual Defendants argue that the proposed § 20A class representatives are not adequate to represent the class because they are not familiar with the legal and factual theories of the case, have relied entirely on Lead Counsel for factual investigation, and cannot distinguish among the defendants in this action.  Many have never even read an opinion or order issued by the Court in this litigation and have not spent more than a few hours on this suit since its commencement.  They cite examples from the deposition testimony of Dr. Richard Kimmerling, Michael Henning, Dr. Fitzhugh Mayo, Joseph Speck, Ben Schuette, and John Cassidy.

### G.      Vinson & Elkins, LLP (#1799)

Vinson & Elkins LLP ("V&E") also argues that class treatment is not appropriate as applied to claims against it because the fraud-on-the-market theory of presumed reliance applies only where a defendant communicated a misrepresentation to the relevant market, thus distorting the market price for the security at issue.  V&E insists there is no evidence that it communicated any misrepresentation to the markets for Enron securities.[35]  Therefore each plaintiff would have to prove reliance on the alleged fraud claims against it, precluding class certification.  Moreover it argues that Lead Plaintiff has not shown that it was the creator of any misleading statements that did reach the market, although the Court found that Lead Plaintiff has alleged that it was.  Lead Plaintiff has not provided any support for its unsubstantiated claim that V&E "drafted and/or approved the adequacy of Enron's press releases, shareholder reports and SEC filings."  Nor has Lead Plaintiff identified specific statements that V&E allegedly was involved in creating or the specific securities to which such statements relate.  V&E urges the Court to follow the majority rule of those courts that apply a "bright line rule" prohibiting a finding of primary liability under § 10(b) unless the secondary actor is identified as the author of a statement that reached the market; otherwise, it argues, application of the creator standard to support invocation of the fraud-on-the-market theory would allow plaintiffs to circumvent the reliance requirement.[36]

---

[35] Lead Plaintiff responds that in denying V&E's motion to dismiss, this Court found that the complaint did allege that the law firm made statements to the public about Enron's business and financial condition.  *In re Enron*, 235 F. Supp. 2d  at 705, 656-79.

[36] The Court previously rejected the "bright-line" rule approach. #1194.

### H.   Merrill Lynch's Supplemental Opposition (#2286), Reply to Lead Plaintiff's Opposition (#2318), and Supplemental Memorandum (#4486)

With respect to the claims against it, Merrill Lynch argues that the class is not certifiable under *Greenberg v. Crossroads Systems*, 364 F.3d 657, 663 (5th Cir. 2004)(holding that plaintiffs are not entitled to the fraud-on-the-market presumption of reliance for confirmatory statements, i.e., statements embodying information already known to the market and therefore already reflected in a stock's price), and that *Greenberg* disposes of the entire case against Merrill Lynch. The *Greenberg* panel opined that "[a] causal relationship between the statement and actual movement of the stock price" is essential to demonstrate reliance. *Id.* at 665. The Fifth Circuit concluded that even for non-confirmatory, i.e., "actionable," statements, there is no presumption of reliance where the price of the company's stock "did not decline significantly after a revelation that the earlier positive statements were misleading." *Id.* at 665. Furthermore, merely offering evidence that the price decreased after negative "truthful" information was released does not trigger the presumption of reliance; plaintiffs must also show that the earlier false statement that affected the stock's price and that was not confirmatory is related to the later "truthful" statement with negative information that caused the decrease in value, i.e., "that it is more probable than not that it was this negative statement, and not other unrelated negative statements, that caused a significant amount of decline." *Id.* at 665-66.

Merrill Lynch labels as "confirmatory" the fraudulent conduct claims asserted against it, specifically the allegations that it engaged in power swaps, the Nigerian barge transaction, and the LJM2 transactions in the fourth quarter of 1999 that "falsely inflated Enron's profits to meet Wall Street's and Enron's internal targets," and that "in response to Enron meeting analysts' estimates," Enron's stock price increased. The alleged purpose and the resulting effect of Enron's wrongful conduct was for Enron to meet Wall Street's and analysts' estimates. Merrill Lynch argues that Enron's January 18, 2000 announcement, that Enron's earnings for the fourth quarter of 1999 of $.31 per share ($1.18 for the year) were in line with the consensus estimates, is a "classic example of confirmatory information," *(Greenberg*, 364 F.3d at 688 n.16, and Amended Complaint at ¶¶ 742.5,

742.16, 742.18, and 742.22).[37]  Moreover, Merrill Lynch insists that the press statement "embodied virtually all of Merrill Lynch's allegedly wrongful conduct" and emphasizes that despite the alleged fraud, Enron's stock price did not go up, but down.

Lead Plaintiff also alleges that Merrill Lynch issued misleading analyst reports, but Merrill Lynch claims that those alleged misrepresentations were also confirmatory, based on information previously announced by Enron.  *See* #2286 at 5 n.6, listing the reports and their derivations from Enron announcements; Amended Complaint at ¶¶ 130, 142, 147, 149, 162, 181, 201, 208-09, 226, 250, 266, 321, and 362 (the bulk of which Merrill Lynch argues are repetitions of Enron information).  Merrill Lynch further contends that Plaintiffs have not provided any evidence that the alleged false statements by Merrill Lynch's analysts materially affected the price of Enron's stock.

In addition to alleged conduct that was merely confirmatory and thus had no impact on stock price, not only did the price of Enron stock decline, not rise, after Merrill Lynch's alleged participation in illicit transactions followed by Enron's positive earnings announcement on January 18, 2000, but after the ultimate revelation of ("the truth") in the Nigerian barge transaction and the power swaps transaction on April 9, 2002 and August 8, 2002, respectively, after Enron had filed for bankruptcy in December 2001, Enron stock actually rose three cents in value.  Thus even for non-confirmatory statements Lead Plaintiff failed to show a significant decline following revelation of the truth, much less that any drop in price was attributable to these revelations as opposed to other news about Enron.

Therefore because Lead Plaintiff has not shown that Merrill Lynch's conduct actually moved Enron's stock price, the presumption of reliance is not triggered and a class cannot be certified on the claims against Merrill Lynch.  Ex. C to #2286, Enron Press Release, Jan. 18, 2000; Ex. D, *Houston Chronicle*, Jan. 19, 2000; Ex. E, Stock Price Chart.

In addition, under the Fifth Circuit's holding in *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 364, 366 (5th Cir. 2004)(because group pleading did not survive

---

[37] Merrill Lynch notes that the report of Lead Plaintiff's expert, Dr. Blaine Nye, is silent on the question of whether the January 18, 2000 press statement was confirmatory.

passage of the PSLRA, to determine whether a statement was made by a corporation with scienter one must examine the state of mind of the individual corporate official making or issuing the statement), the firm insists the § 10(b) claims against Merrill Lynch based on the analysts' reports must be dismissed.

### III.  Prerequisites for Class Certification Under Rule 23

### A.   General Principles

Under Federal Rule of Civil Procedure 23(c)(1)(A) and (B), as amended in 2003, the court "must--at an early practicable time[38]–determine by order whether to certify the action as a class action" and, if it determines that it should do so, "define the class and the class claims, issues, or defenses" in the order certifying the class.  The court has wide discretion in determining whether to certify a class, but that discretion must be exercised within the bounds of Rule 23.  *Henry v. Cash Today, Inc.*, 199 F.R.D. 566, 570 (S.D. Tex. 2000), *citing  Castano v. American Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996).  "Rule 23 is a remedial rule which should be construed liberally to permit class actions, especially in the context of securities fraud suits, where the class action device can prove effective in deterring illegal activity." *Longden v. Sunderman*, 123 F.R.D. 547, 551 (N.D. Tex. 1988), *citing inter alia Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880 (5th Cir. 1973), and 5 *Newberg on Class Actions* § 8800 (1977).  The district court's decision to certify a class will only be reversed for abuse of discretion or application of incorrect legal standards.

---

[38] Before the 2003 amendment, Rule 23(c)(1)(A) required the district court to decide the class certification hearing "as soon as practicable."  The Advisory Notes explain the amendment was necessary so that Rule 23 would "reflect prevailing practice" and provide a sufficient opportunity to "gather information necessary to make the certification decision"; they further state that it is "appropriate to conduct controlled discovery into the 'merits,' limited to those aspects relevant to making the certification hearing on an informed basis."

The Court concedes that the timing of the instant action's class certification hearing is not "early," but points to the onslaught of complex motions to dismiss filed in MDL 1446, some of which remain to be resolved.  *The Manual For Complex Litigation Fourth* § 21.33 at 253 (Federal Judicial Center 2004) notes that precertification rulings on threshold Rule 12 motions to dismiss are not only proper, but frequently effective in disposing of part or all of the litigation, and that "early resolution of these questions may avoid expense for the parties and burdens for the court and may minimize use of the class action process . . . ."  Moreover, "[e]fficiency and economy are strong reasons for a court to resolve challenges to personal or subject-matter jurisdiction before ruling on certification."  *Id.*

*Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999), *cert. denied*, 528 U.S. 1159 (2000).

In the process of determining whether a class should be certified, the court is required to conduct a rigorous analysis of Federal Rule of Civil Procedure 23's prerequisites. *General Telephone Co. v. Falcon*, 457 U.S. 147, 161 (1982); *Castano*, 84 F.3d at 740. "Class certification hearings should not be mini-trials on the merits of the class or individual claims," but nevertheless the court must go beyond the pleadings and examine the evidence to understand the claims, defenses and relevant facts and applicable substantive law to make a meaningful certification decision. *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005)("The plain text of Rule 23 requires the court to 'find,' not merely assume, the facts favoring class certification."), *citing Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974). The Fifth Circuit has stated that *Eisen* does not support "the view that a district court must accept, on nothing more than pleadings, allegations of elements central to the propriety of class certification under rule 23." *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 311-12 (5th Cir. 2005)(holding that a review of the merits of a claim is proper to the degree necessary to determine whether the requirements of Rule 23 have been satisfied). Where the facts that must be considered for a Rule 23 determination overlap with the facts relating to the merits, they may be reviewed even where the resulting court findings might also coincidentally overlap. *Id.* at 312 (but warning that "'[t]he findings made for resolving a class action certification motion serve the court *only* in its determination of whether the requirements of Rule 23 have been demonstrated'"), *citing and quoting Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 366 (4th Cir. 2004).[39] In addition, the court, though not reaching the merits, must consider how plaintiffs' claims will be tried, individually or on a class basis. *Castano*, 84 F.3d at 744. While the Court has reached

---

[39] Shortly after *Eisen*, the Supreme Court observed in *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978), that even though courts should not rule on the merits at the class certification stage, "class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" Several years later, requiring the "rigorous analysis" to ensure the prerequisites of Rule 23 are met, the high court further suggested that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 160 (1982), *quoted in In re Initial Public Offering Securities Litig.*, 227 F.R.D. 65, 91 (S.D.N.Y. 2004).

the motion to certify rather late in the litigation, with fact discovery in large part completed, the evidence gleaned by the parties in that pursuit makes easier a rigorous analysis of the elements of Rule 23.

"District courts are permitted to limit or modify class definitions to provide the necessary precision." *In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 & n.7 (5ᵗʰ Cir. 2004)(*citing and quoting Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993)("A court is not bound by the class definition proposed in the complaint and should not dismiss the action simply because the complaint seeks to define the class too broadly."), *cert. denied sub nom. Am. Nat'l Life Ins. Co. v. Bratcher*, 543 U.S. 870 (2004); *Harris v. Gen. Dev. Corp.*, 127 F.R.D. 655, 659 (N.D. Ill. 1989)("[I]t is certainly within the court's discretion to limit or redefine the scope of the class."); *Meyer v. Citizens & S. Nat'l Bank*, 106 F.R.D. 356, 360 (M.D. Ga. 1985)("The Court has discretion in ruling on a motion to certify a class. This discretion extends to defining the scope of the class.), *cert. denied sub nom. American Nat'l Ins. Co. v. Bratcher*, 543 U.S. 870 (2004); *Turner v. Murphy Oil USA, Inc.*, No. CIV. A. 05-4206, 2006 WL 267333 (E.D. La. Jan. 30, 2006)(*citing Monumental Life* for that proposition).

As the movant for class certification here, Lead Plaintiff bears the burden of demonstrating that a class action is appropriate and that all requirements of Rule 23 are satisfied. *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5ᵗʰ Cir. 2001), *clarified and reh'g en banc denied*, 279 F.3d 313 (5ᵗʰ Cir. 2002).

## B.    Rule 23(a)'s Requirements

Rule 23(a), setting forth part of the "Prerequisites to a Class Action,"[40] provides,

One or more members of a class may sue or be sued as class representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses

---

[40] "Technically, only the requirements of section (a) of Rule 23 are 'prerequisites' to a class action, and section (b) describes the categories of classes maintainable as class actions," but the Fifth Circuit requires that a class action qualify for at least one of the Rule 23(b) categories to be certified. *Horton v. Goose Creek Independent School District*, 690 F.2d 470, 484 n.25 (5ᵗʰ Cir. 1982), *cert denied*, 463 U.S. 107 (1983).

of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

## 1.   Numerosity

Plaintiffs need not prove the precise number of members in a class, but "must ordinarily demonstrate some evidence or a reasonable estimate of the number of purported class members." *Zeidman v. J. Ray McDermott & Co., Inc.,* 651 F.2d 1030, 1038 (5th Cir. 1981)("the proper focus is not on numbers alone but on whether joinder of all members is practicable."). Furthermore, as is the case here, "the prerequisite expressed in Rule 23(a)(1) is generally assumed to have been met in class action suits involving nationally traded securities." *Id.* at 1039 (finding it reasonable to assume that "any class composed of the sellers of a nationally traded security during a period in which hundreds of thousands or even millions of shares of the security were traded must necessarily be 'so numerous that joinder of all members is impracticable.'"); *In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263, 268-69 (S.D. Tex. 2005)(*quoting Zeidman*). The Court finds that, for all Counts, the numerosity requirement, which has not been seriously challenged, has been easily satisfied by Plaintiffs' reasonable estimate, where Enron security investors are clearly so numerous that joinder of all members is impracticable, i.e., extremely difficult or inconvenient. *Henry v. Cash Today, Inc.*, 199 F.R.D. 566, 569 (S.D. Tex. 2000).

## 2.   Commonality

Commonality's undemanding test is satisfied by Lead Plaintiff's showing that there are questions of law or fact common to the class and that resolution of at least one issue will affect all or a significant number of class members. *Henry*, 199 F.R.D. at 569, *citing Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993); *In re Electronic Data Systems Corp. Sec. Litig.,* 226 F.R.D. 559, 564 (E.D. Tex. 2005), *aff'd*, 429 F.3d 125 (5th Cir. 2005).

The claims in *Newby* arise from the same set of facts and are brought under shared legal theories. Lead Plaintiff asserts that Defendants participated in an umbrella *Ponzi* scheme, a practice or course of business involving material misrepresentations which operated as a pervasive fraud to deceive the market and purchasers of Enron's and Enron-related entities' publicly traded securities,

both stocks and bonds.[41]  Here shared issues of law and fact satisfying the commonality requirement include whether Defendants violated the federal securities statutes; whether Defendants employed the alleged manipulative devices or engaged in the alleged wrongful *Ponzi* scheme to defraud investors; whether Defendants made misstatements and/or whether Defendants' statements omitted material facts necessary to make those statements, under the circumstances in which they were made, not misleading; whether Defendants misrepresented material facts; whether Defendants knew or recklessly disregarded that the statements made by them were false and misleading; whether the value of the publicly traded Enron securities was artificially inflated; what damages were sustained by the putative class members; and what is the appropriate measure of damages.  The facts satisfying the elements of §§ 10(b), 11, and 12(a)(2), and the derivative claims under §§ 20A, 20(a) and 15 (since they require proof of an underlying violation of the primary statutes), overlap, as does the proof of the alleged scheme of patterns of fraud.  While the § 11 claimants focus on proving material misrepresentations in the Registration Statements of the securities they purchased, those statements incorporate the SEC filings targeted as part of the scheme by the § 10(b)/Rule 10b-5 claimants, who or which also seek to show the misrepresentations in the Registration Statements as part of the overall fraudulent course of business perpetrated by Defendants to conceal Enron's actual financial status.  The same is true of the offering documents for the section 12(a)(2) claimants.  Thus commonality is satisfied.

### 3.    Typicality

Similarly not demanding, the test for typicality is satisfied if the class representatives' claims or defenses are typical of, but not necessarily identical to, those of the class; class representatives should have the same interests and have suffered the same injuries as others in the class, and the

---

[41] In certifying the class in *Lincoln Savings*, the court found,

> Significantly, Plaintiffs' case is not predicated exclusively or even predominantly on Rule 10b-5(b).  The central issue is whether Defendants orchestrated . . . a far-reaching scheme to inflate the apparent worth and prospects of ACC/Lincoln, while simultaneously concealing its latent but material weaknesses.  These allegations are consonant with § 10b-5(a) and (c).

140 F.R.D. at 428.

representatives' and class members' claims need only share the same essential characteristics, i.e., arise from a similar course of conduct and share the same legal theories. *Henry*, 199 F.R.D. at 569; *Electronic Data*, 226 F.R.D. at 565. *See also Koch v. Dwyer*, No. 98 Civ. 5519 (RPP), 2001 WL 289972, *3 (S.D.N.Y. Mar. 23, 2001)("'Rule 23(a)(3) is satisfied when each class member's claim arises from the same course of events and each class member makes similar arguments to prove the defendant's liability'"); *In re IKON Office Solutions, Inc.*, Nos. MDL 1318, 00-87, 191 F.R.D. 457, 463 (E.D. Pa. 2000)("Usually a plaintiff's claim is typical of a class if it challenges the same conduct as would the putative class. . . . Even quite significant factual differences will not defeat typicality so long as the legal theory upon which plaintiffs seek redress is the same as those they seek to represent."); *White v. Sundstrand Corp.*, No. 98 C 50070, 1999 WL 787455, *3 (N.D. Ill. Sept. 30, 1999)("A claim is typical if 'it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory.'").

The Court agrees with Lead Plaintiff that the claims of the proposed class representatives are typical because they arise from the same alleged *Ponzi* scheme, material misrepresentations, and course of conduct to defraud investors and artificially inflate the price of Enron's and Enron-related entities' publicly traded securities while concealing Enron's debt, all of which purportedly induced them and the putative class to invest in these securities; and they are grounded in the same legal theory, federal securities law. The interest of the proposed class representatives, like that of the other putative class members, is to achieve the maximum possible recovery for the class. *See Lehocky v. Tidel Technolgies, Inc.*, 220 F.R.D. 491, 502-03 (S.D. Tex. 2004)("[A]s long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes.'").

The major concern under Rule 23(a)(3) is if unique defenses against a named plaintiff "threaten to become the *focus of the litigation*," and the "key inquiry is whether a class representative would be required to devote considerable time to rebut the Defendants' claims." *Lehocky*, 220 F.R.D. at 501. The Fifth Circuit has recently rejected an argument that "the presence

of a unique defense necessarily destroys typicality." *Feder v. Electronic Data Systems Corp.*, 429 F.3d 125, 137 (5th Cir. 2005).

**4.     Adequacy**

The court examines the zeal and competence of the class representatives' counsel and the class representatives' willingness, experience, and ability to handle class actions, to take an active role in and control of the litigation, and to protect the interests of the absent members, to determine if there is fair and adequate representation of the interests of the class. *Henry*, 199 F.R.D. at 569; *Electronic Data*, 226 F.R.D. at 566, *citing Berger*, 257 F.3d at 479-82. Even in the absence of proof that the class representatives and/or their counsel are inadequate, the court may not presume that they are adequate; the party seeking certification must demonstrate that they are adequate. *Berger*, 257 F.3d at 481. The court must also determine if there are any conflicts of interest between the named plaintiffs and the class they seek to represent, which would make the class representation inadequate. *Berger*, 257 F.3d at 480. "[B]ecause absent class members are conclusively bound by the judgment in any class action brought on their behalf, the court must be especially vigilant to ensure that the due process rights of all class members are safeguarded through adequate representation at all times." *Id.* at 480.

Pursuant to Rule 23(g) regarding the appointment of class counsel with the ability to fairly and adequately represent the interests of the class, the court must examine (1) "the work counsel has done in identifying or investigation potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action"; (3) "counsel's knowledge of the applicable law"; and (4) the resources counsel will commit to representing the class." Rule 23(g)(1)(C)(I).

In appointing Bill Lerach's law firm, then Milberg Weiss Bershad Hynes & Lerach LLP, now Lerach Coughlin Stoia Geller Rudman & Robbins LLP, as Lead Counsel under the PSLRA, the Court found counsel to be highly qualified, widely experienced in securities class actions, and competent to conduct litigation in the *Newby* class action. The firm is comprised of probably the most prominent securities class action attorneys in the country. It is not surprising that Defendants

have not argued that counsel is not adequate.  Counsel's conduct in zealously and efficiently prosecuting this litigation with commitment of substantial resources to that goal evidences those qualities is evident throughout this suit.  Since the beginning they have propelled the *Newby* litigation forward.  They have established the website by which attorneys serve and communicate with each other, established the central depository for discovery materials, negotiated an agreed, organized, nonduplicative, and pared-down discovery schedule, and negotiated complex settlements with a number of defendants.  Similarly, Liaison Counsel, Schwartz, Junell, Campbell & Oathout LLP is qualified and experienced in prosecution of securities class actions and has assisted Lead Plaintiff's counsel throughout the litigation to vigorously and effectively prosecute this suit over the past several years.

Although common interests and monetary loss shared by the class representatives and class members, even though both groups are a mixture of small individual investors and large institutional investors, have been demonstrated in the satisfaction of the commonality and typicality tests, at issue here is the adequacy of some of the designated class representatives.

In securities fraud suits under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, Lead Plaintiffs must be highly knowledgeable because of "Congress's emphatic command that competent plaintiffs, rather than lawyers, direct the cases." *Berger*, 257 F.3d at 481-83.  The PSLRA, 15 U.S.C. § 78u-4(a)(3)(B), requires that the Lead Plaintiff must be "the most sophisticated investor available and willing to serve in a putative securities class action" and "an investor capable of understanding and controlling the litigation."

Noting that the Supreme Court[42] left the defining of the contours of Rule 23(a)'s adequacy requirement to lower courts, with a resulting lack of uniformity in standards among them, and calling "for rule 23 to be interpreted to accommodate the substantive policies of the governing statute," the Fifth Circuit in *Berger*, 257 F.3d at 479 n.7, 483, opined that the PSLRA clarified the

---

[42] *Hansberry v. Lee*, 311 U.S. 32 (1940); 7A Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, *Federal Prac. & Proc. Civ. 3d* § 1765 at 269 (2d ed. 1986)..

adequacy standard for class representatives in securities class actions.[43]  It found the clarification was in accord with its long established standard in mandating "an inquiry into . . . the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of the absentees."  *Berger*, 257 F.3d at 479, 482 (*citing Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 484 (5th Cir. 1982), *cert. denied*, 463 U.S. 1207 (1983)), *clarified*, 279 F.3d at 313-14.  A class representative, like the Lead Plaintiff, must have a "sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation"; class representatives do not have to "be legal scholars and are entitled to rely on counsel," but they "need to know more than that they were 'involved in a bad business deal.'"  *Berger*, 257 F.3d at 482-83. "Plaintiffs should understand the actions in which they are involved, and that understanding should not be limited to derivative knowledge acquired solely from counsel."  *Id.* at 483 n.18.  In sum, "competent plaintiffs, rather than lawyers, [must] direct such cases."  *Id.* at 484.

Lead Plaintiff, which this Court found fully capable in appointing it as such, is one of the designated representatives and has satisfied the requirements for adequacy for all claims except those under § 12(a)(2).  Following the class action hearing, at which the Court raised the question of adequacy because of its concerns about other designated class representatives, counsel for the Regents has submitted a Declaration of Christopher M. Patti (#4551) that reaffirms their adequacy to serve as class representative.  The other proposed class representatives will be scrutinized subsequently.

The Court will address the adequacy of some of the designated class representatives below under "IV.  Specific Issues."

---

[43] The *Berger* standard has since been applied to cases not involving securities fraud.  *See, e.g.*, *In re Electronic Data Systems Corp.*, 224 F.R.D. 613 (E.D. Tex. 2004)(for ERISA as well as PSLRA claims); *In the Matter of American Comm. Lines, LLC*, Nos. Civ. A. 00-252, 00-2967, and 00-3147, 2002 WL 1066743 (E.D. La. May 28, 2002)(maritime negligence and strict liability); *Umsted v. Intelect Communications, Inc.*, Civ. A. 3:99-CV-2604, 2003 WL 79750 (N.D. Tex. Jan. 7, 2003); *Ogden v. Americredit Corp.*, 225 F.R.D. 529, 532-38 & n.2 (N.D. Tex. 2005)(ERISA); *In re Reliant Energy ERISA Litig.*, No. Civ. A. H-02-2051, 2005 WL 2000707 (S.D. Tex. Aug. 18, 2005).

## C.     Rule 23(b)(3)'s Requirements

Aside from the deferred issue of the adequacy of these proposed class representatives, because the Court finds that Rule 23(a) requirements are satisfied, the Court examines whether the proposed class is maintainable under Rule 23(b)(3).  Rule 23(b) authorizes certification of a class action

> if the prerequisites of subdivision (a) are satisfied, and in addition
>
> (1) the prosecution of separate actions by or against individual members of the class would create a risk of
> (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct of the party opposing the class, or
> (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests . . . .
>
> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  The matters pertinent to the findings include:  (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

In  *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 412 (5th Cir. 1998), the Fifth Circuit observed, "Under Rule 23, the different categories of class actions, with their different requirements, represent a balance struck in each case between the need and efficiency of a class action and the interests of class members to pursue their claims separately or not at all."  The panel summarized,

> The (b)(1) class action encompasses cases in which the defendant is obliged to treat class members alike or where class members are making claims against a fund insufficient to satisfy all of the claims. . . . The (b)(2) class action, on the other hand, was intended to focus on cases where broad, class-wide injunctive or declaratory relief is necessary. . . . Finally, the (b)(3) class action was intended to dispose of all other classes in which a class action would be "convenient and desirable," including those involving large-scale, complex litigation for money damages.

*Id.* The procedural safeguards provided under (b)(3), i.e., the absolute right to notice and right to opt out of the class, are not available to class members of a (b)(1) or (b)(2) class action, because these two classes are more cohesive and homogenous, while the monetary remedies sought by a (b)(3) class are often related to disparate merits of individual claims of members with divergent interests. *Id.* at 413. Rule 23(b)(3) applies where "a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

Lead Plaintiff seeks certification under the last provision, (b)(3). A class may be certified under Rule 23(b)(3) when "common questions predominate over any questions affecting only individual members (predominance requirement)" and "class resolution is superior to other available methods for fair and efficient adjudication of the controversy (superiority requirement)." *Henry*, 199 F.R.D. at 570.

## 1.      Predominance of Common Issues

Although in part similar to the commonality requirement,[44] the predominance element is "'far more demanding' because it 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Unger*, 401 F.3d at 320, *quoting Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997). "In order to predominate common issues must constitute a significant part of the individual cases." *Jenkins v. Raymark Indus.*, 782 F.2d 468, 472 (5th Cir. 1986). In examining the predominance requirement of this Rule, the court should "inquire into the substance and structure of the underlying claims without passing judgment on their merits. 'Although 'the strength of a plaintiff's claim should not affect the certification decision,' the district court must look beyond the pleadings to 'understand the claims, defenses, relevant facts, and applicable substantive

---

[44] The Supreme Court has stated that the adequacy, typicality, and commonality requirements "'tend[] to merge'" and that they "'serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997), *quoting General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n.13 (1982).

law in order to make a meaningful determination of the certification issues.'" *Robinson v. Texas Automobile Dealers Assoc.*, 387 F.3d 416, 421 (5th Cir. 2005), *cert. denied*, 544 U.S. 949 (2005). Where a "common nucleus of operative fact" exists, the predominance factor is met. *Henry v. Cash Today*, 199 F.R.D. at 572. *See also Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 176 (3d Cir. 2001)("Presuming reliance class-wide is proper when the material nondisclosure is part of a common course of conduct."); *Schwartz v. TXU Corp.*, No. 3:02-CV-2243-K, et al., 2005 WL 3148350, *15 (N.D. Tex. Nov. 8, 2005)(and cases cited therein). Moreover, the Supreme Court has observed, "Predominance is a test readily met in certain cases alleging . . . securities fraud . . . ." *Amchem*, 521 U.S. at 624.

Nevertheless, as discussed *supra*, in recent years several federal Courts of Appeals, including the Fifth Circuit, have required at the class certification stage particularized analysis of the issue of an efficient market, a requirement to trigger a fraud-on-the-market presumption of reliance for claims under section 10(b) and Rule 10b-5. *See generally* Brian E. Pastuszenki, Inez H. Friedman-Boyce, and Goodwin Procter, *Back to Basic–Challenging the Application of the Efficient Market Hypothesis in Federal Securities Lawsuits*, SK080 ALI-ABA 907, 911, 925-32 (Apr. 28-29, 2005).

a.  ***Affiliated Ute* and/or Fraud-on-the-Market Presumptions for Section 10(b)/Rule 10b-5 Claims**

To establish a claim under § 10(b) and Rule 10b-5(b),[45] a plaintiff must ultimately prove (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the purchase or sale of the security and the material misrepresentation or omission; (4) reliance [or "transaction causation" in fraud-on-the-market cases]; (5) economic loss; and (6) loss causation,[46] i.e., causal connection between the material misrepresentation or omission and the plaintiff's actual loss. *Dura*

---

[45] To state a claim on conduct that violates Rule 10b-5(a) and (c), plaintiff must assert that the defendant (1) committed a deceptive or manipulative act, (2) with scienter, that (3) the act affected the market for securities or was otherwise in connection with their purchase of sale, and (4) that the defendant's actions caused the plaintiff's injuries. *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 491-92 & n.90 (S.D.N.Y. 2005)(and cases cited therein).

[46] The securities statutes do not "provide investors with broad insurance against market losses, but . . . protect them against those economic losses that misrepresentations actually cause." *Dura Pharmaceuticals*, 125 S. Ct. at 1633.

*Pharmaceuticals, Inc. v. Broudo*, 125 S. Ct. 1627, 1631 (2005).  Transaction causation requires a pleading facts showing that "but for" the fraudulent statement or omission the plaintiff would not have entered in the securities transaction at issue, while loss causation requires pleading facts showing that the content of the fraudulent statement or omission was the cause of the plaintiff's actual loss.[47]   *See, e.g.*, *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,* 416 F.3d 940, 943 (9th Cir. 2005); *Leykin v. AT&T Corporation*, No. 02 Civ. 1765 (LLS), 2006 WL 762970, *5 (S.D.N.Y. Mar. 23, 2006); *In re Enron Corp. Sec., Derivative and "ERISA" Litig.*, 310 F. Supp. 819, 830-31 (S.D. Tex. 2004)(and cases cited therein).

 "'Transaction causation' and 'reliance' are virtually synonymous."  *In re Mutual Funds Investment Litig.*, 384 F. Supp. 2d 845, 864 (D. Md. 2005).  The reliance element for claims for compensatory damages under § 10(b) and Rule 10b-5 serves as the causal connection between the defendant's action and the plaintiff's loss.  *Basic, Inc. v. Levinson*, 485 US. 224, 243 (1988); *Finkel v. Docutel/Olivetti Corp.*, 817 F.2d 356, 359 (5th Cir. 1987)("Proof of reliance establishes that the damaged party was induced to act by the defendant's conduct; it defines the causal link between defendant's conduct and the plaintiff's decision to buy or sell securities . . . . It is the generally applied bond between bad conduct and damages."), *cert. denied*, 485 U.S. 959 (1988).

A district court may not certify a fraud class where individualized proof of reliance must be shown and thus the requirement of predominance of common issues is defeated.  *Castano*, 84 F.3d at 745.  The Supreme Court has relaxed the requirement of demonstrating individual reliance on material misrepresentations and omissions by providing a presumption of reliance under certain circumstances.[48]  Such presumptions, where applicable, circumvent the need for individualized proof of reliance and make class certification more available.  The two major doctrines that have evolved

---

[47] The Court will address loss causation in greater detail with regard to damages later in this opinion.

[48] "Reliance may be presumed in cases based on omissions if a plaintiff can show that such omissions were material.  Otherwise, transaction causation is properly pled by the allegation that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'"  *Catton v. Defense Technology Systems, Inc.*, No. 05 Civ. 6954 (SAS), 2006 WL 27470, *5 (S.D.N.Y. Jan. 3, 2006).

to provide such a presumption of classwide reliance are the *Affiliated Ute* presumption and the "fraud on the market" theory.  The Fifth Circuit has also adopted a "fraud created the market" presumption in an undeveloped market.

In *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972),[49] the Supreme Court examined the language of Rule 10b-5 and observed that it did not expressly require proof of reliance in actions alleging primarily a failure to disclose.  Thus it held that in § 10(b) cases based primarily on material omissions, i.e., failure to disclose, reliance on the omitted information may be presumed where such information is **material**, i.e., where a reasonable investor might have considered it important in his decision to buy or sell securities.  *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972)(the "obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact"); *Akin v. Q-L Investments, Inc.*, 959

---

[49] In *Affiliated Ute*, two bank employees, Gale and Haslem, devised a plan to induce mixed-blood Indian shareholders of the Ute tribe to sell their securities to non-Indians and actively solicited a market for those securities among non-Indians.  Gale and Haslem did not disclose to the shareholders that Gale and Haslem would receive commissions and gratuities from the buyers and the bank would gain increased deposits from the new market from the sales of the securities or that the shares would draw a higher price in the non-Indian market.  The Supreme Court examined the three subsections of Rule 10b-5 and concluded that the much broader first and third subsections were not restricted, as was the second, to the making of an untrue statement of material fact and/or the omission to state a material fact.  The high court found that the defendants' activities fell within the "course of business" or "device, scheme or artifice that operated as a fraud" upon the Indian sellers under what are now subsections (a) and (c).  Finding that as market makers Gale and Haslem had an affirmative duty under Rule 10b-5 to disclose material facts that could have influenced their decision to sell their securities, the Supreme Court  wrote,

> Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. . . . This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact.

*Affiliated Ute*, 406 U.S. at 153-54.  The high court did not use the term "presumption," but in its wake, the lower courts developed tests for rebutting the presumption in nondisclosure cases by showing that the plaintiff would not have bought or sold his securities even if the material information had been disclosed or had never read the registration materials or prospectuses if the nondisclosure was in them.  *See, e.g., Shores v. Sklar*, 647 F.2d 462, 468 (5th Cir. 1981), *cert. denied*, 459 U.S. 1102 (1983); *Finkel v. Docutel/Olivetti Corp.*, 817 F.2d 356, 359 & n.6 (5th Cir. 1987)(observing that although *Affiliated Ute* did not discuss the question, "[c]ourts applying *Affiliated Ute* have doctrinally invoked a rebuttable presumption of reliance based on proof of materiality alleging deception by non-disclosure of information."), *cert denied*, 485 U.S. 959 (1988).

F.2d 521, 529 (5th Cir. 1992); *Smith v. Ayres*, 845 F.2d 1360, 1363 (5th Cir.1988)(where fraud allegations are based on a failure to disclose, as opposed to a fraudulent misrepresentation, a plaintiff is entitled to a rebuttable presumption of reliance), *cert. denied*, 508 U.S. 910 (1993). "The presumption is a judicial creature. It responds to the reality that a person cannot rely upon what he is not told." *Ayres*, 845 F.2d at 1363.

A defendant may rebut the *Affiliated Ute* presumption of reliance by showing that a plaintiff's investment decision would not have been affected even if the defendant had revealed the omitted facts. *Akin*, 959 F.2d at 530, *citing Rifkin v. Crow*, 574 F.2d 256, 262 (5th Cir. 1978).

Second, under *Basic, Inc.*'s fraud-on-the-market theory, drawing on the Ninth Circuit's earlier opinion in *Blackie v. Barrack*,[50] where plaintiff alleges there has been a material misrepresentation, reliance is presumed where investors trade in securities in well developed markets because in efficient markets, the market price of securities purportedly reflects all material, public information and thus the investor may be presumed to rely upon the integrity of the market price. 485 U.S. at 241-49. In *Basic, Inc.*, the Supreme Court explained,

> "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market,[51] the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the

---

[50] 524 F.2d 891, 905-08 (9th Cir. 1975), *cert. denied*, 429 U.S. 816 (1976).

[51] In an influential opinion that has helped frame Fifth Circuit law, *Cammer v. Bloom*, 711 F. Supp. 1264, 1276 n.17 (D.N.J. 1989), *appeal dismissed*, 993 F.2d 875 (3d Cir. 1993), the district court set out the key terms for an efficient market relating to the fraud on the market theory, as defined by Bromberg & Lowenfels, 4 *Securities Fraud and Commodities* § 8.6 (Aug. 1988):

> –-An open market is one in which anyone, or at least a large number of persons, can buy or sell.
> --A developed market is one which has a relatively high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available. It is principally a secondary market in outstanding securities. It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).
> --An efficient market is one which rapidly reflects new information in price.
> These terms are cumulative in the sense that a developed market will almost always be an open one. And an efficient market will almost invariably be a developed one.

Examples of open and developed securities markets are the New York and American Stock Exchanges.

> purchasers do not directly rely on the misstatements. . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations."

*Basic, Inc.*, 485 U.S. 241-42, *quoting Peil v. Speiser*, 806 F.2d 1154, 1160-61 (3d Cir. 1986). Thus the investor may rely on the price of the stock, which reflects all publicly available information. Where reliance is presumed under the fraud-on-the-market theory, reliance can be treated as a common, instead of an individual, issue with regard to proof. The Supreme Court found that the presumption was consistent with congressional policy underlying the Securities Exchange Act of 1934 and was supported by common sense and probability. *Id.* at 246. The United States Supreme Court further stated, "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Id.* For example the defendant may show that the plaintiff would have made the same investment decision even if he had known about the misstatement or nondisclosure, or that the plaintiff knew of the misstatement or nondisclosure before he traded, or that the material information was incorporated into the market price before the plaintiff bought or sold his securities. *Id.* at 248-49.[52] Another way to rebut the fraud-on-the-market

---

[52] Neither the *Affiliated Ute* nor the *Basic* presumption may help plaintiffs who purchased their securities in an initial offering or who purchased or sold securities in an undeveloped market. Some courts, led by the Fifth Circuit, have recognized a third theory for presuming reliance, generally dubbed "the fraud-created-the-market theory," to be discussed further. *See, e.g., Shores v.* Sklar, 647 F.2d at 469-70(presumption of reliance established under Rule 10b-5(a) or (c) if plaintiff "proved the scheme was intended to and did bring the Bonds onto the market fraudulently and proved he relied on the integrity of the securities market"; if the market was not developed, plaintiff must show "that (1) the defendants knowingly conspired to bring securities onto the market which were not entitled to be marketed, intending to defraud purchasers, (2) [plaintiff] reasonably relied on the Bonds' availability on the market as an indication of their apparent genuineness, and (3) as a result of the scheme to defraud, he suffered a loss."); *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1122-23 (5th Cir. 1988)(reliance may be presumed if the promoter knew despite an inefficient market that the "enterprise was worthless . . . when the securities were issued"), *vacated on other grounds sub nom. Fryar v. Abell*, 492 U.S. 914 (1989); *Ross v. Bank South, N.A.*, 885 F.2d 723, 729 (11th Cir. 1989), *cert. denied*, 495 U.S. 905 (1990). *See also Dalton v. Alston & Bird*, 741 F. Supp. 1322, 1327 (S.D. Ill. 1990)("an investor in a new issue obviously cannot rely on the integrity of the market to determine a price for [the] issue; therefore, in a new issue case, to show reliance the purchaser must show that the bonds were not entitled to be marketed at any price."). Unlike the fraud-on-the-market theory, which views the investor as relying on the integrity of the market price of a security, the fraud-created-the-market theory views the investors as relying on the integrity of the existence of a market in the security, itself, to trigger the presumption; the plaintiff must show that absent the fraud, the security would not have been marketable.

Other courts have rejected the fraud-created-the-market theory. *See, e.g., Eckstein v. Balcor*

presumption of reliance is to demonstrate that the market for the security was not efficient, an approach that has recently had some success. *See, e.g.*, Brian E. Pastuszenki, Inez H. Friedman-Boyce, and Goodwin Procter, *Back to Basic–Challenging the Application of the Efficient Market Hypothesis in Federal Securities Lawsuits*, SK080 ALI-ABA 907 (Apr. 28-29, 2005).

To determine whether an action is "primarily a nondisclosure case or a positive misrepresentation case" for the applicability of the *Ute* presumption or the fraud-on-the-market theory, the Fifth Circuit focuses on under which subsection of Rule 10b-5 the misconduct alleged in the pleadings falls. *Finkel v. Docutel/Olivetti Corp.*, 817 F.2d 356, 359-60 (5th Cir. 1987), *cert. denied*, 485 U.S. 959 (1988). A plaintiff's claim may give rise to the *Ute* presumption of reliance based on material omission if it arises under Rule 10b-5(a)("to employ any device, scheme, or artifice to defraud") and/or (c)("to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security"). *Ayres*, 845 F.2d at 1363; *Finkel*, 817 F.2d at 360 ("Cases involving primarily a failure to disclose implicate the first and third subsections of Rule 10b-5; cases involving primarily a misstatement or a failure to state a fact necessary to make the statements made not misleading implicate the second subsection . . . ."); *Shores v.* Sklar, 647 F.2d 462, 471 (5th Cir. 1981)(*en banc*)(12-10), *cert. denied*, 459 U.S. 1102 (1983); *Heller v. Am. Industrial Properties REIT*, No. CivASA97CA1315EP, 1998 WL 1782550, *3 (W.D. Tex. Sept. 28, 1998).

In contrast, Rule 10b-5(b) covers cases involving primarily a misstatement or failure to state a fact necessary to make statements made not misleading. *Finkel*, 817 F.2d at 360. The Fifth Circuit has repeatedly limited the *Ute* presumption to cases with claims based primarily on alleged omissions under subsections (a) and (c). *See, e.g., Finkel*, 817 F.2d at 359 ("A court must, therefore, analytically characterize a 10b-5 action as either primarily a nondisclosure case (which would make the presumption applicable), or a positive misrepresentation case."); *Abell v. Potomac Ins. Co.*, 858 F.2d at 1119 ("[T]he Ute presumption is limited to cases, like *Ute* itself, in which the plaintiffs have based their complaint primarily upon alleged omissions. Such non-disclosure suits are those in

*Film Investors*, 8 F.3d 1121, 1130 (7th Cir. 1993), *cert. denied*, 510 U.S. 1073 (1994).

which the complaint is grounded primarily in allegations that the defendant has failed to disclose any information whatsoever relating to material facts about which the defendant has a duty to the plaintiff to disclose.  *Ute*, however, does not require the burden of persuasion to shift in cases where the plaintiffs allege either that the defendant has made false statements or has distorted the truth by making true, but misleading, incomplete statements.  Thus we apply the *Ute* presumption in non-disclosure cases, but not in falsehood or distortion cases"); *Joseph v. Wiles*, 223 F.3d 1155, 1163 (10th Cir. 2000)("Any fraudulent scheme requires some degree of concealment, both of the truth and of the scheme itself.  We cannot allow the mere fact of this concealment to transform the alleged malfeasance into an omission rather than an affirmative act.  To do otherwise would permit the *Affiliated Ute* presumption to swallow the reliance requirement almost completely."); *in accord Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999)("the *Affiliated Ute* presumption should not be applied to cases that allege both misstatements and omissions unless the case can be characterized as one that primarily alleges omissions."), *cert. denied sub nom. Binder v. Wilson*, 528 U.S. 1154 (2000).  Some cases have required that there be no mixture of the two types of claims.  *See Lehocky*, 220 F.R.D. at 509-10 (holding that "Plaintiffs may not rely on the *Affiliated Ute* presumption in this mixed context"), *citing Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 722 (11th Cir. 1987)("[T]he *Affiliated Ute* presumption of reliance is not warranted in a Rule 10b-5 case when the plaintiff alleges both nondisclosures and positive misrepresentations instead of only nondisclosures as in *Affiliated Ute*."); *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 276 (the *Ute* presumption applies to cases "grounded primarily upon allegations that the defendant failed to disclose *any information whatsoever*" relating to material facts about which the defendant had a duty to disclose"), *clarified on other grounds*, 739 F. Supp. 1087 (N.D. Tex. 1990);  *Griffin v. GK Intelligent Systems, Inc.*, 196 F.R.D. 298, 305 (S.D. Tex. 2000)("The *Affiliated Ute* presumption applies only to allegations that the defendant company 'failed to disclose any information whatsoever relating to material facts about which [it] had a duty to disclose"), *quoting Steiner v. Southmark Corp.*, 734 F. Supp. at 275-76.  This Court follows the literal meaning of  "primarily" in *Ute*, 406 U.S. at 153 ("primarily a duty to disclose"), *Finkel*, 817 F.2d at 359*,* and progeny and

concludes a mixed context does not *per se* preclude the application of the *Ute* presumption, but does require the court to find the allegations are **primarily** of omissions.[53]

Financial Defendants have argued that *Affiliated Ute* is inapplicable here because one of its requirements is that the defendant have a duty to disclose to the plaintiff, and they maintain they do not owe such a duty to the *Newby* plaintiffs under the circumstances alleged.  The Court agrees that the Financial Institutions did not owe a duty to disclose to plaintiffs.  If one assumes for the moment that *Newby* is primarily an omission case, the Fifth Circuit has ruled that for a presumption of reliance, a duty to disclose is relevant only to Rule 10b-5(b) claims of statements that are either false or misleading; in a scheme case brought under Rule 10b-5(a) and (c)("employ any device, scheme or artifice to defraud" or "engage in any act, practice or course of business that operates or would operate as a fraud"), the Fifth Circuit has indicated that the requisite duty is not a duty to disclose, but a "the duty not to engage in a fraudulent 'scheme' or 'course of conduct' [that] could be based primarily on an omission."  *Ayres*, 845 F.2d at 1363 & n.8; *in accord Heller v. American Properties Reit*, No. Civ. A. SA97CA1315EP, 1998 WL 1782550. *3 (W.D. Tex. Sept. 28, 1998)(the first and third subsections of Rule 10b-5 create a duty not to engage in a fraudulent scheme or course of conduct a case alleging failure to disclose, in contrast to fraudulent misrepresentation).  It appears to this Court that logically and as a matter of law that duty not to engage in a Rule 10b-5 scheme, practice or course of conduct to defraud would be owed to the investing public generally.

At the Class Certification hearing the Financial Institution Defendants complained and demonstrated that Lead Plaintiff did not plead the *Affiliated Ute* presumption of reliance and contended that it therefore could not assert that theory now.  Reliance, i.e., the causal link between the defendant's misconduct and the plaintiff's decision to buy or sell the securities at issue, is an element of a Rule 10b-5 claim that must be pleaded; the *Ute* presumption, like the fraud-on-the-market theory, is a method of proving it.  *Heller*, 1998 WL 1782550 at *3 (finding that a presumption of reliance is a presumption of proof, not a presumption of pleading).  Lead Plaintiff

---

[53] The Court further notes that, as will be discussed, a number of alleged misstatements in the complaint are not actionable under developing law in the Fifth Circuit, their elimination supports a finding this case is primarily one of omissions.

has pleaded the factual underpinnings to trigger the presumption by alleging deception by nondisclosure, i.e., that Plaintiffs relied upon the false picture of financial health of Enron created by the Defendants' concealed, material conduct in a scheme to defraud. The rebuttable *Ute* presumption may be established at trial or on summary judgment by proof that the alleged concealed misconduct was material and that the plaintiff's allegations are primarily ones of omission, not of false and/or misleading statements. Thus the Court rejects Defendants' failure-to-plead argument.

Defendants have argued that the theory of fraud on the market, which serves to provide a presumption of class-wide reliance without having to prove individualized reliance for a § 10(b) claim, only applies to misrepresentations and omissions that make a defendant's statement misleading, in other words a claim under Rule 10b-5(b). The Fifth Circuit has not limited the theory[54] to statements by a defendant containing misrepresentations and omissions but, at times, intermingled the two presumptions of class-wide reliance under *Ute* and *Basic* for allegations of schemes to defraud or course of business that acts as a fraud. *Finkel*, 817 F.2d at 359 ("the *Affiliated Ute* presumption and the 'fraud on the market' theory . . . interact.").

The Fifth Circuit's approach to the fraud-on-the-market theory has evolved over the years. In *Shores v.* Sklar, 647 F.2d 462, 471 (5th Cir. 1981)(*en banc*)(12-10), *cert. denied*, 459 U.S. 1102 (1983), the twelve-judge majority partially reversed the district court's summary judgment in a

---

[54] In *Finkel v. Docutel/Olivetti Corp*, 817 F.2d 356, 360 (5th Cir. 1987), *cert. denied*, 485 U.S. 959 (1988), the Fifth Circuit explains the theory as follows:

> The fraud on the market theory is premised on the hypothesis that the market price of a security, in an open market as opposed to a private transaction between seller and buyer, accurately reflects the value of that security if all relevant information has been disclosed in the marketplace [the "efficient market" model]. When one fails to disclose or misrepresents material information about a security, the market's efficient pricing mechanism is skewed and the price of the security is distorted. A purchaser or seller who relies on the market to accurately value the security suffers damages if the market does not have all the information. Thus, the fraud on the market theory rejects the traditional notion of the investor who acts after carefully examining all available information. It says investors need not, and do not, act that way in an open market transaction because they have a right to presume the market's integrity. It constructs an environment which is hospitable to the reliance presumption of *Affiliated Ute*. In place of the traditional model it substitutes a market model in which the explicit assumption is that the market relied on the alleged deception, and it rejects the conceptual need to inquire whether or not the injured party did. The market becomes the theoretical agent of the investor.

putative class action securities suit against participants in the issuance of revenue bonds purportedly to finance construction of a mobile home manufacturing plant in Alabama.  The suit was brought by Charles E. Bishop, Jr., alleging that he was the victim of a pervasive scheme to defraud members of the investing public by means of the fraudulently marketed[55] industrial development bonds for which a misleading Offering Circular was issued.  The bonds were to be repaid from sales proceeds of the mobile homes, but the lessee of the industrial business premises defaulted after two payments and the bonds became worthless.  The district court had entered summary judgment for the defendants because Bishop's answers to interrogatories demonstrated that he had not seen nor even been aware of the Offering Circular, but had purchased the bonds based on his broker's oral representation that the bonds were a good investment.

In *Shores*, on appeal the majority of the Fifth Circuit, sitting *en banc,* focused on the text of the three separate subsections of Rule 10b-5.  It affirmed the lower court's summary judgment for the defendants to the extent that Bishop had unsuccessfully asserted a misrepresentation or omission claim under Rule 10b-5(b) in light of Bishop's admission that he did not rely on the Offering Circular, noting that even if the *Ute* presumption applied to the nondisclosures in the Offering Circular, Bishop's admission that he did not know about the document rebutted the presumption.

---

[55] "'Fraudulently marketed' . . . means the fraudulent scheme alleged by Bishop was so pervasive that without it the issuer would not have issued, the dealer could not have dealt in, and the buyer could not have bought these Bonds, because they would not have been offered on the market at any price."  647 F.2 464 n.2.  Nevertheless, under the facts of the case, "at any price" was subsequently modified or clarified by the Fifth Circuit because the bonds were not completely worthless; the plaintiff investors "recouped about 37 percent of their investment when the municipal assets dedicated to the failed corporation were liquidated."  *Abell*, 858 F.2d at 1121-22 (discussing *Shores v. Sklar*).

In *Abell*, the Fifth Circuit responded to bondholders arguing that under *Shores* worthlessness is not a prerequisite to show "not entitled to be marketed" for establishing a fraud on the market with the following distinction:

> This argument misses the point, since saleable assets may bless even the most worthless enterprise.  In *Shores*, the illegitimate securities represented an investment in a hoax made to seem real because valuable assets, including a factory, backed the promoters' promises.  Although the assets may have added value to the securities, the sham "business" did not because the promoters never intended to start a legitimate one.  We hold, therefore, that securities meet the test of "not entitled to be marketed" only where the promoters knew the enterprise was patently worthless.

*Id.* at 1122.

But the majority, emphasizing that the policy behind the federal securities acts and Rule 10b-5 was to protect investors from fraud, found the Rule's provisions also authorized a cause of action beyond misrepresentations and omissions in statements and "reach[ed] complex fraudulent schemes" such as the alleged "elaborate scheme to create a bond issue that would appear genuine, but was so lacking in basic requirements that the Bonds would never have been approved by the Board nor presented by the underwriters had any one of the participants in the scheme not acted with intent to defraud or in reckless disregard of whether the other defendants were perpetrating a fraud."  647 F.2d at 470, 468.  The majority observed that Bishop's complaint tracked the language of all three subsections of Rule 10b-5, including (a) and (c), in alleging "a course of business" or "device, scheme or artifice that operated as a fraud" upon Bishop in connection with the sale of bonds.  *Id.* at 469, 471-72.  (The same is true of the *Newby* pleadings.)  The Fifth Circuit concluded that even in an undeveloped market Bishop could satisfy the causation element of his claim by proving that the alleged scheme was intended to and did bring the bonds onto the market fraudulently and that he had relied on the integrity of the offerings of the securities market, rather than the statements in the Offering Circular.  *Id.* at 469.  Thus Bishop bore the burden of proving that (1) the defendants, with the intent to defraud purchasers, knowingly conspired to bring securities "which were not entitled to be marketed" onto the market; (2) that Bishop "reasonably relied on the Bonds' availability on the market as an indication of their apparent genuineness"; and (3) that Bishop suffered a loss as a result of the scheme.  *Id.* at 469-70.[56] Furthermore, the majority emphasized,

> Whenever the rule 10b-5 issue shifts from misrepresentation or omission in a document to fraud on a broader scale, the search for causation must shift also.  The "reliance" that produces causation in the latter type of case cannot come from

---

[56] The Eleventh Circuit strictly follows the Fifth Circuit's original standard of unmarketability in *Shores* for the fraud-created-the-market presumption of reliance, while, as will be discussed, the Fifth Circuit subsequently modified it.  *Ross v. Bank South, N.A.*, 885 F.2d 723, 732, 729-30 (11th Cir. 1989)(*en banc*)(plaintiffs must meet a "high threshold" because the fraud-created-the-market theory only applies to "securities that are so tainted by fraud as to be totally unmarketable"; "fraud must be so pervasive that it goes to the very existence of the bonds."), *cert. denied*, 495 U.S. 905 (1990).  District courts in the Third Circuit have implied that given the right facts, they might apply the theory.  *See, e.g.*, *Stinson v. Van Valley Development Corp.*, 714 F. Supp. 132 (E.D. Pa. 1989), *aff'd*, 897 F.2d 524 (3d Cir. 1990); *In re Bexar County Health Facility Development Corp. Sec. Litig.*, 130 F.R.D. 602 (E.D. Pa. 1990); *Gruber v. Price Waterhouse*, 776 F. Supp. 1044 (E.D. Pa. 1991).

reading a document.  It may arise from the duty to speak as in *Ute*, a scheme to manipulate the market at a time when a merger had forced a sales as in *Schlick*,[57] a scheme to inflate common stock prices by misleading statements as in *Rifkin*,[58] or a claim by a bond buyer that he relied on the market to provide securities that were not fraudulently created as we have here.  The most significant common thread in all these precedents is that rule 10b-5 is not limited to a narrow right to recover for knowing fraudulent misrepresentations or omissions in disclosure documents which mislead a securities buyer.  The rule is recognized also to provide the basis for a federal cause of action for more elaborate, intentional schemes which deceive or defraud purchasers of securities.

*Id.* at 472.  *See also Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1120 (5th Cir. 1988)("A fraud on the market is any deceit that successfully disseminates false or misleading information into the securities market or withholds vital information from that market.  The theory holds that such a deceit defrauds investors even when they are unaware of misrepresentations or omissions that skew the market price, because investors depend upon the integrity of the market price."), *vacated on other grounds*, 492 U.S. 914 (1992).

Subsequently in *Finkel v. Docutel/Olivetti Corp*, 817 F.2d 356, 359 (5th Cir. 1987), *cert. denied*, 485 U.S. 959 (1988), observing that the *Ute* presumption and the fraud on the market theory "interact," the panel noted there was disagreement over "what *Shores* means." *Id.* at 361.  Without highlighting the fact that Bishop expressly stated that he had not read the Offering Circular, the panel held, *"Shores* permits a plaintiff to assert a fraud on the market theory under 10b-5(a) and (c) but not under 10b-5(b)."  817 F.2d at 362.  While noting that "[o]ther Circuits have gone even farther and recognize the fraud on the market theory under 10b-5(b)," they stated, "We do not because *Shores* does not."  *Id.* at 362-63.  Based on *Ute*, the appellate panel opined that the language of Rule 10b-5 requires that the court must, as a threshold matter, "analytically characterize a 10b-5 action as either primarily a nondisclosure case (which would make the [*Ute*] presumption [of reliance] applicable, or a positive misrepresentation case. . . . Cases involving primarily a failure to disclose implicate the first and third subsections of Rule 10b-5; cases involving primarily a misstatement or failure to state a fact necessary to make statements made not misleading implicate

---

[57] *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374 (2d Cir. 1974), *cert. denied*, 421 U.S. 976 (1975).

[58] *Rifkin v. Crow*, 574 F.2d 256 (5th Cir. 1978).

the second subsection (which is the only subsection of the Rule that specifically mentions the active misrepresentation concept of prohibited conduct)." *Id.* at 359-60.  The case need only be primarily one of nondisclosure, not a case of pure nondisclosure, for the *Ute* presumption of reliance to apply for scheme or course of business liability under Rule 10b-5(a) and (c).  *Id.* at 363.  Further, the panel noted part of the holding in *Shores* was "tailored to the facts of the case":  because it was unclear whether Bishop bought in the primary or the secondary market, and, more important, because the market for bonds in *Shores* was not "the active efficient market for which the fraud on the market theory was initially conceived," *Shores*' "limitation of Bishop's claim to proof that the bonds were unmarketable is simply a rule formulated for newly issued securities."  *Id.* at 364.  Thus the "majority in *Shores* simply recognized that a Rule 10b-5 action based on the fraud on the market theory could embrace a claim for a fraud that resulted in the issuance of worthless securities as well as a fraud that inflated the price of a security."  *Id.* at 364.[59]  The *Finkel* panel followed its interpretation of *Shores* as not allowing the theory of fraud on the market for claims of misrepresentation under Rule 10b-5(b) where the plaintiff failed to allege that she read or relied on any of the documents containing the alleged misrepresentation or omission, but allowing the theory for scheme and course of business fraud claims under 10b-5(a) and (c).  The majority reversed the district court's dismissal of those claims and remanded the case for further proceedings, including the opportunity for defendants to rebut the *Ute* presumption of reliance established by proof of materiality of the alleged misconduct "1) by showing, upon the shifting of the burden to the defendant, that the nondisclosures did not affect the market price; or 2) that plaintiff would have purchased the stock at the same price even if she had known the information that was not disclosed, or that she actually knew the information that was not disclosed to the market."  *Id.* at 364-65.

Shortly thereafter, in 1988 the Supreme Court issued *Basic, Inc.,* in which the Supreme Court "announced its support for a new, largely undefined version of this presumption of reliance," and implicitly "vitiated part of [the Fifth Circuit's] fraud-on-the-market jurisprudence." *Abell*, 858 F.2d

---

[59] Docutel stock in *Finkel* was found or assumed to have been traded in an over-the-counter, active, efficient market.

at 1120.  In *Abell*, the Fifth Circuit explained that until *Basic*, it had allowed "the fraud-on-the-market presumption, like the *Ute*, [to be] available only to plaintiffs who based their rule 10b-5 claims primarily upon non-disclosure."  *Id.*   *Basic* held that plaintiffs "alleging active misrepresentation (i.e., making false statements and failing to correct distorted statements) may **also** assert a fraud-on-the market theory of reliance."  *Id.* (emphasis added by this Court).[60]  *See Basic, Inc.* 485 U.S. at 247 ("An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price.  Because most publicly available information is reflected in the market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action.").  *See also Steiner v. Southmark Corp.*, 734 F. Supp. 269, 277 ("The effect of *[Basic, Inc.]* was to vitiate the prior distinction cabining fraud-on-the-market to nondisclosure cases and to give the presumption potential applicability to any Rule 10b-5 action involving openly traded securities."), *clarified on other grounds*, 739 F. Supp. 1087 (N.D. Tex. 1990).  In *Basic, Inc.,* furthermore, the Supreme Court left "each of the circuits room to develop its own fraud-on-the-market rules."  *Abell*, 858 F.2d at 1120.  Thus ironically, while Defendants in *Newby* object that the fraud-on-the-market theory applies only to misrepresentations in statements and documents under Rule 10b-5(b), which they claim not to have made, until *Basic, Inc.* overruled the Fifth Circuit, the Fifth Circuit in *Sklar* refused to apply the fraud-on-the-market theory only to that second subsection of Rule 10b-5, but did apply it to allegations of a generalized scheme to defraud investors under Rule 10b-5(a) and (c).

Addressing *Finkel, post-Basic, Inc.*, the panel in *Abell* summarized the Fifth Circuit's approach, in stating that fraud on the market can be established by a plaintiff in two ways: (1) by showing that the securities at issue were "traded on an active secondary market, such as a public

---

[60] As suggested by the word "also," which this Court has emphasized in the quoted passage above, *Abell* does not appear to have affected the Fifth Circuit's application of the theory to a claim of defendants' primarily undisclosed conduct in a scheme or course of conduct to defraud securities investors, as opposed to nondisclosure within a statement or document: "This [fraud-on-the-market] presumption [of reliance] assumes that investors ordinarily and correctly rely upon the 'market price' of a security as an accurate estimate of the future value of that security.  Accordingly, if a defendant distorts the market price by lying or concealing the truth, the fraudulently-distorted price can deceive even prudent investors."  *Id.* at 1122.

exchange," and proving that the defendant's nondisclosures materially affected the market price of the security; and (2) where there is no active, efficient secondary market, by proving that the defendants conspired to bring securities that were not entitled to be marketed, were fraudulently marketed[61] (would never have been issued or marketed were it not for defendants' fraudulent scheme). *Abell*, 858 F.2d at 1120. As noted earlier, the latter theory is generally known as the fraud-created-the-market theory and does not apply under the facts here.[62] *See also T.J. Raney & Sons, Inc. v. Fort Cobb, Oklahoma Irrigation Fuel Authority*, 717 F.2d 1330, 1333 (10th Cir. 1983)(defining "unmarketability" of the Fifth Circuit's standard for fraud-created-the market" as "unlawfully issued," and allowing reliance on existence of securities on the market as evidence that they were lawfully issued), *cert. denied*, 465 U.S. 1026 (1984).

Important for the *Newby* class action, there appears to have been no modification nor implied overruling to *Shores*' holding that the fraud-on-the-market and the *Ute* presumptions of reliance may apply to claims of a scheme or course of business to defraud in connection with the sale of securities under Rule 10b-5(a) and (c).

---

[61] It is insufficient to show that the securities would have been offered at a higher or lower price. *Abell*, 858 F.2d 1120.

[62] As an illustration of the development of different rules by the Circuit Courts of Appeals, the Sixth Circuit has questioned this rule of the Fifth and Eleventh Circuits for newly issued securities traded on an undeveloped market, which has been dubbed "the fraud-created-the-market theory," and recognizes the fraud-on-the-market theory of reliance only when the securities are traded on an efficient market. *Freeman v. Laventhol & Horwath*, 915 F.2d 193 (6th Cir. 1990); *Ockerman v. May Zima & Co.*, 27 F.3d 1151, 1158-60 (6th Cir. 1994). The Seventh Circuit also rejects it. *Eckstein v. Balcor Film Investors*, 8 F.3d 1121 (7th Cir. 1993), *cert. denied*, 510 U.S. 1073 (1994).

Furthermore, as one commentator observed, courts applying the fraud-created-the-market theory [the Fifth, Third, Tenth, and Eleventh Circuits] differ on how to determine what amount of assets qualifies a company as

economically unmarketable or "patently worthless." The Third, [Tenth] and Eleventh Circuits established that their standard for "patently worthless" requires that there be no assets in the company underlying the security in question, while the Fifth Circuit allows for a degree of flexibility in the amount of assets. The Fifth Circuit focuses more on the intention of the issuer rather than an absolute dollar amount. The Sixth and Seventh Circuits have apparently rejected the fraud-created-the-market theory . . . .

*See generally* Peter J. Dennin, *Which Came First, the Fraud of the Market: Is the Fraud-Created-The-Market Theory Valid Under Rule 10b-5?*, 69 Fordham L. Rev. 2611, 2626-41 (May 2001).

Moreover, the district court in *Lincoln Savings*, 140 F.R.D. 432-33, upon which Lead Plaintiff heavily relies, followed the reasoning in *Shores* to support a fraud-on-the-market theory of reliance. It concluded,

> [T]he justification for this authority [*Shores*] is consistent with the materiality and reliance principles endorsed by *Basic*. If an enterprise is so laden with fraud that its entire public image is distorted, it is sensible to presume that reasonable investors relied on many material misrepresentations which, in aggregate, created a false image. In this situation, the offending misrepresentations are not merely presumed to compete successfully for the investor's attention amidst a mix of material, undistorted facts. Rather, the entire picture of the company's economic health and lawful character is skewed. . . . [T]here is virtually nothing more material to a decision to invest in the subordinated debt of a company than a reliable, undistorted picture of its financial integrity.

*Id.* at 432-33.

Nevertheless part of the rationale of *Lincoln Savings* is based on a presumption not recognized by this Circuit.[63] The *Lincoln Savings* district court also relied on a Ninth Circuit doctrine for a presumption of reliance based "on the integrity of the regulatory process and the truth of any representations made to the appropriate agencies and the investors at the time of the original issue" of securities "to ensure that at a fundamental level the securities were entitled to be marketed." *Lincoln Savings*, 140 F.R.D. at 433-34, *citing Arthur Young & Co. v. U.S. District Court,* 549 F.2d 686, 695 (9th Cir.), *cert. denied*, 434 U.S. 829 (1977).[64] The *Lincoln Savings* court found, "Plaintiffs here are entitled to a presumption of reliance if a network of misrepresentations

---

[63] For one thing, the district court in *Lincoln Savings* rejected *Abell*'s restrictive construction of the proof needed for a Rule 10b-5 claim relating to securities sold in a limited market (that presumption is available in a limited market only where promoters knew enterprise was worthless at the time they issued the securities and the securities were successful only because of the scheme to defraud); instead the *Lincoln Savings* judge held that the plaintiffs in that case were entitled to a presumption of reliance because the promoters' knowledge was not determinative of plaintiffs' knowledge under *Basic* and "because the alleged scheme to defraud is of such pervasive materiality as to generally and fundamentally distort the public representations concerning the company." *Lincoln Savings*, 140 F.R.D. at 433.

[64] The Fifth Circuit's approach in *Shores* and *Abell* to the fraud-created the market theory, with the presumption of reliance for securities "not entitled to be marketed," has been widely characterized as economic unmarketability, while the compliance of the issuer with regulatory procedures has been dubbed legal unmarketability. *See, e.g.,* Julie A. Herzog, *Fraud Created The Market: An Unwise and Unwarranted Extension of Section 10(b) and Rule 10b-5*, 63 Geo. Wash. L. Rev. 359, 373- (March 1995); Peter J. Dennin, *Which Came First, the Fraud of the Market: Is the Fraud-Created-The-Market Theory Valid Under Rule 10b-5?*, 69 Fordham L. Rev. 2611, 2625 (May 2001).

or omissions to the Federal Home Loan Bank Board or other federal and state regulators enabled the bond sales to go forward."  140 F.R.D. at 434.

The Fifth Circuit has heightened the requirements for applying fraud on the market for a presumption of reliance in a misrepresentation case under Rule 10b-5(b) at the summary judgment stage.  *Greenberg v. Crossroads Systems, Inc.*, 364 F.3d 657 (5th Cir. 2004).  In light of the Fifth Circuit's recent requirement of a rigorous analysis for class certification and the fact that discovery in *Newby* is largely complete, this Court concludes that *Greenberg* has relevance at class certification time also.   For class claims seeking money damages under § 10(b) for material misrepresentations,[65] where private plaintiffs seek to satisfy the statutory element of reliance with a rebuttable presumption of class-wide reliance under the fraud-on-the-market theory of *Basic, Inc.*,[66] the plaintiff must show that (1) the defendant made public material misrepresentations, (2) the defendant's shares were traded in an efficient market, and (3) the plaintiffs traded shares between the time the misrepresentations were made and the time the truth was revealed."  *Greenberg v. Crossroads Systems, Inc.*, 364 F.3d 657, 661 (5th Cir. 2004), *citing Basic, Inc.*, 485 U.S. at 247 n.47. Furthermore to satisfy Rule 23(b)(3)'s predominance requirement, the Fifth Circuit mandates that plaintiffs do more than conclusorily plead market efficiency for purposes of class certification; they must demonstrate by a rigorous, though preliminary, standard of proof[67] that the market for a

---

[65] "To state a private securities fraud claim under § 10(b) and Rule 10b-5, 'a private plaintiff must allege, in connection with the purchase or sale of securities, (1) a misstatement or an omission (2) of material fact, (3) made with scienter (4) *on which plaintiff relied* (5) that proximately caused 'the plaintiffs'] injury.'"  *Greenberg v. Crossroads Systems, Inc.*, 364 F.3d 657, 661 (5th Cir. 2004), *quoting Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 406-07 (5th Cir. 2001).

[66] Lead Plaintiff points out there is no reliance element for its claims under §§ 11, 12(a)(2), and 15 of the 1933 Act. #1445 at 26.  It further states that Enron's common stock, preferred stock, and certain debt securities trade on the New York Stock Exchange, among others, and that "[b]y proxy, the prices of Enron's and Enron-related entities' publicly traded securities not traded on that exchange closely approximated movements in the Company's NYSE benchmark securities."  *Id.*

[67] "Courts have likened the degree of proof required to the standards used in preliminary hearings . . . or in Fed. Rule. Civ. P. 12(b)(1) and 12(b)(2) jurisdiction contests . . . .  Although the court's determination for class certification purposes may be revised (or wholly rejected) by the ultimate factfinder, the court may not simply presume facts in favor of an efficient market."  *Unger*, 401 F.3d at 322-23. "A preliminary injunction requires the movant, by a clear showing, to carry the burden of persuasion. . . . [Establishing] a 'substantial likelihood of success on the merits' . . . is not the same as holding that the Plaintiffs had established disputed facts as a matter of law. [citations

company's stock was efficient. *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 311 & n.7 (5th Cir. 2005).[68]

At the class certification hearing and in the record we have the proverbial battle of experts regarding the efficiency of the market(s) for Enron securities. The Court notes that *The Manual for Complex Litigation Fourth* § 21.21 at 267-68, states,

> Expert witnesses play a limited role in class certification hearings; some courts admit testimony on whether Rule 23 standards, such as predominance and superiority, have been met. The judge need not decide at the certification stage whether such expert testimony satisfies standards for admissibility at trial. . . . A judge should not be drawn prematurely into a battle of competing experts.

The *Manual*, *id.* at 268 n. 817, cites *In re Visa Check/Master Money Antitrust Litigation*, 280 F.3d 124, 135 (2d Cir. 2001), *cert. denied sub nom. Visa U.S.A., Inc. v. Wal-Mart Stores, Inc.*, 536 U.S. 917 (2002), for the propositions that a district court "must ensure that the basis of the expert opinion is not so flawed that it would be inadmissible as a matter of law"; that it "may not weigh conflicting expert evidence or engage in a 'statistical dueling' of experts"; and that its role is to decide "whether plaintiff's expert evidence is sufficient to demonstrate common questions of fact warranting certification of the proposed class, not whether the evidence will ultimately be persuasive."

In a case focusing on the fraud-on-the-market presumption of reliance in a class certification context, the First Circuit, relying on the Fifth Circuit's opinions in *Castano* and *Unger*, with which the majority of courts agree, recently rejected the Second Circuit's approach. *In re Polymedica*

---

omitted]" *Okpalobi v. Forster*, 190 F.3d 337, 341 (5th Cir. 1999), *on rehearing en banc rev'd and remanded on other grounds*, 244 F.3d 405 (5th Cir. 2001). Thus the court must make a preliminary inquiry into the merits, but its factual findings will not be binding on the jury that may ultimately adjudge the merits.

In *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988), which established the fraud-on-the-market presumption as an alternative to proving individualized reliance on a defendant's misstatement, the Supreme Court observed that the Advisory Committee Note on Rule 301 of the Federal Rules of Evidence, addressing presumptions generally, states that a party seeking to invoke the presumption need only establish "basic facts giving rise to" the presumption, while to rebut it the nonmovant must establish the nonexistence of the presumed fact. *Basic*, 485 U.S. at 245; *In re Polymedica Corp. Securities Litig.*, 432 F.3d 1, 16-17 (1st Cir. 2005).

[68] The previously scheduled class certification hearing in this case was continued for thirty days to allow Defendants to respond to a submission by Lead Plaintiff's expert, Declaration of Blaine F. Nye, Ph.D. in support of Lead Plaintiff's Amended Motion For Class Certification (#4390) to support Lead Plaintiff's case for market efficiency.

*Corp. Securities Litig.*, 432 F.3d at 5 ("[T]he majority of courts of appeals that have addressed this issue . . .[have ruled that] a district court is not limited to the allegations raised in the complaint and should instead make whatever legal and factual inquiries are necessary to an informed determination of the certification issues.)(citing also *Cooper v. Southern Co.*, 390 F.3d 695, 712 (11th Cir. 2004); *Gariety v. Grant Thornton LLP*, 368 F.3d 356, 365 (4th Cir. 2004); *West v. Prudential Sec., Inc.*, 282 F.3d 935, 938 (7th Cir. 2002); *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 189 (3d Cir. 2001); and *Wagner v. Taylor*, 836 F.2d 578, 587 (D.C. Cir. 1987)). This Court will follow the more demanding rule of the Fifth Circuit.

The Fifth Circuit has stated that "although '[t]here is no requirement for expert testimony on the issue of market efficiency . . . many courts have considered it when addressing this [predominance] determination, which may often benefit from statistical, economic, and mathematical analysis.'" *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 314 n. 13 (5th Cir. 2005)(approving consideration of "at least the reliability of expert testimony on market efficiency at the class certification stage")(quoting *Unger*, 401 F.3d at 323 n.6).

In *Basic, Inc.*, the Supreme Court failed to address how to apply fraud on the market, but left the lower courts to decide what constitutes an "open and developed" market, in other words an "efficient" market, a prerequisite to triggering the theory's presumption of reliance. The result has been a lack of a uniform standard for determining efficiency. *See, e.g.*, Pastuszenki, *et al.*, *Back to Basic–-Challenging the Application of the Efficient Market Hypothesis in Federal Securities Lawsuits*, SK080 ALI-ABA at 921. The Supreme Court in *Basic, Inc.* stated, "By accepting this rebuttable [fraud-on-the-market] presumption, we do not intend conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price." 485 U.S. at 248 n.28.

Adopting and supplementing the most widely accepted multi-factor test first developed in *Cammer v. Bloom*, 711 F. Supp. 1264, 1276-77 (D.N.J. 1989), *appeal dismissed*, 993 F.2d 875 (3d Cir. 1993), the Fifth Circuit has identified, in a non-exhaustive list, a variety of factors also used by

other courts to determine whether the stock at issue traded in an efficient market, although it ruled

that not every one must be addressed:

> (1) the average weekly trading volume expressed as a percentage of total outstanding shares[69]; (2) the number of securities analysts following and reporting on the stock[70]; (3) the extent to which market makers[71] and arbitrageurs trade in the stock; (4) the

---

[69] Judge Lechner explained in *Cammer v. Bloom*, in which the first five factors were discussed,

> The reason the existence of an actively traded market, as evidenced by a large weekly volume of stock trades, suggests there is an efficient market is because it implies significant investor interest in the company. Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information.

*Cammer v. Bloom*, 711 F. Supp. 1264, 1286 (D.N.J. 1989), *appeal dismissed*, 993 F.2d 875 (3d Cir. 1993). Dr. Blaine Nye, Lead Plaintiff's expert, related high trading volume to liquidity, supporting market efficiency: "A market for a stock is liquid if investors can trade a large number of shares on demand. Liquidity allows investors to buy and sell shares quickly when their assessments about the value of a company's stock have changed, facilitating a prompt price reaction to material new information." #4390 at 16.

*Cammer*, 711 F. Supp. at 1293, cites *inter alia* Bromberg & Lowenfels, 4 *Securities Fraud and Commodities* § 8.6 (Aug. 1988)("Turnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption."). The average trading volume is one of the most important factors in determining whether the market for a particular stock is efficient. *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001).

[70] "The more securities analysts who follow and report on a company's stock, the greater the likelihood that information disseminated by a corporation is being relied upon by the stock trading public. . . . The presence of a substantial number of such analysts indicates that the stock was closely reviewed by investment professionals, who made buy/sell recommendations to client investors based on information publicly available about the company." *Krogman*, 202 F.R.D. at 475, *citing Cammer*, 711 F. Supp. At 1286.

[71] The National Association of Securities Dealers ("NAIC") defines a "market maker" as a "'firm that maintains a firm bid and offer price in a given security by standing ready to buy or sell at publicly-quoted prices.'" *In re Safety-Kleen Corp. Bondholders Litig.*, No. 3:00-1145-17, 2004 WL 3115870, *7 (D.S.C. Nov. 1, 2004)(citing *http://www.nasd.com/resources/glossary.asp. See also In re Polymedica Corp. Sec. Litig.*, 432 F.3d 1, 9 (1st Cir. 2005)("The capacity of arbitrageurs to 'seek out new information and evaluate its effects on the price of securities' distinguishes them from ordinary investors, who 'lack the time, resources or expertise to evaluate all the information concerning a security.' . . . In an efficient market then, an ordinary investor 'who becomes aware of publicly available information cannot make money by trading on it' because the information will already have been incorporated into the market by arbitrageurs. [citations omitted]"). Judge Lechner observed, "The existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286-87 (holding that the existence of many market makers is one factor helping to support an inference that a company's stock is traded in an efficient market). Other courts have discounted this factor as an indicator of market efficiency. *See Krogman*, 202 F.R.D. at 476 (and cases cited therein), *cited by Unger*, 401 F.3d at 324 ("the 'number of market makers factor' has in practice proven an

company's eligibility to file SEC registration Form S-3 (as opposed to Form S-1 or S-2)[72]; (5) the existence of empirical facts "showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price"[73]; (6) the company's market capitalization[74]; (7) the bid-

---

unreliable measure of market efficiency unless tied to trade volume and price").

[72] The panel in *Unger* explained, 401 F.3d at 323 n.5,

> Form S-3 is reserved for companies whose stock is actively traded and widely followed.  To file a Form S-3, a company must have filed SEC reports for twelve consecutive months and possess a seventy-five million dollar market capitalization level.  *See* 17 C.F.R. § 239.13.  By contrast, there is no minimum capitalization requirement to file either Form S-1 or S-2.  Further, a company need not even meet the reporting requirements spelled out in § 239.13  to file a Form S-1.  *See* 17 C.F.R. §§ 239.11-239.12.

*See also Cammer v. Bloom*, 711 F. Supp. 1264, 1271 n.5 ("Generally speaking it is the largest and most well known companies which register equity securities on Form S-3.  To be eligible to use Form S-3 in connection with an equity offering, an issuer must, among other things, have been filing reports under the Exchange Act for at least thirty-six months and either have outstanding $150 million of voting stock held by nonaffiliates or $100 million of such stock outstanding coupled with an annual trading volume of three million shares per year.  SEC Form S-3 Instructions, ¶ 1-B-1.") and 1284-85 (SEC allows older, "more seasoned" companies to use Form S-3 because they usually provide high quality corporate reports, including Exchange Act reports, their corporate information is widely disseminated, and they are widely followed by professional analysts and investors in the market place) (D.N.J. 1989), *appeal dismissed*, 993 F.2d 875 (3d Cir. 1993).  *Id.* at 1287.  The *Cammer* court found that "Form S-3 status is an important factor weighing in favor of a finding that a market is efficient."  711 F. Supp. at 1285.  Similarly the district court in *Krogman*, 202 F.R.D. at 476, noted that the SEC permits the filing of an S-3 Registration Statement only where

> "the stock is already traded on an open and efficient market, such that further disclosure is unnecessary." . . . According to SEC regulations, certain companies may use the S-3 short form, rather than Form S-1, to register securities if they are sufficiently large and have filed reports with the SEC for the requisite period of time.  Corporations permitted to use the S-3 form are thus presumed to be actively traded and widely followed. . . . Therefore, a company's ability to file an S-2 Registration Statement points to market efficiency.

Thus demonstrating that a company is entitled to file an S-3 Registration statement in connection with public offerings supports a showing of an efficient market.  During the class certification hearing various individuals characterized Form S-3 as a "short-cut" allowed by the SEC to "seasoned" public issuers about which there was substantial information available, like Enron Corporation.

[73] *Cammer* states that this factor is "the essence of an efficient market and the foundation for the fraud on the market theory."  711 F. Supp. At 1287.  *See also Krogman*, 202 F.R.D. at 477 ("[I]n an efficient market, a stock's price remains relatively stable in the absence of news, and changes very rapidly as the market receives new and unexpected information.").

[74] "Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."  *Krogman*, 202 F.R.D. at 478.

ask spread for stock sales[75]; and (8) float, the stock's trading volume without counting insider-owned stock.[76]

*Bell*, 422 F.3d at 313 n.10, *citing Unger*, 401 F.3d at 323, and *Cammer*, 711 F. Supp. at 1286-87.

*See also Krogman v. Sterritt*, 202 F.R.D. at 476-78 (discussing and applying all eight factors and concluding that the plaintiffs in *Krogman* had failed to establish that the market was efficient).  In *Unger*, the Fifth Circuit made clear that these factors "must be weighed analytically, not merely counted, as each of them represents a distinct facet of market efficiency."  401 F.3d at 323.  These factors were referenced in Dr. Blaine Nye's expert report (#4390)[77] and by counsel during the class certification hearing as the *"Cammer/Unger/Bell* Factors," a term this Court will adopt in its analysis of the evidence relating to market efficiency.

Although in *Basic, Inc.* the Supreme Court presumed that the securities at issue traded in an efficient market because they were traded on the New York Stock Exchange, 485 U.S. at 227-28, the Fifth Circuit has stated that "the mere fact that a stock trades on a national exchange does not necessarily indicate that the market for that particular security is efficient": "[w]hile the location of where a stock trades might be relevant, it is not dispositive of whether the current price reflects all available information,' . . . the hallmark of an efficient capital market."  *Bell*, 422 F.3d at 313-14.  *See also Unger*, 401 F.3d at 322 ("In many cases, where heavily traded or well known stocks are the

---

[75] "The bid-ask spread is the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares. . . . A large bid-ask spread in indicative of an inefficient market, because it suggests the stock is too expensive to trade."  *Krogman*, 202 F.R.D. at 478.

[76] "'Because insiders may have private information that is not reflected in stock prices, the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information about the security.'" *Krogman*, 202 F.R.D. at 478 (finding that a low float, i.e., a small percentage of shares held by the public in contrast to the percentage held by insiders, weighs against a finding of market efficiency).

[77] Dr. Nye adds three more that "have been addressed in the economic literature and/or have been considered by the Courts:

      - the principal exchange on which the security    was listed and traded;
      - institutional ownership of the security; and
      - news coverage and dissemination of informa-  tion to news sources pertaining to the Company and its securities during the Class Period.

#4390 at 14.

target of suits, market efficiency will not even be an issue."). As for trading volume, it is not the average trading volume that is key, but the turnover measured as a percentage of outstanding shares. *Bell*, 422 F.3d at 316. Expert testimony may be considered but is not required. *Id.* at 314 n.13, discussing *Unger*, 401 F.3d at 323 n.6. "Absent an efficient market, individual reliance by each plaintiff must be proven, and the proposed class will fail the predominance requirement." *Unger*, 401 F.3d at 322. Nevertheless, "[i]n many cases, where heavily-traded or well known stocks are the target of suits, market efficiency will not even be an issue." *Unger*, 401 F.3d at 322.

It should be noted that under the case law in which they were developed, these factors expressly relate to stock. Dr. Nye found that some are relevant to evaluating the efficiency of the market for Enron bonds, preferred securities, and Foreign Debt Securities and discussed them accordingly. #4390 at 15.[78]

The Fifth Circuit has held that the presumption of reliance under the fraud-on-the-market theory" may be rebutted by '[a]ny showing that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff.'" *Nathenson v. Zonagen*, 267 F.3d 400, 414 (5th Cir. 2001), *quoting Basic*, 485 U.S. at 248. The Fifth Circuit opined that the link

---

[78] Dr. Nye states that he employed the following factors in evaluating market efficiency for Enron debt and preferred securities during the Class Period:

-whether information on the purported financial condition of Enron was made available to the investors in the securities from many sources, including
    -whether securities analysts followed and reported on the Company and its securities;
    -news coverage and dissemination of information by news sources pertaining to the Company and its securities;
-whether the securities had a significant trading volume;
-the market value of the securities;
-underwriters/market makers for the securities;
-whether the company was eligible to file SEC Form S-3;
-the registration status and trading venues for the securities;
-institutional ownership of and trading activity in the securities;
-the bid/ask spread for the securities;
-the securities' public float (amount outstanding excluding insider ownership);
-whether credit rating agencies rated the securities; and
-whether there are empirical facts showing a cause-and-effect relationship between unexpected corporate events or financial information releases, and an immediate response in the securities' prices.

#4390 at 18-19.

-64-

may be severed by "a showing that 'the market price would not have been affected by' the alleged 'misrepresentations,' as in such a case 'the basis for finding that the fraud had been transmitted through market price would be gone.'"  *Id.*  Thus the panel concluded "that a fraud-on-the-market theory may not be the basis for recovery in respect to an alleged misrepresentation which does *not* affect the market price of the security in question."  *Id.* (emphasis in original).

In *Greenberg v. Crossroads Systems, Inc.,* 364 F.3d 657 (5th Cir. 2004), emphasizing that "[i]t is the *actual movement* of stock price which must be shown by fraud-on-the-market plaintiffs," the Fifth Circuit raised its proof requirements for application of the fraud-on-the-market presumption.  *Id.* at 663.  Requiring not only that plaintiffs "show that the price of . . . [the relevant] stock was actually affected by the allegedly false statements, either by showing an increase in price following the allegedly false positive statements or a corresponding decrease in price following the revelation of the misleading nature of these statements," the panel rejected the argument that the fraud-on-the-market presumption could be triggered "simply by offering evidence of any decrease in price following the release of negative information."  *Id.* at 662, 665.  "To raise an inference through a decline in stock price that an earlier false positive statement actually affected a stock's price, the plaintiffs must show that the false statement causing the increase was related to the statement causing the decrease."  *Id.* at 665.  It opined, "[T]o trigger the presumption plaintiffs must demonstrate that there is a reasonable likelihood that the cause of the decline in price is due to the revelation of the truth and not the release of the unrelated negative information.  In the absence of such a showing the invocation of the presumption of reliance would be based solely on speculation."  *Id.*  Furthermore, the panel recognized as "a market reality that a stock's price will not change upon the release of confirmatory information, i.e., information already known to the market."  *Id.* at 663.  It noted, "The fact that a market will not double-count the same information does not establish a nexus between misrepresentation and injury, especially in the context of fraud on the market where we allow this relationship to be proved indirectly.  A causal relationship between the statement and actual movement of the stock price is still required."  *Id.*  The panel concluded,

> In sum, in order for plaintiffs to show that a stock's price was actually affected through evidence of a significant price decrease following the revelation of the

alleged "truth" of earlier false statements, plaintiffs must demonstrate:  (1) that the negative "truthful" information causing the decrease in price is related to an allegedly false, non-confirmatory positive statement made earlier and (2) that it is more probable than not that it was this negative statement  and not other unrelated negative statements, that caused a significant amount of the decline.[79]

*Id.* at 666.

The issue of market efficiency for the securities at issue in *Newby* will be addressed subsequently under "IV.  Rulings on Specific Issues."

**b.      Reliance and Section 11 Claims**

The Court has noted many times that generally reliance is not an element of a section 11 claim.  Pointing to the statutory exception, 15 U.S.C. § 77k(a)(5),[80] Financial Institutions argue that for the § 11 claims some class members must prove reliance because they purchased the securities after Enron filed its Form 10-Ks for 1999 and 2000.

 Lead Plaintiff objects that Defendants have the facts wrong and have misread the statute. Demonstrating that the Amended Complaint (¶1006) identifies when the class representatives purchased their notes and the effective date of each of the four Registration Statements still at issue, Lead Plaintiff has alleged that each of the proposed class representatives purchased on the first day of the offering or, under 15 U.S.C. § 77k(a), before issuance of an earning statement covering twelve months after the effective date of the Registration Statement occurs (¶ 1008).  Furthermore the twelve month-period commences after the effective date of the Registration Statement; defendants incorrectly look simply to the next twelve-month financial statement, not to the first statement after a twelve-month period.  #1854 at 89, 98-100.  All purchases were timely and thus there is no issue of reliance about the § 11 claims, insists Lead Plaintiff.  The Court agrees as regards class representatives.

---

[79] In *Unger* the Fifth Circuit characterized the causal connection between corporate information and stock price as "one of the most important market-efficiency factors," and pointed out that a court must "take into account the many other factors that could affect the price" of the company's stock. 401 F.3d at 324.

[80] See footnote 15.

Even in the event that putative class members did purchase after the first statement following the twelve-month period, 15 U.S.C. § 77k(a)(5) triggers the requirement of demonstrating individualized reliance.  As Judge Denise Cote reasoned in *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 288-89, 293-94 (S.D.N.Y. 2003), *appeal granted in part on other grounds sub nom. Havesi v. Citigroup*, 366 F.3d 70 (2d Cir. 2003), the Form 10-K earning statement for purposes of § 77k(5) must satisfy the rules and regulations of the SEC, which set out what information must be included, require that the statement be prepared in accordance with generally accepted accounting principles, and mandate that the form filings not contain material omissions.  17 C.F.R. §§ 249.310 and 210.4-01(a).

As noted above, on November 8, 2001, Enron publicly announced that it was restating its financial statements for 1997-2000 to eliminate $600 million in profits and approximately $1.2 billion in shareholder equity, and Enron expressly warned that its financial statements and audit reports for that period "should not be relied upon."  In an analogous situation, Judge Cote pointed out in *In re WorldCom*, that

> WorldCom has admitted that its financial statements from 1999 through the first quarter of 2002 overstated earnings by over $9 billion.  WorldCom's admissions leave no doubt that the earning statements filed with the SEC from 1999 through the first quarter of 2002 were misleading and omitted material information required by the SEC to be disclosed.
>
> An earning statement that violates the SEC filing  requirements should not be considered an "earning statement" for purposes of Section 11, and should not function in a Section 11 claim to shift to the plaintiff the burden of proving reliance. It would be illogical indeed if any filing--no matter how inaccurate or misleading, and despite its perpetuation of the very misrepresentations at stake in the Section 11 claim--were sufficient to shift the burden to the plaintiffs to establish reliance on the Registration Statement.  Whether a filing is sufficient to shift the burden must depend on whether it meets the requirements for earning statements imposed by the SEC rules and regulations,  Here, because the earning statement requirements were not met, the burden does not shift to plaintiffs to prove reliance.

219 F.R.D. at 293. This Court fully concurs with Judge Cote's reasoning.[81] Furthermore, under the facts alleged in *Newby*, this Court finds that any argument from the Financial Institutions about possible individualized reliance based on 15 U.S.C. § 77k(a)(5) and Enron's Form 10-K's is too hypothetical to preclude class certification.

## 2.      Superiority

In addition to predominance of common issues over individual issues, Rule 23(b)(3) mandates that a class action must be "superior to other available methods for the fair and efficient adjudication of the controversy." According to the Advisory Committee Note to 1966 Amendment of Rule 23(b)(3),

> [A] fraud perpetrated on numerous persons by use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of damages suffered by individuals within the class. On the other hand, although having a common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.

Rule 23(b)(3)(A)-(D) identify four factors for the court to weigh in addressing the issue of superiority: "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

---

[81] Morever Judge Cote went further and concluded that if WorldCom's SEC filing were accepted as an "earning statement" for purposes of § 11, "issues common to the class would continue to predominate. The fraud on the market presumption should apply to the plaintiffs' Section 11 claims, just as it does to the Section 10(b) claims." 219 F.R.D. at 294. She observed, "The reasons behind the creation of the presumption for securities fraud claims apply with equal force to the Section 11 claims brought here. Not only does the statute provide that even when a twelve-month earning statement triggers the burden to show reliance on the registration statement, the investor need not show that she actually read the registration requirement. *Id.* Where the securities at issue are sold in an open and developed market, as WorldCom's were, like the § 10(b) claimants, the § 11 investor/claimants relied on the market price as the reflection of all public information about the company's financial condition and should be entitled to a presumption of reliance under such circumstances." *Id.* This Court will not speculate whether the Fifth Circuit would also apply the fraud-on-the-market theory to § 11 claims.

Multiple Enron cases have arisen out of the same facts in state and federal courts around this country, while the Enron bankruptcy proceedings have also drawn numerous similar proceedings. A large number of these cases have been transferred to this Court as part of MDL 1446. Aided by the commitment of counsel and the establishment of a document depository and a website for inexpensive and swift service of all documents on and notice to all parties that have registered, the coordinated discovery has generally been smooth and efficient, avoiding substantial replication and expense, and has demonstrated a remarkable manageability despite the size of this enormous litigation. That efficiency would be further enhanced and sustained by class certification. Many Enron securities investors, who are geographically disbursed, as evidenced by the MDL, have claims too small and their finances are too limited to pursue individual suits against the alleged wrongdoers. The Supreme Court has stated that for Rule 23(b)(3) the Advisory Committee "had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'" *Amchem Prods. v. Windsor*, 521 U.S. 591, 617 (1997). Efficiency is clearly served here because Defendants' alleged course of conduct and fraudulent scheme to misrepresent Enron's financial status affected the investing public's perception in evaluating the purchase of Enron securities, regardless of what type of Enron investments they ultimately chose. Furthermore, because a class action avoids multiple individual actions and trials on the same liability issues, it is judicially efficient for Enron securities investors to bring all the claims in one action in one forum, and a class action will minimize the number of inconsistent rulings. Clearly, as a threshold step, the Judicial Panel on Multidistrict Litigation made such a predicate determination in establishing MDL 1446 and assigning it to this Court. Moreover, since Enron's principal place of business was in Houston, much of the alleged wrongdoing occurred here, and most of the witnesses and much of the documentary evidence are here. The coordination in this forum has allowed proceedings to go forward expeditiously, with an efficient, nonduplicative discovery and other pretrial proceedings at minimized cost of time and money for all parties and the Court. Moreover, procedurally multidistrict litigation and class certification make the plaintiffs' claims far more manageable, as evidenced by the coordinated and restricted discovery schedule,

without which extraordinarily redundant discovery, including interrogatories and depositions, would result.  As Lead Plaintiff noted in quoting *In re First Republicbank Sec. Litig.*, Nos. 3-88-0641-H and 3-88-1251-H, 1989 WL 108795, *16 (N.D. Tex. Aug. 1, 1989), "'[A]ny administrative difficulties in handling this class action are preferable to duplicating judicial resources in several individual lawsuits and denying access to the courts for class members.'"  #1445 at 26-27.  In this instance there would be substantially more than "several."

## IV.  Rulings on Specific Issues

### A.    Single Class

Most of the elements required to establish liability for the putative class claims under Section 10(b) and Rule 10b-5 of the 1934 Act  and under Sections 11 and 12(a)(2) of the 1933 Act, as well as the derivative claims, are common to the entire proposed class.  All these claims arise from a common nucleus of facts and an alleged common course of conduct and scheme to defraud.

Defendants have claimed that the class definition is too broad because it includes investors who bought and sold within the class period and were not injured, indeed those who may have profited from the transactions.  The Court finds that this problem, discussed further *infra*, can be easily cured by modifying the class definition with the addition of a phrase such as "and were injured thereby."  *See, e.g., In re Cendant Corp. Litigation*, 264 F.3d 201, 225 (3d Cir. 2001), *cert. denied sub nom. Mark v. Cal. Public Employees' Retirement System*, 535 U.S. 929 (2002); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. at 274-75. It accordingly instructs Lead Plaintiff to alter the definition appropriately.

Plaintiffs need not prove scienter and generally not reliance for the §§ 11 and 12(a)(2) claims, nor for derivative control person claims under § 15.

Lead Plaintiff's section 11 claims are expressly part of the scheme to defraud and shared issues of fact and law predominate.  Section 11 in essence imposes strict liability where plaintiff shows that the registration statement contains material misrepresentations and that he acquired the securities without knowledge of the misrepresentations; any decline in the value of the securities is presumed to be caused by the misrepresentation.  *In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263, 283

(S.D. Tex. 2005).  The exception is that discussed under 15 U.S.C. § 77k(a)(5), which Lead Plaintiff has shown does not apply here.

Regarding the § 20A claims against Defendants for selling stock at an inflated price based on inside information,[82] the alleged common course of conduct and scheme to defraud creates a common question supporting certification of a single class that embraces these plaintiffs.  The Court finds that elements of the § 10(b)/Rule 10b-5 claims here clearly overlap with elements of the § 20A claims since a claim under § 20A again requires proof of an underlying violation of § 10(b)/Rule 10b-5.  The § 20A claims are factually based on the same alleged patterns of fraud:  e.g., misrepresentations and/or omissions regarding Enron's financial condition, deceitful accounting practices, disguised transactions, and inaccurate SEC filings.  *See, e.g., In re Tyco International, Ltd. Sec. Litig.*, Nos. 00-MD-1335-B, 2000 DNH 182, 2000 WL 1513772 (D.N.H. Aug. 17, 2000).  Many § 20A claimants are the same as the § 10(b) claimants here, although the number of § 20A claimants necessarily is fewer than those bringing §§10(b) and 20(a) claims.  *Lehocky*, 220 F.R.D. at 499.

The numerosity test is satisfied here.  Lead Plaintiff reasonably estimates that many thousands of persons have § 20A claims.  Defendants do not challenge the fact that the average national trading volume of Enron stock on a national stock exchange during the class period was 4,967,622 shares per day and that Defendants traded on 244 of those days.  *See Lehocky*, 220 F.R.D. at 499 ("While Plaintiffs have not provided evidence concerning how many contemporaneous traders exist, the Court relies on the sheer number of shareholders alone, which indicates joinder of all class members is impracticable.")(certifying a single class of persons bringing §§ 10(b), 20(a) and 20A claims).

Common legal and factual issues for § 20A claimants include whether Defendants violated § 10(b) and whether Defendants traded contemporaneously with Plaintiffs.

---

[82] Section 20A, 15 U.S.C. § 78t-1(a), provides in relative part, "Any person who violates any provision of this chapter or the rules and regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . or sold . . . securities of the same class."

Section 20A class representatives' claims are typical because they, like putative class members, invested in Enron stock contemporaneously with the sale of Enron stock by Defendants with alleged inside information; their claims arise from the same course of events, part of the same scheme and course of business, and make the same legal arguments.

Certain Individual Defendants contend that individual issues undermine typicality and predominance here: determining standing to sue requires a claimant-by-claimant inquiry as to when the individual plaintiff investor purchased and sold which stock, material nonpublic information allegedly available to the trading defendant at the time of the transaction, whether and to what extent the price of that stock was inflated at the time of that purchase and sale as a result of particular undisclosed material information used by which defendant, and whether that plaintiff suffered a loss[83] and if so, how much.  They insist that proof would vary with individual defendants, trading days, and transactions.  They argue there would be conflicts of interest among putative class members in competition to demonstrate that Enron stock was the most inflated on the day they traded.

The Court has already addressed the same arguments with respect to the § 10(b) claims and rejects them for the same reason.  To satisfy typicality, as stated by Judge Cote in the *WorldCom* litigation,

> The factual background of each named plaintiff's claim need not be identical to that of all the class members as long as "the disputed issue of law or fact occup[ies] essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." . . .  "When it is alleged that the same unlawful conduct was directed at or affected both the same plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." . . . For example, the possibility that proof of injury might require separate evaluations of the artificiality of a commodities price at moments affecting each of the class members need not defeat class certification.  [citations omitted]

_____

[83] Certain Individual Defendants claim that the class definition includes persons with conflicting interests because it includes not only those who suffered losses as a result of defendants' actions, but also those who bought and sold at profitable times, benefitting from their stock investment. Furthermore, because the class representatives are intent on proving Defendants' conduct was wrongful, the interests of those who benefitted will not be properly represented by the named plaintiffs.  The Court's requirement that Lead Plaintiff amend the class definition to include only those injured by the alleged wrongful conduct will cure such a problem.

*WorldCom*, 219 F.R.D. at 280.

Moreover, damages for § 20A claims are limited to "the profit gained or loss avoided in the transaction or transactions that are the subject of the violation." 15 U.S.C. § 78t-1(b). As noted by Lead Plaintiff, determining whether Plaintiffs' trades are contemporaneous (within two or three days or at maximum one week after Defendants' trades) is a mechanical task that can be performed by the claims administrator using a formula. Their trading information is a matter of public record and judicially noticeable, and may be demonstrated by their SEC filed Forms 4 and 5. "The prevailing view is that differences in individual questions of reliance and amount of damages are not grounds for refusing to permit an action to proceed as a class action." 7 Alba Conte and Herbert B. Newberg, *Newberg on Class Actions* § 22:64 (4th ed. 2005); 7B Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 1781 at 8 (2d ed. 1986)("[I]t uniformly has been held that differences among the members [of a class] as to the amount of damages incurred does not mean that a class action would be inappropriate."). Thus the Court finds that the § 20A class representatives have standing to assert the § 20A claims on behalf of the class.

**B.      Scheme Liability**

In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), the Supreme Court held that claims for aiding and abetting are not cognizable under § 10(b). It also cursorily indicated that a secondary actor, e.g., business partner, bank, law firm, and/or accounting firm, may be liable as a primary violator when "all of the requirements for primary liability under Rule 10b-5 are met." *Id.* at 191. The Supreme Court did not develop that issue in *Central Bank*. This Court and others have continued to struggle to define parameters for such liability. As discussed in #1194, in Rule 10b-5(b) misrepresentation cases courts have disagreed about whether a defendant is primarily liable only if he made the false statement or omission, or if he reviewed and approved it, or if he substantially participated in the making of it.

Determining when secondary actors are liable as primary violators of § 10(b) is especially difficult where the allegations are of scheme liability based on concealed conduct under Rule 10b-

5(a) and (c).[84]  Defendants have argued that pleading scheme liability under Rule 10b-5(a) and (c),

when a scheme participant that has engaged in a sham transaction or fraudulent conduct that allows

a securities issuer to submit false and misleading financial statements but makes no statement itself,

is no longer viable in the wake of *Central Bank,* but is merely an attempt to circumvent its holding

that aiding and abetting is not actionable under the statute.

Section 10(b) makes it "unlawful for any person, *directly or indirectly,*" to "*use or employ*

in connection with the purchase or sale of any security . . . *any manipulative or deceptive device*

*or contrivance* [emphasis added by the Court]."  15 U.S.C. § 78j(b).  Rule 10b-5(a) makes it

unlawful for "any person," "directly or indirectly," to "employ any device, scheme, or artifice to

defraud."  Rule 10b-5(c) makes it unlawful for "any person," "directly or indirectly" to "engage in

any act, practice or course of business which operates or would operate as a fraud or deceit upon

any person."  This Court has accepted the pleading of scheme liability based on nonrepresentational

conduct in this litigation, but recognizes that the controversy about its viability persists.  Case law

has slowly developed regarding claims under Rule 10b-5(a) and/or (c) and in some cases

highlighted, if not clarified, key issues regarding such claims.

Defendants have pointed out that the question is on appeal in the following cases before the

First and Ninth Circuits, respectively: (a)  *Quaak v. Dexia, S.A.*, 357 F. Supp. 2d 330, 337, 341-42

(D. Mass. 2005), *quoting its earlier opinion in In re Lernout & Hauspie Sec. Litig.*, 236 F. Supp.

2d 161, 173-74 (D. Mass. 2003)(holding that Section 10(b) and Rule 10b-5 "impose primary

liability on any person who substantially participates in a manipulative or deceptive scheme by

directly or indirectly employing a manipulative or deceptive device (like the creation or financing

of a sham entity) intended to mislead investors, even if a material misstatement by another person

creates the nexus between the scheme and the securities market."; reliance on a manipulative or

---

[84] Although Lead Plaintiff in its latest submission (#4621) objects to Defendants continuing to argue against the Court's earlier rulings on motions to dismiss, the Court emphasizes that it does have the power to reconsider such interlocutory decisions, especially in light of the limited and much of it recent case law emerging on scheme liability.  Moreover, as noted, at class certification, especially after such substantial discovery as has been done here, the Court may look behind the pleadings at evidence to determine whether a class should be certified.

deceptive scheme may be satisfied "by alleging facts sufficient to show (1) that the defendants

substantially participated in a fraudulent scheme; and (2) when the scheme is viewed as a whole,

the plaintiffs relied on it")[85]; and (b) *In re Homestore.com Sec. Litig.*, 252 F. Supp. 2d 1018 (C.D.

Cal. 2003)(holding that plaintiffs relied on material misleading financial statements and omissions

made by the issuer of the securities, and not on the underlying actions of its business partners in

sham transactions that permit the issuer to artificially inflate its financial results, but who did not

make statements and omissions and thus were not primarily liable under § 10(b)).   Moreover, as

pointed out by the Financial Institution Defendants in their final Notice of Supplemental Authority

and then a Reply (#4596 and #4629),[86] the Eighth Circuit has just affirmed a district court holding

---

[85] S*ee also In re Parmalat Sec. Litig.*, 376 F. Supp.2d 472, 502-03 (S.D.N.Y. 2005)("This Court
largely agrees [that the sham companies in *Lernout* were deceptive devices because they created an
appearance of substance where substance was lacking], but takes issue with the *Lernout & Hauspie*
court on one point.  The term 'substantially participated' does not appear in the text of Section 10(b)
or Rule 10b-5, and it invites dispute over whether a particular defendant's role was or was not
substantial.  The text asks only whether a defendant directly or indirectly used or employed a
manipulative or deceptive device or contrivance.  The Court adheres to that language.").  Judge
Kaplan insists, "This analysis is not a back door into liability for those who help others make a false
statement or omission in violation of subsection (b) of Rule 10b-5.  The Second Circuit [which
follows a bright-line rule] has made clear that to 'make' a statement for purposes of Rule 10b-5(b)
requires that the statement be attributed to its maker at the time it is made.  That is a different matter
from whether a defendant's challenged conduct in relation to a fraudulent scheme constitutes the use
of a deceptive device or contrivance."  *Id.* at 503.

For other post-*Central Bank* decisions recognizing scheme liability *see also SEC v. Hopper*,
No. Civ. H-04-1054, 2006 WL 778640, *11 (S.D. Tex. Mar. 24, 2006)(Werlein, J.)(finding that "the
SEC has adequately alleged that Pallas' round-trip trading scheme was a 'device' or 'scheme' to
defraud, or at least a 'practice' or 'course of business' which operated as a fraud or deceit upon the
investing public, that encompassed conduct beyond mere misstatements" "[b]ecause the round-trip
trades were sham transactions, and therefore had an inherent tendency to deceive"); *In re Global
Crossing Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 336-37 (S.D.N.Y. 2004)("Schemes used to artificially
inflate the price of stocks by creating phantom revenue fall squarely within both the language of
section 10(b) and its broad purpose to 'prevent practices that impair the function of stock markets
in enabling people to buy and sell securities at prices that reflect undistorted (though not necessarily
accurate) estimates of the underlying economic value of the securities traded.'"); *In re AOL Time
Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 217 (S.D.N.Y. 2004)("If, as the 308-page
Amended Complaint alleges, the defendants in fact engaged in a systemic scheme for more than 3½
years to inflate AOL's reported advertising revenue by at least $1.7 billion based on various sham
transactions and accounting improprieties,' then there can be little doubt that investors have been
very seriously misled by the defendants' acts.  Accordingly, plaintiff is permitted to proceed under
both Rules 10b-5(a) and (c).").

---

[86] The Court has also reviewed Deutsche Bank Entities' Notice of Supplemental Authority
(#4626), addressing the *Charter* case with respect to their motion for reconsideration and dismissal
(#3791, #3794)and Lead Plaintiff's motion for leave to file a second amended complaint (#3903).

in *In re Charter Communications, Inc. Sec. Litig.*, MDL Docket No. 1506,  No. 02 Civ. 1186 (CAS), Memorandum and Order, Doc. No. 252 (E.D. Mo. Oct. 12, 2004)(affirming dismissal, as mere aiding and abetting under *Central Bank,* plaintiffs' § 10(b) claims against vendors in an alleged scheme involving sham purchases from a cable company by the vendors of boxes to affix to televisions for delivery of cable so as to allow the cable company to artificially inflate its financial results by fraudulent accounting).  *In re Charter Communications Sec. Litig.*, 433 F.3d 987, No. 05-1974, 2006 WL 925354 (8th Cir. Apr. 11, 2006).

The appellate panel in *Charter* stated that plaintiffs had alleged that the vendors' contracts to buy the equipment were "sham or wash transactions with no economic substance," that the vendors "entered into these sham transactions knowing that Charter intended to account for them improperly and that analysts would rely on the inflated revenues and operating cash flow in making stock recommendations," although the venders were not alleged to have "played any role in preparing or disseminating the fraudulent financial statements and press releases through which Charter published its deception to analysts and investors."  443 F.3d at 989-90, 2006 WL 925454 at *1.

The Eighth Circuit focused on *Central Bank*'s pronouncement that private plaintiffs "may not bring a [Rule] 10b-5 suit against a defendant for acts not prohibited in the text of § 10(b)." *Id.* at 990, or *2, citing Central Bank*, 511 U.S. at 173.  Section 10(b) prohibits only "manipulative or deceptive" devices or contrivances.  *Id.*  The panel opined that earlier Supreme Court cases had held that "'deceptive' conduct involves either a misstatement or a failure to disclose by one who has a duty to disclose," while "manipulative" is "'a term of art' and refers to illegal trading practices such as 'wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.'"  *Id.* at 990, 992 or *2,*4 (and cases cited therein).  The Eighth Circuit concluded that claims under the statute and under Rule 10b-5(a) and (c) were limited by *Central Bank* to claims that the defendant made, or affirmatively caused to be made, a fraudulent misstatement or omission, or to claims of a misstatement or failure to disclose by a defendant who has a duty to disclose, or to claims of a defendant's direct engagement in

manipulative securities trading practices; anything else is at most aiding and abetting and cannot support liability under the statute. *Id.* at 992 or *4. It stated, "To impose liability for securities fraud on one party to an arm's length business transaction in goods or services other than securities because that party knew or should have known that the other party would use the transaction to mislead investors in its stock would introduce potentially far-reaching duties and uncertainties for those engaged in day-to-day business dealings." *Id.* at *4.

In comparison, in a more expansive reading of the language of the statute and the Rule, in the *Parmalat* litigation Judge Kaplan noted that "the language of Section 10(b) and subsections (a) and (c) is broad and that the Supreme Court has emphasized repeatedly that Section 10(b) 'should be 'construed not technically and restrictively, but flexibly to effectuate its remedial purposes.'" *Parmalat*, 376 F. Supp.2d at 501, *citing SEC v. Zandford*, 535 U.S. 813, 819 (2002)(*quoting Affiliated Ute*, 406 U.S. at 151). Judge Kaplan also turned to the text of the statute and found that the high court has defined the key terms much more liberally than the Eighth Circuit determined:

> The Supreme Court has given instructions on the meaning of the relevant terms in Section 10(b). The key phrase for present purposes is "directly or indirectly . . . [t]o use or employ . . . any . . . deceptive device or contrivance." "Device," according to the Supreme Court, should be understood to mean "that which is devised, or formed by design; a contrivance; an invention; project; scheme, often, a scheme to deceive; a stratagem; an artifice." The same dictionary used by the Supreme Court defines "deceptive" as "[t]ending to deceive; having the power to mislead."

*Id.* at 502, *citing Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199, n.20 (1976), and *Webster's New International Dictionary* 580, 713, 679 (2d ed. 1934).

The SEC has filed an *amicus curiae* brief in the *Homestore.com* appeal before the Ninth Circuit that urges a broad construction of the statute, a copy of which Lead Plaintiff has submitted. Ex. I to #4528. Specifically with regard to the *Newby* litigation, the SEC addressed *inter alia* two of the reasons why the *Homestore.com* district court dismissed the plaintiffs' claims: (1) "the primary architects of the scheme were officers of Homestore"; and (2) "Homestore's shareholders were injured by their reliance on material statements and omissions made by Homestore about the revenues, not the transactions that created the revenues." *Id.* at 4, *citing Homestore.com*, 252 F. Supp. 2d at 1037-42. Emphasizing that the statutory intent behind § 10(b) was to protect investors

against fraud and ensure honest markets, *United States v. O'Hagan*, 512 U.S. 642, 658 (1997), the

SEC argues,

> Where a wrongdoer, intending to deceive investors, engages in a deceptive act as
> part of a scheme to defraud, he can cause the same injury to investors, and the same
> deleterious effects on the market regardless of whether he designed the scheme.
> Wrongdoers could studiously avoid engaging in any design activity, and effectively
> immunize their conduct. . . . The district court's test would suggest that an unlimited
> number of schemers could simply mimic some prior, well-publicized scheme and
> escape liability—none having designed it.  Liability should be available against any
> person who engages in a deceptive act within the meaning of Section 10(b) as part
> of a scheme to defraud, regardless of who designed the scheme.
>
> [Second], deceptive acts under Section 10(b) include conduct beyond the
> making of false statements or misleading omissions, for facts effectively can be
> misrepresented by action as well as words.  For example, if an investment bank
> falsely states that a client company has sound credit, there is no dispute that it can
> be primarily liable.  If the bank creates an off-balance-sheet sham entity that has the
> purpose and effect of hiding the company debt, it has achieved the same deception,
> and liability should be equally available.

*Id.* at 7-8.

Observing that "[i]t has long been accepted that Section 10(b), and Rule 10b-5(a) and (c)

thereunder, cover conduct beyond the making of false statements and misleading omissions, which

are covered by Rule 10b-5(b)," the SEC quotes the conclusion of the Supreme Court in *Zandford,*

"'Indeed, each time respondent 'exercised his power of disposition [of his customers' securities]

for his own benefit,' that conduct, 'without more,' was a fraud.'"  *Id.* at 13-14, *quoting Zandford*,

535 U.S. at 815 (emphasis added by SEC); *Affiliated Ute*, 406 U.S. at 152 (noting that while Rule

10b-5(b) targets false statements or omissions, paragraphs (a) and (c) "are not so restricted").

The SEC, emphasizing that *Central Bank* did not bar liability based on allegations that a

group of defendants acted together to violate the securities laws as long as each defendant

committed a manipulative or deceptive act in furtherance of the scheme,  proposes the following

test for liability under § 10(b) and Rule 10b-5(a):

> Any person who directly or indirectly engages[87] in a manipulative or deceptive act
> as part of a scheme to defraud can be a primary violator . . .; any person who

_____

[87] Turning to contemporary definitions, the SEC states that "employ" and "use" (derived from
the Latin word for "engage") are synonyms and that "use" means "to engage in" or "to put into
operation."  Ex. I at 15, *citing* Funk & Wagnalls, *New Standard Dictionary of the English Language*
2622 (2d ed. 1934).

> provides assistance to other participants in a scheme but does not himself engage in a manipulative or deceptive act can only be an aider and abettor.

#4528, Ex. I at 16.  Recognizing the need to distinguish between an aider and abettor and a primary violator in the wake of *Central Bank*, the SEC requires that a primary violator thus, directly or indirectly, engage in a manipulative or deceptive act, which is conduct expressly covered by the statute.  In contrast to the Eighth Circuit's narrow reading of the term as limited to misleading statements or failure to disclose by one who has a duty to do so, the SEC urges that a "deceptive act" includes a "transaction whose principal purpose and effect is to create a false appearance of revenues," which can be accomplished by acts as well as by words.  *Id.* at 18-19.  Section 10(b) also covers market manipulation, which the SEC construes broadly as "typically involv[ing] conduct that creates a false appearance of trading activity."  *Id.* at 19, *citing United States v. Russo*, 74 F.3d 1383, 1391 (2d Cir. 1996)(holding trading scheme which "create[d] a false impression" of demand for the subject stock constituted market manipulation under Section 10(b) and Rule 10b-5), *cert. denied*, 519 U.S. 927 (1996).  *Id.* at 19.

A major difficulty in the wake of *Central Bank* is defining clearly what conduct constitutes aiding and abetting and what would qualify as a primary violation of § 10(b).  The SEC's brief provides some illuminating examples to distinguish the two.  The SEC maintains that a bank that makes a loan, even if it knows that the borrower will use the proceeds to commit securities fraud, may be liable only an aider and abettor because the bank, itself, has not engaged in any manipulative or deceptive act; similarly a bank that provides services arranging for financing for a client that it knows will use then use the funds for securities fraud is only aiding and abetting.  *Id.* at 20.  In the same vein, if a third party enters into a legitimate transaction with a corporation where it knows that the corporation will overstate revenue generated by that transaction, the third party is merely aiding and abetting; in contrast, if the third party and the corporation engage in a transaction whose principal purpose and effect is to create a false appearance of revenues, intended to deceive investors in that corporation's stock, the third party may be a primary violator.  *Id.* at 20.  As a final example, if a third party enters into a transaction to purchase goods from the corporation where terms include a legitimate option to return the goods for a full refund, knowing that the

corporation will misrepresent the transaction as a final sale, the third party at most is an aider and abettor; but if the parties to that transaction have a side oral agreement that no goods will be delivered and no money paid and the corporation falsely states that it received revenue from the transaction, the third party may be liable as a primary violator. *Id.* at 20-21.  The SEC departs from *Lernout*, 236 F. Supp. 2d at 173)(holding that primary liability exists for "any person who substantially participates in a manipulative or deceptive scheme by directly or indirectly employing a manipulative or deceptive device (like the creation or financing of a sham entity) intended to mislead investors, even if a material misstatement by another person creates the nexus between the scheme and the securities market."), concluding that the "substantial participation" is not appropriate in the context of a scheme to defraud under Rule 10b-5(a), but aptly applies to the making of a misleading statement under Rule 10b-5(b). Ex. I at 16-17, n.3.

Applying these examples, this Court finds, for instance, that in *Newby* the allegations against JP Morgan based on the Mahonia commodity trades, where no gas was ever transferred, the allegations against Merrill Lynch relating the the Nigerian barge "sales," the specific details of the prepaid swaps through Delta by Citigroup, or specific allegations regarding Credit Suisse First Boston ("CSFB") and Laurence Nath's repeated involvement in structuring SPEs for Enron, or allegations regarding CIBC's partnership in project Braveheart satisfy the requirements for pleading primary violations of the statutes.

Regarding reliance, the SEC notes that "deception created by fraudulent activity frequently will be disseminated into the marketplace through some [other] person's making a false statement. If prior fraudulent activity, from which the making of that false statement flowed as a natural consequence is not covered [by the statute], large swaths of fraudulent activity could go unremedied" and the earlier "schemers would be insulated from liability as a matter of law." *Id.* at 8; *id.* at 21 ("Nothing in the rules of causation suggests that only the final act in a scheme to defraud meets the causation requirement.")(*citing Lernout*, 236 F. Supp. 2d at 173 (holding that a person who employs a deceptive device as part of a fraudulent scheme may be primarily liable "even if a material misstatement by another person creates the nexus between the scheme and the

securities market")).  The SEC argues, "The reliance element should be viewed as satisfied whenever a plaintiff relies on a material deception flowing from a deceptive act, even though the conduct of other participants in the scheme may have been a subsequent link in the causal chain leading to the plaintiff's securities transaction." *Id.* at 8; 22 ("a prior deceptive act, from which the making of false statements follows as a natural consequence, can constitute a sufficient step in the causal chain to support a finding of reliance").  The SEC also rejected the *Homestore.com* district court's conclusion that the primary violators are the architects of a scheme, i.e., those who designed it.  *Id.* at 11.  The SEC insists that the "use or employ" statutory language does not require "masterminding" and could lead to the absurd result that a group of defendants that joined in a scheme with a mastermind who designed it but who then implemented the scheme without further involvement of the mastermind would not be primarily liable because they had no part in designing it.  *Id.* at 11, *citing SEC v. U.S. Environmental*, 155 F.3d 107, 108, 112 (2d Cir. 1998)(holding stock broker primarily liable under § 10(b) "for following a stock promoter's directions to execute stock trades that [the stock broker] knew, or was reckless in not knowing, were manipulative, even if [the stock broker] did not share the promoter's specific overall purpose to manipulate the market for that stock"; stock broker "'participated in the fraudulent scheme,' . . . *i.e.*, the manipulation of USE's stock, by effecting the very buy and sell orders that artificially manipulated USE's stock price upward"), *cert. denied sub nom. Romano v. SEC*, 526 U.S. 1111 (1999).  Furthermore, the SEC contends that in concluding that the plaintiffs relied on Homestore's misrepresentations about its revenue and not on the business partners' conduct, the district court erred in assuming that the scheme did not include the making of false statements about Homestore.com's financial condition; the scheme did not end before the alleged false statements were made.  *Id.* at 12; at 22 ("where the making of the false statements by one participant in the scheme is an objective of the scheme, the making of the statements should not be viewed as breaking the chain of causation"), *quoting Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)(if "Xoma intentionally used these third parties to disseminate false information to the investing public," it "cannot escape liability simply because it carried out is alleged fraud through the public statements of third parties.").

It is obvious that courts are divided over the scheme liability issue. The Eighth Circuit's decision in *Charter* is not final or even binding on this court. An appeal to the United States Supreme Court is available. Meanwhile, this Court continues to agree with the SEC because its interpretation appears not only reasonable, but consistent with the purposes behind the federal securities laws. The Court finds the SEC's clarification of the distinctions between aiding and abetting and a primary violation under § 10(b), and the application of reliance where the alleged wrongful conduct is nonrepresentational under Rule 10b-5(a) and (c), illuminating and helpful and hereby adopts its approach.

## C.    Limitations and Tolling regarding § 12(a)(2) Claims

The Financial Institutions have blurred the distinction between legal tolling under the class action tolling doctrine and equitable tolling or the fraudulent concealment doctrine; they refer to both as equitable tolling. They are not the same. *See, e.g., Joseph v. Wiles*, 223 F.3d 1155, 1166-68 (10th Cir. 2000); *Ballard v. Tyco Int'l Ltd.*, No. MDL 02-MD-1335-PB, Civ. 04-CV-1336-PB, 2005 WL 1683598, *7 (D.N.H. July 11, 2005); *In re Discovery Zone Sec. Litig.*, 181 F.R.D. 582, 600 (N.D. Ill. 1998); *Salkind v. Wang*, No. Civ. A. 93-10912-WGY, 1995 WL 170122, *2-3 (D. Mass. Mar. 30, 1995); *Mott v. R.G. Dickinson and Co.*, No. 92-1450-PFK, 1993 WL 63445, *5 (D. Kan. Feb. 24, 1993); *In re Activision Sec. Litig.*, No. C-83-4639(A)MHP, 1986 WL 15339, *2-5 (N.D. Cal. Oct. 20, 1986). Equitable tolling may be applied where a plaintiff timely files a defective pleading or has been tricked by his opponent's misconduct into not filing before the deadline. *Joseph*, 223 F.3d at 1166.

In *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364 (1991), the Supreme Court held that "litigation . . . must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation" of § 10(b). The three-year period is a statute of repose. The high court further held that equitable tolling does not apply to statutes of repose. *Id.* at 363.

Under the class action tolling doctrine established in *American Pipe and Construction Co. v. Utah*, 414 U.S. 538, 554 (1974)("the commencement of a class action suspends the applicable

statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action"), and *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350, 352-55 (1983), the filing of a class action under Fed. R. Civ. P. 23 legally tolls any applicable statute of limitations or statute of repose for all putative members of the potential class when an action is commenced and a motion for class certification is pending, up to the point that the court denies class certification, at which juncture the tolling ends and the plaintiffs, to protect their interests, may file individual suits. *See also Calderon v. Presidio Valley Farmers Ass'n*, 863 F.2d 384 (5th Cir. 1985)(statute of limitations begins to run from the date the district court denied class certification, notwithstanding subsequently filed class actions, motions to intervene or appeals of the class certification ruling), *cert. denied*, 493 U.S. 821 (1989). The rationale for allowing legal tolling is to dissuade every potential class member from filing a separate action, resulting in a multiplicity of suits and judicial inefficiency and lack of litigation economy, which would defeat the goals of Rule 23; moreover, "the notice and opt-out provision of Rule 23(c)(2) would be irrelevant without tolling because the limitations period for absent class members would most likely expire, 'making the right to pursue individual claims meaningless.'" *Joseph*, 223 F.3d at 1167. Statutes of limitation and repose serve to keep plaintiffs from sleeping on their rights and to protect defendants from being surprised by assertion of old claims. *Crown, Cork & Seal*, 462 U.S. at 352; *Joseph*, 223 F.3d at 1167. The filing of a class action complaint, however, puts defendants on notice of the claims and the number and identities of the plaintiffs. *Joseph*, 223 F.3d at 1168. Thus legally tolling the repose period while a class action is pending does not undermine the purpose of the time-bars.

The Foreign Debt Securities at issue[88] were offered on the following dates:

11/15/99  Yosemite Securities Trust I

02/15/00  Yosemite Securities Co., Ltd.

08/17/00  Enron Credit Linked Notes Trust

---

[88] The Court previously ruled that the § 12(a)(2) claims based on the Osprey Trust Osprey I, Inc. issue on 9/23/99 are time-barred. #2044 at 6-7.

09/28/00  Osprey Trust Osprey I, Inc.

05/17/01  Enron Sterling Credit Linked Notes Trust

05/17/01  Enron Sterling Credit Linked Notes Trust II

07/12/01  Marlin Water Trust II Marlin Water Capital Corp. II

The Court has deemed the First Amended Consolidated Complaint, which first included them, as filed on January 14, 2003.  Under § 13, the applicable statute of limitations for § 12(a)(2) claims, suit must be brought "within one year after the discovery of the untrue statement or the omission . . . . In no event shall such action be brought to enforce a liability created . . . under section [12(a)(2)] of this title more than three years after the sale [or the security]."  The three year period thus reaches back to offerings on or after January 15, 2000.  Therefore claims based on the first offering on 11/15/99 of Yosemite Securities Trust I were time-barred before the First Amended Consolidated Complaint was filed.  The statute of repose for all the remaining claims was legally tolled, and thus they have not expired, as of the filing date of the First Amended Consolidated Complaint, as this Court only now rules on the class  certification motion.

The Financial Institutions claim that because no named Plaintiff has standing to assert the § 12(a)(2) claims, the tolling rule of *American Pipe* does not apply.[89]  *In re Colonial Ltd. P'ship Litig.*, 854 F. Supp. 64, 82 (D. Conn. 1994)("[I]f the original plaintiffs lack standing to bring their claims in the first place, the filing of a class action complaint does not toll the statute of limitations for other members of the purported class."), *citing Korwek v. Hunt*, 827 F.2d 874, 879 (2d Cir. 1987); *In re Elscint, Ltd. Sec. Litig.*, 674 F. Supp. 374, 378 (D. Mass. 1987).

First, the Court notes that the district court in *Colonial* has been criticized for misinterpreting *Korwek*.  In *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 352 F. Supp. 2d 429, 455 (S.D. N.Y. 2005), *amended and superseded on other grounds*, 411 F. Supp. 2d 377 (S.D.N.Y. 2006), for example, the district court opined, and this Court agrees,

---

[89] This Court observes that the Supreme Court noted in *American Pipe* that it was not addressing a case in which class certification was denied "for lack of standing of the representative," but one where certification was denied for failure to satisfy the numerosity requirement.  414 U.S. at 553.

> [T]he failure to apply the *American Pipe* rule to cases where a class action was dismissed for lack of standing undermines the policies underlying Rule 23 and is inconsistent with the Court's reasoning in *American Pipe*.  Second, the court in *Colonial* cited *Korwek* to support its assertion that *American Pipe* is inapplicable to cases where the original plaintiff lacked standing to file a class action.  However, *Korwek* is silent on this subject and stands only for the proposition that once class certification is denied, putative class members may not rely on the *American Pipe* rule to commence a new, substantially identical class action because this would allow the putative class members to "argue and reargue the question of class certification by filing new but repetitive complaints."  *Korwek*, 827 F.2d at 879. . ..

*Id.* at 454 n.20.  In *Korwek* the Second Circuit concluded that after class certification was denied because the claims were inappropriate for class treatment, the *American Pipe* rule did not apply to "permit the filing by putative class members of a subsequent class action nearly identical in scope to the original class action which was denied certification," because doing so would open the door to "'piggy-back[ing] one class action onto another and thus toll[ing] the statute of limitations indefinitely.'"  *Korwek*, 827 F.2d at 876, 878, *following Salazar-Calderon v. Presidio Valley Farmers Ass'n*, 765 F.2d 1334, 1351 (5th Cir. 1985)(concluding there is "no authority for [the] contention that putative class members may piggyback one class action onto another, and thus toll the statute of limitations indefinitely"), *cert. denied*, 475 U.S. 1035 (1986).  *In accord Basch v. Ground Round, Inc.*, 139 F.3d 6, 8 n.4 (1st Cir. 1998), *cert. denied*, 525 U.S. 870 (1998); *Andrews v. Orr*, 851 F.2d 146, 149 (6th Cir. 1988).

Justice Powell, in his concurrence in *American Pipe*, commented, "The tolling rule of *American Pipe* is a generous one, inviting abuse."  462 U.S. at 354.  In *In re Elscint, Ltd. Sec. Litig.*, 674 F. Supp. 374, 378 (D. Mass. 1987), the district court, although stating that "lack of standing may not *per se* mandate an exemption from the application of the tolling rule," was "troubled by the potential abuse of a rule extending class action tolling of all cases in which certification is denied for lack of standing" and potentially "encourag[ing] attempts to circumvent the statute of limitation by filing a lawsuit without an appropriate plaintiff and then searching for one who can later intervene with the benefit of a tolling rule"; it concluded that "it would be improper to allow the filing of a class action by nominal plaintiffs who are wholly inadequate to represent the asserted class to have the effect of tolling limitation to permit the otherwise untimely

intervention of proper class representatives." *See also Hess v. I.R.E. Real Estate Income Fund, Ltd.*, 255 Ill. App. 3d 790, 810, 629 N.E.2d 520, 534 195 Ill. Dec. 935, 949 (Ct. App. 1993)("we hold that the *American Pipe* class tolling rule does not apply where the representative lacks standing"), *appeal denied*, 152 Ill. 2d 559, 622 N.E.2d 1206, 190 Ill. Dec. 889 (1993).

Other courts disagree.  For example, in *Haas v. Pittsburgh Nat'l Bank*, 526 F.2d 1083 (3d Cir. 1975), a plaintiff filed a class action against three banks relating to their methods of computing interest on their credit cards.  The district certified a class, but subsequently found that the plaintiff lacked standing to sue one bank, Equibank, because she did not hold a credit card from it.  The court permitted her to file an amended complaint to join as a named plaintiff a credit card holder from Equibank.  Before the amended complaint was filed, however, the district court granted partial summary judgment in favor of Equibank, which had stopped using the contested method of calculating the service charge on its cards before the amended complaint was filed to substitute the new class representative, on the grounds that the claims against it were time-barred.  On appeal, *inter alia,* the Third Circuit reversed and remanded the dismissal of the class claim, holding that "commencement of the original class action by Haas tolled the statute of limitations as to all members of the class who would have been parties to the suit had it been permitted to continue as a class action.  The amendment of the complaint by the addition of Equibank cardholder Mitchell therefore relates back to the initial filing of the complaint."  The panel found that the original complaint had provided Equibank with notice of "the claims against which [it] would be required to defend and also 'the number and generic identities of the potential plaintiffs.'" *Id.* at 1097.  *See also Rose v. Arkansas Valley Environmental & Utility Authority*, 562 F. Supp. 1180, 1193 (W.D. 1983)("the fact that a class action is disallowed because the class representative lacks 'standing' does not, *per se*, prevent application of the *American Pipe* tolling rule."); *McKowan Lowe & Co. v. Jasmine, Ltd.*, 295 F.3d 380, 384-85 (3d Cir. 2002)(tolling claims and permitting intervention of a class representative with standing against one defendant where the original class representative lacked such because tolling diminishes the filing of repetitious suits and is "consistent with the twin functions of statutes of limitations providing defendants with timely notice and avoiding stale

claims--because the action is tolled only by timely service of the class complaint on the defendants by the named plaintiffs")(vacating portion of district court's order denying class certification and remanding), *cert. denied sub nom. Arthur Andersen, LLP v. Berger*, 537 U.S. 1088 (2002).

As noted earlier, the Financial Institution Defendants argue that any belated intervenor in *Newby* will not relate back to Lead Plaintiff's filing of the Amended Consolidated Complaint on May 15, 2003, which this Court has deemed filed as of January 14, 2003 (#2044 at 6-7). Under *McKowan,* the Financial Institutions' argument that the doctrine of relation back cannot save claims of a newly added party fails. If Lead Plaintiff had found class representatives with standing to pursue the § 12(a)(2) claims, the class might have proceeded on these claims since the class action has been tolled since the filing of the First Amended Consolidated complaint under *American Pipe*. *See, e.g., Goodman v. Lukens Steel Co.*, 777 F.2d 113, 124 (3d Cir. 1985). This is not a case where class certification was previously denied and where the propriety of a class action is being **re**litigated, which the Second Circuit in *Korwek* and the Fifth Circuit in *Presidio Valley Farmers*, and others, have barred. *Basch,* 139 F.3d at 11-12; *Andrews v. Orr*, 851 F.2d 146, 148-49 (6th Cir. 1988); *Robbin v. Fluor Corp.*, 835 F.2d 213, 214 (9th Cir. 1987); *McKowan*, 295 F.3d at 386.

## D. Length of Class Period

In opposition to Lead Plaintiff's proposed Class Period from October 19, 1998 to November 27, 2001, the Financial Institutions argue that the Class Period for claims against them must not begin before April 8, 1999 (the farthest extent to which the statute of repose allows claims in the First Consolidated Complaint (#441), filed on April 8, 2002, to be asserted, as this Court has previously ruled) and must end by October 16, 2001, when Enron announced it would record a $1 billion charge-off. They insist the latter announcement precluded any reasonable reliance on Enron's financial statements.

At the class certification hearing Mr. Lerach conceded that he recognized the Court's ruling that the three-year period of repose barred recovery for purchasers before April 8, 1999. Nevertheless he urged the Court to leave the definition as it was "for proof purchases" as the Court held in "that prior ruling." TR at 25. The Court presumes he is referring to its ruling that for

purposes of establishing scienter, Lead Plaintiff may rely on facts happening before the time bar. That proof issue is a separate matter and should not be the reason for defining a class period beyond the reach of the statute of limitations.

Nevertheless, the claims against other Defendants were filed earlier and are not restricted by the same statute of repose.

Regarding the commencement of the Class Period, the claims against the four Financial Defendants were added  in the First Amended Consolidated Complaint (#1388), deemed by the Court to have been filed on January 14, 2003, later than those against other Defendants, and are subject to different statutes of limitations/repose than others.  The reach of the statute of limitations is a fact issue that should not be resolved at class certification.[90]  Other courts have viewed variation in time bars for different class claimants in a predominance analysis as a consideration, but not necessarily a controlling one.  *Waste Management Holdings, Inc. v. Mowbray*, 208 F.3d 288, 295-96 (1st Cir. 2000)("Although a necessity for an individualized statute-of-limitations determinations invariably weighs against class certification under Rule 23(b)(3), we reject any per se rule that treats the presence of such issues as an automatic disqualifier.  In other words, the mere fact that such concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones.  As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3).").  The *Mowbray* panel ruled that a court "must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues will predominate" and thus, in part, whether class certification is appropriate. *Id.* at 298.  *See also In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. at 303 ("Although affirmative defenses such as the statute of limitations defense may be considered as one factor in the class certification calculus, the existence of even a meritorious statute of limitations defense does not necessarily defeat certification.") (*citing*

---

[90] Factual issues about limitations should not be resolved at the class certification stage.  *Chiang v. Veneman*, 385 F.3d 256, 269 (3d Cir. 2004)(statute of limitations defense goes to the merits and should not be a basis to deny class certification).

*Mowbray*); *George Lussier Enterprises, Inc. v. Subaru of New England, Inc.*, No. Civ. 99-109-B, 2001 WL 920060, \*3, 6, 11 (D.N.H. Aug. 3, 2001)("No precise, mechanical test exists to determine whether common issues predominate in a proposed class. . . . Instead courts look for 'a sufficient constellation of common issues [that] binds class members together.'")(*citing Mowbray*); *CV Reit, Inc. v. Levy*, 144 F.R.D. 690, 699 (S.D. Fla. 1992); *Gruber v. Price Waterhouse*, 117 F.R.D. 75, 78-80 (E.D. Pa. 1987); 7 Alba Conte and Herbert B. Newberg, *Newberg On Class Actions* § 22:55 (4th ed. updated Nov. 2005)("Possible differences in the application of a statute of limitations to individual class members, including named plaintiffs, relate to the merits of individual claims and do not preclude certification of a Rule 23(b)(3) class action when the necessary commonality and predominance are otherwise present."). *But see Broussard v. Meineke Discount Muggler Shops, Inc.*, 155 F.3d 331, 342 (4th Cir. 1998)("when the defendant's affirmative defenses (such as . . . the statute of limitations) may depend on facts peculiar to each plaintiff's case, class certification is erroneous").

The Fifth Circuit has cited *Mowbray* for the proposition that a court should not adopt a *per se* rule against certification where a limitations defense is raised by some defendants because the "result would foreclose use of the class action device for a broad subset of claims, a result inconsistent with the efficiency aims of rule 23.  Though class members whose claims are shown to fall outside the relevant statute of limitations are barred from recovery, this does not establish that individual issues predominate, particularly in the face of defendants' common scheme of fraudulent concealment."  *In re Monumental Life Ins. Co.*, 365 F.3d 408, 420-21 (5th Cir. 2004), *cert. denied sub nom. Am. Nat. Ins. Co. v. Bratcher*, 543 U.S. 870 (2004).  Here plaintiffs allege a common scheme to defraud throughout the class period.  The Court concludes that variations in time bars for some claimants are not sufficient to preclude class certification here.

"In a securities class action based on material misrepresentations and omissions to the investing public, the class period should end when curative information is publicly announced or otherwise effectively disseminated to the market."  *In re Ribozyme Pharmaceuticals, Inc. Sec. Litig.*, 205 F.R.D. 572, 579 (D. Colo. 2001)(and cases cited therein).  Nevertheless, "a class period

should not be cut off if questions of fact remain as to whether the disclosures completely cured the market." *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. at 307 *(citing inter alia Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 572 (2d Cir. 1982), *cert. denied*, 459 U.S. 838 (1982), and *Friedlander v. Barnes*, 104 F.R.D. 417, 421 (S.D.N.Y. 1984)), *appeal granted in part on other grounds sub nom. Havesi v. Citigroup*, 366 F.3d 70 (2d Cir. 2003); *In re Ribozyme*, 205 F.R.D. at 579 (When there is "'a substantial question of fact'" whether a "release had cured the market or was itself misleading, . . . then the broader time period will be certified.  In essence, the test is a preliminary merits determination whether the facts which underlie the gravamen of the plaintiff's complaint continue to represent a reasonable basis on which an individual purchaser or the market would rely."), *citing In re Data Access Sys. Secs. Litig.*, 103 F.R.D. 130, 143 (D.N.J. 1984), and *Friedlander v. Barnes*, 104 F.R.D. at 421; *Bovee v. Coopers & Lybrand*, 216 F.R.D. 596, 614-15 (S.D. Ohio 2003)(finding a substantial question of fact as to when the market was cured because even though a great deal of negative information had come out before class representatives purchased their stock, which had dropped below $1 in price, in the midst of these negative disclosures defendants had filed a Form 10-K with numerous misrepresentations and omissions).

There were a number of key disclosures of different content during the fall of 2001, and issues of fact exist whether adequate curative disclosures about the complicated relationship between Enron and the Financial Institutions, as well as other defendants, and the intricate scheme as a whole were made and when.  The record evidences disagreement whether even the November 8, 2001 announcement cured the market from the effect of earlier misrepresentations and omissions.  Moreover, as brought out by the expert witnesses, there are key differences in what information would lead a stock purchaser or seller to act in comparison to what would cause a bond purchaser or seller to act.  Lead Plaintiff maintains that the bond market did not collapse until after October 16, 2001 and the equity market suffered further significant declines after that date also.  These are issues of fact that should be determined at trial.

**E.    Scheme or Schemes/Individual Damages:  Potential Conflicts of Interest Among Class Members**

Certain Defendants argue that the complaint identifies many separate fraudulent schemes under § 10(b), in at least seven distinct time periods, involving different subsets of Defendants, with each scheme purportedly inflating the market price of the securities.  Thus different class members purchased and sold Enron securities at different times and presumptively relied on different alleged misrepresentations; such highly individualized issues are not subject to class-wide proof, insist Defendants.  *See, e.g., Richland v. Cheatham*, 272 F. Supp. 148 (S.D.N.Y. 1967).  Moreover, the class includes some investors who bought and sold during the first two years and were not damaged by the alleged fraud and indeed may even have made money.  Others bought their securities after the alleged fraud was disclosed to the market.  "Where the plaintiffs' damage claims focus almost entirely on facts and issues specific to individuals rather than the class as a whole, the potential . . . that the class action may degenerate in practice into multiple lawsuits separately tried renders class treatment inappropriate."  *Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003), *quoting Countrywide Home Loans*, 319 F.3d at 744.  Defendants maintain that unlike § 11 claims, whose damages could be determined by a mathematical or formulaic calculation, damages for § 10(b) claims would depend on date(s) of trading, profit or loss incurred, the extent to which the price paid and received reflected the "true" value vs. inflated value of the stock, i.e., individual issues that would predominate over questions common to the class.  Furthermore there would be inevitable conflicts of interest among class members and class representatives who purchased at different dates to maximize the inflation on the dates favoring larger damages for them.

The Court disagrees.  Any potential conflict is substantially outweighed by the common interests of the proposed class in establishing the alleged scheme or course of business to defraud and the material misrepresentations and omissions, and in maximizing the overall inflation of Enron securities throughout the Class Period to prove liability and to obtain the largest recovery for the class.  As noted by then District Court Judge Patrick E. Higgenbotham in *In re LTV Sec. Litig.,* 88 F.R.D. 134, 152 (N.D. Tex. 1980), "It is doubtful that in any open market fraud case extending beyond a matter of months whether the fit between the class representative's claim and the class

claim is ever perfect. . . . [I]f defendants' argument be well taken, there could be few, if any at all, classes certified in the market fraud context." *Id.* "The prevailing view is that differences in individual questions of reliance and amount of damages are not grounds for refusing to permit an action to proceed as a class action." 7 Alba Conte and Herbert B. Newberg, *Newberg on Class Actions* § 22:64 (4th ed. 2005); 7B Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 1781 at 8 (2d ed. 1986)("[I]t uniformly has been held that differences among the members [of a class] as to the amount of damages incurred does not mean that a class action would be inappropriate."). *See also Blackie v. Barrack*, 524 F.2d at 905, 909 ("The amount of damages is invariably an individual question and does not defeat class action treatment. . . .[W]e are confident that should the class prevail on the amount of price inflation during the period can be charted and the process of computing individual damages will be virtually a mechanical task"; "courts have generally declined to consider conflicts, particularly as they regard damages, sufficient to defeat class action status at the outset unless the conflict is apparent, imminent, and on an issue at the very heart of the suit"); *Allapattah Servs. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003)("[N]umerous courts have recognized that the presence of individualized damages issues does not prevent a finding that common issues in the case predominate."); *Kalodner v. Michaels Stores, Inc.*, 172 F.R.D. 200, 208 (N.D. Tex. 1997)("A conflict on damages does not preclude class certification unless it is imminent and 'at the very heart of the suit.' . . . Here, any conflict is substantially outweighed by the common interests of the class members."; "The hypothetical conflict between early and late purchasers does not destroy typicality"), *citing Hawk Industries, Inc. v. Bausch & Lomb, Inc.*, 59 F.R.D. 619, 624-25 (S.D.N.Y. 1973)("certifying class despite potential conflict on damages"); *LTV*, 88 F.R.D. at 149 (addressing potential conflict between those who bought and those who sold during the class period)("[S]ubclassing has the potential to cure any such problems.  It follows that a definition of the class should include persons who have both bought and sold during the class period.  We do not find such a potential conflict to be sufficient to deny class certification.  Significantly available techniques of proof such as econometric modeling are sufficiently demanding of internal consistency as to reduce the

opportunity for . . . manipulation of data."); *Winkler v. DTE, Inc.*, 205 F.R.D. 235, 242 (D. Az. 2001); *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 92 (S.D.N.Y. 1998)("[I]t is settled in this Circuit that factual differences in the amount of damages, date, size or manner of purchase, the type of purchaser, the presence of both purchasers and sellers, and other such concerns will not defeat class action certification when plaintiffs allege the same unlawful course of conduct affected all members of the proposed class", *citing Green v. Wolf*, 406 F.2d 291, 299-301 (2d Cir. 1998)(where common course of conduct alleged to manipulate the market price of the subject stock, class action treatment is appropriate, especially where separate trials on issues such as individual damages can be ordered if necessary"), *cert. denied sub nom. Troster, Singer & Co. v. Green*, 395 U.S. 977 (1969); *Bovee v. Coopers & Lybrand*, 216 F.R.D. 596, 610-11 (S.D. Ohio 2003)("'[T]he traditional rule' is that 'a plaintiff class should be certified despite conflicts over damages issues between early and late sellers of the stock'")(and cases cited therein); *In re Intelcom Group Sec. Litig.*, 169 F.R.D. 142, 148 (D. Colo. 1996)("Although the plaintiffs may have purchased their stock at different times, and relied upon different sources of public information in making their investment decisions, those variations are insufficient to defeat the class on typicality grounds.").  Whether different plaintiffs relied upon different documents is not determinative.   "It is now settled . . . that the claims of such a plaintiff are typical of the claims of the class if all the documents relied upon are part of a common course of conduct or common scheme to defraud." 7 *Newberg on Class Actions*, § 22:26; *see also* 4 Herbert B. Newberg, *Newberg on Class Actions* § 22.13 at 34 (2d ed. 1985)(same).

As then District Court Judge Patrick Higgenbotham in *LTV* noted, should a conflict develop, there are available "sophisticated techniques of market analysis.  This method of proof reduces to one of remoteness the opportunity for any class representative to feather their own next."  *LTV*, 88 F.R.D. at 152.  *See also Kalodner*, 172 F.R.D. at 208; *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259-60 (11th Cir. 2004)("'[I]n assessing whether to certify a class, the Court's inquiry is limited to whether or not the proposed methods [for computing damages] are so insubstantial as to amount to no method at all. . .  [Plaintiffs] need only come forward with plausible statistical or economic

methodologies to demonstrate impact on a class-wide basis.' . . . Particularly where damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is not impediment to class certification."), *cert. denied sub nom.   UnitedHealth Group, Inc. v. Klay*, 543 U.S. 1081 (2005); *Newberg on Class Actions* § 10.8 (4th ed. 2002)("The determination of damages sustained by individual class members in securities class action suits is often a mechanical task involving administration of a formula determined on a common basis for the class"; "these necessary mechanics do not bar certification").[91]

Certain Defendants contend that current and former Enron employees should not be included in the class because some based their decisions to buy and sell Enron stock on various misrepresentations made to them as employees that were not made to the public, and therefore did not impact the public market price for the Enron stock, because they have individual reliance issues, and because some may have had personal knowledge from working on the transactions involved. Once again in view of the allegations of a course of misconduct to defraud, such occasional individual questions should not preclude defining the class to include Enron employees and certifying it.  Lead Plaintiff's response is appropriate:  "To say that all present and former Enron employees should be excluded from the class because some ***might*** have known about the alleged fraud disadvantages thousands of potential class members who lost their life savings in Enron." #1854 at 64.  Those Enron employees who have been named as defendants have been excluded from the class definition.

## F.    Damages and Causation

## 1.    Claims Under § 10(b)

---

[91] Certain Defendants argue that Hawaii Laborers' Pension Fund and Employer-Teamsters Local Nos. 175 & 505 should not be included in the class because they bought and sold Enron stock during the Class period and thus profited from the alleged fraudulent scheme.  Lead Plaintiff properly responds that the two brought claims under § 11 based only on their bond investments and did lose money on the bonds, so they were damaged by the fraud.

Regarding calculation of damages and causation, traditionally damages have been determined in § 10(b) claims by the out-of-pocket measure, arising out of common law fraud, which allows "a purchaser to recover the difference between the purchase price and the true value of the securities absent the alleged fraud as measured by the correction in the market price following curative disclosure," i.e, the difference between what the plaintiff paid for the security and what the plaintiff would have paid "but for the fraud." *See, e.g., Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289, 297 (3d Cir. 1991). *See also Randall v. Loftsgaarden*, 478 U.S. 647, 661-62 (1986)[92]; *Foster v. Financial Technology, Inc.*, 517 F.2d 1068, 1071 (9th Cir. 1995); *Janigan v. Taylor*, 344 F.2d 781, 786 (1st Cir. 1965); *Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 303 F.2d 527, 533 (10th Cir. 1962); *In re LTV Sec. Litig.,* 88 F.R.D. 134, 148 (N.D. Tex. 1980)("a defrauded buyer can recover the value of the consideration he paid for the security less the actual value of the security he received, all measured at the time of the transaction"), *citing Bridgen v. Scott*, 456 F. Supp. 1048, 1060 (S.D. Tex. 1978); *Kalodner*, 172 F.R.D. at 207-08, *citing Smokey Greenhaw Cotton Co., Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 785 F.2d 1274, 1278 (5th Cir. 1986); *Restatement (Second) of Torts* § 549.  The Supreme Court approved of the out-of-pocket measure of damages for Rule 10b-5 claims in *Affiliated Ute*, 406 U.S. at 155 (Section 28(a) of the 1934 Act, 15 U.S.C. § 78bb(a) established as the proper measure of damages the limiting of the claimant's recovery to a sum not "in excess of his actual damages on account of the act complained of"), but since *Affiliated Ute* was not a "fraud on the market" case, it did not explain how the rule should be applied and damages calculated in such cases.  *See* Bradford Cornell and R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud in the Market Cases*, 37 U.C.L.A. 883, 884 (June 1990); Daniel P. Lefler and Allan W. Kleidon, *Just How Much Damage Did Those Misrepresentations Actually Cause and To*

---

[92] Neither § 10(b) nor Rule 10b-5 addresses how to calculate damages.  Courts have applied the out-of-pocket measure in § 28 of the 1934 Act, 15 U.S.C. § 78bb(a)("correct measure of damages . . . is the difference between the fair value of all the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct") to these claims.  *Randall v. Loftsgaarden*, 478 U.S. at 661-66, *quoted for that proposition, Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 178 n.19 (3d Cir. 2001).

*whom? Damages Measurement in "Fraud on the Market" Securities Class Actions*, 1505 PLI/Corp 285, 289-90 (Sept. 2005).

In an influential concurrence in *Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1344 (9th Cir. 1976), Judge Sneed noted that the out-of-pocket measure of damages "fixes recovery at the difference between the purchase price and the value of the stock at the date of purchase," a difference that "is proximately caused by the misrepresentations of the defendant." He suggested using data for the period between the date of the misrepresentation and the date of disclosure of the falsity of that misrepresentation to create a chart with a "price line," which would "reflect, among other things, the effect of the corporate defendant's wrongful conduct," and a "value line." *Id.* at 1344. Theoretically in an efficient market without misrepresentation, the two lines would coincide. Where material misrepresentation has occurred, an investor who has not sold his stock before the corrective disclosure of the misrepresentations can calculate his damages merely "by subtracting the true value of his stock on the date of his purchase from the price he paid therefor." Judge Sneed recognized that "[f]ixing the value line for the entire period involved in this case is a more difficult and complex task that would be the establishing the price at the date of disclosure of the misrepresentations and the price at all relevant dates prior to disclosure," but that "establishing the required value line is practicable" and the effort is "necessary if class certification in this case is to survive." *Id.* Judge Sneed also pointed out that "the spread [between the price and value lines], or value of the misrepresentations, may increase or decrease as a result of market forces, operation on the misrepresentations." *Id.* The concept of transaction causation in fraud on the market cases corresponds to the "but for" value line in Judge Sneed's approach to measuring damages in *Green*. Lefler, *Just How Much Damage*, 1505 PLI/Corp. at 291.

As for loss causation, the United States Supreme Court's recent opinion in a fraud-on-the-market case, *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 125 S.Ct. 1627 (2005), heightened the pleading requirements and has significant implications for proving damages in a § 10(b) case. Lefler, *Just How Much Damage*, 1505 PLI/Corp. at 292-94. In *Dura Pharmaceuticals*, purchasers of stock in the pharmaceutical company that had submitted a new asthmatic spray

device for approval from the Food and Drug Administration, alleged in a securities fraud class action suit that some of the company's managers and directors misrepresented that the company expected its drug sales to be profitable and that it expected FDA approval of the spray device shortly.  On the final day of the purchase period, the defendants disclosed that the earnings would be less than anticipated largely because of slow sales; eight months later they announced that the FDA would not approve the device.  The complaint asserted only, "'*In reliance on the integrity of the market, [the plaintiffs] . . . paid artificially inflated prices for Dura securities' and the plaintiffs suffered 'damage[s]' thereby.*"  125 S. Ct. at 1630 (emphasis in the original).

Justice Stephen Breyer, writing for a unanimous Supreme Court, reversed a Ninth Circuit ruling that a plaintiff pleading securities fraud under § 10(b) and Rule 10b-5 need only establish that the price of a security was artificially inflated on the date he purchased it to plead economic loss and loss causation under the 1934 Act.  The Supreme Court opined that in a fraud-on-the-market case, where a plaintiff alleges that he suffered losses because he paid an artificially inflated price for a security, generally "as a matter of pure logic, at the moment that a transaction takes place, the plaintiff who has purchased securities at an inflated price] has suffered no loss; the inflated purchase payment is offset by ownership of a share that at the instant possesses equivalent value." 125 S. Ct. at 1631.  In other words, at the time the purchase of a security occurs, the alleged inflated price, alone, logically cannot constitute "economic loss" because the plaintiff acquires a security of "equivalent value" and the "misrepresentation will not have led to any loss" if the plaintiff sells the shares "quickly before the truth begins to leak out."  *Id.*  Furthermore, the Supreme Court pointed out that an implied private securities fraud action under the Securities and Exchange Act is similar in many ways to common-law causes of action for deceit and fraudulent misrepresentation, which require a plaintiff to show (1) that if he had known the truth he would not have acted as he did; (2) that he suffered actual, substantial damage; and (3) that the defendant's deception was the proximate cause of the plaintiff's injuries.[93]  *Id.*

---

[93] In 1995 Congress codified the loss causation element in the PSLRA:

In any private action arising under this chapter, the plaintiff shall have the burden of

Even when the purchaser later sells his shares at a lower price, the Supreme Court questioned any automatic assumption of a link between an inflated price and a subsequent economic loss after news of the deception is leaked:

> If the purchaser sells later after the truth makes its way into the market place, an initially inflated purchase price *might* mean a later loss.  But that is far from inevitably so.  When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other related events which, taken separately or together, account for all of that lower price. . . . Other things being equal, the longer the time between purchase and sale, the more likely that this is so, *i.e.*, the more likely that other factors caused the loss.

*Id.* at 1631-32. Thus the high court addressed a narrow issue: it held that in a fraud-on-the-market case a plaintiff must plead, and ultimately prove, more than simply that the defendant's misrepresentation caused the stock price to be inflated; an artificial high purchase price "is not itself a relevant economic loss," but merely "touches upon" the subsequent loss of value and does not necessarily cause the plaintiff economic loss, especially in light of the "tangle of factors affecting price." *Id.* at 1634, 1632.[94]

Focusing on threshold pleading requirements rather than the ultimate burden of proof, but with clear implications for that ultimate burden, the high court did not indicate what must be pled to establish loss causation other than requiring more than a simple allegation of inflated stock price: "We need not, and do not, consider other proximate cause or loss related questions." *Id.* at 1633-34. The Supreme Court did not affirmatively adopt Dura Pharmaceuticals' argument that a plaintiff must allege and ultimately prove that the defendant made a corrective disclosure of the fraud that

---

proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.

15 U.S.C. § 78u-4(b)(4).

[94] Justice Breyer noted that the Ninth Circuit's standard would not serve the public policy goals of the federal securities laws, i.e., maintenance of public confidence in the market by making available private securities fraud actions; these statutes do not aim to "provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." 125 S. Ct. at 1633. The PSLRA "makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss." *Id.*

was followed by a related price drop, nor did it specify what must be pled to establish that "the truth became known"; instead, the Supreme Court stated vaguely that a complaint must "provide defendants with notice of what the relevant economic loss might be or what the causal connections might be between that loss and the misrepresentation" (i.e., "some indication of the loss and the causal connection that the plaintiff has in mind," a subjective standard), the pleading of which "should not prove burdensome" for a plaintiff.[95]   *Id.* at 1634.   Thus besides a formal corrective disclosure by a defendant followed by a steep drop in the price of stock, the market may learn of possible fraud through a number of sources:  e.g., from whistleblowers, analysts' questioning financial results, resignations of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals, etc.  *See* Alan Schulman and Nicki Mendoza, *Dura Pharm., Inc. v. Broudo--The Least of All Evils*, 1505 PLI/Corp. 272, 274 (Sept. 2005).  Plaintiff's economic loss may occur as "relevant truth begins to leak out" or "after the truth makes its way into the market place," and the plaintiff need only give "some indication" of the causal link between that leaked truth and his economic loss.  125 S. Ct. at 1631, 1632, 1634.  The pleading of a single formal corrective measure is not necessary.

Moreover, the plaintiff's loss need not be caused exclusively by the defendant's fraud. *Id.* at 1632-32, *citing Sosa v. Alvarez-Machain*, 124 S. Ct. 2739, 2750 (2004)("Proximate case is causation substantial enough and close enough to the harm to be recognized by the law, but a given proximate cause need not be, and frequently is not, the exclusive proximate cause of harm."); *Caremark Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir. 1997)(Loss causation "does not require . . .  that the plaintiff plead that all of its loss can be attributed to the false statement of the defendant.").

---

[95] In *Dura Pharmaceuticals* the Supreme Court found that although the complaint alleged that the plaintiffs paid artificially inflated prices for Dura Pharmaceutical's securities, it failed to allege that the share price of the stock at issue fell substantially after the truth was disclosed.  125 S. Ct. at 1634.  Instead the only allegation was that the purchase price was inflated and "the complaint nowhere else provides the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between the loss and the misrepresentation concerning Dura's 'spray device.'"  *Id.* at 1634.

Judge Sneed's concurrence in *Green v. Occidental Petroleum* and the Supreme Court's opinion in *Dura Pharmaceuticals* make clear that investors who purchased during the Class Period and then sell before the corrective disclosure(s) ("in-and-out traders) do not suffer loss because of defendants' alleged fraud.  *Green*, 541 F.2d at 1345 (Where the spread between the price and value lines remains constant, permitting a class member purchaser who sold before the disclosure to recover the same cost from the defendant corporation would not only provide him with a double recovery, but any market price decline after the purchase would not be attributable to the defendant's misrepresentations but to market forces unrelated to the misrepresentations); *Dura Pharmaceuticals*, 125 S.Ct. at 1632 (aware of the impact of other forces, including "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions or other events" that can cause stock prices to decline independently of any wrong doing by defendants, the high court emphasized that the 1934 Act "expressly imposes on plaintiffs 'the burden of proving' that defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover," and that private lawsuits are "available not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause.").  The *Dura Pharmaceuticals* ruling further supports the Court's decision to require Lead Plaintiff to restrict the class definition to those who actually lost money and suffered damages attributable to Defendants' misconduct and instructions to Lead Plaintiff to modify the class definition.

Damages experts and financial economists have been trying to construct more reliable methodologies for measuring damages in § 10(b)/Rule 10b-5 cases; Judge Sneed's concurrence prefaced a significant trend of courts' requiring more sophisticated damages calculations with analysis of how factors that impact stock price, including ones unrelated to the fraud, and of how to exclude general factors such as overall stock price decline, or factors that impact the particular industry or company that are not fraud related, in an effort to base damages only on those factors that actually relate to the alleged fraudulent activity.  Jay W. Eisenhoffer, Geoffrey C. Jarvis, and James R. Banko, *Securities Fraud, Stock Price Valuation, and Loss Causation: Toward A*

*Corporate Finance-Based Theory of Loss Causation*, 59 Bus. Law. 1419, 1419, 1427 (August 2004); Daniel P. Lefler and Allan W. Kleidon, *Just How Much Damage Did Those Misrepresentations Actually Cause and To whom?  Damages Measurement in "Fraud on the Market" Securities Class Actions*, 1505 PLI/Corp 285 (Sept. 2005); Bradford Cornell and R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 U.C.L.A. 883 (June 1990).

One method increasingly recognized by courts and mandated by some of them[96] is an event study, a statistical method of measuring the effect of a particular event such as a press release, a Form 10-K, or a prospectus, on the price of a company's stock:

> An event study is a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price.  This approach assumes that the price and value of the security move together except during days when disclosures of company-specific information influence the price of the stock. The analyst then looks at the days when the stock moves differently than anticipated solely based upon market and industry factors--so-called days of "abnormal returns."  The analyst then determines whether those abnormal returns are due to fraud or non-fraud related factors. . . . [E]vent study methodology has been used by financial economists as a tool to measure the effect on market prices from all types of new information relevant to a company's equity valuation.

Eisenhoffer, 59 Bus. Law at 1425-26.

Thus far no court in the Fifth Circuit has required such a study, no less expert testimony, at the class certification stage, although such expert statistical information has been found helpful. *Unger,* 401 F.3d at 323 n.6 ("There is no requirement for expert testimony on the issue of market efficiency, but many courts have considered it when addressing this determination, which may often benefit from statistical, economical, and mathematical analysis.")(*citing Bell v. Ascendant*

---

[96] *See, e.g., In re Imperial Credit Industries, Inc. Sec.* Litig., 252 F. Supp. 2d 1005, 1014-15 (C.D. Cal. 2003)(requiring an event study or similar analysis to eliminate the parts of a stock price decline because "[a] proper measure of damages in the securities context . . . requires elimination of that portion of the price decline or price difference which is unrelated to the alleged wrong"), *aff'd sub nom. Mortensen v. Snavely*, 145 Fed. Appx. 218 (9th Cir. 2005); *In re Northern Telecom Sec. Litig.*, 116 F. Supp. 2d 446, 460, 468 (S.D.N.Y. 2000)(granting summary judgment for defendants where their expert's event study concluded that none of the challenged statements caused increases in the stock price and where plaintiffs' expert failed to perform an event study or similar analysis to controvert the defendants'); *In re Executive Telecard Ltd. Sec. Litig.*, 979 F. Supp. 1021, 1025-26 (S.D.N.Y. 1997); *In re Oracle Sec. Litig.*, 829 F. Supp. 1176, 1181 (N.D. Cal. 1993)(rejecting expert's report for failure to perform an event study).

*Solutions, Inc.*, No. CIV. A. 301CV0166N, 2004 WL 1490009, *2 (N.D. Tex. July 1, 2005, *aff'd and remanded*, 422 F.3d 307 (2005), *aff'd and remanded*, 422 F.3d at 314 n.6 (*quoting Unger* for same proposition)("[T]hough *Unger* admonishes district courts 'not to insist upon 'a battle of experts' at the class certification stage.' . . . we quoted with approval a statement from the district court's opinion in this case in defense of considering at least the reliability of expert testimony on market efficiency at the class certification stage."); *Lehocky*, 220 F.R.D. at 491; and *Krogman*, 202 F.R.D. at 467).  Thus it is not clear, beyond demonstrating that the opinion of a damages expert is reliable, how much Lead Plaintiff must establish at class certification under Fifth Circuit law.

**2.      Claims under §§ 11 and 12(a)(2)**

For claims under § 11 of the 1933 Act, damages generally are calculated as the difference between the amount paid for the security, not to exceed the price at which the security was offered to the public, and the price of the security at the time the lawsuit was filed or the security was disposed of in the market.  Section 11(e), 15 U.S.C. § 77k(e); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 873 (5th Cir. 2003).  Such calculations are more mechanical in nature than those for § 10(b) and should not preclude class certification.

Section 12(a)(2) imposes liability on any person who offers or sells a security by means of a prospectus or oral communication which either contains an untrue statement of fact or omits a material fact necessary to make the other statements not misleading, without requiring "proof of either fraud or reliance."  *Gustafson v. Alloyd Co.*, 513 U.S. 561, 582 (1995).  The remedy for violations of § 12(a)(2) by the statutory "seller" is rescission "except where the plaintiff no longer owns the security," under which circumstance damages may be recovered.  *Randall v. Loftsgaarden*, 478 U.S. 647, 655 (1986); *Gustafson v. Alloyd Co.*, 513 U.S. 561, 567 (1995).

The Court agrees with Lead Plaintiff that common class-wide damages issues also predominate in the 1933 Act claims.[97]

---

[97] Section 11, like § 12(a)(2), provides two affirmative defenses: where the party can show that the depreciation in the value of the security was caused by something other than the misrepresentations in the registration statement or prospectus and where it can show due diligence, 15 U.S.C. § 77k(e) and § 77k(b)(3), and 15 U.S.C. § 77l(b) and § 77l(a)(2).  Affirmative defenses need not be addressed at this stage of the litigation.

3.      **PSLRA and Exchange Act "Inconsistency"**

Observing that Lead Plaintiff has alleged that Defendants are liable for all damages arising out of the alleged scheme or course of business to defraud, Defendants have argued that Lead Plaintiff's § 10(b) claims for damages under the Exchange Act are inconsistent with the PSLRA's provisions for damages, which Defendants contend have made the damages issue an individual one, thus defeating class certification.

Before the passage of the PSLRA in 1995, liability in federal securities cases was joint and several. The PSLRA, 15 U.S.C. § 78u-4(f)(2)(A), states that defendants are "liable for damages jointly and severally only if the trier of fact specifically determines that such covered person knowingly committed a violation of the securities laws."[98] Control person liability under § 20(a) of the 1934 Act for both the controlling and the controlled persons is joint and several. 15 U.S.C. § 78t(a). For a detailed discussion of liability under both the 1933 and 1934 Acts, *see In re WorldCom, Inc. Sec. Litig.*, No. 02 CIV. 3288 (DLC), 2005 WL 334201 (S.D.N.Y. Feb. 14, 2005), *reconsideration granted on other grounds*, 2005 WL 681455 (S.D.N.Y. March 24, 2005).

_____

[98] Liability under the 1933 Act operates as follows. Section 11 provides for joint and several liability for all defendants (any signer, director of the issuer, accountant preparing or certifying the registration statement, or underwriter) except outside directors. 15 U.S.C. §§ 77k(f)(1). Outside Directors are generally subject to proportionate liability. 15 U.S.C. § 78u-4(f)(2)(B)(I). If, however, the jury finds that the outside directors are "knowing" violators of the securities laws, they are subject to joint and several liability. § 78u-4(f)(2)(A). There is also a very limited exception for underwriters under § 11(e): "In no event shall any underwriter (unless such underwriter shall have knowingly received from the issuer for acting as an underwriter some benefit, directly or indirectly, in which all other underwriters did not share in proportion to their respective interests in the underwriting) be liable in any suit or as a consequence of suits authorized under subsection (a) of this section for damages in excess of the total price at which the securities underwritten by him and distributed to the public were offered to the public." § 77k(e). Thus in these exceptions the "knowing" violator is subject to the harsher joint and several liability.

The remedy for violations of § 12(a)(2) by the statutory "seller" is rescission "except where the plaintiff no longer owns the security," under which circumstance damages may be recovered. *Randall v. Loftsgaarden*, 478 U.S. 647, 655 (1986); *Gustafson v. Alloyd Co.*, 513 U.S. 561, 567 (1995).

For control person liability, the controlling person is held jointly and severally liable with the controlled person under § 15 of the 1933 Act and § 20(a) of the 1934 Act. 15 U.S.C. § 77o., § 78t(a).

Relevant here is the unresolved question of the scope of damages for which defendants may be liable under a scheme liability theory under Rule 10b-5(a) and (c): is a defendant liable only for the loss suffered by plaintiff that was caused by that defendant's own primary violation or is a defendant liable for the loss caused by all primary violators participating in the scheme as a whole? Defendants, as expected, object to the expansive liability concept.  There is almost no case law even asking this question.

The Court finds that a reasonable argument can be made that where a defendant knowingly engaged in a primary violation of the federal securities law that was in furtherance of a larger scheme, it should be jointly and severally liable for the loss caused by the entire overarching scheme, including conduct of other scheme participants about which it knew nothing.  Indeed, express joint and several liability in the statute is a meaningless concept if it is limited to a defendant's own wrongdoing.  This Court acknowledges that it has previously questioned whether liability for conduct caused by all the scheme participants is compatible with the "knowing" requirement under § 78u-4(f)(2)(A).  *In re Enron Corp. Sec., Derivative & ERISA Litig.*,  235 F. Supp. 2d 549, 593 (S.D. Tex. 2002).  Nevertheless, the Court observes that the PSLRA not only replaced joint and several liability with proportionate liability except when the conduct was "knowing", but established a right to contribution under § 78u-4(f)(8) to provide a remedy for unfairness, and, with a similar result, the judgment reduction formula embodied in § 78u-4(f)(2)(A). Accordingly this Court concludes that Lead Plaintiff may pursue its claims for joint and several liability against those Defendants found to be primary violators in the scheme, as a whole.

Lead Plaintiff has alleged each Defendant acted with scienter, which in the Fifth Circuit can be "knowingly" or "with severe recklessness."  The question of whether a Defendant acted knowingly will have to be presented to the factfinder.  If a defendant is found not to have acted knowingly, the defendant is "liable solely for the portion of the judgment that corresponds to the percentage of [its] responsibility," in other words proportionate liability.  15 U.S.C. § 78u-4(f)(B)(1); *In re  Cedant Corp. Litig.*, 264 F.3d 201, 237 & n.19 (3d Cir. 2001), *cert. denied sub nom. Mark v. Cal. Public Employees' Retirement Sys.*, 535 U.S. 929 (2002); *Greebel v. FTP*

*Software, Inc.*, 194 F.3d 185, 200 (1st Cir. 1999).  Should the trier of fact in this action determine

that a defendant is liable but did not act knowingly, and should the determination of proportionate

liability among all wrongdoers so necessitate, the calculation, though it would necessitate extending

the trial, should not defeat the class certification.  As noted in *In re WorldCom, Inc. Sec. Litig.*, No.

02 CIV. 3288 (DLC), 2005 WL 334201 at *7,

> Under Section 21D(f),[99] so that responsibility may be allocated among the various
> defendants, the court must instruct the jury to answer special interrogatories . . . in
> regard to each Covered Person and "each of the other persons claimed by any of the
> parties to have caused or contributed to the loss incurred by the plaintiff," *id.* § 78u-
> 4(f)(3)(A), a category that includes co-defendants and parties that have settled.  The
> interrogatories are to concern "whether each person violated the securities laws,"
> "the percentage of responsibility of such person measured as a percentage of the
> total fault of all persons who caused or contributed to the loss incurred by the
> plaintiff," and whether such person *knowingly* committed a violation of the
> securities laws."  *Id.* § 78u-4(f)(3)(A)(i-iii)(emphasis supplied).

## G.     Standing and Foreign Debt Securities Claims Under § 12(a)(2) and § 10(b)

As noted, under Fifth Circuit law, if a proposed class representative lacks standing, "he or

she may not seek relief on behalf of himself or herself or any other member of the class."  *James*

*v. City of Dallas, Texas*, 254 F.3d 551, 563 (5th Cir. 2001), *cert. denied*, 534 U.S. 1113 (2002).

Standing, like class certification, must be determined as to each claim.  *Id.*

This Court has held several times during this litigation that because § 12(a)(2) requires

privity between the seller and the investor, an investor only has standing to sue his immediate

seller.  Thus a class representative only has standing to sue his immediate seller for a security he

purchased and can only represent those class members that purchased the same security from the

same seller.  In contrast where the complaint alleges a course of conduct or illegal scheme under

§ 10(b), which does not have a privity requirement, the class representative may have purchased

---

[99] Section 21D(f) of the 1934 Act, added by the PSLRA, provides:

> For purposes of this subsection, the term "covered persons" means-
> (I) a defendant in any private action arising under this chapter; or
> (ii) a defendant in any private action arising under section 77k of this title [§ 11 of
> the 1933 Act], who is an outside director of the issuer of the securities that are the
> subject of this action . . . .

15 U.S.C. § 78u-4(f)(10)(C).

the same type of security as those purchased by other members of the class, but from different sellers.  #1999 in *Newby* at 89, 90-96; #2050 in *Newby* at 4; #4336 in *Newby* at 2; #27 in H-03-2240 at 11-12.

The record makes clear that the Foreign Debt Securities were distinctly different than the other Enron securities at issue here.  As noted, they were issued not by Enron, but by different Enron-related entities, although their value was directly or indirectly related to Enron's financial condition.  They were issued pursuant to unregistered private placements under 17 C.F.R. §§ 230.901-230.905 in private offerings limited to QIBs under Rule 144A for the United States market and in foreign markets under Regulation S, exempting such securities from registration requirements under § 5 of the Securities Act of 1933.  Because of their distinct nature, the Court concludes that some investor that purchased at least one of the nine types must be available as a class representative for § 10(b) claims by purchasers of the Foreign Debt Securities.

Lead Plaintiff did not purchase any of the Foreign Debt Securities and has not named a viable class representative who did who thus would have standing to represent class members who purchased any of the Foreign Debt Securities even for claims under § 10(b).  Following the withdrawal of ICERS, Lead Plaintiff's two most recently proposed foreign securities class representatives, the Evangelical Lutheran Church Pension Fund and the Illinois State Board of Investment, purchased such securities, but only from Citigroup, which has settled with Lead Plaintiff.  Moreover the Pension Fund only purchased Yosemite I securities, and this Court previously ruled claims based on this offering are time-barred.  Thus the proposed Intervenors' claims are all moot. TR (#4559) at 357-59.  Lead Plaintiff has had three years to find someone with standing to represent this proposed subset of securities, but has failed to do so.  The Court accordingly finds that without a class representative with standing to sue based on any of the foreign debt securities, such claims under § 10(b), as well as under § 12(a)(2), cannot be certified for class prosecution and must be dismissed without prejudice.[100]

---

[100] Therefore the Court does not have to resolve an issue raised by Lead Plaintiff about whether the Rule 144A and Reg S offerings are covered by § 12(a)(2).

**H.    Adequacy of Challenged Class Representatives**

At the class certification hearing, Bill Lerach explained that Lead Counsel had attempted to designate a cross section of investors, from ordinary individuals to sophisticated and experienced institutional investors, to serve as class representatives.  Nevertheless, each must meet the standard for the role.

Under Federal Rule of Civil Procedure 23(a)(4), the court examines the zeal and competence of the class representatives' counsel and the class representatives' willingness, experience, and ability to handle class actions, to take an active role in and control of the litigation, and to protect the interests of the absent members, to determine if there is fair and adequate representation of the interests of the class. *Henry v. Cash Today, Inc.*, 199 F.R.D. 566, 569 (S.D. Tex. 2000); *In re Electronic Data Systems Corp. Sec. Litig.,* 226 F.R.D. 559, 566 (E.D. Tex. 2005)(*citing Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479-82 (5th Cir. 2001), *clarified and reh'g en banc denied*, 279 F.3d  313 (5th Cir. 2002)), *aff'd*, 429 F.3d 125 (5th Cir. 2005).  Even in the absence of proof that the class representatives and/or their counsel are inadequate, the court may not presume that they are adequate; the party seeking certification must demonstrate that they are adequate.  *Berger*, 257 F.3d at 481.  The provision also requires the court to determine if there are any conflicts of interest between the named plaintiffs and the class they seek to represent, which would make the class representation inadequate.  *Berger*, 257 F.3d at 480.  "[B]ecause absent class members are conclusively bound by the judgment in any class action brought on their behalf, the court must be especially vigilant to ensure that the due process rights of all class members are safeguarded through adequate representation at all times."  *Id.*

The PSLRA, 15 U.S.C. § 78u-4, 15 U.S.C. § 78u-4(a)(3)(B), requires that the Lead Plaintiff must be "the most sophisticated investor available and willing to serve in a putative securities class action" and "an investor capable of understanding and controlling the litigation."  While the standard for Lead Plaintiff  is more demanding than that for a class representative, under Fifth Circuit law a number of requirements overlap. Noting that the Supreme Court[101] left the defining

---

[101] *Hansberry v. Lee*, 311 U.S. 32 (1940).

of the contours of Rule 23(a)(4)'s adequacy requirement to lower courts with a resulting lack of uniformity in standards, and calling "for rule 23 to be interpreted to accommodate the substantive policies of the governing statute," in *Berger*, 257 F.3d at 479 n.7, 483, the Fifth Circuit opined that the PSLRA clarified the adequacy standard for class representatives in securities class actions.[102] It found the clarification was in accord with its long established standard in mandating "an inquiry into . . . the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of the absentees." *Berger*, 257 F.3d at 479, 482, *clarified*, 279 F.3d at 313-14, *citing Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 484 (5th Cir. 1982), *cert. denied*, 463 U.S. 1207 (1983).  An adequate class representative should have "'commendable familiarity with the complaint and the concept of a class action.'" *Krim v. pcOrder.com, Inc.*, 210 F.R.D. 581, 587 (W.D. Tex. 2002)(*citing Horton*, 690 F.2d at 484).

The Fifth Circuit's "generic standard" for determining adequacy of a class representative, in addition to uncovering any conflicts of interest with the class, is demanding: "'the class representatives [must] possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation.'"  *Feder v. Electronic Data Systems Corp.*, 429 F.3d 125, 129 (5th Cir. 2005), *quoting Berger*, 257 F.3d at 482-83.  The Fifth Circuit has concluded that "'the PSLRA raises the standard adequacy threshold' with its 'requirement that the securities class actions be managed by active, able class representatives who are informed and can demonstrate they are directing the litigation.'"  *Id.* at 130, *quoting Berger*, 257 F.3d at 483.  It did not "create[] an additional requirement under rule 23(a)(4) that . . . the putative class representative possess[] a certain level of experience, expertise, wealth or intellect, or a level of knowledge and understanding of the issues beyond that required by our long-established standards for rule 23 adequacy of class representatives," i.e., "'an inquiry into [1] the zeal and competence of the representative[s'] counsel

___

[102] The *Berger* standard has since been applied to cases not involving securities violations.  *See, e.g.*, *In re Data Systems Corp.*, 224 F.R.D. 613 (E.D. Tex. 2004)(for ERISA as well as PSLRA claims); *In the Matter of American Comm. Lines, LLC*, Nos. Civ. A. 00-252, 00-2967, and 00-3147, 2002 WL 1066743 (E.D. La. May 28, 2002)(maritime negligence and strict liability); *Umsted v. Intelect Communications, Inc.*, Civ. A. 3:99-CV-2604, 2003 WL 79750 (N.D. Tex. Jan. 7, 2003); *Ogden v. Americredit Corp.*, 225 F.R.D. 529, 532-38 & n.2 (N.D. Tex. 2005)(ERISA); *In re Reliant Energy ERISA Litig.*, No. Civ. A. H-02-2051, 2005 WL 20000707 (S.D. Tex. Aug. 18, 2005).

and . . . [2] the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees[.]'" *Id.* at 130, *quoting Berger*, 257 F.3d at 479. The panel further stated that although "class representatives need not be legal scholars and are entitled to rely on counsel," they should 'know more than that they were 'involved in a bad business deal.''" *Id.* at 131, 132 n.4, *quoting Berger*, 257 F.3d at 483. "While [plaintiff] cannot be expected to know all of the legal minutia involved in litigating [its] case, [it] should at least have an understanding of why all of the individuals or companies are defendants other than [its] general knowledge that a bad business deal occurred." *Ogden v. Americredit Corp.*, 225 F.R.D. 529, 534-35 (N.D. Tex. 2005), *citing Berger*, 257 F.3d at 482-83. Moreover, "it is not enough that plaintiff's counsel are competent if the plaintiffs themselves almost totally lack familiarity with the facts of the case. . . . Plaintiffs should understand the actions in which they are involved, and that understanding should not be limited to derivative knowledge acquired solely from counsel." *Berger*, 257 F.3d at 483 n.18. In sum, "competent plaintiffs, rather than lawyers, [must] direct such cases." *Id.* at 484.

This Court would highlight the fact that this litigation is extraordinarily complex, both legally and factually, as well as vast in scope, and involves a myriad of parties. The defendants and Enron's business deals span the globe. Experts are still attempting to understand Enron's intricate operations and allegedly manipulated accounting. As evidenced by this Court's opinions, much of the applicable law is unsettled and many issues raised have been novel. To expect a person, especially an individual investor, to investigate, unravel, and understand the particularities of the alleged scheme and the legal documents filed in this litigation, not to mention to be capable of controlling, if not actually controlling, the proceedings, requires some relaxation under the circumstances. Certification of a class should not be rigidly denied because defendants may have created an extraordinarily complex scheme to defraud. With an effort to satisfy the Fifth Circuit's high standard for a layman class representative under the circumstances alleged here, the Court examines each of these individuals' knowledge about and understanding of the litigation, including from sources other than counsel, and their ability and willingness to take an active role in the

ongoing preparation of the case, to monitor the proceedings and the lawyers, and that they understand their obligations as class representatives to protect the putative class' interests.

Based on the deposition testimony taken in August or September of 2003, Certain Individual Defendants have challenged as inadequate six putative class representatives for § 20A claimants who allegedly purchased Enron stock contemporaneously with certain Defendants' sales of theirs:  Dr. Richard Kimmerling, Michael Henning, Dr. Fitzhugh Mayo, Joseph Speck, Ben Schuette, and John Cassidy.

Dr. Richard Kimmerling (deposition is Ex. 17 to #1855), identified by Lead Plaintiff as a practicing surgeon in an Atlanta suburb, testified that initially he had read newspaper articles and observed television coverage about the Enron collapse, congressional investigations, the alleged fraud and deceit, and the tremendous losses suffered by many other people.  He believes he learned on the Internet about the proposed class action suit.  Stating that he does not know the specifics of the fraud and could not name the defendants, but thinks that there were quite a few people involved and a number of enablers who helped them perpetuate it, "[s]o I think they're all guilty," the only defendants he could name were Ken Lay and Jeff Skilling.  Lay was one of those stating that "the company was just doing great, and . . . couldn't be doing any better, and they were going into new fields and great promise for the future," but because "he was selling off his own stock during that time, I would think he was lying."  #17 at 24, ll. 12-20.  Enron's subsequent filing for bankruptcy demonstrated to Kimmerling that Lay's claims were inaccurate.  The deponent also thought there was "a lot of manipulating" of the books to make things look better than they were, obtaining loans from the banks and counting  them as assets.  He complains that Skilling gave "a high rating for his company too, while he was there," but believed Skilling knew his statements were false and "bailed out, took his money and ran, didn't publicize what was going on".  *Id.* at 28, ll. 1-9.  He though both Lay and Skilling, given their positions at Enron, would have known what was going on.

Hearing about a potential class action against Enron, Dr. Kimmerling used the Internet to discover Milberg, Weiss, with which he was previously unfamiliar.  Dr. Kimmerling stated that the

complaint was provided to him by his attorney, that he read a good bit of it, "enough for me to know that--that I wanted--wanted to be a part of" the lawsuit.  *Id.* at 42., ll. 16-19.  He received a lot of other materials from the law firm, which showed what the attorneys were doing on the case; he stated he could not read all of it, but "perused it."  He also talked on the telephone with his attorneys two or three times, met face-to-face with them, and generally had spent about twenty-five hours, "probably more," up to his deposition in the case.  He spent an hour or an hour and a half skimming the Consolidated Complaint and about the same on the Amended Consolidated Complaint.  Asked what he was doing to monitor the litigation, he replied that he had not called or sought additional information and was pleased with the law firm's efforts.  When asked about future plans to insure that Milberg, Weiss was putting forth truthful allegations, he replied, "I'm depending on them."  He stated that as a class representative he had a duty "to perhaps be a little more informative [*sic*] than I am concerning the ongoing investigating and the court proceedings in the future."   When asked if he understood the nature of the fiduciary duty he owed to the class members, he answered, "as an example, to be here, going through this interrogation and answering as best I can."  *Id.* at 57, ll. 2-8, 11-19.  He could identify the three-year Class Period for actionable claims permitted by the law, though he did not use the legal term "statute of limitations," and that as a class representative he would represent all shareholders who purchased Enron stock during that period unless they opt out of the class.  Asked what the nature of the claims are in this suit, he responded, "[T]he stock was falsely elevated in its evaluation and that, through attorneys, accountants and banks, they enabled it to appear real."  *Id.* at 61, ll. 12-15.  He further stated, "[T]he basis of the claim is fraud, and there's a lot of people that enabled the fraud to occur.  And, rightfully, all those people are named."  *Id.* at 62, ll. 9-11.  He continued to read articles about Enron and also a book (*Pipe Dreams*) sent to him by his attorneys.  He skimmed a couple of rulings made by Judge Harmon, but had only the vaguest idea of their effect on the suit.[103]

---

[103] "[S]he agreed that the majority of people that had been named were involved, and--and any attempt of theirs to get out of it was denied.  And I think there was someone, a lead attorney or something for Enron that was released."

Michael Henning (Ex. 18 to #1855), an Indiana insurance executive who retired in Florida, also used the Internet to contact Milberg Weiss after reading about Enron, trying to find out as much as he could about the collapse, and deciding on his own to become a named plaintiff in this class action.  He had read the complaints, but not Judge Harmon's opinions, and relied on the attorneys to inform him about which parties were dismissed from the litigation.  At the time he was deposed, he stated that he had spent about ten hours on the case, two or three of them on the Consolidated Complaint.  He demonstrated only a vague idea of the alleged fraudulent scheme to keep the stock price up and "make themselves wealthy along the line," involving Enron officials, auditors, attorneys, and banks, and of the roles of Skilling, Fastow and Lay.  He stated that the trading arrangements with the bank were actually loans, but the debt was not shown on Enron's balance sheets.  He insisted that Skilling must have known about it because of his position with the company and his brilliance, but was unable to articulate any specifics about these Defendants or transactions alleged in the complaint.  He had no source of information other than the complaint.  He recognized a few names of Enron officers or directors, but did not know what they did.  ("[T]hey're all listed there.  I--I guess I could go through and find out, but I'm not--I'm not--I don't know if all those guys are directors or officers.  I assume they are.").  He understood that as a class representative he would represent shareholders of common and preferred stock and stock options as well as purchasers of Enron debt who purchased during the three-year Class Period from October 1998 to November 2001, including those with insider trading claims, but did not know why it was not a five-year period, in light of Enron's restatement of five years' of financial reports.  He was willing to give as much time as required and would participate wherever needed, including attending meetings and testifying.  He thought it was the attorney's job, not his, to investigate.  Asked how he would monitor and control Milberg, Weiss's actions, he replied, "I don't know that I can control all of them.  Certainly the lead plaintiff, I'd look to them to be the lead on that, and I would--I'd participate in any kind of meetings or anything that they wanted me to participate in."  *Id.* at 97, ll. 1-5.  Asked if he intended to conduct his own independent investigation of the facts or of his attorney's work in the future, he responded, "Only if it would be raised by maybe one of the

other plaintiffs or whatever.  I--I can't image that I would be invest--I think that's the attorneys' job."  If any differences of opinion or regarding the direction of the litigation arose, he stated that he "would take the lead of the--lead plaintiff, I think, and participate to the degree that they wanted me to."

Dr. Fitzhugh Mayo (Ex. 24 to #1855), a family doctor, founding director of the Medical College of Virginia and Richmond, and a seemingly savvy investor who subscribed to and read securities newsletters, followed financial shows on television, attended investment seminars, monitored stock prices on the internet, and investigated Enron stock for a year before purchasing it, also monitored stock prices over the Internet.  He learned of the class action on the Internet and filled out a form online.  He could not remember if he then called the Milberg Weiss law firm or it called him to ask if he would be interested in being a class representative.  He stated that the law firm regularly furnished him with information about the proceedings in the litigation.  He testified that he spent about three hours a week reading the information and read parts of the amended complaint in about five or six hours.  He remembered allegations in the complaint that "Fastow concocted some off-the-books transactions that distorted the--the true financial status of Enron," that accountants and banks enabled these transactions by giving a false impression of the worth of Enron stock, and the time and duration of the Class Period.  Before the complaints were drafted he did not call his attorney and ask to review or have input into the drafts.  He kept a file of the Enron documents sent to him by his attorneys, tried to read at least 30% of it (skimming and then focusing on sections he thinks are particularly important), discussed the case with his lawyer both face-to-face and on the telephone, and participated in a couple of conference calls among people who might become class representatives.  He stated that his responsibility as a class representative with respect to class counsel is to expect an explanation from them of all the strategic planning going into the handling of the case and that he would expect them to listen to the class representatives' opinions, communicating perhaps once a month.  He further testified that he was not aware that mediation was ongoing, that he was not asked for his views about the settlement strategy in the case, nor had

his lawyers communicated with him about settlement, although he would ask for an explanation if he learned settlement discussions were going on.

Joseph Speck (Ex. 20 to #1855), a retired certified public accountant from Peoria, Illinois now living in Florida, listened to stock discussions on CNBC and bought Enron stock after hearing of its entry into the broadband market. He stated emphatically that the fact that Enron had to write off a billion dollars in assets "[p]roves that they were guilty. . . . [T]his was too gross because it had accumulated over a period of time." He described the amended consolidated complaint as charging Enron officers with making false statements and authorizing reports which they knew were not correct, Lay with okaying bonuses on contracts that had no chance of success, attorneys with approving things they should have known were wrong, Arthur Andersen and the banks with going along, the banks with making disguised loans to Enron and the SPEs, and the auditing committee with negligent oversight. He did not recognize the names of many individual Enron officer defendants (e.g., he did not recognize Rick Causey, Mark Frevert, Stan Horton, Ken Rice, Jeff McMahon, Cindy Olson, Joe Sutton, Kevin Hannon, Mark Koenig)[104] and stated that he was "relying entirely on our attorneys—on these facts" and admitted that he had no means other than information from Milberg Weiss to monitor developments the class action. When asked, he said he was unaware that any banks other than J.P. Morgan Chase and Citigroup and their subsidiaries were defendants in the litigation. The major source of his information about his claims was the two complaints; his only other source was what he read in the newspaper or saw on the television. He conceded that the sum total of his knowledge of the facts relating to the claims was from the complaint, which he assumed was true. Other than the consolidated and the amended consolidated complaints, he said he had not read any documents filed in the litigation and had only heard about the undersigned judge's opinions from his counsel. He knew he was seeking to represent people who bought Enron securities during the three-year class period, which was determined by the

---

[104] Speck did recognize Rick Buy as "the guy that married the stripteaser" and Rebecca Mark-Jusbasche as "the gal that . . . wanted to get to the top, wanted to be the top one, and she was pretty well in charge of the Wessex (phonetic) deal and the--water deal and she blew that very well by engaging in contracts that didn't have a chance."

statute of limitations.  When questioned about his uncertainty and hesitancy about being a class representative, he explained he was not enthusiastic about having to travel to Houston and that being a class representative involves "quite a bit of work potentially . . . but as I say, somebody's got to do it."  He further stated that "it wasn't a job you go out and ask for [because it involved a great deal of reading, of work . . . [and] potentially having to travel. . . yet I felt at least that my background was better than a lot of other people, a lot of other stockholders would have been, and I felt that I should.  And, of course, I'm retired so I did have the time . . . ."  As a class representative, he stated that he could and would contact Milberg Weiss if he found something that was contrary to the allegations in the complaint and that his goal was to obtain the maximum recovery for the class.

Ben Schuette (Ex. 21 to #1855), a retired electrical contractor from Corpus Christi, Texas, testified that he chose to be a class representative to try to get back the $140,000 he lost and the money lost by the other class members, as well as to right the wrong done to them.  He stated that to fulfill his obligations as a class representative he goes through the information sent to him by Milberg, Weiss ("I don't read it every line, but I go through it.  If something catches my eye about particular names that I see that I know of, I read it and try to inform myself about what's going on.").  He does not otherwise keep his eye on the litigation because that is the attorneys' job and "[t]hat's what we pay them for."  He testified that he had no responsibility for the truth or accuracy of the allegations in the complaint even though they are made on his behalf and he is a proposed class representative.  Other than reading the communications from the law firm, he stated that he did nothing to investigate the allegations in the case.  He did not recognize the names of many of the individual defendants (e.g., John Wakeham, Charles Walker, Bruce Willison, Lawrence Greg Whalley, Herbert S. Winokur, John Zegarski), he did identify one bank defendant (Citicorp), he stated that Vinson & Elkins served as Enron's lead counsel and "approved legal documents for Enron to enable them to do what they wanted to do," and he had a vague idea of who was in the plaintiff class.  Only with prodding on cross examination by his attorney did he identify the Class Period as the three years ending November 2001.  When asked what the bank defendants allegedly

did, he responded that they "enabled Enron to do their shady trading, shady deals.  Without the money, they wouldn't have been able to do it. . . . They provided the money, and they signed off on deals to make it work."  He stated that thus far he had spent between five and eight hours on the litigation.  He spent several hours twice with his attorney, the rest examining documents sent to him by the firm.

John Cassidy (Ex. 23 to #1855), retired after working at Pacific Telephone for over thirty years and living in San Diego, California, testified that he wanted to be a class representative "to see justice done for all the . . . fraudulent actions that were taken by Enron et al.," which he explained as follows:

> [T]he officers and the board . . . created an impression on the financial statements that the company was solvent when it wasn't. They put that information over to Andersen, the accountant.  They concurred when it wasn't true.
>   It went from there to the banks.  The banks not only concurred, they financed it, and they brought into–-they created more straw companies.  I'm using that straw company as an expression of SPEs.  They created all these straw companies, and then they financed those, and then they implemented those and put them into-–into-–into the action.
>         And finally, we get to Vinson & Elkins, and–-and-–and they did nothing to-–but concur in the–in–in the proceedings, which means, to me, they condone it. If they didn't–-if they didn't stop Enron, then that was the final fire wall.  There was nothing else.  It burned to the ground.

Ex. 23 at 40, ll. 10-41, l.3.

Cassidy testified that he and his wife had done computer research on investing and had relied on "glowing reports" about Enron in Utility Forecaster, Money Line and other periodicals in deciding to buy his Enron securities directly through Enron's direct service and reinvestment program.  Moreover, he subsequently learned from information in the newspaper and later from checking public SEC records that he invested the same day that Ken Lay sold stock.

Cassidy testified that he read everything his attorneys sent him, including the complaints (although "not through"), and the correspondence between them:  "Further than that, I just do my homework with the attorneys."  He did not read the undersigned judge's opinions, but only a report about them from his attorneys.  He knew the litigation was in the discovery phase, was going to mediation shortly, and if that failed, would go to court (trial).  He testified that he believed that the price he paid for Enron stock was inflated because of the enormous debt accumulated in the SPEs,

transferred and resold from one to the other, thereby creating an asset on Enron's balance sheet when there was no real profit.

Cassidy testified that, as a class representative, he would represent all the investors in securities of any kind that were purchased between October 1998 and November 2001, that he "would have to keep the interest of my class people equal to mine so I don't take any personal re[muneration] or whatever else, benefits, over them."  Cassidy further stated that he "must keep informed, which my attorneys have done, kept me informed," and that he would "testify at trial, if necessary."  Ex. 23 at 51, ll. 4-21.  Nevertheless, he also remarked that he did not think he was qualified to supervise his attorneys, but would give them any information they requested.  In the event of a settlement, he understood that he was responsible for getting the best settlement possible "for my class and for myself, equal."  He guessed that he had spent about 36 hours to date on the case, participating in conference calls, visiting with his attorney, and reviewing voluminous documents ("but I didn't thoroughly go through them"), and he hoped the time required after this day would be minimal, but he would spend substantial time on the case if it were needed.  Cassidy represented that he did not do any independent investigation and did not gather any evidence other than "what he supplied to the counsel," although he reviewed the media and watched television reports on the Enron matter.  He knew that he would not be compensated for serving as a class representative; that his attorneys were "on consignment" and would get paid if there was a settlement; that if the plaintiffs won, the defendants would pay the attorneys' fees, but if the plaintiffs lost, the plaintiffs would absorb the expenses.

When asked about the individual defendants, he said he did not know the names of Norman Blake, Jr., Ronnie Chan, James Derrick, John Duncan, Kevin Hannon, Ken Harrison, Stan Horton, Robert Jaedicke, Mark Frevert, Joe Foy, Steven Kean, Charles LeMaistre, Rebecca Mark-Jusbasche, John Mendelsohn, Jerome Meyer, Cindy Olson, John Urquhart, Bruce Willison, John Wakeham, Lawrence Greg Whalley, Herbert Winokur, Jr., and Paulo Feraz Pereira.  He recognized the names of, but knew nothing about, Robert Belfer, Richard Causey, Jeffrey McMahon, Frank Savage, and Charles Walker.  He knew the names of and stated something about Richard Buy ("I

don't know where he fit in the puzzle. . . . . Perpetrating the fraud that we see all up and down the line.  He kept condoning it because he was in the organization. . . . I don't [know what he did in the organization, but he was employed."); Wendy Gramm ("She's the wife of the senator . . . . she was a director, and she didn't do anything to stop the—to put out the fire.  So she was as involved as the rest of the board.  She didn't continue—she didn't fulfill her fiduciary capacity."); Joseph Hirko ("He is associated, I think, with the Portland, Oregon, West Coast CEO or something of that—after Enron purchased it."); Mark Koenig ("I remember as being on the defendant's list, but I don't know where he fit."); Ken Lay ("[H]e ended up as—chairman of the board . . . [P]rior to that, he was chief—chief financial officer, and he—he made his way up the chairs.  He was CEO and then chairman of the board. . . . [H]e did wrong by doing nothing to—to stop the obvious fraud that could have been—that should have been discerned by Andersen, and before it ever got to—to his desk, he should have—but when he signed off that everything was—was—in the annual report that everything was stated as all of these people said it was, then he was wrong.  Whether he knew about it or not, he was still wrong."); Joseph Sutton ("I don't know too much about him, but I know he was up in the chain of command a little bit higher than some you've mentioned that I suspect."); Jeff Skilling (started the SPEs in the 90's and, as they helped the company, was promoted "up the chain of command, from CEOO to CEEO"; regarding Skilling's resignation he thought Congress "uncovered enough evidence of fraud that—I think he was trying to bail out while he could."); Lou Pai (does not know his function in the organization but "he's prominent in the filings").  Cassidy knew that the bank defendants included Citigroup, Barclays, Merrill Lynch, CIBC, Deutsche, Bank of America and Lehman; he asserted that the banks were "in competition to get Enron's business, offered to finance all these straw companies" and, to enrich the themselves, lent money at very high interest rates to Enron and its false companies that did not exist.

A common, crucial deficiency in all six proposed representatives is nearly total if not complete reliance on class counsel, Milberg, Weiss,[105] for investigation and prosecution of the case

---

[105] Moreover, while several said they found Milberg, Weiss independently by searching the internet, none testified they had done any research about counsel's qualifications or suitability as class counsel.  *See Ogden v. Americredit Corp.*, 225 F.R.D. 529, 535 (N.D. Tex. 2005).  Because

and on the complaints, prepared by counsel apparently without input from the class representatives, for all information about the facts of the case. The deposition questioning evidenced in all six a substantial lack of knowledge about who the named parties are, about the roles played by many defendants, beyond conclusory allegations of fraud. They were unable to articulate specific facts supporting their vague allegations. Most did not understand that their attorneys were paid on a contingency basis. Generally these designated class representatives knew they had lost money in their Enron securities investment and assumed that the defendants, because of their positions at Enron or business involvement with Enron, were responsible, the essence of knowing only that they were "involved in a bad business deal." *Feder v. Electronic Data Systems Corp.*, 429 F.3d at 132, *quoting Berger*, 257 F.3d at 483  "While [plaintiff] cannot be expected to know all of the legal minutia involved in litigating [its] case, [it] should at least have an understanding of why all of the individuals or companies are defendants other than [its] general knowledge that a bad business deal occurred." *Ogden v. Americredit Corp.*, 225 F.R.D. 529, 534-35 (N.D. Tex. 2005).

As reflected in their depositions, these six designated class representatives have little or no knowledge of the litigation beyond that provided by counsel, have not read the majority of documents given to them by their attorneys, nor even read the complaints carefully.  The Consolidated Complaint was about 500 pages, the Amended Consolidated Complaint about 650. The amount of time these six individuals have stated they spent on these key documents, concededly skimming, not reading them, is nowhere near the time a meaningful review would require, and putative representatives' lack of input into the substance of these complaints further suggests their inadequacy as class representatives.  They were unable to name, or even recognize the names of, a large number of the parties, despite the substantial publicity about Enron's collapse and the documents sent to them by counsel; thus it is no surprise that they could not articulate specific facts about the defendants' involvement that would support their vague allegations of fraud.  None researched Milberg Weiss' suitability as class counsel, no less demonstrated that he

---

there is no challenge to the adequacy of designated class counsel, the Court does not place much weight on this failure.

took an active role in monitoring the attorneys and directing or even having input into the litigation. Many showed a lack of zeal. Other than Cassidy, they lacked knowledge of the mediation in the case. They did not know why certain parties were dismissed and others added. They did not know the names of other putative class representatives. Several indicated that because they lost money,

they assumed the defendants at Enron, especially those in high positions, were responsible.[106]   In

---

[106] The Court has read the deposition excerpts of all the designated class representatives and finds those not challenged by Defendants to be adequate, though some are "close questions."  Rather than go into detail about each, as an example of an individual class representative for comparison, the Court examines the deposition of Michael Bessire (Ex. 16 to #1855) from Lubbock, Texas, previously an executive at Safeway, who summarized the lawsuit's allegations as having to do

> directly with Enron and its chief officers' engagement in fraudulent financial activities, deception, and providing inaccurate information to the public that was making investment decisions and doing it in a--in a knowing way.  And--and then the--the enablers or the banks and the attorneys and auditing firms that went along with these deceptive practices that allowed the--allowed the--that led to the collapse and the financial losses of so many people.

Ex. 16 at 121, l. 23-122, l. 8.   Bessire understood the "fraudulent financial activities as "[s]pecifically setting up debt in companies that were off the balance sheet and borrowing money that--where the debt was not reflected on the balance sheet of the company and then using the borrowed money to report as revenue. . . . [The off-balance-sheet transactions were] not disclosed to the public. . . ." Id. at 122, ll.16-24.  He did state that his understanding came from investigations and information provided by his attorney; he also represented that he had not done any independent investigation of the truth of these allegations because "that's the job of the attorneys." Id. at 123, ll. 6-12.  Nevertheless Bessire qualified that comment, stating that he had, on his own, obtained written materials (press releases, analysts' reports) relating to Enron's restatement of its earnings over five years for over a billion dollars, which made it "in my mind, more factual than allegation and improper--improper bookkeeping and reporting." and led him to be part of the class action and "allow the attorneys to--to do the additional legal research that will be required to make a case out of it." Id. at 124, ll. 6-18; at 125, ll. 1-9.  As noted, a class representative must have a "sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation"; class representatives do not have to "be legal scholars and are entitled to rely on counsel," but they "need to know more than that they were 'involved in a bad business deal.'" Berger, 257 F.3d at 482-83.  "Plaintiffs should understand the actions in which they are involved, and that understanding should not be limited to derivative knowledge acquired solely from counsel." Id. at 483 n.18. Bessire did state that the lawyers, not he, were running the litigation for the plaintiffs. Ex. 16 at 201 at ll. 23-25.  He also commented that although he was not aware that he had any responsibility to direct or monitor what his lawyers were doing, he did have a responsibility to communicate with them "enough to where I'm comfortable with the direction that they are going," and if he was not, "to address it with the rest of the class members." Id. at 150, ll. 1-19.

He knew defendants included Ken Lay, Jeffrey Skilling, and Andrew Fastow, Arthur Andersen and a number of banks, naming Citibank, and brokerage firms, naming Merrill Lynch, but was not familiar with the names of the individual defendants.  He identified two statements by Lay in the months prior to Enron's bankruptcy filing that he believes were inaccurate when made.

As a class representative he was prepared to spend whatever time was necessary on the case and was willing to testify at trial, and to participate generally.  His zeal to participate in a class action against "a huge deception that was intentional" and where "the greed factor is--is to the scope that the American public's never seen before," was effectively expressed:

> And I think I want to, in some way, take a stand, and if that means, you know, doing--being deposed or appearing at a trial or, you know, having to memorize 1,150 pages of documents to make this thing happen, I'd like to see--I'd like to see a ruling that would prevent this type of action, if in fact . . . it's seen by a judge and jury that it did take place in the--in what I perceived, I'd like to see that--a ruling that's so grave that it provides a disincentive for anyone to ever think of doing this again.  I

sum, the Court finds that these six designated class representatives are not adequate.

Certificates signed by some of the named class representatives[107] and deposition testimony demonstrate that they have discussed the case with counsel, are knowledgeable about claims and defendants in, and the general status of, the litigation, recognize as their fiduciary duty that the class claims come before their own individual ones, have as their goal the maximization of the recovery for the class, are able and willing to play an active role throughout, including testifying at trial if needed, and will accept no payment for serving as class representatives other than recouping reasonable costs and expenses incurred in that role that are approved by the Court.

Alliance and the Outside Directors have challenged the standing and adequacy of Staro Assets Management to represent purchasers of Enron's Zero Coupon Convertible Senior Notes due 2021 for claims under § 11. The Court has reviewed its designated representative Donald T. Bobbs' Deposition (whole document available as Ex. A to #1785), the certification signed by its General Counsel Colin Lancaster (Ex. 40 to #1855), and the Declaration of Lancaster in support of Staro's Motion for Appointment as Lead Plaintiff and Approval of its Selection of Lead Counsel in *Newby* (Ex. 40 to #1855).

Staro Assets Management, an institutional investor, served as investment manager of a group of private investment partnerships ("Staro Group") for which it purchased the Zero Coupon Notes and as appointed investment manager or general partner for each of the funds it manages, with complete discretionary authority over the investment decisions of all the funds. It brings suit on behalf of the Staro Group and all of the funds. Declaration of Colin Lancaster, Staro's general counsel.      Section 11 of the 1933 Securities Act permits "any person acquiring such security" to sue. There is a split in the courts over whether an asset manager to which its clients have delegated complete authority and discretion  to make investment decisions for them, is a

---

think there are hundreds of thousands of people outside the scope of just employees whose lives were altered forever, and people should not be able to personally benefit at the cost, you know, of tens of thousands or hundreds of thousands of people. And so I want to participate . . . .

[107] See exhibits to Instrument #1446 (Declaration of James I. Jaconnette, Exs. 5-25) and #1855 (Lead Plaintiff's Appendix in Support of Replies for Class Certification).

"purchaser" under § 11.  The clear trend, with some variation in requirements, is not only to find standing to sue, but also the ability to serve as Lead Plaintiff or class representative where the investment manager, although not purchasing the securities at issue for its own account, is authorized as the client's (clients') attorney-in-fact, with unrestricted decision-making authority about purchasing securities on behalf of its client(s) and authority to sue on the client's (clients') behalf.  *See, e.g., EZRA Charitable Trust v. Rent-Way, Inc. ("Rent-Way I"),* 136 F. Supp. 2d 435, 441, 443, 444 (W.D. Pa. 2001)(observing that the 1933 Act does not require a plaintiff to be an owner, but only a purchaser, and appointing Asset Manager as Lead Plaintiff because (1) its "financial interest is so aligned with its clients' financial interest that the two are synonomous," since the Asset Manager had a significant financial interest as incentive to recover the full amount lost by its clients "in order to maintain their goodwill and future business," (2) its supporting declaration stated it was an attorney-in-fact for its clients and authorized to bring suit on their behalf," and (3) because it had unrestricted decision-making authority regarding the purchase and sale of stocks for its clients); *EZRA Charitable Trust v. Rent-Way, Inc. ("Rent-Way II"),* 218 F.R.D. 101, 107-09 (W.D. Pa. 2003)(finding standing because the investment advisory agreements between the asset manager and its clients giving the Asset Manager full authority in its discretion to purchase and sell stocks, bonds and other securities and manage the daily affairs of the accounts; "we do not view the 'power-of-attorney'/'attorney in fact' language (or lack thereof) as a controlling factor," but rather the "level of discretion exercised . . . in the day-to-day purchase of securities for its clients")); *Smith v. Suprema Specialties, Inc.,* 206 F. Supp.2d 627 (D.N.J. 2002)(requiring not only evidence that the asset manager has the authority to invest on the client's behalf, but also to initiate suit on its behalf)[108]; *In re DaimlerChrysler AG Sec. Litig.,* 216 F.R.D. 291, 298-99 (D.Del. 2003); *Weinberg v. Atlas Air Worldwide Holdings, Inc.,* 216 F.R.D. 248, 255 (S.D.N.Y. 2003)("Generally a client's grant of authority to an investment manager to purchase

---

[108] In *Smith v. Suprema*, the district court refused to appoint the asset manager with twenty-two independent clients (which did not work together effectively as a group, so the asset manager could not function as a "single investor") as a Lead Plaintiff because its clients were the actual purchasers of the securities at issue, the authority to invest is not the same as authority to initiate suit, and it did not show that its clients had authorized it to file suit.

stock on his or her behalf does not also confer authority to commence suit on his or her behalf. However, when the investment authority is also attorney-in-fact for its clients with unrestricted decision making authority, the investment adviser is considered the 'purchaser' under the federal securities laws with standing to sue in its own named."); *Roth v. Knight Trading Group, Inc.*, 228 F. Supp. 2d 524, 529 (D.N.J. 2002)(same); *In re the Goodyear Tire & Rubber Co. Sec. Litig.*, No. 5:03 CV 2166, 2004 WL 3314943, *5 (N.D. Ohio May 12, 2004)(same); *Olsen v. New York Community Bancorp, Inc.*, 233 F.R.D. 101, 107 (E.D.N.Y. 2005)(same); *In re Able Laboratories Sec. Litig.*, __ F. Supp. 2d ___, No. CIV. A. 05-2681 (JAG), 2005 WL 851638 (D.N.J. Apr. 3, 2006)(concluding that investment advisor with complete authority over its trades and acting as agent and attorney-in-fact with full power and authority to act in connection with its investments had standing to sue). *But see In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.,* 209 F.R.D. 353, 358 (S.D.N.Y. 2002)(Finding that the fact that the investment manager "was not the legal purchaser of Turkcell stock prevents them from suiting on behalf of its investors"); *In re Bank One Shareholders Class Actions*, 96 F. Supp. 2d 780, 784 (N.D. Ill. 2000)(refusing to appoint investment manager Lead Plaintiff because *inter alia* it was "not a buyer for its own account, standing instead in the place of whatever number of investors are participants in the managed fund."). *See generally* Brian P. Murray, *Does an Asset Manager have Standing under the Federal Securities Laws*, 79 St. John's L. Rev. 405 (Spring 2005).[109]

---

[109] Murray observes, *id.* at 411,

> An asset manager who purchases for a client's account often has some, if not all, of the attributes viewed as desirable in a lead plaintiff [or class representative]: sophistication, wealth, experience, and incentive to achieve a large recovery. Although the purchase is not made with the manager's own money, the asset manager's reputation and credibility are on the line with the client, and an asset manager has every incentive to achieve a recovery and get back in its client's good graces.  In addition, it is almost impossible to get in a position to manage someone else's money without having achieved a certain level of sophistication and experience in financial matters.

At the close of his article, *id.* at 418, he concludes,

> The trend of authority is to allow asset managers to serve as lead plaintiffs or class representatives.  These decisions seem more consonant with the purpose of the federal securities laws, which, as one court noted, is "to protect decision-makers in

Here the Declaration of Colin Lancaster, filed in support of the Staro Group's motion for appointment as Lead Plaintiff of a debt securities class in *Newby*, Ex. 40 to #1855, states that "Staro is either general partner[110] or the appointed investment manager for each of the funds that it manages"; that it "has complete discretionary authority over the investment decisions of all the funds that it manages"; that it "has authority to bring suit on behalf of all its affiliates and the funds it manages." Thus the Court finds there is evidence demonstrating that Staro does have standing to sue on behalf of § 11 claimants here. The Court therefore rejects Alliance's charge that Staro lacked candor in not revealing its lack of standing because it never purchased the zero coupon bonds for its own account.[111]

The Court acknowledges that Staro might well be subject to unique defenses. According to Bobbs' testimony, Staro did purchase the zero coupon notes along with bonds, stocks, puts and

> securities transactions. The federal securities laws are premised on a theory of full and fair disclosure. An asset manager, who has been granted investment discretion and actually purchases the securities, even if for the account of another, is in the best position to assess whether it is the victim of fraud or misrepresentation and should be accorded standing to sue. [footnote omitted]

[110] Staro's typical partnership agreement (second part of Ex. 41 to #1855) states that the general partner is authorized "to commence or defend any litigation involving the Partnership or the General Partner in its capacity as General Partner," "to make all investment and trading decisions to sell, hold and purchase Securities (including the short sale or lending of Securities)," and authorizes the general partner to acts as it "lawful attorney-in-fact."

[111] Similarly, to the complaint that Staro failed to list all the securities transactions Staro had with Enron on its application to serve as Lead Plaintiff and reply brief in *Newby*, the Court finds that Staro's explanation on its face that Staro's claim rests only on the zero coupons is reasonable and not indicative of deception.

The same arguments of edited disclosure (listing only bond investments and leaving out stock) and the absence of any loss because of the net effect of Staro's offset convertible arbitrage strategy were raised against Staro in *In re Sepracor Inc. Sec. Litig.*, 233 F.R.D. 52 (D. Mass. 2005). Judge Lasker rejected

> Sepracor's suggested cumulative methodology, which includes offsetting gains in the loss calculation. To the contrary, I find a transaction-based methodology, which allows claims for unprofitable transactions without offsetting that recoverable loss with gains from profitable transactions, to be more consistent with the provisions of the statute and the Rule. . . . Both provisions make it illegal for someone to make materially misleading statements "in connection with the purchase or sale of any security." . . . Neither the statute nor the Rule authorize any kind of aggregation of purchases or sales that could sanction the cumulative approach.

*Id.* at 54.

at times options as part of a unified arbitrage investment strategy, and, as part of that strategy, it also purchased additional Enron securities even after the November 8, 2001 announcement that Enron was restating its financials for December 1997 through 2000 and admonishment not to rely on prior financials, suggesting fraud.  Bobbs testified that although Staro lost about $40 million in the bonds, it was able to offset that by short selling equity[112] and buying puts.  Dep. At 172. Nevertheless, as Judge Lasker ruled in *Sepracor*, 233 F.R.D. at 54,

> Convertible arbitrage is not inconsistent with reliance on the integrity of the market. Accordingly, the argument that Staro is subject to unique defenses that might rebut the presumption of reliance to the detriment of the class members' case does not make the grade.  Moreover, courts are traditionally reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members.  As the Court of Appeals for this circuit has stated: "where common issues otherwise predominated, courts have usually certified Rule 23(b)(3) classes even though individual issues were present in one or more affirmative defenses.  After all, Rule 23(b)(3) requires merely that common issues predominate, not that all issues be common to the class."  *Smilow v. Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32, 39 (1st Cir, 2003)(internal citations omitted).

Nevertheless, as this Court has found was the case with the six other challenged class representatives, the deposition of investment analyst[113]and designated representative Bobbs who worked on the Enron purchases or investment strategy for various Stark-managed funds, reveals

_____

[112] Dr. Blaine Nye, a financial economist and Lead Plaintiff's expert on market efficiency, defines a "short sale" as

> the sale of a stock that an investor does not own.  When an investor holds the belief that a stock price will decline, he can borrow the stock, sell the stock, and then buy the stock back later to return it to the lender.  If the price drops between the time that the short seller sold the stock and he buys it back, the short seller realizes a gain. Thus short-selling can facilitate market efficiency by allowing borrowing and selling of stock when investors believe that the price could decline.

#4390 at 21.

[113] Bobbs explained his job:

> Well, I am an investment analyst, so the real crux of my investments all originates from analyzing publicly filed financial statements that companies are required to issue that are presented in accordance with generally accepted accounting principles.
>     And I rely heavily upon those publicly filed financial statements to--to--form my opinions and to evaluate prices of securities that are issued by companies who file those financial statements.

Bobbs Dep. At 15-15.  In addition to the financial statements, he would review the offering memorandum, *id.* at 31, and would read and rely on Arthur Andersen's audit opinion, *id.* at 51.

his inadequacies as Staro's designated class representative because he fails to demonstrate knowledge about the case and an interest in, no less the ability for, controlling or monitoring the lawyers prosecuting the litigation.  Bobbs lacked knowledge about basic aspects of the relationships between Staro and the mutual funds and limited partners and about the *Newby* litigation, and he relied on his attorneys for practically all information.  With regard to the initial class action complaint filed by Staro[114] against Arthur Andersen LLP, Kenneth Lay, Jeffrey Skilling and Andrew Fastow, before joining *Newby*, Bobbs testified that he did not participate in discussions as to who specifically should be sued and did not read the complaint before it was filed, but relied on his attorneys (Dep. At 60); he was not aware that the fraud claim (under § 10(b) against the Outside Directors had been dismissed or why (Dep. at 66); he had not read any of the undersigned judge's orders in *Newby,* but relied on his in-house counsel to do so (Dep. At 67); and even though Staro had transactions in Enron securities after the end of the proposed class period, he left determination of the class period to the lawyers (Dep. At 162).  Although he was aware that Staro served as a class representative in the *Sepracor*, *Global Crossing*, and *Iowa Beef Processors/Tyson*, he did not know the details of any of them (Dep. At 23-23, 76-80); he did not know if Staro had informed its limited partners, to which Staro has a fiduciary duty, about the Enron lawsuit or that Staro sought to serve as a class representative, but assumed counsel made all such decisions (Dep. At 90-93); he did not know which attorneys filed the amended *Newby* complaint, which he did not "recall looking at . . . . It was something our lawyers handled for the most part." (Dep. At 95); although he did provide facts, he did not receive a copy of the amended complaint before it was filed but assumed "our general counsel or one of our other attorneys" did (Dep. At 96); he never talked to anyone from Milberg Weiss, but only his in-house counsel (Dep. At 97); the in-house attorneys decided to add defendants to the § 11 claims (Dep. At 97, 228); contrary to his lawyers' argument in the motion to be appointed Lead Plaintiff, he stated clearly that he did not think that the equity and debt classes in this litigation have conflicting interests (Dep. at 140-43); he testified that the

---

[114] *Staro v. Arthur Andersen, et al.*, H-01-CV-4480, filed on December 21, 2002.  Ex. 39 to #1855.

litigation did not "require a substantial amount of my time at all. . . . [I]t requires certainly more time on the part of our in-house counsel [Dan McNally and Colin Lancaster]," and he did not know whether they attended any hearing in the case or how often they spoke with Milberg, Weiss or the Regents (Dep. At 187); he did not know that mediation had been ordered or whether any representatives from Staro attended it (Dep. at 188); when asked who was keeping up with the zero coupon note holders, mediations, and strategy, he responded, "I'm sure there's folks that are responsible that are on the team, but I'm not sure exactly who that would be, in-house counsel or outside counsel or anybody else" (Dep. at 189); he professed ignorance about expenses born by Staro, how damages would be calculated for the zero coupon noteholders, or what legal fees had been paid to anyone, but left these matters to counsel (Dep. at 190-91); he could provide no more specific discussion of the alleged role of the bank defendants than that "they were involved in a major way in assisting the company to pull these fraudulent transactions off and hid significant amounts of debt off of the company's financial statements" (Dep. at 211) and "That was something for my attorneys to discuss, specifically what our claims are against the banks" (Dep. at 212); and he stated about the most current complaint, "I have seen it and scanned it.  To be able to tell you that I read it word for word would be an overstatement.  I rely upon our attorneys to-to do that." (Dep. at 214-15).

For these reasons the Court does not approve an appointment of Staro, as represented by Bobbs, as a class representative.

## I.      Presumptions of Reliance

## 1.      Affiliated Ute Presumption Applies

Under Fifth Circuit law, to trigger the *Ute* presumption of reliance, the Court must first determine whether Lead Plaintiff's allegations in the First Amended Consolidated Complaint "primarily" address conduct in a scheme to defraud and/or focus on material misrepresentations. Synonyms for "primary" used in this context would include "principal," "main" "chief," or "first in importance."  As earlier in this litigation, the Court finds that Lead Plaintiff's suit targets an overarching, concealed scheme to defraud, which involves a large number of alleged material

misrepresentations or omissions, but primarily aims at wrongful conduct by key participants that allegedly employed a device, scheme or artifice to defraud or engaged in an act, practice or course of business that operated as a fraud, under Rule 10b-5(a) and (c)).  Moreover, as discussed below, because a number of the alleged misrepresentations are not actionable under *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353 (5th Cir. 2004), the number of viable misleading statements alleged is greatly reduced.

Financial Institution Defendants have argued that the *Affiliated Ute* presumption does not apply because they had no duty to disclose their conduct to Plaintiffs.  Courts in this Circuit have recognized "the duty not to engage in a fraudulent 'scheme' or 'course of conduct' [that] could be based primarily on an omission."  *Ayres*, 845 F.2d at 1363 & n.8; *in accord Heller v. American Properties Reit*, No. Civ. A. SA97CA1315EP, 1998 WL 1782550. *3 (W.D. Tex. Sept. 28, 1998).  *See also In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 381-82 (S.D.N.Y. 2003)("Where a defendant has engaged in conduct that amounts to 'market manipulation' under Rule 10b-5(a) or (c), that conduct creates an independent duty to disclose. . . . [P]articipants in the securities market are entitled to presume that all of the actors are behaving legally; silence that conceals illegal activity is therefore intrinsically misleading and (presuming the illegality is also material) is always violative of Rule 10b-5(b)."); *U.S. SEC v. Santos*, 355 F. Supp. 2d 917, 920 (N.D. Ill. 2003)(relying on *Initial Public Offering* and holding that its rule that violations of subsections (a) and (c) of Rule 10b-5 create an independent duty to disclose is not limited to market manipulation).

Thus the Court concludes that the *Affiliated Ute* presumption of reliance is available to Lead Plaintiff who has pled the necessary underlying facts.

## 2.      Fraud-On-the-Market Presumption

The Court has indicated *supra* that now under Fifth Circuit law the fraud-on-the-market presumption of reliance is applicable to claims under Rule 10b-5(a),(b), and (c).  It thus addresses specific issues here with regard to that application under the facts alleged or not alleged in *Newby*.

### a.      Analyst Reports

As a threshold matter, a novel issue exists as to whether the fraud-on-the-market presumption of reliance under *Basic, Inc.* extends to non-issuer defendants, here specifically analysts employed by underwriters who are alleged to have issued misleading reports in order to artificially inflate the issuing company's stock prices.  A few district courts in the Second Circuit in particular have raised the issue and either have not resolved the question or are divided over the answer.

In the *WorldCom* securities litigation, Judge Cote certified a class over objections from Citigroup defendants that the fraud-on-the-market doctrine does not apply to analysts' opinions in contrast to an issuer's statements.  *In re WorldCom Inc. Sec. Litig.*, 219 F.R.D. 267, 299-300 & n.42 (S.D.N.Y. 2003)(allegations that Jack Grubman's statements of opinion affected the price of WorldCom securities during the Class Period and in light of his annual $20 million salary and positive research reports "it comports with both common sense and probability to apply the presumption here"), *interlocutory appeal granted in part*, *Hevesi v. Citgroup Inc.*, 366 F.3d 70 (2d Cir. 2004)(because "application of the fraud-on-the-market doctrine to opinions expressed by research analysts would extend the potentially coercive effect of securities class actions to a new group of corporate and individual defendants-–namely research analysts and their employers" and because "Citigroup Defendants have presented an issue that is 'of fundamental importance to the development of the law of class actions'").  Judge Cote had declined to "wade into th[e] battle of experts" over the causal link between Grubman's analyst reports and the movement of WorldCom stocks price.  *WorldCom*, 219 F.R.D. at 299.  In granting an interlocutory appeal under Rule 23(f) by Citigroup, which argued that the fraud-on-the-market presumption of reliance cannot apply to analysts' research reports absent a finding by the court that the analysts' alleged misrepresentations actually affected the price of securities traded in an open and efficient market, the Second Circuit recognized "that substantial issues exist as to the applicability of the *Basic* presumption to analyst reports," but did not "decide what evidentiary showing, if any, the plaintiffs must make at the class certification stage in order to benefit from the *Basic* presumption in an action against research

analysts and their employers." *Havesi*, 366 F.3d at 77.  Moreover, the case settled before the Second Circuit decided the substantive issue.

Since then, a few lower courts in the Second Circuit have applied the doctrine to analysts' opinions, but have reached different conclusions about what the plaintiffs must show to give rise to the presumption of class-wide reliance.  *See, e.g., DeMarco v. Lehman Brothers, Inc.*, 222 F.R.D. 243, 246-47 (S.D.N.Y. 2004)(holding that "the 'fraud-on-the-market' doctrine applies in a case premised on a securities analyst's false and fraudulent opinions or recommendations *only* where the plaintiff can make a showing[115] that the analyst's statements materially impacted the market price in a reasonable quantifiable respect"; at the class certification stage "the plaintiff must adduce admissible evidence . . .. that makes a *prima facie* showing that the analyst's statements alleged to be false or fraudulent materially and measurably impacted the market price of the security to which the statements relate.")[116]; *DeMarco v. Robertson Stephens*, 228 F.R.D. 468, 474-75 (S.D.N.Y. 2005)(following the relaxed *Caridad* standard "whether plaintiffs' evidence is 'sufficient to demonstrate common questions of fact . . ., not whether the evidence will ultimately be persuasive," opining that "[w]hile a court may consider expert evidence at the class certification stage, the

---

[115] The Second Circuit employs a much laxer evidentiary standard for class certification than the Third, Fourth, Fifth, and Seventh Circuits and requires only "some showing" of evidence, without the district court testing it and making findings.  *Caridad v. Metro-North Commuter Railroad*, 191 F.3d 283, 292-93 (2d Cir. 1999)(plaintiffs have the burden to make "some showing," e.g., by expert opinion, document, affidavit, or live testimony, but the "district court is forbidden to weigh the evidence on class certification [and] plaintiffs need not establish the elements of Rule 23 by a preponderance of the evidence"); *In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124 (2d Cir. 2001); *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 179 (S.D.N.Y. 2005).  In contrast, the Third, Fourth, Fifth and Seventh Circuits require the Court to go beyond the pleadings to make factual and legal inquiry where necessary for making findings in an informed ruling on class certification.

[116] Judge Jed Rakoff in *DaMarco v. Lehman Bros.* opined, "[T]here is a qualitative difference between a statement of fact emanating from an issuer and a statement of opinion emanating from a research analyst.  A well-developed efficient market can reasonably be presumed to translate the former into an effect on price, whereas no such presumption attaches to the latter. . . ." 222 F.R.D. at 246.  Judge Rakoff denied class certification because "plaintiffs' proffered evidence does not remotely satisfy the aforementioned burden because, even when taken most favorably to plaintiffs, it does not warrant a finding that [the research analyst's] allegedly false statements materially impacted the market price of [the subject securities] in any reasonably quantifiable respect." *Id.* As discussed, in the Fifth Circuit, under *Greenberg*, a showing that the statement affected the price of the securities in an efficient market is required no matter who issues the allegedly misleading statement.

purpose of that consideration is not to evaluate the strength of the plaintiffs' case on the merits of their claims, but to determine whether the requirements of Rule 23 have been met," and finding predominance for class certification was satisfied even though "plaintiffs' showing on reliance is so weak relative to defendants' showing.")[117]; *Fogarazzo*, 232 F.R.D. at 185 (in securities class action against three investment banks that allegedly issued materially misleading analyst reports, Judge Scheindlin rejected the argument "that plaintiffs must *first* prove that a 'material misrepresentation actually distort[ed] the market price,' and only *then* are they entitled to use the fraud on the market presumption to establish that they relied on that price" and concluded that "[w]hether alleged misrepresentations *in fact* altered securities prices is a question of fact, not a Rule 23 inquiry," permitting plaintiffs to proceed to "employ the fraud on the market presumption to prove transaction causation on a common basis).  Meanwhile the Second Circuit has granted review in another case raising the issue of "[w]hether the presumption of reliance established in *Basic* was properly extended to plaintiffs' claims against [] non-issuer defendants," *Miles v. Merrill Lynch & Co.*, No. 04-8026 (2d Cir. June 30, 2005);  *Fogarazzo*, 232 F.R.D. at 184 n.66.  *See also Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 268 (D. Mass. 2005)("The matter is what, if any, showing a plaintiff seeking to benefit from the *Basic* presumption of reliance in a case based upon statements by research analysts––rather than those by securities issuers––must make at the class certification stage is an open question and one on which no circuit court of appeal has yet spoken.")(following *Robertson Stephens*).

 This Court finds that there is precedent for application of the fraud-on-the-market doctrine to analysts' reports, provided that plaintiff makes an adequate showing of market efficiency and

---

[117] In *Robertson Stephens*, the court found that the predominance requirement for class certification was met where plaintiffs provided evidence that the court characterized as "weak," including "(1) the 12.6% rise in the market price of the subject company's stock following the publication of a favorable research report by the defendant investment bank; (2) the decline in the price of the stock in the day after the publication of a newspaper article detailing how the defendant analyst and some of his colleagues . . . sold their own shares [of] the stock while their employer maintained a "Buy" rating for it; (3) the role of the investment bank as the lead underwriter for the company and, accordingly, the 'influence its pronouncements would have on the market'; and (4) the affidavit of an expert 'attesting to the prevalence in the financial literature of 'robust' empirical results supporting a generally-accepted conclusion that analyst rating changes are 'associated with significant stock-price changes."  *Id.* at 473.

meets the other requirements of section 10(b)/Rule 10b-5. *Basic, Inc. v. Levinson* dealt with an issuer that allegedly misled the public by denying that it was engaged in merger talks. 485 U.S. 224. Nevertheless, as noted by Judge Lynch, "Nothing in the language of *Basic* limit its holding to issuer statements alone." This Court agrees, but will apply the Fifth Circuit's more demanding evidentiary standard at class certification to the issue here. *DeMarco v. Robertson Stephenson, Inc.*, 228 F.R.D. 468, 474 (S.D.N.Y. 2005)(*citing and quoting Basic*, 485 U.S. at 247) ("Because most *publicly* available information is reflected in market price, an investor's reliance on any *public material misrepresentations*, therefore, may be presumed for purposes of a Rule 10b-5 action.").

Nevertheless, because the Fifth Circuit has recently concluded that because the group pleading doctrine did not survive passage of the PSLRA, to hold a corporate defendant liable based on its analysts' statements under § 10(b)/Rule 10b-5, at this stage Lead Plaintiff must make an evidentiary showing that the analyst in issue had scienter (intent to deceive, manipulate, or defraud or severe recklessness). *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 364, 366 (5th Cir. 2004)("For purposes of determining whether a statement made by the corporation was made by it with the requisite Rule 10(b) [*sic*] scienter, we believe it appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information of language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.").[118] Discovery in *Newby* is largely over and those analysts sought by Defendants for deposition have been deposed. Plaintiffs have not identified nor provided the necessary facts to make such a showing about specific analysts. Therefore claims against Merrill Lynch entities and Credit Suisse entities based on their analysts' statements cannot be certified for class prosecution and must be dismissed. Because there are intertwined issues involving Deutsche Bank entities and their pending motions that complicate the matter, the Court addresses the claims against them subsequently and separately.

---

[118] As with *Greenberg*, the Fifth Circuit issued *Southland* long after this Court denied Defendants' motions to dismiss.

**b.**    ***Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657 (5th Cir. 2004).**

With respect to *Greenberg's* requirement of actual movement of stock price relating to misrepresentations or disclosures to trigger the fraud-on-the-market presumption of reliance, 364 F.3d at 663, 666, Lead Plaintiff argues that *Greenberg,* which relates to statements, does not apply to its claims against Merrill Lynch for two reasons.  First, Merrill Lynch's purported role as a primary violator in the *Ponzi* scheme is based principally not on misrepresentations, but on its manipulative, fraudulent actions as a major participant in furtherance of that scheme, all of which contributed to the artificial inflation of the price of Enron and Enron-related securities.  Second, Lead Plaintiff argues that Merrill Lynch's analysts' reports were not based on information previously announced by Enron and thus merely confirmatory, but on Merrill Lynch's own conduct and knowledge that there was no reasonable basis for their published forecasts.  *Cooper v. Pickett*, 137 F.3d 616, 629 (9th Cir. 1998)("Even the analysts' optimistic statements can be actionable if not genuinely and reasonably believed, of if the speaker is aware of undisclosed facts that tend seriously to undermine the statement's accuracy.").

Lead Plaintiff insists that the key "truthful" revelation was not the post-bankruptcy disclosure of Merrill Lynch's specific role nor the identification of each perpetrator, but the revelation of pervasive fraud, especially in Enron's announcement of its multi-year restatement in the fall of 2001.  Because the market did not know of Merrill Lynch's involvement (e.g., in power swaps, LJM, and the Nigerian barge transactions) before that partial, but unexpected disclosure of the company's actual financial condition in the fall of 2001, the stock price could not reflect that particular deception.  For the same reason, argues Lead Plaintiff, Merrill Lynch's analysts' statements are not "classically confirmatory"; Merrill Lynch's allegedly false and misleading analyst reports were issued as an integral part of the much larger fraudulent scheme to maintain the inflated securities prices and to lull the investing public into a false sense of security and to conceal the underlying fraud in which Merrill Lynch was a knowledgeable participant.  Merrill Lynch knew its analysts' forecasts were false because of the deals it had done with Enron.  The analysts' reports went beyond merely reporting previously announced information and embellished Enron's business

prospects and future success and operations, recommended Enron securities, and touted Enron's ability to succeed in its projects. Lead Plaintiff contends that *"Greenberg* does not hold inactionable an analyst statement that is one part confirmatory and 99 parts fraud." #2318 at 7. *See Lincoln Savings*, 140 F.R.D. at 432 ("If an enterprise is so laden with fraud that its entire public image is distorted, it is sensible to presume that reasonable investors relied on many material misrepresentations which, in aggregate, created a false image.").[119] Thus Lead Plaintiff argues that application of the rebuttable fraud-on-the-market presumption of reliance is warranted here.

First, as with the Financial Institution Defendants, Lead Plaintiff has failed to allege facts and to show evidence demonstrating that any Merrill Lynch's analyst issued his report(s) with scienter. Thus any § 10(b)/Rule 10b-5 claims against Merrill Lynch based on those analysts' reports are not certifiable for a class action prosecution and must be dismissed.

*Greenberg*, of course, addresses loss causation and requires the plaintiff to prove that a significant part of the stock price decline was more likely than not caused by the alleged misrepresentation.[120] This Court agrees with Lead Plaintiff that *Greenberg's* language expressly refers to alleged **misrepresentations** and misleading **statements**, which must meet *Greenberg*'s requirements to be actionable under Rule 10b-5(b), and not to conduct in an alleged course of business or scheme to defraud, actionable under Rule 10b-5(a) and (c)).

As is the rationale behind the *Ute* presumption of reliance, since the alleged wrongdoing here is concealed conduct ("A person cannot rely upon what he is not told"), logically there is no way to objectively and discretely measure its impact on the price of securities until disclosure of

---

[119] Even if Lead Plaintiff had shown scienter on the part of its analysts, the Court would agree and would not accept as a general principle that analyst reports with financial statements attached are *per se* confirmatory under *Greenberg* because if the analysts did not contribute something of significance, there would be no purpose in issuing the reports. Clearly the substance of such reports would need to be examined on a case by case basis to determine if the analysts's statements independent of the financial statements were false and misleading.

[120] Dr. Nye's Declaration focuses solely on information efficiency in the market for Enron securities. He expressly states that his Declaration "is not a damage study, or a calculation of damages, or a determination regarding loss causation, and should not be construed as such. Any report or analyses on the subjects of damages or loss causation in this matter will be submitted at a later time." #4390 at 89.

that fraud.  As yet there is no case law on point determining whether *Greenberg* applies in scheme liability cases, but logically and in terms of its express language it does not appear to do so.  The Supreme Court has not limited § 10(b)/Rule 10b-5 violations to misrepresentations, but has recognized scheme and course-of-business liability under the Rule's subsections (a) and (c).  *SEC v. Zandford*, 535 U.S. 813, __, 122 S. Ct. 1899, 1903 (2002)(finding broker's alleged fraudulent scheme to sell his client's securities and use the proceeds for the broker's own benefit without the customer's knowledge or consent constituted "fraudulent conduct in connection with the purchase or sale of any security" within the meaning of § 10(b) and Rule 10b-5)("neither the SEC nor this Court has ever held that there must be a misrepresentation about the value of a particular security to run afoul of the Act").  *See also  In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 509-10 (S.D.N.Y. 2005)("where, as alleged here, a financial institution enters into deceptive transactions as part of a scheme in violation of Rule 10b-5(a) and (c) that causes foreseeable losses in the securities markets, that institution is subject to private liability under Section 10(b) and Rule 10b-5"; "The loss causation requirement applies as well where the claims are based on deceptive or manipulative conduct in violation of Rule 10b-5(a) and (c). . . .[T]he loss causation requirement will be satisfied if such conduct had the effect of concealing the circumstances that bore on the ultimate loss.  The schemes involving worthless invoices and the CSFB transactions created the appearance of assets or revenue where there was none and therefore concealed, among other things, the risks that Parmalat would be unable to service its debt and consequently suffer financial collapse. . . . [T]hat risk materialized when Parmalat suffered a liquidity crisis in December 2003.")[121]; *Quaak*, 357 F. Supp. 2d at 341-42 (plaintiff may "demonstrate[] reliance on the manipulative or deceptive device by 'alleging facts sufficient to show (1) that defendants substantially participated in a fraudulent scheme; and (2) when the scheme is viewed as a whole, the plaintiffs relied on it."), *citing Lernout*, 236 F. Supp. 2d at 174.  Thus the Court finds that the

---

[121] The Second Circuit has established as the test for loss causation for scheme liability under § 10(b) and Rule 10b-5(a) and (c) that the plaintiff must show both that the loss was foreseeable and that it was caused by materialization of the concealed risk.  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005), *cert. denied*, 126 S.Ct. 421 (2005).  *Parmalat* is in accord with that standard.  The Fifth Circuit has not addressed the question.

allegations against Merrill Lynch, *inter alia*, based on concealed conduct, i.e., employment of a device, scheme or artifice to defraud or engaging in an act, practice or course of business that operated as a fraud under § 10(b) and Rule 10b-5(a) and (c), are certifiable.

**c.     Market Efficiency and Fraud On The Market:  Enron Securities**

Lead Plaintiff's evidence of market efficiency was presented through its expert Dr. Nye, and Defendants opposed that evidence with the report and testimony of Deutsche Bank's expert Dr. Sundaresan.  This Court is required to apply Federal Rule of Evidence 702 and the gatekeeping standards under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 119 S. Ct. 1167 (1999), to experts' testimony to determine if it is admissible.  Rule 702 provides,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise.

*Daubert* requires the court to determine if the expert's testimony is reliable and if his "reasoning or methodology properly can be applied to the facts in issue," i.e., whether it is relevant and will help the trier-of-fact decide the ultimate issues in the case.  509 U.S. at 590, 593.  The Supreme Court provided four non-exclusive factors to measure reliability, but emphasized that the test must be flexible: whether the theory has been tested; whether it has been subjected to peer review and publication; whether there is a high known or potential rate of error in applying it and whether there are standards controlling its operation; and (4) whether the theory has been generally accepted by the relevant community.  *Id.* at 593-94.

Nevertheless, for purposes of the class certification hearing in *Newby*, the parties agreed that with court approval the expert witnesses would be qualified as experts on the subjects of their report.  Transcript of Class Certification Hearing (hereafter, "TR")(#4558 and 4559), at 55.  The Court notes that no motion to exclude Dr. Nye as an expert has been filed. by Defendants  Dr. Nye has a Bachelor of Arts in physics from Stanford University, and master's degree and Ph.D. in finance from Stanford University, has served as a consultant or expert witness in the areas of market efficiency, materiality, causation and damages in a number of securities suits, and is

President of Stanford Consulting Group, Inc., which provides research and consulting services in financial economics and related areas. #4390 at 1 and Ex. 1. He has testified in a number of trials.

Dr. Nye's analysis is based on the "semi-strong" efficient capital market hypothesis ("ECMH"), established in *Basic, Inc.*, which theorizes that securities markets incorporate into stock prices all current, publicly available information and which Dr. Nye states has received growing acceptance in recent decades. *See generally* #4390 at 10-11; Jonathan R. Macey and Geoffrey P. Miller, *Good Finance, Bad Economics: An Analysis of the Fraud-on-the-Market-Theory*, 42 Stanford L. Rev. 1059, 1077-1083 (April 1990)(discussing the weak, semi-strong, and strong forms of ECMH and use of the semi-strong version by the courts for application of the fraud-on-the-market theory). Dr. Nye states that ECMH has been empirically validated in numerous studies. *See generally* #4390 at 10-11. *See also* Macey, et al., 42 Stanford L. Rev. at 1082 ("'[T]he evidence . . . is sufficiently persuasive that the semi-strong form of 'market efficiency is now an accepted working assumption in financial economics research.'")(quoting J. Lorie, P. Dodd & M. Kimpton, *The Stock Market: Theories and Evidence* at 73 (2d ed. 1985).

Dr. Sundaresan is Professor of Finance and Economics and the chairman of the Finance Department at the Graduate School of Business at Columbia University and is an expert in the area of corporate bonds, default risk, risk management and issues dealing with fixed income securities markets.

After review of the relevant materials in the record and the testimony of Dr. Nye and Dr. Sundaresan at the hearing, the Court approves the stipulation of expert qualifications for both.

There is no dispute among the parties that Enron common stock traded in an efficient market during the Class Period; the disagreement is over the markets for the debt securities.

With regard to demonstrating an efficient market, at the class certification hearing Mr. Lerach argued that the markets for all Enron securities, including the debt markets, were related and tied together, and thus should not be examined in isolation from one another. He further contended that because Enron was one of the largest and most prominent companies in the world, with securities traded on the major exchanges around the world, followed by at least a hundred

securities analysts on a constant basis, was rated by Moody's, Fitch, and Standard & Poor's, and was a seasoned public issuer entitled to use the shortcut S-3 Form because of all the information available to the public about it, it is "preposterous" to argue that the markets were not efficient. Class Certification Hearing TR (#4558) at 29, 32, 34, 11-13.  He maintained that although the Foreign Debt Securities were not issued by Enron, nevertheless their value was dependent upon the financial condition of Enron and was accordingly affected by the scheme to misrepresent and conceal that financial condition.

Lead Plaintiff's market efficiency expert, Dr. Nye, however, emphasized the distinction between stock investor response and bond investor response and the factors for that difference, to be discussed in greater detail *infra*, to explain why events that might affect the price of Enron stock might not affect the prices of the bonds.  Noting that the likelihood of a default by a company is dependent on that company's financial health, which therefore is central to valuation of all of its debt securities, Dr. Nye took a bird's eye approach and argued that "if one of the Enron registered bonds is known to have traded in an efficient market, then one can infer that similar Enron bonds would have also traded in efficient markets because the bases for valuation, such as interest rate environment and default risk, are similar."  #4390 at 58; TR (#4558) at 79 ("[A] bond is priced on two things, interest rate levels[122] and default risk.[123]  Things that have the same default risk at the same point in time, in other words, have the same interest rate environment, are priced the same.").  He therefore selected a representative "exemplar" registered bond (the 6.625% Enron Bonds due

---

[122]   In his Rebuttal Declaration (#4527 at 13), Dr. Nye pointed out that with bonds, when the interest rate goes up, usually the yield goes up and the price of the bond goes down because that bond is less desirable compared with the higher rate of a newly issued bond of similar quality; conversely, typically when the interest rate falls, price of the bond goes up and the yield goes down. The longer the time of a bond to maturity, the more its price is affected by those changes.  He submitted the graph in Exhibit 4, charting the yields of each of the Enron bonds against the yields for Aaa and Baa corporate bonds during the pre-distressed period, which he states demonstrates that the price of each of the Enron bonds moved with changes in interest rates.

[123] Dr. Sundaresan's view is similar.  He identifies as the key factors for pricing debt securities (1) probability of default by the issuer; (2) the likely loss to bond investors in the event of a default; (3) information that influences the issuer's ability to meet contractual bond payments; and (4) macro-economic factors such as interest rates and inflation.  #4481 at 6.

Nov. 15, 2005), Foreign Debt Security, and preferred security as a proxy for the others in the three categories and demonstrated their response to selected events during the Class Period, although he also provided some data about other individual securities, including price and trading volume, where available.   Dr. Nye concluded that during the Class Period the markets for all Enron securities, equity and debt, were informationally efficient.  In his Rebuttal Declaration, he also asserts that his collective approach is appropriate "because information on one security can inform investors about the value of others."  #4527 at 2.

Deutsche Bank's expert on market efficiency, Dr. Suresh M. Sundaresan, concluded the following during the Class Period:  (1) the primary markets for all offerings of Enron debt securities were inefficient; (2) the secondary markets for five of the six Enron Preferred Securities (Numbers 1-5) were inefficient; (3) the secondary markets for all of the eleven Foreign Debt Securities (Numbers 30-40) were inefficient; (4) the secondary markets for eleven of the Enron Registered Bonds (Security Numbers 7-10, 19, 21-22, 25-27, and 20) were inefficient; and (5) Dr. Nye has not established and has insufficient information to determine whether the twelve other Registered Bonds (Numbers 11-18, 20, 23-24, and 28)[124] were sold in efficient markets.  #4481 at 3-4.

Dr. Sundaresan disagreed with any collective or group approach, stating that "[t]he efficiency or lack of efficiency of a security has to be established in each of its cases.  In other words, in order to declare that a particular security traded in an efficient market, we have to establish that the security price of that particular security reacted rapidly to relevant information." TR of Class Certification hearing (#4558) at 240-41; *see also* #4481 at 4.  Taking a microscopic approach, he pointed out that corporate bonds are highly fragmented, with variations in maturity, coupon, security seniority, issue sizes, etc., that would cause different price reactions to information because one might be more senior with greater security than a unsecured or junior bond; "If the security is not homogenous, then one should not try to infer efficiency about one based on the other."  *Id.* at 240-42.

---

[124] Dr. Sundaresan stated that he had found "multiple indications of inefficiency and of non-transparent, non-well-developed markets" for these bonds.  #4481 at 4-5.

Thus while one expert focused on the large picture and the other on close-up distinctions, the crucial difference in their disagreement relates to what "news events" were material to the Enron debt securities investors, as will be discussed.  There seems to be little, if any, dispute that the nature of news that would affect the markets for stock can be quite different and what would affect the markets for bonds, but the experts disagreed about which news events should have and/or did affect the market for the debt securities.

While commentators and courts have recognized that the *Cammer/Unger/Bell* factors were developed to measure the efficiency of stock markets and do not fit the bond markets well, they, like Dr. Nye, have tried applying them where possible to bond markets to determine efficiency. This Court observes that the *Cammer/Unger/Bell* factor approach, endorsed by the Fifth Circuit, is to a substantial degree a group analysis, as the factors would largely yield the same result no matter to what securities offering of a particular company they are applied, which lends legitimacy to Dr. Nye's collective analysis approach.

The Court notes that the *Cammer* court found that "the more persuasive reasoning indicates the proper inquiry involves the market for the specific security at issue." *Cammer*, 711 F. Supp. at 1282.  Yet this Court has been unable to find other cases that establish this proposition as a hard and fast rule.  The Deutsche Bank entities (#4489 at 10) cite the Fifth Circuit in *Bell*, 422 F.3d at 313 ("the market for that particular security is efficient"), but they quote the clause out of context and distort its meaning: the whole clause states that "the mere fact that a stock trades on a national exchange does not necessarily indicate that the market for that particular security is efficient." *Id.*, *quoting Cammer*, 711 F. Supp. at 1281 ("some  companies listed on the national stock exchanges are relatively unknown and trade there only because they met the eligibility requirements.").  Thus this Court does not agree that the only acceptable analysis is one focusing on the market for every security, separately.

Finance theory has been used to support multiple approaches to weighing market efficiency; nevertheless, as is evident from even a cursory review of the literature, it is far from an exact science, but, in its varied forms, provides hypotheses that financial experts test empirically, but with

results are typically subjected to criticism for inaccuracies and weaknesses.  Not only has a uniform standard for measuring market efficiency even for stocks not been established, but no standard at all appears to have been established for measuring market efficiency for debt securities.  Adding to that difficulty, thus far there is little scholarly literature about, and only a few courts have addressed, market efficiency for bonds.[125]  The Fifth Circuit is not among the latter.  Bonds are usually traded in the over-the-counter market.  The *Cammer* court commented, "[w]hile research has not revealed an empirical academic study of the over-the-counter-market[126] (focusing particularly on whether there exists the requisite efficiency for the fraud on the market theory), the absence of such a study is not conclusive on the issue of whether the over-the-counter market is efficient."  *Cammer*, 711 F. Supp. at 1281.

The Court finds that both experts' reports here inevitably exhibit vulnerabilities.  Each focuses on a different portion of the Class Period and data that will support his client's stance in this litigation, and neither study excludes other factors in the market that might have caused price movement.  Nevertheless the information events that each focuses on are company-specific and patently material.  Because Lead Plaintiff bears the burden of proof, the Court examines the basis of Dr. Nye's opinion and the disagreements voiced by Dr. Sundaresan to decide if Lead Plaintiff's expert has presented reliable and admissible evidence and rational argument to establish at least a *prima facie* case of market efficiency so as to trigger the fraud-on-the-market presumption of reliance here; at this stage, the Court's job is not to determine which expert is more persuasive.

---

[125] During the class certification hearing, Dr. Sundaresan stated, "But I must confess that, when I searched the literature for studies of bond market efficiency, I could not look at too many of them. In a way, I'm not surprised because you don't have good quality data that is available so easily that you could get in the stock market.  After the introduction of TRACE [rules approved by the SEC to establish a corporate bond trade reporting and transactions dissemination facility that became effective on July, 1, 2002, after the Class Period], in two, three years' time, we are going to have lots of studies speaking to the efficiency of the corporate bond market.  But, as of today, I couldn't look at too many papers.  In fact, I couldn't look at one."  TR at 250; #4481 at 16.  *See also* #4481 at 6 (The ECMH's weak form, semi-strong form and strong form of efficiency  "were developed in the context of equity markets.  The literature on the efficiency or inefficiency of bond markets is very sparse.")

[126] In *Cammer*, the securities being traded over-the-counter were stocks, not bonds.

Under Dr. Sundaresan's analysis it appears highly unlikely that any corporate bonds trade in an efficient market and thus cannot trigger a fraud-on-the-market presumption in a case under section 10(b).[127] Given the policy behind the federal securities laws of protecting securities investors from fraud, the Court finds it unreasonable that merely because bonds are not marketed in the same manner or as efficiently as stocks on national exchanges, one must conclude that the bond market is inefficient and thus defrauded bond investors should not have a right use the fraud-on-the-market theory to permit them to pursue class action litigation.  In line with Fifth Circuit comments about applying the *Cammer* factors to stock, the Court concludes that factors affecting debt securities must also be examined analytically, not cursorily or superficially, with a view to their distinctive nature and to the kinds of news that would move their market price in contrast to the kind of information that might affect the more volatile stock market, as well as the manner in which that movement would occur.  *See, e.g.*, Jonathan R. Macey and Geoffrey P. Miller, *Good Finance, Bad Economics:  An Analysis of the Fraud-on-the-Market-Theory*, 42 Stanford L. Rev. 1059, 1085 (April 1990)("[I]t seems clear that not all corporate information will affect all securities of a given issuer in the same way.  Debt securities will be more insulated from the shocks associated with bad news than will equity securities.").

The fraud on the market presumption of reliance established in *Basic, Inc.,* which addressed the stock market, did not require informational efficiency to reflect *all* available information, but rather a sufficient degree of information to justify an investor's reliance on the price of the security. *Basic, Inc.* 485 U.S. at 247 ("An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price.  Because **most** publicly available information is

---

[127] Dr. Sundaresan maintains generally that secondary markets for corporate bonds are inefficient because, in contrast with the national exchange markets for stocks, there is a lack of transparency in the over-the-counter market:  transaction prices and volume information are not displayed or reported on electronic platforms at central exchanges the way they are for stocks, the market makers do not post live bids and offers, trading activity is less in volume and more sporadic than for stocks, and there is a lack of impersonal trading because the traders "negotiate" trading prices with each other over the telephone. #4481 at 3. When asked under what conditions a corporate bond might trade efficiently, he cautiously and speculatively replied, "For example, the top 10 percent of the bonds, like GM or Ford, they trade almost every day.  Their trading volume is quite high.  I would expect with that kind of a trading frequency and trading volume to be possibly efficient, but I have not conducted any tests."  TR of Class Certification Hearing (#4558) at 247.

reflected in the market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action. [emphasis added by the Court]").[128]

Efficiency is a relative concept, a matter of degree. As noted, the plaintiff need not satisfy all the *Cammer/Unger/Bell* factors to establish an efficient market even for stocks, and there is no absolute or established level of evidence to demonstrate any of the factors, such as average weekly trading volume, the number of analysts following the security, active market makers. *See, e.g., Cammer*, 711 F. Supp. at 1293, cites *inter alia* Bromberg & Lowenfels, 4 *Securities Fraud and Commodities* § 8.6 (Aug. 1988)("Turnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption."); *see also Unger*, 401 F.3d at 323 ( concluding that the list of *Cammer* factors is not exhaustive, "in some cases one of the above factors may be unnecessary," the court must weigh the factors analytically, and the panel rejects the view that "there is not an efficient market as a matter of law for stocks trading in the over-the-counter market."). Moreover, the emphasis on rapid, i.e., almost immediate, price response to all publicly available information may be misguided. In determining that the presumption of reliance would be rebuttable, the high court in *Basic, Inc.* wrote, "By accepting this rebuttable presumption, **we do not intend conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price**." *Id.* at 248 n.28 (emphasis added by the Court). The *Cammer* court, on summary judgment, examined the entitlement to a presumption of reliance for shareholders of common stock bought over the counter

---

[128] Suggesting that the efficient market "premise" (*id.* at 246) is not a perfect or accurate construct, the Supreme Court in *Basic, Inc.* also commented,

> We need not determine by adjudication what economists and social scientists have debated through the use of sophisticated statistical analysis and the application of economic theory. For purposes of accepting the presumption of reliance in this case, we need only believe that market professionals **generally** consider **most** publicly announced material statements about companies, thereby affecting market prices.

*Id.* at 247 n.24 (emphasis added by the Court).

and rejected both the argument that all common stock sold over the counter was traded in an inefficient market and the application of inflexible tests for determining efficiency. *Id.* at 1281-82. The court stated, "The issue here is whether market makers in the over-the-counter market, specifically the market for Coated Sales stock, provided a sufficiently fluid and informed trading environment so that when material information about Coated Sales was disseminated, investors had available to them an opportunity to trade at informed, and therefore appropriate, bid and asked prices." *Id.* at 1282-83. It turned to the Bromberg treatise ("ultimately, one must decide what degree of responsiveness suffices for an efficient market") for guidance on the quantity of evidence required to support efficiency and attempted to provide approximate ranges that might suggest efficiency: weekly turnover of one % of a security's float would justify a substantial presumption, two % a strong presumption; for over the counter markets, the number of market makers is probably the best single criterion, with ten justifying a substantial presumption that the market is efficient and five making a more modest case. *Id.* at 1292-93. Thus there is an implied acceptable range even within each factor.

Dr. Blaine Nye's Declaration (#4390) in support of Lead Plaintiff's amended motion for class certification, his Rebuttal Declaration (#4527), and his testimony at the class action hearing (TR #4558 and 4559) were based on the data thus far provided by the underwriters. The Declaration (#4481, Supplemented #4520) of Dr. Suresh M. Sundaresan, Deutsche Bank's expert, was based on the same data. Both experts emphasized at the class certification hearing that they had received only limited data from the underwriters[129] and that there were outstanding subpoenas for more; thus the absence of key data was not their fault. Nevertheless that lack of data, particularly with respect to bond trading, hampered their analyses and limited the specificity of

---

[129] The Court notes that only last year did the Fifth Circuit issue the three cases requiring more stringent examination of market efficiency (*Bell v. Ascendant Solutions, Inc.; Unger v. Amedisys, Inc.; Greenberg v. Crossroads Systems, Inc.*), sending the parties scrambling in the fall to meet the demand with detailed expert reports before the class certification hearing. Indeed the Court postponed the hearing to allow Defendants to respond to Dr. Nye's Declaration.

Dr. Nye's Declaration states that approximately sixty-two subpoenas were sent to underwriters, and that thus far data had been received back from only thirteen. He suggests that some of the underwriters may have merged.

their studies.  Dr. Nye attempted to draw as much information as he could from the limited actual

trading data, but supplemented it with theoretical pricing models (matrix pricing) to construct a

value line for the debt securities.  Dr. Sundaresan, who relied  on the limited actual data regarding

trade frequency and weekly turnover, admitted that there might be a number of dealers and

institutional investors who bought and sold during the Class Period but whose data they did not yet

have.  Class Certification Hearing TR at 244.

Defendants challenged the definition of an efficient market provided by Lead Plaintiff's

financial economist Dr. Nye, and Dr. Sundaresan testified that he had not seen that definition in the

literature he had reviewed.  TR at 240.  Regardless of Dr. Nye's choice of language for his

definition/test,[130] it is evident from his testimony on direct and on cross and from his reports that

he aimed to demonstrate an informationally efficient market as traditionally defined and he applied

the factors identified in case law and by financial economists in his field and examined the response

of the price of those securities to public statements about Enron's financial status to weigh the

informational efficiency of the equity and the debt markets for Enron securities.  TR at 196.  This

Court, of course, follows the definition adopted by the Fifth Circuit, which is in accord with Dr.

Eugene Fama's traditional definition.  *Greenberg*, 364 F.3d at 662 n.6 ("where securities are traded

---

[130] In his report (#4390 at 2) Dr. Nye provided as "a clear and simple definition of and test for market efficiency . . . someone with publicly available knowledge can access the market that he/she desires and can trade on any information that he/she might have."  *Id.*  But then he discussed an "informationally efficient" market, in which "the price of the security reflects publicly available information," the traditional definition of an efficient market, and concluded that "[t]he response of Enron securities prices to material new information during the period at issue (most dramatically the price responses to the cascade of fraud-related disclosures from mid-October through late November 2001), indicates the prices of Enron securities did respond promptly to material new information." *Id.*  His report also states, "A direct empirical test of market efficiency is to examine price responsiveness to the release of new and material information.  If the security price responds quickly, the response supports a conclusion that the market for the security is efficient."  *Id.* at 12. Moreover,  during the class certification hearing he stated, "A market is efficient if the prices at which transactions take place fully reflect all publicly available information."  TR at 61. He also discussed and applied the *Cammer/Bell/Unger* factors to the Enron bond market.  He did later say that this last definition is "not my view.  That's a definition."  TR at 163.  He identified it as the definition of Dr. Eugene Fama. the "godfather" of expertise in market efficiency.  *Id.* at 163-64. *See In re Polymedica Corp. Sec. Litig.*, 432 F.3d 1, 10 (1st Cir. 2005), *citing* Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. Fin. 383 (1970)(an efficient market is one in which market price reflects all publicly available information).  Nevertheless his analysis meets the traditional definition.

in an efficient market, it is assumed that all public information concerning a company is known to the market and reflected in the market price of the company's stock").

A review of the two experts' declarations demonstrates each focused on a different part of the Class Period and identified different news events as the most material to the debt securities investors to make their cases.

In reaching his conclusion that all types of Enron securities traded efficiently during the Class Period, Dr. Nye reviewed *inter alia* SEC filings, analyst reports and press releases, conference call transcripts, pricing data, closing price data, trading volume, daily returns, institutional holdings. Through selected debt securities as examples, Dr. Nye tracked matrix pricing and actual pricing that he obtained regarding the response of a number of Enron registered bonds to news events in the last quarter of 2001, which he found largely identical with only occasional anomalies. Declaration (#4390)(Exhibits 5D2-5D8).

Dr. Nye performed an event study (formal regression analysis, a formal model to isolate company-specific returns) on Enron common stock to determine whether it was traded on efficient market, although he did not use the term "event study" in his report. TR of Class Certification hearing at 193, 195. He did not do an event study on the debt securities, but did examine events, including announcements that would risk default, and the expected response in the bond market. *Id.* at 193-94. He noted, "In a sense, default risk is company-specific. So an increase in that risk you can just match straight to the information. So I'd almost say, yeah, then we did do an event study in the debt because you wouldn't regress out the market in the industry like you do on the stock." *Id.* at 194.

As stated, there is no dispute among the parties that Enron common stock traded in an efficient market during the Class Period, and Dr. Nye's expert report demonstrates such using the *Cammer/Unger/Bell* Factors. Regarding weekly trading volume, Enron common stock traded on the New York Stock Exchange ("NYSE"), with a reported trading volume during the Class Period of 3,539,312 shares. There were 659 million outstanding shares at the beginning of the Class Period, 750 million at the end, and the average weekly reported trading volume during the Class

Period was 21,009,253 shares, or 2.9% of the shares outstanding, sufficient to justify a strong presumption that the market was efficient.  Its annualized turnover ratio was 151.9%, greater than the average for all stocks listed on the NYSE during each year of the Class Period. #4390 at 16-17. For the second factor, Nye reported there were at least 400 analysts' reports published on Enron during the Class Period.  *Id.* at 17-18 and Ex. 7.  Instead of market makers, used by Nasdaq to facilitate market efficiency, Dr. Nye explained that the New York Stock Exchange assigns one dealer (an independent corporation or partnership), known as a specialist, to each security traded on that exchange to maintain a fair, competitive, and efficient market for the securities assigned to it.  Enron's specialist at the end of the Class Period was Fleet Specialist.  Dr Nye explained that "[t]he level of short interest in Enron's common stock relative to the public float indicates that short-selling of Enron's common stock was not constrained during the Class Period and that arbitrage opportunities could be exploited, which is evidence of market efficiency." *Id.* at 23.  He further found, "Trading in Enron stock on the NYSE prior to and during the Class Period, where the market in the stock was facilitated by a specialist, indicates that the market for Enron common stock was efficient during the Class Period, as does the possibility of arbitrage activity via short sales." *Id.*  He also reported, "The average short interest in Enron's common stock represented approximately 1% of total shares outstanding until October 2001 when it started to increase.  Short interest represented 2.4% of shares outstanding at October 15, 2001; 4.1% of shares outstanding at November 15, 2001; and, 11.8% of shares outstanding at December 15, 2001, after the Class Period." *Id.* at 21-22.  Relating to the fifth factor, Enron was eligible to file SEC Form S-3 and did so many times before and during the Class Period.  Dr. Nye identified twelve dates when it did so during the Class Period.  *Id.* at 23.  To examine the cause-and-effect relationship between unexpected corporate events or financial releases and the immediate stock price reaction, Dr. Nye performed an event study**.** *Id.,* at 24-27 and Ex. 5 and 11.  He provided a number of examples of information releases and stock price reactions to demonstrate that the market for Enron common stock was efficient.  Enron's common stock also had substantial capitalization (calculated by multiplying the number of shares by the prevailing market share price) throughout the class period,

suggesting an efficient market: in 1998, it ranged from $17 billion to $19 billion; in 1999 from $22 billion to $31 billion; in 2000, from $47 billion to $64 billion; and in 2001, from $20 billion to $43 billion. *Id.* at 27 & Ex. 14. The average market capitalization of a NYSE stock was %4.5 billion in 1998, $5.6 billion in 1999, $6.0 billion in 2000, and $5.7 billion in 2001. *Id.* at 27. Dr. Nye described the bid/ask spreads of Enron as "comparable to its competitors during the Class Period"; he observes that the fact that they were not large reflects that arbitrage opportunities could be exploited, supporting the finding of an efficient market for the stock. *Id.* at 28 and Ex. 16. During the Class Period, there were between 659-750 million shares of Enron common stock outstanding, with approximate 92% held by the public; thus the float strongly supports a finding of an efficient market. *Id.* at 28. Finally Dr. Nye described extensive news coverage of Enron during the Class Period, another factor favoring a finding of an efficient market. *Id.* at 31-34. Dr. Sundaresan stated that he did not analyze this part of Dr. Nye's report, and Defendants have not argued that Dr. Nye's evidence is insufficient to trigger the fraud on the market presumption. The Court finds that Dr. Nye has presented sufficient evidence of an efficient market for Enron common stock to trigger the fraud-on-the-market presumption of reliance for the § 10(b) claims.

The Financial Institution Defendants objected in their briefs and at the class certification hearing to the inclusion of Enron call and put options[131] in Lead Plaintiff's class definition on the

---

[131] *Black's Law Dictionary* (6th ed. West 1990) defines "puts and calls": "A 'put' in the language of the commodity or stock market is a privilege of delivering or not delivering the subject-matter of the sale; and a 'call' is a privilege of calling or not calling for it." It further defines a "call option" as follows:

> A negotiable instrument whereby writer of option, for a certain sum of money (the "premium"), grants to the buyer of the option the irrevocable right to demand, within a specified time, the delivery by the writer of a specified number of shares of a stock at a fixed price (the "exercise" or "striking" price). . . . An option permitting its holder (who has paid a fee for the option) to call for a certain commodity or security at a fixed price in a stated quantity within a stated period.

It defines a "put" as,

> An option permitting its holder to sell a certain stock or commodity at a fixed price for a stated quantity and within a stated period. Such a right is purchased for a fee paid the one who agrees to accept the stock or goods if they are offered. The buyer of this right to sell expects the price of the stock or commodity to fall so that he can deliver the stock or commodity (the put) at a profit. If the price rises, the option need

grounds that their inclusion was not fairly revealed to Defendants before they received Dr. Nye's damages report, especially since all previous definitions spoke of "purchasers," but now Lead Plaintiff wants to include sellers of the put options.  Lead Plaintiff submits they fall under the term "securities."

This Court agrees that options are "securities" within section 10(b) of the Securities Exchange Act, 15 U.S.C. section 78j(b), and Rule 10b-5.  Section 3(a)(10) of that Act, 15 U.S.C. section 77b(a)(1), provides, "The term 'security' means [any of a number of designated securities, such as notes, stock, and investment contracts], any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein based on the value thereof) or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, . . . or any warrant or right to subscribe to or purchase any of the foregoing."  *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 751 (1975)("the holders of puts, calls, options, and other contractual rights or duties to purchase or sell securities have been recognized as 'purchasers' or 'sellers' for purposes of Rule 10b-5 . . . .").  Moreover, options holders have standing to sue for damages under section 10(b) for affirmative misrepresentations in a corporate statement and for fraudulent omissions. *Deutschman v. Beneficial Corp.*, 841 F.2d 502 (3d Cir. 1988), *cert. denied*, 490 U.S. 1114 (1989); *Fry v. UAL Corp.*, 84 F.3d 936 (7th Cir. 1996), *cert. denied*, 519 U.S. 1996).  They do not have standing to sue for insider trading under section 20A because the corporate officials owe no fiduciary duty to options holders as it does to its shareholders.  *Laventhall v. General Dynamics Corp.*, 704 F.2d 407, 412-14 (8th Cir. 1983), *cert. denied*, 464 U.S. 846 (1983).

Dr. Nye addressed the efficiency of the market for these options, which he points out were traded on the Chicago Board Options Exchange ("CBOE") beginning in December 1999 and concluded that the market was efficient.  The value of these derivative securities depended upon

---

not be exercised.  The reverse transaction as a *call.*

A "put option" is "one under which buyer of the option may demand payment by the writer of a fixed price (the "striking" price) upon delivery by the buyer of a specified number of shares of stock."

the value of Enron common stock, and all the information about the stock was readily available to investors and factors affecting the price of the stock were incorporated into the determination of the value of the call and put options.  *Id.* at 34-35.  *See, e.g., Deutschman*, 841 F.2d at 504 ("The market price for options is directly responsive . . . to changes in the market price of the underlying stock, and to information affecting that stock.").  The Court finds that Dr. Nye's evidence applying the *Cammer/Unger/Bell* factors to the stock, is sufficient to trigger the fraud-on-the-market presumption for Plaintiffs' § 10(b) claims based on the options.

The real dispute among the parties is over Dr. Nye's finding that the market was efficient for Enron Registered Bonds and Preferred Stock.

Even though Dr. Nye observed that the *Cammer/Unger/Bell* factors are more applicable to stocks than bonds,[132] he did attempt to apply and provide supporting analysis for the eleven factors he identified, listed in footnote 78, with respect to the Enron registered bonds, foreign debt securities, and preferred securities, all contained within his Declaration.  The Court will not repeat all of these, but refers the parties to his indicia of efficiency with supporting exhibits.[133]  The Court

---

[132] Dr. Nye explained that stock trades on major exchanges in a centralized market with rules, regulations and price listings, in high frequency and volume and it generally splits when its prices get too high.  In contrast the bond market tends to be over-the-counter, not centered around a hub, and operates by dealers and brokers communicating with each other via telephone and electronic messaging devices.  Bonds are "bigger animals" that do not trade as frequently or in as large a volume as stocks, and the bond market in many ways is "a market of big boys"—institutions, dealers, brokers, investment banks etc., which have numerous trained staff and information gatherers, and which are in constant communication with each other, polling for the up-to-the-minute prices of these debt securities.  TR at  69-71.  He emphasized that the important point is that an efficient market reflect information, not that the securities be traded quickly or in large volume.  TR at 74, 67 ("informational efficient market means that the price fully reflects all publicly available information").

[133] For example, he found that information on the purported financial condition of Enron was available to investors from many sources, including analyst and media coverage, identified in his discussion of the market for stocks, and was relevant to the bonds.  Emphasizing that bond investors focus upon the terms of the debt security and the company's creditworthiness, reflected in the bond's yield to maturity and price, and, critically, on the risk of default, which depends on the financial health of the company, Dr. Nye pointed out that information on Enron's financial and operational performance was widely disseminated during the Class Period through the following avenues: registration materials and prospectuses of the securities at issue (available to the public from the SEC); Enron's SEC filings (including Forms 10-K and quarterly Forms 10-Q containing Enron's published financial statements), annual Proxy Statements, Forms 8-K reporting new events and developments, and other filings; conference calls between Enron executives and the investor and analyst communities; news coverage of the company (summarized at pp. 37-38); and security

would again emphasize that no standard has been identified to determine what level each factor should reach before a debenture market can be designated efficient, and that a comparison between equity and bond markets is a comparison between the proverbial apple and orange.  As a top Fortune 500 company, Enron's bond trading was substantial, as evidenced by the data.

Dr. Nye also identified dates of release of significant company-specific information and the impact on security prices to demonstrate a cause and effect relationship. #4390 at 24-27 and Ex. 10, 11 and 5.[134]  Dr. Nye pointed out regarding the Enron Registered Bonds that bond investors focus on the terms of a company's debt securities and the creditworthiness of the issuer, which are reflected in the bond's yield to maturity and its price. #4390 at 35.  In turn, the price depends upon the current interest rate environment, on the timing of expected payments from the security, and on the likelihood of default, the most critical factor.  A company demonstrating strong financial performance and condition will have a low likelihood of default, a low yield to maturity, and a high bond price.  *Id.*

In support for his conclusion that the debt securities traded efficiently, Dr. Nye noted that extensive and continuous information about Enron's financial state for purposes of bond market efficiency came from the same multiple sources pointed out in discussing the efficiency of the market for Enron stocks, as well as from analysts and media that follow fixed-income securities. Ex. 7 to Dr. Nye's report lists Enron's numerous analysts of its fixed-income securities during the Class Period.  Fixed-income analysts from a number of prominent investment firms during the Class Period followed and reported regularly on Enron's long-term debt.  *Id.* at 37 and Ex. 7 from Nelson's Directory of Investment Research (listing them) and Ex. 8B (partial list of analysts' reports issued during the Class Period about Enron's fixed-income securities).  Major news media followed Enron's long-term debt, with over 180 articles published during the Class Period with the words "Enron" and "bonds" or "senior notes" in the headlines or lead paragraph, not to mention

---

analysts' reports, including reports issued by credit rating agencies and reports on Enron's debt issues by credit analysts, in addition to reports by equity analysts which are also relevant.

[134] Again because the market for Enron stocks during the Class Period is not contested as inefficient, the Court will not repeat his statistics here.

the coverage regarding Enron generally, Enron's industry, and Enron's competitors.  #4390 at 37-38.  As noted above, Enron was eligible to file SEC Form S-3.

Dr. Nye also provided data on trading volume for Enron bonds during the Class Period, which he described as "considerable" and "supports my conclusion that the market for the Enron Registered Bonds was efficient," including transaction data from the underwriters (Ex. 18) and data about quarterly institutional holdings during the Class Period (provided by reporting United States insurance companies, mutual funds, and government pension funds and state government pension funds, Ex. 19) from Lipper, Inc. #4390 at 38, 39.  The underwriter data reflect over 15,800 trades for Enron Registered Bonds during the Class Period.  The number of transactions per issue during the Class Period ranged from 24 to 3,684 per issue, an average of 69, a median of 282.  #4390 at 38.  The percentage of days on which the trades occurred and the issue was outstanding falls between 1% (11 days) to 36% (132 days), with an average of 12.2% and a median of 9.71%.  *Id.* at 38-39, Ex. 18.  Lipper's data on institutional holdings demonstrates that from 20 to 115 institutions held Enron  bonds during any quarter end during the Class Period (65 on average, a median of 65).  Total holdings for all reporting institutions at a quarter-end during the Class Period ranged from 2.7% of face value to 93% of face value per issue (45% on average, a median of 49%).  The total reported increases in holdings for quarters in the Class Period (Q4-98 through Q4-01) as a percentage of issue amount ranged from 12% to 137% per issue (77% on average, a median of 69%).  Thus there was active trading in Enron Registered Bonds during the Class Period, there were a substantial number of institutional investors, and Nye concluded that the data demonstrate the market for these bonds was efficient.

He also provided data for the total market value of Enron bonds (analogous to market capitalization for stocks) during the Class Period, calculated by multiplying the current price of the bond by the principal amount outstanding (the total face value).  He reported that at year-end 1998 the Enron Registered Bonds had a total market value of $3.416 billion (nineteen Enron Registered bonds outstanding with a total of $3.300 billion face value), with market values ranging from $51.6 million to $307.7 million per issue; in year-end 1999, a total market value of $3.627 billion (twenty

bonds with a total face value of $3.8 billion) with market values ranging from $48.4 million to $470 million per issue; at year-end 2000 these bonds had a total value of $4.321 billion (twenty-two bonds with a total of $4.3000 billion face value), and market values ranging from $50.4 million to $498.3 million per issue; and at the end of the Class Period after disclosure of Enron's true financial condition, the bonds had a total value of $3.059[135] billion (twenty-two bonds outstanding with a total of $5.900 billion face amount), with market values ranging from $27.6 million to $636.5 million per issue.  #4390 at 44-45 and Ex. 15.  Dr. Nye stated that he did not yet have data of the bid/ask spreads for these bonds.

As for public float, Dr. Nye testified that he was unaware of significant bond holdings by Enron insiders.  He also pointed to the institutional holdings data provided by Lipper and NAIC to support his conclusion that the market for Enron Registered Bonds was efficient during the Class Period.  He additionally highlighted the fact that the bonds were rated throughout the Class Period by Moody's, Standard & Poor's and Fitch (Ex. 22).  The ratings remained constant for the most of that time, until the debt ratings began to be cut beginning with negative news reported on October 16, 2001 when Enron announced significant write-downs, and continued downward with respect to all three credit-rating agencies as the bad news accumulated.  *Id.* at 46-50.

Dr. Nye applied the same factors to the Preferred Securities[136] (#4390 at 76-88).[137]  Dr. Nye explained that two of the preferred securities at issue ((1) Enron Corp. $10.50 Convertible preferred Securities with ticker EONOQ and (2) Enron Corp. 7% Exchangeable Preferred Securities with ticker EONPQ  were "stock-like," and were exchangeable into common shares of Enron Corporation and Enron Oil and Gas Reserves ("EOG"), while the other four (tickers ECSPQ, ENRPQ, EONNQ, and ECTPQ) were "bond-like" and nonconvertible.  Of the stock-like preferred

---

[135] In his Declaration at 145 Dr. Nye left out the period and reported $4059 billion, but his illustrative Ex. 15 reflects the proper amount, in line with the other figures.

[136] The Court notes that the preferred securities were traded on the NYSE and acted more like the common stocks than the bonds.

[137] Nye did the same to the Foreign Debt Securities (#4390 at 60-76), but since the Court has found no plaintiff with standing to represent the class for claims under § 10(b), as well as under § 12(a)(2), it does not summarize his analysis as to these securities.

securities, the $10.50 Convertible Preferred was exchangeable into 27.304 post-split shares of Enron at the option of the holder at any time he chose, and thus the security's value was dependent on the value of the Enron common stock, the value of which could be obtained by any holder at any time. The 7% security was mandatorily exchangeable in July 2002, and not before, into shares of EOG, which were held by Enron. Thus the value of that preferred security depended upon the value of EOG and the creditworthiness of Enron, specifically on whether Enron would perform on its obligation to deliver the shares in July 2002 or keep the asset if it became insolvent before the exchange date; therefore it also related to efficiency for the Enron Registered Bonds. The "bond-like" securities were issued by limited partnerships which existed solely to sell each class of securities, invest the proceeds in Enron and Enron-related entities, and make interest and principal payments to the holders of the preferred securities. Enron, as the beneficiary of the proceeds, guaranteed the interest payments and return of the principal (called the liquidation preference, which was only $25 per security in contrast to the usual $1000 in a typical bond) to the investors. Thus, as with a bond, the investors looked to Enron's ability to make these payments.

Dr. Nye reasonably argued that extensive information on Enron's financial condition from the multiple sources relating to the value of its common stock also was available to the Enron Preferred Securities investors (stock and debt analysts covering Enron, SEC filings, media, and credit rating agencies). Morever, he identified news agencies that wrote specifically about the Preferred Securities during the Class Period. He did not receive data from Lipper on trading volume, but did from the underwriters and from FactSet regarding the trading volume on the NYSE for each Preferred Security. According to the data the underwriters have provided thus far, the underwriters reported 28,300 trades for four of the six[138] securities. For these four, with the limited data he has received, the number of transactions per security during the Class Period ranged from

---

[138] He did not include the $10.50 Convertible, for which he has not been able to identify the underwriter and for which he has thus far only ten underwriter transactions during the Class Period, and he also excluded the $200M Enron Capital LLC MIPS 8% Preferred Securities, due November 20, 2043, for which he has received fewer than ten underwriter transactions. He stated that he has not received transaction data from Goldman Sachs, which is listed as the lead underwriter for these two Preferred Securities.

4,366 to 10,452 (7,076 on average, a median of 6,744). The number of trading days ranged from 53% to 98% of total trading days during the Class Period for which the security was issued and outstanding (78% on average, a median of 81%). He summarized from the available data the average daily trading volume during the Class Period on the NYSE for each of the six Preferred Securities: (1) $75 million Enron Capital Resources LP 9% Series A Preferred Securities due August 31, 2024: 6,075; (2) $150 million Enron Capital Trust II 8.125% Preferred Securities: 8,568; (3) $200 million Enron Capital Trust II 8.125% Preferred Securities: 11,624; (4) $200 million Enron Capital LLC 8% MIPS: 16,2000; (5) Enron Corp. $10.50 convertible Preferred Securities: 55; and (6) $255 million Enron 7% exchangeable Preferred Securities due July 31, 2002, issued August 1999: 131,363. He stated that he had not received comprehensive trading data for the $10.50 convertible Preferred Securities, but that he had concluded there was "considerable trading" for all the others during the Class Period. #4390 at 80.

Dr. Nye explained that the underwriters typically make a market for the securities that they underwrite. Ex. 4 to #4390 lists the names of the underwriters for each of the Preferred Securities except for the $10.50 convertible securities, which first issued in 1983 and for which he has not yet discovered the first underwriter. The transaction data he has received from the underwriters demonstrates that the underwriters of the other five Preferred Securities did trade in them during the Class Period.

As noted, Enron was eligible to file the SEC Form S-3. Each of the Preferred Securities, as reflected in SEC filings and for some on the face of their prospectuses that they were registered with the SEC and  listed on the NYSE, and thus eligible to be publicly traded in this country. Enron was also subject to the SEC's stringent reporting requirements and continuous disclosure of material information to investors. These factors all support an efficient market for the Preferred Securities.

Data from Thomson Financial regarding institutional holdings on five of the six Preferred Securities evidences the following: (1) of the $200 million Enron Capital LLC 8% MIPS, between 1.2% of the amount issued (at the end of the fourth quarter of 2000) and 8.1% of the amount issued

(at the end of the fourth quarter of 2000) was held by institutions; (2) of the Enron $10.50 convertible Preferred Securities, institutions reported holding between 4.3% of the amount issued at the end of the second quarter of 2001 and 26.8% of the amount issued at the end of the first quarter of 2001; (3) of the $75 million Enron Capital Resources LP 9% Series A Preferred Securities due August 31, 2024, the $150 million Enron Capital Trust II 8.125% Preferred Securities, and the $200 million Enron Capital Trust I 8.3%[139] Preferred Securities, the institutions reported holding less than 1%.  Dr. Nye had not received data for the $255 million Enron 7% exchangeable Preferred Securities due July 31, 2002.  #4390 at 82.

NAIC data with reported holdings by U.S. insurance companies was available for all but the Enron Capital LLC 8% MIPS  Preferred Securities.  Less than 1% of issue amount for Enron Capital Trust II 8.125% Preferred Securities, Enron Capital Trust II 8.125% Preferred Securities, and Enron Corp. $10.50% convertible Preferred Securities were held by U.S. insurance companies. U.S. insurance companies did report holding 2.1% of issue amount for year-end 1998, 1999,2000; no holdings were reported for year-end 2001.  #4390 at 82-83.

Analogous to market capitalization for stocks, the total market value of the Preferred Securities calculated as the shares outstanding multiplied by the current price of the security, was substantial throughout the Class Period:  (1) at year-ends 1998, 1999, 2000 and on November 27, 2001 the four non-convertible Preferred Securities had a total market value of $634.6 million, $563.4 million, $628.3 million, and $320.5 million, respectively; (2) at years end 1998, 1999 and 2000 and on November 27, 2001 the $10.50 convertible Preferred Securities had a market value of $1.016 billion, $1.555 billion, $2.916 billion, and $139.6 million, respectively; and (3) at years-end 1999, 2000, and on November 27, 2001 the 7% Exchangeable Preferred Securities had a market value of $215.6 million, $554.2 million, and 206.0 million, respectively.  #4390 at 83 and Ex. 15.

As for bid/ask spreads, Dr. Nye obtained data for three of the six Preferred Securities which reflected that the spreads during the period were comparable to the spreads of Enron common stock

---

[139] Dr. Nye previously reported this as 8.125%; the Court assumes that one or the other is a typographical error.

and the spreads of Enron's competitors' common stock (Ex. 16) and were not large, indicating that arbitrage opportunities could be exploited, and thus supported his finding of an efficient market. #4390 at 83-84.

Dr. Nye reported that he was not aware of any company insiders with significant holdings for five of the six Preferred Securities. The exception was for the Enron Corp. $10.50 Convertible Preferred Securities, ticker EONOQ, which Enron Director Robert A. Belfer was listed in Enron's Proxy Statements as holding. On February 15, 1999 Belfer held sole or shared voting investment power over 238,825 securities, approximately 18% of that class of security; on February 15, 2000, 219,207, or 17%; on February 15, 2001, 215,207, or 17%. Nye states that on each of these dates, Belfer's holdings were equal to the total amount held by all directors and executive officers as a group. During the Class Period the Enron Corp. Savings Plan also held 70,000 of the EONOQ securities, so approximately a total of 23% of EONOQ was held by Enron affiliates and 77% was available as public float.

Each of the Preferred Securities was rated by Standard and Poor's and Fitch throughout the Class Period, while Moody's rated each of the four non-convertible securities and the Enron Corp. 7% Exchangeable Preferred Securities for the same time. Dr. Nye was still searching for Moody's ratings for the Enron Corp. $10.50 Convertible Securities. He traces all the others, noting that downgrades again began on October 16, 2001. #4390 at 85. The prices of the two convertible securities were affected by the events and factors that affect the common stock, such as the news releases on March 12, 2001 (termination of Blockbuster VOD deal), August 15, 2001 (resignation of CEO Jeffrey Skilling), October 17, 2001 (Enron's third quarter 10Q press release), and November 28, 2001 (Moody's downgraded Enron debt to junk status). #4390 at 85-86, Exs. 5E1, 5E2, 5F1. The 7% Exchangeable Preferred Security was tied to the value of the shares of EOG that Enron held and that were to be mandatorily exchanged on the due date of July 31, 2002. Dr. Nye found that the price of the 7% Exchangeable Preferred security moved in similar fashion to the price of the EOG common stock during the Class Period. Ex. 5F1. Dr. Nye traced the price decline coinciding with the information flow about Enron's financial condition and the increasing

likelihood that it would not fulfill its obligation to exchange the EOG stock for the Preferred Security, beginning in October 2001. #4390 at 86-87. The price of the non-convertible Preferred Securities declined when news called into question Enron's ability to perform on its promise to pay interest and principal in full and on time. *Id.* at 87-88.

Thus based on the indicia of market efficiency for the Preferred Securities during the Class Period (publicly available Enron SEC filings and debt offering materials, equity and fixed-income analyst coverage for Enron and the energy industry, wide dissemination of news about Enron and the Preferred Securities, the sizeable trading volume, the making of the market by underwriters, Enron's eligibility to file Form S-3, SEC registration and eligibility to trade on the NYSE, large market values, substantial public float, ratings by major credit rating agencies, and prompt price responses to material new information), Dr. Nye concluded that all Enron Preferred Securities traded in efficient markets.

Defendants challenge Dr. Nye's use of matrix prices and New York Stock Exchange Closing Prices to estimate trading prices of Enron's debt securities.[140] Dr. Nye explained that matrix prices, which are published by such entities as Financial Times, Bloomberg, FactSet, Factiva, Reuters, and Interactive Data Corporation, are "theoretical prices based on credit rating and other important creditworthy events of a company." TR at 41. *See also* Nye's Rebuttal Declaration (#4527) at 21-22 (Reliability of Matrix Prices). They are "calculated prices based on a fixed-income security's credit risk, term to maturity, and when applicable, its redemption features." Nye Declaration (#4390) at 50. Given the relative infrequency of bond trades compared with the frequency of stock trades, Nye explains that matrix prices are used by financial institutions that invest in bonds to be able to accurately price the securities in their portfolios periodically, even daily, for regulators, life insurance companies and others. *See* 4527 at 21-22 nn.33-36 He also used New York Stock Exchange closing prices, which price a bond on days when it has not traded to allow bondholders to evaluate their portfolios. Given the failure of the underwriters thus far to provide much of the requested actual trading data for Enron securities during the Class Period, he

---

[140] Dr. Sundaresan characterizes these as "made up" or fictional prices.

compared the matrix prices for those bonds for which he could obtain them with the actual trading prices he did receive from the underwriters and found the matrix prices were reasonable estimates of the value of Enron bonds throughout the Class period.  Nye Declaration at 50.  This established use of matrix prices and the current restriction on data from the underwriters lead the Court to find Dr. Nye's data to be admissible.

Dr. Sundaresan divided the Class Period into two parts:  the "pre-distressed period" and the last forty days or "distressed period" (October 16, 2001-end). Because both experts used these terms during the Class Certification Hearing, the Court will also use them in discussing their opposed conclusions.

With supporting exhibits (5C1 through 5C40 and 5D1 through 5D10) Dr. Nye reported that there was "minimal variation in pricing indicators" of the debt securities prior to the fourth quarter of 2001, compared to the precipitous decline in prices of the great majority of Enron registered Bonds that occurred in that final quarter or distressed period.  Dr. Nye testified that during the first three years of the Class Period, there was little change in Enron's default risk, and any price movement in the securities largely reflected changes in the interest rates.  He explained,

> This is not surprising given that debt issues have claims superior to equity in bankruptcy, but do not benefit from improvement in a solvent firm's prospects as equity holders do.  During periods of relatively low credit risk, *i.e.*, when the market perceived a high probability that Enron would pay its interest and principal payments in full and on time, the debt and debt-like securities traded near par and responded comparatively little to company-specific news.  It is during "distressed period" that debt and debt-like securities will move sharply with company-specific news.  Therefore, it is consistent with market efficiency that there were no large price reactions during the "pre-distressed period."

#4527 at 5.

In evaluating the market efficiency of the debt securities, the Dr. Sundaresan identified the following as news event announcements in 2001 material Enron debt securities, although, as Dr. Nye points out, Dr. Sundaresan fails to explain why all these events should have affected the price of the debt securities (#4527 at 5):  (1) February 12, 2001, when Skilling became CEO of Enron; (2) March 9, 2001, when the Blockbuster VOD deal terminated; (3) May 24, 2001, when Dabhol served its termination notice; (4) August 14, 2001, when Skilling resigned; (5) October 16, 2001,

when  Enron's third quarter 10Q press release took place; (6) October 22, 2001, when the SEC begins investigating Enron; (7) October 24, 2001, when Andrew Fastow was terminated; (8) October 29, 2001, when Moody's downgraded Enron notes to Baa2; (9) November 8, 2001, when Enron admitted overstating its earnings and released its 8-K; (10) November 9, 2001, when Moody's downgraded Enron's senior unsecured notes to Baa3; (11) November 21, 2001, when discussions regarding restructuring Enron's debts took place; (12) November 28, 2001 when Moody's downgraded Enron debt to junk bond status; and (13) December 2, 2001, when Enron filed for Chapter 11 bankruptcy.  *See, e.g.*, #4481 at 26.

Dr. Nye argued that events that affected pricing in the stock market in the first half of 2001, such as the first three events (Skilling's appointment as CEO of Enron in February 2001, the termination of the Blockbuster deal in March 2001, and the termination of the Dabhol deal in May 2001) did not affect the bond market because the stock price was still relatively high, Enron still had an ample equity buffer, the events would not be expected to have much impact on Enron bond prices, and the bondholders' expectations of repayment were therefore not threatened. TR at 91-92; #4527 at 5-6.  To demonstrate his point, Dr. Nye quoted several analysts' responses to bonds in the wake of these events.  #4520  at 7.  He emphasized that even Skilling's abrupt resignation on August 14, 2001, was characterized to the public as for purely personal reasons, and Kenneth Lay, former CEO who had shepherded Enron through its remarkable growth, returned to replace Skilling and assured the market there was no reason to be concerned.  #4527 at 6.  The resignation received extensive media and analyst coverage, and Dr. Nye pointed out that many analysts continued to recommend Enron stock, summarized that "market commentary found Skilling's resignation to either have small impact for bonds, or to be a non-event."  *Id.* at 6.  As an example, he quoted an analyst of Defendant Deutsche Bank stating that although the stock share price dropped 15% by the end of trading on August 16, "we do not see the Skilling resignation as a credit/ratings/spread event for ENE."  *Id.* at 6.

Dr. Nye also pointed out that on October 16, 2001, the date identified by Dr. Sundaresan as commencing the distressed period, in a press release Enron presented its results for the third

quarter of 2001 and reported a one-time charge of $1 billion, or $1.11/share, for a loss of $40.84/share.   Chairman and CEO Kenneth Lay publicly represented that Enron was "very confident in our strong earnings outlook" and that the charges resulted from "a thorough review of our business" and "to clear away issues that have clouded the performance and earnings potential of our core energy businesses."   #4527 at 9.   Enron "reaffirmed today it is on track to continue strong earnings growth and achieve its previously stated targets of recurring earnings per diluted share of $0.45 for the fourth quarter 2001, $1.80 for 2001, and $2.15 for 2002."   Lay itemized some of the charges as related to some of the troubled aspects of its business (e.g., Azurix, Broadband). Nye noted that Kenneth Lay told the public that the credit rating agencies had informed Lay that there would be no change in Enron's rating as a result of the October 16th announcement, and Nye demonstrated with examples that generally analysts, including analysts from Merrill Lynch and Deutsche Bank, saw the charge as a positive sign that Enron was getting its house in order.   *Id.* at 9-11.

By ten days after that, however, the bond prices did begin reacting to subsequent events, including the announcement of the SEC investigation and Fastow's termination, and they declined further when the credit rating agencies lowered Enron's rating.[141]   He provides sample quotations

---

[141] More specifically, Nye maintained that the October 16, 2001 announcement by Enron of substantial write-downs and charges did not have much impact of the stocks because bondholders focus on the corporation's ability to pay; Enron's credit rating at that time remained intact because the credit rating agencies perceived Enron as having the financial ability to make good on its debt securities and not insolvent and assured the public that their credit ratings would remain the same. Dr. Nye identified the following public announcements of key information for Enron bond investors and corresponding drops or increases in the price of the exemplar Enron bond, constituting indicia of an efficient market for Enron registered bonds, after that date:  Enron announced on October 22, 2001 that the SEC was seeking information from the company regarding related party transactions; during a conference call on October 23, 2001 Enron was confronted with questions about the adequacy of assets held by the Marlin and Osprey entities to pay those entities' debts; Fastow was terminated on October 24, 2001; Fitch and Standard & Poor's revised their evaluation of Enron's long term outlook to negative on October 25, 2001; on October 26, 2001 the *Wall Street Journal* published an article reporting that Enron had drawn down about $3 billion, the bulk of its available bank credit lines, and was seeking to obtain a new multibillion dollar credit line from its banks; Enron announced on November 1, 2001 that its investment bankers had committed to providing Enron with $1 billion of secured credit, to the disappointment of analysts; Standard & Poor's lowered Enron's corporate credit and senior unsecured debt ratings and commercial paper ratings on November 1, 2001; reports surfaced during the week leading up to November 8, 2001 that Dynegy might rescue Enron; Moody's cut Enron's senior unsecured debt ratings to its lowest investment grading on November 9, 2001; later the same day Enron announced that Dynegy would

-162-

from analysts. *Id.* at 11-12. With increasing revelations of Enron's financial troubles and news events of significance to bond investors, the default risk rose, the prices of the bonds fell and then, reflecting efficiency, rebounded when it appeared that Dynegy might bail Enron out, and then fell again when that merger fell apart. Focusing on the fourth quarter of 2001 (mid October through late November), Dr. Nye demonstrated that the matrix and underwriter data of actual trade prices of the Registered Bonds "cascaded downwards to the series of negative disclosures about Enron's creditworthiness." #4390 at 52.[142]  In particular Dr. Nye explained that he focused on changes in Enron's credit rating during the distressed period because the central concerns of investors in debt security are interest rate levels and default risk.

Observing that "[p]rice-reaction is the most important and direct test of market efficiency, Dr. Sundaresan examined (1) the response of the Enron debt securities to changes in market interest rates from October 19, 1998 to December 31, 2000; and (2) given firm-specific news releases in 2001, the probability of default, as measured by expected default frequency ("EDF") from Moody's KMV and by Credit Default Swaps on the debt securities, which incorporate both probability of default and the loss given default.  Dr. Sundaresan concluded with regard to the first period that although market interest rates climbed from 6.8% in October 19, 1998 to 9.02% by May 2000, an increase of over 220 basis points that he insists necessarily had adverse effects on corporate bonds with fixed coupon rates even if the credit quality did not change, the prices of the Enron debt securities, with just a few exceptions, barely moved, an indicator according to him of an inefficient market.  #4481 at 22.

With regard to his analysis of price movement in 2001, Dr. Sundaresan employed information about EDFs and credit default swap spreads to evaluate price reaction of Enron debt securities to Enron-specific news during the Class Period.

---

buy Enron and Fitch upwardly revised its rating of Enron; Enron filed its Form 10-Q for the third quarter of 2001; and Dynegy called off of the merger on November 28, 2001.

[142] Dr. Nye provided data demonstrating the declining matrix price reaction of an exemplar Enron registered bond to the entry into the market of material public information during the remainder of that fall. #4390 at 52-58.  He did the same kind of detailed factor analysis for an exemplar Enron Foreign Debt Security and for an Enron Preferred stock.  *Id.* at 58-76, 76-88.

Dr. Sundaresan defined EDF as an estimate of the probability of default within a given time period (Sundaresan used one year), "probably the most important factor that drives corporate bond prices." TR at 219-220; #4481 at 22. He explained that EDF is computed by Moody's KMV using information about (1) enterprise value (present value of future cash flows), (2) level of leverage (the aggregate book value of the debt that has been issued by the company), and (3) the operating risk of the firm (whether the company operates in a risky or less risky business). TR at 220. In turn, a credit default swap allows an investor to buy credit default swap, in essence an insurance policy, to protect him against the probability of default by requiring the seller of protection to pay the investor the par value if there is a default before the bond matures. *Id.* at 220-21. A credit default swap spread in the price the seller of protection charges, capturing "the spread between a risk-free bond and . . . a risky bond." *Id.* at 221. Sundaresan testified that he wanted to see (1) to what extent the probability of default, as measured by the EDF, and the credit default swap spreads captured the probability of default and (2) how well they reacted to firm-specific information during the class period. TR at 221. In particular he wanted to understand the extent to which bond prices in predistressed period reacted to increases and probability of default. TR at 225.

Dr. Sundaresan testified that the one-year probability of default for Enron, as measured by EDFs, continuously increased from 0.35% in February 2001 to 2.34% by October 8, 2001, more than five-fold. #4481 at 26. By November 20, 2001, the probability of default reached the maximum level of 20%. *Id.* at 27. Dr. Sundaresan argued that bond investors should have viewed the five-fold increase in the probability of default from February 12, 2001 and October 10, 2001 as adverse information about the value of Enron's debt securities, but they did not; therefore the fact that the prices with a few exceptions stayed close to par, with little volatility, demonstrates that the bond investors were trading in inefficient markets throughout the Class Period. #4481 at 27-29. He claimed that examining price reactions to the news announcements in the second half of October, 2001, when default was imminent for Enron, is not an appropriate test of market efficiency because by then Enron was in major financial distressed and investors "had no choice but to sell out their positions" in active trading at distressed prices. *Id.* at 27. Thus, in contrast to Dr. Nye's

emphasis on the distressed period, Dr. Sundaresan maintained that only the pre-distressed period was relevant and in essence he discounted the significance of steep decline in the last six weeks and eliminated nine of his selected 2001 thirteen news events to measure price responsiveness.[143]  Dr. Sundaresan also used the KMV data to show that during the predistressed period, a two-and-a-half-year period, the credit default swap spreads, like the EDF, in 2001 increased five times.  TR at 226; #4481 at 31.  Yet traded prices only slightly appreciated during the same time.  TR at 226-27.  Dr. Sundaresan concluded that price reactions for all the Enron debt securities during predistressed period were minimal, despite the fact that the credit default swaps spreads had increased five fold, implying an increase in the probability of default (and resulting increase in the loss to bond investors), and were not consistent with what one would expect to see in an efficient market.  TR at 227-28; #4481 at 32.  During the distressed period, which consisted of only forty days, the "credit default swap spread dramatically increased," but, according to Dr. Sundaresan, it "ballooned *well before* the prices of most of the Enron debt securities reacted."  TR at 227; #4481 at 31-32.  Specifically the credit default swap spreads went from 50 basis points in middle of February 1999 to nearly 300 basis points on October 3, 2001, to nearly 700 by October 22, 2001 when the SEC announced its investigation, to over 1100 basis points by October 29, 2001 when Moody's announced its credit downgrade.  #4481 at 31.

Nevertheless Dr. Sundaresan admitted that the EDFs of KMV data were publicly available, although one had to pay for them;  thus theoretically the market had that information and under the semi-strong theory, it was incorporated into the price of Enron debt securities.  TR at 265, 270-71.  Furthermore he conceded that large institutional investors, which are generally considered knowledgeable and sophisticated investors and which were the primary purchasers of the Enron debt securities, would be able to purchase KMV data.  Sundaresan also admitted that there is no

---

[143] Dr. Nye responded that it was unreasonable not to consider price reactions during the distressed period as indicators of an efficient price response. This Court agrees. Dr. Nye asserts that even by October 23, 2001, although the risk of default by Enron was perceived as higher, default was not viewed as imminent. It is precisely at such a time that one would expect a price reaction if the market was efficient. He points out that although the debt security prices declined, they also then rose with news that Dynegy might buy Enron. #4527 at 8-9.

exclusive way to analyze the KMV data, but that different analysts calculate the data in different ways.  TR at 266.  He agreed that it was possible that Enron bond investors, which were primarily QIBs, analyzed all publicly available information and came to a different conclusion from his conclusion.  TR 274.  When asked about a 2004 article, "Forecasting Defaults with the KMV-Merton Model" by Barras and Shumway, which concluded that the model was only a marginally useful default forecaster but not a sufficient statistic for default, Sundaresan responded that he was not familiar with the article, but agreed that his and their divergence could also be characterized as a disagreement among academics."  TR at 266.  Furthermore, on cross examination,  Dr. Sundaresan did not appear to know, until Mr. Howse pointed the fact out to him, that the *Newby* Plaintiffs have claimed that Enron's true financial situation was concealed, specifically that Defendants manipulated during the three-year Class Period the factors Sundaresan set out in his report as the three "key drivers of EDF," i.e., market value of Enron's assets, book value of its debt obligations, and risk of Enron's assets for pricing debt, (1) cash flow, probability of default; (2) debt to asset value (i.e., are Enron's assets worth enough to cover the loans?); and (3) Enron's business' ability to meet its payment or the  operating risk of the company.  TR at 279-81. Sundaresan responded, "I'm operating in the context of situations where concealment is not an issue."  *Id.* at 281.  He also admitted that when bond investors learned of Enron's actual financial condition with the disclosures in the distress period in late October and November 2001, the bond prices reacted immediately.  TR at 279.  Moreover, with regard to the ballooning of the credit default swaps in the distressed period, his contention that it occurred "*well before* the prices of most of the Enron debt securities reacted" appears to this Court to be an exaggeration in light of the few days and barrage of disclosures involved in the distressed period.

Dr. Sundaresan argued that the use of matrix pricing for price reaction studies was criticized in two papers that he cited in his report[144] and that a table he included demonstrated such errors. TR at 242-43.  The Court again notes that finance theory and economic models used to calculate value lines are not exact science.  Moreover there has also been criticism of event studies, upon

---

[144] Dr. Nye stated that a lot of economic studies use matrix pricing.  TR at 136.

which a number of courts have relied. *See, e.g.,* Bradford Cornell and R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 U.C.L.A. 883, 903 (June 1990)("for a fraud which is revealed slowly over time, the event study approach is likely to significantly understate the true damages"). Reflecting a similar controversy among experts, on cross-examination, Dr. Sundaresan disagreed with the statement by Harvard's Mike Jensen in an article entitled "Some Anomalous Evidence Regarding Market Efficiency," published in the *Journal of Financial Economics*, stating that the New York Stock Exchange, NASDAQ, and the corporate and government bond markets are considered by some academics to be informationally efficient. TR at 249. Dr. Sundaresan conceded that his disagreement with Dr. Nye could simply be two experts disagreeing on efficiency. TR at 250. He also admitted he had trouble finding studies on bond market efficiency. Dr. Sundaresan admitted that for expected default frequency, different analysts could calculate differently the KMV data, which Dr. Sundaresan used for calculating his expected default frequency and which he also admitted are just one of the many pieces of information that the market takes into account. *Id.* at 265-66, 274. Furthermore Dr. Nye testified that he reviewed 500-600 analyst reports and does not remember any analyst mentioning EDF data or KMV data from Moody's. TR at 93-94. He also pointed out in his Rebuttal Declaration that KMV's EDF is only one of many models available as tools to market participants and not the only factors that can measure market efficiency. #4527 at 16. The two experts also disagreed over whether transparency exists, or what degree of transparency must exist, in the over-the-counter bond market, especially with respect to Enron bond purchasers, which were mainly sophisticated QIBs with substantial research capabilities and traders constantly engaging in conversation with traders from other large institutions, which Sundaresan admitted could have analyzed the publicly available information and come to a different conclusion than he had. *Id.* at 251, 269, 274-75.

Dr. Nye described the over-the-counter bond market, in contrast to a central stock exchange with a board posting prices, as a multi-dealer market in which traders call and negotiate with and among themselves by telephone or electronic messaging system. TR at 69. He

maintained it is an efficient, informationally up to the minute market and that bond dealers could obtain the most recent prices, whereas Bloomberg data was comparatively old.

Arguing that secondary corporate bond markets tend to be inefficient, Dr. Sundaresan focused on transparency, which he argued substantially supports efficiency.  He testified that to demonstrate "transparency," which his Declaration defines as "the widespread availability of information relative to current opportunities to trade and recently completed trades" (#4481 at 7), one must consider two aspects:  (1) pre-trade transparency (a potential buyer or seller in a transparent market would be able to evaluate the buy and sell interest in terms of an aggregation of bids and offers and the quantities that the market maker or market participants are willing to transact) and (2) post-trade transparency (where a buyer or seller who has completed a transaction could see how his transaction compared with that of others in price).  TR at 214-15; #4481 at 8.  He identified as a "market condition" promoting efficiency, low or no costs in trading securities and in obtaining information, which not available in the multi-dealer bond market, but admitted that condition is typical of an "idealized market."  #4481 at 6-7.  He maintained that a market with a high degree of transparency is likely to be informationally efficient, with higher trading volume and frequency, and vice versa.  *Id.* at 215; #4481 at 7.  He testified that he does not like the fact that corporate bond traders talk to each other on the telephone and he would prefer to see live bids and live offers so he can trade without negotiations.  *Id.* at 268  *See also* #4481 at 15; at 8 ("The existence of effective consolidation mechanisms would serve to reduce the search costs to potential investor by providing them with a complete picture of trading  opportunities with not just one dealer, but with multiple dealers.  This in turn, would promote transparency and efficiency.").

Nevertheless he conceded the bond traders at large institutions do not trade on unreliable information or on less than all publicly available information, which is the test of informationally efficiency.  *Id.* at 269.  *See also* #4481 at 14-20.  When asked if fewer events cause market participants to revalue bonds than for stock holders to revalue their investments, Sundaresan admitted, "That's probably true."  TR at 271-72.

The Court notes that no-cost efficiency, or for that matter transparency, has not been established as the standard for an informationally efficient, over-the-counter bond market. Obviously "transparency" is relative, involving consideration of numerous factors. No standard of requisite transparency has been established by the courts. Nor do Dr. Sundaresan's personal preferences for National Exchange trading set an absolute benchmark. In *Cammer*, the district court rejected arguments that stock traded over the counter was not traded in as efficient a market as stock on the National Exchanges, noting that "well-followed stocks, such as Apple Computer and MCI Telecommunications, have chosen to trade in the over-the-counter market rather than on a national exchange. On the other hand, some companies listed on national stock exchanges are relatively unknown and trade there only because they met the eligibility requirements." 711 F. Supp. at 1281. The district judge further discounted conclusory charges that the over-the-counter market is inefficient, thinly traded, with limited floats, where only a small portion of investors are comfortable investing, where trading is infrequent, slow etc., while national exchanges are better equipped to provide investors with the ability to trade instantaneously, and the market is more liquid than the stagnant over-the-counter market. *Id.* at 1282. The court stated, "The central question under the fraud on the market theory is whether the stock price, *at the time a plaintiff effected a trade,* reflected the 'misinformation' alleged to have been disseminated." *Id.* at 1282. It is not whether the market is the most efficient, but whether it is an adequately efficient market, that is required to trigger the fraud-on-the-market presumption. In other words, "The issue here is whether market makers in the over-the-counter market, specifically the market for [the particular issuer's] stock, provided a sufficiently fluid and informed  trading environment so that when material information about [the issuer] was disseminated, investors had available to them an opportunity to trade at informed, and therefore appropriate, bid and asked prices." *Cammer*, 711 F. Supp. at 1282-83. As pointed out by Dr. Nye, Enron was among the largest publicly traded firms in this country and ranked 27, 18, 7, and 5 in the Fortune Five Hundred List for 1998, 1999, 2000, and 2001, respectively. #4390 at 88. Moreover it was a cutting-edge, news-making leader in the energy industry, was followed and scrutinized constantly by analysts and the media.

Dr. Nye argued that the bond market is transparent if you wish to buy and follow the different, but still effective, procedure of the over-the-counter market, and the fact that the market is substantially composed of large QIBs, with trained staffs and substantial research capabilities that keep them well informed, ensures the market is informationally efficient. TR at 69-73.  Macey, *et al.* in *Good Finance*, 42 Stanford L. Rev. at 1089, quoting from Ronald J. Gilson & Reinier H. Kraakman. *The Mechanisms of Market Efficiency*, 70 Va. L. Rev. 549, 571-72 (1984), support Dr. Nye's point:  "in today's securities markets, the dominant minority of informed traders is the community of market professionals, such as arbitrageurs, researchers, brokers and portfolio managers who devote their careers to acquiring information and honing evaluative skills. . . . [P]rofessionally informed trading . . . explains why any information that is accessible to significant portions of the analyst community is properly called 'public,' even though it manifestly is not. Such information is rapidly assimilated into price, with only minimal abnormal returns to its professional recipients."  Macey, *et al.*, conclude, "Thus, when courts declare that plaintiffs are entitled to a presumption of reliance in fraud-on-the-market theory cases, what they actually mean is that plaintiffs are entitled to rely on the price decoding and setting mechanisms of market professionals."  *Id.*  He also pointed out that during the Class Period Bloomberg provided information about security terms, descriptions and certain pricing.  #4527 at 22.  Moreover the Securities Valuation Office of NAIC, an organization of insurance regulators, evaluated the riskiness of Enron-related securities  and provided valuations at which domestic insurance companies were required to carry these securities on their financial statements for regulatory capital purposes.  These insurers had holdings in each of the Enron registered bonds during the years of the Class Period.  #4390 at 43-44 and Ex. 20.

The Court finds that Dr. Nye has made a *prima facie* showing that Enron Registered Bonds and Preferred Securities did trade in an efficient secondary market. His analysis of the applicable *Cammer/Unger/Bell* factors support that showing.  Without an established standard or test for bond market efficiency or transparency or significant precedent, the Court finds that Dr. Nye has presented data demonstrating and reasonable arguments explaining why the secondary markets for

Enron debt securities were efficient, sufficient for a preliminary showing to trigger fraud on the market.  The Court concludes that denying application of fraud on the market to the bond market because it does not operate in the same way as a national exchange or trade in the same volume, frequency, or manner as equity on those exchanges is throwing out oranges because they are not apples.  The Court finds that the issue is not whether the market for equity is more efficient than the market for debt securities, but whether the market for debt securities is adequately informationally efficient (whether the price reflect all publicly available information) to trigger the fraud-on-the-market presumption of reliance.

Financial Institution Defendants disagree with Dr. Nye's finding that there was efficiency in the **primary** markets for bonds.[145]  Clearly some of the differences between stocks and bonds are evident in the ways they are first sold on the market.  When addressing the *Cammer* factor of market makers, Nye distinguished bonds from stocks and explained that when bonds are first offered, underwriters, as the intermediaries between sellers and buyers, bring them to market and typically state they intend to "make the market" in the issue they are underwriting. Dr. Nye stated that the data he received from the underwriters indicates that they did trade in the Enron Registered Bonds during the Class Period.  Nevertheless an *ex post facto* look at what happened does not

---

[145] Dr. Sundraresan cites from case law the characteristics of an efficient equity market: open ("any one, or at least a large number of persons, can buy or sell"); well developed ("one which has a relatively high level of activity and frequency, and for which trading information (*e.g.*, price and volume) is widely available"); and impersonal ("where transactions are executed based on posted bids and offers without further negotiations"). #4481 at 10-11.  While he cites cases for the first two definitions, he fails to do so for the last, which constitutes one of his main objections to the corporate bond market generally as an efficient market.  Moreover, the cases he cites dealt with stocks, not debt securities.

Dr. Sundaresan then argues that for primary markets for new issuances of corporate bonds, "there can be no assessment whether the markets have developed well and are performing efficiently, because the markets have not developed at all.  A primary market is not an open market, with many buyers ane sellers, but instead has only one seller and pricing is set by the issuer and the underwriter, after assessing macroeconomic conditions and what customers will likely pay.  With bond offerings, they may overprice the issue and offer a 'new issue premium' to the issuer from highly rated bonds." *Id.* at 12.

Primary bond markets are very different from primary stock markets, as is true of the relevant secondary markets.  It appears to this Court that rather than impose identical standards on both the equity and bond markets, primary and secondary, even when those standards will not fit the bond market, the Court needs to look at the specific facts of the disputed bond market, whether primary or secondary, and determine whether it was sufficiently informationally efficient.  There is no established, absolute standard.

translate into a conclusion that at the time of the trade there was an efficient market for these securities.

In *Basic, Inc.* the Supreme Court adopted the fraud-on-the-market theory in the context of an open, actively traded, well developed stock market. There is a line of cases conclusorily holding that primary bond markets *per se* are not open and have not developed at all, and thus the theory should not apply. *See, e.g., Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990)("We hold . . . that a primary market for newly issued municipal bonds as a matter of law is not efficient."); *Lipton v. Documation, Inc.*, 734 F.2d 740, 746 (11th Cir. 1984), *cert. denied*, 469 U.S. 1132 (1985); *In re Bexar Sec. Litig.*, 130 F.R.D. 602, 607 (E.D. Pa. 1990)(a primary market for newly issued bonds "is not efficient or developed under any definition of these terms."); *Ockerman v. May Zima & Co.*, 27 F.3d 1151, 1158-59 (6th Cir. 1994); *In re Safety-Kleen Corp. Bondholders* Litigation, No. 3:00-1145-17, 2004 WL 3115870, *5 (D.S.C. Nov. 1, 2004). *But see AAL High Yield Bond Fund v. Ruttenberg*, 229 F.R.D. 676, 684-85 & n.9 (N.D. Ala. 2005)(concluding that the market in a private offering of high yield corporate debentures was informationally efficient even though on some days there was low or no trading because there was a rapid reaction of the price to the release of firm-specific information, the company was eligible to file an S-3 registration statement, and there was a market maker).

Nevertheless, as court have increasingly recognized regarding ministerial applications of the *Cammer/Unger/Bell* factors or market efficiency evidence under *Greenberg*, there is a growing trend toward objecting to methodical and superficial application of them by courts without analysis of specific facts, as misleading.[146] The Fifth Circuit has noted that the *Cammer* factors are not exclusive and they are an analytic tool, not a checklist. *Unger*, 401 F.3d at 323, 325. There has

---

[146] Dr. Sundaresan makes such a showing when, instead of methodically applying the market maker factor from the equity analysis to the primary bond market and concluding there is a deficiency, he points out that the offering memoranda for several of the Foreign Debt Securities (i.e., Marlin Trust II, Marlin Water Capital Corporation II, Osprey Trust (Osprey I, Inc.) $750 million, 7.79% issue, Osprey Trust (Osprey (, Inc.) $1.40 billion, 8.31% issue, and Enron CLN Trust), state that there is no existing or potential markets for these notes. The Court agrees. Because, however, there is no class representative who has bought the Foreign Debt Securities, the Court has already ruled that the section 10(b) claims based on them must be dismissed.

been criticism of the assumption that the fraud-on-the-market presumption should not be extended to the initial public offering/primary market context. *See, e.g.*, Robert G. Newkirk, Comment, *Sufficient Efficiency: Fraud on the Market In the Initial Public Offering Context*, 58 U. Chi. L. Rev. 1393, 1394 (Fall 1991)(in the context of ECMH's theory of informational efficiency, "plaintiffs' reliance on the market price is indeed reasonable in many IPO situations, and . . . courts should consider the characteristics of the individual IPO market in applying the fraud on the market theory.").[147]

One factor that has been considered significant in such a determination is whether there is a "group of independent market professionals" involved in the IPO, "evidence that the market price is sufficiently information efficient" for reasons discussed *supra* with respect to QIBs. 58 U. Chi. L. Rev. at 1412. Newkirk proposes the following factors to evaluate whether such a group exists whose activities will generate a sufficiently information efficient market: "(1) the issuance of a significant volume of securities; (2) a large number of potential investors; (3) participation by professional investors outside of the IPO (such as pension fund managers or brokerage firms); and most critically, (4) the direct involvement of an impartial, reputable underwriter in the offering." *Id.* at 1414.

Dr. Nye testified that institutions (pension plans, mutual funds, etc.) were the major players in the Enron bond market. The underwriters were among the top financial institutions in the world. That they were also allegedly primary violators who secretly participated in the scheme to defraud was not publicly known information until the corrective disclosures occurred. (The issue of when the operative curative disclosure date occurred is one of fact, not properly resolved at class certification.)

Moreover, argued Nye, even in private placements, the debt securities are traded on publicly available information because the participants poll each other and exchange bids in setting prices.

---

[147] Mr. Newkirk defines "IPO": "An IPO is the issuer's original sale of a security to the investing public. This initial offering occurs in what is known as the primary market. The secondary market in which buyers and sellers trade the security after the initial sale. (The New York Stock Exchange and the over-the-counter markets are examples of secondary markets.) IPO securities may be stocks, bonds, or other financial instruments." 58 U. Chi. L. Rev. at 1422 n.5.

Furthermore, Dr. Nye attempted to show that the setting of the price of a new debt security is not an arbitrary decision of the issuer or the underwriter.  Dr. Nye points to the Declaration of R. Scott Flieger (#4488), Managing Director in the Debt Capital Markets Department of Deutsche Bank Securities, Inc. and previous co-head of its U.S. investment grade syndicate desk, who explains how a primary market price for registered Rule 144A and Regulation S fixed income investment grade corporate bonds in the primary market is set in consultation with knowledgeable institutional buyers in consideration of information available at the time.  #4527 at 19-20.  While Mr. Flieger described the process followed by Deutsche Bank, he stated, "My experience is that the process worked the same way as other institutions that served as lead Bookrunners during the Relevant Period [October 19, 1998 to November 27, 2001]."  #4488 at 2.

> Issuances of Bonds during the Relevant Period were managed by either a sole bookrunning, "Lead" bank or multiple "Joint Bookrunners" (each a "Bookrunner"). The New Issue Syndicate Desk (the "Syndicate Desk" of the Bookrunner(s) worked with the issuing entity (the "Issuer") to set the pricing terms at which the Bonds would be offered.
>
> . . . When Deutsche Bank acted as a Bookrunner during the Relevant Period, Deutsche Bank's Syndicate Desk indicated a "spread" range to the Issuer that the Syndicate Desk believed would be attractive to potential investors.  The spread range referred to the number of basis points the interest rate yield of a bond was (with 100 basis points equaling 1% above the then prevailing interest rate yield on a comparable U.S. Treasury bond.  By way of background, U.S. Treasury bonds were considered "risk-free" but non-U.S. Treasury Bonds were not.  As a result, a particular Bond offered during the Relevant Period had to yield more than the yield on a comparable U.S. Treasury bond in order to generate interest among potential investors.   Each Bond's comparable U.S. Treasury bond was known as its "benchmark" bond.  The difference between the yield of a particular Bond and its benchmark bond was referred to as the "credit spread." . . .
>
> . . . If the Issuer agreed with the credit spread indicated by Deutsche Bank's Syndicate Desk, the Syndicate Desk then shared the indicative credit spread range with the salesforce of Deutsche Bank's Institutional Client Group ("ICG").  The ICG's salesforce then communicated the indicative credit spread range to institutional investor clients.  The Issuer and the Syndicate Desk, based on an analysis of market credit conditions, prices for comparable bonds, interest rate levels and feedback ICG received from potential investors about the indicative spread range, settled on the final credit spread pricing terms that they believed would secure the most successful distribution of the Bonds to investors. . . . Bonds offered during the relevant Period were marketed primarily to institutional investors, with occasional sales to "Accredited Investors" (sophisticated investors with a high net worth).

#4488 at 1-2.

Nevertheless, Mr. Flieger's Declaration shows that the primary market was not an "open" one. Once the credit spread was determined as indicated *supra*, it was provided to the initial purchaser/underwriter's salesforce, which then selected, targeted and solicited particular institutional investors through such means as "preliminary offering documents, group investor conference calls, invitation-only group investor meetings, Bloomberg Roadshows, one-on-one meetings and telephone conversations." #4488 at 2. Dr. Nye does not address this aspect of the primary market.

Mr. Flieger describes the secondary market for buying and selling bonds during the Class Period as tending to involve the same institutional investors that bought the bonds in the primary market and "street brokers" who facilitated bond trading between bond traders at various banks, with some expansion to include other institutional investors and dealers. #4488 at 3. Nevertheless the secondary market was "open" in that anyone wishing to participate could, by phoning in or sending an e-mail via Bloomberg to the salespersons they knew at different banks, and the informal, informational flow of the over-the-counter market place described earlier would ensue.

The Court finds that the primary markets, with a single seller and with the private and targeted solicitation of investors by the initial purchasers/underwriters' salesforces in the primary markets here, cannot qualify as open markets.[148] Nevertheless, because any statutorily qualified investor could enter the secondary market, participate in negotiating a buy based on real-time up-to-th-minute prices by calling the secondary market participants, the Court finds that a preliminary case has been made that these secondary over-the-counter markets for debt securities are efficient, albeit in a very different way than the national stock exchange markets.

## J.    Claims Against Deutsche Bank Entities

This Court has reviewed the following related pleadings:  (1) the Deutsche Bank Entities' motion for partial reconsideration and dismissal, or motion to require a second amended complaint

---

[148] Although the Court has ruled that claims based on the Foreign Debt Securities cannot be certified here, it notes in passing that the offering memoranda of the Osprey, Yosemite and Marlin offerings stated, "There is no existing market for" the securities and "there can be no assurance as to the liquidity of any market that may develop." Osprey I at 14; Yosemite III at 11; Osprey II at 16; Marlin II at 16-17. These facts also support a finding of an inefficient primary market.

before a response by them (#3791), memorandum in support (#3794), and notice of supplemental authority (#4626); (2) Lead Plaintiff's motion for leave to file an amended complaint as to Deutsche Bank, motion for entry of an order requiring Deutsche Bank to answer Lead Plaintiff's amended complaint, and Lead Plaintiff's opposition to Deutsche Bank's motion for partial reconsideration and dismissal (#3903); (3) Deutsche Bank Entities' reply memorandum in support of their motion for partial reconsideration and dismissal and memorandum in opposition to Lead Plaintiff's motions (#3941); and (4) Deutsche Bank Entities' supplemental filing (#4338).

After a careful review of these documents, the Court's order of July 26, 2005 (#3727) granting Lead Plaintiff's motion for reconsideration (#2101) of the Court's order of March 29, 2004 dismissing §§ 10(b) and 20(a) claims against Deutsche Bank Defendants,  and recent and highly relevant Fifth Circuit law, the Court finds that Lead Plaintiff's past claims (First Amended Consolidated Complaint #1388, ¶¶ 787-799 (which includes time-barred tax scheme allegations)) and proposed amended allegations (Ex. 1 to #3904) against Deutsche Bank fail to assert a claim under the statutes.

The Court had previously ruled that claims based on Deutsche Bank's conduct in creating the structured tax transactions, which allegedly violated tax law by lacking a legitimate business purpose and serving only to artificially and substantially inflate Enron's pre- and post-tax income (and claims based on the substantial financial impact resulting from them), are time-barred (#2036), except perhaps for Valhalla.  The Court also concluded that conduct might be used to demonstrate scienter for subsequent violative conduct.[149]

---

[149] The Court earlier determined that the allegations that Deutsche Bank's six pre-Class Period structured tax transactions  operated as a sham, lacked a legitimate business purpose, were designed to mislead investors by inflating Enron's financial results, and thus the value of its publicly traded securities, and allowed Enron to avoid paying federal income taxes from 1996-2001 as well as to recognize present earnings from future speculative tax savings, would have stated primary violations of § 10(b) and Rule 10(b)-5(a) and (c) if they were not time-barred.  Among the SEC's examples in its recent *amicus curiae* brief, the Court would place these allegations in the category of the third party (as primary violator) and the corporation engaging in a sham transaction whose principal purpose and effect is to create a false appearance of revenues for years into the future, intended to deceive investors in that corporation's stock.

After dismissal in this Opinion and Order of the § 12(a)(2) claims for lack of a class representative, the crux of Lead Plaintiff's remaining § 10(b) claims against Deutsche Bank entities are based (1) on underwriter Deutsche Bank's offering memoranda for various Foreign Debt Security notes, which were allegedly false and misleading because they incorporated Enron's false and misleading financial statements and SEC filings; (2) on statements made by analysts, specifically Paul Tice, or by Deutsche Bank managing director Paul Cambridge, who allegedly helped draft the offering documents for Osprey I and II Notes Offerings and the Marlin II Note Offering, which he purportedly knew were false and misleading because he knew from extensive personal involvement about Deutsche Bank's structured tax transactions; and (3) Deutsche Bank's nonrepresentational conduct involving LJM2 and related SPEs in the alleged Ponzi scheme.

The first category and the second category's claim involving Cambridge[150] are based on alleged misrepresentations in the offering memoranda, not concealed conduct contributing to the scheme.   Previously (#3727), before the issuance of *Greenberg*, the Court found that Lead Plaintiff's allegations against Cambridge (#2698) satisfied the scienter requirements in *Southland* to assert liability against Deutsche Bank for Cambridge's statements, specifically the offering memoranda for Osprey I, II, Marlin II, and Yosemite I Notes that Cambridge purportedly made or authorized to be made, and for which he had the primary responsibility to perform due diligence. Cambridge had been substantially and personally involved in the earlier tax transactions.  #3727

---

[150] Initially the Court dismissed the § 10(b) claims against Deutsche Bank based on the structured tax transactions as time-barred, but left the § 12(a)(2) claims pending.  In the wake of *Southland*, Lead Plaintiff was permitted to replead with allegations against Cambridge making or authorizing misleading offering memoranda for the Foreign Debt Securities at issue within the Class Period. To plead scienter, the new pleadings alleged that Cambridge knew about the fraudulent structured tax transactions because, as Deutsche Bank's Senior Relationship Manager for the Enron account, he reviewed all the tax transactions at least once a year, met with the tax team to discuss the objectives of each transaction before it was closed, received numerous memoranda on specific dates from named individuals regarding specific tax transactions generating specified sums in after-tax accounting income, indicating that Enron was recognizing pre- and post-tax income from these tax transactions that had no legitimate business purpose, and that Neal Batson's interim report found no reasonable basis for characterizing such income as pre-tax income.  Thus Lead Plaintiff alleged that Cambridge knew that the offering memoranda for the Foreign Debt Securities underwritten by Deutsche Bank, incorporating Enron's financial statements and not disclosing the lasting effects of the tax transactions, were false and misleading.  The Court found these allegations sufficient at the time to state a primary violation under § 10(b) and reinstated the claims under the statute.  The *Greenberg* case issued since, however, requires reconsideration of that ruling.

at 7-8.  In their motion to reconsider, Deutsche Bank entities argue that Lead Plaintiff has failed to allege facts raising a strong inference that Cambridge knew or was severely reckless in ignoring that the tax transactions were purportedly fraudulent, no less that the offering memoranda were.

Even if one assumes for this purpose that in its proposed amended allegations Lead Plaintiff has pled sufficient facts to raise a strong inference that Cambridge knew the written offering memoranda were false when he drafted or authorized them because the memoranda incorporated Enron's false and misleading financial statements, and even if  Cambridge and Deutsche Bank intended to defraud investors by these offering memoranda, a proposition that Deutsche Bank vigorously challenges, claims based on these purportedly misleading offering memoranda cannot survive under *Greenberg*.  First, as a matter of law, the alleged misrepresentations in the offering memoranda that incorporated Enron's financial statements and SEC filings are "confirmatory" and cannot be the basis for a fraud-on-the-market presumption of reliance.[151]  Lead Plaintiff does not identify any alleged misleading statements other than Enron's incorporated financial statements in the offering memoranda,[152] in particular any statements that were actually "created" by Deutsche Bank employees, nor has it shown that Deutsche Bank employees in any way participated in the preparation of the incorporated, allegedly misleading Enron financial statements.  *See generally* Court's Opinion and Order, #46 on H-04-0088 at 46-47[153] (dismissing claims against Milbank Tweed).

---

[151] Moreover, as noted elsewhere in this opinion, for purposes of the fraud-on-the-market presumption of reliance, more than a preponderance of the evidence thus far indicates that the offering memoranda of these Foreign Debt Securities state that they were issued under Rule 144A or Regulation S in restricted offerings, which as discussed elsewhere in this opinion, would not qualify as efficient markets.  The offering memoranda expressly stated that they are confidential and prepared solely for the QIBs permitted to purchase them, are not offers to any other persons of the public generally, and that there is no existing market for the notes offered nor any assurance that there would be the development or liquidity of a market for them.

[152] Lead Plaintiff argues that in the offering memoranda Deutsche Bank not only incorporated the Enron financial statements, but also omitted any explanation of the tax transactions.  As noted, claims based on the latter are time-barred.

[153] Available on Westlaw:  2005 WL 3704688, *10-11 (S.D. Tex. Dec. 5, 2005).

Second, Lead Plaintiff fails to allege and show loss causation, i.e., that the misleading offering memoranda of the Foreign Debt Securities had a significant effect on the market price of Enron securities. Since the offering memoranda of the Foreign Debt Securities expressly state that they were prepared by the issuers (not by Deutsche Bank), that the information about Enron was provided by Enron, and that they are confidential and intended for use exclusively in the restricted offering of these Notes to QIBs and for which there is no established market, Lead Plaintiff provides no satisfactory reason why *Newby* class member investors generally, i.e., purchasers of other Enron securities,[154] would be relying on the offering memoranda of the Foreign Debt Securities at issue to support a § 10(b) claim against Deutsche Bank entities.

As for the allegations relating to fixed-income research analyst Paul Tice, the proposed amended allegations fail to allege facts demonstrating that Tice knew, or was severely reckless in not knowing, that his report was false and misleading.   Lead Plaintiff futilely attempts to circumvent *Southland*'s requirement that plaintiff must allege facts demonstrating that the analyst had the requisite scienter by pleading that the "publication has been prepared by and reflects the current view of Deutsche Bank Securities, Inc." and its holding company.  Proposed allegations at 19-20, Ex. 1 to #3904.  That Tice may, as alleged, have ignored the Chinese wall between securities analysts and the commercial and investment bank services at Deutsche Bank and discussed his reports with Deutsche Bank investment bankers does not give rise to a strong inference of scienter nor demonstrate that Tice knew or was reckless about whether his reports were accurate.  Thus under *Southland* Lead Plaintiff fails to state a claim against the Deutsche Bank entities based on Tice's report.

Lead Plaintiff's proposed amended allegations against Deutsche Bank Entities (attached as Ex. 1 to #3904) assert that Deutsche Bank employees Calli Hayes and Markus Tarkington, in the Credit Risk Management Group, and Vice President Seth Rubin had the responsibility during due diligence to approve the statements that went into the offering memoranda for the note offerings

---

[154] As indicated, the claims of the purchasers of those Foreign Debt Securities are not certifiable as class claims because of a lack of a class representative to prosecute them.

as accurate, full, and fair.  Regardless of whether they knew of any fraudulent statements or were reckless in approving the offering memoranda, their intent does not cure the problem that the only alleged misrepresentations in the offering memoranda are the incorporated Enron financial statements, which are confirmatory statements under *Greenberg* and thus cannot trigger the fraud-on-the-market presumption of reliance.

The proposed amended allegations assert that various employees worked on various Enron-related projects; but they are  conclusory and fail to demonstrate by pleading specific facts how, when and where these particular employees learned that Enron was fraudulently employing these deals to manipulate its financial results.  None of the statements Lead Plaintiff quotes demonstrates that the devices or transactions employed were inherently illegal, deceptive, or fraudulent as used in Enron's course of business.

The proposed amended allegations that Deutsche Bank provided standard services, i.e., underwrote billions of dollars of Enron-related securities, lent money to Enron, provided commercial banking and investment banking services to Enron, and earned a lot of money in fees from Enron, or that its employees who performed due diligence on Enron projects had an obligation to ensure that statements in offering memoranda are full, fair and accurate, in an effort to plead scheme liability under § 10(b), are too general and clearly lack the kind of specific facts that would support a strong inference of scienter under the PSLRA.  Moreover, under the SEC's examples these acts constitute aiding and abetting and thus are not actionable under § 10(b) in this case pursuant to the holding of *Central Bank*.  Lead Plaintiff also conclusorily asserts that Deutsche Bank loaned $50 million to the Hawaii 125-0 Trust (characterized by Deutsche Bank as "participation in routine group loan syndicates for deals designed and led by others"), so that Enron could sell underperforming assets to the Trust to recognize earnings without disclosing that the sale was guaranteed by a total return swap with Enron.  It also asserts that even Deutsche Bank made a number of other loans but, unlike with regard to other Financial Institution Defendants, provides no details supporting the conclusion that they were "concealed." Again, application of the SEC's examples distinguishing aiding and abetting, inactionable in a private action after *Central Bank*,

from primary violations under § 10(b), places such conduct in the former category.  A bank making a loan to a borrower, even where it knows the borrower will use the proceeds to commit securities fraud, is aiding and abetting.  #4528, Ex. I at 20.  Thus a loan by Deutsche Bank to an Enron-related entity merely provided the means for Enron to commit securities fraud.  *See Parmalat*, 376 F. Supp. 2d at 303 (Financings and investments are not sham transactions if there is no suggestion that the transactions were something other than what they purported to be; "[a]ny deceptiveness resulted from the manner in which [the issuer] or its auditors described the transactions on [the issuer's] balance sheet and elsewhere.").

The remaining allegations of liability under Rule 10b-5(a) and (c) present a closer question as Lead Plaintiff paints a picture of Deutsche Bank's involvement as "a robust participant" in the deceptive scheme or course of business that was something other than what it appeared to be and from which Deutsche Bank pocketed allegedly illicit gains.  Lead Plaintiff has alleged that Deutsche Bank structured and financed LJM2 and thereafter served on LJM2's Advisory Committee, though no details are provided about its specific actions.[155]  Lead Plaintiff highlights the fact that in spite of the obvious conflict of interest created by Fastow's dual roles at Enron and LJM2, "as a reward" for ongoing services to Enron in the scheme, Deutsche Bank was solicited and lured, along with other Enron-selected institutional investors and their executives via confidential offering memoranda containing blatant promises of extraordinary and rapid returns of 30% or more ("more" as it turned out) if they invested in LJM2.  Deutsche Bank's top executives invested at least $10 million in LJM2.[156]  Then they, along with the other banks investing in LJM2, "actually

---

[155] Lead Plaintiff asserts generally that as a member of the Advisory Committee Deutsche Bank had an obligation to police the transactions that LJM2 entered into to make sure they were negotiated at fair-market rates, review transactions for potential conflicts of interest, including Fastow's self-dealing, and approve a number of LJM2's investments including the fraudulent Raptor transactions.  As a member of the Committee, Deutsche Bank may have had such an **obligation**, but Lead Plaintiff fails to assert facts addressing specifically what was presented to that Committee and what Deutsche Bank, in particular, actually did on that Committee.

[156] The First Amended Consolidated Complaint (#1388 at ¶ 648)  asserts that "Fastow's glaring conflict of interest" and the self-dealing of the banks investing in LJM2 were noted.  The February 11, 2002 edition of *Business Week* reported that many institutional investors rejected the invitation to buy in and questioned the credibility of "some of the world's biggest" that "took a piece," including Citigroup, Credit Suisse Group, Deutsche Bank, JP Morgan and Lehman Brothers.

***witnessed and benefitted*** from a series of extraordinary payouts from the Raptor SPEs which LJM2 controlled over the next two years--securing hundreds of millions of dollars in distributions from the Raptors to LJM2 and ***then to themselves***--cash generated by illicit and improper transactions Enron was engaging in with the Raptors to falsify its financial results." *Id.* at ¶¶ 461, 649.

The Court finds that Lead Plaintiff reasonably infers that the alleged facts surrounding the investment were sufficient at least to provide Deutsche Bank with knowledge that LJM2 did not satisfy the 3% rule for independent SPEs, that, in what was an obvious conflict of interest, the SPE was run by Enron's CFO Andrew Fastow, and thus was not independent of Enron, and that LJM2 should have been consolidated on Enron's financial statements, all violations of GAAP. The complaint (#1388 at 444) states that the investors in LJM2 "knew, because LJM2 was going to be principally used to engage in transactions with Enron where Enron insiders (Fastow, Kopper, and Glisan) would be on both sides of the transactions, that the LJM2 partnership would be extremely lucrative." Thus according to these allegations, the institutions' investments aided and abetted the Enron insiders ("LJM2's day-today activities would be managed by Enron insiders Fastow, Kopper and Glisan," *id.*) to do transactions with Enron to create a deceptive picture of Enron's financial condition for the public. Lead Plaintiff in essence charges that LJM2 was a deceptive device or contrivance that was then used by Enron insiders, and therefore Enron, to create a number of other SPEs, including the "infamous Raptors," "with which Enron engaged in illusory transactions to artificially inflate Enron's profits while concealing billions of dollars in debt that should have been on Enron's balance sheet."[157] First Amended Consolidated Complaint (#1388 at ¶ 646). The allegations are sufficient to raise a inference that the LJM2 investors should have been suspicious that they were engaging in illicit or at least questionable conduct to get rich quick. Nevertheless no specific facts are alleged showing that they knew, or were severely reckless in not knowing, that the transactions involving LJM2 were being used to conceal debt and inflate earnings for Enron, but even if they did, their investment again would constitute aiding and abetting. The key fact is

---

[157] Lead Plaintiff does not plead specific facts showing how any of the LJM2 investing banks knew the Raptors were, or would be "infamous," no less for what purposes they were to be used.

that Lead Plaintiff does not allege facts demonstrating that they were involved in the operation of LJM2 and in where and how its monies were being used by Enron and Fastow.

In the context of the purported scheme, Lead Plaintiff asserts that Deutsche Bank also structured two of what Lead Plaintiff calls LJM2's ongoing "manipulative transactions," Osprey Trust and Marlin Trust, to permit Enron and/or its auditors to conceal debt, but does not explain specifically what was inherently deceptive in these structurings created by Deutsche Bank. Instead the complaint only pleads in conclusory fashion, that Osprey and Marlin were "designed to transfer billions of dollars of debt off Enron's balance sheet." Once again, without specific facts demonstrating that Deutsche Bank established an innately illicit deceptive entity or device, Deutsche Bank was at most merely aiding and abetting any subsequent deceptive use of these entities by Enron, the trustees,[158] and Enron's auditor. *Id.* at §§ 466, 497-98. Nor do allegations that Deutsche Bank provided its services as underwriter for Enron's Osprey I notes (9/99), Yosemite I notes (11/99), ECLN I notes (8/00), Osprey II notes (9/00), zero coupon convertible notes (2/01 with resale 7/01), and Marlin II notes (7/01) state a claim for a violation of § 10(b).

Given the extensive discovery that has occurred, under recent Fifth Circuit case law the Court finds that the current and proposed amended allegations against Deutsche Bank fail to state a primary violation of § 10(b), and derivatively a claim for control person liability under § 20(a). Thus the Court grants Deutsche Bank Entities' motion to reconsider and its motion for dismissal of the § 10(b) claim (#3791) against them, and denies as moot Lead Plaintiff's motion for leave to amend and motion for entry of order requiring Deutsche Bank to answer (#3903).

**V.    Court's Order:**

Consistent with the findings and conclusions discussed above, the Court ORDERS the following:

---

[158] The same is true of Lead Plaintiff's claim that Deutsche Bank "structured Osprey to fund Whitewing knowing Enron sold assets to Whitewing at inflated values to falsify Enron's earnings." There are no specific facts demonstrating an inherently improper, deceptive structure designed by Deutsche Bank that deceived investors. As stated, the allegation is for aiding and abetting.

Because no class representative with standing to sue under § 12(a)(2) has come forward, the § 12(a)(2) claims of the 1933 Act against all Defendants are dismissed without prejudice.

Deutsche Bank Entities' motion to reconsider and motion for dismissal (#3791) is GRANTED, and Lead Plaintiff's motion for leave to amend (#3903) is DENIED as moot.  Because all claims against Deutsche Bank have been dismissed, all its pending motions are MOOT.  If, in the light of this Court's refinement of its primary violator standard, any other party wishes to challenge claims against it on the grounds that they are merely aiding and abetting allegations, it shall do so by summary judgment and not re-urge or move to reconsider motions to dismiss at this stage of the litigation.  All have had the benefit of substantial discovery for preparation of such motions or opposition.

All § 10(b) claims against remaining Defendants based on offering memoranda of the Foreign Debt Securities are DISMISSED without prejudice for lack of standing.

Based on *Southland*, 364 F.3d 353, the Court dismisses with prejudice all § 10(b) claims against Defendant corporations based on analyst statements where there have been no facts pled giving rise to a strong inference that the analyst making the statement did so with scienter.  If there is a question, it should be raised by motion for summary judgment.

Lead Plaintiff shall amend the class definition as indicated within one week of entry of this order in accordance with this opinion.  The Court has previously ordered Plaintiff to file a trial plan, with an opportunity for Defendants to respond.  After reviewing these submissions, if the Court finds them satisfactory, it will issue an order certifying the *Newby* class.

**SIGNED** at Houston, Texas, this 5th   day of June, 2006.


MELINDA HARMON
UNITED STATES DISTRICT JUDGE