IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re Enron Corporation Securities, Derivative & "ERISA" Litigation | § § § § | MDL-1446 |
| MARK NEWBY, ET AL., | § § | |
| Plaintiffs | § § | |
| VS. | § § | CIVIL ACTION NO. H-01-3624 CONSOLIDATED CASES |
| ENRON CORPORATION, ET AL., | § § | |
| Defendants | § | |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al., Individually and On Behalf of All Others Similarly Situated, | § § § § § § | |
| Plaintiffs, | § | |
| VS. | § § | |
| KENNETH L. LAY, et al., | § § | |
| Defendants. | § | |

**OPINION AND ORDER OF CLASS CERTIFICATION**

In the aftermath of the opinion and order issued by the Court on June 5, 2006 and entered on June 7, 2006 (#4735), the Court has received Lead Plaintiff's Trial Plan (#4729) and responses to it filed by the parties (#4755 by Financial Institution Defendants; #4756 and 4757 by Merrill Lynch, Pierce, Fenner & Smith Incorporated and Merrill Lynch & Co., Inc.; and #4758 by Alliance Capital Management L.P., now known as Alliance Bernstein L.P.). It has also received Lead Plaintiff's proposed order with an amended

1

class definition (#4765), the Financial Institutions' objection (#4798), and Lead Plaintiff's response (#4804).

As part of the rigorous analysis of Federal Rule of Civil Procedure 23 prerequisites required before a class can be certified, although a district court has broad discretion to certify a class, it must exercise that discretion within the confines of the Rule. *Castano v. American Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996).  It must go beyond the pleadings to understand the claims, defenses, relevant facts and applicable substantive law.  *Id.* at 744.  Under the predominance and superiority inquiries for certification of a class under Rule 23(b)(3), aided by a trial plan submitted as part of the plaintiff's burden of establishing the prerequisites to class certification, the court must consider how a trial on the merits would be conducted and make a meaningful determination of which claims should be tried on a class basis or on an individual basis. *Id.* at 740, 744-45 (knowing how a case will be tried is necessary to decide whether the common issues predominate, while "the greater the number of individual issues, the less likely superiority can be established").

Nevertheless no set criteria for trial plans have been established by the Fifth Circuit, while the necessity of one appears to rest in large part on the novelty of the cause of action and the number and significance of common issues versus individual

2

issues. Moreover, not only is there no clear standard that a trial plan must meet, but it appears that the district court may also construct such a plan to satisfy the Rule 23 analysis. Therefore it can make up for any deficiencies in the Plaintiffs' trial plan.

In *Castano*, which was a multi-state class action based on state law with a novel theory of liability, i.e., that "defendants fraudulently failed to inform consumers that nicotine is addictive and manipulated the level of nicotine in cigarettes to sustain their addictive nature," 84 F.3d at 737, the panel found two errors in the district court's class certification analysis that warranted reversal: (1) the district court did not consider how variations in different states' laws impacted the predominance and superiority analysis and (2) in its predominance evaluation, court did not consider how a trial on the merits would be conducted. 84 F.3d at 740. In *Newby*, by contrast, Plaintiffs sue only under federal law and the Texas Securities Act so there is no variation in law that might "swamp any common issues and defeat predominance." 84 F.3d at 741. This Court has considered and continues to consider how the trial will be conducted.

In *Smith v. Texaco, Inc.*, 263 F.3d 394 (5th Cir. 2001)(2-1), the majority of a Fifth Circuit panel reversed the district court's certification of a class of salaried black employees alleging race discrimination under Title VII and remanded the suit. While a petition for rehearing *en banc* was pending, the parties settled

3

their dispute and the same panel withdrew its earlier opinion and dismissed the action.  281 F.3d 477 (5th Cir. 2002).  Nevertheless in the first opinion, Judge Smith, writing for the majority, stated that *Castano* did not establish a general rule that the district court must detail a litigation plan, but instead

> criticized the district court for certifying a class in the absence of any knowledge of how an addiction-as-injury case actually would be tried. . . . *Castano* merely requires district courts to appreciate the legal theories applicable in a particular case, not to recite standard management strategies for common suits.

263 F.3d at 416-17.  Noting that employment discrimination is not a "new-fangled" cause of action like the novel theory in *Castano*, which the Fifth Circuit concluded necessitated a detailed trial plan, Judge Smith observed in *Smith v. Texaco, Inc.* that "the district court *might* have been able to describe a management plan that would resolve the superiority challenges presented in this case.  It did not do so, however.  That omission is a lost opportunity, not a defect."  *Id.* at 417.

Federal securities law violations are not novel causes of action, although issues regarding scheme liability, loss causation, and proportionate liability are unresolved.  Moreover, few federal securities class actions have been tried so as to offer "a track record of trials from which the district court could draw the information necessary to make the predominance and superiority analysis required by rule 23."  *Id.*  Thus in determining how a trial on the merits will be conducted, the Court here considers

4

certain matters that it did not reach in #4735, but will not address a number of arguments raised by objectors to Plaintiff's Trial Plan that are rehashings of issues of law upon which this Court has recently ruled.

The Court finds that some of the objections are to the absence of information that is not required in a trial plan, such as Alliance's objection that Lead Plaintiff has not identified its witnesses. Others seem to have misinterpreted the Court's recent opinion (#4735). For instance, Merrill Lynch asserts that the Court finds that the *Affiliated Ute* presumption of reliance applies, but not the fraud-on-the-market presumption under *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657 (5th Cir. 2004). This Court concluded with respect to the fraud-on-the-market theory that *Greenberg* applies only to misrepresentation claims under Rule 10b-5(b), but not to representational conduct cases; it also concluded that fraud-on-the-market presumption of reliance can apply to conduct charged under Rule 10b-5(a) and (c), not addressed by *Greenberg*. Moreover, the Court has adopted the SEC's approach to reliance and causation for such deceptive conduct because otherwise early key schemers, "directly or indirectly" committing primary violations of § 10(b), but not making public misleading statements, would be insulated from liability. #4735 at 77-82. While some objectors complain of a lack of evidence in the trial plan, proving the claims will be Plaintiffs' burden at trial:

there is no authority for their contention that evidence must be presented in a trial plan.

The Court finds that Lead Plaintiff's trial plan (#4729) presents an orderly and methodical approach for trying the alleged overarching scheme, arising from a common nucleus of fact and common course of conduct, to misrepresent Enron's financial status, fool credit rating agencies, and deceive investors. Lead Plaintiff has organized the numerous and varied parties, entities, and transactions into eight main categories (prepays, share trusts' transactions, Forest Products transactions, FAS 125/140,[1] tax transactions, minority-interest financing,[2] related-party transactions, and other[3]). Lead Plaintiff also categorized separately the transactions used to misrepresent Enron's broadband business: (1) the "phantom broadband business"; (2) the "investment grade credit rating cliff" created by concealment of

---

[1] Use of off-balance-sheet SPEs for fraudulent "sales" of Enron assets.

[2] Described by Enron Bankruptcy Examiner Neil Batson in his Second Interim Report at 37, 44-45, Lead Plaintiff claims that Enron borrowed over $1.75 billion through majority-owned subsidiaries and reported it as equity investments by minority investors and $500 million of that amount as recurring cash flow from operations.

[3] "Other" encompasses five transactions that do not fit into the other categories but were central to the alleged scheme used to misstate Enron's financials at key times: (1) the Nigerian Barge transaction with Merrill Lynch; (2) the Electricity Transaction with Merrill Lynch; (3) the JP Holdings transaction with Barclays, Credit Suisse First Boston and Citigroup; (4) the SO2 transaction with Barclays; (5) Camelot I and II with Barclays.

Enron's true debt; and (3) Enron Energy Services, falsely represented as an ongoing, viable business.

Moreover, the causes of action are organized into four categories: (1) fraud claims under § 10(b) (and derivative claims under § 20(a)); (2) strict liability claims under § 11 (and derivative claims under § 15); (3) insider selling claims under § 20A of the 1934 Act ; and (4) and claims under the Texas Securities Act.  Lead Plaintiff identifies the elements of each of the causes of action and the Defendants against which each is asserted.

For the § 10(b) claims, Lead Plaintiff summarizes its factual allegations against each Defendant and explains how it will establish scienter as to each Defendant.  Plaintiffs have indicated that they will prove reliance to be a common issue by demonstrating that they are entitled to the group presumptions of reliance under *Affiliated Ute* and/or the fraud-on-the-market theory.  #4729 at 11-19.  The Court's recent opinion (#4735) discussed Lead Plaintiff's evidence of market efficiency at length and determined that the primary bond markets as a matter of law were not traded in an "open" market and thus investors in those Enron securities are not entitled to the fraud-on-the-market presumption of reliance for claims based on them.  #4735 at 137-175.  The Court also addressed loss causation under *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 125 S. Ct. 1627 (2005), #4735 at 94-102, and with respect to *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657 (5th Cir. 2004),

*SEC v. Zandford*, 535 U.S. 813, 122 S. Ct. 1899 (2002), and *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472 (S.D.N.Y. 2005), *inter alia*. I*d.* at 74-82, 134-37. In its trial plan, to demonstrate cause and effect Lead Plaintiff identifies a number of misleading statements that inflated the price of Enron stock and negative disclosures which caused significant drops. #4729 at 22-25.

One area that has caused significant concern among the objectors and which the Court has not yet addressed in detail is the liability scheme under § 21D(g), added to the Securities Exchange Act of 1934 by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(g)(West Supp. 2005). Although the issues it raises are common to the class members as a whole, and they are decided by the same jury as all other issues at trial, so there is no Seventh Amendment problem, the provisions' lack of clarity and ambiguity make an orderly trial a challenge. Lead Plaintiff's trial plan has failed to deal with the PSLRA's joint and several/proportionate liability scheme for the trial. After reviewing the matter, the Court concludes that there are substantial difficulties with the statute, which has been criticized as potentially unconstitutional, impractical, and incapable of being effected. *See, e.g.,* Stuart M. Grant and Megan D. McIntyre, *The Devil Is In The Details: Application Of The PSLRA's Proportionate Liability Provisions Is So Fraught With Uncertainty That They May Be Void for Vagueness*, 1505 PLI/Corp 83

(September 2005); Denis T. Rice, *A Practitioner's View of the Private Securities Litigation Reform Act of 1995*, 31 U.S.F.L. Rev. 283 (Winter 1997); Donald C. Langevoort, *The Reform of Joint and Several Liability Under the Private Securities Litigation Reform Act of 1995: Proportionate Liability, Contribution Rights and Settlement Effects*, 51 Bus. Law. 1157 (Aug. 1996). Furthermore the Court has been unable to find any opinion by a court that has actually tried a case utilizing the provisions. Nevertheless the Court will summarize the law and set out a plan for its application here in an effort to alleviate the problems. The Court notes that the same difficulties caused by § 21D(g) would apply to a non-class action as well as to a class action and thus they do not raise a superiority challenge.

Eliminating joint and several liability in most private federal securities actions, the PSLRA provides for proportionate liability unless the trier of fact finds that the defendant "knowingly" violated the securities law. 15 U.S.C. § 78u-4(f)(2)(A)("Any covered person[4] against whom a final judgment is entered in a private action shall be liable for damages jointly and severally only if the trier of fact specifically determines that such covered person knowingly committed a violation of the

---

[4] A "covered person" is "a defendant in any private action arising under the chapter" or "a defendant in any private action arising under section 77k of this title, who is an outside director or the issuer of the securities that are the subject of the action." 15 U.S.C. § 78u-4(f)(10).

securities laws.").[5] Thus only knowing violators of the Securities and Exchange Act of 1934 and outside directors and other defendants who knowingly violate Section 11 of the Securities Act of 1933[6] will be subject to joint and several liability.

Otherwise, "a covered person against whom a final judgment is entered in a private action shall be liable solely for the portion of the judgment that corresponds to the percentage of

---

[5] To "knowingly commit a violation of the securities laws" with respect to a material misrepresentation or omission means

> (I) that covered person makes an untrue statement of material fact, with actual knowledge that the representation is false, or omits to state a fact necessary in order to make the statement made not misleading, with actual knowledge that, as a result of the omission, one of the material representations of the covered person is false; and
> (II) persons are likely to reasonably rely on that misrepresentation or omission . . .

15 U.S.C. § 78u-4(f)(10)(A). For conduct that violates the statute, a covered person "knowingly" commits a violation "if that covered person engages in that conduct with actual knowledge of the facts and circumstances that make the conduct of that covered person a violation of the securities laws." § 78u-4(f)(10)(B).

[6] As noted by Langevoort, 51 Bus. Law. at 1164 [footnotes omitted],

> Concerned with the harsh impact of section 11 on outside directors, and fearing that section 11 liability makes outside directors harder to attract, the new legislation allows for proportionate liability where an outside director's only failing was a lack of due diligence or negligent failure to discover the truth. Given the very small role that outside directors play in public offerings vis-a-vis the other participants, one would suspect the effect of this provision should be near total elimination of liability exposure for those not actually privy to the fraud.

responsibility of that covered person . . . ." 15 U.S.C. § 78u-4(2)(B). Therefore a reckless violation of the securities laws will result in only proportionate liability[7]; actual knowledge, more demanding that the Fifth Circuit's "severely reckless" standard for scienter under § 10(b), is required to impose joint and several liability.

To determine what portion of the judgment a covered party is responsible for,

> the court shall instruct the jury to answer special interrogatories, or if there is no jury, shall make findings with respect to each covered person and each of the other persons claimed by any of the parties to have caused or contributed to the loss incurred by the plaintiff, including persons who have entered into settlements with the plaintiff or plaintiffs concerning–
>
>> (I) whether such person violated the securities laws;
>> (ii) the percentage of responsibility of such person, measured as a percentage of the total fault of all persons who caused or contributed to the loss incurred by the plaintiff; and
>> (iii) whether such person knowingly committed a violation of the securities laws.

15 U.S.C. § 78u-4(f)(3)(A). Furthermore the factfinder is to "specify the total damages that the plaintiff is entitled to recover and the percentage of responsibility of each covered person found to have caused or contributed to the loss incurred by the plaintiff or plaintiffs." 15 U.S.C. § 78u-4(f)(3)(B). In

---

[7] "Reckless conduct by a covered person shall not be construed to constitute a knowing commission of a violation of the securities laws by that covered person." 15 U.S.C. § 78u-4(f)(10)(B).

11

determining each covered person's percentage of responsibility, the factfinder must consider "(I) the nature of the conduct of each covered person found to have caused or contributed to the loss incurred by the plaintiff or plaintiffs; and (ii) the nature and extent of the causal relationship between the conduct of each such person and the damages incurred by the plaintiff or plaintiffs." 15 U.S.C. § 78u-4(f)(3)(C). The statute mandates that the jury not be informed why it is answering the interrogatories apportioning fault, i.e., of the consequence of its answers, specifically limiting the liability of a particular defendant or barring plaintiffs from full compensation for their loss. 15 U.S.C. § 78u-4(f)(6).

These provisions on their face raise obvious and substantial problems. Neither the PSLRA nor its legislative history explain or limit the clause "each of the other persons claimed by any of the parties to have caused or contributed to the loss," which could include non-parties to the suit, defendants that have settled, defendants that have been dismissed, and indeed even the plaintiffs. Langevoort, 51 Bus. Law. at 1167. From the standpoint of strategy, under such vague language defendants most likely will attempt to designate any person or entity that might conceivably have any responsibility for the plaintiffs' loss in an effort to minimalize their own liability in the apportionment of fault. Grant, et al., 1505 PLI/Corp at 87. The undefined terms "claimed,"

"caused, "contributed to," and loss" are subject to differing interpretations. *Id.* at 92. Indeed, in the aftermath of *Central Bank of Denver, N.A. v. First Interstate Bank of Denver,*, 511 U.S. 164 (1994), precluding a private suit under § 10(b) against aiders and abettors, what does "caused" or "contributed to" mean? Furthermore, these potentially responsible non-parties might include those whom plaintiffs could not sue because plaintiffs could not meet the heightened pleading standards under the PSLRA, including scienter, or who are merely aiders and abettors. *Id.* at 96. In addition, it is unclear whether a party need to do anything more than "claim" a person or entity is responsible for plaintiffs' loss. *Id.* at 87. What evidentiary showing of fault must be made and by whom? The statute is silent about allocation of the burden of proof as to proportionate responsibility of the non-parties for plaintiffs' loss and about when and how potentially responsible persons that are not parties to the suit should be identified and "qualified" for inclusion in the fault allocation. *Id.* The statute appears to offer an opportunity for defendants to "sandbag" plaintiffs at trial unless defendants are required to give adequate and timely notice of each potential responsible person and the factual basis for apportioning fault to it. Nor is it clear whether or when individuals and the entities that employ them are both included for allocation of responsibility or whether the liability of the entity derives from that of the individual. *Id.*

at 88. Moreover, the addition of non-parties to the liability determination could vastly extend a trial. *Id.* There is the additional problem that a non-party claimed to be responsible for plaintiffs' loss will likely not have notice and, since it is not a defendant, the non-party will be absent from the proceeding and be deprived of any opportunity to defend itself from the allegations against it to protect its reputation. In addition, because the non-party is not part of the proceeding, a judgment on whatever proportional fault it is responsible for will also not be enforceable against it. *Id.*[8]

This Court, in an effort to manage its docket and this case, finds that the fairest approach is to establish some threshold requirements about which the statute is silent or ambiguous. For guidance, the closest analogue this Court can find to the proportionate fault scheme established in the PSLRA is that of comparative negligence statutes adopted by some states that provide for determination by the jury of the comparative fault of all potential tortfeasors, including non-parties (often dubbed "phantom parties"), in a single action. *See, e.g., LeRay v. Bartholomew*, 871 So.2d 492 (La. App. 5 Cir. 2004)(Louisiana Civil Code Article 2323); *Gust v. Jones*, 162 F.3d 587 (10th Cir. 1998)(Kansas' statutory system of comparative negligence); *Gregory & Appel Ins.*

---

[8] There are also problems with effecting the PSLRA's provisions for contribution, but since these are after-trial concerns, the Court does not address them here.

*Agency v. Philadelphia Indemnity Ins.*, 835 N.E.2d 1053 (2006)(Indiana Code § 34-51-2); *Wall v. Cherrydale Farms, Inc.*, 9 F. Supp. 2d 784 (E.D. Mich. 1998)(M.C.L. § 600.2957). In such statutes, it is standard that the claim that a non-party is at least in part at fault for the plaintiff's loss is an affirmative defense, on which the defendant asserting the claim has the burden of proof to establish by a preponderance of the evidence that the non-party was at least partially at fault. Where a plaintiff is not required to name as defendants all persons who might be responsible for his loss, such a defense protects a defendant from being wholly responsible where other actors are also at fault. Thus the Court will require any party designating a non-party as potentially wholly or partially at fault to bear the burden of proof demonstrating that the non-party violated the federal securities statutes.

Second, as suggested by several commentators, because the phrase, "other parties claimed by any of the parties to have caused or contributed to the plaintiff's loss," appears only in the section addressing the three jury interrogatives, 15 U.S.C. § 78u-4(f)(3)(a), if the jury answers the first question (whether the defendant violated the securities laws) with a "no," the jury should be instructed not to answer any further questions about that person, thereby preventing any allocation of fault to a person that did not violate the federal securities laws. Grant, *et al.*, 1505

15

PLI/Corp. at 99, *citing Hardin v. Manitowoc-Forsythe Corp.*, 691 F.2d 449 (10th Cir. 1982)(to submit the name of a non-defendant for allocation of fault to the jury, defendants had to offer sufficient evidence of that non-party's liability to justify a court's denial of a motion for directed verdict by that non-party), and John C. Coffee, Jr., *Developments Under the Private Securities Litigation Reform Act of 1995: The Impact After Two Years*, ALI-ABA Course of Study, Corporate Governance: Current and Emerging Issues, at 420-21 (Dec. 11, 1997). That evidence must demonstrate the non-party's scienter (in the Fifth Circuit, at least "severe recklessness") and causation under § 10(b).

Third, all parties who wish to claim that another person or entity, not currently a party to the *Newby* action, is responsible in part for any or all of the alleged loss that Plaintiffs may succeed in proving during the trial, shall file in this action, and serve on all parties, the name of such person or entity and provide a statement of the factual basis for claiming that fault should be allocated to that non-party, settling party, or dismissed party by August 14, 2006. Moreover, the Court will require that the designating person demonstrate in that factual statement that the non-party could have been sued by plaintiffs, i.e., that the claims against it could have met requirements of the PSLRA, but was bypassed or dismissed (for example, perhaps deliberately because the non-party was not a "deep pocket" or because Lead Plaintiff

16

could not meet the pleading standards under the PSLRA, or did not know about the non-party's role).

Accordingly, pursuant to #4735 and this opinion and order, the Court

ORDERS that Lead Plaintiff's amended motion for class certification (#1445) is GRANTED and that the following *Newby* class, in accord with Lead Plaintiff's proposal (#4804) amended in response to the Financial Institution's objection to its earlier definition, is hereby CERTIFIED:

> (I) all persons, excluding defendants and members of their immediate families, any officer, director or partner of any defendant, any entity in which a defendant has a controlling interest and the heirs of any such excluded party, who purchased the publicly traded equity and debt securities of Enron Corporation (excluding purchases of the 6.95% Notes issued November 1998, the 8.375% Notes issued May 2000, and the Zero Coupon Convertible Notes issued July 2001 in the initial offerings of these notes) between October 19, 1998 and November 27, 2001, and were injured thereby and (ii) all states or political subdivisions thereof or state pension plans that purchased from defendants Enron's 6.40% Notes due 7/15/06 or 6.95% Notes due 7/15/28, and were injured

thereby and that authorize the prosecution of the claim pursuant to the Texas Securities Act.

**SIGNED** at Houston, Texas, this 5th day of July, 2006.

_____
                MELINDA HARMON
        UNITED STATES DISTRICT JUDGE