UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re ENRON CORPORATION SECURITIES LITIGATION | § § § | MDL Docket No. 1446 |
| This Document Relates To: | § § § | |
| MARK NEWBY, et al., Individually and On Behalf of All Others Similarly Situated, | § § § | Civil Action No. H-01-3624 and Consolidated, Related Coordinated Cases |
| Plaintiffs, | § § | |
| vs. | § § | |
| ENRON CORP., et al., | § § § | |
| Defendants. | § § § | |

## DECLARATION OF JOSEPH B. SCHMIT

Joseph B. Schmit, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury as follows:

1.     I am an attorney at the law firm of White & Case LLP, which represents defendants Deutsche Bank AG, Deutsche Bank Trust Company Americas, and Deutsche Bank Securities Inc. ("Deutsche Bank") in the above-captioned action. I submit this declaration in support of Deutsche Bank's Opposition to Lead Plaintiff's Motion for Reconsideration (#4806) Of The Court's Order Dated June 5, 2006, As It Pertains to Deutsche Bank (#4735), which is being filed today.

2.     Attached hereto as Exhibit 1 is a true and correct copy of an excerpt from the transcript of the class certification hearing held on March 8, 2006.

3.      Attached hereto as Exhibit 2 is a true and correct copy of pages from the Osprey I Offering Memorandum dated September 16, 1999.

4.      Attached hereto as Exhibit 3 is a true and correct copy of a ratings report from Duff & Phelps dated September 16, 1999, identified as CSFBLLC 005707474.

5.      Attached hereto as Exhibit 4 is a true and correct copy of an article from Bloomberg News dated September 27, 1999, identified as DBG 022462-66.

6.      Attached hereto as Exhibit 5 is a true and correct copy of the cover and an excerpt from a presentation given to Standard and Poor's dated August 20, 1999, identified as SP019097 & SP019105.

7.      Attached hereto as Exhibit 6 is a true and correct copy of an Osprey rating report from Standard and Poor's dated September 16, 1999, identified as ANARPT009458.

8.      Attached hereto as Exhibit 7 is a true and correct copy of an Osprey rating report from Moody's dated June 1, 2000, identified as CITINEWBY00195742.

9.      Attached hereto as Exhibit 8 is a true and correct copy of pages from the Osprey II Offering Memorandum dated September 28, 2000.

10.     Attached hereto as Exhibit 9 is a true and correct copy of an excerpt from the deposition of Charles Drott, in Newby v. Enron, No. H-01-3624 (S.D. Tex.).

11.     Attached hereto as Exhibit 10 is a true and correct copy of the amicus reply brief filed by the SEC in Simpson v. AOL Time Warner, Inc., No. 04-55665 (9th Cir.).

12.     Attached hereto as Exhibit 11 is a true and correct copy of excerpts from the deposition of Saul Solomon in Newby v. Enron, No. H-01-3624 (S.D. Tex.).

13.     Attached hereto as Exhibit 12 is a true and correct copy of pages from the Marlin II Offering Memorandum dated July 12, 2001.

14.     Attached hereto as Exhibit 13 is a true and correct copy of a true and correct copy of an excerpt from the Milbank Rule 30(b)(6) deposition of Trayton Davis, in Newby v. Enron, No. H-01-3624 (S.D. Tex.).

15.     Attached hereto as Exhibit 14 is a true and correct copy of an excerpt from a draft of the Osprey II memorandum, identified as LBP0095875-77.

16.     Attached hereto as Exhibit 15 is a true and correct copy of an excerpt from the deposition of Blaine F. Nye, Ph.D., in Newby v. Enron, No. H-01-3624 (S.D. Tex.).

17.     Attached hereto as Exhibit 16 is a true and correct copy of excerpts from the expert report submitted by Blaine F. Nye, Ph.D. on January 17, 2006, in Newby v. Enron, No. H-01-3624 (S.D. Tex.).

18.     Attached hereto as Exhibit 17 is a true and correct copy of the Osprey I Certificate Purchase Agreement dated September 16, 1999, identified as E145995-6016.

19.     Attached hereto as Exhibit 18 is a true and correct copy of the Osprey Interim Certificate Purchase Agreement dated July 12, 2000, identified as E1007242-62.

20.     Attached hereto as Exhibit 19 is a true and correct copy of a letter to the LJM2 Limited Partners dated July 21, 2000, identified as CITINEWBY00047968-71.

21.     Attached hereto as Exhibit 20 is a true and correct copy of an excerpt from a presentation to the LJM2 partnership dated March 31, 2000, identified as CITINEWBY00352041.

22.     Attached hereto as Exhibit 21 is a true and correct copy of excerpts from two presentations to investors, the first for investors in the interim Osprey certificates (undated) and

the second for investors in the Osprey II certificates, dated August 2000, identified as DBG 069155, DBG 069159, DBG053320 & DBG 053346.

23.    Attached hereto as Exhibit 22 is a true and correct copy of  Nighthawk presentations given to Moody's and Standard and Poor's, dated October 31, 1997, and November 18, 1997, respectively, identified as MDY 001171-82 & SP20849-74.

24.    Attached hereto as Exhibit 23 is a true and correct copy of the cover and an excerpt from a Condor/Osprey presentation given to Moody's dated August 19, 1999, identified as MDY 003904 & MDY 003909.

25.    Attached hereto as Exhibit 24 is a true and correct copy of excerpts from the Disclosure Statement to Accompany Plan of Reorganization Filed By LJM2 Co-investment, L.P. dated February 21, 2003 in In Re LJM2 Co-investment, L.P., No. 02-38335-SAF (N.D. Tex. Bankr.).

26.    Attached hereto as Exhibit 25 is a true and correct copy of an excerpt from Lead Plaintiff's Responses to Deutsche Bank's First Set of Requests for Admissions dated December 12, 2005.

27.    Attached hereto as Exhibit 26 is a true and correct copy of excerpts from the LJM2 Third Amended and Restated Limited Partnership Agreement.

28.    Attached hereto as Exhibit 27 is a true and correct copy of pages from Enron's prospectus associated with the Enron Zero Coupon notes registration dated July 18, 2001.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 19th of July, 2006.

Joseph B. Schmit

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing has been served upon all known counsel of record by electronic mail to the esl3624.com website on this 19th day of July, 2006.

Kimberly A. Rohback

# Exhibit 1

```
 1                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF TEXAS
 2                       HOUSTON DIVISION


 3

   MARK NEWBY, ET AL.           .
 4                              .
                               .
 5                              .  Consolidated Civil Action
                               .  No. H-01-3624
   V.                           .
 6                              .  VOLUME 2 of 2
                               .  PAGES 295 - 444
 7                              .
                               .  March 8, 2006
 8   ENRON CORPORATION,         .  9:00 A.M.
     ET AL.                        HOUSTON, TEXAS
 9

10         TRANSCRIPT of CLASS CERTIFICATION HEARING
            BEFORE THE HONORABLE MELINDA HARMON
11               UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   FOR THE PLAINTIFFS:        MS. HELEN HODGES
                               LERACH, COUGHLIN, ET AL.
14                              655 West Broadway, Suite 1900
                               Sam Diego, California 92101-3301
15
                               MR. PAUL HOWES
16                             LERACH, COUGHLIN, ET AL.
                               Houston Trial Office
17                              1111 Bagby, Suite 4850
                               Houston, Texas  77002
18
     FOR DEFENDANTS:            MR. LARRY BYRNE
19                             WHITE & CASE
                               1155 Avenue of the Americas
20                              New York, NY  10036-2787

21                              MR. RICHARD CLARY
                               CRAVATH, SWAINE & MOORE
22                              Worldwide Plaza
                               825 Eighth Avenue
23                              New York, NY  10019-7475

24
   Proceedings recorded by mechanical stenography, transcript
25 produced by computer-aided transcription.
```

1    foreign debt securities are different than the other

2    securities at issue here.

3                Now moving to the foreign debt securities, Your

4    Honor, again, the financials of Enron appeared in those

01:09:52PM  5    offering memoranda.  I agree that the foreign debt securities

6    offerings were not hidden.

7                Those purchasers bought those notes, that debt,

8    but they were relying upon the information that was in the

9    market regarding that security, and that most prominently was

01:10:18PM  10    based on Enron's financial statements, which were false

11    because of the transactions that these Defendants entered into

12    which hid the debt and hid its massive losses.

13                Your Honor, The Regents of the University of

14    California can, therefore, represent the purchasers of the

01:10:36PM  15    foreign debt securities as well as the stock and the other

16    Enron notes that are at issue here because this is one scheme.

17    It is one claim.  There are common issues.

18                All the liability issues with respect to the

19    Defendants, they are common issues for The Regents to prove.

01:11:00PM  20    There is no need to have a purchaser of the foreign debt

21    securities step forward as a class representative, we believe,

22    because of this overarching scheme that The Regents is going

23    to prove.

24                However, if you want to have somebody who

01:11:24PM  25    bought one of the foreign debt securities -- you've allowed

# Exhibit 2

OFFERING MEMORANDUM



# Osprey Trust
# Osprey I, Inc.
## $1,400,000,000

## 8.31% Senior Secured Notes due 2003

The 8.31% Senior Secured Notes due 2003 (the "Senior Notes") being offered hereby (the "Offering") will be issued by Osprey Trust, a Delaware statutory business trust ("Osprey"), and Osprey I, Inc. a Delaware corporation and a wholly-owned subsidiary of Osprey (the "Co-Issuer" and, together with Osprey, the "Issuers"). The closing of the Offering is expected to occur concurrently with, and the Offering is conditioned upon, the closing of an offering of $100 million face amount of Osprey Trust Certificates (the "Osprey Trust Certificates" and, together with the Senior Notes, the "Osprey Securities"), representing beneficial ownership interests in Osprey. The Osprey Trust Certificates are not being offered hereby. Osprey will use the proceeds from the sale of the Osprey Securities to purchase a limited partner interest in Whitewing Associates L.P., a Delaware limited partnership ("Whitewing LP") and a member interest in Whitewing Management LLC, a Delaware limited liability company and the sole general partner of Whitewing LP. Enron Corp., an Oregon corporation ("Enron"), will indirectly own a limited partner interest in Whitewing LP and the managing member interest in Whitewing Management LLC. Whitewing LP will use proceeds from the sale of a limited partner interest to Osprey, among other things, to redeem an equity interest of an unaffiliated equity investor in Whitewing LP for approximately $578 million and to purchase, from time to time, certain assets owned or originated by Enron.

The Senior Notes will bear interest from September 24, 1999 (the "Closing Date") at the rate of 8.31% per annum, payable semi-annually in arrears on each January 15 and July 15, commencing January 15, 2000. The principal of the Senior Notes will be due and payable on January 15, 2003 (the "Maturity Date") to the extent not redeemed or repaid prior thereto. The Senior Notes may be redeemed at the option of the Issuers, in whole or in part, at any time, at a redemption price equal to the sum of the accrued and unpaid interest to the date of redemption plus the greater of (i) 100% of the outstanding principal amount of such Senior Notes and (ii) the sum of the present values of the remaining scheduled payments of principal and interest thereon discounted to the date of redemption on a semi-annual basis at the applicable US Treasury yield plus 50 basis points. Upon the occurrence of certain Osprey Note Trigger Events, the Senior Notes will be redeemed, on a pro rata basis, on the dates fixed by the Indenture Trustee at a redemption price equal to the accrued and unpaid interest to the date of redemption plus 100% of the outstanding principal amount of the Senior Notes plus all other amounts due and owing to the Noteholders under the Indenture. See "Description of the Senior Notes — Redemption."

The Senior Notes will represent senior secured limited recourse obligations of the Issuers and will be secured, on a first priority basis, by: (i) all of the rights of Osprey, excluding Excepted Rights, under the Participation Agreement, the Whitewing LLC Agreement, the Whitewing Partnership Agreement, the Remarketing Agreement and certain other Transaction Documents; (ii) Osprey's member interest in Whitewing Management LLC and Osprey's limited partner interest in Whitewing LP; (iii) certain accounts established pursuant to the Indenture, all amounts credited to such accounts and all investments of such amounts pursuant to the applicable provisions of the Indenture and (iv) all proceeds of the conversion, voluntary or involuntary, of any of the foregoing into cash, instruments, securities or other property (the "Security for the Senior Notes"). See "Description of the Senior Notes — Security for the Senior Notes." Holders of the Senior Notes will have recourse only to the Security for the Senior Notes for payments due thereon. The Senior Notes are not guaranteed by, and the Security for the Senior Notes does not represent a guarantee by, Enron.

Except as otherwise described herein, upon the occurrence of an Osprey Note Trigger Event, the Indenture Trustee will exercise Osprey's rights under the Remarketing Agreement to cause the Share Trustee to liquidate the mandatorily convertible junior preferred stock, Series B, no par value, of Enron (the "Enron Mandatorily Convertible Preferred Stock") held by the Share Trust through a mandatory remarketing arrangement and apply the proceeds against the Senior Notes. The Indenture Trustee will cause the Share Trustee to exercise the Share Settlement Agreement to the extent of any shortfall. See "Description of the Senior Notes — Osprey Note Trigger Events and Remedies" and "Description of Certain Transaction Documents — Description of the Share Settlement Agreement." Upon the occurrence of an Osprey Note Trigger Event and subject to certain limitations described herein, the Indenture Trustee also may, or at the direction of the holders of at least 25% of the then outstanding principal amount of the Senior Notes or the holders of at least 25% of the then outstanding face amount of the Osprey Trust Certificates will, foreclose on Osprey's limited partner interest in Whitewing LP and cause the sale of Whitewing LP's assets, including the Whitewing Assets. See "Description of the Senior Notes — Limitations on Remedies of the Indenture Trustee."

Application has been made to list the Senior Notes on the Luxembourg Stock Exchange.

## See "Risk Factors" beginning on page 12 for a discussion of certain matters that should be considered in connection with an investment in the Senior Notes.

THE SENIOR NOTES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS AND MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. ACCORDINGLY, THE SENIOR NOTES ARE BEING OFFERED HEREBY ONLY (A) TO "QUALIFIED INSTITUTIONAL BUYERS" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT ("RULE 144A")) IN RELIANCE ON THE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED BY RULE 144A AND (B) OUTSIDE THE UNITED STATES TO CERTAIN PERSONS IN RELIANCE UPON REGULATION S UNDER THE SECURITIES ACT ("REGULATION S"). PROSPECTIVE PURCHASERS ARE HEREBY NOTIFIED THAT SELLERS OF THE SENIOR NOTES MAY BE RELYING ON THE EXEMPTIONS FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A AND REGULATION S. FOR A DESCRIPTION OF CERTAIN RESTRICTIONS ON RESALES OR TRANSFERS OF THE SENIOR NOTES, SEE "NOTICE TO INVESTORS."

|  | Price to Investors(1) | Commissions(2) | Proceeds to the Issuers(2) |
|---|---|---|---|
| Per Senior Note | 100.00% | 0.50% | 100.00% |
| Total | $1,400,000,000 | $7,000,000 | $1,400,000,000 |

(1) Plus accrued interest, if any, from the date of issuance.

(2) Enron has agreed to pay all commissions and expenses relating to the Offering. Enron has agreed to indemnify the Initial Purchasers against, and to provide contribution with respect to, certain liabilities under the Securities Act. See "Plan of Distribution."

The Senior Notes are offered by Donaldson, Lufkin & Jenrette Securities Corporation, Deutsche Bank Securities Inc., Bear, Stearns & Co. Inc. and Salomon Smith Barney Inc. (the "Initial Purchasers"), subject to prior sale, when, as and if delivered to and accepted by the Initial Purchasers, and subject to certain conditions. It is expected that delivery of the Senior Notes will be made in book-entry form through the facilities of The Depository Trust Company ("DTC") against payment therefor in immediately available funds on or about September 24, 1999.

### Joint Bookrunning Managers

**Donaldson, Lufkin & Jenrette**          **Deutsche Banc Alex. Brown**

### Joint Lead Managers

**Bear, Stearns & Co. Inc.**          **Salomon Smith Barney**

### September 16, 1999

E 87909

Confidential Treatment Requested By Wilmer, Cutler & Pickering

EX. 000000055

each fiscal year, unaudited consolidated balance sheets and statements of income and cash flows for such fiscal quarter and the portion of the fiscal year ending with such fiscal quarter; and shall provide to the Indenture Trustee and to holders of the Senior Notes, within 120 days after the end of each fiscal year, audited consolidated financial statements. See "Description of the Senior Notes — Covenants — Reports."

Each purchaser of the Senior Notes shall be furnished with a copy of this Offering Memorandum and any related amendments or supplements to this Offering Memorandum. Enron will provide without charge to each person to whom a copy of this Offering Memorandum is delivered, on the request of any such person, a copy of the Transaction Documents or any other information considered to be necessary to verify the accuracy and completeness of the information herein. Written or telephone requests for such copies should be directed to the Secretary, Enron Corp., at its principal executive offices, 1400 Smith Street, Houston, Texas 77002 (telephone number: (713) 853-6161). The Transaction Documents will be available at the office of Bankers Trust Luxembourg S.A., the Luxembourg paying and transfer agent, free of charge at any time.

Each person receiving this Offering Memorandum acknowledges that such person has been afforded an opportunity to request from Enron and to review, and has received from Enron, all additional information considered by it to be necessary to verify the accuracy and completeness of the information herein.

## INCORPORATION BY REFERENCE

The following documents filed by Enron (File No. 1-13159) with the Commission pursuant to the Exchange Act are incorporated herein by reference:

(a) Annual Report on Form 10-K for the year ended December 31, 1998;

(b) Quarterly Report on Form 10-Q for the quarter ended March 31, 1999;

(c) Quarterly Report on Form 10-Q for the quarter ended June 30, 1999;

(d) Current Reports on Form 8-K dated January 26, 1999 and March 18, 1999; and

(e) The description of Enron's capital stock set forth in Enron's Registration Statement on Form 8-B filed on July 2, 1997.

Each document filed by Enron pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act subsequent to the date of this Offering Memorandum and prior to the termination of the Offering shall be deemed to be incorporated herein by reference and to be a part hereof from the date of filing of such document. Any statement contained herein or in a document all or a portion of which is incorporated or deemed to be incorporated by reference herein shall be deemed to be modified or superseded for purposes of this Offering Memorandum to the extent that a statement contained herein or in any other subsequently filed document which also is or is deemed to be incorporated by reference herein modifies or supersedes such statement. Any statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Offering Memorandum.

Enron will provide without charge to each person to whom a copy of this Offering Memorandum is delivered, on the request of any such person, a copy of any or all of the foregoing documents incorporated herein by reference other than exhibits to such documents (unless such exhibits are specifically incorporated by reference into the documents that this Offering Memorandum incorporates). Written or telephone requests for such copies should be directed to the Secretary, Enron Corp., at its principal executive offices, 1400 Smith Street, Houston, Texas 77002 (telephone number: (713) 853-6161). Such copies will be available also at the office of Bankers Trust Luxembourg S.A., the Luxembourg paying and transfer agent, free of charge at any time.

vi

E 87914

Confidential Treatment Requested By Wilmer, Cutler & Pickering

# OFFERING MEMORANDUM SUMMARY

*The following summary information does not purport to be complete and is qualified in its entirety by reference to, and should be read in conjunction with, the more detailed information and financial statements, and the related notes thereto, included elsewhere or incorporated by reference in this Offering Memorandum. See the Index of Defined Terms for the definitions of certain terms used in this Offering Memorandum.*

Enron is one of the world's leading international integrated natural gas and electricity companies. Enron's activities are conducted through its subsidiaries and affiliates which are principally engaged in the transportation of natural gas through pipelines to markets throughout the United States; the generation and transmission of electricity to markets in the northwestern United States; the marketing of natural gas, electricity and other commodities and related risk management and finance services worldwide; the development, construction and operation of power plants, pipelines and other energy related assets worldwide; and the delivery of high bandwidth communication applications throughout the United States. Enron has a proven track record of creating value in markets that are deregulating and privatizing in North America, Europe and other areas worldwide.

In the implementation of several of Enron's core business strategies, Enron has frequent opportunities to invest in debt and equity interests of its customers and in projects it is developing, or originating through its wholesale operations and services, retail energy services and related financing activities (the "Designated Assets"). Enron periodically seeks to sell Designated Assets as a means to create liquidity for its business.

In order to create a vehicle to acquire, hold and sell Designated Assets from time to time, Enron and Osprey are investing in Whitewing LP, a Delaware limited partnership, through a series of transactions (the "Osprey Transactions"). Prior to the closing of the Offering, Whitewing LP's principal asset will be the Enron Mandatorily Convertible Preferred Stock which has an approximate market value of $2.1 billion (based on the closing price of Enron common stock on September 15, 1999). Osprey will purchase a limited partner interest in Whitewing LP using the proceeds from the Senior Notes, as well as the proceeds from the Osprey Trust Certificates. Whitewing LP will utilize a portion of the proceeds of Osprey's investment to acquire Designated Assets. The Designated Assets acquired by Whitewing LP are referred to as the "Whitewing Assets."

The Senior Notes will be supported by assets in Whitewing LP which include (i) the Enron Shares which will be held in a wholly-owned subsidiary of Whitewing LP; (ii) Enron's obligation to issue additional equity to such wholly-owned subsidiary of Whitewing LP as necessary to raise proceeds of a required amount at least equal to $1.4 billion; (iii) the Whitewing Assets; and (iv) additional Permitted Investments.

## Transaction Overview

Upon issuance of the Senior Notes and the Osprey Trust Certificates, Osprey will invest substantially all of the $1.5 billion in cash proceeds in Whitewing LP, in exchange for a limited partner interest. Approximately $578 million of the Osprey investment will be used by Whitewing LP to redeem the interest of an existing equity investor in Whitewing LP that is not affiliated with Enron and approximately $115 million (the "Overfund Amount") will be contributed to a wholly-owned subsidiary of Whitewing LP and invested in Enron Debt Securities or other Permitted Investments. The dividend payments from the Enron Mandatorily Convertible Preferred Stock, principal and interest payments on investments purchased with the Overfund Amount and payments on the Enron Notes will fund the required payments to be made by Whitewing LP to Osprey on a semi-annual basis. These required payments have been sized in order to meet interest payments on the Senior Notes and the required yield payments on the Osprey Trust Certificates. The remaining proceeds, approximately $807 million, will be used to purchase Designated Assets and Permitted Investments.

Proceeds from the Whitewing Assets must be (i) reinvested in additional Designated Assets or Permitted Investments; or (ii) distributed to Osprey and deposited with the Indenture Trustee to repay the Senior Notes at or before the Maturity Date. See "Description of the Senior Notes."

Upon the occurrence of certain credit events tied to Enron or the failure to deposit proceeds from the sale of equity securities in a required amount of at least $1.4 billion in the aggregate with the Indenture Trustee no

1

E 87915

Confidential Treatment Requested By Wilmer, Cutler & Pickering

**Osprey Transaction Summary**

    The following diagram illustrates a summary of the structure of the Osprey Transactions. The diagram does not purport to be complete and is qualified in its entirety by, and should be read in conjunction with, the more detailed information regarding the Osprey Transactions included elsewhere in this Offering Memorandum and the transaction documents described herein. See "The Osprey Transactions."



3

E 87917

Confidential Treatment Requested By Wilmer, Cutler & Pickering

Enron as support for the Marlin Notes. There can be no assurance that the market will be sufficiently liquid to absorb the remarketing of Enron common stock if the preferred stock supporting the Marlin Notes is being remarketed immediately prior thereto. There can also be no assurance that Enron's rights to market a New Series of Enron equity securities prior to or at the same time as a remarketing under the Remarketing Agreement will not adversely affect market liquidity and the remarketing proceeds available to repay the Senior Notes. Also, certain holders of Enron equity securities have registration rights that may require the registration of such securities as part of the remarketing process. Moreover, Enron's continued investment grade status is critical to the success of its wholesale businesses, as well as its ability to maintain adequate liquidity. Enron's inability to maintain adequate liquidity would likely have a material adverse effect on the market price of Enron common stock. There can be no assurance that the Remarketing Agents will be able to successfully remarket the Enron Shares, or that the proceeds from the sale of the Enron Shares will be at least equal to a required amount of not less than $1.4 billion.

*Equitable Subordination.*   If a proposed sale of the Enron Shares would likely fail to generate proceeds of a required amount at least equal to $1.4 billion, Enron will be obligated under the Share Settlement Agreement to issue to the Share Trust an amount of Enron Shares to be sold by the Remarketing Agents such that the proceeds of the remarketing would be equal to a required amount of at least $1.4 billion. The Remarketing Agreement also provides for an additional remarketing of Enron Shares to be issued by Enron to the extent of any deficiency in proceeds from an initial remarketing.

To the extent that sufficient funds are not generated pursuant to the provisions of the Remarketing Agreement and the Share Settlement Agreement because of legal prohibitions or Enron's breach of its obligations under such agreements, Enron is obligated following a Failed Remarketing to pay to the Share Trust the amount of such deficiency. Enron's payment obligation differs in certain material respects from an Enron guarantee of indebtedness. There is the possibility that if Enron were to become a debtor in a case under the United States Bankruptcy Code, a bankruptcy court might recharacterize Enron's obligation to make a payment to the Share Trust as being equivalent to an obligation to purchase the Enron Shares from the Share Trust. In such event, there is a risk that, if the Share Trust asserted a claim against Enron arising from Enron's failure to make such payment to the Share Trust, a bankruptcy court might subordinate part or all of that claim to other claims against Enron.

*Blind Pool; Uncertainty of Ability to Realize on Any Liquidation of the Whitewing Assets.*   None of the Whitewing Assets will be acquired prior to the closing of this Offering and there can be no assurance as to any such acquisition or the terms thereof. Enron intends that each acquisition of Whitewing Assets will be at a price and on other terms determined by internal Enron negotiations conducted on an arms length basis, and the holders of the Osprey Trust Certificates (the "Certificateholders") will have certain consent rights with respect to such acquisitions, but there can be no assurance that such prices and other terms will reflect those that would be agreed by unaffiliated third parties. Upon the occurrence of an Osprey Note Trigger Event and subject to certain limitations, the Indenture Trustee may have the right to, or at the direction of the holders of at least 25% of the then outstanding principal amount of the Senior Notes or the holders of at least 25% of the then outstanding face amount of the Osprey Trust Certificates the obligation to, foreclose on Osprey's limited partner interest in Whitewing LP and cause the sale of the Whitewing Assets. There may be no established markets for the Whitewing Assets and there may be contractual or other limitations relating to such sale. There is also no limitation on financing by Whitewing Operating Subsidiaries relating to the Whitewing Assets, which financing may need to be discharged in connection with any such sale. Consequently, a sale of such assets may be difficult and there can be no assurance as to the proceeds thereof.

*Limited Recourse Obligations.*   The Senior Notes will represent senior secured limited recourse obligations of the Issuers. The Senior Notes will be secured by the Security for the Senior Notes and holders of the Senior Notes will have recourse only to the Security for the Senior Notes for payments due thereon. If the net proceeds from the realization of the Security for the Senior Notes are not sufficient to pay all amounts due to the holders of the Senior Notes, no other assets of the Issuers shall be available for payment of any shortfall arising therefrom. None of the holders of the Senior Notes may take any further action against the Issuers in respect of such obligations or such sums and, in particular, shall not be entitled to petition or take any other steps for the winding up of the Issuers nor shall any of them have any claim in respect of any sums in respect

13

E 87927

Confidential Treatment Requested By Wilmer, Cutler & Pickering

# Exhibit 3

**Osprey Trust/Osprey I, Inc.'s $1.4B Issuance of Senior Secured Notes Rated 'BBB' by DCR**

09/16/1999
PR Newswire
(Copyright (c) 1999, PR Newswire)

CHICAGO, Sept. 16 /PRNewswire/ -- Duff & Phelps Credit **Rating** Co. (DCR) has assigned a 'BBB' (Triple-B) credit **rating** to **Osprey** Trust/**Osprey** I, Inc.'s $1.4 billion issuance of senior secured notes (notes), due 2003 to be issued and sold under Rule 144A. Proceeds will be used to purchase an LP interest in Whitewing LP and a member interest in Whitewing LLC. Whitewing LP will use the proceeds to redeem an existing unaffiliated equity investor in Whitewing LP for approximately $515 million; fund an overfund account for approximately $150 million; and purchase other designated/permitted assets and investments.

In December 1997, **Enron** (ENE, senior unsecured rated 'BBB+' (Triple-B- Plus) and preferred securities rated 'BBB-' (Triple-B-Minus)) issued convertible preferred into Whitewing LP, convertible five years forward in 2002. The member interest mentioned earlier purchased a portion of the convertible preferred and will be taken out with proceeds from notes. The convertible preferred issued in December 1997 will be exchanged on 1:1 basis with newly created mandatory convertible preferred. The mandatory preferred securities are calculated into ENE's EPS calculation, have voting rights similar to other preferred stock and ENE is restricted from issuing preferred stock that is senior to the **Osprey**-related mandatory preferred stock.

The $1.4 billion of notes will be raised in conjunction with $100 million in trust certificates. The Whitewing **LP** will be owned by wholly owned subsidiaries of **Enron** and **Osprey**, which will also form an LLC that will be the GP in the Whitewing LP. Whitewing LP will apply $1.5 billion in proceeds and the intentions to purchase approximately $830 million of ENE's merchant asset portfolio, pre-fund the overfund amount for approximately $150 million, and redeem portion of existing holders of Whitewing LP for $515 million.

The company's rationale behind the sale of the notes and the purchase of the merchant assets is to allow ENE an efficient vehicle to monetize its merchant portfolio. ENE has monetized a significant portion of its merchant portfolio as a means to raise capital and re-balance its balance sheet. To unwind positions in an efficient manner is time consuming and costly. This monetization effectively speeds up the process for capital redeployment.

The $150 million ENE note mentioned earlier and an existing $58 million ENE amortizing note will cover approximately 50 percent of the interest and yield on the notes. DCR considers the related 50 percent cover on the interest and yield to be a 'BBB+' like cash flow stream; the remaining 50 percent is to be covered by dividend payments on the mandatory preferred securities which represent a 'BBB-' like cash payment stream. The ENE $58 million note, a $85 million demand note and the mandatory convertible preferred will be contributed to the Condor Trust to support the notes and certificates.

Payment of principal relies on the re-marketing of mandatory preferred securities. In the event that the liquidation of the preferred securities yields less than $1.4 billion, under the Share Settlement Agreement, ENE is required to deliver additional shares until at least $1.4 billion has been raised. If ENE cannot deliver on this obligation, then the difference between the $1.4 billion floor and the amount raised becomes a payment obligation to ENE. This obligation would represent a general unsecured claim of ENE. In a downside case, **Osprey** noteholders would have the ability to cause the liquidation of the preferred shares (currently rated 'BBB-') and an unsecured claim on ENE for any deficiency, which is characterized as a 'BBB+' like claim. When this is coupled with the significant overcollateralization backstopped by ENE's common stock (more than $2.2 billion compared to $1.4 billion face value of the securities) and the security interest in the assets and cash flows related to the more than $835 million merchant portfolio, DCR believes that the likelihood of timely principal payment represents a 'BBB' type risk.

The issuance of additional shares to make noteholders whole helps mitigate exposure to ENE's common equity and credit profile and includes the following: an event of default on **Osprey** notes; 120 days prior to maturity on **Osprey** notes if amounts sufficient for 100 percent principal repayment have not been received by the trustee as a result of the sale of ENE equity or other equity (which may include the mandatory convertible preferred

CSFBLLC 005707474

# Exhibit 4

*ENRON / OSPREY TRUST*

*BLOOMBERG 9/27/99*

<MENU> to return to headlines, 99 <GO> for list of story options **Govt    MSG**

Page 1  / 6

| BN | Enron Sells $1.4 Bln of Notes Via Trust to Reduce Interest Cost |
|----|------------------------------------------------------------------|
|    | Sep 27 1999  15:42 |

Enron Sells $1.4 Bln of Notes Via Trust to Reduce Interest Cost

New York, Sept. 27 (Bloomberg) -- Enron Corp., the world's
largest energy trader, created the Osprey Trust to sell $1.4
billion of notes, cutting its interest cost at least a percentage
point, without expanding its balance sheet.
    Enron arranged the sale to draw cash from its debt and
equity investments in power plants, pipelines and other projects
around the world. The sale gives Osprey Trust about $830 million
to buy such assets, which Osprey plans to bundle for sale in the
asset-backed securities market. The remaining proceeds will be
used to invest in and reorganize Whitewing, another Enron trust.
    Repayment of the Osprey notes three years from now depends
on the value of an existing issue of Enron's convertible
preferred shares, currently owned by Whitewing. Those securities
are now worth $2.2 billion, though if their value drops below
$1.4 billion Enron must cover the gap by delivering additional
preferred shares. Enron could also be forced to issue more shares
if its bond rating drops to junk or its shares dip below 28 from
39 3/16 currently.
    ''What you are buying when you buy into these notes, when

Copyright 1999 BLOOMBERG L.P.   Frankfurt:69-920410   Hong Kong:2-2977-6000   London:171-330-7500   New York:212-318-2000
Princeton:609-279-3000    Singapore:226-3000    Sydney:2-9777-8686    Tokyo:3-3201-8900    Sao Paulo:11-3048-4500
I698-547-1 27-Sep-99 17:41:29

**¦Bloomberg**

DBG 022462

DBG-022463

you really force the issue, is Enron credit,'' even though they
aren't backed directly by the company, said Kevin Boone, an
analyst who follows energy service and pipeline companies for
Bear Stearns & Co., which helped manage the sale. Still, ``it
doesn't throw debt onto their consolidated balance sheet.''

The transaction works because Enron can indirectly support
the Osprey notes through a series of contractual agreements,
though without recording the notes on its balance sheet as direct
obligations.

If Enron has to issue more convertible preferred shares for
Osprey noteholders, investors in the company's common stock would
find their earnings per share reduced. Until there is a need to
issue the additional preferred stock, Enron's earnings per share
are not affected.

### 1997 Preferred Stock

``They're getting credit from an equity perspective for
preferred securities issued in 1997,'' said John O'Connor, who
rated the Osprey for Duff & Phelps. The preferred securities are
currently worth about $2.2 billion, so there is a wide cushion to
protect buyers of the $1.4 billion in Osprey notes, he said.

The three-year Osprey notes, rated ``Baa3'' by Moody's

Copyright 1999 BLOOMBERG L.P.  Frankfurt:69-920410  Hong Kong:2-2977-6000  London:171-330-7500  New York:212-318-2000
Princeton:609-279-3000    Singapore:226-3000     Sydney:2-9777-8686     Tokyo:3-3201-8900   Sao Paulo:11-3048-4500
                                                                                          I698-547-I 27-Sep-99 17:41 44

**∎Bloomberg**

DBG 022463

<MENU> to return to headlines, 99 <GO> for list of story options **Govt   MSG**
Page 3  / 6

Investors Service and ``BBB'' by Standard & Poor's, were sold
last week at 8.31 percent, or 250 basis points more than
Treasuries of comparable maturity. That was about 110 basis
points more than Enron's ``Baa2/BBB+''-rated notes due 2006.

    Based on Moody's current rating of Enron debt, two rating
downgrades could push the company to below investment grade.

    Enron considered at least two structures other than the
Osprey to accomplish the same goals, though the Osprey structure
saved Enron ``well north of 100 basis points,'' said Jeff
McMahon, Enron's treasurer.

### Asset Acquisitions

    Osprey proved the most cost-effective strategy because Enron
expects its assets will fetch higher prices if bundled and
repackaged as securities than they would if sold individually, he
said.

    Osprey is near to completing its first two purchases from
Enron, $300 million to $400 million of equity stakes in power
stations on the Sardinia coast in Italy and in Turkey, McMahon
said. The trust is expected to accumulate enough assets in a year
to support its first sale of asset-backed securities. It then
expects to use the proceeds from that asset-backed sale to fund a

Copyright 1999 BLOOMBERG L.P.   Frankfurt:69-920410   Hong Kong:2-2977-6000   London:171-330-7500   New York:212-318-3000
Princeton:609-279-3000   Singapore:226-3000   Sydney:2-9777-8686   Tokyo:3-3201-8900   Sao Paulo:11-3048-4500
1698-547-1 27-Sep-99 17:41:51

**▌Bloomberg**

DBG 022464

<MENU> to return to headlines, 99 <GO> for list of story options **Govt   MSG**
Page 4  / 6

new round of acquisitions.

Osprey is designed to continue packaging Enron assets as securities even after the three-year notes mature.

''I would expect a typical asset-backed type of thing with 'AA' to 'B'-type of securities with a package of cash flows from these assets,'' McMahon said. If the company had instead sold asset-backed securities from a ''blind pool'' trust and then invested the proceeds in unspecified merchant assets, its notes would surely have sold at higher yields, he said.

Here's how Osprey works. The trust will use about $830 million of the sale proceeds to fund its asset purchases from Enron. Most of the remaining proceeds will be used to restructure another trust, called Whitewing LP, owned by Enron and Osprey.

## Undervalued Stock

Enron devised Whitewing in 1997 as a means of expanding the equity portion of its balance sheet. The company believed, at that time, that its stock price was undervalued, making it an unattractive time to sell more shares.

That led Enron to sell equity, in the form of convertible preferred stock, to Whitewing, a trust the company owned. ''That allowed us to keep the lion's share of the increase of that

Copyright 1999 BLOOMBERG L.P.  Frankfurt:69-920410  Hong Kong:2-2977-6000  London:171-330-7500  New York 212-318-2000
Princeton:609-279-3000    Singapore:226-3000    Sydney:2-9777-8686    Tokyo:3-3201-8900    Sao Paulo:11-3048-4500
I698-547-1 27-Sep-99 17:41 56

**Bloomberg**

<MENU> to return to headlines, 99 <GO> for list of story options **Govt   MSG**

security,'' McMahon said.

The bet paid off. Enron's stock price has doubled since January 1998, boosting the value of Whitewing's preferred securities by about $1 billion, he said. ''Lo and behold we had $1 billion of additional value sitting in an equity security.''

Osprey will allow Enron to unlock its gains on the convertible preferred shares in the Whitewing trust.

Enron will exchange Whitewing's preferred securities due 2002 for new mandatory convertible preferred shares due 2003 that will held by a Whitewing subsidiary. Dividends from the new preferred will help support Osprey's interest payments.

Donaldson Lufkin & Jenrette Inc. and Deutsche Bank AG managed the sale.

--Jonathan Tower in the New York newsroom (212) 318-2396/mq

Story illustration: To view Osprey Trust, type: ENE8.31 01/15/03 <Corp> DES.

<Page Fwd> for Related Information.

Copyright 1999 BLOOMBERG L.P.   Frankfurt:69-920410   Hong Kong:2-2977-6000   London:171-330-7500   New York:212-318-2000
Princeton:609-279-3000   Singapore:226-3000   Sydney:2-9777-8686   Tokyo:3-3201-8900   Sao Paulo:11-3048-4500
I698-547-1 27-Sep-99 17:42:00

**▌Bloomberg**

# Exhibit 5

Strictly private & confidential

# Presentation to Standard & Poor's Project Condor

August 20, 1999

SP 019097

# Transaction business purpose

- Improve Nighthawk by modifying selected provisions.

  *(14/97)*

  – eliminate Enron's option to redeem Nighthawk investment for cash

  – exchange existing convertible preferred series for the new series which is mandatorily convertible by its terms

  – utilize embedded value of the Mandatorily Convertible Preferred Stock

- Underlying common stock already included in EPS calculation.

- Create an efficient monetization vehicle for Enron's merchant portfolio.

# Exhibit 6

**STANDARD &POOR'S**    **R A T I N G S D I R E C T**

# Research:

Return to Regular Format

## Osprey Trust's $1.4 Billion Notes Are Rated 'BBB'

**Publication date:** 16-Sep-1999
**Credit Analyst:** Todd A Shipman, CFA, New York (1) 212-438-7676

NEW YORK (Standard & Poor's CreditWire) Sept. 16, 1999--Standard
& Poor's today assigned its triple-'B' rating to Osprey
Trust's proposed offering of $1.4 billion of senior notes due 2003,
to be privately issued under Rule 144A of the Securities Act of 1933. In
addition, triple-'B' long-term corporate credit ratings were
assigned to Osprey Trust and Osprey, Inc. The outlook is stable.
    Osprey Inc. is a co-issuer of these securities. Osprey Trust and
Osprey Inc. are the third-party vehicles created by Enron Corp.
(triple-'B'-plus/Stable/'A-2') to restructure an
existing financing vehicle controlled by Enron called Whitewing. In the
future, Whitewing will be used to improve Enron's liquidity by
purchasing noncore Enron merchant assets at fair market value. Enron and
Osprey Trust will hold limited partnership interests in a newly-created
Whitewing L.P. The two entities will jointly act as Whitewing's
general partner. Enron's participation in the partnership will be
through wholly owned subsidiaries.
    Osprey Trust's ratings rely heavily on actions to be taken by
Enron. In a complex structure, Osprey Trust will overfund the transaction
to provide a portion of its interest payment. The overfunded amount will
be channeled into qualifying investments, including loans to Enron.
Support for interest payments will come mainly from the overfunded amounts
and dividends from an issuance by Enron of $1 billion of mandatorily
convertible preferred stock to be held in trust by a Whitewing subsidiary.
Principal repayment of the Osprey Trust senior notes depends primarily on
Enron's ability to successfully accomplish an equity offering when
the notes mature. Support for principal repayment is based in part on the
mandatorily convertible preferred stock and other contractual commitments
by Enron. Although Osprey debt service and repayment also will be
supported by the cash flows and asset values of the merchant assets that
Whitewing will purchase from Enron, the rating is substantially based on
the willingness and ability of Enron to support those payments. The
one-notch difference between Enron's senior debt rating and that of
Osprey Trust's senior notes recognizes that Osprey is structurally
subordinated to Enron's direct obligations.
OUTLOOK: STABLE
Ratings stability at Osprey Trust reflects the soundness of Enron's
credit quality, since Enron's own debt-service requirements and
financial strength are strong factors in the Osprey Trust ratings,
Standard & Poor's said. --CreditWire

Copyright © 1994-2002 Standard & Poor's, a division of The McGraw-Hill Companies. All Rights
Reserved. Privacy Policy



A Division of The McGraw-Hill Companies

ANARPT009458

# Exhibit 7

MoodysResearch.com [Home]

Go to Portfolios



**Moody's Investors Service**
Global Credit Research

Fundamental Credit Research
Opinion Update
Published 1 Jun 2000

# Osprey Trust

Parent: OSPREY TRUST
*Wilmington, Delaware, United States*

### Ratings

| Category | Moody's Rating |
|---|---|
| Bkd Senior Secured | Baa2 |

### Contacts

| Analyst | Phone |
|---|---|
| Stephen G. Moore/New York | 1.212.553.1653 |
| John Diaz/New York | |

### Opinion

#### Rating Rationale

Osprey Trust is a special purpose vehicle established by Enron to monetize its merchant portfolio of investments primarily in energy-related firms, pipelines, power facilities and other project assets. The portfolio also includes some debt investments in these firms as well. Through other wholly-owned entites, it will hold as security, those and other assets to suppot the Noteholders. It is a similar structure to the Marlin Water Trust issued by Enron but with less ultimate support.

The Baa2 rating assigned to Osprey reflects Note repayment support by: i) an Enron mandatory convertible preferred issue held in trust, ii) the issuance of Enron equity, and iii) the liquidation of merchant assets held by Whitewing LP. Interest has been prefunded and lent back to Enron for an Enron note payable to the trust, mirroring the interest amount due on the Osprey Notes.

The rating did not achieve the same level as Marlin becasue of a weaker support level. In the event of a severe downturn in Enron's fortunes leading to a trigger of the Notes, the value of the merchant assets, should the converts and Enron equity not be sufficient to pay the $1.4 billion in Notes, is expected to decline as well due to a high correlation to Enron's markets.

Shares reserved to support the mandatory converts are two times that required at the share price at time of Note issuance and trigger events for mandatory repayment include an Enron stock price drop below $28.00 in conjunction with Enron's rating dropping below investment grade.

#### Rating Outlook

The oulook for the Osprey Notes is stable following an upgrade to Baa2 in conjunction with Enron being upgraded to Baa1 in March, 2000.

CITINEWBY 00195742

# Exhibit 8

PROCESSED BY
NOV 1 3 2000



20013711

OFFERING MEMORANDUM

PRIMARY

# Osprey Trust
# Osprey I, Inc.

**$750,000,000 7.797% Senior Secured Notes due 2003**
**€315,000,000 6.375% Senior Secured Notes due 2003**

The 7.797% Senior Secured Notes due 2003 (the "Dollar Senior Notes") and the 6.375% Senior Secured Notes due 2003 (the "Euro Senior Notes" and, together with the Dollar Senior Notes, the "New Senior Notes") being offered hereby (the "Offering") will be issued by Osprey Trust, a Delaware statutory business trust ("Osprey"), and Osprey I, Inc., a Delaware corporation and a wholly-owned subsidiary of Osprey (the "Co-Issuer" and, together with Osprey, the "Issuers"). The closing of the Offering is expected to occur concurrently with and the Offering is conditioned upon, the closing of an offering of $50 million face amount of Osprey Trust Certificates (the "New Trust Certificates" and, together with the New Senior Notes, the "New Securities"), representing beneficial ownership interests in Osprey. The New Trust Certificates are not being offered hereby. Osprey will make a capital contribution of the proceeds from the sale of the New Securities to Whitewing Associates L.P., a Delaware limited partnership ("Whitewing LP") in exchange for an increase of Osprey's pledged limited partner interest in Whitewing LP. Whitewing LP will use the proceeds from such contribution to, among other things, purchase, from time to time, certain assets owned or originated by Enron Corp., an Oregon corporation ("Enron").

The New Senior Notes will bear interest from October 5, 2000 (the "Closing Date") at the rate of (i) 7.797% per annum, payable semi-annually in arrears on each January 15 and July 15, in the case of the Dollar Senior Notes and (ii) 6.375% per annum, payable annually in arrears on each January 15, in the case of the Euro Senior Notes, in each case, commencing January 15, 2001. The principal of the New Senior Notes will be due and payable on January 15, 2003 (the "Maturity Date") to the extent not redeemed or repaid prior thereto. The New Senior Notes may be redeemed at the option of the Issuers, in whole or in part, at any time, at a redemption price equal to the sum of the accrued and unpaid interest to the date of redemption plus the greater of (i) 100% of the outstanding principal amount of such New Senior Notes and (ii) the sum of the present values of the remaining scheduled payments of principal and interest thereon discounted to the date of redemption (a) on a semi-annual basis at the applicable US Treasury yield plus 50 basis points, in the case of the Dollar Senior Notes, or (b) on an annual basis at the applicable European Government Yield plus 50 basis points, in the case of the Euro Senior Notes. Upon the occurrence of certain Osprey Note Trigger Events, the New Senior Notes will be redeemed, on a pro rata basis, on the dates fixed by the Indenture Trustee at a redemption price equal to the accrued and unpaid interest to the date of redemption plus 100% of the outstanding principal amount of the New Senior Notes plus all other amounts due and owing to the Noteholders under the Indenture. See "Description of the New Senior Notes — Redemption."

The New Senior Notes will represent senior secured limited recourse obligations of the Issuers ranking pari passu in right of payment with the Issuers' $14 billion 8.31% Senior Secured Notes due 2003 (the "Existing Senior Notes" and, together with the New Senior Notes and any Additional Notes outstanding, the "Senior Notes"). The Senior Notes will be secured, on a first priority basis, by: (i) all of the rights of Osprey, excluding Excepted Rights, under the Participation Agreement, the Whitewing LLC Agreement, the Whitewing Partnership Agreement, the Remarketing Agreement, the Enron Agreement and certain other Transaction Documents; (ii) Osprey's member interest in Whitewing Management LLC and Osprey's pledged limited partner interest in Whitewing LP, (iii) certain accounts established pursuant to the Indenture, all amounts credited to such accounts and all investments of such amounts pursuant to the applicable provisions of the Indenture and (iv) all proceeds of the conversion, voluntary or involuntary, of any of the foregoing into cash, instruments, securities or other property (the "Security for the Senior Notes"). See "Description of the New Senior Notes — Security for the Senior Notes." Holders of the Senior Notes will have recourse only to the Security for the Senior Notes for payments due thereon. The Senior Notes are not guaranteed by, and the Security for the Senior Notes does not represent a guarantee by, Enron.

Except as otherwise described herein, upon the occurrence of an Osprey Note Trigger Event, the Indenture Trustee will exercise its rights under the Remarketing Agreement to cause the Share Trustee to liquidate the mandatorily convertible junior preferred stock, Series B, no par value, of Enron (the "Enron Mandatorily Convertible Preferred Stock") held by the Share Trust through a mandatory remarketing arrangement and apply the proceeds against the repayment of the Senior Notes. The Indenture Trustee will cause the Share Trustee to exercise the Share Settlement Agreement to the extent of any shortfall. See "Description of the New Senior Notes — Osprey Note Trigger Events and Remedies" and "Description of Certain Transaction Documents — Description of the Share Settlement Agreement." Upon the occurrence of an Osprey Note Trigger Event and subject to certain limitations described herein, the Indenture Trustee also may, or at the direction of the holders of at least 75% of the then outstanding principal amount of the Senior Notes or the holders of at least 25% of the then outstanding face amount of the Osprey Trust Certificates will, foreclose on Osprey's pledged limited partner interest in Whitewing LP and cause the sale of Whitewing LP's assets, including the Whitewing Notes. See "Description of the New Senior Notes — Limitations on Remedies of the Indenture Trustee."

Application has been made to list the New Senior Notes on the Luxembourg Stock Exchange.

### See "Risk Factors" beginning on page 14 for a discussion of certain matters that should be considered in connection with an investment in the New Senior Notes.

THE NEW SENIOR NOTES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS AND MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. ACCORDINGLY, THE NEW SENIOR NOTES ARE BEING OFFERED HEREBY ONLY (A) TO "QUALIFIED INSTITUTIONAL BUYERS" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT ("RULE 144A") IN RELIANCE ON THE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED BY RULE 144A AND (B) OUTSIDE THE UNITED STATES TO CERTAIN PERSONS IN RELIANCE UPON REGULATION S UNDER THE SECURITIES ACT ("REGULATION S"). PROSPECTIVE PURCHASERS ARE HEREBY NOTIFIED THAT SELLERS OF THE NEW SENIOR NOTES MAY BE RELYING ON THE EXEMPTIONS FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A AND REGULATION S. FOR A DESCRIPTION OF CERTAIN RESTRICTIONS ON RESALES OR TRANSFERS OF THE NEW SENIOR NOTES, SEE "NOTICE TO INVESTORS."

|                                          | Per Senior Note(1) | Total        |
| ---------------------------------------- | ------------------ | ------------ |
| Price to Investors of Dollar Senior Notes | 100.000%           | $750,000,000 |
| Price to Investors of Euro Senior Notes   | 99.905%            | €314,700,750 |

(1) Enron has agreed to indemnify the Initial Purchasers against, and to provide contribution with respect to, certain liabilities under the Securities Act. See "Plan of Distribution."

The New Senior Notes are offered by Donaldson, Lufkin & Jenrette Securities Corporation, Deutsche Bank Securities Inc., Credit Suisse First Boston Corporation, Lehman Brothers and UBS Warburg LLC (the "Initial Purchasers"), subject to prior sale, when, as and if delivered to and accepted by the Initial Purchasers, and subject to certain conditions. It is expected that delivery of the New Senior Notes will be made in book-entry form through the facilities of The Depository Trust Company ("DTC") (in the case of the Dollar Senior Notes) and the Euroclear System ("Euroclear") or Clearstream Banking, société anonyme ("Clearstream") (in the case of the Euro Senior Notes) against payment therefor in immediately available funds on or about October 5, 2000.

*Joint Bookrunning Managers*

**Donaldson, Lufkin & Jenrette**          **Deutsche Banc Alex. Brown**

*Co-Managers*

**Credit Suisse First Boston**      **Lehman Brothers**      **UBS Warburg LLC**

September 28, 2000

EX. 000000064

## AVAILABLE INFORMATION

Enron files annual, quarterly and special reports, proxy statements and other information with the Commission. Enron's Commission filings are available to the public over the Internet at the Commission's web site at http://www.sec.gov. You may also read and copy any document Enron files at the Commission's public reference rooms in Washington, D.C., New York, New York and Chicago, Illinois. Please call the Commission at 1-800-SEC-0330 for further information on the public reference rooms and their copy charges. Reports, proxy statements and other information concerning Enron can also be inspected and copied at the offices of the New York Stock Exchange at 20 Broad Street, New York, New York 10005, the offices of the Chicago Stock Exchange at 120 South LaSalle Street, Chicago, Illinois 60603, and the offices of the Pacific Stock Exchange at 301 Pine Street, San Francisco, California 94014. The Commission allows Enron to "incorporate by reference" the information it files with them, which means that Enron can disclose important information by referring to those documents. The information incorporated by reference is an important part of this Offering Memorandum, and information that Enron files later with the Commission will automatically update and supersede this information. The documents listed below and any future filings made by Enron with the Commission under Sections 13(a), 13(c), 14, or 15(d) of the Exchange Act until all of the New Senior Notes are sold are hereby incorporated by reference.

- Enron's Annual Report on Form 10-K for the fiscal year ended December 31, 1999;

- Enron's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2000 and June 30, 2000;

- Enron's Current Report on Form 8-K filed May 19, 2000; and

- Enron's capital stock description set forth in Enron's Registration Statement on Form 8-B filed on July 2, 1997.

A copy of these filings may be obtained at no cost, by written or oral request to Enron at its principal executive offices: Secretary Division, Enron Corp., 1400 Smith Street, Houston, Texas 77002; telephone: (713) 853-6161. Such copies will also be available at the office of Deutsche Bank Luxembourg S.A., the Luxembourg paying and transfer agent, free of charge at any time.

None of the Issuers, Egret, Peregrine, Whitewing Management LLC, Whitewing LP or the Share Trust is currently subject to the informational requirements of the Exchange Act. Consequently, none of the Issuers, Egret, Peregrine, Whitewing Management LLC, Whitewing LP or the Share Trust has been or will be required to file reports, proxy statements or other information with the Commission. The Issuers have agreed that for so long as any Senior Notes remain outstanding, the Issuers will furnish to the holders and to prospective transferees of the Senior Notes, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act. The Issuers shall provide to Enron, to the Indenture Trustee and to holders of the Senior Notes, within 60 days after the end of the first, second and third fiscal quarters of each fiscal year, unaudited consolidated balance sheets and statements of income and cash flows for such fiscal year and the portion of the fiscal year ending with such fiscal quarter, and shall provide to the Indenture Trustee and to holders of the Senior Notes, within 120 days after the end of each full fiscal year, audited consolidated financial statements. See "Description of the New Senior Notes — Covenants — Reports."

Each purchaser of the New Senior Notes shall be furnished with a copy of this Offering Memorandum and any related amendments or supplements to this Offering Memorandum. Enron will provide without charge to each person to whom a copy of this Offering Memorandum is delivered in accordance with the procedures established herein, on the request of any such person, a copy of the Transaction Documents or any other information considered to be necessary to verify the accuracy and completeness of the information herein. Written or telephonic requests for such copies should be directed to the Secretary Division, Enron Corp. at its principal executive offices, 1400 Smith Street, Houston, Texas 77002 (telephone number: (713) 853-6161). The Transaction Documents and, upon request, any other information considered to be necessary to verify the accuracy and completeness of the information herein, will also be available to persons

## OFFERING MEMORANDUM SUMMARY

*The following summary information does not purport to be complete and is qualified in its entirety by reference to, and should be read in conjunction with, the more detailed information and financial statements, and the related notes thereto, included elsewhere or incorporated by reference in this Offering Memorandum. See the Index of Defined Terms for the definitions of certain terms used in this Offering Memorandum.*

Enron is an Oregon corporation and is headquartered in Houston, Texas. Enron provides products and services related to natural gas, electricity and communications to wholesale and retail customers. Enron's operations are conducted through its subsidiaries and affiliates which are principally engaged in the marketing of natural gas, electricity and other commodities and related risk management and finance services worldwide; the development, construction and operation of power plants, pipelines and other energy related assets worldwide; the delivery and management of energy commodities and capabilities to end-use retail customers in the industrial and commercial business sectors; the development of an intelligent network platform to provide bandwidth management services and to deliver high bandwidth applications; the transportation of natural gas through pipelines to markets throughout the United States; and the generation and transmission of electricity to markets in the northwestern United States.

In the implementation of several of Enron's core business strategies, Enron has frequent opportunities to invest in debt and equity interests and in projects it is developing, or originating through its wholesale operations and services, retail energy services and related financing activities (the "Designated Assets"). Enron periodically seeks to sell Designated Assets as a means to create liquidity for its business.

Enron and Osprey, through a series of transactions (the "Original Osprey Transactions"), invested in Whitewing LP, a vehicle designed to acquire, hold and sell Permitted Partnership Investments, including Designated Assets, from time to time. Osprey purchased a limited partner interest in Whitewing LP using the proceeds from the Existing Senior Notes, as well as the proceeds from the Osprey Trust Certificates issued on September 24, 1999 (the "Existing Trust Certificates" and, together with the Subsequent Trust Certificates and the New Trust Certificates, the "Osprey Trust Certificates"). Whitewing LP utilized a portion of the proceeds of Osprey's initial investment to acquire Designated Assets.

The Existing Senior Notes are, and the New Senior Notes will be, supported by assets in Whitewing LP which include (i) the Enron Shares which are held in a wholly-owned subsidiary of Whitewing LP; (ii) Enron's obligation to issue additional equity to such wholly-owned subsidiary of Whitewing LP as necessary to raise proceeds of a required amount at least equal to approximately $2.43 billion; (iii) the Whitewing Assets; and (iv) additional Permitted Partnership Investments.

**Transaction Overview**

Upon issuance of the New Senior Notes and the New Trust Certificates, Osprey will invest all of the proceeds of the Offering in Whitewing LP, in exchange for an increase in the portion of its limited partner interest in Whitewing LP that is pledged as part of the Security for the Senior Notes (the "Pledged Osprey Limited Partner Interest"). Approximately $171 million of the Osprey investment (the "New Overfund Amount") will be contributed to a wholly-owned subsidiary of Whitewing LP and invested in Enron Debt Securities or other Permitted Investments. The dividend payments from the Enron Mandatorily Convertible Preferred Stock, principal and interest payments on investments purchased with the Overfund Amount and payments on the Enron Notes will fund the required payments to be made by Whitewing LP to Osprey on a semi-annual basis. These required payments have been sized in order to meet interest payments on the Senior Notes and the required yield payments on the Osprey Trust Certificates plus certain other payment obligations of Whitewing LP to Osprey. The remaining proceeds will be used to purchase Permitted Partnership Investments, including Designated Assets.

Proceeds from the Whitewing Assets must be (i) reinvested in additional Permitted Partnership Investments, including Designated Assets or (ii) distributed to Osprey and deposited with the Indenture Trustee to repay the Senior Notes at or before the Maturity Date. See "Description of the New Senior Notes."

1

Date, or upon the occurrence of any other Osprey Note Trigger Event, the Indenture Trustee (on behalf of Osprey) will direct the Share Trust to sell the Enron Shares pursuant to the Remarketing Agreement.

*Remarketing and Share Settlement Agreements.* Upon the occurrence of an Osprey Note Trigger Event and to the extent the market value of the Enron Shares held by the Share Trust is less than approximately $2.43 billion, Enron, under the Share Settlement Agreement, will be required to issue additional Enron Shares with a value equal to such deficiency. Any additional Enron Shares issued under the Share Settlement Agreement shall be subject to remarketing under the Remarketing Agreement. If Enron is unable to meet its obligations under the Share Settlement Agreement or the Remarketing Agreement, or the foregoing remarketing attempts ultimately do not raise proceeds of a required amount at least equal to approximately $2.43 billion, Enron will be obligated to pay to the Share Trust an amount equal to any remaining deficiency.

*Liquidation of Whitewing LP's Assets.* If the Senior Notes are not repaid in full when due in accordance with the Indenture, the Indenture Trustee (on behalf of Osprey) may liquidate the Pledged Osprey Limited Partner Interest, including its ownership interests in Permitted Partnership Investments, including the Whitewing Assets, subject to the limitations described under "Description of the New Senior Notes — Limitations on Remedies of the Indenture Trustee."

Proceeds of up to a required amount at least equal to approximately $2.43 billion from such remarketing or liquidation will be distributed by Whitewing LP to Osprey and Osprey will apply such proceeds to repay the Senior Notes in accordance with the Indenture.

6

other equity securities, including the Enron Shares, sufficient to redeem the outstanding Senior Notes has not been deposited with the Indenture Trustee; or (iii) a downgrading of Enron senior unsecured debt to below "Baa3" by Moody's or below "BBB–" by S&P or below "BBB–" by Fitch and a decline in the closing price of Enron common stock to below $59.78 for three consecutive Trading Days, after adjustment of such price to reflect any split, stock dividend or certain other events occurring with respect to Enron common stock after the date of this Offering Memorandum. See "Description of the New Senior Notes — Osprey Note Trigger Events and Remedies."

**Remedies Upon an Osprey Note Trigger Event** . . . . . . . . . . . . . . .

Upon the occurrence of an Osprey Note Trigger Event, the Indenture Trustee shall take the action described in clause (i) below and may or, at the direction of the holders of 25% of the then outstanding principal amount of the Senior Notes or the holders of 25% of the then outstanding face amount of the Osprey Trust Certificates, shall take the actions described in clause (ii) below, subject in each case to the limitations set forth under "— Limitation on Remedies of the Indenture Trustee:"

(i) exercise its rights under the Remarketing Agreement to cause the Share Trustee to liquidate the Enron Shares held by the Share Trust and/or shares issued pursuant to the Share Settlement Agreement through a mandatory remarketing arrangement (see "Description of Certain Transaction Documents — Description of the Remarketing Agreement") and apply the proceeds in accordance with the Whitewing Partnership Agreement and the Indenture; and

(ii) foreclose on Osprey's member interest in Whitewing Management LLC and the Pledged Osprey Limited Partner Interest and cause a sale of Whitewing LP's assets.

In taking action under clause (ii) above with respect to the Pledged Osprey Limited Partner Interest, the Indenture Trustee is required to use its reasonable efforts to achieve the maximum proceeds for both the Senior Notes and Osprey Trust Certificates consistent with a prompt and orderly proceeding, without regard to any proceeds available to the Senior Notes under the Remarketing Agreement or the amounts then on deposit in the Collection Accounts.

**Limitations on Remedies of the Indenture Trustee** . . . . . . . . . . .

In the case of any Osprey Note Trigger Event, the Indenture Trustee shall forbear from exercising its remedies described in clause (i) under "— Remedies Upon an Osprey Note Trigger Event" above for up to 60 days if, within 21 days after such event, Enron files a registration statement for and is diligently pursuing the registration and the sale of Enron equity (including the Enron Mandatorily Convertible Preferred Stock if the net proceeds of such sale are expected to result in net proceeds at least equal to approximately $2.43 billion to be paid to the Share Trust) in order to generate proceeds of a required amount at least equal to approximately $2.43 billion.

In the case of any Osprey Note Trigger Event described under clause (i) of the definition thereof, the Indenture Trustee may pursue the actions described in clause (ii) under "— Remedies Upon an Osprey Note Trigger Event" above only after 60 days following the occurrence

9

## RISK FACTORS

*Prospective purchasers of the New Senior Notes should carefully review the information included elsewhere and incorporated by reference in this Offering Memorandum and should particularly consider the following matters.*

### Risks Relating to the New Senior Notes

*Uncertainty of Repayment From Equity Offerings.* None of Enron or its affiliates will be obligated to undertake to consummate an offering of a new series of equity securities in order to provide funds for the repayment of the Senior Notes. If Enron or any of its affiliates undertakes to consummate an equity offering, there is no assurance that the conditions of the capital markets will permit the consummation of an equity offering at a price satisfactory to Enron or any of its affiliates.

*Risks Associated with the Remarketing of the Enron Shares.* The provisions of the Remarketing Agreement, taken together with the terms of the Share Settlement Agreement, are designed to result in the sale of an amount of Enron Shares sufficient to generate proceeds of a required amount at least equal to approximately $2.43 billion in proceeds in the event of an Osprey Note Trigger Event, but there can be no assurance that such result will be successfully achieved.

The Remarketing Agents have agreed to use commercially reasonable efforts to sell the Enron Shares in accordance with the procedures set forth in the Remarketing Agreement, and Enron is required to assist in the sale of the Enron Shares, regardless of market conditions or the market price of Enron common stock, to the extent legally permitted. The Remarketing Agreement contemplates that the Remarketing Agents will use their commercially reasonable efforts to maximize the proceeds from the sale of the Enron Shares. If Enron does not comply with its obligations to register, or is otherwise unable to register, the sale of the Enron Shares held by the Share Trust, the Remarketing Agents will be required to use their commercially reasonable efforts, to the extent legally permissible, to sell the Enron Shares in a private transaction. The sale of the Enron Shares in a private transaction would likely result in less proceeds than would be received in a public offering. In any event, such commercially reasonable efforts do not represent a firm commitment by the Remarketing Agents to buy, sell or place any securities or an undertaking to enter into any such commitment.

If the proceeds from a remarketing of the shares are expected to be less than a required amount equal to at least approximately $2.43 billion, Enron will be obligated under the Share Settlement Agreement to issue additional Enron Shares to the Share Trust to the extent of the deficiency. The additional shares issuable by Enron under the Share Settlement Agreement will be remarketed in accordance with and subject to the Remarketing Agreement. There can be no assurance that the remarketing of additional shares issued under the Share Settlement Agreement will be successful, or, if successful, that such remarketing will yield sufficient proceeds to meet a deficiency in proceeds from a remarketing of Enron Shares.

On September 27, 2000, the closing price of Enron common stock was $87.457 per share. A substantial decline in the market price of Enron common stock could have a material adverse effect on the remarketing of the Enron Shares. In addition, Enron is a party to certain financial contracts that contain provisions for early settlement in the event of a significant market price decline in which Enron common stock falls below certain levels or if the credit ratings for Enron's unsecured senior long-term debt obligations fall below investment grade, and the Transaction Documents permit Enron to enter into similar future arrangements, subject to certain limitations. The impact of this early settlement could include the issuance of additional shares of Enron equity securities, including issuances of shares at the same time that the Enron Shares or other Enron equity securities are required to be sold pursuant to the Remarketing Agreement, and any such issuance could adversely affect the timing and success of the remarketing process under the Remarketing Agreement. In connection with the issuance by Marlin Water Trust of its senior notes due 2001 (the "Marlin Notes") of which approximately $828 million is currently outstanding, Enron is obligated to issue and register for sale an amount of mandatorily convertible preferred stock, with terms similar to the Enron Mandatorily Convertible Preferred Stock, upon a substantial decline in Enron's common stock price and a downgrade of its debt ratings. Under the terms of the Marlin Notes, Enron is restricted to remarketing its common stock instead of the Enron Mandatorily Convertible Preferred Stock during a remarketing of the preferred stock issued by

14

Enron as support for the Marlin Notes. There can be no assurance that the market will be sufficiently liquid to absorb the remarketing of Enron common stock if the preferred stock supporting the Marlin Notes is being remarketed immediately prior thereto. There can also be no assurance that Enron's rights to market a New Series of Enron equity securities prior to or at the same time as a remarketing under the Remarketing Agreement will not adversely affect market liquidity and the remarketing proceeds available to repay the Senior Notes. Also, certain holders of Enron equity securities have registration rights that may require the registration of such securities as part of the remarketing process. Moreover, Enron's continued investment grade status is critical to the success of its wholesale businesses, as well as its ability to maintain adequate liquidity. Enron's inability to maintain adequate liquidity would likely have a material adverse effect on the market price of Enron common stock. There can be no assurance that the Remarketing Agents will be able to successfully remarket the Enron Shares, or that the proceeds from the sale of the Enron Shares will be at least equal to a required amount of not less than approximately $2.43 billion.

*Equitable Subordination.* If a proposed sale of the Enron Shares would likely fail to generate proceeds of a required amount at least equal to approximately $2.43 billion, Enron will be obligated under the Share Settlement Agreement to issue to the Share Trust an amount of Enron Shares to be sold by the Remarketing Agents such that the proceeds of the remarketing would be equal to a required amount of at least approximately $2.43 billion. The Remarketing Agreement also provides for an additional remarketing of Enron Shares to be issued by Enron to the extent of any deficiency in proceeds from an initial remarketing.

To the extent that sufficient funds are not generated pursuant to the provisions of the Remarketing Agreement and the Share Settlement Agreement because of legal prohibitions or Enron's breach of its obligations under such agreements, Enron is obligated following a Failed Remarketing to pay to the Share Trust the amount of such deficiency. Enron's payment obligation differs in certain material respects from an Enron guarantee of indebtedness. There is the possibility that if Enron were to become a debtor in a case under the United States Bankruptcy Code, a bankruptcy court might recharacterize Enron's obligation to make a payment to the Share Trust as being equivalent to an obligation to purchase the Enron Shares from the Share Trust. In such event, there is a risk that, if the Share Trust asserted a claim against Enron arising from Enron's failure to make such payment to the Share Trust, a bankruptcy court might subordinate part or all of that claim to other claims against Enron.

*Uncertainty of Ability to Realize on Any Liquidation of the Whitewing Assets.* Enron intends that each additional acquisition of Whitewing Assets will be at a price and on other terms determined by internal Enron negotiations conducted on an arms length basis, and the holders of the Osprey Trust Certificates (the "Certificateholders") will have certain consent rights with respect to such acquisitions, but there can be no assurance that such prices and other terms will reflect those that would be agreed by unaffiliated third parties. Upon the occurrence of an Osprey Note Trigger Event and subject to certain limitations, the Indenture Trustee may have the right to or, at the direction of the holders of at least 25% of the then outstanding principal amount of the Senior Notes or the holders of at least 25% of the then outstanding face amount of the Osprey Trust Certificates, the obligation to foreclose on the Pledged Osprey Limited Partner Interest and cause the sale of Permitted Partnership Investments, including the Whitewing Assets. There may be no established markets for the Whitewing Assets and there may be contractual or other limitations relating to such sale. There is also no limitation on financing by Whitewing Operating Subsidiaries relating to the Whitewing Assets, which financing may need to be discharged in connection with any such sale. Consequently, a sale of such assets may be difficult and there can be no assurance as to the proceeds thereof.

*Limited Recourse Obligations.* The Existing Senior Notes represent and the New Senior Notes will represent senior secured limited recourse obligations of the Issuers. The Senior Notes will be secured by the Security for the Senior Notes and holders of the Senior Notes will have recourse only to the Security for the Senior Notes for payments due thereon. If the net proceeds from the realization of the Security for the Senior Notes are not sufficient to pay all amounts due to the holders of the Senior Notes, no other assets of the Issuers will be available for payment of any shortfall arising therefrom. None of the holders of the Senior Notes may take any further action against the Issuers in respect of such obligations or such sums and, in particular, will not be entitled to petition or take any other steps for the winding up of the Issuers nor will any of them have any claim in respect of any sums in respect of any assets of the Issuers other than the Security

15

Therefore, the duties of the directors and officers of Enron may conflict with the duties of the directors and officers of Whitewing Management LLC. In addition, certain other conflicts of interest exist and may arise in the future as a result of the extensive relationships between Enron, Whitewing Management LLC and Whitewing LP and its subsidiaries. See "Certain Relationships and Related Party Transactions."

**Business of Whitewing LP**

During the term of the Senior Notes, Whitewing expects to acquire, hold, participate in and dispose of various Designated Assets generated from the activities of the Enron business units described above and other Permitted Partnership Investments. Since its formation in September 1999, Whitewing LP has acquired an aggregate of fourteen Designated Assets, four of which have been subsequently sold. The principal Designated Assets held by Whitewing LP at the date hereof are briefly described below.

### *Sarlux*

On September 30, 1999, an indirect subsidiary of Whitewing LP purchased an approximately 45% economic interest in Sarlux Srl ("Sarlux") for approximately $350 million. The remaining economic interest is owned by SARAS S.p.A., an Italian energy company ("SARAS"). Project financing also includes 989 billion Italian Lire in loans from Banca Commerciale Italiana S.p.A. and 750 billion Italian Lire in loans from the European Investment Bank.

Sarlux is developing a 551 megawatt integrated gasification and power plant (the "Facility") in Sardinia, Italy. The Facility will utilize residue from an adjacent SARAS oil refinery as feedstock under a long-term contract. Power generated by the Facility will be sold to ENEL, an Italian government owned electricity company, under a long-term contract. The plant has not yet been completed.

### *Trakya*

On October 25, 1999, an indirect subsidiary of Whitewing LP purchased an approximately 22% economic interest in Trakya Elektrik Uretim ve Ticaret A.S. ("Trakya") for approximately $100 million. Project financing has received the benefit of a United States Export-Import Bank political risk policy and a loan facility from the Overseas Private Investment Corporation, as co-lender.

Trakya is a 478 megawatt combined cycle power station located by the Sea of Marmara. Trakya began commercial operations in June of 1999. Long-term fuel supply and power purchase agreements are with state-owned entities and have the benefit of Republic of Turkey guarantees.

### *ESSA*

On August 31, 2000, an indirect wholly-owned subsidiary of Whitewing LP purchased approximately 46% of the outstanding ordinary shares of Enron Brazil Power Holdings V Ltd. ("Holdings V"). The balance of the Holdings V ordinary shares are indirectly owned by Enron. Holdings V indirectly owns 51.78% of Electricidade e Servicos S.A. ("ESSA"), the seventh largest electric distribution company in Brazil. The purchase price was $461.5 million. As of December 1999, ESSA served 1.6 million customers throughout 223 towns and cities in the State of São Paulo and five towns and cities in the eastern part of the State of Mato Grosso do Sul. ESSA's largest customers are in the cement, pulp and paper and food products sectors. ESSA's largest overall customer (SABESP) accounts for approximately 3.25% of total sales and its 14 largest customers represent 19.6% of total volume sales.

### *Promigas*

On October 25, 1999, Whitewing LP indirectly acquired a significant equity interest in Promigas, a publicly traded company on the Bogota Stock Exchange and the largest natural gas transportation and distribution company in Colombia, for approximately $137 million. Promigas was created in 1976 to design and construct the first natural gas pipeline in Colombia from Ballena to Cartagena, connecting the gas producing region in the northern part of the country with major gas consumption centers along Colombia's Caribbean coastline. The principal asset of Promigas is an 850 km pipeline extending from Ballena through Cartagena and terminating in Jobo.

*Wind River/Powder River*

On June 30, 2000, an indirect subsidiary of Whitewing LP purchased substantially all of ENA's economic interest in (i) ECT Powder River, L.L.C., representing a 35% economic interest in Lost Creek Gathering Company LLC ("Lost Creek") and (ii) ECT Wind River, L.L.C. representing an indirect 33⅓% economic interest in Fort Union Gas Gathering L.L.C. ("Fort Union") for approximately $76 million. Lost Creek owns a gas gathering system consisting of an approximately 120 mile 24" mainline and 39 miles of 12" laterals. The system extends south from the north central Wind River Basin to the pipeline corridor running adjacent to the Interstate 80 highway in Wyoming. The system is projected to be operational by September 30, 2000. Fort Union owns a gas gathering system consisting of a 103 mile 24" high pressure gathering line (with numerous lateral supply lines attached) which extends from the east-central region of the Powder River Basin near Gillette, Wyoming to near Glenrock, Wyoming. On September 22, 2000, such indirect subsidiary sold all of its interest in Lost Creek and Fort Union to an affiliate of Enron for an amount in excess of $76 million.

# Exhibit 9

Case 4:01-cv-03624   Document 4865   Filed in TXSD on 07/19/06   Page 42 of 238

Newby vs. Enron                    4/28/06 Charles R. Drott, Vol. 3

Page 607

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

In Re:  ENRON CORPORATION    * MDL Docket No. 1446
SECURITIES LITIGATION        *
                             * Civil Action No. H-01-3624
MARK NEWBY, ET AL.,          * (Consolidated)
INDIVIDUALLY AND ON BEHALF   *
OF ALL OTHERS SIMILARLY      * CLASS ACTION
SITUATED,                    *
                             *
          PLAINTIFFS,        *
                             *
VS.                          *
                             *
ENRON CORP., ET AL.,         *
                             *
          DEFENDANTS.        *
_____*

THE REGENTS OF THE           *
UNIVERSITY OF CALIFORNIA,     *
ET AL., INDIVIDUALLY AND     *
ON BEHALF OF ALL OTHERS      *
SIMILARLY SITUATED,          *
                             *
          PLAINTIFFS,        *
                             *
VS.                          *
                             *
KENNETH L. LAY, ET AL.,      *
                             *
          DEFENDANTS.        *
_____*

-------------------------------------
ORAL AND VIDEOTAPED DEPOSITION OF
CHARLES R. DROTT
VOLUME 3
APRIL 28, 2006
-------------------------------------

Newby vs. Enron          4/28/06 Charles R. Drott, Vol. 3

```
                                                    Page 854

        1    5:00.

        2                  (Off the record 5:00-5:07.)

        3                  THE VIDEOGRAPHER:  We're back on record

        4    at 5:07.

05:07   5                          EXAMINATION

        6    BY MR. JACONETTE:

        7         Q.   Mr. Drott, did you perform a forensic

        8    investigation in this case?

        9         A.   Yes.

05:07  10         Q.   The type of investigation that would be

       11    performed by a certified fraud examiner?

       12                  MR. SCOTT:  Objection, form.

       13         A.   It's one of the types of engagements that a --

       14    a fraud -- certified fraud examiner would perform.

05:07  15         Q.   (BY MR. JACONETTE)  Did you --

       16         A.   There are -- there are other types.

       17         Q.   Did you reach conclusions from your

       18    investigation?

       19         A.   I did.

05:07  20         Q.   Are your conclusions reflected in your report?

       21         A.   They are.

       22         Q.   And would you please summarize your principal

       23    conclusion reflected in your report?

       24         A.   That's basically in Paragraph 2.11, which is

05:08  25    that:  Andersen's audit opinions and supporting audit
```

ALPHA REPORTING SERVICES, INC. DALLAS, TX  (888) 667-3376

7098adce-2605-4485-b3b6-1a55c6475d5e

Newby vs. Enron               4/28/06 Charles R. Drott, Vol. 3

Page 855

1    work relative to numerous structured finance

2    transactions was, as the evidence reflects, undermined

3    by the secret understandings, verbal assurances, or side

4    agreements between Enron's management and third-party

05:08    5    financial institutions.

6                Such secret verbal assurances,

7    undertakings, or side agreements were clearly indicative

8    of collusion, whose purpose was to conceal material

9    information from Andersen for the purpose of fraudulent

05:08   10    financial reporting by Enron and its management.

11        Q.    From your investigation, did you gather what

12    you believed to be evidence that certain members of

13    Enron's management concealed material information from

14    Andersen to falsify Enron's financial reporting?

05:09   15        A.    I did.

16        Q.    From your investigation, did you gather what

17    you believed to be evidence that certain of Enron's

18    banks participated in collusion with Enron to conceal

19    material information from Andersen?

05:09   20                MR. SCOTT:  Objection, form.

21        A.    I did.

22        Q.    (BY MR. JACONETTE)  Are those banks identified

23    in your report?

24        A.    Yes.

05:09   25        Q.    Would you please name those banks?

ALPHA REPORTING SERVICES, INC. DALLAS, TX  (888) 667-3376

Newby vs. Enron          4/28/06 Charles R. Drott, Vol. 3

Page 856

1      A.   Barclays, Merrill Lynch, Credit Suisse First

2   Boston, Royal Bank of Scotland, Royal Bank of Canada,

3   and Canadian Imperial Bank of Commerce.

4      Q.   Is some of the key evidence that you've

05:09   5   gathered from your investigation with you today?

6      A.   Yes.

7           MR. SCOTT:  Objection, form.

8      Q.   (BY MR. JACONETTE)  The stack of documents

9   sitting right beside you?

05:10  10           MR. SCOTT:  Objection, form.

11      A.   The totality of the evidence which I have had

12   with me throughout this deposition includes my expert

13   report, the handwritten outlines which were produced

14   during my -- at -- at the start of my deposition, and

05:10  15   packages of supporting documentation.

16           (Drott Exhibit 2A marked.)

17      Q.   (BY MR. JACONETTE)  I'm going to hand you

18   Exhibit 2A.  Does that evidence in the stack of

19   documents beside you include Exhibit Number 2A, which

05:11  20   says, "Nigerian Barge Transaction, Merrill Lynch

21   Documents," on the top?

22      A.   Yes.

23           MR. SCOTT:  Objection, form.  Do we have

24   that?  Do we have copies?

05:11  25           MR. WASHER:  Are these the documents that

7098adce-2605-4485-b3b6-1a55c6475d5e

# Exhibit 10

No. 04-55665

_____

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

T. JEFFREY SIMPSON, on behalf of himself and
all others similarly situated,

Plaintiff,

and

CALIFORNIA STATE TEACHERS' RETIREMENT SYSTEM,

Plaintiff - Appellant,

v.

HOMESTORE.COM, INC.; et al.,

Defendants - Appellees.

_____

On Appeal from the United States District Court
for the Central District of California

_____

REPLY BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION,
AMICUS CURIAE, IN SUPPORT OF POSITIONS THAT FAVOR APPELLANT

_____

GIOVANNI P. PREZIOSO
General Counsel

JACOB H. STILLMAN
Solicitor

KATHARINE B. GRESHAM
Assistant General Counsel

MICHAEL L. POST
Senior Counsel

Of Counsel
MEYER EISENBERG
Deputy General Counsel

Securities and Exchange Commission
450 Fifth Street, N.W.
Washington, D.C.  20549
(202) 942-0921 (Post)

# TABLE OF CONTENTS

<u>Page</u>

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

1.    Conduct Covered by Section 10(b) and Rule 10b-5(a)  . . . . . . . . . . . . . . . 1

2.    Criticism of the Commission's Proposed Tests for Primary
      Liability and Reliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      a.    Primary Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      b.    Reliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

<u>CASES</u>:                                                                                       <u>Page</u>

<u>Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.</u>,
  511 U.S. 164 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,6,11,14,15
                                                                                                  <u>passim</u>
<u>Cooper v. Pickett</u>, 137 F.3d 616 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . .  6,11

<u>Ernst & Ernst v. Hochfelder</u>,
  425 U.S. 185 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,3,4

<u>Export Group v. Reed Industries, Inc.</u>,
  54 F.3d 1466 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

<u>Santa Fe Industries v. Green</u>,
  430 U.S. 462 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,3,4

<u>SEC v. Zandford</u>, 535 U.S. 813 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

<u>Wharf (Holdings) Ltd. v. United Intern. Holdings, Inc.</u>,
  532 U.S. 588 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

<u>Statutes and Rules</u>                                                          <u>Page</u>

<u>Securities Act of 1933, 15 U.S.C. 77a, et. seq.:</u>

Section 17(a), 15 U.S.C. 77q(a)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6


<u>Securities Exchange Act of 1934, 15 U.S.C. 78a, et seq.:</u>

Section 10(b), 15 U.S.C. 78j(b)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,2,3,4,10
                                                                           <u>passim</u>
Rule 10b-5(a)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,3,4,5,
                                                                           <u>passim</u>
Fed.  R. Civ. P. 9(b)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Private Securities Litigation Reform Act of 1995  . . . . . . . . . . . . . . . . . . . . . . . 6


<u>Miscellaneous</u>

<u>Black's Law Dictionary</u> 465 (7<u>th</u> ed. 1999)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

The Securities and Exchange Commission, which is participating in this appeal as *amicus curiae*, submits this reply brief to address issues raised in the briefs of the defendants and the *amicus curiae* briefs supporting them.  In our initial brief, we addressed the appropriate test for finding a defendant to be a primary violator rather than an aider and abettor in a scheme to defraud under Rule 10b-5(a).

As explained in our initial brief, this case involves allegations that a public company and its business partners engaged in a scheme to defraud in which they committed the deceptive act of engaging in transactions whose principal purpose and effect was to create a false appearance of corporate revenues.  As we noted, this situation has arisen in a number of recent cases involving schemes to inflate the revenues of internet companies, as well as other types of schemes to misrepresent the financial condition of publicly traded companies.  Such schemes harm the integrity of the nation's securities markets and undermine the confidence of public investors.

1.   Conduct Covered by Section 10(b) and Rule 10b-5(a)

Defendants and their *amici* incorrectly interpret Supreme Court cases as holding that deceptive conduct under Section 10(b) is limited to conduct that involves material misstatements or omissions, and does not include other deceptive acts.  The principal support they offer for this interpretation is the

following statement in <u>Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.</u>, 511 U.S. 164 (1994):

> As in earlier cases considering conduct prohibited by § 10(b), we again conclude that the statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act.  See <u>Santa Fe Industries [v. Green]</u>, 430 U.S. at 473 ("language of § 10(b) gives no indication that Congress meant to prohibit any conduct not involving manipulation or deception"); <u>Ernst & Ernst [v. Hochfelder]</u>, 425 U.S. at 214 ("When a statute speaks so specifically in terms of manipulation and deception . . . , we are quite unwilling to extend the scope of the statute").

511 U.S. at 177.  According to defendants and their *amici*, this statement is a holding by the Supreme Court on the interpretation of the "manipulative or deceptive device or contrivance" language of Section 10(b), with "manipulative act" the conduct covered by the manipulative component and "misstatement (or omission)" the conduct covered by the deceptive component.  Thus, in their view, "deceptive" covers only conduct that deceives by false statement or misleading omission.

The <u>Central Bank</u> statement, however, is *dictum*, as it was not essential to the determination of the case, which concerned "the existence and scope of the § 10(b) aiding and abetting action" (511 U.S. at 170).[1]  It was not necessary for the

---

[1]  <u>See</u> <u>Export Group v. Reef Industries, Inc.</u>, 54 F.3d 1466, 1472 (9th Cir. 1995) (adopting <u>Black's Law Dictionary</u> definition of *dicta* as "'[e]xpressions in the court's opinion which go beyond the facts before the court'"); <u>Black's Law Dictionary</u> 465 (7th ed. 1999) (defining *dictum* as "[a] court's stating of a legal principle more broadly than is necessary to decide the case").

Supreme Court, in deciding that aiding and abetting is not covered by the statutory language, to determine the full extent of deceptive conduct covered by Section 10(b) – an issue that was not raised by the case or briefed by the parties.

It is also inconceivable that the Court would make a pronouncement on such an important matter of statutory construction without explanation.  Instead, as is apparent from the citations to <u>Santa Fe Indus., Inc. v. Green</u>, 430 U.S. 462 (1977), and <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185 (1976), and the accompanying parentheticals, the sentence is best explained as an unfortunate choice of words to paraphrase the statutory language.  The parentheticals refer to both the statutory terms "manipulation" and "deception" and do not purport to explain the scope of conduct encompassed by those terms.

Indeed, both <u>Santa Fe</u> and <u>Hochfelder</u> contain language showing that deceptive conduct under Section 10(b) and Rule 10b-5 can include more than misrepresentations.  In <u>Santa Fe</u>, the Court observed in discussing case law on what constitutes deceptive conduct:  "[T]he cases do not support the proposition . . . that a breach of fiduciary duty by majority stockholders, without any *deception, misrepresentation, or nondisclosure*, violates the statute and the Rule." 430 U.S. at 476 (emphasis supplied).  In other words, deceptive conduct can be

something other than misrepresentation or nondisclosure. [2]  In <u>Hochfelder</u>, the

Court observed that the language of subsections (b) and (c) of Rule 10b-5 could be

read as "proscribing . . . any type of material misstatement or omission, and any

course of conduct, that has the effect of defrauding investors . . . ."  425 U.S. at

212.  Again, the Court recognized that the Rule covers conduct beyond

misstatements and omissions.   (<u>See also</u> the Commission's initial brief at pp. 13-

14, 18-19 n.6 for other cases and authorities showing that the statute and rule

cover conduct beyond the making of misstatements and omissions.)

 *Amicus* American Institute of Certified Public Accountants acknowledges

that Rule 10b-5(a) focuses on "actions rather than statements," but asserts that the

provision "should be understood simply as implementing Section 10(b)'s

prohibition" on "manipulative conduct."  AICPA Brief at 20.  No support is

offered for this statement, and the plain language of neither Section 10(b) nor Rule

---

 [2]  *Amicus* American Institute of Certified Public Accountants states that in
<u>Santa Fe</u> the Court "held that because 'the complaint failed to allege a material
misstatement or material failure to disclose,' there was no allegation of 'deceptive'
conduct within the meaning of Section 10(b)."  AICPA Brief at 20, quoting <u>Santa
Fe</u>, 430 U.S. at 474.  The AICPA attempts to elevate the Court's observation about
the complaint into a holding that deceptive conduct under Section 10(b) can only
involve misstatements or omissions.  In <u>Santa Fe</u>, however, there was no allegation
of *any* type of deceptive conduct:  investors "were furnished with all relevant
information on which to base their decision" (430 U.S. at 474).  The Court's
holding was that the transaction at issue "if carried out as alleged in the complaint,
was neither deceptive nor manipulative and therefore did not violate either § 10(b)
of the Act or Rule 10b-5."  *Id.*

10b-5(a) suggests such a restrictive intent.  Moreover, the Commission interprets Rule 10b-5(a) as covering not only manipulative conduct, but also deceptive conduct, as is apparent from the test proposed by the Commission in this case – that "any person who directly or indirectly engages in a manipulative *or deceptive* act as part of a scheme to defraud can be a primary violator under Section 10(b) and Rule 10b-5(a)."  SEC Brief at 16 (emphasis added).

It is important that the narrow view of Section 10(b) urged by the defendants and their *amici* be rejected because it ignores the reality that facts can be misrepresented by conduct as well as words.  <u>See</u> SEC Brief at 18-19 & n.6. One who creates a material deception through a false statement can be a primary violator; similarly, one who creates the same material deception through deceptive conduct rather than words can also be a primary violator.

    2.    <u>Criticism of the Commission's Proposed Tests for Primary Liability and Reliance</u>

        a.    <u>Primary Liability</u>

Commission's Test:  Any person who directly or indirectly engages in a manipulative or deceptive act as part of a scheme to defraud can be a primary violator of Section 10(b) and Rule 10b-5(a).

The Commission's test for primary liability is not new, as the defendants suggest, but rather a restatement of existing law as applied to participation in a scheme to defraud.  The crux of the test is the requirement that the defendant *himself* engage in a "manipulative or deceptive" act – a requirement that is based

5

squarely on the language of the statute itself.  SEC Brief at 16.  The remainder of the test is a combination of (i) language the Supreme Court has found to be synonymous with Section 10(b)'s language, (ii) language from the related antifraud provision in Section 17(a) of the Securities Act of 1933, and (iii) language from Rule 10b-5.  See SEC Brief at 12-15.  The test is consistent with this Court's statement in Cooper v. Pickett that "Central Bank does not preclude liability based on allegations that a group of defendants acted together to violate the securities laws, as long as each defendant committed a manipulative or deceptive act in furtherance of the scheme."  137 F.3d 616, 624 (9th Cir. 1998).

As explained in the Commission's initial brief, the Commission's test provides a meaningful distinction between a primary violator and an aider and abettor and is thus consistent with Central Bank.  SEC Brief at 17-18.  It is important that the test requires that *each defendant* engage in a "manipulative or deceptive" act; this requirement avoids the danger of extending primary liability to cover activity that is only aiding and abetting.  We also note that the Commission's test, together with the application by the courts of the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act, will help to weed out frivolous or vexatious

litigation.  See Wharf (Holdings) Ltd. v. United Intern. Holdings, Inc., 532 U.S. 588, 598-97 (2001).[3]

    None of the defendants or their *amici* presents an argument that would justify rejection of the Commission's test for primary liability in a scheme to defraud.  Indeed, given its grounding in the language of the statute and rule, they attack the test by misstating it and explaining why their misstated version amounts to aiding and abetting.

    For instance, defendant AOL Time Warner asserts that the Commission defines primary violators as "all who 'directly or indirectly' engage in *any* 'part of' a 'scheme to defraud.'"  AOL Brief at 42 (emphasis in original).  AOL then argues that there is no meaningful difference between substantial assistance in the primary violation (*i.e.*, aiding and abetting) and "'indirect engagement as part of a scheme.'" *Id.*  The Commission's actual test, however, covers "any person who directly or indirectly *engages in a manipulative or deceptive act* as part of a scheme to defraud."  The test thus distinguishes covered conduct from mere aiding and abetting, which does not require a person to engage in a manipulative or deceptive act.  The test also does not cover engaging in "any part" of a scheme to

_____

    [3]  As noted in our initial brief, we do not believe that, in the context of a scheme to defraud, a test turning on whether a defendant had "substantial participation" in the scheme would be appropriate.  See SEC Brief at 16-17 n.3.

defraud; it covers only parts of the scheme that constitute a manipulative or deceptive act within the meaning of Section 10(b). [4]

The defendants and their *amici* also use this tactic of knocking down straw men in their critiques of the Commission's examples of conduct that could constitute a primary violation, particularly the example of "engaging in a transaction whose principal purpose and effect is to create a false appearance of revenues."  The AICPA argues that "[c]onduct that, by itself, would not mislead investors is not actionable simply because it has the 'purpose' and 'effect' of helping a third party do so," since such conduct is only aiding and abetting. AICPA Brief at 24.  But the Commission's example says nothing about conduct whose purpose and effect is "helping a third party" mislead investors.  Rather, it covers conduct whose principal purpose and effect is *creating a false appearance* of revenues – conduct that is *itself* deceptive.

The BMA and AICPA briefs characterize the Commission's test as turning on a distinction between "legitimate and illegitimate" transactions and complain

---

[4]  Similarly, defendant Keller maintains that the "Commission's new version of 'deception' means that a person who does not make a misstatement can nevertheless be primarily liable if he intentionally commits *an act* with the intention that someone else make a misstatement."  Keller Brief at 27 (emphasis added).  This reformulation, like AOL's, ignores the test's "manipulative or deceptive" act requirement.  Under the Commission's actual test, a person who does not make a misstatement is potentially a primary violator only if he or she engages in some other manipulative or deceptive act within the meaning of Section 10(b).

that such a test is too "ambiguous" or "vague" to provide a workable test for primary liability.  BMA Brief at 30; AICPA Brief at 25.  The Commission, however, urges no such test.  The Commission's initial brief stated that a transaction whose principal purpose and effect is to create a false appearance of revenues is deceptive.  The Commission did not suggest that all transactions a plaintiff alleges to be in any way "illegitimate" are deceptive.

Some defendants and *amici* criticize the Commission as proposing a distinction between a primary violation and aiding and abetting that turns on the actor's state of mind.  See Colburn Brief at 28; see also Cendant Brief at 36 (arguing a transaction could be the basis for liability based on a party's principal purpose) and BMA Brief at 30.  The Colburn brief, which is illustrative of this argument, recounts the Commission's contrasting hypothetical examples:

> [1] a third party that "engages with the corporation in a transaction whose principal purpose and effect is to create a false appearance of revenues, intending to deceive investors in the corporation's stock,  . . . may be a primary violator", [2] while a third party that "enters into a legitimate transaction with a corporation, knowing that the corporation will overstate the revenue generated by the transaction, . . . is at most an aider and abettor."

Colburn Brief at 28.  The Colburn brief then states that "the *conduct* of the third party – entering into the underlying business transaction – is the same in both [examples]," and the only difference is that in the first example, "the third party not only knows how the corporation will account for the transaction but

affirmatively intends that result." *Id.* at 29 (emphasis in original).  This argument, however, ignores the fact that the first example involves a transaction whose principal purpose and effect is to create *a false appearance* of fact and the second does not.  To engage in one or the other of the hypothetical transactions is not the same conduct, and the distinction between them therefore does not turn on the actor's state of mind. [5]

Finally, the AICPA rejects primary liability for deceptive transactions that do not themselves involve false statements on the ground that such transactions have no effect on the market unless a third party reports them fraudulently.  AICPA Brief at 25-26.  In the AICPA's view, "a primary defendant must be culpable – in the sense of actually defrauding investors or the market – based solely on its own actions, rather than as a result of the conduct or statements of someone else." *Id.*  The AICPA's view of primary liability ignores the plain language of Section 10(b) and Rule 10b-5, both of which include the phrase "directly or indirectly."  A defendant indirectly defrauds the market if he or she

---

[5]  L90 believes that the Commission's contrasting examples suggest that its conduct would be covered "just because *Homestore's* 'principal purpose' was to misstate revenue," and that the test would thus make Rule 10b-5 liability turn on the intent of a defendant's "counter-party," rather than on the defendant's own intent.  L90 Brief at 30 (emphasis added).  This critique misstates the Commission's position.  The *transaction's* principal purpose and effect must be to create a false appearance of revenues.  Each defendant, of course, must also have the requisite scienter.

engages with an issuer of securities in a transaction whose principal purpose and effect is to create a false appearance of revenues that will be reported falsely by the issuer. [6]

The AICPA's argument is also foreclosed by this Court's decision in Cooper v. Pickett, 137 F.3d at 616. There, corporate officials provided false information to securities analysts with the intent that the analysts would then make statements to the securities markets based on that false information. (To use the AICPA's formulation, the investors were not defrauded "based solely on the [corporate officials'] own actions," but "as a result of the conduct or statements of [the analysts].") The Court ruled that Central Bank did not bar the plaintiffs' claims because the plaintiffs "are asserting that [defendants], through false statements to analysts, and those analysts, by issuing reports based on statements they knew were false, together engaged in a scheme to defraud the shareholder." 137 F.3d at 625. If the AICPA's approach were correct, then the complaint against the corporate officials would have been dismissed because their deception

---

[6] In Central Bank, the Supreme Court rejected the suggestion that the statutory "directly or indirectly" language could be used to support aiding and abetting liability under Section 10(b). 511 U.S. at 176. The Court stated: "The problem, of course, is that aiding and abetting liability extends beyond persons who engage, even indirectly, in a proscribed activity; aiding and abetting liability reaches persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do." *Id.* This statement indicates that a secondary actor in a scheme to defraud can be primarily liable if he or she indirectly engages in a manipulative or deceptive act.

was not communicated to the market until the analysts made their subsequent statements.

Acceptance of the approach of defendants and their *amici* would undermine the intent of Section 10(b) to protect investors against fraud and to ensure honest markets. If two companies together make a false statement about the revenues of one of them, both companies undisputedly could be primarily liable for securities fraud. If they together achieve the same deception by engaging in a transaction whose principal purpose and effect is to create a false appearance of revenues, but only one of them makes a misstatement about the revenues, investors would be misled by the deceptive conduct of both, and both can be primarily liable.

      b.   <u>Reliance</u>

Commission's Test: The reliance requirement is satisfied where a plaintiff relies on a material deception flowing from a defendant's deceptive act, even though the conduct of other participants in the fraudulent scheme may have been a subsequent link in the causal chain leading to the plaintiff's securities transaction.

The Commission's reliance test is derived from basic legal principles concerning causation as applied to participation in a scheme to defraud investors in the securities markets. <u>See</u> SEC Brief at 21-23. The test is met where the plaintiff relies on a material deception that flows from a deceptive act committed by the defendant, even though the conduct of others is a subsequent link in the chain of causation that injects the material deception into the securities markets.

As explained in greater detail below, the defendants and their *amici* mischaracterize the Commission's test and then criticize the mischaracterized test as eviscerating the reliance requirement.  Their arguments ignore the crux of the Commission's test, which requires the *material deception* created by the defendant to flow through the subsequent actor's actions; the test does not just require the subsequent actor's actions to flow or follow from the defendant's *actions*.

The AICPA, for example, argues that the Commission's "notion that a plaintiff who relies on a misstatement thereby relies on the actions of every party who played some antecedent role in helping that misstatement come into life is precisely what <u>Central Bank</u> rejected."  AICPA Brief at 23; <u>see also</u> AOL Brief at 46 (arguing that the Commission's test allows reliance on a statement that "in any way 'flow[ed] from' the scheme in which the defendants allegedly took part"). Under the Commission's actual test, however, the defendant must himself commit a deceptive act, not simply have "some antecedent role in helping [a] misstatement come into life."  The material deception created by the defendant must then flow through a misstatement made by a subsequent actor that is the natural consequence of the defendant's initial deceptive act.  Thus, when the plaintiff engages in a securities transaction, the plaintiff relies on a material deception initially created by the defendant.

In addition to mischaracterizing the test, the defendants and their *amici* argue that the requirement that a plaintiff plead and prove reliance as to each defendant means that a plaintiff must rely on each defendant "directly."  BMA Brief at 12. [7]  They base this argument on the Supreme Court's statement in Central Bank that "[a] plaintiff must show reliance on the defendant's misstatement or omission to recover under 10b-5."  511 U.S. at 180.  Violations of Section 10(b) and Rule 10b-5, however, can be accomplished indirectly, as explained supra p. 10.  There is no suggestion in Central Bank that reliance on a defendant's actions cannot be indirect – as on a material deception flowing through the subsequent actions of others.

The defendants and their *amici* also argue that the Commission's test is at odds with the Supreme Court's statement in Central Bank that the argument made by the plaintiffs in that case "'would impose 10b-5 aiding and abetting liability when at least one element critical for recovery under 10b-5 is absent:  reliance.'"  511 U.S. at 180.  According to defendants and their *amici*, allegations of mere aiding and abetting would meet the Commission's reliance test, and the test is

---

[7]  The BMA brief argues that "[b]ecause it is only Homestore's public statements to the marketplace that connect investors to the alleged 'scheme,' Plaintiff cannot plead or prove that investors relied on the Business Defendants at all."  BMA Brief at 23.  See also AICPA Brief at 22-23; L90 Brief at 30-31; Keller Brief at 22.

therefore foreclosed by Central Bank.  See AICPA Brief at 22; Colburn Brief at 43; AOL Brief at 46.

To place the Supreme Court's statement in context, however, it is significant that the Court went on to say in the same paragraph that "[w]ere we to allow the aiding and abetting action proposed *in this case*, the defendant could be liable without any showing that the plaintiff relied upon the aider and abettor's statements or actions."  511 U.S. at 180 (emphasis added).  In Central Bank, the defendant bank had been the indenture trustee for a defaulted bond issue, and had not created any misrepresentations, but had failed to update the appraisal for land securing the bonds.  Before concluding that summary judgment for the bank was proper, the Court noted that the plaintiffs  "concede[d] that Central Bank did not commit a manipulative or deceptive act within the meaning of §  10(b)."  *Id.* at 191.  Thus, the plaintiffs in that case, as the Supreme Court recognized, could not be said to have relied on any deception created by the bank.  The Commission's reliance test begins with the requirement that the defendant engage in a deceptive act, and requires the plaintiff to have relied on the material deception created by the defendant.  Thus, contrary to the contentions of defendants and their *amici*, the allegations in Central Bank would not have met the Commission's proposed test, and there is therefore no tension between that test and Central Bank.

15

It is important that the Court reject the approach of defendants and their *amici* to reliance, as it would only invite gamesmanship on the part of wrongdoers. Defendants and their *amici* essentially argue for a rule precluding reliance on parties that are one or more causal steps removed from the injured party. But under such a rule, wrongdoers could structure their conduct so as to engage only in materially deceptive activity that is at least one causal step away from false statements to investors and the market, and thereby escape liability in a private action. This would be the case even though their actions caused the same injury to investors and the same deleterious effects on the market as if they had committed fraud through their own false statements. [8]

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in the Commission's initial *amicus curiae* brief, the Court should hold that any person who has the requisite scienter can be liable as a primary violator of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5(a) thereunder when he or she,

---

[8]  The BMA *amicus* brief argues that the "in connection with" requirement under the statute and rule is not satisfied here, basing that argument on <u>SEC v. Zandford</u>, 535 U.S. 813 (2002). BMA Brief at 16-21. The Court in <u>Zandford</u> stated that to satisfy the requirement "it is enough that the scheme to defraud and the sale of securities coincide." 535 U.S. at 822. Where, as part of a scheme to misrepresent a company's true financial results, a defendant engages in a transaction whose principal purpose and effect is to create a false appearance of revenues, and where that effect continues at the time of purchases and sales of the company's stock, the fraud and the securities transactions *do* coincide.

directly or indirectly, engages in a manipulative or deceptive act as part of a scheme to defraud; that engaging in a transaction whose principal purpose and effect is to create a false appearance of revenues constitutes such a deceptive act; and that the reliance requirement in private actions is satisfied where a plaintiff relies on a material deception flowing from a defendant's deceptive act, even though the conduct of other participants in the fraudulent scheme may have been a subsequent link in the causal chain leading to the plaintiff's securities transaction.

Respectfully submitted,

GIOVANNI P. PREZIOSO
General Counsel

JACOB H. STILLMAN
Solicitor

KATHARINE B. GRESHAM
Assistant General Counsel

_____
MICHAEL L. POST
Of Counsel                                     Senior Counsel
  MEYER EISENBERG
  Deputy General Counsel            Securities and Exchange Commission
                                                    450 Fifth Street, N.W.
                                                    Washington, D.C.  20549-0606
                                                    (202) 942-0921 (Post)
February 2005

# Exhibit 11

Case 4:01-cv-03624   Document 4865   Filed in TXSD on 07/19/06   Page 69 of 238

Newby vs. Enron          5/2/06          Saul Solomon, Vol. 1

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

In Re: ENRON CORPORATION   * MDL Docket No. 1446
SECURITIES LITIGATION      *
                           * Civil Action No.
                           * H-01-3624
MARK NEWBY, ET AL.,        * (Consolidated)
INDIVIDUALLY AND ON BEHALF *
OF ALL OTHERS SIMILARLY    * CLASS ACTION
SITUATED,                  *
                           *
     PLAINTIFFS,           *
                           *
VS.                        *
                           *
ENRON CORP., ET AL         *
                           *
     DEFENDANTS.           *
                           *
THE REGENTS OF THE         *
UNIVERSITY OF CALIFORNIA,  *
ET AL., INDIVIDUALLY AND   *
ON BEHALF OF ALL OTHERS    *
SIMILARLY SITUATED,        *
                           *
     PLAINTIFFS,           *
                           *
VS.                        *
                           *
KENNETH L. LAY, ET AL.,    *
                           *
     DEFENDANTS.           *


--------------------------------------
VIDEOTAPED ORAL DEPOSITION
OF SAUL SOLOMON
VOLUME 1
MAY 2, 2006
--------------------------------------

1257b750-e78e-46c5-ae14-19dbf0ecf06e

Newby vs. Enron          5/2/06          Saul Solomon, Vol. 1

Page 414

1    everything?

2         A.    Yes, but -- but, again, that -- I

3    don't want to give the opinion -- the impression

4    that that negates the issue, which is that the

5    equity was protected, or at least the equity is

6    not considered fully at risk.

7         Q.    Okay.  Is there a difference

8    between protected or guaranteed or supported or

9    available?  I mean, you use those words kind of

10   variously throughout your report.

11        A.    I think I do use them somewhat

12   interchangeably as it concerns the -- the equity

13   or the certificate holder's position.  And to

14   me, they -- they really mean the same thing.

15        Q.    Was the Osprey equity guaranteed?

16        A.    They viewed it that way.

17        Q.    I didn't ask that.

18        A.    It was supported.  It was supported

19   by the notes, and under most scenarios, other

20   than the ultimate demise of Enron, to where they

21   would be unable to perform under their

22   obligations in the agreements, the equity

23   would -- would be covered --

24        Q.    In that sense --

25        A.    -- would be protected.

ALPHA REPORTING SERVICES, INC, DALLAS, TX (888) 667-DEPO

Newby vs. Enron          5/2/06        Saul Solomon, Vol. 1

Page 415

1        Q.     In that sense, the equity would not
2   be guaranteed?
3        A.     In the event -- well, it may be,
4   but -- but it may not be.  It just depends upon
5   the -- the value of the assets that were in the
6   deal.
7        Q.     Do you have any documents from the
8   bankers who were involved in this deal that
9   indicated they considered the accounting
10  significance of the hundred and eighty-seven
11  million dollar notes issued, aside from the fact
12  of knowing about the hundred and eighty-seven
13  million notes?  I'm talking about the accounting
14  significance of the fact.
15       A.     I don't think I have seen anything
16  that indicates that, you know, aha, this is an
17  issue because eighty-five percent is protected.
18       Q.     Okay.
19       A.     Certainly, this comment that
20  eighty-five percent is covered or protected.
21       Q.     Okay.  How about --
22       A.     Beyond that, I didn't see anything.
23       Q.     Okay.  How about -- the other
24  reason you list in Tab 7 is something you call
25  quote, back-weavering, closed quote.

Newby vs. Enron          5/2/06       Saul Solomon, Vol. 1

Page 416

1      A.    Well, that has to do with
2   Whitewing, not on -- not on Osprey.  And, you
3   know, Whitewing was a joint venture that was
4   fifty/fifty owned, and Enron did not consolidate
5   it.  And we believe it should have been
6   consolidated and -- you know, for a number of
7   reasons, but the -- probably the easiest ones to
8   get to the answer is concerning the equity in
9   Whitewing, the outside -- the fifty percent
10  outside equity was partly LJM2 and partly funded
11  with debt, recourse debt.  I'm sorry.
12  Nonrecourse debt.
13      Q.    Is that what you mean by
14  back-weavering?
15      A.    Yes, yes.
16      Q.    Okay.  And I have -- I have the
17  same question on that, and that is:  Other than
18  knowing about that -- that some of the equity
19  was funded with nonrecourse debt -- debt, did
20  you see any banker memos or documents that
21  addressed the accounting significance that that
22  might have happened?
23      A.    I don't think so.
24      Q.    With respect to Osprey 1, it was --
25  the money that was raised was 1.4 billion in

Newby vs. Enron          5/2/06          Saul Solomon, Vol. 1

Page 418

1    triggers, I believe.

2          Q.     Right.  Whose job was it to

3    disclose those triggers?

4          A.     Well, it's Enron's responsibility

5    to have proper disclosures in their financial

6    statements.

7          Q.     Okay.  Is it fair to say, based

8    upon what you write in your report on Page 277,

9    that while you have some issues with the -- the

10   clarity of the disclosures on this point, a

11   reader of the financial statements who could do

12   the math that you do would understand that Enron

13   had a contingent liability of 1.4 billion in

14   connection with Osprey 1?

15         A.     That's what we were able to deduce,

16   but it was not an easy deduction from the

17   information that was disclosed.  But I would say

18   a -- certainly a sophisticated reader of the

19   financial statements probably could figure it

20   out.  I'm not sure that anybody could figure it

21   out.  It was a little complicated.

22         Q.     Is it also true that the contingent

23   liability of 1.4 billion in Osprey 1 was known

24   to the rating agencies that rated it, Osprey?

25         A.     It's possible.  I don't know as I'm

# Exhibit 12

**OFFERING MEMORANDUM**



# Marlin Water Trust II
# Marlin Water Capital Corp. II

*Jon R. Marinelli*

### $475,000,000 6.31% Senior Secured Notes due 2003
### €515,000,000 6.19% Senior Secured Notes due 2003

## The Issuers

- Marlin Water Trust II is a Delaware business trust formed for the purposes of:
  - issuing the Senior Notes;
  - acquiring and holding two short term Enron notes bearing interest at rates equal to the interest rates on the Senior Notes;
  - purchasing a Class C beneficial interest in Atlantic Water Trust with the proceeds from the repayment of such Enron notes; and
  - upon the redemption of the outstanding debt of Marlin Water Trust, merging into Marlin Water Trust with Marlin Water Trust as the surviving entity (together with certain concurrent events, the "Merger").
- Marlin Water Capital Corp. II is a Delaware corporation formed for the purposes of co-issuing the Senior Notes and merging into Marlin Water Capital Corp. Marlin Water Capital Corp. II is a wholly-owned subsidiary of Marlin Water Trust II.

## The Senior Notes and the Offering

- Maturity Date: July 15, 2003.
- Interest Payments on the Dollar Senior Notes: semi-annually in arrears on January 15 and July 15, commencing on January 15, 2002.
- Interest Payments on the Euro Senior Notes: annually in arrears on July 15, commencing on July 15, 2002.
- Principal Payment: in full on the Maturity Date.
- Redemption: the Senior Notes are redeemable at par plus accrued interest if the Merger does not occur on August 14, 2001. After the Merger, the Senior Notes will be redeemable in whole or in part at any time at the option of the Issuers, at the prices set forth herein. After the Merger, the Senior Notes will be mandatorily redeemable at par plus accrued interest upon the occurrence of certain events, as described herein.
- Use of Proceeds: to purchase two short term Enron notes, the payment upon maturity of which will be used ultimately to redeem outstanding debt of Marlin Water Trust and prefund interest on the Senior Notes and yield on the Marlin Trust Certificates.
- Closing Date: July 19, 2001.

Application has been made to list the Senior Notes on the Luxembourg Stock Exchange.

## Security

Until the acquisition of the Class C beneficial interest in Atlantic Water Trust on the business day prior to the Merger, the Senior Notes will be secured by the Enron notes purchased with the proceeds of the issuance and sale of the Senior Notes, and holders of the Senior Notes will have recourse only to such Enron notes for payments due on the Senior Notes.

Effective upon the Merger, the Senior Notes will be secured by the collateral described below, and holders of the Senior Notes will have recourse only to such collateral for payments due on the Senior Notes.

Effective upon the Merger and upon the occurrence of certain events, including the acceleration of the Senior Notes as a result of an event of default, and following the expiration of applicable standstill periods, the Indenture Trustee will have certain remedies, including with respect to:

- Share Trust: all of the rights of Marlin Water Trust under the Share Trust Agreement to cause the liquidation of mandatorily convertible preferred stock of Enron issued on the Merger Date.
- Bristol Water Trust: all of the rights of Marlin Water Trust against Bristol Water Trust and its assets (consisting of (i) Enron debt securities or other permitted investments acquired with a portion of the proceeds of the offering of the Senior Notes and (ii) the Azurix Europe Deed).
- Class A Beneficial Interest in Atlantic Water Trust: all of the rights of Marlin Water Trust as holder of the Class A beneficial interest in Atlantic Water Trust.

The Senior Notes are not guaranteed by Enron, Azurix or any of their subsidiaries.

## Enron

- Enron owns the Class B beneficial interest in Atlantic Water Trust.
- Enron is one of the world's leading natural gas, electricity and communications companies.

| | Per Senior Note | Total |
|---|---|---|
| Price to Investors of Dollar Senior Notes ........................................... | 100% | $475,000,000 |
| Price to Investors of Euro Senior Notes ........................................... | 100% | €515,000,000 |

## This investment involves risk. See "Risk Factors" beginning on page 12.

THE SENIOR NOTES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS AND MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. ACCORDINGLY, THE SENIOR NOTES ARE BEING OFFERED HEREBY ONLY (A) TO "QUALIFIED INSTITUTIONAL BUYERS" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT ("RULE 144A")) IN RELIANCE ON THE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED BY RULE 144A AND (B) OUTSIDE THE UNITED STATES TO CERTAIN PERSONS IN RELIANCE UPON REGULATION S UNDER THE SECURITIES ACT ("REGULATION S"). PROSPECTIVE PURCHASERS ARE HEREBY NOTIFIED THAT SELLERS OF THE SENIOR NOTES MAY BE RELYING ON THE EXEMPTIONS FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A AND REGULATION S. FOR A DESCRIPTION OF CERTAIN RESTRICTIONS ON RESALES OR TRANSFERS OF THE SENIOR NOTES, SEE "NOTICE TO INVESTORS."

It is expected that delivery of the Senior Notes will be made in book-entry form through the facilities of The Depository Trust Company (in the case of the Dollar Senior Notes) and the Euroclear System or Clearstream Banking, *société anonyme* (in the case of the Euro Senior Notes) against payment therefor in immediately available funds on or about July 19, 2001.

*Joint Bookrunning Managers*

## Credit Suisse First Boston

## Deutsche Banc Alex. Brown

*Co-Managers*

## ABN AMRO Incorporated

### Banc of America Securities LLC

### CIBC World Markets

### Dresdner Kleinwort Wasserstein

### JPMorgan

July 12, 2001

DBM-012145

# DESCRIPTION OF AZURIX

Azurix is a global water company engaged in the business of owning, operating and managing water and wastewater assets, providing water and wastewater related services and developing and managing water resources. Azurix is a holding company and conducts substantially all of its operations through its subsidiaries.

Azurix was formed by Enron in 1998. In December 1998, Enron contributed Azurix to Atlantic Water Trust. In connection with Enron's contribution, Marlin acquired a 50% voting interest in Atlantic Water Trust. In June 1999, Azurix completed its initial public offering of its common stock. Following the offering, Atlantic Water Trust owned approximately 67% of the Azurix common stock, with public shareholders owning the remainder.

On March 16, 2001, Azurix's shareholders approved and adopted an agreement and plan of merger whereby an indirect, wholly-owned subsidiary of Enron was merged into Azurix with Azurix being the surviving corporation. As a result of the merger, Atlantic Water Trust owns two-thirds, and Enron, through a wholly-owned subsidiary, owns one-third of the issued and outstanding common stock of Azurix. Enron and Marlin each continue to own a 50% voting interest in Atlantic Water Trust. Upon completion of the merger, the Azurix common stock was delisted from the New York Stock Exchange and is no longer publicly traded. In addition, under the agreement and plan of merger, Azurix retired $180 million of borrowings outstanding under Azurix's credit agreement with Enron through the issuance to Enron of 11% cumulative mandatorily redeemable preferred stock with an initial liquidation preference of $180 million.

Azurix's largest asset is Wessex. Wessex's principal business is providing water supply and wastewater services in parts of southwestern England. Wessex has a virtual monopoly over water supply and wastewater services in its region, with the exception of extensive areas around and including the cities of Bristol and Bournemouth and a small area of rural Wiltshire, where three other companies provide only water services and Wessex provides wastewater services.

The Wessex region covers approximately 10,000 square kilometers and is predominantly rural. There are two major urban areas in the region, with Bristol and Bath in the north and Bournemouth and Poole in the south. The largest town for which Wessex provides water is Poole with a population of approximately 102,000 as of March 31, 2001, and the largest town for which Wessex provides wastewater services is Bristol, with a population of approximately 400,000 (approximately 800,000 including the surrounding area) as of March 31, 2001.

As of March 31, 2001, Wessex supplied approximately 370 million liters of water per day to a population of approximately 1.2 million using its water infrastructure. The system included as of such date approximately 135 water sources, 123 water treatment plants, 366 pumping stations, 360 storage reservoirs and 11,130 kilometers of water mains. As of March 31, 2001, Wessex served approximately 519,000 domestic and commercial locations. Wessex's customer base as of such date was approximately 55% residential and 45% commercial by volume of supply.

As of March 31, 2001, Wessex treated on average 480 million liters of wastewater per day from a population of approximately 2.5 million through its infrastructure of approximately 392 wastewater treatment plants, 1,314 pumping stations and 15,400 kilometers of sewers. Residential customers accounted for approximately 86% of the volume of wastewater retrieved and commercial customers accounted for approximately 14%.

The U.K. Director General of Water Services sets limits on the rates Wessex may charge for its regulated water supply and wastewater treatment businesses, including the extent of annual rate increases. In 1999, the Director issued new price limits for Wessex and other U.K. water and wastewater companies that applied from April 1, 2000. As a result, Wessex's prices were reduced by 12.0% beginning April 1, 2000, before adjustment for inflation. Current pricing limits will remain level through March 2003 with price increases effective April 1, 2003 of 3.8% and April 1, 2004 of 4.7%, before adjustment for inflation.

DBM-012197

# Exhibit 13

# In The Matter Of:

*WESTBORO PROPERTIES, L.L.C. v.*
*CREDIT SUISSE FIRST BOSTON, INC.*

_____

## *TRAYTON M. DAVIS*
*May 3, 2006*
_____

# *LEGALINK MANHATTAN*

*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

**DAVIS, TRAYTON M. - Vol. I**



Page 27

1                    TRAYTON M. DAVIS

2        Q.    How much time roughly in total do you

3   think you spent preparing?

4        A.    Maybe 25, 30 hours.

5             MR. MYTELKA:   For the record, unless

6   someone cares, I will use exhibits that were

7   previously marked without remarking them because

8   I think we have killed enough trees.

9        Q.    For the record I hand you an exhibit

10  that is previously marked as Exhibit 20523.  Can

11  you identify this document, sir?

12       A.    I have certainly seen a lot of drafts

13  of offering memos for Osprey Trust.  This appears

14  to be a draft.  I don't know that I can identify

15  this particular draft, but it does appear to be a

16  draft of that offering memo.

17       Q.    There is some like I guess it's a bar

18  code at the top.  Is that an internal bar code

19  from Milbank's firm?

20       A.    Not that I know of.

21       Q.    Was the various drafts of Osprey

22  Trust documents upon which Milbank was engaged to

23  represent the banks?

24             MR. MC GUINNESS:   Could I hear the

25  question back, please?

1           TRAYTON M. DAVIS

2           (Requested portion of record read.)

3           MR. MC GUINNESS:   Objection to the

4    form of the question.   You can answer if you

5    understand the question.

6           A.    We were engaged to represent the

7    banks on the Osbrey Trust transaction and that

8    would include reviewing the offering memo with

9    them and with the working group.

10          Q.    Again, without telling me any of the

11   comments that you made to your client, were

12   comments made to the offering memorandums

13   communicated to Enron or any of Enron's advisors?

14          A.    Sure.

15          Q.    I would like you to turn to page 30.

16   There is little page numbers?

17          A.    The ones in the lower right here?

18          Q.    Bates stamp number 876.

19          A.    876?

20          Q.    Yes, sir.

21          A.    Okay.

22          Q.    You see there is a description on

23   page 876 of an asset known as Hartland Steel

24   Inc.?

25          A.    Yes, let me read it again to refresh

1                  TRAYTON M. DAVIS

2    my recollection.

3         Q.    Read anything that you need to put it

4    in context.  Hopefully not the whole OM.

5              (Witness reviewing document.)

6         A.    I just read it, yes.

7         Q.    Do you recall any conversations

8    between Milbank or conversations that Milbank had

9    with its clients where Enron or Enron's advisors

10   were present concerning the disclosure on

11   Hartland Steel?

12        A.    I recall some privileged

13   conversations, but I also recall some

14   conversations with Vincent & Elkins as well.

15        Q.    I'm not asking for privileged

16   conversations.  If you could tell me about the

17   conversations that you had with Vincent & Elkins

18   concerning Hartland Steel I would appreciate it.

19        A.    Well, these are Milbank conversations

20   as opposed to Tray Davis conversations, but my

21   understanding of the conversations were that

22   there was due diligence work done on the various

23   assets that were listed in this offering

24   memorandum as I think potentially assets that

25   could come into the Whitewing Partnership.  So

1            TRAYTON M. DAVIS

2    that would have been a discussion and I know

3    there was close questioning of Enron and its

4    counsel about all of these.

5            Then there was I recall this, again,

6    my attorneys and I discussed in --

7        Q.    I'm not asking you what you discussed

8    with your attorneys.

9        A.    Right, okay.

10        Q.    So you're going to make

11    Mr. McGuinness nervous here if you start saying

12    that.

13        A.    During my preparation for this

14    deposition, I realized that this is -- this

15    language was not included in the final offering

16    memo and I thought about the conversations that

17    were involved there and I know there were

18    conversations with Vincent & Elkins as to the

19    appropriateness of leaving this one in or leaving

20    a number of the other smaller assets in.

21        Q.    First of all, who specifically at

22    Milbank had the conversation with

23    Vincent & Elkins?

24        A.    I believe it was my partner, Joy

25    Gallup.

fdbb07c9-a924-40b1-9376-a813fa626f99

Page 31

1                    TRAYTON M. DAVIS

2          Q.    Do you know who Miss Gallup spoke to

3     specifically at the Vincent & Elkins firm?

4          A.    I believe she spoke to Ron Astin, but

5     I'm not certain.

6          Q.    You believe there was a conversation

7     between Miss Gallup --

8          A.    Gallup.

9          Q.    -- and Mr. Astin specifically about

10    the disclosure of the Hartland Steel matter?

11         A.    I believe there was a conversation

12    where they talked about -- where they talked

13    about whether assets such as this that are a very

14    small percentage of the deal were appropriate to

15    include in this disclosure.

16         Q.    Was Milbank aware at the time of that

17    conversation between Miss Gallup and Mr. Astin

18    that Hartland Steel was in default of its loans?

19         A.    Milbank had certainly read this

20    language that says that.

21         Q.    And did Milbank have any further

22    conversations with Vincent & Elkins to determine

23    the scope of the default or why the default

24    happened or anything else about it?

25         A.    Not that I know of.

fdbb07c9-a924-40b1-9376-a813fa626f99

Page 32

TRAYTON M. DAVIS

1

2      Q.    As a result of the conversation

3  between Miss Gallup and Mr. Astin, the Hartland

4  Steel disclosure of the defaulted asset was

5  removed from the OM; isn't that correct?

6           MR. MC GUINNESS:    Objection to the

7  form of the question.  You can answer the

8  question.

9      A.    A number of transactions including

10 Hartland Steel the working group concluded it

11 would be excessive disclosure and potentially

12 misleading to include some of these assets that

13 are relatively small.  And I think if you look at

14 the final versus this one I believe you will see

15 that the assets that came out were all less than

16 say 10 percent of assets or something like that.

17     Q.    In your last answer you used the word

18 working group.  Who were members of the working

19 group that you were referring to in your last

20 answer?

21     A.    I was using the term generally to

22 pick up the people at Vincent & Elkins, Enron,

23 Deutsche Bank, DLJ and now CSFB and Milbank that

24 were at the printer working on the offering memo.

25     Q.    Just so the jury has an

1          TRAYTON M. DAVIS

2    understanding, when people say working at the

3    printer, actually the way these work is the day

4    or two days before these things go to print, a

5    whole group of people shows up at the printer's

6    office and makes changes as they go; is that

7    correct?

8          A.    Sometimes it is like that.  I don't

9    remember exactly how it worked here.  Whether at

10   what stage -- it is expensive to work at the

11   printer and often people try to do as much as

12   they can before they go to the printer.  I don't

13   remember exactly, but yes, there was a printer

14   trip where and in the normal course of business

15   since everyone is there it's a way to tie up

16   loose ends in terms of getting the document

17   completed.

18         Q.    As a result of the working group

19   decision, in Milbank's mind there is no question

20   that not based on privileged conversation,

21   Deutsche Bank, DLJ and maybe other of the banks

22   knew that the Hartland transaction was being

23   deleted; is that correct?

24         A.    Everybody knew that we were deleting

25   transactions that were below a numerical threshold

1               TRAYTON M. DAVIS

2    which Hartland is.

3          Q.    Was the decision to delete items

4    below a numerical threshold intended to allow

5    Enron to or Osprey Trust to delete those

6    transactions that were in default?

7          A.    No.

8          Q.    What was the intent?

9          A.    As I understand it, I mean I can't

10   speak for everybody's intent, because I can't go

11   into their heads, obviously.  As I understand it,

12   it was because the disclosure was potentially

13   misleading because it presented some very large

14   aluster of disclosure of very large investments

15   as well as some relatively smaller investments.

16         Q.    Tell me how a disclosure of an asset

17   that was in default is potentially misleading to

18   an investor.

19              MR. MC GUINNESS:   Objection to the

20   form.  I think you misstated his testimony, but

21   answer it if you can.

22         A.    The decision was not made, as I said

23   previously, based on anything in particular about

24   Hartland.  The decision was made based on the

25   size of these investments and everything that

1          TRAYTON M. DAVIS

2   fell below the threshold was deleted.

3          Q.    Can tell me other merchant assets

4   that were deleted based on this size criteria?

5          A.    I would have to look at both -- I

6   would have to look at this draft and look at the

7   final OM.  If I had that I could compare them.

8          Q.    Great, here is Exhibit 11459 which I

9   believe is the final draft and just in the way of

10  background for the record this was the Osprey II

11  offering; correct?

12         A.    No.  What you have handed me -- hang

13  on, I have to look carefully.  Yes, this is the

14  Osprey II offering.

15              What you have given me appears to be

16  the final offering memo from the Osprey II

17  offering, excuse me.

18              Do you have a question?

19         Q.    I didn't know if you were reviewing

20  the documents?

21         A.    I looked at it quickly.

22         Q.    Can you tell me then, sir, which

23  merchant assets were deleted from the final based

24  on this joint discussion and decision of the

25  working group?

fdbb07c9-a924-40b1-9376-a813fa626f99

1                    TRAYTON M. DAVIS

2         A.    Well, there was a joint discussion of

3    the working group and action to exclude assets

4    below a numerical threshold.  Okay?

5         Q.    Okay.

6         A.    And just by comparing the size, you

7    can see that the, I'm going to pronounce this

8    wrong, it is on page 34 of the draft that you

9    gave me, Nowa Sarzyna, that was omitted and that

10   was a $14.8 million investment?

11        Q.    Correct.

12        A.    Hartland Steel was omitted it was a

13   $15 million investment, apparently.  And the ENA

14   CLO was omitted, it was a $23.5 million

15   investment.  And the Yosemite certificates were

16   deleted, that was a $33.8 million investment.

17   Those are well below 10 percent of the deal size

18   which as I recall was the cut off.

19        Q.    Are you finished with your answer?

20        A.    I am.

21        Q.    Did anyone in the working group

22   object and say, why wouldn't -- we should let

23   investors know everything?

24        A.    Not that -- I don't recall that.

25        Q.    So this was a joint decision to

1                     TRAYTON M. DAVIS
2   delete these certain assets from the final OM?
3         A.    Yes.
4         Q.    The fact that Hartland Steel was in
5   technical default was never a factor, is that
6   your testimony?
7         A.    That is my testimony.  As far as I
8   know it was not a factor.
9         Q.    As far as you know, you actually
10  weren't there, right?
11              MR. MC GUINNESS:   Objection to the
12  form of the question.  If you understand it you
13  can answer.
14        A.    No, I was not there, but as far as I
15  know that didn't happen.
16        Q.    I'm not sure that I understood before
17  and maybe I just missed it, why was it
18  potentially misleading to include these smaller
19  assets?
20              MR. MC GUINNESS:   He is asking you
21  about the discussion around that topic.
22              MR. MYTELKA:   Absolutely.
23        A.    I don't know that we discussed -- I
24  don't know that we discussed -- I don't recall
25  any discussions with Enron or V&E as to that.

Page 38

TRAYTON M. DAVIS

That is a legal discussion that we had internally with our clients, so I don't recall any nonprivileged thing on that.

Q.   So, you want to strike all the language about potentially misleading because that never happened in the working group?

MR. MC GUINNESS:   Objection to the form of the question.   Could you try to ask your question in a neutral way designed to elicit facts and not be argumentative.

Can we hear the pending question back?

(Requested portion of record read.)

MR. MC GUINNESS:   I mean, if it is your testimony -- maybe we should go off record.

MR. MYTELKA:   Let's go off the record.   I wasn't intending to get into private conversations.   It either was or wasn't.

THE WITNESS:   I would like to consult my counsel about the bottom line of this privilege here.   Because there is an aspect of it that was --

MR. MC GUINNESS:   We will step out.

MR. MYTELKA:   You don't need to tell

fdbb07c9-a924-40b1-9376-a813fa626f99

1                    TRAYTON M. DAVIS

2      me, just tell him.

3                    THE VIDEOGRAPHER:   Going off the

4      record at 9:47.

5                    (Recess taken.)

6                    THE VIDEOGRAPHER:   Returning to the

7      record 9:54

8      BY MR. MYTELKA:

9           Q.    Mr. Davis, we took a quick break so

10     you could consult with your lawyer as to where

11     the line of privilege lies.  Do you want to fix

12     any of your prior testimony or make a statement?

13          A.    Let me make a statement.  Hopefully I

14     could clarify the answer to the questions.

15                 I do recall that there was one of the --

16     that there was -- it was stated that it might be

17     misleading to include the smaller transactions

18     under the threshold and I do recall that at least --

19     at least once that was discussed with

20     Vincent & Elkins.  We did not discuss with

21     Vincent & Elkins our reasoning or thinking as to

22     why we came to that view.  And that is I think

23     clearly privileged, so I can't answer that

24     following question that you had.

25          Q.    Are you finished?

fdbb07c9-a924-40b1-9376-a813fa626f99

Page 40

1                    TRAYTON M. DAVIS

2          A.    I am.

3          Q.    So the view that it was, quote,

4    personally misleading was a view expressed by

5    Milbank to Vincent & Elkins or vice-versa?  I'm

6    trying to figure out whose view this.

7          A.    It was our view and I believe the

8    nature of the conversation was that it was

9    Vincent & Elkins's view as well.

10         Q.    It was a joint view?

11         A.    Both law firms seemed to have the

12   view that that was an issue.  That was an issue.

13         Q.    Can you tell me specifically what

14   occurred in that conversation, if you can?

15         A.    I don't remember the details of the

16   conversation, I'm sorry.  I mean I wasn't in the

17   conversation.  I remember it happening based on

18   the research that we did leading up to this

19   deposition.

20         Q.    I thank you for clarifying that you

21   weren't actually there.  But in educating

22   yourself for this deposition, you came to learn

23   that there was this conversation between I guess

24   Miss Gallup and Mr. Astin?

25         A.    Right, and I also recall Miss

Page 41

1                    TRAYTON M. DAVIS

2    Gallup's report to me at the time of this

3    conversation.

4           MR. MC GUINNESS:   You don't have to

5    disclose your conversation with Miss Gallup.

6           THE WITNESS:   Okay.

7           Q.    Did you come to understand, however

8    you came, that reasons for both firm's views as

9    to this being potentially misleading were

10   expressed?

11          A.    No.

12          Q.    So, both firms said, oh, this is

13   potentially misleading and out they came?

14          A.    I don't think it went quite like

15   that.  I think what happened was the agreement

16   was it was appropriate -- a concern was expressed

17   as to this -- a concern was expressed probably

18   more than once on including the smaller assets.

19   I'm relatively certain the words potentially

20   misleading were used within a nonprivileged

21   conversation, that is why of testified to that.

22          We did -- we thought about it and we

23   propose the numerical threshold as a solution.

24   Our thoughts and legal conclusions as to why that

25   was a solution were not discussed with

Page 42

1                    TRAYTON M. DAVIS

2   Vincent & Elkins.  And we didn't discuss with

3   Vincent & Elkins what their thoughts and reasons

4   were.

5        Q.    So you guys just miraculously came to

6   the same thought and conclusion but you can't

7   tell me what the basis was?

8             MR. MC GUINNESS:   Objection to

9   form.

10       A.    I don't know that miracles had

11  anything to do with it.

12       Q.    I will take that out.  But you cannot

13  today or because of an assertion of a privilege

14  cannot tell me what the basis for your belief and

15  expression to Vincent & Elkins that this was

16  potentially misleading is?

17            MR. MC GUINNESS:   Objection, misstates

18  his testimony.

19            MR. MYTELKA:   Then let me rephrase.

20       Q.    Tell me what the basis was for your

21  conclusion and expression to Vincent & Elkins

22  that this was potentially misleading?

23            MR. MC GUINNESS:   I believe he

24  asserted privilege.

25       A.    That is what privileged.

1              TRAYTON M. DAVIS

2              MR. MYTELKA:   I don't think my last

3    question was misleading then.

4              MR. MC GUINNESS:   I'm not going to

5    debate it.  The question has been answered.  What

6    is your next question.

7         Q.   Was the discussion of this potential

8    misleading nature discussed in a wider working

9    group other than Miss Gallup and Mr. Astin?

10        A.   I don't recall any nonprivileged

11   conversations to that effect.

12        Q.   Were there any other conversations

13   between Milbank and either Vincent & Elkins or

14   Enron or any of Enron's advisors discussing other

15   aspects of the particular Exhibits 20523 which

16   was finalized in 11459 that were potentially

17   misleading?

18        A.   I don't understand the question.  The

19   discussions were potentially discussions.  I

20   don't understand what you mean.

21        Q.   I want to know if there were any

22   other conversations about other aspects of the OM

23   that were, quote, potentially misleading?

24        A.   I don't recall any.

25        Q.   In a nonprivileged setting?

# Exhibit 14

Bowne Integrated Typesetting System 14-SEP-00 02:56
Style: STYLE013.BST;118 BOD0000324 Fmt:V5.22F:BOH31605/8 Vjust
Seq:20 Free lead     0D*points, Next lead: 240D C:100
ENRON-PROJECT OSPREY  BOWNE OF HOUSTON, IN     (713) 869-9181
BOH_CPS     BL/SM   CURRENT:3     14-SEP-2000 03:36   NEXT PCN: 042.00.00.00 -- Page is valid, no graphics

JB: H79737  PN: 041.00.00.00  SN: 5X <SQ>

### Wholesale Energy Operations and Services

Enron's wholesale energy operations and services strategy is to establish fully integrated regional energy networks, involving asset ownership, contractual access to third-party assets and market-making activities, throughout the world. Enron believes that it is the premier energy service provider in the rapidly growing and highly competitive North American wholesale energy market. Similarly, Enron has adopted a continent-wide approach in Europe, that it believes is unparalleled by any other competitor. Enron's strategy in developing and deregulated markets such as South America and India is to acquire and construct key assets that form the basis for an integrated regional gas or electricity business. Enron also believes that its combination of strategically located assets, skilled employees and expertise in electricity and natural gas marketing gives it competitive advantages in deregulating markets worldwide and will facilitate a leadership role in these markets as they deregulate.

Enron's wholesale energy operations and services business provides integrated energy solutions to Enron's customers, primarily through the bundling of products and services. These products and services may include commodity supply and purchase agreements, risk management, financial services or capital investments. As part of its strategy of creating regional energy networks, Enron is one of the world's leading developers of energy related infrastructure projects, including power plants, pipelines and other energy related assets. Enron often makes a significant capital investment in a project during its development phase. During the development and construction of any given project, Enron will often reduce its investment in such project in order to generate additional liquidity to fund other capital requirements.

Revenues from Enron's wholesale energy operations and services business represented approximately 90% of Enron's total consolidated revenues for the year ended December 31, 1999.

#### Sarlux

On September 30, 1999, an indirect subsidiary of Whitewing LP purchased an approximately 45% economic interest in Sarlux Srl ("Sarlux"). The remaining economic interest is owned by SARAS S.p.A., an Italian energy company ("SARAS"). Project financing also includes 989 billion Italian Lire in loans from Banca Commerciale Italiana S.p.A. and 750 billion Italian Lire in loans from the European Investment Bank.

Sarlux is developing a 551 megawatt integrated gasification and power plant (the "Facility") in Sardinia, Italy. The Facility will utilize residue from an adjacent SARAS oil refinery as feedstock under a long-term contract. Power generated by the Facility will be sold to ENEL, an Italian government owned electricity company, under a long-term contract. The plant has not yet been completed.

#### Trakya

On October 25, 1999, an indirect subsidiary of Whitewing LP purchased an approximately 1221% economic interest in Trakya Elektrik Uretim ve Ticaret A.S. ("Trakya"). Project financing has received the benefit of a United States Export-Import Bank political risk policy and a loan facility from the overseas Private Investment Corporation, as co-lender.

Trakya is a 478 megawatt combined cycle power station located by the Sea of Marmara. Trakya began commercial operations in June of 1999. Long-term fuel supply and power purchase agreements are with state-owned entities and have the benefit of Republic of Turkey guarantees.

#### ESSA

On August 31, 2000, an indirect subsidiary of Whitewing LP purchased approximately 46% of the outstanding ordinary shares of Enron Brazil Power Holdings V Ltd. ("Holdings V"). The balance of the Holdings V ordinary shares are indirectly owned by Enron. Holdings V indirectly owns 51.78% of Electricidade e Servicos S.A. ("ESSA"), the seventh largest electric distribution company in Brazil. The purchase price was $461.5 million. As of December 1999, ESSA served 1.6 million customers throughout 223 towns and cities in the State of São Paulo and five towns and cities in the eastern part of the State of Mato Grosso do Sul. ESSA's largest customers are in the cement, pulp and paper and food products sectors. ESSA's largest

33

Confidential.

LBP0095875

Bowne Integrated Typesetting System 14-SEP-00 02:56
Style: STYLED13.BST;118 BOD0000324 Fmt:V5.22F:BOH31605/8 Vjust J1:1
Seq:21 Free lead        600*points, Next lead: 120D C:100
ENRON-PROJECT OSPREY BOWNE OF HOUSTON, IN    (713) 869-9181
BOH_CPS       BL/SM   CURRENT:3    14-SEP-2000 03:36 NEXT PCN: 043.00.00.00 – Page is valid, no graphics

JB: H79737  PN: 042.00.00.00  SN: 4X <SQ>

overall customer (SABESP) accounts for approximately 3.25% of total sales and its 14 largest customers represent 19.6% of total volume sales.

### Nowa Sarzyna

On March 29, 2000, an indirect subsidiary of Whitewing LP acquired a 50% ownership in Nowa Sarzyna, a Polish power plant, for $14.8 million. The Nowa Sarzyna plant produces 116 MW of electric and 70 MW of thermal power. There is a twenty-year Power Purchase Agreement with Polish Power Grid Company which commits the entire 116 MW nominal capacity of the plant and a twenty-year Thermal Energy Supply Agreement with Organika, a state owned chemical company, which commits 60MW of the thermal power. An additional three-year Thermal Energy Supply Agreement for the remaining 10MW capacity is currently being negotiated with the City of Nowa Sarzyna and is expected to be signed shortly. These contracts provide the project with a stable, predictable revenue stream.

### Promigas

On October 25, 1999, Whitewing LP indirectly acquired a significant equity interest in Promigas, a publicly traded company on the Bogota Stock Exchange and the largest natural gas transportation and distribution company in Colombia, for approximately $137 million. Promigas was created in 1976 to design and construct the first natural gas pipeline in Colombia from Ballena to Cartagena, connecting the gas producing region in the northern part of the country with major gas consumption centers along Colombia's Caribbean coastline. The principal asset of Promigas is an 850 km pipeline extending from Ballena through Cartagena and terminating in Jobo.

### Heartland Steel, Inc.

On December 29, 1999, Whitewing LP indirectly acquired a 9.5% equity interest in Heartland Steel, Inc. ("Heartland"), a privately held flat rolled steel processing facility, for approximately $15 million. Heartland, located in Terre Haute, Indiana, is recognized as the only flat-rolled processor in the United States. Heartland was formed specifically to develop, construct and operate an advance steel processing plant with an annual capacity of 1.1 million tons. Heartland has tolling/off-take agreements with Ryerson Tull, the nation's largest steel center company with over 70 facilities in North America, and the Tri-Orient Trading that account for over 50% of the plant's production.

Heartland is in technical default of its senior and subordinated loans, and the senior and subordinated lenders have entered into a forbearance agreement that expires September 30, 2000. Heartland is also experiencing liquidity constraints, and it is currently unclear that Heartland will be able to cure its technical defaults or resolve its liquidity crisis, and that the value of the equity could be impaired as a result. The company has engaged outside technical advisors to expedite start-up of the plant at production levels sufficient to provide cash flow in excess of cash requirements. Additionally, company management is currently holding discussions with existing as well as potential equity parties to raise capital which could result in a dilution of Whitewing LP's equity interest.

### ENA CLO

On December 22, 1999, Whitewing LP indirectly invested $23.5 million in "BBB" and "BB" rated securities in ENA CLO I Trust. The securities have July 2014 maturities. ENA CLO I Trust is a bankruptcy-remote, special purpose vehicle established to issue notes and to acquire the limited partnership interest in ENA CLO I Holding Co. I LP ("Holding I LP"), a Delaware limited partnership, the assets of which are 22 loans originated by Enron North America Corp. ("ENA") and its affiliates. ENA is a wholly-owned subsidiary of Enron. The "BBB" and "BB" notes have an outstanding principal amount of $46,200,000 and are serviced by ENA on behalf of the noteholders. The loans are made to companies in the independent oil and gas production, oil field service, marine transport and drilling, pulp and paper, building materials, coal mining, steel and independent power production industries. The securitized loan pool is static; no new loans may be added to the transaction. Certain of these loans have defaulted. As a result, certain over-collaterization ratios

34

Bowne Integrated Typesetting System 14-SEP-00 02:56
Style: STYLE013.BST;118 BOD0000324 Fmt:V5.22F:BOH31605/8 Vjust SF2:1
Seq:22 Free lead    3120DMpoints, Next lead: 0D C:100
ENRON:PROJECT OSPREY  BOWNE OF HOUSTON, IN    (713) 869-9181
BOH_CPS      BL/SM  CURRENT:3    14-SEP-2000 03:36  NEXT PCN: 044.00.00.00 -- Page is valid, no graphics



JB: H79737  PN: 043.00.00.00  SN: 6X <SQ>

were not met and the "BBB" and "BB" noteholders did not receive interest payments on July 15, 2000. Subsequent to the July 15, 2000 reporting date, $113 million in additional collateral support was added to the ENA CLO I Trust portfolio which should have the effect of ensuring future over-collateralization tests are met. The additional collateral should also have the effect of ensuring that future interest payments are met. Also, as part of the over-collateralization, Fitch, an independent credit rating agency, reaffirmed its "BBB" rating and, at Enron's request, withdrew its "BB" rating for the respective tranches of securities.]

*Yosemite Certificates*

On February 28, 2000, Whitewing LP indirectly purchased a 45%, beneficial ownership interest for $33.8 million in Yosemite Securities Trust I, a Delaware business trust that owns investments which may from time to time include payment obligations supported, in whole or in part, directly or indirectly, by Enron. Citibank has provided a swap to Yosemite Securities Trust I which provides for principal and yield payments on the ownership interests in exchange for actual payments on the investments except upon the occurrence of certain Enron credit events.

**Wind River/Powder River**

On June 30, 2000, an indirect subsidiary of Whitewing LP purchased substantially all of ENA's economic interest in (i) ECT Powder River, L.L.C., representing a 35% economic interest in Lost Creek Gathering Company LLC ("Lost Creek") and (ii) ECT Wind River, L.L.C. representing an indirect 33⅓% economic interest in Fort Union Gas Gathering L.L.C. ("Fort Union"). Lost Creek owns a gas gathering system consisting of an approximately 120 mile 24" mainline and 39 miles of 12" laterals. The system extends south from the north central Wind River Basin to the pipeline corridor running adjacent to the Interstate 80 highway in Wyoming. The system is projected to be operational by September 30, 2000. Fort Union owns a gas gathering system consisting of a 103 mile 24" high pressure gathering line (with numerous lateral supply lines attached) which extends from the east-central region of the Powder River Basin near Gillette, Wyoming to the interconnection with WIC Medicine BOW, KMI, and CIG near Glenrock, Wyoming.

35

Confidential.

LBP0095877

# Exhibit 15

Case 4:01-cv-03624   Document 4865   Filed in TXSD on 07/19/06   Page 101 of 238

Newby vs. Enron         5/4/06      Blaine F. Nye, Vol. 2

Page 383

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

In Re:  ENRON CORPORATION   * MDL Docket No. 1446
SECURITIES LITIGATION       *
                            * Civil Action No.
MARK NEWBY, ET AL.,         * H-01-3624
INDIVIDUALLY AND ON BEHALF  * (Consolidation)
OF ALL OTHERS SIMILARLY     *
SITUATED,                   * CLASS ACTION
                            *
     PLAINTIFFS,            *
                            *
VS.                         *
                            *
ENRON CORP., ET AL.,        *
                            *
     DEFENDANTS.            *
                            *
THE REGENTS OF THE          *
UNIVERSITY OF CALIFORNIA,   *
ET AL., INDIVIDUALLY AND    *
ON BEHALF OF ALL OTHERS     *
SIMILARLY SITUATED,         *
                            *
     PLAINTIFFS,            *
                            *
VS.                         *
                            *
KENNETH L. LAY, ET AL.,     *
                            *
     DEFENDANTS.            *

-------------------------------------------
ORAL AND VIDEOTAPED DEPOSITION OF
BLAINE F. NYE, PH.D.
VOLUME 2
MAY 4, 2006
-------------------------------------------

Newby vs. Enron          5/4/06      Blaine F. Nye, Vol. 2

Page 676

1     Q.   And you're not going to opine at trial
2  that any analyst report issued by CSFB or DLJ
3  actually moved the market price of Enron or
4  Enron-related securities, right?
5     A.   Right.  Not by that -- not specifically to
6  those companies, right.
7     Q.   You don't plan to do any additional
8  analysis between now and trial to determine when --
9  whether any CSFB or DLJ analyst report actually
10  moved the market price of Enron or Enron-related
11  securities, right?
12     A.   I think that's true.
13     Q.   And you have no opinion as to the extent
14  of any losses caused by any CSFB or DLJ analyst
15  report, do you?
16     A.   No.
17     Q.   And you don't expect to offer any such
18  opinion at trial, correct?
19     A.   That's correct.
20     Q.   You also have not traced actual movements
21  in the price of Enron or Enron-related securities
22  attributable to any misstatements made in offering
23  documents for any offering that CSFB or DLJ
24  underwrote, correct?
25     A.   Do that again, please.

Newby vs. Enron          5/4/06      Blaine F. Nye, Vol. 2

Page 677

1         MR. KRATENSTEIN:  Actually, I'm going

2    to ask the court reporter to read back the

3    question.

4              (Requested text was read.)

5    A.    Did I trace any damage to misstatements

6    and offering documents?

7    **Q.    And I should say alleged misstatements.**

8              MR. HAYS:  I liked it better the first

9    way.

10             MR. KRATENSTEIN:  I'm sure you did.

11   A.    Well, you know, again, not -- not in terms

12   of CSFB, isolated to CSFB.  I mean, to the extent

13   it's alleged that there are misstatements in

14   offering documents as part of the fraud -- you

15   know, scheme to defraud, certainly, in general,

16   that -- that, I think.

17             But as far as if I picked out a C -- a DLJ

18   or a CSFB offering statement and said, those guys

19   did it, I haven't isolated it like that.

20   **Q.    In other words, you also haven't taken any**

21   **offering document or off -- any offering document**

22   **and determined whether or not statements made in**

23   **that offering document had any impact on the market**

24   **price of Enron or Enron-related securities, right?**

25   A.    I haven't looked at the documents that

31e9cf40-eb9e-4eb2-850d-89418c598d44

Newby vs. Enron          5/4/06      Blaine F. Nye, Vol. 2

Page 678

1   that statement did, no.  I have assumed the

2   offering -- that there was a -- a scheme to defraud

3   and the offering documents didn't represent the

4   truth, you know, on a general basis, but that's it.

5       **Q.   Okay.  And you don't have any of those**

6   **offering documents listed among the statements that**

7   **allegedly inflated the price of Enron securities in**

8   **your report at pages 126 through 129, do you?**

9       A.   I -- there is no mention, I don't think,

10  of CSFB or -- probably should go the other way --

11  D, Donald, Lufkin and --

12      **Q.   DLJ.**

13      A.   DLJ.  Thank you.  That's a mouthful.

14  That's seven letters.

15          I don't think they're specifically

16  mentioned anywhere in these dates about what came

17  out.

18      **Q.   Nor -- nor are any offering documents from**

19  **offerings that they underwrote, are there?**

20      A.   I don't believe so.

21      **Q.   Now, you understand that many analysts --**

22  **and I think you referenced this in your report --**

23  **many analysts, including analysts not affiliated**

24  **with any of the banks that are defendants on lead**

25  **plaintiff's Section 10(b) claims in this case, many**

# Exhibit 16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re ENRON CORPORATION SECURITIES LITIGATION | § § § | Civil Action No. H-01-3624 **(Consolidated)** |
| | § § | CLASS ACTION |
| This Document Relates To: | § § | |
| MARK NEWBY, et al., Individually and On Behalf of All Others Similarly Situated, | § § § | |
| Plaintiffs, | § § | |
| vs. | § § | |
| ENRON CORP., et al., | § § | |
| Defendants. | § § | |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al., Individually and On Behalf of All Others Similarly Situated, | § § § § | |
| Plaintiffs, | § § | |
| vs. | § § | |
| KENNETH L. LAY, et al., | § § | |
| Defendants. | § § | |

REPORT OF BLAINE F. NYE, PH.D.


Contains References to and Excerpts from Documents Marked "Confidential"


January 17, 2006

"What don't we know that went on at that company? Where's the credibility?" asked one frustrated analyst.  "We don't know if it's limited to this," he said.

Enron shares declined yet again on October 19  Enron's share price fell from $29.00 at close on October 18, to $26.05 at close on October 19, a decline of 10.2%, or 10.7% net of market and industry, a statistically significant decline.  An internal document which Enron presented to banks during this period of precipitous declines in its securities prices, indicates that on October 19, 2001, Enron bond spreads gapped.[144]  The bond spreads reported to "gap" in this document are likely the yield spreads of Enron bonds over Treasury securities of similar maturities.  Corporate bond percentage yield is a measure of the market's assessment of a company's credit risk.  Treasury securities are considered risk-free.  Thus, the greater the difference, or "spread" between a company's bond yields and the contemporary yields of comparable Treasury securities, the greater the company's perceived credit risk.  In this document, Enron appears to have told the credit rating agencies that the Company saw its bond yields rising and therefore prices falling, on or about October 19, 2001.

142.  On the following trading day, Monday, October 22, 2001, Enron announced that the SEC had "requested that Enron voluntarily provide information regarding certain related party transactions."[145]  An AP Newswire reported that "[i]nvestors were upset by the news," that Enron's share price plunged 20% after acknowledging the SEC inquiry, and that "Enron officials declined to provide details about the transactions" or identify the partnerships at issue, "instead referring questions to a section of the annual report on related party

---

[144] EC05019A0170132 (marked Confidential)

[145] *PR Newswire*, "Enron Announces SEC Request, Pledges Cooperation," October 22, 2001.

transactions."[146]  News of the SEC inquiry, and the absence of clarification from Enron

management, continued to fuel market suspicions about Enron's condition and the validity

of its financial reporting.  Enron's share price fell from the prior closing price of $26.05 to

$20.65 at close, a decline of 20.7%, or 21.3% net of market and industry, a statistically

significant decline.

143.  By October 22, 2001, it was apparent that the market prices of the Enron bonds were

responding to the gradual revelation of the fraud.  News commentary attributed the drop in

the prices of the Enron bonds to the news of the Company's equity write-downs and

earnings charges, as well as the SEC investigation.

> Enron, an investment-grade company whose bonds are now trading
> like junk, has proved a nasty surprise.  Its bonds tumbled after the
> company disclosed equity write-downs and earnings charges,
> raising concern about Enron's financial viability and ability to
> retain its investment grade status.[147]

> The bonds of embattled Enron Corp. (ENE) are trading on a dollar
> basis and not on a yield margin or spread to Treasurys - another
> sign of increasing investor skittishness about the once high flying
> energy trader.
> The bonds, which carry investment-grade ratings, "started trading
> with a dollar price two days ago," said Gary Brown, managing
> director and head of corporate trading, Wachovia Securities,
> Charlotte, N.C.
> Bonds are being offered at dollar prices in the high 80's to low
> 90's, say traders.
> Investment grade bonds typically trade on a spread margin over
> comparable Treasury issues. "Credit bonds," which have questions
> about their quality, are traded in dollar quotes, said one analyst.
> Moody's Investors Service rates the company's senior unsecured
> debt Baa1, but recently placed the debt on review for downgrade.
> Both Standard & Poor's Corp. and Fitch rate the debt triple-B-plus.

---

[146] *Associated Press Newswire:* "Enron shares plunge 20 percent after acknowledging SEC inquiry," October 22, 2001.

[147] Financial Times, "Off the Wall," October 22, 2001.  See also, *LA Times,* "IN BRIEF / ENERGY Enron Asks Citigroup for $750-Million Loan," October 24, 2001

But the company "may be going into the double-B (non-investment grade) sector," said Harold Rivkin, principal of H. Rivkin & Co., a distressed debt brokerage firm, Princeton, N.J. "I am starting to get inquiry from investment grade holders about the market for Enron bonds," Rivkin said, noting that some high-grade portfolios can't have paper below investment-grade.[148]

On October 22, the matrix price for the exemplar Enron bond fell approximately 2%, from 102.93% in face value to 100.89% of face value on October 22, 20001.

144.   On Tuesday, October 23, 2001, at 9:30 am ET, Enron held a conference call "to address questions and concerns raised over the last few days."  Despite the recent revelations, during the call Chairman and CEO Lay asserted that "I and Enron's Board of Directors continue to have the highest faith and confidence in Andy [Fastow], and  believe he is doing an outstanding job as CFO."[149]  Enron's officers faced questions concerning the adequacy of assets held by Marlin and Osprey entities to pay the entities' debts.  Enron's officers insisted that the assets held were sufficient to cover obligations of Marlin and Osprey entities without a dilutive issuance of new shares by Enron.  Enron executives would not answer questions regarding the Fastow-related transactions under scrutiny by the SEC, claiming they were prevented by the SEC inquiry from being more forthcoming with investors. During the conference call, Enron Treasurer Glisan acknowledged that Enron's committed revolving credit facilities, which had not yet been drawn down, had "a single financial covenant requiring debt to cap, not to exceed 65 percent, which is very lenient." Treasurer Glisan asserted that "we, you know, feel very confident and comfortable in all of

---

[148] *Capital Markets Report*, "Bonds Of Troubled Enron Quoted In Dollars, Not Spreads," October 24, 2001, 3:55 pm.

[149] October 23, 2001 Conference Call Transcript, p. ECi000717130.

the terms and conditions of those facilities."[150]   Investor and analyst participants expressed

frustration with Enron's inadequate disclosure.

> Analysts—even some who have been longtime Enron fans—challenged
> executives about the Fastow partnership arrangement and the company's often
> opaque financial reports.  'There's the appearance you are hiding something,'
> said Goldman Sachs analyst David Fleischer. 'You need to do everything in
> your power to demonstrate to investors that your dealings are above board.'[151]

On October 23, after the unsatisfying conference call, the price of  the exemplar Enron

Bond continued to fall, reaching approximately 100.83% of face value.  Enron's share price

also fell from $20.65 to $19.79, a decline of 4.2%, or 3.9% net of market and industry and

a statistically significant residual return.  Enron management had exacerbated investor

concerns about Enron's true financial condition and financial reporting practices rather than

allaying those concerns.

145.  On Wednesday October 24, 2001, *The Wall Street Journal* reported on an interview with

Enron's Treasurer Glisan, on stock triggers and repayment of notes issued by Enron-related

entities.  Mr. Glisan continued to offer reassurances.[152]   According to the *Journal,* Enron

faced the prospect of being required to issue substantial amounts of new stock during the

next 20 months to cover possible shortfalls in its investment vehicles, diluting the interests

of existing shareholders. Analysts issued reports downgrading Enron stock and criticizing

management's performance on the conference call.  For example, analyst A. Feygin

described the conference call as a "missed opportunity" and downgraded Enron, although

only to "Long-Term Buy."[153]

---

[150] October 23, 2001, conference call transcript, p. ECi00071734.

[151] *The Wall Street Journal*, "Enron May Issue More Stock to Cover Obligations," October 24, 2002.

[152] *Id.*

[153] J. P. Morgan: "Enron Corporation: Downgrading to Long-Term Buy," October 24, 2001, 9:37 am EDT.

We are downgrading Enron Corporation to a Long-Term Buy from a Buy in the wake of lingering concerns regarding the company's credit situation and management disclosure of liabilities stemming from off-balance sheet financing vehicles….The company's stagnant and negative credit situation may begin to pose issues operationally, as the company's paper may increase transaction costs and slow trading velocity.  Although we don't believe earnings are at risk at this point, if the problem persists, earnings forecasts may be revisited…..

In our view, management's conference call yesterday morning was a missed opportunity to disclose the necessary information to assuage investor concerns. From the tone of the call investors appear to be clamoring for more financing specifics….Although management affirmed Enron should be able to meet all of its obligations (which may still be true), we think investors were largely unconvinced.  We believe this is largely due to a lack of information to substantiate that claim.  So far, analysts have been drawing their own conclusions suggesting Enron may be facing more risks than management cares to admit.

The price of the exemplar Enron Bond fell 11.6% on October 24, 2001.  Enron stock declined a total of 17.1% to $16.41 at close, a decline of 16.2% after market and industry effects and another statistically significant residual return.

146.  After market close on October 24, and just one day after Chairman and CEO Lay had expressed complete confidence in CFO Fastow, Enron announced the ouster of Mr. Fastow, said to be on a leave of absence, and his replacement as CFO by J. McMahon.[154]

147.  On October 25, 2001, S&P revised its long-term outlook on Enron to negative due to "concerns that the significant drop in market capitalization in the past week has adversely affected the company's financial flexibility and could impede management's ability to pursue plans to rebuild its balance sheet." According to S&P, "The negative outlook acknowledges the potential for erosion of the company's credit quality as investor confidence in the company's management has waned and concerns have arisen about the

---

[154] *First Call Corporate Release:* "Enron Names Jeff McMahon Chief Financial Officer," October 24, 2001, 4:25 pm EDT.

warned that it may cut ratings again.[162]  The price of the exemplar Enron Bond fell 1.2%

on the following day.  Enron shares also declined a total of 10.3% on October 29, a

statistically significant residual decline net of market and industry effects of -9.7% , and

closed at $13.81.

150.  On Tuesday, October 30, 2001, Enron's share price continued to fall after the reduction

in Enron's credit rating by Moody's.  Enron shares closed at $11.16, down a total of 19.2%,

for a statistically significant residual return of -18.48%.

151.  On Wednesday, October 31, 2001, it was revealed that the SEC inquiry had become a

formal investigation of Enron, again signaling the still-worsening prospect that Enron had

significantly misstated its financial results and condition .[163]  Reuters noted that Enron

trusts could be "troublesome" if Enron's credit rating fell below-investment-grade, the

Company could be forced to sell more stock and could face a severe cash crunch, and

default could occur.[164]  The price for the exemplar Enron Bond fell 1.3%.  In contrast,

Enron stock rose 24.6% to close at $13.90, a statistically significant residual price change,

according to Reuters "after investors said the deep plunge had made the stock attractive,"

and according to AP, "amid takeover speculation." [165]

152.  On Thursday, November 1, 2001, Enron announced that its investment bankers had

committed to provide Enron $1 billion of secured credit lines.[166]  The size and terms of the

commitment, which required Enron's equity in important assets as collateral, reportedly

---

[162] Reuters 11:23 am

[163] PR Newswire 5:22 pm

[164] Reuters 6:11 pm

[165] Reuters: October 31, 2001, 13:20;  AP: October 31, 2001.

[166] PR Newswire 9:33

163.  On Friday, November 16, 2001, *Platt's* reported possible issues in the Enron/Dynegy

merger, including that Dynegy had stated on November 16 that it had a right to review

Enron's plans to divest non-core businesses, and that the merger might yet need European

approval.[187]  Enron's share price declined again to close at $9.00, a return of -5.1%, and a

statistically significant residual decline of -5.9% net of market and industry effects.

164.  There was little change from Friday's closing price in Enron's closing share price on

Monday, November 19, 2001.  However, after market close on  that date, Enron filed its

Form 10-Q for the third quarter, warning of additional problems.[188]  The negative

disclosures in this filing caused the market to fear that Dynegy would walk away from the

Enron merger.  Among the items discussed in the 10-Q, Enron revised previously reported

earnings and provided additional information on its current liquidity situation and on

approaching maturities of its obligations.  The filing also stated that the 10-Q numbers were

not necessarily final because of ongoing auditor reviews.  Enron warned that a raft of

problems could hurt fourth-quarter 2001 results.  Enron also reported without explanation

that it had consumed  a considerable amount of cash, which raised further liquidity

concerns.  Enron warned it might be required to come up with additional funds to honor a

near-term collateral call on a $690 million note which became a demand obligation when

S&P lowered its credit rating to BBB-.   The value of the exemplar Enron bond fell

substantially, with a decline of  19.09% on November 20, 2001 and a further decline of

12.28% on November 21, 2001.  Enron shares also fell to close at $6.99 on November 20,

down from $9.060 on November 19.  The full decline of 22.85%, net of market and

---

[187] *Platt's:* November 16, 2001, 13:32 and 13:45.

[188] *Financial Times:* November 20, 2001.

industry effects, resulted in a statistically significant residual decline of 23.8%, as more of the truth about Enron's financial misstatements, liquidity, and debt burden emerged. News reports attributed the decline in prices of Enron securities to negative new information on Enron's earnings and cash flow in the Form 10-Q.

> Enron Corp.'s stock and bond prices took another beating after the energy company's release late Monday of its much-anticipated third-quarter financial filing with the Securities and Exchange Commission, which revealed potentially major new cash-flow and earnings headaches.[189]

165. Enron's share price declined further on Wednesday, November 21, 2001, a trading day before a holiday, amid continuing negative commentary and speculation that Dynegy would withdraw under the "material adverse change" clause of the merger agreement. On November 21, Enron shares closed at $5.01, down a total of 28.3%, for a statistically significant residual decline of 27.5%.

166. On Friday, November 23, 2001, the *Wall Street Journal* reported Dynegy was coming under increasing pressure to renegotiate or walk away from the merger agreement.[190] Other news sources also reported growing doubts that the deal would survive, or survive in its then-current form. Enron shares closed at $4.71, down 6.0%, for a statistically significant residual return of -6.6%.

167. Doubts regarding the merger's survival intensified on Monday, November 26, 2001. *Reuters* reported Enron shares were sliding lower on merger doubts.[191] *Dow Jones News Service* reported ominously that the Dynegy Board was silent. Enron shares closed at $4.010, down a total of 14.86%, with a statistically significant residual return of -14.5%.

---

[189] *Wall Street Journal*, "Enron Stock, Bonds Receive More Hits Following Warning," November 21, 2001.

[190] *Wall Street Journal:* "Dynegy Deal to Buy Enron Hits Crossroads," November 23, 2001.

[191] *Reuters:* 10:07 am

# Exhibit 17

OSPREY TRUST

$100,000,000 of
Certificates of Beneficial Ownership

CERTIFICATE PURCHASE AGREEMENT

Dated as of  September 16, 1999

Confidential Treatment Requested By Wilmer, Cutler & Pickering

E 145995

## CERTIFICATE PURCHASE AGREEMENT

CERTIFICATE PURCHASE AGREEMENT, dated as of September 16, 1999, (this "*Agreement*") by and among OSPREY TRUST, a Delaware statutory business trust ("*Osprey*"), and the holders of Osprey Certificates (as defined herein) named in Schedule I hereto (together with their permitted successors, assigns and transferees, each an "*Osprey Certificateholder*" and collectively, the "*Osprey Certificateholders*"). Unless otherwise indicated, capitalized terms used herein and not defined herein shall have the meanings ascribed thereto in the Participation Agreement (as defined herein) or Appendix A thereto.

### ARTICLE I

### PURCHASE AND SALE OF THE OSPREY CERTIFICATES

Section 1.1    Authorization of Issue of Osprey Certificates. On or before the Closing Date, Osprey will authorize the issuance of $100,000,000 of Certificates of beneficial ownership (the "*Osprey Certificates*") pursuant to an amended and restated trust agreement (the "*Osprey Trust Agreement*"), to be made and entered into as of the Closing Date, by Wilmington Trust Company (not in its individual capacity but solely as trustee, the "*Trustee*"), and Lord Securities Corporation, as the initial depositor thereunder. Each Osprey Certificateholder acknowledges that the Osprey Certificates will be offered and sold to the Osprey Certificateholders without being registered under the Securities Act of 1933, as amended (the "*Securities Act*"), in reliance on exemptions therefrom and may not be offered or sold except pursuant to an exemption from the registration requirements of the Securities Act. The proceeds from Osprey's sale of (i) the Osprey Certificates and (ii) $1.4 billion of senior notes (the "*Osprey Senior Notes*") to be issued pursuant to an indenture dated as of the Closing Date (the "*Indenture*") among Osprey, as issuer, Osprey I, Inc., a Delaware corporation, as co-issuer, and United States Trust Company of New York as trustee thereunder (the "*Indenture Trustee*") will be used to purchase a membership interest in Whitewing Management LLC, a Delaware limited liability company, and a limited partner interest in Whitewing Associates L.P., a Delaware limited partnership. Osprey, Enron, Egret I LLC, Whitewing Management LLC, Peregrine I LLC, Whitewing Associates L.L.C., Condor Share Trust and the Indenture Trustee, have entered into a Participation Agreement, dated as of the date hereof (the "*Participation Agreement*"), pursuant to which each of the parties, as applicable, has made certain representations and warranties and agreed to engage in certain transactions, including the issuance and sale of the Osprey Certificates and Osprey Notes.

Section 1.2    Purchase and Sale of Osprey Certificates. Osprey hereby agrees to issue and sell, on the Closing Date, to each Osprey Certificateholder, and each Osprey Certificateholder hereby agrees to purchase, on the Closing Date, from Osprey, subject to the fulfillment of the conditions precedent described below, that amount of Osprey Certificates set forth opposite the name of each such Osprey Certificateholder under the caption "Certificate Face Amount" on Schedule I hereto at a purchase price equal to 100% of such Certificate Face Amount. Osprey will deliver to each Osprey Certificateholder one or more Osprey Certificates, authenticated by the Trustee, in such denominations and registered in such names as the Osprey Certificateholders shall have requested, against payment of the purchase price therefor by wire transfer to an account previously designated by Osprey, at the offices of Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005 on the Closing Date.

Confidential Treatment Requested By Wilmer, Cutler & Pickering        E 145996

Section 1.3     Payments on Account of the Osprey Certificates.  All payments on account of the Osprey Certificates or other obligations in accordance with the provisions of the Osprey Certificates, the Osprey Trust Agreement and the other Transaction Documents shall be made by wire transfer of immediately available funds to the account of each Osprey Certificate-holder, as specified on Schedule II hereto.

## ARTICLE II

## CONDITIONS OF PURCHASE

Section 2.1     Conditions Precedent to Purchase.  The obligation of each Os-prey Certificateholder to purchase and pay for the Osprey Certificates on the Closing Date is subject to (a) the satisfaction of the conditions precedent contained in Section 3.1 of the Partici-pation Agreement in a manner reasonably satisfactory to it, or the waiver thereof in writing by such Osprey Certificateholder and (b) the execution and delivery of that certain Tax Indemnifica-tion Agreement dated as of the Closing Date among Osprey, the Osprey Certificateholders and Enron in form and substance satisfactory to the Osprey Certificateholders.

Section 2.2     Further Conditions.  The obligation of each Osprey Certificate-holder to purchase and pay for the Osprey Certificates shall be subject to the further condition precedent that on Closing Date the following statements shall be true:

(i)     No event has occurred and is continuing, or would result from the sale of the Osprey Certificates or from the application of the proceeds therefrom, that constitutes an Osprey Certificate Trigger Event under the terms of the Osprey Trust Agreement or would constitute an Osprey Certificate Trigger Event under the terms of the Osprey Trust Agreement but for the requirement that notice be given or time elapse, or both.

(ii)     Each Osprey Certificateholder has received such other docu-ments, certificates or opinions as such Osprey Certificateholder may reasonably request in connection with the consummation of the transactions contemplated by this Agree-ment.

(iii)     There has been no change in any law, rule or regulation or the interpretation thereof (including any law, rule or regulation relating to taxes) that (x) pro-hibits or prevents the consummation of this Agreement, any of the transactions contem-plated hereby (including the sale and purchase of the Osprey Certificates) or any Trans-action Document, or (y) has an adverse effect on the economic or other benefits that each Osprey Certificateholder expects to derive from this Agreement, the sale and purchase of the Osprey Certificates, or the Transaction Documents.

(iv)     Arrangements reasonably satisfactory to each Osprey Certifi-cateholder and to any Person with a right to Claim by, through or under such Osprey Certificateholder, or who is entitled to any contractual right of reimbursement or indem-nity in connection with the transactions contemplated by this Agreement, and any docu-ments related to such arrangements, have been entered into by Osprey Associates LLC related to its capital structure.

(v)     All Transaction Documents shall be in form and substance rea-sonably satisfactory to each Osprey Certificateholder and to any Person with a right to

2

355416

Claim by, through or under such Osprey Certificateholder, or who is entitled to any contractual right of reimbursement or indemnity in connection with the transactions contemplated by this Agreement.

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES

Section 3.1 <u>Representations, Warranties and Covenants of Osprey Certificateholders</u>. Each Osprey Certificateholder hereby represents, warrants and covenants to Osprey and Enron as follows:

(i) Such Osprey Certificateholder is an "accredited investor" within the meaning of Rule 501(a)(1), (2), (3) or (7) of Regulation D promulgated under the Securities Act. Such Osprey Certificateholder is a "qualified purchaser" within the meaning of Section 2(a)(51) of the United States Investment Company Act of 1940, as amended.

(ii) Such Osprey Certificateholder is a Tax Matters Representing Purchaser. Such Osprey Certificateholder and Indirect Tax Matters Representing Purchaser has completed or will complete as soon as practicable Schedule III, attached hereto.

(iii) Such Osprey Certificateholder understands and agrees that the Osprey Certificates may not be transferred if 25% or more (as determined under the Plan Asset Regulations, as defined below) of the Osprey Certificates would, upon such transfer, be held by "benefit plan investors." Such Osprey Certificateholder has indicated on Schedule I hereto with respect to each name under which an Osprey Certificate is to be registered, whether such Osprey Certificateholder is (x) a "benefit plan investor" (and/or, if such Osprey Certificateholder is an insurance company using assets of its general account to purchase an Osprey Certificate, the proportion of such account that represents plan assets) or (y) a person who has discretionary authority or control with respect to Osprey's assets or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such person. If the Osprey Certificateholder is a "benefit plan investor" subject to ERISA and/or Section 4975 of the Code, the purchase of Osprey Certificates will not result in a non-exempt prohibited transaction within the meaning of Section 406 or 407 of ERISA or Section 4975 of the Code. For purposes of this paragraph, (1) the term "benefit plan investor" shall have the meaning assigned to such term in the Plan Asset Regulations, (2) the term "*Plan Asset Regulations*" means the U.S. Department of Labor regulations at 29 C.F.R. §2510.3-101, as in effect from time to time, and (3) the 25% limitation shall be determined and applied in the manner provided in the Plan Asset Regulations. If such Osprey Certificateholder is an insurance company that will use assets of its general account to acquire and hold an Osprey Certificate, it agrees to promptly provide a written statement to the Trustee and Osprey setting forth the then current proportion of its general account that constitutes plan assets following a request by the Trustee in connection with a proposed transfer or exchange of any Osprey Certificate or in connection with the issuance of Additional Certificates. If so requested by Enron, the Trustee shall request the statements referred to in the preceding sentence. Promptly upon its receipt of any written statement described above or any Transfer Certificate (as defined in the Osprey Trust Agreement), the Trustee shall provide a complete copy of such statement or certificate to Enron.

3

355416

Confidential Treatment Requested By Wilmer, Cutler & Pickering                E 145998

(iv)    Such Osprey Certificateholder is purchasing the Osprey Certificates for investment purposes only and for its own account, and not with a view to distribution of the Osprey Certificates or any part thereof in any transaction that would require registration or qualification under the Securities Act or under the securities laws of any state of the United States. Such Osprey Certificateholder understands that the issuance and sale of the Osprey Certificates to the Osprey Certificateholders contemplated hereby is being effected without registration under the Securities Act by reason of an exemption therefrom that depends, in part, on the accuracy of the foregoing representation.

(v)    Such Osprey Certificateholder agrees that (i) the Osprey Certificates may not be sold, transferred or otherwise disposed of unless they are subsequently registered and/or qualified under the Securities Act and applicable state securities laws or unless an exemption from the registration or qualification requirements is otherwise available and (ii) unless and until an Osprey Note Trigger Event has occurred and is continuing, no transfer of an Osprey Certificate will be effective or recognized without the prior consent of Enron if such transfer is to a Competitor of Enron. In that connection, such Osprey Certificateholder hereby understands that the Osprey Certificates issued to such Osprey Certificateholder hereunder may be imprinted with a legend in substantially the form set forth in Exhibit A to the Osprey Trust Agreement.

## ARTICLE IV

## MISCELLANEOUS

Section 4.1    Amendments, Etc. No amendment or waiver of any provision of this Agreement, nor consent to any departure by Osprey therefrom, shall in any event be effective unless the same shall be in writing and signed by each of Osprey, Enron and each Osprey Certificateholder affected, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 4.2    Notices, etc. All notices and other communications provided for hereunder shall be in writing and shall, if addressed as provided in the following sentence, be deemed to have been given (i) when delivered by hand, (ii) one Business Day after being sent by a private nationally or internationally recognized overnight courier service or (iii) when sent by telecopy, if immediately after transmission the sender's facsimile machine records in writing the correct answer back. Actual receipt at the address of an addressee, regardless of whether in compliance with the foregoing is effective notice hereunder. Until otherwise so notified by the respective parties, all notices and other communications shall be addressed as follows: (i) to  Enron or  Osprey, at their respective addresses specified in Section 7.2 of the Participation Agreement and (ii) to the Osprey Certificateholders at the respective addresses specified for each Osprey Certificateholder on Schedule II hereto.

Section 4.3    Severability. If any provision hereof is held to be illegal or unenforceable, such provision shall be fully severable, and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by such provision's severance. Furthermore, in lieu of any such provision, there shall be added automatically as part of the Agreement a legal and enforceable provision as similar in terms to the severed provision as may be possible that maintains for each party hereto the benefit of such party's bargain.

4

355416

Confidential Treatment Requested By Wilmer, Cutler & Pickering                    E 145999

Section 4.4      Binding Effect and Transfers. This Agreement shall be binding upon and inure to the benefit of Osprey, Enron and the Osprey Certificateholders and their respective successors and assigns.

Section 4.5      Limitation of Liability. It is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by Wilmington Trust Company, not individually or personally, but solely as Trustee, in the exercise of the powers and authority conferred and vested in it under the Osprey Trust Agreement, (b) each of the representations, undertakings and agreements herein made on the part of Osprey and the Trustee is made and intended not as personal representations, undertakings and agreements by Wilmington Trust Company but is made and intended for the purpose of binding only Osprey or the Trustee, respectively, and (c) under no circumstances shall Wilmington Trust Company be personally liable for the payment of indebtedness or expenses of Osprey or the Trustee, as the case may be, or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by Osprey or the Trustee, as the case may be, under this Agreement or the other related documents; *provided, however,* that this Section 4.5 shall not limit the liability expressly assumed by Wilmington Trust Company under the Osprey Trust Agreement.

Section 4.6      General Limitation on Liability. Section 7.12 of the Participation Agreement is incorporated by reference herein as if fully set forth herein.

Section 4.7      Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

Section 4.8      Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

Section 4.9      Waiver of Jury Trial; Consent to Jurisdiction. (a) EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATING DIRECTLY OR INDIRECTLY TO ANY OF THIS AGREEMENT OR THE TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED EXPRESSLY OR OTHERWISE, THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PARAGRAPH.

(b)      ANY PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY TRANSACTION DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK IN THE COUNTY OF NEW YORK IN THE COMMERCIAL DIVISION OF THE SUPREME COURT, CIVIL BRANCH OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK OR THE EASTERN DISTRICT OF NEW YORK AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY,

355416

Confidential Treatment Requested By Wilmer, Cutler & Pickering          E 146000

GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS.

(c)     EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULL-EST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORE-SAID PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN SECTION 4.9(b) HEREOF AND HEREBY FURTHER IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(d)     OSPREY HEREBY IRREVOCABLY DESIGNATES, APPOINTS AND EMPOWERS AND HEREBY CONFERS AN IRREVOCABLE SPECIAL POWER, AMPLE AND SUFFICIENT, TO CT CORPORATION SYSTEM, WITH OFFICES ON THE DATE HEREOF AT 111 EIGHTH AVENUE, NEW YORK, NY 10011 AS ITS DESIGNEE, AP-POINTEE AND AGENT WITH RESPECT TO ANY SUCH PROCEEDING IN NEW YORK TO RECEIVE, ACCEPT AND ACKNOWLEDGE FOR AND ON ITS BEHALF, AND IN RE-SPECT OF ITS PROPERTY, SERVICE OF ANY AND ALL LEGAL PROCESS, SUMMONS, NOTICES AND DOCUMENTS WHICH MAY BE SERVED IN ANY SUCH PROCEEDING AND AGREES THAT THE FAILURE OF SUCH AGENT TO GIVE ANY ADVICE OF ANY SUCH SERVICE OF PROCESS TO OSPREY AND THE CO-ISSUER AS THE CASE MAY BE, SHALL NOT IMPAIR OR AFFECT THE VALIDITY OF SUCH SERVICE OR OF ANY CLAIM BASED THEREON. IF FOR ANY REASON SUCH DESIGNEE, APPOINTEE AND AGENT SHALL CEASE TO BE AVAILABLE TO ACT AS SUCH, OSPREY AGREES TO DESIGNATE A NEW DESIGNEE, APPOINTEE AND AGENT IN NEW YORK CITY REA-SONABLY SATISFACTORY TO THE INDENTURE TRUSTEE ON THE TERMS AND FOR THE PURPOSES OF THIS PROVISION. TO THE EXTENT PERMITTED BY APPLICABLE LAW, OSPREY HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS WITH RESPECT TO ANY PROCEEDING (WHETHER OR NOT IN NEW YORK), BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO SUCH PERSON, AT ITS RESPECTIVE ADDRESS SET FORTH IN SECTION 4.2 HEREOF, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAIL-ING.

Section 4.10     Third Party Beneficiaries.  Except as otherwise provided in this Section, there shall be no third party beneficiaries to this Agreement except those non-signatory parties hereto claiming by, through or under the Osprey Certificateholders, and no parties other than the signatories hereto and such non-signatory parties or their transferees, successors or as-signs shall have or be entitled to assert rights or benefits hereunder. Each of Osprey and the Os-prey Certificateholders agrees that Enron shall be an express third party beneficiary of the repre-sentations, warranties and agreements hereunder, and Enron shall be entitled to enforce remedies with respect thereto.

\*          \*          \*

6

355416

IN WITNESS WHEREOF, the parties hereto have caused this Certificate Purchase Agreement to be executed and duly authorized, as of the date first above written.

OSPREY TRUST

By:    Wilmington Trust Company,
        not in its individual capacity, but solely
        as trustee of Osprey Trust

By:_____
Name:
Title:

OSPREY ASSOCIATES LLC, a Delaware
limited liability company

By: Stonehurst Capital, L.L.C., a New
        York limited liability company,
        its Manager

    By: Stonehurst Capital Inc., a
          Delaware corporation, its
          Manager

By: _____
       Douglas D. Stark
       Vice President


WESTBORO PROPERTIES L.L.C.
By its Manager
STONEHURST CAPITAL INC.

By: _____
       Name:   Douglas D. Stark
       Title:    Vice President


[CERTIFICATE PURCHASE AGREEMENT]

Confidential Treatment Requested By Wilmer, Cutler & Pickering                                E 146003

JOHN   HANCOCK   MUTUAL   LIFE
INSURANCE COMPANY

By:

Name:  Barry E. Welch
Its:      Second Vice President


JOHN   HANCOCK   VARIABLE   LIFE
INSURANCE COMPANY

By:

Name:  Barry E. Welch
Its:      Authorized Signatory


INVESTORS      PARTNER      LIFE
INSURANCE COMPANY

By:

Name:  Barry E. Welch
Its:      Authorized Signatory


[CERTIFICATE PURCHASE AGREEMENT]

LJM CAYMAN, L.P.

By:   LJM PARTNERS, L.P.,
its General Partner

By:   LJM PARTNERS, LLC,
its General Partner

By: _____
Name: Andrew S. Fastow
Title:  Member

[CERTIFICATE PURCHASE AGREEMENT]

Confidential Treatment Requested By Wilmer, Cutler & Pickering                                    E 146005

PRINCIPAL LIFE INSURANCE
COMPANY, ON BEHALF OF ONE OR
MORE SEPARATE ACCOUNTS

By:    Principal Capital Management, LLC
a Delaware limited liability
company, its authorized signatory

By: _____
Name: _____
Its: _____

By: _____
Name: _____
Its: _____

[CERTIFICATE PURCHASE AGREEMENT]

SCHEDULE I

| Osprey Certificateholder | Certificate Face Amount | Percentage of assets being invested that will be considered assets of a Benefit Plan Investor | Osprey Certificateholder is a person described in clause (y) of Section 3.1(iii) |
|---|---|---|---|
| *John Hancock* (4 Certificates) Registered in the name of: | | | |
| John Hancock Mutual Life Insurance Company | $ 26,500,000 | Less than 15% | No |
| John Hancock Mutual Life Insurance Company | $ 2,500,000 | Less than 15% | No |
| John Hancock Variable Life Insurance Company | $ 500,000 | 0 | No |
| Investors Partner Life Insurance Company | $ 500,000 | 0 | No |
| *Principal* (2 Certificates) Registered in the name of: | | | |
| Principal Life Insurance Company, on behalf of one or more separate accounts | $ 2,000,000 | 100% | No |
| Principal Life Insurance Company, on behalf of one or more separate accounts | $ 2,000,000 | 100% | No |
| *Osprey Associates* (2 Certificates) | | | |
| Osprey Associates LLC | $ 16,000,000 | 0 | No |
| Osprey Associates LLC | $ 26,000,000 | 0 | No |
| LJM Cayman, Ltd. | $ 15,000,000 | 0 | No |
| Westboro Properties L.L.C. | $ 9,000,000 | 0 | No |
| **Total:** | $100,000,000 | | |

SCHEDULE II
ACCOUNT INFORMATION

| Purchaser Name | JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY (two certificates) |
|---|---|
| Certificate Principal Amount (First) | $26,500,000 |
| Certificate Principal Amount (Second) | $ 2,500,000 |
| (1) Payment on account of the Notes or other obligation by:<br><br>Account Information: | Bank wire transfer of immediately available funds for credit, not later than 12 noon, Boston time, to:<br><br>BankBoston<br>ABA No. 011000390<br>Boston, Massachusetts 02110<br>Account of: John Hancock Mutual Life Insurance Company<br>    Private Placement Collection Account<br>Account Number: 541-55417<br>On Order of: Osprey Trust [PPN No.]<br>[Full name, interest rate and maturity date of the Notes or other obligations] |
| (2) Contemporaneous with the above wire, advice setting forth: | (1) the full name, interest rate and maturity date of the Notes or other obligations;<br>(2) allocation of payment between principal and interest and any special payment; and<br>(3) name and address of Bank (or Trustee) from which wire transfer was sent shall be delivered or faxed and mailed to:<br><br>John Hancock Mutual Life Insurance Company<br>200 Clarendon Street<br>Boston, MA 02117<br>Attention: Manager<br>    Investment Accounting Division, B-3<br>Fax: 617-572-0628 |
| (3) All notices related to prepayments, both scheduled and unscheduled, whether partial or in full, and notice of maturity shall be delivered or faxed and mailed to: | John Hancock Mutual Life Insurance Company<br>200 Clarendon Street<br>Boston, MA 02117<br>Attention:  Manager<br>    Investment Accounting Division, B-3<br>Fax:  617-572-0628 |
| (4) All other communications which shall include, but not be limited to, financial statements and certificates of compliance with financial covenants, shall be delivered or faxed and mailed to: | John Hancock Mutual Life Insurance Company<br>200 Clarendon Street<br>Boston, MA 02117<br>Attention: Bond and Corporate Finance Group, T-57<br>Fax:  617-572-1605 |
| (5) A copy of any notice relating to change in issuer's name, | John Hancock Mutual Life Insurance Company<br>200 Clarendon Street |

| Purchaser Name | **JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY**<br>(two certificates) |
|---|---|
| address or principal place of business or location of collateral and a copy of any legal opinions shall be delivered or faxed and mailed to: | Boston, MA 02117<br>Attention: Investment Law Division, T-50<br>Fax: 617-572-9268 |
| (6) All securities to be registered in the name of: | John Hancock Mutual Life Insurance Company |
| (7) Tax Identification Number | 04-1414660 |

| Purchaser Name | JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY |
|---|---|
| Certificate Principal Amount | $ 500,000 |
| (1) Payment on account of the Notes or other obligation by:<br><br>Account Information: | Bank wire transfer of immediately available funds for credit, not later than 12 noon, Boston time, to:<br><br>BankBoston<br>ABA No. 011000390<br>Boston, Massachusetts 02110<br>Account of: John Hancock Mutual Life Insurance Company<br>      Private Placement Collection Account<br>Account Number: 541-55417<br>On Order of: Osprey Trust [PPN No.]<br>[Full name, interest rate and maturity date of the Notes or other obligations] |
| (2) Contemporaneous with the above wire, advice setting forth: | (1) the full name, interest rate and maturity date of the Notes or other obligations;<br>(2) allocation of payment between principal and interest and any special payment; and<br>(3) name and address of Bank (or Trustee) from which wire transfer was sent shall be delivered or faxed and mailed to:<br><br>John Hancock Variable Life Insurance Company<br>200 Clarendon Street<br>Boston, MA 02117<br>Attention: Manager<br>      Investment Accounting Division, B-3<br>Fax: 617-572-0628 |
| (3) All notices related to prepayments, both scheduled and unscheduled, whether partial or in full, and notice of maturity shall be delivered or faxed and mailed to: | John Hancock Variable Life Insurance Company<br>200 Clarendon Street<br>Boston, MA 02117<br>Attention:  Manager<br>      Investment Accounting Division, B-3<br>Fax:  617-572-0628 |
| (4) All other communications which shall include, but not be limited to, financial statements and certificates of compliance with financial covenants, shall be delivered or faxed and mailed to: | John Hancock Mutual Life Insurance Company<br>200 Clarendon Street<br>Boston, MA 02117<br>Attention: Bond and Corporate Finance Group, T-57<br>Fax:  617-572-1605 |
| (5) A copy of any notice relating to change in issuer's name, address or principal place of business or location of collateral and a copy of any legal opinions shall be delivered or faxed and mailed to: | John Hancock Mutual Life Insurance Company<br>200 Clarendon Street<br>Boston, MA 02117<br>Attention: Investment Law Division, T-50<br>Fax: 617-572-9268 |
| (6) All securities to be registered in the name of: | John Hancock Variable Life Insurance Company |
| (7) Tax Identification Number | 04-2664016 |

| Purchaser Name | INVESTORS PARTNER LIFE INSURANCE COMPANY (formerly, John Hancock Life Insurance Company of America) |
|---|---|
| Certificate Principal Amount | $ 500,000 |
| (1) Payment on account of the Notes or other obligation by:<br><br>Account Information: | Bank wire transfer of immediately available funds for credit, not later than 12 noon, Boston time, to:<br><br>BankBoston<br>ABA No. 011000390<br>Boston, Massachusetts 02110<br>Account of: John Hancock Mutual Life Insurance<br>              Company<br>              Private Placement Collection Account<br>Account Number: 541-55417<br>On Order of:  Osprey Trust [PPN No.]<br>[Full name, interest rate and maturity date of the Notes or other obligations] |
| (2) Contemporaneous with the above wire transfer, advice setting forth: | (1) the full name, interest rate and maturity date of the Notes or other obligations;<br>(2) allocation of payment between principal and interest and any special payment; and<br>(3) name and address of Bank (or Trustee) from which wire transfer was sent shall be delivered or faxed and mailed to:<br><br>Investors Partner Life Insurance Company<br>200 Clarendon Street<br>Boston, MA 02117<br>Attention: Manager<br>          Investment Accounting Division, B-3<br>Fax: 617-572-0628 |
| (3) All notices related to prepayments, both scheduled and unscheduled, whether partial or in full, and notice of maturity shall be delivered or faxed and mailed to: | Investors Partner Mutual Life Insurance Company<br>200 Clarendon Street<br>Boston, MA 02117<br>Attention:  Manager<br>          Investment Accounting Division, B-3<br>Fax:   617-572-0628 |
| (4) All other communications which shall include, but not be limited to, financial statements and certificates of compliance with financial covenants, shall be delivered or faxed and mailed to: | John Hancock Mutual Life Insurance Company<br>200 Clarendon Street<br>Boston, MA 02117<br>Attention: Bond and Corporate Finance Group, T-57<br>Fax:   617-572-1605 |
| (5) A copy of any notice relating to change in issuer's name, address or principal place of business or location of collateral and a copy of any legal opinions shall be delivered or faxed and mailed to: | John Hancock Mutual Life Insurance Company<br>200 Clarendon Street<br>Boston, MA 02117<br>Attention: Investment Law Division, T-50<br>Fax: 617-572-9268 |
| (6) All securities to be registered in the name of: | Investors Partner Life Insurance Company |
| (7) Tax Identification Number | 13-3072894 |

| Purchaser Name | **PRINCIPAL LIFE INSURANCE COMPANY ON BEHALF OF ONE OR MORE SEPARATE ACCOUNTS** |
|---|---|
| Certificate Principal Amount | $ 2,000,000 |
| (1)  All payments on account of the Certificates to be made by 12:00 noon (New York City time) by wire transfer of immediately available funds to: | ABA No.:  073000228<br>Norwest Bank Iowa, N.A.<br>7th and Walnut Streets<br>Des Moines, Iowa  50309<br>For credit to Principal Life Insurance Company<br>Account No.:  0000032395<br>OBI PFGSE (S) B0062452()OSPREY TRUST<br><br>With sufficient information (including interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds. |
| (2)  All notices with respect to payments to: | Principal Capital Management, LLC<br>801 Grand Avenue<br>Des Moines, Iowa  50392-0960<br>Attn:  Investment Accounting - Securities<br>Fax (515) 248-2643<br>Confirmation (515) 247-0689 |
| (3)  All other communications to: | Principal Capital Management, LLC<br>801 Grand Avenue<br>Des Moines, Iowa  50392-0800<br>Attn:  Investment - Securities<br>Fax (515) 248-2490<br>Confirmation (515) 248-3495 |
| (4)  Tax Identification No.: | 42-0127290 |
| (5)  Upon closing, deliver Notes to: | Principal Capital Management, LLC<br>801 Grand Avenue<br>Des Moines, Iowa  50392-0301<br>Attn:  JoEllen J. Watts |
| (6)  Other Instructions: | PRINCIPAL LIFE INSURANCE COMPANY, ON BEHALF OF ONE OR MORE SEPARATE ACCOUNTS<br><br>By:   Principal Capital Management, LLC<br>a Delaware limited liability company,<br>its authorized signatory<br><br><br>By:_____<br>Its:_____<br><br><br>By:_____<br>Its:_____ |

Confidential Treatment Requested By Wilmer, Cutler & Pickering

| Purchaser Name | **PRINCIPAL LIFE INSURANCE COMPANY ON BEHALF OF ONE OR MORE SEPARATE ACCOUNTS** |
|---|---|
| Certificate Principal Amount | $ 2,000,000 |
| (1) All payments on account of the Certificates to be made by 12:00 noon (New York City time) by wire transfer of immediately available funds to: | Norwest Bank Iowa, N.A. <br> 7th and Walnut Streets <br> Des Moines, Iowa 50309 <br> ABA No.: 073000228 <br> For credit to Principal Life Separate <br> Account No.: 0007051484 <br> OBI PFGSE (S) B0062452()OSPREY TRUST <br><br> With sufficient information (including interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds. |
| (2) All notices with respect to payments to: | Principal Capital Management, LLC <br> 801 Grand Avenue <br> Des Moines, Iowa 50392-0960 <br> Attn: Investment Accounting - Securities <br> Fax (515) 248-2643 <br> Confirmation (515) 247-0689 |
| (3) All other communications to: | Principal Capital Management, LLC <br> 801 Grand Avenue <br> Des Moines, Iowa 50392-0800 <br> Attn: Investment - Securities <br> Fax (515) 248-2490 <br> Confirmation (515) 248-3495 |
| (4) Tax Identification No.: | 42-0127290 |
| (5) Upon closing, deliver Notes to: | Principal Capital Management, LLC <br> 801 Grand Avenue <br> Des Moines, Iowa 50392-0301 <br> Attn: JoEllen J. Watts |
| (6) Other Instructions: | PRINCIPAL LIFE INSURANCE COMPANY, ON BEHALF OF ONE OR MORE SEPARATE ACCOUNTS <br><br> By:  Principal Capital Management, LLC <br>       a Delaware limited liability company, <br>       its authorized signatory <br><br><br> By:_____ <br> Its:_____ <br><br><br> By:_____ <br> Its:_____ |

Confidential Treatment Requested By Wilmer, Cutler & Pickering

| Purchaser Name | LJM Cayman, L.P. |
|---|---|
| Certificate Principal Amount | $15,000,000 |
| (1) Payment on Account of Certificates | LJM Cayman, L.P.<br>Citibank, N.A. - New York<br>ABA# 021000089<br>Account Number 4079-8088 |
| (2) Address for all notices and other information: | Andrew S. Fastow<br>1831 Wroxton Road<br>Houston, TX 77005<br>(713) 526-6833 |
| Tax Identification Number | 98-0210392 |

| Purchaser Name | **OSPREY ASSOCIATES LLC** |
|---|---|
| | (two certificates) |
| Certificate Principal Amount (First) | $16,000,000 |
| Certificate Principal Amount (Second) | $26,000,000 |
| Address for financial reports, compliance certificates and all other written communications, including notices of prepayments: | c/o Stonehurst Capital<br>890 Clinton Square<br>Rochester, NY  14604 |
| with copies to: | TCW Asset Management Company<br>200 Park Avenue, Suite 2200<br>New York, NY  10166-0228<br>Attention: Justin Driscoll<br>Fax: (212) 771-4069<br><br>and<br><br>John Hancock Mutual Life Insurance Company,<br>Portfolio Advisor<br>200 Clarendon Street<br>Boston, MA  02117<br>Attention: George H. Braun<br>         Bond and Corporate Finance Group, T-57<br>Fax: (617) 572-1605 |
| Account for Payment: | [] |
| Notices of Scheduled Payments/Written Confirmations of Wire Transfers: | c/o Stonehurst Capital<br>890 Clinton Square<br>Rochester, NY  14604 |
| Certificate to be delivered to: | c/o Stonehurst Capital<br>890 Clinton Square<br>Rochester, NY  14604 |
| Taxpayer I.D. Number: | 16-1574089 |

| Purchaser Name<br>Certificate Principal Amount | **WESTBORO PROPERTIES L.L.C.**<br>$9,000,000 |
|---|---|
| Address for financial reports, compliance certificates and all other written communications, including notices of prepayments: | c/o Stonehurst Capital<br>890 Clinton Square<br>Rochester, NY  14604 |
| Account for Payment: | Fleet Bank<br>    Rochester Office<br>    Attn: Sheila Hanley (716-546-9020)<br>    Checking Account No.: 9380505596<br>    ABA No.: 021300019<br>    For Credit to Westboro Properties- New LLC |
| Notices of Scheduled Payments/Written Confirmations of Wire Transfers: | c/o Stonehurst Capital<br>890 Clinton Square<br>Rochester, NY  14604 |
| Certificate to be delivered to: | c/o Stonehurst Capital<br>890 Clinton Square<br>Rochester, NY  14604 |
| Taxpayer I.D. Number: | 16-1442678 |

# Exhibit 18

EXECUTION COPY

OSPREY TRUST

$70,000,000 of
Certificates of Beneficial Ownership

CERTIFICATE PURCHASE AGREEMENT

Dated as of July 10, 2000

NY3:#7243639

Confidential Treatment Requested By Wilmer, Cutler & Pickering

E 239001

## CERTIFICATE PURCHASE AGREEMENT

CERTIFICATE PURCHASE AGREEMENT, dated as of July 10, 2000, (this "*Agreement*") by and among OSPREY TRUST, a Delaware statutory business trust ("*Osprey*"), and the holders of Subsequent Certificates (as defined herein) named in Schedule I hereto (together with their permitted successors, assigns and transferees, each a "*Subsequent Certificateholder*" and collectively, the "*Subsequent Certificateholders*"). Unless otherwise indicated, capitalized terms used herein and not defined herein shall have the meanings ascribed thereto in the Participation Agreement or Appendix A thereto.

### ARTICLE I

### PURCHASE AND SALE OF THE SUBSEQUENT CERTIFICATES

Section 1.1   <u>Authorization of Issue of Subsequent Certificates</u>. On or before the Subsequent Closing Date, Osprey will authorize the issuance of $70,000,000 of Certificates of beneficial ownership (the "*Subsequent Certificates*") pursuant to the Osprey Trust Agreement. Each Subsequent Certificateholder acknowledges that the Subsequent Certificates will be offered and sold to the Subsequent Certificateholders without being registered under the Securities Act of 1933, as amended (the "*Securities Act*"), in reliance on exemptions therefrom and may not be offered or sold except pursuant to an exemption from the registration requirements of the Securities Act. The proceeds from Osprey's sale of the Subsequent Certificates will be used to purchase an additional limited partner interest in Whitewing Associates L.P., a Delaware limited partnership. Osprey, Enron, Egret I LLC, Whitewing Management LLC, Peregrine I LLC, Whitewing Associates L.P., Condor Share Trust and the Indenture Trustee, have entered into Amendment No. 1 to the Participation Agreement, pursuant to which each of the parties, as applicable, has made certain representations and warranties and agreed to engage in certain transactions, including the issuance and sale of the Subsequent Certificates.

Section 1.2   <u>Purchase and Sale of Subsequent Certificates</u>. Osprey hereby agrees to issue and sell, on the Subsequent Closing Date, to each Subsequent Certificateholder, and each Subsequent Certificateholder hereby agrees to purchase, on the Subsequent Closing Date, from Osprey, subject to the fulfillment of the conditions precedent described below, that amount of Subsequent Certificates set forth opposite the name of each such Subsequent Certificateholder under the caption "Certificate Face Amount" on Schedule I hereto at a purchase price equal to 100% of such Certificate Face Amount. Osprey will deliver to each Subsequent Certificateholder one or more Subsequent Certificates, authenticated by the Trustee, in such denominations and registered in such names as the Subsequent Certificateholders shall have requested, against payment of the purchase price therefor by wire transfer to an account previously designated by Osprey, at the offices of Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005 on the Subsequent Closing Date.

Section 1.3   <u>Payments on Account of the Subsequent Certificates</u>. All payments on account of the Subsequent Certificates or other obligations in accordance with the provisions of the Subsequent Certificates, the Osprey Trust Agreement and the other Transaction

NY3:#7243639

Documents shall be made by wire transfer of immediately available funds to the account of each Subsequent Certificateholder, as specified on Schedule II hereto.

## ARTICLE II

## CONDITIONS OF PURCHASE

Section 2.1   Conditions Precedent to Purchase.   The obligation of each Subsequent Certificateholder to purchase and pay for the Subsequent Certificates on the Subsequent Closing Date is subject to the satisfaction of the conditions precedent contained in Section 3.3 of the Participation Agreement, as amended by Amendment No. 1 to the Participation Agreement, in a manner reasonably satisfactory to it, or the waiver thereof in writing by such Subsequent Certificateholder.

Section 2.2   Further Conditions.   The obligation of each Subsequent Certificateholder to purchase and pay for the Subsequent Certificates shall be subject to the further condition precedent that on the Subsequent Closing Date the following statements shall be true:

(i)   No event has occurred and is continuing, or would result from the sale of the Subsequent Certificates or from the application of the proceeds therefrom, that constitutes an Osprey Certificate Trigger Event under the terms of the Osprey Trust Agreement or would constitute an Osprey Certificate Trigger Event under the terms of the Osprey Trust Agreement but for the requirement that notice be given or time elapse, or both.

(ii)   Each Subsequent Certificateholder has received such other documents, certificates or opinions as such Subsequent Certificateholder may reasonably request in connection with the consummation of the transactions contemplated by this Agreement.

(iii)   There has been no change in any law, rule or regulation or the interpretation thereof (including any law, rule or regulation relating to taxes) that (x) prohibits or prevents the consummation of this Agreement, any of the transactions contemplated hereby (including the sale and purchase of the Subsequent Certificates) or any Transaction Document, or (y) has an adverse effect on the economic or other benefits that each Subsequent Certificateholder expects to derive from this Agreement, the sale and purchase of the Subsequent Certificates, or the Transaction Documents.

(iv)   All Transaction Documents shall be in form and substance reasonably satisfactory to each Subsequent Certificateholder and to any Person with a right to Claim by, through or under such Subsequent Certificateholder, or who is entitled to any contractual right of reimbursement or indemnity in connection with the transactions contemplated by this Agreement.

NY3:#7243639

Confidential Treatment Requested By Wilmer, Cutler & Pickering                    E 239003

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES

Section 3.1   <u>Representations, Warranties and Covenants of Subsequent Certificateholders</u>. Each Subsequent Certificateholder hereby represents, warrants and covenants to Osprey and Enron as follows:

(i)   Such Subsequent Certificateholder is an "accredited investor" within the meaning of Rule 501(a)(1), (2), (3) or (7) of Regulation D promulgated under the Securities Act. Such Subsequent Certificateholder is a "qualified purchaser" within the meaning of Section 2(a)(51) of the United States Investment Company Act of 1940, as amended.

(ii)   Such Subsequent Certificateholder is a Tax Matters Representing Purchaser. Such Subsequent Certificateholder and Indirect Tax Matters Representing Purchaser has completed or will complete as soon as practicable Schedule III, attached hereto.

(iii)   Such Subsequent Certificateholder understands and agrees that the Osprey Certificates may not be transferred if 25% or more (as determined under the Plan Asset Regulations, as defined below) of the Osprey Certificates would, upon such transfer, be held by "benefit plan investors." Such Subsequent Certificateholder has indicated on Schedule I hereto with respect to each name under which a Subsequent Certificate is to be registered, whether such Subsequent Certificateholder is (x) a "benefit plan investor" (and/or, if such Subsequent Certificateholder is an insurance company using assets of its general account to purchase a Subsequent Certificate, the proportion of such account that represents plan assets) or (y) a person who has discretionary authority or control with respect to Osprey's assets or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such person. If the Subsequent Certificateholder is a "benefit plan investor" subject to ERISA and/or Section 4975 of the Code, the purchase of Subsequent Certificates will not result in a non-exempt prohibited transaction within the meaning of Section 406 or 407 of ERISA or Section 4975 of the Code. For purposes of this paragraph, (1) the term "benefit plan investor" shall have the meaning assigned to such term in the Plan Asset Regulations, (2) the term "*Plan Asset Regulations*" means the U.S. Department of Labor regulations at 29 C.F.R. §2510.3-101, as in effect from time to time, and (3) the 25% limitation shall be determined and applied in the manner provided in the Plan Asset Regulations. If such Subsequent Certificateholder is an insurance company that will use assets of its general account to acquire and hold an Osprey Certificate, it agrees to promptly provide a written statement to the Trustee and Osprey setting forth the then current proportion of its general account that constitutes plan assets following a request by the Trustee in connection with a proposed transfer or exchange of any Osprey Certificate or in connection with the issuance of Additional Certificates. If so requested by Enron, the Trustee shall request the statements referred to in the preceding sentence. Promptly upon its receipt of any written statement described above or any Transfer Certificate (as defined in the Osprey

3

NY3:#7243639

Trust Agreement), the Trustee shall provide a complete copy of such statement or certificate to Enron.

(iv)    Such Subsequent Certificateholder is purchasing the Subsequent Certificates for investment purposes only and for its own account, and not with a view to distribution of the Subsequent Certificates or any part thereof in any transaction that would require registration or qualification under the Securities Act or under the securities laws of any state of the United States.  Such Subsequent Certificateholder understands that the issuance and sale of the Subsequent Certificates to the Subsequent Certificateholders contemplated hereby is being effected without registration under the Securities Act by reason of an exemption therefrom that depends, in part, on the accuracy of the foregoing representation.

(v)    Such Subsequent Certificateholder agrees that (i) the Subsequent Certificates may not be sold, transferred or otherwise disposed of unless they are subsequently registered and/or qualified under the Securities Act and applicable state securities laws or unless an exemption from the registration or qualification requirements is otherwise available and (ii) unless and until an Osprey Certificate Trigger Event has occurred and is continuing, no transfer of an Osprey Certificate will be effective or recognized without the prior consent of Enron if such transfer is to a Competitor of Enron. In that connection, such Subsequent Certificateholder hereby understands that the Subsequent Certificates issued to such Subsequent Certificateholder hereunder may be imprinted with a legend in substantially the form set forth in Exhibit A to the Osprey Trust Agreement.

## ARTICLE IV

## MISCELLANEOUS

Section 4.1    Amendments, Etc.  No amendment or waiver of any provision of this Agreement, nor consent to any departure by Osprey therefrom, shall in any event be effective unless the same shall be in writing and signed by each of Osprey, Enron and each Subsequent Certificateholder affected, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 4.2    Notices, etc.  All notices and other communications provided for hereunder shall be in writing and shall, if addressed as provided in the following sentence, be deemed to have been given (i) when delivered by hand, (ii) one Business Day after being sent by a private nationally or internationally recognized overnight courier service or (iii) when sent by telecopy, if immediately after transmission the sender's facsimile machine records in writing the correct answer back.  Actual receipt at the address of an addressee, regardless of whether in compliance with the foregoing is effective notice hereunder.  Until otherwise so notified by the respective parties, all notices and other communications shall be addressed as follows: (i) to Enron or Osprey, at their respective addresses specified in Section 7.2 of the Participation Agreement and (ii) to the Subsequent Certificateholders at the respective addresses specified for each Subsequent Certificateholder on Schedule II hereto.

4

NY3:#7243639

Confidential Treatment Requested By Wilmer, Cutler & Pickering                    E 239005

Section 4.3    Severability.  If any provision hereof is held to be illegal or unenforceable, such provision shall be fully severable, and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by such provision's severance.  Furthermore, in lieu of any such provision, there shall be added automatically as part of the Agreement a legal and enforceable provision as similar in terms to the severed provision as may be possible that maintains for each party hereto the benefit of such party's bargain.

Section 4.4    Binding Effect and Transfers.  This Agreement shall be binding upon and inure to the benefit of Osprey, Enron and the Subsequent Certificateholders and their respective successors and assigns.

Section 4.5    Limitation of Liability.  It is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by Wilmington Trust Company, not individually or personally, but solely as Trustee, in the exercise of the powers and authority conferred and vested in it under the Osprey Trust Agreement, (b) each of the representations, undertakings and agreements herein made on the part of Osprey and the Trustee is made and intended not as personal representations, undertakings and agreements by Wilmington Trust Company but is made and intended for the purpose of binding only Osprey or the Trustee, respectively, and (c) under no circumstances shall Wilmington Trust Company be personally liable for the payment of indebtedness or expenses of Osprey or the Trustee, as the case may be, or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by Osprey or the Trustee, as the case may be, under this Agreement or the other related documents; *provided, however*, that this Section 4.5 shall not limit the liability expressly assumed by Wilmington Trust Company under the Osprey Trust Agreement.

Section 4.6    General Limitation on Liability.  Section 7.12 of the Participation Agreement is incorporated by reference herein as if fully set forth herein.

Section 4.7    Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

Section 4.8    Governing Law.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

Section 4.9    Waiver of Jury Trial; Consent to Jurisdiction.  (a) EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATING DIRECTLY OR INDIRECTLY TO ANY OF THIS AGREEMENT OR THE TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED EXPRESSLY OR OTHERWISE, THAT

5

NY3:#7243639

Confidential Treatment Requested By Wilmer, Cutler & Pickering                                    E 239006

SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PARAGRAPH.

(b)     ANY PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY TRANSACTION DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK IN THE COUNTY OF NEW YORK IN THE COMMERCIAL DIVISION OF THE SUPREME COURT, CIVIL BRANCH OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK OR THE EASTERN DISTRICT OF NEW YORK AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS.

(c)     EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN SECTION 4.9(b) HEREOF AND HEREBY FURTHER IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(d)     OSPREY HEREBY IRREVOCABLY DESIGNATES, APPOINTS AND EMPOWERS AND HEREBY CONFERS AN IRREVOCABLE SPECIAL POWER, AMPLE AND SUFFICIENT, TO CT CORPORATION SYSTEM, WITH OFFICES ON THE DATE HEREOF AT 111 EIGHTH AVENUE, NEW YORK, NY 10011 AS ITS DESIGNEE, APPOINTEE AND AGENT WITH RESPECT TO ANY SUCH PROCEEDING IN NEW YORK TO RECEIVE, ACCEPT AND ACKNOWLEDGE FOR AND ON ITS BEHALF, AND IN RESPECT OF ITS PROPERTY, SERVICE OF ANY AND ALL LEGAL PROCESS, SUMMONS, NOTICES AND DOCUMENTS WHICH MAY BE SERVED IN ANY SUCH PROCEEDING AND AGREES THAT THE FAILURE OF SUCH AGENT TO GIVE ANY ADVICE OF ANY SUCH SERVICE OF PROCESS TO OSPREY AND THE CO-ISSUER AS THE CASE MAY BE, SHALL NOT IMPAIR OR AFFECT THE VALIDITY OF SUCH SERVICE OR OF ANY CLAIM BASED THEREON.  IF FOR ANY REASON SUCH DESIGNEE, APPOINTEE AND AGENT SHALL CEASE TO BE AVAILABLE TO ACT AS SUCH, OSPREY AGREES TO DESIGNATE A NEW DESIGNEE, APPOINTEE AND AGENT IN NEW YORK CITY REASONABLY SATISFACTORY TO THE INDENTURE TRUSTEE ON THE TERMS AND FOR THE PURPOSES OF THIS PROVISION.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, OSPREY HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS WITH RESPECT TO ANY PROCEEDING (WHETHER OR NOT IN NEW YORK), BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO SUCH PERSON, AT ITS

6

NY3:#7243639

RESPECTIVE ADDRESS SET FORTH IN SECTION 4.2 HEREOF, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING.

      Section 4.10   <u>Third Party Beneficiaries</u>.  Except as otherwise provided in this Section, there shall be no third party beneficiaries to this Agreement except those non-signatory parties hereto claiming by, through or under the Subsequent Certificateholders, and no parties other than the signatories hereto and such non-signatory parties or their transferees, successors or assigns shall have or be entitled to assert rights or benefits hereunder.  Each of Osprey and the Subsequent Certificateholders agrees that Enron shall be an express third party beneficiary of the representations, warranties and agreements hereunder, and Enron shall be entitled to enforce remedies with respect thereto.

7

NY3:#7243639

Confidential Treatment Requested By Wilmer, Cutler & Pickering

E 239008

IN WITNESS WHEREOF, the parties hereto have caused this Certificate Purchase Agreement to be executed and duly authorized, as of the date first above written.

OSPREY TRUST

By:    WILMINGTON TRUST COMPANY, not in its individual capacity, but solely as Osprey Trustee

By: _____
Name:    Ann E. Roberts
Title:    Assistant Vice President

[Subsequent Certificate Purchase Agreement]

Confidential Treatment Requested By Wilmer, Cutler & Pickering

OSPREY TRUST

By:    WILMINGTON TRUST COMPANY,
       not in its individual capacity, but solely
       as trustee of Osprey Trust


       By: _____
            Name:
            Title:


WESTBORO PROPERTIES L.L.C.

By:    STONEHURST CAPITAL INC., its
       managing member


       By: _____
            Name:  Bonnie Sue Ross
            Title:  Secretary


JOHN HANCOCK LIFE INSURANCE COMPANY


By: _____
     Name:
     Title:


JOHN HANCOCK VARIABLE LIFE
     INSURANCE COMPANY


By: _____
     Name:
     Title:

OSPREY TRUST

By:   WILMINGTON TRUST COMPANY,
not in its individual capacity, but solely
as trustee of Osprey Trust


By: _____
     Name:
     Title:

WESTBORO PROPERTIES L.L.C.

By:   STONEHURST CAPITAL INC., its
managing member


By: _____
     Name:
     Title:

JOHN HANCOCK LIFE INSURANCE COMPANY

By: _____
     Name:
     Title:   **Carl F. Knowlton**
             **Director**


JOHN HANCOCK VARIABLE LIFE
INSURANCE COMPANY

By: _____
     Name:
     Title:   AUTHORIZED SIGNATORY

LJM2-OSPREY, LLC

By:   LJM2CO-INVESTMENT, L.P., its
managing member

    By: LJM2 CAPITAL MANAGEMENT, L.P.,
its general partner

      By:  LJM2 CAPITAL MANAGEMENT,
LLC, its general partner

        By: _____
Name: KATHY LYNN
Title: AUTHORIZED PERSON

PRINCIPAL LIFE INSURANCE COMPANY, ON
BEHALF OF ONE OR MORE SEPARATE
ACCOUNTS

By:   PRINCIPAL CAPITAL MANAGEMENT,
LLC, a Delaware Limited Liability
Company, its authorized signatory

    By: _____
Name: _____
Title: _____

    By: _____
Name: _____
Title: _____

LJM2-OSPREY, LLC

By:    LJM2CO-INVESTMENT, L.P., its
       managing member

     By:  LJM2 CAPITAL MANAGEMENT, L.P.,
        its general partner

        By:  LJM2 CAPITAL MANAGEMENT,
           LLC, its general partner

           By:_____
              Name:
              Title:

PRINCIPAL LIFE INSURANCE COMPANY, ON
BEHALF OF ONE OR MORE SEPARATE
ACCOUNTS

By:    PRINCIPAL CAPITAL MANAGEMENT,
      LLC, a Delaware Limited Liability
      Company, its authorized signatory

    By:_____
       Name:
       Title:   JON C. HEINY, Counsel

    By:_____
       Name:
       Title:   KENT T. KELSEY, Counsel

SCHEDULE I

| Certificateholder | Certificate Face Amount | Percentage of assets being invested that will be considered assets of a Benefit Plan Investor | Subsequent Certificateholder is a person described in clause (y) of Section 3.1(iii) |
|---|---|---|---|
| John Hancock Life Insurance Company | $1,000,000 | 100% | No |
| John Hancock Life Insurance Company | $3,000,000 | 15% or less | No |
| John Hancock Life Insurance Company | $19,000,000 | 15% or less | No |
| John Hancock Variable Life Insurance Company | $2,000,000 | 15% or less | No |
| Principal Life Insurance Company, on behalf of one or more separate accounts | $12,000,000 | 100% | No |
| Principal Life Insurance Company, on behalf of one or more separate accounts | $2,000,000 | 100% | No |
| LJM2-Osprey, LLC | $26,000,000 | 0 | No |
| Westboro Properties L.L.C. | $5,000,000 | 0 | No |

NY3:#7243639

SCHEDULE II
ACCOUNT INFORMATION

| Purchaser Name | JOHN HANCOCK LIFE INSURANCE COMPANY |
|---|---|
| Certificate Principal Amount | $23,000,000 (in 3 certificates: $3,000,000; $1,000,000; and $19,000,000) |
| 1) Payment on account of the Notes or other obligation by:<br><br>Account Information: | Bank wire transfer of immediately available funds for credit, not later than 12 noon, Boston time, to:<br>    BankBoston<br>    ABA No. 011000390<br>    Boston, Massachusetts 02110<br>    Account of: John Hancock Life Insurance Company<br>           Private Placement Collection Account<br>    Account Number: 541-55417<br>    On Order of: Osprey Trust [PPN No.]<br>    [Full name, interest rate and maturity date of the Notes or other obligations] |
| (2) Contemporaneous with the above wire, advice setting forth: | (1) the full name, interest rate and maturity date of the Notes or other obligations;<br>(2) allocation of payment between principal and interest and any special payment; and<br>(3) name and address of Bank (or Trustee) from which wire transfer was sent shall be delivered or faxed and mailed to:<br><br>John Hancock Life Insurance Company<br>200 Clarendon Street<br>Boston, MA 02117<br>Attention: Manager, Investment Accounting Division, B-3<br>Fax: 617-572-0628 |
| (3) All notices related to prepayments, both scheduled and unscheduled, whether partial or in full, and notice of maturity shall be delivered or faxed and mailed to: | John Hancock Life Insurance Company<br>200 Clarendon Street<br>Boston, MA 02117<br>Attention: Manager, Investment Accounting Division, B-3<br>Fax: 617-572-0628 |
| (4) All other communications which shall include, but not be limited to, financial statements and certificates of compliance with financial covenants, shall be delivered or faxed and mailed to: | John Hancock Life Insurance Company<br>200 Clarendon Street<br>Boston, MA 02117<br>Attention: Bond and Corporate Finance Group, T-57<br>Fax: 617-572-1605 |
| (5) A copy of any notice relating to change in issuer's name, address or principal place of business or location of collateral and a copy of any legal opinions shall be delivered or faxed and mailed to: | John Hancock Life Insurance Company<br>200 Clarendon Street<br>Boston, MA 02117<br>Attention: Investment Law Division, T-50<br>Fax: 617-572-9268 |
| (6) All securities to be registered in the name of: | John Hancock Life Insurance Company |
| (7) Tax Identification Number | 04-1414660 |

NY3:#7243639

Confidential Treatment Requested By Wilmer, Cutler & Pickering          E 239015

| | |
|---|---|
| Purchaser Name | JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY |
| Certificate Principal Amount | $2,000,000 |
| 1) Payment on account of the Notes or other obligation by:<br><br>Account Information: | Bank wire transfer of immediately available funds for credit, not later than 12 noon, Boston time, to:<br>   BankBoston<br>   ABA No. 011000390<br>   Boston, Massachusetts 02110<br>   Account of: John Hancock Variable Life Insurance Company<br>            Private Placement Collection Account<br>   Account Number: 541-55417<br>   On Order of: Osprey Trust [PPN No.]<br>   [Full name, interest rate and maturity date of the Notes or other obligations] |
| (2) Contemporaneous with the above wire, advice setting forth: | (1) the full name, interest rate and maturity date of the Notes or other obligations;<br>(2) allocation of payment between principal and interest and any special payment; and<br>(3) name and address of Bank (or Trustee) from which wire transfer was sent shall be delivered or faxed and mailed to:<br><br>John Hancock Variable Life Insurance Company<br>200 Clarendon Street<br>Boston, MA 02117<br>Attention: Manager, Investment Accounting Division, B-3<br>Fax: 617-572-0628 |
| (3) All notices related to prepayments, both scheduled and unscheduled, whether partial or in full, and notice of maturity shall be delivered or faxed and mailed to: | John Hancock Variable Life Insurance Company<br>200 Clarendon Street<br>Boston, MA 02117<br>Attention: Manager, Investment Accounting Division, B-3<br>Fax: 617-572-0628 |
| (4) All other communications which shall include, but not be limited to, financial statements and certificates of compliance with financial covenants, shall be delivered or faxed and mailed to: | John Hancock Variable Life Insurance Company<br>200 Clarendon Street<br>Boston, MA 02117<br>Attention: Bond and Corporate Finance Group, T-57<br>Fax: 617-572-1605 |
| (5) A copy of any notice relating to change in issuer's name, address or principal place of business or location of collateral and a copy of any legal opinions shall be delivered or faxed and mailed to: | John Hancock Variable Life Insurance Company<br>200 Clarendon Street<br>Boston, MA 02117<br>Attention: Investment Law Division, T-50<br>Fax: 617-572-9268 |
| (6) All securities to be registered in the name of: | John Hancock Variable Life Insurance Company |
| (7) Tax Identification Number | 04-2664016 |

2

Confidential Treatment Requested By Wilmer, Cutler & Pickering

| Purchaser Name | PRINCIPAL LIFE INSURANCE COMPANY ON BEHALF OF ONE OR MORE SEPARATE ACCOUNTS |
|---|---|
| Certificate Principal Amount | $12,000,000 |
| (1) All payments on account of the Certificates to be made by 12:00 noon (New York City time) by wire transfer of immediately available funds to: | ABA No.: 073000228<br>Wells Fargo Bank Iowa, N.A.<br>7th and Walnut Streets<br>Des Moines, Iowa 50309<br>For credit to Principal Life Insurance Company<br>Account No.: 0000032395<br>OBI PFGSE (S) B0062452()OSPREY TRUST<br><br>With sufficient information (including interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds. |
| (2) All notices with respect to payments to: | Principal Capital Management, LLC<br>801 Grand Avenue<br>Des Moines, Iowa 50392-0960<br>Attn: Investment Accounting - Securities<br>Fax (515) 248-2643<br>Confirmation (515) 247-0689 |
| (3) All other communications to: | Principal Capital Management, LLC<br>801 Grand Avenue<br>Des Moines, Iowa 50392-0800<br>Attn: Investment - Securities<br>Fax (515) 248-2490<br>Confirmation (515) 248-3495 |
| (4) Tax Identification No.: | 42-0127290 |
| (5) Upon closing, deliver Notes to: | Principal Capital Management, LLC<br>801 Grand Avenue<br>Des Moines, Iowa 50392-0301<br>Attn: JoEllen J. Watts |
| (6) Other Instructions: | PRINCIPAL LIFE INSURANCE COMPANY, ON BEHALF OF ONE OR MORE SEPARATE ACCOUNTS<br><br>By:   Principal Capital Management, LLC<br>       a Delaware limited liability company,<br>       its authorized signatory<br><br><br>By: _____<br>Its: _____<br><br><br>By: _____<br>Its: _____ |

3

NY3:#7243639

Confidential Treatment Requested By Wilmer, Cutler & Pickering

E 239017

| Purchaser Name | PRINCIPAL LIFE INSURANCE COMPANY ON BEHALF OF ONE OR MORE SEPARATE ACCOUNTS |
|---|---|
| Certificate Principal Amount | $2,000,000 |
| (1) All payments on account of the Certificates to be made by 12:00 noon (New York City time) by wire transfer of immediately available funds to: | ABA No.: 073000228<br>Wells Fargo Bank Iowa, N.A.<br>7th and Walnut Streets<br>Des Moines, Iowa 50309<br>For credit to Principal Life Insurance Company<br>Account No.: 0000032395<br>OBI PFGSE (S) B0062452()OSPREY TRUST<br><br>With sufficient information (including interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds. |
| (2) All notices with respect to payments to: | Principal Capital Management, LLC<br>801 Grand Avenue<br>Des Moines, Iowa 50392-0960<br>Attn: Investment Accounting - Securities<br>Fax (515) 248-2643<br>Confirmation (515) 247-0689 |
| (3) All other communications to: | Principal Capital Management, LLC<br>801 Grand Avenue<br>Des Moines, Iowa 50392-0800<br>Attn: Investment - Securities<br>Fax (515) 248-2490<br>Confirmation (515) 248-3495 |
| (4) Tax Identification No.: | 42-0127290 |
| (5) Upon closing, deliver Notes to: | Principal Capital Management, LLC<br>801 Grand Avenue<br>Des Moines, Iowa 50392-0301<br>Attn: JoEllen J. Watts |
| (6) Other Instructions: | PRINCIPAL LIFE INSURANCE COMPANY, ON BEHALF OF ONE OR MORE SEPARATE ACCOUNTS<br><br>By:    Principal Capital Management, LLC<br>       a Delaware limited liability company,<br>       its authorized signatory<br><br><br>By: _____<br>Its: _____<br><br><br>By: _____<br>Its: |

4

NY3:#7243639

| Purchaser Name | LJM2-OSPREY, LLC |
|---|---|
| Certificate Principal Amount | $26,000,000 |
| (1) Payment on Account of Certificates | LJM2-Osprey, LLC<br><br>Wire transfer of immediately available funds to:<br><br>Chase Manhattan Bank<br>New York, NY<br>ABA#: 021 000 021<br>Account of: LJM2 Co-Investment, L.P.<br>Account Number: 323-156460 |
| (2) All Notices regarding payments, financial statements, etc. sent to: | LJM2-Osprey, LLC<br>c/o LJM2 Co-Investment, L.P.<br>333 Clay Street, Suite 1203<br>Houston, TX  77002<br>Attn:  Kathy Lynn<br>Attn:  Joyce Tang<br>Fax:  713-646-8656 |
| (3) All other communications, etc: | LJM2-Osprey, LLC<br>c/o LJM2 Co-Investment, L.P.<br>333 Clay Street, Suite 1203<br>Houston, TX  77002<br>Attn:  Kathy Lynn<br>Fax:  713-646-8656 |
| Tax Identification Number | (LJM2 Co-Investment, L.P.)  76-0625726 |

5

NY3:#7243639

Confidential Treatment Requested By Wilmer, Cutler & Pickering

E 239019

| Purchaser Name | **WESTBORO PROPERTIES L.L.C.** |
| --- | --- |
| Certificate Principal Amount | $5,000,000 |
| Address for financial reports, compliance certificates and all other written communications, including notices of prepayments: | c/o Stonehurst Capital<br>890 Clinton Square<br>Rochester, NY 14604 |
| Account for Payment: | Fleet Bank<br>    Rochester Office<br>    Attn: Sheila Hanley (716-546-9020)<br>    Checking Account No.: 9380505596<br>    ABA No.: 021300019<br>    For Credit to Westboro Properties- New LLC |
| Notices of Scheduled Payments/Written Confirmations of Wire Transfers: | c/o Stonehurst Capital<br>890 Clinton Square<br>Rochester, NY 14604 |
| Certificate to be delivered to: | c/o Stonehurst Capital<br>890 Clinton Square<br>Rochester, NY 14604 |
| Taxpayer I.D. Number: | 16-1442678 |

6

Confidential Treatment Requested By Wilmer, Cutler & Pickering

## SCHEDULE III
## TAX INFORMATION

1.  Name: _____

2.  Tax Status:  ☐  Domestic (if not a corporation, will deliver IRS Form W-9)

    ☐  Foreign (will deliver IRS Form W-8)

3.  Type of Entity (check one):

    ☐  (i)  An entity other than a partnership, grantor trust or S corporation.

    ☐  (ii)  A Flowthrough Entity (*i.e.*, a partnership, grantor trust or S corporation), less than 50% of whose assets will be represented, directly or indirectly, by Osprey Certificates.

    ☐  (iii)  A Flowthrough Entity (*i.e.*, a partnership, grantor trust or S corporation), 50% or more of whose assets will be represented, directly or indirectly, by Osprey Certificates.

    If described in clause (iii) above, the number of direct or indirect nominal owners that are described in clause (i) or (ii) above _____
    (attach a separate Schedule III for each such nominal owner)

NY3:#7243639

# Exhibit 19

JUL 21 2000 17:22 FR LJM2          713 646 8656 TO COLLEEN CITI      P.02/05



July 21, 2000

To the Limited Partners:

   This correspondence from the General Partner summarizes the investment activities of LJM2 Co-Investment, L.P. ("LJM2") during the month of June as well as provides an update of other activities at LJM2.

## Investment Portfolio

   June was a very busy month for LJM2 with the closing and funding of seven new investments. In order to fund these investments, the General Partner made two capital calls, totaling $167.1 million. The funds were applied as follows:

| Source ($ millions) | | Uses ($ millions) | |
|---|---|---|---|
| Capital Calls | 167.1 | Investments | 145.3 |
| | | Partnership Exp. | 3.5 |
| | | Mgmt Fees | 3.6 |
| | | Excess | 14.7 |
| Total | 167.1 | | 167.1 |

The excess of $14.7 million is being retained and invested by the Partnership and will be used to fund investments in August. LJM2 now has $220.5 million of investments, with $202.7 million of undrawn limited partners' capital available. A summary of the current portfolio is as follows:

| Investment | Cost ($ millions) |
|---|---|
| ENA CLO: debt and equity | $32.5 |
| Resco | 0.7 |
| Rawhide | 12.5 |
| Raptor I | 29.5 |
| GECC Turbine | 3.8 |
| EBARGE | 7.5 |
| Backbone | 30.0 |
| Raptor II | 30.0 |
| Margaux | 10.0 |
| TNPC | 38.0 |
| Osprey | 26.0 |
| Total | $220.5 |

333 Clay St., Suite 1203   Houston, TX 77002   phone: 713-345-5867   fax: 713-646-8656

CITINEWBY 00047968

## New Investments

The **GECC Turbine** investment was completed on May 12, 2000. LJM2 purchased two Frame 7EA gas combustion turbines from General Electric and entered into an option agreement to allow Enron Engineering & Construction Company ("EE&CC") to purchase the turbines in six months. The purpose of this transaction was to secure the purchase of the turbines for EE&CC and to keep the assets off of Enron's balance sheet until EE&CC determines a specific project for the turbines. LJM2 received an option premium of $820,078 at closing and will be required to fund $9.76 million over the next six months for the turbines. We expect EE&CC to purchase the turbines at the end of the option period.

LJM2 purchased $7.5 million of equity in **EBARGE, LLC,** a special purpose entity set up to own 9 power barges with a combined capacity of 276 MW. LJM2 expects to exit this equity investment within 7 months through a sale to a strategic equity investor.

The **Backbone** investment consists of the purchase of 40 fiber optic strands and 86,760 fiber route miles from Salt Lake City, Utah to Houston, Texas. LJM2 purchased the strands for $30.0 million. LJM2 and Enron Broadband Services (EBS) also entered into a marketing agreement whereby EBS originators will market the fiber to third parties on behalf of LJM2.

**Raptor II** is a replication of the Raptor I investment, which is a structured finance transaction designed to allow Enron to hedge its mark-to-market exposure from publicly traded and private equity investments. LJM2 funded $30 million for Raptor II and expects to receive a distribution of $41 million in December 2000. LJM2 will continue to own an interest in Raptor with additional upside possible in three years.

The **Margaux** investment is a purchase of $10 million of equity certificates in a monetization of Enron's equity interest in three European power plants. LJM2 purchased 33% of the Class A certificates, which will yield 16% per annum and are subordinated in payment to $95 million of Trust Notes.

**TNPC** is "The New Power Company", formed to provide electricity and other energy services to the residential and small commercial market. LJM2 purchased $38 million of special warrants as part of a $100 million private equity offering. TNPC has filed an S-1 for a $400 million IPO, which is expected to occur in September 2000. LJM2 has demand registration rights six months after the IPO.

LJM2 purchased 18% of the equity in **Osprey Trust,** which is an indirect owner of approximately $920 million of Enron's merchant assets. The $26 million investment in Osprey equity will earn a current yield of 12.75%, and repayment of capital is primarily dependent on the sale of Enron stock and the sale of the assets in the merchant portfolio.

CITINEWBY 00047969

As part of its return on this investment, the Osprey equity holders are entitled to a 1.5% upside sharing in the value of the Trust. The current value of this sharing is $1.85 million.

Additionally, LJM2 entered into a put obligation with a partnership owned by Avista Power, which required no cash investment from LJM2. The put gives Avista the right to sell a GE7FA turbine to LJM2 on July 22, 2000 if Avista does not complete the purchase of the equity in a power plant from Enron and enter into a construction contract with Nepco, a wholly owned subsidiary of Enron, for the construction of the new plant. LJM2 received a put premium at closing on July 7, 2000 of $357,000, and the put obligation will be outstanding for two weeks. If Avista exercises the put, LJM2 will have an additional $3.2 million from the transaction to cover the expenses of remarketing the turbine. We expect the equity sale and construction contract to be completed by Enron and Avista and the put to expire unexercised.

## Liquidated Investments

At year-end 1999, LJM2 purchased 90% of the equity of Bob West Treasure, L.L.C. for $2.95 million. Bob West Treasure is a special purpose vehicle created to acquire the domestic exploration and production assets of Tesoro Petroleum. LJM2 received a cash payment of $3.25 million for this investment, representing a return of and on capital, giving LJM2 an unlevered annualized return of 25% and a levered annualized return of 93% on this investment. LJM2 continues to hold the economic interest in this investment, which may give rise to future tax benefits.

## Potential Investments

LJM2 is working on several new investments that are expected to close and fund in August. We expect that some of these investments will be LJM2's first non-Enron investments.  Approximately $100 million of additional capital may be required to fund these investments, which will most likely require additional capital calls in the month of July. The following is a short summary on each potential investment.

Coyote Springs II Equity and Blue Ridge - Investment Summaries on these two investments were included in a package of seven investment summaries, distributed to you as part of the capital calls made in June. Coyote Springs II is a power plant in Oregon. LJM2 is considering the purchase of 50% of the equity interest in this plant. Blue Ridge is a CLO structure offered by First Union and LJM2 is considering the purchase of preferred shares in the structure. The capital to fund these two investments was not part of the June capital calls. We expect both of these investments to be closed and funded in August.

Westinghouse Turbine  - LJM2 is considering the purchase of a Westinghouse W501d5A gas combustion turbine and subsequently entering into an option agreement to allow Enron Engineering & Construction Company to purchase the turbine within four months. The purchase of the turbine will allow Enron to secure the turbine, while maintaining off balance sheet treatment of the asset. LJM2 will be paid an option

CITINEWBY 00047970

premium and will need to fund approximately $12.4 million in turbine payments over the option period.

   Zenith Telecom - LJM2 is considering the purchase of 20% of the equity in Zenith Telecom Trust, which is a new off balance sheet vehicle to be created by Texas Utilities ("TXU") to fund the growth of its telecommunications business. The investment is expected to be $30 million and the certificates will earn a 16% yield that will be prefunded through a debt offering. After four years, if LJM2's equity has not been returned through either a third party equity sale or an IPO of the telecom business, the yield will increase 1% every six months. At dissolution, the certificate holders will receive 80% of any gains/profits until a 20% IRR is achieved and then 5% of any gains/profits thereafter.

## Debt Facilities

   A portion of the June capital calls was used to repay the Chase revolver by $8.5 million, bringing the outstanding available balance to $15 million. Availability under this facility is determined by the amount of unfunded partners' capital; therefore as additional capital calls are made, the ability to use the revolver decreases. Therefore, we are currently working on a new $200 million debt facility that will be advanced against the value of the investment portfolio. This new facility will be used to repay outstandings under the Chase revolver and to fund new investments.

   A payment of $1.17 million was required under the terms of the SE Acquisition Loan, bringing the outstanding balance to $14.14 million. We anticipate repaying this loan from the proceeds of the new credit facility.

## Co-Investment

   LJM2 offered its second co-investment opportunity to selected limited partners during June. Two limited partners invested a total of $12 million as co-investors in the TNPC special warrants. The General Partner continues to see opportunities to offer co-investments, and encourages all limited partners who are interested in co-investment to contact Kathy Lynn.


Best regards,

Andrew S. Fastow
General Partner

CITINEWBY 00047971

# Exhibit 20

# LJM2 Co-Investment, L.P.

## Significant Events

### Portfolio Activity

Through March 31st, LJM2 made nine investments. LJM2 liquidated four of these investments and subsequently re-invested the capital. All of the remaining investments are currently meeting performance expectations. LJM2's active deal pipeline has potential investments totaling $215,000,000.

### Purchase of Raptor

On April 18th, 2000, LJM2 committed to purchase 100% of the voting interest in Raptor, a structured finance transaction designed to hedge Enron's mark-to-market exposure from certain publicly-traded and privately negotiated equity investments. LJM2 funded $29,500,000 on May 4th, 2000. LJM2 expects to receive a distribution in November which will result in a 68% unlevered annualized IRR on its investment.

### Final Close

On April 5th, 2000, LJM2 held the fourth and final close for an additional $173,545,000 of limited partner commitments. The final close brought the fund's total limited partner commitments to $387,145,000. On May 8th, 2000, the final close limited partners funded their pro rata share of earlier investments, their portion of earlier management fees, and interest on both items. LJM2 distributed these proceeds to the prior limited partners on May 12th, 2000.

### Repayment of Credit Facilities

On April 6th, 2000, LJM2 applied $22,036,348 of the proceeds from the sale of its investments in Nowa Sarzyna and MEGS, LLC to its outstanding credit facilities with LJM Cayman and S.E. Acquisitions. LJM2 retired the remaining $9,380,121 of the LJM Cayman facility and reduced the outstanding amount under the S.E. Acquisitions facility to $15,314,327.



Confidential

2

# Exhibit 21

# OSPREY TRUST

## $70,000,000 Certificates of Beneficial Ownership

ENRON

DBG 069155



# PERMITTED INVESTMENTS TO DATE

4

| Asset | Description | Purchase Price ($ in millions) |
|---|---|---|
| Promigas | Purchase 41.25% of the public equity of a gas transmission and distribution company in Colombia | $137.2 |
| Sarlux | Purchase 45% economic interest in a 551 MW power plant in Sardinia, Italy | 350.4 |
| Trakya | Purchase 22% economic interest in a 478 MW power plant near Sea of Marmara, Turkey | 100.5 |
| Sutton Bridge | Purchase 68.75% of a 790 MW power plant in Lincolnshire, United Kingdom | 177.2 |
| Heartland Steel | Purchase of approximately 9.5% of the equity in a privately held flat rolled steel facility | 15.0 |
| Kafus Industries | Purchase of 7.24% of the public equity of Kafus Environmental Industries | 15.0 |
| Quanta Services | Purchase of $12.4 million face value of convertible subordinated notes | 25.1 |
| Yosemite I | Purchase of 45% of the equity of a Trust that owns AAA securities, U.S. obligations, and payment obligations supported by Enron | 35.0 |
| LJM2 Loan | Loan to LJM2 to fund general acquisitions by LJM2 | 38.5 |
| Merlin CLO | Purchase of the BB and BBB rated securities in ENA's collateralized loan obligation fund | 23.5 |
| | **Total** | **$917.4** |

DBG 069159

DBG 053320

Confidential

*Presentation to Investors*

# $50,000,000 CERTIFICATES OF
# BENEFICIAL OWNERSHIP IN OSPREY TRUST

*AUGUST 2000*

**Deutsche Banc Alex. Brown**

Donaldson, Lufkin & Jenrette

DBG 053346

OSPREY CERTIFICATES

# WHITEWING CURRENT INVESTMENTS

The original Osprey transaction created an efficient monetization vehicle for Enron's merchant investment portfolio. Whitewing currently holds the following investments:

| Asset | Description | Purchase Price ($ in Millions) |
|---|---|---|
| Promigas | Purchase 41.25% of the public equity of a gas transmission and distribution company in Colombia | $137.2 |
| Sarlux | Purchase 45% economic interest in a 551 MW power plant in Sardinia, Italy | 350.4 |
| Trakya | Purchase 22% economic interest in a 478 MW power plant near Sea of Marmara, Turkey | 100.5 |
| Heartland Steel | Purchase of approximately 9.5% of the equity in a privately held flat rolled steel facility | 15.0 |
| Yosemite I | Purchase of 45% of the equity of a Trust that owns AAA securities, U.S. obligations, and payment obligations supported by Enron | 35.0 |
| LJM2 Loan | Loan to LJM2 to fund general acquisitions by LJM2 | 38.5 |
| Nowa Sarzyna | Purchase 50% of a power plat in Nowa Sarzyna, Poland (notes and equity) | 21.3 |
| Powder River | Purchase of a 33.33% economic interest in Fort Union Gas Gathering System | 46.3 |
| Wind River | Purchase of a 35% economic interest in Lost Creek Gathering System | 29.7 |
| Merlin CLO | Purchase of the BB and BBB rated securities in ENA's collateralized loan obligation fund | 23.5 |
| **Total** | | **$797.4** |

# Exhibit 22

SP 020849

Project Nighthawk

# Enron Corp.

## Presentation for Standard & Poor's

New York City
November 18, 1997

SP020849

SP0208050

# Enron Nighthawk
## Participants

**Enron**

| | | |
|---|---|---|
| David P. Chang | Director, Corporate Finance | (713) 853-9619 |
| Phillip M. Sisneros | Director, Corporate Finance | (713) 853-7482 |

**Citicorp Securities**

| | | |
|---|---|---|
| Elliot S. Conway | Managing Director, Capital Structuring | (212) 559-4445 |

2

ENRON

SP-020851

3

# Enron Nighthawk
# Agenda

- Funding Needs and Objectives
- Structure
- Derivatives
- Junior Convertible Preferred Stock
- Key Terms
- Termination / Liquidation
- Equity Attributes
- GAAP and Pro-Forma Impact
- Rationale



SP 020852

4

## Enron Nighthawk
## Funding Need and Objectives

Funding Need

- High quality investment opportunities create a need for additional equity capital to enhance (support) our credit profile

  – Improve ratings, subject to opportunities and future impact of international, retail and other ventures

  – 3-5 year lag before business and growth opportunities play out

Funding Objective

- $500 million contingent common shares issuance

  – Capture anticipated future share price appreciation

  – $290 million benefit over 5 years @ 9.6% historic share price growth rate

  – With such appreciation, 25% fewer shares will be issued

    • *Significant EPS and share appreciation impact*

- Low cost, tax-deductible dividends

- Flexibility--potential to issue early if needed without breakage costs



SP 020853

# Enron Nighthawk
## Basic Structure

5



- **Enron and third party investor create a 50/50 Joint Venture**
  - Controlled by Enron
- **Joint Venture Assets**
  - $1 billion Enron Junior Convertible Preferred Stock
- **$500 million net proceeds to pay down debt**



# Enron Nighthawk
## Forming the Joint Venture





SP020854

SP020855

# Enron Nighthawk
## JV Buys Enron Shares





SP 020856

## Enron Nighthawk
## Junior Convertible Preferred Shares

- $1 billion par value
  - Convertible into 25 million Enron common shares
  - Dividend rate adjusts with commercial paper index
  - Sufficient to distribute adequate return to Investor
  - Fixed rate equivalent cost is roughly 5.0% after-tax
- Structure gives Enron the unrestricted right to convert shares as Joint Venture Manager

| Enron | Investor |
|-------|----------|
| 50% managing member interest | 50% preferred member interest |

Joint Venture

$1 billion Junior Convertible Preferred shares

8



SP 020857

# Enron Nighthawk
## Underperformance Put Option



- Citibank pays Enron $30 million for the option
  - Strike price is 50% of the Enron stock price at the start of the transaction
    - Historically, Enron has never hit the 50% trigger on a daily rolling five year basis (data available back to 1981)
  - Settled by delivering additional Enron common shares
    - Any Enron obligation to deliver shares is contingent on Enron's share price (a) falling below 50% of today's price and (b) underperforming the S&P 500
- In bankruptcy, claims under the put option rank with common stock

9



835df854970823

10

# Enron Nighthawk
## Citibank/AMBAC Support



50% out-of-the-money
puts on the S&P 500

**Citibank**

50% out-of-the-money cash
settled put on Enron shares

**AMBAC**

surety bond

**Investor**

50% out-of-
the-money
share settled
Enron
under-
performance
put

**Enron**

**Joint Venture**

$1,000 million
Enron shares

ENRON

SP020858

SP 020859

11

# Enron Nighthawk
## Cash flow



- Enron dividends are sole source of Joint Venture cash flow
  - As and when declared
- Enron provides *no guarantees* of cash flow or redemption amounts for Investor



SP 020860

12

# Enron Nighthawk
## Key Terms

- Five year term, unless Enron terminates early
  - Any time without penalty
- Redeem Investor from proceeds of issuing common stock at the prevailing market price
  - Enron's decision to issue the shares will be a function of our rating at the time of liquidation



SP 020861

# Enron Nighthawk
## Key Terms

- Termination Event results in Joint Venture liquidation and mandatory conversion and issuance of common shares
  - Enron stock price declines by 50%
  - Bankruptcy
  - Enron default on $50 million of debt
  - Non-investment grade rating by S&P and Moody's
- Enron has the option to prevent conversion and mandatory issuance of underlying common shares
  - DECs-like option to repay with cash
  - Cash option is limited/not available if Enron less than investment grade

13



14

# Enron Nighthawk
## Termination & Liquidation

*Shares worth 200% of original cost*



**Investor**

50% preferred member interest redeemed for $500 million cash

**Enron**

50% managing member interest redeemed for $1.5 billion Enron shares

**Joint Venture**

Enron shares ($250 million original value) sold for $500 million



SP02O862

SP 020863

15

# Enron Nighthawk
## Termination or Liquidation

*Shares worth 45% & S&P worth 47.5%*



Puts on the S&P 500 are exercised for $25 million

**Citibank**

$50 million

**AMBAC**

$50 million

**Investor**

50% preferred member interest redeemed for $450 million

**Joint Venture**

Enron shares ($1,000 million original value) are sold for $450

**Enron**

Enron under-performance put is exercised for $25 million in Enron shares

ENRON

SP 020864

16



# Enron Nighthawk Summary Diagram

50% out-of-the-money puts on the S&P 500

Citibank

50% out-of-the-money cash settled put on Enron shares

Investor

50% preferred member interest

50% out-of-the-money share settled Enron under-performance put

Enron

$500 million cash

$500 million cash

50% managing member interest

$1 billion cash

Joint Venture

$500 million Enron shares



SP 020865

17

# Enron Nighthawk
## Enron support

- Share settled underperformance option
- Indemnity for its wrongful acts as manager of the JV (pledging assets, incurring debt)
- Indemnifies for losses caused by failure to provide "free shares" (e.g. registered)
- No Enron guarantees
  - No margin calls or equity "top-ups" permitted



SP 020866

18

# Enron Nighthawk
## Equity Attributes

- No ongoing payments that could lead to default
  - Payments come from Enron convertible preferred shares dividends (if and when declared)
  - Failure to pay dividends simply results in share conversion and issuance
  - No default triggers



SP020866

SP 020867

19

## Enron Nighthawk
## Equity Attributes

- No maturity or repayment requirement
  - Prefereds issued by Enron are perpetual
  - Following conversion, common shares are perpetual
  - A termination or liquidation results in share issuance
  - Enron has no cash pay or repayment obligations



SP020867

SP 020868

20

# Enron Nighthawk
## Equity Attributes

- Cushion for creditors in bankruptcy

  – No parties to the transaction become Enron creditors or have creditor claims against Enron following bankruptcy

  – Citibank derivative is share settled and claims rank with common stock

  – Investors have no claim against Enron if the public market price of Enron falls below $500 million

  – Enron's "creditors" receive the unfettered use of $500 million cash proceeds up-front to pay down debt

  – Equity is issued in the future; only the issue price and number of shares issued is not known

  – Enron common shares are effectively "issued" at $500 million regardless of actual price in bankruptcy



SP020868

SP 020869

21

# Enron Nighthawk
## Equity Attributes

- Permanent capital structure feature
  - $500 million non-recourse funds provided are permanent
  - Shares are effectively sold at closing through related derivatives
  - In year five (or earlier) investors may be retired through
    - sale of the shares, or
    - proceeds of Citibank's put contract



SP02O869

SP 020870

22

## Enron Nighthawk
## Equity Attributes

- Enron expects to issue Nighthawk equity during the next 5 years when needed to maintain a rating necessary to achieve our business objectives

  – At today's rating level, Nighthawk offers protection from a downgrade compared to debt

  – Enron expects fundamentals alone will earn an upgrade in 5 years

  – Year 5 fundamentals may be strong enough to make additional equity unnecessary



SP020871

# Enron Nighthawk
## Conversion and Equity Issuance

- Automatic in trigger event:
  - Downgrade below investment grade
  - Default
  - Potential for conversion of preferred stock
  - Anytime at the issuer (Enron's) option
    - Unrelated to stock price movement
  - When share price drops 50%
  - Year 5

- Although shares are initially convertible preferreds, Enron retains the right to convert to common at any time--irrespective of creditworthiness; in the interim the funds maintain the health of the business
  - The proceeds for issuing the converted common stock is locked in at $500 million



23

SP 020872

24

# Enron Nighthawk
## GAAP and Pro-Forma Impact

### GAAP

- $500 million Minority Interest increase with offsetting reduction in debt

- $30 million Stockholders' Equity increase

- Investor distributions are Payments to Minority Interest

- Shares issued to Joint Venture will increase Shareholders' Equity with an identical offset for Treasury Shares resulting in no additional shares outstanding for EPS purposes

| Pro-Forma Ratio Impact | 6/30/97 | Pro-forma |
|---|---|---|
| Funds flow interest coverage | 3.46x | 3.62x |
| Pre-tax interest coverage | 2.22x | 2.33x |
| Total obligations/ total capital | 49.1% | 45.4% |
| Funds from operations/ total obligations | 20.3% | 22.1% |



SP 020873

25

# Enron Nighthawk
# Rationale

- Lowest cost of the equity hybrids
  - Pre-tax all-in spread 0.75% to 1.50% lower than public market alternatives
- Longer tenor than DECs/PERCS
  - 5 year v. 3 year public market alternatives
- Ability to maintain price exposure in Enron common stock
  - No desire to pay for downside protection provided by other structures
  - Bullish long-term stock view consistent with earnings expectations
- Capture $290 million anticipated appreciation in share price
  - 25% fewer shares are issued in five years
  - Permanent EPS enhancement v. issuing today



SP020873

SP 020874

26

# Enron Nighthawk
## Rationale

- Flexibility to issue in line with 3-5 year time lag in growth payoff
    - Available to offset any credit harming effects of delayed payoffs
- Superior equity content-closest instrument to issuing common equity
    - Strong alternative to debt finance
    - Incremental downgrade protection
- Our business success is dependent on our:
    - Maintaining a credit profile consistent with market-making activities
    - Strong access to capital at a reasonable price without restrictive covenants



SP020874

REDACTED

Project Nighthawk



# Enron Corp.

# Rating Agency Presentation

New York City

October 31, 1997

**CONFIDENTIAL**
MDY 001171

## Enron Nighthawk
## Participants

**Enron**

| William D. Gathmann | Vice President Finance and Treasurer | (713) 853-5296 |
| David P. Chang | Director, Corporate Finance | (713) 853-9619 |
| Phillip M. Sisneros | Director, Corporate Finance | (713) 853-7482 |

**Citicorp**

| Elliott S. Conway | Managing Director, Capital Structuring | (212) 559-4445 |
| Bran A. Raskovic | Vice President, Structured Securitization | (212) 559-0607 |

*Confidential*

2

**CONFIDENTIAL**
**MDY 001172**

## Enron Nighthawk Agenda

- Funding Needs and Objectives
- Basic Structure
- Common Equity Attributes
- Derivative
- Junior Convertible Preferred Stock
- Key Terms
- Termination / Liquidation
- GAAP and Pro-Forma Impact
- Rationale

*Confidential*

3



**CONFIDENTIAL**
**MDY 001173**

## Enron Nighthawk
### Funding Need and Objectives

**Funding Need**

- High quality investment opportunities create a need for additional equity capital to enhance (support) our credit profile
  - Improve ratings, subject to opportunities and future impact of international, retail and other ventures
  - 3-5 year lag before business and growth opportunities play out

**Funding Objective**

- $500 million contingent common shares issuance
  - Capture anticipated future share price appreciation
  - $290 million benefit over 5 years @ 9.6% historic share price growth rate
  - With such appreciation, 25% fewer shares will be issued
    - *Significant EPS and share appreciation impact*
- Low cost, tax-deductible dividends
- Flexibility--potential to issue early if needed without breakage costs

*Confidential*

4



**CONFIDENTIAL**
**MDY 001174**

# Enron Nighthawk
## Basic Structure



REDACTED

Enron

**Investor**

$500 million cash

$1 billion of Enron shares

$500 million cash

**Joint Venture**

$500 million to pay down debt

- Enron and third party investor create a 50/50 Joint Venture
  - Controlled by Enron
- Joint Venture Assets
  - $1 billion Enron Junior Convertible Preferred Stock
- $500 million net proceeds to pay down debt

*Confidential*



5

**CONFIDENTIAL**
**MDY 001175**

## Enron Nighthawk
## Common Equity Attributes

- Enron receives $500 million up-front with no repayment/redemption obligation

- No default triggers or acceleration events which impact Enron debt

- Failure to declare and pay dividends results in share issuance

- Although shares are initially convertible preferreds, Enron retains the right to convert to common at any time--irrespective of creditworthiness

- In bankruptcy, claims rank with common stock

- Related derivative is "share settled"

- GAAP Impact

  – $500 million incremental Minority Interest equity

  – $30 million incremental Stockholder's Equity (put option premium)

  – Distributions are Payments to Minority Interest

  – No additional common shares outstanding

*Confidential*



6

CONFIDENTIAL
MDY 001176

# Enron Nighthawk Derivative



**Underperformance Put Option**

- Citibank pays Enron $30 million for the option
  - Strike price is 50% of the Enron stock price at the start of the transaction
    - Historically, Enron has never hit the 50% trigger on a daily rolling five year basis (data available back to 1981)
  - Settled by delivering additional Enron common shares
    - Any Enron obligation to deliver shares is contingent on Enron's share price (a) falling below 50% of today's price _and_ (b) underperforming the S&P 500
- In bankruptcy, claims under the put option rank no senior than common stock

*Confidential*



7

**CONFIDENTIAL
MDY 001177**

8

## Enron Nighthawk
## Junior Convertible Preferred Stock

- **$1 billion par value**
  - Convertible into 25 million Enron common shares
  - Dividend rate adjusts with commercial paper index
  - Sufficient to distribute adequate return to Investor
  - Fixed rate equivalent cost is roughly 5.0% after-tax

- **Structure gives Enron the unrestricted right to convert shares as Joint Venture Manager**

*Confidential*



**CONFIDENTIAL**
**MDY 001178**

## Enron Nighthawk
## Key Terms

- Five year term, unless Enron terminates
  - Any time without penalty
- Redeem Investor from proceeds of issuing common stock at the prevailing market price
- Termination Event results in Joint Venture liquidation and mandatory conversion and issuance of common shares
  - Enron stock price declines by 50%
  - Bankruptcy
  - Enron default on $50 million of debt
  - Non-investment grade rating by Moody's and S&P

9

*Confidential*



**CONFIDENTIAL**
**MDY 001179**

## Enron Nighthawk
### Termination / Liquidation

- Enron has the option to prevent conversion and mandatory issuance of underlying common shares
  - DECs-like option to repay with cash
- Enron's decision to issue the shares will be a function of our rating at the time of liquidation
- Our business success is dependent on our:
  - Maintaining a credit profile consistent with market-making activities
  - Strong access to capital at a reasonable price without restrictive covenants

10

*Confidential*



**CONFIDENTIAL**
**MDY 001180**

# Enron Nighthawk
## GAAP and Pro-Forma Impact

### GAAP

- $500 million Minority Interest increase with offsetting reduction in debt
- $30 million Stockholders' Equity increase
- Investor distributions are Payments to Minority Interest
- Shares issued to Joint Venture will increase Shareholders' Equity with an identical offset for Treasury Shares resulting in no additional shares outstanding for EPS purposes

| Pro-Forma Ratio Impact | 6/30/97 | Pro-forma |
|---|---|---|
| Funds flow interest coverage | 3.46x | 3.62x |
| Pre-tax interest coverage | 2.22x | 2.33x |
| Total obligations/ total capital | 49.1% | 45.4% |
| Funds from operations/ total obligations | 20.3% | 22.1% |

*Confidential*



11

## Enron Nighthawk
### Rationale

- **Lowest cost of the equity hybrids**
  - Pre-tax all-in spread 0.75% to 1.50% lower than public market alternatives
- **Longer tenor than DECs/PERCS**
  - 5 year v. 3 year public market alternatives
- **Ability to maintain price exposure in Enron common stock**
  - No desire to pay for downside protection provided by other structures
  - Bullish long-term stock view consistent with earnings expectations
- **Capture anticipated appreciation in share price**
  - Significantly fewer shares are issued in five years
  - Permanent EPS enhancement v. issuing today
- **Flexibility to issue in line with 3-5 year time lag in growth payoff**
- **Superior equity content-closest instrument to issuing common equity**

*Confidential*

12



**CONFIDENTIAL**
**MDY 001182**

# Exhibit 23

# Presentation to Moody's
# Project Condor

August 19, 1999

Strictly private & confidential

CONFIDENTIAL
MDY 003904

Introduction

Section I

# Objectives for meeting

**Enron's objectives for today's meeting include the following:**

- Discuss Enron's rationale for creating Osprey Trust ("Osprey").

- Provide an overview of a proposed funding joint venture that is designed to:
  - repay and replace the existing Nighthawk financing ("Nighthawk")
  - form a joint venture between a wholly-owned subsidiary of Enron and a third party investor, Osprey
  - fund an investment by Osprey in the joint venture through the issuance by Osprey of $1.4 billion of senior notes (the "Osprey Notes") and $100 million of certificates (the "Certificates")

- Request a rating for the Osprey Notes.

CONFIDENTIAL
MDY 003909

# Exhibit 24

H. Christopher Mott
KRAFSUR GORDON MOTT P.C.
4695 N. Mesa St.
El Paso, Texas  79912
Tel: (915) 545-1133
Fax: (915) 545-4433

Mitchell I. Sonkin
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York  10036-4003
Tel: (212) 556-2100
Fax: (212) 556-2222

Sarah R. Borders
KING & SPALDING LLP
191 Peachtree Street
Atlanta, Georgia  30303-1763
Tel: (404) 572-4600
Fax: (404) 572-5149

Attorneys for Debtor and Debtor-in-Possession

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| LJM2 CO-INVESTMENT, L.P., | § | Case No. 02-38335-SAF |
| | § | |
| Debtor. | § | |

DISCLOSURE STATEMENT TO ACCOMPANY
PLAN OF REORGANIZATION FILED BY
LJM2 CO-INVESTMENT, L.P.

February 21, 2003

THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE
PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS
DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY
COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL
BUT HAS NOT YET BEEN APPROVED BY THE COURT.

17, 2001, LJM2 made an additional borrowing under the Credit Facility of $3,500,000. The proceeds of this borrowing were advanced to Capital Management to pay certain purported tax liabilities of Capital Management, which were incurred in its role as the Debtor's former general partner.

The Debtor made voluntary repayments to the Bank Group Creditors of $2,750,000 on September 17, 2001 and $10,000,000 on October 17, 2001, reducing the outstanding principal under the Credit Facility to $70,000,000. The Debtor made monthly interest payments totaling $5,272,000 from December 2000, through and including December 2001 to the Bank Group Creditors. The Debtor paid fees to the Bank Group Creditors of $1,155,000 in November 2000, $38,000 in April 2001 and $35,000 in October of 2001, totaling $1,228,000. No payments were made to the Bank Group Creditors by the Debtor after January 1, 2002. According to the Proof of Claim filed by the Bank Group Creditors, the Bank Group Creditors contend that as of the Petition Date, $75,395,158 was owed by the Debtor under the Credit Facility, which consists of $70,000,000 in principal, $4,022,294 in accrued and unpaid interest, and $1,372,864 in other fees and costs.

### C.  Capital Contributions and Distributions to Limited Partners

The following reflects historical cash contributions of the Limited Partners to the Debtor and cash distributions to the Limited Partners from the Debtor. As reflected below, the Limited Partners contributed to the Debtor approximately $30,000,000 more than the amount of distributions received by such Limited Partners from the Debtor.

| Date | Cash Contributed by Limited Partners | Cash Distributed to Limited Partners | Cumulative Cash Invested by Limited Partners |
|---|---|---|---|
| 12/22/99 | $16,050,000 | | $16,050,000 |
| 3/31/00 | 8,581,433 | | 24,631,433 |
| 4/5/00 | | 7,226,677 | 17,404,755 |
| 5/8/00 | 8,672,663 | | 26,077,419 |
| 5/12/00 | | 7,049,816 | 19,027,603 |
| 6/26 & 6/29/00 | 165,400,940 | | 184,428,543 |
| 9/19/00 | 37,620,038 | | 222,048,581 |
| 10/11/00 | 21,285,021 | | 243,333,602 |
| 10/31/00 | | 97,376,617 | 145,956,985 |
| 2/28/01 | | 42,737,183 | 103,219,802 |
| 3/28/01 | | 30,947,614 | 72,272,188 |
| 6/28/01 | | 42,141,067 | 30,130,121 |
| | $257,610,095 | $227,478,974 | $30,130,121 |

The Debtor's books and records also reflect that Capital Management (as the Debtor's former general partner) (i) made contributions and received distributions in respect of its interests in the Debtor, (ii) contributed and received cash for

# EXHIBIT L
# FILED CLAIMS SCHEDULE

**LJM2 Co-Investment, L.P.**
Filed Proof of Claims

| Claim # | Creditor | Amount | Description |
|---|---|---|---|
| 1 | Dresdner Bank AG | $ 75,395,158.83 | As Agent for Dresdner Bank AG, New York and Grand Cayman Branches; Credit Suisse First Boston Global Impaired Asset Management; National Westminster Bank, Plc. n/k/a The Royal Bank of Scotland; First Union National Bank n/k/a Wachovia Bank, National Association; Merrill Lynch Capital Corporation, and Royal Bank of Canada. Provides credit agreement as support. |
| 2 | Merrill Lynch, Pierce, Fenner & Smith Inc. | $ 1,827,000.00 | As Placement Agent. Also claims undetermined amount of interest, fees and expenses. |
| 3 | Kathy M. Lynn | Unliquidated | Claim is for indemnity. |
| 4 | Enron Corporation | Unliquidated | Claim is also on behalf of Enron North America, Porcupine I LLC, Fishtail LLC and Annapurna LLC. |
| 5 | Merrill Lynch Capital Corporation | $ 5,948,251.00 | Claim is for $5,833,333 in principal and $114,918 of interest, and appears duplicative of Claim #1 by Agent for Bank Group Creditors. |
| 6 | Investors Partner Life Insurance Co. (c/o John Hancock Life Insurance Co.) | Unliquidated | Claim appears Enron related; cites investments in Osprey, Brazilian Power Development LLC, European Power Equity Trust, Marlin Water Trust I, Marlin Water Trust II, Enron Equity Corp., DPC Ponderosa LLC, Enron Teeside Operating Ltd. and Spokane Energy Funding Trust. |
| 7 | Investors Partner Life Insurance Co. (c/o John Hancock Life Insurance Co.) - Duplicate of #6 | Unliquidated | Claim appears to be a duplicate of Claim #6. |
| 8 | John Hancock Variable Life Insurance Co. (c/o John Hancock Life Insurance Co.) | Unliquidated | Claim appears Enron related; cites investments in Osprey, Brazilian Power Development LLC, European Power Equity Trust, Marlin Water Trust I, Marlin Water Trust II, Enron Equity Corp., DPC Ponderosa LLC, Enron Teeside Operating Ltd. and Spokane Energy Funding Trust. |
| 9 | John Hancock Variable Life Insurance Co. (c/o John Hancock Life Insurance Co.) - Duplicate of #8 | Unliquidated | Claim appears to be a duplicate of Claim #8. |
| 10 | John Hancock Life Insurance Co. | Unliquidated | Claim appears Enron related; cites investments in Osprey, Brazilian Power Development LLC, European Power Equity Trust, Marlin Water Trust I, Marlin Water Trust II, Enron Equity Corp., DPC Ponderosa LLC, Enron Teeside Operating Ltd. and Spokane Energy Funding Trust. |

**LJM2 Co-Investment, L.P.**
Filed Proof of Claims

| Claim # | Creditor | Amount | Description |
|---|---|---|---|
| 11 | John Hancock Life Insurance Co. - Duplicate of #10 | Unliquidated | Claim appears to be a duplicate of Claim #10. |
| 12 | Mellon Bank, N.A. as trustee for Bell Atlantic Master Trust (c/o John Hancock Life Insurance Co.) | Unliquidated | Claim appears Enron related; cites investments in Osprey, Brazilian Power Development LLC, European Power Equity Trust, Marlin Water Trust I, Marlin Water Trust II, Enron Equity Corp., DPC Ponderosa LLC, Enron Teeside Operating Ltd. and Spokane Energy Funding Trust. |
| 13 | Mellon Bank, N.A. as trustee for Bell Atlantic Master Trust (c/o John Hancock Life Insurance Co.) - Duplicate of #12 | Unliquidated | Claim appears to be a duplicate of Claim #12. |
| 14 | Mellon Bank, N.A. as trustee for Long-term Investment Trust (c/o John Hancock Life Insurance Co.) | Unliquidated | Claim appears Enron related; cites investments in Osprey, Brazilian Power Development LLC, European Power Equity Trust, Marlin Water Trust I, Marlin Water Trust II, Enron Equity Corp., DPC Ponderosa LLC, Enron Teeside Operating Ltd. and Spokane Energy Funding Trust. |
| 15 | Mellon Bank, N.A. as trustee for Long-term Investment Trust (c/o John Hancock Life Insurance Co.) - Duplicate of #14 | Unliquidated | Claim appears to be a duplicate of Claim #14. |
| 16 | Signature 1A (Cayman) Ltd. (c/o John Hancock Life Insurance Co.) | Unliquidated | Claim appears Enron related; cites investments in Osprey, Brazilian Power Development LLC, European Power Equity Trust, Marlin Water Trust I, Marlin Water Trust II, Enron Equity Corp., DPC Ponderosa LLC, Enron Teeside Operating Ltd. and Spokane Energy Funding Trust. |
| 17 | Signature 1A (Cayman) Ltd. (c/o John Hancock Life Insurance Co.) - Duplicate of #16 | Unliquidated | Claim appears to be a duplicate of Claim #16. |
| 18 | Signature 5 L.P. (c/o John Hancock Life Insurance Co.) | Unliquidated | Claim appears Enron related; cites investments in Osprey, Brazilian Power Development LLC, European Power Equity Trust, Marlin Water Trust I, Marlin Water Trust II, Enron Equity Corp., DPC Ponderosa LLC, Enron Teeside Operating Ltd. and Spokane Energy Funding Trust. |
| 19 | Signature 5 L.P. (c/o John Hancock Life Insurance Co.) - Duplicate of #18 | Unliquidated | Claim appears to be a duplicate of Claim #18. |
| 20 | The Bank of New York as indenture trustee for Yosemite Securities Trust I Notes | Unliquidated | Claim refers to summary of Osprey related agreements (Whitewing, Condor, etc.) as support. |
| 21 | The Bank of New York as indenture trustee for Osprey Notes | Unliquidated | Claim refers to summary of Osprey related agreements (Whitewing, Condor, etc.) as support. |
| 22 | Osprey Trust (c/o Wilmington Trust Co.) | Unliquidated | Claim refers to summary of Osprey related agreements (Whitewing, Condor, etc.) as support. |

**LJM2 Co-Investment, L.P.**
Filed Proof of Claims

| Claim # | Creditor | Amount | Description |
|---|---|---|---|
| 23 | LJM2 Capital Management L.P. | $    3,177,557.01 | Claim refers to: capital contribution $824,193.57, expenses while General Partner $445,674.44, unpaid placement agent fees $1,827,000.00 and unpaid tax distributions $80,689.00; also attaches litigation related documents. |
| 24 | Claimants in the Newby Class Action Pending in Houston before Judge Melinda Harmon * | Unliquidated | Claim refers to Newby class action litigation. |

* Late filed claim.

## THE DEBTOR DISPUTES ALL CLAIMS, EXCEPT FOR THE BANK GROUP CLAIM THAT WILL BE ALLOWED UPON CONFIRMATION OF AND PURSUANT TO THE PLAN.

# Exhibit 25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re ENRON CORPORATION SECURITIES LITIGATION | § § § | Civil Action No. H-01-3624 **(Consolidated)** |
| | § | CLASS ACTION |
| This Document Relates To: | § § | |
| MARK NEWBY, et al., Individually and On Behalf of All Others Similarly Situated, | § § § | |
| Plaintiffs, | § § | |
| vs. | § § | |
| ENRON CORP., et al., | § § | |
| Defendants. | § § | |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al., Individually and On Behalf of All Others Similarly Situated, | § § § § | |
| Plaintiffs, | § § | |
| vs. | § § | |
| KENNETH L. LAY, et al., | § § | |
| Defendants. | § § | |

**LEAD PLAINTIFF'S RESPONSES TO DEUTSCHE BANK'S FIRST SET OF
REQUESTS FOR ADMISSION**

knowledge Enron was forced into bankruptcy in December 2001 and never restated its financial statements on account of any of the Deutsche Bank tax transactions.

REQUEST FOR ADMISSION NO. 89:

Enron has never restated its financial statements on account of the Tomas Transaction.

RESPONSE TO REQUEST FOR ADMISSION NO. 89:

Lead Plaintiff incorporates its General Objections in response to this Request for admission. Lead Plaintiff further objects that Enron's actual tax and accounting treatment of the Deutsche Bank tax transactions will be the subject of expert testimony, which has not yet begun.  Subject to the foregoing General Objections and specific objections, Lead Plaintiff states that to the best of its knowledge Enron was forced into bankruptcy in December 2001 and never restated its financial statements on account of any of the Deutsche Bank tax transactions.

REQUEST FOR ADMISSION NO. 90:

No director or officer at Deutsche Bank personally invested money in the LJM partnership.

RESPONSE TO REQUEST FOR ADMISSION NO. 90:

Lead Plaintiff incorporates its General Objections in response to this Request for admission. Lead Plaintiff further objects to the term "personally invest" as vague and ambiguous.  Subject to the foregoing General Objections and specific objections, Lead Plaintiff states that to the best of its knowledge no director or officer personally invested money in the LJM partnership.

REQUEST FOR ADMISSION NO. 91:

Paul Cambridge did not personally invest money in the LJM Partnership.

RESPONSE TO REQUEST FOR ADMISSION NO. 91:

Lead Plaintiff incorporates its General Objections in response to this Request for admission. Lead Plaintiff further objects to the term "personally invest" as vague and ambiguous.  Subject to the

# Exhibit 26

EXECUTION COPY

# LJM2 CO-INVESTMENT, L.P.

## THIRD AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT

April 5, 2000

I:\Corporate\LJM2\Fund\Agmts\3rdAmReLPA.EXE.wpd

EVE 05045

Confidential Treatment Requested By Wilmer, Cutler & Pickering                    E 151122

Partnership may incur indebtedness for borrowed money, and, subject to Section 1.4, may provide guaranties in connection with a borrowing by, or other transaction involving, a Portfolio Company, any parent company that directly or indirectly wholly owns such Portfolio Company, or any of such Portfolio Company's direct or indirect wholly owned subsidiaries. The Partnership and the General Partner, on its own behalf and on behalf of the Partnership, may enter into and perform their obligations under the Subscription Agreements and Other Agreements with any Limited Partner or prospective Limited Partner without any further act, vote or approval of any Partner or any other Person notwithstanding any other provision of this Agreement.

1.4     *Investment Limitations.*  The Partnership shall not: (a) invest or commit to invest (whether in the form of an Investment, a Partnership guaranty, or a commitment to provide either of the foregoing), in any single Portfolio Company more than the greater of (i) $20 million, and (ii) 10% of the aggregate Commitments of the Partners; *provided, first,* that if the aggregate Commitments of the Partners equal or exceed $150 million, then the Partnership may, with the consent of the Advisory Committee, invest or commit to invest an amount not to exceed the greater of (A) $40 million, and (B) 20% of the aggregate Commitments of the Partners in a single Portfolio Company (it being understood that the Partnership may rely on this proviso only twice during the term of the Partnership); *provided, second,* that if the aggregate Commitments of the Partners equal or exceed $150 million, then the Partnership may, with the consent of the Majority Limited Partners, invest or commit to invest an amount not to exceed the greater of (A) $40 million, and (B) 20% of the aggregate Commitments of the Partners in a single Portfolio Company; and *provided, third*, that the foregoing limitations shall not apply to the Initial Investments; (b) acquire shares of any class of publicly traded securities of a Person if such Investment is actively opposed by such Person's board of directors or other governing body at the time of such proposed Investment; or (c) make an Investment in any Portfolio Company (i) that is organized in a Foreign Jurisdiction unless the General Partner reasonably determines (based upon advice of local counsel) that at the time such Investment is made, the courts of such Foreign Jurisdiction would respect the limited liability of Limited Partners to the same extent as would a United States court applying Delaware law, or (ii) that is either organized in a Foreign Jurisdiction or is organized as a "flow through" entity for U.S. federal income tax purposes and is engaged in a trade or business in a Foreign Jurisdiction unless the General Partner reasonably determines (based upon advice of local counsel or its tax advisors) that the making of such Investment would not, of itself, cause a Limited Partner to be required to file a tax return in such Foreign Jurisdiction or cause a Limited Partner to become subject to income taxation in such Foreign Jurisdiction on a net basis. For purposes of this Section 1.4, the term "Portfolio Company" shall include any Person (other than the Partnership) that wholly owns such Portfolio Company, either directly or through one or more intermediate wholly owned Persons, and any Person that is wholly owned by such Portfolio Company, either directly or through one or more intermediate wholly owned Persons, and shall include the amount of any Partnership guaranty only to the extent such guaranty remains outstanding.

1.5     *Place of Business.*  The Partnership shall maintain an office and principal place of business at 333 Clay Street, Suite 1203, Houston, Texas 77002, or at such other place or places within the United States of America as the General Partner may from time to time designate.

1.6     *Registered Office.*  The address of the registered office of the Partnership in the State of Delaware is c/o Corporation Service Company, 1013 Centre Road, Wilmington, Delaware  New Castle County, 19805.

1.7     *Registered Agent.*  The Partnership's registered agent for service of process on the Partnership in the State of Delaware is Corporation Service Company, 1013 Centre Road, Wilmington, New Castle County, Delaware  19805.

I:\Corporate\LJM2\Fund\Agmts\3rdAmReLPA.EXE.wpd                    - 2 -

EVE 05050

ARTICLE III
CAPITAL CONTRIBUTIONS;
CAPITAL ACCOUNTS; MEMORANDUM ACCOUNTS

3.1    *Capital Contributions*. (a) Each Limited Partner admitted to the Partnership on the Initial Closing Date shall make an initial Capital Contribution equal to fifteen percent (15%) of such Limited Partner's Commitment, and the General Partner shall make a Capital Contribution equal to fifteen percent (15%) of the General Partner Minimum Commitment on December 22, 1999; the entire amount of such Capital Contributions will be utilized as Investment Contributions and the General Partner shall be deemed to have elected pursuant to Section 3.1(b) to have reduced to zero the amount of the Capital Contribution that the General Partner otherwise would have been required to make in respect of the General Partner Additional Commitment (including the portion of the Waiver Contribution that it otherwise would have been required to fund in respect of the General Partner Additional Commitment), such Waiver Contribution to be deemed to be funded by the Partners ratably in accordance with their Commitments (the General Partner Minimum Commitment, in the case of the General Partner). Thereafter, each Partner shall, except as otherwise expressly provided herein, make Capital Contributions to the Partnership at such times as the General Partner shall specify in written notices (each, a "*Drawdown Notice*") delivered from time to time not less than ten (10) Business Days prior to the date for any funding specified in the applicable Drawdown Notice (the "*Drawdown Date*"). Each Drawdown Notice shall specify (i) the amount being drawn (the "*Drawdown Amount*") and the amount of such Partner's Capital Contribution in respect thereof (which, except as otherwise expressly provided herein, shall be a ratable share of the Drawdown Amount, based on the respective Commitments of the Partners), (ii) the Drawdown Date, (iii) the purpose of Capital Contribution and, subject to Section 11.5, a brief description of the Investment, if applicable and (iv) the account of the Partnership to which such Capital Contribution is to be paid on the Drawdown Date, together with wire transfer instructions. Subject to Section 3.1(c) and 6.6(b), no Partner shall be obligated to make aggregate Capital Contributions pursuant to this Section 3.1 in excess of such Partner's Commitment. The Partnership may invest Capital Contributions in Short-Term Investments pending use. All Capital Contributions shall be paid to the Partnership by means of a wire transfer in immediately available funds in U.S. Dollars by 12:00 noon (New York City time) on the specified Drawdown Date.

(b)    Notwithstanding Section 3.1(a), at such time as the General Partner delivers any Drawdown Notice for an Investment Contribution, the General Partner's required Capital Contribution in respect thereof attributable to the General Partner Additional Commitment, at the election of the General Partner, shall be reduced by an amount equal to the lesser of (i) the amount of the Capital Contribution otherwise required to be made by the General Partner pursuant to Section 3.1(a) attributable to the General Partner Additional Commitment, and (ii) the Unapplied Waived Fee Amount, and such amount shall instead be funded by the Partners *pro rata* according to their respective Commitments (for any Partner, a "*Waiver Contribution*"); *provided* that the provisions of this Section 3.1(b) may at the General Partner's election also be applied to reduce its share (in respect of its General Partner Additional Commitment) of any such Waiver Contribution, to zero.

(c)    The General Partner may cause the Partnership to return to the Partners all or any portion of any Capital Contribution (whether made to the Partnership or to a trust account or escrow fund as provided in Section 3.1(e)) not invested in a Portfolio Company, not used to pay, nor provide for payment of, Partnership Expenses or Organizational Expenses and not otherwise deployed for Partnership purposes. Such Capital Contributions shall be returned to the Partners ratably in the same proportion as the Partners made such Capital Contributions. All amounts distributed to the Partners (i) constituting Capital Contributions returned pursuant to this Section 3.1(c), (ii) constituting Capital Contributions returned pursuant to Section 7.6

EVE 05062

Confidential Treatment Requested By Wilmer, Cutler & Pickering                E 151139

upon the admittance of a new Limited Partner, or (iii) prior to the expiration of the Commitment Period, constituting Investment Proceeds for any Investment (not to exceed the amount of the original Capital Contribution for the Investment from which such Investment Proceeds were realized) previously distributed pursuant to Section 4.3, may, in each case, be called again by the General Partner according to the provisions of this Section 3.1 as if such returned amounts had not been called previously; *provided* that in the case of clause (iii) above, such Investment Proceeds were distributed by the Partnership within eighteen (18) months after the Investment giving rise to such Investment Proceeds was made by the Partnership.

(d)    Notwithstanding the provisions of Section 3.1(a), each Partner's obligation to fund its Commitment will expire upon the termination of the Commitment Period; *provided* that the Partners shall remain obligated to make cash contribution throughout the term of the Partnership pursuant to their respective Commitments to the extent necessary (i) to fund commitments of the Partnership to make Investments (or to satisfy Partnership guarantees) outstanding at the end of the Commitment Period, (ii) except in the case where the General Partner has been removed pursuant to Section 6.2(b), to make Follow-on Investments (not to exceed, for all Follow-on Investments made after the Commitment Period, ten percent (10%) of the Partnership's Commitments), or (iii) to pay or provide for payment of Partnership Expenses, including Partnership funded indebtedness.

(e)    Notwithstanding Section 3.1(a) above, if at least twenty-five percent (25%) of the aggregate Commitments of all Limited Partners (excluding any Limited Partners that are Affiliates of the General Partner) are made by Limited Partners that are "benefit plan investors" as defined in the Plan Asset Regulations, no Capital Contribution shall be made to the Partnership until the Partnership makes an investment which qualifies the Partnership as a VCOC under the Plan Asset Regulations. Prior to such time, (i) Partnership Expenses, including Partnership funded indebtedness, shall be paid as provided in Section 5.5 and (ii) any Capital Contributions required by any Drawdown Notice to permit the Partnership to make an Investment in a Portfolio Company shall be contributed to one or more directed trust accounts or escrow funds established by the General Partner (and upon the release of such Capital Contributions to consummate an Investment in a Portfolio Company, all Short-Term Investment Income earned thereon shall be returned to the Partners ratably in accordance with their respective Commitments). The obligation of an ERISA Partner to make its initial Capital Contribution to the Partnership shall be conditioned on receipt by such ERISA Partner of a Certificate of the General Partner regarding ERISA matters in substantially in the form attached as *Exhibit A* hereto, which shall be dated as of the date on which the Partnership makes its first long-term investment.

(f)    The provisions of this Agreement (including this Article III) are intended solely to benefit the Partners and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any creditor of the Partnership (and no such creditor shall be a third party beneficiary of this Agreement), and no Limited Partner shall have any duty or obligation to any creditor of the Partnership to make any Capital Contributions or to cause the General Partner to make a call for Capital Contributions.

3.2    *Creation and Maintenance of Capital Accounts.*  The Partnership shall maintain a separate capital account for each Partner (each, a "*Capital Account*") according to the rules of U.S. Department of Treasury Regulation Section 1.704-1(b)(2)(iv). For this purpose, the Partnership may, upon the occurrence of any of the events specified in U.S. Department of Treasury Regulation Section 1.704-1(b)(2)(iv)(f), increase or decrease the Capital Accounts in accordance with the rules of such regulation and U.S. Department of Treasury Regulation Section 1.704-1(b)(2)(iv)(g) to reflect a revaluation of Partnership property.

EVE 05063

of the Code or section 406 of ERISA or violate state law or regulation applicable to a governmental benefit plan. The Partners shall be required to make capital contributions directly to each such Investment or vehicle, as the case may be, to the same extent, for the same purposes and on the same terms and conditions as Partners are required to make Capital Contributions to the Partnership, and such capital contributions shall be deemed to reduce the unfunded Commitment of each Partner to the same extent that it would be reduced if made to the Partnership. The provisions and economic terms of such Investment or vehicle, as the case may be, shall be substantially identical in all material respects to those of the Partnership. Except to the extent otherwise necessary for tax or regulatory reasons, the gains and losses of any such alternative investment vehicle shall be treated as having been realized by the Partnership for all economic calculations under this Agreement (including the General Partner's obligations under Section 9.2(c)); *provided*, that the Partnership may only cause the Partners to invest through an alternative investment vehicle that does not provide that the gains and losses of any such alternative investment vehicle shall be treated as having been realized by the Partnership for all economic calculations under this Agreement (including the General Partner's obligations under Section 9.2(c)), if the General Partner has obtained the consent of the Advisory Committee thereto. The General Partner's obligations pursuant to Section 6.8 shall apply with respect to such vehicle (or the entity in which such vehicle invests) shall provide for the limited liability of the Limited Partners as a matter of the organizational documents of such vehicle (or the entity in which such vehicle invests) and as a matter of local law.

ARTICLE VII
LIMITED PARTNERS

7.1     *Limited Liability*. The Limited Partners shall not be personally liable for any obligations of the Partnership and shall have no obligation to make contributions to the Partnership in excess of their respective Commitments, except to the extent required by this Section 7.1, Section 3.1, 6.6(b), 7.3, 7.6, 7.7, 7.8, or 7.9 or the Delaware Partnership Act; *provided* that a Limited Partner shall be required to return any distribution wrongfully made to it. To the extent that any Limited Partner is required by the Delaware Partnership Act to return to the Partnership any distributions made to such Limited Partner and does so, such Limited Partner shall have a right of contribution from each other Limited Partner similarly liable to return distributions made to it to the extent that such Limited Partner has returned a greater percentage of the total distributions made to it than the percentage of the total distributions made to such other Limited Partner.

7.2     *No Participation in Management*. The Limited Partners shall not participate in the control of the business of the Partnership as contemplated by the Delaware Partnership Act, nor shall the Limited Partners participate in the management, direction or operation of the affairs of the Partnership. The Limited Partners shall have no power to bind the Partnership.

7.3     *Transfers of Limited Partner Interests*. (a) Except as otherwise provided in Section 7.7, in no event shall all or any part of a Limited Partner's interest in the Partnership be Transferred without the consent of the General Partner, which consent may be withheld in its sole and absolute discretion. Unless otherwise waived by the General Partner, the following conditions shall be satisfied in connection with any such Transfer: (i) the transferor has delivered to the General Partner an Opinion of Limited Partner's Counsel reasonably acceptable to the General Partner that such Transfer would not violate the Securities Act, or any blue sky laws (including any investor suitability standards); (ii) the transferor has demonstrated to the reasonable satisfaction of the General Partner that such Transfer is being made to a Person that is a "qualified purchaser" within the meaning of sections 2(a)(51) and 3(c)(7) of the Company Act and the regulations

EVE 05075

Confidential Treatment Requested By Wilmer, Cutler & Pickering                                                      E 151152

Partner stating that, as a result of a change in law or regulation applicable to such BHC Partner, such BHC Partner is no longer prohibited from acquiring or controlling more than 4.99% (or such greater percentage as BHC Partners may be permitted to hold under the BHCA or other applicable statute or regulation) of the voting Interests held by the Partnership.

7.13     *Activities of Limited Partners.*  Neither the participation of a Person as a Limited Partner in the Partnership nor the participation of such Person's designee as a member of the Advisory Committee shall in any way restrict (or be deemed to restrict) the activities of, or, except as required by law, impute any fiduciary responsibility to, such Person or any Affiliates thereof, including the ability to directly or indirectly compete with the Partnership or pursue business opportunities suitable for the Partnership without offering such to the Partnership.

## ARTICLE VIII
## ADVISORY COMMITTEE

8.1     *Advisory Committee.*  For the benefit of the Partnership, an Advisory Committee (the "*Advisory Committee*") of not less than three and not more than nine individuals shall be annually appointed by the General Partner for a one-year term; *provided* that representatives of the Limited Partners or of their advisors shall at all times constitute the members of the Advisory Committee and no Advisory Committee member may be an LJM Related Person, officer, director or employee of Enron or its Subsidiaries. The Advisory Committee shall perform the duties contemplated by this Agreement, shall periodically review the valuations of the Partnership's assets made by the General Partner, and shall provide such other advice and counsel as the General Partner requests in connection with Partnership investments, potential conflicts of interest and other Partnership matters; *provided* that the General Partner shall retain ultimate responsibility for investment strategy and for making all decisions relating to the operation and management of the Partnership, including making all investment decisions. The General Partner (a) shall provide promptly to the members of the Advisory Committee information relating to any transaction between the Partnership and Enron or any of its subsidiaries (including, without limitation, information as to the nature of such transaction and the amount of consideration, fees or other payments made by the Partnership, directly or indirectly, to Enron or such subsidiary in connection with such transaction), and (b) shall provide the members of the Advisory Committee with information relating to an Investment at least ten (10) days prior to the consummation of such Investment by the Partnership; *provided*, that the General Partner's obligation under clause (b) shall be deemed to have been satisfied with respect to the Initial Investments. The Partnership shall reimburse each member of the Advisory Committee for his or her reasonable out-of-pocket expenses incurred in connection with the proceedings of the Advisory Committee. All meetings of the Advisory Committee shall be held on such date(s), at such place(s) and at such time(s) as shall have been established by the General Partner or, with five (5) days' advance notice to the General Partner, by a majority of the members of the Advisory Committee. Notice of all meetings shall be given or mailed to each member not less than five (5) days before the date of such meeting. Notice of any meeting may be waived in writing, either before or after the meeting, and shall be deemed to be waived by any member in attendance. Members of the Advisory Committee may vote and participate in meetings in person, by proxy or delegate, or by means of conference telephone or similar communications equipment. The Advisory Committee may adopt such by-laws for the conduct of their meetings as they may deem proper; *provided* that such by-laws may not be inconsistent with this Agreement. Unless otherwise provided in this Agreement, all matters to come before the Advisory Committee shall be determined by a majority vote. Action may be taken by the Advisory Committee by written consent based upon the same vote that would be required to authorize such action at

EVE 05085

Confidential Treatment Requested By Wilmer, Cutler & Pickering                    E 151162

a meeting of the Advisory Committee. Notwithstanding anything to the contrary contained herein, (i) no member of the Advisory Committee shall, except as required by law, owe any fiduciary duty to the Partnership or to any Partner in connection with such member's discharge of his or her responsibilities as a member of the Advisory Committee, (ii) neither the Advisory Committee nor any member thereof shall have the power to bind or act for or on behalf of the Partnership in any manner and (iii) in no event shall a member of the Advisory Committee be considered a general partner of the Partnership by agreement, estoppel, or otherwise or be deemed to participate in the management or control of the business of the Partnership as a result of the performance of his duties hereunder or otherwise, nor shall any Partner be deemed to participate in the management or control of the business of the Partnership as a result of appointing an individual to act as its representative on the Advisory Committee or as a result of such representative's performance of its duties hereunder.

## ARTICLE IX
## DURATION AND TERMINATION

9.1     *Duration.*  The Partnership shall be dissolved at any time there are no Limited Partners (unless the Partnership is continued in accordance with the Delaware Partnership Act) and shall be dissolved on the first to occur of (a) the tenth anniversary of the Final Closing Date (*provided* that the term of the Partnership may be extended beyond the tenth anniversary by the General Partner in its sole discretion for additional one-year periods (but not for more than a total of two additional years) to allow for an orderly dissolution and liquidation of the Partnership's investments), (b) the election of the General Partner, with the consent of the Majority Limited Partners, to dissolve the Partnership, (c) the occurrence of any event that causes the General Partner to cease to be a general partner of the Partnership under the Delaware Partnership Act, unless the Partnership is continued in accordance with the Delaware Partnership Act, (d) the entry of a decree of judicial dissolution under section 17-802 of the Delaware Partnership Act, (e) the election of 75% in Interest of the Limited Partners to dissolve the Partnership at any time for any reason (or for no reason) by delivering written notice to such effect to the General Partner, and (f) the election of the Majority Limited Partners to dissolve the Partnership following any permanent Suspension of Commitments pursuant to Section 3.3(b) hereof.

9.2     *Liquidation of the Partnership.*  (a) Upon dissolution, the Partnership shall be liquidated in an orderly manner in accordance with the provisions of this Agreement and the Delaware Partnership Act. The General Partner shall be the liquidator to wind up the affairs of the Partnership pursuant to this Agreement or, if the General Partner is not able to act as the liquidator, a liquidating trustee may be appointed by the Majority Limited Partners.

(b)     Following dissolution of the Partnership (whether pursuant to Section 9.1 or otherwise) and upon winding up of the Partnership, the General Partner or the liquidating trustee, as the case may be, shall make a final allocation of all items of income, gain, loss and expense in accordance with Article IV hereof, and the Partnership's liabilities and obligations to its creditors shall be satisfied (whether by payment or the making of reasonable provision for the payment thereof) prior to any distributions to the Partners. After satisfaction of all liabilities and obligations of the Partnership, the remaining assets, if any, shall be distributed among the Partners in accordance with Article IV; *provided* that the amount distributable to any Defaulting Partner shall not exceed the balance of such Partner's Default Capital Account on the date of the distribution. Any amount that would otherwise be distributable to such Defaulting Partner shall be distributed to the Partners (not including such Defaulting Partner) ratably in accordance with their

EVE 05086

Confidential Treatment Requested By Wilmer, Cutler & Pickering

E 151163

# Exhibit 27


<TYPE>EX-3
<SEQUENCE>1
<FILENAME>h87698b3e424b3.txt
<DESCRIPTION>ENRON CORP - REGISTRATION NO. 333-62168
<TEXT>

<PAGE>    1

Filed pursuant to Rule 424(b)(3)
Registration No. 333-62168

**PROSPECTUS**

$1,907,698,000

ENRON CORP.

ZERO COUPON CONVERTIBLE SENIOR NOTES DUE 2021

---------------------

This prospectus relates to the offering for resale of Enron Corp.'s Zero
Coupon Convertible Senior Notes due 2021 and the shares of our common stock
issuable upon conversion of the notes. In this prospectus, the terms "Enron,"
"we" "us," and "our" will each refer to Enron Corp.

We issued the notes in a private placement on February 7, 2001 at an issue
price of $655.24 per $1,000 principal amount at maturity. This prospectus will
be used by selling securityholders to resell their notes and shares of our
common stock issuable upon conversion of their notes. We will not receive any
proceeds from sales by the selling securityholders.

We will not pay interest on the notes prior to maturity. Instead, on
February 7, 2021, the maturity date of the notes, noteholders will receive
$1,000 per note. The issue price per note represented a yield to maturity of
2.125% per year calculated from February 7, 2001. If a Tax Event (as defined
herein) occurs and we so elect, interest, instead of future original issue
discount, shall accrue and be payable semi-annually on each note at 2.125% per
year. We may redeem some or all of the notes at any time on or after February 7,
2004 at the prices described under the heading "Description of the
Notes -- Optional Redemption."

Noteholders may convert their notes at any time on or before the maturity
date, unless the notes have been redeemed or purchased previously, into 5.7565
shares of Enron common stock per note (equivalent to an initial conversion price
of $113.83 per share). However, if the Sale Price (as defined herein) of common
stock on the conversion date is less than 110% of the accreted conversion price,
then the exercising holder will receive, in lieu of common stock, cash in an
amount described herein. Upon other conversions, we will have the right to
deliver, in lieu of common stock, cash in an amount described herein. The
conversion rate may be adjusted for certain reasons, but will not be adjusted
for accrued original issue discount.

Noteholders may require Enron to purchase all or a portion of their notes
on February 7, 2004, February 7, 2009, and February 7, 2014 at a price per note
of $698.13, $775.59 and $862.46, respectively. We will pay cash for all notes
purchased on February 7, 2004, but on the other two purchase dates we may choose
to pay the purchase price in cash or common stock valued at its Market Price (as
defined herein) or a combination of cash and common stock.

Noteholders may also require us to repurchase notes upon a Fundamental
Change (as defined herein) involving Enron prior to February 7, 2004. In the
case of a repurchase upon a Fundamental Change, the repurchase price will be
equal to the issue price of the notes plus accrued original issue discount and
we may pay the repurchase price in cash, in common stock valued at its Market
Price, or in a combination of cash and common stock, at our election.

The notes are unsecured obligations of ours and rank equally with all of our other unsecured senior indebtedness.

Our common stock is listed on the New York Stock Exchange under the symbol "ENE." On July 18, 2001, the last reported sale price for our common stock was $48.97 per share.

Investing in the notes involves risks. See "Risk Factors" beginning on page 10.

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR DETERMINED IF THIS PROSPECTUS IS TRUTHFUL OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

July 18, 2001

<PAGE>    2

YOU SHOULD RELY ONLY ON THE INFORMATION CONTAINED, OR INCORPORATED BY REFERENCE, IN THIS PROSPECTUS. WE HAVE NOT AUTHORIZED ANYONE TO PROVIDE YOU WITH DIFFERENT INFORMATION. YOU SHOULD NOT ASSUME THAT THE INFORMATION CONTAINED IN THIS PROSPECTUS IS ACCURATE AS OF ANY DATE OTHER THAN THE DATE ON THE FRONT OF THIS PROSPECTUS.

----------------------

TABLE OF CONTENTS

<TABLE>
<CAPTION>

|  | PAGE |
| --- | --- |
| <S> | <C> |
| Where You Can Find More Information........................ | 3 |
| Special Note Regarding Forward-Looking Information......... | 4 |
| Enron Corp................................................. | 5 |
| The Offering............................................... | 7 |
| Risk Factors............................................... | 10 |
| Use of Proceeds........................................... | 10 |
| Ratio of Earnings to Fixed Charges........................ | 10 |
| Price Range of Common Stock and Dividends.................. | 11 |
| Description of the Notes................................... | 12 |
| Registration Rights....................................... | 29 |
| Description of Capital Stock............................... | 30 |
| United States Federal Income Tax Considerations........... | 38 |
| Selling Securityholders................................... | 43 |
| Plan of Distribution...................................... | 46 |
| Validity of Securities.................................... | 47 |
| Experts................................................... | 47 |

</TABLE>

This prospectus is part of a registration statement that we filed with the SEC utilizing a "shelf" registration process or continuous offering process. Under this shelf registration process, the selling security holders may, from time to time, sell the securities described in this prospectus in one or more offerings.

This prospectus provides you with a general description of the securities which may be offered by the selling securityholders. Each time a selling securityholder sells securities, the selling securityholder is required to provide you with a prospectus and, if not included in the prospectus,  a prospectus supplement containing specific information about the selling securityholder and the terms of the securities being offered. Any prospectus supplement may also add, update or change information in this prospectus. If there is any inconsistency between the information in this prospectus and any prospectus supplement, you should rely on the information in that prospectus supplement. You should read both this prospectus and any prospectus supplement

a United States real property holding corporation at any time during the shorter of the five-year period ending on the date of the disposition or the period during which you held our notes or common stock. Enron does not believe it is or is likely to become a United States real property holding corporation.

U.S. Federal Estate Tax.  A note held by an individual who at the time of death is not a citizen or resident of the United States (as specially defined for U.S. federal estate tax purposes) will not be subject to United States federal estate tax if the individual did not actually or constructively own 10% or more of the total combined voting power of all classes of stock of Enron and, at the time of the individual's death, payments with respect to such note would not have been effectively connected with the conduct by such individual of a trade or business in the United States. Common stock held by an individual who at the time of death is not a citizen or resident of the United States will be included in such individual's estate for U.S. federal estate tax purposes, unless an applicable estate tax treaty otherwise applies.

BACKUP WITHHOLDING AND INFORMATION REPORTING

U.S. Holders.  Information reporting will apply to payments of interest (including the amount of OID accrued) or dividends, if any, made by Enron on, or the proceeds of the sale or other disposition of, the notes or shares of common stock with respect to certain noncorporate U.S. holders, and backup withholding at a rate of 31% may apply unless the recipient of such payment supplies a taxpayer identification number, certified under penalties of perjury, as well as certain other information or otherwise establishes an exemption from backup withholding. Any amount withheld under the backup withholding rules is allowable as a credit against the U.S. holder's federal income tax, provided the required information is provided to the IRS.

Non-U.S. Holders.  Backup withholding and information reporting will not apply to payments of principal, including cash payments in respect of OID, on the notes by Enron or any agent thereof to a non-U.S. holder if the non-U.S. holder certifies as to its non-U.S. holder status under penalties of perjury or otherwise establishes an exemption (provided that neither Enron nor its agent has actual knowledge that the holder is a United States person or that the conditions of any other exemptions are not in fact satisfied).

Enron must report annually to the IRS and to each non-U.S. holder the amount of any dividends paid to, and the tax withheld with respect to, such holder, regardless of whether any tax was actually withheld. Copies of these information returns may also be made available under the provisions of a specific treaty or agreement to the tax authorities of the country in which the non-U.S. holder resides.

The payment of the proceeds of the disposition of notes or shares of common stock to or through the United States office of a United States or foreign broker will be subject to information reporting and backup withholding unless the owner provides the certification described above or otherwise establishes an exemption. The proceeds of a disposition effected outside the United States by a non-U.S. holder of notes or shares of common stock to or through a foreign office of a broker generally will not be subject to backup withholding or information reporting. However, if such broker is a United States person, a controlled foreign corporation for United States tax purposes, a foreign person 50% or more of whose gross income from all sources for certain periods is effectively connected with a trade or business in the United

42

<PAGE>    43

States, or a foreign partnership that is engaged in the conduct of a trade or business in the United States or that has one or more partners that are United States persons who in the aggregate hold more than 50 percent of the income or capital interests in the partnership, information reporting requirements will apply unless such broker has documentary evidence in its files of the holder's non-U.S. status and has no actual knowledge to the contrary or unless the holder

otherwise establishes an exemption. Any amount withheld under the backup withholding rules will be refunded or is allowable as a credit against the non-U.S. holder's federal income tax liability, if any, provided the required information or appropriate claim for refund is provided to the IRS.

## SELLING SECURITYHOLDERS

All of the notes, and any shares of our common stock issued upon conversion of the notes, are being offered by the selling securityholders listed in the table below or referred to in a prospectus supplement. We issued and sold the notes in a private placement to Salomon Smith Barney Inc., Deutsche Banc Alex. Brown Inc., J.P. Morgan Securities Inc., Banc of America Securities LLC and Barclays Capital Inc., and the notes were simultaneously sold by Salomon Smith Barney Inc., Deutsche Banc Alex. Brown Inc., J.P. Morgan Securities Inc., Banc of America Securities LLC and Barclays Capital Inc. to the selling security holders in transactions exempt from registration under the Securities Act.

No offer or sale under this prospectus may be made by a holder of the securities unless listed in the table in this prospectus or until that holder has notified us and a supplement to this prospectus has been filed or an amendment to the related registration statement has become effective. We will supplement or amend this prospectus to include additional selling securityholders upon request and upon provision of all required information to us.

The selling securityholders may offer and sell, from time to time, any or all of their notes or common stock issued upon conversion of those notes.

43

<PAGE> 44

The following table sets forth the name, principal amount at maturity of notes and number of shares beneficially owned by the selling securityholders intending to sell the notes or common stock and the principal amount at maturity of notes or shares of common stock to be offered. Based on information provided to us by the applicable selling securityholder, the table also discloses whether any selling securityholder selling in connection with the prospectus or prospectus supplement has held any position or office with, been employed by or otherwise has had a material relationship with us or any of our affiliates during the three years prior to the date of the prospectus or prospectus supplement.

<TABLE>
<CAPTION>

| NAME | PRINCIPAL AMOUNT AT MATURITY OF NOTES BENEFICIALLY OWNED THAT MAY BE SOLD HEREBY | PERCENTAGE OF NOTES OUTSTANDING | NUMBER OF SHARES OF COMMON STOCK THAT MAY BE SOLD HEREBY(1) | PERCENTA COMMON OUTSTAND |
|------|------|------|------|------|
| ---- | ------------------- | ------------- | ---------------- | -------- |
| <S> | <C> | <C> | <C> | <C> |
| Allstate Life Insurance Company................... | $ 2,050,000 | 0.11% | 11,800.83 | *% |
| Allstate Insurance Company... | 2,450,000 | 0.13 | 14,103.43 | * |
| Alta Partners Holdings, LDC...................... | 15,000,000 | 0.79 | 86,347.50 | * |
| Amaranth Securities LLC ..... | 9,000,000 | 0.47 | 51,808.50 | * |
| Argent Convertible Arbitrage Fund Ltd................. | 10,000,000 | 0.52 | 57,565.00 | * |
| Argent Classic Convertible Arbitrage Fund (Bermuda) Ltd...................... | 10,000,000 | 0.52 | 57,565.00 | * |
| Banc of America Securities LLC...................... | 18,500,000 | 0.97 | 106,495.25 | * |
| BBT Fund, L.P............... | 40,000,000 | 2.10 | 230,260.00 | * |
| Bear, Stearns & Co. Inc. .... | 55,000,000 | 2.88 | 316,607.50 | * |
| Black Diamond Capital I, | | | | |

| | | | | |
|---|---|---|---|---|
| Ltd. ..................... | 4,000,000 | 0.21 | 23,026.00 | * |
| Black Diamond Offshore, Ltd...................... | 2,468,000 | 0.13 | 14,207.04 | * |
| Double Black Diamond Offshore LDC.................... | 10,989,000 | 0.58 | 63,258.18 | * |
| CIBC World Markets........... | 5,000,000 | 0.26 | 28,782.50 | * |
| CFFX, LLC.................... | 19,250,000 | 1.01 | 110,812.63 | * |
| Credit Suisse First Boston... | 105,100,000 | 5.51 | 605,008.15 | * |
| Deutsche Banc Alex. Brown Inc. ........................ | 169,100,000 | 8.86 | 973,424.15 | * |
| First Union International Capital Markets, Inc. ..... | 10,000,000 | 0.52 | 57,565.00 | * |
| First Union National Bank.... | 15,000,000 | 0.79 | 86,347.50 | * |
| GLG Market Neutral Fund...... | 500,000 | 0.03 | 2,878.25 | * |
| Goldman Sachs & Company...... | 46,735,000 | 2.45 | 269,030.03 | * |
| Granville Capital Corporation................ | 14,500,000 | 0.76 | 83,469.25 | * |
| SAM Investments LDC.......... | 100,000,000 | 5.24 | 575,650.00 | * |
| RAM Trading Ltd.............. | 25,000,000 | 1.31 | 143,912.50 | * |
| HBK Master Fund L.P.......... | 129,000,000 | 6.77 | 742,588.50 | * |
| HighBridge International LLC.................... | 205,000,000 | 10.75 | 1,180,082.50 | * |
| HSBC Trustee, Zola Managed Trust...................... | 1,600,000 | 0.08 | 9,210.40 | * |
| JMG Capital Partners, LP..... | 25,000,000 | 1.31 | 143,912.50 | * |
| JMG Triton Offshore Fund, Ltd....................... | 54,000,000 | 2.83 | 310,851.00 | * |
| KBC Financial Products USA... | 6,000,000 | 0.32 | 34,539.00 | * |
| Liberty View Global Volatility Fund L.P. ...... | 10,000,000 | 0.52 | 57,565.00 | * |
| Lyxor Master Fund............ | 1,400,000 | 0.07 | 8,059.10 | * |
| McMahan Securities Co. L.P. .................... | 2,500,000 | 0.13 | 14,391.25 | * |
| Morgan Stanley & Co. ........ | 100,000,000 | 5.24 | 575,650.00 | * |

</TABLE>

44

<PAGE>   45

<TABLE>
<CAPTION>

| NAME | PRINCIPAL AMOUNT AT MATURITY OF NOTES BENEFICIALLY OWNED THAT MAY BE SOLD HEREBY | PERCENTAGE OF NOTES OUTSTANDING | NUMBER OF SHARES OF COMMON STOCK THAT MAY BE SOLD HEREBY(1) | PERCENTA COMMON OUTSTAND |
|---|---|---|---|---|
| ---- | ------------------- | ------------- | --------------- | -------- |
| <S> | <C> | <C> | <C> | <C> |
| Nomura Securities International, Inc. ....... | 30,000,000 | 1.57 | 172,695.00 | * |
| Paloma Securities LLC ....... | 9,000,000 | 0.47 | 51,808.50 | * |
| R(2) Investments, LDC........ | 57,500,000 | 3.01 | 330,998.75 | * |
| Shelby County Trust Bank as Custodian for Citizens Security Life Insurance Company................... | 300,000 | 0.02 | 1,726.95 | * |
| Salomon Smith Barney Inc. ... | 369,638,000 | 19.38 | 2,127,821.15 | * |
| Spear, Leeds & Kellogg, L.P. ...................... | 4,000,000 | 0.21 | 23,026.00 | * |
| TD Securities (USA) Inc. -- Formerly Toronto Dominion (New York), Inc. ....... | 45,000,000 | 2.36 | 259,042.50 | * |
| TQA Master Plus Fund, LTD.... | 2,500,000 | 0.13 | 14,391.25 | * |
| TQA Master Fund, LTD......... | 15,000,000 | 0.79 | 86,347.50 | * |
| TRIBECA Investments LLC...... | 70,000,000 | 3.67 | 402,955.00 | * |
| UBS O'Connor LLC F/B/O O'Connor Global Convertible | | | | |

| | | | | |
|---|---|---|---|---|
| Portfolio.................. | 1,000,000 | 0.05 | 5,756.50 | * |
| UBS O'Connor LLC F/B/O UBS Global Equity Arbitrage Master Ltd................ | 10,000,000 | 0.52 | 57,565.00 | * |
| White River Securities L.L.C. ................... | 55,000,000 | 2.88 | 316,607.50 | * |
| Worldwide Transactions, Ltd....................... | 543,000 | 0.03 | 3,125.78 | * |
| Zola Partners, L.P. ......... | 3,000,000 | 0.16 | 17,269.50 | * |
| Any other holder of notes or future transferee, pledgee, donee, or successor of any such holder(3)............ | 11,075,000 | 0.58 | 63,753.00 | * |

  </TABLE>

---------------

* Less than 1%.

(1) Assumes conversion of all of the holder's notes at a conversion price of 5.7565 shares of our common stock per $1,000 principal amount at maturity of the notes. This conversion price, however, will be subject to adjustment as described under "Description of the Notes -- Conversion Rights." As a result, the number of shares of our common stock issuable upon conversion of the notes may increase or decrease in the future.

(2) Calculated based on Rule 13d-3(d)(i) of the Exchange Act using 748,979,078 shares of common stock outstanding as of June 30, 2001. In calculating this amount, we treated as outstanding the number of shares of common stock issuable upon conversion of all of that particular holder's notes. However, we did not assume the conversion of any other holder's notes.

(3) Information about other selling securityholders will be set forth in one or more prospectus supplements, if required. Assumes that any other holders of notes, or any future transferees, pledgees, donees or successors of or from any such other holders of notes, do not beneficially own any common stock other than the common stock issuable upon conversion of the notes at the initial conversion rate.

   We prepared this table based on the information supplied to us by the selling securityholders named in the table, and we have not sought to verify such information.

   The selling securityholders listed in the above table may have sold or transferred, in transactions exempt from the registration requirements of the Securities Act, some or all of their notes or shares of our

                                    45

<PAGE>   46

common stock since the date on which the information in the above table was provided to us. Information about the selling securityholders may change over time.

   Because the selling securityholders may offer all or some of their notes or the shares of our common stock issuable upon conversion of the notes from time to time, we cannot estimate the amount of the notes or number of shares of our common stock that will be held by the selling securityholders upon the termination of any particular offering by such selling securityholder. See "Plan of Distribution."

                          PLAN OF DISTRIBUTION

   The selling securityholders intend to distribute the notes and the shares of our common stock issuable upon conversion of the notes from time to time only as follows (if at all): (i) to or through underwriters, brokers or dealers, (ii) directly to one or more other purchasers, (iii) through agents on a best-efforts

basis; or (iv) otherwise through a combination of any such methods of sale.

If a selling securityholder sells the notes or shares of our common stock issuable upon conversion of the notes through underwriters, dealers, brokers or agents, such underwriters, dealers, brokers or agents may receive compensation in the form of discounts, concessions or commissions from the selling securityholder and/or the purchasers of the notes or shares of our common stock.

The notes and the shares of our common stock issuable upon conversion of the notes may be sold from time to time (i) in one or more transactions at a fixed price or prices, which may be changed; (ii) at market prices prevailing at the time of sale; (iii) at prices related to such prevailing market prices; (iv) at varying prices determined at the time of sale; or (v) at negotiated prices.

Such sales may be effected in transactions (i) on any national securities exchange or quotation service on which the notes or our common stock may be listed or quoted at the time of sale; (ii) in the over-the-counter market; (iii) in block transactions in which the broker or dealer so engaged will attempt to sell the notes or shares of our common stock issuable upon conversion thereof as agent but may position and resell a portion of the block as principal to facilitate the transaction, or in crosses, in which the same broker acts as an agent on both sides of the trade; (iv) transactions otherwise than on such exchanges or services or the over-the-counter market; (v) through the writing of options; or (vi) through other types of transactions.

In connection with sales of the notes or our common stock or otherwise, the selling securityholder may enter into hedging transactions with brokers or dealers or others, which may in turn engage in short sales of the notes or our common stock in the course of hedging the positions they assume. The selling securityholder may also sell notes or our common stock short and deliver notes or our common stock to close out such short positions, or loan or pledge notes or our common stock to brokers or dealers or others that in turn may sell such securities. The selling securityholder may pledge or grant a security interest in some or all of the notes or our common stock issued upon conversion of the notes owned by it and, if it defaults in the performance of its secured obligations, the pledgees or secured parties may offer and sell the notes or our common stock from time to time pursuant to this prospectus. The selling securityholder also may transfer and donate notes or shares of our common stock issuable upon conversion of the notes in other circumstances in which case the transferees, donees, pledgees or other successors in interest will be the selling securityholder for purposes of the prospectus. The selling securityholder may sell short our common stock and may deliver this prospectus in connection with such short sales and use the shares of our common stock covered by the prospectus to cover such short sales. In addition, any notes or shares of our common stock covered by this prospectus that qualify for sale pursuant to Rule 144, Rule 144A or any other available exemption from registration under the Securities Act may be sold under Rule 144, Rule 144A or such other available exemption.

At the time a particular offering of notes or shares of our common stock issuable upon conversion thereof is made, a prospectus supplement, if required, will be distributed which will set forth the aggregate amount of notes or number of shares of our common stock being offered and the terms of the offering,

46

<PAGE>    47

including the name or names of any underwriters, dealers, brokers or agents, if any, and any discounts, commissions or concessions allowed or reallowed to be paid to brokers or dealers.

Selling securityholders and any underwriters, dealers, brokers or agents who participate in the distribution of the notes or shares of our common stock may be deemed to be "underwriters" within the meaning of the Securities Act and any profits on the sale of the notes or shares of our common stock by them and any discounts, commissions or concessions received by any such underwriters, dealers, brokers or agents may be deemed to be underwriting discounts and