IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re Enron Corporation | § | |
| Securities, Derivative & | § | MDL-1446 |
| "ERISA" Litigation | § | |
| | § | |
| MARK NEWBY, ET AL., | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-01-3624 |
| | § | CONSOLIDATED CASES |
| ENRON CORPORATION, ET AL., | § | |
| | § | |
| Defendants | § | |
| THE REGENTS OF THE UNIVERSITY | § | |
| OF CALIFORNIA, et al., | § | |
| Individually and On Behalf of | § | |
| All Others Similarly Situated, | § | |
| | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | |
| | § | |
| KENNETH L. LAY, et al., | § | |
| | § | |
| Defendants. | § | |

**OPINION AND ORDER**

Pending before the Court in the above referenced cause is Barclays PLC, Barclays Bank PLC, and Barclays Capital, Inc.'s (collectively, "Barclays'") motion for partial judgment on the pleadings (instrument # 3615), asking the Court to dismiss with prejudice Plaintiffs' first claim for relief against Barclays for violations of Sections 10(b)[1] and 20(a) of the Securities Exchange

---

[1] Section 10(b), in pertinent part, prohibits "any person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." Securities Exchange Act of 1934, § 10(b), 15 U.S.C. § 78j(b).
    Because a control person claim against Barclays under § 20(a), 15 U.S.C. § 78t(a), requires as an element an underlying

Act of 1934, and Rule 10b-5 thereunder, based on *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 125 S. Ct. 1627 (2005)(holding that to plead loss causation adequately under § 10(b), a plaintiff cannot merely allege that he purchased securities at a price that was inflated because of misrepresentations by defendant(s); plaintiff must allege an actual causal connection between a defendant's misconduct and plaintiff's damages).

### Standard of Review

Federal Rule of Civil Procedure 12(c) provides, "After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings.  If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 . . . ."  Once a responsive pleading has been filed, a motion to dismiss for failure to state a claim should properly be filed as a motion for judgment on the pleadings.  *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999)(per curiam).  "A motion brought pursuant to Fed. R. Civ. P. 12(c) is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by

---

primary violation of § 10(b) by the controlled person, here necessarily a Barclays' entity since the complaint does not allege that Barclays controlled any outside party, failure to state such a claim under § 10(b) should also result in the dismissal of a § 20(a) claim.  *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 383-84 (5th Cir. 2004).

looking to the substance of the pleadings and any judicially noticed facts." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002), *quoting Hebert Abstract Co. v. Touchstone Props., Ltd*, 914 F.2d 74, 76 (5th Cir. 1990)(per curiam)(citing 5A Charles A. Wright & Arthur Miller, *Federal Practice and Procedure* § 1367, at 509-10 (1990)); *see also Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004).

The standard of review under Rule 12(c) is the same as that under Rule 12(b)(6) or 12(h)(2). *Great Plains*, 313 F.3d at 313 & n.8. The court should construe the pleadings liberally and should grant a Rule 12(c) motion only when there is no disputed issue of fact and there are only questions of law. *Id.* at 312. A claim may be dismissed when it is clear that the plaintiff "can prove no set of facts in support of his claim that would entitle him to relief." *Id.* at 312, *citing Greninger*, 188 F.3d at 324. The court must accept all well-pleaded facts as true and view them in a light most favorable to the plaintiff. *Id.* at 312-13. Conclusory allegations and unwarranted deductions of fact are not accepted as true and will not preclude dismissal. *Id.* at 313. The question is not whether the plaintiff will ultimately prevail, but whether he may present evidence in support of his claim. *Id.*

Although generally a court may not rely on materials outside the pleadings in a Rule 12 review, in securities fraud suits the court may also consider documents attached to or incorporated by reference in the complaint, and materials of public record subject to judicial notice, including "the contents

of relevant public disclosure documents which (1) are required to be filed with the SEC, and (2) are actually filed with the SEC." *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017-18 (5th Cir. 1996); *Davis v. Bayless*, 70 F.3d 367, 372 n.3 (5th Cir. 1995). "Such documents should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents." *Lovelace*, 78 F.3d at 1017-18.

Lead Plaintiff has provided an appendix in support of its opposition, but many of the documents are not appropriate for a Rule 12 review. Nevertheless the Court is concerned that the First Amended Consolidated Complaint (#1388), the governing pleading here, was filed May 14, 2003, **nearly two years before** the Supreme Court issued *Dura Pharmaceuticals* on April 19, 2005. The Court finds that to hold Lead Plaintiff to its standard retroactively, without an opportunity to amend to meet that standard if it is able to do so, would be unjust. Therefore the Court considers Lead Plaintiff's briefing and documents to determine whether they demonstrate that Lead Plaintiff could state a § 10(b) claim, including proper pleading of loss causation, by repleading, if the Court finds that it has not already done so.

### First Amended Consolidated Complaint and Barclays

The First Amended Consolidated Complaint (#1388) states the following about Barclays' purported role in the alleged Enron scheme. Regarding Barclays' general involvement, the complaint conclusorily recites that Barclays had an extensive and close

relationship with Enron, provided commercial banking and investment banking services to Enron, interacted constantly with Enron's top executives regarding Enron's business during the Class Period, and participated in the fraudulent scheme and furthered Enron's fraudulent course of conduct and business by participating in loans of over $3 billion during the Class Period and helping Enron to raise almost $2 billion from investors in the sale of new securities.[2]  #1388 at ¶¶ 750-51.  None of these statements is adequate to state a violation of § 10(b) and Rule 10b-5.

Although the complaint asserts that in return for enormous profits (including interest fees, syndication fees, and investment banking fees) Barclays helped Enron to structure and finance "certain" illicit SPEs and partnerships and to participate in illicit transactions that allowed Enron to falsify its reported financial results, the only one alleged in detail involving Barclays is Chewco Investments ("Chewco"), as the Court will discuss.  #1388 at ¶¶ 750, 755-56.

Lead Plaintiff also claims that Barclays is liable for statements in registration statements and prospectuses used by Enron and Barclays to raise new capital for Enron and for false and misleading statements in Barclays' analysts' reports, but provides no particulars as to which statements nor what was false or misleading and why.  *Id.* at 761.  Nor does it identify the

---

[2] The securities for which Barclays acted as placement agent or reseller are listed in ¶¶ 752-53, while its loans are identified in ¶ 754.

analyst(s) nor allege facts giving rise to a strong inference of scienter as to those analysts.[3]

As background to Enron's repeated use of special purpose entities ("SPEs") to forward the purported fraudulent scheme to fabricate assets and conceal debt for Enron, the complaint at ¶¶ 429-447 charges that in failing to consolidate Enron-controlled and Enron-financed SPEs and partnerships into Enron's own financial statements, Enron violated GAAP (Accounting Research Bulletin No. 51)[4] and FASB Statement of Financial Accounting

---

[3] As noted by the Court in recent opinions, since the First Amended Consolidated Complaint was filed, the Fifth Circuit has required specific allegations to raise a strong inference of an analyst's scienter to hold an employer corporation liable for the analyst's statements. *See Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 364, 366 (5th Cir. 2004)("For purposes of determining whether a statement made by the corporation was made by it with the requisite Rule 10(b) [*sic*] scienter, we believe it appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information of language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment."). Thus Lead Plaintiff has not adequately pleaded such a claim against Barclays.

[4] No. 51 provided in part,

> There is a presumption that consolidated statements are more meaningful than separate statements and that they are usually necessary for a fair presentation when one of the companies in the group directly or indirectly has a controlling financial interest in the other companies.

The complaint also claims that Defendants improperly relied on FASB Emerging Issues Task Force Abstracts ("EITF"), in particular EITF No. 90-15, Impact of Nonsubstantive Lessors, Residual Value Guarantees, and Other Provisions in Leasing Transactions, which allows avoidance of consolidation where the initial substantive

Standards ("SFAS") No. 94, which requires consolidation of all majority-owned subsidiaries unless control is temporary or does not rest with the majority owner.  The complaint asserts that Enron used qualifying and nonqualifying SPEs to conceal billions of dollars in loans and losses, to wrongfully recognize millions of dollars of income from transactions with these entities, and to "monetize" (accelerate recognition of) future contract revenues and book them as current revenues.

In 1993 Enron created a joint venture investment partnership call Joint Energy Development Investment Limited Partnership, or "JEDI."  #1388 at ¶ 436.  At that time Enron was

_____

residual equity investment on behalf of the lessor was at least 3%. SFAS No. 125 mandates that to qualify as an SPE, so as not to have to be consolidated, an SPE must have standing separate from the transferor (Enron, in this case), i.e., be independent and unrelated to Enron, and it must maintain the risks and rewards of ownership.  The complaint states that EITF Topic D-14 sets out the rule for nonconsolidation of an SPE:

> Generally the SEC staff believes that for nonconsolidation and sales recognition by the sponsor or transferor to be appropriate, the majority owner (or owners) of the SPE must be an independent third party who has made a substantive capital investment in the SPE, has control of the SPE, and has substantive risks and rewards of ownership of the assets of the SPE (including residuals).  Conversely, the SEC staff believes nonconsolidation and sales recognition are not appropriate by the sponsor or transferor when the majority owner of the SPE makes only a nominal capital investment, the activities of the SPE are virtually on the sponsor's or transferor's behalf, and the substantive risks and rewards of the assets or the debt of the SPE rest directly or indirectly with the sponsor or transferor.

#1388 at 329, n.9.

general partner and had a limited partner, so that it was not required by GAAP to consolidate JEDI into its consolidated financial statements. *Id.* But in 1997 the limited partner withdrew, and Enron was unable to find a new, independent partner, raising the specter of Enron's having to consolidate and to wipe out 40% of the profits it had reported earlier that year and having to record millions of dollars of debt on its balance sheet. *Id.* at ¶ 757. According to the complaint, Enron's Chief Financial Officer, Andrew Fastow, created Chewco to replace the 3% equity partner and positioned his subordinate, Enron employee Michael Kopper, as its manager after Vinson and Elkins had advised that Kopper's role would not have to be disclosed because he was not a senior Enron officer. *Id.* at ¶¶ 436-37. Chewco did not comply with the nonconsolidated SPE rules because Kopper, an Enron employee, controlled Chewco and because Chewco had no third-party independent investors. *Id.* at 437. To avoid consolidation at year end 1997, Enron first arranged *inter alia* for a $240 million unsecured subordinated loan to Chewco from Barclays, which Enron guaranteed,[5] and a sham transfer of Kopper's ownership interest (he had invested $125,000) in Chewco to Kopper's domestic partner, William Dodson, concealing Enron's control of and interest in

_____

[5] In exchange for the guarantee, Chewco agreed to pay Enron a fee of $10 million up front plus 315 basis points annually on the average outstanding balance of the loan, calculated to provide a beneficial financial statement for Enron. During the twelve months the loan was outstanding, JEDI, through Chewco, paid Enron $174.4 million under the fee agreement, which Enron recognized as "structuring fees," but which the complaint alleges were improper transfers from one Enron pocket to another that should never have been recognized under GAAP. #1388 at ¶ 443.

Chewco.  *Id.* at ¶ 438-39.  In addition to Enron's guarantee, Barclays was awarded with a very high interest rate and significant commitment and lending fees.  *Id.* at ¶ 758.

Because a third-party investor with outside equity of $11.4 million to reach 3% ownership was still required for Chewco to qualify as an SPE for off-balance-sheet treatment, the complaint alleges that Barclays also granted Enron's request that Barclays provide loans to two entities, strawmen named Big River Funding LLC and Little River Funding LLC, which were controlled by Enron and lacked any real credit standing, for that purpose. *Id.* at 758.  Barclays and Enron Defendants drew up documents characterizing the advances as loans for business and regulatory reasons, but allowing Enron and Chewco simultaneously to characterize them as equity contributions for purposes of the 3% "independent" investment.  *Id.* at ¶ 439.  The loans were recorded in documents similar to promissory notes and loan agreements, but were designated "certificates" and "funding agreements," and required the borrowers to pay a specified percentage rate "yield," i.e., interest.  *Id.*  In addition, the complaint claims, because Barclays knew the "equity investors" were straw persons and that Chewco was being secretively and improperly manipulated to prevent an unwinding or restatement of Enron's previously reported '97 profits and to serve as a deceptive device for future use in other non-arm's length transactions, Barclays required the borrowers to set up cash "reserve accounts" to secure repayment to Barclays of the $11.4 million.  *Id.* at ¶ 758.  To fund the accounts, JEDI

wired $6.58 million to Barclays on 12/30/97 under an agreement drawn up by Vinson & Elkins, in effect cutting in half Chewco's purported 3% at-risk, independent equity. *Id.* Because Chewco was not a qualified SPE, it should have been consolidated into Enron's financial statements from the time the limited partner withdrew. *Id.* at ¶ 440. Furthermore, JEDI's nonconsolidation in turn depended on Chewco's nonconsolidation status. *Id.* Since Chewco was supposed to be an independent, unrelated partner in JEDI, but was not, all revenues that Enron recognized from JEDI were also improper. *Id.* at ¶ 442. Thus JEDI also should have been consolidated in Enron's financial statement in 11/97. Barclays purportedly knew about the manipulation because it helped to structure its loan to appear as equity. *Id.* at ¶ 441.

In ¶ 447 of the complaint, Lead Plaintiff sets out specific amounts of unrecorded losses and unrecorded debts that Enron was able to hide from 1997-2000 by using the two unqualified SPEs.

### *Dura Pharmaceuticals, Inc. v. Broudo*

The United States Supreme Court's opinion in a fraud-on-the-market case, *Dura Pharmaceuticals, Inc. v. Broudo*, heightened the pleading requirements for loss causation and has significant implications for proving damages in a § 10(b) case. Daniel P. Lefler and Allan W. Kleidon, *Just How Much Damage Did Those Misrepresentations Actually Cause and To whom? Damages Measurement in "Fraud on the Market" Securities Class Actions*, 1505 PLI/Corp 285, 292-94 (Sept. 2005).

In *Dura Pharmaceuticals,* purchasers of stock in the pharmaceutical company that had submitted a new asthmatic spray device for approval from the Food and Drug Administration, alleged in a securities fraud class action suit that some of the company's managers and directors misrepresented that the company expected its drug sales to be profitable and that it expected FDA approval of the spray device shortly.  On the final day of the purchase period, the defendants disclosed that the earnings would be less than anticipated, largely because of slow sales; eight months later they announced that the FDA would not approve the device. The complaint asserted only, "'*In reliance on the integrity of the market, [the plaintiffs] . . . paid artificially inflated prices for Dura securities' and the plaintiffs suffered 'damage[s]' thereby.*"  125 S. Ct. at 1630 (emphasis in the original).

Justice Stephen Breyer, writing for a unanimous Supreme Court, reversed a Ninth Circuit ruling that a plaintiff pleading securities fraud under § 10(b) and Rule 10b-5 need only establish that the price of a security was artificially inflated on the date he purchased it to plead economic loss and loss causation under the 1934 Act.[6]  The Supreme Court opined that in a fraud-on-the-market case, where a plaintiff alleges that he suffered losses because he paid an artificially inflated price for a security,

_____

[6] Barclays points out that this Court relied on the Ninth-Circuit's now reversed standard for loss causation in denying Merrill Lynch's motion to dismiss.  *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 310 F. Supp. 2d 819, 831-32 (S.D. Tex. 2004).  The Court notes that this is only one of many modifications that it has made as the law has evolved in the course of this litigation.

generally "as a matter of pure logic, at the moment that a transaction takes place, the plaintiff [who has purchased securities at an inflated price] has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value." 125 S. Ct. at 1631 (emphasis in original). In other words, at the time the purchase of a security occurs, the alleged inflated price, alone, logically cannot constitute "economic loss" because the plaintiff acquires a security of "equivalent value" and the "misrepresentation will not have led to any loss" if the plaintiff sells the shares "quickly before the truth begins to leak out." *Id.* Furthermore, the Supreme Court pointed out that an implied private securities fraud action under the Securities Exchange Act is similar in many ways to common-law causes of action for deceit and fraudulent misrepresentation, which require a plaintiff to show (1) that if he had known the truth he would not have acted as he did; (2) that he suffered actual, substantial damage; and (3) that the defendant's deception was the proximate cause of the plaintiff's injuries.[7] *Id.*

---

[7] In 1995 Congress codified the loss causation element in the PSLRA:

> In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.

15 U.S.C. § 78u-4(b)(4).

Even when the purchaser later sells his shares at a lower price, the Supreme Court questioned any automatic assumption of a link between an inflated price and a subsequent economic loss after news of the deception is leaked:

> If the purchaser sells later after the truth makes its way into the market place, an initially inflated purchase price *might* mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other related events which, taken separately or together, account for all of that lower price. . . . Other things being equal, the longer the time between purchase and sale, the more likely that this is so, *i.e.*, the more likely that other factors caused the loss.

*Id.* at 1631-32. Thus the high court addressed a narrow issue: it held that in a fraud-on-the-market case a plaintiff must plead, and ultimately prove, more than simply that the defendant's misrepresentation caused the stock price to be inflated; an artificial high purchase price "is not itself a relevant economic loss," but merely "touches upon" the subsequent loss of value and does not necessarily cause the plaintiff economic loss, especially in light of the "tangle of factors affecting price." *Id.* at 1634, 1632.[8]

---

[8] Justice Breyer noted that the Ninth Circuit's standard would not serve the public policy goals of the federal securities laws, i.e., maintenance of public confidence in the market by making available private securities fraud actions; these statutes do not aim to "provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." 125 S. Ct. at 1633. The PSLRA

Focusing on threshold pleading requirements rather than the ultimate burden of proof, but with clear implications for that ultimate burden, the high court did not indicate what must be pled to establish loss causation other than requiring more than a simple allegation of inflated stock price:  "We need not, and do not, consider other proximate cause or loss related questions." *Id.* at 1633-34.  The Supreme Court did not affirmatively adopt Dura Pharmaceuticals' argument that a plaintiff must allege and ultimately prove that the defendant made a corrective disclosure of the fraud that was followed by a related price drop, nor did it specify what must be pled to establish that "the truth became known"; instead, the Supreme Court stated vaguely that a complaint must "provide defendants with notice of what the relevant economic loss might be or what the causal connections might be between that loss and the misrepresentation" (i.e., "some indication of the loss and the causal connection that the plaintiff has in mind," a subjective standard), the pleading of which "should not prove burdensome" for a plaintiff.[9]  *Id.* at 1634.  Thus besides a formal

_____

"makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss." *Id.*

[9]  In *Dura Pharmaceuticals* the Supreme Court found that although the complaint alleged that the plaintiffs paid artificially inflated prices for Dura Pharmaceutical's securities, it failed to allege that the share price of the stock at issue fell substantially after the truth was disclosed.  125 S. Ct. at 1634. Instead the only allegation was that the purchase price was inflated and "the complaint nowhere else provides the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between the loss and the misrepresentation concerning Dura's 'spray device.'"  *Id.* at 1634.

corrective disclosure by a defendant followed by a steep drop in the price of stock, the market may learn of possible fraud through a number of sources:  e.g., from whistleblowers, analysts' questioning of financial results, resignations of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals, etc.  *See* Alan Schulman and Nicki Mendoza, *Dura Pharm., Inc. v. Broudo--The Least of All Evils*, 1505 PLI/Corp. 272, 274 (Sept. 2005).  Plaintiff's economic loss may occur as "relevant truth begins to leak out" or "after the truth makes its way into the market place," and the plaintiff need only give "some indication" of the causal link between that leaked truth and his economic loss.  125 S. Ct. at 1631, 1632, 1634.  The pleading of a single formal corrective measure is not necessary.[10]

---

[10] *See* Patrick J. Coughlin, Eric Alan Isaacson, and Joseph D. Daley, *What's Brewing in Dura v. Broudo?  The Plaintiffs' Attorneys Review The Supreme Court's Opinion and Its Import for Securities Fraud Litigation*, 37 Loy. U. Chi. L.J. 1 (Fall 2005), in which the authors conclude that the Supreme Court expressly declined Dura Pharmaceutical's request to require that a stock drop be directly tied to a corrective disclosure for a plaintiff to recover:

> Justice Breyer, at oral argument, noted that inflation might come out in many different ways, not simply an announcement "I'm a liar." . . . According to Justice Breyer, inflation could "ooze out as earning reports come in, but it has to come out." . . . Even the Solicitor General recognized "fraud can be revealed by means other than a corrective disclosure and a drop in the stock price may not be a necessary condition for establishing loss causation in every fraud-on-the-market case." Brief for the United States as Amici Curiae Supporting Petitioners at 19 . . . The Supreme Court nowhere requires there be a corrective disclosure tied to a stock drop;

Moreover, the plaintiff's loss need not be caused exclusively by the defendant's fraud. *Id.* at 1632, citing the common-law precedents of deceit and misrepresentation for implied private securities-fraud actions under § 10(b) and W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Law of Torts* § 110, at 765 (5th ed. 1984); *see also Sosa v. Alvarez-Machain*, 124 S. Ct. 2739, 2750 (2004)("Proximate case is causation substantial enough and close enough to the harm to be recognized by the law, but a given proximate cause need not be, and frequently is not,

---

instead, the Court speaks in terms of when "the relevant truth begins to leak out." *Dura*, 125 S. Ct. at 1631.

*Id.* at 15-16, 21-22 & n.104.   *Id.* at 21-22 & n.45 ("At oral argument Justice Breyer recognized the truth might come out in 'subtle ways as well as direct ways.'").   Instead the high court required only that plaintiffs provide "'some indication' of the connection between the leakage and plaintiffs' claimed economic loss." *Id.* at 22.   *In accord* Evan R. Chesler and J. Stephen Beke, *Loss Causation Post-Dura*, 1517 PLI/Corp 1277, 1282 (Nov. 2005).
This Court observes that in the wake of *Dura Pharmaceuticals* there is some disagreement among courts as to whether or not a corrective disclosure is required, but the majority appear to have concluded that methods other than corrective disclosures satisfy *Dura's* requirement for pleading loss causation: *see, e.g., Catton v. Defense Technology Sys., Inc.*, No. 05 Civ. 6954(SAS). 2006 WL 1716862, *4 (S.D.N.Y. June 20, 2006), relying on *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005), *cert. denied*, 126 S. Ct. 421 (2005)(recognizing various permissible ways of pleading loss causation including materialization of the risk and corrective disclosure); *In re Bradley Pharmaceuticals, Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828 (D.N.J. 2006)(rejecting Defendants' "rigid and dogmatic interpretation" that there must be a "true corrective disclosure" and concluding that "*Dura* did not address what type of events or disclosures may reveal the truth" or "how specific such a disclosure must be" or "set forth any requirements as to who may serve as the source of the information" or "that the disclosure take a particular form or be of a particular quality"); *Freeland v. Iridium World Communications, Ltd.*, 233 F.R.D. 40, 47 & n.9 (D.D.C. 2006)(and cases cited therein).

the exclusive proximate cause of harm."); *In re Daou Systems, Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005)(misrepresentation need not be sole reason for investment's decline but only a substantial cause); *Caremark Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir. 1997)(Loss causation "does not require . . . that the plaintiff plead that all of its loss can be attributed to the false statement of the defendant.").

The Supreme Court, "assum[ing], at least for argument's sake, that neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss," appeared to suggest that Federal Rule of Civil Procedure 8(a)(2)'s standard ("a short plain statement of the claim showing that the pleader is entitled to relief") applies to the pleading of economic loss and proximate causation and that plaintiff must merely give fair notice of his claim and the grounds on which it is based, a "simple test." *Id.* at 1634 ("We concede that ordinary pleading rules are not meant to impose a great burden upon a plaintiff. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 508, 513-15 . . . (2002). But it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.").[11]  Thus, as

---

[11] Not all courts agree. *See, e.g., Joffee v. Lehman Brothers, Inc.*, No. 04 Civ. 3507 RWS, 2005 WL 1492101, *14 (S.D.N.Y. June 23, 2005), in which Judge Sweet concluded that the heightened pleading standard under Federal Rule of Civil Procedure 9(b) for common law fraud applied to the pleading of loss causation for a § 10(b), Rule 10b-5 claim.

noted *supra*, under *Dura Pharmaceuticals*, one acceptable, but not the only, way to plead proximate cause and economic loss (the difference between the price the purchaser paid and the subsequent price to which the stock dropped) in fraud-on-the-market cases is to allege that the price a plaintiff paid for a security "fell significantly after the truth [of the material misrepresentation or omission] becomes known" and that the disclosure of the misrepresentation or omission had a significant effect on the market price. In sum the high court found that the plaintiffs in *Dura Pharmaceuticals* failed to state a claim because they did not provide the defendants with fair notice of their claim and the grounds on which it rested, did not assert that Dura Pharmaceuticals' share price dropped substantially after the falsity of their alleged misrepresentations became known (suggesting "that plaintiffs considered the allegation of purchase price inflation alone sufficient"), did not identify their relevant economic loss, and did not describe the causal connection between their economic loss and the alleged misrepresentation. *Id.* at 1634.

While the Supreme Court rejected the Ninth Circuit's lenient test for economic loss and loss causation as inadequate pleading in fraud-on-the-market cases, it did not address, and thus left intact, more stringent requirements that had been established by other Circuit Courts of Appeals, including the

Second, Third, Seventh, and Eleventh.[12]  125 F.3d at 1630.  For example, in *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005), *cert. denied*, 126 S.Ct. 421 (2005),[13] the Second Circuit indicated that a plaintiff must allege that his loss was "foreseeable" and that it was caused by the "materialization of the concealed risk."  396 F.3d at 173.  In *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003), the Second Circuit described loss causation in terms of the tort-law concept of proximate cause, i.e., "that damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation."  Stated another way, "a misstatement or omission is the proximate cause of an investor's loss if the risk caused by the loss was within the zone of risk *concealed* by the

---

[12] These Circuit Courts of Appeals, like the Supreme Court, have concluded that the plaintiff must allege and prove that he suffered an economic loss and that it was proximately caused by defendant's fraudulent conduct; it is insufficient merely to allege the difference between the purchase price and the true value of the security at the time of the purchase. *See, e.g., Semerenko v. Cedant Corp.*, 223 F.3d 165, 185 (3d Cir. 2000)("Where the value of the security does not actually decline as a result of an alleged misrepresentation, it cannot be said that there is in fact an economic loss attributable to that misrepresentation.  In the absence of a correction in the market price, the cost of the alleged misrepresentation is still incorporated into the value of the security and may be recovered at any time simply by reselling the security at an inflated price."), *cert. denied*, 531 U.S. 1149 (2001); *Robbins v. Koger Properties, Inc.*, 116 F.3d 1441, 1447-48 (11th Cir. 1997)("Our decisions explicitly require proof of a causal connection between the misrepresentation and the investment's subsequent decline in value."); *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 685 (7th Cir. 1990)(plaintiff must prove causation).

[13] The Court notes that *Lentell* issued on January 20, 2005, about three months before *Dura Pharmaceuticals*, and that the Supreme Court denied certiorari, but did not reverse it, after issuing *Dura Pharmaceuticals*.

misrepresentations and omissions alleged by the disappointed investor"; thus to demonstrate loss causation the complaint must allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. Otherwise the loss in question was not foreseeable . . . " The complaint must also assert "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered." *Lentell*, 396 F.3d at 172-73, 175.[14] If the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant is sufficiently direct, the element of loss causation for pleading, which requires a fact-specific inquiry at trial stage, is satisfied. *Id.* at 174. The pleading burden will vary with the circumstances. A disparity between the purchase price and the "true investment quality" at the time of purchase, by itself, is not sufficient; if there is a market-wide drop in prices, the plaintiff must plead facts that show that the plaintiff's loss was caused by the alleged misstatements and not by any intervening factor. *Id.* at 174. If there was an intervening event, like a fall in the price of gasoline stock, the issue becomes "a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion

---

[14] Thus if the complaint asserts that a broker initially rated a stock as "buy" and subsequently downgraded it to "neutral," that fact does not constitute a "corrective disclosure" because it does not disclose to the market the falsity of the earlier recommendation nor allege that the recommendation is the cause of the decline in stock value that plaintiff's claim is their loss. *Id.* at 175 & n.4.

to dismiss." *Id.*   Thus it appears *Lentell* provides different modes of pleading for different problems.

> A federal district court in New York has commented,

> Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, it is the materialization of the undisclosed condition or event that causes the loss.[15] By contrast, where the alleged misstatement is an intentionally false opinion, the market will not respond to the truth until the falsity is revealed–i.e., a corrective disclosure.[16]

*In re Initial Public Offering Securities Litig. v. Credit Suisse First Boston Corp.*, 399 F. Supp. 2d at 307.

In the aftermath of *Dura Pharmaceuticals* two appellate courts have ruled on the pleading of loss causation and economic loss.   In an unpublished opinion in a securities fraud class action suit alleging that senior Kmart officers and PricewaterhouseCoopers made misrepresentations about Kmart's financial condition before the corporation filed for bankruptcy and restated some interim financial reports, the Sixth Circuit affirmed the lower court's dismissal of the complaint for failure

---

[15] As examples, the district court cites concealed incompetence that led to the corporation's collapse, and concealment of a company's intent to recapitalize that led the plaintiff to sell his stock because he was unaware that a recapitalization will greatly increase his stock's value.   *In re Initial Public Offering Securities Litigation*, 399 F.  Supp. 2d 298, 307 n.55 (S.D.N.Y. 2005), *aff'd sub nom. Tenney v. Credit Suisse First Boston Corp., Inc.*, 2006 WL 1423785 (2d Cir. May 19, 2006).

[16] The complaint must plead disclosure of the intentional *falsity* of a statement, not merely that the statement was wrong, and tie that disclosure to the economic loss. Thus "plaintiffs' failure to allege a corrective disclosure of the falsity of defendants' opinions precludes any claim that such falsity caused their losses." *Initial Public*, 399 F. Supp. 2d at 307.

to plead loss causation for the same reasons as the Supreme Court, i.e., because in conclusory boilerplate language the complaint alleged only that plaintiffs paid artificially inflated prices for Kmart's securities and it "did not plead that the alleged fraud became known to the market on any particular day, did not estimate the damages that the alleged fraud caused, and did not connect the alleged fraud with the ultimate disclosure and loss." *D.E. & J.L.P. v. Conaway*, No. 02-2334, 2005 WL 1386448, *5, 133 Fed. Appx. 994 (6th Cir. June 10, 2005). Nor did plaintiffs allege that the bankruptcy filing disclosed the fraud behind the prior misrepresentation; "of course, the filing of a bankruptcy petition by itself does not a security fraud allegation make." *Id.* at *6. Thus the complaint did not give fair "notice of what the relevant economic loss might be or of what the causal connection might be between the loss and the misrepresentation." *Id.* at *6 ("Here, D.E. & J. has done nothing more than note that a stock price dropped after a bankruptcy announcement, never alleging that the market's acknowledgment of prior misrepresentations [defendants' fraud] caused that drop.").

In *In re Daou Systems, Inc.*, 411 F.3d 1006 (9th Cir. 2005), the plaintiffs alleged that defendants "systematically and fraudulently violated the Generally Acceptable Accounting Principles ('GAAP') in order to artificially inflate the price of Dauo's stock." *Id.* at 1012. The Ninth Circuit found the pleading of loss causation adequate where the complaint alleged a steep drop in the price of the company's stock after revelation of

accounting figures that showed its true financial condition. Specifically the complaint stated that on August 13, 1998, Daou's stock was priced at $18.50 per share. Subsequently at the beginning of August 1998, and not before, the defendants disclosed that "Daou's operating expenses and margins were deteriorating." *Id.* at 1026. On October 28, 1998 they announced that the Company had substantially missed its projected 3Q98 earnings and would report a loss of $0.17 per share, and "'that the Company's rapidly escalating work in progress account represented over $10 million in unbilled receivables-*the direct result of prematurely recognizing revenue.*'"   According to the complaint, before August 13, 1998 the defendants did not reveal the actual figures to analysts in order to hide the deterioration of operating earnings and margins resulting from premature and improper recognition of revenue. *Id.* at 1026.   After that date, defendants began disclosing figures reflecting the actual financial condition of the company, revealing that the operating expenses and margins were deteriorating and, on October 28, 1998, that Daou had substantially missed its projected 3Q98 earnings projections. Moreover they also disclosed that the accounting practice of premature recognition of revenue before it was earned allegedly resulted in a "dramatic negative effect on the market, causing Daou's stock to decline to $3.25 per share, a staggering 90% drop from the Class Period High of $34.375 *and a $17 per share drop from early August 1998.*'"   *Id.*   Plaintiffs' purported economic loss was not their purchase of their stock at inflated prices, but

the decline in the value of their stock directly resulting from disclosure of Dauo's true financial condition in contrast to earlier misrepresentations. *Id.* at 1027. The Ninth Circuit, taking Plaintiffs' allegations as true, found they were adequate to provide Daou with the requisite indication that the drop in its stock price from its August 13 1998 high of $18.50, following its disclosures beginning in August 1998, was causally related to its practice of prematurely recognizing revenue before it was earned. *Id.*

The Fifth Circuit has not addressed loss causation since *Dura Pharmaceuticals* was issued, although it previously examined the question of loss causation with respect to misrepresentations in *Greenberg v. Crossroads Systems, Inc.*, 364 F.3d 657 (5th Cir. 2004).[17] It has not addressed loss causation relating to concealed fraudulent conduct under Rule 10b-5(a) and (c). Therefore for conduct, this Court applies the Second Circuit's standard under *Lentell* (that a plaintiff must allege that his loss was "foreseeable" and that it was caused by the "materialization of

---

[17] Before the Supreme Court decision, the Fifth Circuit used the same language as the Ninth Circuit in discussing pleading loss causation, but it is clear from the context that the language was defined differently and required a showing of proximate cause: *Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir. 1981)(the plaintiff must prove loss causation by demonstrating that "the untruth was in some reasonably direct, or proximate, way responsible for his loss. The causation requirement is satisfied in a Rule 10b-5 case only if the misrepresentation **touches upon** the reasons for the investment's decline in value. If the investment decision is induced by misstatements or omissions that are material and that were relied upon by the claimant, but are not the proximate reason for his pecuniary loss, recovery under the Rule is not permitted. [emphasis added by the Court]"), *aff'd in part and rev'd in part on other grounds*, 459 U.S. 375 (1983).

the concealed risk," 396 F.3d at 173).  Moreover, pursuant to the Supreme Court's discussion in *Dura Pharmaceuticals*, the Court does not impose heightened or onerous pleading requirements for loss causation.

**The Issue**

**Barclays' Motion for Judgment on the Pleadings**

Barclays insists the pleadings fail to state a claim because they merely assert that plaintiffs "suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices in connection with their purchase of Enron securities," an allegation that by itself is insufficient as a matter of law.  First Amended Consolidated Complaint (#1388) at 629, ¶ 997.  Such price inflation allegations are like those rejected by the Supreme Court in *Dura Pharmaceuticals*.  The complaint does not allege that plaintiffs suffered losses caused by Barclays' purported misconduct.

Furthermore, even if the Court allows Lead Plaintiff to amend again, Barclays maintains that Lead Plaintiff cannot adequately plead loss causation with respect to Barclays because the governing complaint identifies only one public disclosure of a Barclays-related transaction before Enron Corporation filed for bankruptcy.  The sole Barclays-related transaction publicly disclosed before Enron filed for bankruptcy was Chewco.  Chewco closed in December 1997,[18] and therefore claims based on it are

_____

[18] First Amended Consolidated Complaint (#1388) at 511, ¶ 757 (describing Chewco transaction as commencing "at year-end 97" and "very late in 97"), triggering the running of the three-year

time-barred by the applicable three-year statute of repose, which limits claims against Barclay to conduct arising after April 8, 1999.[19]  *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 235 F. Supp. 549, 689 (S.D. Tex. 2002); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.,* 310 F. Supp. 2d 819, 848 (S.D. Tex. 2004); *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364 (1991).  Although during the Class Period the price of Enron stock fell from allegedly inflated prices to near bankruptcy level, Lead Plaintiff can only allege that the class members suffered damages because of conduct not associated with Barclays.

Barclays also insists that pleading loss causation as to Barclays cannot be satisfied by alleging that Plaintiffs' losses were caused by a gradual series of disclosures over time of some, but not all, details of the alleged *Ponzi* scheme generally (e.g., the broadband business, failed investments, Skilling's resignation, the SEC investigation, etc.), lumping together the alleged conduct of all the defendants, when none of these disclosures involved actionable conduct by Barclays. Plaintiffs must demonstrate that their losses were caused by Barclays' particular conduct, not the conduct of other Defendants, to state a § 10(b)/Rule 10b-5 claim against Barclays:  plaintiff "shall have the burden of proving the act or omission of the

---

statute of repose).

[19] This suit was commenced on April 8, 2002.  *In re Enron Corp. Sec., Derivative, & "ERISA" Litig.*, 235 F. Supp. 2d 549, 689 (S.D. 2002).

defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(4). Moreover, under *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994), a defendant may be held liable as a primary violator under an alleged scheme to defraud only "if all the requirements for liability under Rule 10b-5 have been satisfied *as to each secondary-actor defendant* . . . ." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 549, 591 (S.D. Tex. 2002). Loss causation is one of the elements that must be satisfied.

Last of all, Barclays contends that scheme liability was "flatly rejected in *Dura*."[20] Instead the Supreme Court examined the effect of each alleged misrepresentation separately and found the pleadings insufficient to state a claim.

**Lead Plaintiff's Opposition**

In opposition, Lead Plaintiff argues that Barclays "purposefully structured numerous transactions for Enron to artificially increase the amount of Enron's reported cash flows from operations, to conceal from investors the actual amount of Enron's debt obligations, to mask the volatility of Enron's risky business endeavors, to move impaired assets off Enron's books at inflated values and to create the false appearance that Enron was conservatively accounting for its mark-to-market profits and had

---

[20] Lead Plaintiff maintains that *Dura Pharmaceuticals* is not a "scheme" case.

high quality earnings.   Barclays' fraudulent conduct helped to create[] the appearance Enron was a creditworthy and financially successful company[] when nothing was further from the truth." #3681 at 1.   The known risk of this fraudulent conduct, that Enron would go bankrupt, was deliberately concealed from shareholders and investors, ultimately and foreseeably materializing in Enron's bankruptcy and in Plaintiffs' losses, exemplifying classic loss causation, argues Lead Plaintiff.   Throughout the Class Period in response to partial disclosures, rumors, and questions relating to Enron's fraudulent scheme, the price of Enron stock dropped. Lead Plaintiff insists, "It is of little significance investors' fears were not fueled by **specific** revelations that Barclays had structured a number of the transactions that disguised Enron's true financial condition."   #3682 at 4.   Lead Plaintiff contends, "An examination of Barclays' acts during the Class Period demonstrates the very concerns that led to Enron's bankruptcy-liquidity, undisclosed debt, financial engineering-were concealed by various Barclays/Enron deals."   *Id.* at 9.

         With respect to Chewco,[21] Lead Plaintiff argues that its role in Barclays' role in the transaction continued long after April 1999 when the transaction closed.   It claims that Barclays acted to protect its loans to Big River and Little River and to

_____

         [21] Although Lead Plaintiff repeatedly states that this Court held that Barclays is liable for its role in Chewco, the Court did no such thing.   In opinions issued before *Dura Pharmaceuticals*, the Court examined the allegations in the complaint to determine whether or not they stated a claim for purposes of Rule 12(b)(6); it made no ruling on the merits of the claim.

"do deals including a financing in JEDI at the end of 1999."
#3682 at 10.  It lists a notice from Big River and one from Little
River stating  each entity's intent to repay loans and an e-mail
stating the financing had been repaid in full.  Lead Plaintiff
asserts that the Big River and Little River reserve accounts, to
which Chewco had fraudulently funneled money, were actively
monitored by Barclays as of November 9, 1999.  Exs. 5-7 to #3682.
In December 1999 Barclays provided $128.375 million of $513.5
million financing,[22] supported by c.12 million shares of Enron
stock currently held by JEDI.  Ex. 8 to #3682.[23]  Alternatively,
should the Court find that the claims based on Chewco are time-
barred, Lead Plaintiff argues that the transaction can still be
used to show Barclays had scienter in its subsequent participation
in the scheme.  *In re Enron*, 235 F. Supp. 2d at 689.

Moreover, Lead Plaintiff asserts that it has met the
Fed. R. of Civil Procedure 8's notice pleading requirements by
providing "some indication" of the loss and the causal connection.
Noting that "Chewco operated to affect Enron's financial
statements as late as 2000," it provides a copy of Enron's
September 30, 2001 (Ex. 2 at 16 to #3682) demonstrating that
"[t]he deal resulted in the overstatement of income by $405
million during 1997-2000 and an understatement of debt by $711

---

[22] The rest was to be provided by Chase, CSFB, and Lehman
Brothers.

[23] Lead Plaintiff also refers to Enron, Fastow and Kopper's
continued involvement in Chewco, but these allegations do not state
a claim against Barclays.

million, $561 million, $685 million and $682 million for the years ending 1997, 1998, 1999, and 2000, respectively."  #3682 at 10.

In addition to Chewco, Lead Plaintiff maintains that Barclays was a primary actor in three prepay deals (Nixon, Roosevelt, and the 2001 Prepay), characterized as "loans" and classified as debt in internal reviews of Enron's credit risk by Barclays.  In actuality, Lead Plaintiff asserts, Enron accounted for them as cash flow from operations rather than cash from financing (debt obligations that would have to be repaid), and they served to deceive investors by hiding billions of dollars of Enron's debt, overstating Enron's cash flow from operations[24] by billions of dollars, and fraudulently propping up Enron's credit rating.  Although Lead Plaintiff cites the First Amended Consolidated Complaint at ¶¶ 44-47,[25] 684[26], these paragraphs do not relate to these three prepay deals.  It also cites Exhibits 10-12 to #3682, but without any discussion or explanation.

Lead Plaintiff describes Nikita, which closed in September 2001, as "an FAS 140 deal whereby Enron effectively sold

---

[24] Lead Plaintiff states that these deceptions made it appear that the cash from the prepays came from successful business operations and were not debt obligations that would have to be repaid.  John Meyer Dep., Ex. 13 at 255-57 to #3682.  The Court notes that Meyer testified that he had concluded that the prepays were a type of financing for Enron, but that it was Arthur Andersen, not Meyer, that decided the prepays should be accounted for as cash flow from operations.

[25] Refer not to Barclays, but to JP Morgan, Citigroup, and Credit Suisse First Boston's alleged disguised loans.

[26] Refers not to Barclays, but to Citigroup's prepaid swaps via Delta.

- 30 -

its limited partnership interests in EOTT Energy Partners LLP to Besson Trust, an SPE which was funded by the issuance of notes and certificates, with the certificates serving as the 3% at-risk equity portion of the transaction to obtain off-balance sheet treatment. *See* Exs. 16, 17.   The deal resulted in Enron's reporting incorrectly $10 million in income and $80 million in financing cash flows rather than debt."   #3682 at 13.   Lead Plaintiff states that initially Barclays was supposed to provide the notes and certificates, but decided not to because of regulatory concerns.   Instead Credit Suisse First Boston ("CSFB") performed that role, but required Barclays to enter into a total return swap, so that Enron's verbal assurances that the equity provider would not lose its investment continued to run to Barclays and Barclays was guaranteeing that CSFB would not lose its equity investment.   *Id*.   Lead Plaintiff reports that Nikita was disclosed before Enron filed for bankruptcy.

Lead Plaintiff also points to a J.T. Holdings transaction in November 2001 to refinance a synthetic lease structure of a storage facility and a methanol plant, which Barclays and Enron structured to keep $110 million of debt off Enron's balance sheet.   The outside 3% equity at risk was to come from certificates and A and B notes issued by Enron/NLG.   In actuality, Lead Plaintiff asserts that Barclays purchased a portion of those B notes and certificates while requiring Enron to orally promise that Barclays' equity investment would be repaid; thus Barclays' equity was not at risk and the off-balance-

sheet treatment was improper.  Exs. 19, 20, 21, 23 to #3682.   In addition, when the storage facility was removed from the lease in June 2001, Barclays mandated Enron to establish a "cash collateral account for the benefit of the B notes and certificates," further reducing risk for its equity investment.  Ex. 24.  Lead Plaintiff claims that the J.T. Holdings transactions falsely presented Enron as a successful business.

In September and October 2001, Enron misrepresented $167.6 million in cash flow from financing (debt) as cash flow from operations by selling its interest in sulfur dioxide credits to Colonnade, a Barclays-created special purpose vehicle ("SPV"). Exs. 25, 26.   According to Lead Plaintiff, "The transactions involved a complex structure of put and call options, commodity swaps and guarantees which created the same effect as borrowing by Enron secured by emission credits"; in other words, in essence they were debt obligations.  #3682 at 14.  Lead Plaintiff states that the way Barclays structured Colonnade caused Arthur Andersen to conclude that the SPV could not obtain off-balance-sheet treatment.   Ex. 25.   Moreover, Lead Plaintiff asserts that Barclays "was warned by its external accountants that because the risks and rewards of the deal remained with Enron, off balance sheet treatment would not be proper," but consummated the deal anyway.  Exs. 27-34.

Lead Plaintiff also references two metals transactions between Enron and Barclays, one involving metal warrants and warehouse receipts and closing in September 2000 for $750 million,

and the other involving a sale of physical metal and closing in December 2000 for $1 billion, that allowed Enron to conceal up to $1,750 million of debt and improperly report the same amount as cash flow from operations.   Lead Plaintiff describes the scheme as follows.   Enron sold the metal warrants or physical metal to Barclays at a discounted price in exchange for lump sum payments, while Barclays contemporaneously granted Enron an option with the right to purchase the same amount of warrants or metals at the same price.   Exs. 15, 35, 36, 37.   The discount was a strong incentive for Enron to purchase the metal from Barclays.   Barclays then entered into a forward contract with London Clearing House to sell it the same amount of warrants or metals at the same discounted price.   Exs. 36, 38.   Next Enron entered into a forward contract with London Clearing House to purchase from London Clearing House the same amount of warrants or metals.   According to Lead Plaintiff, these transactions disguised Enron's true debt level and concealed debt obligations, while fraudulently inflating its cash flow, manipulating its earnings, distorting its creditworthiness, and causing Enron to be so highly leveraged that it was overwhelmed by its debt obligations.

To satisfy the element of loss causation, Lead Plaintiff points to the First Amended Consolidated Complaint's detailed identification in ¶¶ 52-74, 280, of a stream of rumors, disclosures, media articles, conference calls, insider trading, and reports about Enron's actual financial condition that caused significant drops in the price of Enron stock toward the end of

2000 and through 2001. Lead Plaintiff charges that "Enron's accumulated financial chicanery had created a liquidity crunch inside Enron," which was gradually revealed to the public through partial disclosures of accounting improprieties, insider trading, departure of key Enron insiders, etc., resulted in the steep stock price decline, damaging plaintiffs. Exs. 39, 40, 41, 42, 44, 43. It points to November 19, 2001 when Enron publicly disclosed its liquidity crunch. Lead Plaintiff argues that at this revelation, Barclays' conduct in creating and disguising Enron's liquidity crisis caused plaintiffs to be damaged. It asserts that November 19, 2001 was the date when Barclays' fraud was expressly disclosed at a conference at the Waldorf-Astoria Hotel in New York, when Enron executives identified Nikita and certain non-Barclays-related prepays as debt obligations. Ex. 50 at ERN0000744 to #3682.

As further evidence of loss causation, Lead Plaintiff points to the failed merger of Enron with Dynegy after Dynegy's due diligence efforts uncovered the actual financial condition of Enron and its fraudulently structured financings, which included at least several of Barclays' transactions. Lead Plaintiff contends, "Barclays fraudulently concealed the very risks that ultimately materialized and caused plaintiffs' damages." It argues, "Barclays structured transactions to deceptively assure investors that Enron was: 1) creditworthy, 2) its earnings were real, 3) its cash flows substantial and 4) its actual debts manageable," when it knew the opposite was true and these

concealed risks materialized in Enron's collapse into bankruptcy,
"classic loss causation."  For authority, *inter alia,* it cites
*Semerenko v. Cedant Corp.*, 223 F.3d 165, 186 (3d Cir.
2000)(rejecting argument that termination of a merger was an
intervening event that caused plaintiffs' loss rather than
defendants' misrepresentations: " . . . it is reasonable to
conclude that the disclosure of the falsity of the alleged
misrepresentations played a substantial factor in the termination
of the merger agreement" and "the complaint alleges sufficient
facts to establish the element of loss causation").  Moreover,
Lead Plaintiff claims that Barclays fraudulently concealed the
very risks that ultimately materialized in Enron's bankruptcy and
caused plaintiffs' damages.  *See In re Taxable Municipal Bonds
Litigation*, Civ. A. MDL No. 863, 1992 WL 165974, *9 (E.D. La. July
1, 1992)(for loss causation plaintiffs "must allege that they
would not have suffered the loss absent the misrepresentations.
Most importantly, 'they must allege that they were injured because
the *risks* that materialized were the risks of which they were
unaware as a result of the defendants' misleading statements, not
the risks of which they were fully aware.'"), *citing Miller v.
American High Income Fund*, 755 F. Supp. 1099, 1107-08 (D. Mass.
1991), and *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 687
(7th Cir.), *cert. denied*, 496 U.S. 906 (1990).  *See also Castellano
v. Young & Rubicam*, *Inc.*, 257 F.3d 171, 189-190 (2d Cir. 2001);
*Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th
Cir. 1997); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 307

(S.D.N.Y. 2005). "[L]oss causation does not require full disclosure and can be established by partial disclosure during the class period which causes the price of shares to decline." *Montoya v. Mamma.com Inc.*, No. 05 Civ. 2313 (HB), 2005 WL 1278097, *2 (S.D.N.Y. May 31, 2005).

**Barclays' Reply (#3756)**

Barclays replies that since the Chewco transaction claims are time-barred and since the governing pleading does not identify any other conduct by Barclays that caused Plaintiffs' loss, they "now try to concoct an entirely new theory of liability," i.e., that Barclays "'concealed the risk' of Enron's precarious financial condition." #3756 at 2. Barclays contends that this new theory is not mentioned in the First Amended Consolidated Complaint, nor was it raised in Lead Plaintiff's opposition to any defendant's motion to dismiss, and thus may not be considered on a motion for judgment on the pleadings. Moreover, since Plaintiffs' claims against Barclays are premised on conduct in violation of Rule 10b-5(a) and (c), and not on material omissions under subsection (b), to plead that Plaintiffs' loss was directly caused by Barclays conduct, Plaintiffs must, but fail to, "allege some aspect of a risk that *Barclays* concealed caused losses after those risks became known or materialized." #3756 at 3. But Plaintiffs do not allege that any of the Barclays' purported transactions were disclosed or unwound before the collapse of Enron stock's price and thus do not show that the disclosure or realization of some risk caused Plaintiffs' loss.

Barclays further argues that merely alleging the existence of a scheme to defraud is also insufficient to plead loss causation; Plaintiffs must allege facts to satisfy all the elements of a § 10(b) claim **as to each defendant**, including loss causation, i.e., a direct causal link between a material misrepresentation or wrongful conduct *by Barclays* and Plaintiffs' loss. Barclays maintains that allegations that Barclays participated in several transactions that Enron failed to properly account for and that the company and its stock ultimately collapsed because of financial and accounting problems is what *Dura Pharmaceuticals* rejected: "To 'touch upon' a loss is not to cause a loss, and it is the latter that the law requires." 125 S. Ct. at 1632. The general allegation that there is "a very strong connection between Barclays' conduct and plaintiffs' being damaged" does not satisfy the element of loss causation. The First Amended Consolidated Complaint does not allege that any actionable Barclays transaction was disclosed or unwound before the price of Enron stock collapsed or that the concealed risk associated with such a transaction was realized and thereby caused the decrease in the stock price and damage to the Plaintiffs. Instead Plaintiffs set out partial disclosures of negative information about Enron, but no corrective disclosure about Barclays' actionable conduct. Barclays argues that Plaintiffs cannot rely on general allegations of loss causation as to all defendants; they must plead that Barclays caused their loss. Rumors of accounting improprieties, insider sales, negative

financial disclosures, an investigation of Enron's mark-to-mark accounting, Skilling's resignation, and Enron's failed merger with Dynegy do not plead loss causation with respect to Barclays. Loss caused by Barclays conduct must be distinguished from loss caused by "the tangle of factors" that affect the price of Enron stock; there must be some disclosure of truth related to Barclays' earlier actionable conduct that eliminates inflation in the stock price.

Barclays complains that Plaintiffs now argue that another Barclays-Enron transaction, "Nikita," which closed in the third quarter of 2001, was publicly disclosed before Enron's bankruptcy and caused Plaintiffs' injury. Barclays emphasizes that Nikita is not mentioned in the First Amended Consolidated Complaint. Even if it had been, insists Barclays, it could not have caused Plaintiffs' losses because the allegedly corrective disclosure regarding Nikita occurred on November 19, 2001 at a PowerPoint presentation by Enron to its bankers, the same day that the transaction appeared on Enron's financial statements (third quarter 10-Q); the "disclosure" could not have caused a decline in the stock price because it did not correct any previously false financial statement. While Plaintiffs argue that the same presentation disclosed Enron's "prepay liability," they do not relate it to prepay transactions in which Barclays participated.

As for Lead Plaintiff's argument that Barclays' involvement in Chewco continued after the transaction (with investors making payments to Barclays, which monitored their

accounts), Barclays points out that these continuing acts are not pleaded in the First Amended Consolidated Complaint nor do they constitute actionable conduct under § 10(b). This Court previously rejected a similar argument with regard to the STDs of Deutsche Bank and ruled that the statute of repose is triggered by the first discrete act in each transaction. *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 310 F. Supp. 2d 819, 844, 848-49 (S.D. Tex. 2004).

**Lead Plaintiff's Sur-Reply (#3751)**

Lead Plaintiff again cites Judge Lewis B. Kaplan's opinion in *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472 (S.D.N.Y. 2005), as authority for its contention that it has adequately pleaded loss causation by asserting that Barclays concealed and disguised material risks concerning Enron's financial well-being and that Plaintiffs were damaged when those risks materialized as Enron collapsed into bankruptcy:

> The Second Circuit recently explained in the context of fraud actions based on misstatements and omissions: "To plead loss causation, the complaint must allege facts that support an inference that [the defendant's] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud. In short, "the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission." As the Court noted in its earlier opinion, loss causation does not, as the defendants would have it, require a corrective disclosure followed by a decline in price.
> The loss causation requirement applies as well where the claims are based on deceptive or manipulative conduct in

> violation of Rule 10b-5(a) and (c).  By
> analogy, the loss causation requirement will
> be satisfied if such conduct had the effect
> of concealing the circumstances that bore on
> the ultimate loss.  The schemes involving
> worthless invoices and the CSFB transactions
> created the appearance of assets or revenue
> where there was none and therefore concealed,
> among other things, the risks that Parmalat
> would be unable to service its debt and
> consequently suffer financial collapse.  As
> the earlier opinion explained, that risk
> materialized when Parmalat suffered a
> liquidity crisis in December 2003.

*Id.* at 510 (footnotes omitted).  Moreover, insists Lead Plaintiff,
its theory is not new.  This Court previously wrote,

> [T]he plaintiffs have adequately pleaded that
> their loss was directly and foreseeably
> caused by Defendants' alleged fraudulent
> practices at Enron. . . . Nonexposure of
> Enron's deceptive business practices and the
> concealment of its actual financial condition
> directly and foreseeably induced the
> plaintiffs to purchase securities at a highly
> inflated price until the Ponzi scheme bubble
> inevitably broke.

*In re Enron*, 310 F. Supp. at 832.  Lead Plaintiff has pleaded that
Barclays and other banks "concealed" the true financial condition
of Enron through Chewco and other secretly controlled partnerships
and entities, until Enron collapsed under the weight of its debts
and it filed for bankruptcy, the realization of the very risks
Barclays worked to conceal.  #1388, ¶¶ 11, 18-20, 48, 66.

**Barclays' Reply to Sur-Reply (#3806)**

Barclays insists that Lead Plaintiff never asserted a
theory based on "concealing the risk" of an investment.  Moreover
in the cases it cites, the defendants had made statements on
specific subjects and therefore had an affirmative duty to

disclose a particular risk and could be liable for material omissions about that risk.  Lead Plaintiff concedes that its claims are under Rule 10b-5(a) and (c) and based on conduct, not material omissions under Rule 10b-5(b), and thus are not about an obligation and failure to disclose the risk of an investment.

Regardless, insists Barclays, Lead Plaintiff's new argument does not satisfy the standard for pleading loss causation under *Dura Pharmaceuticals.*  Lead Plaintiff is required to plead that each defendant's actionable conduct, whether concealed or not, directly caused plaintiffs' loss; in other words it must plead that some risk was concealed by Barclays transactions with Enron that caused losses after those risks materialized.  Because Lead Plaintiff fails to allege that any Barclay transactions were disclosed or unwound before the collapse of Enron, no disclosure or realization of the allegedly concealed risk caused plaintiffs' loss.

Barclays argues that the *Parmalat* court rejected plaintiffs' efforts to pursue liability for transactions in which banks made loans disguised as equity investments or assets as not actionable aiding and abetting under *Central Bank* because "[a]ny deceptiveness resulted from the manner in which Parmalat or its auditors described the transactions on Parmalat's balance sheets and elsewhere."  Barclays claims that the *Parmalat* court did not address the sufficiency of plaintiff's loss causation allegations for those transactions.

### Court's Decision

Barclays has raised a number of issues here, which should be resolved not only for Barclays' motion, but with respect to those pending from other Defendants.   In the course of this litigation, the relevant law has evolved and been modified and clarified, often in different ways by different courts, and the Court has attempted to address the problem, at times retroactively, as here.   In addition to the impact of *Dura Pharmaceuticals*, the Court also re-examines the allegations against Barclays under *Central Bank*'s preclusion of aiding and abetting claims under § 10(b).

As indicated earlier, the Court reads the *Dura Pharmaceuticals* opinion more broadly than does Barclays.   First the Court observes that *Dura Pharmaceuticals* addressed only § 10(b) claims of misrepresentations and omissions, which would fall under Rule 10b-5(b).   Contrary to Barclays' contentions, *Dura Pharmaceuticals* did not address an umbrella scheme involving secondary actors nor conduct under Rule 10b-5(a) and (c), as does *Newby* Lead Plaintiff, but focuses on the alleged misleading statements of Dura Pharmaceuticals' own managers and officers. Its holding was narrow, i.e, that to allege loss causation a plaintiff pleading a fraud-on-the-market claim under § 10(b) must plead more than that it purchased stock at an inflated price because of a defendant's misrepresentation (or wrongful conduct) and thus suffered a loss.   The Supreme Court did not specify or rigidly limit what must be pled; nor did it require a corrective

disclosure rather than other ways that "relevant truth begins to leak out" or "makes its way into the market place." 125 S. Ct. at 1631-32. Nor did it require complete disclosure. *Id.* Moreover, it held that a complaint need give defendants only general notice under a subjective standard, i.e., "some indication of the loss and the causal connection that the plaintiff has in mind." 125 S. Ct. at 1634. Nor need the defendant's fraud be the exclusive cause of plaintiff's loss, but only a substantial cause. *Id.* at 1632. This Court also interprets the opinion as permitting the pleading of loss causation under the notice standard of Rule 8 rather than applying the heightened requirements of Rule 9(b).

Moreover, because in reversing the Ninth Circuit's lenient pleading standard for loss causation, merely that plaintiff purchased securities at an inflated price because of misrepresentations by defendant(s), *Dura Pharmaceuticals* left standing the stricter requirements of other courts and because the Fifth Circuit has not ruled on the question of pleading loss causation since the Supreme Court issued its opinion, this Court has applied the standard of the Second Circuit, i.e., that the plaintiff's loss was foreseeable and was caused by the materialization of the concealed risk. *See, e.g., Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005), *cert. denied*, 126 S. Ct. 421 (2005). Moreover, in certifying the *Newby* class, the Court relied on the analysis by Judge Kaplan in *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472 (S.D.N.Y. 2005), in which, as in *Newby*, claims were asserted against not only the

corporate defendant Parmalat, its officers and directors, but also against outside accountants, lawyers, and banks based on both misrepresentations under Rule 10b-5(b), and on a "device, scheme or artifice to defraud" and/or "any act, practice or course of business which operates or would operate as a fraud or deceit upon any person" in connection with the purchase of sale of any security under Rule 10b-5(a) and (c).   The Court does the same here with regard to the allegations against Barclays.

As indicated, in its opinion and order #4735 this Court adopted the SEC's test[27] for primary liability under Rule 10b-

---

[27]   Any person who directly or indirectly engages in a manipulative or deceptive act as part of a scheme to defraud can be a primary violator . . .; any person who provides assistance to other participants in a scheme but does not himself engage in a manipulative or deceptive act can only be an aider and abettor.

#4528, Amicus Curiae Brief filed in *In re Homestore.com Inc. Sec. Litigation*, No. C01-11115 MJP, then pending before the District Court of the Central District of California, Ex. I at 16.   As this Court wrote, #4735 at 79-80,

Recognizing the need to distinguish between an aider and abettor and a primary violator in the wake of *Central Bank*, the SEC requires that a primary violator thus, directly or indirectly, engage in a manipulative or deceptive act, which is conduct expressly covered by the statute. . . . [A] "deceptive act" includes a "transaction whose principal purpose and effect is to create a false appearance of revenues," which can be accomplished by acts as well as by words.   *Id*. at 18-19.   Section 10(b) also covers market manipulation, which the SEC construes broadly as "typically involv[ing] conduct that creates a false appearance of trading activity."   *Id*.

at 19, *citing United States v. Russo*, 74 F.3d 1383, 1391 (2d Cir. 1996)(holding trading scheme which "create[d] a false impression" of demand for the subject stock constituted market manipulation under Section 10(b) and Rule 10b-5), *cert. denied*, 519 U.S. 927 (1996).  *Id.* at 19.

A major difficulty in the wake of *Central Bank* is defining clearly what conduct constitutes aiding and abetting and what would qualify as a primary violation of § 10(b). The SEC's brief provides some illuminating examples to distinguish the two.  The SEC maintains that a bank that makes a loan, even if it knows that the borrower will use the proceeds to commit securities fraud, may be liable only an aider and abettor because the bank, itself, has not engaged in any manipulative or deceptive act; similarly a bank that provides services arranging for financing for a client that it knows will then use the funds for securities fraud is only aiding and abetting.  *Id.* at 20.  In the same vein, if a third party enters into a legitimate transaction with a corporation where it knows that the corporation will overstate revenue generated by that transaction, the third party is merely aiding and abetting; in contrast, if the third party and the corporation engage in a transaction whose principal purpose and effect is to create a false appearance of revenues, intended to deceive investors in that corporation's stock, the third party may be a primary violator.  *Id.* at 20.  As a final example, if a third party enters into a transaction to purchase goods from the corporation where terms include a legitimate option to return the goods for a full refund, knowing that the corporation will misrepresent the transaction as a final sale, the third party at most is an aider and abettor; but if the parties to that transaction have a side oral agreement that no goods will be delivered and no money paid and the corporation falsely states that it received revenue from the transaction, the third party may be liable as a primary violator.  *Id.* at 20-21.  The SEC departs from *Lernout*, 236 F. Supp. 2d at 173)(holding that primary liability exists for

5(a) and (c).  It appears to be in accord with Judge Kaplan's analysis in *Parmalat*.

Judge Kaplan pointed out that before the issuance of *Central Bank*, "the vast majority of Rule 10b-5 cases has targeted false or misleading statements, conduct prohibited by subsection (b) of the Rule" and did not focus on the language of subsections (a) and (c) other than to "target certain forms of manipulative trading activity." *Parmalat*, 376 F. Supp. 2d at 497.  He opined,

> Presumably one reason for this is that the essence of fraud or deceit, at least at common law, is a misrepresentation that induces detrimental reliance.  This theory of recovery is familiar, and it therefore was not controversial to base private damages actions for Rule 10b-5 violations on this pattern.  Moreover, any deceptive device or practice, other than one involving manipulative trading activity, logically requires that somebody misrepresent or omit something at some point, even though the device could entail more than the misrepresentation.  As it was widely agreed [before *Central Bank*] that Rule 10b-5 prohibited misrepresentations and omissions, and aiding and abetting liability also was uncontroversial, the path of least resistance for a plaintiff suing based on a deceptive arrangement with multiple actors was to

---

> "any person who substantially participates in a manipulative or deceptive scheme by directly or indirectly employing a manipulative or deceptive device (like the creation or financing of a sham entity) intended to mislead investors, even if a material misstatement by another person creates the nexus between the scheme and the securities market."), concluding that the "substantial participation" is not appropriate in the context of a scheme to defraud under Rule 10b-5(a), but aptly applies to the making of a misleading statement under Rule 10b-5(b). Ex. I at 16-17, n.3.

> allege that one actor had misrepresented or
> omitted a material fact and that the other
> actors had aided and abetted that fraud.

*Id.*

Now, post-*Central Bank*, Judge Kaplan insists, one can no longer ignore the issues raised by the language in subsections (a) and (c). *See also* the Ninth Circuit's opinion in *Simpson v. AOL Time Warner, Inc.*, ____ F.3d ____, ____, No. 04-55665, 2006 WL 1791042 , *8 (9th Cir. June 30, 2006)(emphasis in original)(holding that "imposing liability under § 10(b) for conduct other than making a material misstatement or omission" does not conflict with *Central Bank*; "We see no justification to limit liability under § 10(b) to only those who draft or edit the statements released to the public."), *affirming and remanding*, *In re Homestore.com, Inc. Sec. Litig.*, 252 F. Supp. 2d 1018 (C.D. Cal. 2003).

Judge Kaplan also discussed at length the difficulty of distinguishing aiding and abetting from primary violations of § 10(b) before and after *Central Bank*, especially before courts began to focus on the language of Rule 10b-5(a) and (c). *Parmalat*, 376 F. Supp. 2d at 494-503.

Because the claims in *Newby* against Barclays are based on conduct, the Court examines that portion of Judge Kaplan's opinion addressing primary liability under Rule 10b-5(a) and (c) with regard to motions to dismiss from four banks in *Parmalat*.

In *Parmalat*, the plaintiff investors in the company's securities asserted primary violations of § 10(b) based various types of transactions against several bank defendants, i.e.,

Citigroup, Bank of America, Banca Nazionale del Lavoro, and Credit Suisse First Boston.  Rather than recite the allegations against each, as examples the Court summarizes the three claims against Citigroup, which was described generally as "knowingly and actively" participating in a fraudulent scheme with "intimate knowledge" of Parmalat's financial situation because of a close relationship with the company and direct participation in fraudulent acts.  376 F. Supp. 2d at 481.

The complaint charges three deceptive devices or schemes involving Citigroup.  First,[28] plaintiffs alleged that a subsidiary of Citigroup, Eureka Securitization plc ("Eureka"), along with Archimede Securitization S.R.l. ("Archimede"), purchased invoices for goods sold by various Parmalat subsidiaries and then sold commercial paper secured by those invoices.  The court found that securitization by itself was not deceptive, but that Parmalat's billing system was.  Specifically, Parmalat supplied supermarkets and other retailers with its products through wholesale dealers. Parmalat would invoice the wholesale dealers for each delivery and usually was paid the amount of the invoice.  The dealers then sometimes sold to retailers on their own account and sometimes distributed Parmalat's products to supermarkets on behalf of Parmalat.  When they did the latter, they would give Parmalat proof of the delivery to the supermarket and Parmalat would issue another invoice directly to the supermarket and reimburse the dealer for the goods it had distributed to the supermarket.

---

[28] 376 F. Supp. 2d at 481-82.

Deception entered when Parmalat assigned to Eureka and Archimede for securitization not only the original invoices to the dealers, but the secondary (duplicate) invoices to the supermarkets, which did not represent real revenue for Parmalat because it had to reimburse the dealers for those amounts. Having computer access to Parmalat's billing system, Citigroup knowingly sold both types of invoices to investors, double counting them, even though Parmalat was entitled to revenue only from one or the other, and thereby Citigroup misrepresented Parmalat's true financial situation to investors. Furthermore, regulations permit only independent financial institutions, but not the entities generating the receivables, the right to collect payment on the invoices. Here, however, Eureka and Archimede assigned the right to collect payment back to Parmalat, which characterized the arrangement on its balance sheet as a securitization rather than a debt, misleading plaintiffs.

In a second arrangement,[29] Parmalat and Citigroup entered into what was characterized as a joint venture. Parmalat set up a Swiss branch of its subsidiary Gestione Centrale Latte S.r.l. ("Geslat"), into which Citigroup placed funds which Geslat would use to make loans to other companies in the Parmalat group from which Citigroup received a share of the profits. Parmalat simultaneously gave Citigroup a put option which permitted Citigroup to sell its interest in Geslat back to Parmalat at a guaranteed price that would provide Citigroup with profit on its

[29] *Id.* at 482-84.

investment.   Citigroup later modified the arrangement by making two of its subsidiaries, Buconero LLC and Vialattea LLCs, provide the funds to Geslat.   While guaranteeing itself a certain fixed rate of return and the right to cancel the arrangement and require repayment of its initial contribution, Citigroup structured transactions to disguise several of two of the subsidiaries' loans, at favorable rates to Parmalat, as equity investments although they were though actually debt, in order to conceal Parmalat's poor economic performance and prevent a lowering of its credit rating.   Citigroup purportedly knew that Parmalat would use these disguised loans to conceal debt on its financial statements. After Parmalat collapsed, Citigroup publicly characterized the investments as debt and claimed it would only engage in such transactions now if the client provided increased disclosure.

Third, in 1997 and 1998 Parmalat bought three Canadian food and dairy companies (together, dubbed "Parmalat Canada") and then helped finance Parmalat Canada with a substantial sum pursuant to an agreement that Parmalat Canada would either be publicly listed or that Citigroup could return its interest to Parmalat for a specified amount (a put option).   Parmalat recorded Citigroup's funding on its financial statements as equity so that Parmalat's debt-to-equity ration would appear lower, when the funding actually was a high interest loan in which Citigroup bore no risk because of the put option.   Citigroup would receive an unusually high return (in subscription fees, advisory fees, and net tax-free gain of C$47.82 million when it exercised its put

option), reflecting the illegal nature of the transaction.  After 1999 Parmalat's financial statements purportedly failed to disclose the put option.

In *Parmalat*, Judge Kaplan recognized the following elements as the standard for pleading § 10(b) claims in violation Rule 10b-5(a) and (c):

> the plaintiff must allege that a defendant (1) committed a deceptive or manipulative act, (2) with *scienter*, that (3) the act affected the market for securities or was otherwise in connection with their purchase or sale, and that (4) defendants' actions caused plaintiffs' injuries.

376 F. Supp. 2d at 491-92.

Furthermore, in that opinion Judge Kaplan ruled that primary liability may be imposed on a bank that participates in a deceptive scheme by "directly or indirectly employing a manipulative or deceptive device (like the creation or financing of a sham entity) intended to mislead investors, **even if a material misstatement by another person creates the nexus between the scheme and the securities market**."  376 F. Supp. 2d at 502, *quoting In re Lernout & Hauspie Sec. Litig.*, 236 F. Supp. 2d 161, 173 (D. Mass. 2003)(emphasis added by this Court).[30]  Disagreeing

---

[30]  Similarly, the SEC notes that "deception created by fraudulent activity frequently will be disseminated into the marketplace through some [other] person's making a false statement. If prior fraudulent activity, from which the making of that false statement flowed as a natural consequence is not covered [by the statute], large swaths of fraudulent activity could go unremedied" and the earlier "schemers would be insulated from liability as a matter of law."  Amicus Curiae Brief, #4528, Ex. I at 8; *id*. at 21 ("Nothing in the rules of causation suggests that only the final act in a scheme to defraud meets the causation requirement.")(*citing Lernout*, 236 F. Supp. 2d at 173 (holding that

in one respect with *Lernout*, Judge Kaplan, like the SEC,[31] emphasizes that neither § 10(b) nor Rule 10b-5 uses the term, "substantially participated"; rather "the text asks only whether a defendant directly or indirectly used or employed a manipulative or deceptive contrivance." 376 F. Supp. 2d at 502-03.[32] Thus "the major question here is whether the banks directly or indirectly used or employed any device or contrivance with the capacity or tendency to deceive." *Id.* at 504.

---

a person who employs a deceptive device as part of a fraudulent scheme may be primarily liable "even if a material misstatement by another person creates the nexus between the scheme and the securities market")). The SEC argues, "The reliance element should be viewed as satisfied whenever a plaintiff relies on a material deception flowing from a deceptive act, even though the conduct of other participants in the scheme may have been a subsequent link in the causal chain leading to the plaintiff's securities transaction." *Id.* at 8; 22 ("a prior deceptive act, from which the making of false statements follows as a natural consequence, can constitute a sufficient step in the causal chain to support a finding of reliance").

[31] The SEC also departs from *Lernout*, 236 F. Supp. 2d at 173)(holding that primary liability exists for "any person who substantially participates in a manipulative or deceptive scheme by directly or indirectly employing a manipulative or deceptive device (like the creation or financing of a sham entity) intended to mislead investors, even if a material misstatement by another person creates the nexus between the scheme and the securities market."), in concluding that the "substantial participation" is not appropriate in the context of a scheme to defraud under Rule 10b-5(a), even though it aptly applies to the making of a misleading statement under Rule 10b-5(b). #4528, Ex. I at 16-17, n.3.

[32] Initially this Court applied the test of substantial participation in the preparation of an allegedly material misrepresentation or omission to determine liability of defendants for that misrepresentation or omission to allegations of wrongful conduct under §10(b) and Rule 10b-5(a) and (c) to distinguish a primary violation from aiding and abetting. Since there various cases including *Parmalat* have addressed that issue and convince the Court that the SEC and Judge Kaplan's approach is the better reasoned.

Opining that sham companies were deceptive where they "created an appearance of substance where substance was lacking," *id.*,[33] Judge Kaplan found that transactions in which banks simply

---

[33] In the Homestore.com litigation, the SEC's amicus brief defined "a deceptive act" as "'engaging in a transaction whose principal purpose and effect is to create a false appearance of revenues.'"  In its recent opinion, the Ninth Circuit expressly added an element that may have been implied in the SEC's test, but which the Ninth Circuit concluded was not:

> We hold that to be liable as a primary violator of § 10(b) for participation in a "scheme to defraud," the defendant must have engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme.  It is not enough that a *transaction* in which a defendant was involved had a deceptive purpose and effect; the defendant's *own conduct* contributing to the transaction or overall scheme must have had a deceptive purpose and effect.

*Simpson v. AOL Time Warner, Inc.*, ___ F.3d ___, ___, No. 04-55665, 2006 WL 1791042 , *7 (9th Cir. June 30, 2006)(emphasis in original), *affirming and remanding*, *In re Homestore.com, Inc. Sec. Litig.*, 252 F. Supp. 2d 1018 (C.D. Cal. 2003).  The Ninth Circuit explains its choice:  "The focus of the inquiry on the deceptive nature of the defendant's own conduct ensures that only primary violators (that is, only defendants who use or employ a manipulative or deceptive device) are held liable under the Act."  *Id.* at *8.  It suggests that "[c]onduct by the defendant that does not have a principal legitimate business purpose, such as the invention of sham corporate entities to misrepresent the flow of income, may have a principal purpose of creating a false appearance."  *Id.* at *8.
   The Ninth Circuit's standard for a primary violation is higher and less comprehensive than the standard for raising a strong inference of *scienter* under § 10(b) in the Second Circuit (facts constituting strong circumstantial evidence of conscious misbehavior or recklessness or facts demonstrating that defendant had both motive and opportunity to commit fraud), the Fifth Circuit (intent or severe recklessness), or the Ninth Circuit (deliberately reckless or conscious misconduct).  The Ninth Circuit explains,

> Unlike the scienter requirement, the "purpose and effect" test is focused on differentiating conduct that may form the basis of a primary violation under § 10(b) from mere aiding and

made loans to Parmalat allegedly disguised as equity investments or assets, such as Citigroup's to Buconero, Geslat, Parmalat Canada in the second and third claims, are not shams and "did not depend on any fictions"; "what remains when the bluster is stripped away are financings and investments." *Id.* at 505.  The fiction or sham was created by Parmalat in misrepresenting debt obligations as cash flow from operations and painting a fraudulent picture of financial success.

> There is no suggestion that the transactions were something other than what they appeared to be.  These arrangements therefore were not inventions, projects, or schemes with the tendency to deceive.  Any deceptiveness resulted from the manner in which Parmalat or its auditors described the transactions on Parmalat's balance sheets and elsewhere.  In entering into these transactions the banks therefore did not use or employ a deceptive device or contrivance.  At worst the banks designed and entered into the transactions knowing or even intending that Parmalat or its auditors would misrepresent the nature of the arrangements.  That is, they substantially assisted fraud with culpable knowledge-in other words they aided and

> abetting activity . . . . A defendant may intend to deceive the public by substantially assisting another's misconduct as part of a scheme to defraud, but fail to perform personally any action that created a false appearance as part of the scheme. . . . In applying the "scienter" element, we look at whether a defendant's state of mind was sufficiently culpable for § 10(b) liability.  By contrast, we may examine the "principal purpose and effect" of the defendant's challenged conduct in a fraudulent scheme as an aid to assessing whether the defendant's conduct was sufficiently deceptive for ¶ 10(b) liability.

2006 WL 1791042, at 13 n.5.

> abetted it.  Under *Central Bank*, of course,
> that is not a basis for private civil
> liability.

*Id.*

In contrast, Judge Kaplan found that Citigroup's securitizing of worthless invoices was a deceptive device or contrivance under § 10(b) because it "created the appearance of a conventional . . . securitization operation when, in fact, the reality was quite different" because Citigroup knew the duplicate invoices were worthless, purchased them to disguise its loan to Parmalat, and sold them both types of invoices even though Parmalat would receive money from only one set.  By double counting the invoices, Citigroup used them as a device to inflate the appearance of Parmalat's financial status, i.e., "engaged in acts, practices, or courses of business that would operate as a fraud or deceit upon others."  *Id.* at 504.  These transactions "depended on a fiction, namely that the invoices had value.  It is impossible to separate the deceptive nature of the transactions from the deception actually practiced upon Parmalat's investors. Neither the statute nor the rule requires such a distinction." *Id.*

Judge Kaplan noted that under the fraud on the market theory, in an efficient market the price of security is determined by all available information  *Id.* at 508.  The bank defendants in *Parmalat* made no representations in connection with their actions.  Observing that the element of reliance "typically arises in the context of Rule 10b-5 actions based on misstatements and

omissions-in other words, conduct in violation of Rule 10b-5(b) rather than (a) and (c), in order to "provide the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury," he pointed to the Supreme Court's pronouncement, "'There is . . . more than one way to demonstrate the causal connection' for purposes of the Rule 10b-5 cause of action, a cause of action that does not precisely track the common law tort of fraud." *Id.* at 509, quoting *Basic., Inc, v. Levinson*, 485 U.S. 224, 243 (1988), and *Dura Pharmaceuticals*, 125 S. Ct. at 1631 ("The courts have implied from [Section 10(b) and Rule 10b-5] a private damages action, which resembles, but is not identical to, common-law tort actions for deceit and misrepresentation."). The plaintiff need only prove that the defendant's act was "a significant contributing cause" of plaintiff's injury, but it need not be the "sole and exclusive cause." *Id.* Judge Kaplan found that the complaint adequately pleaded loss causation in asserting that

> the banks' actions in connection with the relevant transactions actually and foreseeably caused losses in the securities markets. The banks made no relevant misrepresentations to those markets, but they knew that the very purpose of their transactions was to allow Parmalat to make such misrepresentations. In these circumstances, both the banks and Parmalat are alleged causes of losses in question. So long as both committed acts in violation of statute and rule, both may be liable.

*Id.* at 509. Judge Kaplan maintained that his "analysis is not an end run around *Central Bank*" because the complaint asserts that the four banks committed acts that are within the scope of § 10(b)

and Rule 10b-5 in "enter[ing] into deceptive transactions as part
of a scheme in violation of Rule 10b-5(a) and (c) that causes
foreseeable losses in the securities markets." *Id.* at 509-10.
He insisted that "loss causation does not, as defendants would
have it, require a corrective disclosure followed by a decline in
price." *Id.* at 510.

In addition, Judge Kaplan further opined, the element
of loss causation applies where the damages suffered by the
plaintiff are a foreseeable consequence to a misrepresentation or
material omission:

> The loss causation requirement applies
> as well where the claims are based on
> deceptive or manipulative conduct in
> violation of Rule 10b-5(a) and (c). By
> analogy, the loss causation requirement will
> be satisfied if such conduct had the effect
> of concealing the circumstances that bore on
> the ultimate loss. The schemes involving
> worthless invoices and the CSFB transactions
> created the appearance of assets or revenue
> where there was none and therefore concealed,
> among other things, the risks that Parmalat
> would be unable to service its debt and
> consequently suffer financial collapse. . .
> . [T]hat risk materialized when Parmalat
> suffered a liquidity crisis in December 2003.

*Id.* at 510, *citing* 25 U.S.C. § 78u-4(b)(4), and *Dura
Pharmaceuticals*, 125 S. Ct. at 1631. This Court notes that there
is no mention in the opinion of any disclosure specifically of
Citigroup's worthless invoice scheme prior to Parmalat's financial
collapse.

Applying these criteria to the allegations against
Barclays in the First Amended Consolidated Complaint and in Lead
Plaintiff's briefing in response to Barclays' motion for partial

judgment on the pleadings, this Court finds that the allegations regarding the bank's actions in Chewco in essence are aiding and abetting and fail to constitute a primary violation under § 10(b) and Rule 10b-5(a) and (c).  To quote Judge Kaplan, "what remains when the bluster is stripped away are financings and investments." *Id.* at 505.  When the previous 3% independent equity owner withdrew from Chewco, according to the complaint Barclays provided $240 million in financing for the SPE at Enron's request, with a secret guarantee of repayment by Enron.  Barclays also knowingly provided $11.4 million to two straw parties without credit standing and controlled by Enron, to set them up to be sham 3% equity investors, but protecting itself by requiring the cash accounts.  The fraud occurred not in funding an entity that did not qualify as an SPE for nonconsolidation on Enron's balance sheet; it occurred in the improper accounting by Enron and others that did not consolidate.  The complaint alleges Barclays understood that Enron would use Chewco to circumvent the legal requirements under GAAP and SFAS for such a vehicle to qualify as an independent equity investor and improperly avoid consolidation of the SPE into Enron's own financial statements, with a purpose of concealing debt and preventing an unwinding of profits previously reported by Enron, as well as for future improper transactions, and thereby mislead investors in Enron securities.[34]

---

[34]  Chewco was allegedly a model for numerous subsequent entities without the requisite 3% independent ownership in violations of GAAP that was used or employed by Enron, its officers, directors, employees, accountants, to generate phony profits, conceal its debt obligations from 1997-2000, and avoid

But it was Enron, its accountants, officers, etc., not Barclays, that purportedly  "used or employed" this deceptive device and created the false appearance of a financially strong Enron, while "conceal[ing] the risks that [Enron] would be unable to service its debt and consequently suffer financial collapse. . . . [T]hat risk materialized when [Enron] suffered a liquidity crisis in [the end of 2001]." *Parmalat*, 376 F. Supp. 2d at 510.  The allegations at most portray Barclays as a culpable aider and abettor.  *Id.* at 505 ("At worst the banks designed and entered into the transactions knowing or even intending that Parmalat [Enron] or its auditors would misrepresent the nature of the arrangements. That is, they [Barclays] purportedly substantially assisted fraud with culpable knowledge.  Under *Central Bank*, of course, that is not a basis for private civil liability.").

Even if the complaint had stated a primary violation of § 10(b) against Barclays based on its role in Chewco, the Court agrees with Barclays that claim would be time-barred.

The Court has also examined the allegations in Lead Plaintiff's opposition briefing regarding other Barclays' actions, summarized *supra*, in furtherance of the alleged scheme.  It notes that contrary to Barclays' contention, the First Amended Consolidated Complaint does mention, though cursorily, Nikita and the  sulfur dioxide transactions at ¶ 106(b).[35]

---

consolidation.

[35] In relevant part the paragraph states,

Further, Barclays Bank PLC acted as the lead

As Judge Kaplan observed,

> The PSLRA's pleading requirements regarding misleading statements and omissions do not apply to claims that allege no misrepresentation or omission but instead are based on alleged violations of Rule 10b-5(a) and (c).   These claims, however, sound in fraud and therefore come within Rule 9(b) . . . . The Court therefore concludes that the appropriate level of particularity . . . is that plaintiffs must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and what effect the scheme had on the investors in the securities at issue.

376 F. Supp. 2d at 492-93.[36]   Note, Judge Kaplan states "what effect the *scheme* had on the investors," not what effect that Citigroup's concealed invoice fraud in particular, and apparently undisclosed prior to the bankruptcy, had on them.

After reviewing Lead Plaintiff's submissions, the Court finds that it has failed to meet this standard with respect to all of the transactions beyond Chewco, as well as its nonactionable allegations that Barclays continued to protect its loans to Big

---

bank in a syndicate that had agreed to make up to $235 million available in connection with the fraudulent Nikita transaction (detailed a great length in the First Report of Enron's court appointed Bankruptcy Examiner, Neal Batson ("First Batson Report")). Additionally, Barclays Bank PLC played a primary role in the fraudulent Class Period transactions known as the Sulfur Dioxide transaction (detailed in the First Batson Report) and the Cash 6 transaction (detailed in the Second Batson Report).

[36] Judge Kaplan states that the PSLRA does apply to the pleading requirements for scienter.  375 F. Supp. 2d at 491.

River and Little River by monitoring the reserve accounts and financing JEDI.

Lead Plaintiff fails to provide facts that demonstrate that the prepay deals (Nixon, Roosevelt and the 2001 Prepay) were violations of § 10(b) and Rule 10b-5(a) and (c).  The allegations are conclusory and vague.  Prepays are not *per se* illegal, and Lead Plaintiff does not specify what about these purportedly made them improper.  Alleging that what were "loans" from Barclays were classified as cash flow from operations by Enron does not state an actionable claim against Barclays.  Moreover, the inaccurate accounting of cash flow, debt, etc., that deceived investors is allegedly to have been done by Enron, its officers, and accountants.

The same is true of its roles in the other transactions. In Nikita Barclays, with verbal assurances that the 3% equity provider in Besson Trust would not lose its investment, simply guaranteed CFSB's investment as that 3% equity provider.  Besson Trust was **used by Enron** to buy Enron's interest in EOTT Energy Partners LLP and thereby obtain off-balance-sheet treatment.  As noted, funding of an unqualified SPE is not a primary violation; using the device of an unqualified SPE improperly to avoid consolidation is.  In the J.T. Holdings transaction, again with a promise of no risk from Enron and establishment of a cash collateral account to reduce any risk for the loan, Barclays purchased some of the notes and certificates issued by Enron/NLG to fund part of the purported "independent" 3% equity.  Again, it

was Enron that used or employed the J.T. Holdings transaction as a deceptive device or contrivance to present a false picture of its business success.  In the sulfur dioxide transactions, Enron was a primary violator in selling debt obligations to Colonnade and then misrepresenting the monies received as cash flow from operations.  Barclays' alleged role, in creating that SPV which Arthur Andersen proclaimed was not qualified for off-balance-sheet treatment because it was not independent and all risks and rewards remained with Enron, was that of a culpable aider and abettor. It was not the creation of an unqualified SPV that violated § 10(b), but the use of it to obtain that unwarranted off-balance-sheet treatment that constituted a primary violation.  Barclays' creation merely aided and abetted Enron in concealing its debt and falsely representing its financial condition to potential investors.  Last the metal transactions were similarly deceptive devices used by Enron to improperly account for the amounts it received as cash flow from operations and to mask what was actually a debt obligation; the sales themselves were not shams. *Parmalat*, 376 F. Supp. 2d at 505 ("These arrangements therefore were not inventions, projects, or schemes with the tendency to deceive.  Any deceptiveness resulted from the manner in which Parmalat or its auditors described the transactions on Parmalat's balance sheets and elsewhere.  In entering into these transactions the banks therefore did not use or employ a deceptive device or contrivance.  At worst the banks designed and entered into the transactions knowing or even intending that Parmalat or its

auditors would misrepresent the nature of the arrangements.  That is, they substantially assisted fraud with culpable knowledge–in other words they aided and abetted it.   Under *Central Bank*, of course, that is not a basis for private civil liability.").

Finally there is the issue of loss causation in scheme liability.  Even though Lead Plaintiff has failed to state a claim for a primary violation against Barclays, the Court will address the question to guide other Defendants whose alleged acts might constitute primary violations of § 10(b).

The Court agrees that Plaintiffs must allege the elements of a primary violation by each Defendant that is allegedly part of the fraudulent scheme.  Nevertheless, the Court agrees with Judge Kaplan that a plaintiff may bring a claim under Rule 10b-5(a) and (c) against a defendant allegedly "directly or indirectly employing a manipulative or deceptive device . . . intended to mislead investors, **even if a material misstatement by another person creates the nexus between the scheme and the securities market**."  376 F. Supp. 2d at 502, *quoting In re Lernout & Hauspie Sec. Litig.*, 236 F. Supp. 2d 161, 173 (D. Mass. 2003).  "[T]he loss causation requirement will be satisfied if such conduct had the effect of concealing the circumstances that bore on the ultimate loss," e.g., it "created the appearance of assets or revenue where there was none and therefore concealed, among other things, the risks that [Enron] would be unable to service its debt and consequently suffer financial collapse," and "that risk materialized."  *Id.* at 510.  Disclosure of such conduct can

be gradual and partial, and need not be by corrective disclosure. As noted, the defendant's conduct need not be the sole and exclusive cause of plaintiffs' economic loss, but only a substantial, i.e., significant contributing cause" that materialized in the collapse. *Id.* at 509.

Furthermore, this Court concludes a disclosure of the wrongful conduct in an alleged securities fraud scheme with the same purpose, i.e., overstating revenue and concealing debt, committed by some defendants in the alleged securities fraud scheme that is a substantial cause of plaintiffs' loss is sufficient to plead loss causation; the identity of a particular participant/defendant's primary need not have been revealed if the same type of primary violations by other defendants with the same purpose, here of creating a picture of financial success when the reality was the opposite to defraud investors, is leaked or disclosed to the market and causes a steep decline in the price of Enron's stock, injuring plaintiff investors. Under *Parmalat,* "where the **scheme**[] . . . created the appearance of assets or revenue where there was none and therefore concealed, among other things, the risks that [Enron] would be unable to service its debt and consequently suffer financial collapse," and that risk materialized when Enron declared bankruptcy, an individual scheme participant's specific concealed act, if a primary violation working to the same purpose within the same zone of risk of financial collapse, need not have been disclosed. *Parmalat*, 376 F. Supp. 2d at 510.

Questioning of Enron as a "black box" with "impenetrable financial statements" commenced early in 2001,[37] and began to peak on October 16, 2001,[38] when Enron revealed a $1 billion charge, surged by its disclosure a few weeks later that it was restating its financial results for 1997, 1998, 1999, and 2000 to eliminate $600 million in previously reported profits and approximately $1.2 billion in shareholders' equity,[39] succeeded next by Dynegy's rejection of a "saving" merger with Enron after it performed a due diligence review of Enron's finances, and ultimately Enron's filing for bankruptcy on December 2, 2001.[40]   Disclosure of the roles of some primary violators in a multi-defendant scheme to defraud investors by creating the appearance of assets or revenue that did not exist and concealing debt and increasing risks of financial collapse, reflected in "cooking the books," should be viewed as sufficient to show loss causation for later-disclosed actions constituting primary violations of § 10(b) of other defendants substantially contributing to that fabrication of Enron assets and that hiding of debt in the same scheme.   To hold otherwise would mean that the more complex, intricate, and convoluted a scheme perpetrated by sophisticated defendants who are either unexpected perpetrators or who conceal their identities most successfully, the more likely they would be to escape

---

[37] #1388 at ¶¶ 289-90.

[38] *Id.* at ¶ 364.

[39] *Id.* at ¶ 384.

[40] *Id.* at ¶ 391

liability; this Court is convinced that such a result could not have been the intent of Congress. *See Parmalat*, 376 F. Supp. 2d at 510 ("[T]he loss causation requirement will be satisfied if [the deceptive and manipulative] conduct had the effect of concealing the circumstances that bore on the ultimate loss[, i.e.,] . . . created the appearance of assets or revenue where there was none and therefore concealed, among other things, the risks that Parmalat would be unable to service its debt and consequently suffer financial collapse"); *Simpson v. AOL Time Warner*, ___ F.3d ___, ___, 2006 WL 1791042 at *9 ( In "a scheme to misrepresent the publicly reported revenue of a company," "[t]hat every participant in the scheme did not release the information to the public does not diminish the causal connection between all defendants in the scheme and the securities market.").

Accordingly, for the reasons indicated in this opinion, because the claims against Barclays amount to aiding and abetting and do not constitute primary violations of § 10(b) and Rule 10b-5(a) and (c) as a matter of law, the Court

ORDERS that Barclays' motion for partial judgment on the pleadings (#3615) is GRANTED.  Because the § 10(b) and derivative § 20(a) claims are the only ones asserted against Barclay, the Court

ORDERS that Barclays is DISMISSED from this action and

that all of its other pending motions are MOOT.

      **SIGNED** at Houston, Texas, this 20th day of July, 2006.


_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE