IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re Enron Corporation Securities, Derivative & "ERISA" Litigation | § § § | MDL-1446 |
| | § | |
| MARK NEWBY, ET AL., | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-01-3624 |
| | § | CONSOLIDATED CASES |
| ENRON CORPORATION, ET AL., | § | |
| | § | |
| Defendants | § | |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al., Individually and On Behalf of All Others Similarly Situated, | § § § § | |
| | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | |
| | § | |
| KENNETH L. LAY, et al., | § | |
| | § | |
| Defendants. | § | |

**OPINION AND ORDER**

Pending before the Court in the above referenced cause is

Lead Plaintiff's motion for reconsideration, or in the alternative,

clarification of order[1] granting Barclays PLC and Barclays Capital,

Inc.'s (collectively, "Barclays'")'s motion for summary judgment on

the pleadings[2] and dismissing Barclays from H-01-3624 (instrument

---

[1] Instrument #4874 entered on 7/20/06.

[2] Instrument #3615. The Court rejects Lead Plaintiff's characterization of its order, #4874, as a summary judgment. As was expressly stated in it, the order was a judgment on the governing pleading, the First Amended Consolidated Complaint (#1388), under Federal Rule of Civil Procedure 12(c), pursuant to

#4915).  Lead Plaintiff asks the Court to vacate or stay its order and to revisit the liability of Barclays as well as that of the other Bank Defendants on motions for summary judgment that are now briefed and pending before the Court or, preferably, to specify that the dismissal of Barclays is without prejudice and grant leave to Lead Plaintiff to amend its complaint against Barclays or any other Bank Defendant that is affected by the rulings in #4874. Also pending and impacted by this opinion and order is Merrill Lynch, Pierce, Fenner & Smith, Incorporated's and Merrill Lynch & Co., Inc.'s motion for judgment on the pleadings (#3734).

### Standard of Review Under Rule 59(e)

"A motion to reconsider a dispositive pre-trial motion may be analogized to a motion to 'alter or amend the judgment' under Rule 59(e) of the Federal Rules of Civil Procedure or a motion for 'relief from judgment' under Rule 60(b)." *Stephens v. Witco Corp.*, No. Civ. A. 97-1351, 1998 WL 426214, *1 (E.D. La. July 24, 1998), *citing Lavespere v. Niagra Mach. & Tool Works, Inc.*, 910 F.2d 167, 173 (5th Cir. 1990), *abrogated on other grounds, Little v. Liquid Air Corp.*, 37, F.3d 1069, 1075 n.14 (5th Cir. 1994)(*en banc*). Barclays has not specified under which rule it brings its

---

the standard under Rule 12(b)(6) as applied in securities violation suits.  #4874 at 2-4, 66.  The Court considered the extraneous appendix of documents and Barclays' supplemental allegations in the briefing only to determine whether, if repleading were allowed, as a matter of law, as set out in the order, Plaintiff could state an actionable § 10(b) claim against Barclays.  It did not evaluate the substantive content as evidence nor seek to determine whether there were genuine issues of material fact for trial.

motion.   The express language of Rule 59(e) indicates that it governs a motion filed "no later than ten days after entry of the judgment," but that ten-day period is computed under Federal Rule of Civil Procedure 6(a), which excludes from the count the entry date of the motion, weekend days, and legal holidays.   Here the Court's order was entered on July 20, 2006, and Lead Plaintiff's motion was filed on August 3, 2006, covering two weekends and thus the motion was filed within ten days under Rule 6's exclusions, so the Court construes it as a Rule 59(e) motion.[3]

That conclusion is significant because motions under the Rules 59(e) and 60(b) are not governed by the same substantive requirements.   Unlike Rule 60(b), which requires a showing that the movant's default was the result of mistake, inadvertence, surprise, or excusable neglect or the evidence shows that the judgment was manifestly erroneous, Rule 59 give the Court considerable discretion in deciding whether to reopen the case.   *Koenig v. Dept. of the Navy*, No. Civ. A. C 05 35, 2006 WL 582034, *3 (S.D. Tex. Mar. 8, 2006)(Ellington, Magistrate J.).   Although Rule 59(e) speaks of a "motion to alter or amend a judgment," "it is 'common

---

[3] Under either rule, the timely filing of a motion for reconsideration renders the underlying judgment not final for appeal purposes until the district court rules on the motion to reconsider.   *United States v. Ibarra*, 502 U.S. 1, 5 (1991)("'[T]he consistent practice in civil and criminal cases alike has been to treat timely petitions for rehearing as rendering the original judgment nonfinal for purposes of appeal as long as the petition is pending.'"), *quoting United States v. Dieter*, 429 U.S. 6, 8, (1976); *Simmons v. Reliance Standard Life Insurance Co. of Texas*, 310 F.3d 865, 867-68 (5th Cir. 2002).

practice' to refer to Rule 59 motions as 'motions for rehearing' or motions for reconsideration.'" *Simmons v. Reliance Standard Life Insurance Co. of Texas*, 310 F.3d 865, 868 n.1 (5th Cir. 2002).  A Rule 59(e) motion should not be used to rehash evidence, legal theories, or arguments that have been offered or were raised before entry of judgment.  *Id., citing Templet v. Hydrochem, Inc.*, 367 F.3d 473, 478-79 (5th Cir. 2004).  The limited purpose of Rule 59(e) is to allow the movant to correct manifest errors of law or fact or to present newly discovered evidence.  *Id., citing Templet*, 367 F.3d at 479.  "Reconsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly."  *Id., citing Templet*, *id.*   Nevertheless, in reviewing a motion for consideration, the district court "'necessarily has discretion . . . to reopen a case' and may change its ruling on the merits."  *Simmons*, 310 F.3d 868, *quoting United States v. O'Keefe*, 128 F.3d 885, 891 (5th Cir. 1997).

A motion for reconsideration may also be used to correct a procedural error, such as failure to give a party sufficient opportunity to respond to the issue in the motion.  *Simmons*, 310 F.3d at 869.

Although a motion to reconsider is viewed under an abuse of discretion standard, the district court should "consider judicially the record as it exists at the time of the motion for reconsideration not just as it existed at the time of the  initial

ruling.'"  *Simmons*, 310 F.3d at 869, *quoting Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 349 (5th Cir. 1989).

The purpose of a motion for reconsideration is judicial economy; allowing the district court to review the arguments seeking correction of errors in its earlier decision and perhaps to modify or change the ruling protects both the rights of the parties and the efficiency of court operations.  *Id.* at 869.

### Lead Plaintiff's Motion to Reconsider

As this Court has indicated in its orders, since the last amended complaint was filed, the law relating to § 10(b) and Rule 10b-5(a) and (c) scheme liability has developed[4] and the Court has refined its pleading requirements in response. In its current motion, Lead Plaintiff seeks "a fair opportunity to plead this case in accordance with the coalescing standard of scheme liability that is to be ultimately applied in this matter" so as to "avoid being caught unawares by refined rules being articulated in the middle of briefing dispositive motions and then applied to pleadings that were crafted **years before** those rules were refined, without the benefit of subsequent court orders, independent investigations, governmental proceedings (civil and criminal) and massive pre-trial

_____

[4] The Court notes that petitions for writ of certiorari have been filed with the United States Supreme Court in two cases with divergent rulings on scheme liability:  *In re Charter Communications, Inc. Sec. Litig.*, 443 F.3d 987 (8th Cir. 2006)(concluding there is no such private right of action), *petition for cert. filed*, 75 USLW 3034 (July 7, 2006)(NO. 06-43); and *Simpson v. AOL Time Warner Inc,*, 452 F.3d 1040 (9th Cir. 2006)(adopting a modified version of the SEC's test), *petition for cert. filed*, 75 USLW 3236 (Oct. 19, 2006)(NO. 06-560).

discovery that has occurred during the past three years."   Motion at 2.   Lead Plaintiff points in particular to the recently clarified standard for loss causation in *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336 (2005), which was issued long after this Court denied Barclays' motion to dismiss, and to other developing law relating to scheme liability under Rule 10b-5(a) and (c), which was at issue in Barclays' motion for partial judgment on the pleadings. In the Court's June 5, 2006 order relating to the motion for class certification, the Court stated that it continued to agree with the SEC's *amicus curiae* brief in the Ninth Circuit's *Homestore.com* case (an actor who knowingly commits a deceptive act by engaging in a "transaction whose principal purpose and effect is to create a false appearance of revenues" that deceived investors can be held jointly and severally liable for all damages caused by that fraudulent scheme) and indicated that any defendant wishing to challenge the applicability of scheme liability should do so by summary judgment,[5] with the benefit of pre-trial discovery.   Lead Plaintiff asserts that it relied on the Court's previous rulings in Lead Plaintiff's favor on various motions to dismiss with respect to the adequacy of the scheme liability pleading (both the viability of the theory and pleading of Barclays' specific role in the alleged scheme) and thus in responding to Barclays' motion for

---

[5] Although Barclays claims that this Court previously stated that it would decide the issues on summary judgment, establishing such a schedule in no way precluded any Defendant from filing a motion for partial judgment on the pleadings and obtaining a ruling before the summary judgment stage.

partial judgment on the pleadings, Lead Plaintiff did not focus on the detailed pleading required by Rule 9(b) for fraud nor, in light of the Court's pre-*Broudo* rulings, for pleading loss causation under Rule 8.   It also did not raise procedural objections to Barclay's motion because the cases at issue were rendered after the Court denied Barclays' and other Defendants' motions to dismiss.

Furthermore, while the motion for partial judgment on the pleadings was pending, Lead Plaintiff asserts that massive pretrial discovery relating to Barclays' illicit conduct and participation in transactions that had the purpose and effect of falsifying Enron's financial statements and deceiving investors in Enron securities revealed substantial evidence[6] of Barclays' culpability, "including demanding secret side agreements or guarantees, creating sham entities, structuring deals that lacked any legitimate business purpose, economic substance or economic risk to Barclays, which would satisfy the deception, manipulation or contrivance prong of any scheme liability test."   #4915 at 9-10.   The altered legal standards recognized by this Court should mandate that Lead Plaintiff be given the opportunity to amend to meet their requirements; with notice and an opportunity to be heard and to amend, Lead Plaintiff states "there is nothing wrong" with the Court's modification of pleading scheme liability and loss causation.   #4915 at 20.   Moreover, Lead Plaintiff contends that

---

[6] In particular, Lead Plaintiff highlights the Report of Enron Bankruptcy Examiner Neal Batson, which it would incorporate into its pleadings if amendment is allowed.

when Barclays chose to file its far more comprehensive summary judgment motion, it rendered moot or superseded Barclays' motion for partial judgment on the pleadings.[7]  Lead Plaintiff claims that the evidence it has gathered from discovery makes a far stronger and more incriminating case against Barclays than the allegations of the governing four-year-old complaint and it can draft an amended complaint that will satisfy any scheme test.

Although Lead Plaintiff emphasizes heightened pleading standards for § 10(b) claims and lack of notice for pleading loss causation under *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336 (2005), the Court's decision granting judgment on the pleadings focused on whether, in the wake of *Central Bank of Denver N.A. v. First Interstate Bank of Denver N.A.*, 511 U.S. 164 (1994), the allegations of particular conduct by Barclays, as a matter of law, constituted primary violations of § 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c),[8] or instead amounted to nonactionable aiding

---

[7] Barclays responds that Barclays made its motion for summary judgment pursuant to the scheduling order and not because it changed its views about the merits of the  motion for judgment on the pleadings.

[8] Section 10(b) makes it unlawful "for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . ., any manipulative device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."  The SEC in turn issued Rule 10b-5, subsections (a) and (c) of which provide as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of

and abetting. Lead Plaintiff has readily conceded that "distinguishing participation in a scheme from mere aiding and abetting [is] no easy task". #4915 at 28. Evolving case law is bringing new focus to the issue, and it is this Court's obligation to determine what law should apply, where new Fifth Circuit cases establish binding precedent, and where other courts provide persuasive rulings in areas where the Fifth Circuit remains silent, as with *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005), *cert. denied*, 126 S. Ct. 421 (2005), and Judge Kaplan's decision in *In re Parmalat Sec. Litig.,* 376 F. Supp. 2d 472 (S.D.N.Y. 2005).

<hr>

 the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud, . . . or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.

 Judge Kaplan opined that "[t]o state a claim based on conduct that violates Rule 10b-5(a) and (c), the plaintiff must allege that a defendant (1) committed a deceptive or manipulative act, (2) with *scienter*, that (3) the act affected the market for securities or was otherwise in connection with their purchase or sale, and that (4) defendants' actions caused the plaintiffs' injuries. *In re Parmalat Sec. Litig.,* 376 F. Supp. 2d 472, 491-92 (S.D.N.Y. 2005). The heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(2), apply to the pleading of scienter, while the Rule 9(b) standard for pleading fraud applies to pleading claims under Rule 10b-5(a) and (c). *Id.* at 492; see also *In re Parmalat Sec. Litig.*, 383 F. Supp. 2d 616, 621, 622 (S.D.N.Y. 2005). The plaintiff must specify what deceptive or manipulative acts were performed, when they were performed, which defendants performed them, and the effect the scheme had on investors in the securities at issue. *Id.* at 492; *id.* at 622.

This Court concluded that the nature of the claims against Barclays constituted aiding and abetting because in each alleged transaction actually pleaded in the complaint, it was Enron, its officers, and its accountants, not Barclays, that allegedly "directly or indirectly . . . us[ed] or employ[ed], in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance" to mislead investors, or participated in a 'transaction whose principle purpose and effect is to create a false appearance of revenues" that deceived investors.[9]  This Court did not directly address, but

_____

[9]As indicated by this Court in #4874, in a test endorsed by this Court, the SEC requires that a primary violator directly or indirectly engage in a manipulative or deceptive act within the meaning of the statute.  It describes a deceptive act as including "a transaction whose principal purpose and effect is to create a false appearance of revenues" and "manipulation" typically as "conduct that creates a false appearance of trading activity." #4874 at 44 n.27.  Moreover, the examples provided by the SEC help to distinguish a primary violation of § 10(b) from aiding and abetting:

> The SEC maintains that a bank that makes a loan, even if it knows that the borrower will use the proceeds to commit securities fraud, may be liable only as an aider and abettor because the bank, itself, has not engaged in any manipulative or deceptive act; similarly a bank that provides services arranging for financing for a client that it knows will then use the funds for securities fraud is only aiding and abetting. *Id*. at 20.  In the same vein, if a third party enters into a legitimate transaction with a corporation where it knows that the corporation will overstate revenue generated by that transaction, the third party is merely aiding and abetting; in contrast, if the third party and the corporation engage in a transaction whose principal purpose and effect is to

implied, that had Lead Plaintiff pleaded against Barclays a timely, primary violation of § 10(b) which significantly contributed to and, as part of the alleged scheme, had the foreseeable effect of concealing the risk that Enron would be unable to service its debt and end in bankruptcy, thereby causing plaintiffs' losses, Lead Plaintiff could have sufficiently pleaded loss causation. This Court also opined that pleading the disclosure of similar primary violations of § 10(b) with the same purpose by other defendants in an alleged scheme that was a substantial cause of plaintiffs' losses is sufficient to plead loss causation for a primary violator unmasked subsequently.

The Court will not vacate that part of the order (#4874) identifying and analyzing the applicable law.

Nevertheless, the Court is persuaded by Lead Plaintiff's procedural objection that in adopting a refined test to separate a

_____

create a false appearance of revenues, intended to deceive investors in that corporation's stock, the third party may be a primary violator. *Id.* at 20. As a final example, if a third party enters into a transaction to purchase goods from the corporation where terms include a legitimate option to return the goods for a full refund, knowing that the corporation will misrepresent the transaction as a final sale, the third party at most is an aider and abettor; but if the parties to that transaction have a side oral agreement that no goods will be delivered and no money paid and the corporation falsely states that it received revenue from the transaction, the third party may be liable as a primary violator. *Id.* at 20-21.

#4874 at 44-46 n.27.

primary violation of § 10(b) from aiding and abetting, the Court did not give Lead Plaintiff fair notice and an opportunity to replead to see if it can state a claim.[10]  The same would be true with respect to Merrill Lynch, Pierce, Fenner & Smith, Incorporated's and Merrill Lynch & Co., Inc.'s (collectively, "Merrill Lynch's") motion for judgment on the pleadings (#3734), which the Court will accordingly moot. The Court will grant the motion for reconsideration in part, to the extent that it will stay its dismissal of Barclays, permit repleading, and address the issues on summary judgment.

The Court takes this opportunity to further clarify the applicable law in view of assertions made by Lead Plaintiff in its motion and replies.  Lead Plaintiff paints with a very broad brush that obscures rather than elucidates a viable line between a primary violation under § 10(b) and Rule 10b-5(a) and (c) and nonactionable aiding and abetting.  The statute and Rule 9(b) require that a plaintiff allege *inter alia* and support with factual specificity that a defendant "directly or indirectly . . . use[d] or employ[ed]" a "manipulative or deceptive device or contrivance." Lead Plaintiff claims that the requirement that a "the third party commit a manipulative or deceptive act, employ a contrivance or deceptive device is present if the bank: (i) uses a sham or shell

---

[10]  Barclays supplemental allegations, which were not included in the governing complaint, reflect an effort to cure pleading deficiencies in response to evolving law that must properly be made in an amended, superseding complaint.

entity to create deception and circumvent accounting requirements; or (ii) structures a transaction in a deceptive manner to eliminate real economic risk and create the fictional appearance of a substantive, arm's-length transaction where there is none; or (iii) finances an asset-based transaction knowing that the assets are overvalued while protecting itself against loss due to that undervaluation via a secret side agreement; or (iv) obtains secret side agreements--no loss, no risk repurchase guarantees that eliminate the risk of loss, or that otherwise are to deceive auditors in order to achieve a false accounting result." #4915 at 32.

With respect to these abstractions, under Rule 9(b), Lead Plaintiff must allege specific facts demonstrating that **Barclays used or employed** the entities at issue as deceptive devices or contrivances (created an appearance of substance where it is lacking or created a fiction or false appearance of revenues intended to deceive investors in Enron securities) or that Barclays engaged in acts, practices, or course of business that operated as a fraud or deceit upon any person in connection with the purchase or sale of an Enron security.  In other words, for its first proposition Lead Plaintiff needs to allege in detail not only why each particular entity at issue is a sham or a shell, but Barclays' specific role in using or employing it to avoid accounting requirements to deceive purchasers of Enron securities.[11]  As the

---

[11] The Court would like to clarify one point.  The Court is aware that Judge Kaplan follows the Second Circuit's bright-line

Court noted, with respect to the only entity pleaded in the controlling complaint that related to Barclays, i.e., Chewco,[12] the complaint alleged that Enron, its officers and accountants were the ones that improperly used Chewco to avoid on-balance-sheet accounting, not Barclays.   Moreover if, as claimed, Barclays "structure[d] a transaction in a deceptive manner to eliminate real economic risk" to itself and created the appearance of an arm's

_____

rule for misrepresentations under Rule 10b-5(b), i.e., that a defendant must actually make the false or misleading statement to be liable; a secondary actor is not liable for a statement not attributed to him at the time of its dissemination. *Parmalat*, 376 F. Supp. 2d at 499; 383 F. Supp. 2d at 623.   The result under the bright-line test is that any statement, document, or transaction by a defendant that was allegedly used to make, or was incorporated into, misrepresentations on the company's balance sheets or financial statements, but that was not disclosed as done by that defendant at the time these documents were made public, cannot be liable under Rule 10b-5(b).   The SEC and this Court have not adopted such a bright-line rule.   Moreover, if the plaintiff adequately alleges that acts of that secondary actor created an appearance of substance where it is lacking or created a fiction or false appearance of revenues intended to deceive investors in Enron securities or that engaged in acts, practices, or course of business that operated as a fraud or deceit upon any person in connection with the purchase or sale of an Enron security, that defendant may be liable under Rule 10b-5(a) and (c).

The Court also notes that the Fifth Circuit does not follow the Second Circuit's acceptance of motive and opportunity as adequate to establish scienter, defined by the Fifth Circuit as "'intent to deceive, manipulate, or defraud or that severe recklessness, in which the danger of misleading buyers or sellers is either known to a defendant or is so obvious that the defendant must have been aware of it.'" *R2 Investments LDC v. Phillips*, 401 F.3d 638 (5th Cir. 2005), *quoting Southland Sec. Corp. v. INspire Ins. Solutions, Inc.*, 365 F.3d 353, 366, 368 (5th Cir. 2004)(concluding that more is required to establish scienter than allegations of motive and opportunity, although such allegations "may meaningfully enhance the strength of the inference of scienter.").

    [12] As noted moreover, allegations against Barclays arising from Chewco are time-barred.

length transaction, Lead Plaintiff needs to identify how it did so
and show that Barclays not only acted in a deceptive manner to
eliminate economic risk to itself, but that in eliminating such
personal risk, the resulting cost to investors of that self-
protection was substantial enough to constitute an "act, practice,
or course of business which operates or would operate as a fraud or
deceit upon any person, in connection with the purchase or sale of
any security."[13]   As noted previously, under both the SEC and
*Parmalat* tests, provision of financing to establish an SPE for
Enron's accounting, alone, does not constitute a primary violation
of § 10(b), even if Barclays knew that Enron or others would use
that SPE in violation of the statute.[14]

---

[13] Such a necessary factual predicate applies to (iii),
"finances an asset-based transaction knowing that the assets are
overvalued while protecting itself against loss due to that
undervaluation via a secret side agreement."   Lead Plaintiff must
demonstrate that Barclays participate with scienter, knowing or
severely reckless as to whether the assets involved were
overvalued.

[14] Judge Kaplan found that transactions in which banks simply made loans to
Parmalat allegedly disguised as equity investments or assets were not shams and "did not depend
on any fictions"; "what remains when the bluster is stripped away are financings and investments."
*Id.* at 505.  He wrote,

> There is no suggestion that the transactions were something other
> than what they appeared to be.  These arrangements therefore were
> not inventions, projects, or schemes with the tendency to deceive.
> Any deceptiveness resulted from the manner in which Parmalat or its
> auditors described the transactions on Parmalat's balance sheets and
> elsewhere.  In entering into these transactions the banks therefore did
> not use or employ a deceptive device or contrivance.  At worst the
> banks designed and entered into the transactions knowing or even
> intending that Parmalat or its auditors would misrepresent the nature
> of the arrangements.  That is, they substantially assisted fraud with
> culpable knowledge-in other words they aided and abetted it.  Under
> *Central Bank*, of course, that is not a basis for private civil liability.

Lead Plaintiff asserts that discovery has provided it with substantial evidence of "the extensive nature of Barclays' illicit conduct, showing it was repeatedly involved in transactions which had the principal purpose and effect of falsifying Enron's financial statements and deceiving purchasers of Enron's securities, and each transaction involved conduct by Barclays having a deceptive purpose and effect, including secret side agreements or guarantees, creating sham entities, structuring deals that lacked any legitimate business purpose, economic substance or economic risk to Barclays, which would satisfy the deception, manipulation or contrivance prong of any scheme liability test." *Id.* at 9-10. As this Court has indicated before, conclusory allegations that a defendant designed and structured an SPE or a transaction that was inherently deceptive will not satisfy the pleading standards under the PSLRA and Rule 9(b). Simply calling something a "sham" or a "pretense" or a "fiction" does not make a transaction a primary violation. Lead Plaintiff must allege specific details that show that a structure of the entity or a transaction that was created by Barclays was inherently deceptive and that Barclays used and employed it to deceive investors, not that Enron, its officers and accountants subsequently used the entity improperly to cook its books, or that Barclays engaged in acts, practices, or course of business that operated as a fraud or

_____

*Parmalat*, 376 F. Supp. 2d at 505.

deceit upon any person in connection with the purchase or sale of an Enron security.

Although the Court is mooting Merrill Lynch's motion for judgment on the pleadings because Lead Plaintiff did not have notice and an opportunity to respond to the recent law adopted by this Court, as an example of adequate pleading of a primary violation it points to Lead Plaintiff's allegations of Merrill Lynch's conscious wrongdoing in the Nigerian barge transaction in creating the appearance of a conventional sale. Without Merrill Lynch's deceptive participation as a "buyer," there would have been no sham "sale." The Court finds that the detailed facts alleged satisfy the pleading requirements for stating a primary violation of § 10(b) and Rule 10b-5(a) and (c) and that Merrill Lynch's purported conduct constituted "employ[ment of a] device, scheme or artifice to defraud" or "engag[ement] in an[] act, practice, or course of business which operat[ed] as a fraud or deceit" upon Enron investors. The alleged principal purpose and effect of that fictional "sale" was to create a false appearance of revenues, assets from a fake sale to inflate Enron's revenue accounting and to deceive rating agencies and ultimately investors in that corporation's stock.

Specifically, the complaint represents that after Enron's Jeff McMahon secretly promised Merrill Lynch's investment banker Robert Furst that Enron would buy back the barges, on which there was an incomplete project of three gas turbine power plants

which were accordingly nonfunctional and thus the sale lacked a legitimate business purpose, the initial transaction documents

> were expressly conditioned on Enron's agreement that Merrill Lynch would earn a fixed yield of 15% and guaranteed that Merrill Lynch's investments would be resold by 6/30/00.   But the guarantee to take Merrill Lynch out of the deal within six months could not be written into the transaction documentation.   Therefore, Merrill Lynch obtained an oral side agreement from Enron's CFO, Fastow.   In a conference call with Merrill Lynch and Enron representatives, Fastow confirmed that Merrill Lynch would not own any interest in the barges after six months . . . .

*Id.* at ¶ 742.12.   The complaint asserts that "the obvious sole purpose of the deal was to manipulate Enron's reported profits" in the alleged amount of $12 million.   *Id.* at ¶ 742.10. (The complaint elsewhere charges that the bogus transaction had no other economic purpose than to increase the price of Enron's stock **and** to generate present and future fees from Merrill Lynch through further business.   *Id.* at ¶ 742.7.)

The complaint also states that James Brown, the head of Merrill Lynch's Structure Finance Group, admonished top executives that the transaction was a sham, that it presented "'reputational risk'" because Merrill Lynch was participating in "Enron income [statement] manipulation" and because it violated elementary accounting principles."   *Id.* at ¶ 742.10.   SEC Staff Accounting Bulletin No. 101 at that time, based on GAAP, states that "revenue cannot be recognized in a sales transaction when (a) the seller has significant obligations to bring about the resale of the product by

the buyer, or (b) risks of ownership do not pass from seller to buyer." *Id.* In a side oral agreement from Fastow, confirmed in a conference call from Fastow to Merrill Lynch and Enron representatives, Enron allegedly guaranteed Merrill Lynch it would be "taken out" of the transaction within six months with a profitable return to Merrill Lynch; thus Merrill Lynch never assumed the risk of owning the barges. *Id.* at ¶ 742.11-742.12 Even though warned that the transaction was improper, the Merrill Lynch Commitment Committee, comprised of top Merrill Lynch executives, approved the buyback transaction, apparently to enhance its lucrative relationship with Enron. *Id.* at ¶ 742.11. The complaint quotes Senator Carl Levin: "[M]aking money by assisting a company like Enron to engage in misleading accounting or by discouraging analysts to provide honest ratings or by touting a questionable investment partnership . . . misleads investors, rewards the wrong companies for the wrong reasons, and produces the situation we are in today with a crisis of investor confidence." *Id.*

To effectuate the bogus sale, Merrill Lynch created its own SPE, "Ebarge, LLC." *Id.* at 742.13. The complaint provides additional details that further demonstrate the sale was a sham:

> Concurrently, Merrill Lynch entered an engagement letter with Fastow which provided for Enron's payment to Merrill Lynch of $250,000. At that time Merrill Lynch entered a Shareholder Agreement and Loan Agreement providing for Merrill Lynch's fake acquisition of an interest in the barges for $28 million from Enron Nigeria Barge Limited. Merrill

> Lynch funded Ebarge with $7 million on
> 12/30/99. The $28 million "purchase,"
> consisted of $7 million paid by Merrill Lynch
> and $21 million purportedly "loaned" Merrill
> Lynch by Enron Nigeria Power Hold, Ltd.,
> another Enron entity. Notably, Merrill Lynch
> (Ebarge) never paid any interest or principal
> on the "loan" . . . . Moreover, Merrill
> Lynch's true involvement in the barges was as
> unlikely as the prospect that Merrill Lynch
> would enter a power-generating business off
> the coast of Nigeria. Indeed, Merrill Lynch
> never asked for or received any cash flow or
> profit from operation of the barges, or paid
> for maintenance, development, or operation of
> the barges. . . . The secret buyback further
> confirms Merrill Lynch acted as a strawman in
> a bogus asset sale.

*Id.*

Furthermore, because the project could not be sold within the six-month time period, LJM2 purchased Merrill Lynch's sham interest in Ebarge on 6/29/00 with the agreed-upon 15% return to Merrill Lynch, in addition to the $250,000 up-front fee. *Id.* at ¶ 742.15. The Court finds the complaint adequately alleges that Merrill Lynch directly or indirectly engaged in manipulative or deceptive conduct as part of a scheme to defraud Enron investors in a primary violation of § 10(b) and Rule 10b-5(a) and (c).

Accordingly, for the reasons stated above, the Court

ORDERS that the motion for reconsideration is GRANTED in part as indicated *supra*; the motion for clarification is MOOT. The Court further

ORDERS that Merrill Lynch entities' motion for judgment on the pleadings (#3734) is MOOT.

The Court is determined to keep the trial on schedule. Lead Plaintiff has had substantial time to consider how to amend its complaint.  Thus the Court

ORDERS that Lead Plaintiff shall file an amended pleading, limited to those matters asserted in the last complaint or the supplemental matters raised in its briefing for the motion to reconsider, no later than December 31, 2006.  The Court will not entertain motions to dismiss that amended pleading, but will review Defendants' motions for summary judgment.  Therefore any supplementation of such motions or responses or replies by any party based on the amended complaint shall be made no later than January 19, 2006.

**SIGNED** at Houston, Texas, this 4th day of December, 2006.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE