UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re ENRON CORPORATION SECURITIES LITIGATION | § § § § § § § § § § § § § § § § § § § § § § § § § | Civil Action No. H-01-3624 **(Consolidated)** CLASS ACTION |
| This Document Relates To: | | |
| MARK NEWBY, et al., Individually and On Behalf of All Others Similarly Situated, | | |
| Plaintiffs, | | |
| vs. | | |
| ENRON CORP., et al., | | |
| Defendants. | | |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al., Individually and On Behalf of All Others Similarly Situated, | | |
| Plaintiffs, | | |
| vs. | | |
| KENNETH L. LAY, et al., | | |
| Defendants. | | |

**LEAD COUNSEL'S MEMORANDUM OF LAW IN SUPPORT OF FEE AWARD AND REIMBURSEMENT OF PLAINTIFFS' EXPENSES**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION AND OVERVIEW ..........................................................................1

II.  THE REGENTS NEGOTIATED THE FEE AGREEMENT AT THE START OF THE CASE IN LIGHT OF THE RISKS THEN KNOWN ...............................................15

III.  THIS LITIGATION HAS BEEN VIGOROUSLY AND EFFECTIVELY PROSECUTED..............................................................................................................22

    A.  Initial Investigation and Consolidated Complaint ...................................23

    B.  Legal and Practical Challenges................................................................23

    C.  Litigation Expenditures and Resources ...................................................27

    D.  Bankruptcy Proceedings ..........................................................................29

    E.  Settlement Negotiations ...........................................................................30

        1.  Bank of America and Lehman ......................................................30

        2.  Outside Directors .........................................................................31

        3.  Arthur Andersen...........................................................................32

        4.  Citigroup, JPMorgan Chase and CIBC........................................33

    F.  Ongoing Litigation Against the Non-Settling Defendants.......................34

    G.  Summary Judgment .................................................................................39

    H.  Lead Counsel's Efforts to Reverse the Fifth Circuit and Obtain Further Recoveries for the Class...........................................................................39

IV.  THE FEE SHOULD BE AWARDED BASED ON A PERCENTAGE OF THE RECOVERY ACHIEVED................................................................................................42

    A.  Fees in Common Fund Cases Are Normally Based on a Percentage of the Recovery .................................................................................................42

        1.  The Supreme Court Holds that Fees in Common Fund Cases Are Properly Calculated Based on a Percentage of the Recovery ...................42

        2.  A Majority of Courts of Appeal Have Approved the Percentage-of-the-Recovery Method.........................................................................43

3.    The Fifth Circuit and Numerous District Courts in This Circuit Have Used the Percentage Method to Determine Reasonable Attorneys' Fees ....................................................................46

B.    The Requested Percentage Award Is Not Only Fair and Reasonable When Compared to Other Awards, It Is Conservative .....................................................48

C.    The Lead Plaintiff's Agreed-To Fee Is Entitled to a "Presumption of Reasonableness" ................................................................................55

D.    The Fee Request Is Fair Under the Lodestar/Multiplier Analysis .........................58

V.    THE REASONABLENESS OF THE FEE REQUESTED IS SUPPORTED BY THE *JOHNSON* FACTORS ...........................................................................................60

A.    Time and Labor Required ....................................................................62

B.    Novelty and Difficulty of the Issues ...................................................65

C.    The Skill Required .............................................................................67

D.    Preclusion of Other Employment.........................................................68

E.    The Customary Fee ............................................................................68

F.    Whether the Fee Is Fixed or Contingent ..............................................69

G.    Time Limitations Imposed..................................................................71

H.    The Amount Involved and Results Achieved ........................................73

I.    The Experience, Reputation and Ability of Counsel ..............................73

J.    The Undesirability of the Case ...........................................................73

K.    Nature and Length of Relationship With the Client ...............................74

L.    Awards in Similar Cases ....................................................................75

VI.    IMPORTANT PUBLIC POLICY CONSIDERATIONS SUPPORT THE REQUESTED FEE AWARD ...............................................................................75

VII.    THE EXPENSES FOR WHICH LEAD PLAINTIFF, CLASS REPRESENTATIVES AND OTHER PLAINTIFFS SEEK REIMBURSEMENT WERE REASONABLY INCURRED AND SHOULD BE REIMBURSED ..................76

VIII.    CONCLUSION.................................................................................78

# TABLE OF AUTHORITIES

**Page**

## CASES

*Allapattah Servs. v. Exxon Corp.*,
454 F. Supp. 2d 1185 (S.D. Fla. 2006) ..............................................................50, 51, 54

*Anixter v. Home-Stake Prod. Co.*,
77 F.3d 1215 (10th Cir. 1996) ........................................................................................70

*Backman v. Polaroid Corp.*,
910 F.2d 10 (1st Cir. 1990).............................................................................................70

*Barrie v. Intervoice-Brite, Inc.*,
397 F.3d 249 (5th Cir. 2005) ............................................................................................9

*Barrie v. Intervoice-Brite, Inc.*,
409 F.3d 653 (5th Cir. 2005) ............................................................................................9

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)........................................................................................................75

*Batchelder v. Kerr-McGee Corp.*,
246 F. Supp. 2d 525 (N.D. Miss. 2003).........................................................................46

*Bateman, Eichler, Hill Richards, Inc. v. Berner*,
472 U.S. 299 (1985)........................................................................................................75

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979)...........................................................................................70

*Blum v. Stenson*,
465 U.S. 886 (1984)............................................................................................... *passim*

*Brantley v. Surles*,
804 F.2d 321 (5th Cir. 1986) ..........................................................................................61

*Camden I Condo. Ass'n v. Dunkle*,
946 F.2d 768 (11th Cir. 1991) ........................................................................................44

*Central Bank, N.A. v. First Interstate Bank, N.A.*,
511 U.S. 164 (1994)............................................................................................... *passim*

*Central R. & Banking Co. v. Pettus*,
113 U.S. 116 (1885)........................................................................................................42

*Di Giacomo v. Plains All Am. Pipeline*,
   No. H-99-4137, 2001 U.S. Dist. LEXIS 25532
   (S.D. Tex. Dec. 19, 2001) ...............................................................................48

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)............................................................................... *passim*

*Florin v. Nationsbank, N.A.*,
   34 F.3d 560 (7th Cir. 1994) ............................................................................44

*Foster v. Boise-Cascade, Inc.*,
   577 F.2d 335 (5th Cir. 1978) ..........................................................................46

*Goldstein v. MCI Worldcom*,
   340 F.3d 238 (5th Cir. 2003) .....................................................................66, 70

*Gottlieb v. Barry*,
   43 F.3d 474 (10th Cir. 1994) ..........................................................................44

*Grendel's Den, Inc. v. Larkin*,
   749 F.2d. 945 (1st Cir. 1984).........................................................................59

*Harman v. Lyphomed, Inc.*,
   945 F.2d 969 (7th Cir. 1991) ..........................................................................74

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983).................................................................................44, 73

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983)........................................................................................75

*Hicks v. Morgan Stanley & Co.*,
   No. 01 Civ. 10071 (RJH), 2005 U.S. Dist. LEXIS 24890
   (S.D.N.Y. Oct. 24, 2005) ................................................................................77

*In re Aetna Inc. Sec. Litig.*,
   No. 1219, 2001 U.S. Dist. LEXIS 68
   (E.D. Pa. Jan. 4, 2001) ...................................................................................60

*In re Apple Computer Sec. Litig.*,
   No. C-84-20148(A)-JW, 1991 U.S. Dist. LEXIS 15608
   (N.D. Cal. Sept. 6, 1991) ................................................................................70

*In re Ashanti Goldfields Sec. Litig.*,
   No. CV F-00-6664 JKS, 2005 U.S. Dist. LEXIS 24831
   (S.D.N.Y. Nov. 15, 2005) ...............................................................................77

*In re Brand Name Prescription Drugs Antitrust Litig.*,
   No. 94 C 897, 2000 WL 204112
   (N.D. Ill. Feb. 10, 2000)....................................................................................54

*In re Catfish Antitrust Litig.*,
   939 F. Supp. 493 (N.D. Miss. 1996)...................................................47, 48, 61

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001)........................................................... *passim*

*In re Charter Commc'ns Inc., Sec. Litig.*,
   No. 4:02-CV-1186 CAS, 2005 U.S. Dist. LEXIS 14772
   (E.D. Mo. June 30, 2005).....................................................................60

*In re Charter Commc'ns Sec. Litig.*,
   443 F.3d 987 (8th Cir. 2006),
   *cert. granted*, 127 S. Ct. 1873 (2007) .........................................11, 34

*In re Computron Software*,
   6 F. Supp. 2d 313 (D.N.J. 1998) .........................................................52

*In re Cont'l Ill. Sec. Litig.*,
   962 F.2d 566 (7th Cir. 1992) ...............................................................43

*In re Enron Corp. Sec. Litig.*,
   206 F.R.D. 427 (S.D. Tex. 2002)................................................. *passim*

*In re Enron Corp. Sec. Litig.*,
   235 F. Supp. 2d 549 (S.D. Tex. 2002) .................................33, 41, 66

*In re Enron Corp. Sec. Litig.*,
   236 F.R.D. 313 (S.D. Tex. 2006)........................................10, 39, 41

*In re Enron Corp. Sec. Litig.*,
   310 F. Supp. 2d 819 (S.D. Tex. 2004) .....................................33, 41

*In re Enron Corp. Sec. Litig.*,
   No. H-01-3624, 2006 U.S. Dist. LEXIS 43146
   (S.D. Tex. June 5, 2006) .............................................10, 25, 41, 66

*In re Global Crossing Sec. & ERISA Litig.*,
   225 F.R.D. 436 (S.D.N.Y. 2004) ............................................. *passim*

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995).................................................................44

*In re Ikon Office Solutions, Inc.*,
    194 F.R.D. 166 (E.D. Pa. 2000)................................................................49, 66

*In re King Res. Co. Sec. Litig.*,
    420 F. Supp. 610 (D. Colo. 1976).........................................................................68

*In re Lucent Techs., Inc. Sec. Litig.*,
    327 F. Supp. 2d 426 (D.N.J. 2004) ...........................................................23, 48, 56

*In re MCI WorldCom, Inc. Sec. Litig.*,
    191 F. Supp. 2d 778 (S.D. Miss. 2002)................................................................70

*In re NASDAQ Market–Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) .....................................................................54, 60

*In re Prudential-Bache Energy Income P'ship Sec. Litig.*,
    No. MDL 888, 1994 U.S. Dist. LEXIS 4786
    (E.D. La. Apr. 13, 1994) ...........................................................................43, 46, 69

*In re Rite Aid Corp. Sec. Litig.*,
    396 F.3d 294 (3d Cir. 2005)...........................................................................7, 60

*In re RJR Nabisco Inc. Sec. Litig.*,
    No. 88 Civ. 7905, 1992 U.S. Dist. LEXIS 12702
    (S.D.N.Y. Aug. 24, 1992) .................................................................................60

*In re Terra-Drill P'ships Sec. Litig.*,
    733 F. Supp. 1127 (S.D. Tex. 1990) ..................................................................73

*In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*,
    56 F.3d 295 (1st Cir. 1995).........................................................................44, 58

*In re Visa Check/MasterMoney Antitrust Litig.*,
    297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd sub nom*,
    *Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2005).....................................................................................54, 60

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
    19 F.3d 1291 (9th Cir. 1994) ..........................................................................44

*In re WorldCom Inc. Sec. Litig.*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005)...................................................... *passim*

*In re Xcel Energy, Inc.*,
    364 F. Supp. 2d 980 (D. Minn. 2005)...............................................................60

*In re Zyprexa Products Liab. Litig.*,
    424 F. Supp. 2d 488 (E.D.N.Y. 2006) ............................................................54

*In re Zyprexa Products Liab. Litig.*,
    433 F. Supp. 2d 268 (E.D.N.Y. 2006) ............................................................54

*Johnson v. Georgia Highway Express, Inc.*,
    488 F.2d 714 (5th Cir. 1974) ...........................................................60, 61, 73

*Johnston v. Comerica Mortgage Corp.*,
    83 F.3d 241 (8th Cir. 1996) .............................................................................44

*Kirchoff v. Flynn*,
    786 F.2d 320 (7th Cir. 1986) ..........................................................................44

*LeBlanc-Sternberg v. Fletcher*,
    143 F.3d 748 (2d Cir. 1998)............................................................................58

*Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*,
    487 F.2d 161 (3d Cir. 1973)............................................................................43

*Lindy Bros. Builders v. Am. Radiator & Standard Sanitary Corp.*,
    540 F.2d 102 (3d Cir. 1976)............................................................................43

*Longden v. Sunderman*,
    979 F.2d 1095 (5th Cir. 1992) .................................................................46, 47

*Mills v. Elec. Auto-Lite Co.*,
    396 U.S. 375 (1970) ........................................................................................42

*Missouri v. Jenkins*,
    491 U.S. 274 (1989)........................................................................................58

*Price v. Philip Morris, Inc.*,
    No. 00-L-112, 2003 WL 22597608 (Ill. Cir. Mar. 21, 2003),
    *rev'd on other grounds*, 219 Ill. 2d 182, 848 N.E.2d 1 (Ill. 2005) ...................54

*Rawlings v. Prudential-Bache Props.*,
    9 F.3d 513 (6th Cir. 1993) ..............................................................................44

*Regents of the Univ. of Cal. v. Credit Suisse First Boston*,
    482 F.3d 372 (5th Cir. 2007) ................................................................ *passim*

*Robbins v. Koger Props.*,
    116 F.3d 1441 (11th Cir. 1997) ......................................................................70

*Roberts v. Texaco, Inc.,*
   979 F. Supp. 185 (S.D.N.Y. 1997)..................................................................60

*Shaw v. Toshiba Am. Info. Sys.,*
   91 F. Supp. 2d 942 (E.D. Tex. 2000).......................................................*passim*

*Southland Sec. Corp. v. INSpire Inc. Solutions, Inc.,*
   365 F.3d 353 (5th Cir. 2004) ..................................................................9, 66

*Sprague v. Ticonic Nat'l Bank,*
   307 U.S. 161 (1939)..........................................................................42

*Sutton v. Bernard,*
   504 F.3d 688 (7th Cir. 2007) ..................................................................70

*Swedish Hosp. Corp. v. Shalala,*
   1 F.3d 1261 (D.C. Cir. 1993)...............................................................44, 46

*Trans World Airlines, Inc. v. Hughes,*
   312 F. Supp. 478 (S.D.N.Y. 1970)..............................................................70

*Trustees v. Greenough,*
   105 U.S. 527 (1882)...........................................................................42

*Varljen v. H.J. Meyers & Co.,*
   No. 97 CIV. 6742 (DLC), 2000 U.S. Dist. LEXIS 16205
   (S.D.N.Y. Nov. 8, 2000) .......................................................................77

*Weiss v. Mercedes-Benz of N. Am.,*
   899 F. Supp. 1297 (D.N.J. 1995) ..............................................................60

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
   §78u-4 .................................................................................*passim*
   §78u-4(a)(4)..............................................................................76
   §78u-4(a)(6).........................................................................4, 19, 46, 78

Federal Rules of Civil Procedure
   Rule 23 ..................................................................................51

17 C.F.R.
   §240.10b-5 ..............................................................................2, 74

## LEGISLATIVE HISTORY

H.R. Rep. No. 104-369 (1995) (Conf. Rep.)...................................................................................4


## SECONDARY AUTHORITIES

John C. Coffee, Jr., *Understanding the Plaintiff's Attorney:  The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions* (1986)
        86 Colum. L. Rev. 669 ...............................................................................16, 45

John C. Coffee, Jr., *Litigation Governance: A Gentle Critique of The Third Circuit Task Force Report* (2001)
        74 Temp. L. Rev. 805 .........................................................................................16

1 Alba Conte and Herbert B. Newberg, *Attorney Fee Awards* (2d ed. 1993)
        §2.02...................................................................................................................43

Charles Silver, *Class Actions in the Gulf South Symposium: Due Process and the Lodestar Method: You Can't Get There From Here* (2000)
        74 Tul. L. Rev. 1809 .........................................................................................45

*Manual for Complex Litigation* (3d ed. 1995)
        §24.12.................................................................................................................43

Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*,
        108 F.R.D. 237 (Oct. 8, 1985) ..........................................................................42

Report of the Third Circuit Task Force Report, *Selection of Class Counsel*,
        208 F.R.D. 340 (Jan. 15, 2002)......................................................................5, 21

## I.    INTRODUCTION AND OVERVIEW[1]

The record recovery obtained for the Class – $7.2 billion, plus interest – was spearheaded by The Regents of the University of California ("The Regents" or "Lead Plaintiff") and achieved through the skill and tenacity of The Regents' chosen firm – Coughlin Stoia Geller Rudman & Robbins LLP ("Coughlin Stoia," the "Firm" or "Lead Counsel").[2]  This litigation has endured for six years, and it is not over.  Counsel representing the Class have worked on a contingent basis without fee compensation to date.  The effort and expense – more than $127 million in lodestar and $40+ million in expenses – has resulted in, against significant odds, the largest recovery in *any* class action in history.  For this effort and result, Lead Counsel requests a fee of 9.52% of the recovery – the amount called for by the fee contract negotiated by the Lead Plaintiff at arm's length with Lead Counsel at the outset of the case.  The fee requested is clearly fair and reasonable in light of obstacles overcome, and the time, effort and result achieved.

The Regents' public spokesperson has recently called the settlements "*an enormous accomplishment,*"[3] Dale Kasler, *Huge Enron Payout,* Sacramento Bee, Jul. 28, 2007, at D1

---

[1]    Submitted herewith is the Declaration of Helen J. Hodges in Support of Lead Counsel's Motion for an Award of Attorney Fees ("Hodges Declaration" or "Hodges Decl."), which more fully describes the history of the litigation.  Also submitted herewith are declarations from each firm that worked together with Lead Counsel and expert declarations in support of the Plan of Allocation and fee application.  Per the Court's December 14, 2007 Order, Lead Counsel will submit (in disc form) a Proposed Order and Proposed Findings of Fact and Law for the Court's consideration with our reply to take into consideration any comments in response to the Notice sent to Class members.

[2]    The lawyers prosecuting this case withdrew from Milberg Weiss in May 2004 to form Lerach Coughlin Stoia Geller Rudman & Robbins LLP, which ultimately became Coughlin Stoia.  All references to Coughlin Stoia, the Firm or Lead Counsel include Milberg Weiss and/or Lerach Coughlin as its predecessor.

[3]    Citations and footnotes are omitted and emphasis is added unless otherwise noted.

(Compendium, Ex. A),[4] and The Regents' lead lawyer overseeing the litigation for years concurs: "In light of the liability, causation and damages issues presented in this case as well as the financial condition of certain defendants, the settlements to date represent an outstanding recovery on behalf of the Class and an excellent resolution of those claims that have been resolved by way of those settlements.  The total amount of that fee is less than 10% of the total amount recovered with the result that 90% of the recovery will be returned to the Class."  *See* Declaration of James E. Holst in Support of Lead Counsel's Motion for an Award of Attorney Fees ("Holst Decl."), ¶16.

Expert securities commentators such as Professor John C. Coffee Jr. of Columbia University Law School have described the litigation results as unparalleled:  "Put simply, this is a litigation that can only be described in superlatives. To begin with, it represents the largest recovery ever in any class action—not just securities class actions, but all class actions."  Declaration of John C. Coffee, Jr. ("Coffee Decl."), ¶2.  Professor Coffee notes the obstacles in this case were exceptional:

> Even more impressively, this record recovery was achieved in the face of exceptional hurdles, both because of (a) the bankruptcy of the corporate issuer (i.e., Enron), and (b) the inability of the proposed class to achieve certification. Normally, in Rule 10b-5 litigation, the class obtains the bulk of its recovery from the corporate issuer, with most of the balance, if any, coming from the accounting firm that audited the issuer's financial statements. But here, from the outset, Enron was bankrupt and Arthur Andersen was on the brink of insolvency and clearly could not fund more than a small portion of the recovery.

*Id*.

Further opining on the recovery in this case, Professor Coffee also added:  "Moreover, with a critical issue unresolved – *i.e.*, class certification – it was not surprising that some of the largest defendants with the greatest potential liability declined to settle and held out.  That an all-time record

---

[4]     All references to "Compendium, Ex. __" refer to Lead Counsel's Compendium of Exhibits in Support of Lead Counsel's Memorandum of Law in Support of Fee Award and Reimbursement of Plaintiffs' Expenses filed concurrently herewith.

was achieved on these facts strongly suggests that Lead Counsel performed with an extraordinary level of skill and negotiating prowess." *Id*.

The attributes of Lead Counsel were also recognized in this Court's order appointing The Regents as lead plaintiff and affirming its designation of the Firm as Lead Counsel:

> The University of California, a premier public research university . . . . [S]eeks appointment as Lead Plaintiff in this litigation. . . .

> The Regents emphasize . . . that it possesses the sophistication, expertise and resources to prosecute this litigation, and that it seeks to employ only one law firm . . . *a single law firm with exceptional resources and capability to prosecute this action: a team of two dozen attorneys, investigators, forensic accountants, and corporate governance experts that are already working on this litigation. Moreover, its and its attorneys' zealous prosecution of this action is already evident.*

>            *            *            *

> *This litigation is probably the largest and most complex of its kind in the history of this country and it will demand the full focus of Lead Plaintiff(s) and Lead Counsel.*

>            *            *            *

> Given the magnitude and complexity of this litigation, the geographical and temporal expanse it covers, the number of governmental and private investigations occurring, and the necessary involvement with the bankruptcy proceeding in New York, *the selection of competent, experienced and committed Lead Counsel has even greater import than in normal securities class actions. In reviewing the extensive briefing submitted regarding the Lead Plaintiff/Lead Counsel selection, the Court has found that the submissions of [the Firm] stand out in the breadth and depth of its research and insight.*

*In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 454-58 (S.D. Tex. 2002).

The Regents, a sophisticated institutional investor and consumer of legal services, with a large "in house" legal department and a substantial financial stake in the outcome of this litigation, is the paradigm fiduciary envisioned by Congress when it enacted the Private Securities Litigation

Reform Act of 1995 ("PSLRA").[5]  This fee request results from an agreement negotiated at arm's length between Lead Plaintiff and the Firm at the beginning of Lead Plaintiff's involvement in the litigation.[6]  This is important, as "[c]ourts should afford a presumption of reasonableness to fee requests submitted pursuant to an agreement between a properly-selected lead plaintiff and properly-selected lead counsel."  *In re Cendant Corp. Litig.*, 264 F.3d 201, 220 (3d Cir. 2001) (Becker, C.J.).[7]  Professor Charles Silver, who holds the Roy W. and Eugenia C. McDonald Endowed Chair at the University of Texas School of Law, concurs, noting the requested fee award is reasonable because it was set in light of the risks at the onset of the litigation after arm's-length negotiations by a sophisticated institution with a large stake in the outcome.  Expert Report of Professor Charles Silver

---

[5]     Congress enacted the PSLRA in large part to encourage institutional investors to assume control of securities class actions and "increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel."  *See* H.R. Rep. No. 104-369, at 32 (1995) (Conf. Rep.).  *See also In re Waste Management, Inc. Sec. Litig.*, No. H-99-2183, slip op. at 57 (S.D. Tex. May 10, 2002) ("*Waste Management I*") (Compendium, Ex. B). The PSLRA also endorses the percentage fee approach:

> Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class.

15 U.S.C. §78u-4(a)(6).

[6]     "[T]he system envisioned by the PSLRA demands that courts place considerable weight on the fee structure negotiated by the Lead Plaintiff at the outset of the litigation, when the outcome of the litigation was unknown."  Declaration of H. Lee Sarokin in Support of Lead Counsel's Motion for an Award of Attorney Fees ("Sarokin Decl."), ¶28.

[7]     *Accord In re Dynegy, Inc. Sec. Litig.*, No. H-02-1571, slip op. at 1-2 (S.D. Tex. July 8, 2005) (Compendium, Ex. C) ("These amounts [awarded] represent the percentage fee award negotiated between the Court-appointed Lead Plaintiff and Lead Counsel at this level of recovery."); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 466 (S.D.N.Y. 2004) ("courts presume fee requests submitted pursuant to a retainer agreement negotiated at arm's length between lead plaintiff and lead counsel are reasonable").

Concerning the Reasonableness of Class Counsels' Request for an Award of Attorneys' Fees ("Silver Report") at 3.[8]

This Court has recognized these important principles in what was, until The Regents served as a Lead Plaintiff in *Enron* and *Dynegy*, the largest "mega-fund" securities class action recovery in Texas. In *Waste Management*, this Court noted: "The majority of the courts of appeals favor or require the use of the percentage-of-recovery method to calculate an award of attorneys' fees in common fund cases. The Supreme Court, moreover, has indicated that the percentage method is proper in such cases." *Waste Management I*, No. H-99-2183, slip op. at 54 (Compendium, Ex. B). This Court further noted: "***Most district courts . . . , noting the uncertainty of the Fifth Circuit's guidance, the trend of other Circuit authority, and the considerable burdens and disadvantages of using the lodestar method, have used the percentage method in awarding attorneys' fees in common fund cases such as this***."[9] *Id.* at 55. *Enron* is such a case.

In awarding the percentage fee requested in *Waste Management I*, the Court cited three important factors: (1) "Lead Plaintiff is a sophisticated institutional investor and specifically negotiated the fee agreement to ensure that any fee would be reasonable but not excessive"; (2)

---

[8] Professor Silver also notes the fee is reasonable when compared to fee awards in other class actions, the market for like legal services, bonuses paid to *qui tam* relators and under prevailing ethical standards governing the conduct of lawyers. *Id. See also* Report of the Third Circuit Task Force Report, *Selection of Class Counsel*, 208 F.R.D. 340 (Jan. 15, 2002) ("Third Circuit Report").

[9] The Court further noted that whether the lodestar or percentage of recovery method is used: "[T]he Fifth Circuit has articulated twelve factors to be examined in setting a reasonable attorneys' fee. These are: (1) time and labor required; (2) novelty or difficulty of the issues; (3) skill required to perform the legal services properly; (4) preclusion of other employment; (5) customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) amount involved and results obtained; (9) the experience, reputation and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Id.* at 55. Examination of the facts and circumstances in this case giving rise to the largest class action recovery in history confirms that under either method the fee requested is fair and reasonable.

"[t]he percentage fee is sought pursuant to the terms of an *ex ante* representation agreement entered into by Lead Plaintiff and Lead Counsel at the inception of Lead Plaintiff's involvement in this litigation and long before the parties began to discuss settlement"; and (3) "[b]ased on this representation agreement, Lead Plaintiff, which was heavily involved in each facet of this litigation, including the settlement negotiations, fully supports the fee requested." *Waste Management I*, No. H-99-2183, slip op. at 57 (Compendium, Ex. B).

All three criteria this Court noted in *Waste Management I* are present in *Enron*. The Lead Plaintiff is a sophisticated institutional investor with a portfolio exceeding $73 billion and a legal staff of over 50 in-house lawyers, including lawyers with extensive litigation experience. Holst Decl., ¶¶2-3. According to The Regents' General Counsel at the time the agreement was negotiated, the *ex ante* fee objective was to maximize recovery to the Class by negotiating an agreement lower than those commonly agreed to, but, with a recognition of the size, complexity and difficulty of the litigation, a fee contract that would also provide sufficient incentive to counsel to devote the needed resources necessary to maximize a recovery. Holst Decl., ¶¶8-9. Finally, the Lead Plaintiff was involved in every facet of the investigation, reviewing and approving virtually every pleading, providing significant legal and strategic input and overseeing all settlement negotiations, while recognizing the benefits of the fee contract: "Under this agreement, we assured that more than 90% of the recovery in this action will go to the class. The Regents believe this will lead to an extraordinarily good result for the class. The settlements reached to date of $7.3 billion (including interest) are the largest ever in securities litigation." Declaration of Christopher M. Patti in Support

- 6 -

of Lead Plaintiff's Amended Motion for Class Certification (S.D. Tex., dated Mar. 15, 2006) (Docket No. 4551) at 4.[10]

The fee requested as a percentage of the common fund – 9.52% – is also below the normal range of awards made in contingent fee matters of this type.  In *Rite Aid*, The Third Circuit affirmed the award of 25% in a "mega fund" case, citing with approval an analysis submitted by Professor Coffee, which considered statistical data from other securities class action cases and found: (1) a 31% average fee in actions involving settlements over $10 million; (2) a 27%-30% median fee range over the course of a two-year period in selected federal district courts; and (3) that fees in the 20% range were "'fairly standard'" in "'mega fund'" class actions.  *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 298 (3d Cir. 2005).  District courts in the Fifth Circuit are in accord as Judge Kinkeade stated in *TXU*, "a fee award of 22.2% of the Settlement Fund is consistent with, if not less than, awards made in similar cases.  [C]ourts throughout this Circuit regularly award fees of 25% and more often 30% or more of the total recovery under the percentage of recovery method."  *Schwartz v. TXU Corp.*, No. 3:02-CV-2243-K, slip op. at 3 (N.D. Tex. Nov. 8, 2005) (Compendium, Ex. D).

Notably, at the time the fee agreement was negotiated, it was widely reported that the percentages were far below the usual rates in such cases.  In an April 2002 article, for instance, *The Wall Street Journal* stated:

> [B]ig investors have become increasingly active, using their clout to drive down attorneys' fees and increasing the payment available for shareholders large and small. The Regents of the University of California, for example, are the lead plaintiffs for claims against Enron; their law firm, Milberg Weiss Bershad Hynes & Lerach, is seeking 8% to 10% of any recovery – ***about one-third of the customary take***.

---

[10]    The Regents acknowledge that due to the skill, tenacity and effectiveness of Lead Counsel, the result is extraordinary and thus the fee requested is the same, but this is exactly what the fee contract was designed to accomplish.  Declaration of Christopher M. Patti ("Patti Decl."), ¶22.

Michael Orey, *Cashing In On Shareholder Suits – Class Actions Are Mounting and So Are Payouts, As Deep Pockets Get Tapped; Should You File*?, Wall St. J., April 25, 2002, at D1 (Compendium, Ex. E).

And subsequent to the huge recoveries, knowledgeable but disinterested observers have also praised the *Enron* fee agreement as an example of how institutional investor lead plaintiffs should conduct PSLRA cases.  SEC Commissioner Paul Atkins stated in a February 16, 2006 speech to the U.S. Chamber Institute for Legal Reform:

> When talking about the importance and effectiveness of the lead plaintiff provision of the PSLRA, ***Chairman Cox likes to point to the Enron class action suits***.  As you know, under the PSLRA a judge, not the plaintiff's lawyers, chooses the lead plaintiff – the plaintiff who best represents the class.  In the Enron litigation, the court chose the Regents of the University of California as the lead plaintiff.  ***One of the first moves made by the UC Regents was to negotiate a significantly reduced legal fee that resulted in hundreds of millions more dollars for injured investors***.

Paul S. Atkins, Speech by SEC Commissioner:  Remarks before the U.S. Chamber Institute For Legal Reform (Feb. 16, 2006) (Compendium, Ex. F).  And the appropriateness of the requested fee is further supported by the declarations of several experts with significant experience in contingency and common fund fee matters.[11]  These experts are uniform in their praise of (i) the fee structure agreed to by the Lead Plaintiff; (ii) the quality of the result achieved; and (iii) the skill and intensity of the litigation effort put forth to earn the fee.

The requested fee is especially appropriate in light of the effort expended in the face of the significant risks faced by class counsel involved in prosecuting this litigation.  Throughout, this case has been subject to the provisions of the PSLRA (15 U.S.C. §78u-4) and *Central Bank, N.A.  v. First Interstate Bank, N.A.*, 511 U.S. 164 (1994), formidable obstacles to recovery where the issuer was

---

[11]     *See* Declarations of John C. Coffee, Jr., Lucian Bebchuk ("Bebchuk Decl.") and H. Lee Sarokin.  *See also* Silver Report.

bankrupt, the accounting firm was driven out of business and the only sources of recovery for the most part were third parties.  In addition, due to certain insolvency issues, loss causation became a center piece of the defense.  With the Supreme Court's decision in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005), the standard as to what investors must plead and prove to establish loss causation was raised as the litigation proceeded.  Finally, the case was not only complex and risky from a litigation standpoint, but there was no ready source from which to obtain monies for defrauded pensioners and investors.

The undeniable effect of the PSLRA is to make it harder for investors to bring and successfully prosecute securities class actions.  In the post-PSLRA environment, a greater percentage of cases have been dismissed than before due to defendants' use of the PSLRA's enhanced falsity and scienter pleading standards.  *See* Todd Foster, Ronald I. Miller, Ph.D., Stephanie Plancich, Ph.D., *Recent Trends in Shareholder Class Action Litigation*: *Filings Plummet, Settlements Soar* (NERA 2007), at 4 (Compendium, Ex. G) ("Dismissal rates have nearly doubled since PSLRA."); *TXU*, No. 3:02-CV-2243-K, slip op. at 7 (Compendium, Ex. D) ("Most cases brought in the Fifth Circuit following the passage of the PSLRA have been dismissed on motions to dismiss.").  In fact, in the 12 years since the passage of the PSLRA, it appears that, while scores of securities class action complaints have been dismissed by district courts in this Circuit, to Lead Counsel's knowledge, only two dismissals have been reversed by the Fifth Circuit.  *See Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249 (5th Cir. 2005); *Barrie v. Intervoice-Brite, Inc.*, 409 F.3d 653 (5th Cir. 2005); *Southland Sec. Corp. v. INSpire Inc. Solutions, Inc.*, 365 F.3d 353 (5th Cir. 2004).

*Central Bank* also erected a significant hurdle even in a case in which the secondary actors play a significant role.  *See Regents of the Univ. of Cal. v. Credit Suisse First Boston*, 482 F.3d 372 (5th Cir. 2007), *petition for cert. filed* (Apr. 5, 2007).  Even without these heightened obstacles, the Firm faced serious risks – and expert, highly paid resistance – in establishing the elements necessary

to prove liability as to those defendants with any real ability to pay, as well as establishing the damages for the Class. *See* Hodges Decl.  The bank defendants adamantly denied any knowledge of wrongdoing and argued that the Class had suffered little legally cognizable economic damage due to any conduct specifically engaged in by the banks.

After years of litigation in *Enron*, the United States Supreme Court granted certiorari to review the standards for pleading loss causation.  *Dura*, 544 U.S. 336.  This Court found that in *Dura* the Supreme Court heightened the pleading requirement as to loss causation which also led to "significant implications for proving damages in a §10(b) case."  *In re Enron Corp. Sec. Litig.*, No. H-01-3624, 2006 U.S. Dist. LEXIS 43146, at *206 (S.D. Tex. June 5, 2006).  In Lead Counsel's Trial Plan (Docket No. 4706), Lead Counsel set forth the method to be used to establish loss causation, citing the steady rise in Enron's stock maintained by glowing but false financial reports. Enron's investment-grade credit rating was also integral to the fraud and was maintained by the banks' active involvement in taking debt off of Enron's books.  The Trial Plan set forth precisely how the improper transactions at issue impacted Enron's operations.  Later, as the truth began to be revealed about Enron's actual financial condition, the stock price fell.  When the market realized that Enron would default on its debt, the Company fell into bankruptcy causing billions in damages.  This Court found the Trial Plan presented "an orderly and methodical approach for trying the alleged overarching scheme."  *In re Enron Corp. Sec. Litig.*, 236 F.R.D. 313, 316 (S.D. Tex. 2006).

The risks of this litigation went far beyond the "normal" risks present in any big complex case.  Little more need be said than that after some five years of hard-fought litigation and just weeks before trial, the Fifth Circuit accepted an interlocutory appeal of this Court's class certification Order. Then in March 2007, the Fifth Circuit ruled that the fraudulent scheme/deceptive conduct liability theory advanced by Lead Counsel, adopted by the SEC and supported by two thirds of the State Attorneys General of this country led by the Texas Attorney General and accepted by this

Court, was invalid under the securities laws. *See Regents*, 482 F.3d 372, adopting a similar ruling by the Eighth Circuit in *In re Charter Commc'ns Sec. Litig.*, 443 F.3d 987 (8th Cir. 2006), *cert. granted*, 127 S. Ct. 1873 (2007). The Fifth Circuit's adverse ruling in this case demonstrates how remarkable the $6.6 billion recovery on the fraudulent scheme/conduct claims against Citigroup, JPMorgan Chase and CIBC actually was.

As Professor Coffee notes: "Viewed as a negotiation, this was arguably the highest stakes legal poker game ever played. Three sophisticated financial institutions were convinced to settle for an amount in excess of $2 billion each, based largely on a legal theory that the Fifth Circuit ultimately rejected. *See Regents*, 482 F.3d 372. Few, if any, other plaintiff's counsel in my judgment could have pulled off such a tour de force, and some might have been willing to settle for a small fraction of the recovery here obtained. That Lead Counsel succeeded is attributable in almost equal measure to its credibility, creativity and the intensity of its commitment to this case." Coffee Decl., ¶4. Professor Coffee goes on to note that: "In my judgment, Lead Counsel is the adversary most feared today by the defense bar in securities litigation, and that reputation played an important role here." *Id*.

If this Fifth Circuit setback was the end of this case, the result obtained to date would more than justify awarding the 9.52%.[12] But the Firm has not relented, seeking Supreme Court review of the Fifth Circuit's decision while spearheading major efforts to achieve reversal in *Stoneridge*

---

[12] The 9.52% request equals a total fee of $688 million to compensate all the firms that worked for the past six years in this litigation. By way of comparison to the compensation request here for almost **six years of work**, it has recently been reported that the 20 highest-paid private-equity and hedge fund managers made an average of $657.5 million **each** in 2006 – *i.e.*, **for one year's work** – $210,700 per hour – **and without placing their own capital at risk**. Ian Katz, *No hedging on these salaries; Average pay in 2006 for the top fund managers was $675.5 million*, Houston Chronicle, August 30, 2007, at 2 (Compendium, Ex. H); Ian Katz, *Top Hedge Fund Chiefs Get $210,700 An Hour*, The International Herald Tribune, Aug. 30, 2007, at 15. (Compendium, Ex. I)

- 11 -

*Investment Partners v. Scientific-Atlanta, Inc.*, No. 06-43 ("*Stoneridge*"), a scheme/conduct liability case argued in October 2007.

With the blowup of Enron, everyone knew a huge fraud existed sending Enron into bankruptcy. Within months thereafter, Arthur Andersen was convicted and out of business. The reported fraud was so serious as to the Enron insiders that it jeopardized the directors' and officers' insurance due to the deliberate and dishonest nature of the conduct – conduct that generated criminal prosecutions and seizures of the assets of the primary Enron insider culprits. And while the bankrupt issuer's fraud was clear – the participation of the only other significant source of recovery – the banks – was opaque in the extreme. The structured financial deals were hidden. They had been structured by clever and highly paid lawyers to look legitimate. They involved hidden entities such as the LJM partnerships and offshore entities in the Cayman Islands, Nigeria, Brazil, Poland, etc. All this had to be uncovered – penetrated – reverse engineered – analyzed – understood – and then pleaded in the necessary detail as required by the PSLRA and in accordance with a legal theory that would permit a recovery. But, here again, significant obstacles existed.

Beyond having been agreed to, the fee has been fairly earned. The amount of work – lasting almost six years in a case of unrivaled complexity involving a score of defendants represented by the best lawyers in the U.S. – required to produce this record recovery is unequaled. Because of the size and complexity of the case, the Firm opened, equipped and staffed a state-of-the art litigation center in Houston. As described in the Hodges Declaration, considerable resources were marshaled and significant effort expended with millions of dollars of capital at risk in (i) investigating the case to uncover detailed facts to meet post-PSLRA pleading requirements; (ii) creating novel legal theories and pleading them – along with sufficient detailed facts as to involvement and scienter to survive repeated motions to dismiss; (iii) obtaining class certification (with lots of expert work and creation of a detailed trial plan); (iv) prosecuting the case to the edge of trial, including the analysis of over

70 million pages of documents and hundreds of witness interviews and some 370 depositions, along with extensive summary judgment briefing (again with lots of experts) as well; and (v) advancing, in the aggregate, over $40 million in their own capital to fund the prosecution of this case.[13]

Because of counsel's skill and diligence, and despite the obstacles described above, significant recoveries were obtained:

- **Arthur Andersen LLP** ("Andersen") – Andersen's indictment and conviction, although later overturned, drove Andersen out of business and early settlement discussions were for naught. After Andersen's conviction, Andersen Worldwide Societe Cooperative ("AWSC") renewed the discussions on behalf of the Andersen foreign affiliates. The Class and the *Tittle* (ERISA) plaintiffs agreed to settle with AWSC for $40 million. Near the close of fact discovery Andersen agreed to pay $72.5 million.

- **Kirkland & Ellis** ("K&E") agreed to pay $13.5 million shortly after being dismissed from the case.[14]

- **Bank of America** ("BofA") and **Lehman** – An agreement to settle with BofA for $69 million was reached in May 2004 and an agreement to settle with Lehman for $222.5 million was reached in October 2004.

- **The Outside Directors** agreed to pay the Class 10% of their Enron stock sales gains plus $200 million of the directors' and officers' insurance (the remaining coverage). It was and remains unusual for individuals to contribute to securities class action settlements.[15]

---

[13]   Class counsel put considerable capital at risk throughout the case. Before any significant recovery was obtained, they advanced $12 million in expenses, which was completely at risk. Even after an expense reimbursement out of partial settlements, they continued to advance some $30 million in additional expenses.

[14]   This settlement included a refund provision in the event the Class recovered K&E-related funds in connection with the LJM2 bankruptcy. As a result, $3.34 million was ultimately returned to K&E for a net settlement of $10.16 million.

[15]   To overcome objections by Enron and by the non-settling insured defendants to this use of the remaining insurance proceeds, Lead Counsel negotiated an agreement to pay 17.2% of insurance proceeds to the Enron estate and $13 million of the proceeds to non-settling insured individual defendants. Ultimately, the Class received $168 million from the settlement with the outside directors and Kenneth Harrison. The settlement halted further depletion of the wasting asset insurance policies through payment of defense costs.

- **LJM2** was pursued by Lead Counsel's bankruptcy co-counsel, Genovese Joblove & Battista.  The proof of claim filed in the LJM2 bankruptcy was resolved by agreement to divide the LJM2 estate with Enron such that the Class received 2/3 and Enron received 1/3.  The Class has received over $51.9 million from the LJM2 estate due to these efforts.

- **Citigroup**, **JPMorgan Chase** ("JPMorgan") and **Canadian Imperial Bank of Commerce** ("CIBC") came to the table as litigation pressure increased and the negotiations with these banks spanned many months, culminating in a $2 billion settlement with Citigroup, an agreement with JPMorgan for $2.2 billion and finally CIBC, the bank with the smallest comparative market size, agreed to pay $2.4 billion.  The $6.6 billion in pretrial settlements with Citigroup, JPMorgan and CIBC remains the largest recovery ever in a class action securities case.

Finally, while it may seem an odd point to make in the context of a fee request for achieving a record settlement after six years of hotly contested litigation, we think it proper to mention the civility with which the litigation was conducted.  Cases of this size and complexity, with so much at stake, all too often deteriorate into nasty, accusation-filled and acrimonious fights among lawyers.  Justice is rarely served as a result.  While the advocacy here was without question vigorous – with little quarter given or asked for – civility reigned.  This was no small achievement with the amount of disputed matters – procedural and substantive – and the hundreds of lawyers, court hearings, conference calls and appearances.  Civility is something courts rightly desire and deserve and lawyers should strive for.  Here, the Firm – with the cooperation of defense counsel – succeeded in that regard.

In sum, the Firm faced insuperable obstacles in an unprecedentedly complex case where the issuer was bankrupt, while asserting claims grounded in false accounting where the auditor vaporized following a criminal conviction, and opaque and even hidden transactions had to be discovered, unraveled and pleaded to overcome barriers.  Novel legal theories had to be developed and advanced.  Support for those theories had to be garnered from the SEC and Attorneys General throughout the country.  This all occurred in a case being vigorously defended by highly skilled defense counsel, operating without budgetary restraints.  Yet the Firm succeeded in securing the

- 14 -

largest recovery in history.  We submit that the single-digit percentage fee requested, which was

negotiated at arm's length at the outset, and will provide the Class members with over 90% of the

multi-billion dollar recovery, is not only eminently fair and reasonable, but has also clearly been

earned.

## II.    THE REGENTS NEGOTIATED THE FEE AGREEMENT AT THE START OF THE CASE IN LIGHT OF THE RISKS THEN KNOWN

In  December 2001-January 2002, The Regents entered into written retention and fee

agreements with the Firm.  The fee provision provided:

> [T]his representation has been undertaken on a contingent fee basis and [the] firm
> will look only to the proceeds of any recovery for all of our fees.  We have agreed
> upon the following fees as a percentage of the recovery for the class:  0-$1 billion
> 8%; $1-$2 billion, 9%; $2+ billion, 10%.  The higher percentages apply only to the
> marginal amounts.  In addition, we will also advance all costs and disbursements, and
> will also look only to the proceeds of any recovery for repayment of those costs.

*See* Hodges Decl., Ex. 3.  This provision as applied to the current recovery yields an overall

percentage of 9.52%.  The fee agreement was entered into as a result of arm's-length negotiations

between the Firm and James Holst, John Lundberg and Lloyd Lee of The Regents' General

Counsel's office.  Patti Decl., ¶20.  The Court was aware of the Lead Plaintiff's fee agreement when

it designated The Regents as Lead Plaintiff and approved its selection of the Firm as Lead Class

Counsel.  The *Enron* fee agreement was described to the Court by The Regents' General Counsel's

office during the lead plaintiff proceedings:

> The Regents has negotiated a fee agreement with [the Firm] which we believe to be
> extremely beneficial to the class because it incentivizes counsel to achieve the
> maximum possible recovery. ***This fee agreement was the result of extensive, arms-
> length negotiation between this office and [the Firm] during December 2001 and
> January 2002***.

Supplemental Declaration of The Regents of the University of California In Support of Its Motion

for Appointment as Lead Plaintiff in Response to Surreply of the New York City Pension Funds and

The Florida State Board of Administration (S.D. Tex., dated Feb. 6, 2002) (Docket No. 252) at 1.

- 15 -

During the *Enron* lead plaintiff proceedings, The Regents' General Counsel's office reiterated the careful thought and thorough process it had undertaken in reaching the fee agreement:

> As part of the effort to prosecute the case effectively and efficiently, The Regents reviewed the qualifications and resources of numerous class action specialist law firms and retained outside class counsel which possess the financial resources, skill, experience and track record to obtain optimum results for the Class. We negotiated an agreement with our counsel regarding attorney's fees. ***We have negotiated a fee agreement that we believe to be extremely beneficial to the Class because it incentivizes counsel to achieve the maximum possible recovery.*** In negotiating the fee agreement, The Regents took into consideration the damages in the case, likely parties from whom recovery could be sought, probability of recovery from those parties, potential amounts that could be recovered from those parties, the complexity of the litigation, resources that would be devoted by counsel, the experience of counsel, and the effectiveness of counsel in achieving class recoveries in large complex class actions. ***In addition, the fee negotiated is significantly lower, hence more beneficial to the class, than is customary in securities class actions generally, and to my knowledge the fee is significantly lower than the fee generally received in securities fraud class actions by our chosen lead counsel***.

Declaration of The Regents of the University of California In Support of Its Motion for Appointment as Lead Plaintiff and for Approval of Lead Counsel (S.D. Tex., dated Jan. 21, 2002) (Docket No. 150) at 3.

An increasing percentage of the recovery formula makes greater sense than a decreasing percentage of the recovery formula as the last dollars are the hardest to obtain.[16] *See* John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions*, 86 Colum. L. Rev. 669, 697-78 (1986); *see also* John C. Coffee, Jr., *Litigation Governance: A Gentle Critique of The Third Circuit Task Force Report*, 74 Temp. L. Rev. 805, 809 (2001). This is the precise basis upon which this fee agreement was designed, as greater incentives were added to motivate class counsel to pursue the last marginal dollar as compared to the first dollar. A decreasing percentage formula does exactly

---

[16]     "[A]n increasing fee schedule is necessary to induce valuable investment by counsel." *See* Bebchuk Decl. at 13.

the reverse, giving class counsel a decreasing incentive to obtain the last marginal increment at precisely the point at which defendants become most likely to dig in their heels and resist.  Coffee Decl., ¶45; Bebchuk Decl. at 13.

Moreover, an increasing percentage formula is not necessarily more costly to the class than a decreasing percentage formula because everything depends on where the starting point is placed. Thus, an increasing percentage like the one here, that starts at 8% and goes to 10%, is certainly cheaper to the class than a decreasing percentage that starts at 25% and declines to 10%. *Id*. The Court should permit sophisticated parties to enter into such agreements, as Judge Lake did in *Dynegy* in approving the fee award, and Judge Kinkeade did in *TXU*. *See Dynegy*, No. H-02-1571 (Compendium, Ex. C); *TXU*, No. 3:02-CV-2243-K (Compendium, Ex. D).

According to Professor Silver, a fee and expense agreement negotiated *ex ante* between sophisticated institutions and lawyers in a competitive market – and there is such competition in this market – should be approved.  Silver Report at 3.  The extraordinarily successful results obtained in this case validate such an approach and entitle it to the "presumption of reasonableness" that most courts accord today to a fee agreement between a sophisticated lead plaintiff and class counsel. *See, e.g.*, *Cendant*, 264 F.3d at 282.  Moreover, in this case, which has continued for over six years, there was far greater need (and it was obvious from the outset) to be concerned about incentives, given the Herculean task facing plaintiff's counsel in comparison to smaller, less complex cases which are usually resolved more quickly.  Coffee Decl., ¶46.

Months **after** the negotiation of the *Enron* fee agreement, and based on its then hands-on experience with the work of the Firm, the General Counsel's office of The Regents in July 2002 negotiated and signed a separate fee agreement with the Firm in connection with The Regents seeking to be appointed lead plaintiff in *Dynegy*.  It provided:

- 17 -

We have agreed upon the following fees as a percentage of the recovery for the class:  $0-$200 million, 8%; $200-$400 million, 9%; $400 million+, 10%.  The higher percentages apply only to the marginal amounts.

*See* Hodges Decl., Ex. 4 (*Dynegy* Fee Agreement).  The *Dynegy* litigation ultimately resulted in a recovery of $474 million for the Class.  At the time, this was the 8th largest securities class action recovery since passage of the PSLRA, and the second largest in this District, eclipsed only by partial settlements in *Enron*.  In *Dynegy*, The Regents' General Counsel, James Holst, represented that:

> ***The Regents possess substantial expertise in financial matters and legal affairs.  The Regents also has the benefit of relying upon an accomplished professional staff, which includes financial professionals and a legal staff with over 35 in-house lawyers.  Our legal staff includes lawyers with extensive experience in securities class actions and tobacco industry actions***.  As described further below, our office has gained significant experience monitoring securities class action litigation through our participation in the *In re Enron Corp. Securities Litigation*. . . .

> . . . In June 2002, The Regents applied for appointment as Lead Plaintiff in this action.  By that time we had acquired extensive experience working with Lead Counsel in the Enron case.  We had observed first-hand the skill and determination of Lead Counsel and their dedication to the best interests of the class.  We had developed an extremely effective working relationship with Lead Counsel, and our role in supervision and management of every aspect of the Enron litigation had been welcomed by them.  Based on this experience, as well as the similarity of many issues in the Enron and Dynegy cases, we concluded that Lead Counsel in the Enron litigation was also the best choice for Lead Counsel in this case.

> ***In Enron, we developed a very effective working relationship with Lead Counsel which, I believe, has been extremely beneficial to prosecution of the case***.

Finally, The Regents general counsel noted that:

> ***I believe the fee agreement has benefited the Class because it properly incentivized counsel to maximize the Class's recovery and still was less than the percentage agreed upon in other class and private securities cases***.

Declaration of James E. Holst of the University of California Regents In Support of Lead Plaintiff's Motion for Final Approval of Settlements and Award of Attorneys' Fees and Reimbursement of Expenses (S.D. Tex., dated June 23, 2005) (Docket No. 675 in Case No. 02-1571) at 1-2, 4.

The *Dynegy* court (Judge Lake) awarded the fee as agreed to by The Regents, stating:

Counsel for the Lead Plaintiff are entitled to a fee paid out of the common fund created for the benefit of the Class.  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478-79, 100 S. Ct. 745 (1980).  In class action suits where a fund is recovered and fees are awarded therefrom by the court, the Supreme Court has indicated that computing fees as a percentage of the common fund recovered is the proper approach.  *Blum v. Stenson*, 465 U.S. 886, 900 n.16, 104 S. Ct. 1541 (1984).

Lead Plaintiff's counsel have moved for an award of attorneys' fees in the amount of 8.7257% of the Settlement Amount (after deduction of reimbursable expenses in the amount of $3.2 million).  ***This is the fee percentage negotiated by the Court-appointed Lead Plaintiff with Lead Counsel prior to their appointment by the Court pursuant to 15 U.S.C. §78u-4(a)(6) of the PSLRA***.

***This Court adopts the percentage-of-recovery method of awarding fees in this case, and concludes that the percentage of the benefit is the proper method for awarding attorneys' fees in this case***.

The Court hereby awards attorneys' fees of $35,151,482 in cash and 1,533,872 shares of Dynegy common stock from the Settlement Amount, plus interest on the cash portion of the award at the same rate as earned on the Settlement Amount.  ***These amounts represent the percentage fee award negotiated between the Court-appointed Lead Plaintiff and Lead Counsel at this level of recovery***.

*Dynegy*, No. H-02-1571, slip op. at 1-2 (Compendium, Ex. C).  The fact that The Regents were willing to replicate the 8%-10% Enron fee agreement in *Dynegy* – after months of hands-on experience with the Firm's prosecution of the *Enron* case, validates that approach.  The fact that Judge Lake honored that agreement in *Dynegy*, shows the proper deference paid arm's-length fee agreements with sophisticated lead plaintiffs.

As this case progressed and The Regents had the benefit of seeing the work done and results achieved by the Firm, it repeatedly reaffirmed the fee agreement.  In supporting the motion for class certification in 2006, after the $7.2 billion in recoveries had been achieved, The Regents' General Counsel's office recognized the extraordinary nature of the recovery and how much of it would flow to the Class under the fee agreement The Regents had negotiated, stating:

Another important aspect of this case has been the negotiation of a retention agreement with Lead Counsel.  As discussed in the Supplemental Declaration of The Regents of the University of California in Support of its Motion for Appointment as Lead Plaintiff (Docket No. 252), this agreement was negotiated at the outset with the best interests of the class in mind.  The Regents wants to ensure the damaged investors of Enron receive as much of their losses as possible, while at the same time

retaining skilled and resourceful counsel and providing that counsel with a fair fee based on results obtained. The retention agreement provides for counsel to receive 8% of the first billion dollars recovered, 9% of the second billion dollars recovered and 10% of all recoveries beyond two billion dollars. ***Under this agreement, we assured that more than 90% of the recovery in this action will go to the class. The Regents believe this will lead to an extraordinarily good result for the class***.

> ***The settlements reached to date of $7.3 billion (including interest) are the largest ever in securities litigation.***

Declaration of Christopher M. Patti in Support of Lead Plaintiff's Amended Motion for Class Certification (S.D. Tex., dated Mar. 15, 2006) (Docket No. 4551) at 3-4.

The Regents again publicly endorsed the *Enron* fee agreement in July 2007:

> Lawyers who recovered about $7.2 billion in settlements for Enron Corp. investors damaged by the energy trader's collapse are slated to get about $700 million in fees under a plan to distribute the money.

> Officials of the University of California Regents, the lead plaintiffs in the securities-fraud case, said today they'll ask a judge in Houston to approve the plan so they can begin paying out monies from settlements with Enron's former lenders. That plan calls for investors' lawyers to receive fees based on a percentage of the recovery that could be about $700 million.

> "***The fee we've negotiated is extremely fair for these kinds of cases and for the quality of the legal work required to win this kind of recovery***," Trey Davis, the regents' spokesman, said Friday in an interview.

Jef Feeley and Laurel Brubaker Calkins, *Enron Investor Lawyers May Get $700 Million From Settlements*, Bloomberg, Jul. 27, 2007 (Compendium, Ex. J).

The fee award in *WorldCom* was the fee agreement reached by the New York State Common Retirement Fund and lead counsel in that case. *See In re WorldCom Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 355-56 (S.D.N.Y. 2005). The court noted that while "[a] district court is not required to adhere to a retainer agreement":

> Nonetheless, when class counsel in a securities lawsuit have negotiated an arm's length agreement with a sophisticated lead plaintiff possessing a large stake in the litigation, and when that lead plaintiff endorses the application following close supervision of the litigation, the court should give the terms of the agreement great weight. *See In re Cendant Corp. Sec. Litig.*, 264 F.3d 201, 282 (3d Cir. 2001) (concluding that fee agreements between class counsel and the lead plaintiff enjoy a "presumption of reasonableness" under the PSLRA).

- 20 -

*Id.* at 356.

> With respect to support for the requested fee, the Third Circuit Task Force concluded:

> > The Task Force believes, however, that the deference to the empowered plaintiff's choice of **counsel** in PSLRA cases should extend to the *ex post* review of the fee agreement in those cases.  The PSLRA establishes a model of client control that extends not only to appointment of counsel but also to monitoring of counsel and negotiation of the fee.  The Task Force concludes, therefore, that strict scrutiny of the fee agreement is inconsistent with the client-driven litigation model established in the PSLRA.  This means that a court should presume that the fee is reasonable when it is the result of an agreement between the "most adequate" plaintiff and chosen counsel.

Third Circuit Report, 208 F.R.D. at  425 (emphasis in original).

> Finally, as stated in Professor Coffee's declaration:

> > [I]t is important to note that this case illustrates the best practices in class actions.  Indeed, this action has been a model of transparency.  Lead Counsel here negotiated a fee agreement at the outset in a careful, deliberative manner with The Regents of the University of California ("The Regents"), as Lead Plaintiff.  Such a practice maximized accountability.  Although such fee agreements are today not uncommon, they rarely involve parties as sophisticated as those in this case or a fee formula as carefully thought out as the increasing percentage of the recovery formula adopted in this case.  Here, it is clear that The Regents sought to craft a fee formula that would incentivize their counsel to assume the enormous risks in this case over a potentially indefinite period.

Coffee Decl., ¶6.  Professor Coffee concludes that "The Regents chose a logical and sensible formula that encouraged Lead Counsel to make the extraordinary commitment to this case that produced a record settlement."  *Id.*

The Regents is sophisticated and independent – $73 billion under advisement for over 155,000 employees with a legal staff of more than 50 lawyers.  The Regents lost more than $140 million in this fiasco.  It had experienced in-house counsel – and outside independent legal advice. In agreeing to the single-digit fee, The Regents structured it to incentivize Lead Counsel to seek the maximum recovery, yet assured that over 90% of the recovery would go back to the Class.  This is exactly what the PSLRA envisioned and the Court should enforce that fee agreement and award the requested fee.

## III.    THIS LITIGATION HAS BEEN VIGOROUSLY AND EFFECTIVELY PROSECUTED

According to The Regents:  "Lead Counsel has prosecuted the case with undoubted skill, tenacity and effectiveness, and the size of the recovery is extraordinary." Patti Decl., ¶22.[17] During the litigation, the Firm devoted the resources of dozens of attorneys and many other professionals and paralegals, as well as countless staff personnel, to the case.  Other firms in supporting roles, which, with The Regents' permission, have provided assistance, supplied professional and para-professional assistance as well.  The total attorney and other professional and para-professional time invested in the case – all without any compensation to date – is over $127 million.  *See* Hodges Decl. In addition, throughout the pendency of the litigation, counsel advanced over $40 million in the aggregate in expenses and, at one point, had advanced over $12 million in expenses before having received any expense reimbursement whatsoever out of partial settlements.  The recovery achieved could not have been obtained without this unprecedented at-risk investment of human resources and capital.  As accurately predicted by the Court at the outset, the *Enron* litigation has been the "largest and most complex" class action securities litigation in history.  *Enron*, 206 F.R.D. at 457.  And, as accurately predicted by the Court at the outset, accepting The Regents' designation of the Firm as lead counsel assured a "competent, experienced and committed" law firm would be "Lead Counsel" and provide "a zealous prosecution."  *Id*. at 454, 458

---

[17]    John Moores, former Chairman of The Regents during a portion of the pendency of the litigation, notes the following in his declaration in support of the fee:

> Although I, among others, initially was opposed to the selection of Milberg Weiss, now Coughlin Stoia as Lead Counsel, it is obvious that The Regents' confidence in this firm and in the negotiated fee arrangement was justified based on the outstanding results that were produced on behalf of the Class.  The fee agreement has worked just like it was designed to and has benefited the Class.  ***It should be honored***.

Declaration of John Moores in Support of Lead Counsel's Motion for an Award of Attorney Fees, ¶9.

### A.     Initial Investigation and Consolidated Complaint

After retention by The Regents and approval by this Court, the Firm continued its massive review and investigation of the Enron situation, which resulted in the drafting of an unprecedentedly detailed complaint – over 500 pages – naming some 82 defendants, including Enron's insiders and directors, Enron's accountants, Enron's lawyers and several banks which had worked closely with Enron.  Hodges Decl., ¶¶28-42, 79-80.  Now the battle was joined.

### B.     Legal and Practical Challenges

The challenges faced by the Firm at the outset of the case can not be overstated.  Coffee Decl., ¶¶2, 3.  First of all, Enron – the primarily culpable party – had declared bankruptcy, which greatly curtailed the prospect of any meaningful financial recovery for the victims.[18]  In addition to Enron's bankruptcy, criminal indictments of several Enron insiders who had engaged in insider selling – and the resulting seizures of most of their assets by the government – eliminated the possibility of any major financial recovery from those individuals.  While Enron's directors' and officers' liability insurance policy was $350 million, this was a "wasting asset" policy whereby the coverage was reduced by the defense legal fees – a serious situation, as the Enron insureds were represented by over 20 law firms.  Finally, there was a question as to whether there was any D&O insurance coverage at all because the actual seriousness of the claimed fraudulent conduct implicated the "deliberate and dishonest acts" exclusion of the policy, thus placing the entire coverage in jeopardy.

Andersen, which would normally have been viewed as a significant source of recovery in this accounting fraud case, was indicted and, when convicted, disappeared as a viable business entity

---

[18]     *WorldCom* aside, most of the "mega" recoveries in securities class actions involve solvent issuer defendants which face liability under standard securities liability theories and have the resources to pay, *e.g.*, *Tyco*, *Royal Ahold*, *Nortel*, *AOL Time Warner*, *McKesson HBOC*, *Lucent*, *Bank of America*, *Dynegy*, *Raytheon*, *Waste Management*.  Coffee Decl., ¶¶2, 30, 31.

capable of making a large contribution to any settlement. While Enron's lawyers, Vinson & Elkins ("V&E"), were also sued, the law firm's insurance coverage was modest in relation to the damages claimed and quickly was much depleted by defense costs and other liability claims. That firm's ability to pay was limited by the fact that its assets were modest, and it faced the prospect of going out of business if its partners left rather than fund a large contribution to the settlement. Also, Andersen's and V&E's partners' individual assets were shielded by each firm's LLP status.

Overlaying these difficulties was the ever-present problem presented by the PSLRA's unique judgment reduction/proportionate liability provisions which made settlement with any "professional" defendant a risky proposition, and made their presence at trial fraught with danger. For, in the event a jury assigned them a significant percentage of fault – a potential outcome given the degree of involvement of the accountants and lawyers in structuring Enron's bogus financial transactions – the total judgment would be so reduced. This result would have reduced any judgment by hundreds of millions of dollars, in return for a relatively modest payment.

As to the bank defendants – the only viable source of recovery – most believed that the *Central Bank* decision holding that banks could not be held liable for aiding and abetting a securities fraud meant that ***no fraud recovery could be obtained against the banks here***. While a few of the banks faced §11 Securities Act claims (*i.e.*, non-fraud liability for selling Enron securities to investors), the damages from these offerings were a very small part of the total damages suffered by Enron's investors. And as §11 defendants, the investment banks were likely to vigorously pursue the defense of reliance upon the certification of Enron's financial statements by its accountant, Andersen, upon whose expertise they were entitled to rely.[19]

---

[19]     While certain banks were sued for §12(a)(2) violations in connection with the sale of the foreign debt securities, purchasers of those securities on the offerings did not come forward so as to permit the prosecution of these claims. *Enron*, 2006 U.S. Dist. LEXIS 43146, at *228 ("[W]ithout a

As noted above, after years of litigation, the United States Supreme Court revisited the rules governing loss causation, opining on the pleading and proof of such under the securities laws. *Dura*, 544 U.S. at 345-46. The bank defendants, such as Merrill Lynch, argued that *Dura* radically altered the traditional elements of causation and loss and the traditional understanding of proximate cause and joint-and-several liability, imposing in their stead a requirement of proof of a separate loss attributable to each defendant. *See* Supplemental Submission of Defendants Merrill Lynch, Pierce, Fenner & Smith Incorporated and Merrill Lynch & Co., Inc. in Support of Their Motion for Summary Judgment (Docket No. 5359) at 36. Lead Plaintiff responded, however, that to prove loss causation or proximate cause, plaintiff need only prove that a defendants' conduct was a substantial or significant factor in the loss caused and not the sole or only factor. *See* Lead Plaintiff's Response to Supplemental Submission of Merrill Lynch Defendants in Support of Motion for Summary Judgment (Docket No. 5465) at 24. After thoughtful and painstaking consideration, this Court agreed. *Enron*, 2006 U.S. Dist. LEXIS 43146, at *213 ("moreover, the plaintiff's loss need not be caused exclusively by the defendants fraud").

Finally, the Class also faced real competition for available recovery assets by other claimants – many of whom had negligence or other non-fraud claims. Enron's bankruptcy estate sued most of the defendants named in the securities class action asserting huge claims. There was an ERISA class action on behalf of the Enron employees' pension plans. There were also opt-out securities claims filed by several institutions against some of the same defendants. Finally, government proceedings

---

class representative with standing to sue based on any of the foreign debt securities, such claims under §10(b) as well as under §12(a)(2), cannot be certified for class prosecution and must be dismissed without prejudice.").

were seeking financial payments and penalties.  And all these other suits generated defense costs which were rapidly draining available insurance coverages.[20]

But, despite these obstacles, the Firm did not attempt to arrange a quick settlement that undoubtedly would have "looked good" under such challenging circumstances and justified a very lucrative fee, given the Firm's then limited investment in the case.  Instead, the Firm undertook an energetic, expensive, resource-intensive and risky prosecution of the case, which resulted in a $7.2 billion recovery – beyond all expectations – the largest recovery ever in the history of securities litigation.

That this remarkable result was achieved in the face of these difficulties is a story of "zealous prosecution" – flowing from innovation, commitment and determination.  The achievement of the $7.2 billion recovery was the result of the skill, persistence and courage of the Firm.  The years of litigation were arduous – against the most top-flight defense firms in Texas – indeed, the nation.  But this result was not achieved by litigation skill alone.  Negotiating settlements to achieve this kind of recovery fund required unusual skill and courage as well.  In addition, the settlements include interest which certain defendants resisted vigorously.  One vignette makes this point.  In 2003-2004, a Court-ordered mediation took place before a senior federal district court judge in White Plains, New York, which involved the securities and ERISA cases, the Enron bankruptcy estate and other claimants.  When settlement offers remained in the multi-hundred million dollar range, the mediator noting this would be a significant recovery and generate a large fee, the Lead Plaintiff and the Firm refused to engage in negotiations at these levels, terminated the discussions and refused (with

---

[20]     At the outset of this case, most knowledgeable observers believed that the prospect of any significant recovery was limited by the negative factors discussed above.  One commentator said the class would be "lucky if they recover $1 billion." Edward Iwata, *Law firms tussle over Enron case*, USA Today, Feb. 12, 2002, at 1B (Compendium, Ex. K).

courtesy) several later attempts to engage in discussions with defendants at this low level.  This was difficult to do – but was the type of unusual and courageous conduct that was necessary to create the record result.  Few plaintiffs and fewer firms would have the will and resources to stand up to the significant pressure applied early and often in this case.  It was this type of determination that was to produce the largest securities recovery in history.  That Lead Plaintiff and Lead Counsel refused to give in paid off later when the banks paid over $6 billion.[21]

### C.    Litigation Expenditures and Resources

The Firm mounted an unprecedented litigation offensive to prepare the *Enron* case for trial from 2003 to 2006.  That effort, of course, was instrumental in forcing defendants to settle at the level ultimately achieved.  During these years of pretrial preparation, countless witnesses were interviewed, over 370 depositions were taken or defended and over 70 million documents were obtained and analyzed.  Hodges Decl., ¶4.  Outstanding experts in financial and economic matters, as well as loss causation and damages, were retained by the Firm and generated detailed reports filed with the Court in connection with class certification and summary judgment.[22]  These experts were also prepared for and represented at lengthy depositions.  Hodges Decl., ¶¶211-228.  During this

---

[21]    Another example of Lead Counsel's efforts to maximize the recovery is the negotiation with AWSC.  After the early mediation with Andersen was terminated, Lead Counsel continued the discussions with AWSC and its foreign affiliates which had been named as defendants.  These foreign defendants had strong arguments to be dismissed on jurisdictional grounds.  Yet Lead Counsel negotiated hard and, with the *Tittle* plaintiffs' counsel, obtained $40 million from AWSC for the securities and ERISA classes in August 2002, despite the fact that AWSC's financial condition was severely impaired.  Thereafter, AWSC was in liquidation.

[22]    These included such nationally recognized experts as Blaine Nye, Ph.D. (damages and market efficiency), Scott D. Hakala, Ph.D., CFA (damages), Israel Shaked (insolvency), Bernard Black (disclosure), Claire Hill (rating agencies), Craig Shenkman (tax transactions), Charles Drott (auditing), Joel Finard (investment banking), Saul Solomon (accounting), George Cohen (lawyer ethics and conduct), and Susan Koniak (lawyer ethics and conduct).

entire time period, Lead Counsel, with only limited assistance of other counsel, was dealing with the efforts of at least 30 of the largest and most accomplished defense law firms in America, including

- Cadwalader Wickersham & Taft LLP

- Cravath, Swaine & Moore LLP

- Jones Day

- Latham & Watkins LLP

- Mayer Brown LLP

- Paul, Weiss, Rifkind, Wharton & Garrison LLP

- Shearman & Sterling LLP

- Simpson Thacher & Bartlett LLP

- Sullivan & Cromwell LLP

- White & Case LLP

- Williams & Connolly LLP

These defense lawyers – the premier defense firms in the U.S. – not only resisted Lead Counsel's efforts to develop the case, but also attacked plaintiffs' case on the merits at class certification and factually to shift blame to other parties, like Enron, Enron's insiders and its lawyers, so as to utilize the PSLRA's comparative fault provisions to reduce their own liability exposure.  At any given point, the Firm faced off against a phalanx of 100-200 of the best lawyers in America. During the course of these proceedings, counsel for the Lead Plaintiff:

- Thoroughly investigated the facts underlying the allegations in the consolidated amended complaints, including several hundred initial contacts with and scores of substantive interviews of former Enron, bank, and Andersen employees and third parties;

- Moved for and negotiated the order appointing the Bankruptcy Examiner;

- Opposed complicated motions to dismiss and prevailed against many defendants;

- Worked collegially with all parties for more than five years and coordinated the Deposition Scheduling Committee ("DSC") on myriad discovery issues, including

establishing the document depository, the deposition scheduling protocol, and a cost-sharing agreement to run the deposition centers in New York and Houston;

- Successfully conducted massive and comprehensive fact and expert discovery on exacting schedules;

- Reviewed over *70 million pages* of documents produced by defendants and third parties;

- Participated in over *370 depositions* of defendants, former employees, third parties, experts, and class representatives;

- Propounded interrogatories and Requests for Admission ("RFAs") to streamline depositions;

- Completed detailed discovery responses, which included extensive interrogatories and RFAs;

- Prepared market efficiency, damage, investment-banking, disclosure, tax, credit-rating-agency, ethics, insolvency and accounting experts for their depositions, after assisting in the compilation of their reports, which were crucial to class certification, summary judgment and trial issues; and

- Reviewed and analyzed expert reports generated by, and deposed each of, defendants' *40 experts*.

## D.   Bankruptcy Proceedings

As the Court accurately foresaw at the outset, vigorous prosecution of the case would require "necessary involvement with the bankruptcy proceeding in New York." *Enron*, 206 F.R.D. at 458. The Firm and the Lead Plaintiff, working with noted bankruptcy experts Genovese, Joblove & Battista, were active in the Enron bankruptcy from the start for the benefit of the Class. *See* Declaration of John H. Genovese of Genovese, Joblove & Battista, P.A., in Support of Bankruptcy Counsel/Co-counsel's Application for an Award of Attorney's Fees ("Genovese Decl."). Very early in the bankruptcy proceedings, Lead Counsel moved for the appointment of a trustee. To resolve that motion, Genovese, Joblove & Battista and Lead Counsel negotiated an order for the appointment of the bankruptcy examiner. Genovese Decl., ¶¶8-15. After a tough negotiation and the entry of the negotiated order, we contributed to the selection of Neil Batson as the examiner. Genovese Decl., ¶¶16-17.  We met with Batson and his team and he used the Consolidated

Complaint based on our extensive investigation as a roadmap for his investigation.  Hodges Decl., ¶232; Genovese Decl., ¶18.  Batson gathered documents and took depositions while our formal discovery remained stayed by the PSLRA.  As Batson released his four reports, he revealed substantial evidence supporting the Class's claims of securities fraud against the banks.  Genovese Decl., ¶19.  That evidence bolstered our case and, after a fight to gain access to it, streamlined our discovery.  Hodges Decl., ¶8; Genovese Decl., ¶20.  We also successfully moved to lift the bankruptcy stay of discovery so we could obtain documents from Enron.  Hodges Decl., ¶233.  These efforts in the Enron bankruptcy provided direct benefits to the Class.  Genovese Decl., ¶24.

In addition, Genovese, Joblove & Battista were very active in the LJM2 bankruptcy, which was filed in Dallas.  *See* Genovese Decl., ¶¶33-50.  On behalf of The Regents and the putative Class we filed a proof of claim and then an adversary complaint in the LJM2 bankruptcy.  Our negotiations for a resolution of the claim resulted in a very favorable recovery for the Class of $51.9 million from the LJM2 estate.  It is unusual – indeed remarkable – that such a large recovery was obtained for the Class from a bankrupt entity.  The Class recovered twice a much as the other claimants in the LJM2 estate – all due to the efforts of Lead Counsel and Genovese Joblove & Battista.

## E.    Settlement Negotiations

### 1.    Bank of America and Lehman

After a significant amount of litigation had occurred, counsel for BofA and for Lehman contacted the Firm regarding settlement of their non-fraud §11 claims.[23]  The Firm – on behalf of Lead Plaintiff – negotiated an agreement with BofA for $69 million.  After months of hard-fought negotiations, Lead Counsel then reached an agreement to settle with Lehman Brothers for $222.5

---

[23]    Section 11 claims were the only claims still pending.  However, during settlement negotiations, these banks insisted on full releases, including a release of any potential §10(b) liability.

million.  Hodges Decl., ¶242.  These settlements seem modest in light of the size of the overall result, but they represented a large percentage of these banks' limited §11 exposure – and viewed either in isolation or collectively were large settlements in their own right.

## 2.     Outside Directors

Counsel for the Outside Directors then sought to settle, but settlement discussions with the Outside Directors were extremely complicated because in order to secure the insurance proceeds for the benefit of the Class, plaintiffs necessarily had to cut off further payment of defense costs for certain insureds we could not settle with.  At the time Lead Counsel's discussions with counsel for Outside Directors began, the insurance policies had been drained by defense lawyers' fees of almost $150 million out of the $350 million available.[24]  Hodges Decl., ¶243.

The Firm (at the Lead Plaintiff's urging) forced an agreement that called for the Outside Directors to personally pay 10% of their net gains on their sales of Enron stock, plus their agreement to secure the remaining $200 million in insurance.  Hodges Decl., ¶244.  These individual payments by insiders were all but unprecedented in the history of securities litigation.  Never before had such sums been obtained from directors.  This achievement was the subject of extensive favorable commentary, as one long-standing criticism of securities class actions has been that culpable individuals do not personally contribute to settlements.[25]

Because others had claims on the directors and their insurance, protecting this settlement was a very complex task.  First, Enron and its Creditors Committee stood in the way.  Since the insurance

---

[24]     Genovese Joblove & Battista protected the Class's access to the insurance by taking action early on in Enron's bankruptcy.  *See* Genovese Decl., ¶¶27-32.

[25]     Of course, no good deed goes unpunished.  Having achieved the very type of individual settlement contributions that critics had complained were typically absent from other settlements, the Firm was then criticized because this new result was viewed as unfair to directors and likely to deprive America's corporate board rooms of "qualified" directors.  These prophecies of doom remain unfulfilled.

policies were arguably assets of the bankrupt entity, the Enron estate would object to payment of the proceeds to the Class unless the estate received a cut. The Regents fought off these competitors, reaching a very favorable agreement for the allocation of the insurance proceeds: 82.8% to the Class and 17.2% to Enron/Creditors Committee. Hodges Decl., ¶245.

However, there were non-settling insureds who objected that their ability to defend themselves using the D&O insurance was coming to a halt. Since they were insureds and were not receiving a release from plaintiffs' case, they objected to the use of the insurance proceeds for The Regents' settlement. The Firm conceived the idea of a "set aside" of some amount of the remaining insurance for the non-settling insureds so as to obviate objections from Kenneth Lay, Jeffrey Skilling, *et al*. Ultimately, an agreement provided that the non-settling insureds would receive approximately $13 million out of the $200 million in remaining insurance. Hodges Decl., ¶246.

### 3. Arthur Andersen

Late in 2005, the Firm was approached by Andersen regarding settlement. Because of Andersen's impaired condition, it could only pay a modest amount. The concern was that if plaintiffs settled with Andersen, the judgment against the remaining banks would be reduced by Andersen's proportion of culpability as set by the jury and that amount could be substantial. Because Andersen was no longer operating and it had limited insurance for the Class's claim, it was impossible for the amount it could pay to offset the risk of a large judgment reduction. Crafting the settlements with the directors and Andersen required special skill and experience, breaking new ground in the settlement of a PSLRA case. Settlement was achieved via a "sunset" provision such that if plaintiffs went to trial against the banks, the settlement with Andersen would be terminated. Ultimately Andersen agreed to pay $72.5 million, and it also agreed that if plaintiffs went to trial against the banks, the settlement would be terminated. Thus, the ever-vexing problem of the PSLRA's judgment reduction provision was obviated. Hodges Decl., ¶255.

- 32 -

Lead Plaintiff joined with the *Tittle* (ERISA) plaintiffs and settled with AWSC for a combined $40 million in 2002. Hodges Decl., ¶238. Because this was the first settlement to be executed and AWSC was headed toward liquidation, the settlement took a long time to memorialize. After the Court approved the settlement in 2003, several objectors appealed the approval and Lead Counsel defended the settlement on appeal. The objectors argued that the settlement was too low, that too much money was set aside for the expense of the ongoing litigation, that the expenses were improper, that payment of the settlement funds to Class members was deferred, and that the release of successors in interest to AWSC and its member entities was too broad. Lead Counsel filed a brief responding to each of these arguments. After the Fifth Circuit heard oral argument, it affirmed, in all respects, the district court's approval of the settlement.

### 4. Citigroup, JPMorgan Chase and CIBC

Settlements of $2 billion, $2.2 billion and $2.4 billion were achieved with Citigroup, JPMorgan and CIBC, respectively, during 2005. Hodges Decl., ¶¶251-254. These recoveries were the result of the pursuit of the fraudulent scheme/conduct liability theory – *i.e.*, these banks engaged in deceptive conduct and employed contrivances in a scheme to defraud Enron's investors – fashioned by the Firm to address *Central Bank*. The skillful pleading of the banks' active involvement in falsifying Enron's financials and aggressive briefing resulted in a series of landmark opinions by this Court, upholding plaintiffs' theory and sustaining the complaint even in the face of the PSLRA's very difficult, elevated scienter pleading standard. *In re Enron Corp. Sec. Litig.*, 235 F. Supp. 2d 549 (S.D. Tex. 2002); *In re Enron Corp. Sec. Litig.*, 310 F. Supp. 2d 819 (S.D. Tex. 2004). The Firm successfully protected this recovery theory against mandamus proceedings to the Fifth Circuit by several of the banks (*see* March 11, 2003 Orders of the Fifth Circuit Denying Mandamus Petition of Barclays, Credit Suisse First Boston, and JPMorgan) and against repeated re-challenges to the theory in this Court by way of motions to reconsider, judgment on the pleadings,

etc.  The Firm was successful in upholding this legal theory even after another federal Court of Appeals had ruled that the *Central Bank* decision prohibited the use of a scheme liability theory. *Charter*, 443 F.3d 987.[26]

The record-breaking $6.6 billion in pretrial settlements with Citigroup, JPMorgan and CIBC were achieved – and successfully negotiated – due to the Firm's persistence and determination. Through repeated low-ball offers, threats of breaking-off of settlement talks and the filing of motions, Lead Counsel – on behalf of The Regents and the Class – remained steadfast.  Each of the settlements was expertly documented and presented to the Court for its approval.  This careful structuring was important and was designed to protect the Class's recoveries from any later adverse developments, such as that which later occurred when the Fifth Circuit issued its March 2007 ruling on class certification.

**F.      Ongoing Litigation Against the Non-Settling Defendants**

As the case neared trial, the non-settling bank defendants, including Merrill Lynch, CSFB, Barclays, Royal Bank of Scotland, Toronto Dominion Bank and Royal Bank of Canada, continued to vigorously defend the case.   In the face of expanding adverse Fifth Circuit class certification precedent, the Firm put together an overwhelming showing in favor of certification of the large multi-year, multi-security class, utilizing expert testimony, participating in a multi-day evidentiary hearing, and presenting a detailed Trial Plan, before obtaining a favorable class certification ruling

---

[26]      While preparing oppositions to the numerous motions to dismiss in 2002, the Firm approached the SEC about filing an *amicus curiae* brief in support of plaintiffs.  Although it is highly unusual for the SEC to take action at the trial court level, the Firm succeeded in having it do so here.  The SEC submitted briefs it had filed in other cases on the issue.  In addition, the Firm reached out to Attorneys General and, with the Texas Attorney General leading the charge, they filed *amicus curiae* briefs in support of investors at the trial court level and in the Fifth Circuit.  This court referenced both the SEC and the Attorneys General briefs when it denied the banks' motions to dismiss in December 2002.

from this Court.  Hodges Decl., ¶¶201-210.  The banks had set up the transactions, including in many instances the SPE's, and were fully aware that the transactions were used to increase Enron's earnings and cash flows as well as conceal debt.[27]  In that Trial Plan, Lead Counsel broke down the transactions at issue, transactions Lead Counsel had been uncovering and reconstructing for years (which led to the above-referenced recoveries), to prove that such, despite their complexity, were triable in a single trial:

1.      **Prepays**: Loans disguised as commodity transactions, which Enron reported as "price risk management liabilities" (Enron's term for trading liabilities) on its balance sheet, instead of as debt.  These began in 1992 and continued through 2001. These transactions produced cumulative unreported debt[28] and reported cash flow from operations of over $7 billion by the time of Enron's bankruptcy.

2.      **FAS 125/140**: Enron used off-balance-sheet SPEs to supposedly acquire assets from Enron, even though Enron retained most or all of the upside and downside associated with these assets.  In some cases investors could have understood from Enron's disclosures that sales to SPEs had occurred (though with little knowledge of specific transactions or how much profit Enron recorded).  However, investors did not know that: (i) these were not sales at all because Enron could not sell to itself; (ii) the substantial equity investment and non-Enron control of the SPE required for

---

[27]     ***As JPMorgan noted in 1999***:  "We are making disguised loans, usually buried in commodities or equities derivatives (and I'm sure in other areas).  With a few [sic] exceptions, they are ***understood to be disguised loans and approved as such***.  But I am queasy about the process. . . ."  Email from Don Layton, Vice Chairman (JPMorgan), to David Pflug, Brian O'Neill, Robert Fallow, Herb Aspbury, Don Wilson and Fraser Partridge (JPMorgan), May 12, 1999. ***As CSFB noted in 2000***:  "As you probably know, Osprey is a vehicle enabling Enron to ***raise disguised debt*** which appears as equity on Enron's balance sheet. . . . Osprey serves the added purpose for Enron of being ***an off-balance sheet parking lot*** for certain assets."

[28]     As "prepaid forwards are effectively loans and thus, represent 100% exposure."  Email from George Brash (JPMorgan) to Peter Licalzi (JPMorgan), June 29, 1999.

off-balance-sheet treatment of these SPEs did not exist; and (iii) the transfer of risk on, and control over, the asset required for sale treatment did not exist.  Lead Plaintiff through Lead Counsel analyzed millions of pages and hundreds of SPEs to put this part of the case together.[29]

3. **Minority Interests**: Enron borrowed a cumulative total of over $1.75 billion through majority-owned subsidiaries and reported this borrowing as equity investments by minority investors. Of this amount, Enron also reported $500 million as recurring cash flow from operations. To untangle these complex transactions necessitated countless hours of expert review.

4. **Share Trust Transactions**: Through Share Trusts Enron was able to avoid recording $4.3 billion as debt on its balance sheet.  In each, Enron created a business trust that sold notes and other interests to institutional private buyers.  The trust and Enron contributed assets to a holding company which then bought assets or repaid existing debt.  Enron contributed its own preferred stock and agreed that stock would be sold in amounts sufficient to repay the notes issued by the trust. If Enron's stock in the trust was not sufficient, Enron agreed to issue more stock or pay cash to make up the shortfall.  Enron effectively guaranteed repayment of the debt, but was able to not record it on its financial statements.  The shear size of this category of off-the-books transactions took years to unravel.

5. **Tax Transactions**: These transactions affected Enron's tax reporting, and the principal motive was financial statement cosmetics.  Through these transactions, Enron converted future tax deductions, with limited actual value, into cumulative pre-tax income of over $250 million from 1995 through 2000 and reported after-tax income of almost $900 million, while not reducing its

---

[29] **As Barclays in 1999** noted in the infamous bicycle memo:  "They [Enron] are extremely creative about their financial engineering and they appear to be able to make their published figures read just about anything they want them to . . . it looks like a group that is pedaling [sic] harder and harder to stay ahead of the wolves."  Bicycle email from Jonathan Taylor with reply from John Meyer, June 24, 1999.

actual tax payments during this period at all.  Again, expert review and the ability to understand the impact on Enron's financials of these transactions was necessary for a complete picture of the fraud.

6.   ***Related-Party Transactions***: Enron provided bare-bones disclosure of its transactions with two entities controlled by CFO Andy Fastow ("Fastow") – LJM1 and LJM2 (together, LJM). Fastow's compensation from LJM was never disclosed.  Enron, with the bank defendants fully engaged, also hid the related-party nature of a third related party, controlled by Fastow's assistant Michael Kopper, known as Chewco. Moreover, Enron falsely claimed that the transactions with LJM were on market terms.  In fact, LJM's net gain from dealing with Enron was in the hundreds of millions of dollars, including $60 million received by Fastow and another $20 million received by other Enron insiders who worked for him.  From Enron's disclosures, investors could not have understood: (i) the economic substance of the related-party transactions; (ii) their effects on Enron's reported results; (iii) Enron's use of non-market transactions with LJM to meet quarterly earnings; or (iv) the extent of the conflicts of interest involved in the transactions.  Here the banks were at every juncture ensuring Enron could repay the banks and Fastow first– – leaving investors to foot the bill.

7.   ***Forest Products Transactions***: In the Forest Products transactions, Enron hid debt using different structures, but in each of them the underlying assets were in the forest products industry.  Enron expanded its trading business to the pulp and paper industry and purchased two paper mills and acres of timberland.  Enron then "sold" these assets to SPEs which it controlled. Enron reported the sale as cash flow from operations when in fact the proceeds were from financing. Again the outcome was the same: misrepresented cash flows with unrecorded debt.  The expansion into new areas really complicated Lead Counsel's attempts to simplify the case for trial.

8.   ***Other Transactions***: There were five additional transactions which did not neatly fit into the categories above, but were essential to the overall scheme and used to misstate Enron's

financials at key junctures.  These included the Merrill Lynch Nigerian Barge[30] and Round Trip Electricity transactions and Barclays' J.T. Holdings Synthetic Lease, $SO_2$ and Camelot I and II transactions.  The transactions were designed by the banks to keep debt off Enron's books to ensure Enron hit its numbers, maintained its credit rating and guaranteed a no-risk return to the banks.

9.     ***Purpose of the Transactions – Investment-Grade Credit Rating Cliff***: A large amount of Enron's on and off balance sheet debt, including indirect debt through guarantees and total return swaps, would go into default if Enron lost its investment-grade credit rating.  Lead Plaintiff was prepared to prove that due to the fraud and concealment of Enron's true debt, Enron was on a credit rating cliff.  The investment-grade credit rating was needed for Enron's future trading business.  The transactions described above were used to maintain Enron's investment-grade credit rating.  While investors knew the investment-grade credit rating was important to the trading business, investors did not know about the cliff Enron was perched upon. Enron's Board, however, was presented with a "death spiral" chart in March 2001 that contained the core elements of what might happen.  Investors were not.

As a result of the simplification and organization Lead Counsel brought to this complex scheme, this Court certified the Class, finding the above presented "***an orderly and methodical approach for trying the alleged overarching scheme, arising from a common nucleus of fact and common course of conduct, to misrepresent Enron's financial status, fool credit rating agencies, and deceive investors***."  *Enron*, 236 F.R.D. at 316.

---

[30]     ***As Merrill Lynch noted in 1999 ("Nigerian Barge")***:  "Jeff McMahon, EVP and Treasurer of Enron Corp. has asked ML to purchase $7MM of equity in a special purpose vehicle that will allow Enron Corp. to book $12MM of earnings.  Enron must close this transaction by 12/31/99. Enron is viewing this transaction as a bridge to permanent equity and they have assured us that we will be taken out of our investment within six months.  The investment would have a maximum 22.5% return."

### G.       Summary Judgment

In preparing the case for trial, the Firm fully briefed several complex summary judgment motions by the non-settling bank defendants, while defeating the motions to dismiss pursued by the Royal Bank of Canada.  *See* Hodges Decl., ¶¶263, 266-268.

After securing class certification and filing hundreds of pages of briefs in opposition to the non-settling bank defendants' summary judgment motions, the case was trial ready as to Merrill Lynch, CSFB and Barclays.  The years of work had paid off and in early 2007 the Firm's litigation team was just weeks away from trial.  Then, a Fifth Circuit panel reached out to accept an interlocutory appeal of the class certification Order.  In a split decision, the panel reversed this Court's class certification Order, ruling the earlier decisions upholding scheme/conduct liability were erroneous.  *Regents*, 482 F.3d 372.  This brought the case to an abrupt halt, preventing any further proceedings in the district court on the pending summary judgment motions or the scheduled trial.

The Fifth Circuit's adverse ruling demonstrates just how outstanding the $6.6 billion recovery on the fraudulent scheme claims against Citigroup, JPMorgan and CIBC really was.  Taken at face value, the Fifth Circuit decision means that the Firm's skill and efforts produced a $6.6 billion recovery – ***the largest securities fraud recovery in history*** – on a legal theory that was later rejected by the appellate court.  Coffee Decl., ¶2.  Consistent with the persistence it has displayed from the very outset, the Firm, however, fights on.

### H.       Lead Counsel's Efforts to Reverse the Fifth Circuit and Obtain
### Further Recoveries for the Class

The Firm continues to press forward to overcome the adverse ruling in *Regents*, 482 F.3d 372.  The Firm expeditiously prepared and filed a certiorari petition in order to present the Fifth Circuit's decision to the Supreme Court, so that its review of *Regents* might be considered in

connection with another case presenting the fraudulent scheme/conduct liability issue already pending before the Supreme Court, *Stoneridge*.  Hodges Decl., ¶12.

The Firm's continued devotion to the case did not stop with the preparation and filing of a certiorari petition.  Hodges Decl., ¶¶13-25.  The Firm also realized that the fraudulent scheme/conduct liability issue – and thus the fate of The Regents' Enron case and the Enron victims' cause – would likely be determined in the *Stoneridge* appeal, regardless of whether *Regents* itself was ever accepted for review by the Supreme Court.  So, the Firm directed a massive effort in developing a major *amicus curiae* effort in support of the plaintiffs' fraudulent scheme/conduct position in the *Stoneridge* case.  *See* Declaration of Jonathan W. Cuneo, ¶¶55-59.  And the Firm orchestrated a national effort to persuade the SEC to recommend to the Solicitor General that the SEC appear in the Supreme Court as *amicus curiae* in support of fraudulent scheme/conduct liability.  This involved sophisticated efforts directed at legislators and regulators in Washington, D.C., combined with a major public relations strategy, including press conferences with victims of defendants' misconduct in Washington, D.C. and Houston.  As a result of Lead Counsel's educational efforts, several national labor leaders and major newspapers, including *The New York Times* and *Los Angeles Times*, and writers, like Ben Stein, spoke out and wrote in favor of the SEC siding with investors.

In this endeavor, the Firm's efforts met with great success.  Thirty-three of the nation's State Attorneys General, under the joint leadership of the Texas Republican Attorney General and the Ohio Democratic Attorney General, filed *amicus curiae* briefs in support of fraudulent conduct/scheme liability.  The North American Securities Administrators Association (NASAA) was also persuaded to file an *amicus curiae* brief in favor of fraudulent conduct/scheme liability.  The Council of Institutional Investors, the most important and prestigious institutional investor organization in America, also appeared as *amicus curiae* in favor of conduct/scheme liability.

*Amicus curiae* briefs by Change to Win (a major labor organization), the American Association of Retired Persons, the Consumer Federation of America and several other large public pension funds and investor organizations were also filed.  The Firm also prepared an *amicus curiae* brief for The Regents and provided substantial assistance in the preparation of the *amicus curiae* brief for a group of law professors – recognized experts in securities law – for their *amicus curiae* filing in support of the defrauded investors.  Seldom have so many amici of such prestige joined together to support the position this Court adopted in *Enron*, 235 F. Supp. 2d 549, *Enron*, 310 F. Supp. 2d 819, *Enron*, 236 F.R.D. 313, and *Enron*, 2006 U.S. Dist. LEXIS 43146, in the Supreme Court.  One can surmise with a fair degree of confidence that no other plaintiffs' law firm in America would have been capable of putting this kind of public relations and *amicus curiae* program together.

Through its efforts, the Firm successfully persuaded the SEC to vote to file a brief in support of conduct/scheme liability in the Supreme Court.  The fact that the Justice Department gave in to pressure from the Treasury Department and The White House and went against the recommendation of the SEC by refusing to file an *amicus curiae* brief supporting scheme liability again highlights the risks faced by Lead Counsel in this action.

On August 15, 2007, the Solicitor General did file an *amicus* brief – but remarkably it adopted this Court's view of fraudulent scheme/conduct liability.  The Solicitor General said the Courts of Appeal – the Fifth and the Eighth – were wrong on this liability issue.  *Stoneridge Investment Partners, Inc. v. Scientific-Atlanta, Inc.*, No. 06-43, Brief of United States as Amicus Curiae Supporting Affirmance (U.S., dated Aug. 15, 2007).  The Solicitor General in *Stoneridge* argued however that "eyeball" reliance by the victims on the conduct of the behind-the-scenes schemer was necessary for recovery.  While this is a remarkable, anti-investor argument in an open-market fraud case, it highlights the risks faced by Lead Counsel.

**IV.     THE FEE SHOULD BE AWARDED BASED ON A PERCENTAGE OF THE RECOVERY ACHIEVED**

**A.     Fees in Common Fund Cases Are Normally Based on a Percentage of the Recovery**

Courts have long recognized that attorneys who represent a class and achieve a benefit for class members are entitled to be compensated for their services, and that where a class plaintiff successfully recovers a fund the costs of litigation should be spread among the fund's beneficiaries. Under this "common fund" doctrine, established more than a century ago in *Trustees v. Greenough*, 105 U.S. 527 (1882), attorneys who obtain a recovery for a class in the form of a common fund are entitled to an award of fees and expenses from that fund as compensation for their work. *See Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939).

**1.     The Supreme Court Holds that Fees in Common Fund Cases Are Properly Calculated Based on a Percentage of the Recovery**

The Supreme Court has consistently held that where a common fund has been created for the benefit of a class as a result of counsel's efforts, the award of counsel's fee should be determined on a percentage-of-the-fund basis. *See, e.g.*, *Greenough*, 105 U.S. at 532; *Central R. & Banking Co. v. Pettus*, 113 U.S. 116, 124-25 (1885); *Sprague*, 307 U.S. at 166-67; *Boeing*, 444 U.S. at 478-79. Indeed, by 1984 this notion was so well established that the Supreme Court needed no more than a footnote to make this point in *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984) ("under the 'common fund doctrine,' . . . a reasonable fee is based on a percentage of the fund bestowed on the class"). After analyzing every reported opinion on attorney fees in the country, the Third Circuit Task Force, chaired by the Honorable H. Lee Sarokin, concluded that "the percentage recovery was more appropriate and just than a lodestar method untethered to the benefits conferred." Sarokin Decl., ¶12. *See also* Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D.

237, 242 (Oct. 8, 1985) (hereinafter the "*Task Force Report*") (fee awards in common fund cases have historically been computed based upon a percentage of the fund); 1 Alba Conte and Herbert B. Newberg, *Attorney Fee Awards* §2.02, at 31-32 (2d ed. 1993) (same).  The percentage concept is intended to approximate the market by basing the fee award on what private counsel ordinarily would charge in a contingent fee contract.  *See In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992) ("The class counsel are entitled to the fee they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client.").  *See also* Silver Report at 3, 11-14, 67-76; Sarokin Decl., ¶22.

While some lower federal courts have used an alternative method for calculating fee awards known as the "lodestar/multiplier" method, the Supreme Court has ***never*** adopted the lodestar method in a common fund case. [31]  *See Shaw v. Toshiba Am. Info. Sys.*, 91 F. Supp. 2d 942, 963 (E.D. Tex. 2000) (citing *Manual for Complex Litigation* §24.12, at 189 (3d ed. 1995)); *see also In re Prudential-Bache Energy Income P'ship Sec. Litig.*, No. MDL 888, 1994 U.S. Dist. LEXIS 4786, at *4 (E.D. La. Apr. 13, 1994) ("*Prudential I*").

### 2.    A Majority of Courts of Appeal Have Approved the Percentage-of-the-Recovery Method

Since the issuance of the *Task Force Report* in 1985, virtually every circuit court has joined the United States Supreme Court in approving use of the percentage-of-the-fund method in common

---

[31]    The lodestar approach entails two steps.  First, to determine the lodestar, the court multiplies the number of hours reasonably spent on the case by each attorney's reasonable hourly rate.  Second, the court adjusts that figure (by applying a multiplier) to reflect such factors as the risks faced and overcome, the contingent nature of the litigation, the result obtained, and the quality of the attorneys' work.  *See*, *e.g.*, *Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167-69 (3d Cir. 1973) ("*Lindy I*"), subsequently refined in *Lindy Bros. Builders v. Am. Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 116-18 (3d Cir. 1976) (en banc) ("*Lindy II*").

fund cases.[32]  As these and many other courts have noted, the percentage method directly aligns the interests of the class and its counsel and provides a powerful incentive for efficient prosecution, thereby benefiting both litigants and the judicial system.  For example, in *Kirchoff v. Flynn*, 786 F.2d 320, 325 (7th Cir. 1986), the Seventh Circuit succinctly summarized some of the benefits of the percentage method:

> The contingent fee uses private incentives rather than careful monitoring to align the interests of lawyer and client.  The lawyer gains only to the extent his client gains. . . .  The unscrupulous lawyer paid by the hour may be willing to settle for a lower recovery coupled with a payment for more hours.  Contingent fees eliminate this incentive and also ensure a reasonable proportion between the recovery and the fees assessed to defendants.

The percentage approach is also the most efficient means of rewarding the work of class action attorneys, since it avoids the wasteful and burdensome process of counsel preparing and courts evaluating lodestar-based fee petitions, which the Third Circuit Task Force has described as "cumbersome, enervating, and often surrealistic."  *Task Force Report*, 108 F.R.D. at 258; *see also Shaw*, 91 F. Supp. 2d at 964 ("The lodestar method voraciously consumes enormous judicial resources, unnecessarily complicates already complex litigation, and inaccurately reflects the value of services performed."); *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (warning that a "request for attorney's fees should not result in a second major litigation").

--------

[32]     *See, e.g., In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 307 (1st Cir. 1995); *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 821-22 (3d Cir. 1995); *Rawlings v. Prudential-Bache Props.*, 9 F.3d 513, 515-17 (6th Cir. 1993); *Florin v. Nationsbank, N.A.*, 34 F.3d 560, 564-65 (7th Cir. 1994); *Johnston v. Comerica Mortgage Corp.*, 83 F.3d 241, 246 (8th Cir. 1996); *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1296 (9th Cir. 1994); *Gottlieb v. Barry*, 43 F.3d 474, 487 (10th Cir. 1994) (authorizing percentage approach and holding that use of lodestar/multiplier method was abuse of discretion); *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991) ("After reviewing *Blum*, the [Third Circuit] Task Force Report, and . . . cases from other circuits, we believe that the percentage of the fund approach is the better reasoned in a common fund case."); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1271 (D.C. Cir. 1993) (percentage of the fund recovered is the ***only*** permissible measure of awarding fees in common fund cases).

In earlier articles Professor Silver notes that due process concerns are eliminated in the class action context when the contingent percentage approach is used:

> *The consensus that the contingent percentage approach creates a closer harmony of interests between class counsel and absent plaintiffs than the lodestar method is strikingly broad*.  It includes leading academics, researchers at the RAND Institute for Civil Justice, and many judges, including those who contributed to the Manual for Complex Litigation, the Report of the Federal Courts Study Committee, and the report of the Third Circuit Task Force.  Indeed, it is difficult to find anyone who contends otherwise.  No one writing in the field today is defending the lodestar on the ground that it minimizes conflicts between class counsel and absent claimants.

> *In view of this, it is as clear as it possibly can be that judges should not apply the lodestar method in common fund class actions.*  The Due Process Clause requires them to minimize conflicts between absent claimants and their representatives.  The contingent percentage approach accomplishes this.

Charles Silver, *Class Actions in the Gulf South Symposium: Due Process and the Lodestar Method: You Can't Get There From Here*, 74 Tul. L. Rev. 1809, 1819-20 (2000).[33]  This is particularly true in PSLRA cases such as this one where Congress empowered sophisticated lead plaintiffs with the ability to select counsel and negotiate the type and terms of their fee arrangement with class counsel.

---

[33]    Similarly, in an article published more than a decade before this litigation, Professor Coffee argued that a percentage of the gross recovery is the only reasonable method of awarding fees in common fund cases:

> If one wishes to economize on the judicial time that is today invested in monitoring class and derivative litigation, the highest priority should be given to those reforms that restrict collusion and are essentially self-policing.  The percentage of the recovery fee award formula is such a "deregulatory" reform because it relies on incentives rather than costly monitoring.  Ultimately, this "deregulatory" approach is the only alternative . . . .

John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law through Class and Derivative Actions*, 86 Colum. L. Rev. 669, 724-25 (1986).

As the District of Columbia Circuit has stated: "We adopt a percentage-of-the-fund methodology . . . because it is more efficient, easier to administer, and more closely reflects the marketplace." *Swedish Hosp.,* 1 F.3d at 1270.[34]

### 3. The Fifth Circuit and Numerous District Courts in This Circuit Have Used the Percentage Method to Determine Reasonable Attorneys' Fees

Anticipating the trend away from the lodestar method, Judge Vance of the Fifth Circuit stated in his separate opinion in *Foster v. Boise-Cascade, Inc.*, 577 F.2d 335, 337 n.1 (5th Cir. 1978):

> [I]f mechanically applied, the hourly rate approach almost inevitably leads to an unsatisfactory result in this type of litigation. This method of compensation – which equates professional services to those of laborers and mechanics – frequently has little or no relationship to the value of the services performed in anything but the most routine work. A flash of brilliance by a trial lawyer may be worth far more to his clients than hours or days of plodding effort. Few among us would contend that an operation by a gifted surgeon who removes an appendix in fifteen minutes is worth only one-sixth that performed by his marginal colleague who requires an hour and a half for the same operation.

In fact, "since *Blum* was decided [in 1984], there has been no Fifth Circuit decision that would preclude this Court from employing the percentage of the fund approach endorsed in *Blum* and the circuit and district court decisions that followed and applied *Blum*." *Prudential 1*, 1994 U.S. Dist. LEXIS 4786, at *11-*12; *see also Batchelder v. Kerr-McGee Corp.*, 246 F. Supp. 2d 525, 531 (N.D. Miss. 2003) ("A percentage fee approach, as opposed to a lodestar computation, is the preferred method for determining awards of attorneys' fees in common fund, or class action, cases."); *Shaw*, 91 F. Supp. 2d at 967 n.15 ("the Fifth Circuit has ***never*** . . . reversed a district court judge's decision to award a fee as a percentage") (emphasis in original); *Longden v. Sunderman,* 979 F.2d 1095, 1100 n.11 (5th Cir. 1992) (affirming district court's percentage fee award in securities

---

[34]      The PSLRA also clearly recognizes the propriety of using the percentage method. "Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable ***percentage*** of the amount of any damages and prejudgment interest actually paid to the class." *See* 15 U.S.C. §78u-4(a)(6).

class action, noting that the district court stated its preference for the percentage of recovery

approach "as a matter of policy").

> This Court has also noted:

>> The "percentage method" involves awarding attorneys a reasonable fee based on a percentage of the fund bestowed on the class. *See Blum*, 465 U.S. at n.16. The majority of circuits apply a "percentage fee" approach in common fund cases. *In re Catfish Antitrust Litig.*, 939 F. Supp. 493, 499 (N.D. Miss. 1996) (collecting cases) "Although the prevailing trend in other circuits and district courts has been toward awarding fees and expenses in common fund cases based on percentage amounts, the Fifth Circuit has yet to adopt this method." *Longden v. Sunderman*, 979, F.2d 1095, 1099 (5th Cir. 1992). Nevertheless, numerous district courts within the Fifth Circuit continue to use the percentage method for evaluating attorney's fees in common fund cases. *Shaw*, 91 F. Supp. 2d at 966-67.

>> This procedure involves looking at the percentages awarded on other "common fund" cases to set a benchmark percentage. It is often stated that "attorneys' fees in the range from twenty-five (25%) percent to thirty-three and thirty-four one hundredths percent (33.34%) have been routinely awarded in class actions," but that 15% or more are frequently awarded." *Shaw*, 91 F. Supp. 2d at 972. . . .  "***The percentage [method is] meant for lead or general counsel for plaintiffs in a class action*** . . . ."

*In re Waste Management, Inc. Sec. Litig.*, No. 99-2183, slip op. at 22-23 (S.D. Tex. Dec. 29, 2003)

("*Waste Management II*") (Compendium, Ex. L) (order largely denying fees to objector to a $37

million fee award in securities class action). Recently, a similar 8%-10% fee agreement involving

the same Lead Plaintiff and the Firm was honored by Judge Lake in this district who stated that

"[t]his court adopts the percentage-of-recovery method of awarding fees" as "the Supreme Court has

indicated that computing fees as a percentage of the common fund received is the proper approach"

and awarded the full fee called for by the fee contract in *Dynegy*. *Dynegy*, No. H-02-1571, slip op.

at 1 (Compendium, Ex. C). *See TXU*, No. 3:02-CV-2243-K, slip op. at 2-3 (Compendium, Ex. D)

(awarding a fee to class counsel "which represents the percentage fee award negotiated between

Court-appointed Lead Plaintiffs and Co-Lead Counsel at this level of recovery"; there was a

"presumption that a 22.2% fee award is reasonable," "the percentage of the benefit" is the "proper

method for awarding attorneys' fees" and the negotiated "fee structure . . . which provides a higher

percentage fee for increasing levels of recovery is entitled to deference because it was designed to incentivize counsel to achieve the maximum result possible for the class"); *see also In re Landry's Seafood Restaurants, Inc. Sec. Litig.*, No. H-99-1948, slip op. at 1 (S.D. Tex. June 13, 2002) (Compendium, Ex. M) ("The Court finds that the amount of fees awarded [30%] is fair and reasonable under the 'percentage-of-recovery' method.")[35]

> **B.      The Requested Percentage Award Is Not Only Fair and Reasonable When Compared to Other Awards, It Is Conservative**

The requested 9.52% fee award is significantly less than awards made in other mega fund cases with most well above the percentage requested here, *i.e.*, *Tyco*, 14.5%; *Lucent*, 17%; *Bankamerica*, 17.83%; *Adelphia*, 21.40%; *Global Crossing*, 16.04%; *Freddie Mac*, 20%; *Cardinal*, 18%; and *Qwest*, 15%. Even the average mega fund fee, 11.61%, *see* Top Securities Settlements Chart below, is above the request here and this case was anything but average in risk, complexity, duration, or discovery as the case was litigated for more than six years against the largest banks in the world.

The requested fee is also in line with an analysis of fee awards in class actions conducted in 1996 by National Economic Research Associates, an economics consulting firm. Using data from 433 shareholder class actions, the study reports on the issue of attorneys' fees: "Regardless of case size, fees average approximately 32 percent of the settlement." Denise N. Martin, Vinita M. Juneja, Todd S. Foster, Frederick C. Dunbar, *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions?* at 12-13 (NERA Nov. 1996) (Compendium, Ex. N). The average

---

[35]      Numerous other district courts within the Fifth Circuit have applied the percentage-of-recovery method in awarding fees. *See In re Catfish Antitrust Litig.*, 939 F. Supp. 493, 500 (N.D. Miss. 1996), *Shaw*, 91 F. Supp. 2d at 966-67; *Di Giacomo v. Plains All Am. Pipeline*, No. H-99-4137, 2001 U.S. Dist. LEXIS 25532, at *17-*18 (S.D. Tex. Dec. 19, 2001), list numerous class action cases as examples.

attorney fee as a percentage of the settlement in this Circuit was 30.73%. *Id*. at Table 12b. As Professor Silver points out, even in cases where very large recoveries have been obtained, percentage fees substantially above those requested here have been awarded. *See* Silver Report at 60-67.

As important here is the use of the ascending scale to directly align counsel's incentives with the Class's and maximize the recovery. Coffee Decl., ¶45 (it is axiomatic last dollar of settlement hardest to obtain). As the court observed in *In re Ikon Office Solutions, Inc.*, 194 F.R.D. 166, 197 (E.D. Pa. 2000) (in awarding a 30% fee and criticizing the use of any declining "sliding scale" fee regimen): "This court respectfully concludes that such an approach tends to penalize attorneys who recover large settlements. More importantly, it casts doubt on the whole process by which courts award fees by creating a separate, largely unarticulated set of rules for cases in which the recovery is particularly sizable." The sliding scale also "fails to appreciate the immense risks undertaken by attorneys in prosecuting complex cases in which there is a great risk of no recovery. Nor does it give sufficient weight to the fact that 'large attorneys' fees serve to motivate capable counsel to undertake these actions.'" *Id*. The *Ikon* court would not reduce the attorneys' fee award in a large settlement "simply for the sake of doing so when every other factor ordinarily considered weighs in favor of approving class counsel's request of thirty percent." *Id*. at 196.

Professor Lucian Bebchuk is the Friedman Professor of Law, Economics, and Finance at Harvard Law School and analyzes the fee contract from the perspective of both an economist and a legal scholar, concluding that it was highly reasonable for The Regents to establish an increasing percentage fee schedule, establishing both that the fee agreement was in the interest of Class members and that post-hoc downward judicial adjustment of this and other similarly structured pre-

negotiated increasing percentage fee schedules would discourage the necessary investment of time and capital.  Bebchuk Decl. at 28.[36]

Professor Bebchuk also cautions against courts using the fact of a high recovery as grounds for *ex post* downward adjustment of initially set percent figures established in agreements between a lead plaintiff and a lead counsel.  He focuses on the problem in economics of "hindsight bias," of assuming that the favorable result achieved in this case was evident six years earlier when the fee agreement was made.  As he notes, "[a] court considering whether the Regents' initial assessment of the class' prospects in the *Enron* case was reasonable should be cautious not to let its knowledge of the *ex post* outcome influence its judgment of the reasonableness of the Regents' *ex ante* choices.  It is widely accepted in behavioral economics that individuals have the tendency to view outcomes taking place as having had higher odds of occurring than they in fact had before the outcomes occurred."  *Id.* at 24.  Professor Bebchuk also shows that there would be a significant adverse effect on counsel incentives, settlement decisions and litigation strategy decisions if courts were to allow high *ex post* recovery to serve as a basis for adjusting downward the percent of recovery.  *Id.* at 28.  Application of Professor Bebchuk's economic analysis to the facts of the extraordinary recovery achieved for the fraud victims in this *Enron* case counsels strongly against the Court reducing the percentage recovery simply because application of the originally negotiated percentage to the record recovery results in a large fee award.

Also instructive in this regard is *Allapattah Servs. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1189 (S.D. Fla. 2006).  There, after many years of litigation on behalf of service station operators

---

[36]     Professor Bebchuk applies economic analysis to conclude that incentive considerations call for using an increasing percentage fee schedule as preferable to a sliding schedule or constant schedule, providing counsel with optimal incentives to invest the resources necessary to recover increasingly difficult additional marginal recoveries, thereby maximizing the net recovery for the class of fraud victims.  *Id.*

against corporate behemoth Exxon produced a $1,075,000,000 recovery, the court awarded a 31.3%

fee, stating:

> Without doubt, this Order deals with a lot of money for attorneys' fees and incentive awards. A casual observer, not familiar with the case, may readily conclude that the attorneys' fees and incentive awards are too high. This case, however, is unique. This is not a situation where a class action is brought, soon settled, and Class Members receive an insignificant award and the lawyers get millions. . . .
>
> . . . The amount of attorney's fees awarded should directly correlate to the number of Class Members benefited; the amount of money received by each class member; and the risk borne by Class Counsel, over time, in achieving the benefits obtained. Attorneys' fees should be structured as an incentive for lawyers to risk achieving the highest possible benefits for the greatest number of Class Members. This is what happened in this case. . . .
>
> During all this time, the attorneys have received no fees and litigated at substantial risk to themselves and in the best interest of the Class. It is time for their contributions . . . to be recognized.

The Court in *Allapattah*, 454 F. Supp. 2d at 1217, after noting the hurdles class litigation faces when

litigating against large oil companies (with resources similar to the banks in *Enron*), went on to note:

> Absent an award of fees that adequately compensates Class Counsel, the entire purpose and function of class litigation under Rule 23 of the Federal Rules of Civil Procedure will be undermined and subverted to the interests of those lawyers who would prefer to take minor sums to serve their own self interest rather than obtaining real justice on behalf of their injured clients. *See* John J. Coffee, Jr., *Rescuing the Private Attorney General: Why the Model of the Lawyer as Bounty Hunter is Not Working*, Maryland Law Review, 216, 225-26 (1983) (the private attorney general provides an important mechanism "to enforce the federal antitrust and securities laws, to challenge corporate self-dealing in derivative actions, and to protect a host of other statutory policies," but in the absence of appropriate incentive structures, "litigated judgments are few, cheap settlements are common, and . . . the private watchdog can be bought off by tossing him the juicy bone of a higher-than-ordinary fee award in return for his acceptance of an inadequate settlement").

More recently The Regents' spokesperson noted:

> The Enron fee "in absolute terms is a large number but everything about the Enron case involves large numbers," said Trey Davis, a spokesman for the Regents of the University of California, the lead plaintiff in the Enron litigation. "When you look at work the legal team has conducted and the results, I think most people would objectively consider this a very reasonable fee request." In percentage terms, the fee request would be in line with awards in other large securities class-action settlements.

Nathan Koppel, *Law Firm Seeks Hefty Fee Payout For Enron Suit*, Wall St. J., Nov. 21, 2007, at B10 (Compendium, Ex. O).

Even in those relatively rare cases where there have been "super-mega-fund recoveries" similar to those achieved here, significant percentage-based awards have been granted. For example, recently in the *Tyco* litigation, the court approved a percentage fee award of 14.5%. *In re Tyco Int'l, Ltd. Multidistrict Litig.*, No. 02-MD-1335-PB (D.N.H. Dec. 19, 2007) (Compendium, Ex. P). While well deserved, lead plaintiff's counsel in that case faced far fewer hurdles than Lead Plaintiff's counsel in *Enron*. In *Tyco*, the company and its accountants survived the significant frauds. Thus, the complex theories and questions of liability as to secondary actors that presented themselves in *Enron* were **not** a significant factor in *Tyco*. The very number and strength of the secondary defendants in *Enron* and their experienced counsel[37] is simply unprecedented, and yet Lead Counsel was successful in obtaining significant recoveries. In *Enron*, one firm shouldered virtually the entire burden as opposed to three firms in *Tyco*. Thus, the risks in *Tyco* as to any given co-lead counsel firm were significantly lower. And while significant discovery occurred in both cases, more than 150 additional depositions were taken in *Enron* (over 370 in *Enron* vs. 220 in *Tyco*). Finally, as a percentage of the recovery, the *Enron* fee at 9.52% is nearly a third less than the 14.5% sought and awarded in *Tyco*. As can be seen from a review of the chart below, the fee request is well within the other percentage awards in post PSLRA cases with settlements at or above the $400 million range, as reflected in the "Top Securities Settlements Chart":[38]

---

[37]    Here, Lead Counsel went toe-to-toe with some of the best lawyers in America and obtained a significant result. Courts frequently view the quality of opposing counsel as important in evaluating the quality of services rendered by plaintiffs' counsel. *See In re Computron Software*, 6 F. Supp. 2d 313, 323 (D.N.J. 1998) ("performance and quality of opposing counsel" was a factor in determining appropriate fee).

[38]    The Top Securities Settlements Chart is also Exhibit 5 to the Hodges Decl.

TOP SECURITIES SETTLEMENTS

| Case Name | Settlement Amount | Lodestar | Fee Award | Fee Award % | Stage of Case Upon Settlement | Pages of Documents Reviewed | Depos |
|---|---|---|---|---|---|---|---|
| WorldCom | $6,133,000,000 | $83,183,238.70 | $336,100,000.00 | 5.48% | Various | 10,000,000 | 41 |
| Tyco | $3,200,000,000 | $172,069,355.65 | $464,000,000.00 | 14.5% | Class Cert stage | 83,500,000 | 220 |
| Cendant | $3,186,000,000 | $8,000,000.00 | $55,000,000.00 | 1.73% | Class Cert stage | 1,000,000 | 0 |
| AOL/Time Warner | $2,650,000,000 | $39,973,056.76 | $147,500,000.00 | 5.57% | Merits discovery | 15,500,000 | 0 |
| Nortel I | $1,142,000,000 | $16,655,971.00 | $34,283,259.29 | 3.00% | Class Cert stage | 2,000,000 | 12 |
| Royal Ahold | $1,088,732,241 | $50,858,606.25 | $130,647,868.95 | 12.00% | Class Cert stage | 15,000,000 | 0 |
| Nortel II | $1,039,811,504 | $17,429,370.30 | $83,184,920.32 | 8.00% | Class Cert stage | 10,000,000 | 0 |
| McKesson | $960,000,000 | $31,160,000.00 | $74,784,000.00 | 7.79% | Merits discovery | 2,000,000 | 65 |
| Cardinal Health | $600,000,000 | $18,378,123 | $107,580,000 | 18% | Merits discovery | 7,200,000 | 0 |
| Lucent | $517,000,000 | $20,244,296.58 | $87,890,000.00 | 17.00% | Class Cert stage | 3,000,000 | 0 |
| Bankamerica | $484,551,469 | $28,805,990.75 | $86,416,085.14 | 17.83% | expert disc. completed | 1,500,000 | 75 |
| Dynegy | $474,000,000 | $10,162,041.75 | $41,359,818.00 | 8.73% | expert disc. completed | 1,200,000 | 19 |
| Raytheon | $460,000,000 | $13,160,578.00 | $41,400,000.00 | 9.00% | Trial | 1,000,000 | 45 |
| Waste Mgmt. II | $457,000,000 | $6,842,457.00 | $36,240,100.00 | 7.93% | Motion to Dismiss | 700,000 | 12 |
| Adelphia | $455,000,000 | $33,686,468.00 | $97,370,000.00 | 21.40% | Amended Complaint | 1,500,000 | 0 |
| Global Crossing | $448,000,000 | $28,242,915.18 | $72,470,000.00 | 16.04% | Merits Discovery | 270,000 | 0 |
| Freddie Mac | $410,000,000 | $35,353,394.50 | $82,000,000.00 | 20.00% | Class Cert stage | 6,700,000 | 78 |
| Qwest | $400,000,000 | $18,547,453.65 | $60,000,000.00 | 15.00% | Class Cert stage | 9,000,000 | 60 |
| **Totals** | **$24,105,095,214** | **$632,753,317** | **$2,038,226,051** | | | **171,070,000** | **627** |
| **Average** | **$1,339,171,956** | **$35,152,962** | **$113,234,781** | **11.61%** | | **9,503,888** | **37** |

| Enron (Proposed) | $7,227,390,000 | $127,000,000.00 | $688,000,000.00 | 9.52% | Various | 70,000,000 | 370 |

The fee request here also would compare favorably with awards in non-securities class action settlements. The following is a chart of the top settlements in non-securities class actions and the attorneys' fees awarded in those cases (the "Top Non-Securities Settlements Chart"):

| Case | Common Fund Amount | Fee Award Amount | Fee Award % of Fund |
|---|---|---|---|
| *Price v. Philip Morris, Inc.*, No. 00-L-112, 2003 WL 22597608 (Ill. Cir. Mar. 21, 2003), *rev'd on other grounds*, 219 Ill. 2d 182, 848 N.E.2d 1 (Ill. 2005) | $7,100,500,000 | $1,775,125,000 | 25.00% |
| *In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd sub nom, Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2005) | $3,383,400,000 | $220,290,160.44 | 6.51% |
| *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942 (E.D. Tex. 2000) | $2,100,000,000 | $147,500,000 | 7.02% |
| *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) | $1,038,450,000 | $325,380,997 | 31.33% |
| *In re Vitamins Antitrust Litig.*, No. Misc. 99–197 (TFH), 1285, 2001 WL 34312839 (D.D.C. Jul. 16, 2001) | $1,055,137,127 | $123,188,032 | 11.68% |
| *In re NASDAQ Market–Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998) | $1,027,000,000 | $143,780,000 | 14.00% |
| *In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94 C 897, 2000 WL 204112 (N.D. Ill. Feb. 10, 2000) | $696,667,000 | $175,000,000 | 25.12% |
| *In re Zyprexa Products Liab. Litig.*, 424 F. Supp. 2d 488 (E.D.N.Y. 2006) | $690,000,000[39] | $250,000,000 (approximation) | No more than 35%[40] |

As shown in the chart below, combining the Top Securities Settlements and Top Non-Securities Settlements Charts, the average percentage award of attorneys' fees in those cases is 14.03%, above the 9.52% requested here:

---

[39]     This case was a mass, as opposed to class, action in which approximately 8,000 lawsuits were settled. *See In re Zyprexa Products Liab. Litig.*, 433 F. Supp. 2d 268 (E.D.N.Y. 2006).

[40]     The court set a cap on legal fees at 35% and gave to a special master the power to adjust fee caps upward to a maximum of 37.5% and downward to 30% in individual cases based on special circumstances. *See Zyprexa*, 424 F. Supp. 2d at 496.

| Case | Common Fund Amount | Fee Award Amount | Fee Award % of Fund |
|------|-------------------:|-----------------:|--------------------:|
| *Philip Morris* | $7,100,500,000 | $1,775,125,000 | 25.00% |
| *WorldCom* | $6,133,000,000 | $336,100,000 | 5.48% |
| *Visa Check/MasterMoney* | $3,383,400,000 | $220,290,160 | 6.51% |
| *Tyco* | $3,200,000,000 | $464,000,000 | 14.5% |
| *Cendant* | $3,186,000,000 | $55,000,000 | 1.73% |
| *AOL/Time Warner* | $2,650,000,000 | $147,500,000 | 5.57% |
| *Toshiba* | $2,100,000,000 | $147,500,000 | 7.02% |
| *Nortel I* | $1,142,000,000 | $34,283,259 | 3.00% |
| *Royal Ahold* | $1,088,732,241 | $130,647,868 | 12.00% |
| *Allapattah* | $1,038,450,000 | $325,380,997 | 31.33% |
| *Vitamins Antitrust* | $1,055,137,127 | $123,188,032 | 11.68% |
| *Nortel II* | $1,039,811,504 | $83,184,920 | 8.00% |
| *NASDAQ* | $1,027,000,000 | $143,780,000 | 14.00% |
| *McKesson* | $960,000,000 | $74,784,000 | 7.79% |
| *Prescription Drugs* | $696,667,000 | $175,000,000 | 25.12% |
| *Zyprexa* | $690,000,000 | $250,000,000 | 35.00% |
| *Cardinal* | $600,000,000 | $107,580,000 | 18.00% |
| *Lucent* | $517,000,000 | $87,890,000 | 17.00% |
| *Bankamerica* | $484,551,469 | $86,416,085 | 17.83% |
| *Dynegy* | $474,000,000 | $41,359,818 | 8.73% |
| *Raytheon* | $460,000,000 | $41,400,000 | 9.00% |
| *Waste Mgt. II* | $457,000,000 | $36,240,100 | 7.93% |
| *Adelphia* | $455,000,000 | $97,370,000 | 21.40% |
| *Global Crossing* | $448,000,000 | $72,470,000 | 16.04% |
| *Freddie Mac* | $410,000,000 | $82,000,000 | 20.00% |
| *Qwest* | $400,000,000 | $60,000,000 | 15.00% |
| *Average* | | | **14.03%** |
| *Enron* | $7,227,390,000 | $688,000,000[41] | 9.52% |

In light of the fee awards in other actions where the fund similarly consisted of hundreds of millions of dollars, Lead Counsel's request here for a 9.52% fee award is fair and reasonable.

**C.    The Lead Plaintiff's Agreed-To Fee Is Entitled to a "Presumption of Reasonableness"**

Passage of the PSLRA "shift[ed] the underpinnings of our class action attorneys fees jurisprudence in the securities area." *Cendant*, 264 F.3d at 282. In a PSLRA case, a fee request,

---

[41]    These are the proposed amounts.

which has been approved and endorsed by properly appointed lead plaintiffs, enjoys a "presumption of reasonableness." *Id.* at 220, 283.   In *Cendant*, the court held that the district court abused its discretion by invalidating a fee agreement negotiated between counsel and three institutional investors, in favor of a sealed-bid auction for legal services.   In so holding, the court explicitly recognized that, in enacting the PSLRA, Congress expressed its strong belief that an institutional lead plaintiff would be in a better position than the court to protect the interests of the class by monitoring lead counsel throughout the litigation and by negotiating a reasonable fee for counsel's representation. *Id.* at 276 (holding that Congress believed that "institutional investors would likely do a better job than courts at selecting, retaining, and monitoring counsel than courts have traditionally done").   Accordingly, the court held that a fee agreement negotiated between properly selected lead plaintiff and its counsel should be accorded a "presumption of reasonableness":

> [U]nder the PSLRA, courts should accord a presumption of reasonableness to any fee request submitted pursuant to a retainer agreement that was entered into between a properly-selected lead plaintiff and a properly-selected lead counsel. . . .   This presumption will ensure that the lead plaintiff, not the court, functions as the class's primary agent vis-à-vis its lawyers.

*Id.* at 282. *See also Global Crossing*, 225 F.R.D. at 465 ("[I]n class action cases under the PSLRA, courts presume fee requests submitted pursuant to a retainer agreement negotiated at arm's length between lead plaintiff and lead counsel are reasonable."); *In re Lucent Techs., Inc. Sec. Litig.*, 327 F. Supp. 2d 426, 432 (D.N.J. 2004) (same); Sarokin Decl., ¶20 ("I have always been a strong advocate of such prior agreements and favor reliance upon them, because they are negotiated when the risks, but not the outcome, are known, and thus replicate the marketplace.").

Here, Lead Plaintiff negotiated a graduated fee arrangement with its chosen counsel at the beginning of the case.[42]   In fulfillment of its duties in accordance with the intent of Congress and under the PSLRA, Lead Plaintiff has worked with counsel throughout the prosecution and settlement of the litigation, is familiar with the work done by counsel, and negotiated the requested fee at the beginning of the case.   The fee agreement between the Lead Plaintiff and counsel is "'precisely the type of bargaining that the PSLRA anticipated and to which a court reasonably may give substantial deference.'"   *Global Crossing*, 225 F.R.D. at 468.   Therefore, the negotiated fee is the appropriate fee request to be submitted to the Court, for it reflects the exercise of the power and responsibility vested in lead plaintiffs by Congress.[43]

---

[42]     As Professor Silver notes:  "It would be especially bizarre to use the size of the settlement fund as a reason for invalidating the fee agreement in this case, for a simple reason:  The parties expressly anticipated that the recovery could exceed $2 billion and set fee terms to govern this contingency.  The Regents knew this lawsuit could produce one of the largest settlements in history, if enormous barriers were overcome, when the case began."  Silver Report at 84.

[43]     The reasonableness of the fee agreed to here is also demonstrated by the enormous fees charged by others involved in the *Enron* legal proceedings, much of which fee money was charged on a current no-risk basis by hundreds of defense lawyers defending the case.  The director and officer defendants' lawyers were paid over $160 million in insurance proceeds alone; unknown additional amounts were paid by individuals, such as Lou Pai and Jeffrey Skilling, who had the wherewithal to pay for their defense.  In the *Enron* bankruptcy proceeding, the lawyers and other professionals were paid over $750 million on an hourly basis over the last six years.

D.      **The Fee Request Is Fair Under the Lodestar/Multiplier Analysis[44]**

Analysis of the 9.52% fee request under the lodestar/multiplier method further substantiates its fairness. Lead Counsel and those assisting it have collectively devoted a staggering 280,000 hours resulting in an overall lodestar of over $127 million over six years of this action.

"A court arrives at the lodestar by determining the number of hours productively spent on the litigation and multiplying those hours by reasonable hourly rates." *Thirteen Appeals*, 56 F.3d at 305. To compensate for the long delay Lead Counsel has experienced in receiving any compensation for its work in this case (over six years), it is appropriate to use Lead Counsel's current billing rates in calculating the lodestar. *See Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989) (current rates, rather than historical rates, should be applied in order to compensate for delay in payment); *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998) (same). In determining whether the rates are reasonable, the Court should take into account the attorneys' legal reputation, experience, and status (*e.g.*, partner, counsel, associate). In this case, Lead Counsel is one of the largest and most successful firms in the field of securities class action litigation, and the trial team of lawyers working on the case was led by senior attorneys at the firm, all highly experienced and respected securities

---

[44]     All hour, lodestar and multiplier information in this memorandum and the expert declarations uses plaintiffs' counsel's hours and lodestar as of September 30, 2007 (and does not include the time of one of plaintiffs' law firms). Since then, substantial additional time has been spent working on, among other things, the Plan of Allocation. As of December 15, 2007, Lead Counsel's lodestar was over $113,000,000 based on over 248,000 hours. Total plaintiffs' counsel's hours were over 289,000 and the total lodestar was over $131,000,000 resulting in a multiplier of about 5.2; these figures include the time of the firm previously omitted. *See* Hodges Decl., ¶296 and Exs. 1 and 2. Lead Counsel has excluded time spent preparing this fee application.

lawyers.[45]  In short, the experience and reputation of Lead Counsel support the hourly rates charged. Clearly, the Class received the highest quality representation in this case.

After the basic lodestar figure is calculated, the court considers whether an adjustment should be made in the form of a multiplier to reflect the contingent nature of any fee, the delay in payment, the quality of representation and the results obtained. *Grendel's Den, Inc. v. Larkin*, 749 F.2d. 945, 951 (1st Cir. 1984).  First, the 5.4 multiplier that would accompany the fee request is within the range of reasonableness in several of the mega fund cases.[46]  Second, comparing what has transpired in this case to the cases in the Top Securities Settlements Chart shows that Lead Counsel has reviewed and/or analyzed nearly as many pages of documents (aggregate Top Securities Settlements – 87.57 million pages vs. Enron  – 70 million pages) as plaintiffs' counsel in 17 of the 18 Top Securities Settlement cases ***combined*** (*Tyco* excluded).  In addition, Lead Counsel has participated in 10-times the average number of depositions that plaintiffs' counsel in the same 17 of the top 18 Top Securities Settlements (over 370 vs. 37).  In fact, in about half of the cases in the Top Securities Settlements Chart, not a single deposition was ever taken.

Finally, while plaintiffs' counsel's average hourly rate at $456 is above several of the mega fund cases, the number of depositions and complexity of this case against opposing parties with unlimited defense resources and numerous third-party defendants dictated experienced lawyers take

---

[45]     Summaries of the hours spent and the hourly rates for each attorney and member of support staff working on this matter for all firms submitting this application are set forth in the declarations of plaintiffs' counsel submitted herewith.

[46]     Examples include, *WorldCom* settled for $6.1 billion and the lodestar multiplier for a fee of $336 million was approximately 4.04 at a rate of about $300 an hour.  *Cendant*, which settled for $3.186 billion for a low fee of $55 million still had a 6.8 multiplier at $343 an hour.  *Waste Management* settled for $457 million for a fee of $36 million and a multiplier of 5.296 at $361 an hour.  Finally, *Dynegy* settled for $474 million resulting in an approved fee of $41.4 million with a multiplier of 4.070 at $381 an hour.

the lead at every juncture.  Cheap labor did not do and could not have done the job in this instance.

As Professor Coffee notes, "whether or not a multiplier in the 5 to 6 range would be justified in most

cases, it is justified in this case."  Coffee Decl., ¶35.

The 5.4 multiplier that accompanies a fee of 9.52% is well within the range of multipliers

awarded by courts within this Circuit and elsewhere, and in both securities and non-securities class

action settlements of similar magnitude.[47]  *See also* Coffee Decl., ¶35 ("[T]here has still been general

recognition that the lodestar multiplier should be higher in cases involving higher risk.  As discussed

earlier, this case faced extraordinary risk and, indeed, was ultimately decertified by the Fifth Circuit.

Thus, whether or not a multiplier in the 5 to 6 range would be justified in most cases, it is justified in

this case . . . .").

## V.   THE REASONABLENESS OF THE FEE REQUESTED IS SUPPORTED BY THE *JOHNSON* FACTORS

While Lead Counsel submits that the fee structure negotiated by the Lead Plaintiff is the

appropriate method to determine counsel's fee, application of the *Johnson* factors confirms that the

---

[47]    *Waste Management I*, No. 99-2183, slip op. at 64 (Compendium, Ex. B) (5.296 multiplier);
*In re Cardinal Health Inc. Sec. Litig.*, No. C2-04-575 (S.D. Ohio Dec. 31, 2007) (Compendium, Ex.
Q) (5.9 multiplier); *Visa Check*, 297 F. Supp. 2d at 524 (3.5 multiplier); *NASDAQ*, 187 F.R.D. at 470
(awarding 14% of $4.027 billion fund, representing 3.97 multiplier); *In re Xcel Energy, Inc.*, 364 F.
Supp. 2d 980, 998-99 (D. Minn. 2005) (awarding 25% of $80 million settlement fund, representing
4.7 multiplier); *In re Charter Commc'ns Inc., Sec. Litig.*, No. 4:02-CV-1186 CAS, 2005 U.S. Dist.
LEXIS 14772, at *56 (E.D. Mo. June 30, 2005) (awarding 20% of $146 million settlement fund,
representing 5.6 multiplier); *In re Aetna Inc. Sec. Litig.*, No. 1219, 2001 U.S. Dist. LEXIS 68, at *59
(E.D. Pa. Jan. 4, 2001) (awarding 30% of $82.5 million settlement fund, representing 3.6 multiplier);
*In re Buspirone Antitrust Litig.*, No. 01-CV-7951 (JEK), slip op. at 5 (S.D.N.Y. Apr. 17, 2003)
(Compendium, Ex. R) (awarding multiplier of 8.46); *Roberts v. Texaco, Inc.,* 979 F. Supp. 185, 198
(S.D.N.Y. 1997) (awarding multiplier of 5.5); *In re Rite Aid Corp. Sec. Litig.*, 269 F. Supp. 2d 603,
611 (E.D. Pa. 2003), *vacated, remanded*, 396 F.3d 294 (3d Cir. 2005), *cost/fees granted*, 362 F.
Supp. 2d 587 (E.D. Pa. 2005) (awarding fee equal to multiplier of 4.07 and recognizing that
"multipliers in this range are fairly common"); *Weiss v. Mercedes-Benz of N. Am.*, 899 F. Supp.
1297, 1304 (D.N.J. 1995) (awarding fee equal to multiplier of 9.3); *In re RJR Nabisco Inc. Sec.
Litig.*, No. 88 Civ. 7905, 1992 U.S. Dist. LEXIS 12702 (S.D.N.Y. Aug. 24, 1992) (awarding fee
equal to multiplier of 6.0).

requested fee is fair and reasonable.  Some district courts within the Fifth Circuit have applied a

hybrid – or "crosscheck" – approach in analyzing the fairness and reasonableness of requested fees.

These courts have used the percentage method to set an initial percentage fee, and then adjusted that

fee up or down based on the "*Johnson* factors."  *See In re Harrah's Entm't*, No. 95-3925 Section

"N," 1998 U.S. Dist. LEXIS 18774, at *20-*21 (E.D. La. Nov. 25, 1998); *see also Shaw*, 91 F. Supp.

2d at 967-68.  Application of the *Johnson* factors as a cross-check amply supports the fairness and

reasonableness of the percentage fee agreed to.

> The twelve *Johnson* factors are:
>
> (1) The time and labor required. . . .  (2) The novelty and difficulty of the
> questions. . . . (3) The skill requisite to perform the legal service properly. . . . (4) The
> preclusion of other employment by the attorney due to acceptance of the case. . . . (5)
> The customary fee [for similar work in the community]. . . . (6) Whether the fee is
> fixed or contingent. . . .  (7) Time limitations imposed by the client or the
> circumstances. . . . (8) The amount involved and the results obtained. . . . (9) The
> experience, reputation, and ability of the attorneys. . . . (10) The "undesirability" of
> the case. . . . (11) The nature and length of the professional relationship with the
> client. . . . [and] (12) Awards in similar cases.

*Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).  The relevance of

each of the *Johnson* factors will vary in any particular case, and, rather than requiring a rigid

application of each factor, the Fifth Circuit has left it to the lower court's discretion to apply those

factors in view of the circumstances of a particular case.  *Brantley v. Surles*, 804 F.2d 321, 325-26

(5th Cir. 1986); *Catfish*, 939 F. Supp. at 502 ("not every [*Johnson*] factor need be necessarily

considered").[48]

---

[48]     Many of the factors discussed above address various *Johnson* factors.  To avoid being overly
repetitive, Lead Plaintiff incorporates the earlier portions of the brief here and otherwise summarizes
details supporting the various *Johnson* factors.

## A.    Time and Labor Required

The extensive effort required to prepare this case for trial is summarized above and detailed in the Hodges Declaration.  The case on behalf of Enron investors, which was filed in October 2001, spanned more than 6 years.  The tremendous results for the Class were achieved only through the focused efforts of dozens of attorneys who devoted their waking hours to the case.  Our lawyers led the investigation and compiled the facts alleged in the complaints.  Early on, Lead Counsel aggressively sought to protect the Class's interests by moving to freeze insider sales proceeds, moving to obtain discovery regarding Andersen's document destruction, and moving for the appointment of a trustee in Enron's bankruptcy.  Hodges Decl., ¶¶8, 43-71.  Lead Counsel brought to bear the resources of investigators, consultants, and very experienced lawyers to draft the Consolidated Complaint.  Hodges Decl., ¶¶78-80.  The Firm then drafted oppositions to the 41 motions to dismiss on a very tight schedule set by the Court.  Hodges Decl., ¶¶84-90.  Shortly after the enactment of Sarbanes-Oxley in 2002, which provided for a five-year statute of limitations, Lead Counsel filed a complaint for those who purchased Enron securities in the period from September 1997 to October 1998.  *See Washington State Investment Board v. Lay*, No. 4:02-CV-0341, Complaint for Violation of the Securities Laws, dated October 15, 2003 (Docket No. 47 in Case No. H-02-0341).  After evidence disclosed the involvement of Royal Bank of Canada, Royal Bank of Scotland and Toronto Dominion in the fraud, the Firm filed complaints against them.  *See The Regents of the University of Cal. v. Toronto-Dominion Bank*, No. 4:03-CV-05528, Complaint for Violation of the Securities Laws, dated December 2, 2003 (Docket No. 1 in Case No. H-03-5528); *The Regents of the University of Cal. v. Royal Bank of Canada*, No. 4:04-CV-00087, Complaint for Violation of the Securities Laws, dated January 9, 2004 (Docket No. 1 in Case No. H-04-0087).  Consequently, Lead Counsel was constantly briefing motions to dismiss, motions for judgment on the pleadings and motions for summary judgment in the various cases.  *See* Hodges Decl., ¶¶84-111,

189-199.  Concurrently Lead Counsel sought discovery from Enron, the banks, Andersen, V&E and countless non-parties.  Hodges Decl., ¶¶112-169.  Lawyers from the Firm took hundreds of fact depositions in the main case between June 2004 and November 2005.  Hodges Decl., ¶169.  Then Lead Counsel worked with the experts, who generated reports and were deposed in 2006.  Hodges Decl., ¶¶211-228.

At every stage, this case consumed the full-time attention of at least a dozen lawyers.  During the fact and expert discovery phases, there were over two dozen lawyers who devoted themselves to the effort.  Hodges Decl., ¶7.  Coughlin Stoia lawyers and support staff spent over 247,000 hours prosecuting the case.  Hodges Decl., ¶17.  Notably the Firm did not "over-staff" the case.  For example, only one attorney, rather than two or more, attended most of the fact depositions.  *See* Hodges Decl., ¶169.  Nor did Lead Counsel duplicate work that generated useable evidence such as the governments' or Batson's, but used the evidence to streamline depositions instead of simply running up hours reinventing the wheel.  Lead Counsel's use of such evidence reduced the number of hours the Firm would have otherwise spent.  *See* Genovese Decl., ¶25 (reviewing evidence gathered by Batson reduced the lodestar in this litigation).  This fact should be kept in mind when considering the lodestar multiplier.  That is, counsel should not suffer a reduction of the requested fee on the ground that the multiplier is too high because the lawyers worked efficiently.  Judge Sarokin agrees: "I would have expected the lodestar amount to be significantly higher, which, to me, demonstrates Lead Counsel was extremely efficient in the handling of this case, for which they should be rewarded – not penalized."  Sarokin Decl., ¶33.

One of the criticisms of the use of attorney time as a key factor in determining an attorney's fee award, which has led to the substantial abandonment of the lodestar method in common fund

cases, is that it encourages delay, inefficiency and recalcitrance towards early settlement.[49]   In contrast, the percentage method motivates class counsel to maximize the result because they are paid a straight percentage of what they recover for the class.  *See Harrah's*, 1998 U.S. Dist. LEXIS 18774, at *15 ("Because counsel prosecuted this action on a contingent fee basis, the Court would rather focus on results obtained.  To overly emphasize the amount of hours spent on a contingency fee case would penalize counsel for obtaining an early settlement and would distort the value of the attorneys' services.").

With respect to a lodestar "cross-check," to compare the reasonableness of the percentage fee to the time expended, as set forth in the declarations of plaintiffs' counsel, submitted herewith, over 280,000 hours of attorney and paraprofessional time were expended in the prosecution of this litigation.  The resulting lodestar is $127 million.  The requested fee represents a multiplier of 5.4 of the lodestar.  As noted earlier, Professor Coffee concludes whether using a multiplier in the 5 to 6 range would be justified in most cases is not the question – it is justified in this case.  Coffee Decl., ¶35.  The multiplier also compares favorably with an award in *In re Dynegy, Inc. ERISA Litig.*, No. H-02-3076, slip op. (S.D. Tex. Dec. 10, 2004) (Compendium, Ex. T) (awarding a 25% fee of a $30.75 million settlement resulting in a 4.37 multiplier), and this Court's award in *Waste Management I*, No. H-99-2183 (Compendium, Ex. B) (awarding a fee negotiated with and approved by an institutional lead plaintiff of 7.93% of a $457 million settlement which resulted in a 5.296 multiplier).  *See* Coffee Decl., ¶33.  A multiplier here of 5.4 is amply justified by the record-setting result obtained and the services performed in the face of great risk.

---

[49]      *See* Jerold S. Solovy, Laura A. Kaster and James B. Sowerby, *Attorneys' Fees in Common Fund Cases: The Percentage Method is Back, in Securities Class Actions: Abuses and Remedies*, 145, 147 (National Legal Center for the Public Interest 1994) (Compendium, Ex. S).

Recent decisions have emphasized that the lodestar cross check should not override the percentage approach.  In *Buspirone*, 01-CV-7951 (JEK), (Compendium, Ex. R), United States District Judge John Koetl awarded a 33-1/3% fee with an 8.46 multiplier  Earlier, in *Newman v. Carbiner Int'l. Inc.*, 99 Civ. 2271 (S.D.N.Y. Oct. 19, 2001), where a 7.7 multiplier was approved, United States Judge Gerald Lynch expressly commented:

> "I wanted to note that, in my view, there is no difficulty with the fact candidly acknowledged in the paper that, in terms of the time expended, this is a profitable case for the plaintiffs' lawyers who worked on it.  Contingency type percentage settlements serve an important purpose. . . .  [S]o it is important in awarding fees or approving a fee settlement in a case of this kind not to be . . . blinded or distorted that in this particular case, calculated on an hourly basis, this is a very large, high proportion to what the hourly charges would have been."

Coffee Decl., ¶37 (citing *Newman*, No. 99 Civ 2271, slip op. at 6).

### B.    Novelty and Difficulty of the Issues

Over the course of this case, we have briefed myriad novel and complex issues, starting with whether the banks could be held liable under §10(b) for their deceptive actions.  The banks argued vociferously, starting with the motions to dismiss and most recently in the summary judgment motions that, under *Central Bank*, they could not be held liable under §10(b) because they made no statement.  The Fifth Circuit agreed with the banks when it reversed class certification.  Now the issue is before the Supreme Court in *Stoneridge*.  Over 30 *amicus curiae* briefs have been filed in *Stoneridge*.  You simply cannot find a more novel or cutting-edge issue – unless of course you considered the briefing regarding loss causation after the Supreme Court issued its decision in *Dura*.  During the course of this case the Fifth Circuit issued opinions in *Greenberg v. Crossroads*, *Bell* and *Unger* addressing reliance, loss causation and market efficiency.  These issues too were hotly contested in motions for judgment on the pleadings, class certification and summary judgment.

As the Court has recognized:  "The rapid collapse of Enron Corporation ("Enron") and the resulting scope, variety, and severity of losses are unprecedented in American corporate history.  It is

not surprising that this consolidated action raises a number of novel and/or controversial issues that the law has thus far not addressed or about which the courts are in substantial disagreement." *Enron*, 235 F. Supp. 2d at 565.  Later the Court continued the theme:  "This Court would highlight the fact that this litigation is extraordinarily complex both legally and factually, as well as vast in scope, and involves a myriad of parties.  The defendants and Enron's business deals span the globe.  Experts are still attempting to understand Enron's intricate operations and allegedly manipulated accounting.  As evidenced by this Court's opinions, much of the applicable law is unsettled and many issues raised have been novel."  *Enron*, 2006 U.S. Dist. LEXIS 43146, at *234.

Courts have recognized that the novelty and difficulty of the issues raised in a case is a significant factor to be considered in making a fee award.  From the outset, this post-PSLRA action was a difficult and highly uncertain undertaking, which never involved any acknowledgements of wrongdoing by the major defendants.  There was no assurance that the litigation would be successful at trial or on appeal.  Indeed, courts have properly recognized that "securities actions have become more difficult from a plaintiff's perspective in the wake of the PSLRA." *Ikon*, 194 F.R.D. at 194.[50] For instance, in this Circuit *Goldstein v. MCI Worldcom*, 340 F.3d 238 (5th Cir. 2003), affirmed dismissal with prejudice of a securities fraud class action complaint against Bernard Ebbers and WorldCom arising out of a massive securities fraud that resulted in a $685 million write-off of accounts receivable, for which Ebbers was later criminally convicted.  In addition to being factually complex, the case also involved numerous complex and unsettled questions of law under the PSLRA.

---

[50]     There is no doubt that numerous other provisions of the PSLRA have made these cases more difficult for plaintiffs.  *Southland*, 365 F.3d 353.  For example, the PSLRA provides for: (a) heightened pleading standards as to falsity and scienter; (b) new protections for certain forward-looking statements; (c) a mandatory stay of discovery on plaintiffs; and (d) reduced joint-and-several liability for defendants except for knowing conduct.

Assuming Lead Plaintiff was able to prove liability, it still would also unquestionably have had to confront extensive expert testimony by defendants that any – or most of – the economic damages claimed were not caused by any alleged misleading statements.  Under *Dura*, 544 U.S. 336, defendants would argue the economic damages resulting from the fraud should be reduced significantly.

### C.    The Skill Required

This litigation required considerable skill and experience to successfully conclude.  This case required courage – the ability to develop facts and fashion creative legal theories, as well as the skill to respond to a host of legal and factual defenses.

As the Court recognized in the order appointing The Regents as the Lead Plaintiff, the lawyers at Coughlin Stoia had already distinguished themselves in the zealous prosecution of the case.  That talent, creativity and diligence has continued to this day.  Coughlin Stoia has litigated the case extremely well and negotiated a record recovery for the benefit of investors.  Professor Coffee has stated:  "Few, if any, other plaintiff's counsel in my judgment could have pulled off such a tour de force, and some might have been willing to settle for a small fraction of the recovery here obtained.  That Lead Counsel succeeded is attributable in almost equal measure to its credibility, creativity and the intensity of its commitment to this case.  In my judgment, Lead Counsel is the adversary most feared today by the defense bar in securities litigation, and that reputation played an important role here."  Coffee Decl., ¶4.

Lead Plaintiff's counsel demonstrated that notwithstanding the barriers erected by the PSLRA, they would develop evidence to support a convincing case.  During the settlement negotiations, Lead Plaintiff's counsel demonstrated a willingness to continue the litigation rather than accept a settlement that was not in the best interests of the Class.  Based upon Lead Plaintiff's

counsel's diligent efforts on behalf of the Class and their skill, we were able to negotiate a very favorable result for the Class – the best ever achieved.

In addition, the defendants were represented by highly experienced lawyers from the most prominent and well-respected law firms in the United States. The standing of opposing counsel should be weighed in determining the fee, because such standing reflects the challenge faced by plaintiffs' attorneys. *See In re King Res. Co. Sec. Litig.*, 420 F. Supp. 610, 634 (D. Colo. 1976). The ability of plaintiffs' counsel to obtain such a record settlement for the Class in the face of such formidable legal opposition confirms the superior quality of their representation. Accordingly, this factor also supports the requested percentage. *Shaw*, 91 F. Supp. 2d at 970.

### D.    Preclusion of Other Employment

As discussed above, dozens of our attorneys focused their attention on this case to the exclusion of others for many years. The time spent by Lead Plaintiff's counsel on this case was at the expense of time that counsel could have devoted to other matters. During the fact and expert discovery phases, over two dozen attorneys were assigned work on this case or participated in the day-to-day litigation of the case. Hodges Decl., ¶7. Coughlin Stoia lawyers and support staff spent over 247,000 hours in this effort. Hodges Decl., ¶17. This factor supports the requested percentage.

### E.    The Customary Fee

The "customary" fee in securities class actions is a percentage of the recovery. The PSLRA provides that the percentage should be reasonable. At the time the fee was negotiated, it was lower than the percentage awarded in most securities class actions. As a *Wall Street Journal* reporter wrote in 2002, the fee was about one-third the normal fee percentage.

Lead Counsel's application for a fee award of 9.52% of the settlement amount is below the range normally awarded in contingent cases. In local, regional and national markets, complex commercial cases require a contingent fee between 30% and 40% of the gross recovery. As Justices

Brennan and Marshall observed in their concurring opinion in *Blum*: "'In tort suits, an attorney might receive one-third of whatever amount the plaintiff recovers. In those cases, therefore, the fee is directly proportional to the recovery.'" *Blum*, 465 U.S. at 904 n.*. *See also In re Prudential-Bache Energy Income P'ships Sec. Litig.*, No. 888 Section: "E", 1994 U.S. Dist. LEXIS 6621, at *4 (E.D. La. May 18, 1994) ("*Prudential II*") ("Were this not a class action, attorney's fees would range between 30% and 40%, the percentages commonly contracted for in contingency cases."). In securities cases against brokers, contingency fees are in excess of 35%. *See* Mark Gimein, *When Stock Tips Go Bad, Is the Broker to Blame*?, N.Y. Times, June 5, 2005, Business Section at 3 (Compendium, Ex. U) ($525,000 was awarded to plaintiff and $200,000 of that went to his lawyer).

A comparison of the 9.52% fee here with the fees awarded by courts in other cases or, in fact, fees agreed to by The Regents and other sophisticated institutional investors with the Firm in other class actions, *i.e.*, the marketplace for legal services of this type, also demonstrates that the fee here is well within the bounds of reasonableness. This is especially true here given the recovery achieved and the enormous investment of time and capital required to achieve that result. Again we need look no further than the 14.5% requested and awarded recently in *Tyco* to understand and appreciate the reasonableness of the fee requested here. The tables above at pages 53 and 54 list some large recoveries in class cases and demonstrate that, given the recovery to date in this case, the 9.52% fee is reasonable.

### F.     Whether the Fee Is Fixed or Contingent

Lead Plaintiff's counsel undertook this litigation on a contingent fee basis, assuming a substantial risk that the litigation would yield no recovery and leave them uncompensated. Courts have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorney fees.

Indeed, the risk of no recovery in complex cases of this type is very real.  The Seventh Circuit recently confirmed that the risk of loss is real and should be considered in a motion for attorney fees.  It reversed the district court's order that had rejected counsel's contention that lawyers faced a risk of nonpayment.  *Sutton v. Bernard*, 504 F.3d 688, 694 (7th Cir. 2007) ("Because the district court failed to provide for the risk of loss, the possibility exists that Counsel, whose only source of a fee was a contingent one, was undercompensated.").  There are numerous class actions in which plaintiffs' counsel expended thousands of hours and yet received no remuneration whatsoever despite their diligence and expertise.[51]  Since the passage of the PSLRA, many cases in this Circuit have been dismissed at the pleading stage in response to defendants' arguments that the complaints do not meet the PSLRA's pleading standards.  Approximately 75% of this Circuit's reported PSLRA decisions involving the adequacy of pleadings in securities fraud cases have upheld their dismissal, including the class action arising out of the WorldCom debacle years before the fraud led to a complete collapse of WorldCom.  *In re MCI WorldCom, Inc. Sec. Litig.*, 191 F. Supp. 2d 778 (S.D. Miss. 2002); *TXU*, No. 3:02-cv-2243-K (Compendium, Ex. D).  *See, e.g.*, *Goldstein*, 340 F.3d 238. Even plaintiffs who get past summary judgment and succeed at trial may find their judgment overturned on appeal or on judgment notwithstanding the verdict.[52]

---

[51]   The most recent example is the defense verdict in *In re JDS Uniphase Corp. Sec. Litig.*, No. C-02-1486 CW, Verdict Question Form (N.D. Cal. Nov. 27, 2007) (Compendium, Ex. V).

[52]   *See, e.g.*, *Robbins v. Koger Props.*, 116 F.3d 1441 (11th Cir. 1997) (jury verdict of $81 million for plaintiffs against an accounting firm reversed on appeal on loss causation grounds and judgment entered for defendant); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (Tenth Circuit overturned securities fraud class action jury verdict for plaintiffs in case filed in 1973 and tried in 1988 on the basis of 1994 Supreme Court opinion); *In re Apple Computer Sec. Litig.*, No. C-84-20148(A)-JW, 1991 U.S. Dist. LEXIS 15608 (N.D. Cal. Sept. 6, 1991) (class won jury verdict against two individual defendants, but court vacated judgment on motion for judgment notwithstanding the verdict); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (where the class won a substantial jury verdict and motion for judgment n.o.v. was denied, on appeal the judgment was reversed and the case was dismissed – after 11 years of litigation); *Berkey Photo, Inc.*

In fact – after we had recovered $7.2 billion – we had this experience.  The Fifth Circuit reversed class certification in this case effectively saying the Class had no §10(b) claim against the non-settling banks.  *Regents*, 482 F.3d 372.

Lead Plaintiff's counsel have received no fee compensation to date and have incurred significant expenses – albeit reimbursed in part after some settlements were achieved in prosecuting this litigation for the benefit of the Class.  Any fee award has always been at risk and completely contingent on the result achieved.  Thus, the contingent nature of the litigation supports the requested percentage.

### G.    Time Limitations Imposed

Shortly after the Court appointed the Lead Plaintiff, it held a status and scheduling conference.  While noting that "the eyes of the nation are on this Court" and "[i]t is the nation's impression that the justice system grinds slowly in a Dickensian fashion," the Court set a very aggressive schedule for filing the Consolidated Complaint and briefing the motions to dismiss. 2/28/02 Scheduling Order (Docket No. 326) at 2.  It allowed only 30 days for filing the complaint, 30 days for filing motions to dismiss and 30 days for oppositions.  *Id*.  Trial was set for December 1, 2003.  *Id*.  The Court had no idea that nine of the largest financial institutions in the world and two law firms, plus a number of individuals, would be added as defendants.  While each of those defendants filed only one brief (and some of them were 100 pages long), the Lead Plaintiff had to respond to 41 motions to dismiss in 30 days.  Lead Counsel was under enormous time pressure to respond and generate top-notch arguments.  As discussed above, the issues were novel and complex.

---

*v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) (multimillion dollar judgment reversed after lengthy trial); *Trans World Airlines, Inc. v. Hughes*, 312 F. Supp. 478 (S.D.N.Y. 1970) (judgment for $145 million overturned after years of litigation and appeals).

After the Court denied most of the motions to dismiss and defendants' attempt to appeal those rulings, Lead Plaintiff filed the First Amended Consolidated Complaint and the amended motion for class certification. Then we had round two of motions to dismiss. Hodges Decl., ¶¶107-109. As soon as the claims were upheld, Lead Counsel began to push defendants to produce documents. As described in paragraphs 112-156 of the Hodges Declaration, nothing came easily.

By late 2003 we were negotiating the deposition protocol. The Court entered the agreed order for the Deposition Protocol in March 2004. It called for fact depositions to be completed in 18 months, commencing in June 2004. Hodges Decl., ¶¶157-160. The parties from the consolidated and coordinated cases nominated hundreds of witnesses for deposition. Due in part to inefficiencies in scheduling in the early months, but also due to the large number of witnesses, it was impossible to schedule all the deponents that the parties wanted to question. But the Court wisely imposed a limit on the time for completion of fact depositions. Without the time limit, we would still be taking fact depositions.

Just after fact depositions concluded, the *Newby* parties jumped in to expert discovery. Lead Plaintiff's seven experts submitted reports in January 2006, defendants submitted 40 experts' reports in March and Lead Plaintiff provided 11 rebuttal reports in April. *See* Hodges Decl., ¶¶211-228. Defendants tried to postpone the expert depositions, but the Court denied their motion and over 50 (many multi-day) expert depositions were taken/defended in six weeks.

Thus, at every stage of this case, the Court has imposed time limits and Lead Counsel has worked extremely hard to meet those deadlines. And despite going up against an army of excellent defense lawyers with unlimited resources, Lead Counsel has obtained an unprecedented recovery for investors.

### H.     The Amount Involved and Results Achieved

The eighth *Johnson* factor – the amount involved and the results achieved – is entitled to particular weight when, as in this case, the efforts of counsel were instrumental in realizing a high recovery on behalf of the Class.  *See In re Terra-Drill P'ships Sec. Litig.*, 733 F. Supp. 1127, 1129 (S.D. Tex. 1990) ("[t]he factors enumerated by *Johnson* . . . emphasize 'the results obtained'").  The Supreme Court in *Hensley*, 461 U.S. at 436, recognized that in making a fee award the "***most critical factor is the degree of success obtained***."  Here, the settlements provide all-time record monetary benefits to the Class.  The settlements provide for $7.2 billion, plus interest from the date of settlement.  By any measure, the settlements represent an excellent resolution of the litigation.

### I.     The Experience, Reputation and Ability of Counsel

Lead Plaintiff's counsel's efforts in bringing this litigation to a successful conclusion are the best indicator of the experience and ability of the attorneys involved.  That Lead Counsel has managed the litigation in a disciplined and pragmatic fashion confirms that this litigation was ably prosecuted for the benefit of the Class.  The experience of the law firms that represented Lead Plaintiff in the prosecution of this case is set forth in the accompanying declarations of counsel.

As Professor Coffee states: "[E]ven if other counsel could have developed the same original legal theory (and this is uncertain), only a law firm with Lead Counsel's reputation for zealous advocacy could have convinced the defendants that this case would be carried to trial (at whatever cost it took) and represented too great a risk at trial for them not to settle. . . .  [I]n my judgment, few other counsel (and perhaps no other) could have obtained this degree of success."  Coffee Decl., ¶5.

### J.     The Undesirability of the Case

This case, as measured by the number of cases filed and various institutions' efforts to be appointed lead plaintiff, was desirable.  However, the issues presented rendered the case inherently risky, if not "undesirable" from the start.  When counsel undertook representation of Lead Plaintiff

and the Class in this litigation, it was with the knowledge that they would have to spend substantial time and money and face significant risks without any assurance of being compensated for their efforts. As Professor Coffee notes: "Although the *Enron* litigation received great media and public attention, this did not make it an easy case to resolve or settle – indeed, it was just the reverse. Because of its notoriety, *Enron* could not have been settled as a practical matter for a modest amount, even if such a recovery accurately reflected the high odds facing plaintiffs' counsel in their litigation against basically secondary participants. Thus, this was a legally challenged case from the outset, principally because of the absence of an issuer or other presumptively liable defendant with deep pockets. Although major financial institutions were sued, they had (for the most part) not made any 'attributed statements,' and so they could plausibly assert that they had at most aided and abetted the fraud (which conduct cannot result in liability in private litigation under Rule 10b-5)." Coffee Decl., ¶3. Thus to say this case was risky when Lead Plaintiff's counsel undertook to prosecute the case is an understatement, and the risks Lead Plaintiff's counsel faced must be assessed as they existed at the time counsel undertook the litigation and not in light of the recovery ultimately achieved. Silver Report at 23-34. *See, e.g.*, *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 974 (7th Cir. 1991) (the riskiness of a case must be judged *ex ante* not *ex post*). The "undesirability" of the litigation supports the requested percentage.

### K.    Nature and Length of Relationship With the Client

The Regents retained Lead Counsel for the first time in the *Enron* case. Thereafter, The Regents retained the Firm in two more significant cases. The Regents retained the Firm in the *Dynegy* securities litigation and was appointed lead plaintiff; there over $474 million was recovered for investors. The Regents also retained Coughlin Stoia for its individual securities case against AOL Time Warner. There The Regents negotiated a 14.5% fee and received $200 million net of

fees.  The longer The Regents worked with the lawyers from the Firm, the more comfortable The Regents felt with the Firm, continuing to hire the Firm over the years.

### L.    Awards in Similar Cases

As demonstrated above, the requested fee percentage is significantly less than the percentages that have been repeatedly awarded by courts in this Circuit and District as well as numerous other cases throughout the country.

## VI.    IMPORTANT PUBLIC POLICY CONSIDERATIONS SUPPORT THE REQUESTED FEE AWARD

The federal securities laws are remedial in nature and, in order to effectuate their purpose of protecting investors' private lawsuits, are to be encouraged.  *See Basic Inc. v. Levinson*, 485 U.S. 224 (1988); *Bateman, Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299 (1985); *Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983).  In *Prudential II*, the court noted:

> In complex securities class actions and shareholder derivative litigation, able counsel for plaintiffs can be retained only on a contingent basis.  A large segment of the investing public would be denied a remedy for violations of the securities laws and breaches of fiduciary duty by public companies and those entrusted with their stewardship if contingent fees awarded by the courts did not fairly and adequately compensate counsel for the services provided, the serious risks undertaken and the delay before any compensation is received.

*Prudential II*, 1994 U.S. Dist. LEXIS 6621, at *20-*21.

The public policy considerations applicable to this case are the same as those recently stressed by United States District Judge Denise Cote in her decision in *WorldCom.  See WorldCom*, 388 F. Supp. 2d 319.  There, she wrote:

> Public policy also supports the approval of this fee request.  The size of the recovery achieved for the class which has been praised even by several objectors – could not have been achieved without the unwavering commitment of Lead Counsel to this litigation.  Several of the lead attorneys for the Class essentially devoted years of their lives to this litigation, with the personal sacrifices that accompany such a commitment.  If the Lead Plaintiff had been represented by less tenacious and competent counsel, it is by no means clear that it would have achieved the success it did here on behalf of the Class.  In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and

- 75 -

> willing to do so, it is necessary to provide appropriate financial incentives.  After all, this litigation was conducted on an entirely contingent fee basis, and Lead Counsel paid millions of dollars to fund the litigation.  While some significant recovery in a case of this magnitude may seem a foregone conclusion now, the recovery achieved here was never certain.  It is only the size of the Citigroup and Underwriters' Settlements that make this recovery so historic, and it is likely that less able plaintiffs' counsel would have achieved far less.

*Id*. at 359.

Private attorneys should be encouraged to take the risks required to represent those who would not otherwise be protected from securities fraud. Accordingly, an award of the fee requested herein would be fully consistent with important public policy considerations.

## VII. THE EXPENSES FOR WHICH LEAD PLAINTIFF, CLASS REPRESENTATIVES AND OTHER PLAINTIFFS SEEK REIMBURSEMENT WERE REASONABLY INCURRED AND SHOULD BE REIMBURSED

The "Notice of Hearing for Final Approval of: (a) Plan of Allocation of Settlement Proceeds; and (b) Plaintiffs' Counsel's Application for an Award of Attorney Fees and Lead Plaintiff's and Certain Other Persons' Application for Reimbursement of Expenses" ("Notice") advised Eligible Claimants that The Regents, Amalgamated Bank as Trustee for the LongView Collective Investment Fund, LongView Core Bond Index Fund, and Certain Other Trust Accounts ("Amalgamated Bank"), San Francisco City and County Employees Retirement System, Employer-Teamsters Local Nos. 175/505 Pension Trust Fund, Staro Asset Management, Nathanial Pulsifer as Trustee of Shooters Hill Revocable Trust, Conseco Annuity Assurance, and twelve other individuals who were either proposed as class representatives or otherwise took action for the benefit of the Class would seek reimbursement for their time and expenses incurred in connection with the prosecution and partial resolution of the litigation.  The PSLRA provides that the Court may award "reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." 15 U.S.C. §78u-4(a)(4).  Reimbursement of such expenses should be allowed because it "encourages participation of plaintiffs in the active

supervision of their counsel." *Varljen v. H.J. Meyers & Co.*, No. 97 CIV. 6742 (DLC), 2000 U.S. Dist. LEXIS 16205, at *14 n.2 (S.D.N.Y. Nov. 8, 2000); *Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071 (RJH), 2005 U.S. Dist. LEXIS 24890, at *7 (S.D.N.Y. Oct. 24, 2005) (Courts "routinely award such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place."); *In re Ashanti Goldfields Sec. Litig.*, No. CV F-00-6664 JKS, 2005 U.S. Dist. LEXIS 24831 (S.D.N.Y. Nov. 15, 2005).

The Regents as Lead Plaintiff has been extraordinarily committed to its oversight obligations in this litigation as envisioned by the PSLRA.  As described in more detail in the Declaration of Christopher M. Patti, The Regents assembled a team of in-house lawyers and staff, outside legal and economic consultants and experts, all of whom were intimately involved in the tactical and strategic litigation decisions that were made throughout the litigation, including decisions regarding which defendants to name, which legal theories to pursue, whom to dismiss, whom to settle with and on what terms and whom to proceed to trial against.  Representatives of The Regents reviewed, commented upon and approved virtually every significant pleading filed in the case as well as discovery responses by The Regents.  Its in-house counsel attended virtually every hearing in the case.  It was deeply involved in the development of the proposed Plan of Allocation.  In sum, the extent of The Regents' involvement in the litigation is unprecedented and, without doubt, contributed to the result obtained for the Class.  The roles of the other entities or individuals who seek reimbursement varied and each has submitted a declaration or affidavit describing his, her or its efforts on behalf of the Class.  Some had a certain type of security, others purchased at a particular time.  Some, like Amalgamated Bank, were active early and instrumental in moving to freeze assets and prevent the further destruction of documents.  Others, like the 12 individual Enron purchasers,

kept abreast of the litigation, helped in its prosecution and many were deposed as proposed class representatives.   All of these entities or individuals are most deserving of the requested reimbursement in the amounts set forth in their respective affidavits or declarations.

## VIII.   CONCLUSION

Based on the foregoing and upon the entire record herein, Lead Plaintiff's counsel respectfully request that the Court award attorney fees in the amount negotiated between Lead Plaintiff and Lead Counsel, plus interest on the award at the same rate earned on the recoveries,[53] and reimburse The Regents and other plaintiffs their reasonable expenses as requested.

DATED:  January 4, 2008                            Respectfully submitted,

                                       COUGHLIN STOIA GELLER
                                         RUDMAN & ROBBINS LLP
                                       PATRICK J. COUGHLIN
                                       KEITH F. PARK
                                       HELEN J. HODGES
                                       BYRON S. GEORGIOU
                                       G. PAUL HOWES
                                       SPENCER A. BURKHOLZ
                                       JAMES I. JACONETTE
                                       ANNE L. BOX
                                       JAMES R. HAIL
                                       JOHN A. LOWTHER
                                       ALEXANDRA S. BERNAY
                                       MATTHEW I. ALPERT
                                       JENNIFER L. GMITRO


                                            /s/ Roger B. Greenberg *signed by permission
                                       PATRICK J. COUGHLIN

                                       655 West Broadway, Suite 1900
                                       San Diego, CA  92101
                                       Telephone:  619/231-1058

---

[53]     Interest was also a negotiated part of the settlements even when monies were not immediately deposited into escrow.  Under the PSLRA, fees and expenses awarded to counsel for the class include "prejudgment interest actually paid to the class."  15 U.S.C. §78u-4(a)(6).

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
REGINA M. AMES
9601 Wilshire Blvd., Suite 510
Los Angeles, CA  90210
Telephone:  310/859-3100
310/278-2148 (fax)

**Lead Counsel for Plaintiffs**

SCHWARTZ, JUNELL, GREENBERG
  & OATHOUT, LLP
ROGER B. GREENBERG
State Bar No. 08390000
Federal I.D. No. 3932

_____/s/ Roger B. Greenberg_____
ROGER B. GREENBERG

Two Houston Center
909 Fannin, Suite 2700
Houston, TX  77010
Telephone:  713/752-0017

THE BILEK LAW FIRM
THOMAS E. BILEK
Federal Bar No. 9338
State Bar No. 02313525
1000 Louisiana Street, Suite 1302
Houston, TX  77002
Telephone:  713/227-7720

**Attorneys in Charge**

WOLF POPPER LLP
ROBERT C. FINKEL
845 Third Avenue
New York, NY  10022
Telephone:  212/759-4600

SHAPIRO HABER & URMY LLP
THOMAS G. SHAPIRO
MATTHEW L. TUCCILLO
53 State Street
Boston, MA  02109
Telephone:  617/439-3939

**Attorneys for Nathaniel Pulsifer**

E. LAWRENCE VINCENT
3020 Legacy Drive, #100-324
Plano, TX  75023
Telephone:  214/680-1668
972/491-2417 (fax)

**Attorneys for the Archdiocese of Milwaukee
Supporting Fund, Inc.**

CUNEO GILBERT & LaDUCA, L.L.P.
JONATHAN W. CUNEO
MICHAEL G. LENETT
507 C Street, N.E.
Washington, DC  20002
Telephone:  202/789-3960
202/789-1813 (fax)

**Washington Counsel**

CICCARELLO DEL GIUDICE & LAFON
MICHAEL J. DEL GIUDICE
1219 Virginia Street, East, Suite 100
Charleston, WV  25301
Telephone:  304/343-4440
304/343-4464 (fax)

**Attorneys for Employer-Teamsters Local
Nos. 175 & 505 Pension Trust Fund**

S:\Settlement\Enron.Set\2007 Fee Application\Operative Fee Brief.doc

CERTIFICATE OF SERVICE

      I hereby certify that a copy of the foregoing LEAD COUNSEL'S MEMORANDUM OF LAW IN SUPPORT OF FEE AWARD AND REIMBURSEMENT OF PLAINTIFFS' EXPENSES document has been served by sending a copy via electronic mail to serve@ESL3624.com on January 4, 2008.

      I also certify that a copy of the above-mentioned document has been served via U.S. MAIL on the parties listed on the attached "Additional Service List" on this 4th day of January, 2008.

_____
DEBORAH S. GRANGER

| ADDITIONAL SERVICE LIST | |
|---|---|
| Stuart Yoes<br>THE YOES LAW FIRM, LLP<br>3535 Calder Avenue, Suite 235<br>Beaumont, TX  77726-7584<br>409/833-2352<br>409/838-5577 (fax) | Frank H. Tomlinson<br>PRITCHARD, McCALL; & JONES, LLC<br>505 N. 20th Street, Suite 800<br>Birmingham, AL  35203<br>205/328-9190<br>205/458-0035 (fax) |
| Edward W. Cochran<br>20030 Marchmont Rd.<br>Shaker Heights, OH  44122<br>216/751-5546<br>216/751-6630 (fax) | N. Albert Bacharach Jr.<br>115 N.E. Sixth Avenue<br>Gainesville, FL  32601-6592<br>352/378-9859<br>352/338-1858 (fax) |
| Paul S. Rothstein<br>626 N.E. First Street<br>Gainesville, FL  32601<br>352/376-7650<br>352/374-7133 (fax) | Maureen McGuirl<br>FENSTERSTOCK & PARTNERS LLP<br>30 Wall Street, 9th Floor<br>New York, NY  10005<br>212/785-4100<br>212/785-4040 (fax) |
| Lawrence W. Schonbrun<br>LAW OFFICES OF LAWRENCE W.<br>SCHONBRUN<br>86 Eucalyptus Road<br>Berkeley, CA  94705<br>510/547-8070<br><br>**SERVICE VIA UPS OVERNIGHT** | Richard C. Bauerle<br>30 Greenbriar<br>Ottumwa, IA 52501 |
| Arnold Gregg<br>4445 Forest Glen Road<br>Anaheim Hills, CA  92807 | Steven F. Helfand<br>HELFAND LAW OFFICES<br>582 Market Street, Suite 1400A<br>San Francisco, CA  94104<br>415/397-0007<br>415/397-0009 (fax) |
| Mr. Stanley Majors<br>22868 Beaverhead Drive<br>Diamond Bar, CA  91765<br>909/860-8150 | Stephen Neuwirth<br>QUINN EMANUEL URQUHART OLIVER<br>  & HEDGES, LLP<br>51 Madison Avenue, 22nd Floor<br>New York, NY  10010 |