UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re ENRON CORPORATION SECURITIES LITIGATION | § § § |
| | § |
| This Document Relates To: | § § |
| | § |
| MARK NEWBY, et al., Individually and On Behalf of All Others Similarly Situated, | § § |
| Plaintiffs, | § |
| vs. | § § |
| ENRON CORP., et al., | § § |
| Defendants. | § |
| | §   Civil Action No. H-01-3624 |
| THE REGENTS OF THE UNIVERSITY OF | §   (Consolidated) |
| CALIFORNIA, et al., Individually and On | §   CLASS ACTION |
| Behalf of All Others Similarly Situated, | § |
| Plaintiffs, | § |
| vs. | § |
| KENNETH L. LAY, et al., | § |
| Defendants. | § |

EXPERT REPORT OF PROFESSOR CHARLES SILVER CONCERNING THE
REASONABLENESS OF CLASS COUNSELS' REQUEST FOR AN AWARD OF
ATTORNEYS' FEES

| | | |
|---|---|---|
| 1. | SUMMARY OF OPINIONS | 3 |
| 2. | CREDENTIALS | 3 |
| 2.1. | General | 3 |
| 2.2. | Class Actions and Other Lawsuits Involving Multiple Claimants | 4 |
| 2.3. | Attorneys' Fees | 5 |
| 2.4. | Professional Responsibility | 7 |
| 3. | DOCUMENTS REVIEWED | 9 |
| 4. | SYNOPSIS | 11 |
| 5. | BACKGROUND | 14 |
| 6. | THE REQUESTED FEE AWARD IS REASONABLE UNDER THE PSLRA | 16 |
| 6.1. | The PSLRA's Mechanism for Setting Fees | 16 |
| 6.2. | The Limited Role of Judges in Fee Regulation under the PSLRA | 19 |
| 6.3. | The Process of Determining The Regents' Adequacy Included *Ex Ante* Fee Review | 23 |
| 6.4. | Only Exceptional Circumstances would Warrant a Decision to Re-Set Fees *Ex Post* | 26 |
| 6.5. | The Fee Formula was Set Near the Start of the Case after Arm's-Length Negotiations | 34 |
| 6.6. | The Lead Plaintiff was Sophisticated | 43 |
| 6.7. | The Lead Plaintiff had a Large Stake in Setting Fees Reasonably | 45 |
| 6.8. | The Lead Plaintiff had Access to a Competitive Market for Legal Services | 47 |
| 6.9. | Lead Counsel's Efforts Produced an Outstanding Result | 54 |
| 7. | THE REQUESTED FEE AWARD IS REASONABLE WHEN COMPARED TO FEE AWARDS IN OTHER CLASS ACTIONS | 56 |
| 7.1. | Securities Class Actions | 56 |
| 7.2. | Class Actions in General | 60 |
| 8. | THE REQUESTED FEE AWARD IS REASONABLE WHEN COMPARED TO FEES PAID IN THE MARKET FOR LEGAL SERVICES | 67 |
| 8.1. | Fee Agreements Negotiated by Sophisticated Clients | 67 |
| 8.2. | Fees in Mass Tort Cases | 71 |
| 8.3. | Conventional Plaintiff Representations | 73 |
| 9. | THE AGREED FEE IS REASONABLE WHEN COMPARED TO BOUNTIES PAID TO *QUI TAM* RELATORS | 76 |
| 10. | THE REQUESTED FEE IS REASONABLE UNDER PREVAILING ETHICAL STANDARDS GOVERNING THE CONDUCT OF ATTORNEYS | 80 |
| 10.1. | The Regents Made "a Free and Informed Choice" | 82 |
| 10.2. | The Agreed Fee is within the Range Charged by Lawyers in Similar Representations | 82 |
| 10.3. | No Relevant Circumstances Changed | 83 |

I, Charles Silver, declare as follows:

**1.      SUMMARY OF OPINIONS**

- The requested fee award is reasonable because it was set near the start of the case and after arm's-length negotiations by a sophisticated lead plaintiff with a large stake in the outcome, knowledge of the possible risks and rewards, separate legal and financial representation, and access to a competitive market for legal services, and was disclosed to the court prior to, and in connection with, the lead plaintiff's appointment;

- The requested fee award is reasonable when compared to fees paid in the market for legal services;

- The requested fee award is reasonable when compared to fee awards in other class actions;

- The requested fee award is reasonable when compared to bonuses governments pay qui tam relators; and

- The requested fee award is reasonable under prevailing ethical standards governing the conduct of lawyers.

**2.      CREDENTIALS**

**2.1.      General**

I hold the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the University of Texas School of Law, where I also serve as Co-Director of the Center on Lawyers, Civil Justice, and the Media.  I joined the Texas faculty in 1987, after receiving an M.A. in political science at the University of Chicago and a J.D. at the Yale Law School.  I received tenure in 1991, and held visiting professorships in the law

schools at the University of Michigan and Vanderbilt University in 1994 and 2003, respectively.

I have taught, researched, written, consulted with lawyers, and testified about class actions, other large lawsuits, attorneys' fees, professional responsibility, and related subjects for over 15 years.  I have published 50 major writings, many focusing on subjects relevant to this Report.  A copy of my resume is attached.

### 2.2.    Class Actions and Other Lawsuits Involving Multiple Claimants

I have studied and written about the law and economics of class actions and other large lawsuits for many years.  My published and forthcoming works include:

- Paul Edelman, Richard Nagareda, and Charles Silver, The Allocation Problem in Multiple-Claimant Representations, 14 Supreme Court Economic Review 95 (2006);

- Charles Silver, Merging Roles: Mass Tort Lawyers as Agents and Trustees, 31 Pepperdine Law Review 301 (2004);

- Charles Silver, We're Scared To Death: Class Certification and Blackmail, 78 New York University Law Review 1357 (2003);

- Charles Silver, Law and Economics of Class Actions and Group Lawsuits, International Encyclopedia of Law and Economics (2000);

- Charles Silver, Comparing Class Actions and Consolidations, 10 Texas Review of Litigation 496 (1991); and

- Jules Coleman and Charles Silver, Justice In Settlements, 4 Social Philosophy and Policy 102 (1986).

My writings have been cited in leading treatises and other authorities, including the *Manual for Complex Litigation, Third* (1996) and the *Manual for Complex Litigation,*

*Fourth* (2004).   I currently serve as an Associate Reporter on the American Law Institute's Project on the Principles of Aggregate Litigation.

I also have substantial practical experience with group lawsuits.  I have submitted briefs amicus curiae on class action issues to the Supreme Courts of Texas and the United States.  (I was the principal author of an amicus brief submitted to the U.S. Supreme Court on behalf of a group of law professors in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), urging affirmance of the Third Circuit's standard for the certification of settlement classes.  The Supreme Court affirmed on the issues addressed in the brief.)  I have testified before and submitted written comments to the Advisory Committee on the Rules of Practice and Procedure of the Judicial Conference of the United States regarding proposed amendments to the federal class action rule.  I have also testified as an expert witness on class action issues, including certification, settlement, and attorneys' fees, many times in state and federal courts.  Finally, I have served as co-counsel or consulting counsel in several class actions and have advised lawyers on aspects of many group lawsuits involving large numbers of clients.

### 2.3.   Attorneys' Fees

I have written at length about the subject of attorneys' fees and fee awards, including lodestar-based fee awards, fee awards in class actions, and fees charged in group representations.  My published works include:

- Charles Silver & Sam Dinkin, Incentivizing Institutional Investors to Serve as Lead Plaintiffs in Securities Fraud Class Actions, DePaul Law Review (forthcoming 2008);

- Charles Silver, Reasonable Attorneys' Fees in Securities Class Actions: A Reply to Mr. Schneider, 20:3 The NAPPA Report 7 (August 2006);

- Charles Silver, Dissent from Recommendation to Set Fees Ex Post, 25 Review of Litigation 497 (2006) (accompanied Task Force on Contingent Fees, Tort Trial and Insurance Practice Section of the American Bar Association, Report on Contingent Fees in Class Action Litigation, 25 Review of Litigation 459 (2006));

- Charles Silver, Does Civil Justice Cost Too Much? 80 Texas Law Review 2073 (2002)

- Charles Silver, A Critique of Burrow v. Arce, 26 William & Mary Environmental Law & Policy Review 323 (2001);

- Charles Silver, Due Process and the Lodestar Method: You Can't Get There From Here, 74 Tulane Law Review 1809 (2000);

- Charles Silver, Flat Fees and Staff Attorneys: Unnecessary Casualties in the Battle over the Law Governing Insurance Defense Lawyers, 4 Connecticut Insurance Law Journal 205 (1998);

- Charles Silver, Incoherence and Irrationality in the Law of Attorneys' Fees, 12 Review of Litigation 301 (1993);

- Charles Silver, Unloading the Lodestar: Toward a New Fee Award Procedure, 70 Texas Law Review 865 (1992); and

- Charles Silver, A Restitutionary Theory of Attorneys' Fees in Class Actions, 76 Cornell Law Review 656 (1991).

My writings have been cited in treatises, law review articles, and published judicial opinions in several states. Section 30 of the American Law Institute's *Restatement (Third) of Restitution & Unjust Enrichment*, which sets out principles to

6

govern fee awards in common fund cases, cites my 1991 *Cornell Law Review* article and generally follows its approach.

I have substantial practical experience with attorneys' fees issues. I have submitted expert affidavits and testified as an expert on attorneys' fees many times and in many locations, including federal and state courts, the U.S. House of Representatives, and the Texas legislature.

### 2.4.   Professional Responsibility

The subject of attorneys' fees falls within the area of professional responsibility, also called legal ethics or the law governing lawyers. I have taught a survey course in professional responsibility law many times, and I now offer a class that focuses exclusively on litigation, under the title Professional Responsibility for Civil Litigators.

My writings on professional responsibility are extensive and include the following:

- Charles Silver, When Should Government Regulate Lawyer-Client Relationships? The Campaign to Prevent Insurers from Managing Defense Costs, 44 Arizona Law Review 787 (2002);

- Ellen Smith Pryor and Charles Silver, Defense Lawyers' Professional Responsibilities: Part II—Contested Coverage Cases, 15 Georgetown Journal of Legal Ethics 30 (2001);

- Charles Silver and Frank B. Cross, Review Essay, What's Not To Like About Being A Lawyer?, Yale Law Journal (2000);

- Ellen Smith Pryor and Charles Silver, Defense Lawyers' Professional Responsibilities: Part I--Excess Exposure Cases, 78 Texas Law Review 599 (2000);

- Lynn A. Baker and Charles Silver, The Aggregate Settlement Rule and Ideals of Client Service, 41 South Texas Law Review 227 (1999);

- Charles Silver and Lynn Baker, I Cut, You Choose: The Role of Plaintiffs' Counsel in Allocating Settlement Proceeds, 84 University of Virginia Law Review 1465 (1998);

- Charles Silver and Lynn Baker, Mass Lawsuits and the Aggregate Settlement Rule, 32 Wake Forest Law Review 733 (1997);

- Charles Silver, The Legal Establishment Meets the Republican Revolution, 37 South Texas Law Review 1247 (1996);

- Charles Silver, Professional Liability Insurance as Insurance and as Lawyer Regulation: A Comment on Davis, Institutional Choices in the Regulation of Lawyers, 65 Fordham Law Review 233 (1996);

- Charles Silver, Integrating Theory and Practice into the Professional Responsibility Curriculum at the University of Texas, 58 Law & Contemporary Problems 213 (Summer/Autumn 1996) (multiple authors);

- Charles Silver and Michael Sean Quinn, All Clients are Equal, But Some are More Equal than Others: A Reply to Morgan and Wolfram, 6 Coverage 47 (May/June 1996);

- Charles Silver and Michael Sean Quinn, Are Liability Carriers Second-Class Clients?  No, But They May Be Soon--A Call to Arms against the Restatement of the Law Governing Lawyers, 6 Coverage 21 (Jan./Feb. 1996);

- Charles Silver and Michael Sean Quinn, Wrong Turns on the Three Way Street: Dispelling Nonsense About Insurance Defense Lawyers, 5 Coverage 1 (Nov./Dec. 1995);

- Charles Silver & Kent Syverud, The Professional Responsibilities of Insurance Defense Lawyers, 45 Duke Law Journal 255 (1995); and

- Charles Silver, Does Insurance Defense Counsel Represent the Company or the Insured?, 72 Texas Law Review 1583 (1994).

In 1997, a program sponsored jointly by the Insurance Law and Professional Responsibility Sections of the Association of American Law Schools was devoted to my work on the professional responsibilities of insurance defense lawyers. My work in this area significantly influenced the *Restatement (Third) of the Law Governing Lawyers*, Formal Opinion 96-403 of the American Bar Association, and decisions issued by state courts. I am a former member of the Executive Committee of the Professional Responsibility Section of the Association of American Law Schools.

I have testified as an expert witness on professionalism issues many times, and I frequently advise lawyers on problems arising in this field. I also speak on professional responsibility issues at continuing legal education programs for lawyers and other events.

**3.    DOCUMENTS REVIEWED**

When preparing this Report, I reviewed the items listed below which, unless noted otherwise, were generated in connection with this case. I also reviewed other items, including without limitation cases and published scholarly works.

- *Memorandum of Law in Support of Motion to Appoint Amalgamated Bank, The Regents of the University of California, Deutsche Asset Management, HBK Investments, and the Central states Pension Fund as*

9

*Lead Plaintiff and to Approve Lead Plaintiff's Choice of Co-Lead and Co-Liaison Counsel*

- *UC Regents Appoint Marie Berggren as New Investment Chief, Press Release dated June 2, 2006*

- *Declaration of the Regents of the University of California in Support of Its Motion for Appointment as Lead Plaintiff and for Approval of Lead Counsel*

- *Declaration of Helen J. Hodges in Support of Lead Counsel's Motion for an Award of Attorney Fees*

- *Letter from Darren J. Robbins to James E. Holst dated December 18, 2001*

- *Letter from Darren J. Robbins to James E. Holst dated January 25, 2002*

- *Declaration of The Regents of the University of California in Support of Its Motion for Appointment as Lead Plaintiff and for Approval of Lead Counsel*

- *The Regents of the University of California's Opposition to the Competing Motions for Lead Plaintiff*

- *Declaration of James I. Jaconette in Further Support of the Lead Plaintiff Motion of The Regents of the University of California and in Opposition to the Competing Lead Plaintiff Motions*

- *Supplemental Declaration of The Regents of the University of California in Support of Its Motion for Appointment as Lead Plaintiff and for Approval of Lead Counsel*

- *The Regents of the University of California's Reply in Support of Its Motion to be Appointed Lead Plaintiff*

- *Declaration of California Public Employees' Retirement System in Support of the Motion of the Regents of the University of California for Appointment as Lead Plaintiff and for Approval of Lead Counsel*

- *Supplemental Declaration of The Regents of the University of California in Support of its Motion for Appointment as Lead Plaintiff and in Response to Surreply of the New York City Pension Funds and The Florida State Board of Administration*

- *Notice of Pendency of Class Action*

- *Amended Final Order Approving an Award of Attorneys' Fees, Reimbursement of Expenses, and an Incentive Award to the Class Representatives, In re Enron Corp. Securities and ERISA Litigations (S.D. Texas—Houston July 24, 2006) (Judge Harmon)*

- *Declaration of James E. Holst in Support of Lead Counsel's Motion for an Award of Attorney Fees*

- *Resume of John F. Lundberg*

- *Declaration of John Moores in Support of lead Counsel's Motion for an Award of Attorney Fees*

- *Declaration of Christopher M. Patti*

## 4.    SYNOPSIS

This settlement offers the Court an opportunity to recognize and validate the successful operation of the Private Securities Litigation Reform Act ("PSLRA"), 15

U.S.C.A. § 78u-4, which sought to protect the interests of all investors by placing sophisticated institutions with large claims in charge of securities fraud class actions. Here, The Regents of the University of California ("The Board," or "The Regents") was appointed to the position of Lead Plaintiff. Thereafter, the Regents, helped by their chosen counsel, prosecuted investors' claims diligently and obtained the largest monetary settlement in the history of class action litigation.

The PSLRA sought to bring sophisticated investors with superior resources into class action securities lawsuits as lead plaintiffs. In this instance it succeeded. By any measure of litigation ability, The Regents was well suited to control this case. The Regents demonstrated its ability by selecting excellent counsel to provide legal representation for all investors. Arguably the best securities law firm in the country at the time, Milberg, Weiss, Bershad & Lerach LLP[1] ("Lead Counsel" or "Milberg"), which ultimately became Coughlin Stoia Geller Rudman & Robbins LLP ("Coughlin Stoia"), also brought a wealth of talent, experience, and resources to the table. But for the efforts and sound judgment of The Board and Lead Counsel, investors who lost billions when Enron collapsed would have obtained little or no relief.

Near the start of the case, The Regents and Lead Counsel bargained over the terms that would govern their financial rights and responsibilities. These terms were essential to the success of the undertaking. The Regents' knowledge that it would share in the recovery but would neither pay Lead Counsel's fees nor bear Lead Counsel's costs

---

[1] In this Report, the labels "Milberg," "Lerach Coughlin," "Coughlin Stoia," "Lead Counsel," and "Class Counsel" encompass all law firms retained by or with the consent of The Regents and all successors to those firms. On May 1, 2004, Lead Counsel, formerly with Milberg Weiss Bershad Hynes & Lerach LLP, changed its law firm affiliation to Lerach Coughlin Stoia & Robbins LLP, and, on July 1, 2004, to Lerach Coughlin Stoia Geller Rudman & Robbins LLP ("Lerach Coughlin"). Lerach Coughlin is now known as Coughlin Stoia Geller Rudman & Robbins LLP ("Coughlin Stoia").

until litigation concluded enabled it to act aggressively over a period of years without fear of consuming its budget. Lead Counsel's expectation of receiving compensation and reimbursement according to the agreed terms motivated it to serve The Board well by advancing lawyer hours worth more than $100 million and by bearing more than $45 million in expenses.

The time has now come for the Court to oversee the division of the recovery between the Lead Plaintiff, the absent investors, and their attorneys. Lead Counsel's fee application asks the Court to respect and enforce the bargained-for terms set out in the retainer agreement near the start of the case. This is the correct result, for two reasons.

First, the Court impliedly, but also necessarily, found the agreed terms reasonable when it appointed The Regents Lead Plaintiff. As the Court explained, no presumption existed that The Board would adequately represent the class. The Board had to offer evidence "demonstrating [its] and [its] counsel's adequacy." *In re Enron Corp. Securities Litigation*, 206 F.R.D. 427, 441 (S.D. Tex. 2002), *citing Berger v. Compaq Computer Corporation,* 257 F.3d 475, 480-481 (5th Cir.2001). The Board did so by offering evidence that included its fee agreement with Lead Counsel. Had the agreement shown Lead Counsel's fee to be excessive, the Court would have had to reject The Board's application. By "giving away the store," The Board would have demonstrated inadequacy by showing it lacked "the willingness and ability … to protect the interests of the absentees." *Id.* (quoting *Berger*, 257 F.3d at 482).

In fact, the Court appointed The Regents, endorsed Lead Counsel, and expressed no concerns about the agreed compensation. In my opinion, the Court's silence implies that the Court found the terms of Lead Counsel's retention reasonable in 2002. If this is

so, the Court should not second-guess the matter now.  The terms to which The Regents and Lead Counsel agreed provided the financial basis for an undertaking that worked extraordinarily well for the class.  They motivated the Lead Plaintiff and Lead Counsel to pour enormous quantities of resources into this lawsuit, and thereby to obtain the largest aggregate settlement in history.  Nearly all the money comes from third parties, the hardest defendants to reach.  The final result—a $7.2 billion settlement fund—is the best evidence one could want that the agreed compensation terms were sound.

Second, the fee and expense provisions to which The Regents agreed also seem reasonable in light of all relevant standards, including fees paid by private clients in the market for legal services, fees awarded in other securities class actions and in class actions in general, bonuses governments pay *qui tam* relators[2] in lawsuits where taxpayer dollars are recovered, and prevailing ethical standards governing the conduct of attorneys.  Insofar as I am aware, no basis exists for finding the requested fee award unreasonable.

## 5.    BACKGROUND

Following the collapse of Enron and the consolidation of the many securities lawsuits filed in its wake, a robust competition occurred for the role of Lead Plaintiff. Twelve plaintiffs or groups of plaintiffs sought to be appointed.[3]  On February 15, 2002,

---

[2] A *qui tam* relator is a whistleblower who brings a fraud against a governmental entity to light by filing a lawsuit.

[3] The applicants included Local 710 Pension Fund; the Florida State Board of Administration and the New York City Pension Funds; the Archdiocese of Milwaukee Supporting Fund, Inc.; JMG Capital Partners, L.P., JMG Triton Offshore Fund, Ltd., TQA Master Fund, Ltd., and TQA Master Plus Fund, Ltd.; Pulsifer & Associates; Amalgamated Bank, the Regents of the University of California, Deutsche Asset Management, HBK Investments, and Central States Pension Funds; Anthony P. Davidson and Seymour Nebel; Harry H. Steiner, Daniel Kaminer, Christine Benoit, and Michael and Jennifer Cerone; Staro Asset Management; State Retirement Systems Group; Private Asset Management LLP; and William and Roxann Davis and E. Bruce Chaney.

the Court issued its order selecting The Regents as Lead Plaintiff and approving The Regents' choice of Milberg, Weiss, Bershad & Lerach LLP (now Coughlin Stoia) as Lead Counsel.  *In re Enron Corp. Securities Litigation*, 206 F.R.D. 427 (S.D. Texas 2002).

The Regents and Lead Counsel bargained over Lead Counsel's financial rights and responsibilities before the Court appointed The Board Lead Plaintiff.  They agreed that Lead Counsel's fees would be calculated as a percentage of the net recovery, as shown in Table 1.  They also agreed that Lead Counsel would advance all expenses, and that Lead Counsel would receive neither fees nor expense reimbursements unless and until it produced a recovery for the class.

| TABLE 1: FEE TERMS AGREED TO BY THE REGENTS | |
| --- | --- |
| **Recovery Net of Expenses** | **Fee Formula** |
| $1 Billion or less | 8% of Total |
| $2 Billion or less | 8% of 1st Billion<br>+ 9% of amount between $1 Billion and $2 Billion |
| Greater than $2 Billion | 8% of 1st Billion<br>+ 9% of 2nd Billion<br>+ 10% of amount greater than $2 Billion |

At this time, the total amount collected in settlement of class members' claims is approximately $7.2 billion.  Applying the formula in Table 1 to this amount yields a fee of $688 million,[4] as shown in Table 2.  The requested fee equals 9.52% of the recovery.

---

[4] Rounded to the nearest million.

| TABLE 2: FEE UNDER AGREED FORMULA, GIVEN $7.23 BILLION SETTLEMENT* | | |
|---|---|---|
| **Fee Formula** | **Math** | **Fee Amount** |
| 8% of 1st Billion | (.08)($1 Billion) | $80.00 Million |
| +9% of 2nd Billion | (.09)($1 Billion) | $90.00 Million |
| +10% of amount greater than $2 Billion | (.10)($5.18 Billion)[5] | $518.00 Million |
| **Total** | | **$688.00** Million |

*Dollar values rounded.

Class members received notice of this fee arrangement in the *Notice of Pendency of Class Action*, which was distributed in early 2007.  The relevant portion of the *Notice* read as follows: "At the outset of the case, The Regents negotiated a fee agreement with Lead Plaintiff's counsel that provides for attorneys' fees of 8% to 10% of the recoveries, depending on the amounts recovered.  In the future, counsel to the Lead Plaintiff, upon further notice to the Class and an opportunity to be heard, intend to make a fee application that is consistent with this agreement."  Because the *Notice* also gave class members the opportunity to exclude themselves from the class and to communicate with the Lead Counsel, the opt out rate and other responses to the *Notice* provide a measure of the class' reaction to the fee.  My understanding is that the opt-out rate was tiny and that no complaints concerning the promised fee were received.

6.    **THE REQUESTED FEE AWARD IS REASONABLE UNDER THE PSLRA**

   6.1.    **The PSLRA's Mechanism for Setting Fees**

Class actions should be managed to maximize class members' expected net recoveries, i.e., their expected gross recovery minus the associated expenses.  See *In re Cendant Corp. Litig.*, 264 F.3d 201, 254-55 (3d Cir. 2001) (observing that "a rational,

---

[5] This number is net of $45 million in incurred and anticipated expenses.

self-interested client seeks to maximize net recovery; he or she wants the representation to terminate when his or her gross recovery minus his or her counsel's fee is largest"); *Third Circuit Task Force Report*, 208 F.R.D. 340 (January 15, 2002) ("The goal of appointment [of class counsel] should be to maximize the net recovery to the class and to provide fair compensation to the lawyer, not to obtain the lowest attorney fee.  The lawyer who charges a higher fee may earn a proportionately higher recovery for the class than the lawyer who charges a lesser fee.") (emphasis added).[6]  The Court seemed to acknowledge this object when confirming The Regents' choice of counsel.  As the Court observed, "[h]igher fees can result from superior services."  *In re Enron Corp. Securities Litigation*, 206 F.R.D. 427, 458 (S.D. Texas 2002).  I take this to mean that higher fees are warranted when they help class members recover larger amounts.

The difficulty lies in figuring out how to set fees optimally.  Spending more on legal services can make class members better off by raising their net recoveries, but it can also harm them if it continues beyond the point of diminishing returns.  To address this problem, class members need an informed litigation manager with control of day-to-day decision making who appreciates the trade offs that must be made and who gains by getting them right.  The PSLRA appoints the lead plaintiff, paradigmatically a sophisticated investor with a large financial stake in the outcome of a lawsuit, to fill this position.  It does so in hope of taking advantage of a natural harmony of interests

---

[6] See also Lucian Arye Bebchuk, The *Questionable Case for Using Auctions to Select Co-Counsel*, 80 *Washington University Law Quarterly* 889, 890 (2002) ("From the perspective of the class, it would be desirable to select … a fee schedule so as to maximize the expected net recovery for the class.  This expected net recovery is in turn equal to (i) the expected recovery in the case, minus (ii) the expected expenditure on legal representation."); Charles Silver, *Due Process and the Lodestar Method: You Can't Get There From Here*, 74 *Tulane Law Review* 1809, 1841 (2000) ("[J]udges should set percentages with an eye to encouraging lawyers to maximize the value of class members' claims.  They should do what the sole holder of an entire set of claims would do, namely, select the fee formula that is expected to yield the largest net recovery after the lawyers are paid.").

between the lead plaintiff and other investors, all of whom are in roughly the same position.  By managing a lawsuit well, a lead plaintiff maximizes its own expected net recovery.  Because the lead plaintiff's recovery is a pro rata share of a common fund,[7] however, to maximize its own net share, the lead plaintiff must maximize the net size of the entire fund, for the benefit of all concerned.  This benefits other investors, who collectively own what remains after the lead plaintiff and litigation costs are paid.  Other investors "free-ride" on the lead plaintiff's careful management until the end of the case, at which time they file claims.

In keeping with the policy decision to rely on lead plaintiffs to manage class actions, the PSLRA employs a simple approach to fee regulation.  It empowers adequate lead plaintiffs, subject to trial courts' approval, to "select and retain" counsel for investor classes, 15 U.S.C.A. § 78u-4(a)(3)(B)(v), and it limits "[t]otal attorneys' fees and expenses" to "a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." *Id.*, § 78u-4(a)(6).  The PSLRA does not tell lead plaintiffs which law firms to hire or how much to pay them.  It relies on lead plaintiffs, acting in their own self-interest, to get these matters right.

> Th[is] mechanism discourages overpayment because lead investor-plaintiffs spend their own money.  The higher the fee, the more of their recoveries they must hand over to attorneys.  They should therefore bargain hard, acquire any information or assistance they need to fix

---

[7] The PSLRA limits the lead plaintiff to a "share of any final judgment or of any settlement that is … equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class."  15 U.S.C.A. § 78u-4(a)(4).  The lead plaintiff may also obtain reimbursement for costs and expenses "directly relating to the representation of the class." *Id.*

reasonable fees, and agree to higher fees only when paying more increases

their expected net recoveries

Charles Silver, *Reasonable Attorneys' Fees in Securities Class Actions: A Reply to Mr. Schneider*, 20:3 *The NAPPA Report* 7, 7 (August 2006).

### 6.2.    The Limited Role of Judges in Fee Regulation under the PSLRA

It is almost correct to say that, when Congress enacted the PSLRA, it reduced lead counsel's identity and compensation terms to matters judges ought to treat with benign neglect.  The "right" lawyer for a case depends on the facts, as does the "right" fee.  A sophisticated lead plaintiff with a large financial stake and experience in securities litigation should have better information about both matters than a judge, and should also make better decisions.  Unlike a judge, a lead plaintiff can actually shop for counsel.  It can evaluate lawyers' credentials, assess the "fit" between lawyer and client, compare requested compensation terms, and use market pressure, including the prospect of future business, to extract concessions.  It can also make tradeoffs with an eye to its own bottom line.  Sometimes, a lead plaintiff will be better off hiring a superior lawyer at a higher price; sometimes, a lesser attorney who charges a lower fee will be fine.  Voluntary transactions in the market for legal services are likely to match clients to lawyers better than assignments by regulators.

Professors Elliot Weiss and John Beckerman, who conceived and provided the analytical foundation for the PSLRA's fee-setting mechanism, expressly anticipated that lead plaintiffs' would handle fees differently than judges.  Although they could not "predict exactly what [] arrangements" lead plaintiffs would use, they speculated that lead plaintiffs' preferred arrangements might "differ substantially from the fee structures that courts currently employ."  Elliott J. Weiss and John S. Beckerman, *Let the Money Do*

*the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions*, 104 *Yale Law Journal* 2053, 2107 (1995).   See also *Id.*, at 2121 (contending that "[i]nstitutions with the largest stakes in class actions are better situated than plaintiffs' attorneys or courts to protect class members' interests.").

Displaying remarkable prescience, Weiss and Beckerman guessed that institutional investors might jettison the judicial practice of tying lower percentages to higher recoveries.  "To encourage its attorneys to pursue strong cases more vigorously, an institution might agree to pay them *an increasing portion* of any recovery in excess of some stipulated threshold (e.g., forty percent of the damages initially sought)."   *Id.* (emphasis added).

A lead plaintiff's decision to offer a given percentage (or given range of percentages) should reflect all important case characteristics and market conditions, including economies of scale, opportunities to hire cheaper lawyers in other jurisdictions, etc.  By ignoring any important consideration, a lead plaintiff would harm itself.  It would offer too high a fee, reducing its expected net recovery needlessly.

Reflecting the force of this argument, many courts have "accord[ed] a presumption of reasonableness to any fee request submitted pursuant to a retainer agreement that was entered into between a properly-selected lead plaintiff and a properly-selected lead counsel,", thereby ensuring "that the lead plaintiff, not the court, functions as the class's primary agent vis-à-vis its lawyers."   *In re Cendant Corp. Litig.*, 264 F.3d 201, 282 (3d Cir. 2001).  See also *In re EVCI Career Colleges Holding Corp. Securities Litigation*, 2007 WL 2230177 (S.D.N.Y. 2007); *In re AT & T Corp.*, 455 F.3d 160, 168 (3d Cir. 2006); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 298, 301 n.10 (3d Cir.

2005); *Schwartz v. TXU Corp.*, 2005 WL 3148350 (N.D. Tex. 2005); *In re Global Crossing Sec. & ERISA Litig.* 225 F.R.D. 436, 466 (S.D.N.Y. 2004) ("[I]n class action cases under the PSLRA, courts presume fee requests submitted pursuant to a retainer agreement negotiated at arm's length between lead plaintiff and lead counsel are reasonable."); *In re Lucent Technologies, Inc. Sec. Litig.*, 327 F.Supp.2d 426, 432 (D.N.J. 2004) ("Under [the] PSLRA, a fee[] award negotiated between a properly-appointed lead plaintiff and properly-appointed lead counsel as part of a retainer agreement enjoys a presumption of reasonableness.  This presumption preserves the lead plaintiff's role as 'the class's primary agent vis-a-vis its lawyers.'  Absent unusual and unforeseeable changes, courts should honor that presumption.") (citations omitted).  This presumption "reflects the reality that prices are best set by buyers and sellers bargaining in competitive environments."  Silver, *Reasonable Attorneys' Fees in Securities Class Actions*, *supra*, at 7.

In the *WorldCom* case, which also settled for billions of dollars, the trial judge based the fee award on the retainer agreement.  While recognizing that the agreement was not binding, the court deferred to it: "[W]hen class counsel in a securities lawsuit have negotiated an arm's length agreement with a sophisticated lead plaintiff possessing a large stake in the litigation, and when that lead plaintiff endorses the application following close suprerivison of the litigation, the court should give the terms of that agreement great weight."  *In Re WorldCom Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 356 (S.D.N.Y. 2005).  This analysis is entirely correct.

Still, the PSLRA gives judges a role to play.  It requires judges to approve lead plaintiffs' choices of counsel, and it limits attorneys' fees and expenses to a reasonable

percentage of the recovery.  These provisions require one to ask when judges should overrule or modify lead plaintiffs' decisions.

The first and foremost answer is that judges should make their dissatisfaction known at the start of litigation.  Potential lead plaintiffs' choice of counsel is always clear from their pleadings, and their agreed compensation can be disclosed as well, as happened here.  A judge can, and should, deny the role of lead plaintiff to a candidate who hires inappropriate counsel or offers excessive compensation.[8]  "[O]ne of the best ways for a court to ensure that [a lead plaintiff candidate] will fairly and adequately represent the interests of [a] class is to inquire whether the movant has demonstrated a willingness and ability to select competent class counsel and to negotiate a reasonable retainer agreement with that counsel."  *In re Cendant Corp. Litigation*, 264 F.3d 201, 265 (3rd Cir. 2001).

The reasons for deciding these matters early are obvious.  First, by allowing class litigation to proceed with bad lawyers at the helm or bad compensation terms in place, judges would saddle investors with inadequate representation, in violation of the PSLRA and Federal Rules of Civil Procedure 23.  Second, and relatedly, by setting fees upfront, judges avoid settlement conflicts between lawyers and class members that arise when lawyers bargain for relief and fees separately.  Third, by leaving lead plaintiffs' choices of counsel and fee agreements in place, judges encourage lead plaintiffs, lawyers, and class members to rely on those terms.  Fourth, by reviewing these matters on the back end of lawsuits, judges allow hindsight bias to wreck havoc with their decisions.  The sections that follow will develop the first and fourth reasons at greater length.

---

[8] I take no position on whether a judge should afford an opportunity to modify the choice of counsel or the terms of compensation before rejecting a candidate's application.

### 6.3.   The Process of Determining The Regents' Adequacy Included *Ex Ante* Fee Review

I have long argued that judges presiding over class actions and other fee award cases should set lawyers' compensation terms at or near the start of litigation.[9]  Other law professors have also endorsed this view.  Two of them, Professors Weiss and Beckerman, developed a mechanism for securities cases that would "place institutional investors in a position to negotiate fee arrangements with plaintiffs' lawyers *before class actions are initiated*."  Weiss and Beckerman, *Let the Money Do the Monitoring*, *supra*, 104 *Yale Law Journal* at 2107 (emphasis added).  See also *Id.*, at 2108 (criticizing an alternative fee proposal that would not have "relieve[d] courts of the task of deciding, on an *ex post* basis, how to compensate plaintiffs' attorneys for their efforts").  Congress built their fee-setting mechanism into the PSLRA.

*Ex ante* fee bargaining is desirable for many reasons, one of which is that it enables an institutional investor to demonstrate that it will adequately represent a class.  Adequacy is required by Federal Rule of Civil Procedure 23(a) and by the PSLRA, which directs a trial court presiding over a securities class action to "appoint as lead plaintiff the member or members … most capable of adequately representing the interests of" all investors.  15 USC § 78u-4(a)(3)(B)(i).  The PSLRA denominates this class member the "most adequate plaintiff."  *Id.*

---

[9]See Charles Silver, *Dissent from Recommendation to Set Fees Ex Post*, 25 *Review of Litigation* 497, 497 (2006) ("The tradition of setting fees [in class actions] *ex post* is responsible for much that is wrong with the modern class action"); Charles Silver, *Due Process and the Lodestar Method: You Can't Get There From Here*, 74 *Tulane Law Review* 1809, 1834 (2000) ("[J]udges should announce the percentages they will award shortly after [class] litigation commences"); Charles Silver, *A Restitutionary Theory of Attorneys' Fees in Class Actions*, 76 *Cornell Law Review* 656, 704, n. 232 (1991) (observing that '[t]here is much to be said in favor of the *ex ante* approach" to fee-setting in class actions). I have also designed procedures judges might use when setting fees.  Charles Silver, *Unloading the Lodestar: Toward a New Fee Award Procedure*, 70 *Texas Law Review* 865 (1992).

The Fifth Circuit addressed adequacy under both Rule 23(a) and the PSLRA in *Berger v. Compaq Computer Corporation,* 257 F.3d 475 (5th Cir.2001), a case this Court followed with care when it appointed The Regents.   *Berger* reasoned as follows.

1.   "Rule 23(a)'s adequacy requirement encompasses class representatives, their counsel, *and the relationship between the two.*" *Id.*, 257 F.3d at 479 (emphasis added).

2.   The party seeking certification must prove adequacy.  *Id.*, 257 F.3d at 481.

3.   To prove adequacy, a representative must demonstrate its willingness and ability "to take an active role in and control the litigation and to protect the interests of absentees."  *Id.*, 257 F.3d at 482, quoting *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 484 (5th Cir.1982).

4.   The PSLRA "raise[d] the standard adequacy threshold" by requiring "that securities class actions be managed by active, able class representatives who are informed and can demonstrate they are directing the litigation." *Id.*, 257 F.3d at 483.

These points can be summarized: In a securities class action, a proposed lead plaintiff must prove its adequacy by showing that it is informed and in charge, and is managing the litigation for the benefit of the absentees by employing competent counsel and structuring its relationship with counsel appropriately.

In this case, The Board showed it had structured its relationship with Lead Counsel appropriately by submitting its fee agreement.  The State Retirement Systems Group, a competitor for the lead plaintiff role, submitted its fee agreement too.  The Florida State Board of Administration and the New York City Pension Funds not only

offered their joint retainer agreement; they boasted of having set "fees at materially lower levels than those governing other lead plaintiff applicants." *Memorandum of Law of the Florida State Board of Administration and the New York City Pension Funds in Further Support of Their Motion for Appointment as Co-Lead Plaintiffs and in Opposition to Other Lead Plaintiff Applications*, n. 5  The Court was familiar with these submissions. *In re Enron Corp. Securities Litigation*, *supra*, 206 F.R.D. at 442 (noting that "some parties ha[d] submitted *in camera* information regarding fees").

Having all this information in hand, the Court could easily determine whether The Board demonstrated that it could not be trusted to lead this important case by "giving away the store" when it hired Lead Counsel.  "Due process mandates that the named plaintiff represent the interests of absent class members *at all times*." *Berger*, 257 F.3d at. at 480 n. 8.  The PSLRA requires a sophisticated institution to reject any law firm that demands excessive compensation.  As the Court wrote, "the fees in this class action must be reasonable in light of the circumstance[s] and in compliance with the PSLRA's policy to preserve the substantial portion of any recovery for the Plaintiffs." *In re Enron Corp. Securities Litigation*, *supra*, 206 F.R.D. at 458.  If The Regents had promised Lead Counsel an excessive fee, it would thereby have demonstrated inadequacy and forced the Court to reject its application.

In fact, the Court appointed The Regents, endorsed the retention of Lead Counsel, and expressed no concerns about the agreed compensation.  Under the circumstances, one must infer that the Court found Lead Counsel's retention reasonable.  This may be because Lead Counsel's fee compared well with other firms' or because the superior quality of Lead Counsel's effort warranted a higher percentage.  See *In re Enron Corp.*

*Securities Litigation*, *supra*, 206 F.R.D. at 458 ("Higher fees can be warranted by superior services .... [T]he Court has found that the submissions of [Milberg] stand out in the breadth and depth of its research and insight. Furthermore, Mr. Lerach has justifiably 'beat his own drum' in demonstrating the role his firm has played thus far in zealously prosecuting this litigation on Plaintiffs' behalf.").

One could contest the argument of this section by pointing out that the Court's order appointing The Regents contains no express finding on the reasonableness of Lead Counsel's fee. I admit that no express finding exists, and I have not said otherwise. My claim is that an implied finding of reasonableness can and must be inferred from the Court's decision to appoint The Regents, given the information the Court possessed.

I do not see how this can be denied. Per *Berger*, the adequacy inquiry required the Court to evaluate the relationship between The Regents and Lead Counsel, the heart of which consisted of the financial terms set out in the retainer letters. The Court's express finding that The Regents was adequate therefore implies that the Court found the financial terms acceptable. Had this not been true, the Court would have denied the absent class members due process of law and violated the PSLRA by saddling the class with an inadequate lead plaintiff.

### 6.4. Only Exceptional Circumstances would Warrant a Decision to Re-Set Fees *Ex Post*

When a lead plaintiff's proposed choice of counsel and compensation arrangement passes muster upfront, it should ordinarily survive scrutiny on the back end as well. Only exceptional circumstances can justify an about-face by a court. An enormous settlement fund won in a securities lawsuit following the collapse of a company the size of Enron is not one of them.

One reason for limiting judicial fee re-setting on the back end to exceptional cases is that frequent re-setting would make lead plaintiffs' promises unreliable or irrelevant. This would weaken lawyers' incentives to invest in litigation and harm investors by reducing their expected net recoveries. Ordinary business conduct in a variety of contexts reflects this concern. Owners of oil-bearing lands and operators of oil wells typically assign rights to proceeds before wells are drilled, when there are no proceeds to share. Venture capitalists obtain shares in start-up companies early on. They do not wait for those companies to become profitable to bargain over their returns. Joint venturers in risky projects assign rights early because secure expectations foster good investment decisions.

Plaintiffs in litigation and their lawyers act the same way. "When a plaintiff hires a lawyer directly and promises to pay a contingent fee, neither principal nor agent knows whether there will be a recovery or how large it will be, but both know how the proceeds of any settlement or judgment will be split." Silver, *Due Process and the Lodestar Method*, *supra*, at 1834. This behavior encourages lawyers to invest. It also helps overcome lawyers' aversion to risk. Like most people, lawyers demand premiums for taking risks, and the premiums increase as the risks rise. Many contingent fee lawyers might willingly attempt to double their money by putting $1,000 worth of resources into a case with a 50% chance of generating $4,000 in fees. Few would risk $1 million for a 50% chance of earning $4 million, even though doubling one's money is still the expected result. Losing $1,000 is unpleasant, but it does not mean bankruptcy or the collapse of a law firm. Losing $1 million could mean both of the above and worse. Even

a 50% chance of earning $10 million in fees would fail to encourage many attorneys to gamble $1 million in resources on the outcome of a single case.

Because risk aversion grows as stakes rise, stable expectations of compensation are most important in the largest class actions with the highest stakes. Lead Counsel lent the plaintiff class lawyer time worth more than $100 million and bore about $45 million more in expenses. Only a firm with a phenomenal resource base could afford to invest so heavily in risk-laden litigation, but that is only part of the point. Even a firm with terrific resources has no incentive to squander them. Lead Counsel found it rational to underwrite this lawsuit only because it expected enormous success in litigation to generate an enormous return for the firm.

A second reason to limit the occasions on which judges re-set fees on the back end is that overcoming the presumption in favor of fee agreements negotiated by lead plaintiffs requires an identifiable and serious defect accompanied by a real opportunity for judicial improvement. As always in policy analysis, the issue is one of comparative advantage. When targeting the optimal level of fees, a lead plaintiff will always miss the bulls' eye by some distance; but there is no reason in general to expect judges to be better marksmen, as already explained. A decision to replace a lead plaintiff's agreement on fees with a fee set by a regulator therefore requires a convincing factual showing that, in a particular case, a judge would do better.

Given this, one threshold for judicial fee re-setting is obvious: The fee promised by the lead plaintiff must clearly exceed lead counsel's market rate. Only then does a judge have a real opportunity to improve matters, because only then is it clear that enforcing a lead plaintiff's agreement would cause a class to overpay. When a lead

plaintiff promises a fee in the vicinity of a lead counsel's market rate, a judge should uphold it despite any other concerns, such as a lead plaintiff's failure to conduct an auction or to interview a larger number of law firms. A judge cannot do better than set a fee at a lawyer's market rate.

Having read empirical studies of the market for legal services and having gathered anecdotal information about the fees clients pay in many contexts, I am convinced that The Regents agreed to pay Lead Counsel a market rate. I will review this evidence in Part 8 of this Report.

A second threshold for judicial intervention is an identified failure in the bargaining environment that existed when lead counsel's compensation terms were hashed out. The PSLRA anticipates that (1) sophisticated institutional investors with large financial stakes (2) interested in bargaining for market rates will (3) shop in a deep market for (4) lawyers offering attractive combinations of quality and price. One or more of these conditions may not obtain in a given case, providing a possible basis for a judge to re-set a fee.

Why should an identified defect be a predicate for judicial intervention? Three reasons. First, a fee that exceeds a law firm's usual and customary rate can be warranted in an especially difficult case. The percentages charged by contingent fee lawyers vary significantly across practice areas. Medical malpractice lawyers may charge 50%. Aviation lawyers often charge 15%. The difference in fees reflects differences in the costs, risks, and rewards associated with the two areas of litigation. The same may be true in class actions. A law firm that handles one securities fraud case for a 20% fee may demand 30% in another. The first case may be cheaper because the SEC investigated

before the class action got underway, because the Department of Justice obtained an indictment, because the company restated it earnings, or because the damages were unusually large.  In competitive markets, fees vary.  Variation must be expected in class actions as well.

Second, in cases brought under the PSLRA, a learning process must occur with respect to fee setting, and this process will be delayed if judges often supplant lead plaintiffs' decisions with their own.  Congress wants lead plaintiffs to regulate lead counsels' fees, and it expects them to set fees appropriately.  Unless lead plaintiffs actually pay what they promise, however, the incentive to get fees right will disappear.  A lead plaintiff who knows that a judge will reduce the fee when litigation concludes can safely promise class counsel the moon and the stars.  A lead plaintiff who has to pay the agreed fee will spend money less freely.

The Regents' history with Lead Counsel reveals the learning curve in action. After being named Lead Plaintiff in this lawsuit, The Regents sought the same position in the *Dynegy* case.  *In re Dynegy, Inc. Securities Litigation*, Master File No. H-02-1571 (S.D. Texas—Houston).[10]  Again, The Regents hired Lead Counsel as Lead Counsel and again the retainer agreement provided for a scale of percentage fees starting at 8% on the lowest level of recovery and rising to 10% on the highest level.  Evidently, The Regents' experience working with Lead Counsel in Enron was so positive, even before $7.2 billion in settlement funds were amassed, that The Regents chose to employ the firm in a second high-profile case on similar terms.

---

[10] When the *Dynegy* case settled, I submitted an expert report in connection with class counsel's fee application.

Eventually, the case settled for $474 million, producing the fee entitlement shown in Table 3, below.  To its credit, The Regents honored (and Judge Lake approved) the negotiated fee agreement.  As The Regents wrote when supporting the fee application in *Dynegy*,

> In June 2002, The Regents applied for appointment as Lead Plaintiff in this action.  By that time we had acquired extensive experience working with Lead Counsel in the Enron case.  We had observed first-hand the skill and determination of Lead Counsel and their dedication to the best interests of the class.  We had developed an extremely effective working relationship with Lead Counsel, and our role in supervision and management of every aspect of the Enron litigation had been welcomed by them.  Based on this experience, as well as the similarity of many issues in the Enron and Dynegy cases, we concluded that Lead Counsel in the Enron litigation was also the best choice for Lead Counsel in this case.

*Declaration of James E. Holst of the University of California Regents in Support of Lead Plaintiff's Motion for Final Approval of Settlements and Award of Attorneys' Fees and Reimbursement of Expenses*, submitted in *In re Dynegy, Inc. Securities Litigation*, Master File No. H-02-1571 (S.D. Tex., dated June 23, 2005) (Docket No. 675), at 3-4.  Judge Sim Lake, who presided over the *Dynegy* case, agreed.  He set the fee at the level provided for in the retainer agreement.  *Order Awarding Attorneys' Fees and Reimbursement of Expenses*, *In re Dynegy, Inc. Securities Litigation*, Master File No. H-02-1571 (S.D. Tex. July 8, 2005) (Docket No. 686).

| TABLE 3: DYNEGY FEE, GIVEN AGREED SCALE OF RISING MARGINAL PERCENTAGES AND $474 MILLION RECOVERY | | |
|---|---|---|
| **Recovery Range** | **Marginal Fee Percentage** | **Fee in Dollars** |
| $0-$200 Million | 8% | $16 Million ($200M * .08) |
| $200-$400 Million | 9% | $18 Million ($200M * .09) |
| > $400 Million | 10% | $7.085 Million ($70.85M[11] * .10) |
| **Actual Recovery** | **Actual Fee Percentage** | **Total Fee in Dollars** |
| $474 Million | 8.73% | $41.085 Million[12] |

The hindsight bias, a well known defect in human reasoning, provides the third reason for limiting *ex post* fee re-setting by judges to cases with identifiable defects. The hindsight bias occurs when a person who knows how a risk actually played out is asked to "go back in time" and estimate the *ex ante* likelihood that the observed outcome would occur. For example, suppose one had asked college football fans to estimate the odds that Texas would defeat USC for the national championship *before* the 2006 Rose Bowl game was played. They might have said 50%. Today, the same fans might put the *ex ante* odds at 70% simply because they know Texas won. "Learning how the story ends makes the outcome seem inevitable and predictable, thereby distorting our perception of

---

[11] The retainer agreement provides that expenses are to be reimbursed "off the top" of the recovery. Consequently, the $3.2 million reimbursement comes entirely out of the 10% fee layer.

[12] Because the settlement consisted of $406.5 million in cash and 17,578,781 shares of Dynegy common stock valued at $68 million, the fee request technically was for $35,151,482 plus 1,533,872 shares of Dynegy common stock.

what could have been predicted."  Jeffrey J. Rachlinski, *A Positive Psychological Theory of Judging in Hindsight*, 65 *University of Chicago Law Review* 571, 571 (1998).

The hindsight bias affects federal judges.  To prove this, three law professors gave more than 100 federal magistrate judges a statement describing a case in which a prisoner appealed after being sanctioned by a trial judge for filing a frivolous complaint.  One-third of the statements indicated that the appellate court affirmed the sanction; another third indicated that the appellate court imposed a lesser sanction; and the final third indicated that the appellate court vacated the sanction entirely.  All the judges were then asked to "go back in time" and identify the result that was most likely to occur.  To no one's surprise, the judges' estimates of the "most likely" outcome depended on what they were told about the actual outcome.  "[T]he judges exhibited a predictable hindsight bias; when they learned that a particular outcome had occurred, they were much more likely to identify that outcome as the most likely to have occurred."  Chris Guthrie, Jeffrey J. Rachlinski and Andrew J. Wistrich, *Inside the Judicial Mind*, 86 *Cornell Law Review* 777, 803 (2001).

The hindsight bias poses a serious threat to the incentive structure of the class action.  To encourage lawyers to handle these cases, judges must set fees high enough to offset real risks.  In other words, they must set fees at levels that would have been appropriate "at the outset of [litigation] (that is, when the risk of loss still existed)."  *Synthroid I*, 264 F.3d at 718.  When setting fees in connection with settlements, however, judges know recoveries were obtained.  This information will predictably cause them to over-estimate the *ex ante* odds of success, as in the experiment run by Guthrie *et al*.

knowledge of the actual appellate decision inflated judges' estimates of the likelihood of that result.  In turn, these over-estimates will cause judges to set fees too low.

Because the hindsight bias is well known, the law has developed many practical responses to it.  Rachlinski, *supra,* 65 *University of Chicago Law Review,* Part IV.  The PSLRA's fee-setting mechanism is one more of these.  By empowering lead plaintiffs to retain counsel on agreed terms at or near the start of litigation, the PSLRA enables them to set fees at levels that reflect real *ex ante* litigation risks.  By affording lead plaintiffs' agreements a presumption of reasonableness, judges reduce the likelihood that facts knowable only *ex post*, such as the fact of a settlement or its size, will skew fees downward.  Because a decision to set aside a lead plaintiff's fee agreement always gives the hindsight bias room to operate, a good reason for this decision should be required.

### 6.5.  The Fee Formula was Set Near the Start of the Case after Arm's-Length Negotiations

In this case, negotiations over fees occurred over a period of two months (December 2001-January 2002), and letters memorializing the sliding scale of fee percentages and Lead Counsel's obligation to bear costs were exchanged during that time.  According to the *Declaration of Helen J. Hodges in Support of Lead Counsel's Motion for an Award of Attorney Fees*, § II, the fee negotiations were "protracted" and occurred at "arm's length," with lawyers for Lead Counsel on one side and lawyers for The Regents on the other.  Agreement was reached before the Court appointed The Regents as Lead Plaintiff and endorsed its selection of Lead Counsel.  The terms were also disclosed to the Court.

The lawyers representing The Board in its negotiations with Lead Counsel (and throughout the litigation) were members of its Office of the General Counsel (OGC).[13] At the close of 2001, the OGC maintained a legal staff of "over 35 in-house lawyers" plus an approximately equal number of legal assistants. *Declaration of the Regents of the University of California in Support of Its Motion for Appointment as Lead Plaintiff and for Approval of Lead Counsel*, p. 3. Today, it houses more than 60 attorneys, http://www.ucop.edu/ogc/staff.html, enough to qualify as "a medium-sized law firm," and maintains a support staff of similar size. http://www.ucop.edu/ogc/history.html. The OGC "provid[es] [nearly] a full range of legal services to the entire University." *Id.* Litigation "affecting the University[, …] including formal administrative hearings before the Public Employment Relations Board and other federal and state agencies, internal University hearings, and matters handled through arbitration processes, accounts for approximately one-third of the total effort of the office." *Id.*

The OGC contains eight sections. "Although responsibility for litigation is concentrated in the litigation section, attorneys from other sections are regularly assigned to litigation related to their subject area responsibility." *Id.* Lawyers employed by the Office have impressive credentials, which can be found at http://www.ucop.edu/ogc/attorneys.html.[14]

---

[13] The current General Counsel is Charles F. Robinson, who assumed the position in January, 2007. Robinson previously served as "vice president, general counsel and corporate secretary for the California Independent System Operator Corp., California's wholesale electric transmission operator," as "assistant general counsel for Packard Bell in Sacramento," and as "division counsel for the Raychem Corp. in Menlo Park." Before moving in-house, he was a partner at Heller Ehrman White and McAuliffe in San Francisco. He earned an undergraduate degree at Harvard University and a J.D. from Yale University. http://www.ucop.edu/ogc/gencouns.html.

[14] I am one of the few scholars at any law school in the U.S. who has studied and published articles about in-house legal departments. See Charles Silver, *Flat Fees and Staff Attorneys: Unnecessary Casualties in*

The OGC also has extensive experience managing outside legal counsel on litigation matters. Before 1954, when the Office of Attorney for The Regents was established, The Regents used outside lawyers to handle all its work. Outside lawyers continued to provide legal services for The Regents thereafter, and the OGC manages them. Outside counsel currently provide litigation services to The Regents relating to insurance claims, tort claims, contract claims, patent prosecution, antitrust claims (through the California Attorney General's Office), and special litigation matters. The Regents also employs outside attorneys for non-litigation matters, including patent licensing and bond sales. *Id.* Outside lawyers' legal fees "exceed[] $1.5 million per year," making The Regents a substantial client. *Declaration of the Regents of the University of California in Support of Its Motion for Appointment as Lead Plaintiff and for Approval of Lead Counsel*, p. 3.

The Regents "ha[d] never served as a lead plaintiff" before being chosen for the role in this case, *Declaration of the Regents of the University of California in Support of Its Motion for Appointment as Lead Plaintiff and for Approval of Lead Counsel*, p. 3. Even so, the Court fe[lt] confident that the Regents of a large public university, experienced in investment and litigation, [was] capable of monitoring the lawyers here and industriously pursuing Plaintiffs' claims." *In re Enron Corp. Securities Litigation*, 206 F.R.D. at 458. The Court was right. Through the OGC, the Regents had many decades of experience working with and overseeing outside lawyers in complex lawsuits. It had an experienced in-house legal staff, as large as a mid-sized law firm, that "include[d] lawyers with extensive experience in securities class actions and tobacco

---

the Battle over the Law Governing Insurance Defense Lawyers, 4 *Connecticut Insurance Law Journal* 205 (1998).

industry actions."  It had "filed proofs of claim … in connection with settlements of many fraud actions."  *Declaration of the Regents of the University of California in Support of Its Motion for Appointment as Lead Plaintiff and for Approval of Lead Counsel*, p. 3.

The Regents' bargaining agents were James Holst, John Lundberg and Lloyd Lee, of the Office of General Counsel (OGC).  Christopher Patti also observed the process and participated in conversations internal to The Regents.se.  All four lawyers were experienced in business matters and litigation, and all had excellent training.  Collectively, they possessed over 60 years of experience working for The Regents.  Their dedication is obvious, their loyalty beyond question.  I know of no evidence suggesting that, when bargaining with Lead Counsel, they had any object other than getting the best possible deal for their employer.

The OCG's website and other sources provide the following information about these attorneys.

- James E. Holst graduated with honors in political science from University of California at Berkeley.  He earned his law degree from Berkeley's Boalt Hall.  Holst joined the Office of the General Counsel in 1964.  He became an associate counsel in 1974 and soon became chief associate counsel, a position he held until 1984.  He became General Counsel in June 1986, and held that post for twenty years, retiring in June 2006.  He reported directly to the chair of the Regents and to the University of California President starting in 1993.  See http://www.ucop.edu/ogc/history.html; and http://www.universityofcalifornia.edu/regents/gencounsel.html.  In his declaration, Holst reports that the OCG's "legal staff included lawyers with

37

extensive experience in litigation general and among other specific matters, securities class actions.   During [his[ tenure, [he] had ultimate oversight responsibility for all litigation conducted on the University's behalf.   The volume of such litigation was substantial and much of it was complex, high profile litigation."   *Declaration of James E. Holst in Support of Lead Counsel's Motion for an Award of Attorney Fees,* pp. 1-2.   Holst is currently General Counsel Emeritus.

- John F. Lundberg was Deputy General Counsel for almost 15 years.   In this capacity, he participated in lawsuits of diverse types, including patent litigation against Genentech, Inc., http://www.secinfo.com/d9N9s.5d.8.htm;  the use of standardized test results in the University's admission process, http://naacpldf.org/content/pdf/u_berkley/Castaneda_Consent_Decree.pdf;       a dispute over hospital bills submitted to Medicare and TRICARE, http://chronicle.com/subscribe/login?url=/weekly/v47/i23/23a03401.htm;  and the distribution of UNIX software, http://sco.tuxrocks.com/Docs/USL/Doc-112.html. Lundberg had significant experience managing attorneys.   As Deputy General Counsel he oversaw the legal work of a staff of approximately 40 lawyers.   He also served as Managing University Counsel from 1983 to 1989, during which time he managed attorneys serving the University of California system's medical and professional schools.    As Interim Vice Chancellor for Administrative Services, he also handed budgetary responsibilities.   Lundberg also earned his law degree at Berkeley.  *Resume of John F. Lundberg.*

- Lloyd C. Lee served as a University Counsel in the Office of the General Counsel since 1985. Mr. Lee is a co-leader of the health group. Prior to joining the office, he was an attorney at Bianchi, Hoskins, Stone, Paxton & Engel in San Rafael and at Dechert Price & Rhoads in Philadelphia. Mr. Lee's primary practice areas are business and financing transactions, faculty and student housing, leasing, energy, property taxation, and corporation and limited liability company transactions. He obtained his undergraduate degree at Haverford College in 1965 and his J.D. at Cornell Law School in 1986. At Cornell, he was an editor of the Cornell International Law Journal. See http://www.ucop.edu/ogc/attorneys.html#Lee.

- Christopher Patti is a co-leader of the Office of General Counsel's litigation group and had primary responsibility for overseeing the Enron litigation. He joined the University Counsel in the Office of the General Counsel in 1990, and during his 17 years "overs[aw] or directly litigated hundreds of cases in which the University was a litigant." *Declaration of Christopher M. Patti*. His experience includes education and academic litigation, employment litigation, Federal and State False Claims Act litigation, general litigation, First Amendment issues, Equal Protection issues, and securities litigation. having worked at Heller, Ehrman, White & McAuliffe in San Francisco before that. He graduated from Dartmouth College in 1980 and earned his J.D. at the University of Virginia in 1983.. http://www.ucop.edu/ogc/attorneys.html#Patti.

The lawyers in the OGC also had ready access to the information needed to bargain effectively. For example, they could have contacted attorneys working in-house at other public pension funds, using to their advantage the common connection many

such lawyers have to the National Association of Public Pension Attorneys (NAPPA). Dorothy Dana, a lawyer whose career in the OGC began in 1988 and who submitted an affidavit in this case, served as NAPPA's President in 1999-2000.   *Supplemental Declaration of The Regents of the University of California in Support of Its Motion for Appointment as Lead Plaintiff and for Approval of Lead Counsel*.  As she wrote, NAPPA, "the organization of lawyers who represent public pension funds throughout the United States, … "serves as a clearing house and communications vehicle" for its members.  *Id.*, p. 3.  NAPPA members are greatly interested in the fees paid to class counsel in securities cases.  They exchange information about fees, and they use NAPPA's publication, *The NAPPA Report*, to argue for fee minimization.[15]

In 2001-2002, information about securities litigation firms, fees, and related matters was also available from other sources.  For example, the Federal Judicial Center's (FJC) study of class actions in four federal district courts, whose findings on fees are described below, was available from the FJC's website,[16] and a pre-final version had appeared in the *New York University Law Review*.[17]   National Economic Research Associates (NERA) had begun its series of *Recent Trends* reports.[18]   Critics of class

---

[15] I have personal knowledge of the interest NAPPA members have in fees, having debated Wayne Schneider in the pages of *The Nappa Report*.  *See* Wayne Schneider, *Courts Don't Have To Award Excessive Fees To Incentivize Class Counsel In Federal Securities Class Actions: A Reply to Professor Silver*, 20 The NAPPA Report 8-10 (May 2006); and Charles Silver, *Reasonable Attorneys' Fees in Securities Class Actions: A Reply to Mr. Schneider*, 20:3 *The NAPPA Report* 7 (August 2006).

[16] Thomas E. Willging*, et al.*, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules* 16 (1996) ("*FJC Study*").

[17] Thomas E. Willging, Laural L. Hooper, Robert J. Niemic, An Empirical Analysis of Rule 23 to Address the Rulemaking Challenges, 71 New York University Law Review 74 (1996).

[18] See, e.g., Frederick C. Dunbar, Todd S. Foster, Vinita M. Juneja, Denise N. Martin, *Recent Trends III: What Explains Settlements in Shareholder Class Actions?* (NERA, June, 1995); Denise N. Martin, Vinita M. Juneja, Todd S. Foster, and Frederick C. Dunbar, *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions?* (NERA 1996).

action fee awards were also around and offered their own statistics.[19]   They and, in particular, their widely publicized views about the excessiveness of class action lawyers' fees, were responsible for the success of the PSLRA, which a Republican Congress enacted over President Clinton's veto.   One could also learn about fees by reading settlement notices posted on the Internet, fee opinions published on Westlaw and Lexis, and studies by law professors and other academics.

Academic studies of class actions also contained information that would have helped lawyers in the Office of General Counsel predict the likely recovery in this case, a factor whose relevance to the size of a reasonable contingent fee is apparent.   For example, Table 7 in Mukesh Bajaj, et al., *Securities Class Action Settlements: An Empirical Analysis* (Nov. 16, 2000), showed that recoveries per investor dollar lost fell dramatically as estimated losses increased.   It also showed that investors typically recovered a few pennies on the dollar when their estimated losses exceeded $100 million. *Recent Trends IV*, a NERA publication, depicted the relationship between estimated losses and recoveries in a simple graph entitled "Ratio of Settlement Value to Investor Losses Decreases as Investor Losses Increase."

Although the lawyers in the OCG do not claim familiarity with the studies cited above, they surely knew about market rates.   Lloyd Lee claimed to have negotiated a fee that was "significantly lower … than is customary in securities class actions generally" and "significantly lower than the fee generally received in securities fraud class actions by [Lead Counsel]."   *Declaration of the Regents of the University of California in Support of Its Motion for Appointment as Lead Plaintiff and for Approval of Lead*

---

[19] Vincent E. O'Brien, *A Study of Class Action Securities Fraud Cases, 1988-1996*.

41

*Counsel*, p. 3.  These assertions are credible because lawyers for public pension funds kept track of fees and shared information about them.

The lawyers advising The Regents also knew that Enron shareholders would likely recover only a small fraction of their losses, a matter relevant to the size of the contingent percentage.  Everyone knew this.  The company was insolvent; the individual defendants had limited resources; the insurance money was trivial compared to the losses; and legal barriers impeded claims against third parties.  See, e.g., Mark Curriden, *Lawyers Plan to Expand Enron Suit: Deep-Pocket Corporate Defendants are Sought, Legal Analysts Say*, *Dallas Morning News* 1D, April 5, 2002, 2002 WLNR 13727170 ("'It's simple mathematics,' said Dallas attorney Marc Stanley, who specializes in securities fraud litigation. 'The money available from the companies and their insurance will cover pennies on the dollar.'").  Plus, because investors who lose billions in financial disasters routinely fare poorly in class action suits, newspapers across the country predicted that the results for Enron's shareholders would be the same.  See, e.g., Edward Iwata, *Law Firms Tussle over Enron Case*, *USA TODAY*, Feb. 2, 2002, www.usatoday.com/money/covers/2002-02-12-enron-class-action.htm#more  (attributing to Professor John C. Coffee, Jr. the view that "[s]hareholders will be lucky if they recover $1 billion on the tens of billions of dollars lost in the Enron meltdown," and that "[i]nvestors usually get back 5 cents to 20 cents on the dollar in securities-fraud cases"); Walter Hamilton, *Crisis in Corporate America: Bill Offers Little to Defrauded Investors*, *Los Angeles Times*, July 26, 2002, 2002 WLNR 12451610 ("[C]lass-action lawsuits that shareholders bring against companies often generate big headlines, but investors usually receive only a fraction of what they lost") (citing NERA data showing an average

recovery of 12 cents per dollar of claimed losses); Melissa Davis, *Enron Lesson Shows Workers' Need to Diversify 401(k) Plans*, *The Daily Oklahoman*, December 9, 2001, 2001 WLNR 7659161 (reporting that employees who "joined a class-action lawsuit against Enron … in a desperate attempt to recoup at least some of their losses[, …] could win little more than pennies on the dollar, if that."); Jack Sirard, *Column*, *The Sacramento Bee*, November 24, 2001, 2001 WLNR 7672311 (quoting a money manager as advising Enron investors to "sell[] [their] shares, tak[e] [their] loss and mov[e] on" "because, in most cases, investors get back only pennies on the dollar").

The increasing marginal percentages built into the retainer agreement reflected the lawyers' knowledge that, "given Enron's pending bankruptcy, … no single source of recovery [was] likely … to provide an acceptable level of compensation for the class and that achieving recovery above certain levels would become increasingly challenging." *Supplemental Declaration of The Regents of the University of California in Support of its Motion for Appointment as Lead Plaintiff and in Response to Surreply of the New York City Pension Funds and The Florida State Board of Administration*, at 1-2. Higher dollars would be much harder to obtain than lower ones. By giving Lead Counsel a larger fraction of higher dollars, the fee terms incentivized Lead Counsel "to pursue additional sources of recovery," i.e., third parties who had significant resources but also enjoyed significant legal protections. *Id.* The decision paid off.

### 6.6. The Lead Plaintiff was Sophisticated

The Regents is a highly sophisticated institutional investor. Its twenty six members consist of eighteen gubernatorial appointees who serve 12-year terms, one student member who serves a 1-year term, and seven ex officio members—the Governor, Lieutenant Governor, Speaker of the Assembly, Superintendent of Public Instruction,

president and vice president of the Alumni Associations of the University of California and the University of California president. The Board also contains two non-voting faculty representatives. When The Regents sought to become Lead Plaintiff in December, 2001, assets under its management were worth more than $54 billion. *Id.* Today, those assets exceed $73 billion. http://www.ucop.edu/treasurer/.

The members of The Regents appoint a Treasurer, who "is responsible for managing the investments…. The investment funds managed consist of the University's retirement, defined contribution and endowment funds, including both actively managed equity portfolios and passively managed index funds." *Memorandum of Law in Support of Motion to Appoint Amalgamated Bank, The Regents of the University of California, Deutsche Asset Management, HBK Investments, and the Central states Pension Fund as Lead Plaintiff and to Approve Lead Plaintiff's Choice of Co-Lead and Co-Liaison Counsel*, p. 2.

Currently, Marie N. Berggren holds the position of Interim Treasurer and also serves as Vice President for Investments and Chief Investment Officer. Ms. Berggen has significant experience and training in financial management. Before "joining the Treasurer's Office in 2002," she served as "Executive Vice President/Department Head of Venture Capital Investments for Bank One Corporation," and as "Senior Vice President and Department Head of the Corporation's Mergers and Acquisitions activity" for Bank One and First Chicago Corporation, its predecessor organization. Before that, "she was the Managing Director of Public Equities and Director of Research for First Chicago Investment Advisors." Ms. Berggren has a Masters Degree in Management

from Stanford University Graduate School of Business, and a Bachelors Degree in Economics from the College of New Rochelle. *Id.*

Ms. Bruggen succeeded David H. Russ, who held the office from early 2001 until July of 2005 and was the Treasurer when The Regents chose to seek appointment as Lead Plaintiff. Before becoming Treasurer, Mr. Russ was the public markets managing director for the University of Texas Investment Management Company (UTIMCO), where he worked from 1997 onward. At UTIMCO, Mr. Russ was responsible for all global publicly traded investments, equity and fixed income, alternative marketable assets, investment manager selection and asset allocation as well as its private equity portfolios. He received his undergraduate degree in genetics from UC Berkeley in 1980. In 1986, he received a Master's Degree in administration, with a concentration in finance and accounting, from the Graduate School of Management at the University of California at Davis. 16:2 New Dimensions: Benefits Newsletter for UC Annuitants 1 (Spring 2001) http://atyourservice.ucop.edu/forms_pubs/newsletters/nd_spr2001.pdf.

### 6.7.    The Lead Plaintiff had a Large Stake in Setting Fees Reasonably

When appointing The Regents as Lead Plaintiff, the Court found that "[d]uring the class period, the Regents purchased more than two million shares of Enron common stock and lost more than $144 million." *In re Enron Corp. Securities Litigation*, 206 F.R.D. at 454. Obviously, this is an enormous sum.

The size of The Regents' loss and the possibility of recovering millions should have motivated The Regents seek the best possible result in the lawsuit. By hiring excellent lawyers, The Board improved its own odds of recovering, and thereby the odds for the entire class. By establishing a payment scale that motivated its lawyers to develop innovative legal theories and obtain recoveries from third parties, The Regents again

helped itself and the rest of the class.  The Regents and other investors also gained by keeping fees to the lowest level sufficient to obtain the caliber of representation required by the case.  All this was clear when the Court granted The Regents' motion to be appointed lead plaintiff.

Although the PSLRA focuses on an institution's financial loss, The Board also had (and has) its reputation as a fiduciary at stake.  The competition for control of this lawsuit was fierce.  Had The Regents not entered into a reasonable fee contract, The Regents would have jeopardized its position and reputation.  It would have signaled the Court, which had information about many fee agreements, that it was not the "most adequate plaintiff" because it could not negotiate a reasonable fee contract.  An opinion denying The Regents application for this reason would have reflected badly on The Regents, which is charged with managing beneficiaries' money prudently.  The contract obviously anticipates recoveries in the billions.  The possibility that Lead Counsel exceeded The Regents' expectation by recovering $7 billion does not make the fee unreasonable.  It just shows that the recovery is outstanding, which presumably delights all investors, and that Lead Counsel's outstanding work, which The Regents repeatedly acknowledge, will generate a superior fee.  This is how contingent percentage fee arrangements are supposed to work: lawyers who do better for their clients also do better for themselves.

The members of The Regents undoubtedly knew that, in the event of a large recovery, their decision to offer Lead Counsel a percentage would face intense public scrutiny.  They also knew the enormous downside associated with over-paying the firm.  Given this, their willingness to promise the terms agreed to, to put the terms in writing, to

boast of having obtained unusually low rates, and to offer them to the Court for review speaks loudly about their reasonableness.

### 6.8. The Lead Plaintiff had Access to a Competitive Market for Legal Services

The market for legal services is deep.  As Judge Frank Easterbrook observed when reviewing the fee award in *In re Synthroid Marketing Litigation*, 325 F.3d 974, 979 (7th Cir. 2003), "[n]o law firm supplies more than a tiny fraction of the nation's legal services (even of the specialized submarket in big-stakes litigation).  The Herfindahl-Hirschmann Index in this market is minuscule, and no evidence in this record implies that law firms have conspired to reduce competition."[20]

What is true of the legal services market in general is true for large securities lawsuits as well, as Judge Easterbrook implied.  Plaintiffs' firms compete fiercely for opportunities to represent large investment funds.  "It is no secret that big money for class action securities litigation firms lies in wooing state pension and retirement funds as clients…  [M]aking the cut is a top priority for securities lawyers.  'People recognize they've got to get themselves out there and sell their wares,' said Stuart Grant" of Grant & Eisenhofer, which "won about $610 million for its clients in securities class action settlements [in 2003]."  Leigh Jones, *Securities Litigators Vie for Lists*, *New York Law Journal* 1 (September 20, 2004).

Lawyers employed by public entities that manage pension funds, such as The Regents, know that this brisk competition for their business enables them to cut rates.

---

[20] "[T]he Hirschmann-Herfindahl Index" is "a metric commonly used by the US Department of Justice to assess the potentially anti-competitive effects of concentration within an industry."  James D. Cox, The Oligopolistic Gatekeeper: The U.S. Accounting Profession, Duke Law School Research Paper No. 117, p. 272 (August 2006).

Consider the statements below, which Wayne Schnieder, General Counsel for the New York State Teachers' Retirement System, made in *The NAPPA Report*.

- "[S]ecurities class action lawyers are literally falling all over themselves, trying to get appointed class counsel by potential lead plaintiffs…. In this highly competitive environment, potential lead plaintiffs should have every reason to expect they can engage competent counsel at favorable rates." Wayne Schneider, *Objections to Attorneys Fee Requests in Securities Class Actions*, 19 *The NAPPA Report* 9, 10 (February 2005).

- "If one firm doesn't want to do the case on an investor-friendly fee basis, the lead plaintiff can always look for another qualified firm willing to take the assignment for a favorable fee." *Id.*

The depth of the market is demonstrated by the number of law firms representing funds and individual investors in this case. During the lead plaintiff competition, the service list for plaintiffs' attorneys filled seven bi-columnar pages. A couple of law firms on the defense service list also work for plaintiffs on occasion.

Other sources add interesting details. The ranking of law firms Securities Class Action Services (SCAS)[21] published for 2003 shows that eighteen law firms, one of which was Lead Counsel, settled five or more cases that year. SCAS, *The SCAS 50 for 2003*, http://issproxy.com/pdf/THESCAS502003.pdf. The market thus contains many firms for which securities litigation is a significant source of income. Another source reported that the New York state comptroller's office had long-term contracts with about

---

[21] SCAS is "a wholly-owned subsidiary of Institutional Shareholder Services[, which] maintains the leading database on securities class action litigation." SCAS, *The SCAS 50 for 2003*, http://issproxy.com/pdf/THESCAS502003.pdf.

15 plaintiffs' firms in 2004.  Leigh Jones, *Securities Litigators Vie for Lists*, *New York Law Journal* 1 (September 20, 2004).  The *Affidavit of Linda Lettera* (dated January 11, 2002), annexed to the *Amended Motion for Appointment of Co-Lead Plaintiffs and Co-Lead Counsel*, reports that "[b]oth the [Florida State Board of Administration] and the New York City [Pension] Funds had negotiated fee agreements with their outside counsel at rates substantially below what is typically sought in class actions," and that they had "exchange[d] these agreements" and forced their lawyers to adopt the cheaper set of rates.  These sources show that large clients can easily gain information about fees and use competition to advantage.

The existence of SCAS's top-50 list establishes that the market for lawyers offering securities litigation services has at least fifty firms.  Because the legal services sector as a whole contains thousands of firm, one might conclude that the biggest securities firms, like Lead Counsel, have sufficient market power to influence rates.  Before inferring this, one must remember that no formal barriers to entry exist inside the market.  Law firms can develop as many practice areas as they wish.  If fees in the securities area were excessive over any sustained period, outsiders would move in and bid prices down.  Knowing this, firms already in the area should find it difficult to overcharge.

The Regents' decision to hire Lead Counsel rather than one of its competitors is easy to defend.  In 2001-2002, Lead Counsel was one of the most prestigious firms representing plaintiffs in securities class actions.  It may have been the most prestigious. Lead Counsel topped SCAS Top 50 list of law firms representing plaintiffs in securities class actions for calendar year 2003.  This was true when the scoring criterion was "the

total dollar amount of final securities class action settlements occurring in 2003 in which the law firm served as lead or co-lead counsel," and when it was the total number of settlements concluded that year.  Only when the average amount recovered per case was used did Lead Counsel lose the top spot.  Using that criterion, it ranked fourth.  SCAS, *The SCAS 50 for 2003*, http://issproxy.com/pdf/THESCAS502003.pdf.   An academic study found that after enactment of the PSLRA in 1995, public institutions hired Lead Counsel in 23% of the cases where they served as lead plaintiffs.  Stephen J. Choi, Jill E. Fisch, and A.C. Pritchard, *Do Institutions Matter? The Impact of the Lead Plaintiff Provision of the Private Securities Litigation Reform Act*, 83 Washington University Law Quarterly 869, 893 (2005).

In terms of resources available to clients, Lead Counsel also compared well to other firms.  In 2002, top securities class action firms had the number of attorneys listed in Table 4 below.  At 196 lawyers, Lead Counsel easily topped the list.

| TABLE 4: SIZE OF PLAINTIFFS' SECURITIES CLASS ACTION LAW FIRMS* | |
|---|---|
| **Law Firm** | **Number of Attorneys** |
| Milberg Weiss | 196 |
| Liefff Cabraser Heimann & Berstein | 65 |
| Wolf Haldenstein | 60 |
| Berman De Vevalerio Pease Tabacco Burt & Pucillo | 30 |
| Wolf Popper | 20 |
| Grant & Eisenhofer | 17 |
| Cauley Geller | 16 |
| Lowey Dannenberg Bemporad & Selinger | 15 |
| Shapiro Haber & Urmy | 7 |
| Hoffner & Bilek | 5 |

*Information in this table was compiled by Lead Counsel at my request.  It is believed to be accurate but has not been independently verified.

In 2004, Milberg split in two, and responsibility for the Enron case went with the successor firm of Lerach Coughlin Stoia Geller Rudman & Robbins LLP. Even so, The Regents continued to be served by one of the country's top law firms. In 2006, Lerach Coughlin ranked atop SCAS' Top 50 list, using both total dollar value of settlements and number of settlements as guides. In average amount recovered per case, Lerach Coughlin ranked second, behind only Bernstein Litowitz Berger & Grossmann, which handled a far smaller volume of cases. http://issproxy.com/pdf/SCAS50for2006.pdf. Even had The Regents wanted to do so, it could not have found an outside law firm that was significantly better than Lead Counsel.[22]

Lead Counsel also brought to the table an enormous number of outside resources. It gave The Regents access to a "securities litigation team, comprised of scores of professionals … [including, in addition to experienced securities litigation attorneys,] a team of investigators who already ha[d] developed significant witness contacts [and] gathered detailed factual information concerning [Arthur] Andersen, Enron, and [Enron's] top executives, businesses, and accounting practices; experienced forensic accountants, certified fraud examiners, and accounting experts who ha[d]" already begun to study and unravel Enron's obscure financial statements and corporate structure; and "corporate governance experts who [were] examining conflicts of interest on Enron's Board of Directors, including Enron's Audit Committee." *The Regents of the University of California's Opposition to the Competing Motions for Lead Plaintiff*, p. 6.

All these matters were clear when the Court appointed The Regents. The Court endorsed Lead Counsel, emphasizing the importance of having good counsel for the

---

[22] Bill Lerach retired from Lerach Coughlin on August 31, 2007. His departure has no impact on the opinions expressed in this Report because settlements relevant to the fee request had concluded before he left.

plaintiffs in this case and the special steps Lead Counsel had taken to protect investors even before the firm was formally appointed Lead Counsel.

> Given the magnitude and complexity of this litigation, the geographical and temporal expanse it covers, the number of governmental and private investigations occurring, and the necessary involvement with the bankruptcy proceeding in New York, the selection of competent, experienced and committed Lead Counsel has even greater import than in normal securities class actions.  In reviewing the extensive briefing submitted regarding the Lead Plaintiff/Lead Counsel selection, the Court has found that the submissions of Milberg Weiss Bershad Hynes and Lerach LLP stand out in the breadth and depth of its research and insight. Furthermore, Mr. Lerach has justifiably " beat his own drum" in demonstrating the role his firm has played thus far in zealously prosecuting this litigation on Plaintiffs' behalf.

*In re Enron Corp. Securities Litigation*, 206 F.R.D. at 458.  Lead Counsel's pre-appointment efforts included more than one hundred interviews with witnesses having knowledge of the case, prosecution of a motion to freeze the $1.1 billion in proceeds of stock sales by Enron insiders, and efforts to preserve documents in the possession of Enron or Arthur Andersen.  See also *Declaration of The Regents of the University of California in Support of Its Motion for Appointment as Lead Plaintiff and for Approval of Lead Counsel*, p. 2.

The California Public Employees' Retirement System (CalPERS), "the largest public retirement system in the United States," endorsed The Regents' decision to hire

Lead Counsel as well. *Declaration of California Public Employees' Retirement System in Support of the Motion of the Regents of the University of California for Appointment as Lead Plaintiff and for Approval of Lead Counsel.*  CalPERS, which lost almost $20 million when Enron collapsed, is an activist shareholder, meaning that it pursues improvements in corporate governance aggressively.  See David Hess, *Protecting and Politicizing Public Pension Fund Assets*, 39 *U.C. Davis Law Review* 187, 189 (2005) (describing CalPERS as "the most active (and controversial) [public pension fund] in demanding corporate governance reform").  It claims to have "discuss[ed] [corporate governance] issues with [the] directors and officers of over 2,000 companies" since 1986. *Id.*

CalPERS also serves as lead plaintiff in significant securities fraud lawsuits.  It holds that post in *In re UnitedHealth Group PSLRA Litigation*, No. 06-CV-1691(JMR/FLN) (D. Minn.), an ongoing lawsuit challenging the legality of back-dated stock options.  Lead Counsel represents CalPERS in this high-profile case.

Years before the *UnitedHealth Group* lawsuit started, CalPERS served as a lead plaintiff in *In re Cendant Corp. Litig.*, which settled for more than $3 billion.  In *Cendant*, other fine class action firms served CalPERS.  Even so, CalPERS and hired Lead Counsel in *UnitedHealth Group*.  One may therefore infer that when CalPERS endorsed Lead Counsel as The Regents' counsel in this lawsuit, it was not blowing smoke.

Christopher M. Patti summed up the decision to hire Lead Counsel as follows:

At the time the University moved for appointment as lead plaintiff in the Newby action, the University carefully considered its choice of Lead

Counsel.  It selected Lead Counsel, then Milberg Weiss, now Coughlin
Stoia Geller Rudman & Robbins LLP ("Coughlin Stoia"), on the basis of
its attorneys' extensive experience representing plaintiffs in securities
litigation, the resources the firm could, and we believed would, devote to
prosecution of the case, the aggressiveness it had already demonstrated in
doing so, and, after interviews with the key attorneys involved, our belief
that they would work cooperatively with this Office and would welcome
the high level of supervision we intended to apply in our role as Lead
Plaintiff.

*Declaration of Christopher M. Patti*, p. 2.  In short, The Regents hired Lead Counsel on
the basis of the firm's quality, demonstrated aggressiveness, and willingness to work
under The Regents' supervision.

### 6.9.   Lead Counsel's Efforts Produced an Outstanding Result

The preceding sections showed that no significant defects marred the environment
in which The Regents and Lead Counsel bargained over Lead Counsel's financial rights
and responsibilities.  The Regents was a sophisticated institutional investor with a large
financial stake in the outcome of litigation, a strong reputational interest in keeping fees
low, and ready access to information.  The market for legal services was deep.  The
Regents hired Lead Counsel after "review[ing] the qualifications and resources of
numerous class action specialist law firms."  *Declaration of the Regents of the University
of California in Support of Its Motion for Appointment as Lead Plaintiff and for Approval
of Lead Counsel*, p. 3.  This decision was reasonable because Lead Counsel offered a
superior combination of quality and price.

54

Given the environment in which The Regents retained Lead Counsel, The Regents should have demanded, and Lead Counsel should have offered, a competitive fee arrangement designed to motivate Lead Counsel to maximize investors' net recoveries. Judging from the phenomenal settlement, this is precisely what occurred. With Lead Counsel's help, class members obtained settlements exceeding $7.2 billion. The vast majority of the money comes from secondary defendants, the hardest parties to reach. A good result is the best evidence one can have that a fee arrangement worked as intended; it is a reason to enforce a fee agreement, not to rewrite it. The *Declaration of John Moores in Support of Lead Counsel's Motion for an Award of Attorney Fees* is particularly compelling on this point. Moores, a member of the Board of Regents from 1999 to 2007, "initially … opposed [] the selection of Milberg Weiss, now Coughlin Stoia as Lead Counsel." He now finds it "obvious," however, "that The Regents' confidence in this firm and in the negotiated fee arrangement was justified based on the outstanding results that were produced on behalf of the Class. *Id.* p. 3. He adds that "[t]he fee agreement [] worked just like it was designed to and [] benefited the class. It should be honored." *Id.*

The *Declaration of James E. Holst in Support of Lead Counsel's Motion for an Award of Attorney Fees* is similarly compelling. Holst reports that when the OCG "considered the choice of Lead Counsel," it "reviewed the qualification and resources of a number of class action specialist law firms" and sought a law firm "possessing the financial resources, skill, experience and track record required to obtain optim[al] results for the Class." After selecting Lead Counsel, the OCG then negotiated a fee designed "to maximize the eventual recovery for the ultimate benefit of the Class" and was

particularly careful "to avoid a fee structure that would create an incentive for quick, cheap settlements." The results demonstrate the OCG's success. In Holst's words, "the settlements … represent an outstanding recovery on behalf of the Class," 90% of which "will be returned to the Class" if the terms of the fee agreement are enforced.

Given the thought that went into the selection of Lead Counsel, the object that guided the design of the fee formula, the results Lead Counsel's efforts produced, and The Regents' satisfaction with Lead Counsel's service, the only possible conclusion is that the fee agreement should be enforced.

## 7. THE REQUESTED FEE AWARD IS REASONABLE WHEN COMPARED TO FEE AWARDS IN OTHER CLASS ACTIONS

### 7.1. Securities Class Actions

In *In re Synthroid Marketing Litigation*, 264 F.3d 712, 720 (7th Cir. 2001), Judge Easterbrook urged trial judges to consider "data from securities suits where large investors have chosen to hire counsel up front" when evaluating the reasonableness of fee requests. Such data as are available, all of which are anecdotal, cast the fee promised by The Regents in a favorable light.

For example, in an expert report, Professor John C. Coffee, Jr., a leading commentator on securities class actions, reported

> several examples of 'increasing percentage' fee contracts entered into
> between a very large plaintiffs' law firm and several large, sophisticated
> lead plaintiffs. In one case, the lead plaintiff in a securities class action
> agreed to an 'increasing percentage' formula that provided for payment to
> counsel of 25% of the balance of the recovery over $100 million. In
> another case in which a pension fund served as lead plaintiff in a securities

class action, the fee formula increased so as to provide for payment of 25% of the balance over $50 million to class counsel.

*Declaration of John C. Coffee, Jr., In re High Fructose Corn Syrup Antitrust Litigation*, 13-14 (Oct. 7, 2004).

My experience is similar. Although I have participated in or read about securities cases in which sophisticated lead plaintiffs offered fees at or near 25%, I have also seen fee scales with lower values for certain recovery ranges. Table 5 shows sliding scales agreed to in other cases handled by Lead Counsel or one of its predecessors. The percentages run from 14% to 27%, and all of the scales tie the higher percentages to higher levels of recovery. By comparison, the percentages promised by The Regents are low. In *Dollar General*, the first case listed, one of the lead plaintiffs was the Florida State Board of Administration, which also sought to be the lead plaintiff here.

| TABLE 5: SCALES OF PERCENTAGES USED IN OTHER SECURITIES CASES HANDLED BY LEAD COUNSEL | | |
|---|---|---|
| **Case** | **Recovery Increment** | **Fee Percentage** |
| In re Dollar General Corporation Securities Litigation | $0-$15 Million | 15% |
| | $15-$30 Million | 17.50% |
| | $30-$60 Million | 20% |
| | Greater than $60 Million | 22.50% |
| Schwartz v. TXU Corp. | $0-$20 Million | 18% |
| | $20-$40 Million | 20% |
| | $40-$75 Million | 22% |
| | Greater than $75 Million | 24% |
| Pirelli v. Hanover Compressor Company, et al | $0-$10 Million | 14% |
| | $10-$25 Million | 18% |
| | Greater than $25 Million | 24% |
| In re NorthWestern Corporation Securities Litigation | $0-$6 Million | 17% |
| | $6-$12 Million | 19% |
| | $12-$18 Million | 23% |
| | Greater than $18 Million | 27% |
| In re Cardinal Health, Inc. Securities Litigation | $0-$50 million | 19% |
| | $50-$150 million | 23% |
| | Greater than $150 million | 25% |

The table below, Table 6, displays more anecdotal information about fees agreed to by institutional investors. The cases in it were culled from fee objections filed in other cases by the State of Wisconsin Investment Board (SWIB) and the New York State Teachers Retirement System (NYSTRS). They are cases these objectors identified as having reasonable fees. In all but one of them, the percentages promised exceed those The Regents agreed to pay Lead Counsel. The 7.5% fee set in *Bristol-Myers Squibb* is below the fee promised here, but it started out at 15% and was adjusted downward after

class counsel lost the case, reflecting the fact that the SEC's efforts, not class counsel's, produced the settlement

| TABLE 6: FEES PROMISED IN OTHER SECURITIES CLASS ACTIONS | |
|---|---|
| **Case** | **Agreed Fee Percentage** |
| *Anicom* | 23.50% |
| *Physicians Computer Network* | 15% |
| *CellStar* | 18% |
| *In re Interpublic Securities Litig.* | 20% |
| *In re Bristol-Myers Squibb Securities Litig.* | Initially 15%; reduced to 7.5% after complaint was dismissed with prejudice; |
| *Symbol Technolgies Inc. Securities Litig.* | 17% requested; settlement notice does not indicate whether fee set by agreement with lead plaintiff |
| *Gemstar-TV Guide International, Inc. Securities Litig.* | 17% |
| *Eterasys Networks, Inc. Securities Litig.* | 15% |

Academic studies of post-PSLRA class actions bolster my opinion that The Regents promised a reasonable fee. Choi *et al.* found that fees averaged 30% of the recovery in cases led by individual investors and private institutions, and 25% in cases led by public institutions. Choi *et al.*, *supra*, 83 *Washington University Law Quarterly*, at 897, Table 6A. Professor Michael Perino studied "a random sample of 244 post-PSLRA securities fraud class actions entered into between April 1997 and May 2005, inclusive." He found a mean fee of 20% in cases with public pension funds as lead plaintiffs. Michael A. Perino, *Markets and Monitors: The Impact of Competition and Experience on Attorneys' Fees in Securities Class Actions*, St. John's University School of Law, Legal Studies Research Paper Series, Paper #05-0034 (Dec. 2005). Viewed as a percentage of

the recovery, the fee requested here is well below average for cases led by public institutional investors.

### 7.2. Class Actions in General

The preceding section compared the fee promised by The Board to fees awarded in securities class actions following enactment of the PSLRA. Fee awards in class actions in general have also been studied and may be thought to provide another baseline.

Before turning to the studies, I note that judges have awarded large percentage fees in class actions of other types that produced enormous recoveries. Most recently, a federal judge did so in a breach of contract lawsuit pitting a class of gas station owners against Exxon. In that case, in which I also submitted an expert report, the judge awarded class counsel 31.33% of a settlement fund of $1.06 billion. See *Order on Petitions for an Award of Attorneys' Fees, Costs, and Reimbursable Expenses and for Incentive Awards to Named Plaintiffs, Allapattah Services, Inc. v. Exxon Corp.*, Case No.: 91-0996-CIV-GOLD/SIMONTON, S.D. Fla. (July 6, 2006).

Before the Exxon case settled, a district court judge in Illinois approved fees on the basis of a sliding scale in an enormous ERISA case: "29% of the amount of any Settlement Benefits recovered up to $250 million; … 25% of the amount of any Settlement Benefits recovered in excess of $250 million up to the amount of $750 million; … 21% of the amount of any Settlement Benefits recovered in excess of $750 million up to the amount of $1,250 million; and … 17% of any Settlement Benefits recovered in excess of $1,250 million." *Cooper v. IBM Personal Pension Plan*, 2005 WL 1981501 *8 (S.D.Ill. 2005).

*In re Buspirone Antitrust Litigation*, MDL Docket No. 1413, 01-CV-7951 (JGK), slip op., Apr. 17, 2003, provides another recent example.  There, negotiations produced a global settlement in excess of $500 million, of which $220 million was reserved for the Direct Purchaser Class.  Notice of Proposed Settlement of Class Action and Hearing Regarding Settlement, *In re: Buspirone Antitrust Litigation*, http://www.gardencitygroup.com/cases/pdf/BUS/BUSNotice.pdf.  The trial court approved a fee equal to 33 1/3% of the Direct Purchaser fund, or $73.33 million.

*Exxon*, *IBM Personal Pension Plan*, and *Buspirone* are not unique.  Many cases with settlements exceeding $100 million have yielded high percentage fees.  In *Lucent Technologies*, 327 F.Supp.2d at 441, the trial judge published a table from which I excerpted settlements of $100 million or more.  Table 7 includes both securities cases and lawsuits of other types.

| TABLE 7: FEE AWARDS IN CLASS ACTIONS WITH SETTLEMENTS EXCEEDING $100 MILLION | | |
|---|---|---|
| **Case** | **Recovery** | **Fee Award** |
| 1. In re Rite Aid Corp. Sec. Litig. (Rite Aid II), 269 F.Supp.2d 603 (E.D.Pa.2003) | $126 million | 25% |
| 2. In re Rite Aid Corp. Sec. Litig. (Rite Aid I), 146 F.Supp.2d 706 (E.D.Pa.2001) | $193 million | 25% |
| 3. In re Oxford Health Plans, Inc. Sec. Litig., MDL 1222 (S.D.N.Y. June 2003) | $300 million | 28% |
| 4. Informix Corp. Sec. Litig., Master File No. C-97-1289-CRB (N.D.Cal. Nov. 2, 1999) | $132 million | 30% |
| 5. In re Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. 166 (E.D.Pa.2000) | $111 million | 30% |
| 6. In re Prison Realty Sec. Litig., Civil Action No. 3:99-0458, 2001 U.S. Dist. LEXIS 21942 (M.D.Tenn. Feb. 9, 2001) | $104 million | 30% |
| 7. In re Lease Oil Antitrust Litig., 186 F.R.D. 403 (S.D.Tex.1999) | $190 million | 25% |
| 8. Kurzweil v. Philip Morris Co., Inc., Nos. 94 Civ. 2373(MBM), 94 Civ. 2546(BMB), 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) | $123 million | 30% |
| 9. In re Combustion, Inc., 968 F.Supp. 1116 (W.D.La.1997) | $127 million | 36% |
| 10. In re Sumitomo Copper Litig., 74 F.Supp.2d 393 (S.D.N.Y.1999) | $116 million | 27.5% |
| 11. In re Home-Stake Prod. Co. Sec. Litig., MDL No. 153 (N.D.Okla. Jan. 2, 1990) | $185 million | 30% |
| 12. In re Prudential Sec. Inc. Ltd. P'ships Litig., 912 F.Supp. 97 (S.D.N.Y.1996) | $110 million | 27% |

This Court added to the list of settlements exceeding $100 million in *In re Enron Corp. Securities and ERISA Litigations*. There, the aggregate settlement fund was worth $264,375,000 and the Court approved a 20% fee, observing that this amount was "well within the range of fees awarded in other similar cases." *Amended Final Order Approving an Award of Attorneys' Fees, Reimbursement of Expenses, and an Incentive Award to the Class Representatives, In re Enron Corp. Securities and ERISA Litigations*

*(S.D. Texas—Houston July 24, 2006) (Judge Harmon)*, p. 3.   The Court also awarded almost $900,000 in expense reimbursements.

Now to empirical studies of class actions in general, of which there are several.  I will focus on two studies here: one from the mid-1990s, Thomas E. Willging, *et al.*, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules* 16 (1996) (*FJC Study*); and one from 2004, Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 *Journal of Empirical Legal Studies* 27, 75 (2004) (*E&M Study*).[23]

Empirical studies once generated consistent findings.  Fee awards in settled class actions almost always fell between 20%-40% of the recovery and averaged about 33%.  For example, the *FJC Study*, *supra*, at 69 reported median fee awards in class actions "rang[ing] from 27% to 30%."  Consistency across the districts studied was remarkable, as shown in the table below.

---

[23] Other studies are available, including Stuart J. Logan, Jack Moshman & Beverly C. Moore, Jr., *Attorney Fee Awards in Common Fund Class Actions*, 24 *Class Action Reports* 167 (2003).



Figure 72: Mean and Median Fee-Recovery Rates in Certified Cases Using Percentage of Recovery Method and Providing Net Monetary Distribution to Class

*Note:* "Net monetary distribution" is net of attorneys' fees and administrative expenses.

Source: Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules 151 (1996).

The *2004 E&M Study* contained a larger and more diverse group of cases than the *FJC Study*, and more recent cases as well.   It found that, in percentage terms, fees declined as recoveries grew.   In the following figure, the diamonds show the mean fee percentages for all cases of the identified settlement sizes.   The lines extending outward from the diamonds show the range of fees falling within one standard deviation of the means.   Approximately two-thirds of the cases in each size category involve fee awards within these ranges.   Importantly, the figures describe awards of fees only.   They exclude expense reimbursements.    If included, expense reimbursements would shift the distributions upward.

Looking to the far right of the bottom box, which summarizes one of two datasets Professors Eisenberg and Miller employed (the CAR dataset), one sees that in cases involving recoveries of $84 million and up, the average fee award equals slightly less than 20% of the recovery, and the range defined by the first standard deviation extends upward to 27%.  Looking at the top box, which summarizes what Eisenberg and Miller call the "reported opinion dataset," one sees a mean above 10% and a first standard deviation extending above 20% for cases with recoveries over $190 million.  Obviously, the percentage requested in this case, 9.52% of the recovery, falls below the mean the *E&M Study* reports for the largest class of settlements using either dataset.



Figure 8: Fee percent range (one standard deviation) at levels of client recovery.

Source: Theodore Eisenberg and Geoffrey P. Miller, Attorney Fees in Class Action Settlements: An Empirical Study, 1 Journal of Empirical Legal Studies 27, 75 (2004).

Although the finding that fee percentages decline when recoveries become very large is too robust to deny, it is important to remember that this practice, which judges created, may harm class members.  As Judge Easterbrook observed in *Synthroid I*, 264 F.3d at 718, "[p]rivate parties would never contract for [] an arrangement" capping fees at a very low level because this would encourage cheap settlements.  Professors Weiss and Beckerman also identified the "increase/decrease rule" as a counterproductive policy.  Professor Coffee did as well.  *Declaration of John C. Coffee, Jr., In re High Fructose Corn Syrup Antitrust Litigation*, 17 (Oct. 7, 2004) (reporting Professor Coffee's longstanding belief that courts should refrain from using "declining percentage" formulas because "defendants would quickly come to understand that plaintiffs' counsel lacked an incentive to maximize the recovery … and … could exploit this lack of incentive").  The Regents' scale may not be perfect, but it did not encourage cheap settlements.

## 8.    THE REQUESTED FEE AWARD IS REASONABLE WHEN COMPARED TO FEES PAID IN THE MARKET FOR LEGAL SERVICES

This section will present evidence of the contingent fee market in action.  It will first show that percentage arrangements dominate this market.  It will then show the ranges of percentages that prevail in diverse contexts where clients and lawyers bargain face to face.

### 8.1.    Fee Agreements Negotiated by Sophisticated Clients

Little is known about the percentages businesses and other sophisticated clients pay when acting as plaintiffs in litigation.  They rarely release their agreements.  That said, the limited evidence that is available shows that marginal percentages can be high even when the stakes are very large.

A famous case involving the Texas law firm of Vinson & Elkins ("V&E") exemplifies the use of contingent percentage compensation arrangements by sophisticated clients seeking large recoveries.  ETSI Pipeline Project ("EPP") hired V&E to sue Burlington Northern Railroad and other defendants, alleging a conspiracy on their part to prevent EPP from constructing a $3 billion coal slurry pipeline.  In a sworn affidavit, Harry Reasoner, V&E's managing partner, described the financial relationship between EPP and V&E.

> The terms of our retention were that our client would pay all out-of-pocket expenses as they were incurred, but all legal fees were contingent upon a successful outcome.  We were paid 1/3 of all amounts received by way of settlement or judgment.  We litigated the matter for 5 years.  At the conclusion, we had settled with all defendants for a total of $634,900,000.00.  As a result, a total of $211,633,333.00 was paid as contingent legal fees.

*Declaration of Harry Reasoner*, filed in *In re Washington Public Power Supply System Securities Litigation*, U.S. District Court, District of Arizona, MDL No. 551, Nov. 30, 1990.

Several things about this example are noteworthy.  First, the contingency fraction was one-third of the recovery.  Second, V&E bore no liability for out of pocket expenses.  The percentage was high even though the deal was more favorable to the law firm than the usual contingent fee arrangement, which requires the lawyer to bear litigation costs and entitles the lawyer to reimbursement only if the plaintiff prevails.  Third, the case was enormous.  Fourth, the client was a sophisticated business with access to the best

lawyers in the country.  No claim of pressure or undue influence by V&E could possibly be made.

Sophisticated business clients still pay large contingent percentage fees today. Consider the recently concluded patent infringement litigation between NTP Inc. and Research In Motion Ltd., the company that manufactures the popular Blackberry.  NTP promised its law firm, Wiley Rein & Fielding, a one-third contingent fee.  When the case settled for $612.5 million, the Wiley firm received more than $200 million in fees.  Yuki Noguchi *D.C. Law Firm's Big BlackBerry Payday: Case Fees of More Than $200 Million Are Said to Exceed Its 2004 Revenue*, *Washington Post*, March 18, 2006, D03. Another 33% fee in an enormous commercial case.

In another case involving a sophisticated client with an enormous intellectual property claim, the plaintiff agreed to pay a scale of contingent percentages that rose then fell.  *Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld, LLP, et al.*, 105 S.W.3d 244 (Tex. Appls.—Houston, 2003).   After initially paying another law firm by the hour, Tanox ran out of money and retained a group of law firms on contingency.  "Under the fee agreement, Tanox agreed to pay the Lawyers a contingency fee pursuant to a sliding scale: 25% of the first $32 million recovered by Tanox, 33 1/3 % of recovery from $32 million to $60 million, 40% of recovery from $60 million to $200 million, and 25% of recovery over $200 million."   *Id*. at 248-249.   The agreement also contained other provisions favorable to the lawyers, including a promise of "$100 million if they obtained a permanent injunction."  "The total fees Tanox agreed to pay the Lawyers were capped at $500 million and the total fees derived from royalties were capped at $300 million."

*Id.* at 249.  Like NTP, Tanox agreed to pay both a high percentage and a potentially enormous amount.

Another, and perhaps even more telling, example of a fee promised by a sophisticated client is described in *Synthroid II*.  There, financial intermediaries with tens of millions of dollars at stake agreed to pay outside law firms fees averaging 22 percent of the recovery even though a settlement was already on the table when the lawyers were hired.  The lawyers' job was merely to garner as much as possible of the settlement fund for the clients, not to litigate the case.  Given the lack of risk of non-payment, the size of the percentage reflects well on the fee set by The Regents.  Here, the lawyers bore a significant risk of non-payment and incurred sizeable expenses on behalf of the class.

Other sources of information about fees paid by sophisticated clients also support the reasonableness of class counsel's fee request.  In the report he filed in *In re: High Fructose Corn Syrup Antitrust Litigation*, Professor Coffee stated that the two named plaintiffs, Zarda Enterprises and Publix Supermarkets Inc., agreed to pay fees of 30% and "more than 25%," respectively.  In the same case, an opt-out claimant, Gray & Co, agreed to pay its attorney 33%-40% of the recovery, depending on the time of settlement.  Three other corporate class members, Honickman Group, The Coca-Cola Company, and Admiral Beverage Corporation, submitted affidavits stating that they would have paid at least a 25% fee.  *Declaration of John C. Coffee, Jr., In re High Fructose Corn Syrup Antitrust Litigation*, 1-2 (Oct. 7, 2004).

In the same lawsuit, class counsel submitted a list showing the contingent percentage fees agreed to by 6 named plaintiffs, all of which were businesses that purchased corn syrup.  The percentages ranged from 20% to 33.33%, often varying with

the duration of the lawsuit.  *Plaintiffs' Supplemental Memorandum on Attorneys' Fees in Common-Fund Cases*, Exhibit E, submitted in *In re: High Fructose Corn Syrup Antitrust Litigation* (Oct. 7, 2004).   I have also personally observed testimony by corporate representatives supporting fee awards in the 25-33% range.

Finally, many institutional investors have agreed to pay fees in the 12%-17% range after opting out of class actions.  In *WorldCom*, the trial judge noted that "Milberg Weiss ha[d] filed at least forty-seven Individual Actions on behalf of over one hundred and twenty pension funds" that opted out of the class suit.  *In re WorldCom, Inc. Securities Litigation*, 2003 WL 22701241 *2 (S.D.N.Y. 2003).   According to the court, the opt outs agreed to pay Milberg Weiss "on a contingent fee basis with a base fee of either 12 or 13%, plus expenses, and a cap of 17%."  *Id.*, at *4.

### 8.2.    Fees in Mass Tort Cases

In mass actions, large numbers of clients sign fee agreements that fix the percentages their attorneys will receive.   These agreements provide evidence of prevailing market rates for lawyers who represent large numbers of clients with related claims.   They are therefore relevant to class actions, which also bring together persons with related claims.

After studying the literature on group lawsuits and participating in several group lawsuits personally, I can report that contingent percentage fees of 33-40 percent are common.   "The market for large number representations … consists overwhelmingly of asbestos cases and, to lesser degrees, of cases involving defective products, explosions and other accidents and disasters, and pollutants or toxic substances.   Studies of these cases and anecdotal reports indicate that fees ranging from thirty-three percent to forty

percent predominate in these representations."   Silver, *Due Process and the Lodestar Method*, *supra*, at 1843-1844.

Studies of asbestos litigation by the Institute for Civil Justice at RAND bear out this assessment.  For example, a study of over 3,000 claims closed before August, 1982 found that plaintiffs' legal fees and other litigation expenses consumed an average of about 42 percent of plaintiffs' gross recoveries.  James S. Kaklik, *et al.*, *Costs of Asbestos Litigation* Table S.2 (1983)  Another RAND study of asbestos cases reported legal fees and expenses consumed 39 percent of plaintiffs' gross recoveries.  James S. Kakalik *et al.*, *Variation in Asbestos Litigation Compensation and Expenses* xviii Figure S.1 (1984).

My experience as a consultant in large-group lawsuits supports RAND's findings.  In one case I participated in, approximately 1,700 plaintiffs alleging asbestos-related personal injuries each agreed to pay fees in the range of 33 to 40 percent, with expenses separately reimbursed.  In a second instance, 600 plaintiffs who suffered property damage as a result of an explosion at a natural gas storage facility agreed to pay fees of 33 percent of the recovery, plus expenses.  In a third instance, approximately 60,000 plaintiffs who suffered property damage as a result of defective polybutylene plumbing agreed to pay fees of 40 percent of the recovery, plus expenses.  A fourth case was one in which a single law firm settled the claims of several thousand asbestos clients against a single defendant.   Again, fees ranged from 33 to 40 percent, with expenses separately reimbursed.  I also am familiar with fees lawyers have charged in a variety of cases involving prescription drugs, such as Fen-Phen, and know they fall into the same range.  These examples show that contingent fees of 40 percent are common in the market for aggregated lawsuits involving large numbers of plaintiffs.

Evidence from lawsuits involving large client groups is especially important because market pressures should lead lawyers and clients in these cases to adopt fee arrangements that maximize clients' expected recoveries, net of costs.  The uniform use of contingent percentage arrangements shows that they work best for plaintiffs, and the prevalence of fees in the neighborhood of 33 percent shows that incentives around this level are needed to encourage attorneys to devote sufficient amounts of time and other resources to the development of claims, especially when liability is contested.

### 8.3.    Conventional Plaintiff Representations

In personal injury and other conventional representations, plaintiffs use contingent percentage arrangements far more often than other fee arrangements.[24]  It is therefore unsurprising that lead plaintiffs in securities fraud class actions use them as well.  To my knowledge, every publicly available fee agreement negotiated by a lead plaintiff in a securities case has provided for a contingent percentage fee.  I know of no lead plaintiff which has agreed to pay class counsel a guaranteed hourly rate.

The conventional wisdom, shared by many judges and commentators, is that the "standard" contingent fee in conventional plaintiff representations is one-third of the recovery.  Empirical studies have shown that although one-third fees are common, the conventional wisdom overstates their frequency.  Contingent percentage fees vary in size, both within practice areas and across them.  Generally speaking, they range from a low of 20 percent in automobile accident cases that settle even before complaints are filed to a high of 50 percent in medical malpractice cases.  See Charles Silver, *Due Process and the*

---

[24] See *Kirchoff v. Flynn*, 786 F.2d 320 (7th Cir. 1986).

*Lodestar Method*, *supra*, 1842-1843 (citing studies).  The variation reflects, among other things, the differing risks and costs that different lawsuits entail.

Herbert Kritzer, a professor of Political Science and Law at the University of Wisconsin, is the country's leading empirical researcher of attorneys' fees in plaintiff representations.[25]  In an article based on a sample of 989 representations in Wisconsin, he reports that in slightly more than half the cases the client agreed to pay a one-third contingent fee.  Herbert M. Kritzer, *Investing in Contingency Fee Cases*, *Wisconsin Lawyer* 11, 12 (August 1997).  Many other clients agreed to pay contingent percentages that varied in size according to the stage litigation reached before ending.  The following graph, taken from the same article, shows the range of percentages agreed to for each stage of litigation.

---

[25] At my invitation, Professor Kritzer published an article in the *Texas Law Review* summarizing many existing studies of the impact of fees on lawyers' behavior.  Herbert M. Kritzer, *Lawyer Fees and Lawyer Behavior in Litigation: What Does the Empirical Literature Really Say?*, 80 *Tex. L. Rev.* 1943 (2002).

Figure 2: Contingency Fees
Offered at Each Stage of Disposition

Source: Herbert M. Kritzer, *Investing in Contingency Fee Cases*, Wisconsin
Lawyer 11, 12 (August 1997).

Generally speaking, fee percentages increased as litigation became riskier.  Lower fees were promised when cases settled without lawsuits than when they settled after petitions were filed.  Still higher percentages were promised when cases were tried or appealed.

Other studies have generated findings similar to Kritzer's.  For example, a survey conducted by the State Bar of Texas found average contingent fees ranging from 28% to 45% in the early 1990's.  State Bar of Texas, *1995 Attorney Billing & Compensation Study*.

## 9. THE AGREED FEE IS REASONABLE WHEN COMPARED TO BOUNTIES PAID TO *QUI TAM* RELATORS

One often hears that a judge presiding over a fee request in a class action settlement acts as a guardian or a fiduciary for absent class members, who cannot prevent over-reaching.  This does not mean that judges should deny fees or cut them to the bone.  Withholding fees would deny class members access to representation.  Under-paying attorneys would have the same effect.  The point is just that judges should be careful with class members' money.  Ideally, they should be as careful as class members themselves would be.

We cannot know for certain how much money, or how little, class members would spend hiring agents to vindicate their claims, so we must look for real-world analogues.  Markets in which lawyers and clients bargain over fees provide one set of analogues.  Governments provide another.  Governments offer bounties to agents, called *qui tam* relators or whistleblowers, who help them recover taxpayer dollars taken by fraud.  Compensation rates are set in federal, state, and local statutes called false claims

acts (FCAs).[26]  Because relators' shares appear in statutes and are generally consistent across governments, they may be said to reflect a public consensus on reasonableness.

The analogy between *qui tam* cases and securities fraud class actions is strong. Both are species of business fraud litigation.  Both seek redress for losses imposed on large and anonymous populations.  Both are led by teams of plaintiffs and attorneys who volunteer in hope of winning payments.   In both, the controlling teams work on contingency, meaning they have to win to get paid.  Also in both, regulators (legislators and judges) set fees.  The regulators may be described as guardians or fiduciaries as well, because the fortunes of passive interest holders (taxpayers and shareholders) rest in their hands.  The interest holders would rationally want the regulators to act prudently.

It may help to pose the issue in the form of a question: When spending money recovered for shareholders in a fraud suit, should judges be stingier than other government officials are when spending money recovered for taxpayers?  I see no reason to think so, and barring such a reason, it seems appropriate for judges to take qui tam bonuses as a guide when awarding fees in class actions.

In terms of dollars recovered and bounties paid, the federal False Claims Act, 31 U.S.C. §§ 3729-3733, leads the way.  From 1987 to 2006, the U.S. government recovered $11,062,851,302 in fraud cases initiated by *qui tam* relators and paid a whopping $1,799,444,848 in relators' fees.  Civil Division, U.S. Department of Justice, *Fraud Statistics—Overview, October 1, 1986 - September 30, 2006*, republished at

---

[26]     State and city statutes can be reviewed at quitamhelp.com, http://www.quitamhelp.com/static/false_claims/states.html.  Some state statutes promise higher fees than the federal statute.  Some state statutes employ the same two-tiered structure as the federal act but set fees at different percentages.  See, e.g., Cal. Gov't Code 12650-12655 (1992) - Article 9 (setting the relator's share at 15%-33% of the proceeds if the state or a political subdivision takes over the action, and 25%-50% if the relator keeps control).

http://www.crowell.com/pdf/FalseClaimStat.pdf.    Fees thus approximated 16.3% of recoveries.

From this, one might infer that *qui tam* bounties tend fall below fees paid in class actions, which average around 25%.  One should not leap to the conclusion.  *Qui tam* cases come in two flavors: those in which relators control the prosecution from start to finish; and those in which the U.S. government intervenes and takes over.  The former are costlier and riskier for *qui tam* plaintiffs and their attorneys, and in them bounties are higher.  Fees range from 15% to 25% when the government intervenes and from 25% to 30% when it does not.  Table 8 breaks down the recoveries and fees according to the government's decision.

| TABLE 8: RECOVERIES AND RELATORS' SHARES IN FEDERAL FALSE CLAIMS ACT* CASES | | | |
|---|---|---|---|
| | **Recovery** | **Fees** | **Fee %** |
| **US Intervened** | $10,665,243,139 | $1,700,406,864 | 15.94% |
| **US Declined** | $397,608,163 | $99,037,984 | 24.91% |
| **Total Qui Tam** | $11,062,851,302 | $1,799,444,848 | 16.27% |
| Source: | Civil Division, U.S. Department of Justice, *Fraud Statistics— Overview, October 1, 1986 - September 30, 2006*, republished at http://www.crowell.com/pdf/FalseClaimStat.pdf | | |

*31 U.S.C. §§ 3729-3733

One could debate whether relator-led or government-led cases resemble securities fraud class actions more closely.  I lean toward the relator-led cases because, in them, private parties bear all the risks and cost and derive no leverage from the government's presence.  For present purposes, though, it does not matter how one comes down, for in

all successful False Claims Act cases relators' shares greatly exceed Lead Counsel's requested contingent fee.  The lowest *qui tam* fee (15%) is 56% higher than the fee memorialized in the retainer agreement (9.6%).

One could also argue that fees set in FCAs are irrelevant because recoveries in *qui tam* actions are much smaller than those in securities fraud class actions.  In fact, the cases are closer in size than one might think.  Although the median class action settlement is much larger than the median FCA recovery, the means are much closer.[27]  The median securities settlement was consistently larger than the median *qui tam* settlement, but the difference between the means was less clear.  The largest *qui tam* recoveries also rival all but the very largest class action settlements in size.  Table 9 lists all known qui tam cases with federal recoveries exceeding $100 million (nominal).  Only four securities settlements—those in the Enron, WorldCom, Cendant, and IPO Allocation cases—are bigger than the Tenet settlement that tops the chart.

Table 9 also show relators' shares in all cases where I was able to obtain this information from readily available sources.  In dollar terms the payments are enormous.  The U.S. government has not been stingy.  In percentage terms, *qui tam* bonuses are comparable to class action fee and cost awards, although the former show no tendency to decline as recoveries rise.  Even with hundreds of millions of taxpayer dollars on the line, the U.S. government has rejected the so-called "increase/decrease" rule, providing a reason to question judges' application of that rule in enormous class actions.

---

27 From 1987 to 2005, the mean (median) nominal recovery in a federal *qui tam* action was $10,028,482 ($784,597). Information on False Claims Act Litigation, GAO-06-320R, Briefing for Congressional Requesters (December 15, 2005), p. 31.  From 1991 to 2004, the mean (median) nominal recovery in securities class actions varied between $8 million and $37 million ($3.8 and $6.0 million).  Elaine Buckberg, Todd Foster, Ronald Miller, and Stephanie Plancich, *Recent Trends in Shareholder Class Action Litigation: Bear Market Cases Bring Big Settlements* 8 (NERA, Feb. 2005).

| Company | Settlement Amount** | Relator's Share | Relator's Percentage |
|---|---|---|---|
| Tenet[4] | $900,000,000 | $225,000,000 | 25.0% |
| HCA * | $631,000,000 | $151,591,500 | 24.0% |
| TAP Pharmaceuticals Products Inc. * | $559,483,560 | $95,000,000 | 17.0% |
| Fresenius Medical Care of N. America* | $385,000,000 | $65,000,000 | 16.9% |
| SmithKline Beecham Clinical Labs | $325,000,000 | $52,000,000 | 16.0% |
| National Medical Enterprises * | $324,200,000 | $65,000,000 | 20.0% |
| Gambro Healthcare | $310,000,000 | $56,000,000 | 18.1% |
| AstraZeneca * | $266,127,844 | $47,500,000 | 17.8% |
| St. Barnabas Hospitals | $265,000,000 | $40M-$66M | 15.1%-24.9% |
| Bayer Corp. * | $257,200,000 | $34,000,000 | 13.2% |
| BankAmerica*[1] | $187,000,000 | $26,000,000 | 13.9% |
| Beverly Enterprises Inc. * | $170,000,000 | $28,900,000 | 17.0% |
| United Technologies | $150,000,000 | $22,500,000 | 15.0% |
| GlaxoSmithKline[2] | $140,000,000 | $26,000,000 | 18.6% |
| Blue Cross Blue Shield Illinois * | $140,000,000 | $29,200,000 | 20.9% |
| Mario Gabelli et. al | $130,000,000 | $32,200,000 | 24.8% |
| Northrop Grumman | $111,200,000 | $27,200,000 | 24.5% |
| Vencor Inc./Ventas Inc. | $104,500,000 | $15,000,000 | 14.4% |
| National Health Labs | $100,000,000[3] | $15,000,000[3] | 15.0% |

**TABLE 9: RECOVERIES AND RELATOR SHARES IN FEDERAL FALSE CLAIMS ACT CASES WITH SETTLEMENTS OF AT LEAST $100 MILLION[#]**

#Entries in this table were culled from or checked against several sources: TAF Education Fund, Top False Claims Act Cases By Award Amount (last updated by TAF, Jan. 25, 2006); Corporate Crime Reporter, The Top 100 False claims Act Settlements 4 (Dec. 30, 2003); Kenneth B. Hawkco, The Federal False Claims Act, http://www.kbhawco.com/memo1.html; Company News; United Technologies to Pay Fine in Whistleblower Case, New York Times (Mar. 31, 1994); DOJ, Press Release, Dec. 30, 2004; Illinoisfraud.com, Recent Defendants, www.illinoisfraud.com/content_defendants.htm;and Statement of R. Alexander Acosta, Testimony Before the Subcommittee on Health of the House Committee on Ways and Means (Mar. 8, 2007).  Relators' shares for many settlements could not be determined.
*Criminal fines were also levied.
** Nominal dollars.  May include dollars not attributable to relators' claims.
1 California False Claims Act.
2 Federal Share Only Reported.  States' share was $10 million.
3. Actual recovery and actual payments exceeded listed amounts.
4. Conflicting evidence exists concerning the portion of payment attributable to qui tam suits and the relator's share in this case.  The entry in the table reports the highest values for which support was found. One source reports that relators' claims accounted for only $150 million in settlement payments, of which the related received $12 million.  Statement of R. Alexander Acosta, *supra*.  Because the reported fee falls below the statutory minimum, this report seems unreliable.

10. **THE REQUESTED FEE IS REASONABLE UNDER PREVAILING ETHICAL STANDARDS GOVERNING THE CONDUCT OF ATTORNEYS**

When managing class actions, judges often take little or no account of state bar

rules, which were not written with class actions in mind.  Principles of due process should guide judges in this endeavor, and they often require conduct state bar rules forbid.  "It is no exaggeration to say that if judges were to adhere to all ethics rules, class litigation as we know it would not exist."  Silver, *Due Process and the Lodestar Method*, *supra*, at 1829.

Even so, objectors often invoke the law governing lawyers when challenging fee requests in class actions.  They usually argue that requested hourly rates are excessive, in violation of Rule 1.5 of the ABA's *Model Rules of Professional Conduct* or its state law equivalents, but they have made other arguments as well.  Some contend that ethical standards require courts to apply the so-called "increase/decrease rule," according to which fees, taken as a percentage of recoveries, must fall as recoveries rise.

I believe objections like these should fall on deaf ears.  The Due Process Clause requires judges to manage class actions in ways calculated to minimize conflicts between absent class members and their representatives.[28]  Compensation arrangements that motivate lawyers to obtain the largest net recoveries accomplish this.  That these arrangements may sometimes generate fees that seem at odds with state bar rules is not important.  The Due Process Clause forbids judges from saddling class members with conflicts needlessly.

The law governing lawyers permits Lead Counsel's fee request, in any event.  As the American Law Institute explained its *Restatement (Third) of the Law Governing*

---

[28] In two enormous cases involving claims for monetary relief, the Supreme Court refused to allow class actions to proceed because absent claimants could not rely on their representatives to obtain the largest possible recovery.  *Amchem v. Windsor*, 521 U.S. 591, 621 (1997) ("Class counsel confined to settlement negotiations could not use the threat of litigation to press for a better offer."); *Ortiz v. Fiberboard Corporation*, 527 U.S. 815, 818 (1999) (observing that putative class counsel had a "great incentive to reach any agreement …, rather than the best possible arrangement for the … global settlement class").

*Lawyers*, when evaluating the reasonableness of an agreed fee a judge must ask three questions. "First, when the contract was made, did the lawyer afford the client a free and informed choice?" "Second, does the contract provide for a fee within the range commonly charged by other lawyers in similar representations?" "Third, was there a subsequent change in circumstances that made the fee contract unreasonable?" *Restatement (Third) of the Law Governing Lawyers* § 34, Comment *c* (2007). The answers to these questions make it clear, indeed obvious, that the agreed fee is proper.

### 10.1.   The Regents Made "a Free and Informed Choice"

When discussing the first question, the *Restatement* indicates that the "[r]elevant circumstances" include, inter alia, the client's sophistication and ability to interview other lawyers. *Id.* It then states that "[f]ees agreed to by clients sophisticated in entering into such arrangements (such as a fee contract made by inside legal counsel in behalf of a corporation) should almost invariably be found reasonable." *Id.* (emphasis added). The Board, a highly sophisticated client with easy access to a competitive market for legal services, was represented by lawyers in the OGC when it negotiated with Lead Counsel. Given this, the *Restatement* obviously allows the Court to uphold the bargain.

### 10.2.   The Agreed Fee is within the Range Charged by Lawyers in Similar Representations

When discussing the second question, the *Restatement* makes the following observation: "To the extent competition for legal services exists among lawyers in the relevant community, a tribunal can assume that the competition has produced an appropriate level of fee charges." *Id*. As previously explained, the market for legal services in securities cases is highly competitive, with lawyers "literally falling all over themselves" in their rush to curry clients' favor. Given this, it hardly seems necessary to

discuss the section question further.

One reaches the same conclusion when one compares the fee schedule in this case to the fees Lead Counsel and other law firms earned or were promised in other large cases.  The comparability of fees was established above.

The decision to use a schedule of rising percentages does not render the agreement ethically suspect either.  In *Formal Ethics Opinion 94-389*, the ABA expressly allowed this arrangement.  In a section entitled "The Percentage of a Contingent Fee May Increase with the Amount of the Recovery," the Committee on Ethics and Professional Responsibility wrote that, "as a matter of ethics, … a percentage that increases with the amount of the recovery can be permissible….  Indeed, many would say that this form of contingent fee agreement more closely rewards the effort and ability the lawyer brings to the engagement than does a straight percentage fee arrangement, since everyone would agree that it is the last dollars, not the first dollars, of recovery that require the greatest effort and/or ability on the part of the lawyer."  *Id.*

### 10.3.   No Relevant Circumstances Changed

The last question asked in the Restatement is whether a change in circumstances rendered a fee unreasonable.  The comment that addresses this issue starts by noting that "reasonableness is usually assessed as of the time the contract was entered into."  *Restatement (Third) of the Law Governing Lawyers* § 34, Comment *c* (2007).  *Formal Ethics Opinion 94-389* emphasizes this point, urging everyone "to keep in mind that the reasonableness as well as the appropriateness of a fee arrangement necessarily must be judged at the time it is entered into."  Only truly exceptional circumstances can justify a decision to invalidate a fee agreement that was ethically proper when a representation began.

A large recovery does not satisfy this requirement, as the *Restatement* explains. "A contingent-fee contract … allocates to the lawyer the risk that the case will require much time and produce no recovery and to the client the risk that the case will require little time and produce a substantial fee.  Events within that range of risks, such as a high recovery, do not make unreasonable a contract that was reasonable when made." *Restatement (Third) of the Law Governing Lawyers* § 34, Comment *c* (2007).  This is the only position one can sensibly take.  The entire purpose of a contingent fee agreement is to motivate a lawyer to obtain the largest possible recovery in the shortest possible amount of time.  It would be irrational, even laughable, to invalidate contingent fee agreements when they achieve their greatest successes.

It would be especially bizarre to use the size of the settlement fund as a reason for invalidating the fee agreement in this case, for a simple reason: The parties expressly anticipated that the recovery could exceed $2 billion and set fee terms to govern this contingency.  The Regents knew this lawsuit could produce one of the largest settlements in history, if enormous barriers were overcome, when the case began.

Every lead plaintiff hopes that its case will yield an enormous recovery.  Every lead plaintiff also knows that, if its wish comes true, its contingent fee agreement will generate an enormous fee for its attorneys.  The time passed long ago when any of this could be regarded as surprising.  Business clients have paid enormous contingent fees in private commercial disputes, and their payments have received widespread publicity.  Large fees have also been paid in class actions, mass actions, and state Medicaid recovery lawsuits.  The Regents understood that an enormous recovery was a possibility, a

possibility it wanted Lead Counsel to achieve.  The Board also knew that the success it hoped for would entitle Lead Counsel to a commensurate fee.

I declare under penalty of perjury of the laws of the United States that the foregoing is
true and correct.

Executed on:

_____                    _____
1/2/08                                       Charles Silver
Date

Resume of Charles Silver

## CONTACT INFORMATION

Center on Lawyers, Civil Justice and the Media
School of Law
University of Texas
727 East Dean Keeton Street
Austin, Texas 78705
(512) 232-1337 (voice)
csilver@mail.law.utexas.edu (preferred contact method)

## ACADEMIC EMPLOYMENTS

UNIVERSITY OF TEXAS SCHOOL OF LAW

| | |
|---|---|
| Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure | 2004-present |
| Co-Director, Center on Lawyers, Civil Justice, and the Media | 2001-present |
| Robert W. Calvert Faculty Fellow | 2000-2004 |
| Cecil D. Redford Professor | 1994-2004 |
| W. James Kronzer Chair in Trial & Appellate Advocacy | Summer 1994 |
| Graves, Dougherty, Hearon & Moody Centennial Faculty Fellow | 1991-1992 |
| Assistant Professor | 1987-1991 |

VANDERBILT UNIVERSITY LAW SCHOOL

| | |
|---|---|
| Visiting Professor | 2003 |

UNIVERSITY OF MICHIGAN LAW SCHOOL

| | |
|---|---|
| Visiting Professor | 1994 |

UNIVERSITY OF CHICAGO

| | |
|---|---|
| Managing Editor, Ethics: A Journal of Social, Political and Legal Philosophy | 1983-1984 |

Resume of Charles Silver

## EDUCATION

JD 1987, Yale Law School
MA 1981, University of Chicago (Political Science)
BA 1979, University of Florida (Political Science)

## MAJOR PUBLICATIONS BY SUBJECT

CLASS ACTIONS, GROUP LAWSUITS, AND ATTORNEYS' FEES

1.      "Incentivizing Institutional Investors to Serve as Lead Plaintiffs in Securities Fraud Class Actions," DePaul Law Review (forthcoming 2007) (with Sam Dinkin).

2.      "The Allocation Problem in Multiple-Claimant Representations," 14 S. Ct. Econ. Rev. 95 (2006) (with Paul Edelman and Richard Nagareda) (peer-reviewed).

3.      "Dissent from Recommendation to Set Fees Ex Post," 25 Rev. of Litig. 497 (2006) (accompanied Task Force on Contingent Fees, Tort Trial and Insurance Practice Section of the American Bar Association, "Report on Contingent Fees in Class Action Litigation," 25 Rev. of Litig. 459 (2006)).

4.      "Merging Roles: Mass Tort Lawyers as Agents and Trustees," 31 Pepp. L. Rev. 301 (2004) (invited symposium).

5.      "We're Scared To Death: Class Certification and Blackmail," 78 N.Y.U. L. Rev. 1357 (2003).

6.      "A Critique of *Burrow v. Arce*," 26 Wm. & Mary Envir. L. & Policy Rev. 323 (2001) (invited symposium).

7.      "Due Process and the Lodestar Method: You Can't Get There From Here," 74 Tul. L. Rev. 1809 (2000) (invited symposium).

8.      "The Aggregate Settlement Rule and Ideals of Client Service," 41 S. Tex. L. Rev. 227 (1999) (with Lynn A. Baker) (invited symposium).

9.      "Representative Lawsuits & Class Actions," in Int'l Ency. Of L. & Econ., B. Bouckaert & G. De Geest, eds., (1999) (peer-reviewed).

10.     "I Cut, You Choose: The Role of Plaintiffs' Counsel in Allocating Settlement Proceeds," 84 Va. L. Rev. 1465 (1998) (with Lynn A. Baker) (invited symposium).

11.     "Mass Lawsuits and the Aggregate Settlement Rule," 32 Wake Forest L. Rev. 733 (1997) (with Lynn A. Baker) (invited symposium).

Resume of Charles Silver

12.     "A Model Retainer Agreement for Legal Services Programs: Mandatory Attorney's Fees Provisions," 28 Clearinghouse Rev. 114 (June 1994) (with Stephen Yelenosky).

13.     "Incoherence and Irrationality in the Law of Attorneys' Fees," 12 Tex. Rev. of Litig. 301 (1993).

14.     "Unloading the Lodestar: Toward a New Fee Award Procedure," 70 Tex. L. Rev. 865 (1992).

15.     "Comparing Class Actions and Consolidations," 10 Tex. Rev. of Litig. 496 (1991).

16.     "A Restitutionary Theory of Attorneys' Fees in Class Actions," 76 Cornell L. Rev. 656 (1991).

INSURANCE AND INSURANCE DEFENSE ETHICS

17.     Practical Guide for Insurance Defense Lawyers, International Association of Defense Counsel (2002) (with Ellen S. Pryor and Kent D. Syverud) (published on the IADC website in 2003 and revised and distributed to all IADC members as a supplement to the Defense Counsel J. in January 2004).

18.     "When Should Government Regulate Lawyer-Client Relationships? The Campaign to Prevent Insurers from Managing Defense Costs," 44 Ariz. L. Rev. 787 (2002) (invited symposium).

19.     "Defense Lawyers' Professional Responsibilities: Part II—Contested Coverage Cases," 15 G'town J. Legal Ethics 29 (2001) (with Ellen S. Pryor).

20.     "Defense Lawyers' Professional Responsibilities: Part I—Excess Exposure Cases," 78 Tex. L. Rev. 599 (2000) (with Ellen S. Pryor).

21.     "The Lost World: Of Politics and Getting the Law Right," 26 Hofstra L. Rev. 773 (1998) (invited symposium).

22.     "Flat Fees and Staff Attorneys: Unnecessary Casualties in the Battle over the Law Governing Insurance Defense Lawyers," 4 Conn. Ins. L. J. 205 (1998) (invited symposium).

23.     "The Professional Responsibilities of Insurance Defense Lawyers," 45 Duke L. J. 255 (1995) (with Kent D. Syverud), reprinted in Ins. L. Anthol. (1996) and 64 Def. L. J. 1 (Spring 1997).

24.     "Professional Liability Insurance as Insurance and as Lawyer Regulation: A Comment on Davis, Institutional Choices in the Regulation of Lawyers," 65 Fordham L. Rev. 233 (1996) (invited symposium).

Resume of Charles Silver

25. "All Clients are Equal, But Some are More Equal than Others: A Reply to Morgan and Wolfram," 6-3 <u>Coverage</u> 47 (May/June 1996) (with Michael Sean Quinn).

26. "Are Liability Carriers Second-Class Clients? No, But They May Be Soon-A Call to Arms against the Restatement of the Law Governing Lawyers," 6-2 <u>Coverage</u> 21 (Jan./Feb. 1996) (with Michael Sean Quinn).

27. "Wrong Turns on the Three Way Street: Dispelling Nonsense About Insurance Defense Lawyers," 5-6 <u>Coverage</u> 1 (Nov./Dec.1995) (with Michael Sean Quinn).

28. "Introduction to the Symposium on Bad Faith in the Law of Contract and Insurance," 72 <u>Tex. L. Rev.</u> 1203 (1994) (with Ellen Smith Pryor).

29. "Does Insurance Defense Counsel Represent the Company or the Insured?" 72 <u>Tex. L. Rev.</u> 1583 (1994), reprinted in Practising Law Institute, <u>Insurance Law: What Every Lawyer and Businessperson Needs To Know</u>, Litigation and Administrative Practice Course Handbook Series, PLI Order No. H0-000S (1998).

30. "Thoughts on Procedural Issues in Insurance Litigation," VII <u>Ins. L. Anthol.</u> (1994).

31. "A Missed Misalignment of Interests: A Comment on Syverud, The Duty to Settle," 77 <u>Va. L. Rev.</u> 1585 (1991), reprinted in VI <u>Ins. L. Anthol.</u> 857-870 (1992).

GENERAL LEGAL ETHICS AND PROCEDURE

32. "In Texas, Life is Cheap," 59 <u>Vanderbilt L. Rev.</u> 1875 (2006) (with Frank Cross).

33. "A Rejoinder to Lester Brickman: *On the Theory Class's Theories of Asbestos Litigation,*" 32 <u>Pepp. L. Rev.</u> 765 (2005).

34. "Introduction: Civil Justice Fact and Fiction," 80 <u>Tex. L. Rev.</u> 1537 (2002) (with Lynn A. Baker).

35. "Does Civil Justice Cost Too Much?" 80 <u>Tex. L. Rev.</u> 2073 (2002).

36. "What's Not To Like About Being A Lawyer?," 109 <u>Yale L. J.</u> 1443 (2000) (with Frank B. Cross) (review essay).

37. "Preliminary Thoughts on the Economics of Witness Preparation," 30 <u>Tex. Tech L. Rev.</u> 1383 (1999) (invited symposium).

38. "And Such Small Portions: Limited Performance Agreements and the Cost-Quality/Access Trade-Off," 11 <u>G'town J. Legal Ethics</u> 959 (1998) (with David A. Hyman) (invited symposium).

Resume of Charles Silver

39.    "Bargaining Impediments and Settlement Behavior," in <u>Dispute Resolution: Bridging the Settlement Gap</u>, D.A. Anderson, ed. (1996) (with Samuel Issacharoff and Kent D. Syverud).

40.    "The Legal Establishment Meets the Republican Revolution," 37 <u>S. Tex. L. Rev.</u> 1247 (1996) (invited symposium).

41.    "Do We Know Enough About Legal Norms?" in <u>Social Rules: Origin; Character; Logic; Change</u>, D. Braybrooke, ed. (1996).

HEALTH CARE POLICY, MEDICAL MALPRACTICE LITIGATION & PROVIDER COMPENSATION ARRANGEMENTS

42.    "Malpractice Payouts, and Malpractice Insurance: Evidence from Texas Closed Claims, 1990-2003," <u>Geneva Papers on Risk and Insurance: Issues and Practice</u> (forthcoming April 2008) (with Bernard S. Black, David A. Hyman, William M. Sage and Kathryn Zeiler) (peer-reviewed).

43.    "Physicians' Insurance Limits and Malpractice Payments: Evidence from Texas Closed Claims 1990-2003," <u>J. Legal Stud.</u> (forthcoming 2007) (with Bernard Black, David Hyman, William Sage, and Kathryn Zeiler) (peer-reviewed).

44.    "Do Defendants Pay What Juries Award? Post-Verdict Haircuts in Texas Medical Malpractice Cases, 1988-2003," <u>J. Empirical Legal Stud.</u> 3-68 (2007) (with Bernard Black, David A. Hyman, William M. Sage, and Kathryn Zeiler) (peer-reviewed).

45.    "Medical Malpractice Litigation and Tort Reform: It's the Incentives, Stupid," 59 <u>Vanderbilt L. Rev</u>. 1085 (2006) (with David A. Hyman) (invited symposium).

46.    "Medical Malpractice Reform Redux: Déjà Vu All Over Again?" XII <u>Widener L. J.</u> 121 (2005) (with David A. Hyman) (invited symposium).

47.    "Stability, Not Crisis: Medical Malpractice Claim Outcomes in Texas, 1988-2002," 2 <u>J. Empirical Legal Stud.</u> 207–259 (July 2005) (with Bernard Black, David A. Hyman, and William S. Sage) (peer-reviewed).

48.    "Speak Not of Error, <u>Regulation</u> (Spring 2005) (with David A. Hyman).

49.    "The Poor State of Health Care Quality in the U.S.: Is Malpractice Liability Part of the Problem or Part of the Solution?," 90 <u>Cornell L. Rev.</u> 893 (2005) (with David A. Hyman).

50.    "Believing Six Improbable Things: Medical Malpractice and 'Legal Fear,'" 28 <u>Harv. J. L. and Pub. Pol</u>. 107 (2004) (with David A. Hyman) (invited symposium).

Resume of Charles Silver

51.    "You Get What You Pay For: Result-Based Compensation for Health Care," 58 <u>Wash. & Lee L. Rev.</u> 1427 (2001) (with David A. Hyman).

52.    "The Case for Result-Based Compensation in Health Care," 29 <u>J. L. Med. & Ethics</u> 170 (2001) (with David A. Hyman).

JURISPRUDENCE AND PHILOSOPHICAL ETHICS

53.    "Elmer's Case: A Legal Positivist Replies to Dworkin," 6 <u>L. & Phil.</u> 381 (1987) (peer-reviewed).

54.    "Justice In Settlements," 4 <u>Soc. Phil. & Pol.</u> 102 (1986) (with Jules L. Coleman) (peer-reviewed).

55.    "Negative Positivism and the Hard Facts of Life," 68 <u>The Monist</u> 347 (1985) (peer-reviewed).

56.    "Utilitarian Participation," 23 <u>Soc. Sci. Info.</u> 701 (1984) (peer-reviewed).

OTHER

57.    "Public Opinion and the Federal Judiciary: Crime, Punishment, and Demographic Constraints," 3 <u>Pop. Res. & Pol. Rev.</u> 255 (1984) (with Robert Y. Shapiro) (peer-reviewed).

**AWARDS**

Faculty Research Grant, University of Texas, 2005-06

Fellow, Texas Bar Foundation, Elected 1998

Texas Excellence in Teaching Award, 1997

BRAVO Award, State Bar of Texas, 1995

Felix S. Cohen Prize for Legal Philosophy, Yale Law School, 1987

Olin Foundation Grant for Study of Class Actions, Yale Law School, 1986

National Science Foundation Graduate Fellowship, 1980-1983

**NOTED ACTIVITIES**

Associate Reporter, American Law Institute Project on Aggregate Litigation (2003-present)

Member, Grants Subcommittee, Law School Admissions Council (2005-2007)

Resume of Charles Silver

Invited Academic Member, American Bar Association/Tort & Insurance Practice Section Task Force on the Contingent Fee (2003-2007)

Co-Reporter, Project on the Professional Responsibilities of Insurance Defense Lawyers, International Association of Defense Counsel (1994-2002)

Chair, Chair-Elect, and Treasurer, Section on Insurance Law, Association of American Law Schools (1997-1999)

Member, Executive Committee, Section on Professional Responsibility, Association of American Law Schools (1994-1997)

Program Chair, Joint Program on the Professional Responsibilities of Lawyers for Insurance Companies, sponsored by the Insurance and Professional Responsibility Sections of the Association of American Law Schools (1996)

Member, Special Master's Team, *Cimino v. Raymark Industries* (1989)

Member, State Bar of Texas (admitted 1988)

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing EXPERT REPORT OF PROFESSOR CHARLES SILVER CONCERNING THE REASONABLENESS OF CLASS COUNSELS' REQUEST FOR AN AWARD OF ATTORNEYS' FEES document has been served by sending a copy via electronic mail to serve@ESL3624.com on January 4, 2008.


I also certify that a copy of the above-mentioned document has been served via U.S. MAIL on the parties listed on the attached "Additional Service List" on this 4th day of January, 2008.


_Deborah S. Granger_

_____
DEBORAH S. GRANGER

| ADDITIONAL SERVICE LIST | |
|---|---|
| Stuart Yoes<br>THE YOES LAW FIRM, LLP<br>3535 Calder Avenue, Suite 235<br>Beaumont, TX  77726-7584<br>409/833-2352<br>409/838-5577 (fax) | Frank H. Tomlinson<br>PRITCHARD, McCALL; & JONES, LLC<br>505 N. 20th Street, Suite 800<br>Birmingham, AL  35203<br>205/328-9190<br>205/458-0035 (fax) |
| Edward W. Cochran<br>20030 Marchmont Rd.<br>Shaker Heights, OH  44122<br>216/751-5546<br>216/751-6630 (fax) | N. Albert Bacharach Jr.<br>115 N.E. Sixth Avenue<br>Gainesville, FL  32601-6592<br>352/378-9859<br>352/338-1858 (fax) |
| Paul S. Rothstein<br>626 N.E. First Street<br>Gainesville, FL  32601<br>352/376-7650<br>352/374-7133 (fax) | Maureen McGuirl<br>FENSTERSTOCK & PARTNERS LLP<br>30 Wall Street, 9th Floor<br>New York, NY  10005<br>212/785-4100<br>212/785-4040 (fax) |
| Lawrence W. Schonbrun<br>LAW OFFICES OF LAWRENCE W. SCHONBRUN<br>86 Eucalyptus Road<br>Berkeley, CA  94705<br>510/547-8070<br><br>**SERVICE VIA UPS OVERNIGHT** | Richard C. Bauerle<br>30 Greenbriar<br>Ottumwa, IA 52501 |
| Arnold Gregg<br>4445 Forest Glen Road<br>Anaheim Hills, CA  92807 | Steven F. Helfand<br>HELFAND LAW OFFICES<br>582 Market Street, Suite 1400A<br>San Francisco, CA  94104<br>415/397-0007<br>415/397-0009 (fax) |
| Mr. Stanley Majors<br>22868 Beaverhead Drive<br>Diamond Bar, CA  91765<br>909/860-8150 | Stephen Neuwirth<br>QUINN EMANUEL URQUHART OLIVER<br> & HEDGES, LLP<br>51 Madison Avenue, 22nd Floor<br>New York, NY  10010 |