IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re Enron Corporation | § | |
| Securities, Derivative & | § | MDL-1446 |
| "ERISA" Litigation | § | |
| | § | |
| MARK NEWBY, ET AL., | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-01-3624 |
| | § | CONSOLIDATED CASES |
| ENRON CORPORATION, ET AL., | § | |
| | § | |
| Defendants | § | |

## OPINION, CONCLUSIONS OF LAW, FINDINGS OF FACT, AND ORDER

## RE REIMBURSEMENT OF EXPENSES

Pending before the Court in the above referenced cause pursuant to 15 U.S.C. § 78u-4(a)(4), is a motion for approval of Lead Plaintiff the Regents of the University of California's and certain other persons' request for reimbursement of expenses (instrument #5795), filed by the following: (1) Lead Plaintiff (Christopher M. Patti)[1]; (2) Stephen M. Smith[2]; (3) Staro Asset Management LLC (Daniel J. McNally)[3]; (4) Amalgamated Bank as Trustee for the Longview Collective Investment Fund, Longview Core Bond Index Fund and Certain Other Trust Accounts (Scott Zdrazil)[4];

---

[1] Declaration of Christopher M. Patti (#5796), supplemented (#5865).

[2] Declaration of Stephen M. Smith (#5797).

[3] Declaration of Daniel J. McNally (#5798).

[4] Declaration of Scott Zdrazil (#5799).

(5) San Francisco City and County Employees Retirement System (Owen J. Clemens)[5]; (6) Employer-Teamsters Local Nos. 175/505 Pension Trust Fund (David R. Atkins)[6]; (7) Nathaniel Pulsifer, Trustee of Shooters Hill Revocable Trust[7]; (8) Michel Bessire[8]; (9) John Cassidy[9]; (10) Michael Henning[10]; (11) Dr. Richard Kimmerling[11]; (12) George Maddox[12]; (13) George Placke[13]; (14) Ben Schuette[14]; (15) Mervin H. Schwartz, Jr.[15]; (16) Joseph Speck[16]; (17) John Zegarski[17]; (18) Conseco Annuity Assurance (Gregory Seketa)[18]; and (10) Charles Prestwood.[19]   Lead Plaintiff states

---

[5] Declaration of Owen J. Clements (#5800).

[6] Affidavit (#5801) and Declaration (#5901) of David R. Atkins, Secretary of the two funds.

[7] Declaration of Nathaniel Pulsifer (#5802).

[8] Declaration of Michael Bessire (#5803).

[9] Declaration of John Cassidy (#5804).

[10] Declaration of Michael B. Henning (#5805).

[11] Declaration of Richard Kimmerling (#5806).

[12] Declaration of George Maddox (#5807).

[13] Declaration of George M. Placke (#5805).

[14] Declaration of Ben Schuette (#5809).

[15] Declaration of Mervin H. Schwartz, Jr. (#5810).

[16] Declaration of Joseph C. Speck (#5811).

[17] Declaration of John Zegarski (#5812).

[18] Declaration of Gregory J. Seketa (#5813).

[19] Declaration of Charles Prestwood (#5814).

that these parties were either proposed as class representatives or took action for the benefit of the class [20] and seek reimbursement for the time and expenses they incurred in connection with the prosecution and partial resolution of this litigation.  The supporting declaration or affidavit of each is identified in the above listed footnotes.

After carefully reviewing the record, the Court concludes that some of the requests for reimbursement of expenses and costs under 15 U.S.C. §§ 78u-4(a)(2)(A)(vi) and 78u-4(a)(4) should be granted and others denied for reasons stated below. Because those seeking reimbursement were not given adequate notice of the standards that would be used by this Court in the face of conflicting case law, the Court will allow those whose requests are denied to resubmit revised petitions if they can meet the requirements set out below.

## Applicable Law

There is a rigorous debate whether it is proper in class actions generally to approve an incentive award to named plaintiffs because these class representatives take risks and perform services that benefit the class.  4 Alba Conte and Herbert

---

[20] All seven entities and 10 of the 12 individuals were proposed as class representatives; the two individuals who were not are George Maddox and Charles Prestwood.  Each application will be discussed separately.

B. Newberg, *Newberg on Class Actions* § 11.38 (4th ed. database updated June 2008).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") appears to prohibit such "bounty" payments in federal securities class actions. It mandates that at the beginning of the litigation a plaintiff seeking to serve as a class representative must file a sworn certification that he "will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's pro rata share of any recovery, except as ordered or approved by the court in accordance with paragraph (4)." 15 U.S.C. § 78u-4(a)(2)(A)(vi). Paragraph 4 of the statute, 15 U.S.C. § 78u-4(a)(4), reads

> The share of any final judgment or of any settlement that is awarded to a representative party serving on behalf of a class shall be equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class. Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class.

Moreover, in addition to ensuring there are no incentive or compensatory awards to class representatives, it also requires that the requested costs and expenses be "reasonable." *See, e.g., In re Heritage Bond Litigation*, No. 02-ML-1475 ST, *et al.*, 2005

WL 1594403, *17 (C.D. Cal. June 10, 2005)(rejecting class representatives' reimbursement requests for $10,000 on hours spent in litigation because they did not "demonstrate how such hours can be considered 'reasonable costs and expenses'").

Nevertheless there is a split between courts which have read the statute narrowly and strictly limited reimbursement to actual costs and expenses incurred, many only when proven with detailed evidence,[21] and other courts that have granted lead plaintiffs incentive awards to encourage "high quality monitoring" and not insisted that alleged costs and expenses to be detailed or even limited to "costs and expenses directly relating to

---

[21] *See, e.g., In re Nat'l, Inc. Sec. Litig.*, No. 02-3013, 2007 WL 623808, *10 (S.D.N.Y. Mar. 1, 2007)("Lead Plaintiffs have signed certifications pursuant to the PSLRA, but their affidavits fail to explain how they determined their asserted hourly 'lost wages.' . . . Without a better explanation for claims of $200-$800 per hour of 'lost wages,' the Court should decline to award such amounts."); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, Nos. 02-1484, 02-3176, 02-7854, 02-10021, 2007 WL 313474, *24-25 (S.D.N.Y. Feb. 1, 2007)("Although [lead plaintiff] claims to have spent time during her work day performing her duties as lead plaintiff, she nevertheless fails to claim any actual expenses incurred, or wages or business opportunities she lost, as a result of acting as lead plaintiff. Under the PSLRA, it is simply not enough . . . to assert that she took time out of her workday and that her time is conservatively valued at $500 per hour."); *In re AMF Bowling*, 334 F. Supp. 2d 462 (S.D.N.Y. 2004)(refusing to award lead plaintiffs any money under the PSLRA beyond their pro rata share of the common fund because neither one "claim[ed] any out-of-pocket expense. There is no assertion that either lost time at work or gave up employer-granted vacation time. Neither cites to lost sales commissions nor missed business opportunities.").

representation of the class."[22]   *See, e.g., Smith v. Dominion Bridge Corp.*, Civ. Action No. 96-7580, 2007 WL 1101272, at *11-12 (E.D. Pa. Apr. 11, 2007)(citing cases on both sides).

This Court concludes that the first approach is in accord with the language and the purpose of statute.  Congress enacted the PSLRA on December 22, 1995[23] to "discourage frivolous lawsuits" and to "reform abusive securities class action

---

[22] *See, e.g., In re Gilat Satellite Networks,* Ltd., No. CV-02-1510 (CPS)(SMG), 2007 WL 2743675, *19 (E.D.N.Y. Sept. 8, 2007), *quoting Hicks v. Morgan Stanley & Co.*. 01 Civ. 10071 (RJH), 2005 WL 2757792, *10 (S.D.N.Y. Oct. 24, 2005)("Courts in this Circuit routinely award such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place."), in turn *citing In re WorldCom, Inc. ERISA Litig.*, 2004 U.S. Dist. LEXIS 20671, 2004 WL 2338151 at *11 (S.D.N.Y. Oct. 18, 2001)(awarding the three named plaintiffs $5000 each because "the three plaintiffs have been intimately involved in every step of the litigation.  The named plaintiffs have performed an important service to the class and the burden of this commitment deserves to be recognized through an award from the common fund."), *clarified on other grounds*, 2004 WL 2922083 (S.D.N.Y. Dec. 17, 2004), and *Dornberger v. Metropolitan Life Ins. Co.,* 203 F.R.D. 118, 124 (S.D.N.Y. 2001)("'An incentive award is meant to compensate the named plaintiff for any personal risk incurred by the individual or any additional effort  expended by the individual for the benefit of the lawsuit.'" and discussing incentive awards); *Denney v. Jenkins & Gilchrist*, 2005 WL 388562, *31 (S.D.N.Y. Feb. 18. 2005)("In granting compensatory awards to the representative plaintiff in PSLRA class actions, courts consider the circumstances, including personal risks incurred by the plaintiff in becoming a lead plaintiff, the time and effort expended by that plaintiff in prosecuting the litigation, any other burdens sustained by the plaintiff in lending himself or herself to prosecuting the claim, and the ultimate recovery.").

[23] The PSLRA does not apply to any action "commenced before or pending on December 22, 1995."  15 U.S.C. § 78u-4.

litigation," in particular "the manipulation by class action lawyers of clients whom they purportedly represent." *Swack v. Credit Suisse First Boston, LLC*, Civ. A. No. 02-11943-DPW, 2006 WL 2987053, *4 (D. Mass. Oct. 4, 2006), *citing* H.R. Conf. Rep. No. 104-369, at 31-32 (1995).  Blatant abuses triggering reform included (1) the use of "professional plaintiffs," who own a nominal number of shares in a number of public companies, appear repeatedly as lead plaintiffs in securities class action lawsuits, often promised "bounties" or bonuses" to serve as lead plaintiffs, and who thus do not adequately represent other shareholders, and (2) the attorneys' race to the courthouse to file the first complaint so as to become the lead counsel in class action suits. *In re ESS Technology, Inc. Sec. Litig.*, No. C-02-04497 RMW, 2007 WL 3131729, *3 (N.D. Cal. Oct. 30, 2007), *citing* H.R. Conf. Rep. No. 104-369, 1995 U.S.C.C.A.N. at 731-32.  Among the PSLRA's stringent requirements to qualify as a lead plaintiff is "[l[imiting the lead plaintiff's reimbursement to defined and demonstrated services, as directed in 15 U.S.C. § 78u-4(a)(4), [which] helps protect the system from 'lawyer-driven lawsuits' by 'increas[ing] the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiffs'

counsel.'" *Swack*, 2006 WL 2987053 at *4*, citing* H.R. Conf. Rep. No. 104-369, at 32 (1995).

Thus Congress enacted 15 U.S.C. § 78u-4(a)(4) to "remove the financial incentive for becoming a lead plaintiff." H.R. Conf. Rep. No. 104-369 (1995), *as reprinted in* 1995 U.S.C.A.A.N. 730, 734. The House Conference Committee did note "that lead plaintiffs should be reimbursed for reasonable costs and expenses associated with service as lead plaintiff, including lost wages" and allowed the courts "discretion to award fees accordingly." *Id.* In doing so, however, the court must distinguish between "reasonable costs and expenses (including lost wages) directly relating to the representation of the class," the recovery of which is permissible, and what may be compensation or an incentive award, which is not. *In re ESS Technology, Inc. Sec. Litig.*, No. C-02-04497 RMW, 2007 WL 3131729, *2 (N.D. Cal. Oct. 30, 2007), *citing In re Heritage Bond Litig.*, 2005 WL 1594403, *14 (S.D. Cal. 2005); *Swack v. Credit Suisse First Boston, LLC*, Civ. Action No. 02-11943-DPW, 2006 WL 2987053, *3 (D. Mass. Oct. 4, 2006)("I find it appropriate to join a number of courts that have recognized that an award of 'reasonable costs and expenses' to a representative party must be distinguished from traditional 'compensation' or 'incentive' awards in other contexts and must

be supported by an evidentiary foundation responding to the
PSLRA.").[24]

Permissible reimbursement for lost wages and out-of-
pocket expense includes "time expended by the Class
Representative[s] and Lead Plaintiff[] result[ing] in actual
losses, whether in the form of diminishment in wages, lost sales
commissions, missed business opportunities, use of leave or
vacation time or actual expenses incurred." *Swack*, 2006 WL
2987053 at *3. *See also In re AMF Bowling Securities Litig.*, 334
F. Supp. 2d 462, 470 (S.D.N.Y. 2004)("the better reading [of 15
U.S.C. § 78u-4(a)(4)] is that Congress did not want lead
plaintiffs to gain a benefit in any respect, except as a member
of the class they represented"). "[A] representative plaintiff
is only entitled under the PSLRA to an award of 'reasonable costs
and expenses' over and above his or her pro rata share of the
recovery, and not to a traditional 'compensation ' or 'incentive'

---

[24] The Court notes that in *Heritage Bond*, Judge Tevrizian
stated that he "is mindful as to distinguish between 'reasonable
costs and expenses' and what appears to be a 'compensation' or
'incentive' award"; nevertheless, citing as authority mainly cases
before the PSLRA became effective, he emphasized the court's
discretion "to award incentive fees to named class
representatives," but rejected a request for such an award in that
case because plaintiffs submitted only "blanket statements" about
their participation, insufficient to show how it placed them at
risk of damaged reputation or retaliation. 2005 WL 1594403 at *14,
17. He erroneously relied on *Van Vranken v. Atlantic Richfield
Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995), which was not a PSLRA
case and thus not relevant. *Swack*, 2006 WL 2987053 at *4.

award.  The representative plaintiff's significant stake in the outcome of the litigation is assumed to be sufficient incentive to remain involved in the litigation and to incur such expenses in the first place." *Swack*, 2006 WL 2987053 at *5.  As the district court in *Silberblatt v. Morgan Stanley*, 524 F. Supp. 2d 425, 435 (S.D.N.Y. 2007), opined about "the selfless task of serving as a representative for the class, a fiduciary responsibility,"

> Absent class members are entitled to repose confidence and trust in a class representative to pursue claims with diligence and refrain from proposing a settlement which is unreasonably low.  This confidence derives in large measure from knowing that the class representative stands in the same shoes as all other members of the class.  If the class does well, the class representative will do well in the same proportion to others.

Therefore "[p]ayments to class representatives, while not foreclosed, should be closely scrutinized. . . . A differential payment may be appropriate in order to make the class representative whole.  The representative may have lost wages, vacation time or commissions from sales because of time spent on depositions or other proceedings. . . . A balance must be struck so that a class representative does not view his prospect for rewards as materially different from other members of the class, yet is not disadvantaged by his service in pursuing worthy claims." *Id.* (citations omitted).

"Under the common fund doctrine, class counsel is entitled to reimbursement of all reasonable out-of-pocket litigation expenses and costs in the prosecution of claims and in obtaining settlement, including expenses incurred in connection with document production, consulting with experts and consultants, travel and other litigation-related expenses." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 535 (E.D. Mich. 2003). Courts have reimbursed class representatives for expert and consulting expenses where they were crucial to complex litigation. *See, e.g., In re EVCI Career Colleges Holding Corp. Sec. Litig.*, 2007 WL 2230177, *57-58 (S.D.N.Y. July 27, 2007)(expert witness fees reimbursable where "[t]he expenses incurred were essential to the successful prosecution and resolution of [the] Action"; *In re Immune Response Secs. Litig.*, 497 F. Supp. 2d 1166, 1178 (S.D. Ca;. 2007)(finding reimbursement reasonable where experts and consultants were "crucial or indispensable" to establish materiality, loss causation and damages in a complex case); *Hicks*, 2005 WL 2757792, **9, 10 (awarding expert witnesses fees as expenses to co-lead counsel because they were necessary to the litigation and settlement of the case). Reasonable expenses for "computer research,[25] reproduction/duplication, secretarial

---

[25] *But see In re KeySpan Corp. Sec.. Litig.*, No. 01 CV 5852 (ARR), 2005 WL 3093399, *20 (E.D.N.Y. Sept. 30, 2005)("Judges in this district have 'uniformly disallow[ed] applications for electronic research costs'" and instead "characterized them as

overtime, phone/fax/postage, messenger/overnight delivery, local transportation/meals, filing fees and attorney services" have been reimbursed. *See, e.g., In re Merrill Lynch & Co., Inc. Research Reports Securities Litig.*, No. 02 MDL 1484 (JFK), *et al.*, 2007 WL 313474, *24 (S.D.N.Y. Feb. 1, 2007).

A class representative "must provide meaningful evidence" of his or her actual costs and expenses (including lost wages) directly relating to the representation of the class, and those actual costs and expenses must be reasonable. Preferably, the representative plaintiff should document the value of any lost opportunities–such as lost employer-granted vacation time, lost sales commissions, or missed business opportunities, and costs paid in relation to the litigation." *Swack*, 2006 WL 2987053 at *5. *In accord AMF Bowling*, 334 F. Supp. 2d at 470 (denying as compensation request for their regular rates for time lead plaintiffs spent testifying as a witness, sitting for depositions, reading documents relating to the case and discussing them with counsel, and "participating in this litigation": "Nothing presented to me places the time devoted to this case by the two representatives into the category of a recoverable expense. Neither claims any out-of-pocket expense. There is no assertion that either lost time at work or gave up employer-granted vacation

---

costs attributable to overhead, rather than as recoverable expenses.")(and cases cited therein).

time.  Neither cites to lost sales commissions nor missed business opportunities.  While I am mindful of district courts in other districts permitting awards without such a showing, no circuit precedent has been cited to me. . . . Congress could have decided to allow class representatives to make fee applications based upon their time charges.  But I find nothing in the statute to suggest that Congress intended to do so when it allowed class representatives to recover for the 'reasonable costs and expenses (including lost wages).'"); *In re KeySpan Corp. Sec. Litig.*, No. 01-CV-5852, 2005 WL 3093399, *21 (E.D. N.Y. Sept. 30, 2005)(same).

## Objections

The only objections to the motion for reimbursement of costs and expenses were filed by Brian Dabrowski (#5913) through his attorney, Lawrence Schonbrun.  He complains that while the PSLRA permits reimbursement of reasonable costs and expenses for named representative plaintiffs, it does not allow such for individuals or entities that were proposed as class representatives or whose actions benefitted the class.  #5891 at 22-23.  He also complains that Christopher Patti fails to identify any of the University attorneys, their education and experience, and their current and historical salaries, but instead merely states, "My office monitored and reviewed the bills and found them to be reasonable in amount."  *Id.* at 23, citing #5796.

The Court disagrees with and overrules part of the first objection.  This Court did certify a class and approve certain plaintiffs as proposed class representatives and they performed their duties in that role until the Fifth Circuit decertified the class just before trial.  Their work contributed toward obtaining the settlements making up the recovery thus far.  The proposed class representatives each signed a certification demonstrating his or her willingness to represent the class, participated in discovery, prepared for and sat for deposition, performed various actions on behalf of the class that aided the obtaining of the settlements that comprise the recovery fund, and has submitted a declaration or affidavit in support of his or her request for reimbursement.  The Court finds these proposed class representatives are entitled to reimbursement of "reasonable costs and expenses (including lost wages) directly relating to the representation of the class."

On the other hand, the two individuals who were not named as class representatives, George Maddox and Charles Prestwood, are not covered by the statutory language. Furthermore, both are retired Enron employees, and they request reimbursement based solely on the hourly rate of their previous salaries.  #5807, 5814, 5907 at 75-76.  While they describe participation in the litigation for the benefit of the class, they have not shown lost or diminished wages, lost sales commissions,

missed business opportunities, use of leave or vacation time or out-of-pocket expenses; they also have not asked for reimbursement of permissible, actual expenses incurred, such as airplane travel. *Swack*, 2006 WL 2987053 at *3; *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 2007 WL 313474, at *24-25. Thus the requests for reimbursement from George Maddox and Charles Prestwood are denied.

    The Court finds that Mr. Dabrowski's other objection, i.e., that Christopher Patti fails to identify any of the University attorneys, their education and experience, and their current and historical salaries, lacks merit. Mr. Patti is not asking for an award of fees, but reimbursement of costs and expenses of the University in fulfilling its role as Lead Plaintiff. His Declaration clearly states that his request for reimbursement of $600,000 is based only on an extrapolation of the time that Mr. Patti, himself, spent on the class, and that it is a conservative amount because it does not include costs based on the time spent by other in-house University attorneys on this case. *See infra* and footnotes 25 and 26 and #5796, Ex. B. Moreover, as Lead Plaintiff, the Regents, is a fiduciary for the class, and as such, reviewed and determined that the bills were reasonable. It hired consultants to insure that it was adequately monitoring and managing the litigation. Mr. Patti also presents detailed charts of the hours spent by consultants Robert Fairbank

and Rock Hankin.  #5796 at Ex. A.  Mr. Dabrowski has not alleged, no less demonstrated, that Lead Plaintiff failed to meet its fiduciary obligations.  The objection is overruled.

### Motion for Reimbursement

### 1. The Regents as Lead Plaintiff

Not only has Lead Plaintiff vouched for, but this Court has witnessed and praises, the exceptional dedication and hard work of the Regents as Lead Plaintiff in this litigation in more than fulfilling its fiduciary role to the class and its supervisory and management role as to Lead Counsel.

The Declaration (#5796) of Christopher M. Patti, University Counsel in the Office of General Counsel of the University of California, details all the work performed by the Regents' attorneys on this case.

The Regents seeks unreimbursed expenses incurred or otherwise absorbed in connection with its services as a Lead Plaintiff for this litigation.  Patti Decl., ¶¶ 25-27, Exs. A and B.  Specifically the Regents first seeks reimbursement of the expenses incurred by the University for payment of its attorneys (including Mr. Patti) ($600,000)[26] for their work on this

---

[26] Mr. Patti's Declaration (#5796 at 10) states,

> Because it was not the practice throughout the course of this litigation for all of the attorneys in the office to maintain records of the time spent on various matters, this

litigation, along with their travel and other expenses ($31,402.18)[27]; and combined fees and expenses, including travel, in the amount of $916,524, that it paid to its retained consultants, Robert Fairbank and Rock Hankin, since the Court's previous order of approval (#4701).[28]  In total, the Regents seeks reimbursement for costs and expenses of $1,547,926.56.   Exhibits A and B to Mr. Patti's Declaration (#5796) support the requested costs and expenses.

The problem with Lead Plaintiff's request for $600,000 for University attorneys' time spent on the litigation is that the Regents fails to provide a basis under the PSLRA for these charges

---

request is based on a conservative, good-faith estimate of the time I spent on the case (which I estimate to be approximately 30 percent of my working hours over the past six years).   That time estimate has been multiplied by the total cost to the University of my services based on my current salary, benefits, and share of office administrative overhead.   This estimate is conservative because it does not include the cost of substantial time spent on this matter by other attorneys in this office.

[27]  #5796 at 10 and Ex. B.   Mr Patti declares, "Again, this request is conservative, since this Office has been unable to access records for travel expenses prior to August 2004."  #5706 at 10.   He also represents, "The University has received no reimbursement from any other source for any of the payments or expenses currently requested."  *Id.* at 11; *see also* Supplemental Declaration of Christopher Patti, #5865.

[28]  For services of Rock Hankin the Regents request reimbursement of $102,428; for Robert Fairbank, $814,096.38.   The total amount sought is $916,524.   #5796 at 9-10 and Ex. A.

as recoverable costs and expenses. *See KeySpan*, 2005 WL 3093399 at *21 ("Counsel have not shown how the time expended by the Class Representative and Lead Plaintiffs resulted in actual losses, whether in the form of diminishment in wages, lost sales commissions, missed business opportunities, use of leave or vacation time or actual expenses incurred."); *AMF Bowling*, 334 F. Supp. 2d at 470 ("Congress could have decided to allow class representatives to make fee applications based upon their time charges.  But I find nothing in the statute to suggest that Congress intended to do so when it allowed class representatives to recover for their reasonable costs and expenses (including lost wages).'"); *In re NTL Inc. Sec. Litig.*, No. 02 Civ. 3013 (LAK), 2007 WL 1294377, *10 (S.D.N.Y. May 2, 2007); *Swack*, 2006 WL 2987053, at *3 ("Lead plaintiffs . . . do not claim that they missed any work or other earning opportunity in order to participate in the litigation.  Under the PSLRA, lead plaintiffs cannot be awarded additional compensation. . . . Counsel have not shown how the time expended by the Class Representative and Lead Plaintiffs resulted in actual losses, whether in the form of diminishment in wages, lost sales commissions, missed business opportunities, use of leave or vacation time or actual expenses incurred."); *In re ESS Technology*, 2007 WL 3231729 at *2 (although lead plaintiff seeks reimbursement at his hourly rate of $800 for

his time spent in this litigation, conducting research before contacting an attorney, participating in the litigation by reviewing materials, joining in periodic conferences, reviewing pleadings and motions, and participating in settlement negotiations, court concluded there was no evidence that he was seeking reimbursement for actual costs and expenses under § 78u-4(a)(4); finding that the lead plaintiff "does not establish that the 245 hours he claims to have expended in participating in the litigation of this case resulted in any actual losses to him, whether from time away from work, lost business opportunities, or other missed earning opportunities."). There is no assertion by the Regents that the Regents lost business opportunities or other work because it utilized its in-house counsel to fulfill its duties as Lead Plaintiff in the litigation. Thus the Regents' current application to recover their attorneys' time charges is denied, but Lead Plaintiff may submit an revised application if it can meet the requirements of the statute.

As for the out-of-pocket expenses for travel ($31,402.18) and for consultants Robert Fairbank and Rock Hankin ($916,524.38), these costs are reimbursable under the PSLRA. Given the complexity and length of the case, the Court finds they are reasonable.

**2. Stephen M. Smith**

Like George Maddox and Charles Prestwood, Mr. Smith states he is retired, details his substantial efforts on behalf of the class, and requests reimbursement of $26,850 for his time, "[a]t an hourly rate of $150 for my contributions to the Litigation, based on my last year's salary in the oil and gas business and my hourly rate and real estate commissions." #5797 at 2-3. For the same reasons it denied the requests of Mr. Maddox and Mr. Prestwood, the Court denies Mr. Smith's request. Mr. Smith also has not asked for, nor presented any evidence of, out-of-pocket expenses, such as traveling expenses to Washington to meet with SEC Chairman Christopher Cox or another time, to influence the Justice Department to file a amicus brief.

**3. Staro Asset Management, LLC and Its Affiliates**

Staro Asset Management and its affiliates (collectively, "Staro") serve as an investment manager for a group of private investment funds that purchased Enron securities, including Enron zero coupon bonds. During the Class Period Staro functioned as either the general partner or the appointed investment manager for each of the funds that purchased Enron zero coupon bonds. Staro was proposed as a class representative in May 2003, and after the § 10(b) and Rule 10b-5 claims against the Enron outside directors had been dismissed, it represented a Section 11 sub-class. It participated in providing discovery to defendants, its representative was deposed in 2003, and it helped

Lead Plaintiff obtain a $168 million settlement from the outside directors.

Staro personnel monitored the prosecution of the action and the activities of Staro's counsel, Berger & Montague.[29]  In his sworn Declaration (#5798), McNally requests reimbursement of expenses incurred by Staro's legal and professional staff directly relating to its representation of the purchasers of Enron zero coupon bonds, specifically for (1) work to achieve the settlement expended by himself as Staro's Associate General Counsel from October 2001-December 2005, and thereafter as its General Counsel, (2) by Staro's former General Counsel and current Principal Colin Lancaster, (3) by Staro's portfolio manager Don Bobbs, and (4) by Staro's senior Paralegal Jenifer [*sic*] Bersh.[30]  McNally summarizes many of their activities on behalf of the class (#5798 at 3)[31] that

---

[29] Staro does not seek reimbursement for Berger & Montague's fees; that firm has applied separately for an award of attorney's fees (#5833 and 5834) through Lead Counsel (#5815, 5818 Ex. 2).

[30] It should be noted that the class representative is Staro, not its personnel.

[31] McNally lists the following:

> (a) analyzing Enron's public filings and news reports concerning the Company various draft complaints prepared by Berger & Montague, P.C. and Staro's trading in Enron Debt Securities in connection with the preparation of the initial complaint and motion for appointment as Lead Plaintiff and investigation relating thereto;
> (b) responding to several requests for production of documents and interrogatories

directly relate to Staro's representation of the Debt Purchasers Class.

Because Staro personnel do not usually charge an hourly rate for their time, McNally requests amounts based on the hourly rates paid by Staro for attorneys and paralegals at outside firms in Milwaukee, even though "the vast majority of our work and external law firms are located in New York." *Id.* at 4.  He asks for reimbursement to Staro of $450 per hour, "the rate typically charged by senior corporate and litigation partners at Milwaukee law firms," for Mr. Lancaster's and his own work and $195 per hour for senior paralegal time, all "rates that Staro typically pays when employing outside counsel and other professionals." *Id.* Based on an analysis presented to him by Berger & Montague, he reports that Staro personnel have spent at least 126 hours providing services on behalf of the zero coupon bond sub-class, for expenses and costs in a total amount of $51,560.  Of that amount, Mr. McNally represents that he spent at least 38 hours, for a total value of $17,100; Mr. Lancaster spent at least 44

---

directed to Staro;
(c) preparing for and defending the deposition of Don Bobbs as Staro's representative;
(d) reviewing the significant pleadings, briefs and Court rulings and commenting on the pleadings, and briefs filed on behalf of Staro; and
(e) communicating by e-mail or by telephone with Berger & Montague, P.C. on a regular basis about each of these matters.

hours, at a total value of $19,800; and Ms. Bersch spent 28 hours at a rate of $195 per hour for a total value of $5,460.  He represents that Don Bobs spent one day preparing for his deposition and a second day testifying as Staro's representative. Because Mr. Bobs does not bill by the hour, Mr. McNally set Bobs' hourly rate, $575, based on the hourly rate charged by Stephen P. Feinstein, a financial analyst with comparable expertise in financial markets, and asks for $9,200 for 16 hours of work by Bobs.  Staro's expenses for telephone calls, correspondence, and meetings with Berger & Montague, P.C. are reflected in the contemporaneous time and e-mail records maintained by Berger & Montague, P.C.  Staro seeks an award for these expenses incurred in its direct representation of the zero coupon bond sub-class.

The problem here, too, is that Staro fails to show that in assigning its personnel to work on its representation of this class, it lost business opportunity and/or bore extra out-of-pocket expenses by having to hire other individuals to handle Staro's regular workload in their stead.  If Staro's personnel were able to handle the tasks in their regular work schedules, without Staro's losing business opportunities or incurring additional employee expense, reimbursement is inappropriate. Moreover, reimbursement should be at the rate Staro paid for its employees' services, not what might be their hourly rate in the public market.  The PSLRA will not allow Staro to recoup more than

it expended on paying its staff.   Thus Staro's reimbursement request is currently denied, but an amended petition may be filed if it meets these standards.

**4.   Amalgamated Bank, as Trustee for the Longview Collective Investment Fund, Long View Core Bond Index Fund, and Certain Other Trust Accounts (the "Fund")**

A sworn declaration by Amalgamated Bank's Vice President-Director of Corporate Governance, Scott Zdrazil, asks for reimbursement to the Fund of $51,963.54 for "expenses expended by its staff and Fund counsel, who provided legal guidance that assisted the Fund in its role in this action."   #5799 at 6-7.   He states that

> representatives of the Fund and/or the Fund's counsel, at various times throughout the course of the litigation, (a) engaged in periodic conferences with Lead Counsel; (b) participated in the litigation and provided input into the case; (c) attended hearings held by this Court at various stages of this action; (d) ensured that the Fund was kept informed regarding case status; and (e) participated in providing discovery to defendants, including producing documents and providing a deposition of Louis A. Sarno, Senior Vice President and Chief Investment Officer of Amalgamated Bank.

#5799 at 3.   He points out that the Fund was the first financial institution to file a class action complaint on behalf of purchasers of Enron securities in 2001, *Amalgamated Bank, Individually and on Behalf of All Others Similarly Situated v.*

*Lay, et al.,* H-01-4198, and that same year the first to move for a temporary restraining order to freeze and impose a constructive trust on insider trading proceeds of current and former Enron inside and outside directors with detailed allegations of fraud at Enron. *Id.* at 4. Exhibit A to #5799 is comprised of time records for professional services submitted by various individuals, rendered "in connection with the Fund's service to all Class members as a Class Representative in this action." #5799 at 7.

Mr. Zdrazil's sworn Declaration appears to request reimbursement of the Fund's attorneys' fees, not for costs and expenses, for the entire litigation despite the fact that once a Lead Plaintiff is appointed under the PSLRA, here on February 15, 2002, and a Lead Counsel chosen, a non-lead attorney wishing to be compensated out of the class's recovery must present his fee requests to the Lead Plaintiff, who is empowered to decide which lawyers will represent the class and how they will be paid, subject to approval by the Court. *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 197 (3d Cir. 2005).[32]

---

[32] After researching the issue of compensation for non-lead counsel in PSLRA cases, the Court finds very perceptive and persuasive the analysis in *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173(3d Cir. 2005).

*In Cendant*, the Third Circuit has directly addressed the issues of (1) whether the Court in its discretion may award fees from the common fund to non-class counsel who provided legal services to the class action, and (2) as the only appellate court to do so, whether or to what extent the common fund doctrine survives the enactment of the PSLRA.  The equitable and flexible common fund doctrine "'provides that a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation including attorney's fees.'" 404 F.3d at 187, *citing In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litigation*, 55 F.3d 768, 820 n.39 (3d Cir. 1995), and *Boeing*, 444 U.S. at 478-79.  The panel commented,

> The cases are unanimous that simply *doing* work on behalf of the class does not create a right to compensation; the focus is on whether the work provided a benefit to the class. . . . Non-lead counsel will have to demonstrate that their work conferred a benefit on the class *beyond* that conferred by lead counsel.  Work that is duplicative of the efforts of lead counsel--e.g., where non-lead counsel is merely monitoring appointed lead counsel's representation of the class, or where multiple firms, in their efforts to become lead counsel, filed complaints and otherwise prosecuted the early stages of the litigation--will not normally be compensated.

*Id.* at 191.[33]

Emphasizing the effect of the PSLRA, the Third Circuit panel noted that the statute "creates an exclusive mechanism for appointing and compensating class counsel in securities class actions." *Id.* at 189. "[S]hift[ing] the balance of power away from plaintiffs' attorneys, who traditionally controlled the common fund cases, to the institutional plaintiffs who now supervise securities class actions," the PSLRA authorizes the lead plaintiff, selected by the court under criteria set forth in 15 U.S.C. § 78u-4(a)(3)(B)(I) and (B)(iii)(I), to choose and retain lead counsel, also subject to court approval under 15 U.S.C. § 78u-4(a)(3)(B)(v). *Id.* at 193, 192.

Observing "significant tension" between the common fund doctrine and the PSLRA, the appellate court pointed out that it had previously held that "the PSLRA vests authority over counsel

_____

[33] The Third Circuit opined,

> If a hundred lawyers each perform admirable but identical work on behalf of a class before the appointment of the lead plaintiff, the court should not award fees to each of the lawyers, as this would overincentivize duplicative work. Instead, while all of lead counsel's work will likely be compensable, . . . other attorneys who merely duplicated that work--however noble their intentions, however diligent their efforts, and however outstanding their product--will not be entitled to compensation. Only those who confer an independent benefit upon the class will merit compensation.

404 F.3d at 197.

selection and compensation in the lead plaintiff--not in the court, and certainly not in entrepreneurial counsel who attempt to appoint themselves as representatives of the class." *Id.* at 193.  The appellate court opined that the common fund doctrine remains intact during the period prior to appointment of lead plaintiff, i.e., "from the accrual of the cause of action to the appointment of lead plaintiff" (which might include legal services involving "discover[ing] possible fraud at the issuer, investigat[ing] that possible fraud, determin[ing] whether it warrants filing of a complaint, mak[ing] strategic decisions about the form and content of the complaint, draft[ing] the complaint, fil[ing] it, issu[ing] notice to class members, and navigat[ing] the PSLRA's lead-plaintiff procedures"). *Id.* at 193-93, 194.  "If an attorney creates a substantial benefit for the class in this period--by, for example, discovering wrongdoing through his or her own investigation, or by developing legal theories that are ultimately used by lead counsel in prosecuting the class action-- then he or she will be entitled to compensation whether or not chosen as lead counsel," and "[t]he **court**, not the lead plaintiff, must decide for itself what firms deserve compensation for work done on behalf of the class prior to the appointment of the lead plaintiff." *Id.* at 195 [emphasis added by the Court].  During the preappointment period, the court may substantially defer to lead

plaintiff's determination of what work created the benefits to the class, but it may also consider any objections of counsel who have not been included.   *Id., citing Bank One Shareholders Class Actions*, 96 F. Supp. 2d 780, 790 & n.13 (N.D. Ill. 2000).   The Third Circuit concluded that the filing of a complaint by attorneys not subsequently appointed lead counsel should best be viewed as "entrpreneurial efforts" and should not be compensable because

> each firms's complaint is the price of admission to a lottery that might result in it being named lead counsel.  If the firm wins the lottery, it stands to make significant fees at multiples of its lodestar.  Compensating a firm for filing a complaint and not being named lead counsel would offer free tickets to the lead-counsel lottery, and would thus create incentives for redundant filings.

*Id.* at 196.  Nor was the appellate court convinced "that the mere filing of complaints in securities class action ordinarily confers much benefit on the class.  Such complaints are as often spurred by news reports or press releases disclosing wrongdoing--or by reports that other firms have filed complaints--as by independent investigation."  *Id.*  Indeed the PSLRA was enacted in "reaction against a race-to-the-courthouse model of securities litigation in which attorneys appointed themselves class representatives and chose their own figurehead plaintiffs who had no power to select or oversee 'their' lawyers."  *Id.*  On the other hand, if non-class

counsel do their own investigations and discover distinct grounds or new theories for a suit that are later used and not from public reports, they should usually be compensated out of the class's recovery.  *Id.* at 196-97.  In the unlikely case that the lead counsel do not request fees for these attorneys' work on which lead counsel relied, "we expect that the court will nonetheless reward earlier attorney's work on behalf of the class." *Id.* at 197.

Once a lead plaintiff is appointed, "the primary responsibility for compensation shifts from the court to that lead plaintiff, subject of course to ultimate court approval.  The PSLRA lead plaintiff is the decisionmaker for the class, deciding which lawyers will represent the class and how they will be paid." 404 F.3d at 197.

The very attorneys' fees for which the Fund seeks reimbursement for filing *Amalgamated Bank, Individually and on Behalf of All Others Similarly Situated v. Lay, et al.,* H-01-4198, and the temporary restraining order in it, have already been requested through Lead Counsel for Roger Greenberg and his firm, Schwartz, Junell, Greenberg & Oathout, LLP (#5818 and 5830). Moreover, the Fund does not appear to have sent its attorneys' fees request to Lead Plaintiff.

The Fund cannot seek reimbursement of attorneys' fees that do not meet the *Cendant* standard by circumventing Lead Counsel and recharacterizing them as "expenses and costs." Moreover, if it is seeking reimbursement of expenses and costs, the Fund needs to justify its request with reference to the standards set down in this opinion.  The Fund must demonstrate that the Fund lost business opportunity or suffered added expenditure for additional attorney services if it used its own staff for reasonable legal services in its representation of the class.  *See* discussion of Staro, *supra*.  The Fund also needs to delineate and provide evidence of its specific out-of-pocket expenses.

For these reasons the Court denies the Fund's current request for reimbursement.

**5. The San Francisco Employees Retirement System ("SFERS")**

The sworn Declaration of Owen J. Clements, Chief of Special Litigation in the San Francisco City Attorney's Office and one of the attorneys who represented SFERS in the Enron litigation, requests fees for out-of-pocket expenses previously paid by SFERS for services and expenses necessarily incurred because of its duties as a named plaintiff in the Enron Litigation.  Mr. Clements declares that SFERS' senior equities investment officer Carl Wilberg was deposed on August 29, 2003 by

the defendants in this action and again on November 10, 2003 in *The Florida State Board of Administration v. Alliance Capital Managemente, L.P.*, No. 01-CA-1104[34]; Mr. Clements prepared and defended Mr. Wilberg for both depositions.  SFERS paid the San Francisco City Attorney's office to represent SFERS in the Enron litigation between December 10, 2001 and November 1, 2007; the San Francisco Attorneys Office records show it spent 123.50 hours advising and representing SFERS in the Enron matter and billed SFERS $24,459, plus $102 in costs for messengers.  In addition Mr. Clements billed 10 hours  at $193.95 per hour (rounded to $1,939) to SFERS before a special billing number was opened for the Enron litigation in December 2003.  Dan Maguire, the general counsel of SFERS in December 2003, who advised SFERS about the Enron litigation at the time, billed 7.75 hours at $199.13 per hour (rounded to $1,543), between October and December 2001.  The total for Mr. Clements and Mr. Maguire's services was $3,482.  Thus the San Francisco's Attorneys office billed SFERS a total of $28,043 for work relating directly to the Enron litigation.  Mr Clements represents that the hourly rates of the City's Attorney's Office are far below market rates of attorneys for private practice firms

---

[34] Mr. Clements states that although in November 2003 he billed 5.75 hours to the SFERS investments general advice matter to prepare and defend Mr. Wilberg at his deposition in the *Alliance Capital* case, that time has not been included in this request for costs and expenses.

with similar experience.  Finally Mr. Clements declares, "I am informed and believe the SFERS has paid all amounts billed by the San Francisco City Attorney's Office for time relating to the Enron matter."

Except for Mr. Maguire's $1,543, for which the Employer-Teamster Funds must show lost business opportunity or additional expense to provide services during the time Mr. Maguire worked on the Enron litigation directly related to the Funds' roles as a Class Representative, these are clearly out-of-pocket expenses paid by SFERS, costs and expenses which the Court finds very reasonable, and which are reimbursable under the PSLRA.  The Court grants SFERS' request for reimbursement of costs and expenses in the amount of $26,500 and allows the Funds to submit an appropriate request for reimbursement for Mr. Maguire's fees as expenses if they can.

**6.  Employer Teamsters Local Nos. 175/505 Pension Trust Fund and Employer-Teamsters Local Nos. 175/505 Health and Welfare Fund (the "Employer-Teamsters Funds")**

The affidavit (#5801) of David R. Atkins, as Trustee and Secretary to the Employer-Teamster Funds until June 1, 2005, explains that he was "on salary through the local union which job duties included acting as a Trustee and the Secretary of the Funds." The Employer-Teamster Funds were proposed as a Class

Representative in May 2003.  Atkins states that in his role as Trustee and Secretary and on behalf of all class members, he was kept informed about the litigation, he participated in providing discovery to Defendants, and he sat for a deposition of approximately eight hours, with four hours of preparation with counsel.  He requests reimbursement to Local Union No. 175 for those twelve hours since other than his salary, he was not compensated for this time.  He calculates that since his weekly salary was $1,105.00 for a forty-hour week, the union should be reimbursed $331.50 for the twelve hours.

Mr. Atkins' affidavit was followed by the filing of his more detailed, sworn Declaration (#5901), but the latter does not change the key facts.

Here too, given his statement that he continued to receive his salary from the union, Atkins fails to show that he suffered lost wages or lost vacation time.  Nor does he show that the union suffered lost business opportunity or additional expense because of Atkins' participation in the case and deposition.  Thus the Court denies his current request for reimbursement, but allows the Employer-Teamster Funds to file a revised petition, if appropriate.

**6.  Nathaniel Pulsifer as Trustee of the Shooters Hill Revocable Trust, managed by Pulsifer & Associates, and as the Principal of Pulsifer & Associates**

The sworn Declaration (#5802) of Nathaniel Pulsifer, a trustee of various trusts (including Shooters Hill Revocable Trust) managed by, and a financial advisor to investment clients of, Pulsifer & Associates, seeks reimbursement of his lost wages and out-of-pocket expenses necessarily incurred pursuant to his duties as a named plaintiff in several Enron-related actions.  Mr. Pulsifer explains that he invested in or caused his clients to invest in approximately $1.5 million of Enron Corp.'s 7% Exchangeable Notes (the "7% Notes") issued by Enron Corp. pursuant to a July 23, 1999 Registration Statement and Prospectus dated August 10, 1999, underwritten by Citigroup, Inc., Bank of America Corp. and Goldman Sachs & Co.

Mr. Pulsifer reports that he hired Shapiro Haber & Urmy, LLP ("the Shapiro firm") in December 2001 to prosecute possible securities claims against the underwriters and other persons the firm might think were liable to the Noteholders for misrepresentations in connection with the sale of the 7% Notes. The Shapiro firm researched, prepared, and filed on December 14, 2001 a proposed class action complaint on behalf of Pulsifer & Associates and other 7% Note purchasers against officers of Enron,

Arthur Andersen, and the three underwriters. *Pulsifer &
Associates v. Kenneth Lay, et al.*, H-01-4356.  It was the first
complaint filed on behalf of purchasers of the 7% Notes.  Mr.
Pulsifer additionally retained the law firm of Wolf Popper in
December 2001 as co-counsel because of the magnitude of the
action, but made it clear to both firms that their services would
be non-duplicative.[35]  After the appointment of Lead Plaintiff, on
April 8, 2002 the Regents filed the Consolidated Class Action
Complaint, which named Murray Van de Velde, another of the Shapiro
firm's clients and, unlike Pulsifer & Associates, a direct
purchaser of the 7% Notes, as the class representative for 7%
Noteholders rather than Pulsifer & Associates.  Goldman Sachs was
not named as a defendant in the Consolidated Complaint, which only
named as defendants entities that were sued under Section 10(b)
of the Securities Exchange Act as well as Section 11 of the
Securities Act of 1933.  Lead Plaintiff entered into an agreement
with Goldman Sachs to toll the statute of limitations from
running.  Furthermore, Bank of America moved to dismiss Mr. Van
de Velde's claims on behalf of the 7% Noteholders on the grounds
that his date of purchase of the notes barred him from benefitting

---

[35] Both Shapiro Haber & Urmy and Wolf Popper have applied
through Lead Counsel for an award of aggregated attorneys' fees in
this case.  #5815, 5818 Ex. 2, 5825.

from the presumption of reliance on the Registration Statement for claims under Section 11.

With advice from counsel, Mr. Pulsifer, as Trustee of the Shooters Hill Revocable Trust and therefore a beneficial purchaser of the 7% Notes with a timely purchase date entitling him to presumed reliance on the Registration Statement and Prospectus, on August 9, 2002 filed a new class action against the defendants who were involved in the Offering of those Notes, specifically Enron Board members and other signatories of the Registration Statement, Arthur Andersen, LLP, Bank of America Corporation, and Citigroup, Inc. *Pulsifer v. Lay, et al.*, H-02-3010. On August 22, 2002, this Court consolidated the new action with *Newby*, H-01-3624.[36]

After the Regents filed a motion for class certification on behalf of all plaintiffs in the *Newby* action, H-01-3624, Mr. Pulsifer worked with the Shapiro firm to prepare answers to interrogatories and produce documents pursuant to document requests. He was deposed for a full day on September 5, 2003 by defendants, reviewed the transcript of that deposition and worked with his counsel in preparation of the errata sheet. Subsequently he was certified as the subclass representative on behalf of the 7% Noteholders in connection with settlements against Bank of

---

[36] H-02-3010 was ultimately dismissed at the request of Mr. Pulsifer when he decided to proceed as part of the *Newby* action.

America, Citigroup, Arthur Andersen, and Enron's outside directors. He was also certified as the subclass representative on behalf of the 7% Noteholders against the remaining non-settling defendants. As the sub-class representative, he reviewed the terms of the settlements.

On January 9, 2004, Pulsifer, as Trustee of the Shooters Hill Revocable Trust, filed another suit against Goldman Sachs *inter alia* (*The Regents of the University of Cal. v. Milbank Tweed Hadley, et al.*, H-04-0088), and after attempts to settle failed, he was named class representative plaintiff. For that action he met with an attorney from Wolf Popper to review Goldman Sachs's request for production of documents, to identify the responsive documents, and to prepare for a deposition by Goldman Sachs, which took place on September 13, 2006. The case ultimately settled the 7% Noteholders' section 11 claims, with Goldman Sachs agreeing in a Memorandum of Understanding to pay $11.5 million, plus interest from January 22, 2007, at 5% per annum. Pulsifer claims that without his and the Shapiro firm and Wolf Popper's efforts, there would not have been this recovery.

Mr. Pulsifer declares that altogether he spent 80.5 hours performing duties as class representative in the litigation. His hourly rate is $180 per hour for providing investment consulting services. He claims that his lost wages amount to $14,490 and that he incurred out-of-pocket expenses of $255; he

requests a total of $14,745 in reimbursement.  He supports his request with documentation, Ex. A to #5802.

The Court has reviewed Mr. Pulsifer's applications.  It finds that his Exhibit A adequately documents his out-of-pocket expenses of $255. While his invoices evidence the hours he spent performing his duties in this litigation, he fails to show that his work resulted in lost business opportunities and other earnings.  He is invited to file a revised application if he can meet the standard under the statute.

## 8.  Michael Bessire

Mr. Bessire seeks reimbursement of expenses incurred when he was named Class Representative in May 2004: he states that he participated in providing discovery to defendants, prepared for his deposition and was deposed in late-summer 2003, traveled to Washington in May 2007 to participate in multiple news conferences to persuade SEC Chairman Christopher Cox to support the shareholders' scheme-liability theory by filing an amicus brief, kept up with the litigation and prepared for trial, in which he was willing to testify in Houston, in April 2007.  He states that at the time of his class certification deposition, he was employed as a zone senior vice president of Starbucks Coffee Company, but now lives in Midland Texas and runs a family ranch after retirement.  He requests reimbursement in the amount of $13,770 for the four years he worked as a class representative, based on

the hourly rate of $135 calculated by his last year's salary at Starbucks of $282,500 divided by 50 weeks at 40 hours per week.

Mr. Bessire fails to show that he was not paid while he was working at Starbucks and serving as a Class Representative, does not state when he stopped working at Starbucks and retired, nor that he lost business opportunities or other earnings because of his duties as Class Representative. Nor does he specify and document any out-of-pocket expenses. Thus the Court denies his request for reimbursement, but allows him to file an amended petition if he is able to meet the standards laid out in this order.

**9.  John Cassidy**

Mr. Cassidy's Declaration (#5804) indicates that after he retired in San Diego, he purchased his Enron securities in 1999. Thus he, too, cannot show lost wages and has not shown lost business opportunities because of his duties as a Class Representative. Therefore the Court denies his request for reimbursement of $2500 based on his salary before retirement. Mr. Cassidy has not specified any out-of-pocket expenses.

**10.  Michael B. Henning**

The same is true of retired insurance executive Michael B. Henning, as indicated in his Declaration (#5805).

**11.  Richard Kimmerling**

Dr. Kimmerling states that he "recently retired after 40+ years [as] a practicing surgeon . . ., having retired as a Colonel in the Air Force Reserves," but does not provide the date. He further claims that for the 60 hours he spent performing duties as a Class Representative, he seeks $9,000, "[b]ased on an hourly rate of $150, which is based on my hourly rate I charge for consultations in medicine." #5806.

The Court requires some documentation of the frequency of such consultations to determine whether Dr. Kimmerling's participation in the litigation constitutes "lost wages" or "lost business opportunities."

## 12.  George M. Placke

Mr. Placke's Declaration (#5808) lists activities he participated in as a proposed Class Representative.  He states that he "worked in the oil and gas business for over 20 years in Corpus Christi and San Antonio" and that he seeks reimbursement of $8,750 for 50 hours performing his duties as a Class Representative, "[b]ased on the hourly rate of $175.00, which I charge as a consultant in my oil and gas practice."  As with Dr. Kimmerling, the Court requires documentation showing the frequency of his consulting work to determine whether the requested hours are "lost wages" and/or "lost business opportunity."

## 13.  Ben Schuette

Mr. Schuette similarly states, without providing any dates, that he "worked for 40 years as a master electrician and electrical contractor in Corpus Christi, and [is] now retired to a family ranch in Orange Grove, TX." #5809. He requests reimbursement for sixty hours of work performing his Class Representative duties, in the amount of $1,800, "[b]ased on an hourly rate of $30, which is what I was paid as a master electrician in Corpus Christi before I retired." Again, if Mr. Schuette is retired and has not lost wages or a business opportunity, he is not entitled to reimbursement of costs and expenses under the statute. If he does qualify, he must submit appropriate documentation from which the Court can make such a determination.

**14.  Mervin H. Schwartz, Jr.**

Mr. Schwartz's Declaration (#5810), while describing his activities as a Class Representative, suggests that he retired in 1999. He seeks reimbursement for 180 hours for himself and 115 hours for his wife, who accompanied him on a trip to Washington D.C. in May 2007 to persuade Chairman Cox to file an amicus brief in favor of Enron shareholders, for a total of $10,980, "[b]ased on an hourly rate of $61 . . ., calculated by my last weekly salary at Hershey, divided by 40 hours per week." Again, the Court requires Mr. Schwartz to indicate when he retired and to prove that he lost wages or business opportunities before he

qualifies for reimbursement under the statute.  He must also show that his wife was a proposed Class Representative.

## 15.  Joseph C. Speck

Mr. Speck's Declaration (#5811), also requests reimbursement for 70 hours performing his duties for the Class, "[b]ased on an hourly rate of $60, which is what I charged as a CPA back in Peoria." He needs to demonstrate that he was working at the time and that he lost wages or business opportunities; he also must specify any out-of-pocket costs if he wishes to qualify for reimbursement under the PSLRA.

## 16.  John Zegarski

The Court is unable to tell from Mr. Zegarski's Declaration (#5812) whether he, "a former Company broadband construction employee," is retired and if so, when he retired. After listing the duties he performed as a Class Representative, he seeks reimbursement of $5370 for 60 hours of work, "[b]ased on an hourly rate of $89.50, which is based on my last year's salary $179,000 divided by 50 weeks and 40 hours." Again, more information must be submitted to determine whether Mr. Zegarski was working and lost wages and/or business opportunity as a result of the time he spent fulfilling his obligations as a Class Representative.

## 17.  Conseco Annuity Assurance Company ("CAA")

In a sworn Declaration on behalf of CAA (#5813), Gregory J. Seketa, an attorney and Vice President of 40/86 Advisors, Inc., which manages funds generated by CAA's business operations, explains that he oversees "our affiliates' distressed investments," including the Enron Foreign Debt Securities held by CCA.  He represents that he advised CCA to seek appointment as a class representative in this action on behalf of the Foreign Debt Securities holders.  On June 9, 2005 Plaintiffs and Citigroup (and related entities) reached a settlement in the *Newby* and CAA (H-03-2240)[37] cases.

Seketa describes CAA's services as a class representative on behalf of the Foreign Debt Securities holders and of all class members since 2002:  (1) engaging regularly in communications with counsel, (2) participating in the Enron bankruptcy case, this action, and related mediations, including reviewing and commenting on nearly all pleadings and memoranda involving the Foreign Debt Securities, (3) attending certain court hearings, and (4) participating in voluminous discovery to defendants, including producing paper and electronic documentation of its transactions in Foreign Debt Securities. #5813 at 2.

---

[37] CAA originally was plaintiff in two cases arising in the Southern District of New York, transferred to this Court:  *Hudson Soft Co. Ltd. V. Credit Suisse First Boston* (H-03-0860) and *Conseco Annuity Assurance Co. v. Citigroup, Inc., et al.*  (H-03-1559). These two cases were consolidated into *Newby*.

CAA seeks reimbursement of expenses and costs for the following activities of the CAA staff: (1) investigated the factual and legal bases for claims that became the Conseco Action, CAA's responsibilities as a class representative, and statute of limitations concerns; (2) negotiated retention of counsel and resolved conflicts issues; (3) coordinated and communicated with other Foreign Debt Securities holders, formed several ad hoc committees to monitor and participate in the Enron bankruptcy proceedings, and traveled to Salt Lake City, Utah, New York City, and White Plains, New York for meetings with such holders, possible intervenors, and proposed class representatives; (4) participated in preparing voluminous mediation materials and prepared for and attended two mediation sessions that required several personnel spending multiple days in New York; (5) prepared extensive analyses of CAA and its affiliates' and co-managed accounts' trading activities and resulting damages in connection with the Foreign Debt Securities; (6) reviewed and commented on virtually every substantive complaint, amended complaint, pleading and brief submitted by CAA counsel in connection with this proceeding; (7) monitored the discovery process as to third parties, including in connection with the cost-sharing arrangement, and spent weeks preparing, in coordination with counsel and outside service providers, voluminous paper, audio, and electronic document production in response to Citigroup's

discovery requests; (8) reviewed and commented upon various settlement notices, pleadings and agreements and attended, at the Court's request, a hearing in Houston, Texas regarding the settlement; and (9) reviewed and commented upon the Plan of allocation.  With supporting summary of fees and expenses (Ex. A), Mr. Seketa states that CAA, acting on behalf of all class members, "incurred expenses particularly in connection with time expended by its staff," amounting to about 700 hours of time, for a total of $134,811, and various out-of-pocket expenses of $4,519.05.  To prepare this summary Mr. Seketa states that he and the 40/60 personnel under his supervision "reviewed six years of files accumulated during and before CAA sought to become involved in this case and determined the reasonable hours required to be expended to perform a variety of tasks that our files confirmed occurred and which were necessary to successfully prosecute the action."  #5813 at 4.

Like the others, CAA must demonstrate that it suffered lost business opportunity or incurred expenses for additional staff to cover the work of those employees who were working on this litigation.

Accordingly, for the reasons stated above, the Court

ORDERS that the motion for approval of Lead Plaintiff the Regents of the University of California's and certain other persons' request for reimbursement of $4,200 in expenses

(instrument #5795) in GRANTED IN PART and DENIED IN PART as follows:

(1) the requests for reimbursement of costs and expenses for George Maddox, Charles Prestwood, for Lead Plaintiff's fees for in-house counsel, Stephen M. Smith, Staro, Amalgamated Bank, for Mr. Maguire's fees by SFERS, for Atkins' deposition by the Employer-Teamster Funds, for Mr. Pulsifer's services in the amount of $14,490, for Michael Bessire, for Dr. Richard Kimmerling, for Ben Schuette, for Mervin H. Schwartz, of Joseph C. Speck, for John Zegarski, and for CAA are DENIED;

(2) the Regents' request for reimbursement of expenses for travel ($31,402.18) and for consultants Robert Fairbank and Rock Hankin ($916,524.38), SFERS' request for reimbursement in the amount of $26,500, and the request of Nathaniel Pulsifer as Trustee of the Shooters Hill Revocable Trust for $255 as in reimbursement for out-of-pocket costs are GRANTED.

Those Class Representatives whose current requests for reimbursement of costs and expenses under the PSLRA have been denied may file revised petitions within two weeks of entry of this order if they can meet the standards set out in this opinion.

**SIGNED** at Houston, Texas, this 10th day of July, 2008.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE