IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re Enron Corporation | § | |
| Securities, Derivative & | § | MDL-1446 |
| "ERISA" Litigation | § | |
| | § | |
| MARK NEWBY, ET AL., | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-01-3624 |
| | § | CONSOLIDATED CASES |
| ENRON CORPORATION, ET AL., | § | |
| | § | |
| Defendants | § | |

**CONCLUSIONS OF LAW, FINDINGS OF FACT, AND ORDER**

**RE FINAL APPROVAL OF PLAN OF ALLOCATION**

Pending before the Court in the above referenced cause is Lead Plaintiff the Regents of the University of California's motion for final approval of the proposed Plan of Allocation of the settlement proceeds (instrument #5793).[1] A Fairness Hearing

_____

[1] Lead Plaintiff states that its motion is based on prior pleadings that it filed in support of its motion for preliminary approval of the Plan (#5755, 5756), on the briefing in connection with Lead Plaintiff's responses to objections to preliminary approval of the Plan (#5773, 5774, 5775, and 5776), and on the first Declaration of Professor Roman L. Weil (expert on plan allocation and securities violation damages)(#5794), filed contemporaneously with the instant motion, and any future response to additional objections or pleadings.

In addition to these enumerated pleadings, for this ruling the Court has once again reviewed all the pleadings relating to the preliminary approval of the settlement, as well as those relating to the instant motion: these extra instruments relating to the motion for preliminary approval are #5759, 5763,5764, 5765, 5766, 5775, 5779, 5786; and additional pleadings relating to the instant motion for final approval of the Plan of Allocation are #5794, 5818 5859, 5860, 5861, 5868, 5869 (duplicated in #5879), 5874, 5877, 5880, 5881, 5884, 5892, 5893 (duplicated in 5894, 5895, 5896),

addressing the requested award of attorneys' fees, reimbursement of expenses, and the Plan of Allocation for final approval of the partial settlements[2] was held on February 29, 2008.

## I.  Conclusions of Law

### A.  Jurisdiction

The Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 over this dispute arising out of violations of the federal securities laws, in particular §§ 10(b), 20(a), and 20A of the Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and §§ 11, 12(a)(2), and 15 of the

---

5897, 5898, 5899, 5900, 5919, 5921, 5934, 5936, 5948, 5951, and 5957.  The Court has also considered the oral arguments made by various parties at the Fairness Hearing on February 29, 2008, including presentation of, and objections to, the Plan of Allocation.

[2] The settlement fund is comprised of the following recoveries:

| | |
|---|---|
| Andersen Worldwide | $33,330,000 |
| Bank of America | $69,000,000 |
| Lehman Brothers | $222,500,000 |
| Outside Directors/Harrison | $168,000,000 |
| LJM2 | $51,900,000 |
| Arthur Andersen | $72,500,000 |
| Kirkland & Ellis | $10,160,000 |
| Citigroup | $2,000,000,000 |
| JPMorgan Chase | $2,200,000,000 |
| CIBC | $2,400,000,000 |
| **Total** | **$7,227,000,000** |

Declaration of Helen Hodges, #5818 at 2.

Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o. This Court also has jurisdiction under the Private Securities Litigation Reform Act of 1995 ("PSLRA") pursuant to § 22 of the Securities Act of 1933, 15 U.S.C. 77v, and § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa.

As for personal jurisdiction over the absent plaintiff class members, in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), the Supreme Court noted the distinction between an out-of-state defendant haled into a foreign court to defend or suffer a default judgment and an absent class-action plaintiff who may lack all minimum contacts with the forum state and cited its earlier opinion in *Hansberry v. Lee*, 311 U.S. 32, 40-41 (1940):

> [A] "class" or "representative" suit was an exception to the rule that one could not be bound by a judgment *in personam* unless one was made fully a party in the traditional sense. . . . As the Court pointed out in *Hansberry*, the class action was an invention of equity to enable it to proceed to a decree in suits where the number of those interested in the litigation was too great to permit joinder. The absent parties would be bound by the decree so long as the named parties adequately represented the absent class and the prosecution of the litigation was within the common interest.

*Shutts*, 472 U.S. at 808. Thus "a forum State may exercise jurisdiction over the claim of an absent class-action plaintiff, even though the plaintiff may not possess the minimum contacts

with the forum which would support personal jurisdiction over a defendant." *Id.* at 811.  Nevertheless,

> [i]f the forum State wishes to bind an absent plaintiff concerning a claim for money damages or similar relief at law, it must provide minimal procedural due process protection.  The plaintiff must receive notice plus an opportunity to be heard and participate in the litigation, whether in person or through counsel.  The notice must be the best practicable, "reasonably calculated under all circumstances, to apprise interested parties of the pendency of th action and afford them an opportunity to present their objections. . . . The notice should describe the action and the plaintiffs' rights in it.  Additionally, we hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an "opt out" or "request for exclusion" form to the court.  Finally, the Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members.

*Id.* at 811-12 [citations omitted]; *see also Silber V. Mabon*, 18 F.3d 1449, 1453-54 & n.3 (9th Cir. 1994)(applying *Shutts* in securities class action).

**B. Standard of Review**

Pursuant to Federal Rule of Civil Procedure 23(e)(1) and (2), regarding a proposed settlement, "The court must direct notice in a reasonable manner to all class members who would be bound by the proposal. . . . If the proposal would bind class members, the court may approve it only after a hearing and on

finding that it is fair, reasonable and adequate." *See also Cotton v. Hinton*, 559 F.2d 1326, 1339 (5th Cir. 1977)("In determining whether to approve a proposed settlement, the cardinal rule is that the District Court must find that the settlement is fair, adequate and reasonable and is not the product of collusion between the parties."). The same standard of review "applies with as much force to the review of the allocation agreement as it does to the review of the overall settlement between plaintiffs and defendants." *In re Chicken Antitrust Litig.*, 669 F.2d 228, 238 (5th Cir. 1982), *quoted for the same proposition*, *Schwartz v. TXU Corp.*, No. 3:02-CV-2243-K, 2005 WL 3148350, *23 (N.D. Tex. Nov. 8, 2005); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000)(same). Generally courts will find "reasonable" a plan of distribution that reimburses class members based on the type and extent of their damages. *In re Ikon*, 194 F.R.D. at 184. Nevertheless, "'a class action settlement need not necessarily treat all class members equally.'" *Schwartz v. TSU Corp.*, No. 3:02-CV-2243-K, *et al.*, 2005 WL 3148350, *23 (N.D. Tex. Nov. 8, 2005)[3], *citing inter alia Petruzzi's, Inc. v. Darling-Delaware Co.*, 880 F. Supp. 292, 300-01 (M.D. Pa. 1995)("disparate treatment of class members may be justified by a demonstration

---

[3] Quoting *Cohen v. Resolution Trust Corp.*, 61 F.3d 725, 728 (9th Cir. 1995), *vacated on other grounds*, 72 F.3d 686 (9th Cir. 1996).

that the favored class members have different claims or greater damages").[4]  Deciding the fairness of a settlement is within the sound discretion of the trial court, whose determination will not be overturned absent a clear showing of abuse of that discretion. *Chicken*, 669 F.2d at 238.

Furthermore, the Fifth Circuit has opined, "In addition, our judgment is informed by the strong judicial policy favoring settlements as well as the realization that compromise is the essence of settlement.  As we have said elsewhere, a 'just result is often no more than an arbitrary point between competing notions of reasonableness.'"  *Id., citing In re Corrugated Container Antitrust Litigation*, 659 F.2d 1332, 1325 (5th Cir. 1981).  Lead Plaintiff emphasizes, through its expert Professor Roman Weil, there is no single, unique, fair, reasonable and adequate Plan of Allocation.

**C.  Notice to Class Members**

---

[4]  *Schwartz*, 2005 WL 3148350, at *23, also cites *In re Microstrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 669 (E.D. Va. 2001)(approving plan of allocation that "sensibly makes interclass distinctions based upon, *inter alia*, the relative strengths and weaknesses of class members' individual claims and the timing of the purchases of the securities at issue"); *In re Aetna Sec. Litig.*, No. CIV. A. MDL 1219, 2001 WL 20928, *12 (E.D. Pa. Jan. 4, 2001)(approving plan of allocation that "acknowledges the differing losses suffered by Claimants depending on the dates on which they purchased and sold Aetna stock and the price at which they may have sold the shares").

Federal Rule of Civil Procedure 23(c)(2)(B) requires for classes certified under Rule 23(b)(3) "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Rule 23(e)(1) mandates, "The court must direct notice in a reasonable manner to all class members who would be bound by the proposal." The Due Process Clause of the United States Constitution also imposes minimum notice requirements, which are met if the notice satisfies Rule 23(c)(2).  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-74 (1974)(for due process, notice in a class action must provide a fair recital of the subject matter and of the proposed terms and must give the class an opportunity to be heard); *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1097 (5th Cir. 1977); *Miller v. Republic Nat'l Life Ins. Co.*, 559 F.2d 426, 429-30 (5th Cir. 1977).  Generally the notice requirements of Federal R. Civ. P. 23(c)(2)(B) may be met by a combination of individual notice to identifiable class members and notice by publication. 6A Fed. Proc., L. Ed. § 12:312 (and cases cited therein).

Under Federal Rule of Civil Procedure 23(e), the notice in a class action settlement must inform class members of "(i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member

so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)."

In addition, the notice must also be provided timely, allowing a sufficient period for the class members to respond, make any objections, and prepare for the Fairness Hearing. *See, e.g., Miller*, 559 F.2d at 429 (finding a period of four weeks between the mailing of the notice and the hearing to be sufficient). Notice is "adequate if it may be understood by the average class member. 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 11:53 at 167 (4th ed. 2002).

## II.  Findings of Fact

### A.  Plan of Allocation

A substantial difficulty, unusual if not unique, in drafting a plan of allocation that was fair, reasonable, and adequate to all class members in the *Newby* litigation was the wide variety of securities involved; the settlements covered approximately 195 different Enron or Enron-related securities. Furthermore, there were claims under §§ 10(b), 11 and the Texas Securities Act, each with a different measure of damages.[5]

---

[5] Under Article 581-33(a)(1) of the Texas Securities Act, rescission is the remedy if the purchaser still owns the securities or damages if he no longer does. *Citizens Ins. Co. of America v.*

The Court finds that the settlement Notice, in clear language easily understandable by a layman, defined the class, apprised the potential class members of the terms of the settlement, the proposed plan of allocation and their options, their right to participate in the cash distribution by filing a timely and valid Proof of Claim form, and their right to object and to be heard at the Fairness Hearing on February 29, 2008. Notice was timely given, approximately two months prior to the Fairness Hearing.

Pursuant to Stipulations of Settlement, the settlement fund recovered from nine partial settlements and resolution of the LJM2 bankruptcy claim amounts to $7,227,390,000, plus interest,

---

*Hakim Deccach*, 217 S.W.3d 430, 436 n.1 (Tex. 2007). Section 11 damages are limited by statute, 15 U.S.C. § 77k (plaintiff may recover "the difference between the amount paid for the security) not exceeding the price at which the security was offered to the public)" and (i) the value at the time the case was brought, or (ii) the price at which the security was sold before the case was brought, or (iii) the price at which the security was sold after the case was brought if that generates damages of less than the difference between the price paid (limited to the offering price) and the value on the date the case was brought. Section 10(b) prevailing securities investors recover inflation-adjusted losses. Pursuant to case law, since the statute does not establish a means of measuring damages, Professor Weil explains that the Plan measures § 10(b) losses based on inflation, by using a value line, a standard method of measuring class damages, and the Court refers the parties to that discussion rather than repeating it here. *See* #5794 at 8-10. After reviewing the whole Plan of Allocation, Professor Weil concluded that the Plan is fair, reasonable and adequate. *Id.* at 10.

and minus notice and administration expenses, Lead Counsel's fees and expenses, and various plaintiffs' costs and expenses.

Under the proposed Plan of Allocation, the settlement fund, net of expenses and the fee award,[6] would be distributed to "Eligible Claimants," as defined in the Plan,[7] on the basis of their individual claims. *See* Corrected Order Approving Form and Manner of Notice, #5789, Ex. A, § V.A.; also found at Declaration of Carole K. Sylvester, #5900, Ex. A, "Notice," § V. A. The proposed Plan of Allocation is described in the Notice mailed on December 21, 2007 to all persons and their beneficiaries who purchased or acquired any Enron securities or Enron-related securities by any method from September 9, 1997 to December 2, 2001. *Id.* at § V and Declaration of Carole K. Sylvester, #5900 at 2. The proposed Plan was drafted by Lead Counsel and Lead Plaintiff, aided by their damage consultants and others,[8] and with consultation with other attorneys in this litigation, for

_____

[6] The Notice at VII informs class members of the amounts of money and percentages Lead Counsel and class representatives are seeking as fees and expenses. The Court addresses the issues of Lead Counsel's fee award and of class representatives' expenses in separate orders.

[7] All the definitions of terms used in the Plan are found at #5900, Ex. A, Notice at § III.

[8] Lead Counsel states it received assistance from Stanford Consulting (a damages consultant), Chris Patti (University Counsel for the Regents), consultants Robert Fairbank and Rock Hanken, hired by the Regents, and Professor Roman Weil, in preparing the Plan of Allocation. #5897 at 10-11, ¶¶ 37, 40, 42.

distribution of the settlement fund to investors who suffered losses resulting from the alleged Enron fraud and to pay for the expense of the litigation.  The proposed Plan was first published in July 2007 for public comment, available on the web site www.enronfraud.com.  After receiving and reviewing public comments and further discussions with its consultants, Lead Plaintiff made adjustments to the Plan.  Subsequently in negotiating with objectors, other changes were made.

Lead Counsel divided the eligible securities, listed in exhibits 1 and 3 to the Notice, into two groups.  #5756 at 3-4; Notice at V.B. (#5900 Ex. A).

The first group ("Category 1") were securities issued by Enron, some of its predecessor firms (Internorth or Houston Natural Gas) or trusts, or other entities created by Enron for the purpose of issuing a particular security, or were derivatives of those securities.[9]  *Id.*  Their price or value during the Eligible Period (September 9, 1997 through December 2, 2001, inclusive) was mainly dependent on Enron's credit, financial condition or ability to pay, and disclosure of alleged fraud at Enron had to cause movement in the price of these securities.  *Id.* at 4.  This group were the main focus of the *Newby* litigation and therefore the Plan

---

[9] Category 1 securities include Enron common stock, Enron debt (Notes), Enron preferred securities, put and call options on Enron common stock, and derivatives known as the "Foreign Debt Securities."

of Allocation is structured to distribute about 95% of the proceeds to them. *Id.*

The second group, "Category 2,"[10] were composed of securities issued by Enron-related entities, including equity, debt, preferred securities and derivatives of those securities. Disclosure of the alleged fraud at Enron did not affect the prices of some of them (listed in Exhibit 2), and the plan of allocation therefore excludes those from participation in the settlement funds. Other Category 2 securities' prices were affected by the disclosures; thus purchasers and acquirers of those securities, listed in exhibit 1, which is not necessarily exhaustive, do share in the distribution. Still other Category 2 securities, listed in exhibit 3, are classified in an "unknown" category because pricing data for them was not available despite great efforts by Lead Counsel and its damages expert to obtain them. Thus these may share in the distribution, but only if the claimant presents adequate evidence of both the price or value of the security and of a decline in that the price or value caused by disclosure of alleged fraud at Enron.[11]  Furthermore, because the claims for

---

[10] Lead Plaintiff's expert, Professor Ramon Weill, explains that Category 1 is composed of securities which the *Newby* complaint asserted, while Category 2 is composed of "securities that the settling defendants added to the set of securities subject to the settlements."  #5794 at 6.

[11] The Plan makes clear that in accordance with federal securities law, "The market price (or value, if market prices are

eligible Category 2 securities were determined by Lead Counsel to be "weaker" than the Category 1 claims, the plan of allocation limits distribution to them to 5% of the settlement proceeds.  *Id.*

Lead Plaintiff adequately explains that in an effort to be fair to all eligible claimants, for at least two reasons it commingled the settlement funds into a single pool, rather than allocating them into different pools with distribution dependent on the particular claims (§ 10(b) or § 11) asserted against a particular defendant.  First, even when a settlement was achieved against a particular defendant at a time when only one type of claim was pending against it, e.g., a § 11 claim, having different pools would not have recognized that in certain circumstances, other claims, e.g., § 10(b) claims, had been asserted against that same defendant but had been dismissed, leaving appellate exposure against that defendant.  Second, if a specific amount was allocated to cover only a particular security and the number of claims made based on that security was significantly lower than that for other eligible securities, a windfall would result for those claimants.  Because the Regents observed that certain § 11 claims drove certain settlements with certain defendants, the Regents, with the aid of its economic/damage expert, created

_____

not available) of the Enron or Enron-Related Security, must have declined due to disclosure of the alleged Enron fraud."   #5900, Notice, § V.C.(g).

"multipliers" to put those claimants in the same economic position they would have been in if separate pools of money had been allocated for various section 11 claims and another for the § 10(b) claims.[12]  Last of all, formulae for calculated claims were derived from the Federal Rule of Civil Procedure 26 reports that were prepared by the Regents' economic/damage experts, whose damage theories Lead Plaintiff would have presented at trial; in other words the formulae reflected Lead Counsel's determination of what the damages to class members were and what Lead Counsel thought it could prove at trial.

Under the Plan, "Eligible Claimants," defined in the Plan (Notice at § V.A.1 and 2), who submit valid and timely Proof of Claim forms, under the circumstances identified in Notice §§ V-VI, will receive cash distributions from the net balance of the settlement fund.  The Plan treats all Eligible Claimants similarly, so everyone entitled to a distribution who submits a valid and timely claim will receive a *pro rata* share of the Net Settlement Fund in the proportion that his "Recognized Claim"[13]

_____

[12] For example, purchasers of Enron's 7% Notes, which had both § 10(b) and § 11 claims, that have a "Recognized Claim" are entitled to the greater of the § 10(b) measure of loss or three times the § 11 measure of loss and they share in total settlements, including the $6.5 billion generated through the settlements of § 10(b) claims.  *See* #5764.  See also #5900, Notice, D3 regarding multipliers for § 11 claimants.

[13] Under the Plan, V.C.1.(a), a "'Recognized Loss' is the amount of a claim under this Plan before the application of any

bears to the total of all Recognized Claims.  As Professor Weil declares, "In general each Authorized Claimant will receive an amount determined by multiplying the net settlement fund by a fraction, the numerator of which is the authorized claimant's Recognized Claim and the denominator of which is the total Recognized Claims of all Authorized Claimants."  #5794 at 7-8. Lead Counsel estimates that there are more than a million class members who may submit claims and subsequently receive distributions of the settlement funds.  #5794 at 5, ¶ 20.

The Court finds that the Plan of Allocation was negotiated at arm's length, with no evidence, nor allegations, of collusion, and that the allocation is fair, reasonable and adequate as to Class Members.  The Court further finds that methodology used by Lead Counsel took into consideration the unique facts and circumstances of this litigation, interclass distinctions based on the relative strength and weaknesses of the different claims, the timing of purchases and sales, the magnitude of the loss, and the different kinds of recovery available under the different statutes, in producing a fair, adequate and reasonable plan for distribution of the funds.  The Court notes that the Plan Allocation has also been found to be fair, adequate,

---

multiplier."  Under V.C.1.(b), a "'Recognized Claim' is the amount of a claim under this Plan after the application of a multiplier, or, if no multiplier is applied, remains equal to the Recognized Loss."

and reasonable by expert Professor Ramon Weil, after careful examination of its underlying facts and principles. #5795 at 6-10

The Court finds that Lead Plaintiff has given the best notice practicable under the circumstances and has fully satisfied all applicable notice requirements, including the United States Constitution, Rule 23(e) and Rule 23(c)(2)'s requirement of individual notice "to all members who can be identified through reasonable effort." Reasonable Notice of the Plan of Allocation and opportunity to opt out were provided to in-state and out-of-state Class Members in this action, pursuant to this Court's order. Court's Corrected Order Approving Form and Manner of Notice (#5789)(with Notice, Ex. 1, and Proof of Claim Form, Ex. 2, attached)(finding the Notice "constitutes the best notice practicable under the circumstances" to notify class members of this action, their right to object to the Plan, the award of attorneys' fees, and the award of expenses to be paid to Lead Plaintiff and class representatives). Claims Administrator Gilardi & Co. mailed the Notice and Proof of Claim form by first-class mail, postage prepaid, to all Eligible Claimants that could be identified by Lead Plaintiffs' counsel with reasonable effort at each claimant's last known address. *Id.*; Declaration of Carole K. Sylvester (of Gilardi & Co., LLC)(regarding the mailing of the Notice), #5900. Furthermore the Court's order directed banks,

brokerage firms, institutions, and other persons ("nominees") who purchased Eligible Securities for the beneficial owners of those securities, within ten calendar days of receiving the Notice, either (a) to send the Notice to the beneficial owners, or (b) if they had not already done so with prior settlements, to send a list containing the names and addresses of the beneficial owners to the Claims Administrator, which in turn promptly mailed Notice to the beneficial owners. *Id.* The Claims Administrator mailed 1,262,301 claim packets to potential class members on December 21, 2007, 81 more claim packages on January 2, 2008 to entities holding securities for the benefit of class member customers, and, in response to correspondence or inquiries from potential class members, 328,051 more. #5900 at 2. Notice by publication, twice in *Investor's Business Daily* on December 26 and 27, 2007 and twice in the *Houston Chronicle* on the same dates, was also effected pursuant to the Court's Order. #5789 and 5900. Lead Counsel and the Claims Administrator also published the Notice and Proof of Claim form on the Internet, with a clear explanation of the Fairness Hearing set before this Court on February 29, 2008: http://www.enronfraud.com/enr-cgi-bin/mil?templ=settlement.html and http://www.gilardi.com/enron/securities/. That Fairness Hearing took place as scheduled.

B.  **Objections**

Lead Plaintiff observes that although the class members' losses are approximately $44 billion, the settlement fund is composed of limited dollars (approximately $7.2 billion) for which there are competing claimants; there are more than one million class members who may make claims and receive distributions. Inevitably some will complain that the Plan of Allocation is unfair to them.  If changes are made to the current Plan in response to objections, some claimants will receive more and others less.  Lead Plaintiff urges, "While the Plan may not satisfy every potential claimant, that does not mean that it is unfair.  To the contrary, the Plan is the product of serious informed choices, is fair, reasonable and adequate and should be finally approved."  #5892 at 3.  This Court agrees.  Moreover, in addition to the strong policy favoring settlement in class action suits,[14] the Court notes that had the partial settlements in this litigation not been achieved when they were, under the Supreme Court's recent ruling in *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 126 S. Ct. 761 (2008), most of the recovery fund based on § 10(b) claims would likely not have been obtained by *Newby* plaintiffs.

**1.  Resolved Objections**

---

[14] *See Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)("Particularly in class action suits, there is an overriding public interest in favor of settlement.").

Objections filed by several class members have been resolved: (1) the J. Corman Family Limited Partnership # 3, which objected (#5859)to the inflation percentage (76%) attributed to Enron "bond-like" preferred stock, compared with that (94%) for common stock and "stock-like" preferred, was resolved when Lead Counsel agreed to modify the plan of allocation (#5936 at 1); (2) the Ruben Parties, who complained that the Plan discriminates against Eligible Claimants who "acquired" rather than purchased Eligible Securities (#5861, 5860, 5919) was resolved and withdrawn (#5934, 5936 at 1); (3) Nathaniel Pulsifer as Trustee of the Shooter's Hill Revocable Trust (#5764, 5783); and (4) Brian Dabrowski (#5759, 5783).

**2. Pending Objections**

**a. Stanley Majors** (#5840) complains that the cut-off date of the Eligible Period for reimbursement, December 2, 2001 is too early because he purchased his Enron stock after Enron was in bankruptcy, beginning in January, 2003, at less that eight cents per share.

As Lead Plaintiff responds, the Regents never included 2002 and 2003 in their complaint nor asserted any basis to do so. Moreover, Mr. Majors concedes that he purchased the stock in 2003 "when ENRON was in bankruptcy and 'fraud' was not told to me when I purchased my stocks," but that he did so because "[i]t still

looked to me Enron would come out of bankruptcy and be a viable company once again." His investment decision was not based on the same facts and circumstances as those asserted on behalf of the class in the *Newby* complaint.

The Court agrees with Lead Plaintiff and overrules Mr. Majors' objection.

**b. Larry Fenstad and Dorothy Lancaster McCoppin**[15] (#5868) complain that (1) the Notice and Proof of Claim form are confusing; (2) there is no timetable for the Claims Administrator (Gilardi & Co.) to resolve claims; (3) the Court should require reports about the status of distribution from Claims Administrator every 90 days; (4) should have an appeals process; (5) the deadline for filing claims should be extended; (6) additional instructions from Administrator should be given to all class members; and (7) the claims deadline should be extended.

The Court finds these objections should be overruled. When this Court approved the form and matter of the Notice and Proof of Claim Form (#5789) prior to its being mailed to potential class members, the Court had already found that the Notice, along with the Proof of Claim form, while addressing a complex matter, is clear, understandable by laymen, and adequately informative. If they were confused, the Plan referred then to two web sites,

---

[15] Joined by Nasser Pebdani (#5877).

www.gilardi.com or www.enronfraud.com and stated they could write to Lead Counsel about any questions regarding the Plan of Allocation. Notice at § X. In addition, two open meetings were held on March 27 and 29, 2008 in Houston, Texas for Enron class members, and representatives of Lead Counsel and of the Claims Administrator were present to answer individual questions regarding the Plan of Allocation and the Proof of Claim Form. These objectors have not indicated if they utilized any of these opportunities to express their questions. Lead Counsel has shown that Gilardi & Co. is an experienced and reliable claims administrator that has administered claims in hundreds of other securities class actions. *See* www.gilardi.com. *See also* #5892 at 5; Declaration of Dennis A. Gilardi (# 5899)("During the past 25 years, Gilardi has provided notice and administration services in more than 2,500 class actions."). Its personnel answer telephone calls, email, and regular mail inquiries from claimants. #5899 at 3. They provide individual review of claims, provide information about any deficiencies in the claims or documentation necessary to support them, and help each claimant throughout the process to cure any deficiency where possible. *Id.* at 4-5 ("Gilardi views its role in the deficiency and cure process as that of a facilitator, and never as an adversary."). Furthermore there is an appeals process in the Plan: if the Claims

Administrator rejects the claimant's claim, the Claims Administrator will send a rejection letter advising the claimant of his rights and the reasons for the rejection, and the claimant may request an administrative review and/or has recourse to turn to the Court and ask it to review his claim. *Id.* at 4-6; #5900, Notice, Ex. A, § V.E.(5)("The Court reserves jurisdiction to modify, amend, or alter the Plan of Allocation without further notice or to allow or disallow or adjust any Authorized Claimant's claim, to ensure fair and equitable distribution of funds.").  As for any time limits, Gilardi is "committed to an efficient and timely distribution of the Fund".  #5899 at 6.  As noted by Lead Counsel, there are a number of factors beyond Gilardi's control: whether the Plan of Allocation approved by the Court is appealed; how complete, accurate and properly supported by documentation the submitted claims are; how many Eligible Claimants will require assistance from Gilardi and Lead Counsel; and how many will request a Court review of Gilardi's determination.  As for any delays in claimants' obtaining the necessary documentation to support their claims, the Court has authorized Lead Counsel, "in their discretion, [to] accept for processing late claims so long as the distribution of the Net Settlement Fund to Authorized Claimants is not materially delayed thereby.  The Court finds

unnecessary periodic reports from the Claims Administrator and periodic or delayed payments for its services.

Mr. Fenstad and Ms. McCoppin also request the Court to provide them with "a reasonable incentive award" for their services as class representatives and objectors.  As this Court has indicated in #5996, such incentive awards are contrary to the policy behind the PSLRA.  Thus the Court denies the request.

**c.   Jeanette Dreisbach** (#5873) complains that shareholders will only receive a distribution of $6.79 per share of common stock, especially in view of the settlement recovery of $7.227 billion. She asks the Court to "[a]llow individual investors/shareholders to recover full amount of loss then whatever amount remains in the Allocation Fund be split fairly among the other plaintiffs who were acting as money managers for other people's money and did not suffer personal loss."

While the "money managers" may not personally have lost money, their clients or plan participants surely did.  The institutional investors deserve a fair allocation of the settlement funds as much as the individual investors do.  Ms. Dreisbach's objection is overruled.

d. **Silvercreek Plaintiffs**[16] (#5874)[17] object that the plan, with its single pool, improperly intermingles funds from different settlements[18] and thereby unfairly dilutes the recovery of class member owners of the 7%, 7.375%, 7.875%, and Zero Coupon Notes, whose claims arise exclusively or predominately under Section 11, in favor of open market securities, whose claims are predicated solely or predominately on Section 10(b). Because the section 11 defendants[19] settled claims arising under only that statute, Silvercreek Plaintiffs contend that there is no basis to require the settlement consideration paid by them to be distributed to other class members who have no claim against these defendants. Rather than using multipliers and a single pool, the Silvercreek

_____

[16] Silvercreek Management, Inc., Silvercreek Limited Partnership, Silvercreek II Limited, OIP Limited and Pebble Limited Partnership.

[17] Originally the Silvercreek Plaintiffs joined in the Opposition of Nathaniel Pulsifer as Trustee of Shooter's Hill Revocable Trust (#5764), investors in Enron 7% Exchangeable Notes, arguing that the Plan failed to segregate the funds from the section 11 claims from the funds from the section 10(b) claims. After Pulsifer and Lead Plaintiff resolved Pulsifer's objection by adjusting the Plan by increasing the size of the multiplier for the 7% Exchangeable Notes, Silvercreek filed its own objection.

[18] Specifically they contend that the funds from the "pure § 11 settlements" (with Bank of America, Lehman Brothers, and the Outside Directors) are improperly commingled with the remaining Enron settlements, which included settlement by parties who were liable to all Enron stakeholders, and not just to investors in certain specific Enron Securities.

[19] Bank of America, Outside Directors, and Lehman Brothers.

Plaintiffs want separate pools of funds established for the section 11 claimants and a single pool for all the rest.

Lead Plaintiff urges the Court to overrule the Silvercreek Plaintiffs' objection that the claims of class members with § 11 claims are being diminished in favor of class members with § 10(b) claims. It first insists that monies obtained in settlement of the 7% Note claims were obtained in exchange for extinguishment of both § 11 and § 10(b) claims, and thus should not be segregated from other § 10(b) claims. *See* Lead Plaintiff's Response to Nathaniel Pulsifer's Opposition,[20] #5774 at 1. For example, even though the § 10(b) claims against it had been dismissed, the Bank of America demanded, and was accorded, as a condition of the settlement a broad definition of the settlement class and releases of § 10(b) claims relating to many Enron or Enron-related securities.

Second, Lead Counsel argues against Silvercreek Plaintiffs, establishing separate pools of funds for § 11 purchasers could result in disparate recoveries among claimants because of disparate claim rates. Supplemental Declaration of its Plan expert, Professor Roman L. Weil (#5898). Professor Ramon

---

[20] The Silvercreek Plaintiffs' objections (that access to the settlement funds from section 11 claims should be limited to section 11 claimants) were previously raised by Nathaniel Pulsifer, as Trustee of the Shooter's Hill Revocable Trust, with regard to the preliminary approval of the Plan of Allocation.

Weil explains that such an allocation could result unfairly in "eventual outcomes to participants that could be so disparate as to violate the principle underlying the Plan that all authorized claimants be treated in a way so as to nullify the effect of differential claims rates." *See* Weil Supplemental Declaration (#5898 at 1), *citing* Weil Declaration (#5794) at ¶ 23(h). Exhibit 1 to #5898, asserts Professor Weil, shows how reasonably different claims rates could lead to disparate recovery rates, exactly what Lead Plaintiff has tried to avoid. Instead, under the Plan, he maintains, if the claims rates turn out to be the same across classes of claims, with the use of multipliers the § 11 securities will receive the amounts they would have gotten if there had been separate pools, as long as half or more of the § 11 eligible claimants make claims. #5898, Ex. 2. In other words, a single pool of funds with use of differential multipliers eliminates the possibility of windfall for some of the § 11 claims that would arise if there were separate pools and a low claims rate for one of the pools.

Realizing that the single pool with use of multipliers and separate pools are alternative methods to establish a Plan of Allocation, neither perfect, each potentially favoring and/or disfavoring some class members to some degree depending on the circumstances, the Court finds the Lead Plaintiff has shown that

the single-pool approach with the use of multipliers to put the § 11 Note purchasers in the same economic positions as if segregation of the funds had occurred is a fair, reasonable, and adequate means for distribution of the recovery funds in this litigation.

The Silvercreek Plaintiffs further object to the failure of Section C(1)(q) of the Plan of Allocation to properly address the manner of distribution to class members who opted out of some settlement classes while remaining in others.[21]

Lead Counsel responds that it has already explained to the Silvercreek Plaintiffs by letter, "The Recognized Claims of those who opted out of some, but not all, settlements will be reduced by the amount of those settlements opted out of divided by the total amount of all settlements." Letter from Helen J. Hodges to Steven N. Williams, dated September 10, 2007 (Supplemental Compendium (#5910), Ex. 20). The Silvercreek Plaintiffs never responded to the letter nor objected again at the preliminary approval stage last December. Furthermore, argues Lead Counsel, a *pro rata* adjustment is equitable and the Silvercreek Plaintiffs fail to propose any alternative. The Court

---

[21] Silvercreek Plaintiffs state that they excluded themselves from the Citigroup, CIBC, JP Morgan Chase and Arthur Andersen settlement classes. They are members of the Bank of America, Outside Directors, Lehman Brothers, Andersen Worldwide, and Kirkland and Ellis classes.

agrees with Lead Counsel that the letter's response, which Silvercreek Plaintiffs have not timely or substantively challenged, is equitable and rational, and that it, too, is an adequate, fair and reasonable solution.

**e.   Wiley M. Cauthen** (#5884) objects to exclusion of those who acquired Enron securities before the Eligible Period and held them during the Eligible Period.  Cauthen also objects to exclusion of those who acquired Enron securities during or prior to the Eligible Period by means of a gift, inheritance or operation of law and held them during the Eligible Period.

Lead Counsel correctly cites the law often applied by this Court in ruling on motions in this litigation:  "It is well established that the mere retention of securities in reliance on material misrepresentations or omissions does not form the basis for § 10(b) or Rule 10b-5 claim." *Krim v. BancTexas, Inc.*, 989 F.2d 1435, 1443 n.7 (5th Cir. 1993).  *See also In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F. Supp.2d 511, 635 (S.D. Tex. 2003), *citing Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975), and *Birnbaum v. Newport Steel Corp.*, 193 F.3d 461 (2d Cir. 1952).

Furthermore, a person who receives a security as a gift or through inheritance, but who parts with no consideration and incurs no liabilities in connection therewith, is not a purchaser

or seller of the security entitled to maintain a § 10(b) and Rule 10b-5 cause of action. *Rose v. Arkansas Valley Environmental & Utility Authority*, 462 F. Supp. 1180, 1188-89 (W.D. Mo. 1983)(donees and legatees lack standing to bring § 10(b) claims because they are not purchasers or sellers), *citing Blue Chip* and *Birnbaum*.

Thus the Court overrules Mr. Cauthen's objections.

**f. Fiduciary Counselors, as the independent fiduciary for the Enron Corp. Savings Plan and the Enron Corp. Employee Stock Ownership Plan,** (#5869 at 18-22) focuses on § V.C.(j) of the Notice:

> An Authorized Claimant's gains and losses on a particular Eligible Security acquired in the Eligible Period will be netted against each other to determine the Authorized Claimant's net Recognized Claim on that security. In the case of Enron common stock and options on that stock, gains and losses on both the stock and options will be combined and thereafter netted against each other. In all other cases, gains and losses will **not** be netted or aggregated across different Eligible Securities. For example, an Authorized Claimant's Recognized Claim (as calculated under this Plan) on Enron common stock/options will not offset his/her/its Recognized Claim (as calculated under this Plan) on any issue of Enron Notes, nor will any Authorized Claimant's Recognized Claim on one issue of Enron Note(s) offset any gains on a different issue of Enron Note(s).

*Id.* (emphasis in original).

"A plan of allocation that reimburses class members on the extent of their injuries is generally reasonable." *Schwartz*, 2005 WL 3148350, at *23, *quoting In re Oracle Sec. Litig.*, [1994-1995 Transfer Binder] Fed. Sec. L. Rep. (CCH) 98,355, at 90,446 (N.D. Cal. 18, 1994).   Highlighting this statement, Fiduciary Counselors objects that Notice § V.C.(j) is "fundamentally unfair" because "those who traded multiple Eligible Securities and did not suffer an overall loss on their Enron securities (or whose out of pocket loss was offset in part by gains) may nevertheless claim their full losses from that portion of their investments which were unsuccessful."[22]   #5969 at 18.   Since Eligible Claimants' "gains and losses will not be netted or aggregated across different Eligible Securities," the proposed Plan also "would provide a windfall for sophisticated investors, such as hedge funds or arbitrageurs who engaged in hedging Enron stock against Enron debt securities, as well as other investors who were simply lucky enough to make money on one Enron security while also suffering a loss in another." #5869 at 18.   Their actual injuries from investing in Enron could be far less than their Recognized Claim, or they might actually have no injuries at all (if their gains offset their losses).   An investor who bought Enron bonds

_____

[22] Fiduciary Counselors notes the one exception for purchasers of Enron stock and options on common stock, for which the Plan does net (offset) gains and losses.

and sold its Enron stock short might profit or break even when Enron collapsed, but would still be allocated a portion of the settlement fund for the bond loss.  Fiduciary Counselors argues that the Plan compensates sophisticated investors to the detriment of ordinary investors, including participants of the Enron Plans. #5869 at 18-20,.  Fiduciary Counselors disagrees with Lead Counsel's decision that "the balance of fairness weighs in favor of allowing investors who invested in different types of securities for different purposes to keep the profits from their successful investments, while still compensating those investors for their losses" because it fails "this Circuit's fairness analysis."  #5869 at 21, citing In re Chicken Antitrust Litig., 669 F.2d at 238.  Insisting its objection is not hypothetical, Fiduciary Counselors points out that a fund of Wilbur L. Ross did precisely that.  See WL Ross:  Hope Rising From the Ashes, Euromoney, May 2002 at 80-81 (Ex. 8 to #5869)("the fund went short in Enron stock and simultaneously long in Enron bonds.  The profit made from Enron's precipitous decline from $30 to 30 cents--the level at which [the fund] sold out--was given back when the bonds also collapsed.  Ross [the chairman of the fund's manager] says the firm broke even on the Enron trade.").

In response, Lead Counsel explains that the Plan acknowledges the differing investment objectives of those who

purchased different kinds of Enron securities; it takes into account the fact that purchasers of fixed income securities were seeking regular interest payments under the notes, and that purchasers of common stock looked to capital appreciation as their major source of return and that during the class period they commonly hedged their purchase of Enron common stocks with options on Enron equities.  Because hedging of equity securities was so common at the time, the Plan provides that "in the case of Enron common stock and options on that stock, gains and losses on both stock and options will be combined and thereafter netted against each other."  Notice, § V.C.1.(j).

Lead Counsel further asserts that capital-structured arbitrage only became an accepted investment technique in late 2001, i.e., at the end of the Enron debacle.  #5892 at 21-22, citing *Adam Bradbery, Hedge Funds Take a Capital-Structure Arbitrage*, Wall St. J., Aug. 19, 2003, found in Supplemental Compendium (#5910), Ex. 25; and Robert Clow, *Global Investing-Vultures Scour the Horizon for New Prey*, Fin. Times, Oct. 22, 2001 at 25, found in Supplemental Compendium (#5910) at Ex. 26 at 25 ("The hedge fund managed by his W.L. Ross normally engages in capital structure arbitrage, shorting the equities of distressed companies, which could easily prove worthless, and buying their bonds.")  Because capital structure arbitrage was not

an established investment technique during the Eligible Period, the identification of a single investor by Fiduciary Counselors does not make the Plan unfair.

To Fiduciary Counselors' contention that even ordinary investors who traded in different bond classes could "reap windfalls from the Plan of Allocation at the expense of Plan Participants and other ordinary investors, Lead Counsel counters that profits from these various bond transactions could have come about from changes in interest rates or other factors not related to fraud. Furthermore, the Plan takes into account the different motivations of investors in choosing different types of securities. Lead Plaintiff believes the Plan's allocation is a fair method to distribute the settlement proceeds.

Finally, Lead Plaintiff believes that "the balance of fairness militates against offsetting gains and losses across all classes of Eligible Securities." #5892 at 22. Lead Plaintiff similarly decided it was not fair to offset recoveries that Eligible Claimants received from other legal proceedings against distributions here; therefore the Plan does not offset distributions that Eligible Claimants received in the Bankruptcy proceedings nor recoveries they received in the *Tittle* action. If the Plan were to net gains and losses of a Claimant across all classes of Enron securities, in fairness it should also consider

offsetting gains from recoveries in these Enron-related litigations.

This Court reiterates that there is no way to allocate these proceeds that would not in some way favor or disfavor to some degree some of the class members. On the whole, the Court finds that the considerations behind the Plan's design to not offset gains and losses across all classes of Eligible Securities are very reasonable, and given the difficult balance of so many factors, the chosen method is fair, adequate and reasonable.

**g.   P.E. Ilavia** (#5948) wrote a letter to the Court requesting that it include the common stock he acquired through the stock split that occurred on August 13, 1999 in what the Plan refers to as "Enron Securities you purchased or otherwise acquired during the period September 9, 1997 to December 2, 2001." The letter states that Mr. Ilavia attended both the sessions held in Houston by Gilardi & Co. for investors on March 27 and 29, 2008, where he was told the split would not count as an eligible acquisition. He argues, "A split is an acquisition of a corporation's security, as per SEC, and as such should be counted as an acquisition."

Lead Plaintiff responds that the stock acquired in a 2-for-one stock split on August 13, 1999 is not and should not be included for distribution under the Plan of Allocation. #5951 at 1-2. If a person held ten shares on that date, he had twenty

shares after the split, and each share traded at half the price on the day after the split (on August 13, 1999, the pre-split price of an Enron share was $87.6888, and the next day, $43.875); moreover, there was no payment made nor consideration given for the additional shares. *See* Richard A. Brealey and Stewart C. Myers, *Principles of Corporate Finance*, at 291 (McGraw Hill, 3d ed. 1988)(referring to split transactions as a "free gift" of shares). The Plan states, "For each unit of . . . Enron common stock, . . . purchased in the Eligible Period, the Recognized Loss . . . is the dollar amount of the inflation in the Purchase Price Paid at date of acquisition times the number of units acquired, minus the dollar amount of inflation in the Sale Price Received at date of sale if sold prior to December 3, 2001, times the number of units sold." #5789 or 5900, Notice at V.D.1.(a). "Purchase Price Paid" is defined as "the amount paid or value of the consideration given for each unit of the security." *Id.* at V.D. Since the amount paid or consideration given for the stock received through the 2-for-1 stock split was zero at the time of the split, the "Purchase Price Paid" for the stock acquired is zero. Because the investor paid nothing to "acquire" the stock through the split, he has no Recognized Loss under the Plan for the acquisition of those additional shares. Lead Counsel summarizes, "[R]eal economic losses are determined based on the

amount paid or consideration given at the time of the stock acquisition.  When nothing was paid and no consideration was given to acquire the stock, as in the stock split, there is no compensable economic loss for additional shares received." #5951 at 2-3.

Although Mr. Ilavia reiterated his objection and other complaints in another letter, #5957, the Court finds Lead Counsel's explanation clear, rational, and supported by the language of the Plan.  It is also in accord with the law.  *Rose v. Arkansas Valley Environmental & Utility Authority*, 462 F. Supp. at 1188-89 (a person who receives a security as a gift or through inheritance, but who parts with no consideration and incurs no liabilities in connection therewith, is not a purchaser or seller of the security entitled to maintain a § 10(b) and Rule 10b-5 cause of action).  Accordingly the Court overrules Mr. Ilavia's objections.

### III.  Ruling

Having reviewed all submissions and heard oral arguments at the Fairness Hearing, made findings of fact, and addressed all pending objections, this Court finds that the proposed Plan of Allocation is fair, adequate and reasonable.  Accordingly, the Court

ORDERS that Lead Plaintiff's motion for final approval of the proposed Plan of allocation of the settlement proceeds (instrument #5793) is GRANTED.

**SIGNED** at Houston, Texas, this 8th day of September, 2008.


_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE