IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re Enron Corporation Securities, Derivative & "ERISA" Litigation | § § § | MDL-1446 |
| | § | |
| MARK NEWBY, et al., | § § | |
| Plaintiffs | § § | |
| VS. | § § | CIVIL ACTION NO. H-01-3624 CONSOLIDATED CASES |
| ENRON CORPORATION, et al., | § § | |
| Defendants | § | |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al., Individually and On Behalf of All Others Similarly Situated, | § § § § § | |
| Plaintiffs, | § § | |
| VS. | § § | |
| KENNETH L. LAY, et al., | § § | |
| Defendants. | § | |

**OPINION AND ORDER**

Pending before the Court in the above referenced cause are three motions for summary judgment, filed on June 26, 2006 by (1) Merrill Lynch, Pierce, Fenner & Smith, Inc. and Merrill Lynch & Co. (collectively, "Merrill Lynch") (instrument #4816); (2) Barclays PLC, Barclays Bank PLC, and Barclays Capital, Inc. (collectively, "Barclays")(#4817); and (3) Credit Suisse First Boston LLC (now Credit Suisse Securities (USA) LLC), Pershing LLC,

and Credit Suisse First Boston (USA), Inc. (now Credit Suisse (USA), Inc.)(collectively "CSFB")(#4824).[1]

These motions for summary judgment were "updated" after the issuance of two key decisions, *Regents of University of California v. Credit Suisse First Boston (USA)*, 482 F.3d 372 (5th Cir. 2007)(2-1)[2](hereinafter, "*Regents*"), *cert. denied sub nom. Regents of University of California v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 128 S. Ct. 1120 (2008), and *Stoneridge Investment Partners, LLC v. Scientific-Atlantic, Inc.*, 128 S. Ct. 761 (2008)(hereinafter, "*Stoneridge*") (5-3, with Justice Breyer not participating). After careful review and consideration of the record and the law, as a matter of law this Court concludes that *Regents* and *Stoneridge* are dispositive of Lead Plaintiff the Regents of the University of California's § 10(b) claims against these secondary-actor Financial Institution Defendants, and therefore of the motions for summary judgment.

## I.   Standard of Review

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *See, e.g., Condrey*

---

[1] Hereinafter these entities together are referred to as the "Financial Institution Defendants" or "Banks."

[2] Judge Dennis concurred in the reversal of this Court's certification order and the remand, but disagreed with a number of determinations by the majority, in essence filing a dissent in large part. 482 F.3d at 394-407.

*v. Sun Trust Bank of Ga.*, 429 F.3d 556, 562 (5th Cir. 2005). Movant bears the initial burden of demonstrating that there is no genuine issue of material fact. *Id., citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A genuine issue of material fact exists if the summary judgment evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether a genuine issue of material fact exists, "we view facts and inferences in the light most favorable to the nonmoving party." *Mahaffey v. Gen. Sec. Ins. Co.*, 543 F.3d 738, 740 (5th Cir. 2008).

While "failure to state a claim" is usually challenged by a motion to dismiss under Rule 12(b)(6), it may also serve as a basis for summary judgment. *Whalen v. Carter*, 954 F.2d 1087, 1098 (5th Cir. 1992). In a summary judgment context, the failure to state a claim "is the 'functional equivalent' of the failure to raise a genuine issue of material fact." *Id*. In such an instance also, the court must "accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." "[E]valuated much the same as a 12(b)(6) motion to dismiss," summary judgment is appropriate "if accepting all alleged facts as true, the plaintiffs' complaint nonetheless failed to state a claim." *Ashe v. Corley*, 992 F.2d 540, 544 (5th Cir. 1993); *Gilbert v. Outback Steakhouse of Fla., Inc.*, No. 07-40982, 2008 WL 4538259, *2 (5th Cir. Oct. 10, 2008). *See also United States ex rel. Simmons v. Zibilich*, 542 F.2d 259, 260 n.3 (5th Cir. 1976)("The district court's order does not state whether it rests

on Rule 12(b)(6) or on Rule 56.  That difficulty raises no
material obstacle, since the standard to be met in granting a
12(b)(6) motion (plaintiff unable to prove any set of facts that
would entitle him to recovery) and the standard for granting a
motion for summary judgment (no dispute of material fact and
movant entitled to judgment by law) both reduce to the same
question in this case:  Was defendant entitled to judgment on the
basis that the law does not recognize a federal cause of action
for the facts alleged by plaintiff.").

## II.  Relevant Law

### A. The Fifth Circuit in *Regents*

In *Regents*, 482 F.3d 372, on the interlocutory appeal
reversing this Court's class certification in *Newby* and remanding
the case for further proceedings, the Fifth Circuit briefly
summarized Lead Plaintiff's § 10(b)[3] and Rule 10b-5(a) and (c)

---

[3] Section 10(b) of the Securities Exchange Act of 1934, 15
U.S.C. § 78j(b), provides,

It shall be unlawful for any person, directly
or indirectly, by the use of any means or
instrumentality of interstate commerce or of
the mails, or of any facility of any national
securities exchange--. . . [t]o use or employ,
in connection with the purchase or sale of any
security registered on a national securities
exchange . . . any manipulative or deceptive
device or contrivance in contravention of such
rules and regulations as the Commission may
prescribe as necessary or appropriate in the
public interest or for the protection of
investors.

Rule 10b-5, promulgated by the SEC, 17 C.F.R. §240.10b-5,
provides,

It shall be unlawful for any person, directly

allegations of scheme liability against the Financial Institution
Defendants as follows:

> Plaintiffs allege that defendants Credit
> Suisse First Boston . . . , Merrill Lynch &
> Company, Inc. . . ., and Barclays Bank PLC .
> . . entered into partnerships and
> transactions that allowed Enron Corporation
> ("Enron") to take liabilities off its books
> temporarily and to book revenue from the
> transactions when it was actually incurring
> debt.   The common feature of these
> transactions is that they allowed *Enron* to
> misstate its financial condition; there is no
> allegation that the banks were fiduciaries of
> the plaintiffs, that they improperly filed
> financial reports on Enron's behalf, or that
> they engaged in wash sales or other
> manipulative activities directly in the
> market for Enron securities.

---

> or indirectly, by the use of any means or
> instrumentality of interstate commerce, or of
> the mails or of any facility of any national
> securities exchange,
>
> (a) To employ any device, scheme, or artifice
> to defraud,
>
> (b) To make any untrue statement of a material
> fact or to omit to state a material fact
> necessary in order to make the statements
> made, in light of the circumstances under
> which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course
> of business which operates or would operate as
> a fraud or deceit upon any person, in
> connection with the purchase or sale of any
> security.

Rule 10b-5 reaches "only conduct already prohibited by §
10(b)." *Stoneridge*, 128 S. Ct. at 768, *citing United States v.
O'Hagan*, 521 U.S. 642, 651 (1997).  Although the statute does not
expressly provide for a private right of action, the Supreme Court
has found one implied.   *Stoneridge*, 128 S. Ct. at 768;
*Superintendent of Insurance of New York v. Bankers Life & Casualty
Co.*, 404 U.S. 6 (1971).  It has also held that the implied civil
private right of action does not extend to aiders and abettors.
*Stoneridge, id., citing Central Bank of Denver, N.A. v. First
Interstate Bank of Denver*, *N.A.*, 511 U.S. 164, 191 (1994).

*Id.* at 377.   Moreover,

> Plaintiffs allege that the banks knew exactly
> why Enron was engaging in seemingly
> irrational transactions such as [the Nigerian
> Barge transaction].  They cite certain of the
> banks' internal communications they
> characterize as proving that the banks were
> aware of the personal compensation Enron
> executives received as a result of inflating
> their stock price through the illusion of
> revenue and that the banks intended to profit
> by helping the executives maintain that
> illusion.   Likewise, the plaintiffs allege
> that, although each defendant may not have
> been aware of exactly how each other
> defendant was helping Enron to misrepresent
> its financial health, the defendants knew in
> general that other defendants were doing so
> and that Enron was engaged in a long-term
> scheme to defraud investors and maximize
> executive compensation by inflating revenue
> and disguising risk and liabilities through
> its partnerships and transactions.

*Id.* at 377.

The Honorable Jerry E. Smith, writing for the majority,

first focused on this Court's "incorrect" definition, drawn from

a dictionary, of "deceptive act" under § 10(b) as including

"participation in a 'transaction whose principal purpose and

effect is to create a false appearance of revenues,'"[4] and

---

[4] The Fifth Circuit rejected "as too broad to fit within the
contours of § 10(b)" the SEC's proposed test for primary liability
for secondary actors, which this Court had adopted:  that "primary
liability attaches to anyone who engages in a 'transaction whose
principal purpose and effect is to create a false appearance of
revenues.'"   *Regents*, 482 F.3d at 386-87 and n.24.   Instead the
Fifth Circuit adopted the Eighth Circuit's interpretation in *In re
Charter Communications, Inc. Sec. Litig.*, 443 F.3d 987, 992 (8th
Cir. 2006), *aff'd and remanded sub nom. Stoneridge Inv.*, 128 S. Ct.
761("[A]ny defendant who does not make or affirmatively cause to be
made a fraudulent statement or omission, or who does not directly
engage in manipulative securities trading practices, is at most
guilty of aiding and abetting and cannot be held liable under §
10(b) or any subpart of Rule 10b-5.").   *Id.*  Although the Supreme

determined that this Court's definition was "dispositive of this appeal" because it "sweeps too broadly."[5]  *Id.* at 378, 382, 383, 390.  Moreover, this Court also concluded "that rule 10b-5(a)'s prohibition of any 'scheme . . . to defraud' gives rise to joint and several liability for defendants who commit individual acts of deception in furtherance of such a scheme," such as that which Lead Plaintiff attempted to plead in *Newby*.  *Id.* at 378.

The appellate court opined that only certain Supreme Court case law, and not a dictionary, should be the source of the definition of "deceptive device."  482 F.3d at 389.  It admonished, "It is essential for us to ensure that the district court does not misapply aiding-and-abetting liability under the guise of primary liability, through an overly broad definition of 'deceptive act[s],' and thereby give rise to an erroneous classwide presumption of fraud on the market.[6]"  *Id.* at 383.

_____

Court affirmed *Charter* in *Stoneridge*, it did so on other grounds; the high court emphasized that in an omissions case, to trigger an *Affiliated Ute* presumption of reliance there must be a duty to disclose, while for a fraud-on-the-market presumption there must be communication of the defendant's deceptive acts to the public and reliance by the plaintiffs on those acts to provide the requisite causal connection between the defendant's acts and the plaintiffs' injury.  128 S. Ct. at 769.

[5] Judge Smith criticized that this "overly broad definition" drawn from the SEC's test led this Court "inexorably to the mistaken conclusion that the banks' actions constituted 'misrepresentations' on which the market was legally presumed to rely."  482 F.3d at 385.

[6] The Supreme Court recognized the fraud-on-the-market presumption of reliance in § 10(b) and Rule 10b-5 class actions in *Basic, Inc. v. Levinson*, 485 U.S. 224, 244 (1988), in order to ease the difficult burden of showing "actual reliance" for every member of a class.  The Fifth Circuit has held that Plaintiff investors are entitled to a presumption of reliance if they can show (1) that the defendant made a public, material misrepresentation, (2) the

Judge Smith stressed the Supreme Court's holding that for primary liability, a "device," such as a scheme, is not "deceptive" within the meaning of § 10(b) "unless it involves breach of some duty of candid disclosure" owed to investors; otherwise the defendant merely aided and abetted the fraud by Enron by participating in a scheme and engaging in transactions that allowed Enron to misrepresent its financial condition. *Id.* at 389, *citing Chiarella v. U.S.*, 445 U.S. 222, 234-35 (1980)("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak. . . . We hold that a duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information."), and *U.S. v. O'Hagan*, 521 U.S. 642, 655 (1997)("Because the deception essential to the misappropriation theory[7] involves feigning fidelity to the source of information, if the fiduciary discloses to the source that he plans to trade on nonpublic information, there is no 'deceptive device' and thus no § 10(b) violation.").

---

defendant's shares were traded in an efficient market, and (3) the plaintiffs traded shares between the time the misrepresentations were made and the time the truth was revealed. *Greenberg v. Crossroads System, Inc.*,364 F.3d 657, 661-62 (5th Cir. 2004), *citing Basic*, 485 U.S. at 247.

[7] Under the misappropriation theory, "a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information" and criminal liability under § 10(b) "may be predicated on the misappropriation theory." *O'Hagan*, 521 U.S. at 652, 650.  The misappropriation theory is not asserted in *Newby*.

With respect to the effect of a duty to disclose on the element of reliance under *Affiliated Ute*, the Fifth Circuit opined,

> Where liability is premised on a failure to disclose rather than on a misrepresentation, "positive proof of reliance is not a prerequisite to recovery. . . . This obligation to disclose and the withholding of a material fact establish the requisite element of causation in fact." . . . .
> For us to invoke the *Affiliated Ute* presumption of reliance on an omission, a plaintiff must (1) allege a case primarily based on omissions or nondisclosure and (2) demonstrate that the defendant owed him a duty of disclosure. The case at bar does not satisfy this conjunctive test.
> Assuming *arguendo* that plaintiffs' case primarily concerns improper omissions, the banks were not fiduciaries and were not otherwise obligated to the plaintiffs. They did not owe plaintiffs any duty to disclose the nature of the alleged transactions.

482 F.3d at 383-84 (citations omitted). *See also Regents*, 482 F.3d at 384 ("'[D]eception within the meaning of § 10(b) requires that a defendant fail to satisfy a duty to disclose material information[8] to a plaintiff. Merely pleading that defendants failed to fulfill that duty by means of a scheme or an act rather than by a misleading statement does not entitle plaintiffs to employ the *Affiliated Ute* presumption.").[9]

---

[8] "[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available.'" *Basic, Inc.*. 485 U.S. at 231-32, *quoting TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

[9] The panel explained regarding the language of the statute, "Because 'device' is modified by 'deceptive,' no device [such as a scheme] can be illegal if it is not deceptive within the meaning of the statute." 482 F.3d at 389-90.

The Fifth Circuit expressly found,

> Enron had a duty [of candid disclosure] to
> its shareholders, but the banks did not.  The
> transactions in which the banks engaged at
> most aided and abetted Enron's deceit by
> making its misrepresentations more plausible.
> The banks' participation in the transactions,
> regardless of the purpose or effect of those
> transactions, did not give rise to primary
> liability under § 10(b)."

*Id.* at 390.

Because Lead Plaintiff had pleaded its claims against the Financial Institution Defendants primarily under Rule 10b-5(a) and (c), and not subsection (b), and that an *Affiliated Ute* presumption applied, this Court had determined that no preliminary finding of market efficiency or reliance needed to be made.  This Court did conclude "that the banks lacked any specific duty" to Enron investors; but it found instead that the banks had a "duty not to engage in a fraudulent scheme" or "course of conduct," and determined that because they breached that duty, the *Affiliated Ute* presumption of reliance applied.  *Regents*, 482 F.3d at 384; *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 739 (S.D. Tex. 2006)(relying on *Smith v. Ayres*, 845 F.2d 1360, 1363 & n.8 (5th Cir. 1988)), *subsequent determination*, 236 F.R.D. 313 (S.D. Tex. 2006), *rev'd and remanded sub nom. Regents of University of Cal. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 384 & n.19 (5th Cir. 2007), *cert. denied sub nom. Regents of University of Cal. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 128 S. Ct. 1120 (2008).

The Fifth Circuit disagreed, stating that this Court had misconstrued *Smith v. Ayres*.  *Regents*, 482 F.3d at 384 ("Neither

*Smith* nor any other of this circuit's cases is authority for [the]
proposition" that the *Affiliated Ute* presumption of reliance
"applies because the banks omitted their duty not to engage in a
fraudulent scheme."). The panel stated,

> When [the district court] determined
> (correctly) that the banks owed no duty to
> the plaintiffs other than the general duty
> not to engage in fraudulent schemes or acts
> (that is, the duty not to break the law), the
> district court should have declined to apply
> the *Affiliated Ute* presumption.

482 F.3d at 385. Furthermore the panel opined,

> The logic of *Affiliated Ute* is that where a
> plaintiff is entitled to rely on the
> disclosures of someone who owes him a duty,
> . . . [i]t is natural to expect a plaintiff
> to rely on the candor of one who owes him the
> duty of disclosure . . . . Here, however,
> where the plaintiffs had no expectation that
> the banks would provide them with
> information, there is no reason to expect
> that the plaintiffs were relying on their
> candor. Accordingly, it is only sensible to
> put plaintiffs to their proof that they
> individually relied on the banks' omissions.[10]

*Id.* *See also id.* at 383 (stating that the district court's
"determination that the *Affiliated Ute* presumption applies to the
facts of this case is incorrect"). Therefore, concluded the
majority in *Regents*, "the only presumption potentially available

---

[10] Explaining that "'a fraud class cannot be certified when
individual reliance will be an issue,'" Judge Smith pointed out
that to qualify for a classwide presumption of reliance under the
fraud-on-the-market doctrine, the defendant has to make public,
material misrepresentations or omissions. *Regents*, 482 F.3d at
383. "If the banks' actions were non-public, . . . the banks
should be able to defeat the presumption." *Id.* As discussed
above, the Fifth Circuit determined that the *Affiliated Ute*
presumption of reliance did not apply because the Financial
Institution Defendants did not owe Enron investors or the public at
large any duty to disclose their acts in participating in the
alleged scheme.

in this case" was fraud-on-the market, which requires a showing of an efficient market, a material, public misrepresentation or conduct, and public knowledge and reliance on that misrepresentation or conduct. *Id.* at 383, *citing Basic, Inc. v. Levinson*, 485 U.S. 224, 248 & n.27 (1988).

Nevertheless, even with its proposed revised theory, Lead Plaintiff insists this is not a fraud-on-the-market case, but an *Affiliated Ute* case; Lead Plaintiff emphasized at the hearing on February 1, 2008, after *Regents* and *Stoneridge* were handed down, "It's a straight omissions case with a duty, and the question is whether the duty arises with the banks' financial banking activities in this case." #5885 at 22. Thus Lead Plaintiff maintains that the fraud-on-the-market theory is not applicable here.

## B.   *Stoneridge*

In *Stoneridge*, a 5-3 opinion authored by Justice Anthony Kennedy and issued after *Regents*, the Supreme Court focused on the viability of what is frequently termed the theory of "scheme liability," which had caused conflict among courts and was at the core of Lead Plaintiff's arguments against the Financial Institution Defendants before *Stoneridge*: "when, if ever, an injured investor may rely upon § 10(b) to recover from a party that neither makes a public misstatement nor violates a duty to disclose but does participate in a scheme to violate § 10(b)." 128 S. Ct. at 767.

In the *Stoneridge* class action, filed by investors in common stock issued by Charter Communications, Inc. ("Charter"),

two equipment suppliers, Scientific-Atlanta and Motorola, participated in a number of sham business transactions with Charter.   Charter, in turn, misled its auditor and issued misleading, inflated financial statements that affected its stock price.  The Charter investors alleged that the suppliers knowingly participated in a scheme for the purpose of creating a false appearance about Charter's revenues.  The Supreme Court found that although the two suppliers knew or recklessly disregarded that their transactions with Charter had no economic substance, that the transactions were recorded in back-dated documents, and that Charter intended to use them to inflate its revenues and operating cash flow by $17 million in order to meet Wall Street's expectations, nevertheless the suppliers themselves were not involved in preparing or disseminating Charter's fraudulent financial statements, made no statements to Charter shareholders or the investing public, had no contact with the investors, and had no duty to disclose their deceptive acts to Charter shareholders.  "No member of the investing public had knowledge, either actual or presumed, of respondents' deceptive acts during the relevant times."  128 S. Ct. at 769.

While clearly holding that an oral misrepresentation or omission is not essential for liability under § 10(b) and that "[c]onduct itself can be deceptive" and can give rise to liability when it has the "requisite proximate relation to the investors' harm," the Supreme Court emphasized, "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action."  *Id.* at 769.  Asserting that

"reliance is tied to causation, leading to the inquiry whether respondents' acts were immediate or remote to the injury," the Supreme Court decided that the suppliers could not be liable under the statute because their "deceptive acts, which were not disclosed to the investing public, [were] too remote to satisfy the requirement of reliance." *Id.* at 770.   Thus in addition to satisfaction of the elements of a primary violation under the statute, the rather vague touchstone for determining liability based on a secondary actor's conduct or acts under § 10(b) is whether it is "immediate or remote to the injury." *Id.* at 770. Additionally, the Supreme Court emphasized that the suppliers' wrongful conduct "took place in the marketplace for goods and services, not in the investment sphere" (which was not the case for *Newby* plaintiffs), and "Charter was free to do as it chose in preparing its books, conferring with its auditor, and then issuing its financial statements." *Id.* at 769, 774.

     The Supreme Court had previously recognized that a class-wide rebuttable presumption of reliance may arise in two circumstances:   (1) an omission of a material fact made by one with a duty to disclose  or (2) under the fraud-on-the-market doctrine, the statement [or deceptive act] at issue became public and that information was reflected in the market price of the security. *Id.* at 769. Given the facts of *Stoneridge,* the Supreme Court found that neither circumstance was met, so there was no rebuttable class-wide presumption of reliance applicable under either *Affiliated Ute* or under the fraud-on-the-market theory:

> Respondents had no duty to disclose; and
> their deceptive acts were not communicated to
> the public. No member of the investing
> public had knowledge, either actual or
> presumed, of respondents' deceptive acts
> during the relevant times. Petitioner, as a
> result, cannot show reliance upon any of
> respondents' actions except in an indirect
> chain that we find too remote for liability.

*Id. See also In re Parmalat Sec. Litig.*, 570 F. Supp. 2d 521, 526
(S.D.N.Y. 2008)("*Stoneridge* made plain that investors must show
reliance upon a defendant's *own deceptive conduct* before that
defendant, otherwise a secondary actor, may be found primarily
liable.").

The Supreme Court specifically addressed, though not by
name, the theory of "scheme liability," which was argued by Lead
Plaintiff in the *Newby* action, and rejected it for policy reasons
and under its new standard, i.e., whether the challenged conduct
is "immediate or remote to the injury" [128 S. Ct. at 770]:

> Liability is appropriate, petitioner
> contends, because respondents engaged in
> conduct with the purpose and effect of
> creating a false appearance of material fact
> to further a scheme to misrepresent Charter's
> revenue. The argument is that the financial
> statement Charter released to the public was
> a natural and expected consequence of
> respondents' deceptive acts; had respondents
> not assisted Charter, Charter's auditor would
> not have been fooled, and the financial
> statement would have been a more accurate
> reflection of Charter's financial condition.
> That causal link is sufficient, petitioner
> argues, to apply *Basic*'s [fraud-on-the-
> market] presumption to respondents' acts. .
> . . In effect petitioner contends that in an
> efficient market investors rely not only upon
> the public statements relating to a security
> but also upon the transactions those
> statements reflect. Were this concept of
> reliance to be adopted, the implied cause of
> action would reach the whole marketplace in

> which the issuing company does business; and
> there is no authority for this rule.

128 S. Ct. at 770.  The majority concluded that merely because
respondents engaged in conduct with the intention and result of
creating a false appearance of material fact to further a scheme
to misrepresent Charter's revenue and that the financial
restatement released by Charter to the public was "a natural and
expected consequence of respondents' deceptive acts" (in essence,
the SEC's test for liability), those facts were not sufficient to
impose liability on the secondary actors.  *Id.* at 770.  As noted,
because respondents' acts in the case were not disclosed to the
investing public, the majority determined that they were "too
remote to satisfy the requirement of reliance.  It was Charter,
not respondents, that misled its auditor and filed fraudulent
financial statements; nothing respondents did made it necessary
or inevitable for Charter to record the transactions as it did."
*Id.*

The Supreme Court did acknowledge and affirm its earlier
recognition of an implied private right of action in the statute
and its implementing regulation, but limited it by opining that
implied causes of action are to be based only upon explicit
indication from Congress.  128 S. Ct. at 768, *citing
Superintendent of Ins. of N.Y. v. Bankers Life & Casualty Co.*, 404
U.S. 6, 13 n.9 (1971), 772 ("Though the rule once may have been
otherwise, it is settled that there is an implied cause of action
only if the underlying statute can be interpreted to disclose the
intent to create one. [citations omitted]"), and 773 ("Concerns

with the judicial creation of a private cause of action caution against its expansion.  The decision to extend the cause of action is for Congress, not for us.  Though it remains the law, the § 10(b) private right should not be extended beyond its present boundaries.").  Explaining its heavy reliance on *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994)(5-4)(holding that a § 10(b) private civil action did not extend to aiders and abettors), also authored by Justice Kennedy, the majority in *Stoneridge* highlighted Congress' post-*Central Bank* decision not to provide investors with an express cause of action for aiding and abetting in the PSLRA:

> The decision in *Central Bank* led to calls for Congress to create an express cause of action for aiding and abetting within the Securities Exchange Act. . . . Congress did not follow this course.  Instead, in § 104 of the . . . PSLRA, . . . it directed prosecution of aiders and abettors by the SEC.

128 S. Ct. at 768-69, citing 15 U.S.C. § 78t(3).  Justice Kennedy noted that instead, the statute provided other remedies.  *Id.* at 771 ("Aiding and abetting liability is authorized in actions brought by the SEC but not by private parties."); *id.* at 773 ("Secondary actors are subject to criminal penalties, *see, e.g.,* 15 U.S.C. § 78ff, and civil enforcement by the SEC, *see, e.g.,* § 78t(e).").  Indeed, *Stoneridge* follows the lead of *Central Bank* in reflecting the Supreme Court's intent to limit the scope of the implied private cause of action under § 10(b) and Rule 10b-5.  Yet it did not completely close the door on imposing liability on secondary actors:

> All secondary actors . . . are not
> necessarily immune from private suit. The
> securities statutes provide an express
> private right of action against accountants
> and underwriters in certain circumstances,
> see 15 U.S.C. § 77k, and the implied right of
> action in § 10(b) continues to cover
> secondary actors who commit primary
> violations.

128 S. Ct. at 773-74, *citing Central Bank*, 511 U.S. at 191.  As

in *Central Bank*, it did not clearly define the parameters of such

secondary actor liability under § 10(b), but generally referenced

the elements of a primary violation.  "The conduct of a secondary

actor must satisfy each of the elements or preconditions for

liability": "[i]n a typical § 10(b) private action a plaintiff

must prove (1) a material misrepresentation or omission [or

deceptive act] by the defendant; (2) scienter; (3) a connection

between the misrepresentation or omission and the purchase or sale

of a security; (4) reliance upon the misrepresentation; (5)

economic loss; and (6) loss causation." *Id.* at 768-69, 770.[11]

　　　In the same vein, the Supreme Court also objected to the

*Stoneridge* petitioner's attempt to apply the statute "beyond the

securities markets--the realm of financing business--to purchase

and supply contracts--the realm of ordinary business operations,"

i.e., the "market place for goods and services, not in the

investment sphere," which is generally governed by state law.  *Id.*

---

[11] The Fifth Circuit's most recent opinion states that the elements of a fraud claim under the PSLRA have remained the same: "a material misrepresentation or omission; a defendant with scienter concerning the fraud; reliance; damages; and loss causation." *Indiana Electrical Workers' Pension Trust Fund IBEW*, 537 F.3d 527, 532-22, No. 06-30908, 2008 WL 2894793, *2 (5th Cir. July 29, 2008).

at 770, 774.  It admonished, "Were the implied cause of action to
be extended to the practices described here, however, there would
be a risk that the federal power would be used to invite
litigation beyond the immediate sphere of securities litigation
and in areas already governed by functioning and effective state-
law guarantees.  Our precedents counsel against extension." *Id.*
at 770-71.  While the statute is "not 'limited to preserving the
integrity of the securities markets,' . . . it does not reach all
commercial transactions that are fraudulent and affect the price
of a security in some attenuated way." *Id.* at 771.  The Court
reiterated earlier rulings that § 10(b) "does not incorporate
common-law fraud into federal law," and it "should not be
interpreted to provide a private cause of action against the
entire marketplace in which the issuing company operates." *Id.*

Thus the Supreme Court objected generally on policy
grounds to the practical consequences of expanding the reach of
the statute to "expose a whole new class of defendants" to
potential liability, "raising the costs of doing business," and
deterring overseas firms from doing business here.  *Id.* at 772.[12]

_____

[12]     In effect petitioner contends that in an
efficient market investors rely not only upon
the public statements relating to a security
but also upon the transactions those
statements reflect.  Were this concept of
reliance to be adopted, the implied cause of
action would reach the whole market place in
which the issuing company does business; and
there is no authority for this rule.

128 S. Ct. at 770.

Furthermore, since the implied private cause of action in § 10(b) was a judicial construct, not a right authorized by Congress, since evolving law has now settled that an implied cause of action exists "only if the underlying statute can be interpreted to disclose the intent to create one," and since Congress enacted the PSLRA with its heightened pleading requirements and loss causation requirement, the Supreme Court concluded that restraint is the appropriate approach with the private right of action under § 10(b). *Id.* at 772-73.

In contrast to the claims in *Stoneridge*, the *Newby* allegations of fraud remain largely within the investment sphere.[13] Furthermore, if there is no duty of the Banks to disclose (as the Fifth Circuit concluded), to be actionable, the *Newby* claims must satisfy the requirements of public disclosure of the Financial Defendants' wrongful conduct and direct causation of the plaintiffs' injuries. Under *Stoneridge*, allegations of scheme liability, alone, are insufficient to satisfy the reliance element of § 10(b).  In sum, to be primarily liable, a secondary actor's conduct must meet each element or precondition of a primary cause of action under § 10(b), including reliance and loss causation, demonstrating a "direct chain" between each wrongdoer, individually, and the defrauded investors.

## C.  Law-of-the-Case Doctrine and the Mandate Rule

The threshold legal/procedural issue in the instant case is whether, under the mandate rule, the Fifth Circuit's ruling in

---

[13] An exception might be the Nigerian barge transaction.

*Regents* that the Financial Institution Defendants "did not owe plaintiffs any duty to disclose the nature of the alleged transactions,"[14] forecloses Lead Plaintiff from continuing to litigate whether the Financial Defendants owed a duty to disclose to the *Newby* plaintiffs, or, as argued by Lead Plaintiff, to the market as a whole, the breach of which triggered an *Affiliated Ute* classwide presumption of reliance.

> Elsewhere the Fifth Circuit has explained,

> > The mandate rule "is but a specific application of the general doctrine of law of the case." *United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002). "Absent exceptional circumstances, the mandate rule compels compliance on remand with the dictates of a superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court." *United States v. Lee*, 358 F.3d 315, 321 (5th Cir. 2004). The rule also bars "litigation of issues decided by the district court but foregone on appeal or otherwise waived, for example because they were not raised in the district court." *Id.* The mandate rule applies unless: "(1) the evidence at a subsequent trial is substantially different; (2) there has been an intervening change of law by a controlling authority; [or] (3) the earlier decision is clearly erroneous and would work a manifest injustice." *Matthews*, 312 F.3d at 657.

*United States v. Archundia*, 242 Fed. Appx. 278, No. 06-20773, *1 2007 WL 2766580 (5th Cir. Sept. 20, 2007), *cert. denied sub nom. Hernandez-Hernandez v. U.S.*, 128 S. Ct. 1106 (2008). *See also United States v. Becerra*, 155 F.3d 740, 752 (5th Cir. 1998)(Under "the well-settled 'law of the case' doctrine . . . an issue of law or fact decided on appeal may not be reexamined either by the

---

[14] 482 F.3d at 384.

district court on remand or by the appellate court on a subsequent appeal."), *abrogated on other grounds as recognized in United States v. Farias*, 481 F.3d 289 (5th Cir. 2007).

The law of the case doctrine "'serves the practical goals of encouraging finality of litigation and discouraging 'panel shopping.'" *Becerra*, 155 F.3d at 752, *citing Illinois Cent. Gulf R.R. v International Paper Co.*, 889 F.2d 536, 539 (5th Cir. 1989).  The doctrine "'is predicated on the premise that 'there would be no end to a suit if every obstinate litigant could, by repeated appeals, compel a court to listen to criticisms on their opinions or speculate of chances from changes in its members.'" *Becerra*, 155 F.3d at 752, *quoting White v. Murtha*, 377 F.2d 428, 431 (5th Cir. 1967)(*quoting Roberts v. Cooper*, 61 U.S. (20 How.) 467, 481 (1857)).

"The mandate rule requires a district court on remand to effect our mandate and to do nothing else." *United States v. Castillo*, 179 F.3d 321, 329 (5th Cir. 1999).  Moreover on remand, the district court "must implement both the letter and the spirit of the appellate court's mandate and may not disregard the specific directives of that court." *Matthews*, 312 F.3d at 657. "In implementing the mandate, the district court must 'take into account the appellate court's opinion and the circumstances it embraces.'" *Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 453 (5th Cir. 2007), *quoting United States v. Lee*, 358 F.3d at 321. *See also Af-Cap, Inc. v. Republic of Congo*, 462 F.3d 417, 425 (5th Cir. 2006)(the mandate rule is an application of the law-of-the-case doctrine, which "'applies only to issues that were actually

decided, rather than all questions in the case that might have been decided, but were not.'. . . An issue is 'actually decided' if the court explicitly decided it or necessarily decided it by implication."), *cert. denied*, 127 S. Ct. 1511 (2007).

In the instant action, the Financial Institution Defendants maintain,

> The mandate rule--the basic appellate 'chain of command' rule that allows the appellate process to function--forbids Lead Plaintiff from relitigating the question of whether there was a duty to disclose in this Court. Because Lead Plaintiff's entire opposition to summary judgment hinges on the existence of a duty to disclose already rejected by the Fifth Circuit, summary judgment must be entered in favor of the Financial Institution Defendants.

#5970 at 3. The Financial Institution Defendants contend that the Fifth Circuit "clearly considered this Court's holding concerning the lack of a duty to disclose," "characterized the Court's opinion as a 'determina[ation],'" and stated "that the district court's 'determination that the *Affiliated Ute* presumption applies to the facts of this case is incorrect.'" #5986 at 6, quoting *Regents*, 482 F.3d at 385, 383. *See also Regents*, 482 F.3d at 390 ("Enron had a duty to its shareholders, but the banks did not."); *id.* at 386 (the Financial Institution Defendants "owed no duty to Enron's shareholders."). The Financial Institution Defendants insist, "If, as Lead Plaintiff now asserts, the Fifth Circuit had considered this Court's opinion regarding the duty to disclose to be nothing more than a 'comment,' it certainly would not have reversed the class certification order outright (which it clearly did), but would have had to remand the case with specific

instructions that this Court decide whether defendants owed a duty to disclose."  #5986 at 6.

### III.  Arguments of the Parties

### A.  Lead Plaintiff's Supplemental Opposition to Pending Motions for Summary Judgment (#5939) and Second Supplemental Opposition (#5980)

Lead Plaintiff observes that under *Stoneridge*, while conduct alone can be seen as "deceptive" within the meaning of § 10(b), without more[15] it cannot give rise to a class-wide presumption of reliance.  Therefore, in response to the recent case law, Lead Plaintiff now presents "a revised theory of reliance that fits squarely within the framework established by the Supreme Court and the Fifth Circuit decisions, and is based on long-established legal principles."  #5939 at 1.  Lead Plaintiff contends that this "alternative" theory of reliance, rooted in the Banks' Enron-related market activity in addition to the deceptive transactions (and thus not the solely transaction-based theory of liability reviewed in *Regents* and *Stoneridge*), gives rise to a duty to disclose on the part of the Financial Institution Defendants.  Moreover, maintains Lead Plaintiff, this alternative theory was not presented to either the Supreme Court

---

[15] As stated in this Court's discussion of *Stoneridge*, before conduct of the Financial Institution Defendants can be "deceptive" within the meaning of the statute, they must have "more," i.e., a specific duty to disclose owed at least to Enron investors.

Lead Plaintiff's earlier theory was derived from the SEC's test, i.e., that "deceptive conduct--conduct that had both **the purpose and effect** of creating a false impression of earnings, cash flow or debt--was sufficient in and of itself to support findings on the issues of deception **and** reliance."  #5980 at 7.

or the Fifth Circuit. Furthermore, argues Lead Plaintiff, the Fifth Circuit's review in *Regents* was limited by Federal Rule of Civil Procedure 23, which allows a party to appeal issues of class certification only, and no others. Therefore, insists Lead Plaintiff, for all these reasons its new alternative theory is not subject to the mandate rule. Lead Plaintiff also argues, as a recognized exception to the mandate rule, that the intervening change in the law should permit Lead Plaintiff to "re-sculpt the contours of its argument." #5980 at 10. Lead Plaintiff also seeks to revisit the issue of class certification based on its revised theory.

In summarizing Lead Plaintiff's arguments below, for some of the intricate and detailed disputes the Court has footnoted the Financial Institution Defendants' responses in opposition to Lead Plaintiff's arguments. The footnoting does not mean that the Court is subordinating in importance Financial Institution Defendants' points, but only providing a clear and immediate linkage of particular contentions. The Court has also used footnotes in the traditional way to explain in more detail a party's reasoning.

Maintaining that this case is primarily one of omission ("the Banks' *failure to disclose the impact of the fraud on Enron's financial conditions* [emphasis in original]),"[16] Lead Plaintiff relies not only on the Supreme Court's seminal duty-to-disclose decision in *Affiliated Ute Citizens of Utah v. United*

---

[16] #5939 at 27.

*States*, 406 U.S. 128 (1972),[17] but on a multifactor test for

---

[17] In *Affiliated Ute,* the Ute Partition Act of 1954 ("the Act") provided for partition and distribution of the assets of the Ute Indian Tribe between mixed-blood and full-blood members and for termination of federal supervision of the tribe.  The mixed-bloods were granted the power under the Act to organize what became known as the Affiliated Ute Citizens ("AUC"), an unincorporated association, which in turn created the Ute Distribution Corporation ("UDC") to manage all claims against the United States as well as oil, gas, and mineral rights and assets, as part of the plan of distribution of these assets or their proceeds to the mixed-blood members.  The UDC issued ten shares of its stock in the name of each mixed-blood and made an agreement with First Security Bank of Utah ("the Bank") for the Bank to become the transfer agent for UDC stock, to hold the stock certificates rather than distribute them, but to issue receipts to the shareholders.  Under the UDC articles, a mixed-blood shareholder wanting to dispose of his stock before August 27, 1964 had first to offer it to tribe members; only if no member accepted the offer could a sale be made to a nonmember, and then the price could be no lower than that offered to members. Because the Bank possessed the stock certificates and handled documents implementing the first-refusal procedure, a mixed-blood who wished to sell his shares had to deal through the Bank.
    Two employees of the Bank, John B. Gale and Verl Haslem, devised a scheme to induce mixed-blood Indian shareholders to sell their securities to non-Indians.  They actively solicited a market for those securities among non-Indians on the Bank's premises during business hours.  Gale and Haslem personally bought shares at less than fair value, some for themselves and some for resale. They obtained standing orders from non-Indian buyers. UDC stock sold by mixed-bloods ranged from $300 to $700 per share, while shares transferred between whites sold at prices ranging from $500 to $700 per share.  The two employees failed to disclose to the Indian shareholders that the Bank employees received commissions and gratuities from the buyers, that the Bank would gain increased deposits from the new market from sales of the securities, or that the shares would be sold for a higher price in the non-Indian market.
    Anita R. Reyos and 84 other mixed bloods filed suit for damages against the Bank, the two employees, and others, charging violations of the Securities Act of 1934 and Rule 10b-5, 17 C.F.R. § 240.10b-5, in connection with sales of their UDC shares.
    The Supreme Court determined that the defendants' actions fell within the broad first and third subsections of Rule 10b-5, i.e., a "course of business" or "device, scheme or artifice that operated as a fraud" upon the Indian sellers.  Because Gale and Haslem engaged in more than ministerial actions, i.e., they actively encouraged a market for UDC stock among non-Indians, solicited and accepted standing orders from non-Indians, with the Bank receiving commissions and gratuities from these buyers, and were entirely familiar with the market and the restrictions on

determining the existence of a duty to disclose under Rule 10b-5 adopted in *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1314 (5th Cir. 1977)(*citing White v. Abrams*, 495 F.2d 714, 735 (9th Cir. 1974)), *cert. denied sub nom. Walter E. Heller & Co. v. First Virginia Bankshares*, 435 U.S. 952 (1978); *see also Kaplan v. Utilicorp United*, 9 F.3d 405, 407-08 (5th Cir. 1993)(*citing Virginia Bankshares for that five-factor test*).

> In *Virginia Bankshares*, the Fifth Circuit opined,
>
> Silence, or omission to state a fact, is proscribed only in certain situations: first, where the defendant has a duty to speak, secondly, where the defendant has revealed some relevant material information even though he had no duty (i.e., a defendant may not deal in half-truths). **In determining whether the duty to speak arises, we consider the relationship between the plaintiff and defendant, the parties' relative access to the information to be disclosed, the benefit derived by the defendant from the purchase or sale, defendant's awareness of plaintiff's reliance on defendant in making its investment decisions, and defendant's role in initiating the purchase or sale.**

---

sales of shares, the Supreme Court found that the two Bank employees had assumed an affirmative duty under Rule 10b-5 to disclose material facts to the mixed-blood sellers, who had relied on Gale and Haslem when they decided to sell their securities. Specifically the Supreme Court concluded that the sellers had the right to know that the defendants facilitated the sales to those seeking profit in the non-Indian market which they had developed and encouraged, that the defendants had the potential for financial gain from the sales, and that the shares were selling for a higher price in that non-Indian market. "Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. . . . This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact." 406 U.S. at 153-54. The Supreme Court did not use the term "presumption," but lower courts subsequently developed tests for rebutting a presumption of reliance in nondisclosure cases. *See, e.g., Finkel v. Docutel/Olivetti Corp.*, 817 F.2d 356, 359 & n.6 (5th Cir. 1987).

*Virginia Bankshares*, 559 F.2d at 1314 (emphasis added by the Court).

Instead of arguing that as a matter of law the Financial Institution Defendants had a duty to disclose to the market as a whole what they knew about the fraud that demonstrated that Enron's financial statements were false, Lead Plaintiff attempts to raise fact questions about each of the five *Virginia Bankshares'* factors to argue that "sufficient facts exist to allow a jury to find such a duty" and to defeat summary judgment.

Lead Plaintiff characterizes the facts in *Virginia Bankshares* as revolving around a proposed acquisition by First Virginia of a finance company, Benson. A large financing firm, Heller, had served as Benson's principal financier: Heller extended loans to Benson, secured by Benson's notes receivable, and conducted regular audits of Benson's books. Unknown to First Virginia, Heller discovered that Benson was falsifying its financial condition in its reports. For purposes of the acquisition, First Virginia hired a broker, Michelman, who in turn asked Heller for information about Benson, but Heller did not disclose to Michelman Heller's knowledge of Benson's fraud at that time, nor what it learned subsequently. The Fifth Circuit found,

> The jury could also consider that Michelman's inquiry was more than an ordinary inquiry [*sic*] it covered the Bensons' integrity, ability, and reputation for honesty. . . . Heller had much to gain by encouraging the sale of the Bensons' company because it has [*sic*] more than $3,000,000 at risk in Benson debt that was secured by accounts which were tainted with poor or dishonest accounting, and the Benson operation was losing money rapidly. The jury could find that

> acquisition by another company would relieve
> Heller of risk to its $3,000,000.   Also,
> through its May 1972 examination of the
> Bensons' company, Heller obtained information
> strongly indicating gross inaccuracy in the
> Bensons' books.   This information was not
> known to any potential purchaser and was
> designed by the Bensons not to be discovered.
> As matters stood, Heller had superior
> knowledge of inside information.   On the
> basis of this information, the jury could
> find that Heller had a duty to disclose to
> Michelman the information uncovered by the
> May 1972 examination.

*Virginia Bankshares*, 559 F.2d at 1317.

Lead Plaintiff analogizes the facts here to those in *Virginia Bankshares* and applies the five factors to its evidence in an attempt to show that there is a jury question as to each factor regarding whether the Financial Institution Defendants had a duty to disclose Enron's true financial status to investors. #5939 at 31-35.   Lead Plaintiff contends that all the factors favor finding that the Financial Institution Defendants had a duty to disclose, as summarized below.

Regarding the first factor of the *Virginia Bankshares* test, "relationship between the plaintiff and defendant," Lead Plaintiff argues that a jury could find that the Financial Institution Defendants owed a duty to disclose to investors material information about Enron's actual financial condition. Analogizing the Banks' relationship to Enron to that between Heller and Benson, Lead Plaintiff points out that the Banks provided financing to Enron, as Heller did to Benson.   As in Heller's services to Benson, the Banks' activity and transactions for Enron provided the Banks with superior knowledge of Enron's

fraudulent operations. Furthermore, here the Banks held themselves out as being in a unique position to judge the value of Enron's securities for investors. Merrill Lynch and CSFB issued analyst reports about Enron, purportedly providing unbiased, independent evaluation of the securities for the investing public. The Banks either underwrote the issuance of Enron securities and/or brought Enron-related securities to market, thereby vouching for the alleged quality of these securities.

Regarding the second factor, "the parties' relative access to the information to be disclosed," Lead Plaintiff argues that a jury could find that the Banks had "had superior knowledge of inside information" about Enron's reported financial condition, just as Heller could be found to have superior knowledge of inside information about Benson. The Regents has presented evidence detailing the Banks' knowledge of the fraudulent effects of the transactions with the Banks on Enron's reported financial condition.

Regarding "the benefit derived by the defendant from the purchase or sale," Lead Plaintiff argues that its evidence would allow a reasonable jury to find that the Banks had a tremendous financial interest in the continuing marketability of Enron securities at favorable prices, in continuing to collect lucrative fees from Enron for structured-finance transactions, and in the provision of credit to Enron. Like Heller to Benson, the Banks had significant credit exposure to Enron.

As for "defendant's awareness of plaintiff's reliance on defendant in making its investment decisions," a reasonable jury could find from the evidence here that CFSB and Merrill Lynch knew that Enron needed prestigious investment banks to recommend its securities because investors rely on those influential recommendations.  Moreover in this context, reliance can only mean that the plaintiff relied on the defendant to provide accurate information and full disclosure.  A jury could find that the Banks knew that their recommendations strongly influenced the investors and that they were paid high fees to underwrite and market the Enron securities specifically because of that influence, thus favoring the finding of a duty to disclose.

The last factor, "defendant's role in initiating the purchase or sale," played no role in *Virginia Bankshares*, but here a jury could reasonably find that Financial Institution Defendants helped initiate the purchase of the securities through analyst reports and by underwriting Enron and Enron-related securities for the marketplace.  Indeed Lead Plaintiff analogizes the situation in the instant case to that in *Affiliated Ute*,[18] where the Supreme

---

[18] See also #5939 at 29, Lead Plaintiff arguing that the facts here are similar to those in *Affiliated Ute*:

> Just as in the Supreme Court's seminal *Affiliated Ute* decision, the Banks' activities in the market--activities that included encouraging, inducing, and facilitating investors' purchase of Enron securities-- created a duty to investors to disclose material information of which the Banks were aware regarding those securities.  The defendants in *Affiliated Ute* were market makers and sales agents for the stock of a company holding assets for certain mixed-blood

Court found that the defendants' activities induced the purchase
and sale of the stock.   A jury could reasonably find that the
Banks had a duty to disclose their "superior knowledge" of Enron's

---

        Native American plaintiffs.   The defendants
had also helped create a market for the stock
among non-Indians in which the stock traded
for higher prices.   The defendants failed to
notify the Native Americans about the "White"
market for the stock and its higher prevailing
prices.   The Supreme Court held that the
defendants had a duty to disclose "material
facts that reasonably could have been expected
to influence" the plaintiffs' trading
decisions, such as the existence of the higher
prevailing prices in the "White" market.   That
duty arose not merely from the defendants'
status as transfer agents. . . . Rather, the
duty was created as a result of the
defendants' market activity which encouraged,
induced, and facilitated the plaintiffs' stock
trades.   The Court noted that defendants "were
***active in encouraging*** a market" for the stock,
that they "devised a plan and ***induced*** the
mixed blood holders of UDC stock to dispose of
their shares," and that they "***facilitate[d]***
the mixed bloods' sale to those seeking to
profit in the non-Indian market." . . . Also
important to the Court's duty finding was the
fact that the defendants had a financial
interest in the existence of an active market
in the stock . . . and that the defendants in
fact had, and were understood by the
plaintiffs to have, superior knowledge about
the market for stock.

*Id.* [citations to *Affiliated Ute* omitted][emphasis in Lead
Plaintiff's original submission].  Lead Plaintiff maintains that a
jury could reasonably find the sophisticated Financial Institution
defendants' market activities in this case establish the same duty
because they "encouraged," "induced," and "facilitated" the
purchase of Enron securities by plaintiffs through their constant
"buy" recommendations and their underwriting activities,
purportedly with superior knowledge and expert analysts. *Id.* at 30.

falsified reported financial condition based on the transactions specifically and on their general contacts with Enron.[19]

---

[19] In opposition, Financial Institution Defendants contend that *Affiliated Ute* does not support Lead Plaintiff's claim that they owed a duty to disclose their activities to Enron investors.   In *Affiliated Ute* the Supreme Court noted that "if the two men and the employer bank had functioned merely as a transfer agent, there would have been no duty of disclosure here."   406 U.S. at 151-52. Because the employees were closely involved with the tribe in creating a resale market and because the bank promised tribe members by letter that "it would be [its] duty to see that these transfers were properly made and that, with respect to the sale of shares, the bank would be acting for the individual stockholders," the Court found that a duty of disclosure existed and had been violated by the employees.  *Id.* at 152.   In the instant case, argue Financial Institution Defendants, Lead Plaintiff has not identified a similar relationship between the Financial Institution Defendants and the plaintiffs.   During class discovery, class representatives testified that the Financial Institution Defendants not only did not make any express representations to them, but the class representatives testified that they had had no contact with Defendants and had not relied on anything Defendants said or did in making their investment decisions.   The *Affiliated Ute* presumption arises only in rare situations in which the investor has a fiduciary relationship of trust with the defendant and the investor would reasonably expect to be informed of material information; the *Affiliated Ute* court recognized a duty to disclose because the Bank had not acted merely as a transfer agent but "also had assumed a duty to act on behalf of the shareholder and the [sellers] had relied upon [the bank's] personnel when they sold their stock. . . . Because these officers of the bank were charged with a responsibility to the shareholders, they could not act as market makers inducing the Indians to sell their stock without disclosing the existence of the more favorable non-Indian market." *Chiarella v. U.S.*, 445 U.S. 222, 230 (1980), *citing Affiliated Ute*, 406 U.S. at 152-53.   This Court agrees with the Financial Institution Defendants.
          Moreover, the Financial Institution Defendants emphasize, a duty to disclose under § 10(b) can arise only from a direct, specific, personal relationship between parties akin to a fiduciary relationship, which does not exist here.   Financial Institution Defendants claim that the doctrine of *Virginia Bankshares* has been modified by *Chiarella v. U.S.*, 445 U.S. at 232-33 ("established doctrine that duty arises from a specific relationship between two parties"; basing a duty to disclose on allegedly improper "market transactions" or other "instance[s] of financial unfairness" would "depart[] radically from the established doctrine that duty arises from a specific relationship between two parties").   *Virginia Bankshares* does not apply to parties that are strangers, and it cannot support a market-wide duty.   Arguing that the test in

Referring generally to "well-settled legal principles regarding the existence of a disclosure duty for those that engage in certain market-related activity" (#5939 at 2), Lead Plaintiff

---

*Virginia Bankshares* has been repudiated or substantially modified by the Circuits that have initially applied it (#5986 at 25-28), Financial Institution Defendants observe that Lead Plaintiff has not identified a single investor that made an investment decision even knowing of the information provided by the Financial Institution Defendants, no less relying on it. As for the analyst reports issued by CSFB and Merrill Lynch in the instant action, Lead Plaintiff fails to show the reports support an actual duty of disclosure toward plaintiffs; indeed this Court previously found no duty to disclose, and the Fifth Circuit affirmed that ruling in *Regents*. The absence of a sufficient nexus between any plaintiff and the Financial Institution Defendants makes clear that there is no duty of disclosure here. They point out that the Fifth Circuit only applied the *Virginia Bankshares* test in two cases. In one, the Fifth Circuit affirmed a grant of summary judgment because an insufficient nexus existed between the parties to support a duty of disclosure. *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 622-23 (5th Cir. 1993)(no evidence of reliance by investors in making investment decisions, no less that defendants were aware of plaintiffs' reliance; plaintiffs could not show that defendants played a role in initiating the purchase or sale and defendants had no contact with investors regarding their investment), *cert. denied sub nom. Turnbull v. Home Ins. Co.*, 510 U.S. 1177 (1994). In the other, *Kaplan v. Utilicorp United, Inc.*, 9 F.3d 405, 407-08 (5th Cir. 1993), the panel conclusorily found no duty existed: "After considering these factors we find the connection between the actions of the Aquila officers and the sale of Utilicorp stock is too remote to impose a duty to disclose.").

Lead Plaintiff disagrees, contending that while *Chiarella* examined whether there was a relationship between the parties, it did not require a fiduciary duty or specific transactions between the parties to find that a duty to disclose exists. #5980 at 12, *citing Chiarella*, 445 U.S. at 231-32, which Lead Plaintiff distinguishes as an appeal of a criminal conviction and thus not relevant here. The Fifth Circuit did not require a fiduciary duty in the two opinions addressing the *Virginia Bankshares* test. *Abbott*, 2 F.3d at 623 (applying the *Virginia Bankshares* factors and finding that defendants had no contact with plaintiffs and thus no duty to disclose); *Kaplan*, 9 F.3d 405, 407-08. Moreover, argues Lead Plaintiff, the need to examine the relationship of the parties is incorporated as a factor in the *Virginia Bankshares* test) (1993). *See also Arthur Young & Co. v. Reves*, 937 F.2d 1310, 1329-30 (8th Cir. 1991)(applying *Virginia Bankshares* test, finding no duty to disclose, but confirming that a "relationship for purposes of Rule 10b-5 liability . . . requires neither a 'physical presence nor face to face conversation'"), *aff'd*, 507 U.S. 170.

maintains that there need not be a fiduciary duty before a duty
to disclose arises, as long as the *Virginia Bankshares* test is
satisfied.

Lead Plaintiff insists that the facts here are
distinguishable from those in *Stoneridge* and support finding a
duty to disclose. Their market activity on Enron's behalf
established a relationship with the entire market for Enron
securities[20]--even those investors with whom they had no direct
contact. They were involved in the equity swaps and transacted
in Enron credit-default derivatives. The securities market knows
that an investment bank's central activity is maintaining an
information marketplace that facilitates securities transactions,
and the market expects candor in that information. The Financial
Institution Defendants had superior knowledge to that of the
investors relating to the massive fraud being pursued through
Enron's structured finance transactions, and in some of their

---

[20] Financial Institution Defendants argue that Lead Plaintiff's
emphasis on a distinction between the marketplace for goods and
services and the investment sphere is not important here; the
Supreme Court's decision rests on the conduct of the defendants,
not on their commercial status or economic role. The crucial point
was that because the conduct of these secondary actors was not
disclosed, there could be no reliance by investors on it. The
holding of *Stoneridge* is not limited to commercial transactions
involving non-financial institutions; rather it points out that in
addition to violating the reliance requirement, a "scheme
liability" theory would allow securities laws to reach dangerously
beyond the financial world. *Stoneridge* adopts a strict reliance
requirement for all § 10(b) defendants. #5970 at 24-25. The
Financial Institutions further comment, "[I]f Lead Plaintiff's
generalized 'market activities' theory of duty were correct, most
financial institutions would automatically owe a duty to the
market-at-large simply by virtue of their business activities and
'relationship' with the market. That result would be untenable
under *Central Bank* and *Stoneridge*." #5970 at 26.

roles Defendants held themselves out as experts on Enron.  They issued analyst reports about Enron and recommended purchase of its stock.  They also benefitted from sales of Enron securities, making millions in fees that would only continue to come if Enron's securities remained marketable.  Defendants also knew that the market relied on them in making investment decisions.  By their underwriting of Enron securities, their contact with credit rating agencies, and their issuance of analyst reports recommending that investors buy the Enron securities, the Financial Institution Defendants created a duty on themselves to disclose material information to Enron investors.

In sum, Lead Plaintiff urges that thus the Financial Institutions Defendants here, acting "in the investment sphere," "engaged and interacted with the Enron market on multiple levels" through "a web of market-related activities."  Lead Plaintiff contends that, "[t]aken together (and in some instances taken singly), these multiple points of contact with the securities market created a *duty to disclose* the Banks' knowledge of the falsity of Enron's reported financials." #5932 at 1-2, 11.  More specifically, "[t]he Banks here traded in Enron and Enron-related securities, underwrote offerings in Enron and Enron-related securities, interacted with rating agencies, and at least [CSFB] and Merrill Lynch . . . issued numerous analyst reports." *Id.* at 2; *see also id.* at 10.  The banks "held themselves out as experts having special knowledge and insight into Enron" and actively sought to encourage and induce market investors to purchase Enron securities.  *Id.* at 11, 10, 12.  "Thus, the Banks' role in the

Enron world was not limited to engaging in the Transactions; it
extended beyond, as the Banks were intertwined with Enron's
corporate financing activities, with the market in which Enron
securities traded, and with various constituencies within the
market.  In short, the Banks sought to engage and did engage with
the investor members of the plaintiff class." *Id.* at 11.  These
investors "rightly should have been able to expect candor and to
expect that the Banks were not themselves involved behind the
scenes in deceptive transactions that undercut their market
activity" and "can be said to have a reasonable expectation of
disclosure." *Id.* at 11, 12.  Lead Plaintiff contends that this
theory of reliance, where a duty to disclose is based on
defendants' "complex, multifaceted, active participation . . . in
the market for Enron securities and their efforts to encourage and
induce investors to purchase those securities," is not foreclosed
by the decisions of the Fifth Circuit in *Regents* nor the Supreme
Court in *Stoneridge*.  *Id.* at 10, 2.

        In addition to this duty to disclose arising from the
"web of market-related activities," Lead Plaintiff argues that the
Financial Defendants also had a duty to disclose based on their
insider trading.[21]  Lead Plaintiff relies on the well established

_____

        [21]  Insider trading constitutes a "deceptive device" under §
10(b) arising from "a relationship of trust and confidence between
the shareholders of a corporation and those insiders who have
obtained confidential information by reason of their position in
the corporation" that "gives rise to a duty to disclose because of
the necessity of preventing a corporate insider from . . . taking
unfair advantage of . . . uninformed stockholders." *O'Hagan*, 521
U.S. at 651-52.
        Lead Plaintiff insists that the creation of a duty to
disclose does not require scienter or loss causation; the duty

rule that a corporate insider, e.g., a corporate officer who possesses material non-public information about the company due to his position in it, is subject to a duty to disclose the information to the investing public before trading in the company's securities or a duty to refrain from trading until the information has been revealed to the public. *See, e.g., Chiarella v. United States*, 445 U.S. 222, 227, 229 (1980). Relying on *dicta* in a footnote in *Dirks v. S.E.C.*, Lead Plaintiff argues that not only traditional "insiders," i.e., corporate officers, but others who obtain corporate information from the company may acquire the status of an "insider" and a concomitant duty to disclose or abstain from trading in the corporation's securities:

> Under certain circumstances, such as where corporate information is revealed legitimately to an underwriter, accountant, lawyer, or consultant working for the corporation, these outsiders may become fiduciaries of the shareholders. The basis

---

exists even in the absence of any wrongdoing. It is defendants' failure to act in accordance with their duty (their failure to disclose material information about Enron) that is the wrongdoing. Lead Plaintiff relies on the insider trading only to establish a duty to disclose: CSFB's and Merrill Lynch's trading in Enron securities while in possession of material non-disclosed information gained from their engagement by Enron in the deceptive structured financial Transactions, as well as numerous underwritings, created a duty to disclose. The duty is created by the abstain-or-disclose rule, not scienter. Lead Plaintiff claims it has demonstrated scienter by showing a small select group of individuals at both CSFB and Merrill had knowledge of the falsity of Enron's financials from the Transactions and orchestrated the Banks' Enron-related market activities, including the equity trades. Because the injury is caused not by the trades, but by the breach of the duty to disclose to the entire market, reliance is presumed and causation in fact need not be shown under *Affiliated Ute*. *Shapiro v. Merrill Lynch, Pierce Fenner & Smith, Inc.*, 353 F. Supp. 264 (S.D.N.Y. 1972), *aff'd*, 495 F.2d 228 (2d Cir. 1974). Furthermore, argues Lead Plaintiff, standing is limited to contemporaneous traders under § 20A, but not under § 10(b).

> for recognizing this fiduciary duty is not
> simply that such persons acquired nonpublic
> corporate information, but rather that they
> have entered into a special confidential
> relationship in the conduct of the business
> of the enterprise and are given access to
> information solely for corporate purposes.

*Dirks v. SEC*, 463 U.S. 646, 655 n.14 (1983).  Lead Plaintiff
asserts that the Banks engaged in extensive investment banking
activities with Enron, gained knowledge of the fraud, and were
counterparties to the equity swaps and forward trades; in other
words, they were "insiders" with material inside information which
they must either disclose to the investing public or abstain from
trading in or recommending Enron securities until the inside
information is disclosed.[22]  *SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d
833, 848 (2d Cir. 1968)(*en banc*), *cert. denied sub nom. Coates v.
SEC*, 394 U.S. 976 (1969); *Kurtzman v. Compaq Computer Corp.*, No.
H-99-779, 2000 Dist. LEXIS 22476, at *80 n.32 (S.D. Tex. 12,

---

[22]  The Financial Institution Defendants discount this
constructive insider argument based on three requirements that Lead
Plaintiff has not or cannot  satisfy: (1) an insider trading claim
must be pleaded with particularity, identifying the employee who
engaged  in  the  transaction,  possessed  material  non-public
information, and knowingly failed to make appropriate disclosures;
(2) even if CSFB and Merrill Lynch had a duty to disclose or
abstain, the Supreme Court has made clear that duty does not extend
to the entire market (*Chiarella*, 445 U.S. at 23 ("[S]uch liability
is premised upon a duty to disclose arising from a relationship of
trust and confidence between parties to a transaction."); and (3)
only investors whose trades are contemporaneous with the alleged
insider trades have standing under § 10(b) to bring insider trading
claims, so Lead Plaintiff's attempt to extend the duty to disclose
or abstain to all Enron investors over the entire course of the
class period is contrary to the standing requirements for insider
trading under the statute and, in effect, would eviscerate those
strict standing requirements for insider trading claims (only
investors whose trades are "contemporaneous" with the alleged
inside trades have standing to sue).  Only a small subset of the
proposed *Newby* class would satisfy this contemporaneous standing
requirement for each trade.

2000).  The Banks did neither, insists Lead Plaintiff.  Instead, at Enron's request, their investment bankers performed equity swaps or equity forwards.[23]  Moreover, at several times during the Class Period, Enron requested that CSFB and Merrill purchase Enron stock in the marketplace; Enron would guarantee repayment within one year of the cost at market price of their purchasing these shares, plus commissions and interest.  These transactions increased the share volume and artificially supported the price of Enron common stock, which in turn impacted the market as a whole.  Lead Plaintiff points out that the Banks did not disclose their knowledge of the fraud at the time of the market activity. A trier of fact could find this independent duty to disclose or abstain satisfies the *Affiliated Ute* duty requirement and gives rise to a presumption of class-wide reliance.

Lead Plaintiff also argues that a separate duty to disclose is imposed on all three of the Banks based solely on their underwriting of Enron securities.  The Regents contends that several courts have concluded that underwriters were in essence "insiders," subject to the abstain-or-disclose duty.  *United States v. Bryan*, 58 F.3d 933, 953 (4th Cir. 1995), *abrogated on other grounds*, *United States v. O'Hagan*, 521 U.S. 642 (1997); *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 384

---

[23] Financial Institution Defendants emphasize that in six years of litigation, Lead Plaintiff never alleged against CSFB and Merrill Lynch that these derivative trades were improper, never mentioned them in any court pleading, yet now rests its entire case on them.  #5970 at 35.

n.157 (S.D.N.Y. 2003).[24]   Issuers look to underwriters partly
because the underwriters invest the offering with their
credibility, their reputation, their integrity, their
independence, and their expertise, upon which the public relies.
Underwriters occupy a position of confidence and trust in
relationship to shareholders and have a heightened duty to
investigate and to disclose material information to the investing
public.  *See, e.g., Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634,
641-42 (D.C. Cir. 2008); *In re Enron Corp. Sec., Derivative &
ERISA Litig.*, 235 F. Supp. 2d 549, 612 (S.D. Tex. 2002).   That
position of trust in the underwriter (as a recipient of non-public
inside information) gives rise to a duty to disclose, insists Lead
Plaintiff.[25]

          As another source of a duty to disclose, Lead Plaintiff
points to Item 508(l)(1) of Regulation S-K (17 C.F.R.
§229.508(l)(1)), which requires that underwriters of securities
disclose "any transaction that the underwriter intends to conduct
during the offering that stabilizes, maintains, or otherwise

---

[24] Lead Plaintiff identifies documents showing the status of
the Banks as underwriters and market makers in the Enron
securities.

[25] The Financial Institution Defendants point out that this
Court previously rejected the same argument regarding Deutsche
Banks' various Enron-related underwritings in dismissing Deutsche
Bank. #4735 at 177-83, *found at In re Enron Corp. Sec., Derivative
& "ERISA" Litig.*, 529 F. Supp. 2d at 664 n.27, 772-74, 777.  After
Lead Plaintiff moved the Court for reconsideration of the
dismissal, the Court affirmed its prior rulings.  Feb. 8, 2007
Order (#5391) at 45.  Moreover, even where an underwriter does have
a duty of disclosure, that duty extends only to purchasers that buy
the specific underwritten securities from the particular issuer or
underwriter.  *Gallagher v. Abbott Labs.*, 269 F.3d 806, 809 (7th Cir.
2001).

affects the market price of the offered securities," including
"any other transaction that affects the offered security's price."
Lead Plaintiff alleges that nearly all of the transactions "were
calculated to permit Enron to fraudulently maintain its positive
credit rating--and that this rating affected the market price of
all of Enron's securities."   #5939 at 42.   Item 508(l)(1)'s
required disclosure of the transactions gives rise to a duty to
disclose that is actionable under Rule 10b-5.   *See Woodward v.
Metro Bank of Dallas*, 522 F.2d  84, 97 n.28  (5th Cir. 1975)("A
duty of disclosure may exist where any person possessed inside
information, or where the law imposes special obligations, as for
accountants, brokers, or other experts, depending on the
circumstances of the case.  This list, however, is not intended
to be exhaustive."); *Kunzweiler v. Zero.net, Inc.*, No. 3:00-CV-
255-P, 2002 U.S. Dist. LEXIS 12080, at *31-32 (N.D. Tex. July 3,
2002)("courts have held that an affirmative duty to disclose does
arise when . . . a statute or regulation requires disclosure");
*Kurtzman v. Compaq Computer Corp.*, No. H-99-779, 2000 U.S. Dist.
LEXIS 22476 at *78 (S.D. Tex. Dec. 12, 2000)("Courts have
recognized that a duty to disclose material facts arises when .
. . a statute or regulation requires disclosure . . . .").[26]

---

[26] The Financial Institution Defendants object that there is
no private cause of action for a violation of Regulation S-K.  *See
In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 37-38 & n.129
(S.D.N.Y. 2004)("[T]here is no private cause of action for
violation of Regulation S-K.")(and cases cited therein).  *See also
Golan v. Puleo*, 480 F. Supp. 2d 1325, 1328-29 (S.D. Fla. 2007)("The
case law is clear as to the absence of an express right of action
under Regulation S-K, and courts may not imply a private right of
action under Regulation S-K where Congress has not established
one.")(*citing Central Bank*, 511 U.S. at 171).   Furthermore

After providing these various sources of a duty to disclose, Lead Plaintiff insists it has satisfied the remaining elements of a § 10(b) cause of action.

First, it has demonstrated scienter ("severe recklessness"[27]) by showing senior personnel at CSFB, Merrill, and Barclays knew, or were severely reckless in not knowing, about the

---

Regulation S-K applies only to public offerings, and the Financial Institution Defendants primarily, if not exclusively, participated in private placement offerings. 17 C.F.R. § 229.10(a)(2007).

This Court observes that the cases cited by Lead Plaintiff are very general and do not address the specific regulation at issue. Moreover, it agrees with the Financial Institution Defendants that those cases which do focus on Regulation S-K have concluded there is no private right of action available under it.

[27] The Fifth Circuit has opined that for scienter, which under the PSLRA must be pleaded with factual particularity, the requisite state of mind is an " intent to deceive, manipulate or defraud" or "severe recklessness." *Indiana Electric Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2008), *citing and quoting Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 866 (5th Cir. 2003). Severe recklessness is

> limited to those highly unreasonable omissions
> or misrepresentations that involve not merely
> simple or even inexcusable negligence, but an
> extreme departure from the standards of
> ordinary care, and that present a danger of
> misleading buyers or sellers which is either
> known to the defendant or is so obvious that
> the defendant must have been aware of it.

*Id., citing* id. Moreover the Supreme Court now requires the court, in deciding "whether the plaintiff has alleged facts that give rise to the requisite 'strong inference of scienter,, . . . must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff," and the inference of scienter "must be more than merely reasonable or permissible--it must be cogent and compelling, thus strong in light of other explanations." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2207). The Fifth Circuit allows a party to allege and prove scienter with direct and/or circumstantial evidence. *Indiana Electric Workers*, 537 F.3d at 533, *citing Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 430 (5th Cir. 2002).

extensive fraudulent market activity and scam transactions and the falsity of Enron's reported financial condition (earnings, cash flows and debt), which created their duty to disclose.   As a result of their direct participation in the fraud, the Banks purportedly were generally aware that Enron undertook a substantial number of transactions designed to materially alter its reported financial condition.   In addition, asserts Lead Plaintiff, each of the Banks was aware of the specific and material impact of its own transactions on Enron's financials. *See* #5939 at 53-54 for CSFB; at 55-56 for Merrill; and at 57-58 for Barclays.   Lead Plaintiff maintains that the fact-specific nature of an evaluation of scienter makes the issue inappropriate for summary judgment and that the question should also be determined by a jury.

In *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004), under which this Court dismissed allegations against CSFB and Merrill Lynch based on alleged false statements and misrepresentation in their analyst reports,[28] the Fifth Circuit rejected group pleading.   To determine whether to hold a corporation liable under § 10(b) for a statement that had to be made with scienter, the panel required an examination of the state of mind of the individual corporate official or officials "who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than the collective

---

[28]   #4735 at 129-36, 184, also available at *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 529 F. Supp. 2d at 778.

knowledge generally of all the corporation's officers and
employees acquired in the course of their employment." Lead
Plaintiff now argues that *Southland* applies only to affirmative
statements, not to omissions such as the ones in dispute here.[29]
Thus there is no speaker whose state of mind can be examined.
Therefore the appropriate inquiry for scienter, insists Lead
Plaintiff, is whether relevant individuals at the Banks had
knowledge that the Banks were engaging in deceptive transactions,
that the transactions distorted Enron's financials in a material
manner, that the Banks were active in the market for Enron
securities, and that no disclosure of the fraud was made. Lead
Plaintiffs asserts it has met this test. Furthermore the
*Southland* panel observed that a corporation makes a statement
acting with scienter where the employee who furnished the
"information or language for inclusion therein or **omission
therefrom**" had scienter. 365 F.3d at 367; *see also Makor Issues
& Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 708 (7th Cir.
2008)("The court in the *Southland Securities* case said that
corporate scienter could be based on the state of mind of someone
who furnished false information that became the basis of a
fraudulent public announcement. Suppose he had knowingly supplied
the false information intending to help the company. His
superiors would not be liable for failing to catch the mistake,
but *Southland* implies that the corporation would be liable, just

---

[29] Financial Institution Defendants question whether analyst
reports could possibly be characterized as "omissions."

as it would be in a common law tort suit.").[30]   Lead Plaintiff
points to evidence previously submitted in opposition to the
motions for summary judgment, in an omissions context, that
knowledge of the material facts omitted resided in individuals at
senior levels in each of the Financial Institution Defendants.[31]

       As for the element of "materiality" under § 10(b), Lead
Plaintiff contends that the undisclosed, deceptive transactions
at issue were clearly "material" within the meaning of the
securities laws in that they distorted by billions of dollars
Enron's reported earnings, cash flow, and debt.

       In addition, the alleged wrongful conduct satisfies the
element of "in connection with the purchase or sale of any
security" because the scheme coincided with trading of Enron's
securities.  *SEC v. Zandford*, 535 U.S. 813, 822 (2002)("It is
enough that the scheme to defraud and the sale of securities
coincide" to satisfy the "in connection with" requirement of §
10(b).).

       Lead Plaintiff maintains that the reliance element is
met since the *Affiliated Ute* presumption is applicable.  In *Newby*,
which is primarily based on omission or nondisclosure, the
Financial Institution Defendants had a duty to disclose and failed
to do so.  *Regents of University of California v. Credit Suisse*

---

       [30] This Court notes that if Lead Plaintiff fails to establish
a duty to disclose, Lead Plaintiff would have to meet *Stoneridge*'s
strict requirements of reliance and causation to avoid its being
barred as aiding and abetting under *Central Bank*.

       [31] See #5939 at 45-48 for CSFB; at 49-51 for Merrill; and at
51-52 for Barclays.

*First Boston (USA)*, 482 F.3d 372, 384 (5th Cir. 2007)(for the *Affiliated* Ute presumption to apply, "the plaintiff must (a) allege a case primarily based on omissions or non-disclosure and (2) demonstrate that the defendant owed him a duty of disclosure."), *cert. denied sub nom. Regents of University of California v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 128 S. Ct. 1120 (2008). Lead Plaintiff maintains that the Banks had a duty to disclose, grounded in the multi-factor test of *Virginia Bankshares* and several independent bases, and they breached that duty by not disclosing their fraudulent transactions with Enron as they traded in Enron stock and debt and underwrote Enron-related offers, issued analyst reports, communicated with rating agencies, and allowed the fraud to continue, thereby violating § 10(b) and Rule 10b-5. As a result, all Enron investors were injured. The causation-in-fact element is also satisfied here: had the banks satisfied their duty to disclose, the Enron fraud would have been revealed. *See Affiliated Ute*, 406 U.S. at 154 (showing the defendant had a duty to disclose and the withholding of material information by the defendant establishes the element of causation in fact).

Lead Plaintiff also argues that when causation in fact is present, as here, conduct is actionable under Rule 10b-5 notwithstanding the fact that the breached duty of disclosure ran to another party. *See U.S. v. O'Hagan*, 521 U.S. 642 (1997).[32]

---

[32] Lead Plaintiff asserts that in *O'Hagan*, the defendant attorney was a partner in a law firm that received confidential information identifying a future tender offer target. In possession of this inside information, the attorney purchased stock

and options in the target company and profited when the offer was announced.   The Supreme Court determined the attorney breached a duty of disclosure to his employer law firm and its client, the acquiring company, but that the harm was to a different group, i.e., the target's shareholders.   The Supreme Court concluded that liability under Rule 10b-5 was sufficiently expansive to cover investors where a fraud or deceit can be practiced on one party with resultant harm to another person or group of persons.   521 U.S. at 656.

The Financial Institutions call Lead Plaintiff's interpretation of *O'Hagan* a "gross misreading," leading to a result that is contrary to the Fifth Circuit's ruling in this action. *O'Hagan* involved an appeal of a criminal conviction for insider trading, not imposition of civil liability in a private action under § 10(b).   The Supreme Court did not address the reliance element at all because, unlike in a private cause of action, it does not apply to criminal cases.   *See, e.g., U.S. v. Haddy*, 134 F.3d 542, 549 (3d Cir. 1998)(holding that reliance is not an element of the crime of stock manipulation), *cert. denied*, 525 U.S. 827 (1998); *see also S.E.C. v. Tambone*, ___ F.3d ___, ___, No. 07-1384, 2008 WL 5076554, *17 (1st Cir. Dec. 8, 2008)(and cases cited therein)(unlike in a private action, reliance, economic loss, and loss causation are not elements that must be proven in an SEC enforcement action).   In *O'Hagan* the Supreme Court did not rule that a plaintiff in a civil action may transfer a duty owed to one party (there, the law firm) to another party (the investors with whom O'Hagan actually traded) to support a § 10(b) claim, nor did it address the *Affiliated Ute* presumption of reliance.   Instead it held that criminal liability under that statute may be based on misappropriation theory, which permits the government to impose liability on a person who trades in securities for personal profit, using material, confidential information without disclosing such use to the source of its information (in O'Hagan's case, the law firm of which he was a member), in breach of fiduciary duty to that source (*id*.), because his conduct defrauded the law firm of exclusive use of the confidential information.   Furthermore, argue Defendants, the Fifth Circuit's decision in *Regents* concluded that *Affiliated Ute* requires the defendant to have a duty to the plaintiffs that does not exist here:

> When [the Fifth Circuit in *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1119 (5th Cir. 1988), *vacated on other grounds sub nom. Fryar v. Abell*, 492 U.S. 914 (1989)] determined (correctly) that the banks owed no duty to the plaintiffs other than the general duty not to engage in fraudulent schemes or acts (that is, the duty not to break the law), the district court should have declined to apply the *Affiliated Ute* presumption. . . . The logic of *Affiliated Ute* is that, where a plaintiff is

Relying on *O'Hagan*, Lead Plaintiff asserts that even if the Banks
owed a duty only to the purchasers of the securities they
marketed, because all Enron investors were harmed the factfinder
could find causation in fact.   According to Lead Plaintiff, CSFB
and Merrill's duty to disclose ran not merely to purchasers of the
securities they marketed and sold, as argued by Defendants, but
to the entire market because they were active in Enron's common
stock and their analyst reports addressed that market.[33]   Even if

--------

> entitled to rely on the disclosures of someone
> who owes him a duty, requiring him to prove
> "how he would have acted if omitted material
> information had been disclosed" is unfair. . .
> . It is natural to expect a plaintiff to rely
> on the candor of one who owes him a duty of
> disclosure, and it is fair to force one who
> breached his duty to prove that the plaintiff
> did not so rely.   Here, however, where the
> plaintiffs had no expectation that the banks
> would provide them with information, there is
> no reason to expect that the plaintiffs were
> relying on their candor.   Accordingly, it is
> only sensible to put plaintiffs to their proof
> that they individually relied on the banks'
> omissions.

*Regents*, 482 F.3d at 385 (citation omitted).

[33] The Financial Institution Defendants point out that this
Court previously dismissed all claims against CSFB and Merrill
Lynch that alleged false statements and misrepresentations in
research analyst reports on the grounds that Lead Plaintiff failed
to demonstrate the requisite scienter under *Southland Sec. Corp. v.
INSpire Ins. Solutions, Inc.*, 365 F.3d 353 (5th Cir. 2004)(because
group pleading did not survive the passage of the PSLRA, to
determine whether a statement was made by a corporation with
scienter one must examine the state of the mind of the individual
corporate official making or issuing the statement or causing the
statement to be issued).   #4735 at 129-36, 184, also available at
*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 529 F. Supp.
2d at 778.   They contend that even if the Court could characterize
speaking to the market through an analyst report as an "omission,"
Lead Plaintiff does not show that the Court should reconsider its
ruling or resurrect the claims based on a previously rejected
market-wide duty to disclose.   Indeed to do so would mean that any

the Financial Institutions are correct that they owed a duty of disclosure only to purchasers of the securities that they each marketed, the fact that all Enron investors were harmed allows a finding of causation in fact.

Finally, economic loss satisfying the standard in *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336 (2005), ensued when the true state of Enron's operations was revealed to the market.[34] Lead Plaintiff points out that this Court previously adopted the

_____

entity that issues an analyst report would be outside the scope of *Southerland*, not to mention *Stoneridge* and *Regents*, an irrational result if Lead Plaintiff's argument were accepted.

Moreover, viewing analyst reports as omissions is contrary to the ruling in *Abell* that alleged half-truths and incomplete statements cannot form the basis of an *Affiliated Ute* presumption of reliance. In *Abell*, the Fifth Circuit distinguished between misrepresentations (which "include statements that themselves are false--outright lies--and true statements that are nonetheless so incomplete as to be misleading, i.e., distorted half-truths") and omissions ("[t]o omit a fact . . . is to say absolutely nothing about matters whose very existence plaintiffs have no reason to consider"). 858 F.2d at 1119. See also footnote 42 of this Opinion. The Fifth Circuit pronounces,

> Our cases indicated that the *Ute* presumption is limited to cases, like *Ute* itself, in which plaintiffs have based their complaint primarily upon alleged omissions. Such non-disclosure suits are those in which the complaint is grounded primarily in allegations that the defendant has failed to disclose any information whatsoever relating to material facts about which the defendant has a duty to the plaintiff to disclose. . . . Thus we apply the *Ute* presumption in non-disclosure cases, but not in falsehood or distortions cases.

*Id.*

This Court fully agrees with the Financial Institution Defendants' interpretation of Fifth Circuit law regarding the dismissed claims based on the Banks' analyst reports in *Newby*.

[34] *Dura Pharmaceuticals* addressed a fraud-on-the-market case. 544 U.S. at 336. Lead Plaintiff has been arguing for application of the *Affiliated Ute* presumption of reliance.

loss causation analysis of *Lentell v. Merrill Lynch & Co.*, 396
F.3d 161, 171 (2d Cir. 2005). *In re Enron Corp. Sec., Derivative
& "ERISA" Litig.*, 439 F. Supp. 2d 692, 705-06, 724 ("[T]he loss
causation requirement will be satisfied if [the defendant's]
conduct had the effect of concealing the circumstances that bore
on the ultimate  loss" and concealed the risk that Enron would be
unable to service its debt, and then that risk materialized).[35]

_____

[35] Financial Institution Defendants point out that this Court
adopted the *Lentell* test for loss causation (that plaintiff's loss
be foreseeable or proximate cause of plaintiff's injury) after the
issuance of *Dura Pharmaceuticals* but before the Fifth Circuit
addressed loss causation post-*Dura Pharmaceuticals*. *Lentell* dealt
with allegations of false research reports by analysts, in essence
a claim under Rule 10b-5(b), which were relied on by plaintiffs to
their detriment.  Since then the Fifth Circuit has issued *Oscar
Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d
261, 265 (5th Cir. 2007), requiring that by the class certification
stage, for a claim under § 10(b) and Rule 10b-5 based on the fraud-
on-the-market theory of reliance, in order to trigger the
presumption of reliance the plaintiff must prove, by a
preponderance of all admissible evidence, loss causation, i.e.,
that defendant's material misstatement or non-disclosure actually
moved the market (affected the price of the security) and that the
cause of decline in the price was the revelation of the truth.  The
Fifth Circuit thus intertwined the elements of loss causation and
reliance.  Because before *Stoneridge* the Fifth Circuit had not
accepted conduct as a basis for a § 10(b)/Rule 10b-5(b) claim, it
addressed only material misrepresentations and omissions.  The
Fifth Circuit has not considered loss causation with respect to
Rule 10b-5(a) and (c) under a fraud-on-the-market theory, although
the same standard of a corrective disclosure and movement in the
market price of the security could be applied.

    Nevertheless, since Lead Plaintiff maintains that it is
pursing claims based on conduct and omission and is alleging breach
of defendant's duty to disclose to trigger an *Affiliated Ute*
presumption of reliance, *Dura, Oscar* and *Lentell,* which are fraud-
on-the-market cases, are not relevant.  Moreover in *Affiliated Ute*,
the Supreme Court stated that the demonstration of a duty to
disclose and the withholding of material information established
the element of causation in fact.  406 U.S. at 153-54 ("In a case
involving primarily a failure to disclose, "positive proof of
reliance is not a prerequisite to recovery.  All that is necessary
is that the facts withheld be material in the sense that a
reasonable investor might have considered them important in the
making of this decision. . . . This obligation to disclose and the

This standard is met here:  the Banks breached their duty to disclose what they knew about Enron's falsified financial reports, thereby causing investors to purchase the securities at an inflated price; when the actual state of affairs was disclosed, the investors suffered economic harm in the reduction of value of their investments.

### B.  Joint Supplemental Memorandum of Law in Support of Financial Institution Defendants' Motions for Summary Judgment (#5970) and Second Joint Supplemental Memorandum of Law (#5986)

The Financial Institution Defendants state that together they are filing this Joint Memorandum and each, individually, a separate brief (#5969 (CSFB), 5971 (Barclays), 5972 and 5973 (Merrill)) discussing its own specific issues with respect to Lead Plaintiff's Supplemental Opposition.

The Court points out that, for purposes of order and clarity with regard to specific issues raised by Lead Plaintiff and discussed *supra*, that the Financial Institution Defendants' responses, which Court has summarized *supra* in contemporaneous footnotes, are part of this joint supplemental memorandum and should be so considered.

The Financial Institution Defendants proclaim that Lead Plaintiff's scheme liability theory to impose primary civil

---

withholding of a material fact establish the requisite element of causation in fact. [citations omitted]"). As noted. Lead Plaintiff continues to insist that it is pursuing an *Affiliated Ute* presumption of reliance and that the Banks did have a duty to disclose to Enron investors.

liability on secondary actors under § 10(b) and Rule 10b-5 is clearly not cognizable under the holdings *Stoneridge* and *Regents.* The reliance element of a § 10(b) claim cannot be met by categorizing a secondary actor as a "scheme" participant. Since Lead Plaintiff's earlier theory is not actionable, charge the Financial Institution Defendants, Lead Plaintiff is now using "inventive labeling" to once again attempt to circumvent the requirements for a primary violation of § 10(b) by "recasting" the case as one of omission with a duty to disclose. The Financial Institution Defendants contend that the Supreme Court and the Fifth Circuit have ruled that, regardless of the label, these are not claims of primary liability and that the Financial Institution Defendants owed no duty to Enron investors to disclose the Financial Institution Defendants' Enron-related market activities. Both Courts concluded that plaintiffs could not meet the reliance requirement by labeling a secondary defendant a "scheme" participant and they foreclosed liability against a secondary actor whose undisclosed conduct was not, and could not be, relied upon by investors. They insist Lead Plaintiff's newly labeled action fails for the following reasons.

First, the mandate rule bars suit on an omissions theory because the Fifth Circuit expressly held that as a matter of law the Financial Institutions had no duty to disclose to Plaintiffs[36]

---

[36] Financial Institution Defendants point out that the Supreme Court in *Stoneridge* did not address the question of when a secondary actor owes a duty to disclose, and therefore the Fifth Circuit's decision that they had no duty to disclose controls. Morever they note that this Court had previously held that Financial Institution Defendants had no duty to disclose. *In re*

and therefore Plaintiffs cannot proceed on an omissions/*Affiliated Ute* theory.[37]    The issue was argued by the Financial Institution Defendants on interlocutory appeal of class certification.[38] #5970

_____

*Enron Corp. Sec., Derivative & "ERISA" Litig.*, 529 F. Supp. 2d at 683.

[37] *See Regents*, 482 F.3d at 384, in which the Fifth Circuit opined about Lead Plaintiff's claims against Financial Institution Defendants,

> For us to invoke the *Affiliated Ute* presumption of reliance on an omission, a plaintiff must (1) allege a case primarily based on omissions or non-disclosure and (2) demonstrate that the defendant owed him a duty of disclosure.   The case at bar does not satisfy this conjunctive test.
> Assuming *arguendo* that plaintiffs' case primarily concerns improper omissions, the banks were not fiduciaries and were not otherwise obligated to the plaintiffs.   They did not owe plaintiffs any duty to disclose the nature of the alleged transactions [footnote omitted].

The appellate court dismissed this Court's finding that the banks owed a duty not to engage in a fraudulent scheme as a misreading of Fifth Circuit precedent.  *Id*. at 384, 385 ("[W]here plaintiffs had no expectation that the banks would provide them with information, there is no reason to expect that the plaintiffs were relying on their candor.  Accordingly it is only sensible to put plaintiffs to their proof that they individually relied on the bank's omissions.").

[38] Lead Plaintiff responds,

> In fact, Lead Plaintiff did **not** extensively brief or argue that the Banks owed an independent duty to disclose, because at the time Lead Plaintiff was proceeding on a different theory of reliance, i.e., that the existence of deceptive conduct-conduct that had both the **purpose and effect** of creating a false impression of earnings, cash flow or debt-was sufficient in and of itself to support findings on the issues of deception **and** reliance.  Lead Plaintiff had neither the incentive nor the obligation to pursue an alternative reliance theory, especially in the

at 6-8.   Thus this Court must follow and enforce the Fifth Circuit's ruling in *Regents*.   *United States v. Henry*, 709 F.2d 298, 306 (5th Cir. 1983)("The principle that a district court may not violate the mandate of a circuit court of appeals and may not alter the law of the case so established is basic."). Furthermore, the Court must enter summary judgment in favor of the Financial Institution Defendants.

Second, Lead Plaintiff cannot, at this late date, suddenly argue that what it before characterized as affirmative statements (i.e., misrepresentations under Rule 10b-5(b)) in the Financial Institution Defendants' analyst reports and underwriting documents) are now suddenly transformed into omissions.   They insist that the mandate rule absolutely requires this Court to follow the Fifth Circuit's decision and that summary judgment

---

context of a class certification hearing on which it prevailed.

#5980 at 7.   It further claims,

The issue for decision before the Fifth Circuit in the context of its narrow Rule 23(f) review was whether this Court's class certification order–which did ***not*** in any sense depend upon a finding that the Banks did or did not have disclosure duties–should be upheld.   Because the issue was not germane to the class certification decision, Lead Plaintiff did not brief or argue it, and the record on appeal (consisting primarily of the record developed at the class certification hearing itself) contained little if any of the evidence upon which Lead Plaintiff now relies in support of its post-*Stoneridge* duty argument.   Thus, the duty-to-disclose issue was not fully and fairly litigated on appeal.

*Id.* at 8.

should be entered in their favor.[39]  Moreover, Defendants maintain
that none of the exceptions to the mandate rule apply here: there
has been no change in the law determining when a party owes a duty
to disclose; there is no new evidence;[40] and Lead

_____

[39] Defendants point to the record to demonstrate that Lead
Plaintiff argued vigorously before the Fifth Circuit that it could
demonstrate class-wide reliance against the Defendants under an
omissions/*Affiliated Ute* theory, and the Fifth Circuit rejected the
argument.  #5970 at 6-9.  Thus Lead Plaintiff cannot circumvent the
mandate rule by arguing that it failed to claim a duty to disclose
before the Fifth Circuit or by now presenting a "revised" theory of
liability.  A "lower court may not [be asked to] circumvent the
mandate by approaching the identical legal issue under an entirely
new theory."  *Barber v. Int'l Bhd. of Boilermakers, Iron Ship
Builders, Blacksmiths, Forgers, and Helpers Dist. Lodge #57*, 841
F.2d 1067, 1070 (11th Cir. 1988); *see also Schwartz v. NMS Indus.,
Inc.*, 575 F.2d 553, 555-56 (5th Cir. 1978)(holding that the trial
court on remand erred when it adopted a new theory of damages
contrary to the order of the Court of Appeals).  In sum, the
mandate rule bars re-litigation of issues decided by the Court of
Appeals (here, specifically, whether Lead Plaintiff can proceed on
an omissions theory, the disclosure duty), regardless of whether a
particular theory as to the issue was advanced.

[40] Lead Plaintiff also contends that two exceptions to the
mandate rule, different evidence and change in the law, allow for
consideration of its revised theory.  Lead Plaintiff argues that
the evidence supporting its alternative theory based on market
activity is substantially different from that which supported its
transaction-based theory.  It further maintains that *Stoneridge*
changed and clarified the law, not only rejecting the Fifth
Circuit's holding that deceptive conduct alone cannot be the basis
of § 10(b) liability, but also holding that deceptive conduct in
the realm of ordinary transactions, i.e., not in the investment
sphere, could not support reliance.  *Stoneridge*, 128 S. Ct. at 769-
71, 774.  The *Stoneridge* opinion caused Lead Plaintiff to re-
analyze the case and develop its new theory.
          Financial Institution Defendants respond that Lead
Plaintiff did rely on their market activity giving rise to a duty
to disclose in briefing and oral argument before this Court and
that the Court rejected the argument.  Moreover, a district court
can only consider different evidence when the appellate court
authorizes it do so, or when the mandate leaves the issue open for
consideration, neither the case here.  *U.S. v. Becerra*, 155 F.3d
740, 754 (5th Cir. 1998), *abrogated on other grounds as recognized
in U.S. v. Farias*, 481 F.3d 289, 291-92 (5th Cir. 2007); *Lyons v.
Fisher*, 888 F.2d 1071, 1075 (5th Cir. 1989(("We have held that the
'substantially different' evidence exception to the law-of-the-case

Plaintiff does not and cannot argue that the Fifth Circuit

doctrine does not apply where a prior appeal has not left the issue open for discussion."). Furthermore, the evidence now offered by Lead Plaintiff is not "new" or "different" for the evidence exception because it was available to Lead Plaintiff at class certification and Lead Plaintiff made the deliberate decision not to offer it at an earlier stage because it chose to rely on a strategy emphasizing the duty not to scheme (rejected in *Regents* by the Fifth Circuit as a basis giving rise to a duty to disclose), rather than the duty to disclose.  Courts have routinely refused to allow a party to circumvent the mandate rule on the basis of "new" or "different" evidence where, as here, the party attempts to introduce additional evidence after its chosen strategy is unsuccessful.  *U.S. v. Monsisvais*, 946 F.2d 114, 117 (10th Cir. 1991); *Baumer v. United States*, 685 F.2d 1318, 1321 (11th Cir. 1982); *Becerra*, 155 F.3d at 753-54; *Lyons*, 888 F.2d at 1075.  As for the change-in-the-law exception, the Supreme Court did address the question whether a duty to disclose arises from a defendant's market activities and therefore *Stoneridge* does not affect the legal basis of the Fifth Circuit's holding in *Regents*.  (The Financial Institution Defendants insist Lead Plaintiff previously argued that Defendants's alleged market activities gave rise to a duty to disclose and lists a number of examples in #5986 at 4, 7 n.5, 8 and nn. 6-7, and 10-11 and nn.8-9.)  Moreover, they maintain, logically Lead Plaintiff cannot rely on a case decided in 1977, *Virginia Bankshares*, and yet argue a change in controlling law.  *See Loa-Herrera v. Dept. of Homeland Sec.*, 239 F. Appx. 875, 880-81 (5th Cir. 2007)(holding that an intervening change in statutory interpretation did not amount to a "change in controlling law" under the mandate rule where plaintiffs attempted, on remand, to rely on a different, but related, statute which could have been, but was not previously, raised and the interpretation of which had not changed).  Furthermore the Supreme Court's refusal to remand this case would be illogical if *Stoneridge* had introduced an intervening change in the law that might benefit Lead Plaintiff. Financial Institution Defendants demonstrate that in its supplemental memorandum in support of its petition for a writ of certiorari Lead Plaintiff argued for the same *Affiliated Ute* presumption it reasserts now, based on market presumption and a duty to disclose, and the Supreme Court denied a writ.  Thus *Stoneridge* is not relevant to the Fifth Circuit's holding in *Regents* that the Financial Institution Defendants owed no duty to disclose to Enron's investors and that the *Affiliated Ute* presumption is legally unavailable in this case.

        To their argument that Lead Plaintiff should have presented and litigated the issue of a duty to disclose and may not raise it now, Lead Plaintiff argues that the proceedings in this Court and before the Fifth Circuit were limited in scope to this Court's finding that the relevant duty was a general one not to violate the statute, and that neither side was required to present evidence on all conceivable issues or face a waiver argument.

committed a clear error that was manifestly unjust.[41]   Thus this Court must comply with the Fifth Circuit's ruling.   *Fuhrman v. Dretke*, 442 F.3d 893, 897 (5th Cir. 2006)("[M]andate rule compels compliance on remand with the dictates of the superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court."); *U.S. v. Lee*, 358 F.3d 315, 321 (5th Cir. 2004)(same; "[A] lower court on remand 'must implement both the letter and the spirit of the appellate court's mandate and may not disregard the explicit directives of that court.'" . . . In implementing the mandate, the district court must "tak[e] into account the appellate court's opinion and the circumstances it embraces.'").   Defendants insist, "The mandate rule forbids this Court from entertaining Lead Plaintiff's argument--which now constitutes its <u>entire</u> theory in opposing summary judgment after *Regents* and *Stoneridge*--that the Financial Institution Defendants are liable for omissions because they owed a duty to disclose." #5970 at 10.

---

[41] This Court, like the Fifth Circuit, previously held that the Financial Institution Defendants had no duty to disclose their transactions with Enron to the *Newby* class of investors.   *In re Enron Corp.*, 529 F. Supp. 2d at 683 ("The Court agrees [with Financial Institution Defendants] that the Financial Institutions did not owe a duty to disclose to plaintiffs.").   The clearly erroneous exception is narrow and permits relief in the rare occurrence where the appellate court made a blatant mistake, e.g., applying a statute that had been repealed.   It is not a way to re-litigate legitimately disputed issues.   *City Pub. Serv. Bd. v. General Electric Co.*, 935 F.2d 78, 82("Mere doubts or disagreement about the wisdom of a prior decision of this or a lower court will not suffice for this exception.   To be 'clearly erroneous,' a decision must strike us as more than just maybe or probably wrong; it must . . . be dead wrong."), *amended on other grounds*, 947 F.2d 747 (5th Cir. 1991).

Even if there were no mandate rule, with "scheme
liability" no longer a viable theory, maintain Defendants, Lead
Plaintiff's pleadings and arguments throughout this litigation
demonstrate that this action "cannot be--and never could have
been--an omissions case." #5970 at 15. Lead Plaintiff cannot now
change course and argue that the Defendants' alleged affirmative
statements in analyst reports and underwriting documents, which
Lead Plaintiff previously classified as false statements and
misrepresentations under Rule 10b-5(b), are transformed into an
"omissions" case. A "lower court may not circumvent the mandate
by approaching the identical legal issue under an entirely new
theory"; "the mandate rule bars the relitigation of <u>issues</u> decided
by the Court of Appeals, regardless of whether a particular <u>theory</u>
as to that issue is advanced." *Barber v. Int'l Bhd. of
Boilermakers, Iron Ship Builders, Blacksmiths, Forgers, and
Helpers Dist. Lodge # 57*, 841 F.2d 1067, 1070 (11th Cir. 1988);
#5970 at 14. Lead Plaintiff from the start has claimed these
statements were misrepresentations under Rule 10b-5(b), and this
Court has previously ruled, based on this characterization.[42]

---

[42] Financial Institution Defendants quote the passage in *Abell
v. Potomac Ins. Co.*, 858 F.2d at 1119, distinguishing nondisclosure
(omission) and misrepresentation:

> Misrepresentations include statements that are
> themselves false--outright lies--and true
> statements that are nonetheless so incomplete
> as to be misleading, i.e., distorted half-
> truths. To omit a fact, however, is to say
> absolutely nothing about matters whose very
> existence plaintiffs have no reason to
> consider.

They argue that the question is not what the Defendants said about

Furthermore, contend Defendants, Lead Plaintiff is procedurally barred from reclassifying its case at this late hour by Fed. R. Civ. P. 15, which requires leave of court and a valid reason to amend, and by the doctrine of judicial estoppel, which prevents Lead Plaintiff from adopting a contrary position fatally inconsistent with its prior assertions to this Court.[43]   The Fifth

---

the alleged fraud, but whether they said anything at all about the subject matter, i.e., Enron's financial condition that Defendants had a duty to disclose.  *Abell*, 858 F.2d at 1119; *Griffin v. GK Intelligent Sys., Inc.*. 196 F.R.D. 298, 305 (S.D. Tex. 2001)("The *Affiliated Ute* presumption applies only to allegations that the defendant company 'failed to disclose any information whatsoever relating to material facts about which [it] had a duty to disclose.'").   Defendants contend that Lead Plaintiff cannot credibly argue that they did not provide "any information whatsoever" about Enron, given their analyst reports and offering statements that allegedly painted a false picture of Enron's financial condition.   Instead the claim that the underwriting documents and analyst reports told a materially incomplete story about Enron's financial condition because Defendants allegedly knew, but did not disclose, that Enron was involved in concealed transactions intended to distort its financial results, under the definition in *Abell,* does not qualify as an omission claim under *Affiliated Ute*.   *See also Regents*, 482 F.3d at 384, n. 17 (the *Affiliated Ute* presumption applies where "the defendant has failed to disclose any information whatsoever relating to material facts about which the defendant has a duty to the plaintiff to disclose"), quoting *Abell*, 858 F.2d at 1119.   *See also Abell*, 858 F.2d at 1119 ("[W]e apply the Ute presumption in non-disclosure cases, but not in falsehood or distortion cases.").

[43] As the Fifth Circuit has opined,
> Judicial estoppel is "a common law doctrine by which a party who has assumed one position in his pleadings may be estopped from assuming an inconsistent position." . . . The purpose of the doctrine is "to protect the integrity of the judicial process," by "prevent[ing] parties from playing fast and loose with the courts to suit the exigencies of self interest." . . . Because the doctrine is intended to protect the judicial system, *rather than the litigants*, detrimental reliance by the opponent of the party against whom the doctrine is applied is not necessary. . . "The policies underlying the doctrine

Circuit has clearly rejected Lead Plaintiff's "new omission

theory" by holding that the Financial Institutions had no duty to

---

> include preventing internal inconsistence
> precluding litigants from playing fast and
> loose with the courts, and prohibiting parties
> from deliberately changing positions according
> to the exigencies of the moment." . . . The
> doctrine is generally applied where
> "intentional self-contradiction is being used
> as a means of obtaining unfair advantage in a
> forum provided for suitors seeking justice." .
> . .

*In re Coastal Plains, Inc.*, 179 F.3d 197, 205-06 (5th Cir.
1999)(citations omitted).
     Courts have usually placed "at least two limitations on
application of the doctrine:  (1) it may be applied only where the
position of the party to be estopped is clearly inconsistent with
its previous one; and (2) the party must have convinced the court
to accept that previous position." *Id.* at 206.  *See also Hopkins
v. Cornerstore* America, 545 F.3d 338, 347 (5th Cir. 2008), *citing
Hall v. GE Plastic Pac., PTE Ltd.*, 327 F.3d 391, 396 (5th Cir.
2003)(same), and *New Hampshire v. Maine*, 532 U.S. 742, 750-51
(2001)( approving these requirements as general factors rather than
inflexible or exhaustive requirements).  Moreover, "the party to be
estopped must have acted intentionally, not inadvertently."
*Coastal Plains*, 179 F.3d at 206.
     The Fifth Circuit pointed out, "The Sixth Circuit has
explained that the 'judicial acceptance' requirement 'does not mean
that the party against whom the judicial estoppel doctrine is to be
invoked must have prevailed on the merits.  Rather, judicial
acceptance means only that the first court has adopted the position
urged by the party, either as a preliminary matter or as part of a
final disposition.'"  *Coastal Plains*, 179 F.3d at 206, *citing
Reynolds v. Commissioner of Internal Revenue*, 861 F.2d 469, 473 (6th
Cir. 1988).  In *Hopkins*, 545 F.3d at 348 n.2, the Fifth Circuit
noted, "In practice, we have required that a prior court *actually
accept* the party's earlier position, "either as a preliminary
matter or as part of a final disposition.' . . . The Supreme Court
appeared to approve of this actual-acceptance approach in *(New
Hampshire*, 532 U.S. at 750-51, . . . ('Absent success in a prior
proceeding a party's later inconsistent position introduces no risk
of inconsistent court determinations, and thus poses little threat
to judicial integrity.')."  Nevertheless, emphasizing the "*New
Hampshire* did not purport to establish 'inflexible prerequisites,"
532 U.S. at 751, the Fifth Circuit recently stated, "In *Hall* we
noted in dicta that '[o]ur cases suggest that [judicial estoppel]
may be applied whenever a party makes an argument with the explicit
intent to induce the district court's reliance.'"  *Hopkins*, 545
F.3d at 348.

disclose.     Financial    Institution    Defendants    insist,
"Characterizing a case replete with, and purportedly now based
upon, affirmative statements in analyst reports and underwriting
documents   as   one   of   'omissions'   is   impermissible   under
longstanding Fifth Circuit precedent and illogical on its face."
#5970 at 3.

        Third, argue Defendants, the Supreme Court and the Fifth
Circuit have repeatedly held that to permit an omissions case a
duty to disclose exists only where there is a special, fiduciary-
type relationship between the plaintiff and defendant, not a
professional or commercial relationship. *Chiarella v. U.S.*, 445
U.S. 222, 232-33 (1980).  Such a fiduciary relationship did not
exist between the Financial Institution Defendants and the myriad,
anonymous putative class members.[44]

        Fourth, Financial Institution Defendants maintain that
Lead Plaintiff cannot show scienter under the Fifth Circuit's
ruling in *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*,
365 F.3d 353 (5th Cir. 2004).  This Court previously rejected Lead
Plaintiff's analyst report claims under *Southland*. (#4735 at 129-

_____

        [44] Financial Institution Defendants assert that despite the
Fifth Circuit's ruling that the Financial Institution Defendants
owed no duty to disclose to Enron investors, Lead Plaintiff is
arguing that they have a duty of disclosure to the market at large.
Lead Plaintiff asserts that CSFB and Merrill Lynch assumed a duty
of disclosure by issuing analyst reports on Enron (which were
calculated to endorse and sell Enron securities to the public and
were picked up by media agencies and repeated to the market at
large) and by virtue of their role as insiders with possession of
superior, material, non-public information about Enron, on which
they also traded in connection with some transactions.   Lead
Plaintiff contends that all three Financial Institution Defendants
additionally owed a duty of disclosure based on their roles as
underwriters of certain Enron and Enron-related securities.

36, 184; also available at *In re Enron*, 529 F. Supp. 2d at 740-44, 778.)   Moreover, they contend, without the rejected "scheme liability" theory, and with its "revised" market activities theory (comprised of allegations of incomplete misrepresentations to which the *Affiliated Ute* presumption does not apply), Lead Plaintiff must satisfy the loss causation requirements under *Greenberg v. Crossroad Sys., Inc.*, 364 F.3d 657, 665 (5th Cir. 2004)(to trigger fraud-on-the-market presumption of reliance requires a causal relationship between the alleged material misstatement, which must not be confirmatory of information already in the market place and therefore already reflected in the stock's price, and actual movement of the stock price; plaintiff must show that "the cause of the decline in price is due to the revelation of the truth and not the release of unrelated negative information"), and *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261, 264-65 (5th Cir. 2004)(the Fifth Circuit has tightened requirements for plaintiffs seeking a presumption of reliance and requires proof that the misstatement or nondisclosure actually moved the market, materially affected the market price of the security, i.e., loss causation).   Without distinguishing representations from omissions, the PSLRA provides that "plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate the chapter caused the loss for which plaintiff seeks to recover damages."   15 U.S.C. § 78u-4(b)(4).

In summary, the Financial Institution Defendants maintain that if Lead Plaintiff were allowed to assert its

"revised theory" of omissions/duty to disclose, the theory is fatally flawed and summary judgment should be granted. Initially Lead Plaintiff relied on its now rejected scheme liability theory to satisfy three key elements of § 10(b) liability: reliance, loss causation and scienter. As pointed out *supra*, Lead Plaintiff cannot prove reliance and cannot establish that the Financial Institution Defendants owed a duty to disclose that permits use of *Affiliated Ute* as a surrogate for reliance. Summary judgment is warranted on the reliance element alone.

Summary judgment is also justified because Lead Plaintiff has not provided adequate evidence to support scienter or loss causation, Defendants declare. By "repackaging" the analyst reports as "omissions," Lead Plaintiff is futilely trying to get the Court to reconsider its earlier decision dismissing these claims against CSFB and Merrill Lynch as false statements and misrepresentations because scienter had not been shown under *Southland*, 365 F.3d at 366 ("[L]iability under Rule 10(b)(5)[*sic*] requires not only that the party make a statement which contains an untrue statement of material fact or omits a material fact necessary in order to make the statement not misleading, but also that the party have done so . . . with 'scienter' meaning an 'intent to deceive, manipulate, or defraud' or that 'severe recklessness' in which the 'danger of misleading buyers or sellers . . . is either known to the defendant or is so obvious that the defendant must have been aware of it.'" [citation omitted]). One court in this Circuit has concluded that *Southland* applies to omissions as well as to misrepresentations. *Milano v. Perot Sys.*

*Corp.*, No. 03:02-CV-01269-D, *et al.*, 2006 WL 929325 at *14 (N.D.
Tex. Mar. 32, 2006)("*Southland* teaches that, to determine whether
a statement made by a corporation such as Perot was made with
scienter, it is appropriate to look to the state of mind of the
individual corporate official or officials who made or issued the
statement, or ordered or approved it or its making or issuance,
or furnished information or language for inclusion therein, of the
like, rather than generally to the collective knowledge of all the
corporation's officers and employees acquired in the course of
their employment.   This principle applies with equal force to
omissions.").    Regardless    whether    the    allegations    are
misrepresentations or omissions, *Southland* requires that Lead
Plaintiff allege adequately the state of mind of the individual
corporate official or officials with a duty to disclose that is
responsible for the statement or the omission; it is not enough
to assert that "knowledge of the material facts omitted resided
in those at senior levels in each bank," as Lead Plaintiff has.

        As for loss causation in the recast "omissions" claims,
in an attempt to circumvent the Fifth Circuit's requirement that
a plaintiff must show that the allegedly false statements or
misrepresentations were non-confirmatory and actually "moved the
market,"[45] Lead Plaintiff again fails.   The Fifth Circuit requires
that where a plaintiff claims losses based on a decline in the
stock price allegedly caused by publication of previously

---

[45] *See Oscar Private Equity Investments v. Allegiance Telecom,
Inc.*, 487 F.3d 261 (5th Cir. 2007), and *Greenberg v. Crossroads
Systems, Inc.*, 364 F.3d 657, 665-66 (5th Cir. 2004).

concealed material information, the plaintiff must still present specific, itemized evidence linking each alleged misrepresentation or omission to both the correction of that misrepresentation or disclosure of what was omitted and a stock-price decline resulting from it; and by the class certification stage it must do so by a preponderance of the evidence. *Oscar Private Equity*, 487 F.3d at 271.   They insist Lead Plaintiff has failed to do so.   Lead Plaintiff's expert damages report does not allocate Enron stock price declines to the revelation of information allegedly previously omitted by any particular Financial Institution

## IV.   The Court's Determination

### A.   Scope of Review under Fed. R. Civ. P. 23(f)

As an initial matter, Fed. R. Civ. P. 23(f) for an interlocutory appeal "makes plain that the sole order that may be appealed is the class certification" and "'no other issue may be raised.'"   With regard to Lead Plaintiff's argument that the mandate rule does not apply because the Fifth Circuit's review was "bridled by rule 23(f) which allows a party to appeal only an issue of certification," and that the existence of facts supporting a duty to disclose was not before the Fifth Circuit, the Fifth Circuit expressly addressed the scope of its review on appeal and in essence rejected such an argument.

The Fifth Circuit concluded that "[t]he fact that an issue is relevant to both class certification and the merits, however, does not preclude review of that issue." *Regents*, 482 F.3d at 380.   It observed, "The commentary to rule 23(f) indicates that it is appropriate to grant leave to appeal an adverse

determination where (1) a 'certification decision turns on a novel or unsettled question of law' or (2) '[a]n order granting certification . . . may force a defendant to settle rather than incur the costs of defendant a class action and run the risk of potential ruinous liability.'" *Id.* at 379.

Elsewhere, expanding on policy reasons behind its decision to examine issues that relate to both class certification and § 10(b) on the merits during interlocutory appeal, the Fifth Circuit has opined, "We cannot ignore the *in terrorem* power of certification, continuing to abide the practice of withholding until 'trial' a merit inquiry central to the certification decisions . . . ." *Oscar Private Equity*, 487 F.3d at 267. In decertifying the *Newby* class in *Regents*, Judge Smith wrote, "The necessity of establishing a classwide presumption of reliance in securities class actions makes substantial merits review on a Rule 23(f) appeal inevitable," *inter alia* because "class certification may be the backbreaking decision that places 'insurmountable pressure' on a defendant to settle, even where the defendant has a good chance of succeeding on the merits." *Regents*, 482 F.3d at 393. Judge Smith asserted, "Here, where plaintiffs seek to hold the banks liable for nearly the entirety of securities losses stemming from the Enron collapse, settlement pressure appears to be particularly acute, so it is appropriate to provide appellate review before settlement may be coerced by an erroneous class certification decision." *Id.* at 379. Moreover he stated, "[A]lthough the legal issues underlying the certification decision are intertwined with the merits of plaintiffs' theory of

liability, these broad legal issues are not especially contingent on particular facts likely to be further developed in the district court."  *Id.* at 379-80.

The majority of the panel then aggressively reached substantive issues of scheme liability, duty to disclose, and the scope of § 10(b) and Rule 10b-5, as evidenced by Judge Dennis' concurrence/dissent.  Judge Dennis complains that the majority "committ[ed] a significant error" by addressing the merits on an interlocutory appeal of a class certification and holding "that secondary actors (such as the investment banks involved in this case) who act in concert with issuers of publicly-traded securities in a scheme to defraud the investing public cannot be held liable as primary violators of Section 10(b) or Rule 10b-5 unless they (1) directly make public misrepresentations; (2) owe the issuer's shareholders a duty to disclose; or (3) directly 'manipulate' the market for the issuer's securities through practices such as wash sales or matched orders, thus "immuniz[ing] a broad array of undeniably fraudulent conduct from civil liability under Section 10(b), effectively giving secondary actors license to scheme with impunity."  482 F.3d at 394.  Judge Dennis argued, "Because the issue on which the majority bases its decision today--a significant and unsettled question about the scope of primar[y] liability under Section 10(b)--is unnecessary to a determination of whether the plaintiffs have satisfied the prerequisites for maintaining a class action under Federal Rule of Civil Procedure 23, we should not consider it on this interlocutory appeal of class certification."  *Id.*

The majority clearly disagreed with Judge Dennis. Because the majority's particular holding about the reach of review of a Rule 23 class certification order was not granted a writ of certiorari and was not overturned nor even implicitly affected by *Stoneridge*, it is binding on this Court.  Thus Lead Plaintiff's objection is overruled.

### B.   Mandate Rule

The parties disagree about whether, in the wake of the *Regents* ruling, Lead Plaintiff is foreclosed by the mandate rule from continuing to litigate whether the Financial Defendants owed a duty to disclose to the Plaintiffs or to the market as a whole, so as to trigger a classwide presumption of reliance under *Affiliated Ute*.

A threshold inquiry must first be addressed:  does the mandate rule bar further litigation regarding the Financial Institution Defendants' duty to disclose even in the context of Lead Plaintiff's "revised" theory of liability based on material omission?

This Court agrees with Defendants that Lead Plaintiff's manipulation of language to re-characterize Defendants' alleged wrongdoing as material omissions, instead of participation in a scheme whose principal purpose and effect was to create false revenues for Enron's financial reports to deceive the public about Enron's actual economic condition, does not solve Lead Plaintiff's problem of having to establish a duty to disclose on, and breach thereof by, Financial Institution Defendants to support application of an *Affiliated Ute* presumption of reliance.   As

stated by the Eleventh Circuit Court of Appeals, a "lower court may not circumvent the mandate by approaching the identical legal issue under an entirely new theory"; "the mandate rule bars the relitigation of <u>issues</u> decided by the Court of Appeals, regardless of whether a particular <u>theory</u> as to that issue is advanced." *Barber v. Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers, and Helpers Dist. Lodge # 57*, 841 F.2d 1067, 1070. The Fifth Circuit in *Regents* considered the question of a duty to disclose. The Banks have shown that the duty issue was argued extensively on the appeal of the class certification order. #5970 at 6-9.[46] Moreover, they demonstrate that Lead Plaintiff did previously argue liability based not only transactions, but also on analyst reports, on underwriting documents, on issuing prospectuses, on registration statements, and on deceptive market activities on behalf of Enron.[47] Furthermore the factually specific governing complaint was before the Fifth Circuit in its review of this Court's class certification. The Fifth Circuit clearly and unambiguously held that under the facts of this case, the Financial Institution Defendants owed no duty to disclose anything they knew of wrongdoing to Enron investors. The majority concluded, "Enron had a duty to its shareholders, but the banks did not," emphasizing that the Financial Institution Defendants "owed no duty to Enron's shareholders." *Regents*,482 F.3d at 390,

---

[46] Financial Institution Defendants list a number of examples in #5986 at 4; #5986 at 7 n.5, 8 and nn.6-7, 10-11 and nn.8 and 9.

[47] *See* #5986 at 4, 7 n.5, 8 and nn.6-7, 10-11 and nn. 8-9 for examples.

386.  Moreover it stated that the district court's 'determination that the *Affiliated Ute* presumption applies to the facts of this case is incorrect.'"  *Regents*, 482 F.3d at 385, 383.

Because the appellate court held that the Financial Institution Defendants owed no duty to Enron investors, as a matter of law Lead Plaintiff cannot pursue an omission theory that also requires a duty to disclose, and cannot demonstrate that an *Affiliated Ute* presumption of reliance applies.  This Court notes that even though dissenting, Judge Dennis did agree with "the majority's conclusion that the *Affiliated Ute* presumption does not apply to this case."  *Regents*, 482 F.3d at 395 n.3.  Under "the well-settled 'law of the case' doctrine . . . an issue of law or fact decided on appeal may not be reexamined either by the district court on remand or by the appellate court on a subsequent appeal."  *United States v. Becerra*, 155 F.3d at 752.

The Court further concludes that the exceptions to the mandate rule do not apply here.  Lead Plaintiff does not show any evidence that was not available when it pursued its scheme liability theory.  Nor does he show that the Fifth Circuit made a "blatant mistake" or was "dead wrong" in its determination that the Financial Institution Defendants had no duty to disclose to Enron investors.  *City Pub. Serv. Bd. v. General Electric Co.*, 935 F.2d at 82.

Nor was *Stoneridge* a change in the law.  The *Stoneridge* decision was grounded in established Supreme Court precedent.  The scheme liability theory adopted by Lead Plaintiff was the novel claim here and had invoked conflicting responses among lower

courts and legal scholars; it did not pass muster in *Stoneridge*.
*Stoneridge*, however, did not "come out of the air."  The Supreme
Court in 1980 in *Chiarella,* 445 U.S. at 234-35, ruled, "When an
allegation of fraud is based upon nondisclosure, there can be no
fraud absent a duty to speak."  *Cited in Central Bank*, 511 U.S.
at 174.  *Chiarella* established the "doctrine that duty arises from
a specific relationship between two parties" and held that "a duty
to disclose under § 10(b) does not arise from the mere possession
of nonpublic market information."  445 U.S. at 232-35.  As for
insider trading claims, the Supreme Court further concluded that
when a person trades securities without disclosing inside
information to other investors, § 10(b) is not violated unless the
trader has an independent duty of disclosure.  *Id.* at 232, *cited
in Central Bank*, 511 U.S. at 174.  The *Stoneridge* majority also
relied heavily on the 1994 *Central Bank* case, which, while
conceding "that our cases have not been consistent," definitively
held that § 10(b) did not reach aiding and abetting in private
actions.  *Central Bank*, 511 U.S. at 187, 191.  In particular in
*Central Bank* the majority of the Supreme Court identified reliance
as "one element critical for recovery under 10b-5" that is fatally
absent in an aiding and abetting action.  *Id.* at 180.  "Allowing
plaintiffs to circumvent the reliance requirement would disregard
the careful limits on 10b-5 recovery mandated by our earlier
cases."  *Id.*  In *Central Bank* the Supreme Court also mandated that
for a primary violation of the statute, a defendant, including a
secondary actor, must act within the scope of conduct expressly
proscribed in the statute and meet all the prerequisites for such

a cause of action.   511 U.S. at 191 ("Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device[48] or makes a material misstatement (or omission), on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming *all* of the requirements for primary liability under Rule 10b-5 are met [emphasis in the original].").

Even if one focuses on *Stoneridge*'s new determination that conduct (as opposed to misrepresentations and omissions) can give rise to liability under the statute, which the Fifth Circuit had not permitted before *Stoneridge* was issued, Lead Plaintiff had been alleging fraudulent conduct all along.   Furthermore that holding under the facts alleged in *Newby* would still not get Lead Plaintiff past the hurdles of the requisite duty to disclose (which the Fifth Circuit requires for "deceptive acts") for an *Affiliated Ute* or fraud-on-the-market presumption, while the latter would still require direct, public communication of that conduct and causation in fact, since this Court and the Fifth Circuit have ruled that the Financial Institutions under the facts alleged here did not, as a matter of law, have a duty to disclose. Moreover, even if the mandate rule did not preclude further

---

[48] Lead Plaintiff does not argue that the Financial Institutions' conduct involved manipulation, which is a "'term of art when used in connection with securities markets'" and "'connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.'"   *Regents*, 482 F.3d at 387, *quoting Ernst & Ernst*, 425 U.S. at 1999.   The term "'refers generally to practices, such as wash sales, mated orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.'"   *Id., quoting Santa Fe*, 430 U.S. at 476.

litigation on the issue, for the reasons stated below the Court finds that as a matter of law Lead Plaintiff has still failed to raise a genuine issue of material fact for trial about a duty to disclose and a presumption of reliance.

Furthermore the Fifth Circuit did not remand this case expressly or impliedly for a determination of whether Lead Plaintiff might prevail on any other theory, such as Lead Plaintiff's proposed omission theory. This Court is not free to deviate from the Fifth Circuit's mandate. This Court concludes that the mandate rule bars Lead Plaintiff from continuing to re-litigate the issue of a duty to disclose to investors their knowledge of the alleged Enron fraud.

### C. Duty to Disclose

Were this matter not barred by the mandate rule, as presented by the parties the central issue in this "primarily omissions" case, even under Lead Plaintiff's "revised" cause of action, is whether, under § 10(b) and Rule 10b-5, the Financial Institution Defendants had a duty to disclose their transactions and market activities to Enron investors, or even to the public as a whole, the alleged breach of which would trigger an *Affiliated Ute* class-wide presumption of reliance. To support its determination that the Financial Institution Defendants owed no duty to Enron investors or the market at large, the Court addresses each of the sources of a duty to disclose proposed and argued by Lead Plaintiff.

### 1. *Virginia Bankshares*'s Test and the Supreme Court

With respect to omissions, Rule 10b-5's only express provision relating to disclosure is found in subsection (b), that it is unlawful "to omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading . . . .," i.e., that once a party speaks, it must speak the whole truth, not half truths that cause an investor to reach an erroneous conclusion for lack of full information.   17 C.F.R. § 240.10b-5(b).   Thus for the implied cause of action courts turn to case law.

In defending against the motions for summary judgment here, Lead Plaintiff relies on a common-law multifactor test for determining when a duty to disclose exists, in the absence of a fiduciary or confidential relationship, set out in a 1977 Fifth Circuit case, *Virginia Bankshares*, 559 F.2d at 1314 (discussed *supra*), which in turn adopted it from a 1974 Ninth Circuit case, *White v. Abrams*, 495 F.2d at 735. *Virginia Bankshares*, 559 F.2d at 1314 ("In the absence of a confidential relationship, the particular circumstances of the case may give rise to an obligation to communicate the fact in question."). As noted *supra*, the Fifth Circuit opined,

> In determining whether the duty to speak arises, we consider the relationship between the plaintiff and defendant, the parties' relative access to the information to be disclosed, the benefit derived by the defendant from the purchase or sale, defendant's awareness of plaintiff's reliance on defendant in making its investment decisions, and defendant's role in initiating the purchase or sale.

*Virginia Bankshares*, 559 F.2d at 1314.

This type of multifactor approach to determining whether a duty to disclose exists became known as the "flexible duty standard."[49]  *See, e.g.*, Steven A. Fishman, *Duty to Disclose Under Rule 10b-5 in Face-To-Face Transactions*, 12 J. Corp. L. 251, 268-74 (Winter 1987).

This Court is not persuaded that the multi-factor test in *Virginia Bankshares* controls here, nor that it is still viable. Since *Virginia Bankshares* issued, the Supreme Court has published key decisions that implicitly and severely restrict, if not render obsolete, the flexible multifactor approach to finding a duty outside of a fiduciary or quasi-fiduciary confidential relationship.

First, in *Chiarella*, in the context of insider trading, the Supreme Court addressed the "legal effect of [printer Vincent Chiarella's] silence" when he discovered, from documents sent to him to print, an impending corporate takeover of five companies. Chiarella immediately purchased stock in these target companies, made no affirmative disclosures, and sold his shares after the takeover attempts were made public, thereby pocketing more than $30,000 in profit over fourteen months.  *Chiarella v. U.S.*, 445 U.S. 222, 226 (1980).  The printer was tried and convicted on seventeen counts of violating § 10(b) by insider trading.  His conviction was affirmed by the Second Circuit Court of Appeals.

---

[49] The duty to disclose is not mentioned in § 10(b) or Rule 10b-5 and arises from fiduciary or special relationship of trust and confidence.  Like the duty to disclose, the flexible duty standard appears to arise from common law outside of the federal securities laws, as discussed *infra*.

*Id.* at 224.     On further review, the Supreme Court opined, "What [§ 10(b)] catches must be fraud.   When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak."   *Chiarella*, 445 U.S. at 235.     Reversing Chiarella's conviction, Justice Powell, writing for the majority, opined, "[T]he duty to disclose arises when one party has information 'that the other party is entitled to know because of a **fiduciary or other similar relation of trust and confidence** between them.").   *Chiarella*, 445 U.S. at 228 (emphasis added by the Court).   *See also id.* at 232 n.14 ("A duty [to disclose] arises from the relationship between parties, . . . and not merely from one's ability to acquire information because of his position in the market.").

To reach this conclusion, the high court examined the language and the legislative history of § 10(b) and the SEC's and federal courts' interpretations of it.   Because the statute was silent and the legislative history provided no guidance as to whether silence constituted a manipulative or deceptive device within the meaning of § 10(b), the Supreme Court turned to case law and found that it supported imposition of liability for fraud "premised upon a duty to disclose **arising from a relationship of trust and confidence between parties to a transaction**."   445 U.S. at 226-30 (emphasis added by the Court), *citing and discussing inter alia Cady, Roberts & Co.*, 40 S.E.C. 907, 1961 WL 60638 (1961)[50](holding that a corporate insider must abstain from trading

---

[50] *In re Cady, Roberts & Co.*, 40 S.E.C. 907, No. 8-3925, 1961 WL 60638, *3 (S.E.C. Release Nov. 8, 1961), is a source of the

in shares of his own corporation unless he has first disclosed the

material information known to him, not because of the relationship

between the buyer and seller, but because of the relationship of

trust and confidence between the shareholders and the insider, who

obtained the confidential information by reason of his position

with that corporation; that relationship gives rise to a duty to

disclose because of the need to prevent the insider from taking

unfair advantage of the uninformed minority stockholders); and

---

"disclose or abstain" from trading rule imposed on insiders, grounded in a policy of fairness to public investors which the Supreme Court subsequently restricted to a required confidential relationship (as discussed later). "We, and the courts have consistently held that insiders must disclose material facts which are known to them by virtue of their position but which are not known to persons with whom they deal and which, if known, would affect their investment judgment." *Id.*, 1961 WL 60638 at *3. In *Cady, Roberts* the SEC broadly construed § 10(b) and Rule 10b-5, which "are not intended as a specification of particular acts or practices which constitute fraud, but rather are designed to encompass the infinite variety of devices by which undue advantage may be taken of investors and others." *Id.* The Commission ruled that there is a "special obligation" or duty to disclose material information when "two principal elements" are present: (1) "the existence of a relationship giving access, directly or indirectly, to information intended to be available only for a corporate purpose and not for the personal benefit of anyone" and (2) the inherent unfairness involved where a party takes advantage of such information knowing it is unavailable to those with whom he is dealing. Thus our task here is to identify those persons who are in a special relationship with a company and privy to its internal affairs, and thereby suffer correlative duties in trading in its securities. Intimacy demands restraint lest the uninformed be exploited." *Id.* at *4. "[A] breach of duty of disclosure may be viewed as a device or scheme, in implied misrepresentation, and an act or practice, violative of all three subdivisions" of Rule 10b-5. *Id.* In *Cady, Roberts*, the Commission noted that the term "any person" in Rule 10b-5 included not only traditional corporate insiders, e.g., officers, directors and controlling stockholders, but others who have a special obligation, in that case a broker who received nonpublic information that a company's dividend would be cut and sold shares for his clients before the information became public.

*Affiliated Ute*, 406 U.S. at 152-53[51] ("Court recognized that no duty of disclosure would exist if the bank merely had acted as a transfer agent.  But the bank also had assumed a duty to act on behalf of the shareholders and the Indian sellers had relied upon its personnel when they sold their stock," and thus its employees "could not act as market makers inducing the Indians to sell their stock without disclosing the existence of the more favorable non-Indian market.").

The Supreme Court reversed Chiarella's conviction because there was no fiduciary or special relationship of trust and confidence to give rise to the requisite duty to disclose imposed on Chiarella:  Chiarella had no prior dealings with the sellers of the target company's securities, he was not their agent, there was no relationship of trust and confidence between the sellers and him, and in fact, he was "a complete stranger who dealt with the sellers only through impersonal market transactions."  445 U.S. at 232-33.  Furthermore, the Supreme Court rejected the idea of a "general duty between participants in market transactions to forgo actions based on material, nonpublic information" because it "departs radically from the established doctrine that duty arises from a specific relationship between two parties" and such a broad duty should not be imposed "absent some explicit evidence of congressional intent," which the Court determined was not there.  *Id.* at 233.  It further noted that "problems caused by misuse of market information have been

---

[51] See discussion of facts in *Affiliated Ute* in footnote 17January 29, 2009.

addressed by detailed and sophisticated regulation" by the Legislature and thus are not within the scope of § 10(b).  *Id.* Finally Justice Powell summarized,

> When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak.  We hold that a duty to disclose under § 10(b) does not arise from mere possession of nonpublic market information.  The contrary is without support in the legislative history of § 10(b) and would be inconsistent with the careful plan Congress has enacted for regulation of the securities market.

445 U.S. at 235.

The Fifth, Eighth, Ninth, and Eleventh Circuits have on occasion used the *Virginia Bankshares*' or a similar multifactor flexible duty test, a tool which can expand the scope of potential liability.  This approach appears to have lost favor steadily as the Congress passed the PSLRA and the Supreme Court imposed increasing strictures on the private right of action under § 10(b) and Rule 10b-5.  As noted *supra*, after *Virginia Bankshares* the Fifth Circuit only twice cited the test, both times in 1993, and both times found no duty to disclose; it has not employed the test since.[52]

---

[52] *See Abbott v. Equity Group, Inc.*, 2 F.3d 613, 622-23 (5th Cir. 1993)(no evidence of reliance by investors in making investment decisions, no less that defendants were aware of plaintiffs' reliance; plaintiffs could not show that defendants played a role in initiating the purchase or sale and defendants had no contact with investors regarding their investment), *cert. denied sub nom. Turnbull v. Home Ins. Co.*, 510 U.S. 1177 (1994); and *Kaplan v. Utilicorp United, Inc.*, 9 F.3d 405, 407-08 (5th Cir. 1993),("After considering these factors we find the connection between the actions of the Aquila officers and the sale of Utilicorp stock is too remote to impose a duty to disclose.").

The Ninth Circuit, which had used the test for determining the existence of a duty to disclose and holding that no separate element of scienter need be alleged, later adopted "recklessness" as its standard for scienter under the statute and rejected the flexible duty test's use of a negligence standard after it had been expressly disapproved by the Supreme Court in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 n.12 (1976). *See Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1570 & nn. 9-10 (9th Cir. 1990)(*en banc*)("put[ting] to rest" the flexible duty standard at least as to scienter), *cert. denied*, 499 U.S. 976 (1991). In *Jett v. Sunderman*, 840 F.2d 1487, 1492-93 (9th Cir. 1988)(relying on the *White v. Abrams* test adopted by the Fifth Circuit), *abrogated on other grounds as recognized in Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 535 (9th Cir. 1989), the panel recognized that the first factor of the flexible duty test was restricted by *Chiarella:* "The Supreme Court has held that the parties to an impersonal market transaction owe no duty to disclosure to one another absent a fiduciary or agency relationship, prior dealings, or circumstances such that one party has placed trust and confidence in the other. The reasoning is equally appropriate in this situation. If Jett and Union Bank had no prior dealings or pre-existing relationship of trust and confidence, then the threshold requirement of a duty to disclose has not been met." *Jett*, 840 F.2d at 1492-93, *citing Chiarella*, 445 U.S. at 232. Nor has this Court found that the Ninth Circuit

used the multifactor test again after *Jett*[53] to determine whether a duty to disclose exists.

Ķ    The Eighth Circuit last applied a flexible duty test in *Arthur Young & Co. v. Reves*, 937 F.2d 310, 1330 & n.26 (8ᵗʰ Cir. 1991)(*Hollinger*'s statement "put[ing test] to rest" was "limited to the scienter element of a Rule 10b-5 violation and thus appears not to alter the duty to disclose analysis; applies the test), *aff'd*, 507 U.S. 1092 (1992).  This Court has not found any courts in that circuit that have followed *Arthur Young* and applied the flexible duty standard in the past 15 years.

Ķ    Two district courts in the Second Circuit have refused to apply the test set out in *Jett* because of *Chiarella* and progeny for reasons discussed.  *Gershon v. Wal-Mart Stores, Inc.*, 901 F. Supp. 128, 132 n.8 (S.D.N.Y. 1995)("*Jett*'s reliance upon the parties' 'relative access to information appears to conflict with *Chiarella*'s holding that mere information disparities do not justify a duty to disclose."); *in accord Alexandra Global Master Fund, Ltd. v. Ikon Office Solutions, Inc.*, No. 06 CV 5383 (JGK), 2007 WL 2077153, *8 (S.D.N.Y. July 20, 2007)("It is clear that Chiarella and Dirks worked a broad change in the law of insider trading that is not limited to outsiders or tippees. . . . Pursuant to the Supreme Court's directions, under the traditional insider trading theory, one who trades in a security while in possession of material, nonpublic information, cannot be found to

---

[53] Furthermore, in *Jett* the Ninth Circuit relied upon the parties' "relative access to information"; in *Chiarella*, the Supreme Court made clear that mere disparity in information does not justify a duty to disclose.  *Chiarella*, 445 U.S. at 235.

have violated Rule 10b-5 absent a duty to disclose arising from a 'fiduciary or other similar relation of trust and confidence.'").

The Eleventh Circuit applied a flexible duty standard in *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1043 (11th Cir. 1986), *cert. denied*, 480 U.S. 946 (1987), and in *Ziemba v. Cascade Intern., Inc.*, 256 F.3d 1194, 1206 (11th Cir. 2001).[54]  But it, too, applied it with the *Chiarella* restrictions on the relationship between the parties.  An occasional district court in that Circuit still applies it.  *See, e.g., Cordova v. Lehman Bros., Inc.*, 526 F. Supp. 2d 1305, 1316-17 (S.D. Fla. 2007); *In re Infocure Sec. Litig,*, 210 F. supp. 2d 1331, 1351 (N.D. Ga. 2002).  Otherwise it has largely fallen into disuse.

Moreover, the Fifth Circuit, in an opinion issued a few months before *Virginia Bankshares*, provided well founded criticism of the flexible approach of *White v. Abrams*, on which the panel relied in *Virginia Bankshares*.  *Dupuy v. Dupuy*, 551 F.2d 1005, 1014-15 (5th Cir. 1977), *cert. denied*, 434 U.S. 911 (1977).  As a practical matter, the flexible duty standard varies with the particular circumstances of each case rather than constituting a set, predictable rule; it may make it impossible or quite difficult to apply and to allow a party to decide before it acts whether it has a duty to disclose.  The *Dupuy* panel was critical of the flexible duty approach because "the duty of defendants to

---

[54] Because *Virginia Bankshares* issued in 1977 before the Circuit split in 1981, it was binding precedent for what became the Eleventh Circuit, too.

disclose depends on the sophistication, status, and information of the plaintiff." *Id.* Judge Wisdom, writing for the panel, emphasized that the disadvantages that might result from a flexible standard:

> [I]nconsistent standards of conduct for defendants arise from analyses that vary the duty to disclose with the status of the plaintiff. . . . The dispositive element in these cases is that the defendant owes a duty of full and fair disclosure to the public, not to any particular investor. . . . With a flexible duty approach, however, the defendant owes different duties depending on the status of the victim and the type of legal action. This could lead to unnecessary confusion between public and private enforcement proceedings and to gamesmanship by the defendants.

*Id.* at 1015.

In summary this Court concludes that the development of Supreme Court case law on § 10(b) and Rule 10b-5 impliedly overrules or eliminates much of the multifactor test of *Virginia Bankshares,* which rests on now rejected principles. First of all, the *Virginia Bankshares'* test was premised on "the absence of a confidential relationship," in which case "the particular circumstances of the case may give rise to an obligation to communicate the fact in question." *Virginia Bankshares*, 559 F.2d at 1314. In the *Virginia Bankshares* flexible duty test "the relationship between the plaintiff and the defendant" is only one of the five factors in the test. After *Chiarella* that relationship is the threshold and dispositive element, and it must be fiduciary or confidential--to give rise to a duty to disclose. In *Virginia Bankshares*, the Fifth Circuit had further concluded

that "where the accused has superior knowledge of the suppressed
fact ["the parties' relative access to the information to be
disclosed" factor] and the defrauded party has been induced to
take action which he might not otherwise have taken, the
obligation to disclose is particularly compelling" for imposition
of a duty to disclose in an omission case. 559 F.2d at 1314. But
that factor has been severely restricted by *Chiarella*'s "special
relationship" requirement and reduction of importance of
information, 445 U.S. at 228 ("[O]ne who fails to disclose
material information prior to the consummation of a transaction
commits fraud only when he is under a duty to do so. And the duty
to disclose arises when one party has information 'that the other
[party] is entitled to know *because of a fiduciary or other
similar relation of trust and confidence between them*." [emphasis
added by this Court]). As noted, in *Chiarella*, the Supreme Court
made clear that mere disparity in information does not justify a
duty to disclose. *Chiarella*, 445 U.S. at 235; *id.* at 232 n.14 ("A
duty arises from the relationship between parties, . . . and not
merely from one's ability to acquire information because of his
position in the market."); *id.* at 235 ("When an allegation of
fraud is based on nondisclosure, there can be no fraud absent a
duty to speak. We hold that a duty to disclose under § 10(b) does
not arise from the mere possession of nonpublic market
information."). The Supreme Court insisted, "[N]either Congress

nor the Commission ever has adopted a parity of information rule."
*Id.* at 233.[55]

Subsequently in 1994 in *Central Bank*, 511 U.S. 164, the
Supreme Court again narrowly construed § 10(b), stating that a
failure to disclose material, nonpublic information violates §
10(b) only when there is "an independent duty of disclosure." *Id.*
at 174.   The mere expectation or reliance of a party upon
disclosure where there is no confidential relationship is
insufficient, indeed irrelevant, to the creation of a duty.

Furthermore, *Central Bank's* holding that aiding and
abetting claims are not cognizable in private actions under the
statute made further inroads against the *Virginia Bankshare's*
factors.    In *White v. Abrams*, the source of the *Virginia
Bankshares* test, the Ninth Circuit explained,

---

[55] Lead Plaintiff relies on *SEC v. Texas Gulf Sulphur Co.*, 401
F.2d 833, 848 (2d Cir. 1968), *cert. denied*, 394 U.S. 974 (1969), to
argue for a very broad construction of "insider" and of the duty to
disclose owed to the public as a whole.  In *Texas Gulf Sulphur*, the
Second Circuit extended potential liability beyond a corporate
insider or a person in a special relationship with the company with
access to nonpublic information to reach "anyone who, trading for
his own account in the securities of a corporation has 'access
directly or indirectly, to information intended to be available
only for a corporate purpose and not for the personal benefit of
anyone'" based on the market unfairness of allowing that individual
to take "'advantage of such information knowing it is unavailable
to those with whom he is dealing, i.e., the investing public." *Id.*
at 848.
    As with *Cady, Roberts* and *Virginia Bankshares*, this Court
concludes that *Chiarella's* subsequent emphasis on a requisite
fiduciary relationship or relationship of confidence and trust
between parties to the transaction to give rise to a duty to
disclose by one party to the other one (but not to the market as a
whole) any material nonpublic information and its rejection of the
mere possession of information as a basis for liability have
restricted the scope of liability under § 10(b) and Rule 10b-5.

> By adopting such a [flexible] duty analysis,
> we avoid the confusion that arises from
> classifying the defendants as primary and
> secondary, or from classifying transactions
> as direct and indirect.    This flexible
> approach . . . does away with the necessity
> of creating a separate pigeonhole for each
> defendant whose involvement in the
> transaction in question may not fit nicely
> into one of the previously defined classes.

495 F.2d at 734 & n.14 (citing Ruder, Multiple Defendants in Securities Law Fraud Cases:  Aiding and Abetting, Conspiracy, in Pari Delicto, Indemnification, and Contribution, 120 U. Pa. L. Rev. 597, 620-30 (1972).  In the wake of *Central Bank*, 511 U.S. at 191, although the Supreme Court has still not established a clear test for distinguishing aiding and abetting from primary violations, district courts are required to identify, segregate, and dismiss aiding and abetting claims from private § 10(b) actions.  Thus a major purpose of the flexible duty standard is no longer viable.

Thus, in summary, the first factor of *Virginia Bankshares*, the relationship between the plaintiff and the defendant, is the controlling inquiry:  to impose a duty of candid disclosure, that relationship must be a fiduciary, special or confidential one of trust.  That factor is not satisfied, as is the case here, where the parties are strangers that have never had contact in the large, impersonal market for securities and where the class representatives have all testified they had no contact with the Financial Institution Defendants and had never relied on anything Defendants said or did in their decisions to buy or sell Enron securities.  Moreover, regardless of how many new

allegations of market activity by the Financial Institution Defendants Lead Plaintiff adds, it still needs to establish the existence of a duty to disclose to the investors and reliance on Defendants' material misrepresentations, omissions, or conduct.

Moreover, as this Court has indicated above, under *Chiarella*, 445 U.S. at 230, "liability is premised upon a duty to disclose arising from a relationship of trust and confidence between **parties to a transaction**" and does not extend to the market as a whole.

The significance of the second *Virginia Bankshares* factor, the relative access to information, is discounted under *Chiarella,* which opined that mere disparity in information does not justify a duty to disclose. *Chiarella*, 445 U.S. at 235; *id.* at 232 n.14 ("A duty arises from the relationship between parties, . . . and not merely from one's ability to acquire information because of his position in the market."); *id.* at 235 ("When an allegation of fraud is based on nondisclosure, there can be no fraud absent a duty to speak. We hold that a duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information."). The Supreme Court insisted, "[N]either Congress nor the Commission ever has adopted a parity of information rule." *Id.* at 233.

The remaining *Virginia Bankshares* factors (benefit to the defendant from the purchase or sale, defendant's awareness of plaintiff's reliance, and defendant's role in initiating the sale) are unilateral expectations or concerns that also do not give rise to, or are not relevant or controlling, in the absence of, a duty

to disclose. Indeed, without the existence of such a duty, there can be no justifiable reliance by a plaintiff on a defendant's representations, omissions, or actions.

### 2.  Constructive Fiduciaries

Lead Plaintiff has not shown the existence of a conventional traditional fiduciary relationship or relationship of trust and confidence between the Financial Institution Defendants and the Enron investors; as emphasized by these Defendants, the proposed class representatives testified that they had no relationship and, indeed, no contact with these Defendants. A separate potential legal basis that Lead Plaintiff has asserted for such a relationship is stated in *dicta* in a footnote in *Dirks*, for "constructive" insiders who obtain corporate information from the company and a concomitant duty to disclose or abstain from trading in the corporation's securities (i.e., a prohibition on insider trading):

> Under certain circumstances, such as where corporate information is revealed legitimately to an underwriter, accountant, lawyer or consultant working for the corporation, these outsiders may become fiduciaries of the shareholders. The basis for recognizing this fiduciary duty is not simply that such persons acquired nonpublic corporate information, but rather that they have entered into a special confidential relationship in the conduct of the business of the enterprise and are given access to information solely for corporate purposes. . . . When such a person breaches his fiduciary relationship, he may be treated

> more properly as a tipper than a
> tippee. [citations omitted]

*Dirks v. SEC*, 463 U.S. at 655 n.14.  *See also United States v.
Chestman*, 947 F.2d 551, 565 (2d Cir. 1991)(*en banc*), *cert. denied*,
503 U.S. 1004 (1992)("This theory clothes an outsider with
temporary insider status when the outsider obtains access to
confidential information solely for corporate purposes in the
context of "a special confidential relationship."). *But see*
*S.E.C. v. Cherif*, 933 F.2d 403, (7th Cir. 1981)("Because neither
the Supreme Court nor the Courts of Appeals have explicitly
adopted the 'quasi-insider' theory of liability, however, we
decline to apply it to this case."). The Court has not found any
case in this Circuit where the constructive fiduciary theory was
applied.

Lead Plaintiff argues that the Banks, as underwriters
who gained special knowledge of Enron's fraudulent financial
reporting from their Enron-related transactions and market
activities, were such constructive or temporary fiduciaries and
that they breached their duty to the shareholders when they traded
Enron securities with such inside information.

Nevertheless, according to the allegations in *Newby*, the
Financial Institution Defendants were not "tipped" by Enron
insiders, but learned of the alleged fraud by participating in
transactions and marketing activity of Enron securities and
thereby recognizing that its financial statements were material
misrepresentations of its assets. Moreover, according to the
complaint and current allegations, the purported fraudulent

conduct involving Enron was not "legitimately" revealed to the
Financial Institution Defendants nor given to them for "corporate
purposes." Indeed, rather than acting for the corporation's and
the shareholders' benefit, the Financial Institution Defendants
are alleged to have acted for the benefit of the swindlers who
created and ran the huge Ponzi scheme known as Enron, and of
course for the Financial Institution Defendants' own profit. Nor
does Lead Plaintiff charge that these Defendants contributed to
the "conduct of the business of the enterprise and [were] given
access to information solely for corporate purposes"; rather they
are alleged to have been involved in outside activities, external
to the conduct of Enron's business, that allowed Enron to "cook"
its books. Thus given the allegations in this case, this Court
concludes that the Financial Institution Defendants would not
qualify as temporary or constructive fiduciaries under *Dirks*.

### 3.  Insider Trading

As a separate source of a duty to disclose, Lead
Plaintiff also asserts that the Financial Institution underwriters
at times purchased and sold Enron securities at Enron's direction,
and they were thus subject to the disclose or abstain rule.

To have standing to sue for insider trading under an
implied cause of action under § 10(b) (or an express cause of
action under § 20A[56]), investors must show that they traded

---

[56] Private insider trading claims can be brought under § 20A
and under § 10b and Rule 10b-5. *Neubronner v. Milken*, 6 F.3d 666,
669-70 (9th Cir. 1993)(a plaintiff may elect to proceed against
insider trading defendant under Rule 10b-5 even though Section 20A
remedy is also available; holding that "the scope of liability for
insider trading claims under section 10(b) and Rule 10b-5 is

contemporaneously with these Defendants.[57]   Clearly, many *Newby*
plaintiffs will be unable to do so, and Lead Plaintiff makes no
showing for those who might meet the standing requirement.   *See,*

_____

confined to persons who traded contemporaneously with the insider.
We further hold that contemporaneous trading is necessarily a
'circumstance constituting fraud' [and] . . . thus, contemporaneous
trading must be pleaded with particularity under Rule 9(b)."),
*citing Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 94-
95 (2d Cir. 1981)("Any duty of disclosure is owed only to those
investors trading contemporaneously with the insider; non-
contemporaneous traders do not require the protection of the
'disclose or abstain' rule because they do not suffer the
disadvantage of trading with someone who has superior access to
information.").   *See also In re Browning-Ferris Industries, Inc.
Sec. Litig.*, 876 F. Supp. 870, 909 (S.D. Tex. 1995); *McGuire v.
Dendreon Corp.*, No. CO7-800MJP, 2008 WL 5130042, *9 (W.D. Wash.
Dec. 5, 2008).

[57] The rule for insider trading that a corporate insider with
the advantage of possessing of material information about the
corporation must either disclose it to the investing public or
abstain from trading could result in imposition of unlimited
liability to all investors who lost money trading in the market for
the same class of securities.   Thus some courts established a
contemporaneous trading requirement to restrict the number of
investors who could bring private suits.   *See, e..g., Wilson v.
Comtech Telecommunications Corp.*, 648 F.2d 88, 94-95 (2d Cir.
1981)(duty of disclosure by insiders trading in the open market "is
owed only to those investors trading contemporaneously with the
insider; noncontemporaneous traders do not require the protection
. . . because they do not suffer the disadvantage of trading with
someone who has superior access to information"; to "extend the
period of liability well beyond the time of the insider's trading
simply because disclosure was never made could make the insider
liable to all the world"); *Neubronner v. Milken*, 6 F.3d 666, 669-70
(9th Cir. 1993)(same); *In re MicroStrategy, Inc.*, 115 F. Supp. 2d
620, 662 (E.D. Va. 2000)("Thus, by requiring a showing of
contemporaneity in the trades by the insider and the suing
investor, Section 20A seeks to ensure that, where contractual
privity would otherwise be impractical if not impossible to show,
there nonetheless was a sufficiently close temporal relationship
between the trades that the investor's interests were implicated by
trades made by the insider while in possession of material,
nonpublic information.").   This Court has discussed elsewhere the
disagreement among courts as to how long the period between the
trade by the insider and the purchase by the plaintiff
"contemporaneously" permits.   *In re Enron Corp.*, 258 F. Supp. 2d
576, 599-600 (S.D. Tex. 2003).

*e.g., Wilson v. Comtech Communications Corp.*, 648 F.2d 88, 94-95 (2d Cir. 1981); *Neubronner v. Milken*, 6 F.3d 666, 669 (9th Cir. 1993); *In re Brown-Ferris Indus. Sec. Litig.*, 876 F. Supp. 2d 870, 910 (S.D. Tex. 1995); *Copland v. Grumet*, 88 F. Supp. 2d 326, 338 (D.N.J. 1999).   Furthermore, the standing requirement would undermine any classwide presumption of reliance here, and Lead Plaintiff still wishes to pursue a class action.

Moreover insider trading must be pleaded with particularity, including identification of the person who traded, what material non-public information he had, and facts showing that he knowingly failed to make the disclosure.   *See In re Enron Corp.*, 258 F. Supp. 2d 576, 591 (S.D. Tex. 2003).   Again Lead Plaintiff's pleadings are not adequate to state such a claim.

### 4.   Regulation S-K, 17 C.F.R. § 229.508(1)(1)

This Court agrees with the Financial Institution Defendants that there is no private cause of action under Regulation S-K.   *See* footnote 26 in this Opinion and Order.

### 5.   Underwriter

Sections 11 and 12(a)(2) of the Securities Act of 1933 provide express causes of action against underwriters which are easier alternative routes to liability than that under § 10(b). Section 11 requires only an allegation that the plaintiff purchased a security and that the registration statement contained a false and misleading statement about a material fact.   15 U.S.C. §77k(a); *In re Enron*, 258 F. Supp. 2d at 594-95.   The plaintiff does not have to demonstrate scienter, causation, materiality or reliance under § 11, in contrast to a claim under § 10(b).   *Id.*

at 639; *In re Enron*, 235 F. Supp. 2d at 596.   Section 12(a)(2) permits the purchaser of a security to bring a private action against a seller who "offers or sells a security . . .  by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . .  not misleading." 15 U.S.C. § 77l(a)(2).   It imposes liability without "proof of either fraud or reliance". *Gustafson v. Alloyd Co.*, 513 U.S. 561, 582 (1995).

Only a few courts have discussed, no less actually applied an implied cause of action under § 10(b) against underwriters, usually based on the underwriters' duty to make a reasonable investigation of the issuer and disclose essential facts about the offering because investors rely on the underwriter's reputation, integrity, independence and expertise to judge the value of an issuer and its securities.  *See, e.g., In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 662-63 (S.D.N.Y. 2004); *Sanders v. John Nuveen & Co.*, 524 F.2d 1064, 1070 (7th Cir. 1975).

Moreover, this opinion has discussed *supra* the clear trend in the Supreme Court in *Central Bank* and *Stoneridge, inter alia*, buttressed by public policy explanations, to narrow the scope of judicially implied causes of private securities actions under § 10(b) and Rule 10b-5, in particular where  the statute or regulation does not contain such language and/or Congress has not indicated such was its intent.  This Court is convinced that the Supreme Court would not embrace a *per se* rule of expansive

liability, owed to all investors by underwriters based on their general duty to investigate and disclose.  Even if it did, both *Central Bank* and *Stoneridge* have emphasized that the required element of reliance, which requires public disclosure of violative conduct, under § 10(b), would still have to be, and has not been, met by Lead Plaintiff here.

### 6.  Web of Market-Related Activities

Lead Plaintiff's additional market-related activities do not cure the fatal deficiencies of a lack of duty to disclose or, in its absence, a failure to demonstrate that investors relied on those activities and causation in fact.

### C.  "Revised" Theory and Amendment

In light of Lead Plaintiff's modified theory of liability, revised as a response to *Stoneridge* and *Regents*, the Court agrees with the Financial Institution Defendants that at this juncture Lead Plaintiff is required to amend its pleadings to pursue such a theory and, since Financial Institution Defendants are opposed, must seek leave of Court to do so.

Under the lenient standard of Federal Rule of Civil Procedure 15(a)(2), once a responsive pleading has been timely served, as is the case here, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires."

Under Federal Rule of Civil Procedure 16(b)(4)'s more restrictive standard, once a scheduling order, which would include a deadline for amending pleadings, has been entered, the scheduling order "may be modified only for good cause and with the

judge's consent."  "Rule 16 governs amendment of pleadings after a scheduling order deadline has expired.  Only upon the movant's demonstration of good cause will the more liberal standard of Rule 15(a) apply to the district court's decision to grant or deny leave."  *S&W Enterprises, LLC v. SouthTrust Bank of Ala., N.A.*, 315 F.3d 533, 536 (5th Cir. 2003); *see also Southwestern Bell Telephone Co. v. City of El* Paso, 346 F.3d 541, 546 (5th Cir. 2003); *Hawthorne Land Co. v. Occidental Chemical Corp.*, 431 F.3d 221, 227 (5th Cir. 2005), *cert. denied*, 549 U.S. 811 (2006).  "Good cause" requires the "'party seeking relief to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension.'"  *S&W*, 315 F.3d at 536, *citing* 6A Charles Alan Wright, et al., *Federal Practice and Procedure* § 1522.1 (2d ed. 1990).  To determine whether good cause exists, the district court has broad discretion, but should consider four factors: (1) the explanation for the plaintiff's failure to move timely for leave to amend; (2) the importance of the amendment; (3) possible prejudice if amendment is allowed; and (4) the availability of a continuance to cure such prejudice.  *Id.*; *Southwestern Bell*, 346 F.3d at 546.

Thus under Rule 16, Lead Plaintiff must demonstrate that it could not have met the deadline in the controlling scheduling order for amending its complaint to assert an alternative theory despite its diligence.  The Court finds that the Regents has failed to do so; instead it deliberately chose to pursue a broad, innovative, and risky theory of scheme liability, which tactically might result in liability of a far broader group of deep pocket

defendants, but it also decided not to protect itself by simultaneously arguing in the alternative a more traditional and recognized theory.  Now it seeks to amend because its theory in large part was rejected by *Stoneridge* and *Regents*.  If this Court were to allow amendment at this stage, it would involve reopening discovery in this massive multidistrict litigation, not to mention the extended litigation likely to follow; the prejudice to many parties would be great.  It is unwilling to do so.

Nevertheless, if on appeal, the Fifth Circuit should decide that good cause exists for seeking relief from the controlling scheduling order because Lead Plaintiff reasonably relied on the SEC's test and this and other courts' recognition of scheme liability under § 10(b) and Rule 10b-5(a) and (c), this Court applies the standard for permitting amendment under Rule 15(a).

If good cause is found by the court to satisfy Rule 16, the court then looks to the standard of Federal Rule of Civil Procedure 15(a), which states that "the court should freely give leave when justice so requires."  *Id.*[58]  Nevertheless, even under

---

[58] Although a court's denial of a motion for leave to amend is reviewed under an abuse of discretion standard, "the term 'discretion' in this context may be misleading because Federal Rule of Civil Procedure 15(a) evinces a bias in favor of granting leave to amend."  *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 597 (1981).  "As a result, absent a 'substantial reason' such as undue delay, bad faith, dilatory motive, repeated failures to cure deficiencies, or undue prejudice to the opposing party, 'the discretion of the district court is not broad enough to permit denial.'  Stated differently, district courts must entertain a presumption in favor of granting parties leave to amend."  *Mayeaux v. Louisiana Health Service and Indemnity Co.*, 376 F.3d 420, 425 (5th Cir. 2004)(citations omitted).  *See also Dussouy*, 660 F.2d. at 598 ("The policy of the federal rules is to permit liberal

Rule 15(a) leave still may be denied where the court finds "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Delay in this now more-than-seven-year-old action is of concern with regard to amendment here.  "'A litigant's failure to assert a claim as soon as he could have is properly a factor to be considered in deciding whether to grant leave to amend.  Merely because a claim was not presented as promptly as possible, however, does not vest the district court with authority to punish the litigant.'" *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 864 (5th Cir. 2003), *quoting Carson v. Polley*, 689 F.2d 562, 584 (5th Cir. 1982).  Moreover, "delay alone is an insufficient basis for denial of leave to amend:  The delay must be *undue*, i.e., it must prejudice the nonmoving party or imposes unwarranted burdens on the court." *Mayeaux*, 376 F.3d at 427.  Indeed, in *Dussouy*, the motion for leave to amend came after the plaintiff's voluntary dismissal of the defendant at the pretrial conference one week before the trial date"; the Fifth Circuit stated, "[M]ere passage of time need not result in refusal of leave to amend; on the contrary, it is only undue delay that forecloses amendment.

_____

amendment to facilitate determination of claims on the merits and to prevent litigation from becoming a technical exercise in the fine points of pleading.  Thus, unless there is a 'substantial reason' to deny leave to amend, the discretion of the district court is not broad enough to permit denial."[citations omitted]).

Amendment can be appropriate as late as trial or even after trial." 660 F.2d at 598.

Nevertheless where the plaintiff "was aware of the facts alleged in the proposed amendment from the beginning," the court may infer "that the plaintiff was engaging in tactical maneuvers to force the court to consider various theories seriatim. In such a case, where the movant first presents a theory difficult to establish but favorable and, only after that fails, a less favorable theory, denial of leave to amend on the grounds of bad faith may be appropriate." *Id.* at 559 (finding Dussouy was not aware of facts necessary to his claim and reasonably believed that the theory was unnecessary to the case, so denial of leave to amend was an abuse of discretion).

Lead Plaintiff has asserted its revised theory shortly after the issuance of *Stoneridge*, six years after the *Newby* action was initiated, far outside the controlling scheduling order in the coordinated and consolidated *Newby* actions, and therefore long past the deadline for amendment of pleadings. Fact discovery in the *Newby* coordinated and consolidated cases, out of necessity, was carefully controlled to avoid threatened redundancy and excess in so large an MDL case, and it closed Nov. 30, 2005. After numerous extensions, expert discovery closed on December 15, 2006. This Court's class certification ruling was issued in the summer of 2006, but the Fifth Circuit's reversal in *Regents* was not entered until March 19, 2007, less than a month before the trial setting on April 16, 2007. Moreover, the pending motions for summary judgment, filed on June 26, 2006, have been fully briefed

and have been supplemented after the key rulings in *Regents* and *Stoneridge*. As noted, allowing new factual allegations to be pleaded would prejudice Financial Institution Defendants as well as other parties and innumerable witnesses, because it would necessitate a new pretrial scheduling order, reopening of discovery, and new motions; in sum, it would significantly delay the already extended action and add to its costs in time and money.

Lead Plaintiff had knowledge of the facts and could initially have pled its theory in the alternative, had it chosen to do so. Instead it deliberately made a strategic decision to pursue its novel scheme liability theory, with alleged violations of § 10(b) based primarily on omissions, i.e., the concealed actions of the Financial Institutions, apparently to reach defendants that had not made statements. It was well aware that the theory was new, controversial, and risky. Lead Plaintiff was accorded several opportunities to amend its complaint in the course of the litigation, but in these amended pleadings it has never articulated its revised theory and failed to cure what have now been established as the deficiencies of its original theory. Instead, it shifts responsibility to this Court: "Because this Court adopted the Regents' view that the Banks could face liability solely for their participation in the Transactions, ***The Regents had no need to focus on alternative arguments*** based on the additional evidence it had gathered on the Banks. Also, because this Court concluded that the Banks had a 'duty not to engage in a fraudulent 'scheme' or 'course of conduct''" . . . ,

- 100 -

which permitted application of the *Affiliated Ute* presumption of reliance, the Regents never put forward an alternative argument as to why the Banks had an independent duty to Enron shareholders to disclose their knowledge of the fraud." #5939 at 6.  It also insists it justifiably relied upon the SEC's test, which this Court embraced, and on the holdings of other courts, including *Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1050 (9th Cir. 2006), *cert. granted, vacated, remanded*, 128 S. Ct. 1119 (2008), *vacated and remanded*, 519 F.3d 1041 (9th Cir. 2008), and *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 504 (S.D.N.Y. 2005). #5939 at 4.  Lead Plaintiff explains its current attempt to revise its theory as a response to the recent rulings in *Stoneridge* and *Regents,* as well as based on "long-established legal principles," *id.* at 1, not from the discovery of new facts or information.  The Fifth Circuit, however, had declared that where plaintiffs "deliberately chose to delay amending their complaint, . . . . a 'busy court need not allow itself to be imposed upon by the presentation of theories seriatim.'"  *Azurix*, 332 F.3d at 865, *quoting Freeman v. Continental Gin Co.*, 381 F.2d 459, 469 (5th Cir. 1967)(finding court did not abuse its discretion in denying leave to amend).

          A proposed amendment would be futile if it "would fail to state a claim upon which relief could be granted," in other words, fail to survive a Rule 12(b)(6) challenge.  *Stripling v. Jordan Prod. Co.*, 234  F.3d 863, 873 (5th Cir. 2000).  Permitting amendment here would be futile because, as held by the Fifth Circuit, Lead Plaintiff has not and cannot state a claim under §

10(b) and Rule 10b-5 against the Financial Institution Defendants because it cannot show they had a duty to disclose owed to Plaintiffs or the public at large, entitling Plaintiffs to a presumption of reliance under *Affiliated Ute* and/or that the Banks' alleged omissions were communicated to the market and known to investors for a fraud-on-the-market presumption of reliance for reasons previously explained.  This Court has already concluded that the mandate rule precludes relitigation of the duty to disclose issue.

### Order

Accordingly, the Court

ORDERS that the Financial Institution Defendants' motions for summary judgment (#4816, 4817, and 4824) are GRANTED.

**SIGNED** at Houston, Texas, this 5th day of March, 2009.


MELINDA HARMON
UNITED STATES DISTRICT JUDGE