United States District Court
Southern District of Texas
**ENTERED**
August 02, 2016
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re ENRON CORPORATION SECURITIES, DERIVATIVE & "ERISA" LITIGATION, | § § § | MDL 1446 |

| | | |
|---|---|---|
| MARK NEWBY, ET AL., | § § | |
| Plaintiffs | § § | |
| VS. | § § | CIVIL ACTION NO. H-01-3624 AND CONSOLIDATED CASES |
| ENRON CORPORATION, ET AL., | § § | |
| Defendants | § | |

| | | |
|---|---|---|
| SAMUEL GIANCARLO, Individually and on Behalf of All Others Similarly Situated, | § § § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. H-03-4359 COORDINATED CASE |
| UBS FINANCIAL SERVICES, INC., UBS SECURITIES, L.L.C., and and UBS AG, | § § § § | |
| Defendants. | § | |

## OPINION AND ORDER OF DISMISSAL

Pending before the Court in the above referenced putative

class action,[1] alleging violations of Section 20A of the Securities

---

[1] The First Amended Class Action Complaint (#81 at ¶¶ 11-12) identifies Samuel Giancarlo ("Giancarlo") and Carlos Alsina, M.D. ("Alsina"), as class representatives seeking to represent three putative classes: "(1) all persons and/or entities who purchased and/or acquired Enron Corp. ("Enron") notes, debt or other debt instruments through [UBS Financial Services Inc. f/k/a PaineWebber] during the Class Period [November 5, 2000--December 2, 2001; (2) all persons and/or entities who purchased and/or acquired Enron Zero Coupon Convertible Senior Notes due 2021 (Registration No. 333-62168) through [PaineWebber] during the Class Period; and (3) all persons and/or entities who purchased and/or acquired UBS owned Enron Debt during the Class Period." Each of the two named Plaintiffs acquired these securities "in reliance on the

Exchange Act of 1934 (a/k/a "the 1934 Act"),[2] as amended, 15 U.S.C.

§§ 78j(b)[3] and 78(t),[4] *et seq.*,[5] and the Private Securities

_____

information provided to him, and UBS PaineWebber, Inc.'s non-disclosure of information, and without knowledge of the facts underlying the federal securities fraud claims asserted herein." Additionally, both acquired [their] securities "without any knowledge of the false statements contained in the referenced registration statements and/or prospectuses." *Id.* at ¶¶ 5 and 6.

[2] To state a claim under § 10(b) of the 1934 Act and Rule 10b-5, 17 C.F.R. § 240.10b-5, the plaintiff must plead in connection with the purchase or sale of securities, "'(1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately caused [the plaintiff's] injury.'" *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 406 (5th Cir. 2001), *quoting Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994). An omission is material for purposes of federal securities law if there is a "substantial likelihood that the disclosure of omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)("adopt[ing] *TSC Industries* standard of materiality for the § 10(b) and Rule 10b-5 context").

[3] Section 78j(b), addressing manipulative and deceptive devices, provides, "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

For purposes of § 10(b), during the legislative history of the Securities Exchange Act it appears that Congress sought to reach two forms of wrongdoing, manipulative and deceptive conduct, neither of which is defined in the statute. James C. Dugan and Todd G. Cosenza, *The Future of Secondary Actor Liability Under Rule 10b-5 After Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 5 NYU J. of Law & Bus. 793, 796 (Summer 2009).

---

"'[M]anipulative . . . refers generally to practices such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.'" *Id.*, *quoting Santa Fe Indust., Inc. v. Green*, 430 U.S. 462, 476 (1977). *See also* H.R. Rep. No. 1383, 73-1383, at 15 (1934)(manipulative trading schemes such as wash sales or matched orders that were "designed to create a misleading appearance of activity with a view to enticing the unwary into the market"). "Deceptive" conduct involves "'[f]alse and misleading statements designed to induce investors to buy when they should sell and to sell when they should buy.'" *Id.*, *citing* H.R. Rep. No. 73-1383, at 10 (1934).

[4] Under Section 20A, 15 U.S.C. § 78t-1(a), insider trading can constitute a derivative violation of the 1934 Act:

> Any person who violates any provision of this chapter or the rules and regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

For greater detail see ¶¶ 228-31. To plead a § 20A cause of action, the plaintiff must (1) allege a requisite independent, predicate violation of the Exchange Act or its rules and regulations, e.g., § 10(b), and (2) show that he has standing to sue under § 20A because he "contemporaneously with the purchase of sale of securities that is the subject of such violation has purchased . . . or sold . . . securities of the same class" as the insider defendant. 15 U.S.C. § 78t-1(a). Arising "from a recognition that '[s]ince identifying the party in actual privity with the insider is virtually impossible in trades occurring on an anonymous public market, the contemporaneous standard was developed as a more feasible avenue by which to sue insiders.'" *In re MicroStrategy, Inc.*, 115 F. Supp. 2d 620, 662 (E.D. Va. 2000)("Thus, by requiring a showing of contemporaneity in the trades by the insider and the suing investor, Section 20A seeks to ensure that, where contractual privity would otherwise be impractical if not impossible to show, there nonetheless was a sufficiently close temporal relationship between the trades that

Litigation Reform Act ("PSLRA"), 15 U.S.C. §§ 78(u)(4) and 78(a), *et seq.*, is Defendants UBS Financial Services, Inc.,[6] UBS Securities LLC ("Warburg"),[7] and UBS AG's[8] (collectively, "the UBS Defendants'" or "UBS's") motion to dismiss (instrument #84) the First Amended Class Action Complaint (#81). Also pending are Lead Plaintiffs' motion for class certification (#124) and Plaintiffs' opposed joint motion for amended scheduling order, for additional briefing, and for a ruling (instrument #173).

---

the investor's interests were implicated by trades made by the insider while in possession of material, nonpublic information.").
    Plaintiffs' Complaint, ¶ 25, alleges,

> Additionally, Plaintiffs bring claims against UBS pursuant to § 20A of the Securities Act of 1934 as a result of UBS's sale of Enron debt securities, contemporaneous with Plaintiffs' purchase of such securities, while UBS was in possession of material, non-public information regarding Enron.

[5] Specifically §§ 10(b), 10(b)(5), 20, and 20A.

[6] f/k/a UBS Paine Webber, Inc. ("PW"). #81, p. 2, ¶7. PW is a Delaware corporation authorized to do business in Texas and is a subsidiary of Swiss banking conglomerate UBS AG. *Id.*

[7] f/k/a UBS Warburg, LLC ("Warburg"). #81, p.2. ¶8. Warburg is a Delaware limited liability company authorized to do business in Texas and a subsidiary of Swiss banking conglomerate UBS AG. *Id.*

[8] UBS AG is a foreign corporation registered in Connecticut and authorized to do business in Texas. #81, p. 2, ¶ 9.
    UBS, one of the largest banks in the world, "is an integrated bank offering traditional commercial loans, investment banking opportunities and retail brokerage services." #81 at ¶ 26.
    Warburg and PW are wholly owned subsidiaries of UBS AG. Warburg and PW are separate legal entities with no ownership interests in each other.

Plaintiffs Giancarlo and Alsina, two Paine Webber (sometimes referred to as "PW") retail-brokerage customers, in this suit against the UBS Defendants, have elected to proceed independently of the consolidated amended complaints in the *Newby* and *Tittle* actions. #79.

## I.  Standards of Review

### A.  Rule 12(b)(6)

When a district court reviews a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), it must construe the complaint in favor of the plaintiff and take all well-pleaded facts as true. *Randall D. Wolcott, MD, PA v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011), *citing Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009).  The plaintiff's legal conclusions are not entitled to the same assumption. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."), *citing Bell Atlantic Corp. v. Twombly*, 556 U.S. 662, 678 (2007); *Hinojosa v. U.S. Bureau of Prisons*, 506 Fed. Appx. 280, 283 (5th Cir. Jan. 7, 2012).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007)(citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965, *citing* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1216, pp. 235-236 (3d ed. 2004)("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"). "*Twombly* jettisoned the minimum notice pleading requirement of *Conley v. Gibson*, 355 U.S. 41 . . . (1957)["a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"], and instead required that a complaint allege enough facts to state a claim that is plausible on its face." *St. Germain v. Howard*, 556 F.3d 261, 263 n.2 (5th Cir. 2009), *citing In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)("To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"), *citing Twombly*, 127 S. Ct. at 1974). "'A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Montoya v. FedEx Ground Package System, Inc.*, 614 F.3d 145, 148 (5th Cir. 2010), *quoting Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009).   The plausibility standard is not akin to a "probability requirement," but asks for more than a "possibility that a defendant has acted unlawfully." *Twombly*, 550 U.S. at 556.  Dismissal is appropriate when the plaintiff fails to allege "'enough facts to state a claim to relief that is plausible on its face'" and therefore fails to "'raise a right to relief above the speculative level.'" *Montoya*, 614 F.3d at 148, *quoting Twombly*, 550 U.S. at 555, 570.   "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" under Rule 12(b).  *Iqbal*, 129 S. Ct. at 1949.

Dismissal under Rule 12(b)(6) is proper not only where the plaintiff fails to plead sufficient facts to support a cognizable legal theory, but also where the plaintiff fails to allege a cognizable legal theory. *Kjellvander v. Citicorp*, 156 F.R.D. 138, 140 (S.D. Tex. 1994), *citing Garrett v. Commonwealth Mortgage Corp.*, 938 F.2d 591, 594 (5th Cir. 1991); *ASARCO LLC v. Americas Min. Corp.*, 832 B.R. 49, 57 (S.D. Tex. 2007).  "A complaint lacks an 'arguable basis in law' if it is based on an indisputedly meritless legal theory' or a violation of a legal interest that does not exist." *Ross v. State of Texas*, Civ. A. No. H-10-2008, 2011 WL 5978029, at *8 (S.D. Tex. Nov. 29, 2011).

As noted, on a Rule 12(b)(6) review, although generally the court may not look beyond the pleadings, the court may examine  the

complaint, documents attached to the complaint, and documents attached to the motion to dismiss to which the complaint refers and which are central to the plaintiff's claim(s), as well as matters of public record. *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,* 594 F.3d 383, 387 (5th Cir. 2010), *citing Collins*, 224 F.3d at 498-99; *Cinel v. Connick*, 15 F.3d 1338, 1341, 1343 n.6 (5th Cir. 1994). *See also United States ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 379 (5th Cir. 2003)("the court may consider . . . matters of which judicial notice may be taken"). Taking judicial notice of public records directly relevant to the issue in dispute is proper on a Rule 12(b)(6) review and does not transform the motion into one for summary judgment. *Funk v. Stryker Corp.*, 631 F.3d 777, 780 (5th Cir. 2011). "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

**B.  Rule 9(b)**

Federal Rule of Civil Procedure 9(b) provides,

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person must be averred generally.

"In every case based upon fraud, Rule 9(b) requires the plaintiff to allege as to each individual defendant 'the nature of the fraud, some details, a brief sketch of how the fraudulent scheme operated, when and where it occurred, and the participants." *Hernandez v. Ciba-Geigy Corp. USA*, 200 F.R.D. 285, 291 (S.D. Tex. 2001). In a securities fraud suit, the plaintiff must plead with particularity the circumstances constituting the alleged fraud: Rule 9(b) requires the plaintiff to "'specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.'" *Southland Securities Corp. v. INspire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004), *quoting Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177-78 (5th Cir. 1997), *cert. denied*, 522 U.S. 966 (1997). "'In cases concerning fraudulent misrepresentation and omission of facts, Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading.'" *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006), *quoting United States ex. rel. Riley v. St. Luke's Hosp.*, 355 F.3d 370, 381 (5th Cir. 2004).

Unlike the alleged fraud, Rule 9(b) allows a plaintiff to plead intent to deceive or defraud generally. Nevertheless a mere conclusory statement that the defendant had the required intent is

insufficient; the plaintiff must set forth specific facts that raise an inference of fraudulent intent, for example, facts that show the defendant's motive. *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)("Although scienter may be averred generally, case law amply demonstrates that pleading scienter requires more than a simple allegation that a defendant had fraudulent intent.  To plead scienter adequately, a plaintiff must set forth specific facts that support an inference of fraud."); *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994).

The particularity requirement of Rule 9(b) also governs a conspiracy to commit fraud.  *Southwest Louisiana Healthcare System v. MBIA Ins. Corp.*, No. 05-1299, 2006 WL 1228903, *5 & n.47 (W.D. La. May 6, 2006); *Hernandez v. Ciba-Geigy Corp. USA*, No. Civ. A. B-00-82, 2000 WL 33187524, *4 (S.D. Tex. Oct. 17, 2000)("The weight of Fifth Circuit precedent holds that a civil conspiracy to commit a tort that sounds in fraud must be pleaded with particularity."); *In re Ford Motor Co. Vehicle Paint Litigation*, No. MDL 1063, 1994 WL 426548, *34 (E.D. La. July 30, 1996); and *Castillo v. First City Bancorporation of Texas, Inc.*, 43 F.3d 953, 961 (5th Cir. 1994).

A dismissal for failure to plead with particularity in accordance with Rule 9(b) is treated as a Rule 12(b)(6) dismissal for failure to state a claim.  *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996).

**C.    The  Exchange  Act  and  the  PSLRA's  Heightened  Pleading
Requirements**

The PSLRA "installed both substantive and procedural controls"
that were "[d]esigned to curb perceived abuses of the § 10(b)
private action--nuisance filings, targeting deep-pocket defendants,
vexatious  discover  requests  and  manipulation  by  class  action
lawyers." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S.
208, 320 (2007).    The  PSLRA  heightened  the  particularity
requirements for pleading securities fraud in two ways:  (1) the
plaintiff must "specify each statement alleged to have been
misleading  and  the  reason  or  reasons  why  the  statement  is
misleading . . .," 15 U.S.C. § 78u-4(B)(1)(B); and (2) for "each
act or omission alleged" to be false or misleading, the plaintiff
must "state  with  particularity  facts  giving  rise  to  a  strong
inference that the defendant acted with the required state of
mind," 15 U.S.C. § 78u-4(b)(2).    *Indiana Elec. Workers' Pension
Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir.
2007).  As noted, Rule 9(b) requires the plaintiff in a securities
fraud suit to "'specify the statements contended to be fraudulent,
identify the speaker, state when and where the statements were
made, and explain why the statements were fraudulent.'" *Southland*,
365 F.3d at 362, *quoting Williams v. WMX Technologies, Inc.*, 112
F.3d 175, 177-78 (5th Cir. 1997), *cert. denied*, 522 U.S. 966 (1997).
*See* 15 U.S.C. § 78u-4.  In other words, "'[p]leading fraud with

particularity . . . requires 'time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.'" *Williams*, 112 F.3d at 177 (5th Cir. 1997), *quoting Tuchman*, 14 F.3d at 1068.

"'In cases concerning . . . omission of facts, Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading.'" *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006), *quoting United States ex. rel. Riley v. St. Luke's Hosp.*, 355 F.3d 370, 381 (5th Cir. 2004). To meet the requirement of materiality, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" and would have actually been significant "in the deliberations of the reasonable shareholder." *Basic, Inc.*, 485 U.S. at 231-32; *Southland*, 365 F.3d at 362. *See also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248-49 (5th Cir. 2009)("Once the defendants engaged in public discussion . . ., they had a duty to disclose a 'mix of information that is not misleading."). Thus the standard for misrepresentation in this context is whether the information disclosed, understood as a whole, would mislead a reasonable potential investor. *L.W. Laird v. Integrated Resources,*

- 12 -

*Inc.*, 897 F.2d 826, 832 (5th Cir. 1990).   The Fifth Circuit has "long held under Rule 10b-5, a duty to speak the full truth arises when a defendant undertakes a duty to say anything.   Although such defendant is under no duty to disclose every fact or assumption underlying a prediction, he must disclose material, firm-specific adverse facts that affect the validity or plausibility of that prediction." *Lormand*, 565 F.3d at 249.   "The omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action."   *Id.* at 248 These facts "must be laid out before access to the discovery process is granted." *Williams*, 112 F.3d at 178.

The Fifth Circuit does not permit group pleading of securities fraud suits.   *Owens v. Jastrow*, 789 F.3d 529, 537 (5th Cir. 2015), *citing Southland*, 365 F.3d at 365 ("[T]he PSLRA requires the plaintiffs to distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud. . . . [W]e do not construe allegations contained in the [second amended complaint] against 'defendants' as a group as properly imputable to any particular defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded.").[9]   "Corporate

---

[9] The group pleading or group publishing doctrine permits plaintiffs to presume that statements in prospectuses, registration

- 13 -

officers are *not* liable for acts solely because they are officers or where their day-to-day involvement in the corporation is pleaded." *Financial Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006).  A corporate officer may be liable if plaintiff identifies him and alleges he made materially misleading statements with scienter at a shareholder meeting or he signed documents on which statements were made or which he was involved in creating.  *Id.*  Group pleading, or the group publishing doctrine, fails to satisfy the heightened pleading standards of the PSLRA. *Southland*, 365 F.3d at 363 n.9.

The Fifth Circuit further requires that scienter or the requisite state of mind, which for the PSLRA is "an intent to deceive, manipulate, or defraud," or "'severe recklessness' in which the 'danger of misleading buyers or sellers . . . is either known to the defendant or is so obvious that the defendant must have been aware of it,'"[10] must be pleaded for each act or omission

---

statements, annual reports, press releases, etc. are collectively attributable to persons with direct involvement in the regular business of the company.  *Southland*, 365 F.3d at363 n.9.  In its most expansive form it allows "unattributed corporate statements to be charged to one or more individual defendants based solely on their corporate title.  Under this doctrine, the plaintiff need not allege any facts demonstrating an individual defendant's participation in the particular communication containing the misstatement or omission where the defendants are 'insiders or affiliates' of the company."  *Id.* at 363.

[10] *Quoting Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir. 1981)(*en banc).*

for each defendant in a multiple defendant case sufficiently to
create "a strong inference that the defendant acted with the
required state of mind." *Id.* at 364-65. *See also Owens v.
Jastrow*, 789 F.3d at 536 ("Severe recklessness is limited to those
highly unreasonable omissions or misrepresentations that involve
not merely simple or inexcusable negligence, but an extreme
departure from the standard of ordinary care, and that present a
danger of misleading buyers or sellers which is either known to the
defendant or is so obvious that the defendant must have been aware
of it."), *quoting Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 430
(5th Cir. 2002).   To determine whether a statement made by a
corporation was made with the requisite intent, it is appropriate
to look into the state of mind of the corporate official who made
the statement rather than to the collective knowledge of all of the
corporation's officers and employees acquired in the course of
their employment. *Southland*, 365 F.3d at 366; *Janus Capital Group,
Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011)("[T]he
maker of a statement is the person or entity with ultimate
authority over the statement, including its content and whether and
how to communicate it.").  "A defendant corporation is deemed to
have the requisite scienter for fraud only if the individual
corporate officer making the statement has the requisite level of
scienter, i.e., knows that the statement is false or is at least

- 15 -

deliberately reckless as to its falsity, at the time he or she makes the statement." *Id.* at 366.

"In determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). Furthermore, the inference of scienter ultimately must be "'cogent and compelling,' not merely 'reasonable' or "permissible.'" "Congress required plaintiffs to plead with particularity facts that give rise to a 'strong'--*i.e.*, a powerful or cogent--inference." *Id.   Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2008), *quoting Tellabs, Inc.*, 551 U.S. at 324. "To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 323-24.   But it must be "at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. "[A] tie favors the plaintiff." *Owens v. Jastrow*, 789 F.3d 529, 536 (5th Cir. 2015), *quoting Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009), *citing Tellabs*, 551 U.S. at 324. "The inquiry is whether all of the facts alleged,

- 16 -

taken collectively, give rise to a strong inference of scienter, not whether any individual allegations, scrutinized in isolation, meet that standard." *Lormand*, 565 F.3d at 251, *citing Tellabs*, 551 U.S. at 322-23.  While allegations of motive and opportunity may serve to strengthen the inference of scienter, such allegations alone are insufficient to satisfy the requirement.  *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 208 (5th Cir. 2009); *Owens v. Jastrow*, 789 F.3d at 539.

If the plaintiff fails to satisfy the pleading requirements for scienter, "the district court 'shall,' on defendant's motion to dismiss, 'dismiss the complaint.'"  *Nathenson*, 267 F.3d at 407, citing § 78u-4(b)(3).

Under the PSLRA, 15 U.S.C. § 78u-4(b)(4), a plaintiff must also allege and ultimately prove "the traditional elements of causation and loss," 'that the defendant's misrepresentations (or other fraudulent conduct) proximately caused the plaintiff's economic loss."  *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346 (2005).  The plaintiff must plead economic loss and loss causation, i.e., a causal connection between the material misrepresentation or omission and the loss.  *Id.* at 341-42.  "[A]n inflated purchase price will not itself constitute or proximately cause the relevant loss.  *Id*. at 342.  To establish proximate causation, the plaintiff must prove that when the "relevant truth" about the fraud began to leak out or otherwise make its way into

the marketplace, it caused the price of the stock to depreciate and thereby proximately caused the plaintiff's economic injury. *Lormand*, 565 F.3d at 255 ("[W]e conclude that Rule 8(a)(2) requires the plaintiff to allege, in respect to loss causation, a facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss, including allegations of a material misrepresentation or omission, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the  stock and plaintiff's economic loss."), *citing Dura* at 342, 346.

## II.  Applicable Substantive Law

*A.  The 1934 Act and Rule 10b-5*

Section 10(b) of the Securities Exchange Act states in relevant part,

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of any facility of any national securities exchange . . .
>
> (b) To use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in [S]ection 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

The Securities and Exchange Commission ("SEC") promulgated Rule 10b-5 pursuant to the statute:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) to employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

B. *Primary v. Secondary Violators:  Central Bank, Stoneridge and Janus*

For many years plaintiffs in securities fraud suits brought claims under § 10(b) and Rule 10b-5 against secondary actors,[11] including investment bankers, lawyers and accountants, who participated with primary violators in a scheme to defraud investors.  In the last twenty years, the Supreme Court has greatly limited the reach of a private right of action against secondary actors under Rule 10b-5(a) and (c).  Despite the fact that for

---

[11] Judge Jose A. Cabranes in *Pacific Inv. Management Co., LLC v. Mayer Brown LLP*, 603 F. 3d 144, 148 n.1 (2d Cir. 2010), *cert. denied*, 564 U.S. 1018 (2011), defines "secondary actor" as a term for "lawyers . . . , accountants, or other parties who are not employed by the issuing firm whose securities are the subject of allegations of fraud."  *Id., citing Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 166 (2008)("using the term '[s]econdary actors' to refer to an issuing firm's customers and suppliers"), and *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994).

three decades secondary actors had been found liable under the
federal securities laws as aiders and abettors in lower courts,
given the 1934 Act's silence as to aiding and abetting, the Supreme
Court has concluded, "The section 10(b) implied private right of
action does not extend to aiders and abettors." *Stoneridge*
*Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148,
158 (2008); *see also Central Bank of Denver, N.A. v. First*
*Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177-78 (1994)(for
private parties[12] Section 10(b) "does not itself reach those who aid
and abet" a primary wrongdoer's violation of the securities laws
because while the statute prohibits the making of a material
misstatement or omission or the commission of a manipulative act,
the "proscription does not "include giving aid to a person who
commits a manipulative or deceptive act"; "We cannot amend the
statute to create liability for acts that are not themselves
manipulative or deceptive within the meaning of the statute." 511
U.S. at 177-78.  Instead to impose liability, a plaintiff must
establish that each named defendant committed its own primary
violation of the securities laws to be held liable under § 10(b).
Moreover the Supreme Court concluded that in some circumstances
secondary actors, like lawyers, investment banks, and accountants,

---

[12] The PSLRA added Section 20(e), 15 U.S.C. § 78t(e), to the
1934 Act, affirming the right of the SEC to prosecute aiders and
abettors in enforcement actions.

"who employ[] a manipulative device or make[] a material misstatement (or omission) on which a purchaser or seller of securities relies," can be liable as primary violators if "*all* the requirements for primary liability under Rule 10b-5 are met." *Id.* at 191. *In accord, Stoneridge*, 552 U.S. at 158 (For a secondary actor to be held liable under § 10(b), that person or entity "must satisfy each of the elements or preconditions for [primary] liability.").

The six elements of a private cause of action for a primary violation under § 10(b) are "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge,* 552 U.S. at at 157.

"Where liability is premised on a failure to disclose rather than on a misrepresentation, 'positive proof of reliance[13] is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. . . . This obligation to disclose and the withholding of

---

[13] "[P]roof of reliance ensures that there is a proper 'connection between a defendant's misrepresentation and a plaintiff's injury.'" *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011), *quoting Basic, Inc.*, 485 U.S. 243.

a material fact establish the requisite element of causation in fact.'" *Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 383-84 (5th Cir. 2007)(*quoting Affiliated Ute Citizens of the State of Utah v. U.S.*, 406 U.S. 128, 153-54 (1972)), *cert. denied sub nom. Regents of Univ. of Cal. v. Merrill Lynch, Pierce, Fenner & Smith*, 552 U.S. 1170 (2008). *See also Basic*, *Inc.*, 485 U.S. at 243 ("[W]here a duty to disclose material information had been breached . . . the necessary nexus between the plaintiffs' injury and the defendants' wrongful conduct had been established.").

"When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." *Central Bank*, 511 U.S. at 174, *quoting Chiarella v. U.S.*, 445 U.S. 222, 235 (1980). A duty to disclose arises only from "a fiduciary or other similar relation of trust and confidence between [parties]"; it "does not arise from the mere possession of nonpublic market information." *Chiarella*, 445 U.S. at 228, 235. "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n. 17 (1988). The omission of a material fact by a defendant with a duty to disclose establishes a rebuttable presumption of reliance upon the omission by investors to whom the duty was owed. *Affiliated Ute Citizens of the State of Utah v. U.S.*, 406 U.S. 126, 153-54 (1972). "To invoke the *Affiliated Ute* presumption of reliance on an omission, a plaintiff

must (1) allege a case primarily based on omissions or non-disclosure and (2) demonstrate that the defendant owed him a duty of disclosure." *Regent of Univ. of Cal.*, 482 F.3d at 384. "This presumption is a judicial creature. It responds to the reality that a person cannot rely upon what he is not told." *Smith v. Ayres*, 845 F.2d 1360, 1363 (5ᵗʰ Cir. 1988). "[A]dministrative and judicial interpretations have established that silence in connection with the purchase or sale of securities may operate as a fraud actionable under § 10(b)" when there is "a duty to disclose arising from a relationship of trust and confidence between parties to a transaction." *Chiarella*, 445 U.S. at 230.

"Whether a fiduciary duty exists is a question of law for the court's determination." *Stevenson v. Rochdale Investment Management, Inc.*, No. Civ. A. 3:97CV1544L, 2000 WL 1278479, at *3 (N.D. Tex. Sept. 7, 2000), *citing Fuqua v. Taylor*, 683 S.W. 2d 735, 737 (Tex. App.--Dallas 1984, writ ref'd n.r.e.). Nevertheless the factfinder determines whether the facts give rise to a fiduciary duty. *Id.*

In *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 160 S.W. 2d 509, 512-13 (Tex. 1942), the Texas Supreme Court wrote,

> The term "fiduciary" is derived from the civil law. It is impossible to give a definition of the term that is comprehensive enough to cover all cases. Generally speaking, it applies to any person who occupies a position of peculiar confidence toward another. It refers to integrity and fidelity. It contemplates fair dealing and good faith, rather than legal obligation, as

the basis of the transaction.  The term includes those
informal relations which exist whenever one party trusts
and relies upon another, as well as technical fiduciary
relations.

See also Fisher v. Roper, 727 S.W. 2d 78, 81 (Tex. App.--San

Antonio 1987, writ ref'd n.r.e.):

A fiduciary relationship exists when the parties are
under a duty to act for or give advice for the benefit of
another upon matters within the scope of the relation.
It exists where a special confidence is reposed in
another who in equity and good conscience is bound to act
in good faith and with due regard for the interest of the
one reposing confidence.  A fiduciary relationship
generally arises over a long period of time when parties
have worked together toward a mutual goal.  To establish
a fiduciary relationship, the evidence must show that the
dealings between the parties have continued for such a
period of time that one party is justified in relying on
the other to act in his best interest.  To transform a
mere contract into a fiduciary relationship, the evidence
must show that the dealings between the parties have
continued for such a period of time that one party is
justified in relying on the other to act in his best
interest. [citations omitted].

For example, because of the relationship of trust and

confidence between the shareholders of a corporation and "those

insiders who have obtained confidential information by reason of

their position with that corporation," courts have imposed a duty

to disclose on a corporate insider when the corporate insider

trades on the confidential information ("intended to be available

only for a corporate purpose and not for the personal benefit of

anyone") and makes secret profits. Chiarella, 445 U.S. at 227-28.

"Trading on such [material, nonpublic] information qualifies as a

'deceptive device' under § 10(b) . . . because 'a relationship of

trust and confidence [exists] between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation.'" *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997)*, citing Chiarella*, 445 U.S. at 228.  "That relationship . . . gives rise to a duty to disclose [or to abstain from trading] because of the 'necessity of preventing a corporate insider from . . . tak[ing] unfair advantage of . . . uninformed shareholders.'"  *O'Hagan*, 521 U.S. at 652, *quoting Chiarella*, 445 U.S. at 228-29.  A corporate insider with material information is required to disclose it to the investing public or, if he cannot because he must protect a corporate confidence, or if he chooses not to disclose, he must abstain from trading in or recommending securities concerned while the inside information remains undisclosed.  *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 848 (2d Cir. 1968)(*en banc*)("[A]nyone in possession of material inside information must either disclose it to the investing public, or if he is disabled from disclosing it in order to protect a corporate confidence, or he chooses not to do so, must abstain from trading in or recommending the securities concerned while such inside information remains undisclosed."), *cert. denied sub nom. Kline v. SEC*, 394 U.S. 976 (1969).

    An individual or entity that does not fit within the traditional definition of a corporate insider may become a "temporary insider" if the person "by entering into a special

confidential relationship in the conduct of the business of the enterprise is given access to information solely for corporate purposes." *SEC v. Cuban*, 620 F.3d 551, 554 (5th Cir. 2010), *citing Dirks v. SEC*, 463 U.S. 646, 655 n.13 (1983). The duty to disclose or abstain from trading arises from the corporate insider's duty to his shareholders, and it applies not only "to officers, directors and other permanent insiders of a corporation," but also to "attorneys, accountants, consultants and others who temporarily become fiduciaries of the corporation." *O'Hagan*, 521 U.S. at 228-29, *quoting Dirks v. SEC*, 463 U.S. 646, 655 n.14 (1983).

Violations of Rule 10b-5(a) and (c), which prohibit "employ[ing] any device, scheme or artifice to defraud" or "engag[ing] in any act, practice or course of business which operates . . . as a fraud or deceit upon any person" in connection with the sale of securities, were designated by some courts as scheme liability. In *Stoneridge* (5-3), the Supreme Court addressed the issue, "when, if ever, an injured investor may rely upon § 10(b) to recover from a party that neither makes a public misstatement nor violates a duty to disclose, but does participate in a scheme to violate § 10(b)" and rejected the theory because a plaintiff cannot rely on a defendant's concealed deceptive acts. 552 U.S. at 156, 159-60. Justice Kenney wrote for the majority,

> Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action.  It ensures that, for liability to arise, the

"requisite causal connection between a defendant's misrepresentation and a plaintiff's injury" exists as a predicate for liability. . . . We have found a rebuttable presumption of reliance in two different circumstances. First, if there is an omission of a material fact by one with a duty to disclose, the investor to who the duty was owed need not provide specific proof of reliance. . . . Second, under the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public. The public information is reflected in the market price of the security. Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement. . . .

Neither presumption applies here. Respondents had no duty to disclose; and their deceptive acts were not communicated to the public. No member of the investing public had knowledge, either actual or presumed, of respondents' deceptive acts during the relevant times. Petitioner, as a result, cannot show reliance upon any of respondents' actions except in an indirect chain that we find too remote for liability.

*Id.* at 769.

In *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 137-38, 142, 167 (2011)(5-4), examining what it means to "'make any untrue statement of material fact' in connection with the purchase or sale of securities" under Rule 10b-5 and "mindful that [the Court] must give 'narrow dimensions'" to the implied right of action under § 10(b) since Congress did not authorize it,[14]

---

[14] The majority of the Supreme Court began by construing the word "make" in Rule 10b-5 very narrowly:

One "makes" a statement by stating it. When "make" is paired with a noun expressing the action of a verb, the resulting phrase is "approximately equivalent in sense" to that verb. 6 Oxford English Dictionary 66 (def. 59)(1933)(hereinafter OED) . . . .For instance, "to make a proclamation" is the approximate equivalent of "to proclaim," and "to make a promise" approximates "to

the majority of the Supreme Court attempted to further clarify the distinction between a primary violation and aiding and abetting by holding, "For purposes of Rule 10b-5, the maker of a statement is the person with ultimate authority over the statement, including its content and whether and how to communicate it.   Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right.  One who prepares or publishes a statement on behalf of another is not its maker."[15]   *See also Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2403

---

promise."  See 6 OED 66 (def. 59).  The phrase at issue in Rule 10b-5, "to make any . . . statement." is thus the approximate equivalent of "to state."

In the dissent, Justice Breyer, joined by Justices Ginsburg, Sotomayor, and Kagen, opined,

In my view, . . . the majority has incorrectly interpreted the Rule's word "make."   Neither common English nor this Court's earlier cases limit the scope of that word to those with "ultimate authority" over a statement's content.  To the contrary, both language and case law indicate that, depending upon the circumstances, a management company, a board of trustees, individual company officers, or others, separately or together, might "make" statements contained in a firm's prospectus--even if a board of directors has ultimate content-related responsibility.

*Id.*, 564 U.S. at 149-50.

[15]   The high court compared the relationship between the aider and abettor and the primary violator to that between a speechwriter and a speaker:  "Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it.  And it is the speaker who takes credit--or blame--for what is ultimately said."  *Id.* at 143.

- 28 -

(2014)(Section 10(b) and Rule 10b-5 liability should not be extended "to entirely new categories of defendants who themselves had not made any material public misrepresentation."). Thus *Janus* restricts liability under a § 10(b) private right of action to a person or entity with ultimate authority over a false statement on which an investor relied to his detriment in purchasing or selling a security.

### III.  Stock Broker Standards

At issue in this case is whether PW, in its brokerage relationship with the investors in the Enron Stock Option program, had a fiduciary duty to disclose material information to its investor retail clients.

Firms in the securities market operate in three main capacities: broker, broker-dealer, and investment advisor. Thomas Lee Hazen,, "Are Existing Stock Broker Standards Sufficient?," 2010 Colum. Bus. L. Rev. 710, 730 (2010).

A "broker" is defined in *Black's Law Dictionary* (6th ed. West 1990), as, "An agent employed to make bargains and contracts for compensation.  A dealer in securities issued by others. . . . An agent of a buyer or seller who buys or sells stocks, bonds, commodities, or services, usually on a commission basis." *See also Rauscher Pierce Refsnes, Inc. v. Great Southwest Sav., F.A.*, 923 S.W. 2d 112, 115 (Tex. App.--Houston [14[th] Dist.] 1996)("The relationship between a broker and its customer is that of principal

and agent."). Under the Exchange Act, 15 U.S.C. § 78c(a)(4)(A), a broker is "any person engaged in the business of effecting transactions in securities for the account of others."

A "broker-dealer" is defined as a "securities brokerage firm, usually registered with the S.E.C. and with the state in which it does business, engaging in the business of buying and selling securities to or for customers." *Black's Law Dictionary* (6th ed. West 1990).[16] There is no explicit fiduciary standard applicable to broker-dealers under the Exchange Act,[17] but when they do more than act as order takers for their clients' transactions, they must meet other standards, including of suitability in making investment recommendations to their clients, and they must satisfy the self-

---

[16] Under the Exchange Act a "dealer" is a person who engages in "the business of buying and selling securities . . . for such person's own account," and not as part of a regular business. 15 U.S.C. § 78c(a)(5)(A). The term broker-dealer includes persons who act as brokers, dealers, or both brokers and dealers. Tuch, *Self-Regulation*, 83 Geo. Wash. L. Rev. at 117. In the context of securities offerings, an investment banker plays two roles:  it counsels the corporate issuer and, if it underwrites the offering on a firm-commitment basis, commits to acquiring the issuer's securities, and it sells those securities to investors. *Id.* at 114-15.   Investment banks are correctly designated as broker-dealers, as evidenced by FINRA rules and the SEC's *Guide to Broker-Dealer Registration*. *Id.* at 118.  In particular they qualify as brokers where they advise on security offerings, are involved in the sale or exchange of securities and receive fees for that service, negotiate between the issuer and the investor, and counsel on structuring transactions. *Id.* at 118-20.

[17] Section 913(g) of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, 124 Stat. at 1827-28, gives the SEC rulemaking authority to impose a fiduciary duty on broker-dealers.

regulatory organizations ("SROs"), including national securities exchanges and the Financial Industry Regulatory Authority ("FINRA," the self-regulatory body for broker-dealers)") that oversee them. Thomas Lee Hazen, "Fiduciary Obligations of Securities Brokers," 5 Law Sec. Reg. § 14:133 (March 2016 update).

Thus while a broker owes his investor-client a fiduciary duty, that duty varies in scope with the nature of their relationship, and determining that nature requires a fact-based analysis. *Romano v. Merrill Lynch, Pierce, Fenner & Smith*, 834 F.2d 523, 520 (5th Cir. 1987), *cert. denied*, 487 U.S. 1205 (1988). The nature of the account, whether nondiscretionary or discretionary, is one factor to be considered, as are the degree of trust placed in the broker and the intelligence and qualities of the customer. *Id.* A broker's duty is usually restricted to executing the investor's order when "the investor controls a nondiscretionary account and retains the ability to make investment decisions[18]; however, when investors "lack the time, capacity, or know-how to supervise investment decisions" and "delegate authority to a broker who will make decisions in their best interests without prior approval," in

---

[18]   On the other hand, where the broker's duty simply consists of bringing parties together so they can negotiate a sale by themselves, he is merely a middleman and not necessarily an "agent" of any.  *Rauscher*, 923 S.W. 2d at 115.  The question whether an agency relationship exists is usually a question of fact.  *Coleman v. Klockner & Co.*, 180 S.W. 3d 577, 587 (Tex. App.--Houston [14th Dist.] 2005)

a discretionary account there well may be a duty to disclose.  *Town North Bank, N.A. v. Shay Financial Services, Inc.*, Civ. A. No. 3:11-CV-3125-L, 2014 WL 4851558, at *17 (N.D. Tex. Sept. 30, 2014), *citing Martinez Tapia v. Chase Manhattan Bank, N.A.*, 149 F.3d 404, 412 (5th Cir. 1998),[19] and  *SEC v. Zandford*, 535 U.S. 813, 823 (2002).  Under Texas law,

> In a non-discretionary account, the agency relationship begins when the customer places the order and ends when the broker executes it because the broker's duty in this type of account, unlike those of an investment advisor or those of a manager of a discretionary account, are "only to fulfill the mechanical, ministerial requirements of the purchase or sale of the security . . . ."  As a general proposition, a broker's duty in relation to a nondiscretionary account is complete, and his authority ceases, when the sale or purchase is made and the receipts therefrom accounted for.  Thus, each new order is a new request that the proposed agent consents to act for the principal.  There is no on-going agency relationship as there would be with a financial advisor or manager of a discretionary account.

*Hand v. Dean Witter Reynolds, Inc.*, 889 S.W. 2d 483, 493-94 (Tex. App.--Houston [14th Dist.] 1994, writ denied)(citations omitted).

In a discretionary investment account, in contrast, a broker is a "fiduciary of his customer in a broad sense" and  is required to

---

[19] *Citing Hill v. Bache Halsey Stuart Shields, Inc.*, 790 F.2d 817, 825 (11th Cir. 1996)("fiduciary duty in the context of brokerage relationship is only an added degree of responsibility to carry out pre-existing, agreed-upon tasks properly"); *Limbaugh v. Merrill Lynch Pierce, Fenner & Smith*, 732 F.2d 859, 862 (11th Cir. 1984)("duty owed by the broker was simply to execute the order").

> (1) manage the *account* in a manner directly comporting
> with the needs and objectives of the customer as stated
> in the authorization papers or as apparent from the
> customers' investment and trading history; (2) keep
> informed regarding the changes in the *market* which affect
> his customer's interest and act responsively to protect
> these interests; (3) keep his customer informed as to
> each completed *transaction*; and (4) explain forthrightly
> the practical impact and potential risks of the *course of
> dealing* in which the broker is engaged.

*Anton v. Merrill Lynch*, 36 S.W. 3d 251, 157-58 (Tex. App.--Austin

2001, rev. denied)(citations omitted, emphases added), *quoting Leib

v. Merrill Lynch, Fenner & Smith, Inc.*, 461 F. Supp. 951, 953 (E.D.

Mich. 1978), *aff'd*, 647 F.2d 165 (6th Cir. 1981).[20]

Although there is no statutorily mandated heightened pleading

of fiduciary duty for brokers, Thomas Lee Hazen, a noted scholar in

the field, points out that "there is plenty of authority under the

existing law that recognizes heightened obligations of securities

broker-dealers, at least when they are acting in a capacity beyond

that of mere order taker. . . . The law, regulations, and

regulatory interpretations to date make clear that broker-dealers

have fiduciary or fiduciary-like obligations when they provide

services beyond executing customer orders."  Hazen, "Are Existing

---

[20] Also cited by other courts in the Fifth Circuit, e.g., *In
re Rea*, 245 B.R. 77, 88, 89-90 (N.D. Tex. 2000); *Puckett v.
Rufenacht, Bromagen & Hertz*, Civ. App. No. H88-0035(W), 1989 WL
265340, at *5 (S.D. Miss. May 31, 1989), *aff'd in part by* 903 F.2d
1014 (5th Cir. 1990), *amended by* 919 F.2d 992 (1990), *certified
question* ("*What duty of care under Mississippi law does a
commodities broker owe to commodities customers in a
nondiscretionary account?*") *answered by* 587 So. 2d 273 (Miss.
1991).

- 33 -

Stock Broker Standards Sufficient?," 2010 Colum. Bus. L. Rev. 710, 713-14 (2010).   These legal sources include the Investment Advisers Act of 1940, regarding which the Supreme Court has held that, even though the word "fiduciary" does not appear in the statute, investment advisers are fiduciaries to their clients and must meet the fiduciary duties of care and loyalty, i.e., they must "must fully disclose material facts about prospective investments . . . [and] all conflicts of interests when giving advice." *Id.* at 716, *citing SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 191-92 (1963).   A fundamental purpose common to a number of statutes enacted in the 1930's, including the Investment Advisers Act and the 1934 Act, "was to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry." *SEC v. Capital Gains Research Bureau*, 375 U.S. at 186.

The Investment Advisers Act of 1940, 15 U.S.C. § 80b-2(a)(11), however, defines "investment adviser" in relevant part as follows:

> "Investment adviser" means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities, but does not include . . . (C) any broker or dealer whose performances of such services is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor . . . ."

- 34 -

The Court concludes from the allegations in the complaint and the lack of mention of any special compensation for investment advisor advice that PW does not qualify as an investment advisor under subsection (C).  *See, e.g., Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1039 (4th Cir. 1997)("In this case, it is clear that, to the extent that Epley and Alex. Brown provided 'investment advisory services,' such services were "'solely incidental to the conduct of business as a broker dealer'" and "the Bank was not an 'advisory client' of the defendants."),

Furthermore the Supreme Court has held that private rights of action under the Investment Advisers Act of 1940 are restricted to suits for equitable relief for rescission of investment adviser contracts and restitution under section 215; damages are not available.  *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979).  "'[T]he rescinding party may have restitution of the consideration given under the contract, less any value conferred by the other party.'"  *Douglass v. Beakley*, 900 F. Supp. 2d 736, 745 (N.D. Tex. 2012), *citing Transamerica Mortg. Advisors,* 444 U.S. at 18-24.  The SEC may enforce the Act by obtaining an injunction mandating that a registered investment adviser disclose to his clients any of the adviser's violations of his duties under the Act.  *Capital Gains*, 375 U.S. at 181.[21]

_____

[21] As the Fifth Circuit observed in *Laird v. Integrated Resources, Inc.*, 897 F.2d 826, 833-37 (5th Cir. 1990), "Other

Relevant to the determination whether broker-dealers have fiduciary or fiduciary-like obligations when they provide services beyond executing customer orders are SEC rules, particularly addressing "(a) conflicts between the firm's obligations to its customers and its own financial interests, and (b) trading in or recommending securities in the absence of adequate information about the issuer," made pursuant to the general anti-fraud

---

circuits understand the investment adviser's fiduciary status to require disclosure of any conflicts of interest for the purpose of assessing liability under rule 10(b)-5." *Id.*, *citing and discussing SEC v. Blavin*, 760 F.3d 706, 711-12 (6ᵗʰ Cir. 1985)("As a fiduciary, the standard of care to which an investment adviser must adhere imposes 'an affirmative duty of 'utmost good faith, and full and fair disclosure to all material facts,' as well as an affirmative obligation to 'employ reasonable care to avoid misleading' his clients.")(citing *Capital Gains*), and *Zweig v. Hearst Corp.*, 594 F.2d 1261, 1267-68 (9ᵗʰ Cir. 1979)(addressing section 206(1) and (2)("It shall be unlawful for any investment adviser, by use of the mails and any means or instrumentality of interstate commerce, directly of indirectly (1) to employ any device, scheme, or artifice to defraud any client or prospective client; (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client . . . ."), which tracks the language in Rule 10b-5, of the Investment Advisers Act, as amended 15 U.S.C. § 80b-6(1,2), as analogous to § 10(b) and Rule 10b-5 of the Securities Exchange Act)("The plaintiffs here do not argue that Campbell was an investment adviser as defined in the statute; thus *Capital Gains* is not controlling.  But the failure to bring the case within the Investment Advisers Act does not mean that the claim under Section 10(b) and Rule 10b-5 should fail.  We hold that as applied to the facts we must assume in this case, the Investment Advisers Act was not meant to limit the Securities Exchange Act or Rule 20b-5. Instead, we believe these provisions complement each other and provide different means to curb slightly different types of 'fraud or deceit.' . . . A number of cases since *Capital Gains* suggest *that Rule 10b-5 requires the disclosure of conflicts of interests in situations similar to the facts of this case.")* .

provisions of sections 10(b), 15 U.S.C. § 78j(b), and 15(c), 15
U.S.C. §78o(c), of the 1934 Act, section 17(a) of the Securities
Act of 1933, 15 U.S.C. § 77q(a),[22] and section 206 of the Investment
Advisers Act, described *supra*.  Hazen, "Are Existing Stock Broker
Standards Sufficient?," 2010 Colum. Bus. L. Rev. at 722.

In the late 1930's, Congress amended the Exchange Act to
authorize self-regulatory organizations for broker dealers.  *See,
e.g.,* Andrew F. Tuch, *The Self-Regulation of Investment Bankers*, 83
Geo. Wash. L. Rev. 101, 112 & n.50 (December 2014), *citing*
Securities Exchange Act of 1934, Pub. L. No. 73-291, 48 Stat. 8881
(codified as amended at 15 U.S.C. §§ 78a-78pp (2012)).  Hazen

---

[22] Section 77q(a), addressing "Use of interstate commerce for
purpose of fraud or deceit, states,

It shall be unlawful for any person in the offer or sale
of any securities (including security-based swaps) or any
security-based swap agreement (as defined in section
78c(a)(78) of this title) or by use of any means or
instruments of transportation or communication in
interstate commerce or by use of the mails, directly or
indirectly

(1) to employ any device, scheme, or artifice to
defraud, or

(2) to obtain money or property by means of any
untrue statement of a material fact or any omission
to state a material fact necessary in order to make
the statements made, in light of the circumstances
under which they were made, not misleading; or

(3) to engage in any transaction, practice, or
course of business which operates or would operate
as a fraud or deceit upon the purchaser.

- 37 -

particularly highlights the  SEC and FINRA[23] [formed in 2007 to
replace the National Association of Securities Dealers ("NASD")]
regulations[24] as sources of fiduciary-like duties.  *Id*. at 733-55.
Sections 6(b)(5) and 15A(b)(6) of the Securities Exchange Act

---

[23] The governing complaint, #81 at ¶ 43, states,

43.   The 1934 Act established a self-regulating
scheme  by  means  of  self-regulatory  organizations
("SROs"),  including  the  National  Association  of
Securities Dealers, Inc. ("NASD") and the New York Stock
Exchange  ("NYSE").    The  Securities  and  Exchange
Commission ("SEC"), in turn, supervises these SROs.  The
SROs developed rules of professional conduct to act as
industry  standards,  some  of  which  focus  on  customer
protection and investor rights.  Although the 1934 Act
provides no specific right of action for a violation of
a SRO rule or regulation, nevertheless a breach of such
a rule or regulation implicates a violation fo Section
10(b)/Rule 10b-5.  During the 1934 Act Class Period, as
well as today, SRO rules and regulations governed UBS's
communications and relationship with its retail clients.
By way of example, NASD Rule 2210(d) is one of a number
of NASD and NYSE rules generally requiring its members,
such as UBS, to deal fairly with their customers.  It
mandates that:

All  member  communications  with  the  public
shall be based on principles of fair dealing
and  good  faith  and  should  provide  a  sound
basis  for  evaluating  the  facts  in  regard  to
any particular security or securities or type
of  security,  industry  discussed,  or  service
offered.   No  material  fact  or  qualification
may  be  omitted  if  the  omission,  in  light  of
the  context  of  the  material  presented,  would
cause the communications to be misleading.

[24] For example, Article III, NSAD Rules of Fair Practice, NASD
Manual (CCH) ¶ 2151 provides, "A member, in the conduct of his
business, shall observe high standards of commercial honor and just
and equitable principles of trade."

require stock exchanges and associations of brokers and securities
dealers to establish rules to protect the investing public from
fraudulent and manipulative practices in the securities market.  15
U.S.C. § 78o-3(b)(6).  In response, a number of national exchanges
and SROs have adopted "suitability rules" for brokers.  The NASD
adopted Rule 2310(a), which provides,

> In recommending to a customer the purchase, sale or
> exchange of any security, a member shall have reasonable
> grounds for believing that the recommendation is suitable
> for such customer upon the basis of the facts, if any,
> disclosed by such customer as to his other security
> holdings and as to his financial situation and needs."
> This is the so-called "suitability rule," and its purpose
> is to protect unsophisticated investors of publicly-held
> corporations from the sometimes devious practices of
> unscrupulous securities transactions experts.

The NYSE adopted a similar, "know your customer rule," NYSE Rule
405(a), which requires the officers of member organizations to "use
diligence to learn essential facts relative to every customer,
every order, every cash or margin account accepted or carried by
such organization."  Generally regulatory rules of conduct do not
provide a private right of action for individual investors, but are
for actions brought by the SEC or state regulatory investors.  As
a result, aggrieved individual investors must frame their
securities complaints as claims under § 10(b) of the Exchange Act
and Rule 10b-5.  Steven D. Irwin, Scott A. Lane, and Carolyn W.
Mendelson*, Wasn't My Bother Always Looking Out For My Best
Interests? The Road to Become a Fiduciary*, 12 Duquesne Bus. L. J.

41,44-45 (Winter 2009)("In itself, the regulatory violation does not state an independent claim for economic relief in a civil proceeding for the investor who suffered a loss at the hands of a broker who has made an unsuitable trade recommendation.  Instead, the aggrieved investor must state a valid claim under Rule 10b-5. The plaintiff must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury.").

Hazen comments that regarding violations of NYSE, FINRA or NASD rules, "it is generally held that violation of a rule or a self regulatory organization will not, by itself, support a private right of action.  However, a violation of an exchange or FINRA rule can form the basis of a 10b-5 action, provided of course, that all of the elements of a 10b-5 claim can be established."  "Market Regulation:  Broker-Dealer Regulation; Credit Rating agencies," 5 Law Sec. Reg. § 14:175 (updated March 2016).  The courts are split in a variety of ways over whether a private right of action exists for violations of such rules and regulations.

The Fifth Circuit has deliberately chosen not to decide whether rules for brokers established by national exchanges and SROS, such as the NASD suitability rule or the NYSE "know your customer rule," provide a private cause of action for individual investors, but found they may be used as evidence of industry

standards and practices.  *Miley v. Oppenheimer & Co., Inc.*, 637 F.2d 318, 333 (5th Cir. 1981)(*en banc*)(in a churning case "NYSE and NASD rules are excellent tools against which to assess in part the reasonableness or excessiveness of a broker's handling of an investor's account," the other five factors being the nature and objectives of the account, the turnover rate, in-and-out trading, the holding period of the respective securities, and the broker's profit), *abrogated on other grounds*, 470 U.S. 213 (1985).

The Securities Exchange Act has no express civil remedy for a violation of an exchange or association rule.  In a seminal opinion in *Colonial Realty v. Bache and Co.*, 358 F.2d 178, 181 (2d Cir. 1965), *cert. denied,* 385 U.S. 817 (1966), in which a client sued his broker-dealer for failure to conduct its dealings in accordance with just and equitable principles of trade in violation of NYSE and NASD rules, Judge Henry J. Friendly opined that since a private remedy is not expressly stated in the 1934 Act, the finding of an implied private cause of action should be based on the court's duty to effect Congress's purpose in the statute and the federal policy it has adopted.  A court may find an implied right of action under the Securities Exchange Act where there is explicit condemnation of certain conduct in the statute and when the statute provides a general grant of jurisdiction to enforce liability.  *Id.*  Judge Friendly concluded that there could be no general rule as to when a private claim can be maintained for a violation of NYSE and NASD

rules because "the effect and significance of particular rules may vary with the manner of their adoption and their relationship to provisions and purpose of the statute and SEC regulations thereunder."  An implied action may arise from the protection intended by the legislature and the ineffectiveness of existing administrative and judicial remedies to accomplish.  The court must examine the nature of the specific rule and its role in the regulatory scheme, with the party seeking to impose liability bearing a heavier burden of persuasion than the violation of the statute or of an SEC regulation would require.  *Id.* at 182.  Judge Friendly concluded, "The case for implication of liability would be strongest when the rule imposes an explicit duty unknown to the common law."  *Id*. Judge Friendly found that a private cause of action may exist under section 6 of the 1934 Act, which requires a securities association like the NASD to adopt disciplinary rules. *Id.* 181-83.  He found an implied cause of action where the rule that was violated either constituted a substitute for an SEC regulation and where the rule that was violated established an explicit duty unknown to the common law.  *Id.* at 182.

As indicated in *Miley*, the Fifth Circuit has been hesitant to recognize a private cause of action based only on a violation of a NYSE or NASD rule.  *See also Porter v. Shearson Lehman Bros., Inc.*, 802 F. Supp. 41, 61 (S.D. Tex. 1992), in which the Honorable Ewing Werlein, noting Judge Friendly's opinion, emphasized that the 1934

Act "did not specifically authorize actions for violation of private associations rules," including the "suitability" rule of NASD, which "requires generally that a broker recommend a purchase or sale only after determining that the recommendation is suitable to the customer, and that he use due diligence to learn essential facts regarding the customer. . . . Congress could not have meant that NASD should be given the authority to define new crimes." Observing that district courts within the Fifth Circuit were split about whether an implied cause of action may be based on the NASD or stock exchange rules, Judge Werlein observed that in *Miley* and in *Jolley v. Welch*, 904 F.2d 988, 993 (5th Cir. 1990), *cert. denied*, 498 U.S. 1050 (1981), the Fifth Circuit permitted the NYSE and NASD rules to be considered as one of six factors in determining an element of an excessive trading violation (churning), but not as a private cause of action. *Porter*, 802 F. Supp. at 62-63. *See also Lange v. H. Hentz & Co.*, 418 F. Supp. 1376 (N.D. Tex. 1976)(NASD rules are evidence of the standard of care NASD members should provide and are admissible in determining the question what fiduciary duties are owed by a broker to his investor).

In 1988 Congress passed Section 15(f) of the Exchange Act, 15 U.S.C. § 78o(f),[25] and Section 204A of the Investment Advisers Act,

---

[25] Section 78o(f) provides,

Every registered broker or dealer shall make appropriate rules or regulations about these policies and procedures.

15 U.S.C. § 8ob-4a,[26] which require broker-dealers and investment advisers to establish, maintain, and enforce written policies and procedures reasonably designed to preclude unlawful use of material nonpublic information.

Federal common law has also imposed fiduciary duties in federal securities cases.   For example, because a brokerage relationship is a principal/agent relationship, some courts have found fiduciary duties that generally accompany such a relationship, including that "the broker must act in the customer's best interests and must refrain from self-dealing unless the

---

*See* 17 C.F.R. §§ 230.37, 230.138, 230.139.   Thus an investment bank is required to erect a Chinese wall between its securities analysts' research department and its divisions providing commercial banking, underwriting, or other services to issuers of securities to prevent information from the latter influencing the former.

[26] Section 204A of the Investment Advisers Act, 15 U.S.C. § 8ob-4a ("Prevention of misuse of nonpublic information") provides,

Every investment adviser subject to section 80b-4 of this title shall establish, maintain, and enforce written policies and procedures reasonably designed, taking into consideration the nature of such investment adviser's business, to prevent the misuse in violation of this chapter of the Securities Exchange Act of 1934 [15 U.S.C.A. § 78a et seq.], or the rules and regulations thereunder, of material nonpublic information by such investment adviser.   The Commission, as it deems necessary or appropriate in the public interest or for the protection of investors, shall adopt rules or regulations to require specific policies or procedures reasonably designed to prevent misuse in violation of this chapter or the Securities Exchange Act of 1934 [15 U.S.C.A. § 78a et seq.] (or the rules or regulations thereunder) of material nonpublic information.

customer consents after full disclosure."  Hazen, "Are Existing
Stock Broker Standards Sufficient?," 2010 Colum. Bus. L. Rev. at
736-37 & n.127.     When a broker recommends securities or
transactions, heightened duties have been found to apply that
parallel those under the Investment Advisers Act that arose from
judicial interpretation.  *Id.* at 738.

Under the "shingle theory" of the common law, "by hanging up
a shingle, a broker implicitly represents that he or she will
conduct business in an equitable and professional manner." *Id.* at
749, 738-39.[27]  As an extension of the common law doctrine of
"holding out," it has been long and well established that "a
securities broker occupies a special position of trust and
confidence with regard to his or her customer when making a
recommendation, and that any recommendation of a security carries
with it an implicit representation that the broker has an adequate

---

[27] The complaint, #81 at ¶ 44, asserts,

Federal common law during the 1934 Class Period, and
continuing today, placed a legal duty on UBS not to treat
its retail clients unfairly.   Under the "shingle"
doctrine of broker conduct, when a broker-dealer hangs
out its shingle it implicitly represents that it will
deal fairly with the public and in accordance with the
standards of the profession.   Thus, the 1934 Act, SEC
rules, SRO rules and regulations, as well as federal
common law all required UBS either to notify its retail
clients about the material information known by UBS
relating to Enron securities purchased or acquired in BUS
accounts or if UBS could not disclose this information
for any reason, then to restrict trading and suspend
research coverage of those securities.

basis for the recommendation." *Id.* at 750-51, *citing Hanly v. SEC*, 415 F.2d 589, 506 (2d Cir. 1969).  The "shingle theory" holds that the SEC and self-regulatory rules require broker-dealers to adhere to standards of fair and equitable principles of trade and that breach of the implied representation that a broker will deal fairly with the public [even at arm's length] will be actionable in a private action under the securities laws only if a plaintiff customer can show a causal relationship between the alleged breach and injury to the plaintiff; a breach of fiduciary duty, alone, does not violate federal securities laws.  *Id.* at 750, *citing Charles Hughes & Co. v. SEC*, 139 F.2d 434 (2d Cir. 1943), *cert. denied*, 321 U.S. 786 (1944).  Nevertheless, the Court has been unable to find a single Texas case, no less a case in the Fifth Circuit, that applies the shingle theory, so presumably it has not been adopted in Texas.

"[A]ccountability for the implied representations that may arise out of a fiduciary duty will not violate the securities laws' antifraud provisions in the absence of showing that the defendant acted with the requisite scienter."  Thomas Lee Hazen, "Fiduciary Obligations of Securities Brokers," 5 Law Sec. Reg. § 14:133 (updated March 2016), *citing In the Matter of Michael Flanagan, Ronald Kindschi, and Spectrum Administration, Inc.*, Release No. 160, Release No. ID-160, 71 SEC Docket 1415, 2000 WL 98210, *24 (S.E.C. Release No. 2000).  The SEC also directs attention to the

"basic principle" that by holding itself out as a broker-dealer, "a firm is representing that it will act in the customer's best interests." *Id.* & n.57 (and cases cited therein).

In addition, "[e]ven in the context of federal claims against a broker-dealer, the federal courts may look to state law to determine whether a fiduciary duty existed." Hazen, "Are Existing Stock Broker Standards Sufficient?," 2010 Colum. Bus. L. Rev. at 740, *citing Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999)(finding no fiduciary duty under New York common law for 10b-5 claims relating to mark-ups); *SEC v. Pasternak*, 561 F. Supp. 2d 459, 499 (D.N.J. 2008)("To determine the existence of a fiduciary relationship in federal securities fraud actions, district courts generally look to state law."). Hazen concludes that the "apparent majority of cases applying state common law" found that although "there is no blanket fiduciary relationship between a broker-dealer and a client as a matter of law," certain circumstances "can suffice to create a fiduciary duty," especially when the broker holds itself out as having investment expertise and the customer places faith, confidence, and trust in the broker. *Id.* at 741-46. Even where there is no discretionary account, the degree to which the broker cultivates a degree of trust and confidence in the customer affects the obligations that the broker has to the customer. *Id.* at 748. Among the duties that may be

owed by a broker to a customer in a non-discretionary account[28] are "the duty to recommend a stock only after studying it, sufficiently to become informed as to its nature, price and financial prognosis," "the duty to inform the customer of the risks involved in purchasing or selling a particular security," "the duty to refrain from self-dealing or refusing to disclose any personal interest the broker may have in a particular recommended security," and "the duty not to misrepresent any fact material to the transaction." *Id.* at 748-49, *citing Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 461 F. Supp. 951, 953 (E.D. Mich. 1978)(and cases cited therein).

The Texas Supreme Court has opined that "the term 'fiduciary' is derived from the civil law and contemplates fair dealing and good faith, rather than legal obligation, as the basis of the transaction. Further, that term includes those informal relations which exist whenever one party trusts and relies upon another, as well as technical fiduciary relations." *Texas Bank and Trust Co. v. Moore*, 595 S.W. 2d 502, 507 (1980), *citing Kinzbach Tool, Inc. v. Corbett-Wallace Corp.*, 138 Tex. 565, 160 S.W. 2d 509 (1942). The Supreme Court in *Texas Bank* quoted the Illinois Supreme Court

---

[28] A nondiscretionary account is one in which the customer must approve all transactions before they are effected. *Hand v. Dean Witter Reynolds, Inc.*, 889 S.W. 2d 483, 492 (Tex. App.-Houston [14th Dist.] 1994, writ denied). A discretionary account is one in which the broker makes the investment decisions and manages the account. *Id.*

in *Higgins v. Chicago Title & Trust Co.*, 312 Ill. 11, 18, 143 N.E. 482, 484 (1924),

> A fiduciary relation is not limited to cases of trustee and cestui que trust, guardian and ward, attorney and client, nor other recognized legal relations, but it exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed, and the origin of the confidence is immaterial, and may be moral, social, or domestic or merely personal.

Moreover, "a fiduciary relationship exists when the parties are 'under a duty to act for or give advice for the benefit of another upon matters within the scope of the relation.'  It exists where a special confidence is reposed in another who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence.'" *Id., quoting Lappas v. Barker*, 375 S.W. 2d 248, 251 (Ky. 1964).  "The problem is one of equity and the circumstances out of which a fiduciary relationship will be said to arise are not subject to hard and fast lines." *Id.* at 508.

In Texas, to state a claim for breach of fiduciary duty, the plaintiff must plead "(1) a fiduciary relationship between the plaintiff and defendants; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant." *Billiteri v. Securities America, Inc.*, No. 09-CV-1568-F, 2010 WL 6785484, *9 (N.D. Tex. July 26, 2010), *citing Jones v. Blume*, 196 S.W. 3d 440, 447 (Tex. App.--Dallas 2006, pet. denied).

- 49 -

Texas law recognizes two types of fiduciary duty, a formal relationship arising as a matter of law, and an informal relationship, where there is a close personal relationship of trust and confidence. *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) and *Willis v. Donnelly*, 199 S.W. 3d 262, 277 (Tex. 2006). The latter arises from a "moral, social, domestic, or purely personal relationship of trust and confidence." *Meyer v. Cathey*, 167 S.W. 3d 327, 331 (Tex. 2005); *Thigpen v. Locke*, 363 S.W. 2d 247, 253 (Tex. 1962). "The existence of the fiduciary relationship is to be determined from the actualities of the relationship between the persons involved." Thigpen, 363 S.W. 2d at 253.

Under Texas law the formal relationship between a broker and its customer is one of principal and agent. *Rauscher Pierce Refsnes, Inc. v. Great Southwest Savings, F.A.*, 923 S.W. 2d 112, 115 (Tex. App.--Houston [14[th] Dist.] 1996), *citing Magnum Corp. v. Lehman Bros. Kuhn Loeb, Inc.*, 794 F.2d 198, 200 (5th Cir. 1986)("The relationship between a securities broker and its customer is that of principal and agent. . . . . The law imposes upon the broker a duty to disclose to the customer information that is material and relevant to the order."). The relationship between an agent and a principal is a fiduciary relationship under Texas law. *West v. Touchstone*, 620 S.W. 2d 687, 690 (Tex. App.--Dallas 1981), *citing Restatement (Second) of Agency* § 1 (1958). Nevertheless that

fiduciary relationship is a narrow one, starting with and restricted to the scope of the agency.  *Hand v. Dean Witter Reynolds, Inc.*, 889 S.W. 2d 483, 492 (Tex. App.--Houston [14th Dist.] 1994, writ denied).  "In a non-discretionary account, the agency relationship begins when the customer places the order and ends when the broker executes it, because the broker's duties in this type of account, unlike those of an investment advisor or those of a manager of a discretionary account, are 'only to fulfill the mechanical, ministerial requirements of the purchase or sale of the security or future[s] contracts on the market.  As a general proposition, a broker's duty in relation to a nondiscretionary account is complete and his authority ceases, when the sale or purchase is made and the receipts therefrom accounted for."  *Id.* 493-94, *citing Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 337 F. Supp. 107, 111 (N.D. Ala. 1971), *aff'd*, 453 F.2d 417 (5th Cir. 1972).  In *Rauscher*, 923 S.W. 2d at 115 (citations omitted), the Fourteenth Court of Appeals explains,

> An agent is one who consents to act on behalf of, and subject to, the control of another, the principal, who has manifested consent that the agent shall so act. Agency is a consensual relationship, and the agency or broker/customer relationship does not come into existence until the order has been placed and the broker has consented to execute it. . . . If a broker, under his contract with his principal, is charged with no responsibility and is not obligated to exercise any discretion, but his duty consists of merely bringing the parties together so that between themselves, they may negotiate a sale, and the sale is made in that manner,

the broker is considered a mere "middleman" and is not necessarily the "agent" of either party.

The *Restatement (Third) of Agency* § 1.01 (2006) defines "agency" as follows: "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." An innate duty of good faith and fair dealing, honest performance, and strict accountability is owed by an agent to his principal, and is required in every transaction on behalf of the principal. *Vogt v. Wamock*, 107 S.W. 3d 778, 782 (Tex. App.--El Paso 2003, pet. denied), *citing Sassen v. Tanglegrove Townhouse Condominium Ass'n*, 877 S.W. 2d 489, 492 (Tex. App.--Texarkana 2001, pet. denied). Moreover, under Texas law, to impose an informal fiduciary duty in a business transaction, "the special relationship of trust and confidence must exist *prior to* and *apart from* the agreement that formed the basis of the suit." *Aubrey v. Barlin*, ___F. Supp. 3d __, No. 1:10-CV-00076-DAE, 2016 WL 393551, at *7 (W.D. Tex. Feb. 1, 2016), *citing Meyer v. Cathey*, 167 S.W. 3d 327, 331 (Tex. 1998). "[T]he fact that a business relationship has been cordial and of extended duration is not by itself evidence of a confidential relationship." *Floyd v. CIBC World Market, Inc.*, 426 B.R. 622, 651 (S.D. Tex. 2009), *quoting Lexington Ins. Co. v. North Am. Interpipe, Inc.*, Civ. A. No. H-08-

3589, 2009 WL 1750523, at *3 (S.D. Tex. June 19, 2009). Whether a fiduciary duty exists is a question of law for the court. *Fuqua v. Taylor*, 683 S.W. 2d 735, 737 (Tex. App.--Dallas 1984, writ ref'd n.r.e.). The facts giving rise to a fiduciary duty, however, are to be determined by the fact finder. *Id.* at 737-38. Texas courts do not create a fiduciary relationship lightly. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W. 2d 171, 177 (Tex. 1997); *Meyer*, 167 S.W. 3d at 331.

## IV.  Allegations of Plaintiffs'

## First Amended Class Action Complaint (#81)

The Court refers the parties to the governing complaint for its general summary of UBS's and Enron's background histories. #81 at p. 9, ¶ 33 through p. 23, ¶64.

In light of Enron's rapid and extensive expansion, Enron required substantial cash infusions and considered high credit ratings to be essential for its success and its ability to maintain adequate liquidity. #81 ¶ 55. To reach that goal, in the 1990's Enron began what became a policy of engineering and manipulating its reported financial status by such stratagems as (1) significant, aggressive, and excessive use of off-balance sheet accounting, which is not reflected on the company's audited financial statements nor in the company's published leverage ratios; (2) beyond reasonable business levels, 50% percent or less owned joint ventures to reduce the appearance of balance sheet

leverage; (3) equity swaps and equity forward contracts; and (4) adoption and expansion of mark to market accounting to hide losses, including the loss of billions of dollars by PW's retail customers. In the fall of 2001, Enron made a series of financial disclosures and restatements of its financial statements, ultimately leading to its bankruptcy filing.  The Court has documented these events in numerous other *Newby* orders and refers the parties to them.  Its focus in this action is on the relationship between Plaintiffs and UBS with respect to the 1934 Act.

Plaintiffs' complaint brings fraud claims against UBS based upon "nonrepresentational acts," for "engaging in a scheme or course of conduct violation Section 10(b) of the 1934 Act as implemented through subsections (a) and (c) of Rule 10-b." #81, ¶ 20.  *Stoneridge's* rejection of scheme liability was not issued until two years after Plaintiffs filed the governing complaint in this case.  Nevertheless Plaintiffs also allege that when UBS merged with PW at the beginning of the Class Period and acquired PW's retail brokerage business, through which it then generated profits from  trades in Enron securities by PW's retail clients who constitute the putative class in this action, UBS became a primary violator of Rule 10b-5 as to these investors.  Accordingly, the Court focuses on the complaint's allegations to determine whether Plaintiffs have stated facts that could support a plausible claim of primary liability against UBS Defendants under the 1934 Act.

According to the governing complaint, UBS, one of the biggest banks in the world, is an integrated bank that offers traditional commercial loans, investment banking opportunities, and retail brokerage services. #81, ¶ 26. This integrated status resulted in a situation in which it had conflicting interests.[29]  On December

---

[29]  Hazen, in *Multiservice Brokerage Firms' Information Barriers:  The Chinese Wall or Fire Wall*, Treatise on the Law of Securities Regulation, 5 Law Sec. Reg. § 14:120, observes,

> A typical multiservice firm performs numerous functions. These functions typically include (1) investment banking (including underwriting and rendering advice to corporate issuers); (2) research (which services all of the firm's departments); (3) sales, which includes both retail sales and investment management; and (4) generally firms will have their own trading desk which operates in the over-the-counter markets and also performs arbitrage for their own account. . . . . These varied functions give rise to conflicts of interest as the firm has a duty to guard the confidentiality of any non-public information it received from a corporate client.  A major problem is that while the research department is supplying information to each of the other departments, the research department should be basing its evaluation on independent research, not from confidential information acquired from the firm's other departments.   The antifraud provisions of the security laws require the firm to disclose all material nonpublic information it has or abstain from using it in trading or recommending the security in question.  This "disclose or abstain" rule further obligates firms to refrain from executing or recommending transactions unless justified in light of all information known to the firm.   In response to these conflicting duties, multiservice firms have established internal policies and procedures to restrict the flow of material nonpublic information from the department in which it originates. These procedures are colloquially referred to as "Chinese Walls" or "fire walls.

> The SEC has long recommended the use of Chinese Walls (isolating trading side of firm from investment banking side),

11, 1998, UBS executives (Ken Crews, the North American head of

UBS's corporate finance department, and Jim Hunt, a Managing

---

restricted lists ("prohibit[ing] recommendations to customers relating to, or solicitation of customers' orders to purchase  or sell a particular security, and prohibit[ing] trading for the firm's own account in the security" or preventing "issuance of a research recommendation concerning a security"), and watch lists ("monitor[ing] trading activity to determine whether any leaks in the Chinese Wall have occurred"). *See, e.g.,* 43 S.E.C. 933, Release No. 34,8459 Release No. 8459, 1968 WL 86072 (S.E.C. Release No. 1968); *Slade v. Shearson Hammill & Co.*, 517 F. 2d 398, 403 (2d Cir. 1974); *S.E.C. v. First Boston*, 86 Civ. 3524 (S.D.N.Y. May 5, 1986); *Koppers Company, Inc. v. Am. Express Co.*, 689 F. Supp. 1413, 1416 (W.D. Pa. 1988). *See also* Rule 14e-3 of the Exchange Act, 17 C.F.R. § 240.14e-3 ("the SEC's formalization of the propriety of the information barrier as a way of avoiding liability for misuse of information"), adopted in 1980 to prohibit insider trading by those in possession of material nonpublic information in connection with tender offers. Rule 14e-3(b) "provides a safe  harbor exclusion for firms adopting adequate information barriers if the firm is able to show that (1) the individual making the investment decision had no knowledge of the non-public material information and (2) the firm had implemented 'one or a combination of policies and procedures, reasonable under the circumstances' to ensure that those making investment decisions for the firm do not violate 14e-3."  , *Multiservice Brokerage Firms' Information Barriers*, 5 Law Sec. Reg. § 14.120.  In 1988 Congress passed the Insider Trading and Securities Fraud Enforcement Act, Pub. L. No. 100-704, 102 Stat. 4677 (1988), which *inter alia* amended section 15 of the Exchange Act to mandate that broker-dealers establish a system of internal, written procedures to prevent misuse of nonpublic information by their employees. *Id.*  *See generally also* Marc I. Steinberg and John Fletcher, *Compliance Programs for Insider Trading*, 47 SMU L. Rev. 1783 (July/August 1994).

At the same time, the S.E.C. has warned that if the multiple roles of these multiservice entities were prohibited, '"the capital raising capability of the industry and its ability to serve the public would be significantly weakened.'  As stated in the 1963 Report of the Special Study of the Securities Markets, the total elimination of potential conflicts in the securities industry 'is obviously quite out of the question.'" *Koppers Company*, 689 F. Supp. at 1415-16 (citations omitted)(letter from SEC to district court).

Director in the corporate finance department in UBS's Dallas, Texas Office) met with Enron's Andrew Fastow, with the meeting resulting in UBS's commitment as an investment bank to a relationship with Enron.  #81 ¶ 49.  The complaint, #81 ¶ 50, asserts what was well evidenced in numerous cases consolidated in *Newby,*

> It was well known within the banking industry that Enron rewarded banks, who provided credit capacity, by paying exorbitant amounts of money on investment banking fees. From 1998 forward, the Crews/Hunt team of executives at UBS's investment bank worked tirelessly to expand UBS's credit capacity for Enron so that UBS could participate in capturing a portion of the more than $100 million in non-credit related investment banking dollars Enron paid annually.

As noted above, in 2000 UBS merged with PW and acquired its brokerage business.  The result was that UBS "positioned itself between two classes of clients--its retail brokerage clients and its corporate client [Enron], such that UBS could not fulfill its legal obligations to both Plaintiffs and Enron concurrently."  #81 ¶ 23.

"UBS and Enron's relationship was a mutually self-serving relationship that took precedence over and conflicted with the interests of UBS's retail customers."  #81 ¶ 64.  As Plaintiffs' broker and/or investment advisor, "UBS assumed concrete duties of disclosure as to these retail clients," and its silence regarding its material knowledge about Enron, garnered from its participation with Enron in financing devices to inflate the appearance of Enron's financial status and to conceal the substantial risk that

- 57 -

Enron would be unable to service its debts and would suffer financial collapse, violated § 10(b). Nor did it disclose "the conflicts under which it operated its brokerage business." #81 ¶ 23. PW provided to Enron millions of retail investors to whom UBS could funnel Enron and Enron-related securities, effectively transferring Enron risk to the marketplace." #81 ¶ 64. "Ignorant of this undisclosed information, Plaintiffs acquired and/or held Enron debt securities which were either purchased through their UBS retail brokerage accounts, or which were owned by and sold to them by UBS, during the 1934 Act Class Period." #81 ¶ 24. This course of business operated as "a fraud upon the Plaintiffs and deceived them into believing the price at which they purchased or held their Enron securities was determined by the natural interplay of supply and demand." #81 ¶ 21.

In return, Enron provided PW with a "goldmine" in giving it exclusive administration of the all-Enron-employee stock option program, with the first opportunity to access Enron employee wealth and to generate retail fees and income for PW. More specifically the complaint recites that Rocky Val Emery ("Emery"), originally a financial adviser with PW, in 1993 learned from a client, Bill Roamy, an executive with Enron-owned EOG Resources, that Enron was creating an "all employee" stock option program and putting it out for bids from investment firms for a contract to administer the Stock Option Program, #81 ¶ 65. Seeking to make a lot of money,

Emery put together a plan that impressed Enron, and PW was chosen in 1994 to be the exclusive Administrator of the Enron Employee Stock Option Plan,[30] with Emery given the primary responsibility for overseeing services to Enron and the Enron employees who opened accounts.  Emery's group in PW was known as the Emery Group, which continued to expand and provide services to PW for four years.  In 1998 PW and Enron entered into a written, three-year contract which provided that when an Enron employee chose to exercise his stock options, he had to do so exclusively through PW.  # 81 ¶¶ 45, 67-68.  Once he exercised the stock options, he could either stay with PW or move his business to another firm.  #81 ¶ 66.  To get the retail business, PW did not charge Enron any fee to administer the Employee Stock Option program and thereby insure that it would be PW that would receive a stream of wealth from the arrangement.

---

[30] The complaint, #81 at ¶ 45, emphasizes,

Another fact distinguishing Plaintiffs' claims from every other Enron-related claim is the exclusive relationship between UBS and Enron at the retail brokerage level. When UBS acquired PW, UBS also acquired all of the rights and obligations associated with PW's role as the exclusive administrator of Enron's stock option plans. By letter agreement dated October 19, 1998, PW contracted to assume exclusively the administrative function for Enron's stock option plans in exchange for the exclusive right to be the brokerage firm for all stock option exercises by Enron employees. Through this administrative role, UBS acquired an instant retail brokerage relationship with nearly every employee of Enron and its affiliate companies.

With its goal being to retain wealth generated by Enron employees as they exercised their stock options, with its business model PW was gradually capturing and retaining about 60% of that wealth.[31]  #81 ¶ 70.  The way the arrangement worked, each time an Enron employee received a grant of stock options, PW would send that employee a packet of information regarding that stock grant, the exercise price, vesting dates, tax treatments, and other data about how to exercise those options and a new account form for the employee to apply; in addition it would inform the employee as a lure that PW charged a negligible six cents per share  for them to exercise stock options.  #81 ¶¶ 67-68.  It emphasized to the employee that it provided free services to employees who opened PW accounts, including not only the Resource Management Account itself ($85 per year value), but also free stock option analysis and free financial plans worth hundreds of dollars.  *Id.*  When an employee wanted to exercise his stock options, he could call PW.  If the employee was an insider or had options worth $500,000 or more, he was transferred to Emery; otherwise he was forwarded to one of the brokers in the Emery group on a rotating basis.  When a PW broker answered the call, the broker would immediately offer the employee

---

[31]  The complaint at ¶ 69 states that by 1999 about 45,000-50,000 Enron employees participated in the Employee Stock Option Plans.  Of these, 25% signed up immediately by filling out the forms provided in the introductory packed; 25% opened accounts when they exercised their stock options; and another 25% would slowly flow in over a few months.

a free "financial plan," which would then automatically assign the employee account to that broker, and the employee became an advisory client of UBS under the Investment Advisers Act of 1940. #81 ¶ 71.  One broker described this lucrative flow of money to PW "like shooting fish in a barrel."  #81 ¶ 72.

Furthermore to keep this money flowing, PW made a secret "gentlemen's agreement" with Enron, unknown to PW's clients, that PW financial advisors would not recommend advising their retail customers to sell Enron stock, would advise them to exercise the Enron options, and would say nothing about Enron that might be perceived as negative.  While PW advisors were permitted to advise their clients to diversify, those advisors had to speak with clients in code language, in which they intended "diversify" to mean "sell," in violation of the rules of the National Association of Securities Dealers, Inc. ("NASD").  PW did not reveal that communications between it and its clients were limited nor that there would be no full disclosure.  The communications were intentionally misleading.  Furthermore, whenever a PW client asked his financial advisor about Enron, the financial advisor was required to give the client the managing director of the energy group at UBS  Equity Research Ron Barone's "Strong Buy" rating on Enron's stock, despite the fact that Barone did not intend that

rating to be a "buy" recommendation.[32]   As an example of the deception, Plaintiff Alsina's broker urged him to buy Enron debt even though UBS's debt analyst had issued a "Sell" rating on the notes in question; instead of the "Sell" report, the broker sent Alsina a copy of Barone's "Strong Buy" report.

Because many of the high level executives at Enron had accounts at PW, when a "sudden firestorm of selling Enron stocks began within the ranks of upper level executives at Enron" in mid summer 2000, supported in the complaint by charts showing precise sales by specific, identified executives on pp. 30-32 in #81,[33] PW

---

[32] Barone sent a Note with each rating to the PW brokers to indicate that it was a rating, not a recommendation, and he expected they would read and understand it and discuss with their client whether a stock was appropriate for his account holder, but this information was never revealed to PW clients.   ¶ 76.

[33] Defendants argue that these pages of trades do not demonstrate knowledge by PW of Enron's deteriorating financial condition.   Plaintiffs fail to indicate how many shares of Enron stock each insider retained and whether he sold most of his holdings or retained substantial exposure to Enron.   Moreover allegations of sales of the company's stock by insiders, without more, are insufficient to plead knowledge of the corporation's declining financial state even by those insiders.   *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540 (3d Cir. 1999)("The Third Circuit has held that it "will not infer fraudulent intent from the mere fact that some officers sold stock.").
The Court notes that in *Advanta Corp.*, *id.*, the Third Circuit went on to say "But if the stock sales were unusual in scope or timing, they may support an inference of scienter." *Citing Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1224 (1st Cir. 1996) ("[A]llegations of 'insider trading in suspicious amounts or at suspicious times' may permit an inference that the trader--and by further inference, the company--possessed material nonpublic information at the time.").

- 62 -

knew from these red flags that there was trouble at Enron.  Within thirteen months twenty-one insiders sold more than half a billion dollars in Enron stock and generated hundreds of thousands of dollars in fees for PW, which did not warn its retail clients, but instead focused on keeping them invested in Enron securities. Enron would not permit any adverse comments about its stock.

Plaintiffs describe the experience of various PW employees who disclosed negative information about Enron's financial status and were disciplined for doing so.

Heritage Branch Manager Patrick Mendenhall, Heritage Branch Sales Manager Willie Finnigan, and Rocky Emery warned brokers in the branch on various occasions that if they communicated "any adverse information about Enron to Enron employees, they would be reprimanded, sanctioned, yanked from the Enron account, or even terminated."  #81 ¶ 80.  Whenever someone crossed that line, the brokers were told about the incident and the person was exposed. The brokers were given flat notice, "If you 'piss off' Enron, 'you're done.'"  *Id.*  During the summer of 2000, David Loftus, an employee in management, raised questions about Enron's business decisions to another passenger on a plane and was subsequently criticized for doing so and admonished not to say anything negative about Enron.  In 2001 Craig Ellis, a consultant to help PW's sales force with various investments, at a sales meeting characterized the company as "'cook the books' Enron"; Ken Logsdon, one of Rocky

- 63 -

Emery's right-hand men and an elite member of the Emery Group, told Patrick Mendenhall, who "silenced Ellis." *Id.* ¶ 81.

As an extreme example of Enron's repression of broker communications to clients, the complaint also goes into great detail about a PW broker, Chung Wu ("Wu"), whose client base was largely comprised of Enron employees and former employees who had opened their accounts when exercising their Enron stock options. In 1990 Wu warned one of his clients who was also an Enron employee that a report on Dow Jones news that Enron was considering selling all of its overseas assets might be a negative sign. A few days later Ken Logsdon told Wu not to convey unfavorable information about Enron to Enron employees as such conduct would "displease Enron management." ¶ 79. Watching Enron closely because he believed expectations for its stock were too optimistic, Wu realized that his clients were overly concentrated in Enron stock, and, as a financial advisor under a duty to do due diligence before taking a contrary position on Enron, Wu did his own research on the value of Enron stock. In 2001 Eu corresponded with his clients about Enron's "worsening condition"; all the while, PW was facilitating the higher Enron executives' mass liquidation of their Enron stock. By August 20, 2001 Wu was convinced that Enron's financial state was disastrous and sent out a warning the next day to his investors, urging them to sell their Enron securities. One of the recipients who had an account with Wu was Jeff Donahue

- 64 -

("Donahue"), Enron's Senior Vice President of Corporate Development. Donahue forwarded the email to Kelly Boots, Tim Despain, and Hunt, who sent it on to Barone, and asked to have Wu fired. Other Enron employee/Wu clients also received his email and sent it on to higher managers, some like Mary Joyce ("Joyce"), Senior Vice President of Executive Compensation at Enron, who was one of those executives who had liquidated all of her Enron holdings. Joyce called Mendenhall, who "chewed out" Wu. The correspondence resulted in Wu's immediate termination from PW. PW then worked hard to cover the disclosure up, issued an apologetic retraction letter drafted by UBS's in-house counsel and signed by Mendenhall to those who had been sent the email, and reassured these clients. According to the complaint, not a single recipient of Wu's email followed Wu's advice. PW also purportedly immediately implemented a written policy requiring compliance with the secret "gentlemen's agreement" to prevent another such incident. PW management forbade its financial advisors from giving any advice to their retail clients regarding stock option issuers like Enron after August 21, 2001, and instead ordered them to refer the clients to UBS's current research report and rating on the stock. Not only did Barone's deceptive "Strong Buy" rating remain unchanged until November 28, 2001, when it was merely downgraded to

"Hold,"[34] but even "the Chief Executive Office of UBS's retail brokerage business, the man who was responsible for the corporate gag policy on UBS brokers," like the clients, misinterpreted it to mean he should buy Enron stock. #81 at p. 46, ¶ 112; p. 49, ¶ 115.

UBS, however, allegedly used its extensive information about Enron's financial status, gained in part through its active participation in Enron transactions and financial manipulations[35] in which UBS played significant parts to maximize its Enron-derived income at the expense of and in conflict with the interests of PW's retail customers and to limit its own exposure to Enron. The complaint describes in substantial detail numerous transactions in which UBS's active participation gave it material, nonpublic information about Enron's deteriorating financial condition that Plaintiffs contend UBS had a duty to disclose to its investor clients, who purchased, acquired, and/or held Enron securities through UBS. UBS's involvement with Enron in these Enron transactions, was designed to create a false appearance of Enron's financial position by concealing significant losses as well as to generate income and conceal secret loans to Enron, hidden by off-

---

[34] The complaint points out that by the first week of September UBS had begun its review to downgrade Enron's internal rating and determined by October that such a downgrade would take place.

[35] Including use of and 1999 and 2000 amendments of existing Equity Forward Contracts, the Osprey and Yosemite IV financial structures, and the Enron E-Next Generation loan.

balance sheet and mark to market accounting, in other words, actions in which UBS aided and abetted Enron in its fraud on the investing public generally, now invalidated as primary violations of Exchange Act and Rule 10b-5 by *Central Bank* and *Stoneridge*. Because UBS's participation in these allegedly illegal acts does not constitute a primary violation of the 1934 Act as to Enron, the Court does not summarize them but refers the parties to the complaint's descriptions.

The complaint charges that UBS, as broker, broker-dealer, and/or investment advisor to its retail customers, had a duty to disclose to them this knowledge of Enron's fraud, which it gained from participating in these deals, but that it failed comply with that duty. Section 10(b) prohibits nondisclosure of material information in violation of a duty to disclose as a deceptive act. In failing to disclose material information to its retail clients, UBS therefore committed a primary violation of Rule 10b-5, according to Plaintiffs. Moreover UBS violated tax and accounting principles, industry standards, and its own internal policies of participation in complex or unusual transactions only if it had done its own due diligence, requiring an engagement letter establishing the responsibilities of the parties in the due diligence for the transaction, and taking part onlyif it understood the economic and tax consequences of the transaction.

In the five months starting June 2001, tellingly UBS eliminated almost all of its trading and credit exposure to Enron before Enron filed for bankruptcy on December 2, 2001, as detailed in #181 at pp. 77-83.

When that undisclosed material information was revealed to the public, the price of Enron securities plummeted, causing injury to Plaintiffs. The nondisclosure of material information in violation of a duty to disclose constitutes deception in securities fraud cases. *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 568 n.9 (S.D. Tex. 2002), *citing Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 470 (1977)(defining "deception" in § 10(b) as meaning the making of a material misrepresentation or the nondisclosure of material information in violation of a duty to disclose).

The complaint highlights UBS's purportedly fraudulent claims that its equity research aimed to benefit investing clients with objective, reasonable, and balanced research regarding companies, industries, and countries to determine value and to predict future movement of securities. Moreover it represented that it would not use its Equity Research to advance UBS's interests over those of its clients nor advance its analysts' own interests.

The complaint asserts that UBS's deceptive course of business is partly evidenced by its willingness to permit Ron Barone to continue his recommendations on Enron when UBS knew those positions

were wrong and requiring Barone's "Strong Buy" Research Notes be given to every client who asked questions about Enron's financial condition.  The pleading also complains that UBS "allowed Barone to accept, apparently blindly, Enron's upper management's nonsensical explanations and ignore known hard data.  More importantly, UBS did not manage Barone, took advantage of Barone's contrary rating to mitigate UBS's exposure to Enron, and used Barone to serve Enron, UBS's 'true' client, by enhancing its investment banking and retail revenues at the complete expense of Plaintiffs, to whom UBS owed concrete regulatory duties of disclosure."   #181 at ¶ 208. Moreover, UBS hired and paid Barone, purportedly in 1999 "a $200,000.00 base salary, a guaranteed incentive bonus of at least $1,800,000.00, plus payment in 'customary fashion for investment banking revenue he generated,'" to lure in investing banking business but failed to disclose his activities and payments to the investing public, including Plaintiffs.  #181 ¶ 215.  In October 2000 under a new employment contract with UBS Barone's guaranteed incentive bonus was increased to at least $2,300,000.00, and the next year to at least $3,000,000.00.

In contrast to Barone, who reported on Enron equity and concentrated on movement in stock values, UBS Debt/Credit analyst Stewart Morel reported on Enron bonds and focused on whether a company has the ability to pay its debts by comparing the amount of cash generated relative to the amount of debt outstanding.  #81 ¶¶

219-22.  Morel observed a persistent increase in Enron's debt from
the third quarter of 2000 until Enron's demise.  He was aware of
Osprey and Marlin because they were public bond transactions, and
he worried because Enron's worsening credit and potential loss of
investment grade status could cause an acceleration of these
obligations and increase the amount of short-term money Enron would
require to pay its debt.  Until November 2000, Morel listed Enron
debt as a "Buy"; after that he changed his rating to "Hold"; and in
early 2001 he issued a "Sell" rating on Enron bonds based on his
comparison of the relative strength of 80 companies.   Unlike
Barone's research notes, which were distributed by UBS advisors to
retail  clients  by  UBS's  investment  advisors  providing  them
erroneous  information,  Morel's  report  and  rating  were  not
circulated to retail investors, a violation of UBS's policy to
require a broker's recommendation to a client that is contrary to
the analyst's position be provided to the client.  Focusing on
fraudulent  practices  relating  to  UBS  analysts,  the  complaint
asserts that the manner in which UBS actively employed Barone's
research and concealed Morel's was part of the scheme and artifice
to  deceive  its  retail  clients.   While  touting  its  research  as
objective, sound, fair, and reasonable, UBS did not disclose the
truth  to  its  clients,  i.e.,  that  in  a  scheme  to  assist  UBS
investment  bankers,  UBS  analysts  would  communicate  with  top
management  of  companies  they  covered,  find  investment  banking

opportunities, and alert UBS bankers, who would contact the Equity Research department and pressure it to initiate coverage of companies with which the bankers wanted to do business, and the Equity Research department would "capitulate."  #181 at ¶¶ 210, 223-24.  Analysts in turn were paid significant sums for their roles in investment banking activity.  The complaint states that when an investment bank has negative knowledge that differs from its analysts' recommendations, the bank should stop the analysts' coverage on the stock, suspend the stock's marketing activity and the research coverage, and initiate an investigation.  #181 at ¶ 226.  Instead UBS was hedging its risk by ridding itself of all Enron exposure and securing its future while mandating that its retail clients receive Barone's incorrect information and/or opinions about Enron's financial condition and stock, which supported the market's incorrect perception of the stock's value.

Finally as alleged violations of § 20A, the complaint states that in 2001 UBS, while in possession of all this material nonpublic information about Enron's financial status, bought 800,000 units of Enron Zero Coupon Notes, which UBS claimed to have "accumulated" as a market-maker to fill a "buy" order from Fidelity Investments, but it has not provided any evidence of a sale of the notes to Fidelity.  In addition UBS AG bought 250 million units of the same notes, which it claims it holds as a "custodian" for UBS AG London's prime brokerage clients.  Again, UBS has not submitted

any evidence of the sale or transfer of the notes to UBS AG London. Moreover in July 2001 Enron amended its registration statement and changed the registration, listing Warburg and UBS as the owners, allowing Warburg and UBS AG to sell them on the U.S. market while also making them security holders and underwriters.  The result was that UBS had another duty to disclose to the investing public that would foreseeably be purchasing the registered securities the material nonpublic information that UBS had about Enron.  If it was unable to reveal this information, it had a duty to keep the securities and seek repayment from the issuer, Enron.

### V.   Defendants' Motion to Dismiss (#84)

Aside from the claim of scheme liability, which cannot survive under *Central Bank* and *Stoneridge*, Defendants's motion to dismiss argues that none of the five transactions, through which Plaintiffs claim Defendants injured them by creating "a false public appearance of Enron's financial position" (#81 ¶¶ 51-52), asserts a viable claim under § 10(b).  First (#81, ¶¶ 116-66), Plaintiffs allege that Warburg participated in the following transactions that obscured Enron's reported financial condition:  (1) underwriting a follow-on offering of Osprey notes; (2) underwriting a follow-on offering of "Yosemite IV" credit-linked notes; (3) extending credit to E-Next Generation, LLC; and (4) twice settling existing equity forward contracts by delivering stock to newly created special purpose [vehicles ("SPVs")].  Second (*id.* at ¶¶ 52, 116-17, 167-

87), purportedly based on material, nonpublic information, which was not shared with UBS's retail clients, through trades Warburg lowered its own financial exposure to Enron late in 2001.  Third (*id.* at ¶ 207), Warburg failed to stop UBS research analyst Ron Barone from rating Enron stock a "Strong Buy" even though other Warburg employees purportedly knew facts demonstrating that Barone's opinion was "wrong."  Fourth (*id.* at ¶ 52), PW did not disclose to its customers material nonpublic information that Warburg bankers allegedly knew.  Fifth (*id.* at ¶ 25), PW failed to disclose the conflicts of interest arising from its administration of Enron's employee stock option program.  Thus UBS "failed to disclose knowledge it possessed . . . regarding the manipulation of Enron's public financial appearance, some of which was accomplished through UBS, nor did UBS disclose the conflicts under which it operated its brokerage business."  *Id.* at ¶ 23.  Plaintiffs claim that by failing to disclose to Plaintiffs the material information known to UBS about Enron and by participating in financing devices and schemes to present an inflated picture of Enron's financial status, as well as concealing the risks that Enron would not be able to service its debt and would thus suffer financial collapse, UBS was a significant contributing cause of Enron's foreseeable economic disintegration.[36]

_____

[36] In their memorandum of law in response to UBS's motion, Giancarlo and Alsina state that their claims are based on "UBS's

Furthermore, Defendants assert that Plaintiffs fail to plead the essential element of loss causation as to claims against them, i.e., that allegedly fraudulent brokerage practices at PaineWebber relating to the purchase or sales of Enron stock by PaineWebber's retail brokerage customers, were completely unrelated to Enron's financial-statement fraud and were uncovered only after Enron's stock price had dropped to zero.

Plaintiffs also pursue a claim for insider trading under Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, based on UBS's purported sales of "UBS owned Enron Debt" during the Class Period, while an unnamed UBS employee or entity allegedly had knowledge of material, nonpublic information about Enron. *Id.* at ¶¶ 25, 12. Defendants contend that there is no support for Plaintiffs' allegations that UBS AG and Warburg were "dumping" their holdings in Enron Zero Coupon Notes on PW clients or otherwise fraudulently selling those notes based on material, nonpublic information. The complaint does not identify what specific information about Enron was known to each officer selling his stock, no less demonstrate that the information was material and nonpublic or that the

---

knowledge of Enron's financial manipulations from its extensive interaction, planning and participation with Enron in the five (5) identified fraudulent transactions, as well as its other investment banking activities with Enron, and not on the specific transactions as Securities Act Violations."   #108 at p. 4, citing Complaint (#81) at ¶¶ 20-25, 116-76.

information motivated the trading decisions of any other UBS AG or Warburg employees.

In addition, Defendants maintain that, as in the *Newby* class action, Plaintiffs allege that PW did not disclose to its customer investors that Warburg defrauded them by providing "disguised loans" to Enron and by participating, though less so than in *Newby*, in off-balance-sheet financings.   The Court previously found in *Newby* that similar claims against other banks, including Deutsche Bank and Barclays, merely amounted to aiding and abetting Enron's fraud and thus failed to state a viable primary § 10(b) violation against them.  *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994)(holding that Section 10(b) does not permit a private cause of action for aiding and abetting); *Stoneridge Investment Partners LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 158 (2008)("The § 10(b) implied private right of action does not extend to aiders and abettors. The conduct of a secondary actor must satisfy each of the elements or preconditions [of a primary violation] for liability.").[37]

_____

[37] With respect to the Osprey transaction, Defendants point out that this Court has rejected similar, but much stronger claims against Deutsche Bank in *Newby*, e.g., for underwriting debt issued by the Osprey Trust or Enron, or for structuring Osprey to fund Whitewing while knowing that Enron sold assets to Whitewing at inflated values to falsify Enron's earnings, or for designing Osprey "to transfer billions of dollars of debt off Enron's balance sheet." *In re Enron*, 529 F. Supp. 2d 777 & n. 158; *Newby*, #4735 at 183 & n. 158.  The Court rejected these stronger claims, concluding that the *Newby* Plaintiffs had failed to allege "specific facts

demonstrating that Deutsche Bank established an innately illicit deceptive entity or device." *Id*. Thus Deutsche Bank "was at most merely aiding and abetting any subsequent deceptive use of these entities by Enron, the trustees, and Enron's auditor." *Id*. Unlike Deutsche Bank, Warburg did not "structure" Osprey, but served merely as one of several co-managers in a "follow-on offering of notes." Plaintiffs do not identify any "innately deceptive entities or devices" employed by Warburg in the Osprey offering nor allege they purchased any notes in any Osprey offering as they could not have done so since the Osprey notes were sold in private placements to qualified institutional buyers. *Id.* at 657. As for scienter, or intent to deceive, manipulate or defraud, or severe recklessness, Plaintiffs have simply alleged that two bankers at Warburg knew that Enron needed to complete the transaction for "year end balance sheet purposes," an allegation that does not give rise to a strong inference of scienter. Furthermore the allegations that Warburg engaged in such reckless due diligence that it did not recognize that "Enron used the Osprey structure to generate income by parking overvalued, non-performing assets in the structure" "are too general and clearly lack the kind of specific facts that would support a strong inference of scienter under the PSLRA." *Id.* at 775.

In the same vein, urge Defendants, Plaintiffs (1) fail to plead facts showing that any alleged trades in the Zero Coupon Notes were based on nonpublic information or otherwise intended to defraud investors; (2) they fail to identify any connection between research reports rating Enron stock as a "Strong Buy" and Enron's contemporaneous SEC filing listing UBS AG and Warburg as selling security-holders of these notes other than temporal proximity; and (3) they do not identify any specific nonpublic information possessed by any Warburg or UBS AG employee in August 2001. Plaintiffs' quotation from news clippings about a bond analyst fired from some other financial institution in August 2011 has no relation to the state of mind of anyone at Warburg or UBS AG. Thus they have failed to plead scienter.

Defendants define a "prepay" as "a 'circular' transaction among a bank, a 'conduit' entity, and Enron whereby the bank gave Enron cash up front, which Enron would repay to the 'conduit' entity with interest in the future, which finally would be delivered to the bank. These payments were made pursuant to commodity derivative transactions that did not transfer commodity price risk." #84-1 at p. 18 n. 14, *citing* Lomuscio Decl., Ex. 6 (Third Batson Report App. D) at 51-53. Regarding the Yosemite IV credit-linked notes offering and prepay transaction, this Court dismissed Deutsche Bank from *Newby* even though it underwrote

credit-linked debt associated with Citibank's Yosemite transactions. It also dismissed Barclays, which had executed prepay transactions and which the Court held "are not *per se* illegal and Lead Plaintiff does not specify what about these purportedly made them improper. Alleging that what were 'loans' from Barclays were classified as cash flow from operations by Enron does not state an actionable claim against Barclays. Moreover, the inaccurate accounting of cash flow, debt, etc. that deceived investors is allegedly to have been done by Enron, its officers, and accountants." *In re Enron Corp.*, 439 F. Supp. 2d 692, 722 (S.D. Tex. 2006). In the instant case, Plaintiffs allege that Warburg defrauded them by underwriting credit linked notes in Yosemite IV and by knowing that "Enron used these Yosemite transactions to obtain what in economic substance were loans, despite their public characterization as funds flow from operations." The allegations do not state a primary violation because the inaccurate accounting was allegedly done by Enron, its officers, and its accountants. Nor do such conclusory allegations as that Warburg was aware of the Yosemite IV prepay raise a strong inference of scienter to plead a primary violation of Section 10(b) or Rule 10b-5, insist Defendants. The claims against Warburg bankers Kimberly Blue and Karsten Berlage (Complaint, #81 at ¶ 158) are also vague. Nor does Plaintiffs' contention that if Warburg did not know that the prepay was a disguised loan to Enron, its due diligence must have been severely reckless, raise a strong inference of scienter.

The two equity forward contract "restructurings" in mid 1999 and early 2000 asserted by Plaintiffs occurred before the Class Period and at a time when PW was not affiliated with Warburg or UBS AG. Plaintiffs claim the restructures, which allegedly had all the traditional components of a loan, were "undocumented and undisclosed loans to Enron," designed to "support manufactured hedge transactions between Enron and two related party entities which Enron used improperly to manage its income," while Warburg knew that the undocumented loans were not accounted for as debt and "the manufactured hedge positions were used to preserve [mark-to-market] income by negating the possibility of loss in connection with [the assets hedged by the related parties]." Complaint, #81 at ¶ 122. Defendants insist they were not disguised loans, but modifications of the terms of pre-existing equity forward contracts between Warburg and Enron because Enron's stock had appreciated in value since the contracts were signed in the mid-1990's and UBS owed Enron value in excess of the value Enron owed UBS under the contracts. The restructurings would economically reset Warburg's obligation to Enron to zero and permit an Enron Special Purpose

Entity ("SPE") to accept Enron stock and put in place new equity forward contracts reflecting the market price of Enron stock at that time.   See #84-1 at pp. 23-25 for details of two restructurings.  Even if they had been disguised loans to Enron, argue Defendants, the restructurings simply aided and abetted Enron in concealing its debt and falsely represent its financial state to possible investors.  Defendants insist that no element of the restructurings was innately illicit or deceptive.  If Warburg was involved in designing the LJM, Cayman, and Harrier SPEs, it would not be a primary violator of § 10(b) because it was not the creation of the SPEs that violated the statute, but Enron's use of the SPEs was a primary violation.   The complaint admits that the transfers of Enron stock comprising the restructurings actually took place and the sales were not shams. *Newby*, 4874 at 62.

As for the E-Next Generation LLC Credit facility, allegedly structured to keep the facility off Enron's balance sheet and to provide Enron with a $600 million loan, Defendants claim that Plaintiffs have failed to plead facts showing a primary violation of § 10(b).  Defendants argue that "a bank making a loan to a borrower, even where it knows the borrower will commit securities fraud, is aiding and abetting." *Newby*, #4735 at 181.  "Financings and investments are not sham transactions if there is no suggestion that the transactions were something other than what they purported to be."  *Id*.  The facility was not a sham, as several banks agreed to lend money for legitimate business purposes of obtaining turbines and other equipment and commencing development activity in Phase I and finding locations and constructing a number of gas-fired electric generating plants in Phase II. Complaint at ¶ 162. Any deceptiveness was in Enron and/or its auditors' description of the transactions on Enron's balance sheet.  Moreover there is no showing of scienter because the documents on which Plaintiffs rely demonstrate that UBS expected that the E-Next facility would be properly disclosed.  Richard J.L. Lomuscio Decl., #85-102, Ex. 12 (Lending Commitments Committee Proposal, UBS/LAM 020276-88), at UBS/LAM 20177, cited by Complaint in ¶ 165).  Plaintiffs allege no facts suggesting that any Warburg or UBS AG employee knew that E-Next would be improperly kept off balance sheet by Enron.  It is not the creation of an unqualified SPV, "but the use of it to obtain an unwarranted off-balance-sheet treatment" that is a primary violation of § 10(b).  *Newby*, #4874 at 62.

In sum, the five transactions identified by Defendants cannot state a claim against Warburg or UBS AG under the 1934 because the misconduct charged at most was aiding and abetting frauds committed by Enron and because Plaintiffs fail to allege scienter for either. Nor have Plaintiffs shown a fiduciary relationship  with a duty to

Defendants insist that Plaintiffs' allegations that Warburg and UBS AG provided routine banking work for Enron fail to state a claim for a primary violation of section 10(b).[38]  *In re Enron Corp. Securities, Derivative & "ERISA" Litig.,* 529 F. Supp. 2d 644, 775 (S.D. Tex. 2006)(instrument # 4735 in *Newby,* 4:01-cv-3624),[39]

---

disclose by Warburg and UBS AG with PW's brokerage customers.  They have also failed to plead with particularity any material nonpublic information possessed by UBS.

[38] Plaintiffs respond that this argument is meritless in the face of UBS's own investment bank standards, set out in written protocols, which specify self-prohibited tax, legal, accounting and regulatory-sensitive transactions that UBS should not have undertaken because of its subjective awareness of Enron misconduct. #108 at pp. 27-28, citing Complaint (#81) at ¶¶ 51, 148 ("due diligence must be undertaken for all transactions), 154, 155, 157. Declaration of David L. Augustus ("Augustus"), #109-123, "Attachment 23" (discovery responses indicating UBS's policies during Class Period).

[39] In that opinion, *id.,* this Court wrote,

The proposed amended allegations that Deutsche Bank provided standard [banking] services, i.e., underwrote billions of dollars of Enron related securities, lent money to Enron, provided commercial banking and investment banking services to Enron, and earned a lot of money in fees from Enron, or that its employees who performed due diligence on Enron projects had an obligation to ensure that statements in offering memoranda are full, fair and accurate, in an effort to plead scheme liability under § 10(b), are too general and clearly lack the kind of specific facts that would support a strong inference of scienter under the PSLRA. Moreover, under the SEC's examples these acts constitute

subsequent determination, 236 F.R.D. 313 (S.D. Tex. July 5, 2006), *rev'd and remanded on other grounds*, 482 F.3d 372 (5th Cir. 2007), *cert. denied*, 552 U.S. 1170 (2008).

The complaint asserts that UBS owed Plaintiffs a duty of disclosure, arising from the 1934 Act and UBS's retail brokerage relationship with Plaintiffs, which UBS breached by knowing of, and participating in, a false public characterization of Enron's financial state, that was in conflict with the interests of its retail clients. Defendants argue that although Warburg and PW are wholly owned subsidiaries of UBS AG and were separate and distinct entities during the Class Period, Plaintiffs fail to distinguish among the three and to plead with the required specificity who at which defendant had knowledge or wrongful intent; moreover when Plaintiffs do allege that an employee of one knew something about Enron, the allegations are impermissibly general and vague. *Southland*, 365 F.3d at 365. Warburg and UBS AG are distinct legal entities, separated from PW by "Chinese Walls." Moreover Warburg and UBS AG did not have a retail relationship with Plaintiffs; only PaineWebber had such a relationship with Plaintiffs. In *Newby* this Court's opinions detailed the legal duties owed by banks to Enron investors like Plaintiffs here. Because Plaintiffs here plead no facts that differentiate their claims against Warburg and UBS AG

---

aiding and abetting and thus are not actionable under § 10(b) in this case pursuant to the hold of *Central Bank*.

from those already dismissed against the banks in *Newby*, Plaintiffs' "banking" claims against Warburg and UBS must be dismissed for the same reasons the Court dismissed claims against banks in *Newby*.

In addition, Plaintiffs fail to allege with sufficient particularity facts giving rise to a strong inference that Warburg or UBS acted with scienter.

Nor under Section 20A did Warburg or UBS unlawfully trade on inside information when in a conflict of interest they acted to eliminate their credit exposure to Enron by selling their Enron Zero Coupon notes into the marketplace while at the same time urging PW's retail clients to purchase and hold Enron equity securities without disclosing what they knew about Enron's primary violations of the 1934 Act. Nor does the complaint identify what material nonpublic information Warburg or UBS Ag possessed. Nor have Plaintiffs pleaded that their purchase of Enron Zero Coupon Notes were "contemporaneous" with any wrongful trades by Warburg or UBS AG. "[A]ny person who [wrongfully] purchas[es] or sell[s] a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously . . . has purchased . . . or sold . . . securities of the same class." *Newby*, #1269 at 35. Plaintiffs purchased their Zero Coupon Notes

on October 24, 2001, more than two months afer UBS AG and Warburg's status as "selling security holders" of those securities was disclosed.  In addition, Plaintiffs' trades took place more than a week after Enron began "a series of financial disclosures and restatements of its financial statements pertaining in large part to certain related party transactions [that[ triggered a chain of evens culminating in Enron's unprecedented bankruptcy filing 'starting with' an earnings release on October 16, 2001." Complaint ¶ 61.  Moreover Plaintiffs fail to allege fact as to when and what Warburg and UBS AG allegedly "knew"; thus it is impossible to determine whether any information remained nonpublic or material after Enron's October 16 earnings release.  Finally Defendants point out that Plaintiffs failed to assert any Section 20A claims in their original complaint so any claims arising out of trades executed before August 15, 2001 (five years before they filed their Amended Complaint) are time-barred under 15 U.S.C. § 78t-1(b)(4).

Not only does the complaint fail to identify any trades by UBS AG or Warburg with particularity, with the possible exception of their purchases of Enron debt through PW and the alleged settlement of Warburg's equity forward contracts in late 2001, but because Enron voluntarily provided Warburg in September 2001 with the information on which Warburg and UBS AG purportedly traded to cause

Warburg to extend the equity forward contracts, Warburg and UBS AG did not violate Rule 10b-5 under the misappropriation[40] or classical[41] theories of insider trading. *United States v. O'Hagan*,

---

[40] The high court explained, 521 U.S. at 652,

The "misappropriation theory" holds that a person commits fraud "in connection with" a securities transaction, and thereby violates § 10(b) and Rule 10b-5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information. . . . Under this theory, a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information.   In lieu of premising liability on a fiduciary relationship between company insider and purchaser or seller of the company's stock, the misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information.

This theory was formed "to protec[t] the integrity of the securities markets against abuses by 'outsiders' to a corporation who have access to confidential information that will affect th[e] corporations's security price when revealed, but who owe no fiduciary or other duty to that corporation's shareholders." *Id.* at 653.

[41] In *O'Hagan*, 521 U.S. at 651-52, the Supreme Court opined,

Under the "traditional" or "classical" theory of insider trading liability, § 10(b) and Rule 10b-5 are violated when a corporate insider trades in securities of his corporation on the basis of material, nonpublic information.  Trading on such information qualifies as a "deceptive device" under § 10(b) . . . because "a relationship of trust and confidence [exists] between the shareholder of a corporation and those insiders who have obtained confidential information by reason of their

521 U.S. 642, 650-54 (1997).  Under the misappropriation theory full disclosure "forecloses liability" "[b]ecause the deception essential to the misappropriation theory involves feigning fidelity to the source of the nonpublic information, there is no 'deceptive device' and thus no § 10(b) violation." *Id.* at 655.  Defendants argue that Warburg sold its hedge shares after Enron and Warburg settled the equity derivative forward contracts (Complaint at ¶ 185-86).  Thus Warburg and UBS AG did not "deceive" Enron by selling stock to hedge transactions that Enron knew were terminated.  Nor did they improperly trade on this information under the classic theory of insider trading, which requires the breach of a duty of trust and confidence owed by a corporate insider to corporate shareholders when a corporate insider trades in the securities of his corporation based on material, nonpublic information.  While "outsiders" like underwriters or consultants

---

> position with that corporation." *Chiarella v. United States*, 445 U.S. 222, 228 . . . (1980).  That relationship . . . gives rise to a duty to disclose [or abstain from trading] because of the necessity of preventing a corporate insider from . . . tak[ing] unfair advantage of . . . uninformed . . . stockholder.'" *Id.*, at 228-229 . . . . The classical theory applies not only to officers, directors, and other permanent insiders of a corporation, but also to attorneys, accountants, and others who temporarily become fiduciaries of a corporation. *See Dirks v. SEC*, 463 U.S. 646 n.14 . . . (1983).

may become temporary fiduciaries, they may do so only by "enter[ing] into a special confidential relationship in the conduct of the business of the enterprise and [receiving] access to information solely for corporate purposes." *Dirk*, 463 U.S. at 655 & n.14.  "For such a duty to be imposed, however, the corporation must expect the outsider to keep the disclosed nonpublic information confidential, and the relationship at least must imply such a duty." *Id*. n.14.  Parties to a bilateral derivatives trade, in which one party's gain is the other's loss, do not have a special confidential relationship.  Moreover even if Warburg did assume a duty to aid Enron to conduct the business of the enterprise by extending the equity forward contracts, Plaintiff fails to plead a basis for a continuation of that duty after termination of the equity forward contracts, after which Warburg sold its hedge shares.  Complaint ¶ 186.  Plaintiffs' aiding and abetting allegations do not state a claim under the 1934 Act.

In addition, Warburg and UBS AG's alleged failure to provide inside information about Enron's "true" financial condition, gleaned from their participation in various transactions with Enron, does not state a securities fraud claim, insist Defendants. Plaintiffs do not allege that their agreement to administer Enron's employee stock option plan assisted Enron to conceal anything, nor

that the stock option plan gave PW any knowledge of Enron's financial condition.  Plaintiffs fail to show how the too vaguely described "gentlemen's agreement" between PW and Enron, which allegedly barred PW brokers from advising customers to sell Enron securities or from saying anything negative about Enron, defrauded its PW retail investing customers.

Plaintiffs fail to show that PW was a primary violator since it allegedly engaged in routine business transactions and failed to disclose another party's fraud in the absence of any duty to do so. Plaintiffs do not claim that PW engaged in any banking transaction used by Enron to conceal its actual financial state, nor do they allege that Enron used the employee stock option plan administered by PW to defraud investors.  Even if they had, those allegations are insufficient to state a claim that PW was a primary violator. PW maintains that the accounts of its retail customers are nondiscretionary and that the investors retain the ability to make investment decisions, PW's duties as their broker are restricted to executing the investors' order.  *Martinez Tapia v. Chase Manhattan Bank, N.A.*, 149 F.3d 404, 412 (5th Cir. 1998); *see also Hand v. Dean Witter Reynolds, Inc.*, 889 S.. 2d 483, 492-93 & n.5 (Tex. App.-- Houston [14th Dist.] 1994, writ denied)(under Texas law "the fiduciary duty owed to the customer [holding a nondiscretionary

account] is very narrow--primarily not to make unauthorized trades."). The complaint does not assert that PW did not faithfully execute its customers' orders. Plaintiffs' fraud claims are based on PW's silence when its customers purchased, acquired or held Enron securities or when UBS traded its securities to eliminate its credit exposure to Enron. These claims fail because PW did not owe to its customers a duty to disclose its business relationship with Enron or transactions in Enron securities, no less those of Warburg or UBS AG, the alleged sources of UBS's knowledge about Enron. *Romano v. Merrill Lynch, Pierce, Fenner & Smith*, 834 F.2d 523, 530 (5th Cir. 1987)(broker did not breach any duty to customer trading in silver futures by failing to disclose "its own activity in silver futures market"), *cert. denied*, 487 U.S. 1205 (1988).

Regarding the termination of Chung Wu by Defendants' branch manager Pat Mendenhall, Defendants comment that even if he was wrongfully fired solely to curry favor with Enron's human resources executives, Plaintiffs fail to provide a logical ink between that termination and their securities fraud claim that someone at PW knew something about Enron's true financial condition, but failed to disclose that information to PW customers despite having a duty to do so.

- 87 -

Defendants contend that a statement of opinion, such as an analyst's rating on a stock, is not "false" unless the rating is both objectively false and the public rating does not reflect the analyst's truly held private opinion. *See, e.g., Greenberg v. Crossroads Sys.*, 364 F.3d 657, 670 (5th Cir. 2004)("A statement of belief is only open to objection where the evidence shows that the speaker did not in fact hold that belief and the statement made asserted something false or misleading about the subject matter."); *Joffee v. Lehman Bros., Inc.*, 410 F. Supp. 2d 187, 193-94 (S.D.N.Y. 2006)("[U]nder the Supreme Court's decision in *Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 1095-96 . . . (1991), statements of opinion are actionable only to the extent that they are not honestly held.  Thus to plead that such statements of opinion actually caused Plaintiffs' damages, it is critical for Plaintiffs to allege that the 'relevant truth,' i.e., the alleged dishonesty of the opinions, is revealed to the market."), *aff'd*, 209 Fed. Appx. 80 (2d Cir. Dec. 19, 2006); *Podany v. Robertson Stephens, Inc.*, 350 F. Supp. 2d 375, 379-80 (S.D.N.Y. 2004)(to satisfy scienter requirement, a plaintiff must allege not merely that an analyst's opinions were wrong, misguided, or unjustly optimistic, but also that he deliberately misrepresented his true opinion of the value of securities in reports he issued).  Defendants contend

that although in general, falsity and scienter are different
elements, as a statement may be both objectively false and, at the
same time, believed in good faith by the speaker to be true; in an
alleged false opinion case, however, the same analysis for
determining whether an analyst's opinion is false applies to
determining whether the analyst acted with scienter under the
PSLRA, i.e., whether the statement was subjectively false. *Brown
v. Credit Suisse First Boston, LLC (In re Credit Suisse First
Boston Corp. Sec. Litig.)*, 431 F.3d 36, 48-47 (1st Cir. 2005)(noting
that in false opinion cases "the subjective aspect of the falsity
requirement[42] and the scienter requirement essentially merge"),
*overruled on other grounds by Tellabs, Inc. v. Makor Issues &
Rights, Ltd.*, 551 U.S. 308 (2007)(holding that the court must
consider competing inferences and plaintiff must plead facts
rendering the inference of scienter at least as likely as any
plausible opposing inference in determining whether a complaint
gives rise to a strong inference of scienter under the PSLRA)[43]; *In

---

[42] The *Credit Suisse* panel states, "A plaintiff can challenge
a statement of opinion by pleading facts sufficient to indicate
that the speaker did not actually hold the opinion expressed
(throughout this opinion we refer to such allegations as claims of
'subjective falsity')."  431 F.3d at 47.

[43] In *ACA Financial Guaranty Corp. v. Advest, Inc.*, 512 F.3d
46, 52 (1st Cir. 2008), the First Circuit discusses how *Tellabs*
affected its earlier pleading standard in *Credit Suisse*:

*re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 477, 490 (S.D.N.Y.

2004).  Defendants argue that by withdrawing their allegation that

Ron Barone acted with scienter (Complaint, # 81 at ¶ 223),[44]

---

> *Tellabs* has altered this circuit's prior standard, as set
> forth in [*Credit Suisse*}, for determining the sufficiency
> of pleadings of scienter in securities fraud cases under
> Rule 12(b)(6).   *Tellabs* affirms our case law that
> plaintiffs' inferences of scienter should be weighed
> against competing inferences of non-culpable behavior.
> *Tellabs* also affirms our rule that the complaint is
> considered as a whole rather than piecemeal.  Finally, we
> hold that under the reasoning of *Tellabs*, the PSLRA does
> not alter the liberal amendment policy of Fed. R. Civ. P.
> 15.

Specifically the First Circuit identified two alterations effected
by *Tellabs*, *id*. at 59:

> *Tellabs* has overruled one aspect of the rule this court
> stated in *Credit Suisse*.  *Credit Suisse* held that where
> there were equally strong inferences for and against
> scienter, this resulted in a win for the defendant.  This
> is no longer the law.

Now the court must "consider not only inferences urged by the
plaintiff . . . but also competing inferences rationally drawn from
the facts alleged."  *Id.*, *citing Tellabs*, 551 U.S. at 314.  In
addition, the panel in *ACA* pointed out, *id.*, *citing id.* at 310,

> *Tellabs* held that a "strong inference" of scienter "must
> be more than merely plausible or reasonable--it must be
> cogent and at least as compelling as any opposing
> inference of nonfraudulent intent."   In other words,
> where there are equally strong inferences for and against
> scienter, *Tellabs* now awards the draw to the plaintiff.

[44] Paragraph 223 of the complaint states,

> This is not an "analyst" case.  Plaintiffs do not sue UBS
> because Barone's research was wrong or because Morel's

Plaintiffs have abandoned their claim that Barone's research was "false" and that it acted as a fraud on the market.

Observing about the complaint's assertion at ¶ 207 of a strange scheme in which UBS participated in a "fraudulent course of

_____

> research was right.  However, the manner in which UBS actively **used** Barone's Research notes, and hid Morel's, was part of a scheme and artifice to deceive its retail clients.  As described above, UBS required that its investment advisors send copies of Barone's research to retail clients.  In fact, post-8/21/01, UBS instituted a policy at the Heritage Branch, requiring its financial advisors to **only** provide Barone's research, couched as advice, to retail clients.

The Court concludes that although scheme liability is no longer a viable claim post-*Stoneridge*, the same allegation could support a breach of fiduciary duty claim.  In addition to conceding that "[t]here is a relative dearth of authority speaking to the topic of whether a plaintiff has adequately pleaded subjective falsity in a false opinion case," the First Circuit in *Credit Suisse*, 431 F.3d at 48, expressly stated, "[W]hether [the falsity element] also entails an inquiry into objective falsity is a matter on which we take no view."   The next paragraph of the complaint asserts,

> At the same time UBS represented to retail clients that its research was objective, fair, sound and founded upon a reasonable basis.  UBS did not reveal to its retail clients that the "objective" research analyst received significant amounts of money as a result of investment banking activity, cozied up to corporate management in order to determine whether there was investment banking business to be had, and even covered companies, at the request of the Bank to facilitate investment banking business. This knowledge would be absolutely material to any investor who was inundated with Barone's research opinions and would be necessary information for the investor to know as to make an informed investment decision.

business" by "allow[ing] Barone to continue coverage when he espoused positions that UBS **knew** were **wrong**," not only does the Fifth Circuit reject group pleading, but to hold a defendant liable for failing to correct a false statement made by another defendant, the complaint must "identify which defendant(s) made an statement and who remained silent." *Financial Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 388 (5th Cir. 2006). Plaintiffs fail to identify who in UBS knew that Barone's opinion was wrong but failed to stop him from publishing it, as well as to plead facts showing that Barone acted with scienter. Nor was allowing Barone to publish his research "an extreme departure from the standards of ordinary care" in light of Barone's thirty years' experience as a top-rated natural gas analyst (complaint at ¶ 206). "A securities fraud action may not rest on allegations that amount to second-guesses of defendants' opinions about the future value of issuers' stock--second-guesses made all too easy with the benefit of hindsight." *Podany*, 318 F. Supp. 2d at 154. Alleging that other analysts were more negative than Barone does not show that Barone acted with scienter. *R2 Investments LDC v. Phillips*, 401 F.3d 638, 644 (5th Cir. 2005)("Knowledge of an omission does not itself necessarily raise a strong inference of scienter" where the alleged

omission is a failure to disclose "a 'worst case' estimate" of the company's financial  status.).

Moreover the complaint's allegation at ¶¶ 219-23 that UBS hid Stewart Morel's "Sell" recommendation is false; Morel's June 2001 research report recommended that investors "REDUCE exposure to Enron Corp. (ENE) senior paper and BUY ENE structured offerings." Lomuscio Dec. Ex. 19 (Morel June 21, 2001 research report, UBM/LAM 09845-96) at 10, cited at complaint ¶ 222).  Morel's rating was his opinion that structured Enron debt paid a higher interest rate than ordinary Enron debt, not that Enron was not creditworthy.[45] Moreover, since Plaintiffs do not allege that Morel's opinion was not sincerely held, the fact that Plaintiffs did not receive his research reports cannot be the basis of a fraud claim.

Plaintiffs also fail to allege that UBS's business practices, no matter how conflicted, caused Enron to collapse.  They also

---

[45] Plaintiffs disagree.  #108 at p. 33.  "Reduce" means "to make or become less"; an analyst's "reduce" rating means "sell." Morel downgraded Enron's bonds in his June 21, 2001 report. Moreover his recommendation that clients purchase structured paper was not a recommendation of Enron securities.  Unlike bonds, "structured paper" is a secured investment and not Enron direct debt; if a company goes bankrupt, the holders of its structured paper may still retain the value of their investment, depending upon the asset that secures the paper.  *Id.*  Thus Plaintiffs maintain that Morel was telling his clients to dump Enron debt and protect themselves with secured investments which might provide them with some recovery in the event of bankruptcy.

failed to allege scienter regarding any alleged omissions involving Enron's fiancial state.  The complaint does not plead any facts showing that any PW employees knew or were severely reckless in failing to discover adverse nonpublic information about Enron's financial condition.  No facts are alleged giving rise to a strong inference that any PW personnel possessed nonpublic financial information about Enron or "questionable business practices" allegedly known to UBS.  Nor are any facts asserted that show PW was extremely reckless in failing to obtain nonpublic information from Warburg employees.  It is well established that retail brokers are barred from seeking material nonpublic information from another division of a financial institution to guide clients' investment choices and must by law establish "Chinese Wall" policies that restrict the flow of information within a multi-service institution and prevent their employees from improperly obtaining and trading on material nonpublic information.  H.R. Rep. No. 98-355, at 11 (1984), *as reprinted in* 1983 U.S.C.A.A.N. 2274, 2284.

Loss causation must be pleaded as to each act or omission alleged to violate Rule 10b-5, as to each defendant.  15 U.S.C. § 78u-(b)(4); *Southland*, 365 F.3d at 365 ("the PSLRA requires the plaintiffs to 'distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud.

- 94 -

[emphasis in original].'"").  The complaint's allegations of loss causation fail to distinguish among PW, Warburg, and UBS AG. Plaintiffs fail to identify what actions or inactions, perpetrated or concealed by which defendant, caused their losses.  Although reciting numerous wrongful business practices and omissions by PW, the complaint fails to plead causation as to any acts or omissions attributable to PW.  No allegations are connected to Enron's ability to service its debt.

### VII.  Plaintiffs' Memorandum of Law in Response (#108)

The Court also does not address Plaintiffs' scheme liability aiding and abetting claims, which are no longer viable in the wake of *Central Bank* and *Stoneridge.*

Giancarlo and Alsina distinguish their claims from those in *Newby* by explaining that their claims arise from UBS's relationship to Plaintiffs as their securities broker, as a U.S. broker-dealer, and as a member of self-regulated securities organizations, that owed Enron investors an admitted duty[46] "to comply with the associated regulations establishing the practices and standards of care such broker-dealers are required to follow in connection with

---

[46] *See* Declaration of David L. Augustus ("Augustus"), #109-123, "Attachment 1," UBS Form F-1 Registration Statement at 42-45; *id.* "Attachment 2," UBS Compliance Sales Practice Policy Manual at pp. 215-21.

their retail customers." #108 at p. 5, citing Complaint (#81) at
¶¶ 43-44, 117-18, 226-27. UBS allegedly elevated Enron's business
interests and UBS's own profits above its retail Enron investors'
interests, in a conflict of interest in which UBS breached its
brokerage duties to Plaintiffs. UBS also planned and participated
with Enron in the five transactions identified in the complaint and
other investment banking activities, which provided UBS with the
knowledge that Enron's public financials were misstated (Complaint,
#81 at ¶ 116-76). In violation of its duties to its retail
investor clients, UBS (1) made undisclosed agreements with Enron
not to fulfill UBS's duty to its retail investor customers, who
were acquiring, purchasing and/or holding Enron securities (*id.* at
¶¶ 64-119; (2) secretly allowed Enron control over UBS's retail
operations (*id.* at ¶¶ 74-75, 78-81, 92-115); (3) did not follow
UBS's established protocols and procedures to protect its Enron-
owning retail customers from the Enron fraud and accounting
violations of which UBS was aware (*id.* at ¶¶ 223-2270; and (4)
failed to disclose its substantial conflict of interest when it was
rapidly minimizing its own Enron default exposure into the public
securities market while promoting the purchase of Enron securities
to its retail customers (*id.* at ¶¶ 187-90). UBS's actions
"violated [its] communications duties and created additional duties

of care, full disclosure, and fair dealing, arising from UBS's own policies and industry regulations implementing the federal securities laws."[47]  #108 at p. 6.  Plaintiffs contend that the fact that UBS undertook these self-prohibited transactions, by itself, raises a strong inference of scienter (knowledge or extreme recklessness).

As for the structure of UBS, although Defendants attempt to distinguish among the three entities comprising UBS, Plaintiffs argue that the complaint (¶¶ 27, 32, 35-44, 94-95) asserts, and the Court must accept as true for purposes of the motion to dismiss, that UBS is an "integrated business enterprise," with Warburg and PW under UBS AG, as evidenced by its business operations during the Class Period.  #108, pp. 7-16.  *See also* Augustus, #109, Att. 1 (SEC Form F-1, filed with the SEC on Dec. 27, 2000), p. 11; *Id.*, "Attachment 3," p. 18, *The Making of UBS* (3d ed. March 2006); *Id.*, "Attachments 4-19."

_____

[47] *See GMS Group, LLC v. Benderson*, 326 F.3d 75, 81-82 (2d Cir. 2003)(Although there is no right of action for simply violating NASD rules, violation of NASD Rules 2860(19) and 2310, which govern the conduct of NASD members and address the suitability of securities recommendations, are relevant for purposes of § 10(b) unsuitability claims);  *Hoxworth v. Blinder, Robinson & Co.*, 903 F.3d 186, 200 (3d Cir. 1990)(violations of NASD rules may be probative in demonstrating a course of conduct amounting to fraud); Declaration of Augustus, #109, "Attachment 2," at pp. 10, 12, 29-33, and 55-57.

Plaintiffs call meritless Defendants' claim that UBS only engaged in routine banking activities.  The complaint identifies transactions which were structured to achieve certain tax, legal, accounting, and regulatory treatments as "window dressing" to alter Enron's financial appearance and which were prohibited by UBS's own investment bank protocols.  The fact that it engaged in these self-prohibited transactions raises a strong inference of intent to deceive, manipulate or defraud or severe recklessness.  For example, the two restructurings of equity forward contracts between UBS and Enron did not result in "settlement" of the contracts, demonstrating that the restructuring was a disguised loan.  The E-Next Generation Loan, also a disguised loan to Enron, not the E-Next SPE, was structured to achieve off-balance-sheet accounting treatment, avoid accounting regulations, and hide Enron's actual financial condition.   UBS knew that the Yosemite prepay transactions, in which it insists UBS participated, were shams, structured so as not to transfer any commodity price risk.

Plaintiffs observe there are two kinds of claims under § 10(b) as implemented by and delineated in Rule 10b-5:  (1) under Rule 10b-5(b), liability for materially false or misleading statements or omissions; and (2) under Rule 10b-5(a) and (c) liability for nonrepresentational acts ("employ[ing] any device, scheme or

artifice to defraud" or "for engag[ing] in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.").

Unlike in *Newby*, the complaint here is not centered on UBS's participation in how and by whom the manipulation of Enron's financial statements was effected.  Instead the focus is on UBS's institutional knowledge that the financial statements were manipulated and on UBS's failure to disclose that knowledge to its retail clients purchasing Enron securities (complaint at ¶¶ 21-14, 42, 52, 116-18, 173, 188-90) or to act in accordance with its own established guidelines requiring it under the circumstances to suspend analyst coverage and restrict stock sales (*id.* at ¶¶ 226-27), constituting the nonrepresentational act of which Plaintiffs complain.  The particular nonrepresentational, deceptive act at issue is UBS's continuous failure to disclose to its retail clients, to whom UBS owes a duty to disclose, that Enron's financial appearance was unreliable and materially misleading because its books were "cooked," as UBS knew from its participation in transactions with Enron to create that false financial appearance.

As an on-point case, Plaintiffs cite to *Slade v. Shearson, Hamill & Co.*, No. 42 Civ. 4779, 1974 WL 376 (S.D.N.Y. Mar. 18,

- 99 -

1974)(certifying to the appellate court the question, "Is an investment banker/securities broker who receives adverse material nonpublic information about an investment banking client precluded from soliciting customers for that client's securities on the basis of public information which (because of its possession of inside information) it knows to be false or misleading?"), 517 F.2d 398, 403 (2d Cir. 1974)(finding certification for interlocutory appeal under 28 U.S.C. § 1292(b) was improvidently granted because of unresolved factual issues and "a complexity of interlocking [legal] questions"), *remanded*, *Odette v. Shearson Hammill & Co.*, 394 F. Supp. 946 (S.D.N.Y. 1975).  The district court in *Slade* was seeking an answer to the question, whether once a multiservice investment banker that is also a broker-dealer received adverse nonpublic inside information on an investment banking client, in that case Tidal Marine International Corporation ("Tidal") stock, was it precluded from soliciting purchases for that client's securities? Shearson, Hammill & Co. ("Shearson") moved for summary judgment on the ground that even if its corporate finance department knew the negative information about Tidal stock, the firm was barred from using that inside information to prevent the solicitation of purchases of the stock by its retail sales force.  This Court notes that Judge Carter found the issue to be one of first impression, as

well as one with "far-reaching ramifications for the structure of
the securities industry."  1974 WL 376, at *2.  The district court
denied the motion for summary judgment, noting that an investment
banker cannot reveal inside information; simultaneously it observed
that because Shearson voluntarily entered into a fiduciary
relationship with its investment banking customers, it could not
recognize its duty to its investment bank clients while ignoring
its duty to the stock investing retail clients, and it had to bear
whatever commercial disadvantage each obligation entailed.  Judge
Carter opined, *id.*,

> To require organizations like defendant's to refrain from
> effecting transactions in securities of companies about
> which they have learned adverse inside information may be
> to render it exceedingly difficult for any such
> organization  to function as an investment banker for a
> company and at the same time function as a brokerdealer
> in that company's securities.  On the other hand, so long
> as such organizations continue to exercise a dual
> function, they incur dual (sometimes conflicting)
> fiduciary obligations which neither they nor this court
> can properly ignore.

During the litigation, in a brief the SEC urged to resolve the
problem the use of a "Chinese Wall" that would bar transmission of
inside information between Shearson's investment banking and
broker-dealer departments, as well as the use of a "restricted
list" of companies whose securities Shearson could not recommend
because of an existing bank relationship.  *Id.*

Plaintiffs do not discuss the significant aftermath of the case. The district court certified the question as a permissible interlocutory appeal under 28 U.S.C. § 1292(b) to the Second Circuit, which did not reach the merits of the issue, but instead found the interlocutory appeal improvidently granted because the factual basis had not been developed below and because there was "a complexity of interlocking questions," and remanded the case to the district court, where it settled, leaving the answer to the question unsettled. 517 F.2d 398, 403 (2d Cir. 1974). Thus the Second Circuit did not resolve the issue and the district court's opinion is of questionable precedential value. In subsequently approving the settlement, Judge Carter commented regarding the question whether a firm operating as both investment and securities broker may solicit customers or its client's securities in light of negative inside information, "[I]t is clear that the success of the *Shearson* subclass case at trial was not a foregone conclusion." *Slade v. Shearson, Hammill & Co.*, 79 F.R.D. 309, 313 (S.D.N.Y. 1978).[48]

Plaintiffs also point to the rules of the self-regulatory associations, the NASD, and the NYSE, as establishing obligatory

---

[48] Defendants respond that the *Slade* case is more than thirty years old and has been superseded by legislative and regulatory action.

standards under the 1934 Act for all broker-dealers.  *See, e.g.,
Mihara v. Dean Witter & Co.*, 619 F.2d 814, 824 (9th Cir. 1980).
While not providing a private right of legal action, violations of
the NASD or the NYSE rules are relevant to demonstrating a course
of conduct or deceptive act constituting fraud under § 10(b) and
Rule 10b-5.  *See, e.g., GMS Group, LLC v. Benderson*, 326 F.3d 75,
82 (2d Cir. 2003); *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d
186, 200 (3d Cir. 1990).  SEC statutes and rules impose duties on
those subject to them, including an affirmative duty of disclosure.
Those duties run to both the SROs and to the broker-dealers'
clients.  A principle inherent in the relationship between a dealer
and customer is that the customer will be dealt with fairly and in
accordance with the standards of the profession.  Plaintiffs
contend that under the shingle theory, UBS had an affirmative duty
to disclose its knowledge about Enron's financial manipulations at
the time UBS's retail clients were purchasing Enron securities, and
UBS's failure to disclose is a deceptive act under § 10(b) and Rule
10b-5.

Plaintiffs claim that UBS, as a single, fully integrated
entity, violated the antifraud provisions of the securities laws by
failing to disclose to its retail investor clients its knowledge
that Enron manipulated its public financial image in a materially

misleading way, as evidenced by its own documents, and/or failed to act in accordance with its own established guidelines to suspend analyst coverage and restrict sales.  Plaintiffs insist they have not indulged in impermissible group pleading, but instead have identified specific officers of UBS at the managing director level and above who had knowledge of this negative information. A core group of top executives at UBS, including Jim Hunt, Kimberly Blue, Michael Collins, Karsten Berlage, and Wendy Field, managed UBS's relationship with Enron, while an executive credit team composed of Bill Glass, Bob Verna, Roger Bieri, Chris Glockler, and Steve Landowne served as a major repository of information about Enron. Complaint at ¶¶ 49-50, 130, 139-42, 150, 157-58, 161, 163-65, 176-77.  UBS understood the danger presented to it by Enron.  It made Enron pay it $375 million in cash in September and October of 2001. Complaint at 182-86.  In April 2001, Bill Glass, UBS Head of North American Credit, labeled Enron as one of three companies UBS did not like and transactions subsequently closed creating credit exposure to Enron had to be approved subject to the requirement that the exposure to Enron be sold or hedged.  Complaint at ¶ 164. UBS also took positive steps to limit its credit exposure to Enron. As an example, in June and July 2001 Enron issued and sold approximately $163 million worth of UBS debt securities to a

foreign investor, under which UBS's repayment obligations were linked to Enron's creditworthiness:  if Enron filed for bankruptcy or otherwise defaulted on its payment obligations to UBS, UBS could avoid repayment of its debt to this institutional investor. Complaint ¶ 174.  Plaintiffs describe other efforts by UBS to reduce its exposure to Enron, including negotiating to prevent early termination of the equity forward contracts and in July 2001 selling Zero Coupon Convertible Senior Notes Due in 2012.  #108 at pp. 49-52.

Situated in a conflict of interest between its retail brokerage clients and Enron, UBS learned of material nonpublic information about corporate malfeasance at Enron during a period when it had a regulatory duty of disclosure to its retail clients to whom UBS was recommending purchase of Enron securities.  Under industry standards UBS should have suspended the stock market-making activities and analyst research coverage and authorized an investigation.  Complaint at ¶ 226.  Instead UBS actively peddled Barone's "Strong Buy" opinion while it knew that Enron's public financial statements were unreliable and materially misleading and while UBS moved to rid itself of all its Enron exposure, with the result that Enron's bankruptcy hardly affected UBS.

The "in connection with" language of § 10(b) and Rule 10b-5 is satisfied where a defendant's activities coincide with the purchase or sale of a security.  *SEC v. Zandford*, 535 U.S. 813, 820, 825 (2002).  Here the alleged violation is UBS's course of business concluding with UBS's failure to disclose its knowledge of the financial manipulations at Enron while Plaintiffs purchased Enron securities and/or UBS's failure to act in accordance with its own established protocol to suspend analyst coverage and restrict sales.

Regarding the causation element of a § 10(b) claim, Plaintiffs assert that Defendants "attempt[] to mold the concept of loss causation into something it is not."  #108 at p. 56.  For loss causation, Plaintiffs must demonstrate that the loss complained of was foreseeable and that it was caused by the materialization of the concealed risk.  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)("Put another way, a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor."), *cert. denied*, 546 U.S. 935 (2005).  "Thus to establish loss causation, 'a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual

loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.  Otherwise, the loss in question was not foreseeable."  *Id., citing Suez Equity Investors, LP v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001).  Here UBS's omissions allegedly concealed the purported market manipulation that caused Plaintiffs' losses, a concealed risk which materialized, with losses of the type to be expected; without these omissions Plaintiffs would likely not have purchased the Enron securities or would have sold them before they imploded.[49]  In their

---

[49] Defendants reply that if a PW broker seeking a trade in Enron securities did not know any nonpublic information, he could not make a misrepresentation or omission about Enron's fiancial condition.  Furthermore, if the broker could not disclose nonpublic information about Enron's financial information, he could not wrongfully omit to disclose "the risk that caused the loss." *Lentell*, 394 F.3d at 173.  Any failure to suspend all trading in Enron securities while properly remaining silent regarding the reason for the suspension "does not speak to the relationship between fraud and the loss of the investment." *Id.* at 174.  Rather this at most amounts to *transaction causation*--a showing that "but for the claimed . . . omissions, the plaintiff would not have entered into the detrimental securities transaction." *Id.* at 172.  Transaction causation "'is akin to reliance, and requires only an allegation that "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'" *Id., quoting Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).  In contrast, loss causation "'is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'" *Id., citing id.*  Loss causation is described in the terms used for tort law's proximate cause, i.e., the damages caused by plaintiff must be a foreseeable consequence

memorandum of law supporting their response, Plaintiffs explained,

#108 at p. 58,

> The risk concealed from Plaintiffs by UBS was the risk
> associated with the manipulation of Enron's public
> financial appearance.    The market value of Enron
> securities began to diminish when questions were raised
> regarding Enron's financial status, its liquidity,
> disclosures were made regarding Enron's use of related
> parties and off-balance sheet financing vehicles, etc.
> Ultimately, all confidence in Enron was lost and
> bankruptcy ensued.   UBS knew Enron's public financial
> appearance was materially misleading (Complaint ¶¶ 25,
> 188), knew Enron used related parties and off-balance
> sheet financing vehicles to achieve this appearance
> (Complaint ¶¶ 116-173), and, once the markets began to
> ask questions, UBS appreciated the risk of an Enron
> bankruptcy. (Complaint ¶¶ 174-187). This appreciation
> of the materiality of the non-public information
> possessed by UBS is evidenced by UBS's systematic
> shifting of its Enron exposure to the markets.
> (Complaint ¶¶ 174-187).

Plaintiffs also point out that reliance on unknown information

may be presumed where the undisclosed information is material.

*Affiliated Ute*, 406 U.S. at 153-54 ("Under the circumstance of this

case, involving primarily a failure to disclose, positive proof of

reliance is not a prerequisite to recover.  All that is necessary

is that the facts withheld be material in the sense that a

---

of a misrepresentation or material omission,'" or "a misstatement
or omission is the 'proximate cause' of an investment loss if the
risk that caused the loss was within the zone of risk *concealed* by
the misrepresentations and omissions alleged by a disappointed
investor." *Id*. at 172-73, *citing id*., and *AUSA Life Ins. v. Ernst
& Young*, 206 F.3d 202, 238 (2d Cir. 2000).

reasonable investor might have considered them important in the making of this decision."). Although UBS attempts to cloud the issue by erroneously insisting that Plaintiffs' claims are based on Barone's Research Notes, UBS's distribution of the Notes constitutes another reason why UBS had a duty of disclosure to the putative class or to otherwise act in accordance with its own procedures. Barone's Notes are an element of the course of business undertaken by UBS vis-a-vis the putative class, but Plaintiffs' claims do not depend on the existence of or the material in Barone's Research Notes. Furthermore, given UBS's knowledge of undisclosed information about Enron, under its own protocol and procedures there should not have been any Barone Research Notes.

### VIII.  Defendants' Reply (#125)

Complaining about Plaintiffs' shifting but consistently vague theories of liability in the course of the litigation and insisting that Plaintiffs cannot cite a single case supporting their theory of securities fraud, Defendants identify key deficiencies in Plaintiffs' pleadings warranting their dismissal under Rule 12(b)(6).

First, Plaintiffs fail to allege scienter adequately with the requisite particularity:  they do not distinguish among and give

particular, individual notice to the Defendants as to the specific role each played in the fraud, but rely on impermissible group pleading and attempt to attribute knowledge allegedly held by a few individuals at Warburg or UBS AG to PaineWebber by melding these legally distinct corporations and calling them a "single business enterprise" with "institutional knowledge."[50]   Indeed Plaintiffs fail to allege even one instance when any PW employee learned

_____

[50] Because federal courts apply the law of the state of incorporation to determine whether to disregard the corporate form and pierce the corporate veil, Delaware law governs disregarding the corporate forms of PaineWebber and Warburg.  Complaint at ¶¶ 7-8; *House v. 22 Tex. Servs.*, 60 F. Supp. 2d 602. 609 (S.D. Tex. 1999); #125 at p. 11 n.5.  Under Delaware law, "Ownership [of a subsidiary, such as UBS AG's ownership of Warburg and PW] alone is not sufficient proof of domination or control." *Albert v. Alex. Brown Mgmt. Servs.*, C.A. No. 762, 2005 WL 2130607, at *10 (Del Ch. Aug. 26, 2005).  "The legal entity of a corporation will not be disturbed until sufficient reason appears." *Mason v. Network of Wilmington, Inc.*, C.A. No. 19434, 2005 WL 1653954, at *2 (Del. Ch. July 1, 2005).  To pierce the corporate veil, "the corporation must be a sham and exist for no purpose other than as a vehicle for fraud." *Wallace ex rel. Cencom Cable Income Partners II, Inc. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999).  Defendants point out that the complaint "nowhere alleges, for example, that either PW or Warburg are undercapitalized or did not observe corporate formalities." #125 at p.11 n.5, *citing Mason*, 2005 WL 1653954, at *2-3.  Plaintiffs have failed to show that the corporate forms of the three Defendants should be disregarded and they should be treated as a single entity.  This Court agrees.  *See, e.g., Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521 (D. Del. 2008); *In re Foxmeyer Corp.*, 290 B.R. 229 (D. Del. 2003).  Moreover, even if the three UBS Defendants were "one commonly controlled business enterprise," Chinese Walls are required to separate the Warburg investment banking and the UBS AG commercial banking personnel who allegedly knew nonpublic things about Enron from PW retail brokers with whom Plaintiffs dealt.

Enron-related, material, nonpublic information from Warburg, UBS AG, Enron, or anyone else.  Not only do Plaintiffs fail to allege the "who" of scienter, but they fail to allege precisely "what" nonpublic, Enron-related knowledge was known by any employee of any of the three named Defendants.  Logically Plaintiffs cannot argue that any PW employee failed to disclose information about Enron's financial condition that Plaintiffs have not shown that PW employee possessed.

Second, Plaintiffs failed to plead loss causation.  Plaintiffs have conceded that it was *Enron's* "manipulation of its financials" that caused the price of its stock to drop.  #108 at p. 57. Plaintiffs contend that UBS caused Plaintiffs' losses because the losses were "foreseeable" if the market discovered Enron's fraud and that Defendants were somehow also a proximate cause because they were aware of Enron's numerous fraudulent acts.  Nevertheless PW fails to allege that any of PW's alleged "brokerage practices" (e.g., the "gentlemen's agreement, the termination of Wu, or a violation of its "restricted list") were disclosed before Enron filed for bankruptcy, so the practices could not have caused Plaintiffs' losses.  Warburg's or UBS AG's involvement with Enron constituted at most aiding and abetting Enron's financial-statement fraud, not primary violations of the securities laws.  The five

highlighted transactions were made fraudulent by Enron and its accountants, who used them to falsify Enron's financial statements, rather than by UBS or Warburg.  Nowhere, however, do Plaintiffs plead specific details showing that the structure of an entity or a transaction that was created by the bank was inherently deceptive or used by the bank to deceive investors, nor have Plaintiffs pleaded details showing that the bank engaged in acts, practices or a course of business that operated as a fraud or deceit upon any person in connection with the purchase or sale of an Enron security to establish a primary violation of the 1934 Act by Defendants. Instead Plaintiffs conclusorily charge, without factual support, that Enron, its officers, and its accountants subsequently used the transactions to cook its books.  There is no attempt to plead how any PW brokerage acts directly affected Enron securities' prices or that prices dropped because of any public disclosure of PW's business relationship with Enron.

Although Plaintiffs claim their loss was occasioned by PW's failure to comply with its own "restricted list" or policy guidelines (Complaint at ¶¶ 226-27), that allegation also fails. The governing complaint does not assert that PW's purported policy violations were a violation of Rule 10b-5 or that they caused Plaintiffs' losses.  PW was not the sole source of information

about Enron for those desiring to know, especially given Enron's SEC filings and public statements, nor was PW the only brokerage firm that could trade Enron securities for Plaintiffs. Plaintiffs' claims that had they known what Defendants knew, Plaintiffs would not have entered into the securities transactions at issue, pleads only transaction causation.[51]   Not only did Plaintiffs fail to

---

[51] "Loss causation" is a causal connection between the misrepresentation or omission (the defendant's deceptive conduct) and the plaintiff's claimed economic loss. *Dura Pharmaceuticals*, 544 U.S. at 336, *citing* 15 U.S.C. § 78u-4(b)(4)("In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."); *Erica P. John Fund*, 563 U.S. at 807, 812-13 ("Loss causation . . . requires a plaintiff to show that a misrepresentation that affected the integrity of the market price also caused a subsequent economic loss" to the plaintiff; if other intervening factors, "such as changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events" occurred and "were responsible for the loss or part of it, a plaintiff would not be able to prove loss causation to that extent").   In sum, regarding loss causation, a plaintiff must plead "a facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss, including allegations of material misrepresentation or omission, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock and plaintiff's economic loss." *Lormand*, 565 F. 3d at 258.
   In cases relying on the fraud-on-the-market doctrine, the element of reliance is often called "transaction causation." *Dura Pharmaceuticals*, 544 U.S. at 341-42, *citing Basic, Inc.*, 485 U.S. at 248-49)("nonconclusively presuming that the price of a publicly traded share reflects a material misrepresentation [or omission] and that plaintiffs have relied upon that as long as they would not have bought the share in its absence").   *Id.* at 812. Under the fraud-on-the-market theory that the market price of shares traded

allege that PW's policy guidelines were violations of Rule 10b-5 or caused Plaintiffs' losses, or that there was a causal relationship between PW's restricted list[52] and Plaintiff's losses, but Defendants maintain that Plaintiffs cannot show that Warburg or UBS AG committed a primary violation of the securities laws by participating in a transaction that affected Enron's financial statements.   Thus they cannot plead loss causation against

---

on well-developed markets reflects all publicly available information, including any material misrepresentations. "Because the market 'transmits information to an investor in the processed form of a market price,'" it is presumed that "an investor relies on public misstatements whenever he 'buys or sells stock at the prices set by the market.'"  *Id.*

[52] Arguing that Plaintiffs mischaracterize PW's "restricted list" policy, Defendants contend that this "restricted list" allegation is undermined by the precise document on which Plaintiffs rely.  PW's policy manual did not require PW to "suspend analyst coverage and restrict sales' whenever an employee in the global UBS network obtained material nonpublic information about; instead it stated that securities may be placed on the Legal Restricted List "for a number of reasons," none of which is found in the portion of the policy manual that Plaintiffs cite.  Thus it does not support Plaintiffs' claim that Enron should have been placed on the restricted list.  Furthermore Plaintiffs did not include the pages immediately following those on which they relied, a section entitled, "The Information Barrier," which reflects that PW's policy did not require that the brokerage activities be suspended whenever and investment banker obtained material, nonpublic information.  *See* Supplemental Decl. of Richard J.L. Lomuscio, Ex. 1, 35-37.

Defendants simply by alleging the Enron's financial statements were misleading.[53]

Third, argue Defendants, even if Plaintiffs had properly pleaded that the entities had material nonpublic information about Enron, UBS Ag, Warburg and PW had an affirmative duty ***not*** to share that information because federal law required that PW be separated from Warburg and UBS AG by Chinese Walls, and, in addition, insider trading laws barred the three entities from sharing any material nonpublic information with Plaintiffs. Instead Plaintiffs pleaded that the Chinese Wall was observed by the UBS entities. The controlling complaint does not identify a single communication between Warburg or UBS AG and PW brokers in violation of the Chinese Wall. Even if such nonpublic material information had reached PW brokers, PW could not legally disclose it to Plaintiffs. Furthermore, the SEC has indicated that procedures developed to restrict the flow of nonpublic information within a financial institution are "a means to avoid securities law liability." *Koppers*, 689 F. Supp. at 1416 (letter from SEC to district court).

---

[53] Even if it could, the Court would point out that under *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. at 142-43, Plaintiffs could not state a claim for misrepresentations against any of the Defendants because a Defendants would not be the ultimate authority over the content of Enron's financial statements.

Moreover, insist Defendants, Warburg and UBS AG had no fiduciary relationship with PW's customers, and Plaintiffs fail to plead facts showing that they had a fiduciary relationship even with PW, so their omission-based fraud theory fails. Defendants maintain that the SEC, federal common law, Defendants' compliance policies, and "industry standards" do **not** require a brokerage to automatically suspend operations or disclose nonpublic information whenever a banker learns material nonpublic information regarding an issuer. It is well established that a broker who advises his client to trade based on inside information violates Rule 10b-5. *See, e.g., Dirks v.* SEC, 463 U.S. 64, 646-47 (1983); U.S. *v. Chestman*, 947 F.2d 551 (2d Cir. 1991)(broker's advice to client to buy stock was an unlawful "tip"); *SEC v. Sekhri*, No. 98 Civ. 2320, 2002 WL 31100823, at *17-18 (S.D. Tex. July 22, 2002)(broker ordered to disgorge both his own and his clients' profits from insider trades).

Each of Defendants' affirmative duties not to disclose material nonpublic information to Paine Webber or to Plaintiffs forecloses Plaintiffs' claims.

Given the complaint's conclusory allegations without specific factual support, Defendants insist that here Paine Webber owed no fiduciary duties to its retail customers beyond the faithful

execution of their orders.  *Tapai*, 149 F.3d at 412.  Brokers owe no duty to disclose the brokerage firms' proprietary positions or trades of securities to their retail customers.  *Romano,* 834 F.2d at 530.  Thus the fraud claims should be dismissed.

In addition, Plaintiffs fail to state a § 20A claim based on Warburg's and UBS AG's alleged aftermarket sales of Enron Zero Coupon Notes on nonpublic information because the claims are asserted here by PW's retail customers.  The duty not to engage in insider trading is owed to the source of that information, not to the counterparty to the trade, so Plaintiffs' relationship to PW is irrelevant.  Simultaneously Plaintiffs charge that Defendants violated § 10(b) by failing to help Plaintiffs trade on the same information.  Plaintiffs have not alleged and cannot allege facts showing that the trades in late October 2001 were "contemporaneous" with any purported trades by Warburg or UBS AG in Enron debt as required by 15 U.S.C. § 78t-1(a).  Even more basic, Plaintiffs fail to plead with specificity what material nonpublic information was ever possessed by Warburg or UBS AG, and therefore Plaintiffs cannot show that the information was material and nonpublic when Plaintiffs purchased their Enron debt in late October 2001.  (The complaint asserts that Warburg's and UBS AG's trades occurred in August 2001.).  In *In re Enron Corp. Sec., Derivative & ERISA*

*Litig.*, 258 F. Supp. 2d 576, 500-600 (S.D. Tex. 2003), this Court discussed the lack of agreement on what the word "contemporaneous" means, but generally the range required theinsider and the investor/plaintiff to have traded anywhere from the same day, to less than a week, to within a month to "the entire period while relevant and nonpublic information remained undisclosed. *Id.* (citing cases).   After examining various cases, the Court determined that "two or three days, certainly less than a week, constitute a reasonable period to measure the contemporaneity of a defendant's and a plaintiff's trades under § 20A" and that "the plaintiff's trades must have taken place after the challenged insider trading transaction." *Id.* at 600.  The Court applies the same measure here.  Furthermore any such claim fails here because Plaintiffs have not alleged with factual support that any Paine Webber broker knew any nonpublic information regarding Enron.  To recover under § 20A a plaintiff must at minimum demonstrate that the defendant was "aware" of the material nonpublic information upon which the defendant purportedly traded.  17 C.F.R. § 240.10b-5-1(b).

### IX.  Court's Decision

The Court agrees with Defendants that the alleged actions of the three UBS entities in relation to Enron, as participants in a

scheme to artificially make Enron falsely appear financially sound and creditworthy, constituted aiding and abetting, and did not qualify as primary violations of § 10 and Rule 10b-5. Therefore § 10b and Rule 10b-5 do not reach their actions, and Plaintiffs fail to state a claim or impose liability on UBS separately or as an integrated entity under the statute and Rule 10b-5 relating to their vaguely and conclusorily alleged joint involvement with Enron. *Central Bank*, 511 U.S. at 177-78; *Stoneridge*, 552 U.S. at 58. Moreover, the relationship of the three UBS Defendants to Enron in that scheme was not a fiduciary relationship with a duty to disclose, but a commercial business relationship between a public company and an underwriter/lender bank.

In contrast, the § 10(b) claims based on material omissions which Plaintiffs bring, as PW's retail clients/investors in the Enron Stock Option Program against PW in its capacity as their broker/broker-dealer, arise in a fiduciary relationship, in which PW has a duty to disclose that is defined and limited by the nature and scope of that relationship. PW's self-interested business involvement with Enron, which conflicted with the interests of its retail investor customers, only becomes relevant if PW's duty to disclose is sufficiently extensive to require it to act only in the

investors' self interest and refrain from self-dealing unless the customers consent to PW's conflicting roles after full disclosure.

It is therefore significant that PW's relationship with the clients in the Enron Stock Option Program was established at least in part in the context of, and by, a contract between Enron and PW, in which presumably the parties to that contract were free to define and limit the scope of duties owed to suit their needs and intentions, either implicitly or explicitly.  Viewed from this perspective, the fiduciary duty of PW to those exercising their Enron stock option grants is, to some extent, a matter of contractual interpretation.[54]   Once the Enron stock option participants made the decision to exercise their stock options, the contract between Enron and PW gave PW exclusive control of the process of exercising those stock options.  Once the options were exercised, however, the investors had free choice whether to stay with PW and open an account or move their stock to another firm, regardless of what lures PW extended.  Furthermore, if they opened accounts with PW, those accounts were nondiscretionary.  There are no allegations or descriptions in the complaint of incidents in

---

[54] *See, e.g.,* Donald C. Langevoort, *Brokers as Fiduciaries*, 71 U. Pitt. L. Rev. 439, 442-43 (Spring 2010)("[B]ecause most fiduciary relationships arise within contractual ones[,] . . . the precise content of a fiduciary's responsibility is just a form of contract interpretation.").

which PW acted contrary to an investor's instructions in selling or purchasing securities or that PW effected securities transactions without the authorization of the account holder.

Moreover the allegations reflect that PW acted only as an order taker and order executor, and thus it had a very limited duty to the investor clients compared with that of a broker managing a discretionary account.  Under federal law, "where the investor controls a nondiscretionary account and retains the ability to make investment decisions, the scope of any duties owed by the broker will generally be confined to executing the investor's order." *Martinez Tapia*, 149 F.3d at 412, *citing Romano*, 834 F. 2d at 530, and *Hill v. Bache Halsey Stuart Shields, Inc.*, 790 F.2d 817, 825 (10th Cir. 1986)("fiduciary duty in the context of a brokerage relationship is only an added degree of responsibility to carry out pre-existing, agreed-upon tasks properly"), and *Limbaugh v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 732 F.2d 859, 862 (11th Cir. 1984)("duty owed by the broker was simply to execute the order."). See also *Chiarella*, 445 U.S. at 230 ("[N]o duty of disclosure would exist if the bank merely acted as a transfer agent.").  Absent a specific duty to disclose material, nonpublic information, silence is not misleading and not a basis for Rule 10b-5 liability.  *Basic,*

*Inc.*, 485 U.S. at 239 n.17.   Given the allegations of the complaint, such is the case here.

As noted, under Texas law, the broker/investor relationship is one of agent/principal, but "[i]f a broker, under his contract with his principal, is charged with no responsibility and is not obligated to exercise any discretion, but his duty consists of merely bringing the parties together so that between themselves, they may negotiate a sale, and the sale is made in that manner, the broker is considered a mere 'middleman' and is not necessarily the 'agent' of either party." *Rauscher*, 923 S.W. 2d at 115.   Moreover, generally even in a simple

> non-discretionary account, the agency relationship begins when the customer places the order and ends when the broker executes it because the broker's duty in this type of account, unlike those of an investment advisor or those of a manager of a discretionary account, are "only to fulfill the mechanical, ministerial requirements of the purchase or sale of the security . . . ."  As a general proposition, a broker's duty in relation to a nondiscretionary account is complete, and his authority ceases, when the sale or purchase is made and the receipts therefrom accounted for.  Thus, each new order is a new request that the proposed agent consents to act for the principal.  There is no on-going agency relationship as there would be with a financial advisor or manager of a discretionary account.

*Hand*, 889 S.W. 2d at 493-94.   Moreover, under Texas law, as indicated *supra*, to impose an informal fiduciary duty in a business transaction, "the special relationship of trust and confidence must

- 122 -

exist *prior to* and *apart from* the agreement that formed the basis of the suit." *Aubrey,* 2016 WL 393551, at *7, *citing Meyer v. Cathey*, 167 S.W. 3d at 331 (Tex. 1998).  Such is not the case with PW and its investor clients.  "[T]he fact that a business relationship has been cordial and of extended duration is not by itself evidence of a confidential relationship." *Floyd*, 426 B.R. at 651, *quoting Lexington Ins. Co. v. North Am. Interpipe, Inc.*, 2009 WL 1750523, at *3.

Moreover, Plaintiffs fail to allege scienter adequately, to state with particularity for each alleged material omission facts giving rise to a strong inference that PW acted with the required state of mind.  They fail to identify specific brokers and allege facts that demonstrate each had an intent to deceive, manipulate or defraud or acted with severe recklessness.

Regarding Plaintiffs' theory that the three UBS Defendants form a single enterprise which is liable to them for all their alleged violations of the Securities Exchange Act, when an entity's corporate form is at issue, courts standardly hold that the law of the state of incorporation of that entity applies to determine whether its corporate form should be disregarded, whether to pierce the corporate veil.  *Ace American Ins. Co. v. Huntsman Corp.*, 255 F.R.D. 179, 195 (S.D. Tex.)(and cases cited therein).  PW and

Warburg were incorporated in Delaware; thus the Court applies Delaware's law to determine if their corporate forms should be disregarded and UBS should be treated as a single enterprise Defendant.

To pierce the corporate veil under an alter ego theory, Delaware law requires a showing of fraud or similar injustice. *Id.* at 196 (and cases cited therein). Thus under Delaware law, "[t]he corporate fiction may be disregarded to prevent fraud, and a wholly-owned subsidiary may sometimes be treated as an instrumentality of the parent. *Buechner v. Farbenfabriken Bayer Aktiengesellschaft*, 38 Del. Ch. 490, 493 (Del Ch. 1959). "In the absence of fraud, the separate entity of a corporation is to be recognized. This principle has been enunciated by all the courts of the state." *Stauffer v. Standard Brands, Inc.*, 40 Del. Ch. 202, 178 A.2d 311 (1962).

The Court observes that Plaintiffs have failed to plead their single, fully integrated entity theory of the three UBS Defendants to satisfy requirements under Delaware law by pleading facts demonstrating that the three UBS entities' corporate status should be disregarded. In the context of parent/subsidiary relationships, treating separate legal entities of a corporation as alter egos is closely related to disregarding a corporation's separate legal

identity by "piercing the corporate veil." *Harper v. Delaware Valley Broadcasters, Inc.*, 743 F. Supp. 1076, 1085 (D. Del. 1988). In *ASARCO LLC v. Americas Min. Corp.*, No. Civ. 1:07 CV 00018, 2009 WL 2168778, t *6-7 (S.D. Tex. July 20, 2009), the Honorable Andrew Hanen opined,

> Under Delaware law, a court of equity may pierce the corporate veil on an alter-ego theory where (1) the companies operated as a single economic unit; and (2) an overall element of injustice or unfairness is present. *In re Foxmeyer Corp.*, 290 B.R. 229, 235 (Bankr. D. Del. 2003). "Simply phrased, the standard may be restated as: whether [the two entities] operated as a single economic entity such that it would be inequitable for the Court to uphold a legal distinction between them." *Harper v. Del. Valley Broadcasters, Inc.*, 743 F. Supp. 1076, 1085 (D. De. 1990).

*In accord*, *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995). In *Skouras v. Admiralty Enterprises, Inc.*, 386 A.2d 674, 681 (Del. Ch. 1978), *citing Buechner v. Farbenfabriken Bayer Aktiengesellschaft*, 154 A.2d 684 (Del. Supr. 1959), and *State ex rel. Rogers v. Sherman Oil Co.*, 117 A. 122 (Del. Supr. 1922), the Delaware Court of Chancery emphasized that mere control and even total ownership of one corporation by another is not sufficient to warrant the disregard of a separate corporate entity under Delaware law: [a]bsent a showing of a fraud or that a subsidiary is in fact the mere alter ego of the parent, a common central management alone is not a proper basis for disregarding separate corporate

existence." *In accord, eCommerce Industries, Inc. v. MWA Intelligence, Inc.*, C.A. No. 7471-VCP, 2013 WL 5621678, at *27 (Del. Ch. Oct. 4,  2013). In *Skouras*, the court found that the parent corporation's "subsidiary corporations were so organized and controlled and their affairs are so conducted as to make them adjuncts or instrumentalities of the defendant company," and it listed factors that might be considered in determining whether a parent corporation is liable for the wrongdoing of a subsidiary because they operated as a single economic unit, including  whether

> all of the subsidiary corporations were engaged in the same general business as the parent; the parent owned all of the shares . . . of the subsidiaries; all the members of the boards of directors of . . . the subsidiary corporations were also directors of defendant, and a majority of members of the boards of the remaining . . . subsidiaries were directors of defendant.  Furthermore, the books of the subsidiaries were not in defendant's possession, custody, or control.  Upon determining that the separate subsidiary corporations had been formed for fraudulent purposes, this court granted plaintiffs' demand for inspection of the books of defendant's subsidiaries. . . .

*Id.* at 681.

Plaintiffs in the instant suit have failed to allege any facts supporting their single enterprise theory that UBS Defendants must be treated as a single entity to avoid fraud or miscarriage of justice. *See, e.g., Pauley Petroleum, Inc. v. Cont'l Oil Co.*, 43 Del. Ch. 516, 521, 239 A.2d 629, 633 (Del. 1968)(holding that

corporate entities may be disregarded and "the parent be regarded in law and fact as the sole party in a particular transaction" "only in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable consideration among members of the corporation require it, are involved."). As noted, Plaintiffs here fail to state a fraud claim under § 10(b) against UBS AG and/or its subsidiary, Warburg. The only possible § 10(b) primary violator is PW, so there is no reason to disregard its corporate form.

Moreover, as pointed out by Defendants, not only are there no factual allegations showing a direct relationship of Plaintiffs to Warburg and UBS AG, which were not parties to the contract between Enron and PW and which therefore did not serve as brokers for PW's retail investor clients nor in any fiduciary capacity of trust and confidence which would require them to disclose any nonpublic information they may have discovered about fraud by Enron. Even if Plaintiffs had alleged such facts, Plaintiffs fail to satisfy the PSLRA's heightened pleading standards by specifying exactly what nonpublic, material information they knew about Enron, who discovered it, when, how, and under what circumstances and why it was fraudulent. Under the facts that Plaintiffs did plead, Warburg and UBS AG had no duty to disclose any material omissions to

Plaintiffs, and Plaintiffs have not and cannot state a claim against them under § 10(b) and Rule 10b-5.

Nor have Plaintiffs pleaded facts showing that their broker PW's alleged fraudulent brokerage practices caused Plaintiffs' loss. These practices in no way related to Enron's fraud, i.e., "cooking its books," which, when revealed, caused the price of its securities to plummet and Plaintiffs to suffer economic loss.

Furthermore, as noted, the Fifth Circuit has deliberately chosen not to decide whether rules for brokers established by national exchanges and SROS, such as the NASD "suitability" rule or the NYSE "know your customer rule," provide a private cause of action for individual investors, but found they may be used as evidence of industry standards and practices. *Miley*, 637 F.2d at 333. Because this is a material omissions case and because the Court has concluded that Plaintiffs have not pleaded facts establishing a fiduciary relationship with PW with a duty to disclose, the Court find no reason to reach those rules and regulations here.

Finally, the Court concurs with Defendants that Plaintiffs have failed to state a claim under § 20A, 15 U.S.C. § 78t-1(a) (1) Plaintiffs lack standing to assert such a claim against UBS Defendants because the duty not to engage in insider trading is

owed to the source of the nonpublic information, not to the counterparty to the trade; (2) Plaintiffs have not alleged and cannot allege facts showing that they have standing because their securities trades in late October 2001 were "contemporaneous" with (within a week of) those of Warburg or UBS AG in August 2001; and (3) Plaintiffs fail to plead with factual specificity what material nonpublic information was known to any PW broker (or employee of Warburg or UBS AG) when Plaintiffs sold their Enron stock or when they purchased their Enron debt in late October 2001 or that this information motivated the trading decisions of UBS.

Accordingly, for the reasons stated above, the Court

ORDERS that Defendants' motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the PSLRA is GRANTED.  The Court further

ORDERS that Lead Plaintiffs' motion for class certification (#124) and Plaintiffs' opposed joint motion for amended scheduling order, for additional briefing and for a ruling (instrument #173) are MOOT.

**SIGNED** at Houston, Texas, this 2nd of August, 2016

**MELINDA HARMON**
**UNITED STATES DISTRICT JUDGE**